UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

CSX CORPORATION,

                    Plaintiff,

                    v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS, L.P.,
3G FUND, L.P., CHRISTOPHER HOHN, SNEHAL
AMIN, AND ALEXANDRE BEHRING, A/K/A
ALEXANDRE BEHRING COSTA,

                    Defendants.

-----------------------------------------------------------

THE CHILDREN'S INVESTMENT MASTER
FUND,

                Counterclaim and
                Third-Party Plaintiff,

                v.

CSX CORPORATION AND MICHAEL J. WARD,

                Counterclaim and
                Third-Party Defendants.

-----------------------------------------------------------

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.,

                Counterclaim Plaintiffs,

                v.

CSX CORPORATION AND MICHAEL WARD,

                Counterclaim and
                Third-Party Defendants.

-----------------------------------------------------------x

ECF CASE

08 Civ. 02764 (LAK) (KNF)

**AFFIRMATION OF DAVID K.
MOMBORQUETTE IN SUPPORT OF
DEFENDANTS' MOTION *IN LIMINE*
TO STRIKE PORTIONS OF THE
WITNESS STATEMENT OF
ALAN MILLER**

**DAVID K. MOMBORQUETTE**, an attorney duly admitted to practice before this Court, hereby affirms the following to be true under penalties of perjury:

1.      I am a partner with the firm of Schulte Roth & Zabel LLP, attorneys for Defendants The Children's Investment Fund Management (UK) LLP, The Children's Investment Fund Management (Cayman) Ltd., The Children's Investment Master Fund, Christopher Hohn, and Snehal Amin (collectively, "TCI"), and I am familiar with the facts and circumstances set forth herein.

2.      I respectfully submit this affirmation in support of TCI's Motion *in Limine* to Strike Portions of the Witness Statement of Alan Miller.

3.      Attached hereto as Exhibit A is a true and correct copy of the of Second Amended Initial Disclosures of CSX and Michael Ward Pursuant to Rule 26(a)(1).

4.      Attached hereto as Exhibit B is a true and correct copy of the Witness Statement of Alan Miller, submitted May 14, 2008.

5.      Attached hereto as Exhibit C is a true and correct copy of excerpts of the deposition transcript of CSX General Counsel Ellen M. Fitzsimmons, sworn to on May 3, 2008.

6.      Attached hereto as Exhibit D is a Proposed Witness Statement of Alan Miller.

Dated: New York, New York
       May 19, 2008

David K. Momborquette

# Exhibit A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CSX CORPORATION,

Plaintiff,

v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT (CAYMAN)
LTD., THE CHILDREN'S INVESTMENT MASTER
FUND, 3G CAPITAL PARTNERS LTD., 3G
CAPITAL PARTNERS, L.P., 3G FUND, L.P.,
CHRISTOPHER HOHN, SNEHAL AMIN AND
ALEXANDRE BEHRING, A/K/A ALEXANDRE
BEHRING COSTA,

Defendants.

ECF Case

08 Civ. 02764 (LAK) (KNF)

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.

Counterclaim Plaintiffs,

**SECOND AMENDED INITIAL
DISCLOSURES OF CSX AND
MICHAEL WARD PURSUANT
TO RULE 26(a)(1)**

v.

CSX CORPORATION AND MICHAEL WARD,

Counterclaim Defendants.

THE CHILDREN'S INVESTMENT MASTER FUND,

Counterclaim and Third-Party Plaintiff,

v.

CSX CORPORATION AND MICHAEL WARD,

Counterclaim and Third-Party Defendants

### SECOND AMENDED INITIAL DISCLOSURES OF CSX AND
### MICHAEL WARD PURSUANT TO RULE 26(a)(1)

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and the parties'

scheduling agreement, Plaintiff and Counterclaim-Defendant CSX Corporation and Third-Party

Defendant Michael Ward (collectively, "CSX") hereby submit the following Second Amended

Initial Disclosures. CSX makes these amended disclosures based on the information reasonably

available to it as of the date hereof and reserves the right to supplement or amend the amended

disclosures should any additional information become available.

**A.** **The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

Based upon its investigation to date, CSX believes that the following individuals may

have discoverable information that CSX may use to support its claims or defenses in this action:

**CSX Employees:**

| Name | Address | Subject(s) |
|---|---|---|
| Michael Ward | CSX Corp. 500 Water Street Jacksonville, FL 32202 (904) 359-3200 | Communications with Defendants; Defendants' counterclaims |
| Oscar Munoz | | |
| David Baggs | | |
| Ellen Fitzsimmons | | |
| Nathan Goldman | | |
| Edward Kelly, III | | |
| Dr. William Richardson | | |

**Defendants:**

| Name | Address | Subject |
|------|---------|---------|
| Christopher Hohn | c/o The Children's Investment Fund Management (UK) LLP 7 Clifford Street London W1S 2WE United Kingdom +44 20 7440 2330 | Identified in document demands and notice of deposition served on Defendants; Defendants' counterclaims |
| Snehal Amin | | |
| Rishi Sunak | | |
| Alexandre Behring | c/o 3G Capital Partners Ltd. 645 Fifth Avenue 18th floor New York, NY 10022 | |
| Daniel Schwartz | | |
| Luis Moura | | |
| Representatives of defendants yet unknown to CSX | | |

**Non-Parties:**

| Name | Address | Subject(s) |
|------|---------|-----------|
| Eduardo Mestre | c/o Evercore Partners 55 East 52nd St., 43rd Floor New York, NY 10055 (212) 857-7463 | Communications with Defendants |
| Gil Ha | | |
| Nancy Bryson | | |
| Nelson Walsh | c/o Morgan Stanley 1585 Broadway New York, NY 10036 (212) 761-4000 | Communications with Defendants |
| Eli Gross | | |
| Paul Donahue | | |
| Gilbert Lamphere | c/o Lamphere Capital Management 645 Fifth Avenue 18th floor New York, NY 10014 | Identified in the subpoenas served on these persons or entities |
| Timothy O'Toole | c/o London Underground 55 Broadway London, SW1HOBD, United Kingdom | |
| Gary Wilson | 300 Delfern Drive Los Angeles, CA 90077 | |
| The swap counterparties identified in Defendants' December 19, 2007 Schedule 13D | | |

| Name | Address | Subject(s) |
|------|---------|-----------|
| Richard Semler | c/o Semler Brossy Consulting Group 116 Village Boulevard Suite 200 Princeton, NJ 08540 | Defendants' counterclaims solely relating to compensation. |
| Alan Miller | c/o Innisfree M&A Incorporated 501 Madison Avenue New York, NY 10022 | Claims related to ownership of CSX shares |
| D.F. King & Co., Inc. | 48 Wall Street, 22nd Fl. New York, NY. 10005 | Identified in the subpoenas served on these entities |
| Bain & Company, Inc. | Three Times Square, 25th Floor New York, New York 10036 | |
| Stifel Nicolaus & Co., Inc. | 650 Madison Avenue, 10th Fl. New York, NY 10022 | |

CSX presently intends to call as witnesses at trial Michael Ward, Oscar Munoz, David Baggs, Ellen Fitzsimmons, Nathan Goldman, Edward Kelly III, Dr. William Richardson and Richard Semler; representatives of Evercore (Eduardo Mestre, Gil Ha and Nancy Bryson); representatives of Morgan Stanley (Nelson Walsh, Eli Gross and Paul Donahue); a representative of Innisfree M&A Incorporated (Alan Miller); and representatives of each of the swap counterparties. CSX may also call as witnesses the representatives of defendants listed above and a representative of D.F. King, Bain & Company, and Stifel Nicolaus.

Based upon the information currently available to it, CSX intends to call as trial witnesses in its case in chief one or more of the following experts:

| Name | Address | Subject(s) |
|------|---------|-----------|
| Professor Henry Hu | The University of Texas School of Law 727 E. Dean Keeton Street Austin, TX 78705 | Beneficial ownership of CSX shares referenced in Defendants' swaps, and the disclosure of that ownership in defendants' SEC filings |
| Dr. Marti Subrahmanyam | Stern School of Business New York University 44 West Fourth Street # 9-68 New York, NY 10012 | |

Professor Hu is available to be deposed on May 13, 2008. Dr. Subrahmanyam is available to be deposed on May 16, 2008.

Current employees of CSX and Richard Semler are represented by, and should be contacted through, counsel for CSX. Evercore Partners are represented by, and should be contacted through, Simpson, Thacher & Bartlett LLP. Morgan Stanley is represented by, and should be contacted through, Davis, Polk & Wardwell LLP. Innisfree M&A Incorporated is represented by, and should be contacted through, Day Pitney LLP.

**B.** **A copy of, or a description by category and location of, all documents, electronically stored information, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

Based upon its investigation to date, CSX may use documents, electronically stored information, and/or tangible things in the following categories to support its claims or defenses in this action:

1. Communications with Defendants;

2. The ownership of CSX shares;

3. The 2007 Long Term Incentive Plan; the 2007 Stock Plan; the December 2007 stock grants;

4. The CSX February 4, 2008 Bylaw amendment regarding the right to call Special Shareholder Meetings.

CSX expects these materials -- which are not <u>all</u> in the possession, custody or control of

CSX -- may be found in the files of the persons (from CSX, Evercore Partners, Morgan Stanley,

etc.) listed in Section A above.

     **C.**     **A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.**

     Rule 26(a)(1)(C) is inapplicable to CSX in this action.

**D.**   For inspection and copying as under Rule 34, any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

Rule 26(a)(1)(D) is inapplicable to CSX in this action.

Dated:  April 18, 2008
       New York, NY

CRAVATH, SWAINE & MOORE LLP

by _David Marriott_

Rory O. Millson
Francis P. Barron
David R. Marriott
Members of the Firm

Attorneys for Plaintiff
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

RMillson@cravath.com
FBarron@cravath.com
DMarriott@cravath.com

**DEWEY PEGNO & KRAMARSKY LLP**
Keara A. Bergin
220 East 42nd Street
New York, NY 10017
(212) 943-9000
KBergin@dpklaw.com

**FRIEDMAN KAPLAN SEILER & ADELMAN LLP**
Lance J. Gotko
Paul J. Fishman
1633 Broadway
New York, NY 10019-6708
(212) 833-1100
LGotko@fklaw.com
PFishman@fklaw.com

*Attorneys for Plaintiff CSX*

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CSX CORPORATION,<br><br>                             Plaintiff,<br><br>          v.<br><br>THE CHILDREN'S INVESTMENT FUND<br>MANAGEMENT (UK) LLP, THE CHILDREN'S<br>INVESTMENT FUND MANAGEMENT<br>(CAYMAN) LTD., THE CHILDREN'S<br>INVESTMENT MASTER FUND, 3G CAPITAL<br>PARTNERS LTD.,  3G CAPITAL PARTNERS,<br>L.P., 3G FUND, L.P., CHRISTOPHER HOHN,<br>SNEHAL AMIN AND ALEXANDRE<br>BEHRING, A/K/A ALEXANDRE BEHRING<br>COSTA,<br><br>                            Defendants. | |
| THE CHILDREN'S INVESTMENT MASTER<br>FUND,<br><br>                  Counterclaim and Third-<br>                      Party Plaintiff,<br><br>          v.<br><br>CSX CORPORATION AND MICHAEL WARD,<br><br>                  Counterclaim and Third-<br>                    Party Defendants. | |
| 3G CAPITAL PARTNERS LTD., 3G CAPITAL<br>PARTNERS, L.P. AND 3G FUND L.P.<br><br>                  Counterclaim Plaintiffs,<br><br>          v.<br><br>CSX CORPORATION AND MICHAEL WARD,<br><br>                  Counterclaim Defendants. | |

ECF Case

08 Civ. 02764 (LAK) (KNF)

**WITNESS STATEMENT OF
ALAN MILLER**

1.      My name is Alan Miller.  I am Co-Chairman of Innisfree M&A Incorporated of

New York and President of Lake Isle M&A Incorporated, its wholly-owned UK subsidiary.  My

business address is 501 Madison Avenue, New York, New York 10022.  Innisfree is a proxy

solicitation/investor relations firm specializing in mergers and acquisitions, proxy contests and

corporate governance consulting.

2.      I began working in the proxy solicitation field in 1979, when I went to work for

the Carter Organization, a proxy solicitation firm.  After almost four years with the Carter

Organization, I moved to Georgeson and Company, another proxy solicitation firm, where over

the next 14 1/2 years, I held various positions including account executive, managing director,

senior vice president and member of the board of directors.  In 1997, I left Georgeson, and

together with several of my former Georgeson colleagues, founded Innisfree M&A Incorporated.

During my approximately 30 years in the proxy solicitation business, I have participated in

thousands of proxy solicitations, including more than 350 that were contested and hundreds of

tender and exchange offers.  I have testified as an expert in the field of proxy solicitation and

related matters on at least 4 occasions.

3.      Innisfree was  retained by CSX in February 2007 to provide consulting and

analytical services, including proxy solicitation services in connection with CSX's 2007 Annual

Meeting.  CSX's retention of Innisfree included Innisfree's monitoring of CSX stock trading

activity.  In 2008, CSX once again retained Innisfree to provide similar services related to the

2008 proxy contest.

4.      When CSX retained Innisfree M&A in early February 2007 to analyze

movements in its shareholder base, CSX informed me that it had been contacted by The

Children's Investment Fund ("TCI"), a known activist fund.  We immediately began analyzing

the composition of and movements in the CSX shareholder base and have continued to analyze it to this day.

5.      Innisfree's analysis of CSX's—or any other company's—shareholder base begins with an analysis of participant lists maintained by the Depository Trust Company ("DTC"), a central certificate depository, that record positions resulting from trading activity in CSX stock (the "DTC lists"). Cede & Co, the nominee of DTC, holds virtually all of the CSX shares held by brokers and banks for their clients. Using a top-down analysis of the information from the DTC lists and knowledge and experience gained over the last thirty years, Innisfree can break out the portion of the shareholder base covered by the DTC lists into categories by type of investor, including hedge funds/arbitrageurs, institutional, and retail. This analysis is combined with information from the registered list of shareholders regarding the relatively small portion of the shareholder base not included in the DTC lists. On this basis, a very complete picture of the entire shareholder base by investor category can be constructed.

6.      To separate the positions shown in the DTC lists into the categories of hedge fund/arbitrageur, institutional, and retail, Innisfree assigns each bank and broker whose positions are depicted on the DTC lists to one or more of these categories based on the types of clients that typically custody their shares with that bank or broker. Certain bank and broker custodians hold primarily for hedge funds, including, among others, Deutsche Bank, Goldman Sachs, Morgan Stanley and Bear Stearns. Others hold almost exclusively for retail accounts. We refer to such banks and brokers as "pure plays." Only a small handful of banks and brokers hold for both hedge fund and retail accounts and for those Innisfree reviews settlement history in order to

2

make an educated judgment at to the percentage of the bank's or broker's positions held for hedge funds and arbitrageurs versus that held for retail accounts.

7.      Innisfree also performs a bottom-up analysis relying on information derived from publicly available sources, including SEC filings by institutions and hedge funds on Forms 13F, 13G and 13D, direct inquiries to these large investors and other public information relating to the ownership of CSX stock. Putting both of these approaches together, we are able at any given time to provide what we believe is a highly accurate picture of the shareholder base for the Company, including an estimate of the shares held by retail investors, institutional investors and hedge funds/arbitrageurs. The hedge fund/arbitrageurs category includes direct holdings as well as shares held in swap arrangements.

8.      Innisfree's initial analysis revealed that hedge fund ownership in CSX more than doubled in the fourth quarter of 2006, with additional hedge fund ownership increases as of February 13, 2007. By May 2007, Innisfree's analysis found that total hedge fund ownership had climbed to more than 25% of outstanding shares and that the greatest acceleration appeared to be correlated with TCI's announcement that it would buy more than $500 million in CSX stock.

9.      Based on my experience, increasing hedge fund activity in a company's stock is a concern because such accumulation can lead to volatility and destabilization of a company's shareholder base. This is due, in part, to the fact that hedge funds are typically short-term investors. The concern with hedge fund accumulation of stock is exacerbated when such funds amass significant portions of their holdings in the company through complex swap or other derivative arrangements.

10.    A swap is a contractual arrangement by which an investor, often a hedge fund, enters into an agreement with a counterparty, whereby the bank holds the shares but owes the economics to the hedge fund. In simple terms, a swap agreement provides that the bank will pay to the hedge fund an amount equal to any increase in the price of a set number of the company's shares as of a future settlement date, and the hedge fund agrees to pay to the bank an amount equal to any decrease in the value of those shares as of the settlement date plus a lending fee. Banks invariably acquire the number of shares specified in the swaps to hedge the risk that the value of the shares will go up and the bank will have to pay the value of that increase to the other party. As a result, the bank, which is the putative owner of the shares it acquires to hedge its exposure under the swap, in fact has no economic interest in those shares. And the hedge fund acquires for a tiny fraction of what it would cost to buy the shares outright a significantly greater interest in the company, including the ability to have the shares held in connection with the swap voted as it prescribes if it is able to persuade the counterparty to do so.

11.    Innisfree analyzed both the direct holdings of TCI and 3G, where those parties owned CSX shares outright, and the "economic interest" TCI and 3G claimed to have as to additional CSX shares. In its analysis, Innisfree reviewed the SEC filings of TCI, 3G and the publicly identified counterparties to the swap arrangements that were identified in their 13D filings. Innisfree also reviewed press reports that addressed TCI's and 3G's ownership interests in CSX and statements TCI and 3G made directly to CSX. Innisfree's analysis concluded that TCI and 3G had accumulated a substantial stake in the Company through direct holdings and through swap arrangements with various counterparties.

4

12.     Between February and May 2007, Innisfree communicated regularly with CSX updating it on shareholder composition and share movement. Beginning in May of 2007, Innisfree provided CSX with weekly reports that analyzed CSX's shareholder base and identified notable share movements. These weekly reports were known as shareholder snapshots and were the result of the analysis I described above using DTC lists and publicly available information, including SEC filings. The weekly snapshots provided a breakdown of the shareholder base by institutions, hedge fund/arbitrageurs, employee plans, officer & directors, retail holders and other record holders. The snapshots also provided a weekly settlement commentary on recent trading activity by DTC participants and DTC settlements. Innisfree's weekly snapshots have been marked as PX 189.

13.     The weekly snapshots tracked the magnitude of hedge fund ownership in CSX over time, including the interests directly held by the Defendants TCI and 3G as reported in their public filings. The "hedge fund/arbitrageur" category also included the shares held by TCI's and 3G's swap counterparties. As of February 27, 2008, TCI and 3G directly held shares in CSX totaling 4.4% and 4.3% of outstanding shares, respectively. In addition to those direct holdings, as reported in their preliminary proxy statement, as of February 15, 2008, TCI and 3G also reported additional "economic interests" in swap arrangements that represented approximately a combined 12.3% of current outstanding shares, which would have been included in the "hedge fund/arbitrageur" category.

14.     The original record date for the 2008 CSX Annual Meeting was February 27, 2008. The record date is significant because to vote shares at the annual meeting, shareholders must be the owner of record on the record date selected by the board for that annual meeting.

15.    Innisfree monitored the trading in CSX stock during the period immediately preceding the original 2008 record date. It is part of the ordinary course of the proxy service of Innisfree to provide an analysis of the shareholder base entitled to vote at the annual meeting. Innisfree performed two independent analyses of share movements around the record date: one by Lloyd Lefcourt and the other by Kim Masterson and Meredith Cole. I reviewed both.

16.    In the days leading up to the February 27, 2008 record date, the DTC lists indicated that in the period before the record date there had been a dramatic and aberrant movement of CSX shares to brokers who are primarily custodians for hedge funds, including the counterparties to swap arrangements with TCI, and away from long-term investors such as index funds. Based on Innisfree's independent analyses, my colleagues and I all agreed that the movement among custodians was something that we had never seen before in terms of magnitude and concentration. The most notable feature of this situation was the extraordinary accumulation of shares at Deutsche Bank, one of TCI's swap counterparties.

17.    I was first notified of this movement in shares by my colleague, Lloyd Lefcourt, who is an analyst at Innisfree with over 20 years experience in this business. On the morning of February 28, 2008, Mr. Lefcourt sent me an e-mail expressing his shock as to an extraordinary movement of shares based on magnitude and concentration into the parties identified by TCI as counterparties to its swap agreements—in particular Deutsche Bank. Mr. Lefcourt attached to his e-mail a spreadsheet comparing the number of CSX shares held by DTC participants on February 15, 2008, 12 days before the record date, and February 27, 2008, the record date. Mr. Lefcourt's e-mail and its attachment are marked as PX 179.

6

18.    As indicated by this comparison chart, tens of millions of shares of CSX stock moved into the hands of brokers who are primarily custodians for hedge funds, including the counterparties to the TCI swap arrangements. In my experience and that of my colleagues, we had never seen movements like this in terms of the number of shares moving and the concentration of those shares in the hands of a few brokers who hold for hedge funds.

19.    As indicated by the chart attached to Mr. Lefcourt's February 28, 2008 e-mail, more than 23 million shares moved into the hands of Deutsche Bank, one of the publicly identified counterparties to the TCI swap arrangements. Deutsche Bank had 3,651,539 CSX shares in its principal custodial accounts on February 15, 2008. On February 27, 2008, Deutsche Bank had 27,036,669 CSX shares in its principal custodial accounts, which means that 23,385,130 additional shares moved into its hands during the week before the record date. Also notable were the movements into the DTC accounts of Merrill Lynch, Goldman Sachs and Morgan Stanley, all of which were identified as TCI counterparties.

20.    The chart attached to Mr. Lefcourt's e-mail also indicates that a significant number of shares moved out of the custody of banks which hold significant positions for index funds during the period before the record date.

21.    After having received Mr. Lefcourt's February 28, 2008 e-mail, to confirm that our initial conclusions were correct, we performed a more focused and concentrated look at the numbers to fully understand this aberrant movement of shares. Once this analysis was completed, I advised CSX's outside law firm and Ellen Fitzsimmons, CSX's general counsel, of the unprecedented share movement we had observed. My February 28, 2008 e-mail to Alan Stephenson of Cravath and my February 28, 2008 e-mail to Ellen Fitzsimmons have been

marked as PXs 177 and 178, respectively. My February 28, 2008 e-mail to Alan Stephenson attaches a chart analyzing the top changes in custodial position during the week before the record date and the chart Mr. Lefcourt had sent to me comparing custodial holdings on February 15, 2008 and on February 27, 2008. My February 28, 2008 e-mail to Ellen Fitzsimmons forwards to her my e-mail to Mr. Stephenson and its attached charts.

22.    As indicated in those e-mails, I notified Mr. Stephenson and Ms. Fitzsimmons that our analysis revealed that the movement prior to the record date "resulted in an increase in the hedge fund/SWAP category of approximately 5% of the outstanding shares" and that "a significant number of those shares appear to have been borrowed from index funds (likely in connection with short sales)." I further advised both CSX's outside counsel and Ms. Fitzsimmons that this unprecedented movement and concentration of shares in the hands of swap counterparties to hedge funds likely rendered a fair proxy contest impossible because of the movement of shares away from positions held by long-term investors to positions held by custodians for hedge funds. I reached this conclusion based on my significant concern that, based on my experience, the counterparties to the swap arrangements with the hedge funds were likely to vote the shares they held as directed by the hedge funds, as is frequently the case.

23.    In my experience, the movement of shares to brokers aligned with hedge fund interests was unprecedented in both magnitude and concentration and could not be explained by normal share movements. That caused me to believe that the movements resulted from undisclosed voting arrangements and strongly suggested a coordinated effort to put in place for the record date tens of millions of CSX shares that could be voted consistent with the wishes of TCI and other hedge fund interests.

24.    In my experience, hedge funds frequently influence the voting of shares held by their counterparties in connection with swap arrangements. In swap arrangements, as I described previously, hedge funds own the economics of the shares while the counterparty to the swap is theoretically the beneficial owner of the shares but in fact has no economic exposure as long as it holds, directly or indirectly, the same number of shares specified in the swap as a hedge. Even if an arrangement concerning the voting of shares held by the counterparties is not disclosed, my 30 years of experience in the industry indicate that, to the extent they can, the counterparties to swap arrangements frequently vote such shares in the manner specified by the hedge funds. It is my belief that these counterparties are motivated by a desire to please lucrative hedge fund clients with whom they do business. The dramatic movement of shares into the hands of the TCI counterparties before the February 27, 2008 record date suggested to me that those shares were being put into place for the record date with the understanding that they would be voted at the annual meeting in accordance with the wishes of TCI.

25.    One example in which hedge funds sought to influence the voting practices of the swap counterparties involved ClearChannel. In the ClearChannel matter, hedge funds sought to influence the vote of Deutsche Bank, a counterparty to swap arrangements with many hedge funds. Despite the hedge funds' suggestions, Deutsche Bank was unable to vote in the manner desired by the hedge funds because it was "net short" as of the record date. In other words, it did not hold the shares as of the record date because it had lent out the shares and was making money on those loans. Consequently, Deutsche Bank in that case could not vote any shares because it did not hold them as of the record date.

26.     Banks such as Deutsche Bank are risk averse and when they enter into swap agreements they invariably acquire shares as a hedge against their exposure under the swap. But the banks can make extra money by loaning such shares out to short-sellers and, since the swaps are terminable only after a notice period or on the future settlement date, such loans do not reduce the effectiveness of the banks' hedge because they can recall the shares when needed. In my experience, there is typically no economic motivation to seek the return of loaned shares prior to a record date. Therefore, when we observed what appeared to be the return of very large numbers of loaned shares to the counterparties prior to the CSX record date, that reinforced my concern that undisclosed arrangements as to the voting of those shares were in place. Indeed, we confirmed that the movement of shares within DTC in the days preceding the record date significantly exceeded the reported trading volume reinforcing our belief that a significant portion of the movements were the result of lending activity and not normal trading. This activity was of particular concern given the enormous number of shares moving into the hands of Deutsche Bank, a known counterparty to the TCI swap arrangements.

27.     I was also concerned about the overall movement to brokers who are primarily custodians for hedge funds and away from banks that primarily hold shares for long-term investors such as index funds.

28.     As I stated above, the movement in CSX shares in the days preceding the February record date significantly exceeded the reported trading volume, leading me to conclude that there was significant lending activity occurring. The direction of that movement indicated that banks that primarily hold shares for long-term investors such as index funds were lending out shares and that brokers that primarily service hedge funds were recalling loans and/or

10

borrowing shares for the purpose of increasing the number of shares that could be voted

consistent with hedge fund interests. This led me to be concerned that the franchise of those long

term shareholders was being undermined. I viewed this as particularly unfair because their

franchise was being surreptitiously acquired by entities at a fraction of the cost those entities

would have had to pay to actually acquire those shares outright.

29.    Based on my experience, it is unlikely that the aberrant movement of shares

around the record date was caused by something other than the undisclosed voting arrangements

between hedge funds and the counterparties to the swap agreements.

30.    Despite the fact that CSX had a dividend date of February 29, 2008, I believe it is

very unlikely that the dividend date explains all of the movement we saw. While some of the

share movement we observed was likely related to the dividend date, both the magnitude of the

movement and the concentration of the moved shares among custodians who held for hedge

funds, including TCI, was unprecedented and exceeded the movement we would expect to see

around a dividend date. To confirm this belief, Innisfree analyzed the movement of CSX stock

around other record dates. What we found confirmed our belief that a significant part of the

movement was not the result of the dividend date.

31.    At the March 14, 2008 board meeting, I advised the CSX board of what I viewed

as the aberrant movement of shares before the record date away from custodians that hold shares

primarily for long-term investors and to custodians that primarily hold for hedge funds, including

TCI. I further advised the CSX board that the unprecedented movement of shares away from

custodians for long-term investors to hedge fund positions had negative implications for the

prospective proxy solicitation because those custodians would not have voting rights as of the

11

record date.  As a result, I was concerned that the unprecedented share movement had impaired the prospect for a fair proxy contest.

32.    I recommended to the CSX board that the record date and the annual meeting date be moved.  I made this recommendation because I believed that it was possible, although not certain, that by moving the record date and the annual meeting the aberrant movement we witnessed as of the original record date might not reoccur.

33.    The CSX board moved the record date to April 21, 2008, and the annual meeting is now scheduled for June 25, 2008.

34.    From the time that Innisfree made its initial discovery of the aberrant movement, it anticipated that there would be a massive movement of CSX shares out of the hedge fund/arbitrageur category following the record date.  That in fact is what occurred, as we reported to the company.  The movement of shares out of the hedge fund/arbitrageur category after the original record date is reflected in the snapshots that are included as part of PX 189.

# Exhibit C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------x

CSX CORPORATION,

                        Plaintiff,

            vs.         08 CV 02764

THE CHILDREN'S INVESTMENT FUND

MANAGEMENT (UK) LLP, THE CHILDREN'S

INVESTMENT FUND MANAGEMENT (CAYMAN)

LTD., THE CHILDREN'S INVESTMENT MASTER

FUND, 3G CAPITAL PARTNERS LTD., 3G

CAPITAL PARTNERS, L.P., 3G FUND, L.P.,

CHRISTOPHER HOHN, SNEHAL AMIN and

ALEXANDRE BEHRING, A/K/A ALEXANDRE

BEHRING COSTA,

                        Defendants.

-----------------------------------------x


                ATTORNEYS' EYES ONLY


                    May 3, 2008
                    9:35 a.m.


        Videotaped deposition of ELLEN M.

FITZSIMMONS, at the offices of Cravath, Swaine &

Moore, 825 8th Avenue, New York, New York,

before Nancy Mahoney, a Certified Shorthand

Reporter, Registered Professional Reporter and

Notary Public within and for the States of New

York and New Jersey.

```
 1       A P P E A R A N C E S:
 2           CRAVATH, SWAINE & MOORE LLP
             Attorneys for Plaintiff and the Witness
 3                   Worldwide Plaza
                     825 Eighth Avenue
 4                   New York, New York 10019
 5           BY:     FRANCIS P. BARRON, ESQ.
                     DEBORAH FOX, ESQ.
 6

             KIRKLAND & ELLIS LLP
 7           Attorneys for 3G Capital Partners, Ltd.,
             3G Capital Partners, L.P., 3G
 8           Fund, L.P., Alexandre Behring, A/K/A
             Alexandre Behring Costa
 9                   153 East 53rd Street
                     New York, New York 10022
10
             BY:     ANDREW GENSER, ESQ.
11                   MARISA D. SHEMI, ESQ.
12           SCHULTE ROTH & ZABEL LLP
             Attorneys for TCI and Christopher
13           Hohn and Snehal Amin
                     919 Third Avenue
14                   New York, New York 10022
15           BY:     GREGORY A. KASPER, ESQ.
16
17       ALSO PRESENT:
18           JUSTIN MENDELSOHN
             (Not Admitted)
19           Schulte, Roth & Zabel
20           David Bowling, Esq.
             In-House Counsel CSX
21
             William Pace, Videographer
22           Merrill Legal Solutions
23
24
25
```

|   | ELLEN M. FITZSIMMONS - ATTORNEYS' EYES ONLY |
|---|---|
| 1 | ELLEN M. FITZSIMMONS - ATTORNEYS' EYES ONLY |

            1          ELLEN M. FITZSIMMONS - ATTORNEYS' EYES ONLY

10:52:47    2     of information to you?

10:52:48    3          A.     Yes.

10:52:49    4          Q.     Who?

10:52:49    5          A.     Much later, the public relations

10:52:56    6     firm Joele Frank & Company provided us a New

10:53:06    7     York Times article, I believe written by Andrew

10:53:08    8     Ross Sorkin, pointing to the abuse of swap

10:53:12    9     arrangements in the CNET transaction.

10:53:15   10               In addition, Innisfree provided

10:53:19   11     over time speculation about share movements that

10:53:30   12     might be related to swap arrangements.

           13          Q.     Any --

10:53:40   14          A.     I believe that's the universe, but

10:53:41   15     as we walk through the chronology of the last 16

10:53:44   16     months, I'm sure I'll come up with other

10:53:47   17     insight.

10:53:48   18          Q.     Okay.  Sitting here now, those are

10:53:50   19     the three sources of information you can recall

10:53:54   20     that you received about swaps?

10:53:56   21          A.     In the immediate period after the

10:54:03   22     March 29 meeting or between then and now?

10:54:06   23          Q.     We'll take it in separate

10:54:08   24     questions.

10:54:08   25               So in the immediate period after

|  |  |
|---|---|
|  | 1 |
| 16:37:12 | 2 |
| 16:37:16 | 3 |
| 16:37:18 | 4 |
| 16:37:22 | 5 |
| 16:37:22 | 6 |
| 16:37:26 | 7 |
| 16:37:31 | 8 |
| 16:37:36 | 9 |
| 16:37:39 | 10 |
| 16:38:04 | 11 |
| 16:38:05 | 12 |
| 16:38:08 | 13 |
| 16:38:10 | 14 |
| 16:38:12 | 15 |
| 16:38:12 | 16 |
| 16:38:16 | 17 |
| 16:38:18 | 18 |
| 16:38:31 | 19 |
| 16:38:32 | 20 |
| 16:38:48 | 21 |
| 16:38:49 | 22 |
| 16:38:51 | 23 |
| 16:41:23 | 24 |
| 16:42:10 | 25 |

ELLEN M. FITZSIMMONS - ATTORNEYS' EYES ONLY

Q.      So Innisfree's expressed views about the movement -- about the significance of the movement of those shares was pure speculation?

A.      No.  They're an expert in contested proxy contests and, therefore, their experience and views is not fairly characterized as pure speculation.  It is fairly characterized as expert opinion.

Q.      As I understand your testimony, though, Innisfree did not offer an expert opinion.  They suggested the possibility and did not reach a conclusion or say that's what happened.  Is that correct?

A.      They were an expert in this field offering an opinion about what the movement suggested.

MR. GENSER:  Okay.  I think Mr. Kasper has some questions.

THE VIDEOGRAPHER:  Going off the record, 4:38.

(Recess taken.)

THE VIDEOGRAPHER:  Returning to the record at 4:42.

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CSX CORPORATION,

                                        Plaintiff,

                    v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE
BEHRING, A/K/A ALEXANDRE BEHRING
COSTA,

                                        Defendants.

---

THE CHILDREN'S INVESTMENT MASTER
FUND,

                    Counterclaim and Third-
                          Party Plaintiff,

                    v.

CSX CORPORATION AND MICHAEL WARD,

                    Counterclaim and Third-
                          Party Defendants.

---

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND L.P.,

                    Counterclaim Plaintiffs,

                    v.

CSX CORPORATION AND MICHAEL WARD,

                    Counterclaim Defendants.       .

ECF Case

08 Civ. 02764 (LAK) (KNF)

**[PROPOSED] WITNESS STATEMENT
OF ALAN MILLER**

1.       My name is Alan Miller.  I am Co-Chairman of Innisfree M&A Incorporated of New York and President of Lake Isle M&A Incorporated, its wholly-owned UK subsidiary.  My business address is 501 Madison Avenue, New York, New York 10022. Innisfree is a proxy solicitation/investor relations firm specializing in mergers and acquisitions, proxy contests and corporate governance consulting.

2.       Innisfree was retained by CSX in February 2007 to provide consulting and analytical services, including proxy solicitation services in connection with CSX's 2007 Annual Meeting.  CSX's retention of Innisfree included Innisfree's monitoring of CSX stock trading activity.  In 2008, CSX once again retained Innisfree to provide similar services related to the 2008 proxy contest.

3.       At the March 14, 2008 board meeting, I advised the CSX board of what I viewed as the aberrant movement of shares before the record date away from custodians that hold shares primarily for long-term investors and to custodians that primarily hold for hedge funds, including TCI.  I further advised the CSX board that the unprecedented movement of shares away from custodians for long-term investors to hedge funds positions had negative implications for the prospective proxy solicitation because those custodians would not have voting rights as of the record date.

4.       I recommended to the CSX board that the record date and the annual meeting be moved.

5.       The CSX board moved the record date to April 21, 2008, and the annual meeting is now scheduled for June 25, 2008.

1