UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CSX CORPORATION,

                                    Plaintiff,

                    v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE
BEHRING, A/K/A ALEXANDRE BEHRING
COSTA,

                                    Defendants.

---

THE CHILDREN'S INVESTMENT MASTER
FUND,

                    Counterclaim and Third-
                        Party Plaintiff,

                    v.

CSX CORPORATION AND MICHAEL WARD,

                    Counterclaim and Third-
                        Party Defendants.

---

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.,

                    Counterclaim Plaintiffs,

                    v.

CSX CORPORATION AND MICHAEL WARD,

                    Counterclaim Defendants.

---

ECF Case

08 Civ. 02764 (LAK) (KNF)

**DEFENDANTS' MOTION *IN LIMINE*
TO STRIKE PORTIONS OF CERTAIN
CSX WITNESS STATEMENTS AS
HEARSAY**

Because of the dearth of admissible evidence in support of its claims, Plaintiff CSX has resorted to making its case by having its witnesses sponsor inadmissible hearsay evidence. CSX's witness statements are replete with exactly the kind of secondhand information and speculation that the hearsay rules are designed to exclude and which do not fall within any hearsay exception. Indeed, the goal of many of CSX's witness statements appears to be to have third parties testify through CSX's own officers and directors. By doing so, CSX no doubt hoped to avoid subjecting those third parties to cross examination that would allow defendants to present the whole story, not just the part that CSX wants to tell. But that approach is at odds with the adversarial process underlying our judicial system. It should come as no surprise, therefore, that CSX's approach is also barred by the Federal Rule of Evidence. Accordingly, Defendants respectfully request that the Court strike portions of the witness statements of Oscar Munoz and David Baggs and limit the admissibility of certain portions of Michael Ward's testimony, as discussed in more detail below.

### ARGUMENT

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). "Hearsay is not admissible except as provided by" the Federal Rules of Evidence. Fed. R. Evid. 802. Where a statement contains hearsay within hearsay, the statement is admissible only if each level falls within an exception. Fed. R. Evid. 805; see also Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1238 n.1 (2d Cir. 1995).

The Munoz and Baggs witness statements contain numerous examples of statements made by third parties that are being offered to prove the truth of the matter asserted. Those third party statements are not within the scope of any hearsay exception. Accordingly, that testimony should be stricken. In addition, Mr. Ward's witness statement refers to

2

inadmissible hearsay that may be admissible as to his state of mind, but that should not be admitted for the truth of the matters asserted.

## I.   THE COURT SHOULD STRIKE PORTIONS OF PARAGRAPHS 5-9, 16, 18, 19, 29-31, 34 AND 35 OF THE MUNOZ WITNESS STATEMENT.

The witness statement of Oscar Munoz, CSX's Chief Financial Officer, largely consists of statements made to Mr. Munoz by third parties. The declarants of those statements include (1) David Baggs, (2) Nelson Walsh of Morgan Stanley, (3) Eduardo Mestre and Gil Ha of Evercore, and (4) unnamed individuals at Evercore. Most, if not all, of the statements from these four sources are plainly being offered to prove the truth of the matter asserted and accordingly are hearsay to which no exception applies.

For example, on Paragraph 5 of Mr. Munoz's statement, he reports that "Mr. Baggs later informed me TCI representatives had said that they wanted to meet with [CSX] . . . ." (Munoz Statement at ¶ 5.) This statement actually contains two levels of hearsay -- Baggs's statement to Munoz and the unnamed TCI representatives' statement to Mr. Baggs. Although the statement of the TCI representatives may be admissible as a party admission (depending on who the TCI representatives were), Mr. Baggs's statement is hearsay and does not fall within any exception. As a result, the statement is inadmissible in its entirety. See Cook, 69 F.3d at 1238 n.1 (hearsay within hearsay admissible only if each part falls within an exception).

Mr. Munoz also describes statements made to him from Nelson Walsh of Morgan Stanley. In one, Mr. Munoz testifies that Mr. Walsh "reported in his email that TCI continued to ask many questions." (Munoz Statement at ¶ 9 (internal quotation marks omitted); see also ¶¶ 7-8.) Again, regardless of whether the TCI statements are admissible as party admissions, the statement from Mr. Walsh is not admissible under any hearsay exception. Cook, 69 F.3d at 1238 n.1. In particular, the email is not admissible as a business record because there is no indication

3

that it was made and kept in the course of regularly conducted business activity, as opposed to a record of unusual or isolated activity. See Fed. R. Evid. 803(6); U.S. v. Strother, 49 F.3d 869, 876 (2d Cir. 1995) ("We are reluctant to adopt a rule that would permit the introduction into evidence of memoranda drafted in response to unusual or "isolated" events").

The same analysis applies to Mr. Munoz's testimony about Eduardo Mestre's reports about what TCI told him (paragraphs 16, 18, 19, 30, 31 and 34) and the statements of Gil Ha and other unnamed financial advisors from Evercore (paragraphs 29 and 35).

To be sure, many of these statements could have been offered by Messrs. Walsh, Ha and Mestre. In that case, of course, Defendants would have an opportunity to test those witnesses' recollections and put their testimony in an appropriate context. But CSX may not offer those individuals' testimony through its own witnesses and thereby shield those individuals from cross examination. Accordingly, the portions of the paragraphs noted above, in which Mr. Munoz describes the out of court statements of a third party, should be stricken.[1]

## II.    THE COURT SHOULD STRIKE PARAGRAPHS 9 AND 10 OF THE BAGGS WITNESS STATEMENT.

Like the Munoz statement, the witness statement of David Baggs, CSX's Assistant Vice President for Treasure and Investor Relations, contains similarly impermissible testimony about the out of court statements of Nelson Walsh. Specifically, in paragraphs 9 and 10, Mr. Baggs describes the contents of two emails he received from Mr. Walsh. (Baggs

---

[1]    For the Court's convenience, a blacklined copy of the Munoz witness statement showing the portions of the statement that should be stricken is attached as Exhibit A.

4

Statement at ¶¶ 9-10.) The contents of Mr. Walsh's emails are, of course, hearsay and do not fall within any exception. Those references should therefore also be stricken.[2]

## III.    THE COURT SHOULD LIMIT THE ADMISSIBILITY OF PORTIONS OF PARAGRAPHS 8, 11, 15, 17-19, AND 26 OF THE WARD WITNESS STATEMENT.

The witness statement of Michael Ward contains many of the same hearsay reports from CSX's third party advisors that the Baggs and Munoz statements include. Unlike the Munoz and Baggs statements, however, Mr. Ward appears to offer these statements not to prove the truth of the underlying matters asserted, but to show the effect those statements had on him and various beliefs he held.

For example, Mr. Ward testifies in paragraph 8 about various reports about TCI that he received from CSX employees and third-party advisors and affirms, in the next paragraph that he "believed those reports." (Ward Statement, ¶¶ 8-9.) Later, he states that the source of his belief that TCI is a "short-sighted investor" is "what I have been told by Mr. Munoz and Mr. Baggs, as well as our investment bankers at Morgan Stanley and Evercore," which he then describes in detail. (Id. at 15.)

Defendants do not object to the admissibility of those details if they are offered *only* for the limited purpose of showing the effect they may have had on Mr. Ward's beliefs. See U.S. v. Gotti, 457 F. Supp. 2d 395, 397 (S.D.N.Y.) ("statements offered for their effect on the listener are not hearsay"). But that testimony is, for the reasons discussed above, not admissible to prove the truth of the matters reported to Mr. Ward. See Fed R. Evid. 801(c).

---

[2]    A blacklined copy of the Baggs witness statement showing the portions of the statement that should be stricken is attached as Exhibit B.

Accordingly, Defendants respectfully request that this Court order that any portions of paragraphs 8, 11, 15, 17-19 and 26 of Mr. Ward's witness statement that describe reports made or information transmitted to Mr. Ward from CSX employees or third party advisors is inadmissible to prove the truth of the matters asserted.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court strike those portions of the Munoz and Baggs witness statements that contain the out of court statements of third parties and order that reports made or information transmitted to Mr. Ward from CSX employees or third party advisors is not admissible to prove the truth of the matters asserted..

Dated: New York, New York
May 19, 2008

KIRKLAND & ELLIS LLP

By:   /s/ Andrew M. Genser
      Peter Duffy Doyle
      Andrew M. Genser

153 East 53rd Street
New York, New York 10022
(212) 446-4800

*Attorneys for 3G Capital Partners Ltd,*
*3G Capital Partners, LP, 3G Fund, LP and*
*Alexandre Behring (a/k/a Alexandre Behring*
*Costa)*

SCHULTE ROTH & ZABEL LLP

By:   /s/ Howard O. Godnick
      Howard O. Godnick
      Michael E. Swartz
      Yocheved Cohen

919 Third Avenue
New York, New York 10022
(212) 756-2000

*Attorneys for The Children's Investment Fund*
*Management (UK) LLP, The Children's*
*Investment Fund Management (Cayman) LTD,*
*The Children's Investment Master Fund,*
*Christopher Hohn and Snehal Amin*

# **Exhibit A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CSX CORPORATION,

Plaintiff,

v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE
BEHRING, A/K/A ALEXANDRE BEHRING
COSTA,

Defendants.

THE CHILDREN'S INVESTMENT MASTER
FUND,

Counterclaim and Third-
Party Plaintiff,

v.

CSX CORPORATION AND MICHAEL WARD,

Counterclaim and Third-
Party Defendants.

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND L.P.

Counterclaim Plaintiffs,

v.

CSX CORPORATION AND MICHAEL WARD,

Counterclaim Defendants.

ECF Case

08 Civ. 02764 (LAK) (KNF)

**WITNESS STATEMENT
OF OSCAR MUNOZ**

1.     My name is Oscar Munoz.  I am employed by CSX Corporation ("CSX") as Executive Vice President and Chief Financial Officer.  I have been employed by CSX since May 2003.  As CFO, I am responsible for managing the Company's financial and strategic planning, procurement, technology, and real estate activities.  In that capacity, I have had several interactions with or concerning representatives of TCI and 3G.

2.     I became aware of TCI sometime in the fall of 2006, when David Baggs, CSX's Assistant Vice President, Treasury and Investor Relations, informed me that he had received a call from representatives of TCI, which was apparently performing diligence on CSX and the railroad industry ahead of a possible investment.

3.     On October 20, 2006, in a conference call, I spoke with Christopher Hohn and Snehal Amin of TCI.  Mr. Baggs was also on the call.  During that call, Mr. Baggs and I discussed CSX's views about the long-term value of CSX and the railroad industry more broadly.  TCI was interested in discussing regulatory risks.  On October 23, 2006, Rishi Sunak of TCI sent Mr. Baggs and me an email in which Mr. Sunak wrote that TCI had "since accumulated ~$100 million of stock".  (PX 133.)

4.     On November 3, 2006, Mr. Sunak emailed me to ask for my assistance in scheduling a one-on-one meeting between representatives of TCI and CSX senior management at the upcoming Citigroup Transportation Conference.  In that email, Sunak wrote that TCI had "increased [its] investment to ~$300 million with the potential to scale that further".  (PX 136.)

5.     On December 6, 2006, I attended CSX investor meetings in Jacksonville.  At those meetings, members of CSX's senior management met with

investors. After a group meeting, representatives from TCI told me that they wanted to

have a private meeting with me and Michael Ward, CSX's Chairman, President and

Chief Executive Officer. Mr. Baggs later informed me that TCI representatives had said

that they wanted to meet with us to talk about a potential leveraged buyout transaction

("LBO") involving CSX.

6. ~~Mr. Baggs also told me that, after the December 6, 2006 meeting,~~
~~TCI representatives continued to request a private meeting with Michael Ward and me to~~
~~discuss TCI's views about a potential LBO.~~

7. Mr. Baggs suggested that TCI communicate with CSX's advisors

from Morgan Stanley. ~~On January 15, 2007, after TCI communicated with CSX's~~
~~advisors from Morgan Stanley, Nelson Walsh of Morgan Stanley reported to me that TCI~~
~~perceived a big LBO opportunity. (PX 35.)~~

8. ~~Subsequently, Mr. Walsh told me that at Mr. Baggs' request, he~~
~~and colleagues from Morgan Stanley had met with TCI representatives on January 22,~~
~~2007.~~ Mr. Walsh showed me a document that TCI had given Morgan Stanley. The

document was a presentation in which TCI recommended that CSX be taken private in an

LBO. In that presentation, TCI wrote that it believed that "a major rail will get a private

equity bid"; that "CSX is at the top of people's lists"; that "[i]t is important to seize this

opportunity, act now and be the first"; that the "'perfect storm' of conditions makes a

private equity bid nearly inevitable"; that "CSX is logically the prime candidate"; and

that CSX could be taken private for $50 per share. (PX 37.)

9. On February 1, 2007, Mr. Walsh emailed Mr. Baggs and me. ~~Mr.~~
~~Walsh had communicated with Mr. Amin and reported in his email that TCI "continued~~

2

~~to ask many questions", to which Mr. Walsh responded by telling Mr. Amin that "we all~~
~~need to be mindful of Reg FD issues". Mr. Walsh further reported that TCI was~~
~~frustrated by that response and that TCI was waiting to hear about a private meeting with~~
~~Mr. Munoz and/or Mr. Ward. (PX 39.)~~

10.     On February 15, 2007, I attended the BB&T Transportation
Conference. After a small group meeting with investors, TCI's Mr. Amin approached
Mr. Baggs and me and asked how we intended to accomplish CSX's recently increased
share repurchase program. Mr. Amin said TCI wanted CSX to do a Dutch auction. Mr.
Baggs told Mr. Amin that we could not have a conversation with a select investor about
the specifics of CSX's share repurchase plans because it would run afoul of the Securities
and Exchange Commission's Regulation FD. Mr. Amin replied by saying "We own 14
percent of your company." I responded "You must be very happy with your investment."

11.     In March 2007, TCI sent a letter to Mr. Ward and me in which TCI
requested to meet with us. I responded by letter dated March 12, 2007. I specifically
asked Mr. Amin if TCI was "willing to explain the exact nature of your economic interest
in CSX Corporation, which it has declined to do thus far". (PX 62.)

12.     Those letters led to a meeting on March 29, 2007, attended by
Ellen Fitzsimmons, Senior Vice President of Law and Public Affairs, General Counsel
and Corporate Secretary of CSX, CSX's outside legal counsel, Alan Stephenson of
Cravath, Swaine & Moore LLP, and me for CSX, and Mr. Amin and TCI's legal counsel,
Arnold Jacobs of Proskauer Rose LLP, for TCI. Mr. Amin expressed TCI's desire that
CSX increase its leverage and repurchase 20 percent of its outstanding common stock
during 2007. Mr. Amin said that he wanted CSX to publicly announce the share

repurchase in its first quarter earnings release in April. When I asked what would happen if CSX did not do as TCI wished, Mr. Amin responded that there would be "no limits" to what TCI would do.

13. On April 3, 2007, I reported to the Board of Directors of CSX (the "Board") about TCI and about the March 29, 2007 meeting with TCI representatives. I reported to the Board that: (a) TCI claimed it had economic ownership of between 10 and 14 percent of the outstanding shares of CSX common stock; (b) TCI wished CSX to announce an increase in the planned buyback program in CSX's April 18 earnings announcement; (c) TCI's view was that investment grade ratings are not necessary for CSX; and (d) TCI's model for CSX assumed higher pricing for a longer duration than CSX's forecasts.

14. The Board discussed questions about the likely nature of TCI's interest, given the absence of Williams Act filings. At that meeting, the Board requested management to perform further analysis on possible changes to CSX's capital structure, including possible enhanced or accelerated return to shareholders through dividend increases or share buybacks, and to report back to the Board.

15. CSX retained Evercore Partners ("Evercore") as advisors to help evaluate TCI's proposals with respect to CSX.

16. On April 10, 2007, Evercore sent me a memorandum about a call with Mr. Hohn, Mr. Amin and Mr. Sunak on April 6, 2007. ~~In that memorandum, Evercore reported TCI's statements that CSX should raise prices and that "[a]ny increase in pricing would translate to pure profit/cash flow"; that "[s]o long as safety standards were maintained, the government/regulators would not be overly concerned with price~~

4

increases"; ~~TCI "want[ed] a 20% share buyback in the coming year"; that TCI fully~~
~~"intend[ed] to make it happen"; that although TCI "did not specify details of how much~~
~~of their $2.5 [billion] shareholding was direct and how much in swaps", that TCI had~~
~~"plans to convert [swap] shareholding to direct (and [were] doing so currently)"; and that~~
~~TCI would "likely convert swaps to shares to represent 4.9 [to] 9.9 % of total shares~~
~~outstanding". (PX 76.)~~

17.    On April 13, 2007, I attended a telephonic meeting of the Finance
Committee of CSX's Board. At that meeting, I presented management's
recommendation to continue executing the current $2 billion repurchase program. (PX 5.)

18.    At that April 13, 2007 Finance Committee meeting, Eduardo
Mestre of Evercore and Mr. Walsh of Morgan Stanley led a discussion about the market
and rating agency reactions to CSX's $2 billion stock repurchase program announcement
of February 14, 2007. They also presented an analysis that supported their view that a
leveraged buyout was not in the best interests of CSX at that time. ~~Mr. Mestre reported~~
~~to the Committee that representatives of TCI told him that TCI owned swaps that gave~~
~~TCI an economic interest in CSX equivalent to 10 to 14 percent of CSX's shares~~
~~outstanding, that TCI planned to convert its swap holdings into direct ownership of~~
~~approximately 4.9 to 9.9 percent of CSX's outstanding shares, that TCI wished to see~~
~~CSX buy 20 percent of its outstanding shares, and that TCI did not believe CSX required~~
~~investment grade credit ratings. (PX 5; see also PX 80.)~~

19.    On April 16, 2007, I attended a telephonic meeting of CSX's
Board. ~~At that meeting, Mr. Mestre reported to the Board that representatives of TCI told~~
~~him that TCI owned swaps that gave TCI an economic interest in CSX equivalent to 10 to~~

~~14 percent of CSX's shares outstanding and that TCI planned to convert its swap~~

~~holdings into direct ownership of approximately 4.9 to 9.9 percent of CSX's outstanding~~

~~shares.  Mr. Mestre further reported to the Board that representatives of TCI wished to~~

~~see CSX buy 20 percent of its outstanding shares and that TCI did not believe CSX~~

~~required investment grade credit ratings.  (PX 6.)~~

20.     At that same April 16, 2007 Board meeting, I delivered

management's recommendation to the Board to pursue the current share repurchase

program of $2 billion by year-end 2008 with a firm target of $1 billion in 2007.  I also

recommended that we set out CSX's broader strategy with respect to capital structure at

the Company's September 2007 investor and financial analyst conference, along with a

possible enhancement of the share repurchase program and dividends.  I did not discuss

with the Board a possible additional $2 billion share repurchase until the Board's meeting

on May 1.  (PX 6; *see also* PX 81.)

21.     On May 1, 2007, I reported to the Board of Directors of CSX on

management's recommendations to increase the share repurchase program to $4 billion;

to increase the annual dividend to $.60 per share beginning in September 2007; to

increase capital spending; and to announce more favorable guidance.  I told the Board

that further analysis performed since the previous Board meeting had identified

additional repurchase capacity that could be pursued while maintaining an investment

grade credit rating.  I told the Board that management would be meeting with the rating

agencies to assess the impact those actions would have on CSX's credit rating and that

management would provide an update to the Board  about the rating agency meetings

before seeking final approval of the recommendations.  The Board identified the target

6

increase in the repurchase program as an additional $1 billion, not the additional $2 billion that I had recommended. (PX 8; *see also* PX 88.)

22.    On May 4, 2007, I met with S&P and Moody's to assess the likely impact on CSX's credit ratings of CSX operating with greater leverage to facilitate a larger share repurchase program, increased dividend and increased capital spending. (*See* PX 92.)

23.    On May 7, 2007, I reported to the Board of Directors of CSX on the rating agency meetings and reviewed revised management's recommendation that CSX bring its repurchase program to $3 billion, increase its quarterly dividend by 25 percent and increase capital expenditures in the areas of safety, service, reliability and increased network capacity. I told the Board that the rating agencies indicated that higher leverage could result in a rating action in some form and that CSX would likely be downgraded but maintain investment grade credit ratings. The Board approved the recommendations.

24.    On May 8, 2007, before the market opened, CSX issued a press release announcing a larger share repurchase program, an increased dividend, better guidance and plans for more capital spending. Also before the market opened on that day, I presented at the Bear Stearns transportation conference and discussed these announcements. (PX 97.)

25.    On June 13, 2007, I attended a meeting at 3G's New York office that Mr. Baggs had set up. As I was leaving the 3G offices, I noticed on the corner of the reception desk a document that had both the CSX and TCI logos on the cover. While I do not know the contents of the document, the cover appeared to be the first in a deck of

presentation slides and my impression was that it was a presentation prepared by TCI concerning CSX.

26.    On June 14, 2007, I gave a presentation on behalf of CSX at the Merrill Lynch Global Transportation Conference. At that conference, Mr. Amin of TCI attended a meeting that Mr. Baggs and I held with a group of investors. Mr. Amin said that it was TCI's view that CSX did not need to maintain investment grade credit ratings.

27.    On June 14, 2007, I received a fax from Alexandre Behring of 3G informing CSX that 3G intended to acquire shares of CSX which, together with shares it already held, was in excess of $500 million and may cross 50 percent of CSX's outstanding common stock. (PX 105.)

28.    On June 20, 2007, Mr. Ward, Mr. Baggs and Nathan Goldman, a CSX lawyer, and I participated in a meeting with Mr. Behring, Daniel Schwartz and Luis Moura of 3G at CSX in Jacksonville. At that meeting, Mr. Ward asked Mr. Behring about 3G's intentions with respect to its investment in CSX in light of 3G's HSR filing. Mr. Behring told us that 3G had not been an activist investor.

29.    On June 21, 2007, I was briefed by CSX's financial advisors from Evercore about a meeting they had with Mr. Hohn, Mr. Amin and Mr. Sunak of TCI on June 20, 2007. ~~Evercore told me that TCI was adamant about their demands and agitated about the perceived lack of attention TCI was receiving from CSX management. And on June 21, 2007, Evercore sent me a memorandum about the June 20, 2007 meeting with Mr. Hohn, Mr. Amin and Mr. Sunak. In that memorandum, Evercore reported TCI's statements that TCI "would like to meet with the Board of CSX to communicate TCI's views on the deficiencies of management and on the desirability of leveraging up the~~

~~balance sheet"; that "management has done a poor job and the Board should entertain a~~
~~change in the senior leadership of [CSX]"; that TCI "still own[ed] 4% in physical shares~~
~~and over 10% in swaps"; that TCI "fully intend[ed] to 'go to war'"; that TCI "would seek~~
~~to replace the entire Board as a means to change management"; and that TCI "will get~~
~~support from the shareholders in making the changes at CSX". (PX 109.)~~

30.    On July 11, 2007, I attended a meeting of CSX's Board. I told the
Board that TCI continued to increase its ownership in CSX and that 3G had become
CSX's largest shareholder. I reported to the Board about the meeting with 3G on June
20, 2007. Mr. Mestre of Evercore told the Board about recent conversations he had with
TCI representatives. (PX 10.) ~~Mr. Mestre told the Board that TCI requested to meet with~~
~~the Board and that TCI said that the Board should entertain a change in the senior~~
~~leadership of CSX; that TCI owned 4% in physical shares of CSX stock and over 10% in~~
~~swaps; that TCI intended to go to war; and that TCI would seek to replace the entire~~
~~Board as a means to change management.~~

31.    On July 17, 2007, Mr. Mestre of Evercore emailed me about a call
he and an Evercore colleague had with Mr. Hohn. ~~In that email, Mr. Mestre reported Mr.~~
~~Hohn's statements that TCI "would, in due course, attempt to change the entire Board"~~
~~and that TCI's objective was "to find management that would be more open to leveraging~~
~~[CSX] and that would pursue cost improvements more aggressively". (PX 111.)~~

32.    On August 23, 2007, I received emails from Mr. Hohn in which he
expressed concern about the regulatory environment and the threat of re-regulation that
he perceived to be associated with a bill sponsored by Congressman James Oberstar. In

one of those emails, Mr. Hohn urged us to respond to the bill "with a public specific threat to cut all growth capex". (PX 121.)

33.    On September 6, 2007, following a presentation that I delivered at an investor conference, Mr. Hohn approached me and asked a series of questions and made several comments. Either Daniel Schwartz or Luis Moura of 3G was among the people surrounding me during Mr. Hohn's questioning. Afterward, as I was walking through the room, I saw Mr. Amin and Mr. Sunak of TCI and either Mr. Schwartz or Mr. Moura of 3G standing together in the center of the room.

34.    On September 7, 2007, I received a report from Mr. Mestre of Evercore about a conversation that he and his colleagues had with Mr. Hohn after the presentation at the September 6, 2007 conference. ~~Mr. Mestre reported that Mr. Hohn said, among other things, that CSX and the rail industry "should take a tougher stance with government/regulators by threatening to reduce capex if the industry can not earn a reasonable return"; the stock "[b]uyback should be accelerated"; and the "entire $3 billion [repurchase] program should be done this year". (PX 124.)~~

35.    On December 19, 2007, CSX's advisor from Evercore, Gil Ha, emailed me about a call he had with Mr. Hohn. ~~In that email, Mr. Ha reported Mr. Hohn's statements that TCI "is highly confident that TCI/3G will win the proxy fight and is willing to do whatever it takes to win" and that he "is miffed that the board is still not willing to meet directly with TCI — particularly now that they together with 3G own 20% of the company". (PX 149.)~~

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CSX CORPORATION,

Plaintiff,

v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE
BEHRING, A/K/A ALEXANDRE BEHRING
COSTA,

Defendants.

---

THE CHILDREN'S INVESTMENT MASTER
FUND,

Counterclaim and Third-
Party Plaintiff,

v.

CSX CORPORATION AND MICHAEL WARD,

Counterclaim and Third-
Party Defendants.

---

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND L.P.,

Counterclaim Plaintiffs,

v.

CSX CORPORATION AND MICHAEL WARD,

Counterclaim Defendants.

---

ECF Case

08 Civ. 02764 (LAK) (KNF)

**WITNESS STATEMENT OF
DAVID H. BAGGS**

1.     My name is David H. Baggs.  I am employed by CSX Corporation ("CSX") as Assistant Vice President, Treasury and Investor Relations.  I have held that position since February 1, 2004 and have been employed by CSX since 1985.  In my capacity as the Company's investor relations officer, I represent CSX in communications with analysts, investors and potential investors.  In that capacity, I have had several communications with representatives of TCI and 3G.

2.     During the second half of 2006, I received numerous telephone calls from representatives of TCI, namely Snehal Amin and Rishi Sunak.  Mr. Amin and Mr. Sunak asked questions about the general business environment for the railroad industry, publicly available information about CSX's strategies and CSX's financial statements.  I understood that TCI was conducting due diligence of the sort that an investor would perform before making a sizable investment in CSX.

3.     On October 20, 2006, I participated in a conference call with Christopher Hohn, Snehal Amin and Rishi Sunak of TCI, along with Oscar Munoz, CSX's Chief Financial Officer.  TCI asked questions about regulatory barriers to pricing.  On October 23, 2006, Mr. Sunak emailed me and Mr. Munoz, thanking us for taking the time to participate in the October 20th conference call.  In that email, Mr. Sunak wrote that TCI had "since accumulated ~$100 million of stock".  (PX 133.)

4.     In late October and early November 2006, TCI representatives made several requests for a one-on-one meeting with CSX senior management at the upcoming Citigroup Transportation Conference.

5.     I attended the November 14, 2006 Citigroup Transportation Conference in New York during which Mr. Munoz gave a presentation on behalf of CSX.

After Mr. Munoz's presentation, Mr. Hohn approached Mr. Munoz and me. Mr. Hohn told me that TCI had a $500 million investment in CSX and that he wanted to come down to Jacksonville to visit with CSX management.

      6.     After the Citigroup Transportation Conference, I consulted the stock tracking services to which the Company subscribes but could not confirm TCI's $500 million investment. I subsequently asked Mr. Amin, when he called me, about the nature of TCI's interest in CSX. Mr. Amin told me that TCI's interest in CSX was in the form of swap contracts with various counterparties that gave TCI an economic interest equivalent to owning stock outright. He said that those swaps allowed TCI to avoid paying some sort of tax, but could be converted into direct ownership of shares of CSX common stock at any time. During that conversation, Mr. Amin reiterated TCI's desire to meet with CSX's senior management.

      7.     On December 6, 2006, I attended investor meetings coordinated by a Credit Suisse industry analyst. During those meetings, CSX senior executives met with investors including TCI representatives. After a group meeting, Mr. Amin asked me if TCI could schedule some time to meet privately with CSX's Chairman, President and Chief Executive Officer, Michael Ward, and other members of CSX's senior management team to discuss TCI's views about a potential leveraged buyout transaction ("LBO") involving CSX.

      8.     After December 6, 2006, TCI representatives several times asked me to arrange a private meeting with Mr. Ward and Mr. Munoz to discuss TCI's views about a potential LBO involving CSX. I told the TCI representatives that the Securities and Exchange Commission's Regulation FD limited management's ability to engage in a

conversation about an extraordinary transaction on a select basis with an individual investor or potential investor. I suggested a different way for TCI to have an audience on their ideas they wished to put forward with respect to CSX. I suggested that TCI contact CSX's advisors at Morgan Stanley. (*See* PX 33.)

9.    After TCI communicated with Morgan Stanley, Nelson Walsh of Morgan Stanley sent an email to Mr. Munoz and me on January 15, 2007. ~~In that email, he reported that TCI considered CSX a candidate for an LBO. (PX 35.)~~

10.    On February 1, 2007, in an email to Mr. Munoz and me, Mr. Walsh reported that he had spoken to Mr. Amin. ~~In that email, Mr. Walsh reported that TCI "continued to ask many questions"; that Mr. Walsh responded to TCI by reminding Mr. Amin that "we all need to be mindful of Reg FD issues"; that TCI was frustrated by that response; and that TCI was waiting to hear confirmation of a private meeting with Mr. Munoz and/or Mr. Ward. (PX 39.)~~

11.    On February 8, 2007, I attended investor meetings coordinated by a JPMorgan industry analyst. CSX senior executives met with investors, including TCI representatives. After a group meeting, Mr. Amin and Mr. Sunak asked me what CSX thought about their LBO proposal. I responded by telling them that we had communicated with Morgan Stanley about TCI's proposals but that I was not in a position to provide them with any feedback.

12.    On February 15, 2007, I attended the BB&T Transportation Conference. At that conference, Mr. Munoz made a presentation on behalf of CSX. Following Mr. Munoz's presentation and after a small break-out session where Mr. Munoz engaged in a question and answer session with investors, Mr. Amin

approached Mr. Munoz and me and asked how we intended to conduct CSX's recently
announced increased share repurchase program. Mr. Amin advocated that CSX do a
Dutch auction or some sort of accelerated repurchase. I told Mr. Amin that we could not
have a one-off conversation with him about how CSX planned to conduct the repurchase
program because it would not be appropriate under Regulation FD. Mr. Amin replied by
saying that TCI owned 14 percent of the Company.

13.     On February 21, 2007, I received a call from Daniel Schwartz of
3G. Mr. Schwartz told me 3G was a very large fund with offices in New York and
Brazil. He called again shortly thereafter and inquired about whether 3G representatives
could come to Jacksonville to visit with CSX's senior management team. Mr. Schwartz
told me that 3G held a substantial position in CSX through swap contracts and that the
size of 3G's position in CSX was somewhere between 15 and 20 million shares. During
that call, Mr. Schwartz was insistent that 3G wanted to meet with CSX senior
management very soon.

14.     In late February 2007, I received a call from Arnold Jacobs. Mr.
Jacobs told me he was with TCI. He expressed TCI's frustration at being unable to have
private, substantive conversations with CSX senior management. Mr. Jacobs told me that
such conversations could be had without running afoul of Regulation FD and suggested
ways to avoid selective disclosure problems. He did not tell me that he was an outside
lawyer representing TCI. I later learned that Mr. Jacobs is a partner at the Proskauer
Rose law firm, which was representing TCI.

15.     On March 22, 2007, I attended an industry conference organized
by JPMorgan. At that conference, Mr. Ward gave a presentation on behalf of CSX and

Mr. Ward and I met with small groups of investors. Representatives from 3G attended the conference and participated in one of the small group meetings. At the conclusion of that group meeting, Alexandre Behring of 3G introduced himself to Mr. Ward and me and expressed his desire to come down to Jacksonville to meet with Mr. Ward and CSX's senior management team.

16.    On May 8, 2007, before the market opened, CSX issued a press release announcing an increased share repurchase program, an increased dividend, more favorable forward-looking guidance and plans for increased capital spending. (PX 97.) We made those announcements on May 8, 2007 because there was a major industry conference organized by Bear Stearns that we would be attending and where we would have the opportunity to speak with investors on the day of the announcement.

17.    I attended that Bear Stearns Transportation Conference. Mr. Munoz gave a presentation before the market opened and we met with groups of investors including TCI's Snehal Amin.

18.    At that same conference, Mr. Amin gave a presentation in which he set forth TCI's proposals with respect to the industry and CSX in particular. I attended Mr. Amin's presentation at which attendance was standing-room-only, with people sitting and standing in the aisles and outside the doorways to the auditorium. In his talk, Mr. Amin proposed that CSX buy back 20 percent of CSX stock every year and increase prices charged to customers by 7 percent per year. He questioned why CSX considered safety a capital expenditure issue, saying "You don't need cap-ex to pull up hand brakes in rail cars." He suggested that the major railroads in the US could be taken private at a significant premium, that TCI had spoken to the private equity firms that

5

would line up to bid on the railroads and that he had a 100-page indicative financing proposal from a bank that could underwrite the LBO debt. Although there were other speakers scheduled to speak on the panel with Mr. Amin, the auditorium virtually emptied immediately after he concluded his remarks. After the conference, CSX obtained a tape-recording of Mr. Amin's remarks, the transcript of which is PX 96.

19.    On May 9, 2007, Mr. Amin of TCI sent me an email asking for the results of voting at the annual meeting. (PX 207.) Mr. Schwartz of 3G called my office on the same day to inquire about when the results of shareholder votes at the annual meeting would be available. During the following week or so, my office received numerous calls from investors requesting information regarding the result of the shareholder vote on a special meeting proposal. (PX 101.) That was the first instance in my experience of having investors calling about the outcome of a particular shareholder proposal.

20.    On June 4, 2007, I had a conversation with Mr. Amin in which he urged CSX to increase its indebtedness and asked for CSX's rationale for maintaining its investment grade credit ratings. After the conversation, Mr. Amin sent me a follow-up email reiterating some of that conversation. (PX 102.)

21.    Mr. Schwartz of 3G called my office on May 17, 2007 to request a one-on-one meeting between 3G and CSX representatives at an upcoming conference in New York, scheduled for June 14, 2007. The day prior to that conference, on June 13, 2007, Mr. Munoz and I met with Mr. Behring, Mr. Schwartz and Luis Moura at 3G's New York office. Mr. Behring told us that 3G's lawyers had told them to make a filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR") and that they

6

had made an HSR filing. This was something of a surprise to me because, as far as I knew, 3G had not done due diligence with respect to CSX—at least not with CSX management.

22.     On June 15, 2007, I received a copy of the letter that 3G sent to Oscar Munoz notifying CSX of 3G's HSR filing in which 3G disclosed that it may acquire in excess of 50 percent of CSX's outstanding common stock. (*See* PX 105.) I thought there was a real possibility that 3G would seek to take control of CSX.

23.     On June 20, 2007, I attended a meeting at CSX's office in Jacksonville with Mr. Behring, Mr. Schwartz and Mr. Moura of 3G. Mr. Ward, Mr. Munoz and Nathan Goldman, in-house counsel for CSX, also attended that meeting. Mr. Behring several times mentioned the issue of levering up CSX.

24.     On August 23, 2007, I participated in a call with Mr. Hohn and Mr. Amin of TCI. On that call, Mr. Hohn expressed his concern about the regulatory environment and the threat of re-regulation that he perceived associated with a bill that was being considered by a Congressional Committee. Mr. Hohn told us to send a letter to the sponsor of the bill, Representative James Oberstar, threatening immediately to freeze capital spending if the bill were allowed to proceed. (*See* PX 121.)