UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CSX CORPORATION,

Plaintiff,

v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD.,  3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE BEHRING,
A/K/A ALEXANDRE BEHRING COSTA,

Defendants.

---

THE CHILDREN'S INVESTMENT MASTER
FUND,

Counterclaim and Third-
Party Plaintiff,

v.

CSX CORPORATION AND MICHAEL WARD,

Counterclaim and Third-
Party Defendants.

---

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.,

Counterclaim Plaintiffs,

v.

CSX CORPORATION AND MICHAEL WARD,

Counterclaim Defendants.

---

ECF Case

08 Civ. 02764 (LAK) (KNF)

**JOINT FINAL PRE-TRIAL ORDER**

# TABLE OF CONTENTS

Page

I.    NATURE OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   JURY/NON-JURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  STIPULATED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   PARTIES' CONTENTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.    CSX's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      B.    Defendants' Counterclaims/Third-Party Claims . . . . . . . . . . . . . . . . . . . . . . . 64

V.    ISSUES TO BE TRIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

VI.   JOINT EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

VII.  PLAINTIFF'S EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

VIII. DEFENDANTS' EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

IX.   STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS . . . . . . . . . 97

X.    PLAINTIFF'S WITNESS LIST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

XI.   DEFENDANTS' WITNESS LIST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

XII.  RELIEF SOUGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

The parties having conferred among themselves and with the Court pursuant to

Fed R. Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial

Order herein.

## I.    NATURE OF THE CASE

On March 17, 2008, plaintiff CSX Corporation ("CSX"), filed a complaint against

defendants The Children's Investment Fund Management (UK) LLP, The Children's Investment

Fund Management (Cayman) Ltd., The Children's Investment Master Fund (together, "TCI"), 3G

Capital Partners Ltd., 3G Capital Partners L.P., 3G Fund, L.P. (together, "3G"), Christopher

Hohn, Snehal Amin and Alexandre Behring. (Mr. Hohn, Mr. Amin, and TCI, are referred to

collectively as the "TCI Defendants"; Mr. Behring and 3G are referred to collectively as the "3G

Defendants"; the TCI Defendants and the 3G Defendants are referred to collectively as the

"Defendants").  On April 4, 2008, The Children's Investment Master Fund (the "TCI Fund") and

3G each filed counterclaims against CSX and third-party claims against Michael Ward, CSX's

President, Chief Executive Officer and Chairman of the CSX Board.

The parties' claims, counterclaims and third-party claims relate to alleged

mistatements and omissions in the period leading up to and in connection with the 2008 annual

meeting of the shareholders of CSX (the "Shareholder Meeting"), scheduled for June 25, 2008,

and the validity of the proposals made in connection with the Shareholder Meeting.  On

December 19, 2007, TCI and 3G filed a Schedule 13D with the Securities and Exchange

Commission (the "SEC") disclosing that they had formed a group (the "TCI Group") and that

they intend to nominate a slate of five directors for election to the Board of Directors of CSX (the

"CSX Board") at the Shareholder Meeting.  On January 8, 2008, the TCI Fund submitted a

Notice of Intent (the "January 8 Notice") to nominate five persons for election to the CSX Board.

The TCI Fund supplemented the January 8 Notice on January 21 and January 25, 2008 regarding its intention to present a proposal to amend the CSX Bylaws to permit holders of at least 15% of the outstanding voting shares of CSX to call a special shareholders meeting, as well as to repeal all bylaw amendments adopted by the CSX Board between January 1, 2008 and up to and including the date of the Shareholder Meeting.

The TCI Group filed a preliminary proxy statement Schedule 14A with the SEC on March 10, 2008, a revised preliminary proxy statement on April 15, 2008 and its definitive proxy statement (the "TCI Proxy") on April 28, 2008.  CSX filed its preliminary proxy statement on Schedule 14A with the SEC on February 21, 2008, revised preliminary proxy statements on February 22, 2008 and April 17, 2008 and its definitive proxy statement (the "CSX Proxy") on April 25, 2008.  In addition to the CSX Proxy, CSX has also filed soliciting materials under Rule 14a-12, including a public letter, dated February 14, 2008, from the CSX Board to Christopher Hohn, a March 17, 2008 press release regarding the filing of the Complaint in this action, and (on March 17, 2008) an editorial by Michael Ward, entitled "Rewards for Railroads," that was published in the *Washington Times* on March 11, 2008.

Plaintiff is seeking injunctive relief as set forth in Section XII below. Counterclaim Plaintiffs are seeking declaratory and injunctive relief as set forth in Section XII below.

## II.    JURY/NON-JURY

A jury is not claimed, and the parties agree that the action should be tried to the Court.  The estimated length of the trial is one morning and one day.

### III.    STIPULATED FACTS

1.    CSX is a publicly traded transportation company incorporated under the laws of Virginia and headquartered in Jacksonville, Florida.  Through its wholly owned subsidiary, CSX Transportation, Inc., a Class I rail carrier incorporated under the laws of Virginia, it operates one of the largest rail systems in the United States and the largest rail system in the eastern half of the country.  CSX shares are traded on the New York Stock Exchange (the "NYSE") under the ticker symbol "CSX."

2.    The Children's Investment Fund Management (UK) LLP ("TCIF UK") is an English limited liability partnership.  The Children's Investment Fund Management (Cayman) Ltd. ("TCIF Cayman") is a Cayman Islands company affiliated with TCIF UK.  The Children's Investment Master Fund is a Cayman Islands company managed by both TCIF UK and TCIF Cayman.  Snehal Amin ("Mr. Amin") is a citizen of the United States and a partner of TCIF UK.  Christopher Hohn ("Mr. Hohn") is a citizen of the United Kingdom and managing partner and a controlling person of TCIF UK and sole owner and a controlling person of TCIF Cayman.

3.    3G Fund L.P. ("3G Fund") is a Cayman Islands limited partnership.  3G Capital Partners L.P. ("3G L.P.") is a Cayman Islands limited partnership and the general partner of 3G Fund.  3G Capital Partners Ltd. ("3G Ltd.") is a Cayman Islands company and the general partner of 3G L.P.  Alexandre Behring ("Mr. Behring") is a citizen of Brazil and the managing director of 3G Ltd.

4.    Beginning on October 20, 2006, TCI began entering into cash-settled equity swap agreements ("Total Return Swaps") that reference CSX common stock.  TCI continued to enter into Total Return Swaps that referenced CSX stock, and on April 3, 2007, it began to purchase physical shares as well.

5.      As early as October 20, 2006, TCI contacted CSX about CSX's business.  TCI had telephone and email communications with CSX representatives in December 2006 and January 2007, and visited CSX headquarters on two analyst-organized trips.

6.      On February 15, 2007, David Baggs and Oscar Munoz represented CSX at the BB&T Capital Markets Transportation Conference.  Mr. Amin attended this conference on behalf of TCI.

7.      On March 2, 2007, TCI sent CSX notice that it had submitted a filing under the Hart-Scott-Rodino Antitrust Improvements Act ("HSR") stating that it intended to acquire $500 million or more in CSX stock.

8.      On March 29, 2007, Mr. Amin and TCI's outside counsel met with CSX's CFO, Mr. Munoz, CSX's General Counsel, Ellen Fitzsimmons, and CSX's outside counsel in New York.

9.      On or about April 6, 2007, TCI participated in a conference call with representatives from Evercore Partners, one of CSX's financial advisors.

10.      During the period from October 20, 2006 to April 2, 2007, TCI entered into Total Return Swap transactions with seven different banks:  Citigroup Global Markets Limited ("Citigroup"), Credit Suisse Securities (Europe) Limited ("Credit Suisse"), Deutsche Bank AG ("Deutsche Bank"), Goldman Sachs International ("Goldman"), Merrill Lynch International ("Merrill Lynch"), Morgan Stanley & Co International Limited ("Morgan Stanley"), and UBS AG ("UBS").

11.      In that period, TCI accumulated Total Return Swaps referencing the equivalent of 61,627,400 shares of CSX common stock, which, as of April 2, 2007, had a notional value of over $2.5 billion.

12.     On May 8, 2007, Mr. Amin made a presentation at a Bear Stearns conference held in New York, during which he spoke about corporate governance and operational issues within the U.S. rail industry generally and CSX in particular.

13.     On June 20, 2007, TCI representatives met with CSX's advisors from Evercore Partners in New York and indicated that TCI directly owned 4 percent of CSX's shares outstanding, and had economic exposure to the equivalent of over 10 percent of CSX shares outstanding through swaps.

14.     On September 6, 2007, TCI, 3G and other investors and industry participants attended the CSX Analyst/Investor conference in New York.  At the conclusion of the conference, Mr. Hohn spoke with CSX's Chief Financial Officer, as six to eight other investors, including a representative from 3G, observed.

15.     After speaking to CSX's Chief Financial Officer, Mr. Hohn met with CSX's advisors from Evercore and Morgan Stanley, specifically Gil Ha, Nancy Bryson, Ed Mestre, and Eli Gross.

16.     On November 30, 2007, TCI moved 10,000 physical shares from its account at UBS to Goldman.

17.     During the first week of February 2007, before 3G made an investment in CSX, Daniel Schwartz of 3G contacted CSX's investor relations department seeking information about the company.

18.     By May 25, 2007, 3G held 19,407,894 shares of CSX common stock in its account at Morgan Stanley.

19.     In order to verify to CSX that 3G was indeed a substantial shareholder in the company, at CSX's request, 3G caused its broker, Morgan Stanley, to send CSX an account

statement on May 25, 2007 demonstrating that Morgan Stanley held 19,407,894 CSX shares on behalf of 3G in a brokerage account.  Thereafter, CSX agreed to schedule an in-person meeting with 3G.

20.    On June 11, 2007, David Baggs and Oscar Munoz from CSX met with Mr. Behring and others from 3G at 3G's New York office.  3G informed them that it would be making an HSR filing.

21.    3G made its HSR filing on June 13, 2007.

22.    On October 16, 2007, TCI sent a letter to the Board of Directors of CSX, which it publicized.

23.    On October 22, 2007, TCI followed up with a second letter to CSX's Board.

24.    The Board responded to TCI's letter on November 16, 2007.

25.    On December 19, 2007, TCI and 3G each filed a Schedule 13D with the Securities and Exchange Commission disclosing that they and several individuals had formed a group ("Group") with respect to acquiring, holding, voting or disposing of CSX shares.

26.    The 13D filing disclosed that on December 12, 2007, TCIF UK and 3G Ltd. entered into an agreement to coordinate certain of their efforts with regard to (i) the purchase and sale of securities held by TCIF UK, 3G Ltd. and any investment funds, managed accounts and other investment vehicles managed or advised by either of them, including the other TCI and 3G defendants, and (ii) the proposal of certain actions and/or transactions to CSX.

27.    The Group also disclosed that it intended to conduct a proxy solicitation seeking to elect a slate of five nominees to the Board of Directors of CSX at CSX's 2008 Annual Meeting of Shareholders.  The five nominees are Mr. Hohn, Mr. Behring, Gilbert Lamphere ("Mr. Lamphere"), Timothy T. O'Toole ("Mr. O'Toole"), and Gary L. Wilson ("Mr. Wilson").

28.    TCI and 3G further disclosed that the Group owned, in the aggregate, 8.3% of the CSX shares outstanding.  Specifically, it was disclosed that as of the close of business on December 18, 2007, TCI owned 17,796,998 shares, then constituting approximately 4.2% of the CSX shares outstanding,  3G owned an aggregate of 17,232,854 shares, constituting approximately 4.1% of the CSX shares outstanding, Mr. Lamphere owned an aggregate of 22,600 shares, constituting less than 0.1% of the CSX shares outstanding, and Mr. O'Toole owned an aggregate of 2,500 shares, then constituting less than 0.1% of the CSX shares outstanding.

29.    Finally, TCI and 3G disclosed that the Group held cash-settled total return equity swaps providing economic exposure equivalent to a then additional 11.8% of the CSX shares outstanding.  TCI and 3G did not attach copies of the written ISDA contracts and trade confirmations that constitute the swap agreements to the 13D filings.

30.    On or about November 6 and 13, 2007, Gil Lamphere purchased 22,600 shares of CSX stock.  3G entered into a nominee agreement with Mr. Lamphere on December 10, 2007.

31.    On or about December 6, 2007, Timothy O'Toole purchased 2,500 shares of CSX common stock.  He entered into a nominee agreement with TCI on December 10, 2007.

32.    On January 8, 2008 defendants TCI and 3G submitted a Stockholder Notice of Intent to Nominate Persons for Election as Directors to CSX Corporation.

33.    On January 21, 2008 and January 25, 2008, TCI and 3G sent two supplemental notices to CSX regarding their intent to present a proposal to amend the Bylaws of CSX at the 2008 annual meeting to allow shareholders holding 15% of all the CSX shares outstanding to be able to call a special meeting.

34.    In the January 21, 2008 and January 25, 2008 notices, TCI Fund incorporated the information provided in the January 8 notice concerning its beneficial ownership.

35.     Under the current CSX Bylaws, a shareholder must notify the company with regard to any matter it wishes to raise at the annual meeting no less than 90 days prior to the one year anniversary of the previous year's annual meeting date (the "Notice Period").

36.     In the case of the 2008 annual meeting, the last day of the Notice Period was February 2, 2008.

37.     On March 10, 2008, TCI and 3G filed their preliminary proxy statement on Schedule 14A.  On April 15, 2008, TCI and 3G filed a revised preliminary proxy statement on Schedule 14A, and on April 28, 2008, TCI and 3G filed a definitive proxy statement on Schedule 14A, which they state they began mailing to shareholders on or about May 2, 2008.

38.     TCI and 3G stated in the definitive proxy statement that they were soliciting votes for the 2008 Annual Meeting to elect Mr. Hohn, Mr. Behring, Mr. Lamphere, Mr. O'Toole and Mr. Wilson to serve as directors of the Company.

39.     TCI and 3G's definitive proxy statement also solicits shareholders to adopt their proposal to amend the Company's Bylaws to permit one or more shareholders holding 15% or more of the outstanding shares of capital stock of CSX having voting power to call a special meeting of the shareholders, to vote against ratification the Company's alternative Bylaw amendments related to the calling of special meetings; and to adopt a resolution to repeal any changes made by the Board of Directors of CSX to the Bylaws between January 1, 2008 up to and including the date of the 2008 Annual Meeting.

40.     In their Schedules 13D and 14A defendants 3G and TCI state that they are the beneficial owners of 35,054,952, representing approximately 8.7% of the CSX shares outstanding.  Defendants disclose that they have economic exposure to an additional approximately 12.3 percent of CSX's shares through cash-settled total return equity swap

agreements and disclaim beneficial ownership of any shares referenced in those swap agreements.

### Stipulated Facts Relating to the Counterclaims against CSX and Mr. Ward

41.     CSX filed its preliminary proxy statement with the SEC on February 21, 2008, revised preliminary proxy statements on February 22, 2008 and April 17, 2008 and its definitive proxy statement (the "CSX Proxy") on April 25, 2008.

42.     The CSX Proxy includes disclosure of management compensation, including of the company's Long Term Incentive Plan ("LTIP") that covers the years 2007-2009 (the "2007-2009 LTIP").  The 2007-2009 LTIP covers CSX's Named Executive Officers ("NEOs") and over 600 additional management employees.

43.     The NEOs are CEO Michael Ward, CFO Oscar Munoz, COO Tony Ingram, Senior Vice-President, General Counsel and Corporate Secretary Ellen Fitzsimmons and CCO Clarence Gooden.

44.     Under the 2007-2009 LTIP, the Compensation Committee approved a dollar value schedule of incentive compensation granted to each salary band level.

45.     The information was also announced by CSX's CFO Oscar Munoz during his presentation at the May 8, 2007 Bear Stearns conference in New York.

46.     Article II, Section 2(b) of the CSX Bylaws provides that directors must "comply with all applicable corporate governance, conflict of interest, confidentiality and securities ownership and trading policies and guidelines of the Corporation[.]"

47.     CSX's Insider Trading Policy provides that "[n]o CSX officer, employee or director . . . may purchase, sell or otherwise conduct transactions in any CSX security while he or she is aware of material nonpublic information about CSX."

48.      On February 4, 2008, the Board adopted an amendment (the "February Amendment") to the CSX Bylaws that permits shareholders of record who hold 15% of CSX common stock to call a special meeting for certain purposes.  It does not permit shareholders to call a special meeting for any purpose that: (i) has been addressed in the last 12 months, or (ii) will be addressed at an annual meeting to be held within the next 90 days.

49.      At CSX's June 25, 2008 shareholder meeting, CSX shareholders will be presented with a management proposal seeking shareholder ratification of the February Amendment.

50.      Starting shortly after December 19, 2007, Edward Kelly, the presiding director of the CSX Board had a series of meetings, email communications and telephone communications with Mr. Hohn of TCI.

51.      One purpose of those communications was to assess whether a solution could be obtainable that would avoid a proxy fight.

52.      On March 5, 2008, Mr. Amin and Mr. Ward both testified at a Congressional hearing held before the Committee on Transportation and Infrastructure.

53.      On March 17, 2008, CSX filed this lawsuit, and filed as proxy solicitation materials under Rule 14a-12, a press release announcing the lawsuit.  In that press release, Edward J. Kelly III, Presiding Director of the CSX Board, is quoted as saying that "in an effort to avoid the disruption and expense of a proxy contest we've spoken with TCI on a number of occasions in an attempt to find common ground.  Based on these conversations the [CSX] Board concluded that TCI is not simply interested in having a representative voice on the Board, but is instead seeking to achieve effective control of the CSX Board of Directors and dictate Company strategy."

54. The March 17, 2008 release also quotes Mr. Ward as representing that CSX "filed this suit against TCI and 3G to ensure that all of our shareholders receive complete and accurate information about the group's holdings, agreements, plans and motivations to which they are entitled under federal securities laws."

55. On March 17, 2008, CSX also filed as additional soliciting material under Rule 14a-12, an editorial by Michael Ward, entitled "Rewards for Railroads," that was published in the *Washington Times* on March 11, 2008.

## IV.    PARTIES' CONTENTIONS

The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties:

### A.    <u>CSX's Claims</u>

#### 1.    <u>Plaintiff's Contentions</u>

Plaintiff contends that Defendants are liable and that Plaintiff is entitled to relief on each of four separate causes of action as follows, for which a brief description of Plaintiff's evidence is described below.

##### (a)    **Violations of Section 13(d) of the '34 Act**

Defendants violated Section 13(d) of the Securities Exchange Act of 1934, as amended (the " '34 Act") and the rules and regulations thereunder by (a) failing timely to file a Schedule 13D; and (b) filing a materially false, misleading and incomplete Schedule 13D on December 19, 2007 (the "Schedule 13D").

Defendants failed timely to file a Schedule 13D because they failed to file within ten days after they became beneficial owners of more than five percent of the outstanding shares of CSX common stock both (a) individually (in the case of TCI) and (b) as a group.  15 U.S.C.

§ 78m(d)(1)(D) (1994); *Morales v. Quintel Ent't, Inc.*, 249 F.3d 115, 123 (2d Cir. 2001).  These

failings permitted Defendants to acquire beneficial ownership of twenty percent of CSX's

common stock and coordinate efforts to influence or change control of the board and

management for months in secret.  *SEC v. First City Fin. Corp.*, 688 F. Supp. 705, 724 (D.D.C.

1988), *aff'd*, 890 F.2d 1215 (D.C. Cir. 1989) (finding that a "surreptitious effort to accumulate a

block of shares . . . is the precise type of evil which Section 13(d) was directed to prevent"); *GAF

Corp. v. Milstein*, 453 F. 2d 709, 717 (2d Cir. 1971) ("[T]he purpose of section 13(d) is to alert

the marketplace to every large, rapid accumulation of securities, regardless of technique

employed, which might represent a potential shift in corporate control . . .").

       ***Failure Timely to File by TCI Individually.***  TCI is or was the beneficial owner

of the shares referenced in its swap agreements, pursuant to Rule 13d-3 for at least the following

reasons:  *First*, TCI, directly or indirectly, has or had voting or investment power regarding the

CSX securities referenced in its CSX swaps.  *Second*, TCI has or had the right to (a) acquire

voting or investment power regarding the CSX securities referenced in its swaps within sixty

days pursuant to TCI's power to terminate its swap arrangements at any time; and (b) even if TCI

did not have the right to acquire voting or investment power within sixty days, it had the right to

acquire such power beyond 60 days, and it entered into its swap arrangements with the purpose

or effect of changing or influencing control of CSX.  *Third*, TCI, directly or indirectly, created or

used its swap arrangements with the purpose or effect of divesting TCI of beneficial ownership

of CSX securities or preventing the vesting of such beneficial ownership as part of a plan or

scheme to evade the reporting requirements of Section 13(d) of the Exchange Act.

       *First*, as a result of the swap and other arrangements between TCI and its various

counterparties, TCI, directly or indirectly, has or had investment power or voting power with

respect to the CSX shares referenced in the swaps.  17 C.F.R. § 13d-3(a).  TCI had investment

power over the CSX shares because TCI's swap arrangements gave TCI the ability effectively to

determine the timing and size of the acquisition, holding, and disposition of matching CSX

shares by its swap counterparties.  *SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 607

(S.D.N.Y. 1993); *see also Calvary Holdings, Inc. v. Chandler*, 948 F.2d 59, 64 (1st Cir. 1991).

TCI had that ability because, TCI counterparties holding large CSX swap positions had to, as a

practical matter, hedge their exposure to CSX swaps with matching CSX shares; (b) TCI

counterparties hedged CSX swaps with matching shares; (c) upon termination of large swap

positions, the counterparties had no practical choice but to sell the matching shares, which is

what the counterparties did here.

     As a practical matter, no counterparty bank to any large position of swaps in CSX

shares (like those involved in this case) would hedge any other way than by purchasing matching

physical shares of CSX stock.  Indeed, for each of the counterparties that has produced relevant

documents in this litigation, each one hedged its swaps by acquiring physical shares.  Even

without that proof, the overall pattern in each of the counterparties holdings as reported in its

public filings demonstrate that all of the counterparties hedged with matching shares.  Thus, upon

entering into swaps with a counterparty, TCI effectively determined that the counterparty would

immediately acquire a hedged position in physical shares of CSX.

     Similarly, upon termination of the swaps, the counterparties are, as a practical

matter, economically required to dispose of the shares previously acquired and held as a hedge to

the swap transactions.  Again, that is precisely what occurred here with respect to each of the

counterparties.  Moreover, all the swap contracts between TCI and its counterparties provide for

early termination of swaps by TCI at any time.  Thus, TCI has the ability effectively to determine

not only the disposition of shares by the counterparties but also the specific quantity and timing of that disposition.

TCI's investment power also provides it with an added benefit, namely that TCI obtains an informational advantage over all other market participants because it is aware, in advance, of the number of shares the counterparties will be selling and the timing of that sale such that TCI can acquire shares at a lower cost and without much market impact. Indeed, it appears from TCI's trading records that on five trading days, TCI purchased shares equal to approximately 101% of the amount of swaps TCI unwound. In addition, on several of the purchase dates, TCI purchased a similar number of CSX shares as were sold by the counterparties within several cents of the prices at which the counterparties unwound. TCI has benefited from its failure to disclose its investment power.

Moreover, TCI's swap arrangements also gave TCI voting power because TCI had the ability significantly to influence the voting of the shares. *Wellman v. Dickinson*, 682 F.2d 355, 366-67 (2d Cir. 1982). For example, in acquiring CSX shares as a hedge for the CSX swaps, TCI counterparties, by definition, acquired the actual right to vote the shares, which travels with the physical share itself. Thus, by entering into the swaps TCI had the ability to determine the identity of the vote holder, effectively placing shares and their corresponding voting rights in the hands of the counterparties, as opposed to the hands of whoever else would have otherwise held the shares. This is important as certain types of shareholders vote certain predictable ways in contests for corporate control.

TCI also has the ability significantly to influence the voting of the matching shares during the term of a CSX swap based on understandings and relationships with counterparty banks that extend beyond the execution of the swap in question. For example, four of the

counterparties here are prime brokers to TCI.  Moreover, in addition to prime brokerage

relationships, Deutsche Bank, an important counterparty in this case, holding swaps referencing

more than 28.4 million shares, had relationships with TCI even above and beyond its prime

brokerage relationship with TCI.  TCI intended to try to convince Austin Friars Capital, a

proprietary trading desk of Deutsche Bank, to support TCI because TCI thought that it would be

helpful to persuade Deutsche Bank to vote for TCI if Deutsche Bank's own hedge fund were to

vote that way.

       *Second*, even if TCI did not have investment or voting power over the CSX shares

referenced by its swaps at a specific moment in time, it had the right, within sixty days—indeed

at any time—to acquire those powers or the shares underlying the swaps, for the same reasons

discussed above, including with respect to the counterparties' economic incentives to hedge by

acquiring matching shares upon entering into the swaps and disposing of the shares upon

termination.  17 C.F.R. § 13d-3(d)(1)(i).  Indeed, TCI represented that it had the right to acquire

investment or voting power over the CSX shares or the shares themselves.  For example, TCI

represented to CSX that it owned between 10 and 14 percent of CSX through the swap

arrangements, and that if CSX did not immediately announce a 20% stock repurchase, there

would be "no limits" to what TCI would do.  Moreover, TCI claimed it could "convert at any

time" its swap position into direct ownership of shares.

       Even if TCI did not have the right to acquire those powers or the shares within

sixty days,  it acquired their interests in CSX—including their economic exposure to shares of

CSX common stock by way of their swap arrangements—with the purpose or effect of changing

or influencing the control of CSX.  17 C.F.R. § 13d-3(d)(1)(i).  Defendants formulated plans to

effect a leveraged buyout transaction involving CSX or, failing that, an extraordinary leveraged

share repurchase. Further, Defendants aimed to influence CSX's strategy and urged other major changes in CSX's business and structure, including demands that CSX increase the prices it charges to customers, demands to limit capital expenditures associated with increased capacity and attempts to dictate CSX's management of its regulatory affairs. TCI told CSX representatives that, in addition to other demands, TCI "would seek to replace the entire Board as a means to change management" and that TCI's objective was "to find management that would be more open to leveraging [CSX]". Indeed, Defendant Christopher Hohn himself stated that the reason why TCI made an HSR filing in March 2007 was to try to influence management in how it runs CSX.

*Third*, even if TCI were not otherwise a beneficial owner of the CSX shares referenced in its swaps, TCI, directly or indirectly, created or used its swap arrangements with the purpose or effect of divesting TCI of beneficial ownership of CSX securities or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of Section 13(d) of the Exchange Act. *See* 17 C.F.R. § 13d-3(b); *see also First City Fin. Corp.*, 688 F. Supp. 705 (D.D.C. 1988), aff'd, 890 F.2d 1215 (D.C. Cir. 1989).

TCI used swaps as opposed to acquiring physical shares for the purpose of avoiding having to disclose their interest in CSX. For example, Joe O'Flynn, the CFO of TCI Fund, stated at a TCI Fund board of directors meeting that one of the reasons for using swaps is "the ability to purchase without disclosure to the market or the company." One of the reasons TCI wanted to conceal its interest in CSX was so that it could continue to accumulate its significant position in the company at prices that did not reflect TCI's true interest in CSX. TCI in fact took various steps calculated to conceal its investment from the market. Moreover, TCI acquired up to approximately 4.5 percent in physical CSX shares and focused on remaining

below the 5 percent disclosure threshold for its physical holdings of CSX shares but continued to accumulate swaps above and beyond 5 percent. TCI undertook to ensure that not a single additional share purchase was made so that it would avoid triggering a filing that would disclose its position.

TCI also undertook to conceal the identity and holdings of its swap counterparties. TCI inquired "on a no names basis" to the counterparties as to each of their respective filing requirements with respect to percentage holdings in CSX outstanding shares. TCI assumed that the counterparties to its swap agreements would hedge their exposure with physical shares, and as a result, TCI was "concerned" that some of the counterparties could cross the 5 percent threshold, which would alert the market to TCI's investment in CSX and damage TCI's ability to invest at attractive pricing in a security. In order to try to allay those concerns, TCI planned to and did in fact maintain a diversified CSX swap position among seven counterparties to avoid any one crossing 5 percent of CSX's outstanding shares as a result of TCI's swap position.

Even after TCI consolidated its swap position with Deutsche Bank and Citigroup, it maintained de minimis swap positions with six other counterparty banks in order to avoid disclosing the identity of its primary swap counterparties to conceal from the market any link between TCI and a counterparty that could be used to discern TCI's trading activity.

Because TCI had voting or investment power over the CSX shares; the right to acquire that power over those shares; and engaged in a plan or scheme to evade the reporting requirements, TCI was a beneficial owner of more than five percent of CSX shares outstanding as of December 6, 2006, the date on which TCI had accumulated 5.20% of CSX in its swaps, over a year before TCI actually filed its 13D (which even then disclaimed beneficial ownership

over TCI's present 11.8 percent swap position on top of its approximately 4.4 percent physical share position).

        ***Failure Timely to File as a Group.***  TCI and 3G are or were the beneficial owners of the shares referenced in their swap agreements, pursuant to Rule 13d-5, for at least the following two reasons:  *First*, TCI and 3G and each of their respective swap counterparties acted together in connection with their swap arrangements for the purpose of acquiring, holding, voting or disposing of CSX securities.  *Second*, TCI and 3G acted together for the purpose of acquiring, holding, voting or disposing of CSX securities prior to December 12, 2007, the date on which TCI and 3G admit to having formed a group.  *See* 17 C.F.R. § 240.13d-5(b)(1); *see also Roth v. Jennings*, 489 F.3d 499, 507-08 (2d Cir. 2007); *Quintel Ent't*, 249 F.3d at 123-24.

        *First*, TCI entered into swap arrangements and began accumulating swap positions with respect to CSX shares with the TCI counterparties beginning in late 2006, and 3G began to do so in late 2007.  Pursuant to those arrangements, TCI and 3G and their respective counterparties agreed to act together for the purpose of acquiring, disposing, holding, and/or voting or the CSX shares referenced by the swap arrangements.  Accordingly, TCI and 3G should have disclosed beneficial ownership of the CSX share holdings of each of their respective counterparty banks.

        While TCI and 3G might not have had express agreements with their counterparties requiring the counterparties to hedge their position with physical shares, the counterparties had to, as a practical matter, hedge their exposure to CSX swaps with matching CSX shares.  The contracts negotiated between TCI and 3G and their counterparties contemplate that the counterparties would hedge, and, combined with the economic incentives of the counterparties, that they would do so by acquiring matching CSX shares upon entering into the

swap transaction with TCI and 3G, and TCI assumed they would.  Thus, pursuant to the swap

arrangements, TCI and 3G and their respective counterparties acted together for purposes of

acquiring shares.

By way of further example, TCI and 3G and their counterparties acted together for

purposes of disposing of CSX shares.  All the swap agreements give TCI and 3G the right to

terminate the swaps earlier than their expiration date, which TCI and 3G can exercise at any time

at their discretion.  Upon termination of CSX swaps, TCI counterparties would, and in fact, did,

dispose of the matching shares they had acquired to hedge those swap positions.  Thus, just as

TCI and 3G have the ability effectively to determine the timing and extent of counterparties'

acquisition and holding of matching shares through the initiation of the swaps, by terminating

their swap arrangements with the counterparties, TCI and 3G effectively caused their CSX swap

counterparties to dispose of the matching shares.  In terminating a swap, TCI and 3G and their

counterparties agreed to act together for the purpose of disposing of shares, including the time,

price and/or extent of that disposition.

*Second*, TCI and 3G formed a group in the spring of 2007 when they agreed to

acquire shares of CSX's common stock for the purpose of pursuing operational and structural

changes at CSX and to vote those shares to change or influence the control of CSX if those

changes were not implemented by CSX voluntarily.

TCI and 3G have a long-standing investment relationship through 3G's "Synergy"

fund, which has invested in TCI since its inception in 2004.  TCI and 3G's executives have

interacted for years because of that relationship, and 3G is privy to detailed information on TCI's

investments—including its investment in CSX—through the relationship.  Indeed, both TCI's

and 3G's principals testified that they discussed their opinions of CSX's management team and

governance throughout 2007 and exchanged financial models and analyses of CSX—models that were strikingly similar in both their criticisms of CSX and their proposed strategic alternatives for the Company.

Throughout the spring and fall of 2007, TCI and 3G engaged in parallel and coordinated activities with respect to CSX. TCI and 3G met concerning CSX at 3G's offices in New York City on March 29, 2007—the same day that TCI met with CSX in New York to discuss TCI's proposals for changes at CSX. Immediately following those meetings, 3G substantially increased its shareholdings in CSX and, within days, TCI began for the first time to convert its swaps into physical shares of CSX common stock. By April 18, 2007, TCI and 3G each owned approximately 4.2 percent of the outstanding shares of CSX common stock—an amount substantially the same as they owned at the time they eventually filed their Schedule 13D in December 2007.

Following this stock run up, TCI and 3G's conduct continued in parallel as they moved toward a proxy fight with CSX. Both TCI and 3G sought the support of other hedge funds with respect to their proposals for CSX, both reached out to the same former CSX executive to gather inside information concerning the Company and both began a simultaneous search for nominees to run for election to CSX's board of directors. Despite this, both TCI and 3G make the incredible claim that they did not decide to form a group until December 2007—the eve of the opening of the window under the CSX Bylaws for making shareholder proposals including nominating persons for election as directors at the Annual Meeting.

TCI's and 3G's relationship, interactions and parallel conduct all support an inference that TCI and 3G agreed to acquire CSX stock to further their common plans to implement change at CSX and ultimately to pursue a proxy contest if necessary. *Morales*, 249

F.3d at 124.  Accordingly, TCI and 3G formed a group for purposes of Section 13(d) in the

spring of 2007.  *Id.*; *Roth*, 489 F.3d at 507-08.  Given that the combined holdings of shares alone

as of that time exceeded five percent, and TCI and 3G each should have disclosed the group and

beneficial ownership over its and the other's shares.

   ***Materially False and Misleading 13D.***  The Schedule 13D is materially false,

misleading and incomplete because it:  (a) fails accurately to disclose Defendants' beneficial

ownership of CSX common stock by falsely disclaiming beneficial ownership of shares

associated with total return swaps; (b) fails to disclose information concerning contracts,

arrangements, understandings or relationships among Defendants and between Defendants and

other persons with respect to any securities of CSX; (c) fails to disclose Defendants' plans or

proposals with respect to their interest in CSX; (d) contains other false statements concerning (i)

the date that the Defendants formed a group (as defined by Section 13(d)(3) of the '34 Act), (ii)

each of the defendant's disclaimers of beneficial ownership of the shares owned by other

members of the defendant group, and (iii) the source of funds used to acquire Defendants'

interest in CSX; and (e) fails otherwise to meet the requirements of Schedule 13D by (i) not

sufficiently describing the material terms of Defendants' equity and credit default swap

arrangements, and (ii) not filing copies of the swap contracts and nominee agreements as exhibits

to the Schedule 13D.  *See Quintel Ent't*, 249 F.3d at 123 (citing 15 U.S.C. § 78m(d)(1)(A)-(E);

17 C.F.R. § 240.13d-101 (Schedule 13D)).

    In the Schedule 13D, for example, Defendants state that TCI is the beneficial

owner of 17,796,998 shares of CSX common stock, that 3G is the beneficial owner of

17,232,854 shares and that Defendants' group beneficially owns, in the aggregate, 35,054,952

shares, representing, as of February 15, 2008, approximately 8.7% of CSX's outstanding

common stock.  Defendants also state in the Schedule 13D that they do not beneficially own any shares of CSX as a result of their economic exposure to CSX shares through swaps.  Defendants further state that the swaps "do not give [TCI or 3G] direct or indirect voting, investment or dispositive control over any securities of CSX and do not require the counterparties thereto to acquire, hold, vote or dispose of any securities of [CSX]."  As discussed above, however, TCI did have beneficial ownership of the shares referenced in its swaps and thus its statement to the contrary is materially misleading.  17 C.F.R. § 13d-101 (Schedule 13D, Item 5).

Moreover, Defendants misrepresent the formation of the group and the beneficial ownership of the group members' shares.  In the Schedule 13D, Defendants state that TCI and 3G formed a group for purposes of coordinating certain of their efforts with regard to their interests in CSX on December 12, 2007.  In fact, as discussed above, TCI and 3G began to coordinate efforts with respect to their interest in CSX before December 12, 2007.  Indeed, 3G has had an investment relationship with TCI since 2004; TCI and 3G communicated and exchanged opinions and analyses concerning CSX throughout 2007; TCI and 3G adopted parallel investment and strategic plans for CSX; and TCI and 3G intentionally delayed "formalizing" their agreement long after they began coordinating efforts with respect to CSX.  In addition, Defendants' disclaimer of beneficial ownership over other members' shares is misleading.  When Defendants agreed to act together for the purposes of acquiring, holding, voting, or disposing of CSX securities, the group formed thereby, by operation of law, acquired beneficial ownership as of the date of their agreement of all CSX securities beneficially owned by any group member.  17 C.F.R. §§ 13d-3(c), 13d-5(b)(1).

Defendants also failed properly to disclose other arrangements, understandings and relationships with respect to CSX.  17 C.F.R. § 13d-101 (Schedule 13D, Item 6).  Defendants

state that they have "no contracts, arrangements, understandings or relationships (legal or otherwise) . . . with respect to any securities" of CSX except as described elsewhere in the Schedule 13D. In fact, Defendants have various undisclosed arrangements, understandings and relationships with other persons, including each of the counterparties with respect to their interest in CSX.

Moreover, Defendants failed to disclose the material terms of the swap arrangements (e.g., their termination provisions, the basis price of the referenced shares, the number of CSX shares referenced in each individual swap as well as the aggregate number of CSX shares referenced in Defendants' overall swap position), and did not file copies of the agreements governing their swaps as exhibits to the Schedule 13D. 17 C.F.R. § 13d-101 (Schedule 13D, Items 6 and 7). Moreover, Defendants failed to disclose the material terms of the credit default swap arrangements that they had regarding CSX, which would have informed shareholders that Defendants took a position that effectively was a bet against the company's value as a way to hedge their own position against or to profit from or hedge against any decrease in CSX's credit ratings and/or stock price.

Finally, Defendants failed to disclose their plans or proposals for major changes in CSX's business and structure. 17 C.F.R. § 13d-101 (Schedule 13D, Item 4). Defendants state that they "originally acquired [shares of CSX stock] for investment in the ordinary course of business". In fact, as described above, Defendants acquired their interests in CSX with the purpose or effect of changing or influencing the control of CSX, formulated a plan to effect an LBO involving CSX or, failing that, an extraordinary leveraged share repurchase and developed proposals for other major changes in CSX's business and structure and acquired credit default

swaps referencing CSX securities to hedge their interests in CSX and engaged in other hedging transactions with respect to their CSX shares.

### (b)    Violations of Section 14(a) of the '34 Act

Defendants violated Section 14(a) of the '34 Act and the rules and regulations thereunder by filing false, misleading and incomplete preliminary proxy statements on Schedule 14A on March 10, 2008 and April 15, 2008, and a definitive proxy statement on Schedule 14A filed on April 28, 2008 (collectively, the "Schedule 14A").

The Schedule 14A is materially false, misleading and incomplete because it: (a) fails accurately to disclose Defendants' beneficial ownership of CSX common stock by falsely disclaiming beneficial ownership of shares associated with total return swaps; (b) fails to disclose information concerning contracts, arrangements, understandings or relationships among Defendants and between Defendants and other persons with respect to any securities of CSX; (c) contains other false statements concerning the date that Defendants formed a group (as defined by Section 13(d)(3) of the '34 Act); and (d) fails otherwise to meet the requirements of Schedule 14A by (i) not sufficiently describing the material terms of defendants' equity and credit default swap arrangements and (ii) not reporting all transactions over the previous 2 years associated with the swap arrangements that reference CSX securities.

Defendants violated Section 14(a) by filing materially a misleading Schedule 14A for several of the same reasons their Schedule 13D disclosures were materially misleading, including failure to disclose:  their beneficial ownership of shares referenced by swaps, formation of Defendants' group, beneficial ownership of group members' shares, and the material terms of the equity and credit default swap arrangements.  They falsely state that, other than as disclosed

in the Schedule 14A, neither the TCI/3G Group nor any of them "is, nor was within the past year, party to any contract, arrangement or understanding with respect to any securities of [CSX]".

In addition to compounding several of the Schedule 13D violations in the Schedule 14A, Defendants also violated Section 14(a) in two other ways. In the Schedule 14A, Defendants make statements about discussions between Mr. Hohn and CSX's Presiding Director, Edward Kelly III. Defendants state that "TCI made concessions with the hope of being able to reach an amicable resolution" and that TCI "indicated willingness to sign a one year stand-still agreement". In fact, before the outset of negotiations with Mr. Kelly, TCI took the position that "[t]he only alternative to the proxy fight is if [CSX] will allow our 5 nominees on and we can mutually agree with them which 5 of their directors to replace". Further, before the issue of a standstill ever came up, on January 17, 2008, Mr. Hohn told Mr. Kelly that TCI would not accept any sort of standstill as part of any agreement. Mr. Hohn only suggested a one-year standstill in a call to CSX's financial advisor <u>after</u> negotiations had terminated.

In addition, in the Schedule 14A, Defendants purport to set forth the two-year histories of each of their transactions in CSX securities. Defendants do not disclose any history of swap transactions that reference shares of CSX common stock or any information concerning renewals and extensions of the terms thereof or dates on which such swaps were settled.

(c)     **Violations of Section 20(a) of the '34 Act**

Defendants Christopher Hohn, Snehal Amin and Alexandre Behring (the "Individual Defendants") are individually liable for the foregoing violations of Sections 13(d) and 14(a) of the '34 Act because they are controlling persons pursuant to Section 20(a) of the '34 Act, which provides for joint and several liability for anyone directly or indirectly controlling any person liable for violating the Exchange Act or the rules and regulations

promulgated thereunder.  15 U.S.C. § 78t(a); *see also ATSI Commc'ns Inc. v. Shaar Funds, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

The Individual Defendants maintained discretionary authority to control or influence the conduct of TCI, 3G and the defendant group and did, in fact, control or influence the conduct of TCI, 3G and the defendant group, including the foregoing violations of Sections 13(d) and 14(a).  The Individual Defendants, in controlling TCI, 3G and the Group, were culpable participants in the primary violations, which is all that is required under Section 20(a). Mr. Hohn and Mr. Behring signed the SEC filings at issue on behalf of their respective entities. Mr. Hohn signed TCI's Hart-Scott-Rodino notice in March 2007 and instructed others that this meant TCI intended to attempt "to try to influence management in how [CSX] is run". Messrs. Hohn and Amin were primary players in making or prompting contacts with CSX on behalf of TCI; both signed numerous letters written to CSX and to the Board and authored e-mail communications to CSX.  With respect to 3G, Mr. Behring signed 3G's Hart-Scott-Rodino notice in June 2007 and was the 3G representative who announced to CSX that 3G intended to make that filing.  It was Mr. Behring's decision that 3G would offer Mr. Behring himself as a Board nominee.   Finally, Defendants have admitted that Messrs. Hohn and Behring are deemed to "share beneficial ownership of the [CSX] Shares owned by" TCI and 3G, respectively.

**(d)    Failure of Notice of Proposed Director Nominees and Bylaw Amendments to Comply with CSX's Bylaws**

On January 8, 21 and 25, 2008, Defendants supplied to CSX purported Notices of their intent to nominate five persons for election to the CSX board of directors at the 2008 annual meeting of shareholders and to propose amendments of the CSX Amended and Restated Bylaws ("Bylaws").  Defendants also filed with the SEC numerous other submissions relating to

Defendants' nominated persons and proposed amendments, in the Schedule 13D and 14A filings.

Defendants' Schedules 13D and 14A concerning their intent to nominate persons for election to

the CSX Board and to amend CSX bylaws fail to comply with Article I, Section 11(a)(ii) of

CSX's Bylaws and violate Virginia law.

Article I, Section 11(c)(1) of CSX's Bylaws governs the way in which a

shareholder may bring a nomination or other business before an annual meeting.  That provision

provides:

> "Only such persons who are nominated in accordance with the
> procedures set forth in this Section 11 shall be eligible at an annual or special
> meeting of shareholders of the Corporation to serve as directors and only such
> business shall be conducted at a meeting of shareholders as shall have been
> brought before the meeting in accordance with the procedure set forth in this
> [section]".

Article I, Section 11 of the Bylaws also requires advance notice of nominations

and shareholder business; moreover, the notice must be timely and set forth pertinent information

set forth in Article I, Section 11(a)(ii), including:  (i) the name and address of any beneficial

owner on whose behalf the nomination or proposal is made; (ii) the class and number of shares of

capital stock of CSX that are owned beneficially and of record by such shareholder and such

beneficial owner; (iii) all information relating to each person whom the shareholder proposes to

nominate for election as a director that is required to be disclosed in solicitations of proxies for

election of directors in an election contest, or is otherwise required in each case pursuant to the

'34 Act; and (iv) any material interest in other proposed business of such shareholder.

Defendants are bound by the terms of the CSX Bylaws with respect to the matters contemplated

therein.

Defendants disclaim beneficial ownership over the shares held by the counterparties. As discussed above, however, TCI did have beneficial ownership of the shares referenced in its swaps and thus its statement to the contrary is false. Thus, the notices of intent and disclosures submitted by Defendants violate CSX's Bylaws, and consequently Virginia law, because they failed to accurately report the number of shares of capital stock of CSX that Defendants beneficially owned.

**2.      Defendants' Contentions**

**(A)      Defendants' Contentions As To The Facts Relating To The Complaint**

**(a)      TCI's Swap Agreements Referencing CSX Shares and TCI's Ownership of CSX Stock**

1.      Beginning on October 20, 2006, TCI began entering into cash-settled total return equity swap ("Total Return Swap") agreements that reference CSX common stock.

2.      Each Total Return Swap agreement is a private contract between TCI and a counterparty pursuant to which TCI has taken a "synthetic position" with reference to CSX common stock. Under those contracts, TCI receives cash payments in an amount equal to any dividend payments and increases in the price of CSX common stock (and makes cash payments in an amount equal to any decreases in the price of CSX common stock) over the time period during which the swap agreement is in effect. The swap counterparty, in exchange, receives from TCI a specified fixed or floating cash flow that is unrelated to the ultimate performance of CSX common stock. Although TCI's counterparties to the Total Return Swap agreements may have purchased shares in

CSX in order to hedge their risk, the agreements do not require that the counterparty acquire CSX common stock as a hedge. Under the terms of TCI's swap agreements, the beneficial ownership of any CSX common stock (or, for that matter, any other asset) with which a counterparty bank chooses to hedge rests with the counterparty bank.

      3.     During the period from October 20, 2006 to April 2, 2007 (the "Initial Period"), TCI entered into Total Return Swap transactions with seven different banks: Citigroup Global Markets Limited ("Citigroup"), Credit Suisse Securities (Europe) Limited ("Credit Suisse"), Deutsche Bank AG ("Deutsche Bank"), Goldman Sachs International ("Goldman"), Merrill Lynch International ("Merrill Lynch"), Morgan Stanley & Co. International Limited ("Morgan Stanley"), and UBS AG ("UBS"). The parties have stipulated that TCI's trading activity is accurately reflected in Amin Exhibit 1.

      4.     During the Initial Period, TCI accumulated Total Return Swaps referencing the equivalent of 61,627,400 shares of CSX common stock, which, as of April 3, 2007, had a notional value of over $2.5 billion. The shares referenced by TCI's Total Return Swaps represented the equivalent of 14.02% of CSX's outstanding common stock.

      5.     TCI did not enter into Total Return Swap transactions in order to gain control of CSX. On the contrary, when TCI first started entering into swaps referencing CSX common stock, it had developed an investment thesis that CSX was a cash flow stable business with a pricing opportunity.

6.      TCI made continuing efforts to develop an understanding of CSX's business record and, in December 2006 and January 2007, attempted to engage CSX in a dialogue about operational opportunities for the company.

7.      CSX was not responsive to TCI's attempts at dialogue. TCI repeatedly requested a meeting with the President, CEO and Chairman of the Board of CSX, Michael Ward, but TCI was told that Mr. Ward was too busy to meet with it.  In December 2006 and January 2007, TCI requested a meeting with CSX senior management.  At the request of CSX, TCI met instead with CSX's financial advisors from Morgan Stanley in New York, on January 22, 2007.  At that meeting, TCI told Morgan Stanley that its interest in CSX was through cash-settled total return swaps.

8.      In a March 8, 2007 letter, Mr. Amin told Messrs. Ward and Munoz that they should have received TCI's notice of an HSR filing.

9.      After TCI made its HSR filing, the Chief Financial Officer of CSX, Oscar Munoz, agreed to meet with TCI.  At that meeting on March 29, 2007, Mr. Munoz informed TCI that the meeting was on a "listen-only" basis, meaning that CSX would not comment on what TCI said.  TCI reiterated that its exposure to CSX was in the form of cash-settled swaps.

10.      Following the expiration of the HSR waiting period, TCI began to terminate a portion of its swap position and make purchases of physical shares in the open market.  By May 14, 2007, TCI had terminated swap agreements referencing 13,255,400 shares of CSX stock and accumulated physical shares, equal to approximately 4.1% of CSX's outstanding shares.

11.     All of TCI's common stock purchases were made in the open market and at no time did TCI use the same financial institution to both unwind its Total Return Swaps and purchase CSX common stock.  All of TCI's purchases of CSX common stock were funded from general working capital of TCI.

12.     Because of TCI's growing concern regarding the stability of investment banks as a result of the U.S. financial industry crisis that began in the summer of 2007, beginning on November 12, 2007, TCI reduced its credit exposure to investment banks by terminating Total Return Swaps with certain broker-dealer counterparties and entering into additional Total Return Swaps with counterparties whose credit was backed by central banks, in particular, Deutsche Bank and Citigroup.  As of the end of 2007, TCI's Total Return Swaps (the vast majority of which were at Deutsche Bank and Citigroup) referenced shares representing the equivalent of 11.04% of CSX's total outstanding common stock.

13.     Although UBS was the initial clearing broker for all of TCI's physical shares, on November 30, 2007, TCI moved 10,000 shares to Goldman in order to convert them into record ownership form.

14.     At no time did any of the counterparties have any contract, agreement, arrangement, understanding, or relationship with TCI with respect to shares of CSX common stock held as a hedge to the Total Return Swaps including, without limitation, any contract, agreement, arrangement, understanding, or relationship with regard to the actual or proposed voting of any such CSX shares, directing the voting of any such CSX shares, or the actual or

proposed transfer or sale of any such CSX shares.  Furthermore, at no time did anyone from TCI request, directly or indirectly, that any counterparty take, or refuse to take, any action with respect to any of the shares referenced in the Total Return Swaps.

      **(b)**      **TCI's Investments in CSX Have Long Been a Matter of Public Record and Known to CSX**

15.    Both CSX and the market have long been aware that TCI has derivative and common stock positions in CSX.

16.    Beginning in late December 2006, TCI disclosed the existence of its Total Return Swaps and the counterparties to those agreements in conversations with CSX management.  On April 18, 2007, CSX filed a Form 10-Q, in which it informed the market that TCI held "a significant economic position through common stock ownership and derivative contracts tied to the value of CSX stock."

17.    In Form 13-F disclosures filed with the SEC on May 15, August 14, and November 14, 2007, TCI reported that it had investment discretion over 17,796,998 shares of CSX common stock.  Furthermore, on October 16, 2007, TCI wrote a public letter to the CSX Board of Directors in which TCI stated that it "currently owns 17.8 million shares, or 4.1% of CSX . . . mak[ing] TCI one of CSX's largest shareholders."

18.    The December 19, 2007 Schedule 13D that TCI and 3G Capital Partners filed disclosed that the group they had formed had beneficial ownership exceeding 5% of CSX outstanding shares and that TCI had Total

Return Swap agreements with eight credit counterparties.  In this filing, TCI's

Total Return Swaps were accurately described as giving TCI economic exposure

to approximately 11% of the total outstanding shares in CSX, but without entitling

TCI to direct or indirect voting, investment or dispositive control over those

shares.

19.    The January 8, 2008 notice that TCI submitted to CSX to

notify it of TCI's proposed slate of directors, (the "January 8 Notice") provided

details of TCI's ownership interest in CSX common stock and also disclosed

TCI's Total Return Swap positions.  Moreover, the director nominee

questionnaire submitted with the January 8 Notice on behalf of Christopher Hohn

discloses TCI's ownership of cash-settled total return swaps with respect to

46,401,000 CSX shares.

20.    Plaintiff alleges that TCI stated that it could "convert at any

time" its Total Return Swaps into physical shares of CSX.  (Complaint  62(a).)

TCI representatives do not recall making such a statement, but even if TCI made

such a statement, its meaning is different than what CSX implies.  TCI does not

now have -- and never had -- the right to settle directly with counterparties to its

swap agreements any physical shares that may have been used to hedge either

under the terms of its swap agreements or through other understandings or

arrangements with its swap counterparties.

**(c)    3G's Investment in CSX**

21.    Defendant Alexandre Behring is the Managing Director of

3G Capital Partners Ltd.  He spent 10 years at GP Investments, Latin America's

largest private-equity firm.  From 1998 to the end of 2004, Mr. Behring was the

CEO of America Latina Logistica ("ALL"), Latin America's largest independent

railroad and logistics company, which operates more than 13,000 miles of track in

Brazil and Argentina.  He continues to serve on the Management Committee of

ALL's Board of Directors.  He is also a locomotive engineer.

22.    3G intentionally analyzed the investment potential of North

American railroads in 2005 and 2006.  In late 2006 and early 2007, as part of that

analysis, 3G identified CSX as a potential investment offering a favorable risk-

reward profile.  3G concluded that CSX's share price was less likely to decrease

and more likely to appreciate over time as compared with the other railroads.  3G

understood that CSX had a greater proportion of legacy contracts at below-market

prices that would expire and could then be re-priced over time, thereby increasing

CSX's revenues.  3G also believed that CSX had the greatest upside potential

from improving operational efficiency among the North American railroads.  In

addition to drawing upon Mr. Behring's extensive railroad experience, 3G's due

diligence also included conducting its own research and analysis, and speaking

with sell-side analysts and railroaders knowledgeable about the industry.

23.    3G began investing in CSX by purchasing physical shares

of CSX stock on the open market with a view toward establishing itself as a long

term investor.  3G continued to monitor and analyze CSX and the rail industry as

it built its stock position in the company over the ensuing months.

24.    Over time, 3G became increasingly convinced that CSX

had substantial room for improvement in pricing, capital structure, and operational

efficiency, representing the potential for positive upside in its long term share value.

25.    By May 25, 2007, 3G had acquired shares, representing approximately 4.4% of CSX's total outstanding shares.  All of 3G's purchases of CSX stock were funded from its working capital, and 3G did not borrow any funds for the purpose of acquiring CSX stock.

26.    3G sought to meet with CSX management on several occasions.

27.    In light of the size of 3G's position in CSX and the possibility that 3G might, at some point, wish to acquire additional stock or take an approach other than as a purely passive investor with respect to its investment in CSX, 3G followed the advice of its counsel and made an HSR filing on June 13, 2007.  3G notified CSX's CFO Oscar Munoz of that filing by fax on June 14, 2007.

28.    Upon learning about 3G's HSR filing, CSX scaled back the agenda for a planned meeting between CSX management and 3G at CSX headquarters in Jacksonville, Florida.  Among other things, CSX cancelled a planned tour of CSX's facilities, cut the meeting in half and combined what would have been one-on-one meetings with Messrs. Ward and Munoz in a single meeting with Ward, Munoz and CSX counsel.

29.    When 3G met CSX management on June 21, 2007, CSX's CEO Michael Ward asked 3G in sum and substance whether 3G was aligned with vocal activist hedge funds or the company.  3G assured CSX that it had not taken

any position and was simply seeking to better understand the company and the railroad industry in light of its large investment.

30.      In August and September 2007, due to market turmoil and 3G's concerns about the possibility of a general economic downturn, 3G sold some of its shares of CSX stock.  Beginning in August 2007, 3G accumulated a relatively small amount of economic exposure to CSX through Total Return Swaps, in addition to its direct ownership of CSX stock.  3G used Total Return Swaps, after conferring with counsel, because 3G wanted to ensure that it would not be driven above the 5% threshold of Rule 13D due to share buybacks or other events beyond its control.  3G wanted the ability to decide for itself whether to cross that threshold and wanted to be sure it understood the regulatory requirements and implications before it made any such decision.

31.      By November 8, 2007, 3G had accumulated economic exposure to 3,280,000 shares of CSX through its Total Return Swaps, representing 0.8% of CSX's outstanding common shares.  Morgan Stanley, a CSX strategic advisor in connection with this proxy fight, is the counterparty for all of 3G's Total Return Swaps.

32.      By December 19, 2007, 3G had beneficial ownership of 17,232,854 shares of CSX common stock, which represented approximately 4.1% of the outstanding common shares of CSX stock.  3G had economic exposure to approximately 0.8% of the outstanding shares of CSX common stock through Total Return Swap Agreements with Morgan Stanley.  At all times between February 2007, when 3G began investing in CSX, and December 19, 2007, when

3G filed its Schedule 13D with TCI, 3G's combined stock ownership and its swap contracts amounted to less than 5% of CSX's outstanding stock.

33.    By September 2007, after meeting with CSX management and attending the annual CSX Investor Day, 3G became increasingly disappointed with the lack of initiative displayed by CSX management regarding operational improvements that 3G believed were possible.  As a result, 3G considered nominating Alex Behring to the CSX Board, based in part on his extensive railroad experience.  3G began to research other individuals with substantial railroad experience whom it could potentially nominate to the CSX Board.  3G hoped that Mr. Behring and possibly other nominees, if elected, could help the Board challenge management to achieve some of the operational improvements it had identified and thereby unlock value for 3G and all other CSX shareholders.  In early October 1007, 3G identified Gil Lamphere as another potential nominee.  Mr. Lamphere had experience as a director of Canadian National Railway, Chairman of Illinois Central Railroad, and a director of the railroad and real estate company Florida East Coast Industries.  After several meetings with 3G, Mr. Lamphere agreed to be a nominee to CSX's board if 3G ran a slate.

**(d)    TCI and 3G Formed a Group on December 12, 2007**

34.    As disclosed in the December 19, 2007 Schedule 13D filed with the SEC, TCI and 3G first formed a group on December 12, 2007.

35.    Notwithstanding Plaintiff's allegations in the Complaint, which amount to little more than conjecture, there was no group formed prior to December 12, 2007.

36.     TCI and 3G knew one another prior to forming a group. Representatives from TCI and 3G saw one another at certain rail industry related conferences, along with hundreds of other investors and industry analysts.  On occasion, they had general conversations about the rail industry.  It is not uncommon for investors to share information with respect to the fundamentals of an investment or an industry.

37.     3G first learned of TCI's investment in CSX when Snehal Amin spoke at the May 8, 2007 Bear Stearns Conference.  However, TCI and 3G did not discuss the possibility of forming a group until November 2007.

38.     During the tumultuous summer of 2007, with the U.S. financial industry in the midst of a credit crisis, TCI's focus was on the viability of its investment portfolio.

39.     During this same time period, TCI was also reviewing the viability of its investment in CSX because of the possibility of reregulation of the rail industry.  Such reregulation would have capped the rates CSX could charge, restricted its revenue growth and seriously impacted TCI's investment.

40.     TCI was still hoping to engage CSX in an effective dialogue and accordingly sent open letters (the "October Letters") to the CSX Board on October 16 and 22, 2007.  Shortly thereafter, TCI began to search for nominees for inclusion in a possible minority slate of nominees for election to the CSX Board.  TCI did not communicate, directly or indirectly, with any other fund about its search for potential nominees.

41.     3G approached TCI in approximately mid-November 2007, shortly before TCI received a response to the October letters from CSX on November 16, 2007.  At the time, TCI was not sure how it was going to proceed and held out hope that CSX would respond favorably to TCI's October letters.

42.     Snehal Amin of TCI and Alexandre Behring of 3G began speaking about the possibility of forming a group sometime in November 2007.

43.     There were many issues surrounding the formation of the group that required extensive negotiations between TCI and 3G, including finding qualified nominees for the minority slate.  Negotiations extended over more than three weeks, and even then there were outstanding issues.

44.     TCI and 3G would not agree to form a group until all of their respective nominees committed.  The final nominee signed his agreement on December 12, 2007 (UK time) and 3G and TCI signed the group agreement that same day.

45.     Plaintiff has no credible evidence that TCI and 3G formed a group prior to December 12, 2007 because no such evidence exists.  Once the group was formed on December 12, 2007, Defendants timely filed a Schedule 13D with the SEC to disclose that TCI and 3G had formed a group that had beneficial ownership of CSX common stock exceeding 5%.

**(e)     TCI and 3G Propose a Minority Slate of Nominees to the CSX Board of Directors**

46.     The January 8 Notice that TCI submitted to CSX was prepared pursuant to Article I, Section 11 and Article II, Section 2(b) of the

Amended and Restated Bylaws of the Corporation and in accordance with applicable provisions of the Virginia Stock Corporation Act.

47.    TCI and 3G have not sought to take control of CSX.  In fact, TCI and 3G nominated a minority slate of five directors, less than half of the twelve directors that comprise the CSX Board.  The five nominees put forth by TCI and 3G are Christopher Hohn, Alexandre Behring, Gilbert H. Lamphere, Timothy T. O'Toole, and Gary L. Wilson.

48.    Of the five directors that make up TCI and 3G's slate of nominees for the CSX Board, only one is affiliated with TCI and only one is affiliated with 3G.  The other three nominees are Gilbert Lamphere, Timothy O'Toole and Gary Wilson, none of whom are affiliated with either TCI or 3G.

49.    Gilbert Lamphere is the managing director of Lamphere Capital Management.  He was a director of Canadian National Railway, Chairman of Illinois Central Railroad, and a Director of Florida East Coast Industries (a railroad and real estate company).  Mr. Lamphere has served as a director of nine other public companies, including Carlyle Industries, Inc., Cleveland-Cliffs Inc., R. P. Scherer Corporation, Global Natural Resources Corporation and Recognition International, Inc.  Mr. Lamphere is independent from 3G and TCI.

50.    Timothy O'Toole is the Managing Director of the London Underground.  He has over 25 years of railroad industry experience and served as President and Chief Executive Office of Conrail from 1998 to 2001.  Mr. O'Toole is independent from 3G and TCI.

51.    Gary Wilson is currently a private investor.  He was a principal investor and Co-Chairman of the Board of Northwest Airlines from 1991 to 1997 and Chairman from 1997 to 2007.  From 1985 to 1990, he was Chief Financial Officer and a director of the Walt Disney Company and served on its Board until 2006.  Mr. Wilson was an investor in and a director of Progress Rail.  He is a current director of Yahoo!, Inc. and CB Richard Ellis Shareholders Inc.  Mr. Wilson is independent from 3G and TCI.

52.    Neither TCI nor 3G paid any of the nominees for standing for election despite the fact that such payments are permitted.  Indeed, the executed nominee agreements included the following language with respect to independence:

> Each of us recognizes that should you be elected to the Board of Directors of CSX all of your activities and decisions as a director will be governed by applicable law and subject to your fiduciary duties, as applicable, to CSX and to the stockholders and, as a result, that there is, and can be, no agreement between you and the undersigned that governs the decisions which you will make as a director of CSX.

53.    On January 15, 2008, Ellen Fitzsimmons, the Senior Vice President, General Counsel and Corporate Secretary of CSX sent a letter (the "Response Letter") to TCI's counsel acknowledging receipt of the January 8 Notice.  Although the Response Letter challenged TCI's right to name alternate nominees in the future and requested copies of the nominee agreements, it was silent as to any concerns relating to TCI's and 3G's Total Return Swaps and TCI's and 3G's Schedule 13D disclosures.

54.     Counsel for TCI sent a letter to Ms. Fitzsimmons on January 16, 2008 stating that "the Response Letter does not reference any deficiency with regard to the [January 8] Notice and therefore we deem the Corporation's response to be an acknowledgment that advance notice has been properly given under Section 11(a)(ii) of the Bylaws of the Corporation."  TCI received no response to that letter and CSX did not identify any purported deficiencies in the January 8 Notice until the filing of this lawsuit.

55.     By that time, CSX was long aware of TCI's and 3G's swap position.  Moreover, in two memoranda that were sent to the SEC in 2007, CSX had questioned Defendants' failure to report beneficial ownership of CSX shares referenced in their Total Return Swap agreements.

56.     First, a May 22, 2007 memorandum that counsel to CSX sent to the SEC regarding "Nondisclosure of Beneficial Ownership by The Children's Investment Fund," stated that CSX had "concern that TCI may not be fulfilling its Exchange Act disclosure obligations."

57.     Second, on December 21, 2007, CSX's counsel sent a memorandum to the SEC entitled "Material Deficiencies in the Schedule 13D of The Children's Investment Fund and 3G."  CSX stated that it believed that there were misstatements and omissions in the Schedule 13D that made the filing misleading to investors.  Among the alleged misstatements and omissions identified by CSX is the failure of TCI and 3G to report beneficial ownership of the shares referenced in their swap agreements.  Neither TCI nor 3G knew that

CSX had advocated that position with the SEC until they were provided with a copy of this memorandum during the discovery phase of this litigation.

58. Nonetheless CSX did not notify TCI either in its Response Letter, or by responding to TCI's counsel's January 16, 2008 letter, that it believed that TCI's and 3G's failure to disclose the shares referenced in their swap agreements as beneficially owned shares constituted a potential deficiency in the January 8 Notice.

59. The TCI Group's January 8 Notice complied with the requirements of CSX's Bylaws. The TCI Group disclosed beneficial ownership of 8.3% of the outstanding shares of CSX common stock. In addition, the January 8 Notice included director nominee questionnaires completed by Defendants Hohn and Behring, in which they respectively disclosed, in response to a question about their ownership of derivative instruments "the value or return on which is based on or linked to the value of" CSX shares, that Mr. Hohn and TCI had Total Return Swaps referencing 46,401,000 shares at an average exposure price of €29.07 and that Mr. Behring and 3G had Total Return Swaps referencing 3,280,000 shares of CSX at an average exposure price of $43.72. Mr. Hohn and Mr. Behring also disclosed their beneficially owned shares in response to the relevant question.

     (f)    **TCI and 3G Did Not Have Any Agreements With Their Counterparty Banks Regarding Voting of CSX Shares**

60. Plaintiff alleges that almost 37 million shares of CSX stock were transferred to the counterparties to TCI's and 3G's Total Return Swaps in the two-week period prior to the original record date, thus establishing custody of

those shares with the counterparties as of the record date. That allegation, even if proven, does not establish that TCI or 3G had any control over any CSX common stock with which the counterparties may have hedged their swap agreements.

61.    Further, as a matter of policy, neither Deutsche Bank nor Citigroup, where TCI had all but 6,000 of its Total Return Swaps, vote shares held as hedges to Total Return Swaps or otherwise take actions that would influence the outcome of a contested vote.

62.    Neither TCI nor 3G had the right to instruct their swap counterparties with respect to voting any CSX shares the swap counterparties may have beneficially owned. Furthermore, neither TCI nor 3G instructed any of their swap counterparties to take any steps to take possession of or vote shares they may have acquired to hedge the swap agreements referencing CSX stock, nor did TCI or 3G have any knowledge as to how or if the swap counterparties would vote any shares of CSX that the counterparties may have beneficially owned.

63.    3G's only swap counterparty is Morgan Stanley, who also serves as CSX's strategic advisor in this proxy contest. 3G had no reason to believe that Morgan Stanley would vote any shares that it may have held to hedge 3G's swaps in favor of the TCI Group's proxy proposals, and certainly no agreement or understanding to that effect.

64.    In February 2008, 3G asked Morgan Stanley to move 3G's CSX shares from 3G's margin account -- where those shares might have been loaned to others -- into its cash account. 3G wished to ensure that it could vote its CSX shares as of the expected record date in February 2008, and understood it

might not have that ability if those shares were held in a margin account. This February movement of millions of CSX shares had nothing to do with any swap arrangements.

65.     At all times prior to December 12, 2007, 3G and TCI acted independently in connection with their investments in CSX. At no point prior to that date did either 3G or TCI agree to act with others in connection with the purchase, holding, disposition, or voting of CSX stock.

66.     CSX moved the record date for the 2008 Shareholder Meeting from February 27, 2008 to April 21, 2008 and filed its complaint based solely on the unfounded suspicion that the stock transfers described in paragraph 18 would confer voting rights on TCI swap counterparties and that those swap counterparties would vote the shares they beneficially owned as of the record date in favor of the slate of nominees proposed by TCI and 3G.

67.     The TCI Group's Schedule 14A included the following statements:

(a)     that the TCI Group beneficially owns 35,054,952 shares of CSX common stock, or approximately 8.7 percent of the outstanding shares;

(b)     that TCI and 3G "entered into an agreement to coordinate efforts with regard to the purchase and sale of Shares and other securities conferring beneficial ownership" as of December 12, 2007;

(c)     that, "[o]ther than as disclosed in this proxy statement, there are no arrangements or understandings between either TCI

and/or 3G and any Nominee or any other person or persons with respect to the nomination of the Nominees or of the TCI/3G Group's additional proposals";

(d)      that TCI "expressly disclaims beneficial ownership of the Shares beneficially owned by [3G] and the Nominees (as applicable)" while 3G "expressly disclaims beneficial ownership of the Shares beneficially owned by [TCI] and the Nominees (as applicable)";

(e)      that their nominees, if elected, "will provide a clear perspective of shareholders and experienced railroad operators to the Board and will work with the rest of the Board to effect positive change at CSX" and that their nominees, if elected, "intend to work constructively with the remaining Board members to advance the interests of all CSX shareholders."

68.      In their Schedules 13D and 14A, 3G and TCI state that they are the beneficial owners of 35,054,952 shares representing approximately 8.7% of the CSX shares outstanding.  Defendants disclosed that they had economic exposure to an additional approximately 12.3% of CSX's shares through Total Return Swaps and disclaimed beneficial ownership of any shares referenced in those swap agreements.

### (g)      Mr. Amin is Not a Controlling Person as Defined in Section 20(a) of the Exchange Act

69.      Although Snehal Amin is a partner at TCI and advises Mr. Hohn with respect to TCI's position in the US rails, he does not have decision

making authority with respect to the investment decisions made by TCI.  Nor does

he have final authority to make day-to-day decisions on significant matters

relating to TCI's investment in CSX.  Accordingly, he is not a controlling person

under the federal securities laws.

> **(B)**    **TCI's Contentions as to the Law Relating to the Complaint**

>> **(a)**    **The TCI Defendants Have Accurately Disclosed Their Beneficial Ownership Under Section 13(d) of the Exchange Act**

1.    Section 13(d) of the Exchange Act ("Section 13(d)")

requires that within ten days after any person acquires beneficial ownership of

more than 5 percent of a class of equity securities of a public company, that

person must disclose certain information to the company, the SEC, and the

exchanges on which the stock is traded.  15 U.S.C. § 78m(d)(1).

2.    Under Rule 13d-3 of Regulation D promulgated under the

Exchange Act ("Rule 13d-3"), a person has "beneficial ownership" of a security if

such person has or shares:  "(1) Voting power which includes the power for vote,

or to direct the voting of, such security; and/or (2) Investment power, which

includes the power to dispose, or direct the disposition of, such security."  17

C.F.R. § 240.13d-3(a).  A person will also be deemed the "beneficial owner" of a

security if, by operation of law or as of right, such as through the exercise of an

option, warrant, right or conversion of a security, that person will possess voting

or investment power of an equity security within 60 days.  17 C.F.R. § 240.13d-

3(d)(1)(i).

3.    Plaintiff suggests that beneficial ownership can arise, regardless of whether Defendants had the right to convert their Total Return Swaps into CSX shares within 60 days, if the swaps were acquired with the intent of changing or influencing control of CSX (Complaint  58(c)).  But that ignores the fact that before a person can be deemed a beneficial owner of a security, he must have first have some right - whether through exercise of a warrant, option or some other power - to acquire the issuer's security.   If a person has that right and acquired it with an intent to change or influence control, he is deemed a beneficial owner of the securities regardless of when the right is exercisable.  17 C.F.R. § 240.13d-3(d)(1)(i).  In this case, however, where Defendants have no such right to convert their Total Return Swaps into CSX securities, their purpose in entering into the swap agreements is simply irrelevant.

4.    Indeed, the SEC has issued interpretive guidance stating explicitly that cash settlement does not give rise to Section 13 beneficial ownership status.  SEC Release Nos. 33-8107; 34-46101, effective June 27, 2002, available at http://www.sec.gov/rules/interp/33-8107.htm clearly states:  "A purchaser of a cash-settled security future . . . would not count the equity securities underlying the contract for the purposes of determining whether he or she is subject to the Regulation 13D reporting requirements, *because he or she does not have the right to acquire beneficial ownership of the underlying security.*"  (emphasis added).

5.    The SEC's interpretation of Section 13 under SEC Release Nos. 33-8107 and 34-46101 must be given *Chevron* deference.  Under *Chevron*

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984), the Court is required to defer to an agency's interpretation of a statute that it administers unless Congress has unambiguously addressed the question. "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844. The Second Circuit has held that the SEC's "interpretations of § 13 and of its own regulations thereunder are entitled to deference." *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998). Moreover, an SEC release "is connected to the agency's rule-making function" and therefore receives Chevron deference. *Gryl ex rel. Shire Pharms. Group Plc v. Shire Pharms. Group Plc*, 298 F.3d 136, 146 n.8 (2d Cir. 2002). Thus, where -- as here -- the SEC has interpreted the statutes that it administers, including the scope of required disclosure under those statutes, the SEC's reasonable interpretation of its statutes controls, unless Congress has clearly and unambiguously addressed the question. Accordingly, the SEC's interpretation of Section 13 under SEC Release Nos. 33-8107 and 34-46101 must be given *Chevron* deference because it is neither arbitrary, capricious, nor manifestly contrary to Section 13.

      6.     Moreover, Congress has explicitly recognized that equity-based swap agreements are unique financial instruments and in 2002 amended both Section 2A of the Securities Act of 1933 and Section 3A of the Exchange Act to provide that "[t]he definitions of 'security' . . . does not include any

security-based swap agreement." 15 U.S.C. § 77b-1(a); 15 U.S.C. § 78c-1(a).

Accordingly, statutory and regulatory authority both establish a presumption that

cash-settled swaps do not establish the kind of legal relationship between a person

and the referenced equity securities that would trigger a filing obligation under the

Exchange Act.

7.    Indeed, in its own counsel's May 22, 2007 memorandum

about TCI's swap agreements, CSX advised the SEC that the purchase of cash-

settled options does not generally give rise to "beneficial ownership," citing the

same SEC release that Defendants rely on.  Cravath, Swaine & Moore

Memorandum, dated May 22, 2007, re Nondisclosure of Beneficial Ownership by

The Children's Investment Fund; see also Henry T.C. Hu & Bernard Black,

*Equity and Debt Decoupling and Empty Voting II:  Importance and Extensions*,

156 U. Pa. L. Rev. 624-26 (2008) (noting that SEC rules do not require the

disclosure of economic ownership of shares, only beneficial ownership).

8.    Under the terms of TCI's swap agreements with its

counterparties, to the extent that a counterparty hedges its exposure through the

purchase of equity securities of CSX, the beneficial ownership of the equity

securities remains with the counterparty, not with TCI.  Thus, Defendants had

neither voting power nor investment power over the common stock of CSX

referenced in their swap arrangements, as required for a finding of beneficial

ownership under Rule 13d-3(a), 17 C.F.R. § 240.13d-d(a).

9.    Nor is there any evidence that Defendants were using a

"contract, arrangement, or device . . . as part of a plan or scheme to evade the

reporting requirements" or any other type of relationship, understanding, or other mechanism to provide them with voting or investment power, or the right to acquire such powers, as required for a finding of beneficial ownership under Rule 13d-3(b), 17 C.F.R. § 240.13d-3(b).

10.    Defendants' Total Return Swaps were derivative financial instruments that provided them with the economic returns of an investment in CSX shares without actually holding CSX shares.  Defendants did not have the right to acquire beneficial ownership of the shares of CSX referenced in their swap arrangements within sixty days, whether through the exercise of options, warrants, or rights, through the conversion of a security, or any other means as required for a finding of beneficial ownership under Rule 13d-3(d), 17 C.F.R. § 240.13d-3(d)(1)(i).

11.    Section 16 of the Exchange Act, 15 U.S.C. § 78p, supports the notion that Total Return Swaps do not confer beneficial ownership.  Under Section 16, the beneficial owner of 10% of any equity security must disclose:  (A) "the amount of all equity securities of [an] issuer of which the filing person is the beneficial owner," and, *in addition*, (B) "purchases and sales of the security-based swap agreements."  15 U.S.C. § 78p(a)(3).  Accordingly, under a plain reading of the statute, "equity securities," which confer beneficial ownership, are separate and distinct from "security-based swap agreements," which do not confer beneficial ownership.  In addition, although the Section 16 reporting requirement is triggered based on 10% beneficial ownership of an equity security, unlike Section 13, once the reporting requirement is triggered, Section 16 explicitly

requires the disclosure of equity swap purchases and sales.  This difference

between the two statutes is significant because it shows that if Congress intended

to require that swap agreements be disclosed pursuant to Section 13, it would have

explicitly done so as it had under Section 16.

12.     Defendants did not form a group prior to December 12,

2007.  In determining when a group was formed, the key inquiry is when the

individuals "agree[d] to act together for the purpose of acquiring, holding, voting,

or disposing of equity securities . . . ."  17 C.F.R. § 240.13d-5(b)(1).

13.     To prove that a group formed before December 12, 2007,

Plaintiff must show that Defendants "agreed to act together" to vote CSX

common stock before that day.  "[T]he assertion of existing shareholder rights or a

mere business relationship" between shareholders is insufficient to prove "group

membership."  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 126 (2d Cir. 2001);

*K-N Energy, Inc. v. Gulf Interstate Co.*, 607 F. Supp. 756, 765 (D. Colo. 1983)

(requiring "evidence that indicates an intention to act in concert over and above

the prior and continuing relationships between the various parties").  Rather, there

must be proof of a "common objective" with respect to acquiring, holding, voting

or disposing of CSX securities.  *See Schaffer v. CC Invs.*, LDC, 153 F. Supp. 2d

484, 486 (S.D.N.Y. 2001).  Here, there was no common objective before

December 12, 2007.

14.     At most, the facts demonstrate that a relationship between

TCI and 3G existed before December 12, 2007, but "relationships alone are not

enough to show an agreement to act in concert sufficient to indicate group

membership." *K-N Energy, Inc.*, 607 F. Supp. at 765 (citing *SEC v. Savoy Indus.*, 587 F.2d 1149, 1166 (D.C. Cir. 1978)).

15.    The fact that Defendants formed a group on December 12, 2007 was fully disclosed in the Defendants' Schedules 13D and 14A, filed on December 19, 2007.

16.    In sum, TCI and 3G fully complied with the filing requirements of Section 13(d) by filing their Schedule 13D within 10 days after their beneficial ownership of CSX stock exceeded 5% of the total outstanding common stock of CSX by virtue of the group agreement they entered into, and disclosing the existence of their Total Return Swaps, which are contracts relating to securities of CSX.

     **(b)    The TCI Defendants Have Complied With All Their Other Disclosure Requirements Under Section 13(d) of the Exchange Act**

17.    CSX incorrectly alleges that "once the group was formed, each defendant beneficially owned all shares of CSX common stock that were beneficially owned by all members of the group by operation of law." (Compl. 77, 92) (citing Rule 13d-5(b)(1)).  This allegation is incorrect as a matter of law. Rule 13d-5(b)(1) provides that "[w]hen two or more persons agree to act together for the purposes of acquiring, holding, voting, or disposing of equity securities of an issuer, *the group formed* shall thereby be deemed to have acquired beneficial ownership, for purposes of [Section 13(d)], as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons."  17 C.F.R. § 240.13d-5(b)(1) (emphasis added).  Defendants accurately disclosed that

"*the group* may be deemed to have voting control over a combined 8.3% of [CSX's] Shares."  (Defs.' Dec. 19, 2007 Schedule 13D, Item 5) (emphasis added). The Rule does not provide that "once the group was formed, each defendant beneficially owned all shares of CSX common stock that were beneficially owned by all members of the group by operation of law."  (See Compl. 77, 92).

18.    Defendants did not violate Item 3 of Schedule 13D because they accurately disclosed that they used their general working capital to acquire CSX shares.  Item 3 requires disclosure of "the source and the amount of funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is or will be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, trading or voting the *securities*."  17 C.F.R. § 240.13d-101, Item 3 (emphasis added).  By its plain terms, Item 3 does not require disclosure of economic interests that are not "securities," such as Total Return Swaps.  Accordingly, CSX incorrectly alleges that Defendants must disclose that "TCI and 3G have used borrowed funds to acquire their *interest* in CSX."  (Compl. 80) (emphasis added).

19.    CSX incorrectly alleges that "[i]n violation of Item 7 to Schedule 13D, the defendants have failed to file the written agreements relating to the swap agreements as exhibits to the Schedule 13D."  (Compl. 81).  This allegation is incorrect as a matter of law.  Item 7(3) of 17 C.F.R. § 240.13d-101 requires only that written agreements pertaining to "the transfer or voting of the securities, finder's fees, joint ventures, options, puts, calls, guarantees of loans, guarantees against loss or profit, or the giving or withholding of any proxy

disclosed in Item 6" be filed as exhibits to the Schedule 13D.  A Total Return

Swap agreement is none of these.  It does not pertain to the transfer or voting of

securities finder's fees, joint ventures, options, puts, calls, guarantees of loans or

the giving or withdrawing of any proxy.  It is not a guarantee against loss or profit.

It does not guarantee anything to either of the swap counterparties; rather, one

counterparty gains when the stock price rises and the other counterparty gains

when the stock price falls.  Accordingly, Defendants are not legally required to

file their Total Return Swap agreements as exhibits to their Schedule 13D.

      20.     CSX incorrectly alleges that "[i]n violation of Instruction C

to Schedule D, the defendants have failed to disclose required information

regarding controlling persons of the defendant entities." (Compl.  82).  Under 17

C.F.R. § 240.13d-101, Instruction C provides:  "If the statement is filed by a

general or limited partnership, syndicate, or other group, the information called for

by Items 2-6, inclusive, shall be given with respect to . . . each person controlling

such partner or member."  In Defendants' December 19, 2007 Schedule 13D,

Defendants accurately disclosed the required information for the controlling

person for TCI, Christopher Hohn, and for 3G, Alexandre Behring.  Accordingly,

Defendants have fully complied with Instruction C to Schedule 13D.

      21.     CSX incorrectly alleges that "[i]n violation of Item 7(2) of

Schedule 13D, the defendants have failed to file copies of the nominee agreements

referenced in the defendants' December 19, 2007 Schedule 13D." (Compl.  83).

Under 17 C.F.R. § 240.13d-101, Item 7(2) requires "copies of all written

agreements, contracts, arrangements, understanding, plans or proposals relating to

. . . any other matter as disclosed in Item 4." Item 4(d) requires "any plans or proposals which the reporting persons may have which relate to or would result in . . . [a]ny change in the present board of directors." Nominee agreements are entered into with people that may, or may not, ultimately become nominees as part of a proxy contest. The agreement terminates at the point in time a person succeeds to a board of directors. Therefore, such agreements do not relate to the Item 4(d) disclosure as contemplated in Item 7. In any event, even assuming *arguendo* that nominee agreements are required to be filed with a Schedule 13D, such a *de minimus* technical violation is not a "material" omission and does not render Defendants' Schedule 13D false or misleading. Moreover, the substance of the nominee agreements is described in detail in Defendants' Schedule 14A and therefore there is sufficient public information for the shareholders to decide how to cast their votes.

    (c)    **The TCI Defendants Have Complied with the Disclosure Requirements of Section 14(a) of the Exchange Act**

    22.    In filing their Schedule 14A, Defendants fully complied with Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, which provides that proxy statements must not contain "any statement which . . . is false or misleading with respect to any material fact . . . ." 17 C.F.R. § 240.14a-9(a).

    23.    Defendants' Schedule 14A is materially complete because it accurately discloses information regarding its beneficial ownership in CSX, the

formation of a group with 3G, and any other material information that was disclosed in their Schedule 13D.

### (d) The TCI Group's January 8 Notice Complies With the CSX Bylaws

24.    The TCI Group's notice of its intention to nominate directors and propose amendments to the CSX Bylaws was in full compliance with Article I, Section 11(a)(ii) of the Bylaws, which requires that a shareholder who wishes to propose business at the annual shareholder meeting disclose the number of shares of capital stock of CSX that it owns "beneficially" or of record because the TCI Group did not "beneficially" own any shares of CSX stock other than the shares identified by Defendants as owners of record or in street name. All such shares were reported in the TCI Group's notice.

25.    Plaintiff's position that Defendants failed to comply with the Bylaws because it did not report the shares referred by their Total Return Swap agreements as beneficially owned is untenable.

26.    Under Virginia law, a "shareholder" of a corporation means "the person in whose name shares are registered in the records of the corporation, the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with a corporation, or the beneficial owner of shares held in a voting trust."  VA. CODE ANN. § 13.1-603.[1]

---

[1] CSX is incorporated in Virginia.  Accordingly, Virginia law should be applied in deciding whether Defendants' January 8 Notice complied with CSX's Bylaws.  *See, e.g.*, *Am. Fed'n of State, County, & Mun. Employees v. Am. Int'l Group, Inc.*, 462 F.3d 121, 125 n.2 (2d Cir. 2006) (finding Delaware law "governs" Defendant's "internal affairs" where Defendant is Delaware corporation); *Equal Employment Opportunity Comm'n v. Johnson & Higgins, Inc.*, 91 F.3d 1529, 1546 (2d Cir. 1996) (finding New Jersey law governs voting rights of Defendant's directors where Defendant is New Jersey corporation); *Wisener v. Air Express Int'l Corp.*, 583 F.2d 579,

27.    Under Article 14 of the Virginia Code regarding Affiliated Transactions, a person is deemed to be a "beneficial owner" of stock, when that person, directly or through the use of "any contract, arrangement, understanding, relationship, or otherwise," has either: (a) voting power; (b) investment power, which includes the power to dispose or to direct the disposition of the voting shares; or (c) the right to acquire voting power or investment power, regardless of whether such right is exercisable immediately or after a passage of time.  VA. CODE ANN. § 13.1-725.

28.    Defendants have satisfied their obligations under the Bylaws by disclosing those shares that they own either directly or in street name. Defendants are not the "beneficial" owners of any other shares of CSX stock, including any shares that are referenced in their Total Return Swap agreements.

29.    Even assuming *arguendo* that the Total Return Swaps were "beneficially" owned by Defendants, the information included in Defendants' January 8 Notice satisfied Article I, Section 11(a)(ii) of the Bylaws.  Indeed, in response to questions about "Ownership of CSX Equity Securities and Derivative Instruments" held by the Director Nominees (Part V of Director Nominee Questionnaire, Question 45(a)), Defendants disclosed that Mr. Hohn and TCI had Total Return Swaps referencing 46,401,000 CSX shares at an average exposure price of €29.07 and that Mr. Behring and 3G had Total Return Swaps referencing 3,280,000 CSX shares at an average exposure price of $43.72.

---

583-84 (2d Cir. 1978) (applying Illinois law to interpret rights of former officer and director of Defendant corporation under Defendant's bylaws where Defendant is Illinois corporation).

30.     Because Defendants provided CSX with notice as to all of their holdings that were economically linked to CSX, the January 8 Notice was in compliance with CSX's Bylaws.

31.     Moreover, even assuming that the January 8 Notice did not adequately disclose Defendants' beneficial ownership of CSX stock, CSX should be equitably estopped from raising this defect.  To be estopped from bringing a claim, "(1) [t]here must have been a false representation or concealment of a material fact; (2) the representation must have been made with knowledge of the facts; (3) the party to whom it was made must have been ignorant of the truth of the matter; (4) it must have been made with the intention that the other party should act upon it; and (5) the other party must have been induced to act upon it." Trayer v. Bristol Parking, Inc., 95 S.E.2d 224, 231 (Va. 1956).

32.     On January 15, 2008, CSX sent TCI a letter acknowledging receipt of the TCI Group's notice.  In that letter, CSX informed TCI of its view that, under CSX's Bylaws, TCI could not reserve the right to nominate alternate nominees and asked TCI to provide it with copies of the nomination agreements with each of the TCI Group's nominees.  The letter makes absolutely no mention of the view espoused in this lawsuit, i.e., that TCI's disclosure is invalid because it did not treat the CSX shares referenced by the Defendants' disclosed swap positions as being beneficially owned by Defendants.

33.     In its response letter dated January 16, 2008, with which it included copies of the requested nominee agreements, TCI specifically stated that CSX's letter "does not reference any deficiency with regard to the Notice and

therefore we deem [CSX's] response to be an acknowledgement that advance notice has been properly given under Section 11(a)(ii) of the Bylaws of the Corporation."  Despite the fact that, in correspondence with the SEC during 2007, CSX had espoused the view that TCI and 3G should treat the CSX shares referenced in their Total Return Swap agreements as beneficially owned, CSX did not contradict TCI's statement or otherwise advise Defendants of its view-- raised for the first time in this lawsuit -- that Defendants' disclosure of their beneficial ownership was purportedly deficient.  Rather than provide Defendants with the opportunity to cure any perceived deficiency, CSX waited two months to file the instant lawsuit.  Accordingly, CSX's claim that the TCI Group's notice was deficient by reason of its failure to include the shares referenced in Defendants' swap positions as beneficially owned is plainly nothing more than a pretext to block Defendants' slate of nominees.  For these reasons, CSX should be estopped from raising the claim that the TCI Group's notice is invalid.

**(e)      Plaintiff is Not Entitled to the Requested Relief**

34.      CSX is not entitled to a declaration that "defendants failed to file timely, complete and accurate disclosures in violation of Sections 13(d) and 14(a) of the '34 Act" (see Compl., Prayer For Relief (a)) because, as set forth above, Defendants' Schedule 13D did not violate Section 13(d) of the Exchange Act and Defendants' Schedule 14A did not violate Section 14(a) of the Exchange Act.

35.      CSX is not entitled to an injunction "directing that Defendants file truthful and accurate Schedule 13D and Schedule 14A

disclosures" (see Compl., Prayer For Relief (b)) because, as set forth above, Defendants' Schedule 13D and Schedule 14A disclosures are truthful and accurate.  Moreover, the disclosures that CSX seeks either are not required by law or have been disclosed (i) by Plaintiff in this lawsuit, which has been the subject of significant media attention; (ii) by Plaintiff to CSX shareholders in its definitive proxy statement filed on April 25, 2008; and (iii) in Defendants' subsequent Schedule 13D and Schedule 14A filings.

36.    CSX is not entitled to an injunction directing Defendants to file an amended Schedule 13D or an amended Schedule 14A disclosing CSX's *allegations* against Defendants as *matters of fact* because there is a genuine dispute between the parties as to the truth of CSX's allegations.  Defendants complied with their disclosure requirements under Sections 13(d) and 14(a) by disclosing CSX's Complaint in their subsequent Schedule 13D and Schedule 14A. *Condec Corp.*, 573 F. Supp. at 1387 (S.D.N.Y. 1983) ("When, as here, the record demonstrates that there is a dispute as to the facts, the law requires only that the disputed facts and the possible outcomes be disclosed.  This is the limit of the law unless there is reason to believe that the facts are not genuinely in dispute."); *Int'l Banknote Co. v. Muller*, 713 F. Supp. 612, 619-20 (S.D.N.Y. 1989) (denying the "extreme remedy" of a preliminary injunction because "Plaintiff has not shown that it lacks the information necessary to evaluate defendants' slate of directors . . . . [D]efendants' probable late filing of its Schedule 13D does not constitute irreparable harm to plaintiff.").

37.     CSX is not entitled to an injunction enjoining Defendants "from acquiring additional shares of CSX until accurate and compliant Schedule 13D and Schedule 14A disclosures have been filed" (*see* Compl., Prayer For Relief (c)), or enjoining Defendants "from voting any proxies received prior to such time as the Court ascertains that defendants have filed accurate and compliant Schedule 13D and Schedule 14A disclosures" (*see id.*, Prayer For Relief (f)) because, as set forth above, Defendants' preliminary and subsequent Schedule 13D and Schedule 14A filings are "accurate and compliant." *Condec Corp. v. Farley*, 573 F. Supp. 1382, 1386 (S.D.N.Y. 1983) (denying injunction where "plaintiff has failed to demonstrate irreparable injury because . . . the 13D filings made by defendants subsequent to the initiation of th[e] action appear to adequately set forth the relevant facts and information which a Section 13D filing is intended to afford stockholders and the marketplace in general").

38.     CSX is not entitled to an injunction enjoining Defendants "from acquiring any CSX shares referenced in swap arrangements to which they are party" (*see* Compl., Prayer For Relief (d)) because CSX cannot establish a likelihood of success on the merits or irreparable injury.  *See Treadway Cos. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir. 1980) ("The goal of [Section 13(d)] is to alert the marketplace to every large, rapid aggregation or accumulation of securities which might represent a potential shift in corporate control. . . . Congress expressly disclaimed an intention to provide a weapon for management to . . . prevent large accumulations of stock . . . . Thus, an injunction will issue for a violation of [Section 13(d)] only on a showing of irreparable harm to the

interests which that section seeks to protect." (citations, alterations, and internal quotation marks omitted)).  In any event, TCI has never acquired any CSX shares referenced in any of its Total Return Swaps.

39.    CSX is not entitled to an injunction directing that Defendants "sell . . . all shares acquired, and terminate all swaps referencing CSX shares that they entered into, renewed or extended, after the date by which they should have filed a Schedule 13D and enjoining defendants from voting such shares at the 2008 annual meeting of CSX shareholders or, alternatively, directing that defendants vote such shares in proportion with the votes of other CSX shareholders" (*see* Compl., Prayer For Relief (e)) because Defendants timely filed their first Schedule 13D on December 19, 2007.  Moreover, CSX cannot meet the heightened standard of proof required to justify such an extreme remedy.  *Vantico Holdings S.A. v. Apollo Mgmt.*, LP, 247 F. Supp. 2d 437, 451 (S.D.N.Y. 2003) ("[I]f a party seeks a mandatory injunction, the party must satisfy a higher standard and the preliminary injunction should be granted 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" (quoting *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995)); *see also Plant Indus., Inc. v. Bregman*, 490 F. Supp. 265, 271 (S.D.N.Y. 1980) ("[P]laintiff has made no showing that irreparable injury will flow from the conduct of the defendants unless the Court grants the very drastic injunction sought here. . . . To allow an election to proceed in the face of allegations of improper solicitations and misleading proxy materials does not in and of itself

work an irreparable injury on the party challenging the materials.  The Court

possesses the power, if necessary, to void the election and otherwise 'unscramble'

this kind of transaction." (citations omitted)).

40.    CSX is not entitled to a declaration that Defendants'

Notices are "invalid as noncompliant with CSX's Bylaws" (Compl., Prayer For

Relief (g)) because Defendants accurately reported the numbers of CSX shares

they beneficially owned.  Alternatively, CSX should be equitably estopped from

raising this claim because Defendants relied upon CSX's intentional concealment

of the material fact on which they now base their claim, i.e., the purported

deficiency of the Notice.

**B.**    **Defendants' Counterclaims/Third-Party Claims**

**1.**    **Counterclaim Plaintiffs' Contentions**

**(A)**    **Counterclaim Plaintiffs' Contentions As To The Facts Relating To Their Counterclaims**

**(a)**    **CSX Policies Prohibit Directors and Officers From Engaging In Transactions in CSX Securities While in Possession of  Material Nonpublic Information**

1.    CSX has internal policies aimed at preventing insider

trading by directors, officers and employees.  These policies make it clear that

employees may not engage in *any* transactions in CSX securities while they

possess material nonpublic information.

2.    Nothing in CSX's official "Insider Trading Policy" -- which

expressly provides that "[n]o CSX officer, employee or director . . . may purchase,

sell or *otherwise conduct transactions* in any CSX security while he or she is

aware of material nonpublic information about CSX" (emphasis added) -- carves

out an exception for equity grants or stock awards to directors or officers.

       3.      Further, the CSX Bylaws reinforce the Insider Trading

Policy.  Article II, Section 2(b) of the CSX Bylaws provides that directors must

"comply with all applicable corporate governance, conflict of interest,

confidentiality and securities ownership and trading policies and guidelines of the

Corporation[.]"  Under this provision, a violation of the Insider Trading Policy is

necessarily a violation of the CSX Bylaws.

       4.      Similarly, CSX's "Code of Ethics," specifically addresses

insider trading.  It states that while performing their duties, CSX directors, officers

and employees "may learn important information about CSX or other companies

that has not been made public."  The Code of Ethics instructs that "[u]sing this

information to profit financially is unethical and may violate federal securities

laws" and it specifically refers the reader to the CSX Insider Trading Policy.

       5.      Finally, the CSX Corporate Governance Guidelines require

all director compensation to be "fully disclosed in the annual proxy statement."

      **(b)**    **CSX's Long Term Incentive Plan**

       6.      The CSX Board of Directors may award CSX executives

and employees a variety of equity-based performance compensation, pursuant to

CSX's shareholder-approved Omnibus Incentive Plan.  The Omnibus Incentive

Plan contains no provision authorizing the Board to make equity grants while it is

aware of material nonpublic information.

7.     Pursuant to the Omnibus Incentive Plan, on May 1, 2007, the CSX Board adopted the 2007-2009 Long Term Incentive Plan ("LTIP"), which permits it to issue equity stock grants to several named executive officers (the "NEOs")[2] and other employees.  Under the LTIP, the Board presets the amount of the incentive compensation grants, and the shares of CSX common stock in which the grants are payable are reserved for issuance as incentive compensation following the attainment of certain performance criteria.  The number of shares that are reserved for award under the LTIP is based on the dollar value of the incentive compensation grant divided by the trading price of CSX stock on the grant date.

**(c)     The Board Sets "Spring-Loaded" Stock Grants for CEO Michael Ward and Other Senior CSX Executives Before the Disclosure of Material Non-Public Financial Information in May 2007, in Violation of the CSX Insider Trading Policy.**

8.     On May 1, 2007, the CSX Board set its stock grants under the LTIP for the NEOs, as well as for other CSX employees.  At the time it set these stock grants, it was in possession of material nonpublic information.

9.     The following day, on May 2, 2007, CSX announced a $0.12 per share quarterly dividend.  On May 8, 2007, CSX made a series of positive public announcements, the substance of which the Board, Mr. Ward and certain other executive officers were aware of on or prior to May 1, including: (i) a $1 billion increase in the CSX stock repurchase plan, (ii) a future 25% increase

---

[2] The named executive officers are CEO Michael Ward, CFO Oscar Munoz, COO Tony Ingram, Senior Vice-President, General Counsel and Corporate Secretary Ellen Fitzsimmons and CCO Clarence Gooden.

in quarterly dividends (from $0.12 per share to $0.15 per share), (iii) a commitment to making significant core capital investments of approximately $6.4 billion over a four-year period, and (iv) a financial projection that earnings per share would increase by 15% to 17% by 2010 (collectively, the "May 8 Announcements").

10.    Each item of information that was disclosed on May 8 - *i.e.* the change in CSX's dividend, the billion-dollar buyback program expansion, the significant changes in capital expenditures and improved financial projections - constitutes material information.  Indeed, CSX hoped (and thought it possible) that the May 8 Announcements would cause the stock price to go up.

11.    The CSX Board had considered increasing the CSX stock repurchase plan at least as early as April 16, 2007.  The CSX Board had also considered the increase in quarterly dividends and the increase in capital investments in board meetings prior to May 7, 2007, the date these decisions and the increase in the stock repurchase program were formally adopted.  Indeed, on April 16, CSX management recommended to the Board that CSX convey a broader strategy to investors, including:  (1) higher earnings, cash flow and capital, (2) likely increase or acceleration of share buybacks, and (3) an increased dividend.

12.    On May 1, 2007, the same day that CSX set its LTIP grants, CSX's management recommended that the Board adopt each of the items in the May 8 Announcements and accelerate their announcement, which was originally scheduled for September 2007. The Board, including Mr. Ward, accepted those

recommendations, except to clarify that the increase in the share repurchase program would be to $3 billion, subject to final approval on May 7.

13.    CSX management correctly anticipated that the Board would formally approve those recommendations on May 7, 2007, and that they would be publicly announced following that approval.  In fact, Defendant Michael Ward has testified that he is not aware of a single instance since he has been CEO and chairman in which the Board rejected a management recommendation.

14.    Moreover, CSX knew, and has already testified, that each item of information that was disclosed on May 8, 2007 constitutes material information.  In fact, CSX's Insider Trading Policy includes as examples of information that is "material," information about the operating results of a company and important business developments such as changes in dividends.

15.    The CSX Proxy, which was approved by Mr. Ward (and sent out under a cover letter that he signed), does not disclose material facts regarding the determination of the LTIP performance grants, including (i) that the company set its performance grants while in possession of material nonpublic information; (ii) that the Omnibus Plan, adopted by the shareholders, did not include any provision that would allow the Board to set grants while in possession of such material nonpublic information; (iii) that the setting of the grants violated the company's Corporate Governance Guidelines and Insider Trading Policy and Code of Ethics; and (iv) how the award pursuant to the LTIP is determined.

**(d)    CSX's Stock Plan for Directors**

16.     The CSX Stock Plan for Directors ("Stock Plan") provides that at least 50% of each non-management director's annual retainer must be in the form of CSX stock.  In addition to the annual stock grant, the Stock Plan allows directors to grant themselves shares on a discretionary basis at any time and upon such terms as the Board deems fit.  This authority is limited by the CSX Insider Trading Policy, which prohibits directors from engaging in any security transaction during a blackout period.

17.     A blackout period automatically begins on the first day of the last calendar month of a fiscal quarter, and runs through the second business day following an earnings release.  December 1, 2007 was the first day of the last calendar month of a quarter, and CSX reported its fourth quarter 2007 earnings on January 22, 2008.  Accordingly, the period from December 1, 2007 to January 24, 2008 constituted a "blackout period" during which time no officer, employee or director was permitted to engage in any transactions in CSX securities.

18.     On December 12, 2007, CSX, acting through the Board, exercised its discretion to award each of CSX's eleven independent directors a grant of 5000 shares of common stock, in direct violation of the CSX Insider Trading Policy, which explicitly prohibits directors from engaging in transactions of CSX during the blackout period.

19.     The CSX Proxy includes just a single sentence about the discretionary stock grant to directors:  "On December 15, 2007, each non-employee director also received a grant of 5,000 shares of CSX stock, which had a

market value of $217,625 (based on an average of the high and low price per share on the date of grant of $43.525) and was required to be deferred." In fact, the discretionary grants were not made on December 15, 2007, but on December 12, 2007, which is not the date specified for such grants in the Stock Plan.

20.    Not only does the CSX Proxy misstate the date on which the discretionary grants were awarded, it omits material facts such as (i) that the discretionary grant was awarded during the Blackout Period; and (ii) that the shares were awarded in violation of the company's Insider Trading Policy, Corporate Governance Guidelines, and Code of Ethics.

>    **(e)    The Bylaw Amendment for which CSX Seeks Shareholder Ratification Contravenes Virginia Law.**

21.    On February 4, 2008, the CSX Board adopted an amendment to its Bylaws (the "February Amendment") under which shareholders of record representing at least fifteen percent of the outstanding shares of CSX's stock may call a special meeting for certain limited purposes.

22.    Although CSX claims that the February Amendment was adopted to address shareholders' expressed concerns about CSX corporate governance, the limited nature of the February Amendment fails to accomplish the shareholders' wishes.

23.    At the CSX annual shareholders meeting on May 2, 2007, the shareholders approved a non-binding proposal to permit shareholders to call special shareholders meetings. Unlike the February Amendment, the proposal placed no restrictions on that right, other than that the shareholders seeking to call

a special meeting must hold 10% to 25% of the outstanding shares.  The shareholder who offered the proposal expressed concern about CSX's corporate governance and the independence of CSX directors, including that CSX "had no Independent Chairman," paid CEO Michael Ward $23 million in one year, had one director who was "rated a 'problem director,'" and had other directors who also "served on 5 boards rated D by The Corporate Library."

24.    Despite CSX's opposition to the proposal, it was approved at the 2007 annual meeting by a margin of more than two-to-one.  In opposing the 2007 proposal, CSX expressed the belief that "a minority of shareholders" should not have the ability to call a special meeting, "particularly since shareholders already have an opportunity to bring matters before shareholder meetings on an annual basis."

25.    CSX's Articles of Incorporation do not limit the circumstances under which directors may be removed; therefore, CSX shareholders have the power to remove directors with or without cause.

26.    However, the February Amendment would not allow special meetings to be called for the purpose of electing or removing directors.  The February Amendment states that "the election or removal of directors shall be deemed the same matter with respect to all matters involving the election or removal of directors."  Directors are elected at annual meetings; therefore, defining "same matter" as it is defined in the February Amendment operates to bar shareholders from calling a special meeting for the purpose of electing shareholder-nominated directors or seeking to remove existing directors.  And,

Mr. Ward himself admitted that the amendment would not allow special meetings to be called to elect or remove directors.

27.    CSX management is seeking shareholder ratification of the February Amendment at the Annual Shareholder Meeting.

28.    In contrast to the February Amendment, on January 25, 2008, TCI notified CSX that it intended to present a proposal to amend the CSX Bylaws to give CSX shareholders the ability to call special shareholder meetings as contemplated by the shareholder proposal passed by the shareholders in 2007.

29.    TCI's proposed amendment would permit special meetings to be called by "shareholders that together hold at least 15% of all the shares of capital stock at the time outstanding and [that] hav[e] voting power [to] deliver or cause to be delivered to the Corporate Secretary one or more written demands for the meeting describing the purpose or purposes for which it is to be held."  The proposal is meant to allow shareholders to demand that the Corporation promptly call a special meeting for any purpose granted to the shareholders under Virginia law.  This proposal does not contain the limitations on the right to call a special meeting that are part of the February Amendment.

**(f)    CSX Makes Materially False and Misleading Representations Regarding TCI**

30.    On February 7, 2008, TCI wrote a public letter to the CSX Board criticizing its February 6, 2008 SEC filing regarding the adoption of the February Amendment and reiterating the need for change on the Board.  On February 14, 2008, the CSX Board responded with an open letter to Mr. Hohn,

which it filed as additional solicitation material pursuant to Rule 14a-12 under the Exchange Act, accusing TCI of trying to achieve "effective control of the company notwithstanding its ownership of only 4% of the shares."

31.    That statement is materially false and misleading because the TCI Group has only nominated five directors to the CSX Board, which has twelve members.  Furthermore, only one of the five nominees put forth by the TCI Group is affiliated with TCI and all five nominees have pledged to act in the best interests of all CSX shareholders.

32.    On March 11, 2008, the Washington Times published an editorial entitled "Rewards for Railroads" by Michael Ward.  CSX filed the editorial as additional soliciting materials in a March 17, 2008 Form 14A.  In the editorial, Mr. Ward refers to TCI as having demanded that "CSX freeze investment in its rail system …."

33.    That statement falsely implies that TCI would cut capital expenditures without regard to the public's safety.  In fact, TCI has made it clear that it was only advocating a freeze of growth investment and only until the fate of the re-regulation bill before Congress was known.  TCI made its views clear in its October 16, 2007 public letter to the CSX Board, as well as in testimony that Mr. Amin gave before Congress on March 5, 2008.

34.    Mr. Ward was well aware of TCI's views.  Indeed, he sat next to Mr. Amin and also testified at the March 5, 2008 Congressional hearing when Mr. Amin stated in no uncertain terms that TCI has "never, . . . nor would we ever suggest that railroads cut any spending in maintenance or safety."

(g)    **Mr. Ward and CSX Make Materially False and Misleading Representations in its March 17, 2008 Press Release**

35.    Soon after TCI and 3G filed their Schedules 13D disclosing the formation of the TCI Group and its intention to nominate a slate of five directors to the CSX Board, Edward Kelly, the Presiding Director of CSX's Board, and Christopher Hohn of TCI made arrangements to meet in New York City to discuss the possibility of coming to a resolution that would avoid a proxy fight.  During Messrs. Hohn and Kelly's discussions, which took place in January 2008, CSX stated that it was willing to agree to nominate three of the TCI Group's nominees to the CSX Board, including Messrs. Hohn and Behring, as well as a fourth nominee to be mutually agreed-upon.

36.    In addition to discussing a possible agreement regarding the number of nominees to be proposed, Mr. Hohn had discussions with Mr. Kelly about separating the roles of chairman and CEO, a position that TCI had advocated publicly.  Mr. Hohn suggested that that issue be determined by putting it to a vote of the shareholders at the Annual Shareholders Meeting.

37.    In contrast to Mr. Hohn's continued efforts to reach agreement with CSX, on January 10, 2008, Mr. Ward recommended that Mr. Kelly tell Mr. Hohn that CSX was done negotiating.

38.    On January 11, 2008, Mr. Ward told Mr. Kelly that if Mr. Hohn agreed to the three investor nominees plus one mutually agreeable nominee that Mr. Kelly should try to kill the deal by using a standstill.  Up until that point, there had been no discussion of a standstill between Mr. Kelly and Mr. Hohn.

39.     On February 14, 2008, the CSX Board wrote Mr. Hohn a public letter, which was filed as additional soliciting materials under Rule 14a-12. In that letter, CSX accused TCI of trying to achieve "effective control of the company notwithstanding its ownership of only 4% of the shares."

40.     On March 17, 2008, CSX issued a press release announcing that it had filed this lawsuit.  CSX filed the press release with the SEC as proxy solicitation materials on a Form 8-K.

41.     The press release quotes Mr. Kelly as saying that "in an effort to avoid the disruption and expense of a proxy contest we've spoken with TCI on a number of occasions in an attempt to find common ground.  Based on these conversations the Board concluded that TCI is not simply interested in having a representative voice on the Board, but instead is seeking to achieve effective control of the CSX Board of Directors and dictate Company strategy."

42.     Mr. Kelly's statement, as adopted by CSX in its press release, is materially false and misleading because CSX conducted its negotiations in bad faith and was not attempting to find common ground with TCI.  In fact, CSX had adopted a goal of "zero dissidents" on its Board.

43.     CSX's statement in the March 17 press release (as well as its statement in the Board's February 14, 2008 letter to Mr. Hohn) is also materially false and misleading because CSX could not have concluded in good faith that TCI was seeking to "achieve effective control of the CSX Board" and "dictate Company strategy."  The CSX Board and management knew that the TCI Group was only nominating five directors to a twelve-director Board.

44.    In addition to the fact that the TCI Group was nominating a minority slate, only one of those nominees is affiliated with TCI and one with 3G. All the nominees are independent of CSX management and have committed in writing to act in the interests of all stockholders.  Moreover, neither TCI nor 3G has paid any of the nominees despite the fact that they are permitted to do so.

45.    The March 17, 2008 press release about the lawsuit also quotes Mr. Ward as stating that the reason CSX filed the lawsuit is "to ensure that all of our shareholders receive complete and accurate information about the group's holdings, agreements, plans and motivations to which they are entitled under federal securities laws" and that CSX management is "committed to protecting the interests of all CSX shareholders."

46.    Mr. Ward's statement is materially false and misleading because CSX management was aware of Defendants' swap positions for more than a year prior to filing the lawsuit.  Indeed, during 2007, CSX sent two memoranda to the SEC regarding the issue.  The first memorandum, dated May 22, 2007, entitled "Nondisclosure of Beneficial Ownership by The Children's Investment Fund," expressed "concern that TCI may not be fulfilling its Exchange Act disclosure obligations."  The second memorandum, entitled "Material Deficiencies in the Schedule 13D of The Children's Investment Fund and 3G," dated December 21, 2007, soon after TCI and 3G filed their Schedule 13D, took the position that there were misstatements and omissions in TCI's and 3G's Schedule 13D, including specifically the failure of TCI and 3G to report beneficial ownership of CSX shares referenced in their swap agreements.

47.    Under CSX's Bylaws, all corrective disclosures relevant to the 2008 Shareholder Meeting were required to be submitted by February 1, 2008. Rather than notifying the TCI Group of the purported deficiency in its January 8 Notice before February 1, so that it could cure it by providing shareholders with complete and accurate information, if necessary, CSX waited to file this lawsuit. If CSX was interested in ensuring that its shareholders receive "complete and accurate information about the group's holdings, agreements, plans and motivations," CSX would have raised the purported deficiencies in TCI's and 3G's filings earlier, either soon after TCI and 3G filed their Schedules 13D, or in its January 15, 2008 letter responding to the TCI Group's January 8 Notice of intent to nominate a minority slate of directors.

48.    CSX's statements in the March 17 press release are materially false and misleading because its true purpose in filing the lawsuit was to bar the TCI Group from putting forth its slate, and to entrench the current Board.

**(B)    Counterclaim Plaintiffs' Contentions As To The Laws Relating To Its Counterclaims**

**(a)    The Counterclaim Defendants' Disclosures Violate Section 14(a) of the Exchange Act**

1.    Counterclaim Defendants violated Section 14(a) of the Exchange Act, as codified at Title 15, United States Code, Section 78n(a), by using the mails and other means of interstate commerce, in contravention of rules and regulations prescribed by the Securities and Exchange Commission ("SEC"), to solicit any proxy or consent or authorization in respect of any registered

security.  Here, Counterclaim Defendants have violated two SEC rules in their

solicitation of proxies: SEC Rule 14a-9 (codified at 17 C.F.R. § 240.14a-9), and

SEC Rule 14a-4(a)(3) (codified at 17 C.F.R. § 240.14a-4(a)(3)).

2.      SEC Rule 14a-9 provides that no proxy solicitation "shall

be made by means of any proxy statement, form of proxy, notice of meeting or

other communication, written or oral, containing any statement which, at the time

and in the light of the circumstances under which it is made, is false or misleading

with respect to any material fact, or which omits to state any material fact

necessary in order to make the statements therein not false or misleading[.]"

Under Rule 14a-9, the omission of information is actionable "if either the SEC

regulations specifically require the disclosure of the omitted information in a

proxy statement, or the omission makes other statements in the proxy statement

materially false or misleading."  *See Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir.

2002).

3.      A statement in a proxy solicitation is material "if there is a

substantial likelihood that a reasonable shareholder would consider it important in

deciding how to vote."  *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083,

1090, 111 S. Ct. 2749, 2757 (1991) (quoting *TSC Indus., Inc. v. Northway, Inc.*,

426 U.S. 438, 449, 96 S. Ct. 2126, 2132 (1976)).  The SEC uses the same

definition of "materiality" in its interpretation of Regulation FD, which requires

public disclosure of "any material nonpublic information" when an issuer

selectively discloses such information to certain persons.  17 C.F.R. § 243.100.

According to the adopting release for Regulation FD, "Information is material if

'there is a substantial likelihood that a reasonable shareholder would consider it important' in making an investment decision. To fulfill the materiality requirement, there must be a substantial likelihood that a fact 'would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Selective Disclosure and Insider Trading, Exchange Act Release Nos. 33-7881, 34-43154, 65 Fed. Reg. 51,716, 51,721 (Aug. 24, 2000) (footnotes and citations omitted). The release provides examples of types of information or events that are likely to be considered material, including earnings information and events regarding the issuer's securities such as, *inter alia*, repurchase plans. *Id.*

    4.  In the CSX Proxy, Counterclaim Defendants have violated Rule 14a-9 by offering a misleading and incomplete disclosure of executive compensation, including CSX's use of spring-loaded stock grants; and by offering a misleading and incomplete disclosure of stock grants made to non-management directors.

    5.  The executive compensation disclosure in the CSX Proxy is misleading and incomplete in several regards. The CSX Proxy's disclosures with regard to performance grants set under its LTIP in May 2007 and the award of stock to non-management directors in December 2007 are materially false and misleading because it fails to disclose: (a) that, in May 2007, CSX set performance grants under its LTIP for its named executive officers and other employees while in possession of material nonpublic information; (b) that CSX's shareholder-approved Omnibus Incentive Plan, which grants the CSX Board

authority to award equity-based performance compensation, does not include any provision that allows the Board to set performance grants while in the possession of material nonpublic information; (c) that the setting of the performance grants under the LTIP violated the company's Corporate Governance Guidelines, including its Insider Trading Policy and Code of Ethics; and (d) how the LTIP awards were determined.  These omissions are material because they are specifically required to be included in the Schedule 14A under Item 402(b)(1) of Regulation S-K, 17 C.F.R. § 229.402(b) (which is incorporated by reference into Item 8 of Schedule 14A, 17 C.F.R. § 240.14a-101) and because the information is material to the shareholders' decision to elect the Board members that approved these performance grants and stock awards.

6.    In particular, CSX did not disclose that it set its performance grants for senior officers immediately prior to the public disclosure of material information regarding the expansion of a stock repurchase program, a change in CSX's dividend, and significant changes in capital expenditures. However, Item 402(b)(2)(iv) of Regulation S-K requires that there be disclosure of "how the determination is made as to when [compensation] awards are granted, including awards of equity-based compensation . . . ."  17 C.F.R. § 229.402(b)(2)(iv).  The failure of the CSX Proxy to explain that equity awards were granted under the LTIP on May 1, 2007, while the Board was aware that favorable and nonpublic financial information was to be announced on May 8, 2007 violates these disclosure requirements.  In addition, the CSX Proxy does not disclose that this grant violated CSX's Insider Trading Policy, which prohibits

CSX directors, officers and employees from "conduct[ing] transactions in any CSX security while he or she is aware of material nonpublic information about CSX."  The CSX Proxy also fails to explain that by granting CSX stock while in possession of material nonpublic information, CSX directors violated CSX's Bylaws and Code of Ethics, both of which require adherence to the Insider Trading Policy.  These material omissions violate the SEC disclosure rules regarding executive compensation.  *See Maldonado v. Flynn*, 597 F.2d 789, 796 (2d Cir. 1979) (finding that "the compensation of directors and key officers and transactions between them and their corporation are matters explicitly covered by SEC disclosure regulations;" and that such compensation "involve[s] matters of direct and deep concern to shareholders in the exercise of their right to vote, which the Exchange Act expects to be fully disclosed in proxy solicitations for election of officers and directors.").

       7.     In addition to these undisclosed facts relating to the LTIP performance stock grants, the CSX Proxy's disclosure that the directors awarded themselves discretionary grants on December 15, 2007 is materially false and misleading because it fails to disclose that those awards were made on December 12, 2007 and that the CSX directors violated the CSX Insider Trading Policy by awarding the grants during a "blackout period," in which directors are prohibited from conducting transactions in CSX securities.  The failure to disclose also violates SEC regulations that require the inclusion of detailed information about the timing of equity grants.  *See* 17 C.F.R. § 240.14a-101; 17 C.F.R. § 229.402(b); *Maldonado*, 597 F.2d at 796.

8.     CSX has also violated Rule 14a-9 by making harsh and baseless allegations against TCI in public comments and in additional solicitation materials filed pursuant to SEC Rule 14a-12.  Note (b) to SEC Rule 14a-9 provides that it "may be misleading" to disseminate "[m]aterial which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes changes concerning improper, illegal or immoral conduct or associations, without factual foundation."  17 C.F.R. § 240.14a-9.  Here, CSX has made unfounded accusations that TCI is seeking "effective control" of CSX in a February 14, 2008 letter to Mr. Hohn and in the March 17, 2008 press release regarding the filing of this lawsuit, both of which were filed with the SEC as additional soliciting materials under Rule 14a-12.  These statements are materially false and misleading because TCI is proposing a minority slate of five directors to the twelve-seat CSX Board of Directors, only one of whom is affiliated with TCI and one of whom is affiliated with 3G.  The other two nominees are wholly independent.

9.     In addition, in Mr. Ward's March 11, 2008 editorial (filed with the SEC on March 17, 2008), CSX and Michael Ward made materially false and misleading statements in violation of Rule 14a-9 regarding TCI's demand that CSX freeze investments in its rail system.    That statement is materially false and misleading because it implies that TCI was willing to sacrifice safety.  Mr. Ward and CSX were aware that TCI never advocated freezing all investment, but only growth expenditures and only until the issue of the re-regulation bill before Congress was resolved.

10.     In addition, CSX has violated Rule 14a-9 by falsely describing its discussions with TCI during January 2008 and its motives in bringing this lawsuit in public comments and in additional solicitation materials filed pursuant to Rule 14a-12.  In a press release issued on the date this lawsuit was commenced, and filed as soliciting material on a Form 8-K, Presiding Director of the Board Edward J. Kelly refers to his discussions with Mr. Hohn as "an effort to avoid the disruption and expense of a proxy contest."  In that same press release, Mr. Ward is quoted as stating that this lawsuit was commenced "to ensure that all of our shareholders receive complete and accurate information about the group's holdings, agreements, plans and motivations to which they are entitled under federal securities laws" and that CSX management is "committed to protecting the interests of all CSX shareholders."  Those statements are false and misleading because CSX's discussions with TCI in January 2008 were conducted in bad faith, and because CSX brought this lawsuit for the purpose of entrenching itself and stifling the voices of any dissenters.

**(b)     Third-Party Defendant Michael Ward Is Liable for CSX's Violations of Section 14(a).**

11.     Third-Party Defendant Michael Ward is also liable under Section 20(a) of the Exchange Act.  This provision states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable. . . ."  15 U.S.C. § 78t(a).  "Section 20(a) . . . imposes

liability on a controlling person for violations by a controlled person unless the controlling person acted in good faith and did not induce the violation." *Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281, 284 (S.D.N.Y. 1994). "Knowledge and culpability are not elements of a prima facie case; instead, their absence constitutes an affirmative defense." *Id*. In its answer to TCI's counterclaims, CSX admits that Mr. Ward was Chairman, President and CEO and has discretionary authority to control or influence certain aspects of the conduct of CSX. (Answer ¶¶ 29, 144). Accordingly, Mr. Ward is a controlling person within the definition of Section 20(a) who exercised discretionary authority to control or influence the conduct of CSX.

12.    If a prima facie case of controlling person status is established, the burden shifts to the controlling person to show: (1) "that he acted in good faith," *and* (2) that he "did not directly or indirectly induce the act or acts constituting the violation." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996). Here, Mr. Ward cannot meet that burden because as Chairman of the Board, Michael Ward voted in favor of accelerating the May 8 Announcements. He also chaired the Board that awarded the LTIP stock grants while in possession of material non-public information and in violation of CSX policies, as well as when it awarded discretionary stock grants to directors during a blackout period, also in violation of CSX policies. Moreover, Mr. Ward authored the March 11, 2008 editorial, and is quoted in the March 17, 2008 press release, in which he made false and misleading statements about TCI. Finally, Mr. Ward was on the Board when it adopted the February Amendment and

approved the shareholder solicitation for that proposal.  *See Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1434 (9th Cir. 1995) (rejecting the Section 20(a) affirmative defense because "the allegedly misleading public disclosures, press releases, and statements to the press that constituted the fraud were all approved by one or more of the insured directors and officers").

### (c)    The February Amendment Violates Virginia Law

13.    Virginia Code § 13.1-680 explicitly grants shareholders of a corporation the right to "remove one or more directors with or without cause, unless the Articles of Incorporation provide that directors may be removed only with cause."  Va. Code Ann. § 13.1-680A; *see also Scott Co. Tobacco Wharehouses, Inc. v. Harris*, 201 S.E.2d 780, 783 (Va. 1974) (holding that an interpretation of the legislative purpose of § 13.1-36, the predecessor to § 13.1-680, is to protect and expand on stockholder democracy).

14.    Because CSX's Articles of Incorporation do not limit the circumstances under which directors may be removed, the CSX shareholders have the right to remove directors with or without cause.

15.    Under Virginia law, shareholders may remove a director "*only* at a meeting called for the purpose of removing the director.  The meeting notice shall state that the purpose, or one of the purposes of the meeting, is removal of the director."  Va. Code Ann. § 13.1-680(D) (emphasis added). Moreover, "[t]he terms of all other directors expire at the next annual shareholders' meeting following their election unless their terms are staggered." Va. Code Ann. § 13.1-677.

16.     CSX's Bylaws do not allow for staggered terms; therefore, an annual meeting is never an occasion to remove a director since such director's term expires then as a matter of law.

17.     The February Amendment explicitly bars shareholders from calling a meeting with regard to any subject matter "within 12 months after any annual or special meeting of shareholders at which the same matter was included on the agenda, or if the same matter will be included on the agenda at an annual meeting to be held within 90 days after the receipt by the Corporation of such request."

18.     Moreover, the February Amendment explicitly provides that "the election or removal of directors shall be deemed the same matter with respect to all matters involving the election or removal of directors."  Under the definition of the "same matter" set forth in the February Amendment, shareholders are barred from ever calling a special meeting for the purpose of electing shareholder-nominated directors or removing directors.

19.     Thus, under the February Amendment, there would never be a circumstance when a shareholder could call a special meeting to remove a director.  Because the February Amendment operates to bar shareholders from ever calling a meeting for the purpose of removing existing directors or electing shareholder-nominated directors, it is in complete contravention of Virginia Code § 13.1-680.

20.     In adopting the February Amendment, the CSX Board usurped the right granted to the shareholders by § 13.1-680 of the Virginia Code

to elect or remove directors, which the Virginia courts have found impermissible.
*See, e.g.*, *Harris*, 201 S.E.2d at 783 (finding that the predecessor to § 13.1-680
"was enacted to restrict action by the board of directors and to insure ultimate
corporate control in the shareholders" and "was not designed to inhibit the power
granted to shareholders . . . to remove directors at will").

   21. Section 13.1-624(b) of the Virginia Code provides that the
bylaws of a corporation may contain any provision for managing the business and
regulating the affairs of the corporation that is not inconsistent with law or the
articles of incorporation. The February Amendment is inconsistent with Virginia
law and is void *ab initio*.

**2.**  **CSX's and Michael Ward's Contentions**

**(a)**  **Claims Regarding Compensation.**

Counterclaim Plaintiffs claim that CSX violated Section 14(a) by not disclosing
that grants made by the Compensation Committee of CSX's Board of Directors on May 1, 2007
under the Company's 2007-2009 Long Term Incentive Plan ("LTIP") were "springloaded" and
violated CSX's Insider Trading Policy. They make similar claims about the issuance of stock on
May 2, 2007 to CSX directors as part of their annual retainer. In both cases defendants allege
that, at the time of the grants or issuance, CSX was in possession of material nonpublic
information that was made public on May 8, 2007. They also claim that a December 2007
issuance of 5,000 shares of stock to CSX directors as part of their annual remuneration violated
the Insider Trading Policy because it occurred during a so-called "blackout period."

   (1) These are breach of fiduciary duty claims being "bootstrapped" into
nondisclosure claims under the federal securities laws, and should be dismissed on that basis

alone. *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999) (upholding dismissal of mismanagement claims as "no more than state law breach of fiduciary duty claims under a thin coat of federal paint"); *Field v. Trump*, 850 F.2d 938, 948 (2d Cir. 1988).

(2)    A company is not required to characterize its actions in pejorative terms or engage in self-accusation.  *See GAF Corp. v. Heyman*, 724 F.2d 727, 740 (2d Cir. 1983) ("the proxy rules simply do not require management to accuse itself of antisocial or illegal policies"); *In re American Exp. Co. Shareholder Litigation*, 840 F. Supp. 260, 269 (S.D.N.Y. 1993).  This is another basis for dismissal of the claims on the law.

(3)    The facts concerning the 2007-2009 LTIP, and the issuance of stock to directors, are fully and accurately described in the CSX definitive proxy statement.

(4)    It makes no sense to speak of LTIP grants as being "springloaded" or the subject of insider trading.  LTIP grants are not options or even securities.  They represent only the *possibility* of future income if CSX achieves certain pre-established operating targets three years later.  The employee may earn anywhere from 0 to 240 percent of the performance units granted at the beginning of the performance cycle, depending on how the Company does in relation to the operating targets, and how the Compensation Committee exercises its discretion, three years later.  The relationship between the price of CSX stock on the date of the target grants and the payout of CSX shares three years later is attenuated at best.

(5)    The Compensation Committee was not in possession of material non-public information when it made the LTIP grants on May 1, 2007, and there was no connection between the grants on May 1 and the actions announced on May 8.  Moreover, the announcements on May 8, 2007, had no significant impact on the price of CSX stock.

(6)    The issuance of stock to directors as part of their annual retainer is required to be made, pursuant to the explicit terms of the CSX Stock Plan for Directors, immediately following the Company's annual meeting of shareholders.  The annual meeting occurred on May 2, 2007, and that is the date on which the stock was automatically issued.

(7)    The grant of 5,000 shares to directors as part of their remuneration is something that happens every year in December.  The grant is 5,000 shares no matter what the price of CSX stock may be.  The grant has never been considered a "transaction" covered by the Insider Trading Policy or subject to the "blackout period" rule.

(8)    The CSX Insider Trading Policy prohibits the purchase or sale of securities while in possession of material non-public information.  The LTIP performance units are not securities—they cannot be purchased or sold and are invisible to the eye.  The issuance of stock to directors does not involve a purchase or sale either.  There is no nexus between that issuance and any public market for securities.

**(b)    Claims Regarding Bylaw Amendments and Proposals Relating to Special Meetings of Shareholders.**

(9)    Counterclaim Plaintiffs claim that CSX's disclosures concerning the February 2008 amendments to the Company's bylaws relating to special meetings, and CSX's proposal asking shareholders to approve those amendments, are false and misleading.  They assert that those disclosures represent a "disingenuous" attempt to appear responsive to a non-binding proposal, passed by shareholders in May 2007, asking the Board of Directors to amend the bylaws to permit shareholders holding between 10 and 25 percent of outstanding shares to require the calling of a special meeting of shareholders.  What counterclaim plaintiffs are really complaining about is that the bylaw amendments do not allow shareholders with 15 percent of

the voting stock to call special meetings between annual meetings for the purpose of electing or

removing directors.  They contend that shareholders have a statutory right, under Virginia law, to

call a special meeting for the purpose of removing or electing directors.

(10)    The facts concerning the bylaw amendments, the CSX proposal asking

shareholders to approve those amendments, and the TCI competing proposal, are all set forth in

detail in the CSX definitive proxy statement.

(11)    After the shareholders passed the non-binding proposal in May 2007, the

Board took time to determine what other companies had done and to discuss the matter, and then

adopted amendments to the bylaws allowing, subject to certain safeguards, shareholders holding

15 percent of the outstanding voting stock of CSX to require the Board to call a special meeting.

(12)    The principal safeguard is that, if the special meeting is requested on a

subject matter, including the election of directors, that has been taken up within the previous 12

months or that within 90 days will be taken up at the next annual meeting, the request may

properly be denied.

(13)    The non-binding proposal passed by the shareholders in May 2007 did not

purport to deprive the Board of the discretion to introduce reasonable procedural provisions and

safeguards.  Nor could it.

(14)    The Board, in good faith, attempted to strike a balance between allowing

minority shareholders to call a special meeting and protecting the Company and all shareholders

from the expense, distraction and drain on resources that would be caused by having serial

meetings on the same subject matter within the same 12-month period.

(15)    The Board was mindful that CSX does not have a classified board; each

director stands for election every year at the annual meeting; and even in uncontested elections,

the directors must receive a majority of the votes cast to be elected.  Thus, the shareholders have

the opportunity in every year to elect or remove directors.

(16)    The claim is a disguised attempt to have the Court rule on the

appropriateness of what the Board has done.  Under the business judgment rule, the Court should

not second-guess the balance struck by the Board.

(17)    The Virginia Stock Corporations Act provides that shareholders do *not*

have the right to call special meetings except to the extent that such a right is conferred by the

Company's bylaws.  The Virginia Assembly amended the Act in 1985 to *delete* a provision that

had allowed shareholders to call a special meeting.  Only the president, chairman of the board

and board of directors have the statutory right to call a special meeting.  The Board is permitted,

but not required, to call special meetings in response to shareholder requests.

(18)    The February bylaw amendments do not in any way interfere with the

shareholders' ability to vote out a director, or elect other directors, at any annual meeting.  Every

director stands for election in every year, and must garner a majority of the votes cast to win

election.  The Board's decision not to give minority shareholders the right to call for elections

between annual meetings strikes an appropriate balance and does not violate any law.

> **(c)    Claims Regarding Statements of Opinion by Michael Ward and Edward J. Kelly, III.**

Counterclaim Plaintiffs claim that statements in an op-ed piece by Michael Ward,

chairman, president and chief executive officer of CSX, published in the *Washington Times* on

March 11, 2008, were false and misleading because they suggested that TCI is a short-sighted

investor that would freeze capital expenditures relating to safety.  Defendants also claim that

statements by CSX's presiding director, Edward J. Kelly, III, in a letter of February 14, 2008 and

a press release of March 17, 2008, were false and misleading insofar as they suggested that TCI appears to be seeking "effective control" of the CSX Board of Directors.

(19)    Statements of opinion cannot be held false under the securities laws unless they are both objectively and subjectively false.  *See Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, *5 (S.D.N.Y. May 9, 2003).  Especially "where the statement is prepared in the 'hurly-burly' of a contested election . . . . [f]air accuracy, not perfection is the appropriate standard."  *Caspary v. Louisiana Land Co.*, 579 F. Supp. 1105, 1108 (S.D.N.Y. 1983).

(20)    Mr. Ward and Mr. Kelly believed their statements to be true, and stand by their opinions.  Moreover, their opinions are well-supported by facts that Mr. Ward and Mr. Kelly believed to be true.

(21)    TCI demanded that CSX freeze capital expenditures because of the threat that Congress would pass a bill re-regulating railroads.  TCI also suggested that CSX not make further capital investments if Congress followed through with that bill.

(22)    TCI proposed a leveraged buyout of CSX and subsequently demanded that CSX repurchase 20 percent of its stock each year for the next five years, and in the process incur so much debt that it would lose its investment grade credit ratings.

(23)    Mr. Ward's editorial did not state that TCI's demands for cuts in capital expenditures would jeopardize safety.  However, it is his opinion that the cuts in capital expenditures advocated by TCI could adversely affect safety.

(24)    Mr. Kelly's opinion that TCI is seeking "effective control" is based on reports concerning demands made upon CSX management by TCI, and threats that, for instance, there would be "no limits" to what TCI would do if the CSX management did not acquiesce in TCI's demands.

(25)    Mr. Kelly's opinion is also based on demands made by Chris Hohn of TCI during their discussions in January 2008.  During those discussions, after Mr. Kelly had stated CSX's willingness to nominate three of TCI and 3G's nominees plus a fourth to be mutually agreed upon, Mr. Hohn:

a.    requested that he be able to interview each of the current directors to determine which might be receptive to his views;

b.    insisted on dictating the existing directors who would be replaced by the TCI/3G nominees;

c.    insisted that the TCI/3G nominees be placed on certain committees;

d.    pressed his view that the roles of CEO and Chairman be split;

e.    insisted that the number of Board members not be increased without shareholder approval or approval by 80 percent of the Board; and

f.    insisted that shareholders controlling 10 (or possibly 15) percent of the outstanding shares of CSX voting stock be permitted to call a special meeting of shareholders at any time to consider any business, including the election of new directors or removal of existing directors.

Mr. Hohn further preemptively stated that no standstill would ever be acceptable to him.

(26)    In addition, Mr. Hohn threatened that, if CSX did not agree to his demands, he would run his slate, create a dissident board, and make things unpleasant for Mr. Kelly as presiding director.  Mr. Hohn further suggested that his directors would decline to

provide written consents to Board actions and would otherwise disrupt the operation of the

Board.  The implicit premise underlying Mr. Hohn's threats was that his five nominees would

vote together as a bloc.

(27)    All of these factors led Mr. Kelly and the CSX Board of Directors to

conclude that TCI was seeking to achieve effective control of the Board and dictate CSX's

strategy.

**(d)    Claim that CSX's March 17, 2008, Press Release Misrepresents the Reasons Why CSX Commenced This Litigation.**

Counterclaim Plaintiffs claim that CSX's press release of March 17, 2008 omitted

information concerning the real reasons that CSX commenced litigation against TCI and 3G.

Specifically, they allege that CSX's statement that it filed the lawsuit to ensure that its

shareholders receive complete and accurate information in the proxy fight could not be true given

the timing of CSX's complaint.

(28)    CSX's explanation, in the March 17 release, for why it brought this

lawsuit is supported by uncontradicted facts.  The lawsuit was commenced within two weeks

after CSX's proxy solicitation advisors noticed a pattern in the movement of CSX shares

suggesting that TCI was controlling or influencing the vote of shares held by swap counterparties

and, thus, was the beneficial owner of those shares.  In short, TCI was "parking" the shares.

TCI's allegations that the litigation was commenced for other reasons are untrue and contradicted

by the facts supporting CSX's press release.

(29)    CSX is not required by the securities laws to cast its own actions in

pejorative terms.  (*See* contention 2, *supra*.)

(e)    **Claims Under Section 20(a) Against Michael Ward.**

Counterclaim Plaintiffs claim that CSX's chairman and chief executive officer is liable for the alleged violations of Section 14(a) by CSX.

(30)    There can be no liability under Section 20(a) in the absence of a primary violation. *Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004), and there has been no primary violation here.

(31)    Moreover, Section 20(a) does not impose liability on a person who acts in good faith, and Mr. Ward acted in good faith.

## V.    ISSUES TO BE TRIED

### A.    <u>CSX's Claims</u>

The parties agree that the following issues are to be tried with respect to CSX's claims against defendants:

(1)    whether TCI and 3G are beneficial owners of the CSX shares referenced in their swap arrangements within the meaning of Section 13 of the '34 Act;

(2)    whether TCI and 3G acted as a group with their swap counterparties, as defined by Section 13(d)(3) of the '34 Act;

(3)    whether TCI and 3G acted as a group with each other and others, as defined by Section 13(d)(3) of the '34 Act, prior to ten days before December 19, 2007;

(4)    whether Defendants made misleading statements and omissions in their disclosures pursuant to Sections 13(d) and 14(a) of the '34 Act;

(5)    whether the Individual Defendants are a controlling persons of TCI, 3G and the Group within the meaning of Section 20(a) of the '34 Act and thus liable for any violation of Sections 13(d) and 14(a) of the '34 Act.  (See Count III); and

(6)    whether Defendants' Notices complied with Article I, Section 11(a)(ii) of CSX's Bylaws in the manner in which they reported the number of shares of capital stock of CSX that Defendants owned beneficially.

## B.    Counterclaims and Third-Party Claims.

The parties agree that the following issues are to be tried with respect to the counterclaims and third-party claims against CSX and Michael Ward:

(1)    whether the disclosures in CSX's Proxy Statement regarding equity-based performance grants to certain executives and stock awards to non-management directors are materially false and misleading;

(2)    whether the statements in CSX's additional soliciting materials are materially false and misleading in violation of Section 14(a) of the '34 Act and regulations thereunder;

(3)    whether Michael Ward maintained discretionary authority to control or influence the conduct of CSX, including its actions and omissions in violation of Section 14(a) of the '34 Act; and

(4)    whether the Bylaw amendment adopted by the CSX Board in February 2008, for which CSX seeks shareholder approval at the Annual Shareholder Meeting, violates Virginia law.

## VI.   JOINT EXHIBITS

Joint exhibits are listed in Exhibit A attached hereto.  The parties stipulate to the

admissibility of these documents.  Exhibits not listed in Exhibits A, B or C may not be used at

trial except (a) for cross-examination purposes or (b) if good cause for its exclusion from the

pretrial order is shown.

## VII.   PLAINTIFF'S EXHIBITS

CSX's and Michael Ward's proposed exhibits are listed in Exhibit B hereto, as are any

objections of Defendants to those exhibits.

## VIII.   DEFENDANTS' EXHIBITS

Defendants' proposed exhibits are listed in Exhibit C hereto, as are any objections of

CSX and Michael Ward to those exhibits.

## IX.   STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

The parties agree as to the authenticity and admissibility of all exhibits listed in Exhibit

A.  The parties also agree as to the authenticity of all exhibits listed in Exhibits B and C hereto,

except as expressly stated in Exhibits B and C hereto.

## X.   PLAINTIFF'S WITNESS LIST

Plaintiff has included witness statements or expert reports for the following individuals:

a.    Michael Ward

b.    Edward Kelly, III

c.    Oscar Munoz

d.    Ellen Fitzsimmons

e.    David Baggs

f.    Alan Miller

      g.     William Richardson

      h.     Marti Subrahmanyam (expert witness on affirmative claims)

      i.     Bradford Cornell (expert witness on counterclaims)

In addition, CSX has offered designated deposition testimony of Nancy Bryson in lieu of a statement and will make her available on cross examination. CSX also reserves:

      (1)     the right to subpoena document custodians for exhibits as to which the parties cannot reach agreement as to authenticity and admissibility;

      (2)     the right to subpoena individuals as to whom defendants object to the offering of their deposition testimony; and

      (3)     the right to call defendants Christopher Hohn, Snehal Amin and Alexandre Behring.

CSX and Mr. Ward intend to offer testimony by deposition as described in Exhibit D.

## XI.  DEFENDANTS' WITNESS LIST

      a.     Christopher Hohn

      b.     Alexandre Behring

      c.     Snehal Amin

      d.     Richard Kennedy

      e.     John Arnone

      f.     Paul Busby

      g.     Peter Harkins

      h.     Frank Partnoy

      i.     Daniel Fischel

      j.     Michael Ward

      k.      Edward R. Kelly

      l.      Oscar Munoz

      m.      Ellen Fitzsimmons

      n.      William Richardson

      o.      David Baggs

      p.      Document Custodians for Exhibits as to which the parties cannot reach an agreement as to authenticity and admissibility

Defendants intend to offer testimony by deposition as described in Exhibit E.

### XII.   RELIEF SOUGHT

**A.**   **CSX Claims**

**1.**   **CSX**

CSX seeks an Order (the proposed form of which is set forth at Exhibit F):

(1)    declaring that Defendants failed to file timely, complete and accurate disclosures in violation of Sections 13(d) and 14(a) of the '34 Act;

(2)    directing that Defendants file truthful and accurate Schedule 13D and Schedule 14A disclosures, in compliance with the applicable rules and regulations, forthwith;

(3)    enjoining Defendants from acquiring additional shares of CSX until accurate and compliant Schedule 13D and Schedule 14A disclosures have been filed;

(4)    enjoining Defendants from acquiring any CSX shares referenced in swap arrangements to which they are party;

(5)    directing that Defendants sell, in an orderly manner pursuant to a plan ordered by the Court, all shares acquired, and terminate all swaps referencing CSX shares that they entered into, renewed or extended, after the date by which they should have filed a

Schedule 13D and enjoining defendants from voting such shares at the 2008 annual meeting of CSX shareholders;

(6)    enjoining Defendants from voting any proxies received prior to such time as the Court ascertains that Defendants have filed accurate and compliant Schedule 13D and Schedule 14A disclosures;

(7)    declaring Defendants' Notices invalid as noncompliant with CSX's Bylaws; and

(8)    granting such other and further relief as the Court may deem just and proper.

### 2.    Defendants

Defendants seek an Order:

(1)    dismissing Plaintiffs' claims with prejudice;

(2)    granting them costs (including attorneys fees); and

(3)    such other further relief as the Court may deem just and proper.

### B.    Counterclaims and Third Party Claims

### 1.    TCI Fund/3G

TCI Fund and 3G seek an Order:

(1)    Declaring that CSX failed to file timely, complete and accurate disclosures in violation of Section 14(a) of the '34 Act;

(2)    Directing that CSX file truthful and accurate Schedule 14A disclosures, in compliance with the applicable rules and regulations, forthwith;

(3)    Declaring that CSX's Board of Directors was in violation of CSX's Insider Trading Policy, Corporate Governance Guidelines, CSX's Code of Ethics and Bylaws;

(4)    Directing that the February Amendment is void under Virginia Code §§ 13.1-680 and 13.1-624;

(5)    Enjoining CSX from having its proposal regarding calling special shareholder meetings considered at the June 25, 2008 Shareholders Meeting or, if rescheduled, any annual shareholders meeting scheduled for 2008;

(6)    Enjoining CSX from voting proxies received prior to such time as the Court ascertains that CSX has filed an accurate and compliant proxy statement;

(7)    Enjoining CSX from committing any violations of Rule 14a-9 in connection with any further solicitation relating to the June 25, 2008 Shareholder Meeting or, if rescheduled, any annual shareholders meeting scheduled for 2008;

(8)    Directing the CSX Board of Directors to pay for the preparation and filing of CSX's amended proxy statement; and

(9)    Granting such other and further relief as the Court may deem just and proper.

A proposed form of Injunction is attached hereto as Exhibit G.

## 2.    **CSX and Michael Ward**

CSX and Michael Ward seek an Order (the proposed form of which is set forth at Exhibit F):

(1)    dismissing Defendants' counterclaims with prejudice;

(2)    granting CSX and Mr. Ward costs (including attorneys fees); and

      (3)    granting CSX and Mr. Ward such other and further relief as the Court may

deem just and proper.

Dated:  May 15, 2008

                                _____
                                     Lewis A. Kaplan
                                United States District Judge
      (The manuscript signature above is not an image of the signature on the original document in the Court file.)

SCHULTE ROTH & ZABEL LLP  CRAVATH, SWAINE & MOORE LLP


By: _____  By: _____
  Howard O. Godnick     Rory O. Millson
  Michael E. Swartz     Francis P. Barron
  Yocheved Cohen      David R. Marriott


  919 Third Avenue      825 Eighth Avenue
   New York, New York 10022   New York, NY 10019
    (212) 756-2000      (212) 474-1000

*Attorneys for The Children's Investment Fund* *Attorneys for CSX Corporation*
*Management (UK) LLP, The Children's*
*Investment Fund Management (Cayman) LTD,*
*The Children's Investment Master Fund,*
*Christopher Hohn and Snehal Amin*


KIRKLAND & ELLIS LLP


By: _____
  Peter Duffy Doyle
  Andrew M. Genser


  153 East 53rd Street
   New York, New York 10022
    (212) 446-4800

*Attorneys for 3G Capital Partners Ltd,*
*3G Capital Partners, LP, 3G Fund, LP and*
*Alexandre Behring (a/k/a Alexandre Behring*
*Costa)*