UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CSX CORPORATION,<br><br>                                   Plaintiff,<br><br>v.<br><br>THE CHILDREN'S INVESTMENT FUND MANAGEMENT (UK) LLP, THE CHILDREN'S INVESTMENT FUND MANAGEMENT (CAYMAN) LTD., THE CHILDREN'S INVESTMENT MASTER FUND, 3G CAPITAL PARTNERS LTD., 3G CAPITAL PARTNERS, L.P., 3G FUND, L.P., CHRISTOPHER HOHN, SNEHAL AMIN AND ALEXANDRE BEHRING, A/K/A ALEXANDRE BEHRING COSTA,<br><br>                                   Defendants. | ECF Case<br><br>08 Civ. 02764 (LAK) (KNF)<br><br>**DECLARATION OF GARY A. BORNSTEIN IN SUPPORT OF CSX'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO STRIKE PORTIONS OF THE WITNESS STATEMENT OF ALAN MILLER** |
| THE CHILDREN'S INVESTMENT MASTER FUND,<br><br>         Counterclaim and Third-Party Plaintiff,<br><br>v.<br><br>CSX CORPORATION AND MICHAEL WARD,<br><br>         Counterclaim and Third-Party Defendants. | |
| 3G CAPITAL PARTNERS LTD., 3G CAPITAL PARTNERS, L.P. AND 3G FUND, L.P.<br><br>         Counterclaim and Third-Party Plaintiffs,<br><br>v.<br><br>CSX CORPORATION AND MICHAEL WARD,<br><br>         Counterclaim and Third-Party Defendants. | |

I, Gary A. Bornstein, an attorney duly admitted to practice before this Court, hereby declare the following to be true under penalties of perjury:

1. I am a member of the firm of Cravath, Swaine & Moore LLP, attorneys for Plaintiff CSX Corporation, and I am familiar with the facts and circumstances set forth herein. I respectfully submit this declaration in support of CSX's Opposition to Defendants' Motion *in Limine* to Strike Portions of the Witness Statement of Alan Miller.

2. Attached hereto as Exhibit 1 is a true and correct copy of excerpts of the deposition transcript of Alan Miller, dated May 5, 2008.

Dated: May 20, 2008
New York, New York

_____
Gary A. Bornstein

# EXHIBIT 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4
 5   ------------------------------x
 6   CSX CORPORATION,
 7              Plaintiff,        :
 8         vs.
 9   THE CHILDREN'S INVESTMENT FUND:
10   MANAGEMENT (UK) LLP, THE
11   CHILDREN'S INVESTMENT FUND    :
12   MANAGEMENT (CAYMAN) LTD., THE
13   CHILDREN'S INVESTMENT MASTER  :   Case No.
14   FUND, 3G CAPITAL PARTNERS
15   LTD., 3G CAPITAL PARTNERS,    :   08 CV 02764
16   L.P.; 3G FUND, L.P.;
17   CHRISTOPHER HOHN; SNEHAL AMIN;:
18   and ALEXANDRE BEHRING, a/k/a
19   ALEXANDRE BEHRING COSTA,      :
20              Defendants.
21   ------------------------------x
22
23              May 5, 2008
24              10:13 a.m.
25
26        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
27        Videotaped 30(b)(6) Deposition of ALAN
28   MILLER, held at the offices of Day Pitney LLP, 7
29   Times Square, New York, New York, before Frank
30   J. Bas, a Registered Professional Reporter and
31   Notary Public of the State of New York.
```

```
 1
 2   A P P E A R A N C E S:
 3   CRAVATH, SWAINE & MOORE LLP
 4   Attorneys for Plaintiff
 5        Worldwide Plaza
 6        825 Eighth Avenue
 7        New York, New York  10019
 8   BY:  LILLIAN S. GROSSBARD, ESQ.
 9
10   SCHULTE ROTH & ZABEL LLP
11   Attorneys for TCI, Christopher Hohn, and Snehal
12   Amin
13        919 Third Avenue
14        New York, New York  10022
15
16   BY:  PAMELA C. SERRANZANA, ESQ.
17        KATIE R. MELNICK, ESQ.
18        ASSUNTA VIVOLO, ESQ.
19
20   KIRKLAND & ELLIS LLP
21   Attorneys for 3G Capital Partners, Ltd.; 3G
22   Capital Partners, L.P.; 3G Fund, L.P.; Alexandre
23   Behring, a/k/a Alexandre Behring Costa
24        153 East 53rd Street
25        New York, New York  10011
26
27   BY:  BRIAN W. SONG, ESQ.
28
29   DAY PITNEY LLP
30   Attorneys for Innisfree, Inc., and the Witness
31        7 Times Square
32        New York, New York  10036
33
34   BY:  M. ALEXANDER BOWIE, II, ESQ.
35        AMY J. IANNONE, ESQ.
36
37   ALSO PRESENT:
38
39        HEATHER ZAMORA-HEGG, The Video Operator
40
41
```

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2                  May 5, 2008
 3                New York, New York
 4                     ---
 5        THE VIDEO OPERATOR:  Good morning.
 6   This is the video operator speaking,
 7   Heather Zamora-Hegg of Merrill Legal
 8   Solutions, 25 West 45th Street, New York,
 9   New York.
10        Today is May 5, 2008, and the time
11   is 10:13 a.m.  We are at the offices of Day
12   Pitney, 7 Times Square, New York, New York,
13   to take the videotaped deposition of Alan
14   Miller in the matter of CSX Corporation
15   versus The Children's Investment Fund
16   Management (UK) LLP, et al., in the United
17   States District Court for the Southern
18   District of New York.
19        Will counsel please introduce
20   themselves for the record.
21        MS. SERRANZANA:  I'm Pamela
22   Serranzana from Schulte Roth & Zabel.  I'm
23   here on behalf of TCI, Christopher Hohn,
24   and Snehal Amin.
25        MS. MELNICK:  I'm Katie Melnick,
```

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2   from Schulte Roth & Zabel.  And I'm also
 3   here on behalf of TCI, Christopher Hohn,
 4   and Snehal Amin.
 5        MS. VIVOLO:  Assunta Vivolo from
 6   Schulte Roth & Zabel, on behalf of TCI,
 7   Christopher Hohn, and Snehal Amin.
 8        MR. SONG:  I'm Brian Song from
 9   Kirkland & Ellis, on behalf of 3G and
10   Alexandre Behring.
11        MS. IANNONE:  Amy Iannone from Day
12   Pitney, on behalf of Innisfree M&A
13   Incorporated.
14        MS. GROSSBARD:  Lillian Grossbard
15   from Cravath Swaine & Moore LLP, on behalf
16   of CSX Corporation.
17        MR. BOWIE:  Alex Bowie from Day
18   Pitney, on behalf of Innisfree M&A
19   Incorporated and the witness.
20        THE VIDEO OPERATOR:  The court
21   reporter today is Frank Bas of Merrill
22   Legal Solutions.
23        Will the court reporter please swear
24   the witness.
25
```

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2   40-some-odd professionals.  So theoretically
 3   everyone reports to me.
 4       Q.   Okay.
 5       A.   Although it's not a dictatorship.
 6   We like to think it's a collegial arrangement.
 7            I'll qualify that.  My -- my
 8   co-chairman, my other -- Art Crozier, he doesn't
 9   report to me any more than I report to him.  Nor
10   do Jennifer and Meredith report to me.  I mean,
11   we're -- we all work together.
12       Q.   I'm sure they'll be happy to hear
13   that.
14            Can you tell me about your
15   day-to-day responsibilities at Innisfree?
16       A.   Certainly.  I manage account
17   relationships with clients in connection with
18   proxy solicitation, tender offers, and, you
19   know, shareholder meetings.  That falls under
20   the rubric of proxy.  I also, you know, play a
21   role in managing the firm.
22       Q.   Let's talk about Innisfree itself
23   for a few minutes.  What type of work does
24   Innisfree do?
25       A.   Innisfree is a proxy solicitation
```

17

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2   and investor relations firm.  We represent
 3   issuers and shareholders in -- in M&A matters,
 4   in more mundane solicitations of shareholders.
 5   We do a lot of analytical work for clients.
 6   We're retained routinely by companies to watch
 7   out for hedge fund accumulations.  And by hedge
 8   funds, to evaluate their prospects vis-a-vis
 9   corporations.
10       Q.   Approximately how much of your work
11   do you think is related to this watching out for
12   hedge funds?
13       A.   A significant portion at this point.
14       Q.   Let's talk about the circumstances
15   of Innisfree's retention by CSX.
16       A.   Sure.
17       Q.   When did CSX and Innisfree first
18   discuss working together?
19       A.   Early last year.
20       Q.   Can you be a little more specific?
21       A.   I believe it was January or
22   February.
23       Q.   And do you recall who was involved
24   in those discussions or how it came about?
25       A.   Yes.  I believe I was contacted by
```

18

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2   Mr. Stephenson of the Cravath firm.
 3       Q.   So he called you on the phone?
 4       A.   Yes.
 5       Q.   And said -- what was the substance
 6   of that conversation?
 7       A.   I don't have the specific
 8   recollection of the conversation other than it
 9   would have involved his desire to add me to the
10   team representing CSX at that point.
11       Q.   Did he elaborate at all about the
12   reasons that they wanted to hire you and add you
13   to the team?
14       A.   They had been contacted by TCI at
15   that point, I believe.
16       Q.   So as of that initial conversation
17   you knew that TCI was involved?
18       A.   Yes.  I believe I did.
19       Q.   Who is on the team, Innisfree team
20   that does the work for CSX?
21       A.   Well, I oversee it.  My partner,
22   Jennifer Shotwell, my partner Meredith Cole.
23   Kim Masterson.  Lloyd Lefcourt.  Those are the
24   people that are principally -- Scott Winter.
25       Q.   And what are his --
```

19

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2       A.   Larry Miller.
 3       Q.   I'm sorry.  And what are Mr. Miller,
 4   Mr. Lefcourt, and Mr. Winter's positions at
 5   CSX -- or, I'm sorry, Innisfree?
 6       A.   Again, Mr. Miller is a director and
 7   an account rep.
 8            Mr. Winter is also a director and an
 9   account rep.  Both of them are former attorneys.
10   I guess Mr. Winter's still, I guess, practicing.
11            Mr. Lefcourt does a lot of
12   analytical work.  I've worked closely with him
13   for more than 20 years.  He oversees our banking
14   institutional area.  He works closely with
15   Mr. Lentini in analyzing shareholder bases and
16   movements within them.
17       Q.   Let me just go back for a minute to
18   your call with Mr. Stephenson.
19       A.   Right.
20       Q.   Do you recall what he told you about
21   TCI's contacts with CSX?
22       A.   I don't have a specific recollection
23   of that call.
24       Q.   When did he first tell you about the
25   contacts -- were you told about the contacts
```

20

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2   hedge fund who have had success in pursuing
 3   their agendas at public companies.
 4       Q.   But you've never singled them out as
 5   a topic for discussion.
 6       A.   No.  Not in that -- not from that
 7   perspective.
 8       Q.   How often do you -- would you
 9   estimate you give talks about hedge fund
10   activism?
11       A.   It's fairly frequent.  I did one
12   last week at Northwestern.  I did one several
13   weeks before at the Tulane conference.  You
14   know, certainly three or four times a year.
15       Q.   Moving back to the -- I think you
16   called it the weekly -- what did you call it?  I
17   called it the snapshot.  What -- what did you
18   call it?  The weekly shareholders --
19       A.   I don't think I characterized it.  I
20   think I was responding to your characterization
21   of --
22       Q.   What would you call that document
23   that we were talking about?
24       A.   I would call it a weekly -- a weekly
25   report that endeavors to track movement in the
```

33

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2   shareholder base and to try to explain, you
 3   know, the understanding of our analysts of
 4   what's going on.
 5       Q.   Do you agree that we could call it
 6   the weekly report for simplification purposes?
 7       A.   Sure.
 8       Q.   Okay.  So when did you start putting
 9   together these weekly reports for CSX?
10       A.   I did not ever put them together, so
11   I don't recall the exact date.  I think it was
12   sometime last spring when the type of reporting
13   was formalized in discussions between the
14   company and our -- our people.
15       Q.   And do you remember who was involved
16   in those discussions?
17       A.   It would have been Meredith Cole,
18   and likely Kim Masterson as well.
19       Q.   And who did they speak with at CSX?
20       A.   I don't recall.
21       Q.   Do you recall why --
22       A.   It might have been David Baggs.
23   He's the IR -- head of IR at CSX.
24       Q.   Do you recall why you were asked to
25   put these together, what they -- for what
```

34

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2   purpose they wanted them?
 3            MS. GROSSBARD:  Objection.
 4       A.   I wasn't asked, so I wouldn't have a
 5   recollection of -- of any conversation about it
 6   between us and CSX, so ...
 7       Q.   Were you told about any conversation
 8   between Innisfree and CSX about these weekly
 9   reports?
10       A.   No.  There was -- there was an
11   ongoing discussion.  We had been reporting to
12   the company, you know, individually as, you
13   know, I certainly had conversations with certain
14   people at the company.  Meredith and Kim had
15   conversations with other people at the company,
16   and it represented a formalization of the
17   discussions that Meredith and Kim were having
18   with the IR department, I believe.
19       Q.   What do you call -- what do you mean
20   by "a formalization"?
21       A.   In other words, there was a
22   particular form of reporting that was agreed
23   upon between the -- CSX's IR people and my IR
24   people.
25       Q.   Who did you speak with at CSX about
```

35

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2   this?
 3       A.   I think I just testified that I did
 4   not speak directly to CSX about this, that I
 5   believe Meredith and Kim did.
 6       Q.   Okay.  And you think they spoke with
 7   David Baggs.
 8       A.   I believe that's correct.
 9       Q.   What's the purpose of these
10   documents?
11       A.   The purpose of the weekly reports?
12       Q.   The weekly reports.
13       A.   The purpose of the weekly reports is
14   to provide the client information regarding the
15   movement in the shareholder base in a format
16   that they requested.
17       Q.   So would it be fair to say that CSX
18   approved the format that you eventually ended up
19   with?
20       A.   I believe that's fair to say.
21       Q.   In your experience, why would a
22   client want to see the movement of -- of the
23   shareholder base in these reports?
24       A.   Well, for one thing, as we do for
25   many, many companies, issuers are concerned with
```

36

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2   the concentration of ownership into the hands of
 3   investors who may have a different orientation
 4   than their traditional long-term investors.
 5       Q.   Is it your understanding that this
 6   was one of CSX's concerns?
 7       A.   Yes.  I believe I testified that's
 8   why we were retained in the first place.
 9       Q.   You stated that you don't put these
10   snapshots together.
11       A.   I do not.
12       Q.   You are the boss?
13       A.   That's not an unfair
14   characterization.
15       Q.   Who does put these snapshots
16   together?
17       A.   Kim Masterson, under the direction
18   of Meredith Cole.
19       Q.   And I know that I characterized it
20   as the weekly snapshot, but how often does it
21   actually go out?
22       A.   I believe it goes out on -- on a
23   weekly basis.
24       Q.   Okay.  I know that you said that you
25   don't put these snapshots together, but do you
```

37

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2   know the basic process for how these are
 3   constructed, and -- and can you walk us through
 4   that process?
 5       A.   Yes.  I mean, the -- the analysis
 6   involves a number of elements.  The key element
 7   is tracking movement within the participant
 8   listings provided by the Depository Trust
 9   Company for their nominee, Cede & Co.  That's
10   C-E-D-E.
11            Since virtually all shares held by
12   institutions and hedge funds and a significant
13   portion of the retail base -- a very significant
14   portion of the overall shareholder base is held
15   within this one nominee account, we -- we
16   analyze a subset of that in these participant
17   listings, which will show us movement between
18   custodians that hold primarily for hedge funds,
19   custodians that hold primarily for institutions,
20   and custodians who hold primarily for retail
21   investors among one another.
22            So from that kind of top-down
23   approach we can very accurately, at any given
24   time, provide a -- a close estimate of the
25   shares held by retail investors as opposed to
```

38

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2   the shares held by institutional investors,
 3   again, as opposed to shares held by hedge funds.
 4            And within that overall hedge fund
 5   category there are direct holdings, as well as
 6   shares held in swap arrangements.
 7       Q.   And do you --
 8       A.   We also incorporate the public
 9   information that's available on Forms 13-F, G
10   and D, as filed with the SEC, and any
11   information that we or the client receives
12   directly in communication with shareholders.
13            And with all of these elements, we
14   try to put together as accurate a picture of the
15   shareholder base at any given time.
16            MR. BOWIE:  Let me just -- I think
17       there's a protective order in this case, as
18       I understand it, and the third parties are
19       entitled to designate, and so we would
20       designate this confidential, this
21       transcript confidential.  We're getting
22       into material that I think Innisfree would
23       want to potentially have categorized that
24       way.
25            It may be that we can pare that down
```

39

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2       to less than all of it at some point, but
 3       at this point I would like to just
 4       designate the whole thing as confidential,
 5       if I can.
 6            MS. SERRANZANA:  Okay.  So we'll
 7       designate it as confidential for now, and
 8       we'll review it at a later date.  Or you
 9       will review it at a later date and decide
10       whether or not you want to continue with
11       that designation or only for certain
12       portions of the transcript.
13            MR. BOWIE:  Right.  If -- if you
14       would like me to pare it down, just let me
15       know and I will undertake to do that.
16            MS. SERRANZANA:  Okay.  That would
17       be great.
18            THE WITNESS:  May I use the
19   bathroom?
20            MS. SERRANZANA:  Sure.  Take a
21       break.
22            THE VIDEO OPERATOR:  We're going off
23       the record.  The time is 11:06 a.m.
24                        ---
25                     (Recess.)
```

40

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

---

THE VIDEO OPERATOR: Returning to the record. The time is 11:14 a.m.

BY MS. SERRANZANA:

Q. Sir, you were walking us through the process of putting together the -- the weekly report.

A. Yes.

Q. You mentioned that the shares -- could you tell me what the DTC is?

A. The DTC is an acronym for the Depository Trust Company, an abbreviation for the Depository Trust Company, which is a central certificate depository. It was established some years ago in order to eliminate the paper crunch on Wall Street by the member firms in the New York Stock Exchange. Its participants now include virtually all the banks and brokers that are custodians or shareholders of public companies.

Q. And as part of your analysis that you enumerated before, did you -- am I correct in -- in stating that you assigned the shares within the DTC a category?

41

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

A. That's correct.

Q. And how do you make those --

A. From our experience, most custodians, with several -- few exceptions, are pretty much pure play in the type of investors they hold shares for.

Most institutional shares are held by custodial banks. Most retail shares are held by certain brokerage firms that cater to the retail trade, and most shares held by hedge funds or in swap arrangements are held through other brokerage firms that cater to them.

Q. And how do you know which custodians perform which duties?

A. Well, in 30 years of experience I've, you know, I've developed certain expertise in identifying those.

Q. So this is based on your experience.

A. Based on my experience and the experience of my colleagues over thousands of solicitations.

Q. You mentioned the term "pure play"?

A. Yes.

Q. Could you explain what that is?

42

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

A. What -- what I was saying was that most of these custodians' positions are comprised of purely one type of investment. With very few exceptions. The exceptions include Merrill Lynch, which holds for both retail investors and hedge funds. A little bit of the old Smith Barney Shearson positions through Citigroup also fits that category, although that's a combination of retail, some institutional, and some hedge positions.

All the others, for the most part, are pretty pure play.

Q. And these pure-play institutions, is there any trend toward them diversifying in any way, or is that ...

A. I'm trying to understand your question.

MS. SERRANZANA: Strike that.

BY MS. SERRANZANA:

Q. What do you do -- you mentioned that Merrill Lynch is not one of the pure-play institutions.

A. That's correct.

Q. What do you do with respect to the

43

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

category -- categorizing the non-pure-play institutions such as Merrill Lynch?

A. You can approach it one of several ways. There are formulaic ways of doing it, or, you know, to be more precise, you can look at a -- a baseline and monitor changes from that baseline.

So if Merrill Lynch, for example, held 5 million shares one day and 30 million shares the next, in a situation like this you might conclude, since retail investors are not aggressive traders of shares, they tend to keep and hold their positions, that the increase was not of a retail nature.

Q. So it's based on your knowledge of what -- in this example, what retail typically does?

A. That's correct.

Q. Do you review the weekly reports before they go out?

A. Sometimes. As time permits.

Q. And you make corrections to these reports?

A. Occasionally.

44

5/5/2008 Miller, Alan

```
1    HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
2        Q.   How often do you review these, would
3    you estimate?  What percentage of the time?
4        A.   Perhaps half the time.  Maybe not
5    quite that often.
6        Q.   Does somebody from your office
7    review them before they go out the door?
8        A.   Well, if they're -- if Kim Masterson
9    has primary responsibility for putting them
10   together, Meredith Cole is the first line of
11   review.  I review them when I can.
12       Q.   Do you ever review it at the request
13   of someone in your office?
14       A.   Occasionally Kim will come to me and
15   say, you know, Can you take a look at this?
16       Q.   Has she --
17       A.   Do you agree with my
18   characterization, for example.
19       Q.   Has she ever done that with respect
20   to the -- do you recall any specific snapshots
21   that she's come to you and said -- I'm sorry --
22   weekly reports that she has come to you and
23   said, Could you take a look at this?
24            MR. BOWIE:  On the CSX matter?
25            MS. SERRANZANA:  On the CSX matter.
```

45

5/5/2008 Miller, Alan

```
1    HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
2        A.   Any specific ones?
3        Q.   Or from specific times.  Anything
4    that you can remember.
5        A.   No.  They kind of -- I mean, this is
6    an ongoing matter, and from time to time she'll
7    come to me.  As -- as to recalling a specific
8    conversation about one or more reports, I don't
9    have an immediate recollection of that.
10       Q.   Has she ever come to you about
11   specific topics that you recall, that she wanted
12   some clarification about?
13       A.   There have been discussions, sure.
14       Q.   And what do you recall about those
15   discussions?
16       A.   There was recently some discussion
17   as to shares that were held at Brown Brothers
18   Harriman and how they ought to be characterized.
19       Q.   And what else do you remember about
20   that discussion?  Why did she come to you?
21       A.   Because she was trying to be as
22   accurate as possible in her analysis, and
23   appreciates my point of view.
24       Q.   How had she previously characterized
25   the Brown Brothers Harrison (phonetic) stock?
```

46

5/5/2008 Miller, Alan

```
1    HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
2        A.   I think, you know, typically shares
3    held at Brown Brothers Harriman are held by
4    foreign investors or through one of several US
5    institutions, Fidelity being the most prominent,
6    but they're not a significant holder of CSX.
7    There are several other US institutions.  But
8    primarily it's a foreign institutional holding,
9    although, you know, we don't have -- we don't
10   have -- we can't see through the position.
11            So that's -- that's a position that
12   is more up for discussion.  It fits more into
13   the Merrill Lynch category than it does into the
14   pure-play category.
15       Q.   And do you recall what -- what
16   advice you gave to her?
17       A.   I think, based upon our observance
18   of the movements in and out of Brown Brothers
19   Harriman, we determined that on reflection a
20   significant portion of those were likely
21   hedge-related shares.
22       Q.   And what was that proportion; do you
23   recall?
24       A.   I'm sorry?  Did you say what was
25   that proportion?
```

47

5/5/2008 Miller, Alan

```
1    HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
2        Q.   Did you say "proportion" in your
3    answer?  I'm sorry.
4        A.   Maybe you can read it back.
5        Q.   I withdraw the question.
6             Do you recall any other times that
7    Meredith Cole or Kim Masterson came to you --
8    you said that there have been a few times --
9        A.   Those are recent --
10       Q.   Those are --
11       A.   -- recollections.
12            They happened throughout the course
13   of the year, and I don't -- I mean, this is a
14   significant matter, but it's one of many matters
15   we're involved in.
16       Q.   Right.
17       A.   So I don't have specific -- you
18   know, if -- if there is a particular issue that
19   would help refresh my recollection, I would be
20   happy to -- to try to remember what that was,
21   but ...
22       Q.   Okay.
23       A.   I would say largely I believe that
24   our folks are pretty accurate in what they do.
25   I don't always agree with their
```

48

5/5/2008 Miller, Alan

1  HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
2  characterizations, and I make changes if I
3  believe they're not quite exact. But I think
4  our people are quite professional and good at
5  what they do.
6      Q.   You said that you reviewed these
7  approximately half of the time?
8      A.   Somewhere. That's very approximate,
9  yes.
10     Q.   Has there ever been an instance in
11 which a report went out and you thought, you
12 know, I don't quite agree with this
13 characterization?
14     A.   Yeah, I would -- I would say
15 there -- that's occurred.
16     Q.   And what do you recall about those
17 instances?
18     A.   There was -- there was -- you know,
19 in the documents that we produced I think, I
20 think one of the earlier, I can't remember
21 exactly what it was, there was something I
22 didn't quite agree with. And I think I, as I
23 recall, I informed them that I didn't agree with
24 that characterization -- whatever it was I can't
25 recall -- and they changed it in a subsequent

5/5/2008 Miller, Alan

1  HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
2  report, after discussion.
3      Q.   But you don't recall what it was.
4      A.   I don't recall specifically. If I
5  looked at the documents we could probably find
6  that.
7      Q.   And were there other instances of
8  this?
9      A.   Not that I can recall.
10     Q.   Okay. I'm going to switch topics.
11     A.   Sure.
12     Q.   Did Innisfree perform any analysis
13 of the movement of CSX shares during the time
14 period around the February 27, 2008, original
15 record date?
16     A.   Yes.
17     Q.   Who asked that this analysis be
18 done?
19     A.   Who asked that the analysis be done?
20 I think the analysis was done -- more than one
21 analysis was done independently by our folks.
22 Certainly Meredith and Kim were looking at it
23 from their perspective in terms of their weekly
24 reporting. And Lloyd Lefcourt was looking at it
25 in terms of his assisting me in performing the

5/5/2008 Miller, Alan

1  HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
2  analyses of the shareholder base vis-a-vis the
3  prospective record date.
4      Q.   So you were not asked by anyone at
5  CSX to perform this analysis?
6      A.   No. This is work we would have been
7  doing in the -- in the ordinary course. Whether
8  or not somebody at CSX asked somebody at
9  Innisfree to do something we were already doing,
10 I couldn't -- I couldn't tell you.
11     Q.   So this is an ongoing analysis that
12 wasn't for a -- your analysis wasn't to cover a
13 specific topic?
14     A.   Well, clearly we were focused on the
15 record date.
16     Q.   And how long before and after the
17 record date were you focussing on? What was the
18 time period?
19     A.   We focused on movement within the
20 shareholder bases, as -- as I testified earlier,
21 on a weekly basis, but were not limited to that.
22 And, clearly, when a record date occurs, since
23 that's going to be the -- the snapshot, as it
24 were, as to who can vote with respect to the
25 meeting, we have a particular focus with regard

5/5/2008 Miller, Alan

1  HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
2  to that date.
3      Q.   And what was the purpose of your
4  analysis?
5      A.   What was the purpose of the
6  analysis? Which analysis are you referring to?
7      Q.   Your ongoing analysis, but with
8  respect --
9      A.   I think the ongoing analysis I've
10 previously testified was to inform the client as
11 to changes in their shareholder base that might
12 be of consequence.
13          The specific analysis with regard to
14 the record date, as I just testified, is to
15 understand who would be entitled to vote as of
16 that date.
17     Q.   And if you could tell me again who
18 was involved in the analysis? I believe you
19 named a number of people who did this.
20     A.   As I said, the independent analyses
21 performed revolving around the same subject
22 matter, Meredith Cole and Kim Masterson on the
23 one hand; Lloyd Lefcourt on the other.
24     Q.   And did you and Lloyd Lefcourt
25 discuss your part of the analysis with Meredith

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

with which counterparties.

Q. And do these counterparties, to your knowledge, do they hold positions for other hedge funds?

A. Typically they would, yeah.

Q. Did you share your conclusion with anyone at CSX?

A. Yes.

Q. Who?

A. Initially?

Q. Initially.

A. My initial call was with Mr. Stephenson, and then I spoke shortly thereafter to Ms. -- Mrs. Fitzsimmons.

Q. And what do you recall about your call with Mr. Stephenson?

MS. GROSSBARD: I'm going to note -- just interrupt for a moment to note that I know that you've been involved with conversations with counsel for CSX, and any conversations that you have been privy to that involved legal advice being -- concerning CSX, as well as any -- any matters relating to this litigation, any

61

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

work product you might have been involved with the lawyers, you know, I'm going to ask that you not testify concerning those things, but cut them out.

At this point I'm not saying that there necessarily is anything --

THE WITNESS: I'll keep that in mind.

MS. GROSSBARD: -- but please keep that in mind.

BY MS. SERRANZANA:

Q. What do you recall from your conversation with Mr. Stephenson?

A. I advised both of them that the movement in the shares was not only aberrant in a way we had never seen before but likely made the outcome of a proxy contest untenable, insofar as the number of shares that had moved away from positions held by long-term investors whose support would be required in order to attempt to prevail in such a fight.

Those shares had, in turn, moved into positions held by hedge funds -- or held by custodians for hedge funds and -- in terms of

62

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

direct ownership, and swaps, and I had a significant concern that, based on my experience, that the swap counterparties were likely to vote the shares that they held in a manner prescribed by the hedge funds, even though theoretically that's prohibited.

Q. What was the basis of your statement that the swap counterparties were likely to, I guess, vote with the hedge funds?

A. My experience in numerous transactions -- I think we're involved in more hostile or unsolicited M&A transactions than anyone else, certainly as many as -- as any other party in our business. So my experience in that over the past 30 years.

Q. Do you have any knowledge that there's an arrangement between TCI and its swap counterparties to act in that way?

A. I don't think there's any written arrangement, if that's the question.

Q. Are you aware of any arrangement of any kind?

A. I think I just testified that in my experience, notwithstanding the prohibition

63

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

against hedge funds directing the votes held by counterparties in connection with swap arrangements, that the counterparties frequently vote in a manner specified by the hedge funds.

Q. But in this specific case do you have any knowledge that that is what's happened?

A. That is my concern, that that's what would occur.

Q. But do you have any knowledge that that is what's happening in this case?

A. We -- we won't know until it does happen, won't we? I mean, I'm just -- what I'm testifying to is based on my experience, that that frequently happens, and, therefore, I had a concern that would happen again.

Q. That they would vote --

A. Vote shares for which they had no economic exposure, in a manner specified by their hedge fund clients, which was -- which in my understanding is contrary to law. Notwithstanding that, I've seen it occur many times.

Q. And what was Mr. Stephenson's response?

64

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

1
2  A.  He was clearly concerned, as -- as I
3  was, as Mrs. Fitzsimmons was, as everyone
4  related to the matter was.
5  Q.  How did he express those concerns?
6  What exactly did he say to you?
7  A.  I don't -- I don't have a specific
8  recollection of what he said other than, you
9  know, it's a serious matter.
10  Q.  What exactly were his concerns?
11  A.  I think his concerns were my
12  concerns, which -- which I just enumerated.  I
13  believe that to be the case.  He didn't
14  articulate them in that manner.
15       MS. SERRANZANA:  I've been informed
16  that we have five minutes of tape, so if we
17  could break.
18       THE VIDEO OPERATOR:  This marks the
19  end of Tape Number 1.  Going off the
20  record.  The time is 11:44 a.m.
21       ---
22       (Recess.)
23       ---
24       THE VIDEO OPERATOR:  Returning to
25  the record.  The time is 11:51 a.m.  This

65

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

1
2  marks the beginning of Tape Number 2.
3  BY MS. SERRANZANA:
4  Q.  Mr. Miller, earlier you stated you
5  "looked at the evidence and concluded that the
6  movement among the custodians was something we
7  had never quite seen in that magnitude or in the
8  concentration into the -- into positions held by
9  hedge funds, TCI and 3G among them, held by them
10  or held by their swaps counterparties.  Just to
11  be clear.  And other hedge funds, but largely
12  into positions that appeared to be related to
13  them, and away from long-term investors index
14  funds, primarily around the time of their record
15  date."
16       Can you elaborate on that?
17  A.  Can I elaborate on the fact that I
18  had not seen this degree of movement into
19  positions like that previously?  I mean --
20  Q.  Yes.  Please.
21  A.  In my experience of reviewing
22  shareholder bases in connection with record
23  dates or meetings of shareholders, the movement
24  that we saw was -- was quite extreme, I thought.
25  Q.  And what was the magnitude of this

66

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

1
2  movement; do you recall?
3  A.  I don't recall the exact number of
4  shares, the exact percentages.  It was quite
5  large.
6  Q.  Were these movements reflected in
7  the snapshots that you distributed?
8  A.  I believe so.  You know, I can't --
9  I would have to take a look at the -- any
10  specific snapshot to see if it's something that
11  did accurately reflect my view at the time.
12  Q.  Why wouldn't it be reflected in the
13  snapshot?
14       MR. BOWIE:  Object to the form.
15  A.  I don't know that it wasn't.
16       MR. BOWIE:  Excuse me.  Go ahead.
17  A.  I just simply said that I would like
18  to take a look at any particular snapshot to see
19  if that corresponded to my view.
20  BY MS. SERRANZANA:
21  Q.  You also stated that shares were
22  moving away from long-term investor index funds?
23  That was happening concurrently with the
24  movement into the hedge fund?
25  A.  That's correct.  Around that record

67

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

1
2  date.
3  Q.  And this was something you had never
4  seen before.
5  A.  Not in that magnitude.
6       There was also an issue of the
7  dividend record date being close to or -- or
8  synonymous.  So there would have been some
9  movement in connection with dividend role
10  activity.  But the movement that we saw exceeded
11  what we would have expected would have been
12  related to that type of activity.
13  Q.  Can you explain a little bit more
14  about what kind of movement you expect to see
15  around a dividend date?
16  A.  There -- and I don't focus on -- on
17  the -- that sort of activity typically.  But --
18  so I'm not going to claim to be an expert in
19  what occurs in a dividend role.  But my
20  understanding is that offshore investors can
21  gain tax benefits by engaging in -- in these
22  transactions.
23  Q.  Resulting in what?
24  A.  Resulting in their not being deemed
25  to be in receipt of dividends, and other

68

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

for any rational explanation as to what's going on. So I don't recall a specific conversation. There were certainly many conversations among us relating to what we were seeing.

Q. Who did you speak with?

A. I think I testified earlier I spoke to Mr. Lefcourt, I spoke to Ms. Shotwell, I spoke to Mr. Winter, I spoke to Ms. Cole, I spoke to Ms. Masterson.

Q. I mean at CSX. I'm sorry.

A. Oh, at CSX?

Q. Yes.

A. I think I testified earlier I spoke to Ms. Fitzsimmons. But not -- obviously, not in terms of how you make sausage, but what our conclusions were.

Q. Anyone else?

A. On this particular subject matter?

MR. BOWIE: You mean at any time, later on?

Q. At any time later on, yes.

A. Yeah, it may have come up during the regular calls among the parties that are assisting CSX in this matter.

81

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

Q. Are these Blue Ridge calls?

A. I think -- yes, you're referring to the calls among the working group that are -- and under the rubric of the Blue Ridge team.

Q. Do you recall what was discussed about this issue with the Blue Ridge team during these calls?

A. The -- you know, the only mention of it would have been our -- our conclusion with respect to what was occurring, and its implications. In other words, no one second-guessed our analysis.

Q. Were you ever asked at any time to explore whether there were other possible explanations for the movement of shares?

A. May have been. You know, in speaking to -- to counsel that may have come up, yeah.

Q. And what was the substance of that conversation?

A. You know, again, I don't have a --

MS. GROSSBARD: I don't want you to get into conversations with counsel.

A. Yeah, I think we're going -- going

82

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

into an area that relates to strategy, so I'm going to politely decline to answer that.

Q. Did you -- did you do that analysis, that study of whether there was another explanation? Did you look into it?

A. Did I do an analysis? I did not.

Q. Did Innisfree?

A. Innisfree did, I think, a number of analyses that I was not directly involved in.

Q. Do you know who would know about those analyses?

A. Mr. Crozier, my partner. Arthur Crozier. My co-chairman.

Q. Anyone else?

A. I don't know specifically. I assume Ms. Cole and Ms. Masterson, and potentially Mr. Lefcourt were involved, but I was not directly involved in those.

Q. Do you believe there are other possible explanations?

A. Do I believe there are other possible explanations beyond movement in connection with obtaining votes vis-a-vis the record date and/or dividend role?

83

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

Q. Yes.

A. Anything is possible. I'm just not aware of what they might be. In my experience, which is fairly extensive in these matters, I -- I don't recall encountering another explanation for this type of movement.

Q. You mentioned a while back that in your experience -- and, you know, definitely let me know if this is an incorrect characterization -- that you had come across instances where hedge funds had influenced the vote of a swap counterparty.

A. Yes.

Q. Can you name some of those instances, who it involved, when you saw this take place? Your experience with it.

A. Can I name some of -- it happens frequently.

Q. Can you enumerate some of those times?

A. One classic example is Hewlett-Packard.

Q. And what happened in that case?

A. In that case five of six

84

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

    A.    Morgan Stanley, Evercore, Cravath, and I believe Weil, Gotshal as well.

    Q.    Did Nathan Goldman ask you to present at the meeting in addition to -- I believe you might have said this, but if you could refresh my memory? Did he ask you to make a presentation?

    A.    I was asked to inform -- and I can't tell you in exactly which conversation or whether it was only with Nathan or with others, but I was expected to give my perspective on the current situation, which I did.

    Q.    And tell me again, what topics did you end up presenting?

    A.    I focused solely on the topic we've been discussing here at some length, which was, you know, on the basis of what I viewed as the aberrant movement of shares into hedge positions, some of which likely controlled, directly or indirectly, by TCI and 3G, and away from long-term investors on or about the record date, that the prospects for success were becoming untenable.

    Q.    How long did you present for?

89

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

    A.    Very briefly.

    Q.    Approximately how long?

    A.    Two minutes. I had previously -- on previous occasions I had taken the board through the makeup of the shareholder base and tried to explain our view of how things worked.

    Q.    So you presented your concerns for approximately two minutes --

    A.    Very briefly, yeah.

    Q.    And during that presentation did you hand out any documents?

    A.    I did not.

    Q.    Did you have a PowerPoint presentation --

    A.    I did not.

    Q.    -- or anything of that nature?

    A.    No.

    Q.    Okay. During the course of your presentation did you discuss the possibility that the movement of shares was in some way connected to TCI? I think you testified that you had.

    A.    Yes. I believe that's what -- did I say that in the board meeting? I don't have an

90

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

exact recollection. I certainly said, as I've just testified, that the aberrant -- what we viewed as the aberrant movement of shares was problematic.

    Q.    Problematic because?

    A.    Because of its implications on the prospective solicitation of shareholders. Some -- some of whom, you know, would not have their voting rights as of the record date.

    Q.    And did you present your thoughts -- would you say that they were presented as your -- as a reasonable guess as to the -- as to why the shares moved the way that they did, or as a likely possibility? Or something else?

    A.    What I was discussing was the composition --

    MS. GROSSBARD:    Objection.

    A.    -- of the shareholder base as of the record date and its implications for the outcome of the proxy contest.

    Q.    Did you discuss any -- did you discuss why you thought that the shares were moving in the way that they were?

    A.    What I -- I think I previously

91

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

testified, that what I discussed was the -- what we regarded as the aberrant movement of shares into custodians that hold for hedge funds, and for swap arrangements with hedge funds, and away from longer-term -- custodians that hold for longer-term investors, including index funds.

    Q.    So after your presentation did anyone ask any questions?

    A.    I don't recall.

    Q.    Was there any discussion?

    A.    Not extensive discussion, no.

    Q.    Who did you discuss this with after your presentation?

    A.    Who did I discuss ...

    Q.    Your presentation. You said there weren't extensive presentations.

    A.    I thought you were referring to discussions within the board room.

    Q.    Okay. Tell me about the discussions within the board room.

    A.    I don't recall any specific discussions within the board room after my presentation.

    Q.    Okay.

92

5/5/2008 Miller, Alan

1  HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
2       A.   I think we were quickly on to the
3  next topic, but I don't have an exact -- I
4  couldn't swear to you that nobody asked a
5  question. I just don't have a specific
6  recollection of that.
7       Q.   Okay. So at any time during the
8  meeting or after did anyone question your
9  analysis?
10      A.   No.
11      Q.   Did anyone question the explanation
12 given for the movement of shares?
13      A.   Which explanation?
14      Q.   I'm sorry. I withdraw the question.
15           During the meeting did you suggest
16 that the record date and the meeting date be
17 moved?
18      A.   Yes.
19      Q.   Tell me about what you said.
20      A.   Or at least I believe I did. I'm
21 trying to recollect exactly. I may have not
22 discussed it. It may have been that the company
23 discussed that it was my recommendation that we
24 do that.
25      Q.   And what exactly did they say? Or

93

5/5/2008 Miller, Alan

1  HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
2  to your best recollection what did they say?
3       A.   My best recollection was -- we may
4  be getting into an area that also I should not
5  answer.
6       Q.   Would you like to take a moment to
7  speak with counsel about whether you can talk
8  about it?
9       A.   Yes. That would be helpful.
10           MR. BOWIE: Watch your microphone.
11           THE VIDEO OPERATOR: Going off the
12      record. The time is 12:24 p.m.
13               ---
14               (Recess.)
15               ---
16           THE VIDEO OPERATOR: Returning to
17      the record. The time is 12:30 p.m.
18           MS. SERRANZANA: Would you please
19      read the question back.
20           (The reporter read back as follows:
21           "QUESTION: And what exactly did
22      they say, or to your best recollection what
23      did they say?")
24           MS. GROSSBARD: And I'm just going
25      to note, based on discussions, that to the

94

5/5/2008 Miller, Alan

1  HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
2       extent, Mr. Miller, that you can testify
3       what your suggestions and your proposals
4       were, but to the extent that you can't
5       then, as far as other conversations you
6       were privy to, separate out what
7       conversations about prospective potential
8       litigation, that you not discuss those
9       conversations.
10           THE WITNESS: Okay.
11           MR. BOWIE: With that instruction,
12      are you able to answer the question?
13           THE WITNESS: Could you repeat the
14      question again, the full question?
15           (The reporter read back as follows:
16           "QUESTION: Did anyone question the
17      explanation given for the movement of
18      shares?")
19           MR. BOWIE: That one's already been
20      answered. I think you need to go a little
21      bit further.
22           (The reporter read back as follows:
23           "QUESTION: Tell me about what you
24      said.
25           "ANSWER: Or at least I believe I

95

5/5/2008 Miller, Alan

1  HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
2       did. I'm trying to recollect exactly. I
3       may not have discussed it. It may have
4       been that the company discussed that it was
5       my recommendation that we do that.
6           "QUESTION: And what exactly did
7       they say? Or to your best recollection
8       what did they say?
9           "ANSWER: My best recollection
10      was -- we may be getting into an area that
11      also I should not answer.")
12      A.   I think it would be difficult for me
13 to answer that, what they said, without getting
14 into litigation strategy and other strategy,
15 that may -- may have some privilege attached to
16 it.
17      Q.   Could you tell me what the general
18 reaction was to your suggestion that the meeting
19 date -- that the record -- well, let's get this
20 straight first.
21           Were you suggesting that both the
22 record date and the meeting date be moved?
23      A.   Yes.
24      Q.   Can you tell me what your -- what
25 the general reaction was to your suggestion?

96

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

A. There was at some point a motion to move the record and meeting dates, and it was approved by the board.

Q. Was there any discussion prior to that motion being made?

MS. GROSSBARD: I think that's a yes-or-no question, from my perspective.

A. Yes.

Q. Can you tell me about those discussions without --

A. No.

Q. -- violating privilege?

Why did you make the -- the suggestion to move the record date and meeting date?

A. Why did I make the suggestion to move the record date and meeting date?

Q. Yes.

A. I made the suggestion to move the record date and meeting date with the expectation that it was possible, though not certain, that by doing so the -- the aberrant movement we witnessed as of the initial record date might not repeat.

97

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

Q. Any other reasons?

A. I think that was the primary reason.

Q. So a motion was made to move the record date and meeting date. And did that motion pass?

A. Yes.

Q. Would it be fair to say that your presentation regarding the movement of shares around the February 27, '08, record date was a factor that contributed to moving the meeting date and record date?

A. I believe --

MS. GROSSBARD: I'm going to object to that, because I think that you're cutting out a whole interim bunch of stuff and making an assumption that I don't think is a fair characterization.

If he can answer the question, he can answer.

A. I would assume it was a factor and not the only factor.

Q. You've mentioned a few times that one of the things you saw prior to the record date was the movement of shares away from the

98

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

index funds into the hedge funds?

A. Correct.

Q. Can you elaborate on that, as in what did these transactions consist of? Was it a sale of shares? What kind of movement are we seeing?

A. It's -- let me say this: It's not possible, when viewing movement, to characterize a particular movement as a sale or a loan, but what is clear is that the lending activity in the days preceding the February record date significantly exceeded the trading volume.

The movement -- again, the movement of shares among custodians significantly exceeded the trading volume, so that one could conclude there was a lot of lending activity going on.

MS. SERRANZANA: I think this would be a good time to break for lunch.

MR. BOWIE: Sure.

THE VIDEO OPERATOR: Going off the record. The time is 12:36 p.m.

(Lunch recess taken at 12:36 p.m.)

99

5/5/2008 Miller, Alan

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

A F T E R N O O N   S E S S I O N

(1:19 p.m.)

THE VIDEO OPERATOR: Returning to the record. The time is 1:19 p.m.

- - -

A L A N   M I L L E R,
    resumed as a witness, having been
    previously sworn by the Notary Public,
    was examined and testified further as
    follows:

EXAMINATION
BY MS. SERRANZANA:

Q. Good afternoon, Mr. Miller.

A. How are you?

Q. I'm fine.

In your last answer you stated, "It's not possible when viewing movement to characterize a particular movement as a sale or a loan, but what is clear is that the lending activities in the days preceding the February record date significantly exceeded the trading volume."

Do you recall that?

100

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

CSX -- in CSX stock at that point.

Q. Was this something that hadn't been seen prior to this time?

A. That I couldn't say. This was at or about the time we began working for CSX.

I think what she is saying is that it is aberrant -- aberrant, as it were -- for these types of entities to be filing for such large positions in a company like CSX.

Q. This was something you didn't normally see in your regular course of business, correct?

A. We see positions like this from time to time, and they're indicative of hedge fund ownership and/or swap. in this case, with these counterparties filing, it's indicative, more frequently, of swap contracts.

Q. In the next bullet point she says: "Swap accounts have a mixed record regarding their participation in proxy voting - although ownership can be changed to the hedge fund prior to the meeting date."

Do you see that?

A. I do.

109

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

Q. What was the basis of knowledge for swap accounts having a mixed record regarding their participating -- participation in proxy voting?

MS. GROSSBARD: Objection.

A. This -- let me take this a step back.

This clearly is directed to myself and my partner, Ms. Shotwell. It's clearly a draft of a document that she was contemplating sending to the client. And, you know, these points were apparently composed for our review. What Kim's basis for saying that was I don't know, but I will tell you that that is a true statement --

Q. What is meant by --

A. -- based on my experience.

So this may be a result of conversations with me or others at Innisfree who have had similar experience in dealing with hedge funds, swap counterparties, in the context of activist hedge fund situations.

Q. I'm not sure I see where it says "draft." Is that something you remember, or is

110

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

that on here and I'm not seeing it?

A. No, no. There would be no reason for her to direct this type of a report to me if it were not for the purpose of -- she could easily pick up the phone and say, Here's what I see.

Q. Right. And what does "mixed record" mean, to your understanding?

A. What is my understanding of what Kim was trying to say here?

Q. Yes.

A. I think what she was trying to say here was sometimes the counterparties vote the shares and sometimes they don't.

Q. If you could look at the next page, the chart. And if you would look at swap accounts, the box at the bottom?

(Witness reviewing document.)

Q. Is this Innisfree's understanding of how swap accounts operate?

A. I would have to read the whole thing, but I would say this is -- this is clearly a draft of a description that Kim was considering presenting to the client.

111

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER

(Witness reviewing document.)

These are -- are Kim's words. I would say, in reading this, I don't find anything grossly inaccurate about it. It may not be my words, but it seems to be a fair -- a fair summary of what's going on.

Q. Could you explain to me what your understanding is of a swap?

A. A swap is an arrangement whereby a -- an investor puts up a small amount of money, 10 percent, 20 percent of the value of the equity. The counterparty bank purchases the securities. The counterparty bank charges the investor a lending rate. The investor is responsible for the downside. The counterparty bank is responsible for paying the upside to the investor. And typically these days the contracts are settled in cash.

Q. Well, per your -- per Ms. Masterson's analysis on this sheet, would it be correct in stating that the banks are the owners of the shares and have the full voting rights?

A. That the banks are the owners of the

112

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2   company with this high percentage of hedge
 3   ownership had 'survived' activism with such
 4   levels."
 5            What do you think was meant by
 6   "survived"?
 7            MS. GROSSBARD:  Objection.
 8       A.   I don't know.  It's Kim's
 9   characterization.  I think what she's saying
10   here is that in many of these situations some
11   change demanded by the hedge fund activists had
12   occurred in most of these circumstances.
13       Q.   That sentence also references a
14   previous discussion during which the issues in
15   this e-mail had been discussed.
16            Do you recall that discussion?
17       A.   Not at all.
18            MS. SERRANZANA:  I've just been
19       informed that we need to change the tape,
20       so if we could take a break.
21            THE WITNESS:  Sure.
22            MS. SERRANZANA:  Go off the record.
23            THE VIDEO OPERATOR:  This marks the
24       end of Tape Number 2.  We're going off the
25       record.  The time is 1:53 p.m.
```

125

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2                        ---
 3                      (Recess.)
 4                        ---
 5            THE VIDEO OPERATOR:  Returning to
 6       the record.  The time is 2:04 p.m.  This
 7       marks the beginning of Tape Number 3.
 8       A.   Okay.  Just to clarify an answer I
 9   gave earlier, you asked me how many times I
10   participated in these panels on hedge fund
11   activism?
12       Q.   Yes.
13       A.   As I thought about it, it's probably
14   more like, you know, ten or twelve times in the
15   last year rather than three or four, including
16   the one with Mr. Weingarten a couple of weeks
17   ago.  So ...
18       Q.   Thank you for the clarification.
19       A.   Certainly.
20       Q.   To your knowledge, was there any
21   analysis -- any action taken on CSX's part in
22   reaction to this e-mail or the report attached?
23       A.   I can't imagine.  What do you mean
24   by "action taken"?
25       Q.   Did they decide to -- withdrawn.
```

126

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2       A.   I'm sorry?
 3       Q.   I'm withdrawing the question.
 4       A.   Okay.  Sure.
 5                        ---
 6            (Miller Exhibit 9 was marked for
 7       identification.)
 8                        ---
 9            MR. BOWIE:  Are we on Exhibit 9?
10            THE COURT REPORTER:  Yes, sir.
11            MR. BOWIE:  Great.
12   BY MS. SERRANZANA:
13       Q.   I've just handed you Miller Exhibit
14   9.  Do you recognize this e-mail?
15       A.   Yeah.
16       Q.   What is this e-mail chain?
17       A.   It's an e-mail, let's see, beginning
18   with a question from Nathan Goldman at CSX,
19   addressed to me and Kim, copying outside
20   counsel.
21       Q.   Do you see in your response, I
22   believe it's the second e-mail from the bottom,
23   you state:  "Shares held in swap positions where
24   Deutsche serves as counterparty are frequently
25   not voted in controversial situations"?
```

127

5/5/2008 Miller, Alan

```
 1   HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY-ALAN MILLER
 2            Do you see that sentence?
 3       A.   Right.  Although -- but the complete
 4   sentence is:  "Although they may be subject to
 5   influence by the prop desk or, in some cases, by
 6   their hedge fund clients," which is what we're
 7   talking about here.
 8       Q.   What is the basis for the beginning
 9   of that phrase?
10       A.   I'm sorry?
11       Q.   What is -- what is the basis for --
12   for your statement there?
13       A.   The basis for the statement is that
14   in our experience sometimes the counterparties
15   will vote the shares as directed by the hedge
16   funds.  Sometimes they will not.  And we
17   speculate that sometimes the prop desk may have
18   influence on the voting decision.
19            As I indicated in my testimony
20   earlier, in the ClearChannel situation, which
21   was certainly extraordinarily controversial,
22   Deutsche Bank had lent out all of its shares
23   and, therefore, could not vote the shares
24   pursuant to the wishes of their hedge fund
25   clients, even if they wanted to.
```

128