UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CSX CORPORATION,

                                        Plaintiff,

            v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD.,  3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE
BEHRING, A/K/A ALEXANDRE BEHRING
COSTA,

                                        Defendants.

_____

THE CHILDREN'S INVESTMENT MASTER
FUND,

            Counterclaim and Third-Party Plaintiff,

            v.

CSX CORPORATION AND MICHAEL WARD,

            Counterclaim and Third-Party Defendants.

_____

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.

            Counterclaim and Third-Party Plaintiffs,

            v.

CSX CORPORATION AND MICHAEL WARD,

            Counterclaim and Third-Party Defendants.

ECF Case

08 Civ. 02764 (LAK) (KNF)

**NOTICE OF PLAINTIFF'S MOTION
*IN LIMINE* TO EXCLUDE THE
EXPERT REPORTS OF FRANK
PARTNOY**

Please take notice that upon the accompanying Memorandum of Law and all prior pleadings and proceedings had herein, Plaintiff CSX Corporation will move this Court before the Honorable Lewis A. Kaplan, United States District Judge, at the Daniel Patrick Moynihan United States Courthouse located at 500 Pearl Street, New York, New York, on a date and at a time to be determined by the Court, to exclude the expert reports of Frank Partnoy.

Dated: May 21, 2008
     New York, NY

Respectfully submitted,

**CRAVATH, SWAINE & MOORE LLP,**

by
    /s/ David R. Marriott
          Rory O. Millson
          Francis P. Barron
          David R. Marriott
          Members of the Firm

          Attorneys for Plaintiff
          825 Eighth Avenue
          New York, NY 10019
          (212) 474-1000

          RMillson@cravath.com
          FBarron@cravath.com
          DMarriott@cravath.com

**DEWEY PEGNO & KRAMARSKY LLP**
Keara A. Bergin
220 East 42nd Street
New York, NY 10017
(212) 943-9000
KBergin@dpklaw.com

**FRIEDMAN KAPLAN SEILER & ADELMAN LLP**
Lance J. Gotko
Paul J. Fishman
1633 Broadway
New York, NY 10019-6708
(212) 833-1100
LGotko@fklaw.com
PFishman@fklaw.com

*Attorneys for Plaintiff CSX*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CSX CORPORATION,

|                                         Plaintiff,

v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE
BEHRING, A/K/A ALEXANDRE BEHRING
COSTA,

|                                         Defendants.

———————————————

THE CHILDREN'S INVESTMENT MASTER
FUND,

|                        Counterclaim and Third-
Party Plaintiff,

v.

CSX CORPORATION AND MICHAEL WARD,

|                        Counterclaim and Third-
Party Defendants.

———————————————

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.

|                        Counterclaim Plaintiffs,

v.

CSX CORPORATION AND MICHAEL WARD,

|                        Counterclaim Defendants.

ECF Case

08 Civ. 02764 (LAK) (KNF)

**CSX'S MOTION *IN LIMINE* TO
EXCLUDE THE EXPERT REPORTS
OF FRANK PARTNOY**

# TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................... ii

INTRODUCTION ...................................................................................................1

ARGUMENT ...........................................................................................................2

I.      PROFESSOR PARTNOY'S LEGAL ANALYSIS IS IMPROPER AND
       FLAWED. .................................................................................................2

         A.     Professor Partnoy Impermissibly Opines on Legal Questions. ...................2

         B.     Professor Partnoy's Impermissible Legal Analysis Is Flawed and
             Irrelevant. ........................................................................................8

II.     PROFESSOR PARTNOY IS NOT QUALIFIED TO OPINE ON
       ECONOMIC ISSUES. .............................................................................11

CONCLUSION ......................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346 (S.D.N.Y. 2003) ........................12

*Bazile v. City of New York*, 64 Fed. Appx. 805, 2003 WL 21024765 (2d Cir. 2003) ...................16

*Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207 (D.C. Cir. 1997)...................2

*Calvary Holdings, Inc. v. Chandler*, 948 F.2d 59 (1st Cir. 1991) ........................10

*Carpenters Health & Welfare Fund, et al. v. The Coca-Cola Co., et al.*, No. 1:00-V-2838-WBH (N.D. Ga.) ........................15

*City of Livonia Employees' Retirement Sys. v. Draper et al.*, No. 05-04178 (D.S.D)...................15

*Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) ........................11, 12, 15

*Dreyer v. Ryder Auto. Carrier Group, Inc.*, 367 F. Supp. 2d 413 (W.D.N.Y. 2005) ...................13

*F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987)........................7

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002)...................16

*Fed. Aviation Admin. v. Landy*, 705 F.2d 624 (2d Cir. 1983)........................4

*Feinberg v. Katz*, No. 01 Civ. 2739 (CSH), 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007) .......7, 8

*Hill v. City of New York*, No. 03-CV-1283 (ARR)(KAM), 2007 WL 1989261 (E.D.N.Y. July 5, 2007)........................11, 12

*In re Air Crash Disaster at New Orleans, Louisiana*, 795 F.2d 1230 (5th Cir. 1986) ...................6

*In re PETCO Sec. Litig.*, No. 05-CV-0823-H (S.D. Cal.) ........................15

*In re Rezulin Prod. Liability Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004)........................3, 11

*Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222 (N.D.N.Y. 1994), *aff'd*, 101 F.3d 682 (2d Cir. 1996)........................13

*Loeb v. Hammond*, 407 F.2d 779 (7th Cir. 1969) ........................7

*Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977) ........................2, 6, 7

*Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, No. 95 Civ. 3901 (PKL), 1999 WL 946354 (S.D.N.Y. Oct. 19, 1999) ............................................................................4

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435 (2d Cir. 1995) ..........................16

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ...........................................12

*Plumbers & Pipefitters Nat'l Pension Fund v. Cisco Sys., Inc.*, No. 01-20418 (N.D. Cal.) .........15

*S.E.C. v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587 (S.D.N.Y. 1993) ................10

*S.E.C. v. Todd*, No. 03CV2230 (BEN)(WMC), 2006 WL 5201386 (S.D. Cal. Oct. 17, 2006) ..................................................................................................................15

*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997) .........................................13

*Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326 (2d Cir. 1993) ......................17

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ...........................................8

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)........................................2, 4

*United States v. Cruz*, 363 F.3d 187 (2d Cir. 2004).................................................17

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) ........................................15, 17

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994)................................................3

*Valentin v. New York City*, No. 94 CV 3911 (CLP), 1997 WL 33323099 (E.D.N.Y. Sept. 9, 1997) .........................................................................................................5

## STATUTES & RULES

Fed. R. Evid. 104(a) ................................................................................................12

Fed R. Evid. 403 ...............................................................................................11, 17

Fed. R. Evid. 702 ..........................................................................................passim

Rule 13d-3(a) .........................................................................................................4

Rule10b-5 .............................................................................................................15

17 C.F.R. § 240.13d-3(a) ......................................................................................9

**OTHER AUTHORITIES**

Jonathan R. Macey, *Wall Street Versus Main Street: How Ignorance, Hyperbole, and Fear Lead to Regulation. F.I.A.S.C.O.: Blood in the Water on Wall Street. Frank Partnoy.* 65 U. CHI. L. REV. 1487, 1488 (1998)......................................................14

Leah Nathans Spiro, *Partnoy's Complaint About Morgan Stanley*, BUSINESS WEEK (Nov. 3, 1997)......................................................................................................13, 14

## INTRODUCTION

The Rebuttal Expert Report and Sur-Rebuttal Expert Report of Frank Partnoy do not meet the standards of admissibility set forth in Federal Rule of Evidence 702 and should be excluded in full. Professor Partnoy's reports contain two fundamental flaws:

*First*, Professor Partnoy impermissibly opines on legal questions. His reports are nothing more than legal briefs that address the purported extent of TCI's disclosure obligations; set out policy arguments as to why his legal interpretation of TCI's disclosure requirements must be correct; engage in contract interpretation to support his assertions regarding the extent of TCI's legal power; and make conclusive determinations as to what the Court should consider "relevant" or "material". *See* Argument Part I.A. Moreover, Professor Partnoy applies the wrong legal standard, which makes his reports irrelevant, unhelpful and therefore inadmissible. *See* Argument Part I.B.

*Second*, Professor Partnoy is unqualified to offer the economic analysis that fills the remainder of his reports. He is a law professor and nothing more. Professor Partnoy is not a trained economist, does not teach economics, and has no degree in economics beyond his 19-year-old bachelor's degree. Apart from the scant 21 months he spent in a junior position on Wall Street 15 years ago, he also lacks practical experience on the relevant economic issues. To the extent that his reports touch on these economic subjects, his testimony should be excluded. *See* Argument Part II.

## ARGUMENT

I.  **PROFESSOR PARTNOY'S LEGAL ANALYSIS IS IMPROPER AND FLAWED.**

    A.  <u>**Professor Partnoy Impermissibly Opines on Legal Questions.**</u>

Domestic law is not a proper subject for expert opinion; "[t]he special legal knowledge of the judge makes the witness'[s] testimony superfluous". *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977).[1]  As a purported expert, Professor Partnoy "may not give testimony stating ultimate legal conclusions". *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).  In violation of this maxim, he impermissibly instructs the Court on the law in four areas.

    1.  *Professor Partnoy Inappropriately Offers Legal Conclusions as to TCI's Disclosure Obligations.*

Professor Partnoy engages in a three-part legal argument as to the scope of TCI's disclosure obligations.  This legal analysis is not proper expert testimony under Federal Rule of Evidence 702 and should be stricken.

*First*, Professor Partnoy offers *his* opinion on the meaning and extent of the U.S. securities laws.  For example, he asserts:

- CSX's legal claims are "counter to . . . prevailing regulatory pronouncements" and would establish new "violations of the securities laws as well".  Rebuttal Expert Report of Frank Partnoy ("Partnoy Report") ¶ 111.

- "[S]tatements from the SEC [regarding] the disclosure of positions in cash-settled security futures, which are economically similar to

---

[1]  *See also Marx & Co.*, 550 F.2d at 511 (courts should "not allow trials . . . to become battles of paid advocates posing as experts on the respective sides concerning domestic law"); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province to instruct the jury on the relevant legal standards.").

equity swaps," establish that disclosure in this case "is not required". *Id.* ¶ 12; *see also id.* ¶ 105.

- "Another source of guidance" for the Court is "a Canadian judicial decision illustrating the common understanding that equity swap holders do not have the power to direct the voting or disposition of shares". *Id.* ¶ 13.

Professor Partnoy's attempt to persuade the Court to adopt his view of U.S. disclosure law is impermissible. "[T]his Court requires exclusion of testimony which states a legal conclusion". *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). Moreover, his attempt to gauge the intent of the SEC on the issues in this case is also impermissible. Courts in this Circuit have made it clear that "the opinions of witnesses on the intent, motives or state of minds of corporations, regulatory agencies or others have no basis in any relevant body of knowledge or expertise". *In re Rezulin Prod. Liability Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004).

*Second*, Professor Partnoy offers the alleged expectations of *others* regarding the scope of U.S. disclosure law. For instance, Professor Partnoy declares:

- There is "general agreement among market participants, regulators, academics, and commentators that equity swap holders do not have the power to direct voting of referenced shares". Partnoy Report ¶ 12; Sur-Rebuttal Expert Report of Frank Partnoy ("Partnoy Sur-Rebuttal") ¶¶ 15, 24.

- "Market participants . . . understand the current distinction between the 'beneficial owner' of shares and swap counterparties who 'own the economics.'" Partnoy Report ¶ 107.

- "Market participants generally assume . . . that swaps executed based on standard ISDA documentation do not give the holder 'beneficial ownership' of referenced shares . . . . Market participants generally understand that swap holdings do not trigger the Schedule 13D or Form 13F filing requirements." *Id.* ¶ 77. *See also* ¶¶ 9, 10, 35, 105.

- 3 -

- "[E]quity swap market participants are guided by, and actually rely on, the SEC's 'Q&A' . . . ." Partnoy Sur-Rebuttal ¶ 24.

In making these claims, Professor Partnoy merely has substituted *his* views on the proper construction of U.S. disclosure law with the purported views of *others* — i.e., "market participants, regulators, academics, and commentators". Neither Professor Partnoy nor anyone else may instruct the Court on the scope of disclosure law. *See, e.g., Fed. Aviation Admin. v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983) (finding that questions soliciting a former FAA employee's understanding of the meaning and applicability of administrative regulations would invade the province of the court).

*Third*, Professor Partnoy masks his legal conclusions by elevating asserted "market practice" to the status of controlling disclosure law. Professor Partnoy insists:

- "[M]arket practice was that TCI would not have been required to disclose its equity swap positions". Partnoy Report ¶ 35.

- "[I]t is a well settled practice among market participants that equity swap positions of greater than 5% of a company's outstanding shares do not trigger the reporting requirements of Rule 13d-3(a)." *Id.* ¶¶ 105-06.

- "It is widely known that equity swap positions are not subject to the same disclosure regulations as shares." *Id.* ¶¶ 31, 78.

However, "testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice." *Bilzerian*, 926 F.2d at 1295; *see also Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, No. 95 Civ. 3901 (PKL), 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999) ("[e]ven if his testimony is couched in terms of industry practices, the expert still may not, *under any circumstances*, opine on the ultimate legal issue in the case") (emphasis added). Accordingly, to the extent that Professor Partnoy

- 4 -

offers testimony regarding the scope of U.S. disclosure law, that testimony should be

stricken under Federal Rule of Evidence 702.

> 2. *Professor Partnoy Impermissibly Opines on Policy Arguments to Justify His Interpretation of U.S. Disclosure Law.*

Professor Partnoy then attempts to convince the Court of the soundness of

his assertions regarding U.S. disclosure law through a series of policy arguments.  For

instance, he alleges:

- Requiring TCI to disclose its swap arrangements as "beneficial ownership" "would generate perverse, illogical, and disruptive results".  Partnoy Report ¶ 9

- "Accepting" the conclusions of Dr. Subrahmanyam — CSX's economic expert — "would generate a litany of difficult questions" that are "the tip of an iceberg of uncertainty about the timing and substance of disclosures an equity swap holder would be required to make".  *See id.* ¶¶ 18-19.

- "If . . . the swap arrangements between TCI and its counterparties gave TCI voting and investment power concerning the referenced CSX shares or constituted acquiring, holding or disposing of the referenced CSX shares, then approximately one trillion dollars of swap arrangements suddenly would be subject to tremendous uncertainty."  *Id.* ¶ 106; *see generally* ¶¶ 105-10.

Professor Partnoy even criticizes Dr. Subrahmanyam for not

"discuss[ing]" or "consider[ing] the serious deleterious ramifications" of his conclusions.

*Id.* ¶¶ 17, 105.  Dr. Subrahmanyam did not touch on policy ramifications in his report for

good reason:  such matters are beyond the bounds of permissible expert testimony.

"'[T]rial courts must be wary lest the expert become nothing more than an advocate of

policy before the jury.  Stated more directly, the trial judge must insist that a proffered

expert bring to the jury more than lawyers can offer in argument.'"  *Valentin v. New York*

*City*, No. 94 CV 3911 (CLP), 1997 WL 33323099, at *16 (E.D.N.Y. Sept. 9, 1997)

(quoting *In re Air Crash Disaster at New Orleans, Louisiana*, 795 F.2d 1230, 1233 (5th Cir. 1986)). Professor Partnoy's attempt to extend his already impermissible legal analysis into policy advocacy adds nothing to what TCI's counsel can offer and further highlights his reports' overall impropriety. As such, they violate Federal Rule of Evidence 702 and should be stricken.

> 3.   *Professor Partnoy Improperly Opines on Contract Interpretation.*

Professor Partnoy also interprets contracts on the Court's behalf to determine the scope of TCI's legal power under its swap arrangements. He describes the terms of the relevant swap arrangements, interprets those terms, and then makes legal conclusions based on his understanding. For instance, Professor Partnoy argues:

- "TCI's swap counterparties have disclaimed — in those documents, in their own preexisting policies, and in letters submitted in this litigation — any arrangements that would give TCI the power to direct the counterparties' voting or disposition of referenced CSX shares." Partnoy Report ¶ 9; *see also id.* ¶¶ 10-11, 14-15; *see also* Partnoy Sur-Rebuttal ¶ 2.

- "[T]he evidence does not show that any swap counterparty will — in violation of swap agreement terms and its own policies, and contrary to the commitments expressed in its letters — vote any of the CSX shares it holds as a hedge at TCI's discretion." Partnoy Report ¶ 52; *see also* Partnoy Sur-Rebuttal ¶ 41.

- "[T]he plain language of the swap arrangements and other evidence from the counterparties shows that TCI had no such power to direct the disposition of shares." Partnoy Report ¶ 79; *see also* ¶¶ 45-51, 112.

Professor Partnoy's legal analysis is not only erroneous (*see infra* Argument Part I.B.), it is also improper under Federal Rule of Evidence 702. "'The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do [courts] permit expert testimony.'" *Marx & Co.*, 550

- 6 -

F.2d at 510 (quoting *Loeb v. Hammond*, 407 F.2d 779, 781 (7th Cir. 1969)).  By

"constru[ing] the contract[s]" and giving "his opinion as to the legal standards which he

believed to be derived from the contract[s] and which should have governed [TCI's]

conduct", Professor Partnoy's reports exceed the proper scope of admissible expert

testimony and should be stricken.  *Id.* at 509 (finding that admission of expert testimony

as to the parties' contractual obligations constituted reversible error); *see also F.H. Krear

& Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1258 (2d Cir. 1987) (excluding

testimony concluding that contracts were unenforceable for lack of essential terms).

>    4.    *Professor Partnoy Impermissibly Opines on Whether Certain
>          Information Is Legally "Relevant" or "Material".*

Professor Partnoy also improperly opines on whether certain information

is relevant or material to the Court's ultimate decision.  For instance, Professor Partnoy

contends:

- "My review of the documentation for these swaps uncovered no unusual or atypical material terms relevant to this dispute." Partnoy Report ¶ 30.

- "Moreover, even if TCI had filed a Schedule 13D at that earlier date, whenever it might be, the fact of that earlier filing would be irrelevant today . . . ." *Id.* ¶ 36.

- "Any conclusion about why shares flowed in and out of Deutsche Bank would be speculative and irrelevant." *Id.* ¶ 75.

- "In any event, none of these arguments about price advantage are [sic] relevant to this case . . . ." *Id.* ¶ 87.

Once again, Professor Partnoy's "opinions fail to pass muster under the

general principles of preclusion".  *Feinberg v. Katz*, No. 01 Civ. 2739 (CSH), 2007 WL

4562930, at *9 (S.D.N.Y. Dec. 21, 2007).  Concepts such as "relevance" or "materiality"

are "mixed question[s] of law and fact", and their "*assessments are peculiarly ones for*

- 7 -

*the trier of fact*". *Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, (1976) (emphasis in original)). By opining on these matters, Professor Partnoy "manages . . . to both usurp the trial judge's function of instructing the jury on the law and tell the jury what result to reach on the facts: a breathtaking *tour de force* of inadmissibility". *Id.* As such, to the extent that Professor Partnoy's reports opine on the "materiality" or "relevance" of issues before this Court, his testimony goes beyond Federal Rule of Evidence 702 and warrants exclusion.

**B.**   **Professor Partnoy's Impermissible Legal Analysis Is Flawed and Irrelevant.**

In addition to being impermissible, Professor Partnoy's legal analysis is also faulty. Professor Partnoy's reports sidestep the economic issues currently before the Court and instead addresses legal issues not relevant to the litigation. As a result, they are neither helpful nor relevant and should be excluded pursuant to Federal Rule of Evidence 702.

Dr. Subrahmanyam offered expert analysis as to whether the economics behind the swap arrangements impacted, "directly or indirectly", the ability of TCI "significantly to influence" the investment decisions and votes of its counterparties. *See, e.g.*, Subrahmanyam Report ¶ 11.[2] The bulk of Dr. Subrahmanyam's Expert Report was an in-depth investigation into the economic incentives, pressures and relationships faced

---

[2]   In doing so, Dr. Subrahmanyam emphasized that he was not offering his opinion as to the proper legal standard: "I understand that the issues I have been asked to address relate to whether TCI is or was the 'beneficial owner' of the shares referenced in their swaps, as that term is used in the securities laws. I am not a lawyer, however, and I do not intend to offer any legal opinions in this matter. Rather, I intend only to offer opinions as to the economic issues that I understand relate to the legal matters presented." Subrahmanyam Report ¶ 12. He noted that his analysis was focused on, among other things, economic factors influencing "whether TCI's swap arrangements gave it, directly or indirectly, voting or investment power (the ability significantly to influence the voting or disposition of the referenced CSX shares)" because that was the legal standard on which "I have been asked by counsel for CSX for my opinion". *Id.* ¶ 11.

by TCI and its swap counterparties. *See id.* ¶¶ 86-128.  Although Dr. Subrahmanyam

mentioned the terms of the swap arrangements as empirical support for the economic

conclusions that he drew, he did so only to point out that the permissive language of the

agreements confirms TCI's significant practical influence. *See id.* ¶¶ 132-43 (noting that,

rather than forbidding the counterparties from responding to the economic incentives

created by their arrangements with TCI, the contracts provide that swap counterparties

"may" or "can" respond to that significant economic influence).

   In his reports, Professor Partnoy does not — and cannot — attack the

detailed economic analysis conducted by Dr. Subrahmanyam.  Instead, he improperly

limits and distorts the scope of the issues at hand.  Professor Partnoy's narrowing is the

product of two errors.

   *First*, Professor Partnoy applies the incorrect legal standard.  He initially

recognizes (correctly) that the proper inquiry is whether TCI "directly or indirectly" had

the "ability significantly to influence the voting or disposition of the referenced CSX

shares".  Partnoy Report ¶¶ 5-6 (summarizing Dr. Subrahmanyam's report).  However, in

the rest of his report, and in his Sur-Rebuttal Report, Professor Partnoy focuses on the

much narrower question of whether TCI "had the *power to direct* the disposition of CSX

shares referenced in the swap agreements". *Id.* ¶ 14 (emphasis added).  He addresses

whether "TCI 'directed'" its counterparties to "hedge swap contracts with shares", and

whether "they 'had to'" take such steps "at TCI's direction". *Id.* ¶ 15; *see also id.* ¶¶ 17,

102, 112-13; Partnoy Sur-Rebuttal ¶¶ 14, 15, 29, 57, 59, 62, 75 n.109.

   Professor Partnoy's reading of the applicable legal standard is overly

restrictive:  (1) he mistakenly reads certain terms out of the relevant regulation, *see* 17

C.F.R. § 240.13d-3(a) (attributing beneficial ownership to any person who "directly *or*

*indirectly* . . . has *or shares*" voting and investment power) (emphasis added); and (2) he

incorrectly ignores legal precedent interpreting that regulation, *see, e.g.*, *S.E.C. v. Drexel*

*Burnham Lambert Inc.*, 837 F. Supp. 587, 607 (S.D.N.Y. 1993) (relevant test is whether

the relationship "confers on a person a significant ability to affect how voting power or

investment power will be exercised"); *Calvary Holdings, Inc. v. Chandler*, 948 F.2d 59,

64 (1st Cir. 1991) (similar).[3]

       *Second*, because his initial premise regarding the legal standard is

erroneous, Professor Partnoy spends the bulk of his reports on irrelevant considerations.

His single-minded focus on the "direct" "power to direct" — rather than the "direct[] or

indirect[]" "ability significantly to influence" — leads him to place undue weight on the

terms of the swap arrangements between TCI and its counterparties. In fact, Professor

Partnoy makes those contractual provisions outcome-determinative. In circular fashion,

he opines that because the relevant contracts technically leave some discretion to the

swap counterparties, TCI legally lacks power over any investment or voting decision

related to matching shares of CSX. Professor Partnoy asserts that because the swap

arrangements do not give TCI total control, identification and disclosure of the matching

shares is not required as a matter of law. *See* Partnoy Report ¶¶ 45-51. By applying a

too-stringent test, Professor Partnoy disregards the practical economic realities addressed

by Dr. Subrahmanyam that are relevant to the appropriate legal standard.

---

[3] Professor Partnoy even criticizes Dr. Subrahmanyam for using words such as "significantly" and "influence" in his Expert Report — despite the fact that it is he, and not Dr. Subrahmanyam, who is focused on the wrong inquiry. *See* Partnoy Sur-Rebuttal ¶ 14.

Because of these errors, Professor Partnoy's reports do not "fit" either the economic considerations put forth by Dr. Subrahmanyam's Report or the ultimate issues faced by this Court. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 591 (1993) (citations and internal quotations omitted). As such, they do not "have a valid connection to the pertinent inquiry", *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 540 (citation omitted), and they are "not relevant and, ergo, non-helpful", *Daubert v. Merrell Dow Pharm.*, 509 U.S. at 591 (1993) (citations and internal quotations omitted).

To be admissible under Federal Rule of Evidence 702, Professor Partnoy's reports must "assist the trier of fact to understand the evidence or to determine a fact in issue". Fed. R. Evid. 702. By being both irrelevant and unhelpful, Professor Partnoy's reports warrant exclusion because they fail to provide any assistance. *See Hill v. City of New York*, No. 03-CV-1283 (ARR)(KAM), 2007 WL 1989261, at *7-*8 (E.D.N.Y. July 5, 2007) (excluding an expert report, in part, because of its "limited helpfulness"). Moreover, due to its erroneous assumptions and flawed conclusions, exclusion of the Professor Partnoy's reports is necessary because their "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the [trier of fact]". Fed R. Evid. 403; *see also Hill*, 2007 WL 1989261, at *8.

## II.    PROFESSOR PARTNOY IS NOT QUALIFIED TO OPINE ON ECONOMIC ISSUES.

Once Professor Partnoy's impermissible legal conclusions are stripped from his reports, all that remains is attempted economic analysis. For instance, Professor Partnoy tackles these economic questions:

- Whether TCI's counterparties were compelled by economic needs to hedge through the purchase of underlying CSX shares. *See id.* ¶¶ 78-79.

- Whether TCI's swap counterparties would have found the "Value-at-Risk" associated with hedging through instruments other than CSX shares to exceed their risk tolerance. *Id.* ¶¶ 89-98; *see also* Partnoy Sur-Rebuttal ¶¶ 6, 65-68.

- Whether private information regarding order flow allowed TCI to obtain better prices than it could have otherwise obtained when its swaps were unwound and the underlying CSX shares sold. Partnoy Report ¶ 87; *see also* Partnoy Sur-Rebuttal ¶ 72.

- Whether "economic theory suggests" that TCI's counterparties "decide to sell after TCI unwinds a swap" due to "some 'group activity'". Partnoy Sur-Rebuttal ¶ 73.

To the extent that Professor Partnoy opines on economic issues, he lacks the background and credentials to qualify as an expert in the field. Devoid of relevant expertise, his economic testimony should be stricken. Because his legal opinions are improper and his economic opinions are unqualified, his reports contains no permissible expert testimony and should be excluded in full.

The Court is charged to act as a "gate-keeper" and must exclude an expert's testimony if, among other things, the expert is not qualified to opine on the specific matters in his report. *See Daubert*, 509 U.S. at 597; *Nimely v. City of New York*, 414 F.3d 381, 395-97 (2d Cir. 2005). An expert's background and credentials must be analyzed against the specific subject of his testimony. The party seeking to qualify a witness as an expert must establish that the witness possesses "scientific, technical or other specialized knowledge" relevant to issues in the case, based on the witness's "knowledge, skill, experience, training or education". *See* Fed. R. Evid. 104(a), 702.

It is not enough for the expert to have general experience tangentially related to the matters in his report. *See Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 353-54 (S.D.N.Y. 2003). Instead, the expert's training, knowledge and experience

must qualify him to answer the specific questions he seeks to address. *See Dreyer v. Ryder Auto. Carrier Group, Inc.*, 367 F. Supp. 2d 413, 425, 430 (W.D.N.Y. 2005). The expert must "stay within the reasonable confines of his subject area and cannot render expert opinion on an entirely different field or discipline". *Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222, 227-28 (N.D.N.Y. 1994) (citation omitted), *aff'd*, 101 F.3d 682 (2d Cir. 1996) (table). "[W]here an expert's opinion exceeds the scope of his qualifications, the witness's opinions are subject to exclusion." *Dreyer*, 367 F. Supp. 2d at 425. "[C]ourts may properly conclude that witnesses are insufficiently qualified despite the relevance of their testimony because their expertise is too general or too deficient." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).

Professor Partnoy is not qualified as an expert to opine on the economic issues that are the focus of Dr. Subrahmanyam's report. Professor Partnoy is a law professor and nothing more. He is not a trained economist, and he lacks any graduate, post-graduate or professional degree in the field. *See* Partnoy Report, Ex. A (Résumé). Apart from a scant 21 months employed in a junior capacity on Wall Street 15 years ago, he also lacks practical, real-world experience in dealing with the economic impact, pressures and relationship incentives created by derivatives (let alone the type of total-return swaps at issue in this case). Indeed, the minimal "value" of his brief, outdated experience on Wall Street is illustrated by reviews of his book F.I.A.S.C.O.: BLOOD IN THE WATER ON WALL STREET, in which Professor Partnoy chronicled his few months at Morgan Stanley (*see id.* at 2):

- "After close reading, it's hard to avoid feeling that Partnoy is not being completely honest." Leah Nathans Spiro, *Partnoy's Complaint About Morgan Stanley*, BUSINESSWEEK (Nov. 3, 1997) (*available at* 1997 WL 4031531).

- 13 -

- "Employing cautiously worded statements, he seems to be stretching his somewhat skimpy experience over too large a set of allegations." *Id.*

- "[T]he perspective presented in F.I.A.S.C.O. is fundamentally at odds with economic theory." Jonathan R. Macey, *Wall Street Versus Main Street: How Ignorance, Hyperbole, and Fear Lead to Regulation. F.I.A.S.C.O.: Blood in the Water on Wall Street. Frank Partnoy.* 65 U. CHI. L. REV. 1487, 1488 (1998).

- "Clearly, Partnoy's incomplete understanding of how markets work skewed his perception of the environment in which he found himself during his brief stint on Wall Street." *Id.*

- "Partnoy's highly conjectural descriptions of Morgan Stanley's business stand in sharp contrast to actual industry behavior." *Id.* at 1503.

- "[T]he vast bulk of F.I.A.S.C.O. is misleading or inaccurate . . . . Partnoy displays a calculating lack of understanding of the environment in which he briefly worked." *Id.* at 1510.

- "[F]or an honest student of derivative markets, the book's sensationalism is only surpassed by its intellectual dishonesty." *Id.*[4]

While Professor Partnoy does provide a series in cases in which he has provided — or attempted to provide — expert testimony, *see* Partnoy Report ¶ 3, he does not specify the subjects on which he opined. Indeed, as best we can determine from a review of the listed cases, Professor Partnoy typically offered testimony on issues other than derivatives, and rarely — if ever — addressed the kind of equity swaps at issue here. His testimony, when admitted or considered, generally dealt with matters more befitting

---

[4] Interestingly, Partnoy appears to condemn the kinds of equity swaps employed by TCI, its affiliates, and the other defendants in this case. *See* FRANK PORTNOY, F.I.A.S.C.O: THE INSIDE STORY OF A WALL STREET TRADER 166 (Penguin Books 2d ed. 1999) (1997) ("I couldn't believe the trades were so common. These Equity Swaps were a pure, unadulterated tax scam.").

his background as a law professor than the kinds of economic issues that Dr. Subrahmanyam addressed.[5]

Indeed, in at least one case in which Professor Partnoy has attempted to move outside the scope of his legal expertise and testify as to economic matters, his testimony was excluded. *See S.E.C. v. Todd*, No. 03CV2230 (BEN)(WMC), 2006 WL 5201386 (S.D. Cal. Oct. 17, 2006) ("The Court finds the expert testimony and opinions to be proffered by Mr. Partnoy are not relevant to the issues of this litigation, and therefore grants the SEC's motion as to him."); *see also* Motion in Limine by Plaintiff Securities and Exchange Commission to Exclude Testimony by Defendants' Expert Witnesses Charles Haggerty and Frank Partnoy, *S.E.C. v. Todd*, No. 03CV2230 (BEN)(WMC), 2006 WL 3031653 (filed Sept. 5, 2006) (arguing for exclusion, in part, because "Partnoy is a law professor, not an economist").

Ultimately, Professor Partnoy's limited background and lack of relevant credentials rob him of any credible economic expertise. "When an expert is no longer applying his extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded." *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003). As such, Professor Partnoy's reports — to the extent they attempt to address the

---

[5] *See, e.g., Plumbers & Pipefitters Nat'l Pension Fund v. Cisco Sys., Inc.*, No. 01-20418 (N.D. Cal.) (offering expert testimony on accounting and corporate governance issues); *In re PETCO Sec. Litig.*, No. 05-CV-0823-H (S.D. Cal.) (provided testimony regarding the materiality of an announcement by PETCO adjusting distribution expenses); *City of Livonia Employees' Retirement Sys. v. Draper et al.*, No. 05-04178 (D.S.D) (shareholder action brought to remedy alleged breaches of fiduciary duty by target company's directors, testimony unrelated to derivatives, swaps or economics); *Carpenters Health & Welfare Fund, et al. v. The Coca-Cola Co., et al.*, No. 1:00-V-2838-WBH (N.D. Ga.) (shareholder class action alleging violations of Section 10(b) and Rule10b-5, which did not concern either derivatives or swap agreements).

economic matters set forth in Dr. Subrahmanyam's Expert Report and Rebuttal Expert

Report — should be stricken under Federal Rule of Evidence 702.[6]

    The dangers of admitting Professor Partnoy's untrained economic analysis

can be demonstrated with just one example. In Dr. Subrahmanyam's Rebuttal Report, he

noted that the evidence established that Credit Suisse hedged all of its swaps one-for-one

with matching physical shares, with one exception — a swap referencing 850,000 CSX

shares on January 30, 2007. *See* Subrahmanyam Rebuttal ¶ 30. Based on his economic

background, Dr. Subrahmanyam "strongly suspect[ed] that the absence of hedging shares

on January 30, 2007 is due to an omission of trading data for CSX shares from Credit

Suisse's hedging data production". *Id.* In response, Professor Partnoy criticized

Dr. Subrahmanyam's "strong suspicions" and proclaimed "that the swap was at most

partially hedged . . . using equity derivatives, and [Credit Suisse] later partially replaced

its derivatives with shares". Partnoy Sur-Rebuttal ¶ 58. In fact, Dr. Subrahmanyam was

exactly right, and Professor Partnoy's "sound economic analysis" was anything but.

Credit Suisse produced yesterday, May 20, 2008, an additional set of hedging data that

shows it hedged one-for-one by acquiring 850,000 matching physical CSX shares upon

entering into the January 30, 2007 swap with TCI. *See* Ex. 1 attached hereto (Schedule

Analyzing Recently Produced Credit Suisse Hedging Documents (attaching Exs. 3.2, 4.2

and 5 to Dr. Subrahmanyam's Rebuttal Report)).

---

   [6] *See, e.g., Bazile v. City of New York*, 64 Fed. Appx. 805, 809, 2003 WL 21024765, at *3 (2d Cir. 2003) (upholding exclusion of expert not qualified to opine on relevant field at issue); *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 60 (2d Cir. 2002) (upholding district court's decision to strike expert testimony that strayed outside of scope of expertise); *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 444 (2d Cir. 1995) (similar).

Professor Partnoy is not a trained economist, so such errors are bound to happen, which is why Rule 702 demands the exclusion of his unqualified economic testimony. In addition, "when an expert's testimony 'strays from the scope of [his] expertise,' the testimony may well implicate Rule 403 of the Federal Rules of Evidence." *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004) (quoting *Dukagjini*, 326 F.3d at 54). Because his attempted economic analysis does not — and cannot — provide either a meaningful rebuttal to Dr. Subrahmanyam's report or qualified insight into the economic issues before this Court, exclusion of Professor Partnoy's reports is also warranted under Federal Rule of Evidence 403. *See Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 338 (2d Cir. 1993) (upholding trial court's decision to limit expert testimony on Rule 403 grounds when expert lacked specific expertise at issue on certain topics).

## CONCLUSION

For the reasons set forth above, CSX respectfully requests that this Court strike the Rebuttal Expert Report and Sur-Rebuttal Expert Report of Frank Partnoy and exclude Professor Partnoy's proffered expert testimony.

Dated: May 21, 2008
      New York, NY

           Respectfully submitted,

           **CRAVATH, SWAINE & MOORE LLP,**

           by   /s/ David R. Marriott
                  Rory O. Millson
                  Francis P. Barron
                  David R. Marriott
                  Members of the Firm

           Attorneys for Plaintiff
           825 Eighth Avenue
           New York, NY 10019
             (212) 474-1000

                RMillson@cravath.com
                FBarron@cravath.com
                DMarriott@cravath.com

**DEWEY PEGNO & KRAMARSKY LLP**
Keara A. Bergin
220 East 42nd Street
New York, NY 10017
(212) 943-9000
KBergin@dpklaw.com

**FRIEDMAN KAPLAN SEILER & ADELMAN LLP**
Lance J. Gotko
Paul J. Fishman
1633 Broadway
New York, NY 10019-6708
(212) 833-1100
LGotko@fklaw.com
PFishman@fklaw.com

*Attorneys for Plaintiff CSX*

- 18 -

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CSX CORPORATION,

Plaintiff,

v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE
BEHRING, A/K/A ALEXANDRE BEHRING
COSTA,

Defendants.

---

THE CHILDREN'S INVESTMENT MASTER
FUND,

Counterclaim and Third-
Party Plaintiff,

v.

CSX CORPORATION AND MICHAEL WARD,

Counterclaim and Third-
Party Defendants.

---

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.,

Counterclaim Plaintiffs,

v.

CSX CORPORATION AND MICHAEL WARD,

Counterclaim Defendants.

---

ECF Case

08 Civ. 02764 (LAK) (KNF)

**SCHEDULE ANALYZING RECENTLY
PRODUCED CREDIT SUISSE
HEDGING DOCUMENTS**

**CONFIDENTIAL PURSUANT TO THE
PROTECTIVE ORDER**

## SCHEDULE ANALYZING RECENTLY PRODUCED
## CREDIT SUISSE HEDGING DOCUMENTS

1.      In my Rebuttal Report, submitted on May 18, 2008, I analyzed hedging data

produced by the counterparty banks in this litigation.  Credit Suisse's hedging data, as I stated,

showed that Credit Suisse hedged its swaps one-for-one with matching physical shares.

(Subrahmanyam Rebuttal ¶ 30.)  The only non-de minimis exception I noted was a swap for

850,000 shares entered into between Credit Suisse and TCI on January 30, 2007.

(Subrahmanyam Rebuttal ¶ 30.)  Given the size of this transaction and the fact that Credit Suisse

had hedged perfectly in every other transaction with physical shares, I stated that I "strongly

suspect[ed] that the absence of hedging trades on January 30, 2007 is due to an omission of

trading data for CSX shares from Credit Suisse's hedging data production."  (Subrahmanyam

Rebuttal ¶ 30.)

2.      I understand that Credit Suisse produced today, May 20, 2008, an additional set of

hedging data, which I received today from counsel.  (CS 001319-CS 001415.)  This data

confirms my strong suspicion.  Credit Suisse, in fact, hedged one-for-one by acquiring matching

physical CSX shares upon entering into the swap referencing 850,000 shares with TCI on

January 30, 2007.

2

3.      Accordingly, I have attached updated Exhibits 3.2, 4.2 and 5 of my Rebuttal

Report, and am submitting this Schedule to complete my analysis for the missing Credit Suisse

data.  All my prior opinions are unchanged.

_____

Marti G. Subrahmanyam

May 20, 2008_____
Date

New York, NY_____
Place



**Exhibit 3.2**

**Credit Suisse:  Holdings of CSX Swaps with TCI and CSX Share Hedges**
**12/5/06 – 12/11/07**

No. of Shares
(in millions)

Source: CS 000097–1415; TCI0928579–88; http://www.dtcc.com

Legend:
- Credit Suisse CSX Swap Holdings with TCI
- Credit Suisse CSX Share Hedges

Note:
[1] Credit Suisse Securities (USA) LLC's contra code of 355 was shown as the "deliverer" of these shares, indicating a sale of the shares to Deutsche Bank.
[2] There is no share hedge data for 12/11/07 provided in either the 5/15/08 and 5/20/08 Credit Suisse productions (CS 000097–1415).

## Exhibit 4.2
## Credit Suisse: Transactions in CSX Swaps with TCI and CSX Shares
### 12/5/06 – 12/11/07

Source: CS 000097–1415; TCI0928579–86; http://www.dtcc.com

| TCI Transactions in CSX Swaps with Credit Suisse | | | | Credit Suisse Transactions in CSX Shares | | | |
|---|---|---|---|---|---|---|---|
| Date | Direction | Quantity | Cumulative Position | Date | Direction | Quantity | Cumulative Position |
| 12/5/06 | Long | 1,200,000 | 1,200,000 | 12/5/06 | Buy | 1,200,000 | 1,200,000 |
| 12/6/06 | Long | 1,000,000 | 2,200,000 | 12/6/06 | Buy | 1,000,000 | 2,200,000 |
| 12/7/06 | Long | 800,000 | 3,000,000 | 12/7/06 | Buy | 800,000 | 3,000,000 |
| 12/12/06 | Long | 350,000 | 3,350,000 | 12/12/06 | Buy | 350,000 | 3,350,000 |
| 12/13/06 | Long | 400,000 | 3,750,000 | 12/13/06 | Buy | 400,000 | 3,750,000 |
| 12/14/06 | Long | 1,191,300 | 4,941,300 | 12/14/06 | Buy | 1,191,300 | 4,941,300 |
| 12/26/06 | Long | 600,000 | 5,541,300 | 12/26/06 | Buy | 600,000 | 5,541,300 |
| 12/29/06 | Long | 850,000 | 6,391,300 | 12/29/06 | Buy | 850,000 | 6,391,300 |
| 1/4/07 | Long | 600,000 | 6,991,300 | 1/4/07 | Buy | 600,000 | 6,991,300 |
| 1/16/07 | Long | 797,900 | 7,789,200 | 1/16/07 | Buy | 797,900 | 7,789,200 |
| 1/18/07 | Long | 220,000 | 8,009,200 | 1/18/07 | Buy | 220,000 | 8,009,200 |
| 1/30/07 | Long | 850,000 | 8,859,200 | 1/30/07 | Buy | 850,000 | 8,859,200 |
| 2/5/07 | Long | 350,000 | 9,209,200 | 2/5/07 | Buy | 350,000 | 9,209,200 |
| 2/12/07 | Long | 750,000 | 9,959,200 | 2/12/07 | Buy | 750,000 | 9,959,200 |
| 3/30/07 | Long | 317,700 | 10,276,900 | 3/30/07 | Buy | 317,700 | 10,276,900 |
| 4/11/07 | Short | (2,300,000) | 7,976,900 | 4/11/07 | Sell | (2,300,000) | 7,976,900 |
| 11/2/07 | Short | (2,000,000) | 5,976,900 | 11/2/07 | Sell [1] | (2,000,000) | 5,976,900 |
| 11/5/07 | Short | (2,000,000) | 3,976,900 | 11/5/07 | Sell [1] | (2,000,000) | 3,976,900 |
| 11/6/07 | Short | (2,000,000) | 1,976,900 | 11/6/07 | Sell [1] | (2,000,000) | 1,976,900 |
| 11/7/07 | Short | (1,976,900) | 0 | 11/7/07 | Sell [1] | (1,976,900) | 0 |
| 12/11/07 | Long | 1,000 | 1,000 | 12/11/07 [2] | | | 0 |

Note:
[1] Credit Suisse Securities (USA) LLC's contra code of 355 was shown as the "deliverer" of these shares, indicating a sale of the shares to Deutsche Bank.
[2] There is no share hedge data for 12/11/07 provided in either the 5/15/08 and 5/20/08 Credit Suisse productions (CS 000097–1415).

**Exhibit 5**
**Analysis of Discrepancies Between Dates and Quantities of Swap**
**and Hedge Transactions**
**10/1/06 – 12/31/07**

Source: C 0081–2, 86, 90, 94, 98, 102, 106, 110, 114, 118, 122, 125, 126, 136, 161, 163; CS 000097–1415; DB 00070–2; G 000094–522; ML 74–7, ML 0166–333; MS-CSX_000151–53, 206; TCI0928579–88; TCI0156349–51, 420; TCI159810-5, TCI238382-7, TCI176768-74, TCI180836-41, TCI189004-9, TCI188222-7, TCI334660-5, TCI334666-71, TCI55892-7, TCI55181-6, TCI 334672-7, TCI 348151-8, TCI 348145-50, TCI 937809-13, TCI 0342162-8, TCI 0156229, TCI 0156236-7, TCI 0963064, TCI 0156296, TCI 0156287, TCI 0156264, TCI 0156315, TCI0156322, TCI0765776-81, TCI0156374, TCI0860448-54; UBS 00516-7.

| Counterparty | Number of Swap Transactions | Number of Discrepancies | Date of Swap with Discrepancy | Discrepancy Quantity [1] | Correction of Discrepancy |
|---|---|---|---|---|---|
| Citigroup | 16 | 1 | 11/14/07 | 61,013 | Fully hedged on 11/15/07. |
| Credit Suisse | 21 | 1 | 12/11/07 | 1,000 | |
| Deutsche Bank | 32 | 0 | | | |
| Goldman Sachs [2] | 10 | 0 | | | |
| Merrill Lynch [3] | 25 | 5 | 12/4/06 | (800) | |
| | | | 12/8/06 | (100) | |
| | | | 11/12/07 | 300 | |
| | | | 11/13/07 | (500) | |
| | | | 12/11/07 | 1,000 | |
| Morgan Stanley [4] | 24 | 3 | 11/9/06 | 850,100 | Fully hedged on 11/10/06. |
| | | | 12/8/06 | 100,000 | Fully hedged on 12/11/06. [5] |
| | | | 12/11/06 | 545,000 | Fully hedged on 12/12/06. |
| UBS [6] | 22 | 10 | 10/23/06 | 1,380,000 | Fully hedged on 10/24/06. |
| | | | 11/13/06 | 500,000 | Fully hedged on 11/14/06. |
| | | | 11/14/06 | 300,000 | Fully hedged on 11/15/06. |
| | | | 1/17/07 | 642,000 | Fully hedged on 1/18/07. |
| | | | 11/9/07 | (300,000) | Fully hedged on 11/10/07. |
| | | | 11/13/07 | (1,700,000) | Fully hedged on 11/14/07. |
| | | | 11/14/07 | (1,050,000) | Fully hedged on 11/15/07. |
| | | | 11/15/07 | 850,000 | Fully hedged on 11/16/07. |
| | | | 11/16/07 | 517,900 | Fully hedged on 11/17/07. |
| | | | 12/11/07 | 1,000 | Fully hedged on 12/12/07. |
| **Total:** | **150** | **20** | | | |

Note:
Discrepancies occur when, on any given swap trade date, there is no hedging transaction that exactly matches the corresponding swap, or there are other counterparty CSX stock trades that do not match a previous swap position.
[1] Discrepancy Quantity calculates the difference between swaps and hedges entered into on a given day.
[2] Goldman Sachs Group, Inc. only provided data for hedging transactions corresponding to CSX swap terminations with TCI (G-000094–522).
[3] Discrepancies on 12/4/06, 11/12/07 and 11/13/07 were due to separate transactions, which occurred in addition to the perfectly matching hedge trade on these dates. The Merrill Lynch trading data shows that these three hedge trades have different characteristics than the other trades in the data, including differing portions of the "TID" and "Entering TID" values, and/or the two November trades, differing "Opposing" numbers. These trades may therefore not be hedging trades for TCI swap transactions.
[4] The 5/8/08 production from Morgan Stanley showed a hedging sale for 4 million CSX shares taking place on 10/31/07. 5/13/08 production from Morgan Stanley corrected this data point and showed two trades for 2 million shares each on 10/30/07 and 10/31/07 instead. This more recent production covers only hedging of swap terminations. Therefore, it does not cover the remaining three discrepancies between increases in CSX swap positions and CSX share purchases on 11/9/06, 12/8/06 and 12/11/06.
[5] 12/8/06 was a Friday.
[6] The UBS schedule provides trade dates for swaps and "deal dates" for hedges. In each case when swap trade date is different from the hedge "deal date," "deal date" is the next calendar day, which is Saturday in some cases, and "deal time" is shortly after midnight.