UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CSX CORPORATION,

                                        Plaintiff,

             v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD.,  3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE
BEHRING, A/K/A ALEXANDRE BEHRING
COSTA,

                                        Defendants.

---

THE CHILDREN'S INVESTMENT MASTER
FUND,

                          Counterclaim and Third-
                                   Party Plaintiff,

             v.

CSX CORPORATION AND MICHAEL WARD,

                          Counterclaim and Third-
                                Party Defendants.

---

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND L.P.

                          Counterclaim Plaintiffs,

             v.

CSX CORPORATION AND MICHAEL WARD,

                          Counterclaim Defendants.

---

ECF Case

08 Civ. 02764 (LAK) (KNF)

**PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF
LAW OF CSX CORPORATION
AND MICHAEL WARD
REGARDING
COUNTERCLAIMS AND
THIRD-PARTY CLAIMS**

# TABLE OF CONTENTS

Page

**Preliminary Statement**................................................................................................1

**Proposed Findings of Fact**........................................................................................2

I.    CSX HAS DISCLOSED ALL MATERIAL INFORMATION
      CONCERNING EXECUTIVE AND DIRECTOR COMPENSATION
      PLANS .................................................................................................................2

      A.    2007-2009 Long Term Incentive Plan ....................................................2

      B.    2007 Stock Grants to Directors...............................................................9

II.   MICHAEL WARD AND EDWARD KELLY ACCURATELY STATED
      THEIR HONESTLY HELD OPINIONS .............................................................11

      A.    Mr. Ward's Editorial.............................................................................11

      B.    Mr. Kelly's Statements .........................................................................13

      C.    Mr. Ward's Statements Concerning the Reasons for this Lawsuit...........16

III.  MR. WARD ACTED IN GOOD FAITH .............................................................19

IV.   THE FEBRUARY 2008 BYLAW AMENDMENTS DO NOT VIOLATE
      VIRGINIA LAW ...............................................................................................19

      A.    The 2008 Bylaw Amendments and Shareholder Proposals.....................19

      B.    Disclosure ...........................................................................................21

**Proposed Conclusions of Law** ................................................................................25

I.    TCI AND 3G'S CLAIMS CONCERNING CSX'S DISCLOSURE OF
      COMPENSATION ARE WITHOUT MERIT. .....................................................25

      A.    Defendants' Claims Concerning the CSX's 2007-2009 LTIP are
            Without Merit.......................................................................................25

      B.    Defendants' Claims Concerning the CSX Stock Plan for Directors
            are Without Merit..................................................................................28

II.   TCI AND 3G'S CLAIMS CONCERNING STATEMENTS MADE BY
      MICHAEL WARD AND EDWARD KELLY ARE WITHOUT MERIT............29

      A.    Proposed Conclusions............................................................................29

i

B.      Discussion ................................................................................30

III.    TCI AND 3G'S CLAIM UNDER SECTION 20(a) IS WITHOUT MERIT ........34

      A.      Proposed Conclusion ...................................................................34

      B.      Discussion ................................................................................34

IV.   TCI AND 3G'S CLAIM UNDER VIRGINIA LAW IS WITHOUT
     MERIT. ....................................................................................34

      A.      Proposed Conclusions ..................................................................34

      B.      Discussion ................................................................................35

**Conclusion** ...........................................................................................37

## CITATION CONVENTIONS

"2007-2009 LTIP" or "LTIP": CSX 2007-2009 Long Term Incentive Plan

"3G": 3G Capital Partners Ltd., 3G Capital Partners, L.P., and 3G Fund L.P.

"3G Ans. ¶ [ ]" or "3G Counterclaims ¶ [ ]": Answer, Affirmative Defenses and Counterclaims of Defendants 3G Capital Partners Ltd., 3G Capital Partners, L.P., 3G Fund, L.P. and Alexandre Behring

"Annual Shareholder Meeting" or "Annual Meeting": CSX Annual Meeting of Shareholders

"Board": CSX Board of Directors

"Bylaws": CSX's Amended and Restated Bylaws

"Compl. ¶ [ ]": Complaint

"CSX": Plaintiff-Counterclaim Defendant CSX Corporation

"CSX Proxy": CSX's definitive proxy statement on Schedule 14A filed on April 25, 2008

"Exchange Act": Securities Exchange Act of 1934, as amended

"[EXPERT] ¶ [ ]": Proposed expert reports

"February 2008 amendments" or "bylaw amendments":  CSX 2008 February Bylaw amendments

"LBO": Leveraged Buyout

"PTO at [ ]": Amended Joint Final Pre-Trial Order

"PTO Stip. ¶ [ ]": Stipulated facts in the Amended Joint Final Pre-Trial Order

"PX [ ] at [ ]" and "JX  [ ] at [ ]": Plaintiff's proposed exhibits and joint proposed exhibits

"PFF ¶ [ ]":  Internal citations to CSX's Proposed Findings of Fact

"Stock Plan": Amended and Restated CSX Corporation Stock Plan for Directors

"TCI": The Children's Investment Master Fund

"TCI Ans. ¶ [ ]" or "TCI Counterclaims ¶ [ ]": Answer, Affirmative Defenses of Defendants The Children's Investment Fund Management (UK) LLP, The Children's Investment Fund Management (Cayman) Ltd., The Children's Investment Master Fund,

Christopher Hohn, and Snehal Amin and Counterclaims and Third-Party Claims of The Children's Investment Master Fund

"Virginia Stock Corporations Act": Title 13.1 Chapter 9 of the Virginia Code

"[WITNESS] ¶ [ ]": Direct testimony of witnesses

"[WITNESS] Dep. [PAGE: LINE NUMBER]": Deposition designations

Plaintiff-Counterclaim Defendant CSX and Third-Party Defendant Michael J. Ward respectfully submit the following Proposed Findings of Fact and Conclusions of Law in support of their request for judgment in their favor on all claims asserted against them by 3G and TCI.

## Preliminary Statement

TCI and 3G's counterclaims, which were announced in a press release when filed, were interposed for the purpose of creating negative publicity concerning CSX for the proxy contest.

The much publicized "insider trading" charges against the CSX directors were entirely without merit. Indeed, before trial TCI and 3G abandoned their claim relating to the directors' May 2007 compensation. And, at trial, they effectively abandoned the rest. They did not even bother to cross-examine Dr. William Richardson, the head of CSX's Compensation Committee. Dr Richardson explained, without any contradiction, the grant of LTIP awards for the top CSX executives, including Mr. Ward, Mr. Munoz and Ms. Fitzsimmons, and 600 other employees. Not only did TCI and 3G not cross-examine Dr. Richardson (or Mr. Ward or Mr. Munoz on this topic), but they also chose not to cross-examine Ms. Fitzsimmons at all. This is especially noteworthy because Ms. Fitzsimmons was CSX's witness on the award of stock to directors under the CSX Stock Plan.

The Court's conclusion that these claims were entirely driven by the proxy contest rather than a bona fide claim is confirmed by other aspects of defendants' litigation tactics. At trial, the Court had to admonish counsel on the cross-examination of Mr. Ward not to conduct a proxy fight in the courtroom. Moreover, TCI and 3G made other allegations in their counterclaims that they had to abandon. Their claims about nondisclosure with respect to the bylaw amendments had to be abandoned after Mr. Amin's deposition testimony that CSX had fully disclosed the allegedly hidden information. Similarly, 3G's claims with respect to employee discounts at the Greenbrier Resort were more calculated for the press than for serious consideration by this Court. Likewise, TCI and 3G effectively abandoned their claims concerning opinions expressed by Mr. Ward and Edward J. Kelly III, the presiding director of CSX's Board, by not cross-examining either of them concerning their statements. Their opinions and testimony stand unchallenged.

**Proposed Findings of Fact**

I.     **CSX HAS DISCLOSED ALL MATERIAL INFORMATION CONCERNING EXECUTIVE AND DIRECTOR COMPENSATION PLANS**

     A.     **2007-2009 Long Term Incentive Plan**

       1.     The CSX 2007-2009 LTIP, effective May 1, 2007, is the vehicle pursuant to which CSX awards to senior employees "performance grants" representing the potential to receive shares of CSX common stock in January 2010.  (JX 24 at 1; Richardson ¶ 7.)

       2.     The 2007-2009 LTIP cycle commenced on May 1, 2007, and ends December 25, 2009.  (JX 24 at 1.)

       3.     LTIP grants are not grants of stock.  Nor are they grants of stock options.  CSX moved away from granting options in 2003 primarily because the Board wanted incentive compensation to depend more on the performance of the CSX business rather than the potential vagaries of the stock market.  (Richardson ¶ 3.)

       4.     The LTIP seeks to motivate and reward employees through the issuance of performance grants pursuant to which payouts (sometimes referred to as "performance awards") may be made based on CSX's 2009 operating ratio.  The performance awards will be in the form of CSX common stock.  (JX 24 at 1.)

       5.     Long-term performance-based compensation is intended to provide incentives based on performance measures that have historically driven long-term shareholder value.  The LTIP is designed to emphasize performance that is substantially within management's control, while also linking the payout's value to the share price with awards of CSX stock after the end of the performance period.  (Richardson ¶ 3.)

       6.     LTIP grants are made by the Compensation Committee, which is exclusively made up of non-management directors of CSX.  Each LTIP is established at the conclusion of a deliberative process that extends over several months and takes into account comparison data within the railroad industry as well as a comparison group of approximately 125 industrial companies of roughly comparable size to CSX. (Richardson ¶¶ 2, 4;  See PX 7.)

       7.     The process leading to the LTIP grants begins with the development by management of CSX's three-year strategic plan.  The strategic plan must be completed before LTIP grants are made because the operating targets in the LTIP flow from the strategic plan.  (Richardson ¶ 12.)

8.      The principal target metric for the 2007-2009 LTIP is the 2009 surface transportation operating ratio (expenses divided by revenues) for CSX's rail and intermodal businesses, taking into account a fuel adjustment.  (Richardson ¶ 7.)

9.      For the 2007-2009 LTIP, the strategic plan process started in the fall of 2006 and culminated in a presentation of the strategic plan to the Board at its regularly scheduled retreat on April 1 through 3, 2007.  (Richardson ¶ 12.)

10.      The Compensation Committee sets the LTIP grants in its first regularly scheduled meeting following the Board's approval of the strategic plan. In 2007, that meeting occurred on Tuesday, May 1, the day before the annual meeting of shareholders. (Richardson ¶ 12.)

11.      On May 1, 2007, an initial target grant of performance units was established for each participant.  For instance, the target performance grant to CSX's chief executive officer, Michael Ward, on May 1, 2007, was $4 million.  To determine the number of performance units granted to Mr. Ward, the $4 million was divided by the average of the high and low price of CSX stock on May 1, 2007, to arrive at 92,347 units. However, those performance units will actually be awarded only if, by the end of the cycle in 2009, CSX has achieved certain operating targets set in 2007.  (Richardson ¶ 5.)

12.      An LTIP target grant of performance units represents only the possibility of income in the future.  The grant of performance units to the senior executives and over 600 other management employees in 2007 becomes a payout only at the end of the performance cycle and only if the company meets pre-established goals.  In fact, actual payouts will not occur until January 2010 and probably will vary significantly from the LTIP target grants in terms of both the number of CSX shares paid out and the value of the payout. (Richardson ¶ 6.)  In addition, the employee will earn not earn any performance units if he or she leaves before the end of the performance cycle with designated exceptions for death, disability, and retirement.  (JX 24 at 2.)

13.      The number of CSX shares paid out is contingent upon the operating ratio reaching a threshold level, which is below the target level but represents improvement, or the pre-set target level. Thus:

(a)      If CSX's operating ratio (expenses divided by revenues) does not reach a pre-set "threshold" level in 2009, the recipients of the LTIP grants will earn no performance units (they will get nothing).

(b)      If the operating ratio does reach the "threshold" level, the recipients will earn, subject to certain additional factors discussed below, a percentage of the target performance units.

(c)      If the operating ratio reaches the pre-set target level, the recipients will earn, subject to the additional factors, 100 percent of the target performance units granted three years earlier.

      (d)      If the operating ratio exceeds the target level, the recipients will earn, subject to the additional factors, a number of performance units in excess of 100 percent, up to a maximum of 200 percent.

      (e)      For each performance unit earned, the employee will receive a share of CSX stock in January 2010.  (See Richardson ¶ 7; JX 24 at 2, 6.)

14.     The performance unit awards to the six most senior executives at the end of the cycle are subject to adjustments based on the achievement of a pre-established target for three-year cumulative operating income.  The performance against this measure can produce up to a 20 percent increase or decrease in the actual award of performance units generated by the 2009 operating ratio measure.  (Richardson ¶ 8; JX 24 at 7.)

15.     The Compensation Committee also has discretion to reduce (but not increase) LTIP awards to the most senior executives by up to 30 percent of the performance units generated by the 2009 operating ratio measure, based on its assessment of management's performance against pre-established strategic goals, including safety, corporate responsibility, development of personnel and certain operating measures. (Richardson ¶ 9; JX 24 at 5.)

16.     In exercising its downward discretion with the respect to the amount of any payout to the most senior executives, the Compensation Committee can also take into account any factors that it deems relevant.  (Richardson ¶ 9.)

17.     In each of the last two years, the Committee has exercised their discretion to cap the payout awards below the levels that they otherwise would have been.  For example, in deciding the amount of payouts for the 2006-2007 LTIP in January 2008, the Committee exercised its downward discretion even though a majority of the strategic goals had been achieved.  (Richardson ¶ 9.)

18.     The result was that, despite the fact that the earnings per share were significantly higher than the pre-established target (justifying an upward adjustment of 20 percent), there was no upward adjustment in the senior executives' payouts.  (For the 2006-2007 LTIP, the secondary metric was earnings per share rather than cumulative operating income.)  This downward revision was imposed because the Committee believed that, without the revision, and in light of the higher stock price, the awards to the senior-most executives would have been out of line with what other managers were receiving.  (Richardson ¶ 9.)

19.     The LTIP grants are not like options, where the price on the grant date is determinative of the value of the option.  Allowing for variations in actual performance against the target metrics, as well as the exercise of the Committee's downward discretion, the number of CSX shares of common stock actually earned by the senior executives at the end of a performance cycle can range from 0 to 240 percent of the target number of performance units on the date of the original grant.  Thus, the relationship between the price of CSX stock on the day of the original target grant of performance

4

units and the ultimate payout of CSX stock three years later is attenuated at best. (Richardson ¶ 10.)

20.    The Compensation Committee approved the 2007-2009 LTIP performance unit grants on May 1, 2007.  (PX 7 at 3-4; Richardson ¶ 12.)

21.    The timing of the Compensation Committee's LTIP grants on May 1, 2007, had nothing to do with the actions announced by CSX on May 8, 2007.  The Committee made the LTIP grants on a schedule that was consistent with past practice. (Richardson ¶ 11.)

22.    The schedule for considering and making grants issued on May 1, 2007 under the LTIP was set well in advance of May 1, and had no relationship to the corporate actions announced on May 8, 2007.  (Richardson ¶ 12.)

23.    The Compensation Committee did not discuss the steps that CSX might take either in May or in September when it met on the afternoon of May 1, 2007 to decide on the LTIP grants.  When the Committee met on that day, the members did not know that the actions announced on May 8, 2007 would be discussed later that day, much less be taken.  (Richardson ¶ 14.)

24.    After the Compensation Committee meeting on May 1, 2007, the full Board met in advance of the May 2, 2007 annual shareholder meeting. (PX 8; Richardson ¶ 15.)  The May 1, 2007 Board meeting began with a review of items that had been discussed at the April 16, 2007 Board meeting.  (PX 8 at 1-2.)

25.    At the Board meeting on April 16, 2007, there had been discussion of (a) pursuing CSX's then current share repurchase program and communicating confidence that CSX would complete $1 billion of that $2 billion program by year's end; (b) setting out CSX's broader strategy at the September 2007 analyst meeting; and (c) the likelihood that management would seek approval for additional significant capital expenditures. (PX 6 at 2-3; Richardson ¶ 13.)

26.    Management's recommendation at that time was to announce financial targets and a possible enhancement of CSX's share repurchase programs and dividends in September, not May.  (PX 6 at 4; Richardson ¶ 13.)

27.    The Board did not make any decision at the April 16 meeting.  (See PX 6; Richardson ¶ 13.)

28.    When the full Board met on May 1, 2007, the directors heard that management was recommending (a) an increase in the share repurchase program to $4 billion; (b) an increase in CSX's dividend beginning in September 2007; (c) an increase in capital spending; and (d) an announcement of CSX's three-year expectations as to financial performance.  (PX 8 at 2; Richardson ¶ 15.)

29.     The recommendations made at the May 1, 2007 Board meeting were set forth in presentation materials that the Board members received at the meeting. (Richardson ¶ 15.)

30.     Management wished to announce the four steps at the Bear Stearns Global Transportation Conference scheduled for May 8, 2007 rather than at CSX's September 2007 investor and financial analyst conference.  (Richardson ¶ 15.)

31.     While the Board's reaction to management's recommendations at the May 1 meeting was generally favorable, the Board did indicate to management that it would not favor an increase in the share repurchase program to $4 billion, but that the Board would support an increase to $3 billion instead.  (PX 8 at 2-3; Richardson ¶ 16.)

32.     The Board did not act on the management recommendations on May 1, because the Board wanted to understand the rating agencies' reaction to them and reflect further on the recommendations.  Management undertook to provide an update to the Board after its meeting with rating agencies.  Those meetings were meant to ascertain what effect the steps would have on CSX's credit ratings.  Although the Board recognized that the steps would likely result in a credit ratings downgrade, the Board was determined to maintain an investment grade rating.  (Richardson ¶ 16.)

33.     On May 2, 2007, CSX declared its regular quarterly dividend of $0.12 per share.  (PX 8 at 6.)

34.     The announcement of the regular quarterly dividend on May 2, 2007, was not a surprise to the market.  The dividend amount (12 cents per share) was identical to the dividend for the previous quarter, which was in line with the previously announced earnings for the quarter.  Also, CSX has historically declared its quarterly dividend at its annual shareholders' meeting and so a dividend declaration at its 2007 annual shareholders' meeting was not unexpected.  (Cornell ¶ 26.)

35.     The Board met again on May 7, 2007, by telephone.  Management reported that it had met with the rating agencies, and that the agencies had indicated that CSX's credit ratings would remain at investment grade if the contemplated steps were taken.  (PX 9 at 1-2; Richardson ¶ 17.)

36.     At that point, after discussion, the Board approved the steps that management was recommending, including the reduced increase of the recommended share repurchase program to $3 billion rather than $4 billion.  (PX 9 at 2; Richardson ¶ 17.)

37.     The Board did not know what the impact on the stock price of the four actions being recommended by management would be.  It was hoped that the announcements, on balance, would be received favorably by investors.  The first (increased stock buyback), second (increased dividend) and fourth (more favorable guidance as to future prospects) were expected to be viewed as positive by the market, but the third (increased capital spending) would likely be viewed as negative.  In addition, it was recognized that the steps, if taken, would result in CSX's credit ratings

being downgraded to the last rung above "junk" status, which was expected to be a negative.  (Richardson ¶ 18.)

38.     On May 8, 2007, CSX issued a press release stating that "the company intends to:  repurchase another $1 billion in company stock, for a total current program of $3 billion; increase its quarterly dividend by 25 percent, starting in September of 2007; and increase planned capital investments to accelerate improvements in the safety, service reliability and capacity of its transportation businesses."  The press release also stated: "CSX affirmed today that it expects to achieve record levels of operating income and earnings per share in 2007, while delivering strong free cash flow.  Going forward, CSX expects to deliver double-digit increases in operating income, earnings per share and free cash flow on an average annual basis through 2010."  (PX 97.)

39.     On May 8, 2007, CSX filed a Form 8-K with the SEC that included as exhibits the press release along with a presentation management gave at the Bear Stearns Global Transportation Conference.  (JX 1.)

40.     The CSX announcements on May 8, 2007 were first disclosed through the press release at 7:59 a.m. in the morning.  CSX presented at the Bear Stearns Global Transportation Conference from 8:45 a.m. to 9:25 a.m.  Thus, the announced information was available to the market before the opening of trading at 9:30 a.m.  (Cornell ¶ 35.)

41.     CSX stock opened for trading at approximately $46.90 which was one dollar higher than the previous closing price.  But within a few minutes the stock had dropped a dollar to $45.88 and for almost the next three hours traded in the range of $45.70 to $46.52.  (Cornell ¶ 36; PX 94.)

42.     Defendants' expert concedes that CSX's stock price did not increase significantly in response to the May 8, 2007 disclosures, and speculates that news of CSX announcements leaked into the market before May 8, although he offers no evidence of such a leak.  (Fischel Rebuttal ¶¶ 10-11.)

43.     Snehal Amin, a founding partner of TCI, also presented at the Bear Stearns Global Transportation Conference.  (PTO Stip. ¶ 12; PX 96.)

44.     Mr. Amin's presentation was standing-room only, with people sitting and standing in the aisles and outside the doorways to the auditorium.  (Baggs ¶ 18.)

45.     The CSX stock price increased sharply starting around 12:15 p.m. and peaked at approximately 1:00 p.m.  This period of a sharp stock price jump corresponds almost exactly to the period when Mr. Amin was making his presentation at the Bear Stearns Conference, and shortly thereafter.  (Cornell ¶ 37.)

46.     The only evidence of any information leaking in advance of May 8, 2007 is that Snehal Amin sent a draft of his presentation to Richard@RSharp.co.uk, outside of TCI, in advance of the Bear Stearns Global Transportation Conference on May 6, 2007.  This is unrelated to the CSX announcements.  (PX 93.)

47.     Between May 2, 2007 and May 8, 2007 there was no statistically significant movement in CSX's stock price either on any individual day or cumulatively over the period. The news announced by CSX on May 8, 2007 was not material to CSX's equity investors.  (Cornell ¶ 9.)

48.     The Compensation Committee does not believe that there is any reason to revisit the May 1, 2007 grants in light of the actions announced on May 8, 2007.  First, it appears that there was no significant movement in the stock price attributable to the announced actions.  Second, the Compensation Committee has complete discretion to make adjustments in January 2010 for the payouts to senior executives under the 2007-2009 LTIP.  Third, the comparative data in the presentation provided to the Committee at the time of the LTIP grants on May 1, 2007 showed that the grants to CSX's senior executives were conservative.  For instance, the presentation showed the Committee that Michael Ward's long-term incentive opportunity of $4 million compared to an annual long-term incentive opportunity for other railroad chief executives averaging over $8 million.  (PX 89 at 18.)  The Compensation Committee could have justifiably made a target award to Mr. Ward well in excess of the $4 million.  (Richardson ¶ 19.)

49.     The 2007-2009 LTIP grants were disclosed in CSX's Form 8-K filed with the SEC on May 7, 2007 and CSX's Form 10-Q for the quarter ended June 29, 2007. (Richardson ¶ 20.)

50.      The LTIP and the LTIP awards are fully described in the CSX Proxy. (JX 5 at 27-31.)

51.     The CSX Insider Trading Policy provides that no CSX officer, employee, or director may purchase, sell or otherwise conduct transactions in any CSX security while he or she is aware of material nonpublic information about CSX.  (JX 25 at 1; PTO Stip. ¶ 47.)

52.     The Insider Trading Policy defines transactions as not only open-market purchases and sales, including those through a broker, but also the sale of shares obtained from an exercise of options, including in connection with a cashless exercise (other than pursuant to a Rule 10b5-1 trading plan).  In general, transactions subject to the Insider Trading Policy also include any purchases or sales of securities within CSX's employee benefits plans.  (JX 25 at 2.)

53.     The CSX Code of Ethics provides that no one may buy or sell securities while aware of inside information.  (JX 26 at CSX_00002489-50.)

54.     The CSX Corporate Governance Guidelines incorporate the CSX Code of Ethics and state that directors are expected to fully comply with the Code of Ethics.  (JX 23 at ¶ 24.)

55.     LTIP grants are not options.  (Richardson ¶ 3.)

56.     The CSX Proxy describes TCI and 3G's allegations concerning the grants under the 2007-2009 LTIP on May 1, 2007.  (JX 5 at 6.)

### B.    2007 Stock Grants to Directors

57.    The CSX Stock Plan for Directors, which applies to non-employee directors of the Board, provides for grants of stock, grants of options to acquire stock, and payments of directors' retainers in stock.  It was approved on April 17, 1997 and amended through December 8, 2004.  (PX 261 at 1.)

58.    Two components of the Stock Plan were implicated by defendants' counterclaims:

(a)    Under section 6(a) of the Stock Plan, the directors are required to take at least 50 percent of their annual retainer ($37,500) in stock. (PX 261 at 2; Fitzsimmons ¶ 5.)

(b)    Under section 6(d) of Stock Plan, the Board may make additional awards of stock or options to acquire stock to participants upon such terms as it deems fit. (PX 261 at 3.)  In December 2007, the Board granted the directors 5,000 shares of CSX stock. (Fitzsimmons ¶¶ 9-10.)

59.    Payment of shares under section 6(a) or 6(d) can be deferred at the participant's election.  (PX 261 at 3.)

60.    Under the terms of the Stock Plan, the directors are required to take at least 50 percent of their annual retainer ($37,500) in stock.  (Fitzsimmons ¶ 5; PX 261 at 2.)

61.    The shares of common stock issued as part of the annual retainer are deducted from the retainer amount ($75,000) at their Fair Market Value, determined as of the business day immediately preceding the date of the CSX's annual meeting of shareholders.  (JX 28 at 2; Fitzsimmons ¶¶ 5-6.)

62.    "Fair Market Value" means, as of any given date, the mean between the high and the low selling prices of the stock per share on the New York Stock Exchange on such date.  (PX 261 at 2; Fitzsimmons ¶ 6.)

63.    Section 7(a) of the Stock Plan provides that the 50 percent of the directors' annual retainer that is payable in stock "shall be payable immediately following the Company's Annual Meeting."  (Fitzsimmons ¶ 7;  PX 261 at 3.)

64.    The CSX Annual Meeting was held on May 2, 2007.  As the Stock Plan requires, the day preceding the Annual Meeting, May 1, was the date on which the shares issued as part of the directors' retainer were deducted from the retainer at their "fair market value."  (Fitzsimmons ¶ 8.)

65.    The method by which awards are determined is fully described in the CSX Proxy.

"During 2007, each non-employee director received an annual retainer of $75,000, at least 50% of which was payable in CSX stock pursuant to the CSX Corporation Stock Plan for Directors (the "Stock Plan")….The stock component was paid to directors on May 2, 2007 and, pursuant to the terms of the Stock Plan, was determined using the average of the high and low price per share on May 1, 2007, the day before the 2007 annual meeting of shareholders, of $43.32." (JX 5 at 15.)

66.    The issuance of the shares to the directors as part of their annual retainer is made automatically to the directors pursuant to the terms of the Stock Plan. (Fitzsimmons ¶ 5.)

67.    No action or decision was required of the Board or any Board committee in order to effectuate the issuance of stock as part of the directors' annual retainer. (Fitzsimmons ¶ 8.)

68.    The CSX Employee Benefits Department simply instructs CSX's transfer agent, Bank of New York, to calculate the number of shares payable to the directors.  If the director has elected to defer receipt of the shares, which all directors did for 2007, the shares are sent to Sun Trust, which maintains rabbi trusts for the directors.  The directors can elect to receive the shares when they retire from the Board, or upon attaining a certain age, and they can also elect to receive the shares in installments.  (Fitzsimmons ¶ 8.)

69.    On December 11, 2007, the Governance Committee recommended that the Board approve a grant of 5,000 shares of CSX common stock to each non-employee director.  (PX 13 at 2.)

70.    The grant of 5,000 shares of CSX stock in December 2007 to the directors is part of their annual remuneration for serving as directors and is intended to align their interests with those of shareholders.  (Fitzsimmons ¶ 10.)

71.    On December 12, 2007, the Board adopted a resolution granting 5,000 shares of CSX common stock to each non-employee director of CSX pursuant to sections 6(d) and 15 of the Stock Plan.  (PX 14 at 8.)

72.    It has been CSX's practice since 2003 to make a grant of 5,000 shares of common stock to the directors in December of each year.  (Fitzsimmons ¶10.)

73.    The December 2007 grant of 5,000 shares of common stock was not a grant of options, where the market price of the stock on the grant date becomes the strike price for the options. The December grant was made without regard to the price of the stock at the time of the grant.  (Fitzsimmons ¶ 10.)

74.    The Insider Trading Policy generally permits directors and certain executive officers to engage in transactions in CSX stock outside a "blackout period"— the first day of the last calendar month of each fiscal quarter through the second business day following an earnings release.  (JX 27 at 3.)

75.    CSX has never considered the December grant of 5,000 shares to directors to be a transaction subject to the blackout period rule. (Fitzsimmons ¶ 10.)

76.    The CSX Insider Trading Policy provides that no CSX officer, employee, or director may purchase, sell or otherwise conduct transactions in any CSX security while he or she is aware of material nonpublic information about CSX. (JX 25 at 1.)

77.    Stock was granted to non-management directors on December 12, 2007. (Fitzsimmons ¶ 9.) Stock awards or grants are not covered by the Insider Trading Policy. (See JX 25.)

78.    The CSX Proxy disclosed when the shares were awarded to the Board under the Stock Plan at Annex B, in the Table set forth at B-2 through B-5 and on page 15. (JX 5 at 15, Annex B, B-2 – B-5.)

79.    The CSX Proxy describes the allegations of TCI and 3G concerning the issuance of stock to the CSX directors. (JX 5 at 6.)

## II.    MICHAEL WARD AND EDWARD KELLY ACCURATELY STATED THEIR HONESTLY HELD OPINIONS

### A.    Mr. Ward's Editorial

80.    Mr. Ward submitted an op-ed in the Washington Times on March 11, 2008. (PX 184; Ward ¶ 3.)

81.    In the op-ed, Mr. Ward referred to "[o]ne hedge fund [that] actually demanded that CSX freeze investment in its rail system and pile on large amounts of debt on the eve of the recent credit crisis." Although Mr. Ward did not specifically name TCI, this statement was in fact referring to TCI. (PX 184; Ward ¶ 5.)

82.    Mr. Ward believed and continues to believe this statement to be true. (Ward ¶ 9.)

83.    Mr. Ward was aware that in an email from Chris Hohn, TCI demanded that CSX freeze capital expenditures because of the threat that Congress would pass a bill re-regulating railroads and TCI suggested that CSX not make further capital investments if Congress followed through with that bill. (PX 121.)

84.    Mr. Ward was also aware that TCI had proposed an LBO of CSX and subsequently demanded that CSX repurchase 20 percent of its stock each year for the next five years, and in the process incur so much debt that it would lose its investment grade rating. (Ward ¶ 8; Baggs ¶¶ 8, 12; Munoz ¶¶ 6-8, 10, 12, 19; PX 37.)

85.    In the op-ed piece, Mr. Ward stated:

"By their very nature, railroads require constant investment to ensure high levels of safety and customer service…."

"Any activist hedge fund that would order a railroad freeze capital expenditures…." (PX 184; Ward ¶ 10.)

86.    Mr. Ward believed and continues to believe those statements to be true. (Ward ¶ 11.)

87.    Mr. Ward had been informed that TCI has stated that it wants to increase leverage and reduce capital spending. (Ward ¶ 11.)

88.    Mr. Ward was also aware that, at the May 8, 2007 Bear Stearns Conference, TCI's Snehal Amin discussed safety as not being a capital expenditure issue and stated: "you don't need [capital expenditures] to pull up hand brakes in railcars." (PX 96 at 6; Ward ¶ 12.)

89.    Mr. Ward believes that cuts in capital expenditures could adversely affect safety. (Ward ¶ 12.)

90.    In the op-ed piece, Mr. Ward also stated: "It would be a real shame if we let the rail system fall prey to the whims of short-sighted investors…." (PX 184; Ward ¶ 13.)

91.    Mr. Ward did not state that TCI was a "short-term" investor. (See PX 184; Ward ¶ 16.)

92.    Mr. Ward believed and continues to believe that TCI is a short-sighted investor. (Ward ¶ 15, 16):

    (a)    After becoming an investor in CSX, TCI proposed that CSX be the subject of an LBO. (Hohn ¶ 15; Amin ¶ 23; Munoz ¶¶ 6-8; Baggs ¶ 8; PX 37; PX 96 at 4.)

    (b)    That would have involved an enormous debt load on CSX so that TCI could exit in a short time with a huge profit. (Ward ¶ 15.)

    (c)    TCI also proposed that CSX recapitalize itself by taking on debt, to the extent that its credit ratings would be reduced to 'junk' status, and then repurchase a large percentage of its outstanding shares in a short time. (Munoz ¶¶ 10, 12, 19; Baggs ¶ 12.)

    (d)    TCI has also proposed that CSX should announce that it will raise prices 7 percent per year for the next ten years, which might cause regulatory and antitrust issues. (PX 96 at 5; Ward ¶ 15.)

93.    In February 2007, Mr. Hohn stated in an email to Mr. Amin, "We are not in a private equity world where we have permanent capital especially given the size of our holding. I would be more open to selling at 50 for sure", demonstrating his short-sighted approach to his investment. (PX 44 at TCI0024379.)

94.    In September 2007, Hohn again reiterated his investment outlook in an email in which he said that he would amenable to selling calls at $4 with a $50 strike price in January 2009.  (PX 125.)

95.    The CSX Proxy discloses the allegations of TCI and 3G concerning the March 11, 2008 editorial by Mr. Ward.  (JX 5 at 6.)

**B.    Mr. Kelly's Statements**

96.    In a February 14, 2008 letter from the CSX Board to TCI, Mr. Kelly, the presiding director, stated on behalf of the Board the Board's conclusions that TCI was interested "in achieving effective control of the company".  (PX 176 at CSX_00003030.)

97.    In a March 17, 2008 press release announcing this litigation, Mr. Kelly was quoted as saying:

> "By virtually all measures the performance of CSX has been exceptional. Notwithstanding this, in an effort to avoid the disruption and expense of a proxy contest we've spoken with TCI on a number of occasions in an attempt to find common group. Based on these conversations the Board concluded that TCI is not simply interested in having a representative voice on the Board, but instead is seeking to achieve effective control of the CSX Board of Directors and dictate Company strategy." (PX 185; PTO Stip. ¶ 53.)

98.    TCI made numerous representations to CSX about the extent of its beneficial ownership of CSX shares, stating on February 15, 2007, during a BB&T Capital Markets Transportation Conference that "we own 14 percent of your company" and representing to CSX that it could "convert at any time" the swap arrangements to physical ownership of CSX shares.  (Baggs ¶ 6; Munoz ¶ 10.)

99.    During this time, TCI also made a number of proposals and demands to CSX management and its advisors, including that CSX engage in a leveraged buyout ("LBO") transaction, pursuant to which CSX would no longer have been a public company, and that CSX pursue a recapitalization involving taking on substantially more debt and repurchasing a large portion of its outstanding shares.  (Compl. ¶ 25; TCI Ans. ¶ 25; Hohn ¶ 15; Amin ¶ 23; Baggs ¶¶ 8, 12; Munoz ¶¶ 6-8, 10, 12, 19; PX 37; PX 96 at 4.)

100.    When it perceived that CSX was being non-responsive, TCI threatened that there would be "no limits" to what it would do, that it would be "go to war", and that it would consider all options to implement its agenda, including replacing the entire CSX Board.  (Fitzsimmons ¶ 12; Amin Dep. 192:1-17 ; PX 108; PX 111.)

101.    TCI also hired a proxy solicitor, D.F. King, and evaluated running a majority and a 6-person slate for election to the Board. D.F. King informed TCI that its chances for victory were better with a 5-person slate but that "electing a short-slate

dramatically alters long-standing board alliances and creates opportunities for change."
(PX 118; PX 135.)

102.    On October 16, 2007, TCI sent a letter to the Board of Directors of CSX,
which it released to the public, urging CSX to allow holders of 10 percent of CSX's
shares to call special meetings for any purpose, including the election of directors.
(Compl. ¶ 35 ; TCI Ans. ¶ 35; 3G Ans. ¶ 35; PX 140.)

103.    In its letter, TCI set forth numerous alleged failings in CSX's operations,
corporate governance and management, and asked the Board to take the following
actions:  separate the Chairman and CEO roles; refresh the Board with new independent
directors; allow shareholders to call special shareholder meetings; align management
compensation with shareholder interests; justify the capital spending plan to shareholders;
and provide to shareholders a plan to improve operations.  (PX 140 at 2.)

104.    On December 19, 2007, TCI and 3G filed a Schedule 13D, disclosing that
they had formed a group that held 8.3 percent of CSX outstanding common stock in
direct ownership and an economic interest in an additional 11.8 percent of CSX
outstanding common stock through swaps. TCI and 3G also reported their intent to elect
5 nominees to the Board.  (JX 8; PTO Stip. ¶¶ 25-29.)

105.    The Board requested that Mr. Kelly, as presiding director, enter into
discussions with Chris Hohn of TCI to assess whether a mutually acceptable agreement
might be reached that would avoid a damaging proxy fight. Mr. Kelly had meetings with
Mr. Hohn in January 2008.  (Kelly ¶ 21; Hohn ¶ 43.)

106.    Mr. Kelly indicated to Mr. Hohn CSX's willingness, as part of an
agreement, to nominate three TCI/3G nominees, including Mr. Hohn himself, and also to
agree to a fourth mutually acceptable nominee.  (Kelly ¶ 23; Hohn ¶ 45.)

107.    Mr. Hohn, however, engaged in the discussions with a predetermined
outcome in mind. He told Mr. Amin that the only point TCI could offer CSX would be
for CSX to invite the entire TCI/3G slate on the Board and mutually agree as to who
would leave the Board to make room for those five directors.  (PX 154.)

108.    In an email to Gilbert Lamphere, a TCI/3G nominee, Alexandre Behring
of 3G, Daniel Schwartz of 3G and others regarding the upcoming settlement discussions
between Mr. Hohn and Mr. Kelly, Snehal Amin stated that "[t]he only alternative to the
proxy fight is if they will allow our five nominees on and we can mutually agree with
them which 5 of their directors to replace. Otherwise we will take the fight to the
shareholders and get our 5 on anyway. We believe this strategy conveys our strength and
conviction that we will win."  (PX 155.)

109.    Furthermore, Mr. Hohn made demands that suggested to Mr. Kelly an
intention to exercise control over Board functions:

         (a)    he requested that he be able to interview each of the current
                directors to determine which should be replaced;

14

    (b)      he insisted on dictating which existing directors would be replaced by TCI/3G nominees;

    (c)      he insisted that the TCI/3G directors be placed on certain committees;

    (d)      he pressed his view that the roles of CEO and Chairman be split;

    (e)      he insisted that the number of Board members not be increased without shareholder approval or approval by 80 percent of the Board; and

    (f)      he insisted that shareholders controlling 10 (or possibly 15) percent of CSX stock be permitted to call a special meeting of shareholders at any time to consider any business, including the election of new directors or removal of existing directors.  (Kelly ¶ 23.)

110.    The last of these demands would give TCI the ability to initiate a perpetual "recall" contest through special meetings as a tool to pressure the Board into implementing TCI's proposals without regard to their merit.  (Kelly ¶ 23.)

111.    Mr. Ward became convinced by January 11, 2008 that TCI was seeking to achieve effective control of CSX without paying a control premium and recommended that Mr. Kelly terminate the discussions.  (Ward ¶ 23.)

112.    Mr. Kelly reported on his conversations, including Mr. Hohn's demands, at the Board's meeting of January 16, 2008. The Board asked Mr. Kelly to continue the discussions with Mr. Hohn to see whether he would modify his demands.  (PX 15;  Kelly ¶¶ 21-22.)

113.    Before Mr. Kelly raised the issue of a standstill, Mr. Hohn preemptively indicated that no standstill agreement would ever be acceptable to him.  (PX 169; Kelly ¶ 24.)

114.    It was only after the discussions were terminated that Mr. Hohn indicated to a CSX investment banker at Evercore Partners that he might be willing to agree to a one-year standstill, a virtually meaningless offer. Even assuming a one-year standstill would have been acceptable, Mr. Hohn's other conditions against the backdrop of CSX's offer to nominate three nominees plus one mutually agreed upon, were unacceptable. (Kelly ¶ 24.)

115.    During the discussions, Mr. Hohn had also stated that if he prevailed in electing five directors, Mr. Ward's future would be "bleak" and that, if CSX did not agree to his demands, he would run his slate, create a dissident board and make things unpleasant for Mr. Kelly as presiding director. Mr. Hohn further suggested that his directors would decline to provide written consents to any Board action and otherwise disrupt the operation of the Board.  (Kelly ¶ 25.)

116.    Mr. Kelly believed that the implicit premise underlying all of Mr. Hohn's threats was that his five nominees would vote together as a bloc.  (Kelly ¶ 25.)

117.    In fact, Mr. Hohn had instructed Mr. Amin to let their slate know about his meeting with Mr. Kelly because "[i]t helps them feel that we are a team and treats them as team members".  (PX 154.)

118.    When Mr. Amin did contact their slate by email according to Mr. Hohn's instructions, he addressed the email to the "Team" and made reference to "our 5" and how "we will win".  (PX 155.)

119.    Mr. Kelly concluded that TCI was not simply interested in having a representative voice on the Board, but instead is seeking to achieve effective control of the CSX Board and dictate CSX's strategy.  (Kelly ¶ 26.)

120.    Mr. Kelly reported to the Board on February 4, 2008 that: (a) TCI would not agree to any negotiated settlement without gaining a disproportionate amount of control over Board processes; (b) TCI had not been willing to make material changes in the demands made by Mr. Hohn, which Mr. Kelly had outlined to the Board on January 16; and (c) TCI had preemptively stated that it would not agree to any standstill. (Kelly ¶ 26; PX 16 at 2.)

121.    The Board therefore concluded that TCI was seeking more than a voice, and was seeking to achieve effective control.  (Kelly ¶ 27.)

122.    CSX's belief that TCI is seeking to achieve "effective control" is based on CSX's interactions with TCI, which were reported to the Board by CSX's management, its investment bankers and counsel, and on the meetings of Mr. Kelly, the presiding director of the Board, with Mr. Hohn of TCI.  (Kelly ¶ 19.)

123.    The CSX Proxy discloses the allegation of TCI and 3G concerning Mr. Kelly's statements to the effect that TCI appears to be seeking to achieve effective control.  (JX 5 at 6.)

## C.    Mr. Ward's Statements Concerning the Reasons for this Lawsuit

124.    On March 17, 2008 CSX filed this lawsuit and issued a press release, in which Mr. Ward was quoted as stating that CSX "filed this suit against TCI and 3G to ensure that all of our shareholders receive complete and accurate information about the group's holdings, agreements, plans and motivations to which they are entitled under federal securities laws" and that CSX is "committed to protecting the interests of all CSX shareholders".  (PX 185; PTO Stip. ¶ 54.)

125.    CSX's press release of March 17, 2008, accurately described the lawsuit and the reasons why the Board decided to postpone the annual meeting from May 7, 2008, to June 25, 2008.  (Ward ¶ 30.)

126.    After the filings of the TCI/3G Schedule 13D on December 19, 2007 (JX 8), CSX attempted to reach an accommodation with TCI. (See PFF ¶ 107.)  At that time, CSX had no indication beyond its original suspicions that TCI and 3G beneficially owned the shares underlying their swaps.   (Ward ¶ 23.)

127.    Discussions did in fact take place beginning on January 7, 2008.  Those discussions ended only when the Board became convinced that TCI and 3G were looking for more than a voice in the management of CSX, and were seeking to achieve effective control of CSX and to dictate company strategy.  (Ward ¶¶ 23-24.)

128.    On January 8, 2008, TCI and 3G submitted a Stockholder Notice of Intent to Nominate Persons for Election as Directors to CSX Corporation. (PTO Stip. ¶ 32.)

129.    On January 15, 2008, CSX sent TCI and 3G a letter (misdated 2007) notifying them of two deficiencies in their nominating notice.  (PX 166; Fitzsimmons ¶ 16.)

130.    CSX informed TCI and 3G that they had failed to provide completed nomination agreements and that, under CSX's Bylaws, they could not reserve the right to nominate alternate nominees after February 2, 2008, as they had purported to do.  (PX 166; Fitzsimmons ¶ 16.)

131.    On January 16, 2008, TCI's counsel responded by letter, enclosing completed nominee agreements and deeming TCI's nominating notice valid.  (PX 168; Fitzsimmons ¶ 17.)

132.    CSX did not inform defendants on January 15, 2008, of any deficiency in the nominating notice concerning representations regarding beneficial ownership of CSX common stock.  CSX had asked for information at a March 29, 2007 meeting and had not been given it.  CSX did not have the facts to prove that defendants were misrepresenting the extent of their beneficial ownership.  (Fitzsimmons ¶ 18.)

133.    CSX had serious questions about the adequacy of TCI's disclosure regarding beneficial ownership, but needed further information before the CSX could assert a deficiency.  (Fitzsimmons ¶ 18.)

134.    CSX approached the Securities and Exchange Commission as the agency with the jurisdiction and power to investigate those issues.  (Fitzsimmons ¶ 18.)

135.    CSX subsequently received information from Innisfree M&A Incorporated ("Innisfree"), CSX's proxy solicitation advisor, indicating that TCI and 3G had misrepresented their beneficial ownership.  (Fitzsimmons ¶ 19.)

136.    Innisfree advised CSX management of an anomaly in the ownership patterns for CSX stock.  (Ward ¶ 26.)

137.    Alan Miller of Innisfree advised the Board that in the 10 days prior to the February 27 record date, an unusually large number of CSX shares had moved into the

accounts of banks that are swap dealers, particularly Deutsche Bank, but also other counterparties to swaps identified in TCI and 3G's Schedule 13D. (Miller ¶¶ 16-17; Ward ¶ 26.)

138.    It appeared to Innisfree that TCI's counterparty, Deutsche Bank, had recalled the shares underlying its swaps with TCI, which it had loaned out to others, back into its own accounts for purposes of the record date for the CSX annual meeting. Mr. Miller reported that, as soon as the record date passed, the shares flowed back out of those accounts. Innisfree concluded that the flow of shares in and out around the record date indicated that Deutsche Bank and other swap counterparties were intending to vote the shares in accordance with the wishes of TCI and other hedge funds. (Miller ¶¶ 19, 22; Fitzsimmons ¶ 19; Ward ¶ 26.)

139.    Mr. Miller stated that these facts suggested that TCI and 3G were directly or indirectly controlling or influencing the voting of those shares. (Miller ¶¶ 23-24; Ward ¶ 26.)

140.    The information provided by Innisfree was inconsistent with TCI and 3G's statements concerning beneficial ownership in their nominating notice. (Fitzsimmons ¶ 22.)

141.    On March 14, 2008, there was a CSX Board meeting. At that time, the CSX annual meeting was scheduled for May 7, 2008, and the record date for voting shares at the annual meeting was February 27, 2008. (Ward ¶ 25.)

142.    After discussion among themselves and with CSX's advisors, including Mr. Miller, the Board decided to change the annual meeting date to June 25, 2008 and the record date to April 21, 2008. (Fitzsimmons ¶ 21; Ward ¶ 27.)

143.    The Board took this action because it considered it important that CSX shareholders have accurate and complete information before the election, and that the integrity of the vote be maintained. (Ward ¶ 28.)

144.    CSX decided to commence litigation among other reasons, in order to require TCI and 3G to publish accurate and complete information before the election. (Ward ¶ 29.)

145.    Notwithstanding the conclusion that TCI and 3G had misrepresented their beneficial ownership in their January Notice, CSX has, in the CSX Proxy, noted that the election of directors is contested and stated that TCI and 3G are running a slate. CSX did not engage in self help by deeming the notice defective and refusing to put forward the candidates. Instead, CSX has filed suit, seeking to have the Court determine that the notice is defective. (See Fitzsimmons ¶ 22.)

146.    The CSX Proxy discloses the allegations of TCI and 3G, including the allegation that "the Company's proxy materials mischaracterize CSX's reasons for filing the lawsuit." (JX 5 at 6.)

18

## III.    MR. WARD ACTED IN GOOD FAITH

147.    Mr. Ward believed the statements in his editorial to be true.  (Ward ¶¶ 11, 15-16.)

148.    The LTIP grants made on May 1, 2007, were not made by Mr. Ward—they were made by the Compensation Committee of the Board of Directors, which is made up exclusively of non-management directors of CSX.  (Richardson ¶¶ 2, 4; See PX 7.)

149.    The grant of stock to directors as part of their annual retainer on May 2, 2007, was automatic under the CSX Stock Plan for Directors, and required no action or decision by Mr. Ward or any other director.  (See Fitzsimmons ¶¶ 5, 8.)

150.    The grant of 5,000 shares to directors in December 2007 was made by the full Board, not by Mr. Ward.  (See PX 14 at 8.)

151.    Mr. Ward relied on advisors both within and outside CSX in preparing the CSX proxy.  (See PX 17 at 15.)

## IV.    THE FEBRUARY 2008 BYLAW AMENDMENTS DO NOT VIOLATE VIRGINIA LAW

### A.    The 2008 Bylaw Amendments and Shareholder Proposals

152.    CSX shareholders voted at the 2007 annual meeting on a non-binding proposal to permit shareholders holding 10 to 25 percent of CSX's outstanding common stock to cause special shareholders meetings to be held.  After the non-binding proposal was approved by shareholders, the Board spent some time gathering information about what other companies were doing in similar circumstances.  The Board was advised that other companies had adopted bylaw amendments enabling holders of between 25 and 33 percent of outstanding voting stock to request a special meeting.  (Kelly ¶ 4.)

153.    On February 4, 2008, the CSX Board, by unanimous written consent, adopted amendments to CSX's bylaws to permit holders of 15 percent of CSX's outstanding voting stock to require the Board to call a special meeting of shareholders. (Kelly ¶ 5; JX 30 at Article I, Section 2(b); PTO Stip. ¶ 48.)

154.    The Board believes that the February 2008 amendments are responsive to the non-binding proposal passed by shareholders in 2007.  (Kelly ¶ 5.)

155.    The Board concluded that the February 2008 amendments strike the appropriate balance between giving a minority of shareholders the ability to request a special shareholder meeting and protecting the time and resources of CSX and the interests of all shareholders.  (Kelly ¶ 6.)

156.    The February 2008 amendments provide procedural safeguards to protect CSX's resources from the administrative and financial burdens, and the disruptive

effects, that serial shareholder meetings on the same subject matter would impose on CSX. (Kelly ¶ 7.)

157.    If shareholders have voted upon an item within 12-months of the date of the request, or will vote on an item at an annual meeting within the next 90 days after the request, the request for a special meeting can be denied. (Kelly ¶ 7.)

158.    This provision seeks to balance competing interests. On the one hand, it allows for all items of special interest to shareholders to be voted upon at least annually, since all shareholders who meet certain eligibility requirements are free to submit proposals for consideration at the annual meeting; and shareholders owning 15 percent of CSX's outstanding voting stock can require the Board to call a special meeting to consider items that were not considered at the last annual meeting. On the other hand, it avoids the costs, distractions, and diversion of resources that would result from repeated votes on the same matters within the same 12-month period. (Kelly ¶ 7.)

159.    The 12-month provision applies to all matters, including the election of directors. CSX does not have a classified board of directors—all directors stand for election each year at the annual meeting. Thus, shareholders have the right to "vote out" any one or more of the directors each year. (Kelly ¶ 7.)

160.    The February 2008 amendments also require that the shareholders of record making the request for a special meeting verify that they either beneficially own the requisite shares themselves or are acting at the direction of beneficial owners. (Kelly ¶ 8.)

161.    The Board included this safeguard to ensure that those causing CSX to expend significant time and incur expense should either be, or represent, beneficial owners of the requisite 15 percent of shares. (Kelly ¶ 8.)

162.    The February 2008 amendments require that the shareholder requesting a special meeting continue to hold the requisite percentage of shares through the date of the meeting. This same requirements applies to those submitting proposals for inclusion in CSX's annual meeting proxy statement. (Kelly ¶ 9.)

163.    The Board viewed it as desirable for requesting shareholders to continue to hold the requisite percentage of shares through the date of the meeting in order to ensure that the requesting shareholders, who are causing CSX to expend significant time and incur expense, maintain an investment interest in CSX through the meeting date. (Kelly ¶ 9.)

164.    The February 2008 amendments also require the requesting shareholders to provide certain information (e.g., name and address) to CSX to verify that the requesting shareholder is actually a shareholder of CSX. (Kelly ¶ 11.)

165.    A new subsection (b) of Article VIII provides that the Board cannot amend the special meeting provision to require a greater percentage of shares to be held

by those requesting a special meeting, or to lengthen the 12-month or 90-day periods discussed above, without shareholder approval.  (Kelly ¶ 10; JX 30 at Article VIII (b).)

166.    TCI has submitted a proposal for the annual meeting that would repeal any amendment of CSX's bylaws adopted by the Board after January 1, 2008, including the CSX February 2008 amendments relating to special meetings of shareholders.  (Kelly ¶ 12; JX 5 at 55-56; PTO Stip. ¶ 39.)

167.    In addition, TCI has submitted its own proposal regarding special shareholder meetings.  (Kelly ¶ 12; JX 5 at 56.)

168.    TCI's proposal would not include the procedural safeguards provided for in the bylaw amendments passed by the Board in February 2008.  (Kelly ¶ 12; JX 5 at 56-57.)

169.    The TCI special shareholder meeting proposal would permit shareholders holding 15 percent of CSX's outstanding stock to require more than one special meeting on the same subject, without any limitation on the number of times within any 12-month period that such special meetings could be held.  (Kelly ¶ 13; JX 5 at 57.)

170.    In addition, TCI's proposal provides no mechanism to verify that the persons requesting a special shareholder meeting are acting at the direction of beneficial owners holding the requisite percentage of shares of CSX.  (Kelly ¶ 13; JX 5 at 57.)

171.    The TCI proposal also does not require that the shareholders requesting a special meeting continue to hold the requisite number of shares through the date of the meeting.  (Kelly ¶ 13; JX 5 at 56-57.)

172.    The Board has recommended to shareholders that they reject TCI's proposal and ratify the bylaw amendments adopted by the Board in February 2008.  The Board has concluded that the TCI proposal does not strike the appropriate balance between giving a minority of shareholders the right to call a special meeting between regular annual meetings and protecting CSX and all its shareholders from the expense and distraction of serial meetings on the same subject matter during the same 12-month period.  (Kelly ¶¶ 14-15.)

## B.    Disclosure

173.    The CSX Proxy sets forth the full text of the bylaw amendments at Annex A, which states that special meetings may be called by record holders of shares representing at least 15 percent of the outstanding capital stock of CSX entitled to vote on the proposed matter.  (JX 5 at Annex A.)

174.    TCI's Snehal Amin admitted that the CSX proxy materials disclose that under CSX's bylaw amendments only shareholders of record may make a request for a special meeting:

"Q: This is disclosed in the bylaw that it is registered and not beneficial owner; right?
A: I believe that it is.
Q: So you don't have a claim that the difference between registered and beneficial owner is not disclosed; right?
A: No…" (Amin Dep. 179:10-17); and

"Q: [Y]ou don't claim that the difference between registered and beneficial is not disclosed; right? That's fully disclosed; right?
A: I believe that it is disclosed in the bylaw amendment that you have to be a registered shareholder." (Amin Dep. 180:25, 181:2-7.)

175.    The CSX Proxy fully describes the CSX bylaw amendment and sets forth the full text of the bylaw amendment at Annex A, including all safeguards. (JX 5 at 54-55, Annex A.)

176.    The CSX Proxy expressly discloses the requirement that shares must be held through the meeting date:

"In addition, the procedural safeguards require the requesting holders to continue to hold the requisite percentage of shares through the date of the special meeting. The Board believes that it is important for requesting holders, like shareholders submitting proposals for inclusion in the Company's annual meeting proxy statement, to continue to hold the requisite percentage of shares through the date of the meeting to ensure that the requesting shareholders, who are causing the Company to incur significant time and expense, maintain an investment interest in the Company through the meeting date." (JX 5 at 55.)

177.    TCI's Snehal Amin admitted that the CSX proxy materials disclose this fact.

"Q: That requirement that you own, you being the record owner on the record date and on the date of the meeting is fully disclosed in the bylaw amendment; correct?
A: I believe it is." (Amin Dep. 182:10-14.)

178.    The CSX Proxy sets forth the text of the Annual Meeting safeguards in footnotes at Annex A-2, and explicitly notes overlapping safeguards in procedural requirements for requesting special meetings and for presenting at annual meetings.

"The procedural safeguards in the Amendments also include informational provisions that are similar to those for shareholders making shareholder proposals at shareholder meetings, which provide a mechanism for the Company to determine that the requesting persons are shareholders of the Company and hold the requisite percentage of shares, including evidence that the requesting persons (or the beneficial owners on whose behalf the

22

requesting persons are making the request) are the beneficial owners of the shares."  (JX 5 at 55.)

179.     The bylaw amendments specifically provides that the special shareholder meeting bylaw may only be amended to increase (i) the percentage of shares required to be held by shareholders to request a special meeting of shareholders or (ii) the 12-months or 90 days referred to in clause (x) of the second paragraph of such Section 2 (b), or repealed, with the approval of the shareholders.  This clause (b) may only be repealed or amended with the approval of the shareholders.  (JX 30 at Article VIII(b); JX 3 at Annex A;  JX 5 at Annex A.)

180.     This restriction on amendment is a departure from the general provision that the bylaws may be amended by either the Board of Directors or the shareholders, and is meant to protect shareholder interests.  (Kelly ¶ 10.)

181.     The CSX Proxy describes the Article VIII powers.

"The Amendments provide that shareholder approval will be required in the future to repeal the special meeting provisions or to amend the provisions to increase the 15% requisite percentage of the Company's voting stock necessary to require a special meeting of shareholders or to increase the 12-month and 90-day limitations on requiring special meetings."  (JX 3 at 58; JX 5 at 55.)

182.     The CSX Proxy includes the full text of the TCI proposal.

"SECTION 2.  <u>Special Meetings</u>.  Special meetings of the shareholders may be called from time to time by a majority of the Board of Directors or by the Chairman of the Board.  Special meetings of shareholders shall be promptly called by the Corporation if one or more shareholders that together hold at least 15% of all the shares of capital stock at the time outstanding and having voting power deliver or cause to be delivered to the Corporate Secretary one or more written demands for the meeting describing the purpose or purposes for which it is to be held.  Special meetings shall be held solely for the purposes specified in the notice of meeting."  (JX 3 at 59; JX 5 at 56.)

183.     The CSX Proxy fully describes both the TCI and CSX Special Shareholder Meeting Proposals and provides the full text of both proposals.  (<u>See</u> JX 5 at 54-57, Annex A.)

184.     As required by Rule 14a-4(a)(3), CSX's proxy card identifies each proposal separately and impartially.  (JX 5.)

185.     The CSX Proxy states that the Board believes that the amendments address the views of shareholders reflected in the vote at the 2007 annual meeting to permit shareholders to cause special shareholder meetings to be held, while providing procedural safeguards.  (JX 5 at 54.)

186.    The CSX Proxy discloses the allegations of TCI and 3G concerning the February 2008 bylaw amendments, and the CSX and TCI proposals, relating to special shareholder meetings.  (JX 5 at 6.)

**Proposed Conclusions of Law**

I.    **TCI AND 3G'S CLAIMS CONCERNING CSX'S DISCLOSURE OF COMPENSATION ARE WITHOUT MERIT.**

      A.    **Defendants' Claims Concerning the CSX's 2007-2009 LTIP are Without Merit.**

           a.    **Proposed Conclusions**

         1.    CSX did not violate Section 14(a) of the Exchange Act or the rules and regulations promulgated thereunder.  The facts concerning the 2007-2009 LTIP and the grants made under the LTIP are fully and accurately disclosed in the CSX Proxy.

         2.    The concept of 'springloading' does not apply to the grant of performance units under the CSX LTIP, as opposed to stock options, because of the attenuated relationship between the CSX stock price on the date of the grant and the award of CSX stock three years later.

         3.    The grant of performance units under the LTIP did not constitute a violation of the CSX Insider Trading Policy because the performance units are not securities.

         4.    The grant of performance units under the LTIP did not constitute a violation of the CSX Insider Trading Policy because the grant did not involve a purchase, sale or other transaction covered by the Policy.

         5.    A company is not required to characterize its own actions in pejorative terms or engage in self-accusation.

           b.    **Discussion**

         The facts concerning the 2007-2009 LTIP and grants thereunder are set forth fully and accurately in the CSX Proxy.  (PFF ¶ 50.)

         TCI and 3G contend that the CSX Proxy violates Rule 14a-9 because it does not disclose that CSX set its LTIP performance grants while in possession of material nonpublic information.  TCI also contends that the LTIP grants violated CSX's Corporate Governance Guidelines, including its Insider Trading Policy; that the LTIP awards were improperly "springloaded"; and that the CSX Proxy violates Rule 14a-9 because it does not disclose how the awards under the LTIP were determined.

         It makes no sense to speak of LTIP grants as being springloaded or the subject of insider trading.  All reported cases in which allegations of "springloading" have been

25

raised concern grants of stock options.[1]  With an option, the price of the reference stock on the grant date is of significance because that is usually the strike price— thereby ultimately determining the value of the option.  The target performance units under the LTIP are not options or (as discussed below) even securities.  They represent merely the possibility of future income, the value of which will be determined principally by how the company performs against pre-established operating targets, and also by the exercise of discretion by the Compensation Committee of the Board when awards of stock (if any) are made three years later. (PFF ¶ 12.)  The senior executives could end up earning anywhere from 0 to 240 percent of the units granted at the beginning of the performance cycle.  (PFF ¶ 19.)  The relationship between the price of CSX stock on the date of the target grants and the payout of CSX shares (if any) three years later is highly attenuated.

The Compensation Committee was not in possession of material nonpublic information on May 1, 2007, when it set the target grants of performance units.  But even if it had been, there was no connection drawn between the LTIP grants and the corporate actions announced by CSX on May 8, 2007.  (PFF ¶¶ 21-23.)  Moreover, as even TCI and 3G's expert concedes, the announcement of the corporate actions on May 8, 2007 did not have a significant impact on the price of CSX stock.  (PFF ¶ 42.)  He suggests that the information made public on May 8, 2007 somehow leaked into the market in the prior week and caused an increase in the price of CSX stock, but he offers no evidence that that in fact happened.  It is far more likely that, if anything leaked, it was the content of the speech by Snehal Amin of TCI at the Bear Stearns Conference on May 8, 2007, which actually did cause the price of CSX stock to move sharply higher on that day.  (PFF ¶¶ 45-46.)

The LTIP grants on May 1, 2007, were the result of a process that had started in the fall of 2006.  (PFF ¶ 9.)  It is CSX's practice to make LTIP grants at the first meeting of the Compensation Committee following the presentation of the strategic plan to the Board of directors at its annual retreat, which in 2007 took place on April 1 to 3. The first meeting of the Compensation Committee following the retreat had long been scheduled for May 1, 2007.  (PFF ¶¶ 9-10.)

The Compensation Committee does not believe that there is any reason to revisit the May 1, 2007 grants in light of the actions announced on May 8, 2007.  First, it appears that there was no significant movement in the stock price attributable to the

---

[1] *See, e.g.*, *Weiss v. Swanson*, No. 2828-VCL, 2008 WL 623324, at *5 (Del. Ch. Ct. March 7, 2008); *United States v. Shanahan*, No. S1-4:07 CR 175 JCH DDN, 2008 WL 619213,  at *12-*13 (E.D. Mo. March 3, 2008) ("The practice of 'spring-loading' involve[s] timing a *stock option grant* to immediately precede an announcement of good news") (emphasis added) (citing testimony before Congress); *In re iBasis, Inc. Deriv. Litig.*, 532 F. Supp. 2d 214, 215 (D. Mass. 2007) ("At issue in this litigation are allegations of grant date manipulation in the award of stock options"); *In re Computer Sci. Corp. Deriv. Litig.*, 244 F.R.D. 580, 583 (C.D. Cal. 2007) (concerning "options to buy CSC stock"); *In re Ditech Network, Inc. Deriv. Litig.*, C 06-5157 JF, 440, 2007 WL 2070300, at *2 (N.D. Cal. July 16, 2007)("action arises from the alleged…springloading of stock options").

announced actions.  Second, the Compensation Committee has complete discretion to make adjustments in January 2010 for the payouts to senior executives under the 2007-2009 LTIP.  Third, the comparative data in the presentation provided to the Committee at the time of the LTIP grants on May 1, 2007 showed that the grants to CSX's senior executives were conservative.  For instance, the presentation showed the Committee that Michael Ward's long-term incentive opportunity of $4 million compared to an annual long-term incentive opportunity for other railroad chief executives averaging over $8 million.  (PX 89 at 18.)  The Compensation Committee could have justifiably made a target award to Mr. Ward well in excess of the $4 million.  (PFF ¶ 48.)

The CSX Insider Trading Policy fundamentally prohibits the purchase or sale of CSX securities, or transactions that are the equivalent of a purchase or sale, while in possession of material non-public information.  (PFF ¶ 51.)  The target performance units granted under the LTIP are not securities.  The Supreme Court has stated, that, in determining whether an instrument is a security, "the emphasis should be on economic reality." United Housing Fund., Inc. v. Forman, 421 U.S. 837, 848 (1975)(internal quotation omitted). To align that determination with economic reality, the Court has further identified the characteristics usually associated with a security: "(i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value." Landreth Timber Co. v. Landreth, 471 U.S. 681, 686 (1985).  An LTIP performance unit is not an instrument at all, let alone one that is negotiable, confers voting or dividend rights, can be pledged or hypothecated, or can appreciate in value.  (See PFF ¶¶ 3,12.)  The performance units cannot be sold as an investment and cannot be traded.  See also SEC v. Edwards, 540 U.S. 389, 393 (2004) (stating that "[Congress] enacted a broad definition of 'security'; sufficient to encompass virtually any instrument that might be sold as an investment.") (emphasis added and internal citations and quotations removed); Marine Bank v. Weaver, 455 U.S. 551, 559-60 (1982) (defining "security" to include instruments in which there is "common trading" for speculation or investment).

The grant of performance units is not a purchase or sale.  The grant, therefore, cannot violate the CSX Insider Trading Policy.

TCI and 3G's contention that CSX is required to characterize the LTIP grants as being springloaded, or violating proscriptions on insider trading, run afoul of the numerous authorities in this Circuit and elsewhere holding that a company is not required to characterize its actions in pejorative terms or engage in "self-accusation" or "self-flagellation."  See, e.g., Missouri Portland Cement Co. v. Cargill, Inc., 498 F.2d 851, 873 (2d Cir. 1974), cert. denied, 419 U.S. 883 (1974) ("Courts should tread lightly in imposing a duty of self-flagellation"); GAF Corp. v. Heyman, 724 F.2d 727, 740 (2d Cir. 1983) ("the proxy rules simply do not require management to accuse itself of antisocial or illegal policies") (internal citations and quotations omitted); In re American Express Co. Shareholder Litig., 840 F. Supp. 260, 268-69 (S.D.N.Y. 1993); see also In re Lukens, Inc., 757 A.2d 720, 736 (Del. Ch. 1999) ("It is well understood that directors are not required to engage in 'self-flagellation' by disclosing their alleged breaches of duty" in a proxy filing).

B.    **Defendants' Claims Concerning the CSX Stock Plan for Directors are Without Merit.**

a.    **Proposed Conclusions**

1.    CSX did not violate Section 14(a) of the Exchange Act. The facts concerning the issuance of stock to CSX directors is fully and accurately disclosed in the CSX Proxy.

2.    The issuance of stock to directors as part of their annual retainer did not violate the CSX Insider Trading Policy because it was required to be made, pursuant to section 7(a) of the CSX Stock Plan for Directors, immediately following the CSX annual meeting of shareholders, which occurred on May 2, 2007, and the number of shares to be issued is, pursuant to section 6(a), required to be determined as of the day before the annual meeting.  TCI and 3G no longer press their claim concerning shares issued as part of the directors' retainer in the Pretrial Order. (See PTO at 77-85.)

3.    The grant of 5,000 shares to directors in December 2007 did not violate the CSX Insider Trading Policy because, as a matter of consistent practice, the grant is always made to directors in December and has never been considered a transaction subject to the "blackout period" rule of the Insider Trading Policy.

4.    The issuances of stock to directors did not violate the CSX Insider Trading Policy because they did not involve the purchase or sale of a CSX security, nor were the directors conducting a "transaction".

5.    A company is not required to characterize its own actions in pejorative terms or engage in self-accusation.

b.    **Discussion**

The facts concerning the issuance of stock to directors as part of their remuneration are fully and accurately disclosed in the CSX Proxy.  (PFF ¶ 78.)

TCI and 3G now only contend that the issuance of 5,000 shares of stock to the directors in December 2007 violated the Insider Trading Policy because it was made during a so-called "blackout period."

The grant of 5,000 shares of CSX stock is part of the directors' annual remuneration for serving as directors, and is intended to align their interests with those of the shareholders.  (PFF ¶ 70.)  It has been CSX's consistent practice since 2003 to make such a grant of shares in December.  (PFF ¶ 72.)  It is not a grant of options, where the market price of the stock on the grant date becomes the strike price for the options.  The grant is 5,000 shares, without regard to the price of the stock at the time of the grant. (PFF ¶ 73.)  The December grant has never been considered subject to the "blackout period" rule.  (PFF ¶ 75.)

The issuance of stock in December 2007 did not involve a purchase or sale of securities, or other transaction covered by the CSX Insider Trading Policy.

TCI and 3G essentially complain again that CSX has not characterized its own actions in pejorative terms or accused itself of wrongdoing. CSX is not required to do so. (See discussion supra.)

## II.    TCI AND 3G'S CLAIMS CONCERNING STATEMENTS MADE BY MICHAEL WARD AND EDWARD KELLY ARE WITHOUT MERIT.

### A.    Proposed Conclusions

1.    The opinions expressed by CSX's chairman and chief executive officer, Michael J. Ward, in his editorial of March 11, 2008 for the Washington Times cannot form the basis for a claim under Rule 14a-9 because

    (a)    those opinions were honestly held; and

    (b)    they are supported by objective facts.

2.    The opinion of CSX's presiding director, Edward J. Kelly, III, and its Board of Directors that TCI was "seeking to achieve effective control" of CSX, expressed in a letter of February 14, 2007, and a press release of March 17, 2007, cannot form the basis for a claim under Rule 14a-9 because

    (a)    that opinion was honestly held; and

    (b)    Mr. Kelly's statements are supported by objective facts.

3.    The statement by Mr. Kelly in the CSX press release of March 17, 2008, referring to his discussions with TCI's Chris Hohn as "an effort to avoid the disruption and expense of a proxy contest" cannot form the basis for a claim under Rule 14a-9 because

    (a)    that opinion was honestly held; and

    (b)    the evidence supports the truth of Mr. Kelly's statement.

4.    The statements of Mr. Ward, in the CSX press release of March 17, 2008, to the effect that this lawsuit was commenced "to ensure that all of our shareholders receive complete and accurate information about the group's holdings, agreements, plans and motivations to which they are entitled under federal securities laws", and that CSX management is "committed to protecting the interests of all CSX shareholders", cannot form the basis for a claim under Rule 14a-9 because

    (a)    that opinion was honestly held; and

    (b)    the evidence supports the truth of those statements.

### B.    Discussion

#### a.    Background

Statements of opinion can provide the basis for a claim under Section 14(a) and the rules thereunder, only if the opinion is both objectively and subjectively false.  See In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 266 (2d Cir. 1993) (finding statement not actionable where complaint contained "no allegations to support the inference that defendants either did not have [the] favorable opinions" expressed in statement when statement was made or "that the favorable opinions were without a basis in fact"); Krauth v. Exec. Telecard, 890 F. Supp 269, 288 (S.D.N.Y. 1995) ("The statement of opinion in a proxy statement is not actionable under securities laws unless Plaintiffs are able to show that the opinion expressed did not reflect the considered judgment of the Company and was not honestly held, or that the expression of the opinion was intended to mislead the shareholders"); see also Mendell v. Greenberg, 938 F.2d 1528, 1529 (2d Cir. 1991).

In other words, TCI and 3G must show that Mr. Ward and Mr. Kelly did not actually believe what they said and that their statements were factually incorrect.  TCI and 3G cannot make the required showing, which is especially difficult in the context of a proxy contest in which both sides are actively courting shareholders.  Especially "where the statement is prepared in the 'hurly-burly' of a contested election . . . . [f]air accuracy, not perfection is the appropriate standard."  Caspary v. Louisiana Land Co., 579 F. Supp. 1105, 1108 (S.D.N.Y. 1983)(internal citation omitted).

#### b.    Mr. Ward's Statements in His Editorial Are Based on Objective Facts.

TCI takes issue with an editorial by CSX's chairman and chief executive officer for the Washington Times of March 11, 2008.  TCI and 3G contend that Mr. Ward falsely implied that TCI sought a freeze in capital expenditures that would jeopardize CSX's commitment to safety.  In fact, Mr. Ward did not express the opinion that TCI would jeopardize safety, though it is his opinion that the cuts in capital expenditures advocated by TCI could adversely affect safety.  (PFF ¶ 89.) The basis for that opinion is set forth in Mr. Ward's witness statement. His opinion is not only honestly held, but is supported by the information available to him.  (See PFF ¶¶ 82-94.)

TCI and 3G place great weight on the fact that Snehal Amin of TCI testified before Congress that TCI was not suggesting that railroads cut any spending on maintenance or safety.  But that testimony, even if accepted at face value (which Mr. Ward is not required to do), is not inconsistent with Mr. Ward's view that the cuts in capital expenditures advocated by TCI could nonetheless adversely affect safety.

c.    Mr. Kelly's Opinion that TCI was
Seeking to Achieve "Effective Control" of CSX is Based on
Objective Facts.

TCI and 3G take issue with statements by CSX's presiding director in a letter on behalf of the CSX Board of Directors dated February 14, 2008, and in a CSX press release of March 17, 2008.

In the February 14, 2008 letter, signed by Mr. Kelly on behalf of the CSX Board of Directors, Mr. Kelly expressed the view that TCI was interested "in achieving effective control of the company". In the March 17, 2008 press release, Mr. Kelly was quoted as saying:

> "By virtually all measures the performance of CSX has been exceptional. Notwithstanding this, in an effort to avoid the disruption and expense of a proxy contest we've spoken with TCI on a number of occasions in an attempt to find common ground. Based on these conversations the Board concluded that TCI is not simply interested in having a representative voice on the Board, but instead is seeking to achieve effective control of the CSX Board of Directors and dictate Company strategy."

(PFF ¶ 97.)

The statements that TCI is seeking to "achieve effective control" of CSX or its Board of Directors are statements of opinion based on the information available to Mr. Kelly and the Board, including Mr. Kelly's own discussions with TCI's Chris Hohn in January 2008. (PFF ¶¶ 98-122.)

TCI and 3G's simple-minded theory here is that, because TCI and 3G are nominating only five directors for a 12-member board (of whom 11 are non-management directors) they cannot possibly be "seeking to achieve effective control." That is nonsense. TCI certainly can be "seeking to achieve effective control" by seeking to elect five directors to a 12-member board, if for no other reason, because seeking the five members may be merely a step in what TCI is aiming to achieve. TCI's proposal that shareholders holding 15 percent of outstanding shares be permitted to call a special meeting for any purpose, including the election or removal of directors, suggests that this may be the case. In fact, TCI's proxy advisor, D.F. King advised TCI that its chances for victory were better with a five-person slate, but that electing even a five-person slate "alters long-standing board alliances and creates opportunities for change." (PFF ¶ 101.)

Mr. Kelly's opinion that TCI was seeking to achieve effective control was not only honestly held, but was supported by the objective facts. The opinion was based on reports to the Board concerning demands made upon CSX management by TCI, as well as threats that, for instance, there would be "no limits" to what TCI would do if the CSX management did not acquiesce in TCI's demands. (PFF ¶ 100.) Mr. Kelly's opinion was also based on demands made by Chris Hohn of TCI during their discussions in January

31

2008.  Mr. Hohn had entered into those discussions with a predetermined outcome in mind. He told Mr. Amin that the only point TCI could offer CSX would be for CSX to invite the TCI/3G slate all on the Board and mutually agree as to who would leave the Board to make room for those five directors.  (PFF ¶ 107.)  Mr. Amin reiterated that point in an email he sent to the TCI/3G "team" of nominees stating that mutually agreeing with CSX as to which five directors the TCI/3G slate would replace was the "only alternative to a proxy fight".  (PFF ¶ 109.)  During the discussions between Mr. Kelly and Mr. Hohn, after Mr. Kelly had stated CSX's willingness to nominate three of TCI and 3G's nominees plus a fourth to be mutually agreed upon, Mr. Hohn:

> (a)    requested that he be able to interview each of the current directors to determine which might be receptive to his views;
>
> (b)    insisted on dictating the existing directors who would be replaced by the TCI/3G nominees;
>
> (c)    insisted that TCI/3G nominees be placed on certain committees;
>
> (d)    pressed his view that the roles of CEO and Chairman be split;
>
> (e)    insisted that the number of Board members not be increased without shareholder approval or approval by 80 percent of the Board; and
>
> (f)    insisted that shareholders controlling 10 (or possibly 15) percent of the outstanding shares of CSX voting stock be permitted to call a special meeting of shareholders at any time to consider any business, including the election of new directors or removal of existing directors.

Mr. Hohn further preemptively stated that no standstill would ever be acceptable to him.

(PFF ¶¶ 109, 113.)

    In addition, Mr. Hohn threatened that, if CSX did not agree to his demands, he would run his slate, create a dissident board, and make things unpleasant for Mr. Kelly as presiding director.  He further suggested that his directors would decline to provide written consents to Board actions and would otherwise disrupt the operation of the Board.  (PFF ¶ 115.)  The implicit premise underlying Mr. Hohn's threats was that his five nominees would vote together as a bloc.  (PFF ¶ 116.)  In fact, Mr. Hohn had instructed Mr. Amin to inform their slate about his meeting with Mr. Kelly because "it helps them feel that we are a team and treats them as team members".  (PFF ¶ 117.)

    All of these factors led Mr. Kelly and the Board to conclude that TCI was "seeking to achieve effective control" of the CSX Board of Directors and dictate Company strategy.

### d. Mr. Kelly's Statement Referring to His Discussions With Mr. Hohn is True.

TCI and 3G take issue with Mr. Kelly's description of his discussions with Mr. Hohn as "an effort to avoid the disruption and expense of a proxy contest". As discussed above, Mr. Hohn responded to CSX's offer to nominate three TCI/3G nominees as well as a fourth to be mutually agreed upon with a list of demands and threats if his demands were not met. (See PFF ¶¶ 109-115.) Mr. Kelly reported his discussions with Mr. Hohn to the Board. Notwithstanding Mr. Hohn's demands, the Board asked Mr. Kelly to continue the discussions with Mr. Hohn to see whether he would modify his demands. (PFF ¶ 112.)

The fact that Mr. Ward concluded earlier than other Board members (and on the basis of direct contact with Mr. Hohn) that Mr. Hohn was intent on achieving effective control without paying a control premium, and recommended to Mr. Kelly that he terminate the discussions with Mr. Hohn, does not change the fact that the Board as a whole wanted Mr. Kelly to continue the discussions to see whether an accommodation could be reached, and that the discussions did continue. (PFF ¶¶ 111-112.)

Mr. Kelly's statement that the discussions were "an effort to avoid the disruption and expense of a proxy contest" is supported by the evidence.

### e. Mr. Ward's Statements Concerning the Reasons for This Lawsuit are True.

TCI and 3G contend that Mr. Ward made false statements in violation of Rule 14a-9 in CSX's press release of March 17, 2008, when he stated (a) that the lawsuit was commenced "to ensure that all of our shareholders receive complete and accurate information about the group's holdings, agreements, plans and motivations to which they are entitled under the federal securities laws"; and (b) that CSX management is "committed to protecting the interests of all CSX shareholders." (PFF ¶ 124.) TCI and 3G contend that CSX brought this lawsuit " to bar the TCI group from putting forth its slate, and to entrench the current board." (See PTO at 76.)

The evidence is that CSX commenced this litigation only after receiving information from its proxy solicitation advisor, Innisfree M&A Incorporated, indicating that TCI was controlling or influencing the vote of shares held as hedges by its swap counterparties. (PFF ¶¶ 135-139.) This, in turn, indicated that TCI's statements disclaiming beneficial ownership of CSX shares hedging the swaps were not true. (PFF ¶ 140.) CSX management believed that the shareholders voting in a proxy contest should have that information, and other information, concerning the shareholders putting forward five nominees for the Board and a shareholder proposal. (PFF ¶ 143.)

There is no evidence supporting TCI and 3G's contention that CSX brought this lawsuit to entrench the Board and stifle dissent. The contention is based on pure conjecture.

## III.    TCI AND 3G'S CLAIM UNDER SECTION 20(a) IS WITHOUT MERIT

### A.    Proposed Conclusion

Michael Ward is not liable under Section 20(a) of the Exchange Act because there was no primary violation and he acted in good faith.

### B.    Discussion

There can be no liability under Section 20(a) in the absence of a primary violation.  Rombach v. Chang, 355 F.3d 164, 177-78 (2d Cir. 2004).  There has been no primary violation here.

Moreover, Section 20(a) provides that control person liability does not apply where the individual "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. §78t(a).

While Mr. Ward, as chairman, president and chief executive officer, does control or influence certain aspects of the conduct of CSX, the ultimate control of CSX lies with its Board of Directors.  The LTIP grants made on May 1, 2007, were not made by Mr. Ward—they were made by the Compensation Committee of the Board of Directors, which is made up of exclusively non-management directors of CSX.  (PFF ¶ 148.) The grant of stock to directors as part of their annual retainer on May 2, 2007, was automatic under the CSX Stock Plan for Directors, and required no action or decision by Mr. Ward or any other director.  (PFF ¶ 149.)  The grant of 5,000 shares to directors in December 2007 was made by the full Board, not by Mr. Ward.  (PFF ¶ 150.)

The discussion of compensation issues in the CSX Proxy is the result of work by many people, including outside advisors and experts and is overseen by the Compensation Committee of the Board.  (PFF ¶ 151.)  Mr. Ward relied in good faith on the work of those involved in preparing that part of the proxy statement.

The evidence supports the conclusion that Mr. Ward's statements of opinion in the March 11, 2008 editorial in the Washington Times were made in good faith, as was the statement attributed to him in the press release of March 17, 2008.  (See discussion supra.)

With respect to the February 2008 Amendments to the bylaws relating to special meetings, TCI and 3G no longer contend that the disclosure in CSX's Proxy statement relating to the amendments violates Section 14(a).  (See PTO at 77-85.)  TCI and 3G have confined themselves to arguing that the amendments violate Virginia law. Therefore, the amendments cannot form the basis for liability under Section 20(a).

## IV.    TCI AND 3G'S CLAIM UNDER VIRGINIA LAW IS WITHOUT MERIT.

### A.    Proposed Conclusions

1.    CSX's Bylaws do not violate Virginia law.

34

2.      Under the business judgment rule, the Court should not second guess the balance struck by the CSX Board of Directors between allowing minority shareholders to require the calling of a special meeting and protecting CSX and all its shareholders from the expense, distraction and drain on corporate resources that would be caused by having serial meetings on the same subject matter within the same 12-month period.

**B.      Discussion**

The facts concerning the 2008 bylaw amendments and shareholder proposals concerning special meetings are set forth fully and accurately in the CSX Proxy, and TCI and 3G no longer contend that they are not. (PFF ¶¶ 173-185.)

TCI and 3G continue to contend that the bylaw amendments relating to the calling of special meetings, adopted by the CSX Board of Directors in February 2008, violate Virginia law because they do not permit shareholders to call for a special meeting for the purpose of removing directors. That contention is without merit.

There is no right under Virginia law for shareholders to call a special meeting to remove directors.  Indeed, there is no right under Virginia law for shareholders to call a special meeting for any purpose.  Section 13.1-655A.1 of the Virginia Code provides that a corporation shall hold a special shareholder meeting "[o]n call of the chairman of the board of directors, the president, the board of directors, <u>or the person or persons authorized to do so by the articles of incorporation or bylaws</u>."  Va. Code Ann. § 13.1-655.A.1 (2008)(emphasis added).  Thus, the default rule in Virginia is that shareholders do not have the right to call a special meeting.  That right, if it exists at all, must be expressly conferred in the corporation's charter or bylaws. The Joint Bar Committee Commentary accompanying Section 13.1-655 specifically notes that this Section was amended in 1985 to omit the requirement that public corporations permit shareholders of 10 percent or more of the corporation's shares to call special meetings.  Thus, prior to the adoption of the bylaw amendments by the CSX Board in February 2008, CSX shareholders had no right to call for a special meeting for <u>any</u> purpose.

If a Virginia corporation chooses to authorize its shareholders to call special meetings, nothing in the Virginia Code prevents the corporation from imposing restrictions on that right, including conditioning it upon ownership of a certain percentage of the corporation's voting stock or restricting the topics that may be raised by shareholders calling such special meetings.  The CSX bylaws, as amended in February 2008, permit the owners of 15 percent of CSX's outstanding voting stock to request that the Board call a special meeting.  (PFF ¶ 153.)  However, the request may properly be denied if the special meeting is requested on a subject matter, including the election of directors, that has been taken up within the previous 12 months or that within 90 days will be taken up at the next annual meeting.  (PFF ¶ 157.)

In adopting that provision, the Board attempted to strike a balance between allowing minority shareholders to call a special meeting and protecting CSX and all shareholders from the expense, distraction and drain on resources that would be caused

by having serial meetings on the same subject matter with in the same 12-month period.[2]
The Board was mindful that CSX does not have a classified board; each director stands
for election every year at the annual meeting; and even in uncontested elections, the
directors must receive a majority of the votes cast to be elected.  (PFF ¶ 159.)  Thus, the
shareholders have the opportunity in every year to elect or remove directors.  Indeed, TCI
and 3G now are effectively trying to remove five directors through a proxy contest.[3]

   The February 2008 bylaw amendments do not in any way interfere with the
shareholders' ability to vote out a director, or elect other directors, in any 12-month
period.  Every director stands for election in every year, and must garner a majority of the
votes cast to win election.  The Board's decision not to give minority shareholders the
right to call for elections between annual meetings strikes an appropriate balance and
does not violate any law.  Under the business judgment rule, the Court should not second
guess the reasonable balance struck by the Board.

---

[2] Section 7.02 of the Model Business Corporation Act allows the holders of 10 percent of the
voting securities of a public corporation to call a special shareholder meeting, subject to a
provision in the articles of incorporation lowering the threshold or raising it to not more than 25
percent, but Comment 2 to this Section affords the corporation "some discretion" in determining
whether to call the meeting, including if demands are repetitious or cover matters that have been
addressed in recent past meetings or will be addressed at an annual meeting in the near future.
1984 Model Bus. Corp. Act §7.02 (2008).

[3] The official comment to Section 7.02 of the Model Business Corporation Act provides that
"principal formal differences between an annual and a special meeting are that at an annual
meeting directors are elected and . . . any relevant issue pertaining to the corporation may be
considered, while a special meeting may only consider matters within those purposes."

## Conclusion

Based upon the foregoing evidence and law, judgment should be entered in favor of CSX.

Dated:  May 27, 2008

Respectfully submitted,

By: _____

Rory O. Milson
Francis P. Barron
David R. Marriott

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

**DEWEY PEGNO & KRAMARSKY LLP**
Keara A. Bergin
220 East 42nd Street
New York, NY 10017
(212) 943-9000
KBergin@dpklaw.com

**FRIEDMAN KAPLAN SEILER & ADELMAN LLP**
Lance J. Gotko
Paul J. Fishman
1633 Broadway
New York, NY 10019-6708
(212) 833-1100
LGotko@fklaw.com
PFishman@fklaw.com

*Attorneys for Plaintiff-Counterclaim Defendant CSX Corporation and Third-Party Defendant Michael Ward*

37