UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

CSX CORPORATION,

              Plaintiff,

              v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS, L.P.,
3G FUND, L.P., CHRISTOPHER HOHN, SNEHAL
AMIN, AND ALEXANDRE BEHRING, A/K/A
ALEXANDRE BEHRING COSTA,

              Defendants.

-------------------------------------------------------------------

THE CHILDREN'S INVESTMENT MASTER
FUND,

              Counterclaim and Third-
              Party Plaintiff,

              v.

CSX CORPORATION AND MICHAEL J. WARD,

              Counterclaim and Third-
              Party Defendants.

-------------------------------------------------------------------

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.

              Counterclaim Plaintiffs,

              v.

CSX CORPORATION AND MICHAEL WARD,

              Counterclaim Defendants.

-------------------------------------------------------------------x

ECF CASE
08 Civ. 02764 (LAK) (KNF)

**DEFENDANTS' POST-TRIAL BRIEF**

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iii

SUMMARY OF ARGUMENT ...................................................................................... 1

THE FACTUAL RECORD .......................................................................................... 10

    A. TCI's Investment in CSX.................................................................................. 10
    B. TCI's Total Return Swaps................................................................................ 13
    C. TCI's HSR Filing and Purchase of Common Stock......................................... 18
    D. Early Disclosures of TCI's Investment in CSX................................................ 20
    E. TCI Consolidates its Swap Positions............................................................... 22
    F. 3G's Investment in CSX.................................................................................... 23
    G. TCI and 3G File a 13D..................................................................................... 29
    H. Moving the Record Date .................................................................................. 32

ARGUMENT ................................................................................................................ 33

I. DEFENDANTS DID NOT VIOLATE SECTION 13(D). .......................................... 33

    A. Defendants Could Not Have Had Beneficial Ownership Of Any CSX Shares Held
        By Their Cash-Settled Total Return Equity Swap Counterparties Under Current
        Law Absent Some Actual Agreement, Arrangement, Or Understanding With
        Respect To The Voting Or Disposition Of Shares Of CSX....................................... 33
    B. The Defendants Were Not The Beneficial Owner of The Shares That Their
        Respective Counterparties Purchased as a Hedge. ................................................... 35
    C. TCI Did Not Attempt to Evade its Disclosure Requirements Under Rule 13d-3(b). .. 50
    D. Defendants Did Not Form A Group Until December 12, 2007. ............................ 57
    E. Defendants Have Complied With All Other Disclosure Requirements Under
        Section 13(d)............................................................................................................. 73

II. DEFENDANTS HAVE COMPLIED WITH THE DISCLOSURE REQUIREMENTS OF
    SECTION 14(A) OF THE EXCHANGE ACT. .................................................... 78

III. THE INDIVIDUAL DEFENDANTS ARE NOT LIABLE AS CONTROLLING PERSONS
    UNDER SECTION 20(A). ................................................................................... 81

IV. THE PLAINTIFF HAS FAILED TO IDENTIFY ANY IRREPARABLE HARM AND,
    ACCORDINGLY, NO INJUNCTION SHOULD ISSUE. ................................... 82

    A. Standard for Injunctive Relief............................................................................ 82
    B. Sections 13(d) and 14(a) Are Designed to Provide Information Regarding
        Acquisitions of Equity Securities for the Purpose of Acquiring Control. ................ 84
    C. CSX Has Failed to Establish Irreparable Harm and, Accordingly, No Injunctive
        Relief Is Appropriate................................................................................................ 86
    D. The Other Relief Sought By CSX is Unprecedented, Punitive and Improper............ 94

V. PLAINTIFF'S REQUEST FOR DECLARATORY RELIEF IS WITHOUT BASIS. ......... 102

i

SUMMARY OF ARGUMENT ............................................................................. 106

THE FACTUAL RECORD ................................................................................... 107

    A. CSX's Policies Prohibit Directors and Officers From Engaging In Transactions In
        CSX Securities While In Possession Of Material Nonpublic Information............... 107

    B. CSX's Long-Term Incentive Plan................................................................. 109

    C. CSX's Stock Plan For Directors.................................................................... 112

    D. CSX's Additional Solicitation Materials ....................................................... 113

    E. The Bylaw Amendment For Which CSX Seeks Shareholder Ratification
        Contravenes Virginia Law. ......................................................................... 117

ARGUMENT ..................................................................................................... 118

I. CSX AND MICHAEL WARD HAVE VIOLATED SECTION 14(A)................................ 118

    A. The CSX Proxy's Disclosure Regarding Executive Compensation And Director
        Stock Awards Is Materially False and Misleading. ........................................ 119

    B. The CSX Proxy's Characterization of TCI and Its Intentions Is Materially False
        and Misleading........................................................................................ 124

II. THIRD-PARTY DEFENDANT MICHAEL WARD IS LIABLE FOR CSX'S VIOLATIONS
    OF SECTION 14(A). ....................................................................................... 126

III. CSX'S FEBRUARY BYLAW AMENDMENT VIOLATES VIRGINIA LAW. ............... 128

IV. DEFENDANTS ARE ENTITLED TO INJUNCTIVE AND DECLARATORY RELIEF. 131

CONCLUSION................................................................................................... 133

# TABLE OF AUTHORITIES

## CASES

*325 Bleecker Inc. v. Local Union No. 747*
    50 F. Supp. 2d 110 (N.D.N.Y 2007) ....................................................................131

*ATSI Commc'ns Inc. v. Shaar Funds, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)...................................................................................81

*Aaron v. S.E.C.*,
    446 U.S. 680, 100 S. Ct. 1945 (1980) ..................................................................91

*Am. Fed'n of State, County, & Mun. Employees v. Am. Int'l Group, Inc.*,
    462 F.3d 121 (2d Cir. 2006)................................................................................102

*Amoco Production Co. v. Village of Gambell*,
    480 U.S. 531, 107 S. Ct. 1396 (1987) ................................................................131

*Avnet, Inc. v. Scope Industries*,
    499 F. Supp. 1121 (S.D.N.Y. 1980).....................................................................90

*BFP v. Resolution Trust Corp.*,
    511 U.S. 531, 114 S. Ct. 1757 (1994) ............................................................37, 38

*Bath Indus. v. Blot*,
    427 F.2d 97 (7th Cir. 1970)..................................................................................46

*Bray v. City of New York*,
    346 F. Supp. 2d 480 (S.D.N.Y. 2004)..................................................................93

*Capital Realty Investors v. Dominium Tax Exempt*,
    944 F. Supp. 250 (S.D.N.Y. 1996)..........................................................8, 86, 88

*Champion Parts Rebuilders, Inc. v. Cormier Corp.*,
    661 F. Supp. 825 (N.D. Ill. 1987) ......................................................................100

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837, 104 S. Ct. 2778 (1984) ..................................................................36

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*,
    480 F.2d 341 (2d Cir. 1973)..................................................................................96

*Chromalloy Am. Corp. v. Sun Chem. Corp.*,
    611 F.2d 240 (8th Cir. 1979)................................................................................97

*Comm. for New Mgmt. of Butler Aviation v. Widmark*,
  335 F. Supp. 146 (E.D.N.Y. 1971) .......................................................................100

*Condec Corp. v. Farley*,
  573 F. Supp. 1382 (S.D.N.Y. 1983).................................................................88, 90

*D.L. Cromwell Investments, Inc. v. NASD Regulation, Inc.*,
  279 F.3d 155 (2d Cir. 2002)...................................................................................82

*Edelman v. Salomon*,
  559 F. Supp. 1178 (D. Del. 1983) .........................................................................93

*Electronic Specialty Co. v. Int'l Controls Corp.*,
  409 F.2d 937 (2d Cir. 1969).............................................................................86, 96

*Equal Employment Opportunity Comm'n v. Johnson & Higgins, Inc.*,
  91 F.3d 1529 (2d Cir. 1996).................................................................................102

*Fink v. Weill*,
  No. 02 Civ. 10250(LTS), 2005 WL 2298224 (S.D.N.Y. Sept. 19, 2005) .............105

*Fla. Commercial Banks v. Culverhouse*,
  772 F.2d 1513 (11th Cir. 1985).............................................................................96

*Freedom Calls Found. v. Bukstel*,
  No. 05CV5460, 2006 WL 845509 (E.D.N.Y. Mar. 3, 2006)............................93, 94

*GAF Corp. v. Heyman*,
  724 F.2d 727 (2d Cir. 1983).................................................................................123

*GAF Corp. v. Milstein*,
  453 F.2d 709 (2d Cir. 1973)....................................................................................1

*Gearhart Indus., Inc. v. Smith Int'l, Inc.*,
  741 F.2d 707 (5th Cir. 1984).................................................................................99

*Gen. Aircraft Corp. v. Lampert*,
  556 F.2d 90 (1st Cir. 1977) ............................................................................85, 99

*Golden v. Zwickler*,
  394 U.S. 103 (1969).............................................................................................132

*Gorman v. Coogan*,
  No. 03-173-P-H, 2004 WL 60271 (D. Me. Jan. 13, 2004) .....................................99

*Gottlieb v. Economy Stores*,
    102 S.E.2d 345 (Va. 1958)........................................................................................130

*Green v. Goodman-Gable-Gold Co., Inc.*
    268 Va. 102, 597 S.E.2d 77 (2004)...........................................................................133

*Gregory v. Helvering*,
    293 U.S. 465, 55 S. Ct. 266 (1935)............................................................................52

*Gryl ex rel. Shire Pharms. Group Plc v. Shire Pharms. Group Plc*,
    298 F.3d 136 (2d Cir. 2002).......................................................................................36

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
    286 F.3d 613 (2d Cir. 2002)...............................................................................58, 85

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
    2001 WL 46978 (S.D.N.Y. Jan. 19, 2001)................................................................105

*Hanna Mining Co. v. Norcen Energy Res. Ltd.*,
    574 F. Supp. 1172 (N.D. Oh. 1982) ...........................................................................96

*Harrison v. Rubenstein*,
    No. 02 Civ. 9356(DAB), 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007) ...................82

*In re HealthSouth Sec. Litig.*,
    No. CV-03-BE-1500-S (N.D. Ala.) ...............................................................7, 50, 51

*Henrietta D. v. Bloomberg*,
    331 F.3d 261 (2d Cir. 2003)........................................................................................83

*Hubco v. Rappaport*,
    628 F. Supp. 345 (D.N.J. 1985) .................................................................................85

*ICN Pharmaceuticals v. Khan*,
    2 F.3d 484 (2d Cir. 1993)...............................................................................83, 119

*Int'l Banknote Co. v. Muller*,
    713 F. Supp. 612 (S.D.N.Y. 1989)......................................................................89, 91

*Int'l Trading Co. v. C. I. R.*,
    484 F.2d 707 (7th Cir. 1973).......................................................................................52

*Ithaca (Custodians) Ltd. v. Perry Corp.*,
    [2004] NZLR 731, 2003 NZLR LEXIS 76 (Court of Appeals,
    Wellington, Nov. 4, 2003) ................................................................................ *passim*

*K-N Energy, Inc. v. Gulf Interstate Co.*,
    607 F. Supp. 756 (D. Colo. 1983) ............................................................8, 58, 101

*Kaufman v. Cooper Companies, Inc.*
    719 F. Supp. 174 (S.D.N.Y.1989) ..................................................................124

*In re Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..............................................................79

*Kidder, Peabody & Co., Inc., v. Maxus Energy Corp.*,
    925 F.2d 556 (2d Cir. 1974) ..........................................................................132

*Kirsch Co. v. Bliss and Laughlin Indus., Inc.*,
    495 F. Supp. 488 (W.D. Mich. 1980) ....................................................96, 98, 99

*Knetsch v. United States*,
    364 U.S. 361, 81 S. Ct. 132 (1960) ..................................................................52

*Lake Monticello Owners' Ass'n v. Lake*,
    463 S.E.2d 652 (Va. 1995) ............................................................................130

*Lane Bryant, Inc. v. Hatleigh Corp.*,
    No. 80-Civ. 1617, 1980 WL 1412 (S.D.N.Y. June 9, 1980)...................98, 100, 101

*Estate of Lennon v. Screen Creations, Ltd.*,
    939 F. Supp. 287 (S.D.N.Y. 1996) ................................................................104

*Levy v. Southbrook Int'l Inv., Ltd.*,
    No. 99 CIV. 1480 (NRB), 2000 WL 567008 (S.D.N.Y. May 10, 2000), *aff'd*,
    263 F.3d 10, 17-18 (2d Cir. 2001) .............................................................6, 46, 52

*Liberty Nat'l Ins. Holding Co. v. Charter Co.*,
    734 F.2d 545 (11th Cir. 1984)..........................................................................96

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*,
    223 F. Supp. 2d 435 (S.D.N.Y. Dec. 10, 2001) ..................................................57

*MTD Serv. Corp. v. Weldotron Corp.*,
    No. 93 Civ. 4980 (MP), 1994 WL 455154 (S.D.N.Y. Aug. 19, 1994)....................99

*Maldonado v. Flynn*,
    597 F.2d 789 (2d Cir. 1979)..........................................................................123

*Malleterier v. Burlington Coat Factory Warehouse Corp.*,
    426 F.3d 532 (2d Cir. 2005)..........................................................................132

*Markowski v. SEC*,
    34 F.3d 99 (2d Cir. 1994)........................................................................................56, 57

*Mazurek v. Armstrong*,
    520 U.S. 968, 117 S. Ct. 1865 (1997) ...............................................................................82

*Mo. Portland Cement Co. v. H.K. Porter Co., Inc.*,
    535 F.2d 388 (8th Cir. 1976)...............................................................................................96

*Morales v. New Valley Corp.*,
    999 F. Supp. 470 (S.D.N.Y. 1998)......................................................................................58

*Morales v Quintel, Inc.*,
    249 F.3d 115 (2d Cir. 2001)..........................................................................................57, 66

*Neubauer v. Eva-Health USA, Inc.*,
    158 F.R.D. 281 (S.D.N.Y. 1994) .......................................................................................126

*New York State Nat. Org. for Women v. Terry*
    886 F.2d 1339 (2d Cir. 1989)............................................................................................131

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
    54 F.3d 1424 (9th Cir. 1995).............................................................................................127

*Pantry Pride, Inc. v. Rooney*,
    598 F. Supp. 891 (S.D.N.Y. 1984).............................................................................67, 88, 91

*Portsmouth Square, Inc. v. Shareholders Protective Comm.*,
    770 F.2d 866 (9th Cir. 1985)...............................................................................................39

*Resnik v. Swartz*,
    303 F.3d 147 (2d Cir. 2002)..............................................................................................119

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990)................................................................................................95

*Rich v. Maidstone Fin., Inc.*,
    No. 98 Civ. 2569(DAB), 2001 WL 286757 (S.D.N.Y. Mar. 23, 2001) ..................................81

*Rondeau v. Mosinee Paper Corp.*,
    422 U.S. 49, 95 S. Ct. 2069 (1975).............................................................................9, 34, 83, 86, 92

*Royal Indus., Inc. v. Monogram Indus., Inc.*,
    No. CV 76-3348-R, 1976 WL 860 (C.D. Cal. Nov. 29, 1976) ...............................................53

*Sam Wong & Son, Inc. v. N.Y. Mercantile Exch.*,
   735 F.2d 653, 677 (2d Cir. 1984) ........................................................53

*SEC v. Corporate Relations Group, Inc.*
   No. 6:99CV1222ORL28KRS, 2003 WL 25570113 (M.D. Fla. Mar. 28, 2003)......................51

*S.E.C. v. Culpepper*,
   270 F.2d 241 (2d Cir. 1959)........................................................91

*SEC v. Drexel Burnham Lambert Inc.*,
   837 F. Supp. 587 (S.D.N.Y. 1993)........................................................54

*S.E.C. v. First City Financial Corp.*,
   890 F. 2d 1215 (D.C. Cir. 1989) ........................................................95

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996)........................................................127

*S.E.C. v. Franklin Atlas Corp.*,
   171 F. Supp. 711 (S.D.N.Y. 1959)........................................................82

*S.E.C. v. Manor Nursing Centers, Inc.*,
   458 F.2d 1082 (2d Cir. 1972)........................................................91, 92, 95

*SEC v. Masri*,
   523 F. Supp. 2d 361 (S.D.N.Y. 2007) ........................................................53

*SEC v. McNulty*,
   137 F.3d 732 (2d Cir. 1998)........................................................36

*SEC v. Softpoint*,
   958 F. Supp. 846 (S.D.N.Y. 1997) ........................................................51

*Schaffer v. CC Investments*,
   115 F. Supp. 2d 440 (S.D.N.Y. 2000)........................................................58

*Scott County Tobacco Warehouses, Inc. v. Harris*,
   201 S.E.2d 780 (Va. 1974)........................................................128

*Seaboard World Airlines, Inc., v. Tiger International, Inc.*,
   600 F.2d 355 (2d Cir. 1979)........................................................

*Seinfeld v. Gray*,
   404 F.3d 645 (2d Cir. 2005)........................................................120

*Simmons v. Cranston*,
    No. 07 Civ. 3241, 2008 WL 820474 (S.D.N.Y. Jan. 14, 2008) ...............................82

*TSC Indus., Inc. v. Northway*,
    426 U.S. 438, 96 S. Ct. 2126 (1976) ...............................................................79, 118

*Texas Gulf, Inc. v. Canada Development Corp.*,
    366 F. Supp. 374 (S.D. Tex. 1973) .....................................................................57, 58

*The Guardian News, Inc. v. Amicone*,
    No. 07 Civ. 7078, 2008 WL 594770 (S.D.N.Y. Mar. 3, 2008)........................82, 131

*Tom Doherty Assoc. Inc. v. Saban Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995) ............................................................................................95

*Torchmark Corp. v. Bixby*,
    708 F. Supp. 1070 (W.D. Mo. 1988) ..........................................................................57

*Trane Co. v. O'Connor Sec.*,
    561 F. Supp. 301 (S.D.N.Y. 1983) ..............................................................................96

*Transcon Lines v. A.G. Becker, Inc.*,
    470 F. Supp. 356 (S.D.N.Y. 1979) .......................................................................38, 66

*Trayer v. Bristol Parking, Inc.*,
    95 S.E.2d 224 (Va. 1956) ..........................................................................................104

*Treadway Cos. v. Care Corp.*,
    638 F.2d 357 (2d Cir. 1980) ................................................................................ passim

*U.S. S.E.C. v. Universal Express, Inc.*,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007) .........................................................................91

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
    985 F.2d 1190 (2d. Cir. 1993) ............................................................................79, 131

*Universal Container Corp. v. Horwitz*,
    No. 74 Civ. 3865, 1977 WL 1036 (S.D.N.Y. Sept. 6, 1977) .........................57, 68, 88

*Vantico Holdings S.A. v. Apollo Mgmt., LP*,
    247 F. Supp. 2d 437 (S.D.N.Y. 2003) .........................................................................95

*Vestcom Int'l, Inc. v. Chorpa*,
    114 F. Supp. 2d 292 (D.N.J. 2000) ..............................................................................85

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083, 111 S. Ct. 2749 (1991) ....................................................................118, 124

*Williams v. Southern Bank of Norfolk*,
  203 Va. 657, 125 S.E.2d 803 (1962) ........................................................................132, 133

*Wisener v. Air Express Int'l Corp.*,
  583 F.2d 579 (2d Cir. 1978) ...........................................................................................102

*Zimmerman v. Chicago Bd. of Trade*,
  360 F.3d 612 (7th Cir. 2004) ............................................................................................52

## STATUTES AND REGULATIONS

15 U.S.C. § 78c-1(a)(2008) .................................................................................................2, 35

15 U.S.C. § 78m (d)(1)(2008) ...............................................................................................33

15 U.S.C. § 78n(a) (2008) ....................................................................................................118

15 U.S.C. § 78p(a)(3) (2008) .................................................................................................37

15 U.S.C. § 78t(a) (2008) ...............................................................................................81, 127

17 C.F.R. § 229.402(b) (2008) .............................................................................................121

17 C.F.R. § 229.402(b)(2)(iv) (2008) ..................................................................................121

17 C.F.R. § 240.12b-2 (2008) ................................................................................................81

17 C.F.R. § 240.13d-1(h)(i) (2008) .......................................................................................34

17 C.F.R. § 240.13d-3(a) (2008) ......................................................................................4, 35

17 C.F.R. § 240.13d-3(b) (2008) ...........................................................................................50

17 C.F.R. § 240.13d-5(b)(1) (2008) ................................................................................48, 57

17 C.F.R. § 240.13d-101 (2008) .....................................................................74, 76, 77, 78, 80

17 C.F.R. § 240.14a-4(a)(3) (2008) .....................................................................................125

17 C.F.R. § 240.14a-9 (2008) ..............................................................................................125

17 C.F.R. § 240.14a-9(a) (2008) ....................................................................................79, 118

17 C.F.R. § 240.14a-101 (2008) ...............................................................................81, 121

17 C.F.R. § 240.16a-1(a) (2008)...........................................................................37

17 C.F.R. § 243.100 (2008) .................................................................................121

Filing & Disclosure Requirements Relating to Beneficial Ownership,
    43 Fed. Reg. 18484 (Apr. 28, 1978)..............................................................35, 83

Va. Code Ann. § 13.1-603 (2008)........................................................................103

Va. Code Ann. § 13.1-677 (2008)........................................................................128

Va. Code Ann. § 13.1-680(A) (2008) ..................................................................127

Va. Code Ann. § 13.1-680(D) (2008) ..................................................................128

Va. Code Ann. § 13.1-725 (2008)........................................................................103

Va. Code Ann. § 13.1-870(A) (2008) ..................................................................129

## SEC RELEASES

Various Proposals Relating to Disclosure of Beneficial Owners and Holders of Record of
    Voting Securities,
    Exchange Act Release No. 11616, 1975 WL 177966 (Aug. 25, 1975) ....................................38

Adoption of Beneficial Ownership Disclosure Requirements,
    Exchange Act Release No. 13291, 1977 WL 185650 (Feb. 24, 1977) ....................................54

Filing and Disclosure Requirement Relating to Beneficial Ownership
    Exchange Act Release No. 15348 (Nov. 12 1978)..................................................34, 35, 38, 84

Cross-Board Tender Offers, Business Combinations and Rights Offerings,
    Exchange Act Release No. 7611, 1998 WL 792055 (Nov. 13, 1998) ....................................51

Cross-Board Tender And Exchange Offers, Business Combinations and Rights
    Offerings,
    Exchange Act Release No. 7759, 1999 WL 969592 (Oct. 22, 1999) ......................................52

Selective Disclosure and Insider Trading,
    Exchange Act Release Nos. 33-7881, 34-43154, 65 Fed. Reg. 51,716, 51,721
    (Aug. 24, 2000) ..................................................................................................120

Commission Guidance on the Application of Certain Provisions of the Securities Act of
   1933, the Securities Exchange Act of 1934, and Rules thereunder to Trading in
   Security Futures Products,
   Exchange Act Release Nos. 33-8107; 34-46101 (June 27, 2002),
   *available at* http://www.sec.gov/rules/interp/33-8107.htm............................................2, 35, 36

In re General Elec. Co.,
   Exchange Act Release No. 50,426, 2004 WL 2114047 (Sept. 23, 2004)..............................121

In re Tyson Foods, Inc., et al.,
   Exchange Act Release No. 51,625, 2005 WL 1861834 (Apr. 28, 2005)...............................121

Executive Compensation and Related Person Disclosure,
   Exchange Act Release Nos. 33-8732A, 34-54302A, 71 Fed. Reg. 53,158, 53,164
   (Sept. 8, 2006)......................................................................................................................122

## MISCELLANEOUS

146 Cong. Rec. H12442, HH12498 (daily ed. Dec. 15, 2000) .....................................................35

146 Cong. Rec. S11855, S11867 (daily ed. Dec. 15, 2000) ....................................................35, 49

H.R. Rep. 90-1711 (1968)...............................................................................................34, 84, 86

S. Rep. No. 90-550 (1968) ..............................................................................................34, 84, 86

*Investment in the Rail Industry: Hearing Before the H. Comm. on Transportation and
   Infrastructure* ,
   2008 WL 618062 (Mar. 5, 2008) ........................................................................................125

*CSX, TCI Dig In*,
   Traffic World, Jan. 7, 2008..............................................................................................30, 90

*Section 13(d) and Disclosure of Corporate Equity Ownership*,
   119 U. Pa. L. Rev. 853 (1971).................................................................................................34

Henry T.C. Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership:
   Taxonomy, Implications and Reforms,*
   61 Bus. Law. 1011 (2006) ........................................................................................................36

Henry T.C. Hu & Bernard Black, *The New Vote Buying: Empty Voting and Hidden
   (Morphable) Ownership,*
   79 S. Cal. L. Rev. 811 (2006)...................................................................................................54

Arnold S. Jacobs, *The Williams Act -- Tender Offers and Stock Accumulations*,
  § 2.12 (Thompson West 2008) ............................................................................36, 38

Michael J. de la Merced, *Hedge Funds Propose CSX Directors, Starting Proxy Battle*,
  New York Times, Dec. 20, 2007 ........................................................................30, 90

Bhattiprolu Murphy and Desiree Hanford, *Hedge Fund Files to Acquire Over
  $500M in CSX Stk*,
  Dow Jones News Service, April 18, 2007 ...............................................................89

Travis Reed, *Investors Partner to Nominate Minority Slate to CSX Board*,
  Associated Press, Dec. 19, 2007 ........................................................................30, 90

Pursuant to the Court's May 22, 2008 order, Defendants The Children's Investment Fund Management (UK) LLP, The Children's Investment Fund Management (Cayman) Ltd., The Children's Investment Master Fund (collectively, "TCI"), 3G Capital Partners Ltd., 3G Capital Partners, L.P., 3G Fund, L.P. (collectively, "3G"), Christopher Hohn, Snehal Amin, and Alexandre Behring respectfully submit this post-trial brief in support of their defenses to Plaintiff CSX Corporation's ("CSX") claims and their counterclaims against CSX and Michael Ward.  The first section of this brief (pages 1 to 105) address CSX's claims, and the second section (pages 106 to 134) address Defendants' counterclaims.

## CLAIMS OF CSX

## SUMMARY OF ARGUMENT

Defendants did not violate Sections 13(d) or 14 of the Securities Exchange Act. "The goal of § 13(d) 'is to alert the marketplace to every large, rapid aggregation or accumulation of securities . . . which might represent a potential shift in corporate control.'" *Treadway Cos. v. Care Corp.,* 638 F.2d 357, 380 (2d Cir. 1980) (citing *GAF Corp. v. Milstein,* 453 F.2d 709, 717 (2d Cir. 1973)).  TCI and 3G satisfied both the letter and the spirit of Section 13(d).  On December 19, 2007, within seven days of their acquisition of more than 5% beneficial ownership of CSX securities, Defendants filed a Schedule 13D with the Securities and Exchange Commission ("SEC") disclosing that collectively they had beneficial ownership of 8.3% of the outstanding shares of CSX, as well as 11% in economic exposure to CSX securities through total return cash-settled swaps (the "Total Return Swaps").  Since that time, neither fund has engaged in a single transaction involving a single share of CSX securities or Total Return Swaps in which CSX was the referenced security.  Therefore, for at least the past five months – and six months before the CSX annual shareholder meeting, scheduled for June 25, 2008 – the investing public

1

has fully known about any "potential shift in corporate control" of CSX. (As set forth below, there were also many prior disclosures of the TCI and 3G swap and share positions.)

Nor was disclosure of TCI's swap contracts required prior to December 19, 2007. The Securities Exchange Act of 1934 (the "Exchange Act") was amended in 2002 to exclude equity swaps from the definition of equity securities and to provide that the SEC may not restate the disclosure of equity swaps (other than in the Section 16 content). 15 U.S.C. § 78c-1(a) ("The definition of 'security' . . . does not include any security-based swap agreement . . . ."). Thus, without more, no Section 13(d) filing need be made when the shares referenced in swaps aggregate over 5% of a company's stock. This was confirmed by SEC interpretive guidance, which is entitled to deference by the Court. According to the SEC, "[a] purchaser of a cash-settled security future . . . would not count the equity securities underlying the contract for purposes of determining whether he or she is subject to the Regulation 13D reporting requirements, *because he or she does not have the right to acquire beneficial ownership of the underlying security.*" Commission Guidance on the Application of Certain Provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and Rules thereunder to Trading in Security Futures Products, Exchange Act Release Nos. 33-8107; 34-46101 (June 27, 2002), *available at* http://www.sec.gov/rules/interp/33-8107.htm (emphasis added) (Declaration of Howard O. Godnick, dated May 27, 2008 ("Godnick Decl.") Ex. 9). Although the Release refers to "security futures," the reasoning is equally applicable to swaps since, as discussed below, the fact that the instrument settles in cash, rather than physically, is determinative. In issuing this guidance, there can be no doubt that the SEC was well aware of the market reality that swap counterparties often hedge derivatives with shares of the referenced security.

2

Indeed, the market reality of bank counterparties often hedging cash-settled swaps with shares of the referenced security was found to be insufficient to give rise to beneficial ownership in the Rubicon case that Your Honor inquired about during the trial. *Ithaca (Custodians) Ltd. v. Perry Corp.*, [2004] 1 NZLR 731, 2003 NZLR LEXIS 76 (C.A.). (Godnick Decl. Ex. 10.) Decided under a securities regulatory scheme almost identical to the Williams Act and, like here, involving Total Return Swaps, the New Zealand Court of Appeals rejected the theory urged by plaintiff:

> [I]f we hold that knowledge of market reality suffices to create an arrangement or understanding under § 5(1)(f) and that consensus and communication are not required, this would create uncertainty as to the scope of disclosure generally, as it would raise questions about how certain market reality must be before there is an obligation to disclose. In particular it would, in effect, mean that the majority of equity swaps in New Zealand would create disclosure requirements, whether cash-settled or not. There are obvious policy issues involved in extending disclosure requirements to interests under equity swaps as the regime conceptually is directed at voting rights rather than economic interests. Most equity swaps create only economic interests.

*Id.* at *57.

Judicial endorsement of Plaintiff's theory here would transform cash-settled swaps, which are universally understood as not triggering a filing requirement under Section 13(d), into instruments that can trigger such filing requirements based on awareness of "market reality" that counterparties often hedge swaps by purchasing the referenced security. This is not an overstatement given the record in which there was no consensus, no communication and no agreement between TCI and its counterparties about investing in CSX shares held as hedges to the swaps, nor as to the voting of any such shares. Consequently, a holding that requires disclosure based on the "market reality" that bank counterparties often hedge their swap contracts and "know which side of the bread the butter is on" (Trial Tr. (Kaplan, J. 82:22-83:3))

3

would undermine Congress's and the SEC's carefully structured regulatory framework.  Indeed, as discussed in detail herein, Congress has expressly required that swaps be disclosed after an investor has acquired 10% of equity securities in a particular company.  Thus, when Congress wanted swap positions to be disclosed, it knew how to make that disclosure obligation clear.  (*See* comparison of Exchange Act §§ 16 and 13, *infra* at 37.)  In view of the specific circumstances under which Congress made clear that swap disclosure was required, the absence of such a disclosure obligation under Section 13(d) cannot be ignored.

Under Rule 13d-3(a), beneficial ownership is defined as "(1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or (2) Investment power which includes the power to dispose, or to direct the disposition of, such security."  17 C.F.R. § 240.13d-3(a).  Plaintiff concedes that TCI did not have beneficial ownership by virtue of the "plain vanilla" standard swap contracts that TCI entered into with its counterparties.  Rather, it asserts that TCI had voting power by virtue of the banks seeking to curry favor from TCI, and investment power by virtue of being a puppeteer:  When TCI entered swaps, the counterparties tended to buy CSX shares as hedges, and to sell those shares at the termination of the swaps.

With regard to voting power, there is <u>no</u> evidence that TCI had the ability to vote or to direct voting of the CSX shares held by counterparties as hedges to swaps.  In fact, the evidence is completely to the contrary.  Both heads of the swaps desks for TCI's counterparties, Deutsche Bank and Citigroup, where 99% of TCI's swaps have been held since the end of November 2007, testified that they (1) never discussed voting the CSX shares held as hedges to the TCI Swaps; (2) did not know the record date for voting the shares; (3) did not contact the stock lending desk during the two weeks preceding the record date to recall CSX shares on loan; and (4) as a matter of practice (which they did not disclose to TCI), do not vote the shares held as

hedges to swaps. Although Plaintiff sought to make much of the fact that Messrs. Hohn and Amin periodically spoke with Austin Friars, a proprietary hedge fund within Deutsche Bank, about CSX and other matters, and candidly acknowledged that they had hoped that Austin Friars' interest in CSX would lead Deutsche Bank to vote for TCI in a proxy contest, the uncontradicted evidence is that (1) neither Mr. Hohn nor Mr. Amin asked Austin Friars to seek to have the Deutsche Bank swap desk (on the other side of an internal informational firewall) vote the CSX shares held as hedges, and (2) Austin Friars did not contact the Deutsche Bank swaps desk about voting CSX shares.

Further, and notwithstanding the unremarkable fact that TCI's counterparties tended to purchase CSX shares as hedges to the Total Return Swaps and to sell those hedges at the termination of the Swap transaction, TCI did not have investment power over the Swaps. The uncontroverted evidence, established by, among other things, the heads of the Deutsche and Citigroup swaps desks, is that (1) neither bank had a conversation with TCI about whether they held CSX shares as hedges to their swaps; (2) the acquisition of shares is not the only mechanism through which counterparties hedge their shares; and (3) the fact and mechanism of any hedge is proprietary to the bank and not shared with swap counterparties, including TCI. Given the lack of any communication or mechanism for directing the movement of the CSX shares held as hedges, acquisition and disposition of CSX shares as Swap hedges does not establish the investment power that CSX claims TCI had. Moreover, every single share of CSX stock acquired by TCI was purchased in the open market; not one share was purchased from TCI's swap counterparties. In short, TCI's acquisition of CSX shares was exactly in the same manner and with the same pattern, as it would purchase CSX stock irrespective of its Swap positions.

5

What Plaintiff is left with then, with regard to TCI's acquisition of swaps, is TCI's admitted desire not to disclose its swaps position when not required to do so. But there is nothing illegal or improper about that motive, unless TCI transgressed a disclosure requirement, which, as explained, it did not. TCI's stated desire to keep confidential its CSX swap position led the Court to state:

> [F]or reasons that I don't fully appreciate and maybe they are tactical and maybe I am just overlooking something, it struck me that there was relatively little attention given in the papers to the question whether one way of disclosing in this case would be under Rule 13d-3(b). In other words, the question of whether one could put aside entirely the question whether TCI and 3G were beneficial owners of the CSX shares held in hedge positions by counter parties and nevertheless there was a violation by virtue of either or both of TCI and 3G being deemed to be beneficial owners on the ground that there was a plan or scheme to evade the reporting requirements under the act.

(Trial Tr. 221:25-222:11.) The Court was entirely correct. Plaintiff did not identify Rule 13d-3(b) evasion as a cause of action in its Complaint or in the "Issues To be Tried" in the Joint Pretrial Order, and it does not fit the facts of this case.

As more fully discussed herein, "evasion" in the Schedule 13-D context equates to a sham transaction, where a party divests itself of an ownership interest to avoid reporting requirements with an agreement to re-acquire that interest at a later time. There was no evidence of that here. To the contrary, with the advice of two law firms, TCI carefully sought to remain in compliance with the Exchange Act's reporting requirements. And, it is well settled that efforts to avoid disclosure requirements short of fraud do not constitute evasion. Indeed, the Second Circuit has held that a contractual cap on the right to convert a derivative security to 4.9 % of the outstanding stock is not a "plan or scheme to evade" Section 13(d), *Levy v. Southbrook Int'l Inv., Ltd.*, 263 F.3d 10, 13-14, 17-18 (2d Cir. 2001), and, in a recent *amicus curiae* submission, the SEC criticized as "unprecedented" and "unwarranted," under "Rule 144A *or any other provision*

6

*of the federal securities laws*" (emphasis in original), a plaintiff's argument that "a transaction that complied in substance with the requirement for an exemption was nonetheless denied that exemption solely on the ground that the motives of the participants rendered the transaction part of a 'scheme to evade' registration."  Brief for SEC as Amicus Curiae, *In re HealthSouth Sec. Litig.,* No. CV-03-BE-1500-S (N.D. Ala.), *available at* www.sec.gov/litigation/briefs/2006/headsouthbrief.pdf.  (Godnick Decl. Ex. 16).

Further, not publicly disclosing TCI's economic exposure to CSX was only one of several bona fide business reasons underlying TCI's acquisition of swaps.  There were significant financing and potential tax benefits associated with swaps as well.  There is no evidence that one reason is more important than others.  And, following TCI's Schedule 13D disclosure, TCI did <u>not</u> terminate its swap contracts with its counterparties, as would have been expected had non-disclosure been TCI's primary motive behind the swaps.  This speaks volumes about TCI's reasons for acquiring and holding swaps.  Despite the fact that TCI is engaging in a hotly-contested proxy contest where every vote matters, it has continued to maintain an economic exposure in swaps equating to 11% of the Company, rather than terminate the swaps and buy shares.

Plaintiff's allegation that TCI and 3G formed a group with respect to CSX prior to December 12 is based on circumstantial evidence that is weak at best.  There was not a single sentence among the over one million pages of documents produced, nor any testimony in the extensive record, that reflected an intention to engage in a common plan with regard to CSX stock prior to the November 2007 discussions about forming a group.  Although TCI and 3G did meet from time to time to exchange ideas (in the same manner in which TCI and 3G independently met with other funds), including about their investment in CSX, and although 3G

may have adjusted its buying and selling activity following some of those meetings, nothing suggests that this activity was the result of an agreement or understanding. Moreover, there is ample law that such meetings do not establish the formation of a group. *See K-N Energy, Inc. v. Gulf Interstate Co.*, 607 F. Supp. 756, 767 (D. Colo. 1983) (determining that evidence that showed that the two parties shared information because they knew of each other's investment in the company was not enough to support a finding the two were acting in concert to acquire the target company's stock). Indeed, after April 2007, TCI's position in CSX securities and swaps remained virtually unchanged, while 3G engaged in substantial selling and buying activity. Moreover, when 3G expressed a desire to "work together" with regard to CSX, TCI, which knew the rules, rebuffed the overture. As the cases make clear, the type of relationship that TCI had with 3G, which included information sharing, is insufficient to constitute a group for purposes of Section 13(d) and is entirely ordinary course of business for investment firms.

The above establishes that Plaintiff has not succeeded on the merits. But even should the Court disagree, an injunction should not issue. An injunction will only be granted to redress a Section 13(d) violation upon a showing of "irreparable harm to those interests which that section seeks to protect." *Treadway Cos.*, 638 F.2d at 380 (2d Cir. 1980). As Your Honor noted in *Capital Realty Investors v. Dominium Tax Exempt*, after finding a likelihood of success in proving violations of Section 14(a) in the context of a motion for a preliminary injunction:

> The objective of courts and of injunctive relief in cases like this [is] not to test the ingenuity of sophisticated corporate counsel. Nor is it to punish. Rather, it is to ensure that investors are provided in a timely fashion with the accurate information necessary to the intelligent exercise of the corporate franchise.

944 F. Supp. 250, 258-259 (S.D.N.Y. 1996) (internal quotation and citations omitted).

Plaintiff did not offer a shred of evidence concerning, and thus has failed to prove, that the CSX shareholders will be harmed in any way – much less irreparably – unless an

injunction is granted.  Defendants' economic interest in CSX, their agreement to form a group, have been fully and publicly disclosed for the past five months, which is six months prior to the shareholder vote.[1]  Accordingly, there can be no irreparable harm, and no injunction should issue.

Stripped to its essence, this is a proxy contest.  When assessing Plaintiff's claims, the Court should be mindful of the Second Circuit's admonition that "Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts." *Treadway Cos. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir. 1980) (quoting *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S. Ct. 2069, 2076 (1975)).With all due respect, that is precisely how Plaintiff seeks to use Section 13(d) here, as made plain by its prayer for relief.  In addition to corrective disclosure, Plaintiff seeks, among other things, to:  (i) invalidate Defendants' director slate; (ii) enjoin Defendants from acquiring additional shares of CSX until corrective disclosure is made; (iii) enjoin Defendants from acquiring any CSX shares referenced in their swap agreements; (iv) require Defendants to sell all shares; (v) terminate all swaps acquired after February 2007; (vi) enjoin Defendants from voting their shares at the 2008 annual meeting; and (vii) enjoin Defendants from voting any proxies received prior to such time as the Court determines corrective disclosures have been made.  This requested relief is extreme, punitive,

---

[1]      TCI's swap investment in CSX has been known to CSX since December 2006, and to the general public since no later than April 2007, when CSX issued its first quarter 10Q disclosing not only TCI's Hart-Scott-Rodino filing, but the fact that TCI had a significant investment in derivative securities relating to CSX.  Then, in May 2007, TCI filed a Form 13F, in which it disclosed that it held over 17 million shares of CSX common stock, a position that has remained virtually unchanged since that filing.  Finally, TCI's and 3G's December 19, 2007 Form 13D (disclosing their physical and swap positions), their supplemental 13D filings disclosing this lawsuit, and the intense media attention generated by this case, have certainly assured that the market generally, and CSX shareholders specifically, are fully informed of not only Defendants' respective investments in CSX, but also CSX's contentions that they have beneficial ownership over the shares referenced by the swaps and formed a group earlier than December 12, 2007.

unprecedented, self-serving and inappropriate. It should be rejected, along with all of Plaintiff's other arguments.

## THE FACTUAL RECORD

A.    *TCI's Investment in CSX*

Beginning in the late summer and early fall of 2006, TCI began to research the U.S. rail industry to determine whether the railroads would be a good long-term investment. (DX 145 (Amin ¶ 3).) Mr. Hohn, the ultimate decision-maker at TCI who has final say over all trades, eventually concluded that of the four major U.S. railroads, CSX provided the best long-term investment opportunity. (DX 145 (Amin ¶¶ 5, 10-11); DX 144 (Hohn ¶¶ 5, 8-9).)

On October 20, 2006, TCI began to invest in CSX by entering into Total Return Swaps that reference CSX common stock. (DX 145 (Amin ¶ 16).) TCI utilized Total Return Swaps instead of other financial instruments for several reasons. *First*, Total Return Swaps provide financing benefits, including lower funding costs and lower margin requirements. (DX 145 (Amin ¶ 7); DX 144 (Hohn ¶ 6); DX 154 (Amin Dep. 38:21-39: 11); DX 154 (Hohn Dep. 140:6-11); DX 149 (Partnoy ¶ 38); PX 19 (TCI Board Minutes enumerating TCI's reasons for investing in Total Return Swaps); (PX 106 (reflecting internal TCI discussions about leverage); PX 148 (same).)

*Second*, there are significant potential tax benefits to investing through swaps. (PX 38 (Jan. 26, 2007 e-mail among CSX advisor Morgan Stanley discussing the tax benefits of using Total Return Swaps); PX 19 (TCI Board minutes enumerating the reasons for investing through swaps).) As its board minutes reflect, TCI invests through swaps globally and benefits from favorable tax treatment in multiple jurisdictions, including Germany, the United States, and the United Kingdom.

*Third*, Total Return Swaps are not subject to the same reporting requirements associated with beneficially owned securities.  (*See, e.g.*, PX 203 (presentation prepared by CSX's advisors Morgan Stanley and Evercore Partners ("since it is not the legal owner of assets (only of a financial contract), the hedge fund is not required to report any ownership interests in swaps.")).)  Disclosure of an investment prior to the establishment of an investment position exposes a hedge fund to "front-running."[2]  (DX 145 (Amin ¶¶ 15, 19); Trial Tr. (Hohn Test.188:16-20).)  Specifically, if an investor becomes aware that a fund is building or selling a position, it can trade on that information and cause price differentials for the fund that is also buying or selling that position, thus making it more expensive to trade.  (Trial Tr. (Hohn Test. 188:21-189:1-8).)  There is no evidence in the record that any one of these reasons was given more weight with respect to TCI's decision to invest in CSX through Total Return Swaps.

TCI at all times acted based on what it understood was the applicable disclosure regime in the United States.  TCI had never formed a group prior to the one created with 3G on December 12, 2007.  (Trial Tr. (Hohn Test. 182:18-20).)  The 13D filed on December 19, 2007 was the first 13D TCI ever filed.  (Trial Tr. (Hohn Test. 187:3-7).)  Additionally, because TCI had never run a proxy contest in the United States, at all times they attempted to get a better understanding as to the rules and regulations surrounding it.  (Trial Tr. (Amin Test. 195:1-7).)  As such, TCI retained Schulte Roth & Zabel LLP and Proskauer Rose LLP very early in the process to provide assistance and advice with respect to U.S. disclosure laws.  (Trial Tr. (Hohn Test. 187:8-14).)

Throughout the period when TCI was building its economic exposure, TCI continued to develop a greater understanding of CSX's business.  (DX 145 (Amin ¶¶ 12, 19);

---

[2]    According to Mr. Hohn, front running is "if someone, an investor becomes aware that you are building or selling a position they may buy in advance of you or if you are buying and they believe you to be buying or short stock against you if they believe you are selling."  (DX 154 (Hohn Dep. 188:23-25, 189:1-2).)

DX 144 (Hohn ¶ 14).)  TCI attempted to engage in a dialogue with CSX about operational

opportunities for the Company.  (DX 145 (Amin ¶¶ 29-33); DX 144 (Hohn ¶¶ 18-19); PX 268

(Baggs ¶¶ 4, 6-8, 10); PX 267 (Munoz ¶¶ 4, 10, 11); PX 35 (Jan. 15, 2007 e-mail from Morgan

Stanley to CSX summarizing its conversation with TCI); PX 39 (Feb. 1, 2007 e-mail from

Morgan Stanley to CSX re: TCI).)  Yet, CSX was completely unresponsive to TCI's attempted

discourse.  (DX 145 (Amin ¶¶ 29-33); DX 144 (Hohn ¶¶ 18-19).)  CSX repeatedly denied TCI

the opportunity to meet with the President, Chief Executive Officer, and Chairman of the Board,

Michael Ward.  (DX 145 (Amin ¶¶ 17-20, 22, 29-33, 36); DX 144 (Hohn ¶¶ 18-19).)  CSX

consistently told TCI that Michael Ward was too busy to meet.

        From at or about the time TCI entered into its first Total Return Swap referencing

CSX, TCI made CSX aware that it had significant economic exposure to the Company and the

nature of that exposure.  (PX 268 (Baggs ¶ 3); PX 267 (Munoz ¶¶ 3-4); Trial Tr. (Munoz Test.

37:1-3).)  On November 14, 2006, at a Citigroup Transportation Conference in New York City,

Mr. Hohn alerted Mr. Munoz to the fact that TCI had a $500 million investment with respect to

CSX.  (DX 145 (Amin ¶ 20); PX 268 (Baggs ¶ 5); PX 267 (Munoz ¶ 4).)  Shortly after that

meeting, CSX's head of investor relations, David Baggs, questioned Mr. Amin as to the form of

TCI's investment in CSX.  (DX 145 (Amin ¶ 21); DX 268 (Baggs ¶ 6); Trial Tr. (Baggs Test.

63:8-18).)  Mr. Amin informed him that the investment was in the form of cash-settled swaps.

(*Id.*)  Mr. Amin explained cash-settled swaps to Mr. Baggs, letting him know that while these

derivative instruments gave TCI economic exposure to CSX, they were devoid of all other

characteristics that accompany physical ownership, including the right to vote.  (DX 145 (Amin

¶ 21).)

Despite TCI's disclosure that it had significant economic exposure to CSX, CSX denied TCI's repeated requests to meet with upper management throughout the fall of 2006 and winter of 2007. Instead, on January 22, 2007, TCI met with CSX's financial advisor, Morgan Stanley. (DX 145 (Amin ¶ 26); DX 268 (Baggs ¶¶ 8-9); PX 267 (Munoz ¶ 8).) As part of this meeting, TCI advised Morgan Stanley representatives that its substantial interest with respect to CSX was through cash-settled total return swaps without voting rights. (DX 145 (Amin ¶ 26); PX 35 (Jan. 15, 2007 e-mail from Walsh to Munoz stating he is going to find out "how long the contracts extend for and how the voting rights work" in the swap contracts).) Furthermore, TCI identified to CSX at least some of the bank counterparties to its Total Return Swaps. (DX 154 (Fitzsimmons Dep. 101:22-102:7).)

B.     TCI's Total Return Swaps

Between October 20, 2006 and April 2, 2007 (the "Initial Period"), TCI entered into Total Return Swap transactions with seven different banks: Citigroup Global Markets Limited ("Citigroup"), Credit Suisse Securities (Europe) Limited ("Credit Suisse"), Deutsche Bank AG ("Deutsche Bank"), Goldman Sachs International ("Goldman"), Merrill Lynch International ("Merrill Lynch"), Morgan Stanley & Co. International Limited ("Morgan Stanley"), and UBS AG ("UBS").[3] (DX 145 (Amin ¶ 16); Trial Tr. (Amin Test. 202:10-15); DX 154 (Amin Dep. 68:16-25, 82:5-7); DX 116-134 (TCI Total Return Swap agreements).) TCI initially used seven different banks to diversify the credit risk and to prevent other investors from determining tCI's swap acitivity, which might enable them to front run CSX stock.[4] (DX 145 (Amin ¶ 15).) By December 2007, JP Morgan was also a counterparty. (DX 145 (Amin ¶ 16);

---

[3]     The parties have stipulated that TCI's trading activity is accurately reflected in PX 206.

[4]     If TCI worked exclusively with one or two counterparties then any counterparty trading could be attributed to TCI. Knowing that TCI or its primary counterparty was building a position in a company would allow other traders and funds to purchase the stock before TCI had the opportunity, thus driving the price of the security higher. (DX 145 (Amin ¶ 15).)

Trial Tr. (Amin Test. 202:14-15).)  As of November 30, 2007, TCI held over 99% of its total

Return Swaps at Deutsche bank and Citigroup.  (PX 206.)

        Each Total Return Swap agreement is a private contract between TCI and a

counterparty bank pursuant to which TCI has taken a "synthetic position" with reference to CSX

common stock.  (DX 145 (Amin ¶ 6); DX 144 (Hohn ¶ 10); PX 270 (Miller ¶ 10); DX 152

(Arnone Dep. 41:23-42:11); DX 116-134 (TCI Total Return Swap agreements); DX 149

(Partnoy ¶ 24); PX 38 (Jan. 26, 2007 Morgan Stanley e-mail explaining the benefits of swap

agreements); PX 203 (June 2007 Morgan Stanley/Evercore presentation explaining the

mechanism of swap agreements).)  Under those contracts, TCI receives cash payments in an

amount equal to any dividend payments and increases in the price of CSX common stock, and

makes cash payments in an amount equal to any decreases in the price of CSX common stock,

over the time period during which the swap agreement is in effect.  (DX 145 (Amin ¶ 14); DX

144 (Hohn ¶ 10); PX 270 (Miller ¶ 10); PX 203 (Morgan Stanley/Evercore swaps presentation).)

In exchange, the swap counterparty receives a specified fixed or floating cash flow that is

unrelated to the ultimate performance of CSX common stock.  Thus, TCI has economic exposure

to the referenced shares. (PX 203 (Morgan Stanley/Evercore swaps presentation).)  TCI's Total

Return Swaps do not confer voting rights to TCI. (DX 150 (Partnoy Sur-Rebuttal ¶¶ 2, 24, 33,

36); DX 152 (Arnone Dep. 48:7-9); Trial Tr. (Miller Test. 76:1-4); PX 203 (Morgan

Stanley/Evercore swaps presentation.)  Additionally, there are no conversion rights by which

TCI could acquire any referenced security held as a hedge under the Total Return Swap

agreements.  (DX 144 (Hohn ¶ 12).)  TCI's Total Return Swaps could <u>only</u> be settled for cash.

(DX 154 (Bryson Dep. 252:15-21); DX 145 (Amin ¶¶ 6-7); DX 144 (Hohn ¶ 10).)

Although TCI's counterparties to the Total Return Swap agreements may purchase shares in CSX to hedge their risk, they are not required to do so. The agreements explicitly allow for the swap counterparties to enter into a number of different instruments, or not to hedge at all, in their sole discretion. The Total Return Swaps agreements do not require the swap counterparties to purchase common stock as a hedge. (DX 145 (Amin ¶ 8); DX 144 (Hohn ¶ 12); DX 152 (Arnone Dep. 9:5-8); DX 151 (Kennedy Dep. 41:13-42:4); DX 116-134 (TCI Total Return Swap agreements).) Under the terms of TCI's swap agreements, the acquisition of any CSX common stock (or, for that matter, any other asset) with which a counterparty bank chooses to hedge is in the sole discretion of the counterparty bank. (DX 145 (Amin ¶ 9); DX 151 (Kennedy Dep. 42:10-13), DX 149 (Partnoy ¶ 79); DX 95 (voting scenarios); PX 96 (same); PX 38 (Morgan Stanley e-mail explaining benefits of swaps).) Section 11.2(i) of the Deutsche Bank Portfolio Swaps Standard Term – Master Confirmation[5] and the 2002 ISDA Equity Derivatives Definitions,[6] incorporated into the confirmations of Morgan Stanley (DX 125) and

---

[5]     "The Counterparty [The Children's Investment Master Fund] acknowledges and agrees with DBL [Deutsche Bank AG, London] that:  DBL and its Affiliates may … (B) act for their own accounts in the same or similar instruments underlying Portfolio Swaps and take positions or enter into transactions regarding such instruments (including such trading as DBL and its Affiliates deem appropriate in their sole discretion to hedge market risk in any position whether between DBL and the Counterparty or with third parties), which positions or transactions may or may not be consistent with those taken with respect to Portfolio Swaps with the Counterparty and which may affect the value of Portfolio Swaps with the Counterparty." (DX 92 and 93.)

[6]     "Each party to a Transaction agrees and acknowledges that (i) when entering into, or continuing to maintain, such Transaction, neither party is relying on (A) the manner or method in which the other party or any of its Affiliates may establish, maintain, adjust or unwind its Hedge Positions, (B) any communication, whether written or oral, between the parties or any of their respective Affiliates with respect to any Hedging Activities of the other party or any of its Affiliates, or (C) any representation, warranty or statement being made by such party or any of its Affiliates as to whether, when, how or in what manner or method such party or any of its Affiliates may engage in any Hedging Activities and that *(ii)(A) each party and its Affiliates may, but are not obliged to, hedge any Transaction on a dynamic, static or portfolio basis, by holding a corresponding position in the securities or indices* referenced by or underlying such Transaction or in any other securities or indices or by entering into any Hedge Position; *(B) any Hedge Position established by either party or any of its Affiliates is a proprietary trading position and activity of such party or such Affiliate*; (C) each party or such Affiliate is not holding the Hedge Positions or engaging in the Hedging Activities on behalf or for the account of or as an agent or fiduciary for the other party, and *the other party will not have any direct economic or other interest in, or beneficial ownership of, the Hedge Positions or Hedging Activities*; and (D) the decisions to engage in Hedging Activities is in the sole discretion of each party, and each party and its Affiliates may commence or, once commenced, suspend or cease the Hedging Activities at any time as it may solely determine."  (DX 125 and 134.)  (emphasis added)

Merrill Lynch, (DX 134) provide examples of TCI's limited rights under the Total Return

Swaps.  They expressly disclaim any obligation by the counterparty to hedge, make clear that

any hedge constitutes a proprietary trading position and make clear that the other party has no

economic interest in, or beneficial ownership of, a hedge position.  (DX 116-134 (TCI Total

Return Swap agreements).)

        Richard Kennedy, the head of Citigroup's "Prime Swap" group, testified that the

decision about whether to hedge swaps and the manner in which it hedges the swaps rests in the

sole discretion of Citigroup.  (DX 151 (Kennedy Dep. 42:10-13).)  Kennedy also testified that

the hedge can take many different forms including option combinations, shorts or shares directly.

(DX 151 (Kennedy Dep. 39:11-21); *see also* Trial Tr. (Amin Test. 206:12-17); DX 149 (Partnoy

¶¶ 100, 104).)  Moreover, Mr. Kennedy explained that there are times when Citigroup chooses

not to hedge swap positions entirely, especially in situations of Total Return Swaps.  (DX 151

(Kennedy 39: 22-25).)  While TCI allowed for the possibility that its counterparties would

probably hedge its swaps, it never inquired into whether any of the counterparties were hedging

their swap exposure by buying physical shares.  (DX 145 (Amin ¶ 8).)  Even if they had, it is not

information that the counterparties would disclose to them because according to John Arnone,

head of the swap book at Deutsche Bank, "its none of their business."[7]  (DX 145 (Amin ¶ 8); DX

144 (Hohn ¶ 12); DX 149 (Partnoy ¶¶ 80, 85); Trial Tr. (Amin Test. 202:22-203:1, 206:4-5);

(DX 150 (Partnoy Sur-Rebuttal ¶¶ 37, 38, 52); DX 151 (Kennedy Dep.42:14-19);  DX 154

(Amin Dep. 77:3-19; Hohn Dep. 140:18-141:4, 158:17-159:23; Sunak Dep. 89:16-23, 91:18-22);

DX 152 (Arnone Dep. 14:7-11, 14:17-20, 15:2-8, 37:24-38:13).)

---

[7]     Likewise, CSX had its own swaps and had no idea whether its counterparties hedged those swaps. (Trial Tr. Munoz Test. 36:21-22.)

Neither TCI nor 3G had any formal or informal agreements, understandings or arrangements with any of their counterparty banks regarding voting or disposition of CSX shares.  (DX 145 (Amin ¶ 9); DX 144 (Hohn ¶ 13); DX 146 (Behring ¶ 57); DX 149 (Partnoy ¶ 9, 45-48, 50, 64); Trial Tr. (Amin Test. 219:5-9; Miller Test. 76:5-8); DX 152 (Arnone Dep. 43:8-20, 44:7-19, 46:15-19); DX 151 (Kennedy Dep. 36:9-14, 36:24-38:2); DX 42 (Morgan Stanley confirmation dated Sept. 12, 2007).)  Neither TCI nor 3G had the right to instruct their swap counterparties with respect to voting or directing the disposition of any CSX shares the swap counterparties may have beneficially owned.  (*Id*. and DX 149 (Partnoy ¶ 78 -79 (counter to market practice).)  It is uncontested that TCI's contracts with the swap counterparties <u>do not</u> confer beneficial ownership on TCI.  Furthermore, TCI never instructed or requested any of the swap counterparties to take any steps to possess or vote shares they may have acquired to hedge the swap agreements referencing CSX stock. (DX 145 (Amin ¶ 9); DX 144 (Hohn ¶ 13); Trial Tr. (Hohn Test. 177:8-11); DX 151 (Kennedy Dep. 22:18-23:3, 23:21-24, 36:15-23); DX 152 (Arnone Dep. 26:2-6).)

Moreover, neither TCI nor 3G had knowledge as to how, or if, the swap counterparties would vote any shares of CSX that the counterparties may have beneficially owned. (DX 145 (Amin ¶¶ 8-9); DX 144 (Hohn ¶¶ 12-13); DX 146 (Behring ¶ 59); Trial Tr. (Amin Test. 210:8-11, 219:20); (Hohn Test. 177:5-7, 177:12-14); DX 151 (Kennedy Dep 36:15-23); DX 152 (Arnone Dep. 14:7-11).)  Representatives from Deutsche Bank[8] and Citigroup testified that the practice of both banks – which they did not disclose to TCI – is not to vote

---

[8]    Deutsche Bank on occasion will vote its shares when it feels that an abstention is a vote for or against. In this scenario it will direct the registrar of voting to vote its shares in proportion to the overall vote. (DX 152 (Arnone Dep. 23: 6-9).)

shares that are held as hedge to a swap position.[9]  (DX 150 (Partnoy Sur-Rebuttal ¶ 52); DX 151 (Kennedy Dep. 19:19-20, 20:15:18, 35:21-36:8); DX 152 (Arnone Dep. 23:2-9, 33:5-18); DX 153 (Busby 26:10-17) DX 149 (Partnoy ¶¶ 49-52).)

Even if the counterparty hedges its swap position, it may not hold the shares at the firm because the counterparties have securities lending programs through which they lend out the shares to other institutions for a fee.  (DX 151 (Kennedy Dep. 21:18:-22:5); DX 152 (Arnone Dep. 39:23-40:15).)  Counterparties also pledge securities to prime brokerage firms as collateral.  (DX 153 (Busby Dep. 10:2-11:11).)  When the counterparty does not hold those shares on the record date for voting, it cannot vote those shares.  (DX 151 (Kennedy Dep. 21:18-22:5).)  It was not for any "control" purpose, in fact, because TCI was not a shareholder prior to April 3, 2007, it could neither make a proposal for or vote the 2007 Annual Shareholder Meeting.

C.    TCI's HSR Filing and Purchase of Common Stock

Despite the Company's knowledge of TCI's significant economic exposure to CSX through its Total Return Swaps, CSX refused to meet with TCI to discuss CSX's business, ostensibly because TCI was not a shareholder in CSX.  (DX 145 (Amin ¶ 34); DX 149 (Partnoy ¶ 38).)  Accordingly, TCI concluded that it would need to become a shareholder in CSX if it wanted to have a meaningful dialogue with the company.  (DX 145 (Amin ¶ 34); DX 144 (Hohn ¶ 19); DX 154 (Hohn Dep. 37:19-38:8).)

On March 2, 2007, TCI notified CSX that it had made a Hart-Scott-Rodino ("HSR") filing.  (DX 145 (Amin ¶ 34); DX 8 (notice of HSR filing dated Mar. 2, 2007).)  On March 8, Mr. Amin alerted Michael Ward and Oscar Munoz that they should have received TCI's notice of an HSR filling.  (DX 145 (Amin ¶ 35); DX 10 (letter from TCI to CSX dated

---

[9]    Additionally, according to Kennedy, if TCI had asked about whether Citigroup would vote matched CSX shares, Citigroup would have instructed them that "we won't vote these even if you call and ask us."  (DX 151 (Kennedy 23:14-5).)

Mar. 8, 2007).)  The letter stated that one reason for this filing was CSX's continued failure to allow TCI the opportunity to have an open dialogue with management, despite its full knowledge that TCI maintained significant economic exposure to CSX through derivative contracts.[10]  (*Id*.)

After TCI filed its HSR, Mr. Munoz, along with counsel, agreed to meet with TCI.  (DX 145 (Amin ¶ 36); PX 267 (Munoz ¶ 12); PX 269 (Fitzsimmons ¶ 11); PX 62 (letter setting up meeting between Munoz, Fitzsimmons and TCI).)  However, at this first meeting, Oscar Munoz, the Chief Financial Officer of CSX, stated that CSX was in "listen-only" mode and that it would not comment on anything that TCI said.  (DX 145 (Amin ¶ 36).)  TCI again disclosed that the majority of its exposure to CSX was still in cash-settled swaps, which lacked voting rights. (*Id*.)

On April 3, 2007, following the expiration of the HSR waiting period, TCI began purchasing physical common stock on the open market.  (DX 145 (Amin ¶ 37); DX 144 (Hohn ¶ 21); Trial Tr. (Hohn Test. 164:21-23); DX 154 (Sunak Dep. 39:21-40:5); PX 206 (List of Known Swap and Stock Transactions).)  In an effort to maintain a roughly consistent economic exposure to CSX, TCI also unwound its swap positions.  (DX 145 (Amin ¶ 37); DX 144 (Hohn ¶ 21); Trial Tr. (Hohn Test. 164:21-23, 165:13-20); DX 154 (Amin Dep. 68:22-25, 70:6-8); PX 206 (List of Known Swap and Stock Transactions).)  At no time did TCI purchase CSX shares directly from any of its swap counterparties.  (DX 145 (Amin ¶ 38); PX 206 (List of Known Swap and Stock Transactions); DX 105 (TCI's Terminated Swap Agreements and Physical Share Purchases).)  TCI did not use the same financial institution to both unwind swaps and purchase stock.  (*Id*.)  TCI purchased every single share of CSX common stock on the open market, and did so with its general working capital.  (*Id*.)

---

[10]    According to the letter, TCI was "concerned that since January [CSX] has been unwilling to have an open dialogue with [TCI], despite [TCI's] repeated requests to do so." (DX 10.)

April and May 2007 are the only two months in which TCI purchased CSX stock. (PX 206.)  By May 14, 2007, TCI accumulated physical common stock equal to approximately 4.1% of CSX's then outstanding shares. (DX 145 (Amin ¶ 38); DX 105 (TCI's Terminated Swap Agreements and Physical Share Purchases).)

As set forth below, 3G's trading in CSX differed significantly from TCI's trading. For example, 3G began to purchase stock in CSX as of February 2007 and purchased in blocks long after TCI had completed the bulk of its investing through gradual increases in economic exposure.  (PX 206 (List of Known Swap and Stock Transactions).)  Also, between August 23 and September 14, 2007, in fifteen separate trades 3G sold over 7.5 million shares, or 38%, of its entire CSX portfolio; while, TCI's position remained virtually untouched with the exception of two trades in August 2007.  (*Id*.)

D.    *Early Disclosures of TCI's Investment in CSX.*

TCI's investment in CSX, including its Total Return Swaps, was further disclosed to the SEC, CSX, and the market.  First, on April 18, 2007, in its 10-Q for the first quarter 2007, CSX disclosed that TCI filed an HSR with respect to CSX and that TCI held "a significant economic position through common stock ownership and *derivative contracts* tied to the value of CSX stock."[11]  (emphasis added) (Trial Tr. (Munoz Test. 37:4-19, Hohn Test. 164:5-20, Behring Test. 152:3-14); DX 114 (CSX form 10-Q for the quarter ending Mar. 30, 2007).)

Three weeks later, on May 8, 2007, at a Bear Stearns Conference, Mr. Amin publicly spoke about TCI's investment in CSX, its investment thesis with respect to CSX, and its over $1 billion investment in the U.S. rail industry, the vast majority of which was invested in

---

[11]    CSX had discussed in at least two Board Meetings its plan to disclose TCI's interest in the company to the public markets in its Q1 10-Q.  (PX 5 (CSX Finance Committee Meeting Minutes dated Apr. 13, 2007); PX 6 (CSX Special Board Meeting Minutes dated Apr. 16, 2007).)

CSX.  (PX 96 at 10; DX 145 (Amin ¶ 39); DX 144 (Baggs ¶ 18); Trial Tr. (Behring Test. 114:4-14; Hohn Test. 169:6-13).)

TCI filed the first of four 13Fs on May 15, 2007, in which it disclosed that it had 17,796,998 shares of CSX stock.[12]  (Godnick Decl. Ex. 17.)  Since that time its position in CSX stock has not changed. [13]  Thus, no later than May 15, 2007, it was a matter of public record that TCI held almost 18 million shares of CSX common stock, and had a "significant" economic exposure to CSX through derivative instruments.  That equity/swap position has remained virtually unchanged since May 14, 2007.[14]

TCI also disclosed to CSX's advisors, Evercore Partners and Morgan Stanley, the nature of its investment.  In addition to the January 22, 2007 meeting with Morgan Stanley described on page 12 *supra*, on June 20, 2007; TCI representatives met or spoke with CSX's advisors from Evercore Partners on a number of occasions.  (DX 145 (Amin ¶ 42); DX 144 (Hohn ¶ 27); DX 154 (Sunak Dep. 37:10-17); PX 108 (Evercore Partners Notes re:  meeting with TCI).)  TCI told Evercore that it directly owned 4% of CSX's common stock and had additional economic exposure to the equivalent of over 10% of CSX shares outstanding through swaps.  (PX 108 (according to bullet point 7, "TCI confirmed that they still own 4% in physical shares and over 10% in swaps").)  Evercore relayed this information to CSX.  (*Id*.)  In short, at no time did TCI attempt to conceal from CSX its economic exposure to CSX through Total Return Swaps.

---

[12]     On November 30, 2007, TCI transferred 10,000 shares from its holdings at UBS to Goldman Sachs.  (PX 206.)  This transfer was done for purposes related to record ownership and did not impact TCI's total holding of physical shares.

[13]     TCI also filed 13Fs with the SEC on August 14, 2007, November 14, 2007, February 14, 2008, and May 15, 2008 disclosing its stock position in CSX.  (Godnick Decl. Exs. 20, 21, 25, 26.)

[14]     On August 23 and 31, TCI reduced its overall swap position by 4.07%, but has held consistently since August 31 without change.

E.     *TCI Consolidates its Swap Positions*

During the latter half of 2007, TCI became increasingly concerned with the stability of investment banks as a result of the U.S. financial industry credit crisis.  (DX 145 (Amin ¶¶ 45-46); DX 144 (Hohn ¶ 28); Trial Tr. (Amin Test. 195:17-19).)  Initially, during the summer of 2007 TCI sought parent company guarantees from its counterparties in the event of insolvency.  (PX 19 (TCI Board Meeting Minutes dated July 19, 2007).)  Later, beginning on November 12, 2007, TCI reduced its credit exposure to certain investment banks by terminating its Total Return Swaps with certain "broker-dealer" counterparties and entering into Total Return Swaps with counterparties whose credit was backed by central banks, specifically Deutsche Bank and Citigroup.  (DX 145 (Amin ¶¶ 45-46); DX 144 (Hohn ¶ 30); DX 154 (Amin Dep. 73:16-74:8, Hohn Dep. 152:24-154:3).)  The move was part of a firm-wide move of nearly all swaps to commercial banks.  (Trial Tr. (Hohn Test. 183:4-17).)

An additional reason for moving swaps positions to Deutsche Bank was that TCI was aware that Deutsche Bank's London-based proprietary hedge fund, Austin Friars, was invested in CSX. [15]  (Trial Tr. (Hohn Test. 178:18-179:6).)  Mr. Hohn hoped that if Austin Friars concluded that voting for the TCI/3G slate was in the economic best interest of Deutsche Bank, and if the swaps desk was inclined to vote its CSX shares held as a hedge, it too would conclude that voting for the TCI/3G slate was in Deutsche Bank's best interests.  (Trial Tr. (Amin Test. 218:8-16).)

TCI maintained swaps on 1,000 shares with six remaining counterparties in an effort to not allow other investors to identify where TCI's Total Return Swaps were held to reduce the risk of other investors free riding and front running TCI's trading. (DX 144 (Hohn ¶

---

[15]     Neither John Arnone, Deutsche Bank's Director of the North American Structured Finance Desk, nor Paul Busby, Co-Head of Deutsche Bank's Securities Lending Department within the Global Markets Equity, were familiar with Austin Friars.  (DX 152 (Arnone Dep. 17:8-12; DX 153 (Busby Dep. 27:9-11).)

30); Trial Tr. (Amin Test. 204:21-23).)[16] As of the end of 2007, TCI's Total Return Swaps, which were now primarily held at Deutsche Bank and Citigroup, referenced shares representing the equivalent of 11.04% of CSX's total outstanding value. (*Id.*; DX 144 (Hohn ¶ 42); DX 154 (Hohn Dep. 152:24-153:3).)

On October 16, 2007, TCI issued a press release attaching a public letter to the Board of Directors of CSX disclosing that TCI owned 17.8 million shares or 4.1% of CSX common stock. (PX 140 (letter from TCI to CSX dated Oct. 16, 2007); DX 145 (Amin ¶ 50).)

F.    *3G's Investment in CSX*

As set forth below, 3G made its own investment decisions based upon its own extraordinarily thorough and extensive research and analysis into the North American rail industry and its views about the larger U.S. economy. Although 3G conferred with various industry participants in conducting its research, and, on occasion, shared views and analysis of CSX with other investors including TCI (*e.g.*, Trial Tr. (Behring Test. 116, 119, 131), the recod evidence overwhelmingly demonstrates that 3G acted independently with respect to its investment in CSX until December 12, 2007, when it formed a group with TCI.

1.    3G's Initial Investment Decision

3G's interest in investing in the rail industry in general, and in CSX in particular, grew naturally out of the prior work experience of 3G's managing director, Alex Behring. (*See* DX 146 (Behring ¶ 2).) From 1998 to 2004, Mr. Behring served as the Chief Executive Officer of America Latina Logistica ("ALL"), Latin America's largest independent railroad and logistics company. (DX 146 (Behring ¶ 8).) Mr. Behring's direct participation in rail operations

---

[16]    Mr. Amin testified at trial that it was important that TCI maintained a nominal swap position in the six remaining broker-dealer counterparties to avoid the risk of front-running. (Trial Tr. (Amin. Test. 204:15-205:12); DX 154 (Amin Dep. 74:9-75:22).) If other investors became aware that TCI maintained most of swap positions at one or two banks, every time such banks traded, investors could presumably identify whether TCI was increasing or decreasing its position, and then try to front-run TCI accordingly. (*Id.*)

(including personally operating ALL's trains throughout Brazil and Argentina) contributed to his ability to oversee substantial improvements in technology, safety, and EBITDA margins at ALL. (DX 146 (Behring ¶¶ 9 & 10).)

Over the years, Mr. Behring's ongoing contact with rail industry participants, including customers, gave him insight into the changing balance of supply and demand for North American railroads. (DX 146 (Behring ¶ 15).) As a result, Mr. Behring came to be impressed with the potential for the railroad companies in North America. (DX 146 (Behring ¶ 15).) 3G analyzed the investment potential of various railroads intermittently in 2005 and 2006, and in late 2006/early 2007, began to focus on CSX as having the most investment potential. (DX 146 (Behring ¶ 19).)

As part of its extensive due diligence, 3G prepared detailed analyses of financial, operational and valuation data for CSX and the other major U.S. railroads prior to making its initial investment in CSX. (*See, e.g.,* DX 110 (examples of spreadsheet analyses created prior to February 9, 2007); DX 146 (Behring ¶ 21, 42).) On or about February 9, 2007, 3G made its initial investment in CSX by purchasing 1.7 million shares on the open market, based on its view that CSX was undervalued and had substantial upside potential from increasing revenue and operational improvements. (DX 146 (Behring ¶¶ 20, 22); JX 12 at Annex A.)[17]

     2.    <u>3G Continues to Conduct Extensive Diligence as it Builds Its Position.</u>

3G researched, analyzed and tested its investment thesis in CSX continuously thereafter as it continued to build its position. (DX 146 (Behring ¶ 24).) In February and March 2007, 3G purchased over 9.4 million shares in CSX. (*See* JX 12 at Annex A.) In March of 2007, 3G completed a detailed, 92 page analysis of the investment potential of CSX, called the "US

---

[17] All of 3G's stock was acquired with working capital. 9DX 146 (Behring ¶ 23).)

Railroads Investment Discussion."  (DX 146 (Behring ¶¶ 24 & 25); DX 6.)  3G summarized its investment thesis in four key points:  (1) the potential for sustainable pricing power; (2) CSX's current relatively low share price; (3) the potential for substantial earnings growth from slight improvement in operations; and (4) the potential for share-buy backs by increasing leverage. (DX 6 at 3GC00003189.)

The "Investment Discussion" reflects the enormous amount of financial analysis and industry research that 3G performed with respect to the U.S. rail industry and its CSX investment through March of 2007.  (DX 6.)  For example, the "Investment Discussion" provides granular analysis of, among other things, structural changes in the rail industry (including historical under-investment, the effects of deregulation, the prospect for re-pricing and future industry growth), valuation (including consensus, historical, and discount to replacement-value models), and industry operations (including operating ratio trends, breakdown of volume growth, velocity, dwell time, on-time origination and on-time destination data, accidents per million train miles, efficiency, and the unionized nature of the industry).  (DX 6, *passim.*)

The "Investment Discussion" also contains a detailed discussion of 3G's case for investing in CSX, including the company profile and history, its income statement and balance sheet, the management team, management ownership and incentives.  (DX 6 at 3GC 00003187–3223.)  In its discussion of management, 3G noted hopefully that CSX's CEO was "aggressive"; that its CFO was the "only 'non-railroad' CFO in the industry" and who "might be willing to part with industry norms (low debt) coming from a highly levered industry (Telecom)." (*Id.*)  3G also noted that CSX's COO was "recruited from NSC, was known to be a good operator" and "helped improve [the] operating ratio at NSC" substantially over four years.  (DX 6 at 3GC 00003227.)

The "Investment Discussion" sets forth 3G's analysis of the investment potential for CSX under three different possible scenarios, namely, a base case (consensus); an operational improvement case; and a re-leverage case. (DX 6 at 3GC 00003231–3235.) 3G set forth additional analysis and back-up data in a detailed Appendix to the "Investment Discussion." (DX-6 at 3GC 00003257.) The Appendix reflects the fact that 3G foresaw the potential for investor activism at all of the major U.S. railroads. (*See* DX 6 at 3GC 00003271) ("lack of staggered Boards means investor activism at upcoming AGM's is possible").) Indeed, 3G noted the dates for upcoming board elections for all of the major U.S. railroads. (DX 6 at 3GC 00003272.) (*See also* DX 2, DX 3, DX 4 (additional spreadsheets and notes reflecting 3G's research on CSX investment in February and March 2007).)

On the strength of that exhaustive research and the opportunity that 3G saw in its CSX investment, 3G continued to increase its stake in CSX, acquiring an additional approximately 10.4 million shares between April 2 and April 17, 2007. (DX 146 (Behring ¶¶ 24, 25); JX 12 at Annex A.) 3G maintained its investment at that level through June, July and up to mid-August 2007. (JX 12 at Annex A.) 3G also continued its ongoing research and analysis of CSX, including completing a study of potential productivity improvement opportunities at CSX in April (DX 14) and other analyses. (*See, e.g.,* DX 2 (various spreadsheet analyses post-February 9, 2007).)

### 3. 3G's Evaluation of CSX in The Summer of 2007.

In May 2007, 3G noted in a memo to its investors that, in its 10-Q filing, CSX disclosed that TCI had made an HSR filing and held a substantial derivative position in CSX stock. (DX 23.) 3G also noted that TCI had been an activist investor in the past. (*Id.*) 3G discussed signs of "deceleration in the American economy." (*Id.*)

As part of 3G's continuing diligence on its investment, 3G pursued a meeting with CSX management.  (DX-11, DX 146 (Behring ¶¶ 27-32).)  In order to verify that it was a large investor in CSX, on May 25, 2007, 3G caused its broker, Morgan Stanley, to send CSX a letter confirming that it owned approximately 19.4 million shares in CSX.  (DX 30.)  Thus, 3G disclosed its investment to CSX despite the fact that it was below 5% of shares outstanding and did not trigger Rule 13D disclosures.

In its monthly investor letter for June, 3G noted frustration with CSX's approach to capital improvements (3G believed capacity could be expanded by running a more efficient railroad rather than just by capital spending) and CSX's lack of aggressiveness in pursuing operational improvements.  (DX 32.)  3G noted TCI's public criticism of CSX at the May 8, 2007 investor conference, and the lack of clarity as to "what [TCI's] next move would be."  (*Id*.)  In addition, 3G noticed that another hedge fund, Atticus Capital, increased its stake in CSX and that activist Carl Icahn disclosed a stake in CSX.  (*Id*.)

    4.  <u>3G Files an HSR Notice.</u>

3G began to debate internally its options with respect to CSX at around this time. After consulting with counsel, 3G decided to file an HSR notice.  (DX 146 (Behring ¶ 36; DX 33).)  3G told CSX representatives about the HSR filing at a meeting in New York in mid-June 2007.  (DX 146 (Behring ¶ 37.)  Subsequently, 3G met with CSX senior management in Jacksonville, although CSX truncated the meeting in response to 3G's HSR filing.  (DX 146 (Behring ¶ 37.)  At the meeting 3G was disappointed with CSX's lack of urgency to improve operations.  (DX 146 (Behring ¶¶ 41-42); DX 35 (notes of meeting); DX 37 (investor letter noting disappointment).)  3G's diligence on CSX continued throughout the summer of 2007. (*E.g.,* DX 39 and DX 40.)

5.    3G's Use of Total Return Equity Swaps.

On August 16, 2007, 3G purchased Total Return Equity Swaps referencing 1.7 million shares of CSX.  (DX 107; DX 146 (Behring ¶¶ 54–59).)  3G purchased swaps for a variety of reasons, including lower costs and better terms.  (DX 146 (Behring ¶¶ 54,55).)  3G's total exposure to CSX, including both direct ownership of stock and economic exposure through swaps, was below 5% of shares outstanding up until December 12, 2007 when it formed a group with TCI.  (Id. at ¶ 56.)  3G had no understandings or arrangements regarding the voting of any shares that its counterparty Morgan Stanley – which also serves as CSX's strategic advisor in this proxy contest – may have purchased to hedge those swaps.  (Id. at ¶¶ 57 – 59.)[18]

6.    3G Sells A Portion of Its Stake In the Face of Economic Uncertainty.

By August 24, 2007, 3G's concerns about the overall U.S. economic outlook grew, and as a result, 3G began reducing its investment in CSX.  (Trial Tr. (Behring Test. 107); JX 12, Annex A); (DX 43 (monthly investor letter noting that"[t]he railroads continue to be hit with a perfect storm – high coal inventories at utilities, a weak housing market, and general softness in the economy").)  At CSX's annual investor conference on September 6, 2007 in New York, 3G was again disappointed with CSX's management's lack of initiative, (DX 146 (Behring ¶ 44); DX 37), and continued selling shares.  Indeed, between August 24 and September 14, 2007, 3G sold over 8 million CSX shares as CSX's share price dropped from $43.07 to $38.37.  (JX 12, Annex A.)

7.    3G Rebuilds Its Position.

By September 26, 2007, 3G gained comfort that the economy had stabilized and that 3G had entered into appropriate hedges across the U.S. economy.  (Trial Tr. (Behring Test.

---

[18]    Separate from its Total Return Swaps referencing CSX shares, 3G also on several occasions purchased Credit Default Swaps ("CDS") referencing CSX debt.  (Trial Tr. 96; PX 274.)  3G purchased the CDS's as a hedge against events that might increase CSX's risk of default.  (See Trial Tr. (Behring Test. 96).)

126-127).)  3G was also buoyed by Warren Buffet's decision to increase his stake in Burlington

Northern and to file an HSR with respect to that railroad, which, as it told its investors in a

monthly letter, 3G viewed as a "strong vote of confidence in the railroad industry."  (DX 43.)

3G began rebuilding its position in CSX through November 2007 through stock purchases and

Total Return Swaps, although 3G's combined exposure always remained below 5%.  (JX 12,

Annex A; DX 107.)  During that time, CSX's stock price rose from $38.37 to $43.84 per share.

Thus, as a result of its concerns about the U.S. economy, 3G sold at a lower price and was forced

to rebuild its position at higher price, resulting in a substantial loss from that trading activity.

       *G.*      *TCI and 3G File a 13D.*

          1.    <u>TCI and 3G Did Not Form a "Group" Until</u>
                <u>December 12, 2007.</u>

       TCI and 3G did not reach an agreement to act together with respect to the

disposition of CSX securities until December 12, 2007.  (JX 8 (TCI and 3G Schedule 13D dated

Dec. 19, 2007); (DX 65 (Agreement to form group between TCI and 3G dated Dec. 12, 2007);

(DX 145 (Amin ¶ 60); Trial Tr. (Hohn 184: 3-4).)  On December 19, 2007, TCI together with 3G

filed a Schedule 13D with the SEC that disclosed that TCI and 3G had formed a group with

beneficial ownership exceeding 5% and, as part of the filing, disclosed that TCI had total return

swap agreements with eight credit counterparties.  (JX 8 (TCI and 3G Schedule 13D dated Dec.

19, 2007).)  TCI's Total Return Swaps were accurately described as giving TCI economic

exposure to approximately 11% of the total outstanding shares in CSX, but without entitling TCI

to direct or indirect voting, investment or dispositive control over any CSX securities.  (*Id*. at 17;

DX 144 (Hohn ¶ 42).)  TCI and 3G had a minority slate of only five nominees, of which only

one is affiliated with TCI.  (DX 145 (Amin ¶ 60).)

2.     The Schedule 13D and the January 8, 2008 Notice

As disclosed in the December 19, 2007 Schedule 13D filed with the SEC, TCI and 3G first formed a group on December 12, 2007 (the facts and circumstances leading to the formation of a group as discussed below at pp. 57-73).  (JX 8 (TCI and 3G Schedule 13D dated Dec. 19, 2007); DX 65 (Agreement to form group between TCI and 3G dated December 12, 2007); DX 146 (Behring ¶ 50); DX 144 (Hohn ¶¶ 41-42).)  At no point prior to that date did either 3G or TCI agree to act with others or with each other in connection with the purchase, holding, disposition, or voting of CSX stock.  (DX 145 (Amin ¶ 60); Trial Tr. (Hohn 184: 3-4).)

The 13D disclosed that TCI and 3G's beneficial ownership exceeded 5% and, as part of the filing, disclosed that TCI had total return swap agreements with eight credit counterparties.  (JX 8 (TCI and 3G Schedule 13D dated Dec. 19, 2007).)  TCI disclosed and disclaimed beneficial ownership of TCI's Total Return Swaps.  The Total Return Swaps were accurately described as giving TCI economic exposure to approximately 11% of the total outstanding shares in CSX.  (*Id*. at 17; DX 144 (Hohn ¶ 42).)

In addition, since the 13D filing, over four months before the originally scheduled shareholders' meeting and almost four months before the new record date, Defendants' exact economic exposure to CSX has been extensively disclosed publicly.  (DX 149 (Partnoy ¶ 36) (fact of an earlier filing would be irrelevant roughly five months after the original 13D was filed).)  Over 30 publications, ranging from newspaper articles, AP reports and trade newsletters, have put forward Defendants' percentage of shares beneficially owned and amount of economic exposure held through swaps.  *See, e.g.,* Travis Reed, "Investors Partner to Nominate Minority Slate to CSX Board," *Associated Press*, December 19, 2007; Michael J. de la Merced, "Hedge Funds Propose CSX Directors, Starting Proxy Battle," *New York Times*, December 20, 2007; "CSX, TCI Dig In," *Traffic World*, January 7, 2008.  (*See* Godnick Decl. Exs. 22, 24 and 28.)

30

Furthermore, on January 8, 2008, TCI submitted to CSX its notice pursuant to Article I, Section 11 and Article II, Section 2(b) of the Amended and Restated Bylaws of the Corporation (the "Notice").  (DX 145 (Amin ¶ 62); DX 72 (Jan. 8, 2008 letter to CSX from TCI); JX 30 (CSX Bylaws as of Feb. 4, 2008).)  In the notice, the TCI Group again disclosed beneficial ownership of 35,054,952 shares.  "Such beneficial ownership represents, in the aggregate, approximately 8.3% of the voting common stock of the Corporation."  (DX 72 at 2.)  The January 8 notice also included director nominee questionnaires completed by Defendants Hohn and Behring, in which they respectively disclosed, in response to a question about their ownership of derivative instruments "the value of or return on which is based on or linked to the value of" CSX shares, that TCI had Total Return Swaps referencing 46,401,000 shares at an average exposure price of €29.07 and that 3G had Total Return Swaps referencing 3,280,000 shares of CSX at an average exposure price of $43.72.  (DX 72 at 21-22 of Hohn's Director Nominee Questionnaire.)

TCI and 3G's January 8 notice requested that CSX inform TCI and 3G of any alleged deficiencies in the Notice.  (DX 72 (Jan. 8, 2008 letter to CSX from TCI).)  On January 15, 2008, Ellen Fitzsimmons, the CSX Corporate Secretary, responded to TCI's counsel acknowledging receipt of TCI's January 8 notice letter.  (DX 145 (Amin ¶ 63); PX 269 (Fitzsimmons ¶ 16); DX 68 (letter from CSX to TCI counsel dated Jan. 15, 200[8]).).  The Response letter only challenged TCI's right to name alternate nominees after February 2, 2008[19] and requested copies of the nominee agreements.  (PX 269 (Fitzsimmons ¶ 18); DX 68 (letter from TCI counsel to CSX dated Jan. 16, 2008).)  Fitzsimmons' reply was silent as to any concerns relating to TCI's and 3G's Total Return Swaps and TCI's and 3G's Schedule 13D

---

[19]      The letter stated "In the Notice, TCI purports to reserve the right to nominate 'alternate nominees' if a Nominee is unable to stand for election. Pursuant to Article I Section 11(a)(ii) of the Company's Bylaws, no such nomination of  'alternate nominees' is permitted after February 2, 2008."

31

disclosures. Subsequently, on January 16, 2008, counsel for TCI sent a letter to Ms. Fitzsimmons' stating "the Response Letter does not reference any deficiency with regard to the [January 8] Notice and therefore we deem the Corporation's response to be an acknowledgment that advance notice has been properly given under Section 11(a)(ii) of the Bylaws of the Corporation." (DX 145 (Amin ¶ 64); DX 74.) TCI received no response to that letter and CSX did not identify any purported deficiencies in the January 8 Notice until the subsequent filing of this lawsuit. (DX 145 (Amin ¶ 64); PX 269 (Fitzsimmons ¶ 18).)

  *H.*  *Moving the Record Date*

    The original record date for the May 7, 2008 Shareholder Meeting was February 27, 2008. (PX 264 (Ward ¶ 25).) CSX, knowing that TCI and 3G had the support they needed to elect its nominees at the upcoming meeting, moved the meeting date to June 25, 2008 and the record date to April 21, 2008 and filed this complaint. (PX 264 (Ward ¶¶ 27, 29); PX 269 (Fitzsimmons ¶ 21); Trial Tr. (Miller Test. 79:6-22); (*See* DX 154 (Bryson Dep. 240:9-241:5) (noting that the record date was changed "based on this change in the shareholder base prior to the previous record date in February…."). CSX moved the date based solely on the unfounded suspicion that certain transfers of CSX stock into the various counterparty banks reflected a transfer of shares (and related voting rights) with which those counterparties had hedged the TCI swaps. (PX 264 (Ward ¶ 26); PX 269 (Fitzsimmons ¶ 19); PX 270 (Miller ¶ 16).) Further, Plaintiff surmised that the swap counterparties would vote those shares in favor of the slate of nominees proposed by TCI and 3G. (Trial Tr. (Miller Test. 76:1-78:24); PX 269 (Fitzsimmons ¶ 19, 20); PX 270 (Miller ¶ 23, 24, 29).)

    There was no evidence that the share movement around the record date was for reason of a recall in the stock. (DX 153 (Busby Dep. 24:3-8); DX 149 (Partnoy ¶ 71, 73, 75 (several explanations for the stock movement).) In fact, according to Mr. Busby, the co-head of

the securities lending department at Deutsche Bank, no one at Deutsche Bank requested a recall

of the stock.  (DX 153 (Busby Dep. 24:9-12); (DX 150 (Partnoy Sur-Rebuttal ¶ 17).)  Deutsche

Bank's records confirm that there was no recall.  As Deutsche Bank's counsel confirmed:  (1)

Deutsche Bank keeps records of any stock recalled at Deutsche Banks' request, (2) in response to

Plaintiff's subpoena, Deutsche Bank reviewed the recall records of the two-week period

preceding the February 27, 2008 record date, and (3) found no records of any recall by Deutsche

Bank of CSX shares during that period.

   The movement of CSX shares during the weeks prior to February 27, 2008, while

substantial, was not out of line with CSX share movements that have occurred previously.  (DX

147 (Harkins ¶ 8); *see also* DX 153 (Partnoy ¶ 52) (no evidence as to whether the counterparties

would vote), 54-56, 60-61).)  Further, any return of stock during the two-week period prior to the

record date likely had to do with the fact that the record date for the payment of dividends was

near the record date for voting.  (DX 152 (Arnone Dep. 54:16-58:16).)  As Mr. Miller, Plaintiff's

proxy solicitor confirmed, the dividend dates can account for a substantial return of shares.

(Trial Tr. (Miller Test. 83:12-84:12).)

## ARGUMENT

### I. DEFENDANTS DID NOT VIOLATE SECTION 13(D).

#### A. Defendants Could Not Have Had Beneficial Ownership Of Any CSX Shares Held By Their Cash-Settled Total Return Equity Swap Counterparties Under Current Law Absent Some Actual Agreement, Arrangement, Or Understanding With Respect To The Voting Or Disposition Of Shares Of CSX.

   Pursuant to Section 13(d) of the Exchange Act, any person who, directly or

indirectly, acquires "beneficial ownership" of more than 5 percent of certain classes of "equity

security" is required to file appropriate disclosures with the SEC within ten days of the

acquisition.  15 U.S.C. § 78m (d)(1).  Section 13(d), which was enacted as part of the Williams

Act, was intended to provide an issuer and investors with information regarding certain acquisitions of the issuer's equity securities for the purpose of acquiring control of the issuer. *See* Filing & Disclosure Requirements Relating to Beneficial Ownership, 43 Fed. Reg. 18484 (Apr. 28, 1978) (citing S. Rep. No. 90-550 (1968); H.R. Rep. 90-1711 (1968) (Section 13(d) "was intended to provide information to the public and the affected issuer about rapid accumulations of its equity securities in the hands of persons who would then have the potential to change or influence control of the issuer."); Comment, *Section 13(d) and Disclosure of Corporate Equity Ownership*, 119 U. Pa. L. Rev. 853, 862-63 (1971) (Section 13(d)7 "was not designed to negate the normal inflationary market impact of rapid, large-scale purchases.") (Godnick Decl. Ex. 1). In addition, the proponents of the Williams Act took extreme care to "avoid[] tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid." H.R. Rep. No. 90-1711, at 2814. Thus, courts have rebuffed efforts by management to use Section 13(d) as a sword to entrench management rather than a shield to protect investors. *See Treadway Cos. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir. 1980) (In enacting Section 13(d), "Congress expressly disclaimed an intention to provide a weapon for management to . . . prevent large accumulations of stock . . . .") (quoting *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S. Ct. 2069, 2076 (1975)).

        Existing law and regulations are clear that a person may acquire a large economic interest in an issuer without triggering any disclosure requirements under Section 13(d). It is only after a person acquires five percent or more of an issuer's equity securities that can be voted – and that accordingly can be used to gain control of the issuer – that the disclosure requirements of Section 13(d) apply. Specifically, the SEC defines the type of equity securities that trigger reporting requirements to exclude non-voting securities. 17 C.F.R. § 240.13d-1(h)(i); *see* Filing

and Disclosure Requirement Relating to Beneficial Ownership, Exchange Act Release No. 15348 (Nov. 22, 1978) (excluding all non-voting securities is "an appropriate expression of the Congressional purpose underlying the Williams Act . . . such securities do not carry with them the potential to change or influence control of the issuer."). (Godnick Decl. Ex. 6.) In addition to the SEC's exclusion of non-voting securities from reporting requirements, the Exchange Act was amended in 2002 to exclude equity swaps – such as the cash-settled Total Return Swaps that TCI entered into – from the definition of equity securities. 15 U.S.C. § 78c-1(a).[20] The fact that Congress excluded swap agreements from the Exchange Act strongly suggests that swap agreements, in and of themselves, cannot trigger the filing requirements of Section 13(d), and cannot (without more) confer beneficial ownership under Rule 13d-3.

### B.     The Defendants Were Not The Beneficial Owner of The Shares That Their Respective Counterparties Purchased as a Hedge.

Under Rule 13d-3(a), beneficial ownership is defined in terms of "(1) [v]oting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) [i]nvestment power which includes the power to dispose, or to direct the disposition, of such security." 17 C.F.R. § 240.13d-3(a). The SEC has issued interpretive guidance in an analogous circumstance stating explicitly that cash settlement does not give rise to beneficial ownership. According to the SEC, "[a] purchaser of a cash-settled security future . . . would not count the equity securities underlying the contract for purposes of determining whether he or she is subject to the Regulation 13D reporting requirements, because he or she does not have the right to acquire beneficial ownership of the underlying security." Commission Guidance on the

---

[20]     Legislative history of this amendment reflects that Congress sought to "make[] it clear that the SEC is not to impose regulations on [security-based swap agreements] as prophylactic measures. Banks are already heavily regulated institutions. Further regulatory burden, rather than discouraging wrongdoing, would be more likely to discourage development and innovation . . . ." 146 Cong. Rec. S11855, S11867 (daily ed. Dec. 15, 2000) (statement of Sen. Gramm); *see also* 146 Cong. Rec. H12442, HH12498 (daily ed. Dec. 15, 2000) ("'[S]ecurity based swap agreements' are not securities, and the SEC is prohibited from regulating them as such.") (statement of Rep. Leach).

Application of Certain Provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and Rules thereunder to Trading in Security Futures Products, Securities Act Release No. 8107, Exchange Act Release No. 46101 (June 21, 2002).[21]  The key factor in the SEC's guidance is that the instruments are cash-settled.  (*See* DX 149 (Partnoy Rebuttal Report ¶¶ 12, 25); DX 150 (Partnoy Sur-Rebuttal Report ¶¶ 23-24).)

This interpretation is consistent with the generally accepted understanding of how cash-settled swaps operate in the market.   *See* Henry T.C. Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership: Taxonomy, Implications and Reforms*, 61 Bus. Law. 1011, 1041-42 (2006) (reporting that "[p]ractitioners at law firms prominent in the OTC derivatives market have stated that in their view, disclosure of cash-settled equity swaps is normally not required" (citing to partners at Allen & Overy and Cleary Gottlieb Steen & Hamilton LLP)) (Godnick Decl. Ex. 13); Posting of Alan Dye, http://www.section16.net/QA/?ForumId=2661 (Nov. 14, 2006 3:20 EST) (advising that "the holder [of a cash-settled total return swap] would not be deemed to own the notional shares if (i) the swap may be settled only in cash, and the holder may not force the counterparty to deliver stock instead and (ii) the holder does not have an arrangement or understanding with the counterparty regarding the voting or disposition of actual shares the counterparty my [sic] acquire to hedge its position") (Godnick Decl. Ex. 15); Arnold S. Jacobs, The Williams Act – Tender Offers and Stock Accumulations, § 2.12 at 46 (Thomson West 2008) ("A person who is a party to a cash-settled swap does not beneficially

---

[21]     The SEC's interpretation of Section 13 is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.  Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."); *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (the SEC's "interpretations of § 13 and of its own regulations thereunder are entitled to deference"); *Gryl ex rel. Shire Pharms. Group Plc v. Shire Pharms. Group Plc*, 298 F.3d 136, 146 n.8 (2d Cir. 2002) (SEC releases are "connected to the agency's rule-making function" and therefore receive *Chevron* deference).

own the securities subject to the swap if he does not have the right to vote or sell those securities either pursuant to the swap's contractual terms or pursuant to another understanding or arrangement with the counterparty to the swap."); informal guidance on Federal Trade Commission web site, *available at* http://www.ftc.gov/bc/hsr/informal/opinions/0511010.PDF (informal Guidance from the Federal Trade Commission agreeing that purchases of cash-settled swaps do not confer beneficial ownership of shares that a counterparty may hold as a hedge because "[t]he swap agreement does not confer beneficial ownership over those voting securities of C [issuer] that B [counterparty] may hold to A [holder of swap position], because A does not have title to, or the power to vote or dispose of C's shares) (Godnick Decl. Ex. 11). *See also* DX 149 (Partnoy Rebuttal Report ¶¶ 105, 106); DX 150 (Partnoy Sur-Rebuttal Report ¶ 24).)

Section 16 of the Exchange Act, further supports the notion that Total Return Swaps do not confer beneficial ownership. Under Section 16, the beneficial owner of 10% of any equity security must disclose: (A) "the amount of all equity securities of [an] issuer of which the filing person is the beneficial owner," and, in addition, (B) "purchases and sales of the security-based swap agreements." 15 U.S.C. § 78p(a)(3). Accordingly, under a plain reading of the statute, "equity securities," which confer beneficial ownership, are separate and distinct from "security-based swap agreements," which do not confer beneficial ownership, and need only be disclosed by a beneficial owner of 10% of the equity security. Moreover, beneficial ownership under Section 16 is explicitly defined by reference to Section 13. 17 C.F.R. § 240.16a-1(a). Finally, unlike Section 13, Congress specifically provided for disclosure of swaps under certain circumstances. This difference between the two statutes is significant because it demonstrates that if Congress intended to require that swap agreements be disclosed pursuant to Section 13, it would have explicitly done so as it did under Section 16. *See BFP v. Resolution Trust Corp.*,

511 U.S. 531, 537, 114 S. Ct. 1757, 1761 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section but omits it in another.").

    In addition, courts and the SEC have consistently found that an economic interest in a security, without more, does not confer beneficial ownership. *See*, *e.g., Transcon Lines v. A. G. Becker Inc.*, 470 F. Supp. 356, 374 (S.D.N.Y. 1979) ("beneficial ownership does not extend to the power to dispose or to direct the disposition of income or profits derived from" a security; finding no obligation to file a Schedule 13D based on ownership of economic interest); *see also* Filing and Disclosure Requirements Relating to Beneficial Ownership, Exchange Act Release No. 15348, 1978 WL 171074, at *4 (Nov. 22, 1978) (stating that "the traditional economic interests in securities, *i.e.*, the right to receive dividends and the right to receive proceeds upon sale, have not been included as criteria for defining beneficial ownership for purposes of Regulation 13D-G.") (Godnick Decl. Ex.6); Various Proposals Relating to Disclosure of Beneficial Owners and Holders of Record of Voting Securities, Exchange Act Release No. 11616, 1975 WL 177966, at *3 (Aug. 25, 1975) (stating that "[t]he definition of beneficial owner, although intended to be broad, would not usually include such persons as pledgees pursuant to a bona fide pledge agreement, remainder-men under various trusts or estate arrangements or other persons who have an interest in securities that is subject to a condition occurring over which they have no control.") (Godnick Decl. Ex. 2).

    Although, to our knowledge, no United States court has considered the question of whether the holder of a cash-settled swap is the beneficial owner of hedged shares, this exact question has been considered by the New Zealand Court of Appeals in a case involving Perry Corporation's swap positions referencing shares of Rubicon Ltd. The Court of Appeal's analysis

in that case is instructive, especially given the similarity in reporting obligations between the United States and New Zealand. [22]  *See Ithaca (Custodians) Ltd. v. Perry Corp.*, 2003 NZLR LEXIS 76 (Court of Appeals, Wellington, Nov. 4, 2003) (Godnick Decl. Ex. 10).  In *Ithaca*, Perry initially held shares of Rubicon.  Perry subsequently sold its Rubicon shares to Deutsche Bank and UBS Warburg and entered into matching equity swap contracts.  Later, Perry unwound its swap positions and purchased the same Rubicon shares that were held as a hedge by Deutsche Bank and UBS Warburg directly from those counterparties.[23]  *Id.* at *2.

The Plaintiff claimed that Perry's failure to disclose an interest in Rubicon after it entered into the swap contracts violated the New Zealand Securities Market Act ("NZMA").  *Id.* at *3.  Although the lower court acknowledged that, under the NZMA, no disclosure obligation arose from "the mere fact of being a party to a cash-settled equity swap," it nonetheless held that the parties to the swap arrangement had an "arrangement or understanding that gave Perry Corporation power to reacquire the Rubicon shares" with which the banks had hedged the swaps, thus triggering a disclosure obligation for Perry.  *Id.* at *11.  The court's ruling was based on several factors, including:

---

[22]    Like the Williams Act, the New Zealand Securities Market Act was enacted as a "disclosure regime" to ensure that the market was informed of "the identity of those who control or influence a company's operations …".  *Ithaca*, 2003 NZLR LEXIS 76, at *14-15.  The Act requires disclosure of a "relevant interest" in voting securities of a public issuer, which is broadly defined to "encompass not only *beneficial ownership* of securities but situations where, in practice, a person has *a right or power to control* what happens in relation to the securities."  *Id.* at *15 (emphasis added).  "In particular Section 5(1)(f) includes a person who, under or by virtue of any *trust, agreement, arrangement or understanding* relating to the security, may at any time have the power to acquire or dispose of the security or have the power to control the acquisition or disposition of the security by another person."  *Id.* at *15-16 (emphasis added).  Like the Exchange Act, the obligation to disclose is triggered when a person's "relevant interest" equals 5 percent of the issuer's voting securities.  *Id.* at *15.

[23]    Although *Ithaca* is instructive for its discussion of "arrangement and understanding" issues giving rise to beneficial ownership of cash-settled swaps, the fact pattern in *Ithaca* links Perry much more closely to its counterparties than were the defendants here.  Unlike Perry, at no time did TCI transact to buy or sell shares directly from one of its swap counterparties or even have any conversations regarding whether or to what extent such counterparties were hedged.  Every single share purchased by TCI was purchased on the open market.  (DX 145 (Amin ¶ 38); DX 97 and DX 105 (TCI's Terminated Swap Agreements and Physical Share Purchases).)

- Perry entered into the swaps in order to avoid the NZMA disclosure obligations,

- Perry was confident that the shares would be available for repurchase from the counterparties before the Rubicon annual meeting,

- A telephone conversation between Perry and Deutsche Bank demonstrated a "mutual understanding" that the shares hedging the swaps would be available to Perry for repurchase, and

- Perry had been able to terminate its swap contracts on less notice than was provided for under the swap agreements.

*Id*. at *25.

On appeal, the Court of Appeals noted that, "in the case of an equity swap with respect to a stock like Rubicon, which is neither large nor liquid, it is likely but not necessary that the hedge would be in a holding of the underlying shares themselves." *Id.* at *45. Although the court was unable to conclude it was "inevitable," it found that it was "almost certain that Rubicon shares would be held by both counterparties as a hedge for the duration of the swaps." *Id*. Nonetheless, the court determined that there could be no assurance that the stock would be available for sale to Perry:

> Mr. Gray [of UBS Warburg] indicated . . . that UBS Warburg is free to use shares it holds as a hedge for its own purposes, in order to generate additional revenue. Mr. Cohen gave similar evidence in relation to Deutsche Bank. Shares held as a hedge can be used for stock-lending transactions with other clients, traded internally within the bank, or used as collateral on transactions entered into by the bank. There was thus a possibility that the hedge shares would not be available on demand as they could be used for other purposes such as securities lending.[24]

*Id.* at *45-46.

---

[24]    Significantly, unlike CSX common stock, which is highly liquid, Rubicon was an illiquid stock, reducing the likelihood that the counterparties would use the shares for other purposes. *Ithaca*, 2003 NZLR LEXIS 76, at *46-47 ("[W]e note the illiquid nature of the Rubicon shares and small market capitalisation, which must reduce the likelihood of the shares being used for other purposes. We also remark that committing the shares to other purposes for any length of time would have restricted the ability of the banks to manage the unwind of the hedge in the event of an early termination of the swaps.") (Godnick Decl. Ex. 10).

The court acknowledged that, to the extent the share was not lent or pledged, it was almost certain that the shares would be available for purchase by Perry upon termination of the swap position and that "administratively" it would be the most convenient way for the counterparty banks to dispose of the shares. *Id.* at 47. Accordingly, "it was almost certain that the shares would be sold to Perry Corporation upon the termination of the swaps if Perry Corporation wished to buy, provided the counterparties held the shares (and we have found in the case of UBS Warburg that this was almost certain and in the case of Deutsche Bank that this was highly likely)." *Id.* at *50; *see also* (DX 149 (Partnoy Rebuttal Report ¶¶ 78-82); DX 150 (Partnoy Sur-Rebuttal Report ¶ 15).)

The court then considered whether "merely entering into these particular swap transactions constituted an arrangement or understanding under Section (5)(1)(f) of the NZMA." *Id.* at *51. Acknowledging that an arrangement or understanding is, by definition, "something less than a formal contract," the court held that, at the very least the terms embodied a meeting of the minds." *Id.* at 52. "The meeting of minds embodies an expectation as to future conduct, meaning that there is consensus as to what is to be done. This necessarily involves communication." *Id.* The court held that, although the communication need not be formal or even verbal, "mutual expectations based on commercial reality (but without consensus or communication) are not sufficient to give rise to an arrangement or understanding." *Id.* at *55. Noting the potential market-wide implications of a broader definition of "arrangement or understanding," the Court of Appeals stated:

> [I]f we hold that knowledge of market reality suffices to create an arrangement or understanding under § 5(1)(f) and that consensus and communication are not required, this would create uncertainty as to the scope of disclosure generally, as it would raise questions about how certain market reality must be before there is an obligation to disclose. In particular it would, in effect, mean that

41

> the majority of equity swaps in New Zealand would create disclosure requirements, whether cash-settled or not. There are obvious policy issues involved in extending disclosure requirements to interests under equity swaps as the regime conceptually is directed at voting rights rather than economic interests. Most equity swaps create only economic interests.

*Id.* at *57.

A similar conclusion should be reached here. TCI's swap arrangements were documented through typical "plain vanilla" equity derivatives standard forms, schedules and confirmations. TCI's swaps were entered into pursuant to ISDA Master Agreement forms with eight different counterparties. As discussed in greater detail above (*supra* pp. 13-18), each of the agreements gives the counterparty discretion to hedge its market risk either with shares of the referenced stock or otherwise without regard to how its hedging affects the value of TCI's swap, and provides that any hedge positions are proprietary positions of the counterparty. (*See* DX 149 (Partnoy Rebuttal Report ¶ 48); DX 92 § 11.2(i); DX 130 § 12.2; DX 133 at TCI0155971; DX121 at TCI0156058-59; DX 116 at TCI0156021-22).) Indeed, many of the counterparties have written policies and procedures confirming that the hedge securities are the proprietary positions of the counterparty and that the counterparty has the sole right to vote the hedge securities in its own discretion. (*See* DX 149 (Partnoy Rebuttal Report ¶ 49).)

Certainly, the evidence demonstrates that TCI did not believe it had either voting or investment power over any hedge shares held by its counterparties. For example, when TCI ran scenarios regarding the possible outcome of a proxy contest, it did not assume that those counterparties would vote for its slate, but rather ran a variety of scenarios – some in which assumed none of the counterparties would vote any hedge shares and some in which assumed only a portion of the shares would vote. (*See, e.g.*, DX 95; DX 96; Trial Tr. (Amin Test. 209:3-211:1; 217:19-218:2).) Moreover, as Mr. Hohn testified, TCI had conversations with Austin

Friars, a hedge fund owned by Deutsche Bank.  Nonetheless, those conversations consisted of

discussions about the railroad industry, including comparisons of the different railroads – "the

same types of conversations we had with other funds invested in the industry."  (DX 145 (Amin

¶ 48).)  Significantly, TCI "never discussed with Austin Friars how they would vote at the annual

shareholders meeting, nor have we ever discussed with Austin Friars, or anyone within deutsche

Bank, whether our cash-settled swaps were hedged with CSX shares and, if so, how they would

be voted at the CSX annual stockholders meeting."  (*Id*.)  Mr. Hohn did hope that if Austin Friars

concluded that voting for the TCI/3G slate was in the economic best interest of Deutsche Bank,

and if the swaps desk was inclined to vote its CSX shares held as a hedge, it too would conclude

that voting for the TCI/3G slate was in Deutsche Bank's best interests.  (Trial Tr. (Hohn Test.

177:20-179:6. 181:8-21).)  However, such conversations would be totally superfluous if TCI had

the ability to direct – or even influence – how Deutsche Bank votes the shares it may hold as a

hedge against TCI's swaps.

        Further, the uncontroverted testimony given by Citigroup and Deutsche Bank, the

two counterparties with whom TCI has the vast majority of its swaps, clearly demonstrates that

TCI in fact had absolutely no disposition or voting power over shares used as hedges by the swap

counterparties.  Those witnesses testified:

- There was no agreement or arrangement with TCI as to the voting or disposition of shares held as hedges (DX 155 (Arnone Dep. 40:3-9, 43:8-20, 44:7-11, 46:3-19); DX 151 (Kennedy Dep. 21:18-24, 36:9-38:2));

- The swaps did not give TCI any voting power (DX 152 (Arnone Dep. 41:23-42:21, 43:8-20, 46:3-14));

- TCI's counterparties considered the possibility of hedging with instruments other than shares, and at times either used such instruments or did not hedge (DX 152 (Arnone Dep. 38:14-39:3); DX 151 (Kennedy Dep. 39:7-40:21));

- TCI's counterparties either do not vote shares held as hedges (or vote them proportionally with other votes so as to eliminate any influence on the vote) (DX 152 (Arnone Dep. 22:16-23:17, 33:5-18); DX 153 (Busby Dep. 26:10-17); DX 151 (Kennedy Dep. 19:7-22:5, 22:18-23:24, 35:21-36:8));

- TCI did not have the right to direct the counterparties' disposition of shares held as hedges (DX 152 (Arnone Dep. 38:4-10); DX 151 (Kennedy Dep. 37:5-10));

- TCI's counterparties do not have plans to vote any shares held as hedges in the upcoming vote (DX 152 (Arnone Dep. 24:10-25:17); DX 151 (Kennedy Dep. 21:14-24));

- The heads of the swaps desk for TCI's counterparties, who had institutional responsibility for any shares held or hedged were unaware of whether shares held as hedges were loaned out, or whether they even had the right to vote those shares or where the shares were held (DX 151 (Kennedy Dep. 21:18-22:17));

- TCI's counterparties did not know about TCI's motivations and had limited communications with TCI (DX 154 (Arnone Dep. 11:17-14:20); DX 151 (Kennedy Dep. 8:8-11:14, 13:8-17:2, 22:18-23)); and

- TCI had no communications with its counterparties about voting and did not ask them to vote a particular way (DX 152 (Arnone Dep. 11:17-14:20, 25:22-26:6); DX 151 (Kennedy Dep. 22:18-23, 36:18-23); PX 187).)

Contrary to Plaintiff's claim, there is ample evidence that TCI was not able – and did not expect – to exert voting or investment power over any of the hedge shares held by the counterparty banks.[25]  Indeed, all the evidence is to the contrary.

Although CSX's proxy solicitor concluded that the movement of shares into Deutsche Bank during the two weeks preceding February 27, 2008, the original record date for the 2008 Shareholder Meeting, was the result of Deutsche Bank calling back that stock

---

[25]    In this regard, it is notable that TCI did not concentrate its swap positions with those banks to which it gave the most business.  (DX 149  (Partnoy Rebuttal ¶ 63) (demonstrating that UBS and Morgan Stanley earned the highest prime brokerage fees from TCI, even though TCI has most of its swap contracts at Deutsche Bank and Citigroup).)  In any event, the prime brokerage fees paid by TCI to any of its counterparties constitute a miniscule percentage of each counterparty's overall revenues.  (*Id.* at ¶ 64).  Moreover, if TCI had chosen its counterparties based on the ability to direct voting of any hedge shares, it is unlikely that it would have kept swaps referencing in excess of 17 million shares of CSX stock at Citigroup, when the Presiding Director of CSX is a senior executive at Citi Alternative Investments, a Citigroup affiliate.  (DX 154 (Kelly Dep. 10:7-12).)

(presumably at the direction of TCI), he admitted that that conclusion was nothing more than "speculation." (Trial Tr. (Miller Test. 77:11-16).)  In any event, the Deutsche Bank records do not reflect that it had recalled any CSX securities it held as a hedge to the TCI swaps during the two weeks preceding February 27, 2008 (DX 154 (Arnone Dep. 58:3-16)), and Mr. Arnone, the person at Deutsche Bank who would have made a recall to vote any stocks held as hedges, testified that he made no such recall.  (*Id.* at 39:23-40:19, 51:3-54:10).)  Indeed, as CSX's proxy solicitor acknowledged, there is an alternative explanation for the share movement:  the shares were moved in response to CSX's dividend date, which was February 29, 2008, two days after the record date.  (Trial Tr. (Miller Test. 83:12-84:12).)

Nor does the theory proffered by CSX's expert, Professor Marti Subrahmanyam, demonstrate that TCI had the power to direct the voting or disposition of any hedged shares.  According to Professor Subrahmanyam, the mere fact that a counterparty bank frequently hedged its TCI swap positions with CSX shares in and of itself means that TCI had the power to direct the acquisition, voting and disposition of those shares, since TCI set in motion the chain of events that led to the counterparty's purchase of those shares.  (Expert Report of Dr. Subrahmanyam ¶¶ 126, 153.)

As Professor Subrahmanyam recognized, the counterparties hedge with shares of CSX because that was the most economically efficient thing to do.  (Expert Report of Dr. Subrahmanyam ¶¶ 87-92.)  However, unilateral action based on economic efficiency is <u>not</u> evidence that TCI had the power to direct that outcome, or that it was the result of an agreement or understanding with TCI to do so.  Beneficial ownership does not turn on whether a person's actions may *cause* the holder of certain equity securities to purchase or dispose of them (even if

45

it is a "market reality"), but rather on whether it has the *power to direct* the purchase or disposition of those shares. "Causation" and "power to direct" are two different concepts.

For example, when determining whether voting power was sufficient to confer beneficial ownership, the Seventh Circuit has stated that, exists, "one who has the *right* to determine how stock is voted has a beneficial interest." *Bath Indus. v. Blot*, 427 F.2d 97, 112 (7th Cir. 1970) (emphasis added). Similarly, in *Levy v. Southbrook*, the Second Circuit considered whether the holder of convertible preferred stock can be considered the beneficial owner of more than ten percent of the underlying stock where there was a contractual conversion cap limiting the number of shares into which the preferred stock could be converted to 4.9% of the outstanding common shares. 263 F.3d 10, 12 (2d Cir. 2001). Although the case was decided under Section 16, the Court applied the definition of beneficial ownership under Rule 13d-3 and focused on the distinction between the "ability" to acquire shares and the "right" to acquire shares. *Id.* at 14. Consistent with a position put forth by the SEC in an *amicus curiae* brief, the *Levy* court held that beneficial ownership within the meaning of Section 13(d) of the Exchange Act arises only from a "right" to acquire shares. *Id.* at 12. Here, TCI has *no* right to acquire the hedge shares under its swap contracts. Nor does TCI have the *right* to direct its counterparties to hedge the swaps or sell any hedged share upon the unwind of a swap. A finding that TCI has beneficial ownership of the shares referenced in its swap contracts simply because of the economic rationality (or "market reality") of hedging in shares of the referenced security, would stretch the interpretation of Rule 13d-3 beyond any prior guidance or precedent and would be contrary to accepted market practice.[26]

---

[26] Plaintiff's argument that TCI's swap agreements give it an "informational advantage" that allow it to "acquire shares at a lower cost and without much market impact" ignores the fact that the market for CSX stock is highly liquid. Therefore, even if, when TCI unwinds its swaps, its counterparties sell CSX stock, if any, with which they hedged those swaps, and even if TCI can anticipate that those shares will be sold, such sales would make up

In any event, as set forth above, testimony establishes that, despite the fact that it may be economically rational to hedge TCI's swap positions with shares of CSX stock, it was by no means the only possible hedge that could have been used.  (Trial Tr. (Amin Test. 206:12-17); DX 149 (Partnoy Rebuttal Report ¶¶ 98-100); DX 150 (Partnoy Sur-Rebuttal Report ¶¶ 56-59)); *see also In the Matter of the Securities Act* R.S.O. 1990, c.S.5, As Amended (Aug. 8, 2006) *available at* http://www.osc.gov.on.ca/Enforcement/Proceedings/RAD/rad_20060808_searscanad.pdf. (use of equity swaps to hedge swap position).  (Godnick Decl. Ex. 14.)

Indeed, Richard Kennedy, the global head of Citigroup's prime swap division and a director of CSX, testified that Citigroup does in fact hedge its swaps with instruments other than the referenced common stock.  (DX 151 (Kennedy Dep. 39:7-40:21) (describing various alternative hedging instruments that Citigroup uses to hedge and that were available with respect to CSX common stock, and testifying that Citigroup sometimes chooses not to hedge total return swaps); *see also* (DX 154 (Arnone Dep. 22:16-25; 38:14-39:3) (testifying that Deutsche Bank does not necessarily hedge its swap positions with the shares referenced in a swap contract).)

In addition, even if the swap counterparties hedge with CSX shares, investment banks – including the counterparties to the TCI swap transactions – also have securities lending programs under which they charge fees to loan out securities (including any voting rights associated with such securities).  Accordingly, when TCI terminates a swap position, it is entirely possible that its counterparty bank will not have any (or sufficient) hedge shares

---

only a fraction of trading in CSX stock on any given day which would not have a material impact on the price at which CSX trades.  In contrast, in the Rubicon matter, Rubicon was an illiquid thinly-traded stock and there was evidence that Perry purchased the hedge shares directly from its counterparties upon unwinding the swap transaction.  Nevertheless, the court was unwilling to find that Perry was the beneficial owner of the hedge securities simply because it entered into the swap agreements.

available and thus will not sell any or all CSX shares held as a hedge into the market.  (DX 151 (Kennedy Dep. 21:25-22:17); (Arnone Dep. 39:23-40:15).)

        A finding that merely entering into a Total Return Swap (without any agreement, arrangement, or understanding with the counterparty with respect to voting or disposition of any shares held as hedges by the swap counterparty) creates beneficial ownership over shares used as a hedge by the counterparty raises a myriad of issues.  For instance, because (i) not all swap counterparties hedge with shares of the referenced company, and (ii) swap agreements generally do not require provision of information to the investor about whether or not the counterparty has hedged or in what manner they are hedging, such a rule would cause the investor to be required to attribute beneficial ownership of <u>all</u> referenced shares, regardless of the level of matching of such referenced shares in a hedge by the counterparty.  This may lead to significant over reporting in the market in the aggregate of beneficial ownership of shares of an issuer, including multiple attributions of the same shares to various parties (such as the swap investor and any party who borrows such shares from the bank to acquire voting rights).  Such over reporting would damage the transparency of the information provided through 13D reporting - it would become much more difficult for the issuers and other stockholders to determine what parties <u>actually</u> had accumulated power with the potential to change or influence control of the issuer.

        In addition, it would seem likely that both the counterparty and the client in the Total Return Swap would be forced to consider themselves a "group" pursuant to Rule 13d-5(b) - the logical extension of the rule that automatically attributes to a swap party beneficial ownership because of potential influence over the swap counterparty's voting behavior is that the Total Return Swap contract must be an "agree[ment] to act together for the purpose of . . . voting . . . of equity securities of an issuer."  17 C.F.R. § 240.13d-5(b)(1).  Here, that would mean that

since each and every member of a 13(d) group must make a Schedule 13D filing, each and every one of TCI's swap counterparties would have to make such a filing since they would be considered part of a group with TCI. Such a filing would need to disclose, among other things, the identity of the group members, the full amount of the group's ownership, and any plans or proposals regarding the issuer. *See* Schedule 13D. However, the bank counterparties do not necessarily know the requisite information regarding the identities and holdings of TCI's other counterparties in order to comply with these requirements.

In addition, pursuant to Rule 13d-5(b), each group member normally must disclosure all of its equity securities holdings in the relevant issuer, not just the amount attributable to reference securities in the swap agreement. Therefore, by extension, any person entering into a swap would need to monitor the equity holdings of each counterparty, aggregate the entire equity book of each, and when either (1) the counterparties aggregate holdings exceed 5%, all of the investor and the bank counterparties would need to make a Section 13 filing or (2) the investor's swaps with investment banks exceeded 5% even though the holdings of each bank were under 5%, notify all parties of the existence of a filing obligation. Each entity would need to include all of the information required by the Schedule 13D, and each of the swap counterparties along with the investor seeking economic exposure would be required to sign as filers and take liability for the accuracy of the information in such Schedule 13D. And, because amendments to Schedule 13D trigger upon movements of 1% in the total equity of a public company, the amendment obligations could be continuous. The administrative burden alone to marshal all the information required by Schedule 13D would be potentially massive. An, there may potentially be added liability for the group's actions and filings.[27]

---

[27]  As Congress made clear in the legislative history in connection with the 2000 Amendments to the Securities Act of 1933 and the Exchange Act, "[t]he SEC is directed to focus on the wrongdoers rather than provide

In sum, there simply is no evidence in the record to support a finding that TCI had voting or investment power with respect to the CSX shares referenced in its swap agreements. While Plaintiff has put forth theories as to why TCI should be considered the beneficial owner of such shares, those theories are equally applicable to all standard cash-settled total return swaps, and should be rejected as inconsistent with standard market practice and unsupported by any authority.[28]

### C.    TCI Did Not Attempt to Evade its Disclosure Requirements Under Rule 13d-3(b).

There is no evidence in the record that Defendants violated Rule 13d-3(b).  Rule 13d-3(b) states, in relevant part, that "[a]ny person who, directly or indirectly, creates or uses a . . . contract, arrangement, or device with the purpose or effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d)" shall be deemed to be the beneficial owner of such security.  17 C.F.R. § 240.13d-3(b).  As demonstrated below, a "plan or scheme to evade" the reporting requirements of Section 13(d) means something more than a desire to avoid certain legal requirements.

The presumption that the numerous exemptive provisions from the federal securities laws, such as those found in Sections 3 and 4 of the Securities Act, and Regulation S, Rule 144, and Rule 144A, are legitimate means of engaging in securities transactions is supported both by case law and by official SEC releases.  For example, in 2006, the SEC entered as amicus in *In re HealthSouth Securities Litigation*, for the purpose of addressing, in part,

---

new paperwork burden and regulatory costs on the law abiding investors and financial services providers."  146 Cong. Rec. S11855, S11867 (daily ed. Dec. 15, 2000) (statement of Sen. Gramm).

[28]    For all of the reasons stated above, there is also no basis for a finding that TCI had the right to acquire beneficial ownership of the referenced shares within 60 days or otherwise.  Accordingly, it cannot be deemed the beneficial owner of any such shares within the meaning of Rule 13d-3(d).

whether a group of investment banks that had relied on the exemptive provisions of Rule 144A under the Securities Act had acted so as "to divest the investment banks of an exemption in the registration process." *In re HealthSouth Securities Litigation*, No. CV-03-BE-1500-S (N.D. Ala.), SEC Amicus Letter to Judge Bowdre (Nov. 28, 2006), *available at* http://www.sec.gov/litigation/briefs/2006/healthsouthbrief.pdf.  (Godnick Decl. Ex. 16 ).  As the solicitor states in his amicus, "the Commission did not find that the allegations in the complaint 'establish that the Rule 144A offering should be considered "part of a plan or scheme to evade the registration provisions of the Act"' under Note 3.  The mere fact that the exempt sale was followed by a registered exchange offer pursuant to a pattern common in the industry did not make the initial sale an attempt to evade registration." *Id*. at 7.

In *SEC v. Softpoint*, the court held that Regulation S applies to "bona fide" exempted transactions, so long as the exemption is not used as "a preconceived artifice designed to cloak the sale of unregistered securities." 958 F. Supp. 846, 861 (S.D.N.Y. 1997).  Similarly, in *SEC v. Corporate Relations Group, Inc.*, the court held that Regulation S does not protect a fraudulent "plan or scheme" wherein the defendants misrepresented that certain entities were legitimate foreign purchasers to whom stock could be sold under Regulation S without registration "in a *calculated* albeit failed attempt to evade" Section 5 of the Securities Act.  No. 6:99CV1222ORL28KRS, 2003 WL 25570113, at *14-16 (M.D. Fla. Mar. 28, 2003) (emphasis added).

In an SEC Release proposing exemptions for cross-border tender offers, the SEC stated that the proposed exemptions would not be available for any transaction that is part of a "plan or scheme to evade" registration requirements, "[f]or example, if the exchange offer or rights offering is a *sham*."  Cross-Board Tender Offers, Business Combinations and Rights

51

Offerings, Exchange Act Release No. 7611, 1998 WL 792055, at *23 (Nov. 13, 1998) (emphasis

added) (Godnick Decl. Ex. 7).  In the adopting Release for these exemptions, the SEC explained

that a transaction constitutes a "plan or scheme to evade" when it is done "*solely* as a pretext" to

evade registration requirements.  Cross-Board Tender And Exchange Offers, Business

Combinations and Rights Offerings, Exchange Act Release No. 7759, 1999 WL 969592, at *7

(Oct. 22, 1999) (emphasis added) (Godnick Decl. Ex. 8).

       Structuring investment contracts to prevent crossing the 5% beneficial ownership

threshold of Regulation 13D also is considered legitimate.  For example, it has been held that a

contractual cap on the right to convert a derivative security to 4.9 percent of the outstanding

stock is not a "plan or scheme to evade" under Section 13(d).  *See Levy v. Southbrook Int'l Inv.,

Ltd.*, No. 99 CIV. 1480 (NRB), 2000 WL 567008, at *5 (S.D.N.Y. May 10, 2000), *aff'd* 263

F.3d 10, 17-18 (2d Cir. 2001).

       The law on tax structuring is instructive to this issue.  Under tax jurisprudence,

taxpayers are free to structure their business transactions as they wish, even if they are motivated

by tax avoidance considerations, so long as a legitimate business purpose is also present.  *See

Knetsch v. United States*, 364 U.S. 361, 365-66, 81 S. Ct. 132, 135 (1960); *Gregory v. Helvering*,

293 U.S. 465, 469, 55 S. Ct. 266, 267 (1935) ("The legal right of a taxpayer to decrease the

amount of what otherwise would be his taxes, or altogether avoid them, by means which the law

permits, cannot be doubted."); *see also Int'l Trading Co. v. C. I. R.*, 484 F.2d 707, 711 (7th Cir.

1973) ("[A] taxpayer may achieve benefits under one section of the Code when what might seem

to be the same benefits are denied under another section.").

       In several areas of the federal securities laws, bad faith state of mind only can be

established by showing that the actor's sole or dominant motive was to violate the law.  *See, e.g.*,

*Zimmerman v. Chicago Bd. of Trade*, 360 F.3d 612, 624 (7th Cir. 2004) ("In order to constitute

bad faith, the plaintiffs must show that 'self-interest or other ulterior motive unrelated to proper

regulatory concerns is alleged to constitute *the sole or dominant reason* for the exchange

action.'") (emphasis supplied) (quoting *Sam Wong & Son, Inc. v. N.Y. Mercantile Exch.*, 735

F.2d 653, 677 (2d Cir. 1984)); *SEC v. Masri*, 523 F. Supp. 2d 361, 372-73 (S.D.N.Y. 2007)

(holding that "if an investor conducts an open-market transaction with the intent of artificially

affecting the price of the security, *and not for any legitimate economic reason*, it can constitute

market manipulation," or, in other words, "*but for* the manipulative intent, the defendant would

not have conducted the transaction") (first emphasis added); *Royal Indus., Inc. v. Monogram*

*Indus., Inc.*, No. CV 76-3348-R, 1976 WL 860, at *6-7 (C.D. Cal. Nov. 29, 1976) (liability under

Section 14(e) of the 1934 Act requires a showing that interference with the right to compete in

tender offer was the "principal purpose").

These basic propositions, that choosing to use exempted instruments or

transactions are legitimate means of avoiding registration and that the dominant purpose of the

"evasion" rules under the securities laws is the establishment of bad faith intent, are found in the

interpretive guidance on Rule 13d-3(b).

When the SEC adopted Section 13(d) and the Rules thereunder, the SEC release

accompanying the announcement gave an example of the type of situation covered by Rule 13d-

3(b).  The SEC's example – the only SEC interpretation of Rule 13d-3(b) available – involved a

parking scheme in which, in order to acquire a substantial position in the *voting* securities of "Z

Corporation" prior to the election of directors which was to take place in the near future, "X"

caused ten institutions to each acquire three percent of the outstanding shares of "Z corporation"

for him, and gave "A" an irrevocable power of attorney which would lapse according to its

terms.  The SEC stated that, in this situation, "A is the beneficial owner of the Z shares subject to the proxy due to his power to vote them" and that "X is also deemed a beneficial owner of the same Z shares."  Adoption of Beneficial Ownership Disclosure Requirements, Exchange Act Release No. 13291, 1977 WL 185650, at *14, at Example 8 (Feb. 24, 1977) (Godnick Decl. Ex. 4).  This example is clearly distinguishable from the case at issue, as "X" is purchasing and using a scheme to avoid reporting physical shares of "Z Corporation," which, above a certain threshold amount must be reported.  In contrast, TCI has not taken any position in CSX's voting securities as result of entering into equity swap transactions, has not purchased hedged shares from its counterparties, and has engaged exclusively in open market transactions.  It simply has an economic interest tied to CSX, which it has no obligation to report under the current regulatory framework.

Indeed, since its adoption in 1978, Rule 13d-3(b) has never been amended and has only been applied to arrangements in which a person "parks" physical ownership of shares with another to avoid disclosure requirements, and not to swap arrangements which, as described above, involve no physical ownership, and therefore cannot divest, or prevent the vesting of, beneficial ownership by either party.  *See, e.g., SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 590 (S.D.N.Y. 1993) ("To carry out the plan, it was necessary to enlist others in the conspiracy who would be willing to acquire more than 10% of [the company's] outstanding voting stock and who would file a Schedule 13D announcing such acquisition.").  Investing in total return swaps is materially different from a parking arrangement.  Henry T.C. Hu & Bernard Black, *The New Vote Buying: Empty Voting and Hidden (Morphable) Ownership*, 79 S. Cal. L. Rev. 811, 869 (2006) ("Parking involves an understanding that the client will buy the stock back at a later date and protect its counterparty against loss.  With an equity swap, *there is no such*

*understanding* and the dealer must protect itself against loss.") (emphasis added) (Godnick Decl. Ex. 12).

TCI not only has a myriad of business reasons for its investing in CSX by entering into swap transactions, such as lower financing costs, administrative convenience, and potential international tax benefits, but also uses such instruments regularly. (PX 19.) As Mr. Amin stated in his witness statement, "[w]hen financing has been needed, TCI invests in total return cash-settled swaps. The primary reason for this is that swaps provide financing benefits, including, generally, a lower cost of funding and a lower margin requirement." (DX 145 (Amin ¶ 7); (DX 144 (Hohn ¶¶ 6, 11) (stating that "[w]hen financing is needed, TCI invests in total return cash-settled swaps").)

In November, 2007, TCI consolidated its swap positions in Deutsche Bank and Citigroup. (DX 145 (Amin ¶ 45). If TCI's primary intent was to avoid disclosure, it would have made no sense for TCI to consolidate its position with Deutsche Bank and Citigroup because, in the event that they hedged their swap agreements with CSX common stock, consolidation would trigger disclosure by both banks. In fact, TCI's consolidation did trigger disclosures by both banks. *See* Deutsche Bank AG 13F-HR, SEC File No. 28-10103, at 35 (for Dec. 31, 2007, filed Feb. 14, 2008) (Godnick Decl. Ex. 31); Citigroup Inc. 13F-HR, SEC File No. 28-02427, at 27-28 (for Dec. 31, 2007, filed Feb. 14, 2008) (Godnick Decl. Ex. 30). But, as Mr. Hohn testified, TCI's concerns regarding counterparty risk in light of the credit crisis motivated TCI to move swap positions away from broker-dealers to commercial banks, despite making disclosures by the bank counterparties more likely. (Trial Tr. (Hohn Test. 182:21-183:17).)[29] Mr. Hohn's concerns date back well into the summer of 2007, when he directed TCI's CFO to renegotiate all

---

[29]    As Mr. Hohn further testified, the movement of swap positions away from broker-dealers to commercial banks was not unique to TCI's investment in CSX but, rather, was a strategy employed across TCI's total portfolio swap exposure. (Trial Tr. (Hohn Test. 183:3-17).)

of its prime brokerage agreements to ensure that the fund would not be economically harmed by any shortfalls and insisted that parent company guarantees be put into place. "Mr. Hohn reiterated that, as far as the prime brokers were concerned, this was a non negotiable point." (PX 19.) Because TCI had multiple reasons for holding total return swap positions in CSX, the mere fact that nondisclosure was one of those reasons is not enough for a finding of bad faith or a "plan or scheme to evade."

Similarly, if nondisclosure had been TCI's primary purpose for entering into swap agreements, once TCI's positions in CSX were publicly disclosed in the December, 2007, it would have been logical for TCI, embroiled in a hotly-contested proxy contest, to have unwound its swaps and purchased physical shares – thereby acquiring the ability to vote those shares – at that time. Instead, TCI retained its position in Total Return Swaps (and continues to retain those swaps) even after its position was disclosed.

The record before this Court demonstrates that TCI's interest in the non-disclosure benefits of swaps was not driven by a desire to violate Section 13 with respect to shares of CSX. In fact, TCI made every effort to understand and comply with U.S. securities laws in connection with its CSX investments. In response to questioning by the Court, Mr. Hohn testified, during his examination, that CSX had retained the law firms of Schulte Roth & Zabel and Proskauer Rose "very early on before [TCI] made any investments." (Trial Tr. (Hohn Test. 187:10-14).) He further testified that TCI relied on legal advice from both law firms regarding what TCI's obligations were under U.S. securities regulations. (*Id.*). TCI did not "plan" or "scheme" to evade any SEC reporting requirements, but rather, relied on advice from counsel in making decisions regarding proper disclosure.[30] *See Markowski v. SEC*, 34 F.3d 99, 104-05 (2d

---

[30]    Your Honor asked Mr. Hohn if he was aware of the use of Rule 13d-4 to file under Schedule 13D and then disclaim beneficial ownership. Mr. Hohn was not aware, and in fact, this in not how Rule 13d-4 operates. The

Cir. 1994) (advice of counsel defense is established by showing that defendant "made complete disclosure to counsel, sought advice as to the legality of his conduct, received advice that his conduct was legal, and relied on that advice in good faith.").

In sum, TCI's investment strategy does not constitute a "plan or scheme to evade" the reporting requirements of Section 13(d). Accordingly, under Rule 13d-3(b), TCI does not have beneficial ownership of the shares referenced in their swap agreements.

### D.    Defendants Did Not Form A Group Until December 12, 2007.

1.    <u>Plaintiff Fails To Meet Its Burden of Proving That a Group Was Formed Prior to December 12, 2007.</u>

In determining when a group was formed, the key inquiry is to determine when the individuals "agree[d] to act together for the purpose of acquiring, holding, voting, or disposing of equity securities . . . ." 17 C.F.R. § 240.13d-5(b)(1). The threshold test for determining group status is whether and when a common agreement or understanding was formed between the parties for one of the recited activities. *Morales v Quintel, Inc.*, 249 F.3d 115, 123-24 (2d Cir. 2001). Evidence of parallel action, personal and business relationship, and even information sharing is not enough. "[T]he key inquiry . . . is whether [the shareholders] 'agreed to act together.'" *Id*. at 124 (citing Rule 13d-5(b)(1)).

General allegations of parallel investments by institutional investors are insufficient to establish a group. *See, e.g., Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 441 (S.D.N.Y. Dec. 10, 2001). Moreover, courts generally agree that "[m]ere relationship among persons or entities, whether family, personal or business, is insufficient to create a group" for purposes of Section 13(d). *Universal Container Corp. v. Horwitz*, No. 74 Civ. 3865, 1977 WL 1036, at *6 (S.D.N.Y. Sept. 6, 1977); *see also Torchmark*

determination of whether a filing must be made under Section 13 rests exclusively in Rule 13d-1, which states a filing is triggered only upon acquisition of beneficial ownership of equity securities exceeding 5% of an issuer.

*Corp. v. Bixby*, 708 F. Supp. 1070, 1083 (W.D. Mo. 1988) (same); *Texas Gulf, Inc. v. Canada Development Corp.*, 366 F. Supp. 374, 403 (S.D. Tex. 1973) (same). Indeed, "[a] close consulting relationship, even when combined with a possible future acquisition of stock, is insufficient to bring a defendant within the ambit of Rule 13d-3." *Morales v. New Valley Corp.*, 999 F. Supp. 470, 474 (S.D.N.Y. 1998).

Further, "evidence of discussions between defendants" without focus on "whether the inference of collusion is really justified in light of all the circumstances" is insufficient to establish an agreement to act together. *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 618 (2d Cir. 2002) (citing to this Court). Thus, information sharing alone does not establish the formation of a group. *K-N Energy, Inc. v. Gulf Interstate Co.*, 607 F. Supp. 756, 767 (D. Colo. 1983) (determining that evidence that showed that the two parties shared information because they knew of each other's investment in the company was not enough to support a finding the two were acting in concert to acquire the target company's stock). Information sharing that suggests that an investor <u>hoped</u> that another investor would support actions taken by the first investor is insufficient to establish a group; there must be evidence that the second investor <u>agreed</u> to do so. *Id.* "Simply put," Plaintiff must show that "defendants agreed to combine efforts in furtherance of a commonly held objective." *Schaffer v. CC Investment*s, 115 F. Supp. 2d 440, 444 (S.D.N.Y. 2000). Accordingly, the mere fact that TCI and 3G shared analyses or financial models regarding CSX with each other or any other person does not support a conclusion that a group was formed.

Despite two days of trial testimony, four weeks of deposition testimony, and well over a million pages of documents produced by TCI and 3G during discovery, the record is completely devoid of any evidence that, prior to December 12, 2007, TCI and 3G agreed to act

together for the purpose of acquiring, holding, voting, or disposing of equity securities of CSX. Not a single piece of evidence was offered reflecting a common understanding or agreement between TCI and 3G concerning CSX stock, swaps, or a CSX proxy contest. Rather, at best, CSX relies on inferences based on circumstantial evidence that a group was formed prior to December 12. But the facts prove otherwise. For the reasons stated below, Plaintiff has failed to meet its burden.

In evaluating the evidence with respect to the formation of a group, a number of uncontroverted facts make clear that TCI and 3G were acting independently of each other:

- TCI began building its swap position on October 20, 2006. Its swap position was fully established by March 30, 2007. (PX 206.)

- By December 2006, Mr. Hohn decided to make TCI's position in CSX 15-20% of its fund. (PX 23.)

- By March 29, 2007, the date on which Mr. Amin and Mr. Behring met while Mr. Amin was already in New York City, TCI had established 99% of its ultimate swap positions. (PX 206.)

- At no time prior to November 2007 did TCI have any communications with 3G regarding the purchase or sale of any CSX securities or swaps; nor did TCI have any communications with 3G about running a slate of directors – with or without 3G. (Trial Tr. (Hohn Test. 176:14-177:4).)

- On August 2, 2007, TCI had a call with its advisors, D.F. King and Schulte Roth & Zabel LLP, to discuss logistical and other issues that would arise in connection with a potential CSX proxy contest. (Trial Tr. (Amin Test. 195:1-7); (PX 116).) Neither 3G nor its representative or advisors attended that call or were even informed of the call. (Trial Tr. (Amin Test. 213:8-20).)

- In August and September 2007, 3G sold 38% of its holdings of CSX stock. During this same period, TCI did not sell a single share of CSX stock. (PX 206.)

- In September 2007, TCI retained an executive search firm to assist in finding suitable candidates to stand for election to the CSX board. (Trial Tr. (Amin Test. 201:18-22); DX 144 (Hohn ¶ 34); DX 145 (Amin ¶ 49).)

59

- Neither 3G nor its representatives were made aware of that search. (Trial Tr. (Behring Test. 107:7-11, 136:17-22).)

- In November 2007, Mr. Behring approached TCI and asked whether it would consider forming a group with 3G for the purpose of running a slate of directors for CSX's board. In response, Mr. Hohn authorized Mr. Amin to engage in discussions with Mr. Behring, but made clear to Mr. Amin that he, Mr. Hohn, would have to approve the terms of any group agreement before TCI would commit to act in a group with 3G. (DX 144 (Hohn ¶ 38); DX 145 (Amin ¶ 57).)

- Counsel for TCI (Schulte Roth) and 3G (Kirkland & Ellis) negotiated the terms of a group agreement from mid-November through mid-December 2007. A number of substantive issues protracted those discussions, along with the intervening Thanksgiving holiday. (Trial Tr. (Amin Test. 215:12-20); DX 144 (Hohn ¶¶ 39-40); DX 145 (Amin ¶ 59); DX 146 (Behring ¶ 49).)

- TCI was not aware that 3G had sold almost its entire holding in CSX until November 2007, during group negotiations. (Trial Tr. (Behring Test. 112:4-113:4, 119:8-120:2).)

- TCI did not learn that Mr. Lamphere was going to be proposed by 3G as a potential CSX director candidate until late-November 2007. (DX 144 (Hohn ¶ 39); DX 145 (Amin ¶ 58).)

- During the early morning hours of December 12, 2007, Gary Wilson agreed to be part of a slate of directors to be proposed by TCI and 3G. (DX 64; Trial Tr. (Amin Test. 216:1-14).)

Each of the above facts was proven at trial, and no evidence was offered by CSX in response. Nonetheless, on the basis of the unremarkable fact that during 2007 TCI discussed the U.S. freight rail industry with a number of other funds, including 3G, and that TCI and 3G both purchased shares of CSX stock at various times (but in no parallel pattern), Plaintiff contends that TCI and 3G must have formed a group before December 12, 2007.

CSX's basis for asserting that a group must have been formed between TCI and 3G prior to December 12, 2007 boils down to the following:

- TCI and 3G periodically discussed CSX during the course of 2007.

60

- After some of those meetings, 3G purchased additional shares of CSX stock.

- TCI had internal discussions about its views of CSX, after which 3G sold a large portion of its CSX stock.

- Mr. Hohn testified that on a couple of occasions during the late spring or early summer of 2007, Mr. Behring asked Mr. Hohn whether TCI would be interested in working with 3G in connection with their respective investments in CSX.

- Plaintiff's counsel juxtaposed internal TCI e-mails – only one of which even mentioned 3G – with 3G trading records.

But none of that evidence supports the conclusion that TCI and 3G agreed to act together for the purpose of acquiring, holding, voting, or disposing of CSX stock. In fact, a comparison of 3G's and TCI's trading reveals just the opposite. For example, while 3G was selling off approximately 8.5 million shares of CSX stock – 38% of its position – in August and September 2007, TCI's position remained constant. (PX 206.)

2.    Discussions Among Funds Are Common Practice In The Industry.

There is no dispute that TCI and 3G discussed the U.S. rail industry, including CSX, during the course of 2007. (DX 144 (Hohn ¶ 23).) Indeed, TCI had such discussions with a number of funds during the course of 2007. As Mr. Hohn testified, the sharing of information about an industry or a particular company is common in the hedge fund industry. (DX 144 (Hohn ¶ 22); DX 145 (Amin ¶ 19); Trial Tr. (Behring Test. 130:14-25), (Hohn Test. 176:1-16).) For TCI, those discussions were particularly helpful because TCI was new to the U.S. freight rail industry. Thus, during 2007, TCI spoke with colleagues at a number of other funds, such as Deccan Value Advisors, Seneca Capital Management, Icahn Capital Management, 3G Capital Partners, Lone Pine Capital, and Atticus Capital. (DX 144 (Hohn ¶ 22).)

As with many other funds and as part of the investment process, Mr. Hohn had periodic conversations with Mr. Behring about the railroad sector. (DX 144 (Hohn ¶ 23).) Mr. Hohn was acquainted with him professionally because 3G is an investment advisor to the fund Synergy, which invests in TCI. (*Id.*) Because Mr. Behring serves on a board of a railroad and is an industry expert, Mr. Hohn had discussions with him about the fundamentals of the rail industry during 2007. (*Id.*) Mr. Hohn's interactions with him were in no way different than those with any of the other fund managers. (*Id.*)

Further, sharing information is not unique to TCI. 3G spoke to several other funds, in addition to TCI, about the fundamentals of the rail industry. (Trial Tr. (Behring Test. 130:14-131:16).)[31]

Despite the flow of information among TCI and other funds, the information is not boundless. As Mr. Hohn testified, TCI is careful to limit the nature of conversations and the detail of the information it discloses with other investors about its specific investment objectives. (DX 144 (Hohn ¶ 22).) The information TCI shares is general in nature and does not involve TCI's trading patterns or position size, to prevent another investor from buying a large amount of shares of a company during the time that TCI is establishing its economic exposure to that company, thereby driving up the price. [32] (*Id.*; DX 145 (Amin ¶ 19).) Mr. Hohn testified that

---

[31]    Plaintiff has offered a selection of e-mails between TCI and other funds to supposedly demonstrate that TCI was discussing CSX with third parties. (PX 46; PX 47; PX 49; PX 53; PX 54; PX 58.) As discussed above, however, TCI readily concedes the point. General discussions about industries or investment opportunities are as commonplace between funds as it is between friends, business colleagues or relatives. There has been no suggestion or allegation in this case that TCI was in possession of material inside information about CSX at the time of those communications and, in fact, it was not.

[32]    Of course, as previously stated, the information that TCI shares with selected funds is not material inside information about a company and, thus, nothing prohibits TCI from sharing that information. Indeed, the CSX board and management would not even meet privately with Mr. Hohn or Mr. Amin. Moreover, the downside risk for TCI is that, given TCI's reputation as an activist fund (Trial Tr. (Hohn Test. 180:9-18); DX 144 (Hohn ¶¶ 24, 25)) with a proven track record of successful investments (DX 144 (Hohn ¶ 3)) another entity will "front-run" or "coattail" TCI's investments. This is a risk that TCI runs by discussing its investment theses with funds with which TCI has a close relationship. In order to mitigate this risk, TCI will only share information about a company in

62

TCI is "very careful not to ever tip another investor as to whether [TCI is] going to increase [its] stake in a company or not, because that would disadvantage [TCI's] investors."  (Trial Tr. (Hohn Test. 163:13-16).)  Thus, at no time prior to mid-November 2007 did TCI and 3G discuss their trading activities in CSX, or whether either TCI or 3G intended to purchase or sell CSX stock, or unwind or establish swap positions referencing CSX stock.  (Trial Tr. (Hohn Test. 176:14-177:4), (Behring Test. 112:4-113:4, 119:8-25, 120:1-2), (Amin Test. 197:13-14).)

3.     <u>TCI And 3G's Investments In Of CSX Shares Were Independent Of Each Other.</u>

By December 2006, Mr. Hohn decided to make TCI's position in CSX 15-20% of its fund.  (PX 23.)  The fact that TCI ultimately ended up with CSX as 21% of its fund, which is consistent with Mr. Hohn's initial investment thesis, demonstrates that TCI's investment decisions with regard to CSX were independent of 3G's.  Not surprisingly, Plaintiff did not inquire about TCI's trading activity at trial.

Instead, Plaintiff tried to insinuate group activity by showing that 3G purchased some of its CSX stock after meetings with TCI.  Thus, for example, after Mr. Behring met with Mr. Amin on March 29, 2007,[33] 3G added to the over 8 million shares of CSX stock 3G already owned.  However, whether 3G's decision to purchase additional shares was a result of 3G continuing to build on that position based on (i) an existing investment thesis, (ii) additional research undertaken by 3G, or (iii) 3G riding TCI's coattails because of TCI's well-known record of activism and investment success, the fact is that neither Mr. Amin nor Mr. Behring had any discussions during that meeting about TCI's or 3G's respective positions in CSX, or

which it is investing after TCI has established all, or a significant portion of its position in the company.  (Trial Tr. (Hohn Test. 163:13-16); DX 144 (Hohn ¶ 22).)  Thus, for example, at the time of Mr. Hohn's February 19 e-mail communication with Mala Gaonker of Lone Pine Capital (PX 45), TCI had established 96.3% of its total swap position in CSX.  And, at the time of Mr. Hohn's March 2, 2007 e-mail communication with Mr. Bodas of Deccan Value Fund, TCI had established 96.1% of its total swap position in CSX.  (PX 206.)

[33]     By March 29, 2007, TCI's swap position was 99% complete.  (PX 206.)

intentions with respect to their investments in CSX.  (Trial Tr. (Behring Test. 102:15-19), (Amin

Test. 197:10-14).)

Moreover, the record evidence shows that 3G performed exhaustive research and

diligence throughout its investment in CSX, none of which would have been necessary had it

been relying on TCI to make its investment decisions as plaintiffs seem to posit.  Indeed, just

prior to substantially increasing its position in April 2007, 3G completed its 92-page "Investment

Discussion" reflecting the depth of its research and the strength of its conviction in its own

investment thesis.  3G's trading strategy thereafter was to hold its position relatively constant at a

level below 5% of the outstanding shares of CSX – until 3G's concerns about the broader

economy caused it to sell off a substantial portion of its investment at unfavorable prices.  (*Id.*).

Thus, in August and September 2007, 3G sold almost 8.5 million shares of CSX stock.  (PX

206.)  During this same period, however, TCI's CSX positions remained essentially flat, a fact

that undermines the notion that TCI and 3G were acting together.  (*Id.*)  Moreover, Mr. Hohn

testified that TCI never shared with 3G (or any other fund, for that matter) TCI's specific

investment intentions with respect to CSX.  (Trial Tr. (Hohn Test. 176:14-177:4).)

The table below provides the aggregate exposure (in millions of shares and

reference share equivalents) for both TCI and 3G from the first trade (October 20, 2006) until the

last trade (November 7, 2007).  (PX 206.)  The table illustrates that the trading between the

parties was not coordinated.  In fact, the correlation between the TCI trading and 3G trading is

only 16%.  (*Id.*)  Further, it is clear that 3G began accumulating a position months after TCI

began accumulating its position (in fact by the time 3G started buying CSX stock TCI had

already built 93% of its ultimate position), that 3G's aggregate exposure exhibits "step changes"

whereas TCI's does not, and that 3G sold a very significant part of its investment (approximately

64

38%) during the months of August and September 2007, while TCI sold virtually none of its position (only 3%) over this same period.  (*Id.*)  These separate patterns of buying and selling stock and swaps do not illustrate cooperation or agreement between TCI and 3G to act together. If anything, they show the opposite.



In an attempt to show parallel trading activity, during Mr. Hohn's cross examination, Plaintiff attempted to insinuate that an e-mail, dated February 13, 2007, that included the snippet, "I want to discuss our friend alex of Brazil" was evidence of discussions regarding CSX, between TCI and Behring.  (PX 42; Trial Tr. (Hohn Test. 155:17-157:18).) However, it is clear that the e-mail when viewed as a whole was referring to a Brazilian company, Arcelor Brasil, as the subject heading "Arcelor Brasil MTO – urgent," would indicate. The snippet is simply a part of a laundry list of things that Mr. Hohn wanted to address with Mr. Amin.  Indeed, Mr. Hohn's uncontradicted testimony was that the e-mail related to his desire to speak to Mr. Behring about Arcelor Brasil.  (Trial Tr. (Hohn Test. 156:12-19).)  At the time of the e-mail, the Brazilian SEC was in the process of ruling on a minority buyout and the ruling would have an impact on TCI's investment in Arcelor Brasil.  (*Id.*)  Mr. Hohn further testified

that he in fact spoke to Mr. Behring, a native Brazilian, about Arcelor Brasil during that period, not about the CDS of CSX. (Trial Tr. (Hohn Test. 157:17-158:18).) Nothing in the record contradicts Mr. Hohn's testimony.

In addition, Plaintiff repeatedly pointed to Mr. Amin's meeting with Mr. Behring on March 29, 2007. But the evidence shows that this meeting was unremarkable to the issues in this case.[34] First, it is undisputed that 3G had been conducting its own, independent research and analysis of CSX for some time prior to March 29 (DX 3; DX 4; DX 5; DX 6; DX 7; DX 11) and by that date, 3G already owned over 8 million shares of CSX common stock. (PX 206.) There is no evidence of TCI and 3G ever communicating prior to March 29 about either of their respective position sizes in CSX. Indeed, the uncontroverted evidence is to the contrary. (Trial Tr. (Behring Test. 112:4-113:4, 119:8-120:2).) Furthermore, given TCI's conviction in its CSX investment, it is hardly surprising that Mr. Behring, a sophisticated investor in his own right, decided to increase 3G's stake in CSX based on his knowledge of CSX as well as his confidence in TCI's investment analysis and track record.[35]

    4.    <u>Information Sharing Alone Does Not Constitute an Agreement to Enter Into a Group.</u>

As Mr. Hohn testified at trial, sometime during the spring or summer of 2007 – and after Mr. Amin's May 8, 2007 speech at the Bear Stearns investor conference, at which point

---

[34]    Because Mr. Amin oversees TCI's investments in Brazil (DX 154 (Amin Dep. 140:19-22)), he and Mr. Behring discussed TCI's interests in Brazil, including Arcelor and other investments that they had or were considering in Brazil. (Trial Tr. (Behring Test. 102:15-19).) As previously stated, the existence of a mere business relationship is insufficient to prove group membership. *Morales.*, 249 F.3d at 126; *Transcon Lines v. A.G. Becker, Inc.,* 470 F. Supp. 356, 375 (S.D.N.Y. 1979) ("Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create the group [under 13(d)(3)] which is deemed to be a statutory person."). Significantly, Mr. Amin testified that he and Mr. Behring did not discuss the buying or selling of CSX shares at this meeting. (Trial Tr. (Amin Test. 196:22-197:14).) This meeting reveals nothing about whether any agreement was formed.

[35]    Indeed, 3G's confidence in TCI's investment acumen and success is evidenced by the fact that one of its affiliates, Synergy, is an investor in the TCI fund.

TCI's significant equity and synthetic investment in CSX, as well as its HSR filing, had been

made a matter of public record by CSX in its first quarter 10Q (DX 114) – Mr. Behring

informally brought up the idea of 3G and TCI working together with regard to their investments

in CSX.  Such casual, preliminary discussions, however, do not establish that a group was

formed.  *Pantry Pride, Inc. v. Rooney,* 598 F. Supp. 891, 899-900 (S.D.N.Y. 1984) (group was

not formed until stockholders entered into agreement, even though the idea of a proxy fight had

been floated among certain shareholders previously).

   In response, Mr. Hohn made clear to Mr. Behring that he had no interest in

forming a group with 3G.  Indeed, TCI previously had never been part of a group.  (Trial Tr.

(Hohn Test. 182:18-20).)  As Mr. Hohn explained, forming a group with 3G or any other person

months before any action could be taken to run a director slate or proposed changes to CSX's

bylaws would have limited TCI's options.  (Trial Tr. (Hohn Test. 181:25-182:17); DX 144

(Hohn ¶ 31).)  Given that, as Mr. Hohn further explained, he wished to avoid the appearance of

forming a group.

> We are an activist investor for a material part of our
> investments and we have been involved in the highest profile
> activist investments around the world, such as ABN AMRO
> Bank, and it's almost a certainty that every activist situation we
> are invested in we get a regulator inquiry instigated by the
> company and as a result it's almost automatic in such inquiries
> that they evaluate whether we are in a group with any fund we
> have talked to, and so that is why I am particularly sensitive
> to the issue of groups and knowledgeable about when a group is
> formed and when it is not formed.

(Trial Tr. (Hohn Test. 180:9-18).)[36]

---

[36] Because of this increased sensitivity, Mr. Hohn was particularly careful when discussing investment information and sharing models.  On more than one occasion, he had gone as far as explicitly pointing out to another investor, other than 3G, that TCI cannot become part of a group.  (PX 46.)

Other than simply showing that TCI and 3G had an ongoing business relationship, Plaintiff provides no evidence indicating that there was an agreement to act in "in concert" with 3G. *Universal Container Corp. v. Horwitz*, 1977 WL 1036, at *16 ("Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create the group which is deemed to be a statutory person.  There must be agreement to act in concert.").  The railroad sector is one of many significant investments for TCI and therefore is not the only industry that TCI discusses with 3G or other funds.  For example, in February 2007, TCI held a $500 million position in the Brazilian company Arcelor Brasil.  (Trial Tr. (Hohn Test. 156:15).)

5.    There Was No Reason For TCI To Form A Group Before December 12, 2007.

From July through November 2007, TCI was concerned about two things.  (DX 144 (Hohn ¶ 28); DX 145 (Amin ¶ 43).)  First, the broader credit and equity markets were in turmoil, which caused TCI to reevaluate its entire portfolio.  (*Id*.)  As part of that reevaluation, TCI questioned whether it was overly exposed to the rail industry.  (*Id*.)  Second, TCI became aware of the heightened level of reregulation risk in the rail industry.  (*Id*.)  TCI was concerned that, if the reregulation bill that was contemplated in Congress passed, it would be damaging for TCI's investment.  (*Id*.)  Accordingly, TCI decided that a commitment to go active, let alone form a group, was premature.  Those concerns were not challenged by Plaintiff.

Mr. Hohn succinctly explained why it would be nonsensical for TCI, with such a large economic exposure to CSX, to tie itself with another fund at this point in time:

> after February 2007 there was no ability to conduct a proxy fight, which is really the only tangible form of activism permissible in this company, until February 2008.  And the deadline for filing proxies then would have been January 2008.  So there was absolutely zero purpose or value in forming a group during 2007 because you wouldn't be able to do anything with that until the following calendar year and if you wanted to change your mind and sell the shares because of changes in circumstances of the

> company or changes in circumstances of your fund, you would tie
> your hands if you were in a group prior to that period.

(Trial Tr. (Hohn Test. 181:25-182:17); *see also* DX 144 (Hohn ¶ 31).)

6.    3G Was Completely Absent From TCI's Initial Proxy Efforts.

Meanwhile, however, TCI did not want to foreclose any opportunity to seek Board representation if CSX management and the Board continued to stonewall. Toward that end, because TCI had never run a proxy contest before, in August 2007, TCI had a call with D.F. King, one of the nation's leading proxy solicitation firms, and its counsel, Schulte Roth & Zabel, to discuss the process of a possible proxy fight in the event it chose to run a slate. (Trial Tr. (Amin Test. 195:1-7).) Despite Plaintiff's assertion that TCI and 3G had already formed a group by that time, it is undisputed that neither 3G nor its counsel participated in that call, the very purpose of which was to discuss running a proxy contest. (Trial Tr. (Amin Test. 213:8-16).) Nor did anyone from TCI ever inform 3G or its advisors that TCI was having the call with D.F. King and Schulte Roth (Trial Tr. (Amin Test. 218:17-20)), and Mr. Behring testified that he knew nothing of this meeting (Trial Tr. (Behring Test. 106:20-107:3)). Surely, if a group had been formed or even contemplated between TCI and 3G by this point, 3G would at least have been advised of such a call. There can be no question that, if TCI and 3G had already formed a group as of August 2007, 3G would have been invited to that call. Yet, it was not.[37] This is powerful evidence that the two funds were not part of a group at that time.

In September 2007, Mr. Hohn instructed Mr. Amin to search for potential candidates. (Trial Tr. (Amin Test. 201:18-22); DX 144 (Hohn ¶ 34); DX 145 (Amin ¶ 49).) TCI

---

[37]    Plaintiff's counsel also suggested that TCI and 3G formed a group as far back as August 2007, by pointing to a redacted e-mail from Kirkland & Ellis, 3G's counsel, to Mr. Amin. (Trial Tr. (Behring Test. 103:7-104:20).) After he was shown the unredacted version of the e-mail, Plaintiff's counsel conceded that the e-mail had nothing to do with 3G whatsoever and that it was in connection with TCI's retention of Kirkland & Ellis for legal advice completely independent of the issues in this case. (Trial Tr. (Behring Test. 154:2-8).)

concluded that it would only proceed with a proxy contest if it could find "world class" candidates willing to run. (DX 144 (Hohn ¶ 38); DX 145 (Amin ¶ 49).) If TCI decided to run a slate of world class nominees, it would take some time to assemble. TCI did not discuss the potential of TCI engaging in a proxy contest with 3G or any other investor during this time. (Trial Tr. (Behring Test. 107:7-11, 136:17-22).)

　　　　At the same time, TCI also decided to write an open letter to the Board. TCI determined that if the Company did not satisfactorily respond to its letter, TCI would commit to running a slate of candidates to the Board. (DX 144 (Hohn ¶¶ 32-33), DX (Amin 145 ¶ 50).) On October 16, 2007, TCI sent a public letter to the CSX Board (the "October 16 Letter") stating that "[o]ver the past year we have repeatedly, but unsuccessfully, attempted to engage in a constructive dialogue with the Board and top management of CSX on concerns we have about the business." (DX 47.) The letter also disclosed that TCI "currently owns 17.8 million shares, or 4.1% of CSX." (*Id.*) If a group was formed or contemplated at that time, common sense would dictate that 3G would have participated in drafting the letter or at the very least would have known about the letter prior to it being sent to the CSX board. However, it did not. Again, this undermines Plaintiff's assertion that TCI and 3G were acting together at that time.

　　　　On November 16, 2007, CSX wrote to TCI dismissing all of TCI's recommendations. CSX wrote, among other things, that "[t]hroughout the year, CSX and its representatives have repeatedly made TCI aware that the Board has spent a great deal of time considering its views" and that "TCI criticizes corporate governance, operations and investment levels, notwithstanding CSX's strong performance on the well understood measures of organizational quality. The Board believes that the suggestions outlined in these recent letters are not in the best interests of the company and its shareholders." (DX 59.)

7.     3G Approaches TCI About Running A Proxy Contest.

In early November 2007, 3G approached Mr. Amin to see whether TCI was considering running a proxy contest, and indicated that it may do so itself.  (DX 145 (Amin ¶ 56).)  At that time, TCI was uncertain as to whether TCI was going to run a proxy contest:  TCI was still hoping that its letters to the Board would serve as a catalyst for a constructive dialogue with CSX.  (*Id.*)  Moreover, TCI's view was that, unless TCI had a world class slate to put up, TCI would not run a contest, and TCI had not yet assembled such a slate.  (*Id.*)  Although TCI had identified Tim O'Toole, a former CEO of Conrail, as a possible nominee in October 2007, and although Mr. O'Toole had indicated that he thought it was an opportunity he would consider seriously if TCI decided to run a slate, Mr. O'Toole had not formally committed to running for CSX's Board, and TCI had no other nominees confirmed either.  (*Id.*; DX 144 ¶ 36.)[38]

Mr. Behring, Mr. Hohn and Mr. Amin all testified that, prior to November 2007, TCI and 3G did not discuss forming a group.  (Trial Tr. (Behring Test. 135:4-7), (Amin Test. 212:1-8, (Amin Test. 213:21-25), DX 144 (Hohn ¶ 37-38); DX 146 (Behring ¶ 46).)  There is no evidence that 3G and TCI engaged in discussions about forming a group prior to November 2007.  In early November, TCI told 3G that TCI was not sure how it was going to proceed, and whether it would run a proxy contest.  (DX 144 (Hohn ¶ 37).)  As Mr. Amin testified:  "In that initial contact it was a meeting we had in early November and we hadn't decided what we were going to do yet because our view is we only would go down the path of a proxy contest if we could find what we deemed to be world class nominees and we hadn't at that time identified or

---

[38]     In an attempt to show that TCI and 3G coordinated their activities in search of nominees, Plaintiff's counsel asked Mr. Behring whether on the same day he first met with Gil Lamphere (October 8, 2007), he knew Mr. Hohn also met with Mr. O'Toole.  The evidence, however, shows neither TCI nor 3G chose October 8 as their first meeting date.  Rather, Mr. O'Toole chose October 8 to meet with Mr. Hohn.  (PX 138.)

had people that committed to run and so we put that off.  Once Tim O'Toole came back to us and

said he would be very interested we began discussions with 3G because we were comfortable

then that we had at least one person who would run."  (Trial Tr. (Amin Test. 215:4-12).)

   CSX's November 16, 2007 response to TCI's October letter made clear to TCI

that the CSX board and management were not interested in doing what was in the best long-term

interest of shareholders.  It was only around this time that Mr. Hohn authorized Mr. Amin to

have a discussion with 3G regarding the possibility of forming a group.  (DX 144 (Hohn ¶ 38);

DX 145 (Amin ¶ 57).)  At trial, Mr. Behring confirmed that it was not until "later" in 2007 that

Mr. Hohn expressed an interest in "the possibility of evaluating courses of action" due to his

frustration with CSX.  (Trial Tr. (Behring 122:6-8, 123:7-9).)  Thereafter, Mr. Amin met with

Mr. Behring to discuss the possibility of TCI and 3G forming a group and running a combined

slate.

   Several significant issues were negotiated and had to be agreed upon before the

parties entered into a group agreement.  (Trial Tr. (Amin Test. 215:12-13); DX 145 (Amin ¶ 58);

DX 146 (Behring ¶ 49).)  As Mr. Amin testified:  "One was whether [Mr. Hohn] would stand for

the board . . . And, also, what decisions we would have to get made jointly and what decisions

TCI would have decision power over, and the roles of the lawyers and fees, how fees would get

split.  And then there was Thanksgiving, which brought everything to a halt for a week."  (Trial

Tr. (Amin Test. 215:13-20); DX 144 (Hohn ¶¶ 39-40).)

   In late November 2007, 3G finally informed TCI that it had identified Gil

Lamphere as a nominee (DX 144 (Hohn ¶ 39); DX 145 (Amin ¶ 58)), and TCI informed 3G that

it had identified Mr. O'Toole (Trial Tr. (Behring 136:23-137:1).)  In early December 2007,

although TCI had debated internally whether it wanted a TCI-affiliated nominee, based on 3G's insistence, Mr. Hohn ultimately decided to run on the slate. (DX 145 (Amin ¶ 60).)

        Further, although in late November TCI identified Gary Wilson, former Chairman of Northwest Airlines, as a potential nominee, TCI negotiated with Mr. Wilson over a two-week period to run as a nominee. (DX 144 (Hohn ¶ 41); DX 145 (Amin ¶ 60).) In TCI's view, the final event which enabled it to commit to forming a group was a commitment from Mr. Wilson. (Trial Tr. (Amin Test. 215:21-24).) A fax from Mr. Wilson shows that he did not commit to run as a nominee until December 11, 2007, at 5:04 pm, Pacific Time, which was received in the middle of the night at 2:04 am in the UK on December 12, 2007. (DX 64; Trial Tr. (Amin Test. 216:1-14).) After TCI had commitments from its two nominees, TCI agreed to form a group with 3G on December 12, 2007. Accordingly, TCI and 3G did not form a group prior to December 12, 2007.

###     E.    Defendants Have Complied With All Other Disclosure Requirements Under Section 13(d).

        In addition to Plaintiff's claim that Defendants violated Section 13(d) by failing to treat their Total Return Swaps as conferring beneficial ownership on the referenced CSX shares, and failing to disclose that they formed a group prior to December 12, 2007 (both of which Defendants deny), Plaintiff asserts that Defendants' Schedule 13D was materially false and misleading in several other ways, none of which are supported by the facts or the evidence.

        1.    <u>Item 3 Disclosure</u>

        Plaintiff claims that Defendants' Item 3 disclosure was inaccurate. That claim is based on an incorrect interpretation of Item 3. Item 3 requires disclosure of "the source and the amount of funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is or will be represented by funds or other consideration borrowed or

otherwise obtained for the purpose of acquiring, holding, trading or voting the *securities*."  17

C.F.R. § 240.13d-101, Item 3 (emphasis added).  Defendants accurately disclosed that they used

their general working capital to acquire CSX shares and Plaintiff does not contend otherwise.

(DX 144 (Hohn ¶ 21).)  No evidence to the contrary was offered at trial.  Rather, CSX alleges

that Defendants must disclose "the source of funds used to acquire Defendants' *interest* in CSX."

(PTO at 21 (emphasis added).)  However, by its plain terms, Item 3 does not require disclosure

of economic interests that are not "securities," for purposes of the Exchange Act, such as TCI's

total return swaps.  *See* Section 3A of the Exchange Act, which excludes swap agreements from

the definition of security.  Accordingly, Defendants' Item 3 disclosure was complete and

accurate.

       2.    <u>Item 4 Disclosure</u>

Item 4 of a Schedule 13D requires disclosure of (1) the purpose of the acquisition

of securities, including any purpose to acquire control, and (2) certain specifically listed "plans

or proposals" which would result in the acquisition of disposition of additional shares, any

change in the board or management, or any material change in the business or corporate structure

of the issuer.  17 C.F.R. § 240.13d-101, Item 4.  Plaintiff claims that Defendants' Item 4

disclosure was inaccurate because "Defendants failed to disclose their plans or proposals for

major changes in CSX's business and structure."  (PTO at 23.)

On the contrary, in Item 4 of Defendants' December 12, 2007 Schedules 13D,

Defendants fully and accurately disclosed that Defendants had "multiple unsuccessful attempts

to engage the management or the Board in a constructive dialogue" regarding CSX's operations

and that TCI had suggested to CSX that it should (i) separate the Chairman and CEO roles, (ii)

refresh the Board with new independent directors, (iii) allow shareholders to call special

shareholder meetings, (iv) align management compensation with shareholder interests, (v) justify

the capital spending plan to shareholders, and (vi) provide a plan to improve operations.  (JX 8.)

Defendants also disclosed that they "currently intend to conduct a proxy solicitation seeking to

elect [their] Nominees to the Board at [CSX's] 2008 Annual Meeting" and that on December 12,

2007, Defendants "delivered a letter to [CSX] informing [CSX] of their intention to propose

nominees for election to the Board."[39]  Moreover, Defendants disclosed they may "engage in

discussions with management, the Board, other stockholders of [CSX] and other relevant parties

concerning the business, operations, governance, management, strategy and future plans of

[CSX]" and that Defendants "may in the future take such actions with respect to their

investments in [CSX] as they deem appropriate."  (JX 8.)

Plaintiff claims that Defendants should have disclosed their "plan to effect an

LBO involving CSX, or, failing that, an extraordinary leveraged share repurchase and developed

proposals for other major changes in CSX's business and structure."  (PTO at 23.)  However, the

evidence clearly shows that TCI had abandoned any LBO proposal by March, 2007.  Moreover,

TCI's suggestion that CSX increase leverage for its share repurchase program, for which CSX on

its own initiative had already increased its leverage, does not constitute a "major change in

business and structure" which requires disclosure in Item 4.  Accordingly, Defendants' Item 4

disclosure was complete and accurate.

3.    Item 7 Disclosure

CSX alleges that Defendants failed to file "copies of the swap contracts and

nominee agreements as exhibits to the Schedule 13D."  (PTO at 21, 23.)  Contrary to Plaintiff's

contention, Item 7 does not require that Defendants file copies of the total return swap

---

[39]    In subsequent Schedules 13D, filed on January 22 and 25, 2008, Defendants updated their intentions regarding running a minority slate of nominees to CSX's Board.  (JX 9; JX 10.)  On March 18, 2008, Defendants updated Item 4 by disclosing CSX's complaint in the instant matter and their intent to defend themselves vigorously. (JX 14.)  On April 7, 2008, Defendants updated Item 4 by disclosing their counterclaims against CSX and third-party claims against Michael Ward.  (JX 16.)

agreements.  Item 7 requires only that written agreements pertaining to "the transfer or voting of the securities, finder's fees, joint ventures, options, puts, calls, guarantees of loans, guarantees against loss or profit, or the giving or withholding of any proxy disclosed in Item 6" be filed as exhibits to the Schedule 13D.  17 C.F.R. § 240.13d-101, Item 7(3).  A Total Return Swap agreement is none of these.  It does not pertain to the transfer or voting of securities finder's fees, joint ventures, options, puts, calls, guarantees of loans or the giving or withdrawing of any proxy. It is not a guarantee against loss or profit.  It does not guarantee anything to either of the swap counterparties; rather, one counterparty gains when the stock price rises and the other counterparty gains when the stock price falls.  Accordingly, Defendants are not legally required to file their Total Return Swap agreements as exhibits to their Schedule 13D.

CSX also alleges that Defendants failed to file copies of the nominee agreements referenced in their Schedule 13D.  (PTO at 21.)  Item 7(2) of 17 C.F.R. § 240.13d-101 requires "copies of all written agreements, contracts, arrangements, understanding, plans or proposals relating to . . . any other matter as disclosed in Item 4."  Item 4(d) requires "any plans or proposals which the reporting persons may have which relate to or would result in . . . [a]ny change in the present board of directors."  Nominee agreements are entered into with people that may, or may not, ultimately become nominees as part of a proxy contest.  The agreement terminates at the point in time a person succeeds to a board of directors.  Therefore, such agreements do not relate to the Item 4(d) disclosure as contemplated in Item 7.  In any event, even assuming, *arguendo,* that nominee agreements are required to be filed with a Schedule 13D, such a *de minimus* technical violation is not a "material" omission and does not render Defendants' Schedule 13D false or misleading.  Moreover, the substance of the nominee

agreements is described in detail in Defendants' Schedule 14A and, therefore, there is sufficient public information for the shareholders to decide how to cast their votes.

    4.    <u>Disclosure of 3G's Credit Default Swaps</u>

        In the Joint Final Pre-Trial Order submitted by the parties on May 15, 2008, CSX raised for the first time the claim that 3G failed to make adequate disclosures relating to credit default swaps ("CDS") relating to CSX in its Schedule 13D filings. That contention appears nowhere in CSX's complaint and therefore is an impermissible new claim raised after the close of fact discovery in this matter, that should not be considered by the Court. In any event, disclosure of CDS positions is not required by the rules governing Schedule 13D disclosures. For example, the special instructions for complying with Schedule 13D provide that the primary purpose of the information disclosed is to determine and disclose the holdings of certain beneficial owners of certain equity securities. 17 C.F.R. § 240.13d-101, Special Instructions. Similarly, Item 6 of Schedule 13D provides an illustrative list of types of arrangements to be disclosed that underscores the primary purpose described in the special instructions. 17 C.F.R. § 240.13d-101, Item 6. CDS are essentially insurance against an issuer's defaulting on its debt, and fall outside the scope of that stated purpose. Market practice is to not disclose CDS in Schedule 13D filings. 3G, however, adopted a conservative approach relative to market practice and in fact disclosed that it has a CDS position that references CSX. In Item 6 of its of the December 19, 2007 Schedule 13D, 3G disclosed that:

> In addition, the 3G Reporting Persons currently have contractual agreements with Morgan Stanley Capital Services Inc. with regard to credit default swaps that reference debt securities of the Issuer. The contracts regarding the 3G Total Return Swaps and credit default swaps do not give the 3G Reporting Persons direct or indirect voting, investment or dispositive control over any securities of the Issuer and do not require the counterparties thereto to acquire, hold, vote or dispose of any securities of the Issuer.

(JX 8.)  Accordingly, CSX's belated contention relating to CDS, even if it were to be considered, is entirely without merit.

              5.     Controlling Persons Disclosure

          CSX incorrectly alleges that "[i]n violation of Instruction C to Schedule D, the defendants have failed to disclose required information regarding controlling persons of the defendant entities."  (Compl. ¶ 82).  Because CSX has apparently abandoned this claim in the Amended Joint Pre-Trial Order, CSX has waived this claim.  Even if the Court finds that the claim has not been waived, CSX has failed to carry its burden.  Under 17 C.F.R. § 240.13d-101, Instruction C provides:  "If the statement is filed by a general or limited partnership, syndicate, or other group, the information called for by Items 2-6, inclusive, shall be given with respect to . . . each person controlling such partner or member."  In their December 19, 2007 and March 18, 2008 Schedules 13D, Defendants accurately disclosed the required information regarding TCI's controlling person, Christopher Hohn, and 3G's controlling person, Alexandre Behring.  (JX 8; JX 14.)  As discussed below, Mr. Amin is not a controlling person of any of the Defendant entities, and no evidence to the contrary was offered in this case.  Accordingly, Defendants have fully complied with Instruction C to Schedule 13D.

## II.    DEFENDANTS HAVE COMPLIED WITH THE DISCLOSURE REQUIREMENTS OF SECTION 14(A) OF THE EXCHANGE ACT.

          In filing their Schedule 14A on March 10, 2008 and April 15, 2008, and a definitive proxy statement on Schedule 14A on April 28, 2008 (collectively, the "Schedule 14A"), Defendants fully complied with Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, which provides that proxy statements must not contain "any statement which . . . is false or misleading with respect to any material fact . . . ."  17 C.F.R. § 240.14a-9(a).  For a misstatement or omission to be material "there must be a substantial likelihood that

the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132 (1976).

The Schedule 14A is not an isolated filing, but part of that "total mix of information." *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d. Cir. 1993) (citing *TSC Indus.*, 426 U.S. at 449, 96 S. Ct. at 2132) (internal quotation marks omitted). Shareholders may be deemed to have constructive notice of the facts reported in readily-available media when such reports feature the subject of the proxy solicitation. *Id*. The increased access to public information due to the "explosion in internet availability" has enlarged the total mix of information available to shareholders. *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 374 n.6 (E.D.N.Y. 2003). Therefore, the "total mix of information" includes widely-available news reports as well as knowledge gleaned from public SEC filings. *Id*. at 731.

Plaintiff claims that the Schedule 14A is materially false, misleading and incomplete for many of the same reasons it asserts that Defendants' Schedule 13D is inadequate. Plaintiff argues that Defendants' Schedule 14A "fails accurately to disclose Defendants' beneficial ownership of CSX common stock by falsely disclaiming beneficial ownership of shares associated with total return swaps" and "contains other false statements concerning the date that Defendants formed a group." (PTO at 24.)

For the same reasons as demonstrated above, the disclosures in Defendants' Schedule 14A were not misleading – Defendants did not have beneficial ownership over shares of CSX held by their swap counterparties. Moreover, in light of the information that is publicly available – including TCI's stock holdings, TCI's swap position, TCI and 3G forming a group, and CSX's contentions with respect to TCI's swap position and an earlier formation of a group –

none of the purported disclosures or omissions Plaintiff identifies would alter the total mix of information. *See In re Keyspan Corp.* 383 F. Supp. 2d at 374 n.6. There is nothing to be disclosed that could alter the investor's current information.

In addition to asserting claims similar to the Schedule 13D violations, Plaintiff claims that in Defendants' Schedule 14A, Defendants made false statements about the negotiations between Mr. Hohn and Mr. Kelly. First, Plaintiff claims that Defendants' statement that "TCI made concessions with the hope of being able to reach an amicable resolution" is false. (PTO at 25.) Plaintiff bases this contention on a position that TCI purportedly took "before the outset of negotiations," that TCI would avoid a proxy contest only if CSX allowed Defendants' five nominees. (*Id.*). However, Defendants' stated position prior to negotiations by definition does not reflect concessions made *during* negotiations, when Defendants in fact indicated they were willing to agree to three nominees and a mutually agreed upon fourth nominee. (PX 266 (Kelly ¶ 23); DX 144 (Hohn ¶ 45).)

Similarly, Plaintiff attempts to discredit the statement in Defendants' Schedule 14A that TCI "indicated a willingness to sign a one year stand-still agreement," but admits that "Mr. Hohn . . . was willing to agree to a one-year standstill . . . ." (PTO at 25; PX 266 (Kelly ¶ 24).) Although Plaintiff claims that negotiations "had terminated" when Mr. Hohn indicated his unwillingness to enter into a stand-still (*id.*), it does not disclose that it was CSX that had unilaterally declared that negotiations were over. (DX 75; DX 144 (Hohn ¶ 47).)

Also, Plaintiff asserts that Defendants do not disclose any history of their swap transactions that reference CSX securities. (PTO at 25.) As required by Item 5 of the Schedule 14A, 17 C.F.R. § 240.14a-101 Item 5.(b)(1)(vi), Defendants disclose the history of transactions with respect to CSX securities that were purchased or sold within the past two years (JX 12,

Annex A.)  Because equity swaps are not "securities" under the Exchange act, disclosure of the swap transactions is not required.

For the reasons above, Defendants' Schedule 14A is materially complete and Plaintiff's claims based on the Schedule 14A should be dismissed.

## III.    THE INDIVIDUAL DEFENDANTS ARE NOT LIABLE AS CONTROLLING PERSONS UNDER SECTION 20(A).

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  In order to establish a prima facie case of controlling person liability, CSX must first show a primary violation by TCI and 3G.  *ATSI Commc'ns Inc. v. Shaar Funds, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  If a prima facie case of controlling person status is established, the burden shifts to the controlling person to show "that he acted in good faith."  *Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569 (DAB), 2001 WL 286757, at *8-9 (S.D.N.Y. Mar. 23, 2001).

Here, the individual Defendants are not liable as controlling persons because, as set forth above, CSX has failed to meet its burden of showing any primary violation of the securities laws by either TCI or 3G.  Moreover, even if the Court finds that TCI or 3G did in some way violate the securities laws, the individual Defendants cannot be held liable as controlling persons because they each acted in good faith.  Each of the individual Defendants reasonably relied on the advice of counsel that all of their disclosures in the Schedules 13D and 14A were legal, truthful and accurate.

In addition, Snehal Amin is not a controlling person within the meaning of Section 20(a). Control person status is established by showing that the individual defendant possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Harrison v. Rubenstein*, No. 02 Civ. 9356(DAB), 2007 WL 582955, at *19 (S.D.N.Y. Feb. 26, 2007) (quoting 17 C.F.R. § 240.12b-2). The fact that Mr. Amin "signed numerous letters" and "authored emails communications to CSX" plainly does not make him a controlling person, as CSX claims in the Amended Joint Final Pre-Trial Order. (PTO at 26.) Although Mr. Amin is a partner at TCI and advises Mr. Hohn with respect to TCI's position in the U.S. rail industry, the uncontested evidence shows that he does not have decision making authority with respect to the investment decisions made by TCI, nor does he have final authority to make day-to-day decisions on significant matters relating to TCI's investment in CSX. Accordingly, Mr. Amin is not a controlling person under the federal securities laws.

## IV.    THE PLAINTIFF HAS FAILED TO IDENTIFY ANY IRREPARABLE HARM AND, ACCORDINGLY, NO INJUNCTION SHOULD ISSUE.

### A.    Standard for Injunctive Relief

To obtain an injunction following trial on the merits,[40] Plaintiff must establish irreparable harm and actual success on the merits. *See, e.g., The Guardian News, Inc. v. Amicone*, No. 07 Civ. 7078, 2008 WL 594770, at *14 (S.D.N.Y. Mar. 3, 2008). The standard of proof for demonstrating success on the merits is preponderance of the evidence. *D.L. Cromwell Investments, Inc. v. NASD Regulation, Inc.*, 279 F.3d 155, 161 (2d Cir. 2002).

To obtain an injunction, the Plaintiff must show that "it will suffer 'real and imminent, not remote, irreparable harm' in the absence of a remedy." *Henrietta D. v.*

---

[40]    The Court ordered that the hearing held on May 20-21, 2008 constituted a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). (Trial Tr. (Amin Test. 193:25-194:9).)

*Bloomberg*, 331 F.3d 261, 290 (2d Cir. 2003).  A remote possibility of damage is insufficient.

*Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57-60, 95 S. Ct. 2069, 2075-2078 (1975).

Indeed, injunctive relief is often described as a "drastic remedy."  *See, e.g., Mazurek v.*

*Armstrong,* 520 U.S. 968, 972, 117 S. Ct. 1865, 1867 (1997); *Simmons v. Cranston*, No. 07 Civ.

3241, 2008 WL 820474, at *2  (S.D.N.Y. Jan. 14, 2008); *S.E.C. v. Franklin Atlas Corp.,* 171 F.

Supp. 711, 718 (S.D.N.Y. 1959)**.**

Plaintiff must satisfy the "traditional prerequisites of extraordinary equitable

relief," including establishing irreparable harm, to be granted injunctive relief under the

Exchange Act.  *Rondeau*, 422 U.S. at 61, 95 S. Ct. at 2077.  "[T]he questions of liability and

relief are separate in private actions under the securities laws, and . . . the latter is to be

determined according to traditional principles."  *Id.* at 64, 95 S. Ct. at 2079.  As the Second

Circuit has explained:

> [A]n injunction will issue for a violation of § 13(d) only on a
> showing of irreparable harm to the interests which that section
> seeks to protect.  Those interests are fully satisfied when the
> shareholders receive the information required to be filed.

*ICN Pharmaceuticals v. Khan*, 2 F.3d 484, 489 (2d Cir. 1993) (quoting *Treadway Cos. v. Care*

*Corp.*, 638 F.2d 357, 380 (2d Cir. 1980) (internal citations omitted).

As explained above, CSX is not entitled to any injunction because it has failed to

succeed on the merits – Defendants' Schedule 13D and Schedule 14A disclosures were accurate.

However, even if CSX had demonstrated a violation of Section 13(d) or Section 14(a), CSX

would not be entitled to the injunctive relief it seeks as it has failed to demonstrate any

irreparable harm flowing from any such violation.[41]

---

[41]    Indeed, Plaintiffs offered no evidence of any harm, let alone irreparable harm.

Sections 13(d) and 14(a) are designed, in part, to create transparency in the securities markets and, here, there can be no doubt that CSX shareholders have ample information: Defendants have long since disclosed their economic interest in CSX and TCI and 3G's agreement to form a group, what Plaintiff now claims need to be disclosed again. Put simply, there is no need for a "curative" disclosure because there is nothing left to say. In addition to unnecessary disclosure, CSX goes on to request a myriad of extreme and novel remedies that go far beyond the purposes of the securities disclosure rules and for which there is no legal support.

**B.      Sections 13(d) and 14(a) Are Designed to Provide Information Regarding Acquisitions of Equity Securities for the Purpose of Acquiring Control.**

The primary purpose of Sections 13(d) and 14(a) of the Exchange Act is to ensure the full flow of information to shareholders regarding certain acquisitions of the issuer's equity securities for the purpose of acquiring control of the issuer and to provide a level playing field. *See* Filing & Disclosure Requirements Relating to Beneficial Ownership, 43 Fed. Reg. 18484, 18484 (Apr. 28, 1978) (citing S. Rep. No. 90-550 (1967); H.R. Rep. 90-1711 (1968) (explaining that the legislative history of Section 13(d) "indicates that it was intended to provide information to the public and the affected issuer about rapid accumulations of its equity securities in the hands of persons who would then have the potential to change or influence control of the issuer."). Given the goal of transparency in such accumulations for control purposes, corrective disclosure is the most common remedy imposed for violations of Section 13(d) or Section 14(a). In the case of violations of Section 13(d), "[e]ffectively the only relief available to an issuer, according to the prevailing view, is an order requiring the five percent owner to file a corrected 13D and perhaps enjoining further acquisitions pending the corrections." *Hubco v. Rappaport*, 628 F. Supp. 345, 354 (D.N.J. 1985).

The disclosure requirements are designed to protect the interests of shareholders, not the issuer. *See General Aircraft Corp. v. Lampert*, 556 F.2d 90, 94-95 (1st Cir. 1977). An injunction will only be granted to redress a Section 13(d) violation upon a showing of "irreparable harm to those interests which that section seeks to protect." *Treadway Cos. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir. 1980). In the context of a proxy contest, the shareholders are entitled to truthful and complete information with enough time to make an informed decision regarding the opposing nominees. *See id.* (holding that once the informational purpose of Schedule 13D is fulfilled, there is no risk of irreparable injury and no cause for injunctive relief); *Vestcom Int'l, Inc. v. Chorpa*, 114 F. Supp. 2d 292, 299-300 (D.N.J. 2000) (Denying injunction where, "given the hotly contested nature of this takeover bid, there can be no doubt that plaintiff will fully apprise any shareholder who will listen of defendants' alleged iniquities.").

"The legislative history of the Williams Act . . . [also] makes clear that the Act was intended to assist shareholders while at the same time remaining 'evenhanded' in any struggle between the issuer and entity purchasing large quantities of stock." *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d. 613, 621 (2d Cir. 2002). The disclosure rules are not meant to be used as a tool to permit management or the board to entrench itself in their current positions. The Williams Act legislative history makes plain that it is intended to "avoid[] tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. It is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case." S. Rep. No. 90-550, at 3 (1967); H.R. Rep. 90-1711, at 2813 (1968).

> By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position.

*Rondeau*, 422 U.S. at 58, 95 S. Ct. at 2076.

Finally, the disclosures rules are not designed to punish.  As Your Honor noted in

*Capital Realty Investors v. Dominium Tax Exempt*, 944 F. Supp. 250, 258-59 (S.D.N.Y. 1996), a

case in which it was found that plaintiff would likely be able to prove violations of Section 14(a):

> [T]he objective of courts and of injunctive relief in cases like this
> [is] not to 'test the ingenuity of sophisticated corporate counsel.'
> Nor is it 'to punish.'  Rather, it is to ensure that investors
> provided in a timely fashion with the accurate information
> necessary to the intelligent exercise of the corporate franchise.

*Id.* (internal citations omitted); *see also Electronic Specialty Co. v. Int'l Controls Corp.*, 409 F.2d

937, 947 (2d Cir. 1969) ("The historic injunctive process was designed to deter, not to

punish.").[42]

### C.    CSX Has Failed to Establish Irreparable Harm and, Accordingly, No Injunctive Relief Is Appropriate.

Plaintiff has failed to demonstrate that the CSX shareholders will be harmed in

any way – much less irreparably – unless an injunction is granted.  Defendants' economic

interest in CSX, and TCI and 3G's agreement to form a group have been fully and publicly

disclosed for over five months, and by the time of the June 25 annual shareholders' meeting, the

disclosures will have been public for over six months.  Accordingly, there can be no irreparable

harm and no injunction should issue.

Plaintiff has identified no disclosure necessary for CSX shareholders to make an

informed vote in the pending proxy contest.  Indeed, Plaintiff has not identified any such

irreparable harm and has offered no evidence to support a finding of irreparable harm.  Plaintiff

did not even identify whether CSX or its shareholders had suffered irreparable harm among the

---

[42]    Quoting Judge Friendly, Your Honor further noted that "[P]articipants in proxy contests and tender offers 'act, not in the peace of quiet chamber . . . but under the stresses of the marketplace.'"  *Capital Realty Investors v. Dominium Tax Exempt Fund Ltd., P'ship*, 944 F. Supp. 250, 259 (S.D.N.Y. 1996) (quoting *Electronic Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969)).

issues to be tried in this action.  (PTO at 92-93.)  In fact, there is no mention of irreparable harm anywhere in Plaintiff's submissions in the Amended Joint Pre-Trial Order.  More significantly, Plaintiff presented no proof at trial of any harm.  Plaintiff has done nothing more than purport to identify a series of technical disclosure violations that have long since been remedied.  Under well-established law, this does not constitute irreparable harm and, accordingly, no injunction should issue.

CSX has not – nor can it – explain why CSX shareholders are harmed by the purportedly misleading Schedules 13D and 14A.  The proxy contest is a vote of the shareholders about who should sit on its board and specific corporate governance proposals.  (JX 5 (CSX Definitive Proxy, *see* Notice of Annual Meeting of Shareholders).)  Shareholders will make their decision about how to vote on these matters based on the strength of the Defendants' nominees and their specific (and fully-disclosed) plans for CSX, not based upon whether the Defendants' fully disclosed Total Return Swap position is called beneficial ownership or not.  The CSX shareholders' behavior makes this abundantly clear.  Oscar Munoz, the CSX Chief Financial Officer, testified that he could not recall any investor in CSX *ever* make an inquiry into TCI's Total Return Swap position.  (Trial Tr. (Munoz Test. 37:20-22).)

### 1.    No "Curative" Disclosure is Required.

Plaintiff has sought an order "directing that Defendants file truthful and accurate Schedule 13D and Schedule 14A disclosures, in compliance with the applicable rules and regulations, forthwith."  (PTO at 97.)  Such an order would be inappropriate here because there is nothing left to disclose.  Any "curative" disclosure would be nothing more than a rehash of information that has already been widely disseminated.[43]

---

[43]    CSX is not entitled to an injunction directing Defendants to file an amended Schedule 13D or an amended Schedule 14A disclosing CSX's *allegations* against Defendants as *matters of fact* because there is a genuine dispute

Courts have routinely declined to grant an injunction – despite finding technical violations of the disclosure rules – where all the information had been subsequently disclosed to the public. *See, e.g., Universal Container Corp. v. Horwitz*, No. 74 Civ. 3865, 1977 WL 1036, at *21-22 (S.D.N.Y. Sept. 6, 1977) (denying injunctive relief despite defendant's three-month late Schedule 13D); *Pantry Pride Inc. v. Rooney*, 598 F. Supp. 891, 898-900 (S.D.N.Y. 1984) (finding no irreparable harm despite the fact the group may have been formed earlier than disclosed); *Capital Realty Investors Tax Exempt Fund Ltd. P'ship v. Dominium Tax Exempt Fund LTD. P'ship*, 944 F. Supp. 250, 258-59 (S.D.N.Y. 1996) (Kaplan, J.) (holding that a Section 14(a) violation "of the most technical sort" did not justify injunctive relief).

Once the information is available to the public, the purposes of the disclosure rules under Section 13(d) and Section 14(a) have been satisfied and there can be no irreparable harm. For example, in *Treadway Cos., Inc. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir. 1980), the Second Circuit held that although Care failed to disclose in its original Schedule 13D that it was purchasing stock for the purpose of obtaining control of Treadway, its amended 13D, which "disclos[ed] unequivocally that it had determined to seek control . . . cured any deficiencies in the earlier filings . . . ." The amended 13D satisfied the intent behind Section 13(d) to "alert the marketplace to every large, rapid aggregation or accumulation of securities," so Treadway was not entitled to the injunctive relief it had requested and the claim was dismissed. *Id.* Likewise, in *Int'l Banknote Co. v. Muller*, 713 F. Supp. 612, 619-20 (S.D.N.Y. 1989), the court recognized that the plaintiff likely would be able to prove that a group was in fact formed at a date that would technically violate Section 13(d). Nonetheless, the court refused to find irreparable harm,

---

between the parties as to the truth of CSX's allegations. Defendants complied with their disclosure requirements under Sections 13(d) and 14(a) by disclosing CSX's Complaint in their subsequent Schedule 13D and Schedule 14A. *Condec Corp. v. Farley*, 573 F. Supp. 1382, 1387 (S.D.N.Y. 1983) ("When, as here, the record demonstrates that there is a dispute as to the facts, the law requires only that the disputed facts and the possible outcomes be disclosed. This is the limit of the law unless there is reason to believe that the facts are not genuinely in dispute.")

finding that the shareholders had all the information they needed to evaluate the insurgent slate of directors. *Id.* at 619-20.

As detailed above, TCI's SEC filings, CSX's SEC filings and numerous media reports have all fully revealed TCI's stock holdings, TCI's Total Return Swap position, TCI and 3G forming a group, and CSX's contentions with respect to TCI's Total Return Swap position and an earlier formation of a group. (*See supra* at 30.) Most notably:

- On April 18, 2007, CSX filed its Form 10-Q for the first quarter of 2007 with the SEC. That publicly-available document revealed that on March 15, 2007, CSX received notice from TCI that "it had made a filing under the Hart-Scott-Rodino Antitrust Improvements Act to acquire more than $500 million of CSX stock" and that TCI held "a significant economic position through common stock ownership and derivative contracts tied to the value of CSX stock." (DX 114, at 39; Trial Tr. (Munoz Test. 37:4-19), (Hohn Test. 164:5-17), (Behring Testimony 152:3-14).) In addition, there were press reports publicizing the filing that disclosed the existence of TCI's "significant" common-stock and derivative position. *See* Bhattiprolu Murti and Desiree J. Hanford, *Hedge Fund Files to Acquire Over $500M in CSX Stk,* Dow Jones News Service, April 18, 2007. (Godnick Decl. Ex. 18.)

- Over one year ago, on May 15, 2007, TCI filed a Schedule 13F with the SEC in which it disclosed that it held over 17 million shares of CSX stock. TCI's position in CSX stock has remained unchanged since that date.[44] The same disclosure was made by TCI on Forms 13F submitted on August 14, 2007, November 14, 2007, February 14, 2008, and May 15, 2008.

- On December 19, 2007, TCI and 3G filed a Form 13D with the SEC. The filing disclosed that TCI and 3G had formed a group with beneficial ownership exceeding 5% of the common stock of CSX and disclosed that TCI had Total Return Swap agreements giving TCI economic exposure to approximately 11% of the total outstanding shares in CSX. (JX 8 at 17.) TCI and 3G issued a press release the same day publicizing the filing. Press Release, TCI and 3G Form Group Owning 8.3% of CSX Shares and an Additional 11.8% Economic Interest (December 19, 2007). (Godnick Decl. Ex. 23.)

- In addition to these SEC filings, since mid-December, Defendants' exact economic exposure to CSX has been disclosed in a litany of written publications. Over 30 publications, ranging from newspaper articles, AP reports and trade newsletters, have

---

[44]    On November 30, 2007, TCI transferred 10,000 shares from its holdings at UBS to Goldman Sachs. (PX 206.) This transfer was done for purposes related to record ownership and did not impact TCI's total holding of physical shares.

put forward Defendants' percentage of shares beneficially owned and amount of economic exposure held through Total Return Swaps.  *See, e.g.,* Travis Reed, *Investors Partner to Nominate Minority Slate to CSX Board*, Associated Press, December 19, 2007 (Godnick Decl. Ex. 23); Michael J. de la Merced, *Hedge Funds Propose CSX Directors, Starting Proxy Battle*, New York Times, December 20, 2007 (Godnick Decl. Ex. 24); *CSX, TCI Dig In*, Traffic World, January 7, 2008.  (Godnick Decl. Ex. 28.)

- On March 17 2008, CSX filed this lawsuit fully disclosing its position that the Total Return Swaps held by TCI confer it with beneficial ownership over 12.3% of CSX shares held as hedges by TCI's counterparties to certain Total Return Swaps.  The next day TCI disclosed the lawsuit in an amended Schedule 13D filed with the SEC.  In addition, CSX's claims were widely disclosed in media reports.

Accordingly, by March 2008 – over three months before the scheduled shareholder vote – Defendants' entire economic position in CSX (both it's physical shares as well as its economic exposure via Total Return Swaps), the existence of the TCI/3G group, and CSX's view that the Defendants' previous disclosures were inadequate[45] had all been fully disclosed.  CSX shareholders have known TCI's economic position for over five months and TCI's possible intent for over a full year.  Under those circumstances, additional disclosure serves no purpose, there is no irreparable harm, and no injunction is proper.

CSX shareholders have received complete disclosure of the TCI/3G group's beneficial interest and intentions and have more than ample time to digest this information prior to voting their proxies.  Because complete and truthful disclosures were made with more than enough time for the market to assess the situation any injunction would solely serve as an improper punitive measure benefiting CSX management.  *See, e.g., Int'l Banknote Co., Inc. v. Muller*, 713 F. Supp. 612, 619-20 (S.D.N.Y 1989) (holding that defendants were not entitled to

---

[45]    When, as here, the record demonstrates that there is a dispute as to the facts, the law requires only that the disputed facts and the possible outcomes be disclosed.   This is the limit of the law unless there is reason to believe that the facts are not genuinely in dispute.   In the case at hand, there is no reason to believe that they are not genuinely in dispute.

*Condec Corp. v. Farley*, 573 F. Supp. 1382, 1387 (S.D.N.Y. 1983) (quoting *Avnet, Inc. v. Scope Indus.*, 499 F. Supp. 1121 (S.D.N.Y. 1980).)

an injunction when shareholders had two months before the annual meeting to digest the

information and make an informed decision); *Pantry Pride, Inc. v. Rooney,* 598 F. Supp. 891,

899-900 (S.D.N.Y. 1984) (holding that even if a group existed for two weeks earlier than

disclosed it would not justify the issuance of a preliminary injunction).

      Accordingly, even if the Court determines that the Schedules 13D and 14A filed

by Defendants were misleading, there has been no irreparable harm and no injunction should

issue.

      2.    <u>No Scienter</u>

      A court may consider the lack of scienter as a mitigating factor to be taken into

account in exercising its equitable discretion in deciding whether or not to grant injunctive relief.

*Aaron v. S.E.C.*, 446 U.S. 680, 701, 100 S. Ct. 1945, 1958 (1980); *see also U.S. S.E.C. v.

Universal Express, Inc.*, 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007) ("In the evaluation of

whether there is a 'sufficient evidentiary predicate' for an injunction, the 'degree of intentional

wrongdoing evident in a defendant's past conduct' is an 'important factor.'"). Likewise, in

determining whether to grant an injunction, a court considers the likelihood that the conduct will

be repeated in the future absent the injunction. *See S.E.C. v. Manor Nursing Centers, Inc.*, 458

F.2d 1082, 1100 (2d Cir. 1972); *S.E.C. v. Culpepper*, 270 F.2d 241, 249-50 (2d Cir. 1959). The

presence or absence of good faith on the part of the defendant can be informative as to whether

there is such a likelihood. 458 F.2d 1082, 1100.

      Here, the evidence unequivocally demonstrates that the Defendants made every

effort to determine their obligations under the securities laws, to meticulously follow those

obligations, and fully disclosed their position and intentions. As explained more fully above,

TCI sought the advice of counsel with regard to its obligations. (*See supra* at 11; Trial Tr. (Hohn

Test. 187:8-14).) As soon as TCI was advised that the securities laws required a Schedule 13D

91

filing, TCI fully and forthrightly complied. *See Rondeau*, 422 U.S. at 61-62, 95 S. Ct. at 2077-78 ("[T]hat petitioner acted in good faith and that he promptly filed a Schedule 13D when his attention was called to this obligation support the exercise of the court's sound judicial discretion to deny an application for an injunction, relief which is historically 'designed to deter not to punish' and to permit the court 'to mould each decree to the necessities of the particular case.'"). Moreover, TCI disclosed its interest to CSX at the end of 2006 and Defendants have long since made public their position in CSX, their group and their intentions. There is no suggestion, much less any evidence, that the Defendants sought any advantage in the proxy contest by any purported violations of Section 13(d) or Section 14(a).

3.    <u>CSX Has Unclean Hands.</u>

By contrast, CSX is clearly using this litigation in an effort to gain an unfair advantage in the proxy contest with the Defendants. CSX has been aware of TCI's economic position in CSX – the portion held in physical shares as well as the economic exposure via Total Return Swaps – for over a year. During that time, it did not make the very disclosures that it now seeks, and, accordingly, its belated request for an injunction should be denied. "Because a court sitting in equity is a vehicle for affirmatively enforcing the requirements of conscience and good faith, a party who comes into equity must come with clean hands if relief is to be granted." *Freedom Calls Foundation v. Bukstel*, No. 05CV5460, 2006 WL 845509, at *23 (E.D.N.Y. Mar. 3, 2006); *see also Edelman v. Salomon*, 559 F. Supp. 1178, 1187 (D. Del. 1983) (applying doctrine of unclean hands in matter involving Exchange Act). Likewise, laches bars a plaintiff's claim in equity where he is guilty of unreasonable and inexcusable delay that resulted in prejudice to the defendant. *See Bray v. City of New York*, 346 F. Supp. 2d 480, 492 (S.D.N.Y. 2004).

92

TCI first disclosed its economic interest in CSX to CSX in October 2006. (PX 268 (Baggs ¶ 3); PX 267 (Munoz ¶¶ 3-4); Trial Tr. (Munoz Test. 37:1-3); PX 133.) By November 2006, TCI had explained that the position was held in Total Return Swaps. (DX 145 (Amin ¶ 21); PX 268 (Baggs ¶ 6); Trial Tr. (Baggs Test. 63:8-18).) There is no contention that CSX was under an obligation to keep TCI's disclosure confidential. Nevertheless, despite the passage of over a year and numerous communications with TCI, CSX did not fully disclose TCI's interest to its shareholders. Rather than seek an injunction demanding that TCI and 3G amend its Schedules 13D and 14A disclosures, CSX simply could have made the disclosures itself at any time.

Likewise, again clearly seeking tactical advantage, CSX did not notify TCI of its objections to its nominees until after the time had elapsed under the CSX Bylaws for TCI to make any corrections to its notice. On January 8, 2008, TCI submitted a Notice of Intent (the "January 8 Notice") to nominate five persons for election to the CSX Board. (DX 72; DX 145 (Amin ¶ 62).) On January 15, 2008, Ellen Fitzsimmons sent a letter to TCI's counsel acknowledging receipt of the January 8 Notice (the "Response Letter"). That letter was silent as to any concerns relating to TCI's and 3G's Total Return Swaps and TCI's and 3G's Schedule 13D disclosures. (DX 68.) Counsel for TCI sent a letter to Ms. Fitzsimmons on January 16, 2008 stating that "the Response Letter does not reference any deficiency with regard to the [January 8] Notice and therefore we deem the Corporation's response to be an acknowledgment that advance notice has been properly given under Section 11(a)(ii) of the Bylaws of the Corporation." (DX 74.) TCI received no response to that letter and CSX did not identify any purported deficiencies in the January 8 Notice until the filing of this lawsuit.

93

Again seeking an improper tactical advantage, CSX moved the record date – but not the date to nominate directors to the CSX Board – to avoid losing the proxy contest. The original record date for the May 7, 2008 Shareholder Meeting was February 27, 2008. (PX 264 (Ward ¶ 25).) CSX moved the meeting date to June 25, 2008 and the record date to April 21, 2008 and simultaneously filed this complaint. (PX 264 (Ward ¶¶ 27, 29); PX 269 (Fitzsimmons ¶ 21).) CSX moved the meeting date knowing that TCI had the support it needed to elect its slate of nominees at the upcoming meeting – its own proxy solicitor had concluded that CSX was likely to lose the proxy contest. (Trial Tr. (Miller Test. 77:23-78:7).) CSX did not, however, move back the time in which directors could be nominated to the CSX Board.

Where, as here, the unconscionable behavior is related to the matter at issue to the detriment of the party opposing the motion for injunctive relief, no injunction should be granted. *Freedom Calls Found. v. Bukstel*, No. 05 CV 5460 (SJ) 2006 WL 845509, at *23 (E.D.N.Y. Mar. 3, 2006).)

**D.    The Other Relief Sought By CSX is Unprecedented, Punitive and Improper.**

The other relief sought by Plaintiff is virtually never granted and, certainly, is not granted, as here, in the face of a purported technical disclosure violation. Even if Plaintiff demonstrated an identifiable irreparable harm to the CSX shareholders – which it assuredly has not – this relief would be wholly inappropriate.

In order for the entry of an injunction to be proper, CSX must demonstrate that the Defendants have engaged in improper behavior and that the behavior is likely to continue. "[T]he moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990). Similarly, courts have held that in determining whether to grant an injunction, a court considers the likelihood that the conduct will be repeated

94

in the future absent the injunction. *S.E.C. v. Manor Nursing Centers Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972); *see also S.E.C. v. First City Financial Corp.*, 890 F. 2d 1215, 1228 (D.C. Cir. 1989) (considering "whether a defendant's violation was isolated or part of a pattern" in determining whether injunctive relief is appropriate).  Accordingly, as there is no suggestion that Defendants have engaged in prior disclosure violations, the injunction is improper.

   1. <u>Directing Defendants to Sell All CSX Shares and Total Return Swap Positions</u>

    Plaintiff asks the Court to direct Defendants to divest "all shares acquired, and terminate all Total Return Swaps referencing CSX shares that they entered into, renewed or extended, after the date by which they should have filed a Schedule 13D . . . ."  (PTO at 97.)  Such a mandatory injunction should be granted "'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'"  *Vantico Holdings S.A. v. Apollo Mgmt., LP,* 247 F. Supp. 2d 437, 451 (S.D.N.Y. 2003) (quoting *Tom Doherty Assoc. Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 33-34 (2d Cir. 1995)).  The extreme relief sought by CSX on the eve of a highly-contested proxy contest would be unprecedented and would doubtlessly harm CSX shareholders.  Moreover, CSX offered no evidence of such "extreme or very serious" damage.

    As best as we can determine, not only has no court ever ordered the divestiture of shares based upon a disclosure violation in a proxy contest, no reported decision even reflects that a party in litigation related to a proxy contest has even sought such draconian relief.  Even in the context of tender offers, divestiture has been rejected as impractical, too drastic, and punitive.  *See, e.g., Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 379 (2d Cir. 1973) (holding a divestiture to be inappropriate); *Elec. Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937, 947-48 (2d Cir. 1969) (affirming the district court's decision holding divestiture to be

inappropriate); *Mo. Portland Cement Co. v. H.K. Porter Co., Inc.*, 535 F.2d 388, 399 (8th Cir. 1976) (rejecting divestiture as too drastic); *Trane Co. v. O'Connor Sec.*, 561 F. Supp. 301, 309 (S.D.N.Y. 1983) (finding the Section 13(d) reports to be misleading and denying divestiture due to lack of irreparable harm); *Kirsch Co. v. Bliss and Laughlin Indus., Inc.*, 495 F. Supp. 488, 502-03 (W.D. Mich. 1980) (requiring defendants to file an amended Schedule 13D because "[t]he Court [was] convinced . . . that irreparable injury would occur to present shareholders . . . and the investing public" if it was not corrected, but simultaneously refusing to grant divestiture). Moreover, permitting issuers to obtain divestiture would, contrary to the intention of Congress in passing the Williams Act, "tilt the balance in tender offer battles strongly towards the side of management, at the expense of both the tender offeror and the shareholders." *Fla. Commercial Banks v. Culverhouse*, 772 F.2d 1513, 1519 (11th Cir. 1985).[46]

In addition, divestiture would harm the shareholders as it would doubtlessly cause a dramatic decrease in the price of CSX stock. *See Liberty Nat'l Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 559 (11th Cir. 1984) (refusing to grant divestiture because it was "all too likely not to serve the shareholders' interests . . . . [because] it would have the effect of lowering the market value of the shares of all Liberty stockholders."). If Plaintiff's relief was granted, approximately 20% of the equity of CSX would be put onto the market (JX 8), doubtlessly, resulting in dramatic loss in value to CSX shareholders.

There is no basis for Plaintiff's requested injunction.

---

[46] The sole instance of which we are aware of divestiture being granted is in *Hanna Mining Co. v. Norcen Energy Res. Ltd.*, 574 F. Supp. 1172 (N.D. Oh. 1982). In that tender offer case, divestiture was ordered because corrective disclosures would not be adequate as the defendant "as a result of its stock purchase, was in a position to inhibit competing tender offers, merger proposals or any other business combination for" the plaintiff. *Id.* at 1202. Obviously, Defendants purported technical disclosure violations do not create the same concerns.

2.     Enjoining Defendants From Acquiring Additional Shares

CSX further requests an injunction "enjoining Defendants from acquiring additional shares of CSX until accurate and compliant Schedule 13D and Schedule 14A disclosures have been filed" and that the Court enjoin "Defendants from acquiring any CSX shares referenced in Total Return Swap arrangements to which they are party."  (PTO at 97.) Such an injunction is inappropriate here.  Moreover, the injunction prohibiting the acquisition of the shares referenced in the Total Return Swap agreement is a novel request – we are unaware of any reported decision in which this relief has been requested, much less granted.

There is no need for such an injunction because, as explained above, there is no need for revised "accurate and compliant Schedule 13D and Schedule 14A disclosures" to be made.  Courts have, on occasion, granted injunctive relief limiting further purchases, but only where corrective disclosures were required and only until those disclosures were made.  *See, e.g., Chromalloy Am. Corp. v. Sun Chem. Corp.*, 611 F.2d 240, 243-244 (8th Cir. 1979) (injunction on the purchase of securities until the court approved defendant's Schedule 13D amendment).  As no additional corrective disclosure is required here, it does not make sense to enjoin additional purchases pending unnecessary disclosures.

Even if such corrective disclosures were ordered, on the facts of this case no injunction should issued prohibiting Defendants from acquiring additional shares.  The record date for the shareholder meeting has come and gone.  (JX 5 (CSX Definitive Proxy) ("Only shareholders of record at the close of business on April 21, 2008 will be entitled to vote.").) Accordingly, even if Defendants were to make additional purchases of CSX shares, it would have no effect on the proxy contest that is the subject of this litigation.  As the purchase of shares would not effect the proxy contest, no remedial purpose would be served by entering the injunction.

97

Defendants do not have the right to purchase CSX shares from their counterparties and the counterparties, in turn, are not obliged to sell such shares to Defendants. DX 144 (Hohn ¶ 12); DX 154 (Bryson Dep. 255:2-25).)  CSX has offered no evidence to the contrary.  TCI can make purchases in the open market the same as any other market participant, but does not have the right to purchase shares from counterparties to the Total Return Swaps it entered referencing CSX stock.  Indeed, there is no evidence that when TCI's Total Return Swap positions have been terminated, TCI acquired counterparty shares.  Accordingly, CSX cannot show that the Defendants have any intention to make such purchases, that any such purchases were made prior to the earlier record date, that any such post-record date purchases would have any consequence on the proxy contest that is the subject of this litigation, or that Defendants could make such purchases if they desired.  There is no basis for this relief.

3.     Enjoining Defendants from Voting Their Shares

CSX is not entitled to an injunction "enjoining defendants from voting" its CSX shares at the 2008 annual meeting of CSX shareholders.  (PTO at 97.)  In the case of Section 13(d) violations the appropriate remedy is disclosure and an injunction prohibiting a defendant from voting his stock, sometimes referred to as "share sterilization," is only warranted in the most extreme situations.  See Lane Bryant, Inc. v. Hatleigh Corp., No. 80-Civ. 1617, 1980 WL 1412, at *2-4 (S.D.N.Y. June 9, 1980).  In fact, courts are so hesitant to enjoin voting rights that they have, at times, refused to grant share sterilization even where Section 13(d) disclosure requirements are unmet and the curative disclosure fails to "effectuate a cure."  Gorman v. Coogan, No. 03-173-P-H, 2004 WL 60271, at *12-13 (D. Me. Jan. 13, 2004).

Because such a high standard must be met before a Court will enjoin share voting, courts routinely deny such requests for relief.  In MTD Serv. Corp. v. Weldotron Corp., No. 93 Civ. 4980 (MP), 1994 WL 455154, at *1 (S.D.N.Y. Aug. 19, 1994), a shareholder alleged that

there had been a violation of the beneficial ownership disclosure provisions of Section 13(d) and

the proxy solicitation provisions of Section 14(a) and requested an injunction barring defendants

from voting the shares that were allegedly not disclosed in the Schedule 13D.  The court refused

to strip the Defendants of voting rights because all material information had been disseminated to

the marketplace and as a result there was no prejudice to the shareholders' interests.  *Id.*

Similarly, in *Gorman*, the court refused to grant an injunction despite Defendants failure to

comply with Section 13(d) disclosure requirements and "the failure of the purportedly curative

amendment to effectuate a cure" because "Form 13D filings aside," there was no reasonable

inference that shareholders were "in the dark" as to defendant's true intent.  2004 WL 60271, at

*12-13.  Accordingly, "irreparable harm justifying share sterilization . . . [was] not shown."  *Id.*

*See also Gearhart Indus., Inc. v. Smith Int'l, Inc*., 741 F.2d 707, 717 (5th Cir. 1984) (denying

share sterilization because there was no risk that other shareholders would be harmed if the

shares were voted); *Gen. Aircraft Corp. v. Lampert*, 556 F.2d 90, 97 (1st Cir. 1977) (refusing to

grant voting injunction because there was no irreparable harm and therefore "sterilization of

appellants' legally acquired shares would be punishment, not deterrence"); *Kirsch Co. v. Bliss

and Laughlin Indus., Inc.*, 495 F. Supp. 488, 502-03 (W.D. Mich. 1980) (holding that defendants

would not be enjoined from voting because there was no indication that irreparable harm would

result to existing shareholders or potential investors).

   Here, even if the Court were to hold that Defendants' failed to comply with the

Section 13(d) disclosure requirements, the entirety of Defendants' interest in CSX has now been

disclosed to the public, vesting shareholders with the information necessary to make informed

decisions regarding their investments.  Any potential harm was cured through disclosure and

therefore there is no basis for a voting injunction to be granted.

In the limited cases where courts have granted share sterilization, it is only under circumstances where despite disclosure, shareholders have been irreparably harmed by the faulty Schedule 13D, and, even in such situations, courts are loathe to disenfranchise a shareholder.  In *Champion Parts Rebuilders, Inc. v. Cormier Corp.*, 661 F. Supp. 825, 847-48 (N.D. Ill. 1987), the court granted a voting injunction where the alleged Section 13(d) violations had "substantial and irreparable adverse effects."  There, shareholders faced "an illiquid  market for [their] shares" and the company's "ability to raise equity capital, or to find investment bankers willing to manage placements of its shares [was] substantially impaired." *Id.* at 848.  *See also Comm. for New Mgmt. of Butler Aviation v. Widmark*, 335 F. Supp. 146, 155 (E.D.N.Y. 1971) (finding irreparable injury where there was an "admitted statutory violation by a large stockholder, . . . who determined on his own to launch a campaign to regain control [and] [i]n doing so . . . plunged the corporation into a costly proxy contest that it [could not afford which] might have been avoided had early disclosure of [the] plans been made").  Injuries of this nature have not even been alleged in the current case and further, there are no facts to indicate that a single irreparable adverse effect will result from the purportedly faulty Schedule 13D.

In *Lane Bryant v. Hatleigh Corp.*, No. 80-Civ. 1617, 1980 WL 1412, at *2-4 (S.D.N.Y. June 9, 1980), the court enumerated one other circumstance under which "an injunction against voting stock acquired in the open market . . . could be warranted to protect the corporate shareholders."  The *Lane Bryant* court said such a circumstance would be one in which, among other things, the Section 13(d) violation occurred so close to the election that disclosure was no longer a feasible remedy and where defendants posed a danger of "rap[ing] the target company." *Id.*  However, this, too, is easily distinguishable from the instant case, where all relevant information has long since been disclosed

4.     Enjoining Defendants From Voting Proxies

CSX finally seeks an order "enjoining Defendants from voting any proxies" received prior to filing corrected Schedules 13D and 14A.  (PTO at 97.)  Again, CSX can provide no basis for such an order.  Indeed, the remedy punishes CSX shareholders, the very party that is to be protected by the disclosure rules, by stripping them of their ability to vote in the proxy contest in the manner of their choosing.

In limited instances courts have prohibited the solicitation of proxies until a curative disclosure is made.  *See, e.g., K-N Energy v. Gulf Interstate Co.*, 607 F. Supp. 756, 770-71 (D. Col. 1983) (limitation on solicitation until 30 days after corrective disclosure was filed). This is *not* the remedy sought here.  CSX seeks to invalidate the proxies previously submitted to the Defendants, nullifying those shareholders votes.

As explained above, no curative disclosures are required – the shareholders already possess all the information necessary to make a fully informed vote on the pending proxy contest.  Accordingly, the shareholders will not suffer any irreparable harm if this relief is not granted.  Moreover, even if the Court deems it necessary to order corrective disclosures, the shareholders will have those disclosures sufficiently far in advance of the shareholder meeting to revoke proxies previously given to Defendants and vote for CSX management, should any shareholders determine that the corrective disclosures causes them to desire to do so.  A proxy may be revoked by a shareholder any time before the shareholder meeting by a later-dated proxy card, internet or telephone vote.  (JX 5 (CSX Definitive Proxy at 3) ("A proxy may be revoked by a shareholder at ay time before it is voted by written notice delivered to CSX Corporation … by a later vote via the Internet or by telephone, or by voting by ballot.").)

101

## V.      PLAINTIFF'S REQUEST FOR DECLARATORY RELIEF IS WITHOUT BASIS.

Plaintiff seeks an order "declaring that Defendants failed to timely file, complete and accurate disclosures in violation of Sections 13(d) and 14(a)" and "declaring Defendants' Notices invalid as noncompliant with CSX's Bylaws."  (PTO at 96-97.)  CSX is not entitled to such relief.

First, for the reasons explained above, Defendants' Schedule 13D and Schedule 14A correctly identifies the shares for which it has beneficial ownership.  Likewise, for those same reasons, Defendants' notice of intent to nominate directors and propose amendments to the CSX Bylaws (the "Notice") was in full compliance with Article I, Section 11(a)(ii) of the Bylaws, which requires that a shareholder who wishes to propose business at the annual shareholder meeting disclose the number of shares of capital stock of CSX that it owns "beneficially" or of record.  All such shares were reported in the Notice.  As explained, Plaintiff's position that Defendants failed to comply with the Bylaws because it did not report the shares referenced by their Total Return Swaps as beneficially owned is without support.

Second, under Virginia law, Defendants correctly identified the shares it beneficially owned.[47]  Under Virginia law, a "shareholder" of a corporation means "the person in whose name shares are registered in the records of the corporation, the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with a corporation, or the beneficial owner of shares held in a voting trust."  VA. CODE ANN. § 13.1-603.  Under Article 14

---

[47]      CSX is incorporated in Virginia.  Accordingly, Virginia law should be applied in deciding whether Defendants' Notice complied with CSX's Bylaws.  *See, e.g., Am. Fed'n of State, County, & Mun. Employees v. Am. Int'l Group, Inc.*, 462 F.3d 121, 124 n.2 (2d Cir. 2006) (finding Delaware law "governs" Defendant's "internal affairs" where Defendant is Delaware corporation); *Equal Employment Opportunity Comm'n v. Johnson & Higgins, Inc.*, 91 F.3d 1529, 1546 (2d Cir. 1996) (finding New Jersey law governs voting rights of Defendant's directors where Defendant is New Jersey corporation); *Wisener v. Air Express Int'l Corp.*, 583 F.2d 579, 583-84 (2d Cir. 1978) (applying Illinois law to interpret rights of former officer and director of Defendant corporation under Defendant's bylaws where Defendant is Illinois corporation).

of the Virginia Code, a person is deemed to be a "beneficial owner" of stock when that person, directly or through the use of "any contract, arrangement, understanding, relationship, or otherwise," has either: (a) voting power; (b) investment power, which includes the power to dispose or to direct the disposition of the voting shares; or (c) the right to acquire voting power or investment power, regardless of whether such right is exercisable immediately or after a passage of time. VA. CODE ANN. § 13.1-725. Defendants have satisfied their obligations under the Bylaws by disclosing those shares that they own either directly or in street name. Defendants are not the "beneficial" owners of any other shares of CSX stock, including any shares that are referenced in their Total Return Swaps.

Third, even assuming *arguendo* that the Total Return Swaps were "beneficially" owned by Defendants, the information included in the Notice satisfied Article I, Section 11(a)(ii) of the Bylaws. In response to questions about "Ownership of CSX Equity Securities and Derivative Instruments" held by the Director Nominees (Part V of Director Nominee Questionnaire, Question 45(a)), Defendants disclosed that Mr. Hohn and TCI had Total Return Swaps referencing 46,401,000 CSX shares at an average exposure price of €29.07 and that Mr. Behring and 3G had Total Return Swaps referencing 3,280,000 CSX shares at an average exposure price of $43.72. (DX 72.) Because Defendants provided CSX with notice as to all of their holdings that were economically linked to CSX, the Notice was in compliance with CSX's Bylaws.

Fourth, even assuming that the Notice did not adequately disclose Defendants' beneficial ownership of CSX stock, CSX should be equitably estopped from raising this defect. To be estopped from bringing a claim,

> (1) [t]here must have been a false representation or concealment of
> a material fact; (2) the representation must have been made with

103

> knowledge of the facts; (3) the party to whom it was made must
> have been ignorant of the truth of the matter; (4) it must have been
> made with the intention that the other party should act upon it; and
> (5) the other party must have been induced to act upon it.

*Trayer v. Bristol Parking, Inc.*, 95 S.E.2d 224, 231 (Va. 1956).  In addition, CSX should be

estopped because of the doctrine of unclean hands.  *See Estate of Lennon v. Screen Creations,*

*Ltd.*, 939 F. Supp. 287, 293 (S.D.N.Y. 1996) (finding that plaintiffs are precluded from equitable

relief under the doctrine of unclean hands).

On January 15, 2008, CSX sent TCI a letter acknowledging receipt of

Defendants' Notice.  (PX 166.)  In that letter, CSX informed TCI of its view that, under CSX's

Bylaws, TCI could not reserve the right to nominate alternate nominees and asked TCI to

provide it with copies of the nomination agreements with each of Defendants' nominees.  The

letter makes absolutely no mention of the view espoused in this lawsuit, *i.e.*, that the Notice is

invalid because it did not treat the CSX shares referenced by their disclosed swap positions as

being beneficially owned by Defendants.

In its response letter dated January 16, 2008, with which it included copies of the

requested nominee agreements, TCI specifically stated that CSX's letter "does not reference any

deficiency with regard to the Notice and therefore we deem [CSX's] response to be an

acknowledgement that advance notice has been properly given under Section 11(a)(ii) of the

Bylaws of the Corporation."  (DX 74.)  Despite the fact that, in earlier correspondence with the

SEC during 2007, CSX had espoused the view that TCI and 3G should treat the CSX shares

referenced in their Total Return Swaps as beneficially owned, CSX did not contradict TCI's

statement or otherwise advise Defendants of its view – raised for the first time in this lawsuit –

that Defendants' disclosure of their beneficial ownership was purportedly deficient.  Rather than

provide Defendants with the opportunity to cure any perceived deficiency, CSX waited two

months to file the instant lawsuit.  Accordingly, CSX's claim that the Notice was deficient by

reason of its failure to include the shares referenced in Defendants' Total Return Swaps as

beneficially owned is plainly nothing more than a pretext to block Defendants' slate of

nominees.  For these reasons, CSX should be estopped from raising the claim that the Notice is

invalid.

Fifth, the Court should exercise its discretion to refuse to enter any declaratory

relief.  The declarations sought by CSX relate to issues that will never arise again.  *See Fink v.

Weill*, No. 02 Civ. 10250(LTS)(RLE), 2005 WL 2298224, at *5 (S.D.N.Y. Sept. 19, 2005)

(declaratory remedy not appropriate "unless such a declaration might prevent behavior that could

predictably be repeated").

Sixth, the declaratory judgment sought does nothing to advance the purpose of the

Williams Act, which was solely intended to protect investors.  *See Hallwood Realty Partners,

L.P. v. Gotham Partners, L.P.*, 2001 WL 46978, at *1 (S.D.N.Y. Jan. 19, 2001).  Here,

declaratory relief would not help CSX shareholders obtain information regarding the issues in

the pending proxy contest or anything that Plaintiff complains is misleading.  The declaration

Plaintiff seeks is a transparent attempt by management to gain advantage in the proxy contest.

Accordingly, Plaintiff's declaratory judgment claims should be dismissed.

**DEFENDANTS' COUNTERCLAIMS**

## SUMMARY OF ARGUMENT

CSX filed a definitive proxy statement (the "CSX Proxy") on Schedule 14A with the SEC on April 25, 2008.  (JX 5.)  CSX has also filed additional proxy solicitation materials under Rule 14a-12 of the Exchange Act in connection with the June 25, 2008 shareholders meeting.  As set forth below, the evidence establishes that the CSX Proxy's disclosure about executive compensation and about stock grants that have been awarded to non-management directors is materially false and misleading.  Moreover, as the evidence summarized below establishes, the additional solicitation materials filed by CSX include numerous materially false and misleading statements – including statements by CSX's President, CEO and Chairman, Michael Ward – regarding TCI's purported attempt to achieve effective control of the company, its plans to freeze investment by CSX in its rail system, and its efforts to reach a resolution with CSX that would avoid a proxy fight.

All of this information is significant to CSX's shareholders, who will vote on a minority slate of five directors nominated by TCI and 3G at the upcoming shareholder meeting. CSX's management's false and misleading statements about TCI are likely to unfairly prejudice TCI's and 3G's nominees and to deprive CSX shareholders of the opportunity to breathe new life into a sorely entrenched board about which CSX shareholders have already expressed concern. Shareholders are being asked to re-elect the very same board that approved performance grants to CSX's executives while in possession of material inside information and that awarded itself discretionary stock grants in violation of the company's Insider Trading Policy, Corporate Governance Guidelines and Code of Ethics.  CSX's failure to disclose the material facts about the performance grants and stock awards – and its false and misleading statements about TCI –

deprive shareholders of the information they need to make an informed judgment in connection with this proxy fight.  Corrective disclosure should be ordered.

TCI also seeks a declaration from the Court that a CSX Bylaw amendment adopted by the Board on February 4, 2008 (the "February Amendment") is void.  CSX is seeking shareholder ratification of the February Amendment at the upcoming shareholders meeting.  (JX 5 at 54.)  However, as the evidence demonstrates, the February Amendment deprives shareholders of fundamental rights to which they are entitled under Virginia law – the right elect or remove directors.  Accordingly, the Bylaw should be declared void.

## **THE FACTUAL RECORD**

A.    *CSX's Policies Prohibit Directors and Officers From Engaging In Transactions In CSX Securities While In Possession Of Material Nonpublic Information.*

CSX, like most large publicly traded companies, employs a host of internal policies aimed at preventing insider trading by directors, officers and employees, and designed to otherwise ensure that directors, officers and employees act lawfully and ethically.  (JX 26.) These rules work in conjunction, not only to ban insider trading that is violative of federal criminal or securities law, but also to prohibit a broader array of transactions in order to guarantee the complete integrity of the market for CSX securities.  These policies make it clear that employees may not engage in any transactions in CSX securities while they possess material nonpublic information.

First, CSX has an official "Insider Trading Policy," which expressly provides that "[n]o CSX officer, employee or director . . . may purchase, sell *or otherwise conduct transactions* in any CSX security while he or she is aware of material nonpublic information about CSX."  (JX 27 at 1 (emphasis added).)  "CSX security" is defined broadly in the Insider Trading Policy, and includes "any derivative instrument (including, but not limited to option

contracts, swap contracts, warrants and rights), the value of or return on which is based on or linked to the value of or return on any CSX security. . . ."  (JX 27 at 1.)

Moreover, information is "material" under the Insider Trading Policy "if a reasonable investor would consider it important in making a decision to buy, sell or hold securities."  (*Id*.)  The policy identifies several examples of material information, including "the financial condition and operating results" of CSX and "important business developments such as significant changes in operations or business plans . . . or changes in dividends."  (*Id*. at 2-3.)  Nothing in the Insider Trading Policy carves out an exception for equity grants to directors or officers.

Second, the CSX Bylaws reinforce the Insider Trading Policy.  Article II, Section 2(b) of the CSX Bylaws provides that directors must "comply with all applicable corporate governance, conflict of interest, confidentiality and securities ownership and trading policies and guidelines of the Corporation[.]"  (JX 30 at 8.)  Under this provision, a violation of the Insider Trading Policy is necessarily a violation of the CSX Bylaws.

Third, CSX has a "Code of Ethics" that is part of a "company-wide program that coordinates, implements, and monitors adherence to [CSX's] values, the laws and regulations that apply to [CSX's] business, and Company policies and procedures."  (JX 26.)  The Code of Ethics requires directors, officers and employees of CSX to "avoid even the *appearance* of improper behavior."  (*Id.* (emphasis in original).)  It states that while performing their duties, CSX directors, officers and employees "may learn important information about CSX or other companies that has not been made public."  (*Id*.)  The Code of Ethics instructs that "[u]sing this information to profit financially is unethical and may violate federal securities laws" and specifically refers the reader to the CSX Insider Trading Policy.  (*Id*.)

Finally, the CSX Corporate Governance Guidelines require all director compensation to be "fully disclosed in the annual proxy statement." (JX 23.)

B.    *CSX's Long-Term Incentive Plan*

Under CSX's shareholder-approved Omnibus Incentive Plan, the CSX Board of Directors may award CSX executives and employees a variety of equity-based performance compensation. (JX 29.) The Omnibus Incentive Plan does not contain any provision authorizing the Board to make equity grants while it is aware of material nonpublic information. (*Id.*)

Pursuant to the Omnibus Incentive Plan, on May 1, 2007, the CSX Board adopted the 2007-2009 Long Term Incentive Plan ("LTIP"), which permits it to issue equity stock grants to several named executive officers (the "NEOs")[48] and other employees. (DX 24, at Exh. 10.1.) Under the LTIP, the Board presets the amount of the incentive compensation grants, which are payable in shares of CSX common stock. (*Id.*) The shares are reserved for issuance as incentive compensation, and are awarded if certain performance criteria are satisfied. (*Id.*) The number of shares that are reserved for award under the LTIP is based on the dollar value of the incentive compensation grant divided by the trading price of CSX stock on the grant date. (*Id.*)

On May 1, 2007, the CSX Board set its stock grants under the LTIP for the NEOs, as well as for other CSX employees. (DX 24 at Item 5.02.) At the time it set these stock grants, it was in possession of material nonpublic information.

The following day, on May 2, 2007, CSX announced a $0.12 per share quarterly dividend. On May 8, 2007, CSX made a series of positive public announcements, the substance of which the Board, Mr. Ward and certain other executive officers were aware of on or prior to May 1, including: (i) a $1 billion increase in the CSX stock repurchase plan, (ii) a future 25%

---

[48]    The named executive officers are CEO Michael Ward, CFO Oscar Munoz, COO Tony Ingram, Senior Vice-President, General Counsel and Corporate Secretary Ellen Fitzsimmons and CCO Clarence Gooden.

increase in quarterly dividends (from $0.12 per share to $0.15 per share), (iii) a commitment to making significant core capital investments of approximately $6.4 billion over a four-year period, and (iv) a financial projection that earnings per share would increase by 15% to 17% by 2010 (collectively, the "May 8 Announcements"). (PX 97; DX 25 at Exh. 99.1; Trial Tr. (Munoz Test. 40:18-41:11); DX 154 (Baggs Dep. 164:9-165:6; Munoz Dep. 147:5-148:9).)

CSX executives have testified that each item of information that was disclosed on May 8 – *i.e.*, the change in CSX's dividend, the billion-dollar buyback program expansion, the significant changes in capital expenditures and improved financial projections – constitutes material information. (DX 154 (Munoz Dep. 333:25-334:8, 334:18-335:5, 335:10-337:17, 357:24-358:3; Fitzsimmons Dep. 164:5-9).) Indeed, CSX hoped (and thought it possible) that the May 8 Announcements would cause the stock price to go up. (DX 154 (Richardson Dep. 114:6-14).)

The CSX Board had considered increasing the CSX stock repurchase plan at least as early as April 16, 2007. (PX 4 at 5; DX 154 (Munoz Dep. 345:2-9; Richardson Dep. 110:18-22).) The CSX Board had also considered the increase in quarterly dividends and the increase in capital investments in board meetings prior to May 7, 2007, the date these decisions and the increase in the stock repurchase program were formally adopted. Indeed, on April 16, CSX management recommended to the Board that CSX convey a broader strategy to investors, including: (i) higher earnings, cash flow and capital, (ii) likely increase or acceleration of share buybacks, and (iii) an increased dividend. (PX 81 at 24; DX 154 (Fitzsimmons Dep. 184:16-185:2).)

On May 1, 2007, the same day that CSX set its LTIP grants, CSX's management recommended that the Board adopt each of the items in the May 8 Announcements and

accelerate their announcement, which was originally scheduled for September 2007.  (PX 8 at 2.)
The Board, including Mr. Ward, accepted those recommendations, except to clarify that the
increase in the share repurchase program would be to $3 billion, subject to final approval on May
7.  (PX 8 at 2.)

        CSX management correctly anticipated that the Board would formally approve
those recommendations on May 7, 2007, and that they would be publicly announced following
that approval.  (DX 154 (Fitzsimmons Dep. 180:3-14).)  In fact, David Baggs, CSX's vice
president of investor relations, testified that he started preparing for the May 8 Announcements
two to three weeks prior to May 8th.  (DX 154 (Baggs Dep. 280:7-11).)  Moreover, Third-Party
Michael Ward testified that he is not aware of a single instance since he has been CEO and
chairman in which the Board rejected a management recommendation.  (DX 154 (Ward Dep.
280:7-11).)

        Indeed, CSX knew, and has already testified, that each item of information that
was disclosed on May 8, 2007 constitutes material information.  William Richardson, the
chairman of CSX's compensation committee, testified that it would have been a violation of
CSX's Insider Trading Policy for a member of CSX management to trade in CSX stock before
the May 8 Announcements.  (DX 154 (Richardson Dep. 149:12-151:7).)

        The CSX Proxy, which was approved by Mr. Ward (and sent out under a cover
letter that he signed), does not disclose material facts regarding the determination of the LTIP
performance grants, including (i) that the company set its performance grants while in possession
of material nonpublic information; (ii) that the Omnibus Plan, adopted by the shareholders, did
not include any provision that would allow the Board to set grants while in possession of such
material nonpublic information; (iii) that the setting of the grants violated the company's

111

Corporate Governance Guidelines, Insider Trading Policy and Code of Ethics; and (iv) how the award pursuant to the LTIP is determined.  (JX 5 at 19-52.)

      C.    *CSX's Stock Plan For Directors*

      The CSX Stock Plan for Directors ("Stock Plan") allows directors to grant themselves shares on a discretionary basis at any time and upon such terms as the Board deems fit.  (JX 5 at 15.)  This authority is limited by the CSX Insider Trading Policy, which prohibits directors from engaging in any security transaction during a blackout period.  (JX 27 at 3.)

      A blackout period automatically begins on the first day of the last calendar month of a fiscal quarter, and runs through the second business day following an earnings release.  (*Id.*) December 1, 2007 was the first day of the last calendar month of a quarter, and CSX reported its fourth quarter 2007 earnings on January 22, 2008.  (DX 141.)  Accordingly, the period from December 1, 2007 to January 24, 2008 constituted a "blackout period" during which time no officer, employee or director was permitted to engage in any transactions in CSX securities.

      On December 12, 2007, CSX, acting through the Board, exercised its discretion to award each of CSX's eleven independent directors a grant of 5000 shares of common stock, in direct violation of the CSX Insider Trading Policy, which explicitly prohibits directors from engaging in transactions of CSX during the blackout period.  (DX 14 at 8; JX 27 at 3.)

      The CSX Proxy includes just a single sentence about the discretionary stock grant to directors:  "On December 15, 2007, each non-employee director also received a grant of 5,000 shares of CSX stock, which had a market value of $217,625 (based on an average of the high and low price per share on the date of grant of $43.525) and was required to be deferred."  (JX 5 at 15.)  In fact, the discretionary grants were not made on December 15, 2007, but on December 12, 2007, which is not the date specified for such grants in the Stock Plan.  (JX 28 § 5(d).)

Not only does the CSX Proxy misstate the date on which the discretionary grants were awarded, it omits material facts such as (i) that the discretionary grant was awarded during the blackout period; and (ii) that the shares were awarded in violation of the company's Insider Trading Policy, Corporate Governance Guidelines, and Code of Ethics.

D.    *CSX's Additional Solicitation Materials*

On February 7, 2008, TCI wrote a public letter to the CSX Board criticizing its adoption of the February Amendment.  (*See* DX 79.)   On February 14, 2008, the CSX Board responded with an open letter to Mr. Hohn, which it filed as additional solicitation material pursuant to Rule 14a-12 under the Exchange Act, accusing TCI of trying to achieve "effective control of the company notwithstanding its ownership of only 4% of the shares." (DX 79.)

That statement is materially false and misleading because the TCI Group has nominated only five directors to the CSX Board, which has twelve members.  Furthermore, only one of the five nominees put forth by the TCI Group is affiliated with TCI and all five nominees have pledged to act in the best interests of all CSX shareholders.  (*See, e.g.*, DX 61; DX 62; DX 64; DX 70.)

On March 11, 2008, the Washington Times published an editorial entitled "Rewards for Railroads" by Michael Ward.  (PX 184)  CSX filed the editorial as additional soliciting materials in a March 17, 2008 Form 14A.  (Godnick Decl. Ex. 29.)  In the editorial, Mr. Ward refers to TCI as having demanded that "CSX freeze investment in its rail system . . . ." (PX 184.)  That statement falsely implies that TCI would cut capital expenditures without regard to the public's safety.  In fact, TCI has made it clear that it was only advocating a freeze of growth investment and only until the fate of the re-regulation bill before Congress was known. (DX 47; DX 83.)   TCI made its views clear in its October 16, 2007 public letter to the CSX Board, as well as in testimony that Mr. Amin gave before Congress on March 5, 2008.  (*Id.*)

113

Mr. Ward was well aware of TCI's views.  Indeed, he sat next to Mr. Amin and also testified at the March 5, 2008 Congressional hearing when Mr. Amin stated in no uncertain terms that TCI has "never, . . . nor would we ever suggest that railroads cut any spending in maintenance or safety."  (DX 82 at 109.)

Soon after TCI and 3G filed their Schedules 13D disclosing the formation of the TCI Group and its intention to nominate a slate of five directors to the CSX Board, Edward Kelly, the Presiding Director of CSX's Board, and Christopher Hohn of TCI made arrangements to meet in New York City to discuss the possibility of coming to a resolution that would avoid a proxy fight.  (DX 154 (Kelly Dep. 179:13-180:2).)  During Messrs. Hohn and Kelly's discussions, which took place in January 2008, CSX stated that it was willing to agree to nominate three of the TCI Group's nominees to the CSX Board, including Messrs. Hohn and Behring, as well as a fourth nominee to be mutually agreed-upon.  (DX 154 (Kelly Dep. 179:5-12; 191:9-192:10; 265:21-266:12; 268:2-270:20).)

In contrast to Mr. Hohn's continued efforts to reach agreement with CSX, on January 10, 2008, Mr. Ward recommended that Mr. Kelly tell Mr. Hohn that CSX was done negotiating.  (Trial Tr. (Ward Test. 13:12-14).)  On January 11, 2008, Mr. Ward told Mr. Kelly that if Mr. Hohn agreed to the three investor nominees plus one mutually agreeable nominee that Mr. Kelly should try to kill the deal by using a standstill.  (Trial Tr. (Ward Test. 13:21-23; 16:18-24).)  Up until that point, there had been no discussion of a standstill between Mr. Kelly and Mr. Hohn.  (Trial Tr. (Ward Test. 13:15-17).)

On March 17, 2008, CSX filed this lawsuit.  That same day, CSX issued a press release, filed as "[s]oliciting material pursuant to Rule 14a-12 under the Exchange Act," stating

114

that CSX had brought suit against TCI and 3G for alleged violations of the Exchange Act (the

"March 17 Press Release"). (DX 86.) The press release quotes Mr. Kelly as saying:

> [I]n an effort to avoid the disruption and expense of a proxy
> contest we've spoken with TCI on a number of occasions in an
> attempt to find common ground. Based on these conversations the
> Board concluded that TCI is not simply interested in having a
> representative voice on the Board, but instead is seeking to achieve
> effective control of the CSX Board of Directors and dictate
> Company strategy.

(*Id.*)

Mr. Kelly's statement, as adopted by CSX in its press release, is materially false

and misleading because CSX conducted its negotiations in bad faith and was not attempting to

find common ground with TCI. In fact, CSX had adopted a goal of "zero dissidents" on its

Board. (Trial Tr. (Ward Test. 20:10-15; 22:2-4).) Indeed, Mr. Ward admitted that, on January

10, 2008 (less than ten days after the parties first began negotiating and a mere two days after

Mr. Ward first met with a representative of TCI), he instructed Mr. Kelly to tell Mr. Hohn that

CSX was done negotiating. (Trial Tr. (Ward Test. 12:23-25, 13:9-14); DX 154 (Ward Dep.

342:21-343:2, 344:7-25); DX 306 at CSX_00035068.) Mr. Ward also admitted that he told Mr.

Kelly that, if Mr. Hohn agreed to CSX's offer of the three investor nominees plus one mutually

agreeable nominee, Mr. Kelly should try to kill the deal by using a standstill. (Trial Tr. (Ward

Test. 13:21-23, 16:21-24); DX 306 at CSX_00035069.)

CSX's statement in the March 17 Press Release is also materially false and

misleading because CSX could not have concluded in good faith that TCI was seeking to

"achieve effective control of the CSX Board" and "dictate Company strategy." The CSX Board

and management knew that the TCI Group was only nominating five directors to a twelve-

director Board. In addition to the fact that the TCI Group was nominating a minority slate, only

one of those nominees is affiliated with TCI and one with 3G. All the nominees are independent

of CSX management and have committed in writing to act in the interests of all stockholders. Moreover, neither TCI nor 3G has paid any of the nominees despite the fact that they are permitted to do so.  (JX 19 at 6.)

The March 17, 2008 press release about the lawsuit also quotes Mr. Ward as stating that the reason CSX filed the lawsuit is "to ensure that all of our shareholders receive complete and accurate information about the group's holdings, agreements, plans and motivations to which they are entitled under federal securities laws" and that CSX management is "committed to protecting the interests of all CSX shareholders."  (DX 86.)

Mr. Ward's statement is materially false and misleading because CSX management was aware of Defendants' swap positions for more than a year prior to filing the lawsuit.  Indeed, during 2007, CSX sent two memoranda to the SEC regarding the issue.  On May 22, 2007, CSX sent a memorandum entitled "Nondisclosure of Beneficial Ownership by The Children's Investment Fund" to the SEC, in which it communicated to the SEC that it believed there were serious questions about whether TCI had violated the securities laws.  (DX 154 (Fitzsimmons Dep. at 93:6-19).)  And on December 21, 2007, two days after TCI and 3G filed their Schedule 13D, CSX's counsel sent the SEC a second memorandum, entitled "Material Deficiencies in the Schedule 13D of The Children's Investment Fund and 3G," in which CSX took the position that there were misstatements and omissions in TCI's and 3G's Schedule 13D, including specifically the failure of TCI and 3G to report beneficial ownership of CSX shares referenced in their swap agreements.  (DX 154 (Fitzsimmons Dep. 102:11-104:9).)

Under CSX's Bylaws, all corrective disclosures relevant to the 2008 shareholder meeting were required to be submitted by February 1, 2008.  Rather than notifying the TCI Group of the purported deficiency in its January 8 Notice before February 1, so that it could cure

it if necessary by providing shareholders with complete and accurate information, if necessary, CSX waited to file this lawsuit. If CSX was interested in ensuring that its shareholders receive "complete and accurate information about the group's holdings, agreements, plans and motivations," CSX would have raised the purported deficiencies in TCI's and 3G's filings earlier, either soon after TCI and 3G filed their Schedules 13D, or in its January 15, 2008 letter responding to the TCI Group's January 8 Notice of intent to nominate a minority slate of directors.

CSX's statements in the March 17 press release and in Michael Ward's editorial are materially false and misleading because its true purpose in filing the lawsuit was to bar the TCI Group from putting forth its slate, and to entrench the current Board.

E.    *The Bylaw Amendment For Which CSX Seeks Shareholder Ratification Contravenes Virginia Law.*

On February 4, 2008, the CSX Board adopted an amendment to its Bylaws (the "February Amendment") under which shareholders of record representing at least fifteen percent of the outstanding shares of CSX's stock may call a special meeting for certain limited purposes. (JX 5 at 54.) CSX management is seeking shareholder ratification of the February Amendment at the upcoming shareholder meeting.

CSX's Articles of Incorporation do not limit the circumstances under which directors may be removed; therefore, CSX shareholders have the power to remove directors with or without cause. (DX 98.) Yet, the February Amendment would not allow special meetings to be called for the purpose of electing or removing directors. The February Amendment provides that no special meeting can be held, even if requested by the requisite number of shareholders, "with respect to any matter, within 12 months after any annual or special meeting of shareholders at which the same matter was included on the agenda, or if the same matter will be included on

117

the agenda at an annual meeting to be held within 90 days after the receipt by the Corporation of

such request." (JX 5 at A-1.) Furthermore, the February Amendment states that "the election or

removal of directors shall be deemed the same matter with respect to all matters involving the

election or removal of directors." (*Id.*) Directors are elected at annual meetings; therefore,

defining "same matter" as it is defined in the February Amendment operates to bar shareholders

from calling a special meeting for the purpose of electing shareholder-nominated directors or

seeking to remove existing directors. (*Id.*) And, both Mr. Kelly and Mr. Ward admitted that the

amendment would not allow special meetings to be called to elect or remove directors. (DX 266

(Kelly ¶ 7); DX 154 (Ward Dep. 374:6-20).)

## ARGUMENT

### I.    CSX AND MICHAEL WARD HAVE VIOLATED SECTION 14(A).

Section 14(a) of the Exchange Act prohibits the solicitation of proxy materials in

contravention of rules and regulations prescribed by the SEC. 15 U.S.C. § 78n(a). SEC Rule

14a-9 provides:

> No solicitation subject to this regulation shall be made by means of
> any proxy statement . . . containing any statement which, at the
> time and in the light of the circumstances under which it is made,
> is false or misleading with respect to any material fact, or which
> omits to state any material fact necessary in order to make the
> statements therein not false or misleading . . . .

17 C.F.R. § 240.14a-9(a) (1999) ("Rule 14a-9"). In the context of a proxy solicitation, a

statement is material "if there is a substantial likelihood that a reasonable shareholder would

consider it important in deciding how to vote." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S.

1083, 1090, 111 S. Ct. 2749, 2757 (1991) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S.

438, 449, 96 S. Ct. 2126, 2132 (1976)).

The purpose of Section 14(a) is to ensure that shareholders have adequate information to decide how to vote in a proxy contest. *See ICN Pharm., Inc. v. Khan*, 2 F.3d 484, 490-91 (2d Cir. 1993) (discussing legislative history). Significantly, "there is no additional legislative purpose to provide any special advantage or 'edge' to incumbent management." *Id*. Rather, the regulations are meant only to permit management to have "an opportunity to express and explain its position." *Id*. at 491. The Second Circuit explained in *ICN Pharmaceuticals*:

> Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts. Indeed, the Act's draftsmen commented upon the "extreme care" which was taken "to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid."

*Id.* (quoting legislative history).

### A. The CSX Proxy's Disclosure Regarding Executive Compensation And Director Stock Awards Is Materially False and Misleading.

CSX and Michael Ward violated Rule 14a-9 by offering a misleading and incomplete disclosure of executive compensation in the CSX Proxy, including CSX's use of spring-loaded stock grants under the CSX LTIP; and by offering a misleading and incomplete disclosure of stock grants made to non-management directors. Omission of information from a proxy statement is actionable "if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *See Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002). For a plaintiff to prevail on a material omission claim under Rule 14a-9, "the plaintiff must show that there was a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of

information made available." *Seinfeld*, 404 F.3d at 650 (internal quotations and citations omitted).

It is undisputed that the CSX Board and management knew of the change in CSX's dividend, the billion-dollar stock buyback, and the significant changes in CSX's capital expenditures as early as April 2007.  (PX 4; PX 80; PX 6; PX 81.)  On May 1 – the date of the LTIP stock grant – CSX management recommended to the Board that the announcements of these changes be accelerated from September to May.  (PX 8.)  The Board accepted that recommendation.  (*Id.*)  Significantly, Mr. Ward testified that he is not aware of a *single* instance of the Board rejecting a management recommendation.  (DX 154 (Ward Dep. 280:7-11).)  However, the CSX Proxy fails to disclose that in May 2007, CSX set its stock grants for senior officers immediately prior to the public disclosure of the change in CSX's dividend, the billion-dollar stock buyback, and the significant changes in CSX's capital expenditures.  CFO Oscar Munoz and CSX General Counsel Ellen Fitzsimmons acknowledged that this information, which was announced on May 8, 2007, was "material" information under Regulation FD, which uses the same definition of "materiality" as Rule 14a-9.[49]  (DX 24; DX 154 (Munoz Dep. 333:25-334:8, 334:18-335:5, 335:10-337:17; 357:24-358:3; Fitzsimmons Dep. 163:14-164:9).)

The failure of CSX to disclose these facts in its proxy statement violates Section 14(a) and Rule 14a-9 because the omitted facts about "spring-loading" are material to the election of directors.  In particular, the disclosure of this information is required by SEC rules

---

[49]    Regulation FD requires public disclosure of "any material nonpublic information" when an issuer selectively discloses such information to certain persons.  17 C.F.R. § 243.100.  According to the adopting release for Regulation FD, "Information is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important' in making an investment decision.  To fulfill the materiality requirement, there must be a substantial likelihood that a fact 'would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  Selective Disclosure and Insider Trading, Exchange Act Release Nos. 33-7881, 34-43154, 65 Fed. Reg. 51,716, 51,721 (Aug. 24, 2000) (footnotes and citations omitted).  The release provides examples of the types of information or events that are likely to be considered material, including earnings information and events regarding the issuer's securities such as, *inter alia*, repurchase plans.  *Id.*

that govern the disclosure of executive and director compensation.  The proxy statement must

include "all material elements of the registrant's compensation of the named executive officers,"

including information specified in Item 402 of Regulation S-K.  17 C.F.R. 240.14a-101, Item 8.

Item 402 of Regulation S-K requires disclosure of "[h]ow the determination is made as to *when*

[compensation] awards are granted, including awards of equity-based compensation . . . ."  17

C.F.R. § 229.402(b)(2)(iv) (emphasis added).

These rules are meant to "enhance shareholders' ability to assess how well

directors are representing their interests."  *In re Tyson Foods, Inc., et al.*, Exchange Act Release

No. 51,625, 2005 WL 1861834, at *6 (Apr. 28, 2005) (internal quotation marks and citation

omitted); *see also In re General Elec. Co.*, Exchange Act Release No. 50,426, 2004 WL

2114047, at *4 (Sept. 23, 2004) (same).  Moreover, an SEC release states that companies should

disclose whether the grant date for stock options is set "in coordination with the release of

material non-public information," or whether the company has timed "its release of material non-

public information for the purpose of affecting the value of executive compensation."  Executive

Compensation and Related Person Disclosure, Exchange Act Release Nos. 33-8732A, 34-

54302A, 71 Fed. Reg. 53,158, 53,164 (Sept. 8, 2006).  This release explains that this required

disclosure applies not only to the timing of option grants, but to the timing of all "equity-based

compensation."  *Id.* at 53165 n.76.[50]  Thus, SEC rules specifically require CSX to disclose the

timing of its LTIP stock grants, and yet the CSX Proxy does not make sufficient disclosure on

---

[50]    Further, the SEC's Division of Corporation Finance has explained that "the guidance regarding
Compensation Discussion and Analysis disclosure concerning option grants that is provided in Section II.A.2 of
Securities Act Release No. 8732A . . . also govern[s] disclosure about restricted stock and other non-option equity
awards.  This includes the example of potential material nonpublic information identified in Item 402(b)(2)(iv) of
Regulation S-K, which indicates that it may be appropriate to discuss how the determination is made as to when
awards are granted, including awards of equity-based compensation such as options."  U.S. Securities & Exchange
Commission, Item 402 of Regulation S-K – Executive Compensation, Questions & Answers of General
Applicability, Question 3.01, http://www.sec.gov/divisions/corpfin/guidance/execcomp402interp.htm.  (Godnick
Decl. Ex. 19.)

this subject.  By failing to disclose that the LTIP stock grants were made before the release of material nonpublic information, thereby increasing the value of that compensation award, CSX has made its proxy statement materially incomplete and in violation of federal law.

The use of spring-loaded stock grants under the LTIP also violates the CSX Insider Trading Policy.  This policy prohibits CSX officers and directors from "conduct[ing] transactions in any CSX security while he or she is aware of material nonpublic information about CSX."  (JX 25.)  Here, the CSX directors set the LTIP grants on May 1, 2007 even though they knew that significant business developments were about to be made public.  Indeed, the information that CSX disclosed on May 8 related to CSX's "financial condition," "operating results," "important business developments," and "changes in dividends," all of which CSX's Insider Trading Policy describes as "material nonpublic information."[51]  (*Id.*)

The CSX Proxy does not disclose that the LTIP stock grant violated CSX's Insider Trading Policy.  (JX 25.)  The CSX Proxy also fails to explain that the LTIP stock grant violated CSX's Bylaws and Code of Ethics, both of which require adherence to the Insider Trading Policy.  (JX 30; JX 26.)  Because the CSX Proxy does not disclose that these stock grants violated the Insider Trading Policy, the Code of Ethics and the CSX Bylaws, the CSX Proxy is false and misleading.

In addition to these undisclosed facts relating to the LTIP performance stock grants, the CSX Proxy's disclosure that the directors awarded themselves discretionary grants on December 15, 2007 is materially false and misleading because it fails to disclose that those awards were made on December 12, 2007 and that the CSX directors violated the CSX Insider Trading Policy by awarding the grants during a "blackout period," in which directors are

---

[51]     In fact, Dr. Richardson, a CSX director, testified that it would have violated CSX's Insider Trading Policy for a member of management to have bought shares on May 1 with the knowledge that the announcements would be made on May 8.  (DX 154 (Richardson Dep. 150:13-151:7).)

prohibited from conducting transactions in CSX securities.  (JX 5 at 15; JX 25; JX 28 § 5(d).)

The failure to disclose also violates SEC regulations that require the inclusion of detailed

information about the timing of equity grants.  *See* 17 C.F.R. § 240.14a-101; 17 C.F.R.

§ 229.402(b); *Maldonado v. Flynn*, 597 F.2d 789, 796 (2d Cir. 1979).

   The failure to disclose these facts in the CSX Proxy violates Section 14(a) and

Rule 14a-9 because the omitted facts about "spring-loading" and CSX's violations of its own

internal policies are material to the election of directors.  Because the use of spring-loaded equity

share grants violates company policy and the award of a discretionary grant during a blackout

period violates CSX's Insider Trading Policy, shareholders deciding which director-candidates to

vote for would want to know this information.  Accurate information regarding officer and

director compensation is particularly significant on the facts presented here, given TCI's

publicly-stated view that officers and directors of CSX are over-compensated, and shareholder-

expressed concerns about corporate governance and excessive compensation.  But even in the

ordinary case, the Second Circuit has held that "the compensation of directors and key officers

and transactions between them and their corporation are matters explicitly covered by SEC

disclosure regulations," as discussed above, and also "involve matters of direct and deep concern

to shareholders in the exercise of their right to vote, which the Exchange Act expects to be fully

disclosed in proxy solicitations for election of officers and directors."  *Maldonado v. Flynn*, 597

F.2d 789, 796 (2d Cir. 1979); *see id*. (holding that under Section 14(a) "shareholders are entitled

to truthful presentation of factual information 'impugning the honesty, loyalty or competency of

directors' in their dealings with the corporation to which they owe a fiduciary duty'"); *see also*

*GAF Corp. v. Heyman*, 724 F.2d 727, 742-43 (2d Cir. 1983) (stating that in a proxy dispute,

shareholders would want to be advised when incumbent directors award excessive compensation to directors and officers).

In short, because the CSX proxy is materially incomplete and misleading under Section 14(a) and Rule 14a-9, the proxies that CSX obtains are tainted and CSX should be barred from voting them at the next annual meeting. *See Kaufman*, 719 F. Supp. at 185 ("The misleading proxy statement and outdated information furnished by TCC taint the proxies that they have obtained."). Only court-ordered corrective disclosure can give shareholders sufficient information to vote in the upcoming elections.

**B.    The CSX Proxy's Characterization of TCI and Its Intentions Is Materially False and Misleading.**

CSX has also violated Rule 14a-9 by making harsh and baseless allegations against TCI in public comments and in additional solicitation materials filed pursuant to SEC Rule 14a-12. Note (b) to SEC Rule 14a-9 provides that it "may be misleading" to disseminate "[m]aterial which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes changes concerning improper, illegal or immoral conduct or associations, without factual foundation." 17 C.F.R. § 240.14a-9. Moreover, Rule 14a-9 applies even to statements of "belief" because such statements are "reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093, 111 S. Ct. 2749, 2758 (1991). In a similar vein, Rule 14a-4(a)(3) provides that the "form of proxy . . . [s]hall identify clearly and impartially each matter intended to be acted upon[.]" 17 C.F.R. § 240.14a-4(a)(3).

Here, CSX has made unfounded accusations that TCI is seeking "effective control" of CSX in a February 14, 2008 letter to Mr. Hohn and in the March 17, 2008 press release regarding the filing of this lawsuit, both of which were filed with the SEC as additional

soliciting materials under Rule 14a-12.  (DX 79; DX 86.)  These statements are materially false

and misleading because the uncontested evidence shows that TCI is proposing a minority slate of

five directors to the twelve-seat CSX Board of Directors, only one of whom is affiliated with

TCI and one of whom is affiliated with 3G.  (*See* JX 7-22.)  The other two nominees are wholly

independent.  (*See id.*)

        In addition, in Mr. Ward's March 11, 2008 editorial (filed with the SEC on March

17, 2008), CSX and Michael Ward made materially false and misleading statements in violation

of Rule 14a-9 regarding TCI's demand that CSX freeze investments in its rail system.  (PX 184)

That statement is materially false and misleading because it implies that TCI was willing to

sacrifice safety.  Mr. Ward and CSX were aware that TCI never advocated freezing all

investment, but only growth expenditures and only until the issue of the re-regulation bill before

Congress was resolved.  (PX 147 at 13 (stating that CSX should "[f]reeze growth investment

until the fate of the re-regulation bill is known" because it would be "irresponsible to make long-

term investments without knowing the long-term returns, and the long-term returns are

unknowable while the re-regulation risk persists at this heightened level"); (DX 83)

(Transportation and Infrastructure Committee Hearing Tr., 2008 WL 618062 (Amin testifying

that TCI has "never said, as [it has] been accused of, that [it] would cut any investment in

maintenance and in safety.").)

        In addition, CSX has violated Rule 14a-9 by falsely describing its discussions

with TCI during January 2008 and its motives in bringing this lawsuit in public comments and in

additional solicitation materials filed pursuant to Rule 14a-12.  In a press release issued on the

date this lawsuit was commenced, and filed as soliciting material on a Form 8-K, Presiding

Director of the Board Edward J. Kelly refers to his discussions with Mr. Hohn as "an effort to

avoid the disruption and expense of a proxy contest." (DX 86.) In that same press release, Mr. Ward is quoted as stating that this lawsuit was commenced "to ensure that all of our shareholders receive complete and accurate information about the group's holdings, agreements, plans and motivations to which they are entitled under federal securities laws" and that CSX management is "committed to protecting the interests of all CSX shareholders." (*Id.*) Those statements are false and misleading because CSX's discussions with TCI in January 2008 were conducted in bad faith, and because CSX brought this lawsuit for the purpose of entrenching itself and stifling the voices of any dissenters. (Trial Tr. (Ward Test. 12:23-25, 13:9-14); DX 154 (Ward Dep. 342:21-343:2, 344:7-25); DX 306 at CSX_00035068; DX 307.)

In sum, the CSX Proxy contains materially false and misleading information regarding TCI and its intentions with respect to CSX. Accordingly, the Court should order CSX to file a corrective disclosure to give the shareholders accurate and complete information for the upcoming proxy contest.

## II.    THIRD-PARTY DEFENDANT MICHAEL WARD IS LIABLE FOR CSX'S VIOLATIONS OF SECTION 14(A).

Third-Party Defendant Michael Ward is liable under Section 20(a) of the Exchange Act. This provision states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable. . . ." 15 U.S.C. § 78t(a). "Section 20(a) . . . imposes liability on a controlling person for violations by a controlled person unless the controlling person acted in good faith and did not induce the violation." *Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281, 284 (S.D.N.Y. 1994). "Knowledge and culpability are not elements of a prima facie case; instead, their absence constitutes an affirmative defense." *Id.* In its answer

126

to TCI's counterclaims, CSX admits that Mr. Ward was Chairman, President and CEO and has discretionary authority to control or influence certain aspects of the conduct of CSX. (Answer ¶¶ 29, 144). Accordingly, Mr. Ward is a controlling person within the definition of Section 20(a) who exercised discretionary authority to control or influence the conduct of CSX.

If a prima facie case of controlling person status is established, the burden shifts to the controlling person to show: (1) "that he acted in good faith," *and* (2) that he "did not directly or indirectly induce the act or acts constituting the violation." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996). Mr. Ward did not meet that burden because the evidence establishes that, as Chairman of the Board, he voted in favor of accelerating the May 8 Announcements. (PX 8; PX 9.) Mr. Ward also chaired the Board that awarded the LTIP stock grants while in possession of material non-public information and in violation of CSX policies, as well as when it awarded discretionary stock grants to directors during a blackout period, also in violation of CSX policies. (PX 7; PX 8; PX 14, at 8.) Moreover, Mr. Ward authored the March 11, 2008 editorial, and is quoted in the March 17, 2008 press release, in which he made false and misleading statements about TCI. Finally, Mr. Ward was on the Board when it adopted the February Amendment and approved the shareholder solicitation for that proposal. (PX 6.) *See Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1434 (9th Cir. 1995) (rejecting the Section 20(a) affirmative defense because "the allegedly misleading public disclosures, press releases, and statements to the press that constituted the fraud were all approved by one or more of the insured directors and officers."). Accordingly, Mr. Ward is a controlling person within the meaning of Section 20(a) of the Exchange Act and is liable for CSX's violations of Section 14(a).

## III.    CSX'S FEBRUARY BYLAW AMENDMENT VIOLATES VIRGINIA LAW.

Under Virginia law, shareholders of a corporation are explicitly granted the right to "remove one or more directors with or without cause, unless the articles of incorporation provide that directors may be removed only with cause."  Va. Code Ann. § 13.1-680(A); *see also Scott County Tobacco Warehouses, Inc. v. Harris*, 201 S.E.2d 780, 783 (Va. 1974) (holding that a legislative purpose of § 13.1-42, the predecessor to § 13.1-680, is to protect and expand stockholder democracy).  The CSX Articles of Incorporation do not limit the circumstances under which directors may be removed, therefore CSX shareholders have the right to remove directors with or without cause.

The right to remove directors – explicitly granted by Va. Code § 13.1-680(A) – may only be exercised at a meeting called for that purpose.  Va. Code Ann. § 13.1-680(D).  Thus, under Virginia law, shareholders' statutorily-guaranteed right to remove directors necessitates an ability to convene a special meeting for the purpose of removing directors.

The February Amendment is in complete contravention of Virginia Code § 13.1-680 because it acts to bar CSX shareholders from ever calling a meeting for the purpose of removing existing directors.  The February Amendment explicitly bars shareholders from calling a meeting with regard to any subject matter "within 12 months after any annual or special meeting of shareholders at which the same matter was included on the agenda, or if the same matter will be included on the agenda at an annual meeting to be held within 90 days after the receipt by the Corporation of such request."  (JX 5 at A-1.)  The February Amendment further specifies that the election or removal of directors is to be considered the "same matter with respect to all matters involving the election or removal of directors."  (*Id.*)  Thus, under the February Amendment, there would never be a circumstance when a shareholder could call a special meeting to remove a director.

128

All of CSX's directors are elected annually at the annual shareholder meeting. (JX 30 § 2(c).) Because the CSX Bylaws do not provide for staggered terms, each director's term expires at the annual shareholders meeting. Va. Code Ann. § 13.1-677 ("The terms of all other directors expire at the next annual shareholders' meeting following their election unless their terms are staggered."). Accordingly, an annual meeting is never an occasion to remove a director since such director's term expires then as a matter of law.

Because the February Amendment operates to bar shareholders from ever calling a meeting for the purpose of removing existing directors or electing shareholder-nominated directors, it is in complete contravention of Virginia Code § 13.1-680A.[52] Thus, the February Amendment dispossesses CSX shareholders of the fundamental right guaranteed by Va. Code § 13.1-680(A). It is therefore void *ab initio*.

Indeed, the evidence establishes that CSX is fully aware that by adopting the February Amendment, it has completely eliminated shareholders' statutory right to remove directors from the Board. Mr. Ward testified that the February Amendment prevents CSX shareholders from calling a meeting for an issue already raised during the past year. (DX 154 (Ward Dep. 373:22-373:24).) Mr. Ward further admitted that the February Amendment would not allow shareholders to call a special meeting to elect or remove directors, and Mr. Kelly admitted likewise. (*Id.* 374:4-374:20; DX 266 (Kelly ¶ 7).)

CSX contends that the February Amendment is insulated by the business judgment rule. But that assertion, for which CSX cites no supporting case law or statute, is

---

[52] Without citation to authority, CSX states in the Joint Pre-Trial Order that "[t]he Virginia Stock Corporations Act provides that shareholders do *not* have the right to call special meetings...." (emphasis in original). However, the Act nowhere explicitly so provides. At most, § 13.1-655 of the Act specifies certain circumstances under which a special meeting "shall" be held. Even if the Act were to be read the way CSX suggests, it is clear that CSX's shareholders are ensured the right via Va. Code § 13.1-680 to have a special meeting called by CSX's directors in the exercise of their fiduciary duties. Again, the February Amendment would operate to dispossess CSX shareholders of the rights guaranteed in Va. Code § 13.1-680.

fatally flawed.  The business judgment rule only insulates acts that are an exercise of business

judgment and acts that are in accordance with the law and corporate powers.  *Lake Monticello*

*Owners' Ass'n v. Lake*, 463 S.E.2d 652, 656 (Va. 1995) (quoting Va. Code Ann. § 13.1-870(A);

*Gottlieb v. Economy Stores*, 102 S.E.2d 345, 352 (Va. 1958) ("It is generally held that the power

of courts in reviewing the internal management or policies of corporations is limited in scope,

and confined to cases of fraud, bad faith, breach of trust, gross mismanagement, or *ultra vires*

acts.").  It does not insulate from review the Board's interpretation of a statute or corporate

bylaw and it certainly does not permit the Board to adopt bylaws that violate express statutory

law.  *Lake Monticello Owners' Ass'n*, 463 S.E.2d at 656.

       The foundational question of whether the Board has acted outside of its legal

authority is, however, within the purview of the court.  *Id.*  As the Virginia Supreme Court held

in *Lake Monticello*:

> As the name implies, a necessary predicate for the application of
> the business judgment rule is that the directors' decision be that of
> a business judgment and not a decision, such as that in this case,
> which construes and applies a statute and a corporate bylaw. . . .
>
> Therefore, we reject LMOA's contention that the presumption set
> forth in the business judgment rule should be applied when
> deciding whether LMOA properly construed its bylaws in
> disqualifying the proposals.

*Id.* (citations omitted).  *See also Gottlieb,* 102 S.E.2d at 352 (explaining although the "power of

courts in reviewing the internal management or policies of corporations is limited in scope,"

judicial review is appropriate in cases alleging "ultra vires acts" and acts not "in accordance with

the law and the powers conferred on the corporation.").  Accordingly, the question of whether

the CSX Board's February Amendment violates Virginia law is in no way shielded from judicial

review and, for the reasons described above, the February Amendment is void.

**IV.    DEFENDANTS ARE ENTITLED TO INJUNCTIVE AND DECLARATORY RELIEF.**

Generally, "to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *325 Bleecker Inc., v. Local Union No. 747*, 50 F. Supp.2d 110, (N.D.N.Y. 2007) (citing *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989)).  In addition, the movant must demonstrate actual success on the merits rather than a likelihood of success.  *Id.; see also The Guardian News, Inc. v. Amicone*, No. 07 Civ. 7078, 2008 WL 594770, at *14 (S.D.N.Y. Mar. 3, 2008); *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S. Ct 1396, 94 L.Ed.2d 542 (1987).  A shareholder may seek redress under Section 14(a) for an issuer's misleading statements in or omissions from proxy materials circulated in connection with a matter submitted for shareholder vote.  *United Paperworkers Int'l Union v. Int'l Paper Co.,* 985 F.2d 1190, 1198 (2d Cir. 1993).

Here, for the reasons stated above, TCI and 3G have succeeded on the merits in demonstrating that CSX has violated the proxy solicitation rules by making a series of materially false statements concerning its reasons for filing this lawsuit, its supposed good faith in conducting negotiations with TCI and 3G, and statements about their positions and intentions.  In addition CSX's disclosures concerning executive compensation are inadequate and are materially misleading to investors.

It is equally clear that TCI, 3G and all other shareholders will suffer irreparable injury in the absence of such an injunction.  Without an injunction requiring corrective disclosure, there is a substantial likelihood that the investing public will be misled into believing that CSX's misstatements concerning the lawsuit, the negotiations with TCI, and TCI and 3G's

positions and intentions on important issues facing CSX are true, and, as a result, will cast a vote based on materially false information. There is no adequate remedy at law for such a result.

Similarly, in the absence of an injunction, shareholders will not have adequate information about CSX's executive compensation practices, including its granting of LTIP units while in possession of material, non-public information that was about to be – but had not yet been – announced, and its award of Director stock grants during a blackout period in violation of its insider trading policies. Not only is this information important to investors' ability to understand CSX's executive and director compensation practices, it is also relevant to investor's ability to understand whether CSX management and directors are seeking to entrench themselves in this litigation, and whether they can be relied upon to provide accurate information to investors in the context of a proxy contest. Absent an injunction, investors will be irreparably harmed because they will vote in a proxy contest without a full understanding of these important matters, and may vote differently than they otherwise would if they had full information. There is no adequate remedy at law in such circumstances.

TCI and 3G are also entitled to a declaration that CSX's proposed by-law amendment violates Virginia law. "[T]he question in each case [in which a declaratory judgment is sought] is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Kidder, Peabody & Co., Inc., v. Maxus Energy Corp*., 925 F.2d 556, 562 (2d Cir. 1974)  citing *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (citations omitted). "Whether a real and immediate controversy exists in a particular case is a matter of degree and must be determined on a case-by-case basis. *Kidder*, 925 F.2d at 562 (citations omitted); *see also Williams v. Southern Bank of Norfolk*,  203 Va. 657, 661-62,

132

125 S.E.2d 803, 806-7 (1962) (declaratory judgment would be appropriate to determine construction of definite stated rights, status and other relations commonly expressed in written instruments) *cited in Green v. Goodman-Gable-Gould Co., Inc., et al.*, 268 Va. 102, 597 S.E.2d 77 (2004).

Here, the controversy over the legality of CSX's bylaw amendment is real and immediate. Absent a declaration that it is void for violating Virginia law, CSX shareholders will be subjected to a bylaw amendment that inhibits their ability to elect and remove directors in conflict with their right to do so under Virginia law. Moreover, a declaration would determine the construction of defined rights of CSX shareholders and is therefore warranted. *Id.*

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that all Plaintiff's claims be dismissed in their entirety and judgment be granted for Counterclaim Plaintiffs as to all counterclaims.

May 27, 2008

SCHULTE ROTH & ZABEL LLP


By:  /s/ Howard O. Godnick
        Howard O. Godnick
        Michael E. Swartz
        919 Third Avenue
        New York, New York 10022
        Telephone:     (212) 756-2000
        Facsimile:     (212) 593-5955
        howard.godnick@srz.com
        michael.swartz@srz.com

        Attorneys for Defendants The Children's
        Investment Fund Management (UK) LLP,
        The Children's Investment Fund
        Management (Cayman) Ltd., The
        Children's Investment Master Fund,
        Christopher Hohn and Snehal Amin

KIRKLAND & ELLIS LLP


By:  /s/ Peter D. Doyle
        Peter D. Doyle
        Andrew Genser
        Citigroup Center
        153 East 53rd Street
        New York, New York  10022-4611
        Telephone:     (212) 446-4800
        Facsimile:     (212) 446-4900
        pdoyle@kirkland.com
        agenser@kirkland.com

        Attorneys for Defendants 3G Capital
        Partners Ltd., 3G Capital Partners, L.P.,
        3G Fund, L.P., and Alexandre Behring