UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CSX CORPORATION,

                              Plaintiff,

v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE BEHRING,
A/K/A ALEXANDRE BEHRING COSTA,

                              Defendants.

---

THE CHILDREN'S INVESTMENT MASTER
FUND,

                    Counterclaim and Third-
                         Party Plaintiff,

                    v.

CSX CORPORATION AND MICHAEL WARD,

                    Counterclaim and Third-
                         Party Defendants.

---

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.,

                    Counterclaim Plaintiffs,

                    v.

CSX CORPORATION AND MICHAEL WARD,

                    Counterclaim Defendants.

ECF Case

08 Civ. 02764 (LAK) (KNF)

PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW OF
CSX CORPORATION RELATING TO
ITS CLAIMS

## TABLE OF CONTENTS

Page

**Preliminary Statement**................................................................................................1

**Proposed Findings of Fact**.........................................................................................3

I.      THE PARTIES...........................................................................................3

        A.      CSX..................................................................................................3

        B.      TCI ..................................................................................................4

        C.      3G.....................................................................................................5

II.     TCI SECRETLY ACQUIRES A SUBSTANTIAL ECONOMIC INTEREST ......6

        A.      TCI Accumulates a Substantial Stake Without Disclosure.........................6

        B.      The Fix Goes in for Initial Annual Meeting .................................................8

III.    TCI AND 3G FORM A GROUP IN EARLY 2007 ...............................................14

        A.      TCI Seeks an Ally in 3G in its Quest for Control.....................................14

        B.      TCI and 3G Coordinated Their Analyses ..................................................33

        C.      TCI and 3G Coordinated their Control Plans ............................................35

IV.     THE GROUP SEEKS CONTROL AND INFLUENCE BY STEALTH..............39

        A.      TCI Tries to Force an LBO and a "Junk Recapitalization" on CSX .........40

        B.      The Group Takes Up "Activism", i.e., a Proxy Fight................................44

        C.      TCI Negotiated for "Effective Control" in 2008 .......................................52

V.      THE GROUP'S SWAPS AND ARRANGEMENTS CONFER POWER............55

        A.      The Group Determines Disposition of the Matched Shares .....................55

        B.      The Group Has the Ability Significantly to Influence Voting..................59

        C.      The Group's Response Is Flawed ...............................................................61

        D.      Professor Partnoy's Analysis Is Unreliable and Disingenuous.................63

VI.     THE GROUP CONDUCTS A PROXY FIGHT BY HALF-TRUTHS.................69

        A.      The Group Misrepresents Its Beneficial Ownership..................................69

        B.      The Group Misrepresents Its Plans and Proposals....................................70

        C.      The Group Misrepresents Its Agreements, Arrangements, and
                Relationships....................................................................................71

        D.      The Group Misrepresents Its Group Formation/Ownership......................71

VII.    THE REAL "PARADE OF HORRIBLES" CONCERNS DEFENDANTS'
        CONDUCT .....................................................................................................72

**Proposed Conclusions of Law .........................................................................76**

I.      TCI AND 3G VIOLATED SECTION 13 ...........................................................76

        A.      Proposed Conclusions.........................................................................76

        B.      Discussion .......................................................................................76

II.     TCI AND 3G VIOLATED SECTION 14 ...........................................................90

        A.      Proposed Conclusions.........................................................................90

        B.      Discussion .......................................................................................90

III.    THE INDIVIDUAL DEFENDANTS VIOLATED SECTION 20 OF THE '34
        ACT...............................................................................................................92

        A.      Proposed Conclusions.........................................................................92

        B.      Discussion .......................................................................................92

IV.     TCI'S AND 3G'S NOTICE OF PROPOSED DIRECTOR NOMINEES AND
        BYLAW AMENDMENTS FAIL TO COMPLY WITH CSX'S BYLAWS ........94

        A.      Proposed Conclusions.........................................................................94

        B.      Discussion .......................................................................................94

V.      CSX HAS DEMONSTRATED IRREPARABLE HARM WARRANTING
        INJUNCTIVE RELIEF.....................................................................................95

        A.      Proposed Relief................................................................................95

        B.      Discussion .......................................................................................96

**Conclusion** ........................................................................................................**103**

Addendum A: List of All Known Swap and Stock Transactions

Addendum B: SEC Amicus Brief in <u>San Francisco Real Estate Investors v. Real Estate Inv. Trust of Am.</u>, 701 F.2d 1000 (1st Cir. 1983)

# CITATION CONVENTIONS

"3G": 3G Capital Partners Ltd., 3G Capital Partners, L.P., and 3G Fund L.P.

"3G Ans. ¶ [ ]" or "3G Counterclaims ¶ [ ]": Answer, Affirmative Defenses and Counterclaims of Defendants 3G Capital Partners Ltd., 3G Capital Partners, L.P., 3G Fund, L.P. and Alexandre Behring

"Compl. ¶ [ ]": Complaint

"CSX": Plaintiff-Counterclaim Defendant CSX Corporation

"CSX Proxy": CSX's definitive proxy statement on Schedule 14A filed on April 25, 2008

"PTO at [ ]": Amended Joint Final Pre-Trial Order

"PTO Stip. ¶ [ ]": Stipulated facts in the Amended Joint Final Pre-Trial Order

"PX [ ] at [ ]" and "JX  [ ] at [ ]": Plaintiff's proposed exhibits and joint proposed exhibits

"PFF Section [ ].[ ]":  Internal citations to CSX's Proposed Findings of Fact

"TCI": The Children's Investment Master Fund

"TCI Ans. ¶ [ ]" or "TCI Counterclaims ¶ [ ]": Answer, Affirmative Defenses of Defendants The Children's Investment Fund Management (UK) LLP, The Children's Investment Fund Management (Cayman) Ltd., The Children's Investment Master Fund, Christopher Hohn, and Snehal Amin and Counterclaims and Third-Party Claims of The Children's Investment Master Fund

"Virginia Stock Corporations Act": Title 13.1 Chapter 9 of the Virginia Code

"[WITNESS] ¶ [ ]": Proposed direct testimony of witnesses

"[WITNESS] Dep. [PAGE: LINE NUMBER]": Deposition designations

Plaintiff CSX Corporation ("CSX" or the "Company") respectfully submits the following Proposed Findings of Fact and Conclusions of Law in support of its request for judgment in its favor on all claims asserted by it against The Children's Investment Fund Management (UK) LLP, The Children's Investment Fund Management (Cayman) Ltd., The Children's Investment Master Fund (together "TCI"), 3G Capital Partners Ltd., 3G Capital Partners, L.P., 3G Fund, L.P. (together "3G"), Christopher Hohn, Snehal Amin, and Alexandre Behring, A/K/A Alexandre Behring Costa (together "Individual Defendants") (collectively "Defendants").

## Preliminary Statement

This case concerns a plan and scheme by TCI and 3G to evade the reporting requirements of the securities laws in an attempt to gain control of and exert influence over CSX. Defendants plan to elect a slate of nominees to CSX's board of directors and amend CSX's Amended and Restated Bylaws in order to make major changes in CSX's business and corporate structure and to otherwise change or influence the control of CSX. In carrying out their plan and scheme, Defendants have violated Sections 13(d) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulations of the Securities and Exchange Commission promulgated thereunder, as well as Article I, Section 11(a)(ii) of CSX's Bylaws. In addition, individual Defendants Hohn and Behring violated Section 20(a) of the Exchange Act and are thus personally liable as they are controlling persons of TCI, 3G and the Defendant group.[1]

The securities laws require Defendants to disclose information that shareholders need to make decisions with respect to their investment. Section 13(d) requires any person acquiring beneficial ownership of more than five percent of a class of an issuer's voting equity securities to disclose, within 10 days of the acquisition, information as to the number of shares beneficially owned, any plans or proposals with respect to the issuer and information as to any contracts, arrangements, understandings or relationships with any person relating to the issuer. To prevent groups of investors from secretly coordinating their efforts, Section 13(d) provides that if two or more shareholders act as a group for the purpose of acquiring, holding or disposing of securities of an issuer, such group shall be deemed a person and be required to make disclosures within 10 days of collectively acquiring more than five percent of such class of the issuer's voting equity.

Defendants secretly acquired a large stake in CSX while evading the reporting requirements of Section 13(d). They evaded the reporting requirements by using sophisticated swap arrangements with financial counterparties and coordinating efforts with respect to their interests in CSX among themselves and with others. Defendants also had, but failed to disclose, beneficial ownership of the CSX shares referenced in their swaps because they had voting and investment power with respect to those shares, had the right to acquire such power and acted with the purpose and effect of changing or influencing control of CSX. Defendants also concealed their plans for the future of CSX,

---

[1]     CSX no longer contends that Mr. Amin is a control person of TCI.

its management, and its board, and the details of the morass of contracts that enabled it to control secretly an enormous stake in the Company. When Defendants belatedly filed a Schedule 13D on December 19, 2007 -- more than a year after they had acquired beneficial ownership of more than five percent of the outstanding shares of CSX common stock, it was materially false and misleading. (See Proposed Conclusions of Law Section I.)

Defendants also violated Section 14(a) of the Exchange Act and Rule 14a-9, which prohibit any person from soliciting proxies on the basis of false and misleading information (in order to enable shareholders to make an informed choice when voting their proxies. This they did by failing to disclose, among other things, the extent of Defendants' interest in CSX and the extent of Defendants' coordinated efforts and their contracts, arrangements, understandings, or relationships relating to shares of CSX. (See Proposed Conclusions of Law Section II.) Defendants' violations of Sections 13(d) and 14(a) create individual liability for Messrs. Hohn and Behring (see Proposed Conclusions of Law Section III) and run afoul of Article I, Section II(a)(ii) of CSX's Bylaws (see Proposed Conclusions of Law Section IV).

Based on these violations, Defendants should be required to file truthful and accurate Schedule 13D and Schedule 14A disclosures. Amended disclosures are essential to carry out the undisputed purposes of the Williams Act, as well as the proxy rules.

On the facts of this case, however, corrective disclosure is not enough. Not only did Defendants fail to disclose the scope of their beneficially owned shares of CSX, and not only did Defendants perpetrate a plan and scheme to evade the reporting requirements of the securities laws, but they also concealed their significant stake in CSX and their plans to make significant changes to the Company while selectively tipping their friends. This was done as Defendants and the other members of their Group sought to and achieved dramatic change in the shareholder composition of CSX. If Defendants had disclosed their positions and plans for CSX, other shareholders likely would have held their shares (rather than selling them in recent months), making it more difficult for TCI and 3G to succeed in their quest for influence and control at CSX.

Under the circumstances, the Court should: (1) declare that Defendants have violated Section 13(d) and Section 14(a) of the Exchange Act and enjoin further violations; (2) order Defendants to file truthful, accurate, and complete disclosures, and enjoin them from voting any proxies until they have done so; (3) enjoin Defendants, as well as other members of their group, from voting CSX shares owned by them at the 2008 annual meeting of CSX shareholders; (4) enjoin Defendants from selling their shares of CSX stock until three days following the 2008 CSX annual meeting; and (5) direct the parties to request TCI's and 3G's counterparties disclose to the Court (on a confidential basis) how, if at all, they will vote shares held by them to hedge their CSX swaps with TCI and 3G, and advise the Court as to the banks' position. Any lesser remedy will fail to restore the balance upset by Defendants' scheme, which, unless stopped by this Court, will further compromise the integrity of the election at CSX's upcoming annual meeting.

2

**Proposed Findings of Fact**

## I.    THE PARTIES

### A.    CSX

1.    CSX is a publicly traded transportation company incorporated under the laws of Virginia and headquartered in Jacksonville, Florida.  Shares of common stock of CSX are traded on the New York Stock Exchange (the "NYSE").  (CSX Complaint ¶ 14, TCI Ans. ¶ 14, 3G Ans. ¶ 14.)

2.    Through its wholly owned subsidiary, CSX Transportation, Inc. ("CSXT"), a Class I rail carrier incorporated under the laws of Virginia, CSX operates one of the largest rail systems in the United States and the largest rail system in the eastern half of the country.  (CSX Complaint ¶ 14, TCI Ans. ¶ 14, 3G Ans. ¶ 14.)

3.    CSX's roots date back to the early 19th century when the Baltimore & Ohio Railroad ("B&O"), the nation's first common carrier, was chartered in 1827.  Numerous railroads have combined with the former B&O through mergers and consolidations to create CSX.  Most recently, CSXT acquired key assets of Conrail, Inc., which allow CSX to link New England and New York with Chicago, the Midwest, and growing markets in the Southeast.  (JX 4 at 5.)

4.    CSX provides a crucial link to the transportation supply chain through its approximately 21,000 route mile rail network, which serves every major population center in 23 states east of the Mississippi River, the District of Columbia, and the Canadian provinces of Ontario and Quebec.  (JX 4 at 3.)  CSX serves 70 ocean, river, and lake ports along the Atlantic and Gulf Coasts, the Mississippi River, the Great Lakes, and the St. Lawrence Seaway.  CSX also serves thousands of production and distribution facilities through track connections to more than 230 short-line and regional railroads. (JX 4 at 3.)

5.    In 2007, CSX had its lowest Surface Transportation operating ratio in a decade.  Revenue and revenue per unit increased 5% and 8%, respectively, from 2006 to 2007, reflecting the improving value CSX provides its customers through better service.  (JX 4 at 27.)  The Company was able to achieve substantial pricing gains predominantly due to CSXT service improvements and the overall cost advantages that the Company's rail-based solutions provide to customers versus other modes of transportation.  (JX 4 at 27.)

6.    In March 2008, after discovering aberrant share movements suggesting that TCI and 3G were exercising influence over the voting of the shares of CSX common stock referenced in the cash-settled swaps held by TCI and 3G, CSX commenced this lawsuit.  (See Ward ¶¶ 26-29.)

B.    **TCI**

7.      The Children's Investment Fund Management (UK) LLP ("TCIF UK") is a United Kingdom limited liability partnership.  The Children's Investment Fund Management (Cayman) Ltd. ("TCIF Cayman") is a Cayman Islands company affiliated with TCIF UK.  The Children's Investment Master Fund ("TCI Fund") is a Cayman Islands company managed by both TCIF UK and TCIF Cayman.

8.      TCI is a hedge fund well known for shareholder activism.  (Compl. 15-17; TCI Ans. 15-17; Hohn Dep. 94:7-16, 94:17-20; Hohn  25; Tr. 180:9-11.)

        8.1      After TCI's requests to allow shareholders to vote on a proposed acquisition, TCI forced board and management change of Deutsche Börse.  (Hohn ¶ 25.)

        8.2      TCI called for the break-up, merger, or sale of ABN Amro, which subsequently was broken apart and sold to a consortium of buyers.  (Hohn ¶ 25.)

        8.3      TCI supported Mittal Steel's hostile takeover bid for Arcelor, then obstructed Mittal's subsequent acquisition of an Arcelor subsidiary until Mittal raised its offer price.  (Hohn ¶ 25.)

9.      Like other activist hedge funds, TCI uses derivative financial instruments known as swaps in pursuit of its investment strategy.  (Subrahmanyam ¶¶ 70-71, Exs. C.1 and C.2.)

10.      Christopher Hohn is a citizen of the United Kingdom and managing partner and a controlling person of TCIF UK and sole owner and a controlling person of TCIF Cayman.  (Compl. ¶ 19; TCI Ans. ¶ 19.)

        10.1      Before founding TCI, Mr. Hohn was employed as a portfolio manager at Perry Capital, a well known activist hedge fund.  (Hohn ¶ 1; Tr. 185:15-21.)

        10.2      Mr. Hohn worked at Perry Capital from January 1, 1996, through the spring of 2003.  (Hohn ¶ 1; Tr. 185:15-21.)

        10.3      While Mr. Hohn was employed at Perry, Perry used equity swaps held by Deutsche Bank in an attempt to take over a New Zealand company known as Rubicon.  (Ithaca (Custodians) Ltd. v. Perry Corp., [2003] 2. N.Z.L.R. 216 (High Court – Auckland), [2003] 1 N.Z.L.R. 731 (Court of Appeal – Wellington) (appeal allowed; orders by High Court set aside), [2004] 2 N.Z.L.R. 182 (Court of Appeal – Wellington) (conditional leave to appeal refused).)

        10.4      Mr. Hohn incredibly claims to have no direct knowledge of this investment while at Perry.  (Tr. 186:16-187:2.)

4

C.    **3G**

11.    3G Fund L.P. ("3G Fund") is a Cayman Islands limited partnership.  3G Capital Partners, L.P. ("3G L.P.") is a Cayman Islands limited partnership and the general partner of 3G Fund.  3G Capital Partners Ltd. ("3G Ltd.") is a Cayman Islands company and the general partner of 3G L.P.  (Compl. ¶¶ 20-22; 3G Ans. ¶¶ 20-22.)

12.    Alexandre Behring is a citizen of Brazil and the managing director of 3G Ltd. and has discretionary authority to control or influence the conduct of 3G.  (Compl. ¶¶ 23, 122; 3G Ans. ¶¶ 23, 122; Behring Dep. 4:3-10, 5:25-6:3, 9:12-23; Schwartz Dep. 24:2-4, 24:6-25, 25:3-9, 25:16-26:18.)

13.    3G "has several funds", including 3G Fund onshore, 3G Fund offshore, and Synergy Fund.  (Behring Dep. 15:14-16:4, 48:4-8.)  Like TCI, 3G is a hedge fund that uses swaps to pursue its investment strategy.  (Behring ¶ 54; DX 128.)

14.    Synergy is a "fund of funds" whose "main objective is to invest in hedge funds".  (Moura Dep. 25:8-12; see also Behring Dep. 16:5-8; Hohn Dep. 107:10-20.)

15.    Through "Synergy", 3G has been an investor in TCI since TCI's inception in 2004.  (Hohn Dep. 107:10-108:23; Behring Dep. 15:14-20; 18:15-23; see also Behring Dep. 19:12-19; Moura Dep. 36:19-37:14.)  When asked to identify the funds in which Synergy invests, Mr. Behring initially omitted TCI from his list, admitting 3G was an investor in TCI only when specifically asked.  (Behring Dep. 18:15-23; 19:4-19.)

16.    Luis Moura of 3G is Synergy's portfolio manager.  (Moura Dep. 31:8-32:10.)  But Mr. Behring manages 3G, and 3G is, in turn, Synergy's ultimate manager and investment advisor.  (Behring Dep. 15:14-20.)  Synergy generally discusses the strategy of a fund in which it invests with the fund manager prior to actually investing.  (Moura Dep. 27:10-15.)

17.    Because Synergy is an investor in TCI, 3G executives regularly meet with TCI, receive regular updates on TCI's investments, and attend TCI's investor conferences.  (See Moura Dep. 34:21-35:16; see also Moura Dep. 37:19-38:10, 38:25-39:6, 122:20-123:21, 125:3-18.)  For example, Mr. Behring attended TCI's investor conferences in connection with Synergy's investment in TCI.  (Behring Dep. 109:3-9, 109:18-24.)  Similarly, TCI sent Mr. Behring quarterly letters discussing TCI's investments, including its investment in CSX.  (Behring Dep. 21:25-22:8, 23:18-24:2, 24:12-17.)

18.    TCI's and 3G's joint history predates their interest in CSX.  For example, 3G also advised TCI on TCI's Brazilian holdings.  Mr. Hohn and others at TCI contacted Mr. Behring for information and advice concerning TCI's "investments in Brazil".  (Behring Dep. 108:2-11, 149:22-150:18.)

19.    Until it formed a group with TCI to influence and control CSX, 3G had never before been an activist hedge fund.  (Tr. 122:16-20.)

## II.    TCI SECRETLY ACQUIRES A SUBSTANTIAL ECONOMIC INTEREST

### A.    TCI Accumulates a Substantial Stake Without Disclosure

20.    In late 2006, TCI became interested in investing in U.S. rails and in CSX in particular and undertook secretly to do so using a series of complex equity swap arrangements.  (Subrahmanyam ¶ 75; DX 144 ¶¶ 8-9.)

21.    Like Perry Capital and other hedge funds before it, TCI used swaps to acquire a position in CSX without disclosing it to the market or anyone other than selected friends.  (Subrahmanyam ¶ 72; PX 19 at TCI0011386.)

22.    Minutes from a meeting of the Board of Directors of The Children's Investment Master Fund reflect that TCI recognized the avoidance of public disclosure as an important reason for using swap arrangements to acquire an interest in a public company.  The TCI minutes state that the reasons for use of swaps include "the ability to purchase without disclosure to the market or the company".  (Subrahmanyam ¶ 72; PX 19 at TCI0011386.)

22.1    In his deposition, Mr. Hohn admitted that one of the reasons it did not buy physical shares over the five percent level was to avoid making a filing: "[W]e did not want to buy in physical, amongst other reasons, more than five percent because if we exited at that point, we would be concerned about people front running us and shorting stock against us."  (Hohn Dep. 137:8-18.)

23.    To hide its investment from CSX and the market for as long as possible, TCI split its CSX swap positions among eight counterparties, some of which were TCI prime brokers:  Citigroup Global Markets Limited ("Citigroup"), Deutsche Bank AG ("Deutsche Bank"), Goldman Sachs International ("Goldman"), Merrill Lynch International ("Merrill Lynch"), UBS AG ("UBS"), Credit Suisse Securities (Europe) Limited ("Credit Suisse"), JPMorgan Chase Bank ("JPMorgan"), and Morgan Stanley & Co. International plc ("Morgan Stanley") (collectively, the "TCI counterparties"). (Subrahmanyam ¶ 74; JX 8 at 17; Subrahmanyam ¶ 75; Subrahmanyam Exs. D, D.1-D.7.; Subrahmanyam ¶ 76.)

24.    Not only did TCI divide its swaps among eight counterparties, but it also monitored the physical positions of its counterparties (which acquired matching physical shares to their swap positions) in order to ensure that TCI's position remained opaque to the market.  (Tr. 202:12-18, 203:2-6; PX 22; PX 27; PX 28; PX 30.)

24.1    With the consent of Mr. Amin, Rishi Sunak, a partner at TCI, sent an email to Cathy O'Reilly, another TCI employee, on December 18, 2006 authorizing her to contact TCI's counterparty banks for the express purpose of "ask[ing] the brokers about their total CSX exposure" because TCI was "concerned about [the banks] having to file [13D disclosures] at 5%".  (PX 22.)

24.2    Mr. Sunak provided Ms. O'Reilly with a list of TCI's counterparty banks and the amounts of TCI's exposure to CSX and expressly asked her to "let

me know what the responses [to TCI's inquiries] are when we get them".  (PX 22.)

    24.3    Robert Ottley of TCI then sent Mr. Hohn and other TCI employees information summarizing the "PBs/Brokers" filing requirements and positions in CSX; after receiving this e-mail, Mr. Hohn instructed on December 27, 2006 that "all inquiries should be on a no names basis".  (PX 30)

25.    While swaps can be used for purposes other than avoiding the reporting requirements of Section 13(d), such as avoiding stamp taxes, that is not why TCI used them to acquire a stake in CSX.  If TCI had been motivated by reasons other than non-disclosure, it would have no reason to monitor the actions of its counterparties, for whom there is no evidence that stamp tax is a concern.  (Tr. 202:12-18, 203:2-6; PX 22; PX 27; PX 28; PX 30.)

26.    In secretly accumulating a position of this size, TCI sought not only to invest in TCI, but also to influence and exert control over the Company.  Every time TCI acquired or disposed of a significant swap position in CSX, TCI's counterparties acquired or disposed of a significant position in physical shares of CSX.  Thus, TCI's swap arrangement directly affected the ownership profile of CSX.  (Subrahmanyam ¶¶ 87-125.)

27.    The purpose of TCI's making an investment of this size was to acquire a stake sufficient to permit it to influence and control CSX.

    27.1    In December 2006, TCI contacted Goldman Sachs to explore a possible leveraged buy-out ("LBO") of CSX.  (PX 20.)

    27.2    On December 7, 2006, Mr. Sunak met with Adrian Jones, a partner at Goldman Sachs' principal investment area, to discuss the possibility of an LBO concerning CSX.  (PX 20; Sunak Dep. at 72:6-12, 72:25-73:10.)  The idea was met by Goldman Sachs with "obvious excitement".  (PX 20.)

    27.3    Following the meeting, Mr. Sunak sent an email to Mr. Jones and Philip Grovit, a business unit manager at the principal investment area group at Goldman Sachs, in which Mr. Sunak reiterated TCI's interest in pursuing an LBO with Goldman Sachs for CSX and offering to "spend some time . . . to walk through the business/industry in some detail".  (PX 20; Sunak Dep. at 72:13-16.)

    27.4    Mr. Sunak also attached a detailed LBO model for CSX, and "changed the premium [to be charged to Goldman Sachs] to reflect a more reasonable take out!"  (PX 20.)

28.    By late 2006/early 2007, TCI had, without any public disclosure, accumulated CSX swap positions resulting in economic exposure to well over 5% of the outstanding shares of CSX.  By March 30, 2007, before TCI began to convert some of its swaps into CSX shares, TCI owned swaps referencing 61,627,400 shares, or 14.07% of the CSX shares then outstanding.  (Subrahmanyam ¶ 85.)

29.     After March 30, 2007, TCI converted some of its swaps to physical shares, but its exposure to CSX remained approximately constant.  (Amin ¶ 37; Tr. 195:17-19; PX 206.)

29.1     Mr. Amin testified that "in the beginning of April 2007, TCI began unwinding swap positions and at the same time accumulating physical shares of CSX in the open market.  TCI wanted its exposure in CSX to remain roughly constant."  (Amin ¶ 37.)

29.2     As illustrated in Exhibit E to the expert report of Professor Subrahmanyam, TCI's exposure to CSX reached its pinnacle on April 18, 2007, and has remained constant.



**Exhibit E**
**CSX Share and Swap Ownership by TCI**
**10/20/06 – 2/6/08**

**B.     The Fix Goes in for Initial Annual Meeting**

30.     In late 2007, to implement its plan to secretly influence and control CSX, TCI concentrated its swaps (giving TCI exposure to 46.4 million CSX shares) in the hands of two counterparty banks, Deutsche Bank and Citigroup, to maximize its influence on the shares held by its counterparties as a hedge.  (Subrahmanyam ¶¶ 78-79, 164.)

31.     In so doing, TCI effectively put matching CSX shares in the hands of Citigroup and Deutsche Bank, as opposed to the hands of other shareholders, and thus influenced the voting or non-voting of these shares.  (Subrahmanyam ¶ 154.)

32.     In addition to that influence, TCI concentrated its swaps with Deutsche Bank and Citigroup in order to influence them to vote the CSX shares held by them in favor of TCI and 3G.  (Subrahmanyam Rebuttal ¶¶ 45, 47.)

33.     Neither Deutsche Bank nor Citigroup had any independent economic incentive to vote the CSX shares held by them to hedge their CSX swaps with TCI.  Once perfectly hedged, as they were here, Deutsche Bank and Citigroup were economically neutral to the performance of CSX, but still retained the voting rights of its matching shares.  (Subrahmanyam Rebuttal ¶ 44.)

34.     Deutsche Bank is a prime broker for TCI -- a lucrative relationship that led it to provide free services to TCI.   (Subrahmanyam ¶¶ 161-65.)  While Citigroup is not a prime broker for TCI, it was likely vying for such a relationship and competing for new business.  (Subrahmanyam Rebuttal ¶ 43.)

35.     Moreover, Deutsche Bank owns Austin Friars, a hedge fund that joined TCI's and 3G's scheme to influence and control CSX.  (Amin Dep. 105:11-16; Tr. 132:5-7.)

36.     Mr. Amin admitted that TCI planned to use its connection to Austin Friars, which held approximately one percent of CSX's outstanding shares, as part of a plan to influence control over Deutsche Bank's voting without an explicit agreement:

> Q.  And why did you believe it would be helpful [that there was a hedge fund within Deutsche Bank that owned CSX shares]?
>
> A.  Because Austin Friars, as far as we can tell, is a hedge fund who we thought we could convince of the value case of what we were trying to accomplish at CSX.  It's better for them as a shareholder to support us than to vote and keep the incumbent board in place.  Hedge funds typically are more receptive to those arguments than non-hedge funds.  And so we thought we would have a good chance at being able to have that discussion and convincing them we were indeed right.
>
> Q.  So you thought that given the perspective of a hedge fund that you would be more likely to be able to convince Austin Friars than the regular institutional investor; is that fair?
>
> * * *
>
> A.  Yes, I think that's fair.
>
> Q.  And you thought that if you convinced Austin Friars of this, it would help Deutsche Bank to go along with Austin Friars' recommendation?
>
> A.  We thought it was a helpful fact, yes.

Q.  In convincing Deutsche Bank to vote the counterparty shares your way that they were affiliated with this internal hedge fund; correct?

A.  It was our view that it would be helpful that Austin Friars had a proprietary position in CSX, and that we thought we had a good chance of convincing Austin Friars to support us.  And to the extent that the banks votes in the best interest of the bank and Austin Friars determined that they should support us, we thought that that would be helpful.  (Amin Dep. 104:16-106:17.)

37.    Mr. Hohn admitted that TCI sought to use Austin Friars to influence the voting of Deutsche Bank shares held as a hedge to its CSX swaps with TCI.  Mr. Hohn was asked the following questions and gave the following answers with respect to TCI's decision to concentrate a large CSX swap position with Deutsche Bank:

Q.  I don't want to get into the other situation, but this move to commercial banks has got nothing to do with CSX, right?  It's a generalized concern?

A.  For this specific, I'd say there -- I'd say the two reasons we concentrated our holdings there, one is the credit counterparty issue, and in the case of Deutsche Bank, we observed that they had a physical holding of a few percent of the company, and we had hypothesized that there may be a chance that if they had hedged it, that they -- and they liked our -- in the event that we did run a slate of directors, that they -- that would -- might be a factor for them to consider voting any underlying shares in which they might have hedged their swap -- their swaps.

Q.  So one reason you moved -- you concentrated on Deutsche Bank was that you thought there was a possibility that they would vote the underlying shares for your slate?

A.  If they held them, yeah. We didn't know if they held any, but if they did, there was -- that was one of the reasons. The other was counterparty credit risk.  (Hohn Dep. 154:4-155:4.)

38.    Deutsche Bank is known for cooperating with hedge funds seeking to use swaps to influence and control the companies in which the swaps give the funds exposure.

38.1    In May 2001, Deutsche Bank and another derivatives dealer provided equity swaps to the hedge fund Perry Capital with respect to a 16% undisclosed economic ownership stake in Rubicon Ltd., a New Zealand public company.  When Perry needed the voting rights, it terminated the swaps and bought the shares back from the derivatives dealers.  (Ithaca (Custodians) Ltd. v.

10

Perry Corp. [2003] 2 N.Z.L.R. 216 (H.C.) rev'd, [2004] 1 N.Z.L.R. 731 (C.A.); [2004] 2 N.Z.L.R. 182 (C.A. (refusing conditional leave to appeal).)

38.2     In 2007, Sulzer, a Swiss engineering firm, found that two Austrians and a Russian oligarch had secretly acquired a 32% stake, notwithstanding rules requiring disclosure at a 5% ownership threshold.  This Austro-Russian group had used cash-settled equity derivatives provided by Deutsche Bank and a Swiss bank.  (See Henry T. C. Hu & Bernard Black, Equity and Debt Decoupling and Empty Voting II:  Importance and Extensions, 156 U. Pa. L. Rev. 625, 655-56 (2008).)

38.3     In 2004-2005, Deutsche Bank and BHP Billiton entered into swaps to give BHP Billiton economic exposure to about 4.3% of the voting shares in WMC Ltd.  (Australian Takeovers Panel, Discussion Paper – Equity Derivatives (Sept. 10, 2007), available at http://www.takeovers.gov.au/display.asp?ContentID=1268 .)

39.     Consistent with their plan to keep the market in the dark, TCI kept token positions at six other of its swap counterparties to obfuscate its position, plans and influence relating to CSX from CSX and from the market.  (Tr. 178:24-179:1, 204:15-205:1.)

39.1     Mr. Amin was asked the following questions and gave the following answers:

Q.  Why did you leave those on [referring to TCI's token swap positions]?

A.  We didn't want it easily identifiable to the outside world who our primary swap counterparties were.

Q.  And why is that?

A.  Because doing so leaves you more susceptible to front running by other hedge funds or other investors.

Q.  What do you mean by that?

A.  If people can easily identify who your primary counterparties are, then it's easier for them potentially to identify whether you are increasing or decreasing your exposure to a specific investment which when you are a fund of our size will leave them to try to front run you, could try to lead them to front run you.

Q.  So knowing how many physical shares your counterparty had and knowing who the counterparty was would make you susceptible to being, to having a front runner?

A.  Knowing who your counterparty is puts us at risk.  In other words, if hypothetically speaking if TCI announced to the world that the only counterparty we would ever use is Goldman Sachs there would be a higher likelihood that every time someone saw Goldman Sachs change its position in the company they would attribute it to TCI.  What we didn't want to do is allow people to establish any sort of link between us and specific counterparty so that they could attribute that counterparty's behavior or trading, whatever it was, back to TCI.  (Amin Dep. 74:14-75:22.)

40.    With its positions and plans hidden from the market, TCI and 3G and others in the Group manipulated the ownership of CSX shares around the initial record date after the CSX 2008 annual meeting.  CSX's proxy solicitor, Innisfree M&A Incorporated, found ownership changes in CSX's ownership patterns suggesting the exercise of influence over the voting of physical shares held by its CSX swap counterparties, particularly Deutsche Bank.

40.1    Between February 12 and February 27, 2008, the original record date, Deutsche Bank increased its holdings of CSX shares by 23 million, resulting in total holdings of 27 million shares.  (Subrahmanyam ¶ 167; PX 189 at CSX_00016000, CSX_00016006.)

40.2    For comparison, TCI held economic exposure to 28 million CSX shares through CSX swaps with Deutsche Bank as of February 8, the last day of available data on swap positions and transactions in Deutsche Bank's document production.  (Subrahmanyam ¶ 167; PX 196.)

40.3    The change in Deutsche Bank's holdings represented roughly two-thirds of the net change in holdings of the top hedge fund custodians of CSX shares.  (Subrahmanyam ¶ 167.)

40.4    In the eight business days following the record date, Deutsche Bank decreased its holdings by over 24 million shares, an amount similar to the net change that occurred at the same time in the holdings of the top hedge fund custodians of CSX shares.  (Subrahmanyam ¶ 167; PX 189 at CSX_00016006.)

40.5    This pattern is consistent with Deutsche Bank's lending out CSX matching shares to traders who engage in short-selling of such shares, as is common practice, but recalling those shares in time for the record date (and lending them back again after the record date passed).  (Subrahmanyam ¶ 167; PX 189 at CSX_00016000, CSX_00016006.)

41.    With respect to these share movements, Mr. Miller of Innisfree testified:

41.1    The "unprecedented movement and concentration of shares in the hands of swap counterparties to hedge funds likely rendered a fair proxy contest impossible".  (Miller ¶ 22.)

41.2    Mr. Miller "had a significant concern that, based on [his] experience, the counterparties to the swap arrangements with the hedge funds were likely to vote the shares they held as directed by the hedge funds, as is frequently the case."  (Miller ¶ 22.)

41.3    "The dramatic movement of shares into the hands of the TCI counterparties before the February 27, 2008 record date suggested to me that those shares were being put into place for the record date with the understanding that they would be voted at the annual meeting in accordance with the wishes of TCI."  (Miller ¶ 24.)

41.4    "In my experience, the movement of shares to brokers aligned with hedge fund interests was unprecedented in both magnitude and concentration and could not be explained by normal share movements."  (Miller ¶ 23.)

41.5    "Even if an arrangement concerning the voting of shares held by counterparties is not disclosed, my 30 years of experience in the industry indicate that, to the extent they can, the counterparties to swap arrangements frequently vote such shares in the manner specific by the hedge funds.  It is my belief that these counterparties are motivated by a desire to please lucrative hedge fund clients with whom they do business."  (Miller ¶ 24.)

42.    Defendants rely upon the testimony of Professor Partnoy and a representative of Deutsche Bank, Mr. Arnone, to explain the recall of CSX's stock by Deutsche Bank around the record date.  (Partnoy Rebuttal ¶ 71-75; Partnoy Sure-Rebuttal ¶ 17.)  However, Professor Partnoy's opinion is unfounded speculation (Subrahmanyam Rebuttal ¶¶ 48-49) and none of the witnesses from Deutsche Bank provided an explanation for why the CSX shares were recalled twelve days before the record date.

42.1    In fact, the witnesses provided no information explaining the recall.  Mr. Arnone said he did not know that the shares were lent out, much less recalled.  (Arnone Dep. 52:22-53:11.)  The swap desk would not have been responsible for the recalling of CSX shares, that is the responsibility of the securities lending department.  (Arnone Dep. 51:3-20.)  Mr. Paul Busby, co-head of Deutsche Bank's securities lending department, was not aware that the CSX shares were recalled twelve days before the record date.  (Busby Dep. 21:17-21.)  Mr. Busby did not know the reason why the CSX shares were recalled.  (Busby Dep. 21:17-21, 24:3-8.)  Mr. Busby was shown the records of the recall, but was unable to tell who recalled the shares.  (Busby Dep 40:19-23.)

43.    Although CSX reset the record date and rescheduled the date of the Annual Meeting, TCI and 3G have continued to exercise influence over the upcoming vote.

43.1    Alan Miller of Innisfree provided unrebutted trial testimony as to his concern that Deutsche Bank was recalling shares to vote them on behalf of TCI.  (Tr. 79:23-80:1.)

13

43.2    Citigroup has stated that it does not intend to vote its shares, thus depriving CSX of those votes. (Kennedy Dep. 21:18-24.) Deutsche Bank by contrast claims not to have made a decision about voting its shares, which remain susceptible to influence by TCI, 3G, and Austin Friars. (Arnone Dep. 25:14-17, 26:14-27:2.)

## III.    TCI AND 3G FORM A GROUP IN EARLY 2007

### A.    TCI Seeks an Ally in 3G in its Quest for Control

#### 1.    TCI builds up a secret 13% position in CSX using swaps

44.    In late 2006, TCI began accumulating its position in CSX using swaps. (PX 206.)

45.    By late 2006/early 2007, TCI had, without any public disclosure, accumulated CSX swap positions resulting in economic exposure to well over 5% of the outstanding shares of CSX.

45.1    By December 6, 2006, TCI owned swaps referencing 22,643,200 shares, or 5.20% of the CSX shares then outstanding, . (Subrahmanyam ¶ 85(a).)

45.2    By December 31, 2006, TCI owned swaps referencing 38,135,700 shares, or 8.76% of the CSX shares then outstanding. (Subrahmanyam ¶ 85(b).)

45.3    By January 16, 2007, TCI owned swaps referencing 43,972,200 shares, or 10.10% of the CSX shares then outstanding. (Subrahmanyam ¶ 85(c).)

45.4    By March 30, 2007, before TCI began to convert some of its swaps into CSX shares, TCI owned swaps referencing 61,627,400 shares, or 14.07% of the CSX shares then outstanding. (Subrahmanyam ¶ 85(d).)

45.5    The secrecy of TCI's position perhaps influenced Mr. Amin, TCI's Rule 30(b)(6) witness, at his deposition. When asked how many swap transactions TCI had entered into with respect to CSX, he testified "I don't know". (Amin Dep. 41:10-20.)

46.    At the same time, TCI began contacting the Company regarding its business, and on October 23, 3006, just three days after its initial purchase of CSX swaps, TCI began demanding a meeting with senior management, representing that TCI had approximately "$100m of stock". (PX 133.)

47.    This pattern of secret accumulation and demands for meetings with CSX senior management continued through the early part of 2007. (PX 206; PX 136; PX 33; PX 34.)

48.    During this period, TCI was secretly hatching a plan to force an LBO of CSX, even sending an LBO model to an investment bank and requesting a profile of

CSX's takeover defenses from Proskauer Rose LLP, its outside counsel.  (PX 20; PX 21; PX 24; PX 31.)  Again, the secrecy of TCI's plan for control perhaps influenced Mr. Amin, TCI's Rule 30(b)(6) witness.  When asked why TCI looked at takeover defenses of CSX in December of 2006, he testified "I don't recall specifically".  (Amin Dep. 125:20-126:4.)  And when asked about a specific takeover defense profile, SharkRepellant.Net, and where it came from, he again testified "I don't remember where it came from."  (Amin Dep. 125:12-19; PX 31.)

49.    TCI was promoting an LBO of CSX in order to make a quick profit on its investment that would provide a liquidity event.  Indeed, on December 21, 2006, Patrick Degorce of TCI told Mr. Hohn: "I am getting very stressed by the fund leverage if you want to buy more rails we have to sell something and put every other buying on hold."  (PX 23.)

50.    By late January 2007, TCI had succeeded in arranging a meeting with CSX's financial advisor, Morgan Stanley, to discuss an LBO of CSX.  (PX 37; DX 145 ¶ 26.))

51.    By February 8, 2007, TCI's position in swaps represented 57,259,200 shares or over 13% of the outstanding CSX shares.  (PX 206; Subrahmanyam Ex. C.1.)



2.    TCI Solicits 3G to Form a Group.

52.    By early February 2007, TCI was frustrated with CSX and found a willing co-conspirator in its activism in the form of 3G and Mr. Hohn's "friend Alex of Brazil". (PX 42.)

52.1    3G's intentions were activist from the beginning, because Mr. Hohn had involved Mr. Behring in the conspiracy.  On February 7, 2007, two days <u>before</u> 3G made its initial purchase of CSX shares, Mr. Schwartz noted to Mr. Behring and Mr. Moura in an email titled "CSX Board election" that "it looks like we're past the deadline for shareholder proposals from the 2007 agm". (PX 41.)

52.2    Mr. Behring sought to explain away the investigation of the "dates to nominate board members, and other things [as] part of the normal due diligence for CSX," just as they "were also part of the due diligence for the other[] [Class I rails]".  (Tr. 153:3-8.)  That testimony, far from confirming  the false impression that Mr. Behring tried to leave the court, confirms that Mr. Behring had joined the conspiracy with Mr. Hohn.  Mr. Behring conceded that 3G had no experience in "activism" and looked to Mr. Hohn, a world-class "activist" for advice.  At trial, Mr. Behring noted that he asked Mr. Hohn "about his experience being an activist shareholder around the world, what are the pros and the cons, and things like that". (Tr. 121:1-6.)  TCI had been considering the other Class I rails, including Norfolk Southern, Burlington Northern and Union Pacific, as well as Canadian National.  (PX 21.)  Indeed, Mr. Hohn testified that he told Mr. Behring about TCI's position in other rails, including Norfolk Southern and Union Pacific.  (Tr. 160:22-161:2.)

53.    Mr. Hohn told Mr. Behring of TCI's investment in CSX in January 2007.  (Tr. 161:3-161:6.)  Even Mr. Hohn conceded that Mr. Behring "could interpret a view on what the size [of TCI's interest in CSX and other rails] was".  (Tr. 161:7-161:13.)  TCI and 3G agreed to co-ordinate their purchases no later than February 9, 2007.  (DX 206.)  As a result, 3G bought shares of CSX on February 9 and February 12, 2007.  (DX 206.)  3G's purchases on those two days totaled 3,729,833 shares or 24.03% of the total market volume for CSX shares on those two days.  (Tr. 159:4-159:24, 160:22-161:6; wsj.com.)  As described below, 3G also bought over 4.5 million shares over the next few days.

54.    The documentary evidence shows that Mr. Hohn had a specific conversation about 3G's purchases on February 13, 2007.  Thus:

54.1    On February 13, 2007, Mr. Hohn sent Mr. Amin an e-mail in response to a question that Mr. Amin had sent  about an investment in Arcelor Brasil.  (PX 42.)  Mr. Hohn responded by BlackBerry that he would call Mr. Amin "in a minute" to discuss the Arcelor issue.  (PX 42.)  Mr. Hohn went on to say in a separate paragraph:

54.2    "Increased activity in csx cds has caused excitement in the stock.  I want to also discuss our friend Alex of Brazil."  (PX 42.)

54.3    "[F]riend Alex of Brazil" is Mr. Behring. (Tr. 155:17-155:24)

54.4    On that very day, February 13, 2007, 3G purchased credit default swaps or CDS relating to CSX.  (PX 274.)

16

55.     At his deposition, Mr. Hohn claimed not to remember sending the "friend Alex of Brazil" e-mail. (Hohn Dep. 109:5-13.) Indeed, Mr. Hohn testified at his deposition that he only "assume[d]" that "friend Alex of Brazil" was Mr. Behring; he "didn't" actually remember". (Hohn Dep. 109:12-13.) Likewise Mr. Amin claimed not to have any memory of conversations about "friend Alex of Brazil." (Amin Dep. 140:2-22.) Indeed Mr. Amin testified that he did not "think Alex refers to Alex Behring" (Amin Dep. 140:16-18) and claimed not to know whether there was a relationship between the CSX credit default swaps or CDS and "friend Alex of Brazil". (Amin Dep. 141:10-25.) Similarly, Mr. Behring at his deposition and at trial pleaded ignorance about any conversation with Mr. Hohn about CSX in early 2007. (Behring Dep. 149:22-150:18; Tr. 98:5-98:10.)

56.     At trial, Mr. Hohn, although he did not remember anything about PX 42 at his deposition (Hohn Dep. 109:2-6.), tried to explain it away. He indicated that he wanted to speak with Mr. Behring about Arcelor Brasil, not CSX. (Tr. 156:9-156:19.) That testimony is false. The reference to "Alex of Brazil" comes <u>after</u> the discussion on Arcelor Brasil. More importantly, it is in the same paragraph and follows immediately after the statement regarding increased activity in CSX CDS. (Tr. 157:6-157:18.)

57.     Mr. Hohn and Mr. Behring decided to form a group with respect to purchases of interests in CSX no later than February 9, 2007. This finding is based on the following:

57.1     The January 2007 conversation between Mr. Hohn and Mr. Behring regarding TCI's investment in CSX (Tr. 161:7-13;

57.2     Mr. Hohn's and Mr. Amin's concession that TCI "selectively" tipped certain hedge funds in respect of TCI's investment strategies (Tr. 189:3-20);

57.3     The "friend Alex of Brazil" e-mail, the purported total lack of memory displayed by Mr. Hohn, Mr. Behring and Mr. Amin on the issue, the simultaneous purchase by 3G of CSX CDS on the very day of the e-mail (PX 42; PX 274); and

57.4     The extraordinary level of purchases by 3G around that time (PX 206).

58.     In the three days from February 13-15, 2007, 3G purchased 4,549,560 shares of CSX (PX 206):

| Transaction Date | Number of Shares |
|---|---|
| 2/13/2007 | 2,450,000 |
| 2/14/2007 | 1,613,700 |
| 2/15/2007 | 485,860 |

59.    These purchases were very unusual for 3G.  Indeed, on March 14, 2007, 3G received an inquiry from UBS regarding the trading by 3G in CSX shares in recent weeks, which "was a very sizeable position and not something that fits into [3G's] regular trading patterns."  (PX 63.)

60.    3G's purchases in the period from February 9, 2007, to February 15, 2007,totaled 8,279,393 shares.  The Group's ownership position was at that time 67,653,693 shares of CSX or 15.69% of the then-outstanding shares.  (PX 206.)  The Group decided that this was an appropriate level and began to solicit other conspirators to join the Group.  (PX 47.)



### 3.    TCI Solicits Others for the Group

61.    At the trial, Mr. Hohn testified that TCI is "very careful not to ever tip another investor as to whether [TCI is] going to increase [its] stake in a company or not, because that would disadvantage [its] investors."  (Tr. 163:13-16; see also Hohn ¶ 22.) He tried to lead the Court to believe that this was evidence of why he did not tip 3G. That testimony is false.

62.    Mr. Hohn's testified that the tipping of hedge funds while TCI was building its book "is typical in the hedge fund industry".  (Hohn ¶ 22.)  Mr. Hohn conceded, in response to the Court's questioning, that such tipping was inconsistent with TCI's economic interest to avoid frontrunning:

18

"Q.  And you viewed front running, generally speaking, as against the interests of TCI, is that true?

A.  Yes.

Q.  And the reason for that was what?

A.  Because you would be forced to pay a higher price for the shares or accept a lower price when selling.

Q.  But in one way or another you made known to selective investors, one of them if memory serves me being [Deccan], that you were building a position and suggested or implied to them that they might do the same, true?

A.  I don't know if we told them we were building.  We certainly told them we had a position, and [Deccan] is a very small fund also that has been very highly value added to us.  So I don't think it's true that we told them we were buying securities.

Q.  You told them to buy in exactly those words, 'buy CSX,' true?

A.  Yes, that is true." (Tr. 189:3-20.)

62.1    Mr. Hohn admitted that one of his motivations in avoiding disclosure was to avoid paying a higher price for his shares.  (Trial Tr. 188:16-189:8.)

63.    Mr. Hohn testified that this detriment was outweighed by an informational benefit:

"The benefit of sharing our ideas with other ideas with other investors is that they in turn share their ideas with us."  (DX 144 ¶ 22.)

Mr. Hohn's testimony is incredible.  In fact, TCI tipped funds of its interest in CSX so that these funds could be part of its group in its clandestine assault on CSX.  In the case of the tip to 3G, this strategy paid off by the formation of a full-fledged group.

64.    Indeed, after forming the Group with 3G and securing a joint 15.55% stake in CSX, TCI made disclosures "selectively" to other hedge funds about TCI's "thesis" for CSX.  (Amin Dep. 136:24-137:3.)  Specifically, TCI had been recommending CSX to hedge funds as a "good fundamental investment" and urging other hedge funds to "buy CSX".  (Hohn Dep. 85:6-22; PX 53.)

65.    Mr. Hohn testified that he is "particularly sensitive to the issue of groups and knowledgeable about when a group is formed and when it is not formed".  (Tr. 180:5-18).  He also claims that until a group agreement is signed, there is no group

formation. (Tr. 183:25-184:4.) Mr. Hohn's legalistic approach is illegal. Mr. Hohn ignores the obvious quid pro quo co-ordination. Mr. Hohn tipped other hedge funds so that they could buy the shares cheaply and vote in TCI's favor. (PX 45; PX 46; PX 53; PX 54.) Mr. Hohn did protect his investors against front-running by not tipping most of the other funds until TCI had established its position (and that of its co-conspirator). (Tr. 189:9-191:5.) So once the 15.55% February 15 level for the Group was reached, Mr. Hohn and Mr. Behring looked for more members of the Group, swapping "inside" information for support. (PX 47; PX 48; PX 58.)

66.    In approaching these other hedge funds, TCI sought to expand the Group with other like-minded members. In some cases these other hedge funds, including Deutsche Bank's Austin Friars, bought CSX shares and in the process joined the TCI/3G Group. For example, during this period, TCI urged Deccan Value to "buy" CSX:

66.1    Mr. Hohn testified that he discussed TCI's investment with Deccan Value: "Deccan Value was one, so I knew that . . . they knew Warren Buffett and Buffett's investment in the sector, and so I knew that they had been studying it because of that, and so I asked them their thoughts on it. That was one, but there was, you know, other funds." (Hohn Dep. 32:12-18.)

66.2    On February 20, 2007, Mr. Hohn informed Vinit Bodas of Deccan Value that we think "CSX is the best" railroad investment. (Hohn Dep. 80:6-24; see also PX 46.) Mr. Hohn asked Mr. Bodas to "keep this confidential" and indicated that "we cannot be in a group so we are careful on sending models", but referred Mr. Bodas to Mr. Amin for any questions he might have. (PX 46.)

66.3    Mr. Hohn urged Deccan to buy CSX stock. (Hohn Dep. 80:6-24, 83:25-84:9.)

66.4    In an email exchange on February 23, 2007, Mr. Hohn and Mr. Bodas discussed becoming "sister" organizations where each would "bec[o]me the preferred party for sharing ideas once the other was executed or even while researching with the agreement not to act until a position was reached". (PX 47.)

66.5    By February 24, 2007, Mr. Amin had spoken at length with Mr. Bodas about TCI's "hypothesis about CSX". (Hohn Dep. 83:25-84:9; PX 48.) Again, the secrecy of the effort seems to have affected Mr. Amin's memory at his deposition. When asked whether he recalled having a number of communications with Deccan Value before the May 8, 2007,announcement, he testified "I don't." (Amin Dep. 137:22-138:2.) When asked a second time, he said "I don't. It is not to say it didn't happen, but I don't recall." (Amin Dep. 138:2-4.)

66.6    On March 2, 2007, the day on which TCI notified CSX of its HSR filing, Mr. Hohn recommended that Mr. Bodas "[b]uy csx" and indicated that he would try to speak to Mr. Bodas about it. (PX 53; PX 55.)

66.7    On April 24, 2007, Mr. Hohn directed Mr. Sunak to send TCI's CSX financial model to Mr. Bodas.  Mr. Sunak concluded that sending the model by courier rather than email would be preferable.  (Hohn Dep. 77:20-78:13; PX 84 and 86.)  Mr. Hohn had previously told Deccan Value that trading models could lead to an inference of being a Group.  (PX 46.)  Mr. Hohn said at trial that his statement was honest.  (Tr. 174:20-22.)  Mr. Hohn, of course, had no qualms about sharing models with 3G on this ground (which TCI did) because he knew that TCI and 3G had formed a Group.  He and Mr. Behring had done so by February 9, 2007, even if he now denies it.  (Tr. 179:11-180:2.)

67.    Similarly, during this same period after the Group had reached its desired level of ownership, TCI urged Lone Pine to buy CSX stock:

67.1    On February 19, 2007, Mr. Hohn urged Mala Gaonkar of Lone Pine Capital, a hedge fund in which Synergy is invested (Moura Dep. 50:5-7), to "[t]ake a look at this [CSX] stock".  (PX 45; see also Hohn Dep. 76:21-77:11.)

67.2    On March 2, 2007, the day on which TCI notified CSX of its HSR filing, Eashwar Krishnan of Lone Pine Capital wrote to Mr. Hohn, indicating that "I think this CSX could be a very good stock indeed", after which Mr. Hohn requested Mr. Krishnan's mobile telephone number.  (PX 54; PX 55.)

67.3    Mr. Krishnan also contacted Mr. Amin to discuss CSX and "compare models" and to request a copy of the Bain report.  (PX 58; PX 60.)

68.    Mr. Hohn concedes that "[t]hroughout 2007, I spoke with my colleagues at other funds, such as Deccan Value Advisors, Seneca, [redacted], 3G Capital Partners, Lone Pine, TCW and Atticus".  (Hohn ¶ 22.)  Indeed:

68.1    TCI "recommend[ed]" to Atticus that it have investments in CSX.  (Hohn Dep. 86:22-25.)  Mr. Hohn recognized that "if [Atticus] were a shareholder and we ever became activists, it would be helpful" in connection with TCI's "optionality".  (Hohn Dep. 88:7-89:3.)  Here, Mr. Hohn conceded the quid pro quo agreement -- a tip in exchange for support.

68.2    TCI discussed CSX with multiple other hedge funds during the second half of 2007.  (See Hohn Dep. 32:7-18.)  TCI had communications with Seneca, another hedge fund, regarding TCI's investment in CSX.  (Hohn Dep. 68:11-25.)  Mr. Amin in particular had meetings with five to ten other funds concerning TCI's "view of the fundamental case" for CSX.  (Hohn Dep. 88:20-89:8.)  Those funds included York Capital, Glenview and Atticus.  (Hohn Dep. 89:18-20.)  Mr. Hohn joined Mr. Amin for some of those meetings.  (Hohn Dep. 88:20-89:8.)

69.    TCI needed these discussions to track the undisclosed shareholdings of other funds.  In early 2008, Mr. Sunak created a spreadsheet described as "Share Scenarios".  (PX 191; Sunak Dep. 61:15-23.)  This exhibit calculates the "total physical shares" held by TCI and 3G, as well as the number of shares held in derivative "swap"

transactions by TCI (11%) and 3G (1%). (PX 191.) In addition, in this analysis, Mr. Sunak broke down the number of shares held by various investors – both those formally "disclosed" in securities filings, and "probable" total holdings, whether disclosed or not. (PX 191; Sunak Dep. 63:2-64:17.) TCI got the information from its fellow undisclosed Group members, including Austin Friars Capital, the proprietary hedge fund arm of Deutsche Bank.

> 69.1    Mr. Sunak testified that the holdings of Austin Friars, estimated at over 9.2 million shares, had not shown up in a public filing "because it is amalgamated under the Deutsche Bank filing." (PX 191; Sunak Dep. 61:24-62:13.) Mr. Sunak updated "column E" on the spreadsheet - representing "shares that [TCI] understood those investment firms to actually own" (versus what had been disclosed) – through conversations with those entities. (Sunak Dep. 63:2-7.)

70.    One of the Group's most significant undisclosed additions was Austin Friars, the proprietary hedge fund arm of Deutsche Bank, one of TCI's principal swap counterparties. Thus:

> 70.1    TCI had Austin Friars actively working on its behalf in March 2007. (PX 25; PX 57; Sunak Dep. at 57:18-58:9, 59:17-21, 129:2-14, 130:2-9.)

> 70.2    In exchange for the tip from TCI, Austin Friars had joined the Group by buying shares and was working for the support of the Group.

> 70.3    As discussed later, TCI concentrated its swaps at Deutsche Bank because it is the parent of Austin Friars, one of the undisclosed Group members.

> 70.4    Mr. Hohn testified that he knew that Austin Friars had a lot of CSX shares and that he had picked Deutsche Bank as TCI's main swap counterparty because Austin Friars is owned by Deutsche Bank (Tr. 178:18-179:6.)

> 70.5    However, Mr. Amin, when asked to confirm that he did not remember why TCI chose to enter into swaps referencing CSX shares between October 20, 2006 and December 29, 2006, what percentage of the outstanding CSX shares such swaps represented, or what counterparty TCI used, said, "Yes, that's right. I don't recall." (Amin Dep. 68:2-15.) When asked what Mr. Hohn said when Mr. Amin informed him that there was a hedge fund within Deutsche Bank that owned CSX shares, Mr. Amin said "I don't recall." (Amin Dep. 104:6-8.) When asked if Mr. Hohn agreed with Mr. Amin's view that such information was helpful, he said "I don't recall". (Amin Dep. 104:9-15.)

71.    Austin Friars helped TCI in getting information from others. Thus:

> 71.1    In March 2007, Austin Friars set up a call with John Snow, former Secretary of the Treasury and former CEO of CSX and "invited [TCI] to listen in" on the call, which they did. (PX 57; Sunak Dep. 57:18-58:9, 59:17-21, 129:2-14, 130:2-9.)

71.2    Prior to the call, Darren Curtis and Andre Crawford-Brunt of Austin Friars sent both Mr. Amin and Mr. Sunak proposed questions to ask of Former Secretary Snow.  (PX 57.)  One question of interest to both TCI and Austin Friars was whether companies in the railroad industry could "lend themselves to being run by private equity".  (PX 57.)  Other proposed questions included "[W]hy spend money on expansionary capex unless there is fair return on this spend?"; "Do the rating agencies really matter?"; "Are there non core real estate assets that could be sold?"; and what was Former Secretary Snow's view on CSX's being "criticized for having underspent on capex during the 90s (under his regime)"?  (PX 57.)

71.3    TCI also coordinated its efforts with Austin Friars with respect to other companies.  (PX 25.)

72.    3G also had contact with Austin Friars regarding CSX.  3G's Mr. Schwartz spoke with people from Austin Friars.  Mr. Schwartz testified that "Alex put them in touch with me and we — and we chatted about CSX."  (Schwartz Dep. 183:16-23; 184:8-17; 185:6-13; 185:20-186:14.)  TCI "might have come up" and proxy contests "could have conceivably come up in conversation" with Austin Friars.  (Schwartz Dep. 187:8-16; 188:4-15.)  Mr. Behring's contrary testimony at trial (Tr. 131:17-133:2) is incredible.

73.    3G also discussed CSX with "multiple funds" or "tens" of funds during the course of 2007.  (Moura Dep. 187:9-21.)  Thus:

73.1    3G spoke with Deccan Value.  (Behring Dep. 97:7-98:15.)  Mr. Behring testified that during those conversations, "it probably would have been natural to talk about CSX".  (Behring Dep. 98:8-15.)

73.2    Mr. Schwartz spoke to Atticus and other hedge funds about 3G's ideas concerning CSX pricing.  (Schwartz Dep. 109:14-110:5, 111:8-19, 111:23-112:10; see also PX 202.)  Mr. Behring also spoke with Atticus about "ideas" and that it is "possible" that he discussed CSX with Atticus.  (Behring Dep. 101:3-13.)

73.3    Mr. Moura recalled speaking to Fir Tree, Och-Ziff, Edgerton, and Tiger Global concerning CSX.  (Moura Dep. 188:4-189:2.)

73.4    3G also shared its "Investment Discussion" analysis on U.S. Railroads with different funds.  (Moura Dep. 150:18-24; see also PX 199.)  The 3G "Investment Discussion" focuses on the case for hedge fund investment in CSX.  (PX 199 at 36-62.)

74.    The purpose of soliciting these funds was to find support for the proxy fight TCI is currently running.  In fact, the principal goal has been to get their support on what Mr. Hohn calls TCI's "optionality for activism".  (Hohn Dep. 86:4-20.)  TCI's tippings of these hedge funds were solicitations for its contemplated proxy fight.  This "optionality for activism" is merely a complicated and deliberately unclear description of

23

a proxy fight.  Indeed, Mr. Hohn testified that "a proxy fight…is really the only tangible form of activism permissible in [CSX]".  (Tr. 182:6-17.)

74.1     As a result of TCI's and 3G's secret discussions with other hedge funds, there was a fundamental shift in the shareholder base.  From December 31, 2006 to December 19, 2007,(the date on which TCI's and 3G's total interest in CSX, including cash-settled swaps, was made public), holdings by hedge funds increased from approximately 11% to 35% and holdings by other institutions decreased from over 60% to approximately 39%.  (PX 189 at CSX_00001588, CSX_00016085.)

### 4.    The Group Becomes "Activist" in March 2007

75.    On March 2, 2007, TCI made a filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR") and notified the Company that TCI planned to cross the $500 million acquisition threshold with respect to CSX shares.  CSX disclosed that notice to the public on April 18, 2007.  (Compl. ¶ 28; TCI Ans. ¶ 28; PX 55.)  Under HSR, a filing is not required for purchases of physical securities representing no more than 10% of a company's voting securities if the purchases are made "solely for the purpose of investment".  (15 U.S.C. § 18(c)(9) (2006).)

76.    Mr. Hohn testified that an HSR filing gave TCI the "optionality of potential activism in the future".  (Hohn Dep. 35:5-20.)

77.    Mr. Behring spoke to TCI sometime in "the sequence of" TCI's HSR filing in March 2007.  (Behring Dep. 205:14-206:6.)  This occurred no later than the March 29, 2007, meetings between Mr. Behring and TCI; thus, before public knowledge, which came on April 17, 2007.  (DX 114 at 39.)  3G knew that TCI would begin purchasing CSX shares at the end of the HSR 30-day waiting period in April.

78.    On March 29, 2007, Mr. Hohn and Mr. Amin met with Mr. Behring at 3G's offices in New York to discuss "the fundamental case for CSX".  (Amin Dep. 141:17-142:16; Hohn Dep. 114:6-8; PX 66.)  This meeting was on the same day that TCI met with CSX at the office of TCI's counsel, Proskauer Rose LLP, when Mr. Amin threatened that there would be "no limits" to what TCI would do.  (See Munoz ¶ 12; PX 61; PX 62.)  But, no one can remember what happened.  Mr. Hohn testified, "I remember one meeting at [Behring's 3G] office where we met to go talk about the fundamental case for CSX and, in fact, also the industry."  (Hohn Dep. 113:24-114:3.)  Mr. Amin, who attended both the meeting at Proskauer's New York offices and 3G's New York offices on March 29, 2007, claimed not to recall what was discussed at the March 29, 2007,meeting at 3G.  (Amin Dep. 141:17-142:16.)  Again, he gave the meeting of "fundamentals" -- he testified that "the spring or summer of '07 is when we talked to [3G] about, again, the fundamentals of the railroads.  And we would have discussed each one specifically and our views on each one of the major four, including CSX."  (Amin Dep. 139:14-20, 143:9-22.)  Indeed, at his deposition, Mr. Amin was shown a calendar entry for March 29, for "Alex" at "800 Third Avenue" and he professed ignorance again.  (Amin Dep. 141:17-142:16.)  Mr. Behring confirmed that  "800 Third Avenue" is the

address of 3G's New York offices. (Behring Dep. 10:10-14.) At trial, Mr. Amin finally conceded that he met with Mr. Behring at 3G's New York offices on March 29. (Tr. 196:5-11.)

79.    In truth, TCI and 3G agreed at that meeting that 3G would purchase additional physical shares of CSX common stock – something it had not done for over one month. (PX 206.) The Group was secretly expanding its secret position. The Group also decided that it would begin switching some swaps to shares following termination of the HSR 30-day waiting period in April. (PX 206; Subrahmanyam Ex. E.)

80.    In the period from March 29, 2007,to April 17, 2007, 3G increased its holdings in CSX by 11,145,801 shares (for a total of 19,407,894 shares or 4.44% of the then-outstanding shares). 3G's purchases during this period were as follows (Subrahmanyam Ex. C.2; wsj.com stock quotes):

| Transaction Date | 3G Share Purchases | Daily Volume | % of Total Daily Volume |
|---|---|---|---|
| 3/29/2007 | 600,114 | 9,985,500 | 6.08 |
| 3/30/2007 | 550,000 | 9,775,500 | 5.63 |
| 4/2/2007 | 5,456,387 | 6,087,300 | 89.64 |
| 4/4/2007 | 822,550 | 6,922,000 | 11.88 |
| 4/5/2007 | 610,000 | 11,345,700 | 5.38 |
| 4/6/2007 | 757,100 | N/A | N/A |
| 4/9/2007 | 613,000 | 12,433,900 | 4.93 |
| 4/10/2007 | 800,000 | 7,870,700 | 10.16 |
| 4/11/2007 | 835,000 | 9,079,900 | 9.20 |
| 4/12/2007 | 80,950 | 11,937,400 | 0.68 |
| 4/13/2007 | 14,200 | 10,980,100 | 0.13 |
| 4/17/2007 | 6,500 | 5,971,600 | 0.11 |

81.    Following the expiration of the 30-day HSR waiting period, TCI began to convert a portion of its swaps into physical shares, while remaining at approximately the same exposure level. (PX 206.)



82.    At the end of this April 2007, buying spree, the TCI/3G Group held a total interest in the Company representing 85,567,792 shares or 19.57% of the outstanding shares of CSX.  But TCI individually remained below the five percent threshold in physical shares, 3G remained below the five percent threshold in physical shares and kept quiet about this.



83.    Just as was the case with the initial 3G purchases, Mr. Hohn's coordination with Mr. Behring was against TCI's other investors' best interests, as it allowed 3G to "frontrun" TCI.  (PFF ¶ 39.)

84.    Mr. Behring testified that 3G "learned of TCI's activities regarding CSX through publicly available materials".  (DX 146 ¶ 48.)  That testimony is false.

84.1    Mr. Hohn testified that he had spoken with Mr. Behring regarding CSX in January.  (Tr. 161:3-161:13.)

84.2    TCI and 3G conspired together to form a group before February 9, 2007.

84.3    They conferred again on March 29, 2007.  (Amin Dep. 141:17-142:16; Hohn Dep. 111:4-22; see also PX 66.)

84.4    Indeed, at the trial, Mr. Hohn conceded that he discussed TCI's interests in U.S. rails, and CSX and Union Pacific in particular, with Mr. Behring as early as January 2007.  (Tr. 160:16-161:6.)

84.5    Mr. Behring knew about TCI's HSR filing before it was made public and had spoken to TCI sometime "in the sequence of" TCI's HSR filing in March 2007.  (Behring Dep. 205:14-206:6.; see Addendum A.)

### 5.    The Group Takes a Co-ordinated Time-out in Late Summer/Early Fall 2007

85.    As discussed below, the TCI/3G Group continued with its activist agenda following the April purchasing surge.  (PFF ¶ 146-57.)  However, in the late summer/early fall of 2007, the TCI/3G Group ran into two problems, which affected their covert, co-ordinated effort to take control of CSX:  (i) the downturn in the U.S. economy and (ii) the threat of re-regulation.

85.1    First, the U.S. economy became the subject of concern to both 3G (DX 146 at 22) and TCI.  (DX 146 at 22; DX 145, ¶ 43.)

85.2    On August 17, 2007, Mr. Hohn called Mr. Ha of Evercore to tell CSX that it should accelerate its share buyback program to take advantage of the recent stock price decline.  (PX 120.)  The declining stock price continued to be a concern of Hohn's into September.  (PX 121; PX 123; PX 125; PX 126.)

85.3    Both 3G and TCI considered selling their CSX shares, and 3G actually did sell shares.  "In August and early September [3G] sold a large portion of [its] position in CSX."  (Behring ¶ 22.)  In fact, as illustrated below, 3G sold a net 8,315,171 shares of CSX common stock during the period from August 24 through September 14, 2007.  (PX 121; PX 123; PX 125; PX 126.)



85.4    TCI also engaged in an internal discussion of selling:

85.4.1    On September 8, 2007, in an email titled "Csx", Mr. Hohn examined with his colleagues Mr. Degorce, Mr. Amin and Mr. Sunak "exiting [at the] end [of] 2008" and noted that he saw "no upside on a trading basis". He added that "[t]his stock is at best dead money for 2008 if not a lossmaker in the next year" and that he would be amenable to selling calls at $4 with a $50 strike price in January 2009. (PX 125.)

85.4.2    On September 11, 2007, Mr. Hohn told Mr. Amin:

85.4.3    "Having not done proper work on the volume in the past I do want to step up our work this time to see if there is another shoe to drop on the volumes as the U.S. economy weakens." (PX 126.)

85.4.4    That same day, Mr. Amin responded:

85.4.5    "Let's seriously discuss tomorrow. We are working on volumes but we are not going to be able to accurately forecast volumes. I think we need to sit down and seriously discuss whether we are comfortable holding something which we have high conviction in long-term but isn't forecastable short-term. If not we should exit the rails." (PX 126.)

On September 12, 2007, Mr. Hohn responded:

"I do think there are prices we should reduce csx. I am not a believer that there is no price where we should not sell."

"It is also not all or nothing we can have different position sizes at different prices."

"It is not just an issue of forecastability but quality of work we have been doing." (PX 126.)

That same day Mr. Amin responded:

"Chris I was pushing to [sell] [redacted]...and have also sold mittal, arcelor Brasil, and [redacted] and [redacted] all despite having fundamental upside. We also agreed on [redacted] being a trading sell. In hindsight of course I wished we had sold csx at 10 dollars ago, but I keep telling you that the value of our activism (at the time) made it unobvious for me." (PX 126.)

85.4.6    And Mr. Hohn's response:

85.4.7    "My point was only in reference to CSX. We are not understanding properly the stock movement … My point is every position you manage should have a sale price or a price we have less." (PX 126.)

85.5    Between August 23, 2007, and August 31, 2007, TCI reduced its swap (and total) position in CSX by 1,971,000 shares. (PX 206.)

85.6    TCI's ultimate inability to sell down its position further during this period is explained by its more recent market woes. For example:

85.6.1    On March 1, 2008, Mr. Hohn noted to his colleague Mr. Degorce that "[o]ur fund is likely to be down 15pc soon and we have no money to buy [redacted] since all sales will become distressed prices." In the same email chain on March 2, 2008, Mr. Hohn contemplated raising more capital but worried that it "may damage [TCI's] long term franchise." (PX 181.)

85.6.2    In a March 8, 2008 email exchange between Mr. Hohn and Mr. Degorce of TCI, Mr. Hohn noted "selling discipline has been poor not average. One area I did help on was reducing banks although we went and bought [redacted]. we have not appreciated the banking crisis meant banks were just bad to invest in because we kept too much exposure. losses on [redacted] this year are huge. I am annoyed at this because it was clear how risky banks were." (PX 182.)

85.6.3    Mr. Degorce also reminded Mr. Hohn of Hohn's own risky behavior: "The main issue for me remain that we do not have to be always fully invested . . . I do no[t] see how we can improve in mkt portfolio given your inability to hold short or protection when mkt goes up. You have to make up your mind either we have some protection and we always have it (even in good times) or we do not." (PX 182.)

85.7    In contrast, 3G appears to have significantly hedged its CSX position and could thus afford to sell down its position.  For example:

85.7.1    In its quarterly report dated May 2007, 3G noted that its exposure to CSX was significantly hedged with a net exposure to CSX of $255 million on $723 million worth of shares.  (PX 200 at 40.)  Subsequent quarters show similar hedging of exposure to CSX.  In 3G's July 2007 report for the first half of 2007, 3G indicates that the co-investment portion of its investment is CSX (16.7 million shares out of 19.4 million shares) had a net exposure of $225 million, while the shares were worth $755 million and its short position was $528 million.  (PX 202 at 46.)  In 3G's October 2007 report for the third quarter, 3G indicates that its net exposure to CSX is $144 million, while its shares are worth $573 million and its short position is $424 million.  (PX 132 at 35.)  In 3G's 2007 fourth quarter report, 3G indicates that its net exposure was $168 million, and it held 4.9% of the outstanding shares of CSX and its short position was $679 million.  (PX 204 at 38.)

85.7.2    3G has hedges not only directly against CSX, but also against customers of CSX, including home builders and suppliers and paper/forest products companies.  In an October 23-24 email exchange, Daniel Schwartz and Luis Moura of 3G discussed 3G's "custom" hedges against CSX, which include short positions on companies in the home builder/supplies/mortgages, paper/forest products, trucker, airline and other industrial sectors.  They contemplated taking profits in the home/mortgage sector.  (PX 143.)

85.7.3    3G also has hedges against the other U.S. Class I rails.  As of March 31, 2008, 3G had puts over 2,000,000 shares of Burlington Northern, 2,200,000 shares of Norfolk Southern and 1,440,000 shares of Union Pacific.  (3G Capital Partners Ltd., Quarterly Report (Form 13-F) (May 15, 2008).)

86.    Second, there was growing concern regarding the possibility of re-regulation of the rail industry:

86.1    On August 23, 2007, Mr. Hohn spoke with Mr. Goldman and Mr. Baggs of CSX.  On that call, Mr. Hohn expressed his concern about the regulatory environment and the threat that he perceived of re-regulation associated with a bill that was being considered by a Congressional committee.  Mr. Hohn told CSX to send a letter to the sponsor of the bill, Representative James Oberstar, threatening immediately to freeze capital spending if the bill were allowed to proceed.  Mr. Hohn also emailed CSX to express TCI's concern about the regulatory environment and, in one of those emails, Mr. Hohn urged CSX to respond to the bill "with a public specific threat to cut all growth capex".  (PX 121; Munoz ¶ 32; Baggs ¶ 24; Hohn ¶ 28.)

86.2    Because of the perceived threat of re-regulation, which could potentially impact the economics of an investment in CSX, Hohn indicated that "any possible debate on activism was premature and would have to wait until TCI could study and better understand the regulatory risk". (Hohn ¶ 28.)

87.    In September 2007, the Group decided to purchase more shares. (Tr. 126:3-11.) They agreed to purchase more shares.

87.1    In a September 20, 2007, email exchange between Snehal Amin of TCI and Peter Harkins of D.F. King, Mr. Amin noted that they "are likely to proceed with a proxy contest". (PX 128.)

87.2    In late September, the Group decides to go forward with the proxy fight and to increase their shares. (See PX 128; PX 134; PX 135; Tr. at 194:14-20; PX 206.)

87.3    Although 3G had been engaged in a massive sell down of its CSX position, on September 26, 3G began to repurchase shares of CSX and steadily continued building this position. (PX 206.)



88.    Moreover, as they started finding members for their slate, 3G bought more shares and increased its position to just under 5% of the outstanding shares. TCI's position remained flat during this period. (PX 206; Tr. at 108:13-19.)

89.    On October 8, 2007, TCI and 3G held coordinated meetings with two of their slate's nominees: Mr. Lamphere and Mr. O'Toole. (PX 192; PX 193.) These meetings triggered another series of purchases by 3G. From October 11, 2007 through October 15, 2007, 3G purchased an additional 951,000 shares of CSX. (PX 206.)

90.     3G then bought more shares as Mr. Lamphere joined the Group. 3G resumed building its position in CSX during the period from November 1, 2007 through November 8, 2007, this time with a series of swaps purchases representing a total of 1,580,000 shares and purchases of 421,300 physical shares. (PX 206.)

90.1    On November 1, 2007, Mr. Lamphere met with Mr. Behring. (PX 194.)

90.2    On November 2, 2007, Mr. Lamphere met with Kirkland & Ellis LLP, 3G's attorneys. (PX 145.)

90.3    On November 6, 2007, Mr. Lamphere made his first purchase of CSX common stock, which was "in connection with becoming a nominee". (JX 12 at 24.)

90.4    On November 8, 2007, Mr. Lamphere again met with Mr. Behring. (PX 193.)

91.     These early November meetings and the purchase by Mr. Lamphere coincide with the last period of purchases by 3G. This is illustrated in Addendum A hereto, which lists all of the known CSX stock and swap transactions by 3G from PX 206, with annotations regarding key events. (See Addendum A.; PX 206.)

### 6.     In connection with the proxy fight, TCI moved its swaps to Deutsche Bank, the parent of Group member Austin Friars

92.     In preparation for its proxy fight with CSX, during the period between October 30, 2007 and November 29, 2007, TCI undertook a systematic transfer of its swaps representing 46.4 million shares of CSX into the hands of only two counterparties: Citigroup and Deutsche Bank. (PX 206; Subrahmanyam ¶ 79.)

93.     TCI concentrated its swaps with Deutsche Bank and Citigroup in order to influence them to vote the CSX shares held by them in favor of TCI. (Subrahmanyam Rebuttal ¶¶ 45, 47.)

94.     Deutsche Bank is a prime broker for TCI -- a lucrative relationship that led it to provide free services to TCI. (Subrahmanyam ¶¶ 161-65; Amin Dep 61:22-25, 101:7-16; PX 65; PX 100.) While Citigroup is not a prime broker for TCI, it was likely vying for such a relationship and competing for new business. (Subrahmanyam Rebuttal ¶¶ 43.)

95.     Moreover, Deutsche Bank owns Austin Friars, the hedge fund that is part of the TCI/3G Group. (See Amin Dep. 104:2-25; 11-20.)

96.     Mr. Amin admitted that TCI planned to use its connection to Austin Friars, which held approximately 1 percent of CSX's outstanding shares, as part of a plan to influence control over Deutsche Bank's voting without an explicit agreement. (Amin Dep. 104:16-106:5-17.)

97. Mr. Hohn also admitted that TCI sought to use Austin Friars to influence the voting of Deutsche Bank shares held as a hedge to its CSX swaps with TCI. (Hohn Dep. 154:4-155:4.)

98. Deutsche Bank is known for cooperating with hedge funds seeking to use swaps to influence and control the companies in which the swaps give the funds exposure. (PFF ¶ 10.)

> **7. TCI Concentrated Its Swap Positions at Two Counterparties while Keeping Nominal Positions at Six Others to Mislead the Investing Public**

99. Although TCI's swap position was concentrated at only two swap counterparties, Deutsche Bank and Citigroup, TCI kept swaps referencing 1,000 shares at each of the remaining five counterparties and added a sixth, for a total of eight. (PX 206; JX 19 at 18.)

100. By reporting only an aggregate total swap position across its eight counterparties, TCI made it impossible for the investing public to know where its swaps and the shares of CSX common stock referenced therein were held. When questioned about keeping the six nominal counterparties, Mr. Amin testified that "we didn't want people to be able to identify who our large counterparties were" because if they were identified, that would make TCI more susceptible to front-running by other hedge funds or other investors. (Tr. 204:21-206:5.)

## B. TCI and 3G Coordinated Their Analyses

101. Contrary to the assertions in TCI's and 3G's definitive additional proxy solicitation materials that TCI has spent "years, literally," studying CSX and the industry (JX 20 at 15), both TCI and 3G began analyzing investments in the U.S. railroad industry in late 2006 and early 2007. (Amin Dep. 3:9-4:2; Schwartz Dep. 35:16-19.)

102. TCI and 3G were in constant contact as they coordinated their investment efforts with respect to CSX: TCI and 3G communicated and exchanged opinions and analyses concerning CSX throughout 2007. For example:

> 102.1 TCI's and 3G's principals, Mr. Hohn and Mr. Behring, met and spoke multiple times throughout 2007 "about different things regarding the investment environment, regarding the rail industry, certainly about -- certainly regarding CSX later on in the year". (Hohn Dep. 111:12-25, 112:2-6; Behring Dep. 110:17-111:4,161:15-23.)

> 102.2 Mr. Behring spoke to Mr. Hohn "on and off in the course of '07". (Behring Dep. 110:17-111:4.) Behring testified that "over time, [he had] spoken to the people at TCI, including Chris [Hohn] and Snehal [Amin], about different things, including things other than CSX". (Behring Dep. 150:2-5.) Mr. Behring attended "TCI's [investor] conferences" in connection with Synergy's investment in TCI. (Behring Dep. 109:3-24; Tr. 108:25-109:7.) Synergy (and thus 3G) also

"receives quarterly letters" from TCI discussing "the performance of the [TCI] Funds", and TCI's investments. (Behring Dep. 21:25-22:23.) Mr. Behring "remember[s] references to CSX being made in the last letter" from TCI. (Behring Dep. 23:18-24:2, 24:12-17.)

102.3   Other executives at TCI and 3G also met and corresponded throughout 2007. (See, e.g., Moura Dep. 117:19-118:16, 122:17-123:18, 124:5-10, 141:14-143:8; see also Schwartz Dep. 162:19-163:11.) Mr. Moura met Snehal Amin "[i]n person" at either a TCI "Investor Day or in . . . [a] meeting[]" 3G had at TCI's offices "[p]robably [in the] first half" of 2007. He also saw Amin at several sell-side conferences. (Moura Dep. 117:19-118:16, 122:17-123:21, 124:5-10.)

102.4   At the "end of the first quarter" of 2007, Mr. Moura attended a meeting with TCI at TCI's offices. (Moura Dep. 125:3-13.) Mr. Moura met Mr. Hohn once in 2006, at the 2007 TCI Investor Day, and again in late 2007. (Moura Dep. 138:2-12.) Mr. Hohn "came to [3G's] offices" in New York, possibly in the first half of 2007. (Moura Dep. 209:1-210:2.) Mr. Moura met Rishi Sunak ("Mr. Sunak"), a TCI partner, in the first half of 2007 at one of the "sell-side conferences", and saw him again at the TCI Investor Day and other sell-side conferences. (Moura Dep. 139:12-23, 140:6-20.)

102.5   Mr. Schwartz testified that he first met Mr. Amin in approximately March or April 2007 on "a trip that [he] took to Washington, D.C. with an analyst from JP Morgan and several other — and several other investors to learn more about the rail regulatory environment." (Schwartz Dep. 162:19-163:11.)

102.6   As mentioned above, there was a meeting on March 29, 2007 between TCI and 3G's offices to "discuss the fundamental case for CSX". (Amin Dep. 139:11-20, 141:17-142:16, 143:9-22; Hohn Dep. 111:4-22, 113:20-114:3; Tr. 196:5-11; PX 66.)

103.   These discussions included their opinions of the management team and governance of CSX. (Behring Dep. 161:15-23.)

104.   TCI and 3G exchanged financial models and operations analyses of CSX. (Behring Dep. 156:4-158:2.) Thus:

104.1   3G provided its models of CSX to TCI and requested TCI's input on those models. (Behring Dep. 141:2-13, 142:6-11; 147:13-16, PX 199.)

104.2   TCI provided its models and analyses of CSX to 3G. (Behring Dep. 143:21-144:9-11, 156:4-158:2; Moura Dep. 147:8-148:3.)

104.3   TCI shared a CSX pricing survey, prepared by advisors Bain Capital, with 3G. (Moura Dep. 147:15-19.)

105.    During the spring of 2007, TCI was actively discussing pricing, capex and relevering changes with CSX management and had prepared a model and commissioned a report from Bain completed in March 2007 reflecting the same.  (PX 52; PX 59.)  Thus:

105.1    3G's report to the 3G Board of Directors on CSX for the same time period also focused on pricing power, capex and relevering.  (See PX 200 at 3GC00014093-94; see also Schwartz Dep. 100:9-11, 100:16-19, 123:3-13; Moura Dep. 74:4-22.)

105.2    Both TCI and 3G created parallel models with activist scenarios for CSX.  (See PX 73; PX 199.)

105.3    Both models featured two primary strategic alternatives for CSX: (1) a leveraged buyout of the company at a 7x multiple; and (2) leveraging the company via share buybacks of approximately 20 percent.  (PX 199 at 46, 50; PX 71.)

105.4    Both the 3G March 2007 Investment Discussion report and the TCI-commissioned report from Bain feature similar criticisms of CSX operations.  (PX 199; PX 71.)

105.5    Both reports are premised on the notion that CSX is undervalued because certain operational modifications and increased pricing are easily achievable goals.  (PX 199; PX 71.)

## C.    TCI and 3G Coordinated their Control Plans

### 1.    TCI and 3G Coordinated their Actions

106.    3G's plans and actions in respect of CSX complemented TCI's during the same time periods, showing that these plans and actions were co-developed and efforts were co-ordinated.  Thus:

106.1    As early as August 2, 2007, TCI's attorneys were in the process of preparing a draft Schedule 13D in connection with the proxy contest even though at all times TCI claimed to have beneficial ownership of fewer than 5% of CSX's outstanding shares of common stock.  (PX 116.)

106.2    3G had decided to "attempt . . . to get elected to the [CSX] board" in approximately the fall of 2007.  (Behring Dep. 128:2-25.)

106.3    Mr. Behring testified that by at least "October 5th, 3G was . . . exploring potential people that would make sense in that process" of altering the board composition.  (Behring Dep. 178:2-23.)

106.4    "[A]round the same time," 3G approached "at least one, if not two" additional potential director nominees.  (Behring Dep. 218:3-16.)

106.5    Mr. Behring asked Mr. Schwartz to "help him look for potential candidates." Yet Mr. Schwartz did not engage any consultants. Mr. Lamphere was the first one he found based just on reviewing annual reports. Mr. Schwartz also did not look for any other candidates. (Schwartz Dep. 134:8-136:12, 137:19-20, 137:25-138:2.)

106.6    TCI had been contemplating a control slate, yet only asked its director search firm to find one candidate. (PX 137 at TCI0512739.)

106.7    TCI and 3G both met with their first identified nominees on the same day:

106.7.1    Mr. Amin of TCI met with Mr. O'Toole, who ultimately became a nominee on TCI's slate, on October 8, 2007. (Amin Dep. 154:22-155:2; see also PX 192.)

106.7.2    Mr. Behring and Mr. Schwartz of 3G met Mr. Lamphere, who ultimately became a nominee on 3G's slate, also on October 8, 2007. (PX 193; see also Schwartz Dep. 135:20-136:12.)

106.8    Mr. Lamphere, a 3G nominee, and Mr. O'Toole, a TCI nominee, each purchased shares of CSX common stock "in connection with becoming a nominee". (JX 15 at 8.)

106.9    The nomination agreements entered into between Mr. Lamphere and 3G, on the one hand, and Mr. O'Toole and TCI, on the other, are largely identical and use the same template. In addition, each of the agreements was signed on December 10, two days in advance of the execution of the agreement that TCI and 3G claims made them a "group". (JX 19; PX 168.)

107.    The "Project Improve" operating plan for CSX, which everyone is claiming not to remember, shows further evidence of co-operation and group formation. (PX 142.)

107.1    The plan includes references to:

107.1.1    an "investor group [that] has substantial rail sector expertise and experience" (PX 142 at LAM0000004.); and

107.1.2    a "[g]roup [that] has developed a detailed operating plan showing substantial improvement opportunities". The operating plan was sent to Mr. Amin of TCI by Mr. Schwartz of 3G on December 20, 2007. (PX 152.)

107.2    Mr. Behring claimed not to know what the "credible team" was that that had been assembled by "the group", as described in the document. (Behring Dep. 184:23-186:24.)

107.3   Mr. Lamphere testified that he talked with Mr. Behring about a "group", which included Mr. Behring and "his brothers".  (Lamphere Dep. 9:14-25.)  Mr. Behring does not have any siblings.  (Behring Dep. 31:22-25.)

108.    Despite the multiple copies of the plan produced in discovery (PX 142; PX 152), no one recalls the genesis of the document.

108.1   Despite the fact that the document is written on Mr. Lamphere's letterhead, Mr. Lamphere said Mr. Schwartz created it (Lamphere Dep. 49:15-50:22), and Mr. Schwartz says he does not know who created it, but that Mr. Lamphere sent it to him.  (Schwartz Dep. 145:7-147:18.)

108.2   Mr. Schwartz testified that he "may have" seen drafts of the template document, but that he does not recognize the name "Project Improve".  (Schwartz Dep. 146:24-147:6, 147:19-22.)  He did not "recall" seeing any version prior to November 5, 2007.  (Schwartz Dep. 148:4-11.)

108.3   Mr. Schwartz testified that in "October or November 2007," Mr. Lamphere sent him a mathematical analysis of CSX, which Mr. Schwartz described as  "a template of steps that would be — illustrative template of various steps and analyses."  (Schwartz Dep. 143:14-144:9.)  Mr. Schwartz identified PX 142 as this mathematical "template".  (Schwartz Dep. 144:19-145:23, 146:4-24.)

108.4   Mr. Schwartz further stated that Mr. Lamphere "asked me to fill in some of the numbers on this template that he had", but that Schwartz only "filled in some numbers, not all numbers".  (Schwartz Dep. 144:10-18, 146:14-22.)

108.5   Mr. Schwartz did not recall sending this document to TCI, even though there is a document indicating he "faxed this to Mr. Amin at TCI" on December 20, 2007.  (PX 152; Schwartz Dep. 154:12-14, 155:8-12.)

108.6   Mr. Behring has also disavowed the document, noting that he thinks it was developed by Mr. Lamphere and that Mr. Schwartz may have helped him with the numbers, but that he "never spent [any] time with the document [himself]".  (Tr, 149:7-15.)

## 2.    Defendants' Assertions Regarding Group Formation are Incredible

109.    Mr. Hohn testified that until he signed the group agreement with 3G on December 12, 2007, TCI and 3G were "never in a group".  (Tr. 183:25-184:4.)  He also testified that he started every Group meeting before December with a statement that there was no group:

109.1   Mr. Hohn testified that Mr. Behring asked him multiple times in 2007 whether he wanted to form a group to coordinate activities or engage in a proxy fight against CSX, but that he told Mr. Behring "no".  (Hohn Dep. 116:5-117:23, 118:18-119:9.)

109.2   As Mr. Hohn remembers events, 3G "had asked me at points during the year whether I wanted to be involved with them in a group, and I consistently said, no, I'm not interested in forming any group.  So from—I only decided I was interesting in forming—exploring forming a group in a serious manner in late November 2007."  (Hohn Dep. 116:5-15.)

109.3   The purpose of the group that Mr. Behring proposed was to be activists and run for the board of CSX:  "A.  He asked me do I want to have a group to be an activist on the company, and my answer has always been no. . . . Q.  And to be an activist to achieve what goal?  A.  Well, the only real substance of an activist would be to run for a board because there's no—nothing else is really relevant."  (Hohn Dep. 118:18-119:9; Tr. 182:6-17.)

109.4   Mr. Hohn appears to believe that telling Behring he did not want to form a group would prevent group formation:  "The concept was, 'Do you want to be a group,' and my response is, was 'Definitively no, I don't want to have any agreement and no understanding'. . . Because I was very aware of the group laws that say no agreements, no understandings, no—no whatsoever."  (Hohn Dep. 117:16-118:3; Tr. 183:25-184:4.)

110.    3G has three different versions of the "group" discussions.

*Take One—no "formal" group:*

110.1   Mr. Behring admitted that 3G began debating whether to form a group with TCI in the summer of 2007:  "internally, we debated it some in the summer, some in the fall.  I don't think we ever started a formal conversation with TCI until—until November, or so, but that's my recollection".  (Behring Dep. 114:9-17.)

110.2   Mr. Behring admitted that 3G "may have asked [TCI] more than once" about forming a group, but did not think 3G "started exploring it seriously with any amount of focus or anything before November."  (Behring Dep. 132:8-133:4.)  At trial, Mr. Behring denied having any group discussions, including discussions to form a group to run a proxy contest, prior to November.  (Tr. 134:22-139:8.)

110.3   Mr. Behring later distinguished between "formally" inviting TCI to form a group and just "ventilat[ing] potential courses of action" that TCI and 3G might take with respect to CSX:  "I don't remember asking Chris during the year several times about that.  I may have ventilated potential courses of action that we could take or not or expressed doubts that we had, but I don't remember asking or inviting him to form—formally in the sense that Peter [Behring's counsel at the deposition] alluded to—a group with us in the course of the year.  (Behring Dep. 133:5-18.)

110.4   3G and TCI had "several" conversations throughout 2007, including a November 2007 discussion regarding "the details of [the] potential

group … could [they] form a group and how and when and so on."  (Behring Dep. 160:14-25.)  At trial, Mr. Behring testified that the group discussions started in November 2007.  (Tr. 118:9-11.)

110.5   However, Mr. Behring recalled "asking [Hohn] a little bit what his experience being an activist had around the world" prior to the November group discussion.  (Behring Dep. 161:24-162:16.)  At trial, Mr. Behring testified that in these discussions, Mr. Hohn indicated that he did not want to form a group.  (Tr. 120:22-121:6.)

*Take Two—TCI and 3G activities just a coincidence:*

110.6   When asked "[w]ho communicated the idea of forming a group with TCI", Mr. Moura replied that it was "Alex Behring."  (Moura Dep. 133:24-134:3.)

110.7   One of the things that led to 3G's decision to form a group with TCI was the opportunity for "increasing the economic interest in the company" and thus "[t]rying to elect board members."  (Moura Dep. 131:18-132:15.)

110.8   Mr. Moura testified that 3G began to discuss offering Mr. Behring as a nominee to the CSX board in "[l]ate 2007".  (Moura Dep. 135:21-24.)  Mr. Behring decided that 3G would nominate Mr. Behring as a director.  (Schwartz Dep. 132:4-133:11.)

110.9   Mr. Moura stated that 3G "discussed" internally ways to help CSX improve operations before filing under HSR.   (Moura Dep. 135:14-17.)

110.10  Mr. Moura stated that he learned that TCI had selected potential CSX board nominees "[r]ight when we formed the group," which he identified was "[a]round Thanksgiving" of 2007.  (Moura Dep. 137:11-20.)

110.11  When asked if he heard that Mr. Hohn rejected Mr. Behring's requests to form a group before the group was formed, Mr. Moura testified that he "ha[d] not heard that."  (Moura Dep. 134:15-19.)

110.12  Mr. Moura also testified that he "ha[d] not heard" that Mr. Hohn rejected Mr. Behring's suggestion that TCI and 3G coordinate their efforts regarding CSX.  (Moura Dep. 134:20-24.)

*Take Three—"I don't remember":*

110.13  When asked if he had heard that Mr. Hohn had refused any request by Mr. Behring to form a group in 2007, Schwartz responded, "I - I don't recall hearing that, no."  (Schwartz Dep. 165:18-166:3, 166:19-167:7.)

## IV.    THE GROUP SEEKS CONTROL AND INFLUENCE BY STEALTH

111.    TCI and 3G purchased their holdings in CSX with one goal in mind:  to seize control of the Company without paying a premium to bring about an LBO or other liquidity event and to do it by using swaps to keep their plans secret from the public.

### A.    TCI Tries to Force an LBO and a "Junk Recapitalization" on CSX

112.    Starting in October 2006, TCI expressed its interest in investing in CSX and had numerous calls and other communications, including in-person meetings, with CSX and its advisors about investing in the Company.  (TCI Ans. ¶ 24; Baggs ¶¶ 2-5, 7-8, 14; Munoz ¶¶ 2-7, 9-12; PX 133; PX 136.)

113.    In December 2006, TCI determined that "[t]he rails are takeout candidates", saw "100 pc upside in [CSX]" (PX 24; PX 26) and believed that "CSX has a high probability of being a home run."  (PX 23.)  TCI viewed CN as the most likely LBO candidate, "followed by the two east coast rails.  [W]e strongly prefer [CSX], followed by [NSC] and then BN."  (PX 21.)  TCI even developed a financial model for an LBO of CSX with a leverage multiple of 6.0x EBITDA with a "premium to reflect a . . . reasonable take out!"  (PX 20.)

114.    In December 2006, TCI instructed lawyers from Proskauer Rose LLP to report to TCI on CSX's takeover defenses.  (PX 31.)  TCI sought the report on CSX's takeover defenses "to assess . . . whether it could be subject to a hostile takeover".  (Amin Dep. 125:23-126:4.)

115.    In December 2006, January 2007, and Feburary 2007, TCI representatives several times requested to meet privately with CSX's Chairman and CEO and other members of CSX's senior management team to discuss TCI's views about a potential LBO involving CSX with the current management team in place.  (Compl. ¶ 25; TCI Ans. ¶ 25; Hohn ¶¶ 15, 18; Amin ¶¶ 23, 29; Baggs ¶¶ 8, 10; Munoz ¶¶ 6, 9, 11, 18.)  CSX management suggested that TCI instead contact CSX's advisors at Morgan Stanley to present their views.  TCI contacted Morgan Stanley and told Morgan Stanley that they believed they were "onto something very compelling, and that engaging on it early is in the best interests of all parties involved," that there was a big LBO opportunity with respect to CSX, and that they "could see a transaction for CSX above $50 / share based upon their numbers and [Mr. Amin's] personal background in private equity".  (PX 33; PX 34; Baggs ¶¶ 8-9.)

116.    At the time that TCI made this proposal to CSX, it represented that it owned between 10 and 14% of the outstanding shares of CSX common stock.  (Fitzsimmons ¶ 14; see also Baggs ¶ 12.)

117.    On January 22, 2007, TCI met with Morgan Stanley to pitch the LBO of CSX with the current management team in place at a 6.0x debt to EBITDA ratio.  At that meeting, TCI submitted to Morgan Stanley a presentation in which TCI recommended that CSX be taken private.  In the presentation, TCI wrote that "[i]t is not clear that public markets will ever re-rate rails", that it believed that "a major rail will get a private equity bid"; that "CSX is at the top of people's lists"; that "[i]t is important to seize this

opportunity, act now and be the first"; that the "'perfect storm' of conditions makes a private equity bid nearly inevitable"; that "CSX is logically the prime candidate"; and that CSX could be taken private for $50 per share. (PX 37; Munoz ¶ 8.) At that time, TCI liked CSX management just fine: in the presentation TCI indicated that an LBO would be an "[o]pportunity for top management to become more significant owners of the business"; that "[a]cting early will allow management to choose who it is accountable to"; that the reality of the perceived risk that "[m]anagement teams [are] often fired" is that it "[v]ery rarely happens, especially in [an] operations intensive company"; and that management compensation would typically include an "[o]ptions package with target value of $300m-$400m at exit for a deal of this size". (PX 37 at 3-7.) TCI also requested a "meeting with the CEO & CFO to hear their view on this matter" and stated that "[g]iven our experience and contacts in private equity, we believe we can genuinely add value here. We aim to be constructive". (PX 37 at 8 (emphasis in the original).)

118.    Morgan Stanley had follow up discussions with TCI, and TCI indicated that it was a "bit frustrated" with CSX's response and that it had had discussions in respect of CSX with various LBO firms. (PX 39; PX 43 at 12-13.)

119.    On February 7, 2007, months before 3G ever met with CSX management and even before 3G bought any shares of CSX, 3G reviewed the deadline for shareholder proposals at the CSX 2007 annual meeting of shareholders, noting that "we're past the deadline". 3G also noted that the whole board is up for re-election each year and examined the election process for directors. (PX 41.)

120.    On February 15, 2007, at the BB&T Transportation Conference, Mr. Amin asked Mr. Baggs and Mr. Munoz of CSX how CSX intended to accomplish CSX's increased share repurchase program that had been recently announced. TCI urged CSX to do a Dutch auction. After Mr. Baggs told TCI that CSX could not have a conversation with a select investor about the specifics of CSX's share repurchase plans because it would run afoul of the SEC's Regulation FD, the TCI representative, attempting to influence CSX's conduct of the share repurchase, replied by saying "[We] own 14 percent of your company." (Munoz ¶ 10; Baggs ¶ 12.) At that conference, TCI representatives spoke to other investors or potential investors about a potential LBO of CSX. (PX 44 at TCI002438.)

121.    By February 19, 2007, Mr. Hohn noted that "[i]t will not be easy to put one of [the rail companies] in play. Feasible but not simple." (PX 44 at TCI0024377.)

122.    On February 24, 2007, as part of TCI's plan to influence CSX to buy "back tons of stock", Mr. Hohn contemplated putting in "a bid on [CSX] at 45" and had contacted a "manager that might be interested in an [LBO] of one of the rails or being chairman to increase leverage". TCI considered making a "proposal for him to become a chairman of [CSX] with a mandate to increase leverage, cut costs, [and] sell non core assets". TCI thought that CSX "would likely reject [the proposal] but [would] know that by the next [annual meeting] they had better have bought back tons of stock or the hammer will be on them". Mr. Hohn noted that he thought CSX "could buy back half of its shares in the stock market" and debated taking an activist stance then to "lead an

aggressive campaign for [CSX] to step up releveraging, sell real estate, cut costs more aggressively." Mr. Hohn also indicated that he was "pretty sure that [they] should file hart scott next week to give [TCI] options." (PX 47 at TCI0350650.)

123. On February 27, 2007, Mr. Amin made some remarks on the record date. (Subrahmanyam ¶ 167.)

124. "just talking about [CSX's] announced buyback [program with the Company's CFO] doesn't get us anywhere near what we want". (PX 50.)

125. On March 2, 2007, TCI made a filing under HSR to cross the $500 million acquisition threshold with respect to shares of CSX common stock and informed CSX of the filing. (PX 55.) Mr. Hohn later explained the reason that TCI made the HSR filing in an email. He wrote: "We have filed Hart Scott Rodino in CSX meaning that we intend to try to influence management in how the company is run." (PX 87.)

126. In a March 4-5, 2007 email exchange, Mr. Amin recommended that TCI try to hire the law firm Skadden Arps if they "decide to bid" for CSX, "depending on how [TCI's] mtg with [Deutsche Bank] goes". (PX 56.)

127. In March 2007, Austin Friars -- a Deutsche Bank proprietary fund -- set up a call with former Secretary of the Treasury and former CSX Chairman and CEO, John Snow, and invited TCI to listen in on the call, which they did. Prior to the call, Mr. Curtis and Mr. Crawford-Brunt of Austin Friars sent TCI proposed questions to ask of former Secretary Snow. One question of interest to both TCI and Austin Friars was whether companies in the railroad industry could "lend themselves to being ru[n] by private equity". (PX 57; Sunak Dep. 57:18-58:5.)

128. In March 2007, TCI sent a model it had prepared in respect of CSX to Deutsche Bank. (PX 64.) TCI also sent its CSX model to CSX's financial advisors, Evercore Partners ("Evercore"), in April 2007. (PX 71.) The model includes an LBO analysis at a debt to EBITDA ratio of 7.0x and a leverage recapitalization model with share repurchases at a debt to EBITDA ratio of 5.0x.

129. TCI commissioned a March 21, 2007 presentation from Deutsche Bank regarding an LBO of CSX at a debt to EBITDA ratio of 7.0x. (PX 65 at 1-2.) In the presentation, Deutsche Bank stated that they "believe that there are several significant factors which make CSX a terrific LBO candidate". (PX 65 at 2.) The presentation also discussed real estate financing.

130. 3G gave TCI a 92-page report entitled, "US Railroads Investment Discussion", dated March 2007, which presents a detailed study of CSX financials and operations. (Behring Dep. 146:14-147:16; PX 199.) In that report, 3G analyzed a possible LBO of CSX at a debt to EBITDA ratio of 7.0x and increased leveraging of CSX's balance sheet through share buybacks at a debt to EBITDA ratio of 3.0x, as well as a standalone analysis of CSX's real estate assets. (Behring Dep. 146:14-147:2, 189:2-23; PX 199 at 46, 48, 50.)

131.    On March 29, 2007, Mr. Munoz and Ellen Fitzsimmons of CSX and Alan Stephenson of Cravath, Swaine & Moore LLP, outside counsel to CSX, met with Mr. Amin and Mr. Sunak of TCI and Arnold Jacobs of Proskauer Rose LLP, outside counsel to TCI.  At that meeting, Mr. Amin told CSX that TCI no longer thought that pursuing an LBO was the best course for CSX, but that CSX should increase its leverage and repurchase 20 percent of its stock during 2007.  Mr. Amin said that he wanted CSX to publicly announce the share repurchase in its first quarter earnings release on April 18.  He also said that TCI had the economic equivalent of ownership of between 10 and 14% of CSX's shares outstanding, that TCI could convert the swaps to shares, and that TCI would be taking voting positions with respect to CSX shares.  (Fitzsimmons ¶¶ 11-14.)  When Mr. Munoz asked what would happen if CSX did not do as TCI wished, Mr. Amin responded that there would be "no limits" to what TCI would do.  (Munoz ¶ 12; Fitzsimmons ¶ 12; Amin Dep. 192:16-24.)  Mr. Munoz reported TCI's statements at a meeting of the Board on April 3, 2007 and the Board discussed the likely nature of TCI's interest, given the absence of Williams Act filings.  (PX 4; Munoz ¶¶ 13-14.)

132.    On April 3, 2007, at the same time it was doubling its shareholdings, 3G began to investigate the consequences of CSX being taken private or recapitalized.  In an e-mail on that date, Mr. Behring told Mr. Schwartz, "[please] make sure cds [credit default swaps] on csx we have applies to a situation where the company is taken private or recapped by means of issuing new more expensive debt to retire existing one."  (PX 68.)

133.    On April 5, 2007, Mr. Amin sent Gil Ha of Evercore TCI's model for CSX.  (PFF ¶ 128.)  In the cover email, Mr. Amin noted that the LBO could be done at a 7x debt to EBITDA ratio at a $55 per share price and had conviction that in a competitive process the range could be between $55-60 per share.  (PX 71.)

134.    On April 7, 2007, on a telephone call with CSX's financial advisor, Evercore, which Evercore reported to CSX management and later, to the CSX Board, TCI reiterated that it wanted "a 20% share buyback in the coming year (5% per quarter or 10% in next 6 months followed by another 10% in following 6 months)" with a reassessment thereafter.  TCI also indicated that it had plans to convert indirect holdings of CSX to direct holdings and that it was doing so presently.  (PX 74 at EVR02555; PX 6 at CSX_00045785; Munoz ¶ 16.)  Indeed, in early April 2007, TCI began terminating some of its swaps and purchasing physical CSX shares.  By April 18, 2007, TCI directly owned 17,554,198 shares or approximately 4.02% of CSX's shares outstanding.  (Subrahmanyam ¶ 29; PX 196; PX 197; JX 19 at 26.)

135.    On April 12, 2007, TCI sent to Evercore TCI's analysis advocating that CSX repurchase 20% of its shares in each of 2007 and 2008, and another 10% in each of 2009 and 2010.  (PX 77.)

136.    In its quarterly board presentation dated May 2007, 3G indicated that CSX "can be relevered to at least 3x Net Debt/Ebitda", referring to this scenario as the "Activist Case".  (PX 200 at 42-43.)  Similar statements regarding leverage are included in the reports for subsequent quarters.  (PX 204; PX 132; PX 202; Tr. 146:21-147:1.)

137.    On May 15, 2007, Deutsche Bank sent materials to Mr. Amin (at Mr. Amin's request) regarding a potential leveraged recapitalization of CSX at a 5.0x debt to EBITDA level bringing CSX's credit rating to BB-, i.e., junk status.  (PX 100 at TCI0437446.)

138.    On June 4, 2007, TCI's Mr. Amin again urged CSX to increase its indebtedness level to 5.0x EBITDA and asked for CSX's rationale for maintaining its investment grade credit ratings.  (PX 102; PX 103; Baggs ¶ 20.)

### B.    The Group Takes Up "Activism", i.e., a Proxy Fight

139.    TCI filed under HSR on March 2, 2007 for "optionality" on activism. (Hohn Dep 35:5-20; PX 55.)  This meant that TCI was free to buy shares on April 2, 2007, following the expiration of the 30-day waiting period.

140.    On March 29, 2007, Mr. Munoz and Ellen Fitzsimmons of CSX and Alan Stephenson of Cravath, Swaine & Moore LLP, outside counsel to CSX, met with Mr. Amin and Mr. Sunak of TCI and Arnold Jacobs of Proskauer Rose LLP, outside counsel to TCI.  At that meeting, Mr. Amin told CSX that TCI no longer thought that pursuing an LBO was the best course for CSX, but that CSX should increase its leverage and repurchase 20 percent of its stock during 2007.  Mr. Amin said that he wanted CSX to publicly announce the share repurchase in its first quarter earnings release on April 18. He also said that TCI had the economic equivalent of ownership of between 10 and 14% of CSX's shares outstanding, that TCI could convert the swaps to shares, and that TCI would be taking voting positions with respect to CSX shares.  (Fitzsimmons  ¶ 14.) When Mr. Munoz asked what would happen if CSX did not do as TCI wished, Mr. Amin responded that there would be "no limits" to what TCI would do.  (Munoz ¶ 12; Fitzsimmons ¶ 12; Amin Dep. 192:16-24.)  Mr. Munoz reported TCI's statements at a meeting of the Board on April 3, 2007 and the Board discussed the likely nature of TCI's interest, given the absence of Williams Act filings.  (PX 4; Munoz ¶¶ 13-14.)

141.    On April 3, 2007, 3G examined excerpts from CSX's 2007 proxy statement regarding the record date and the number of shares outstanding as of the record date for the 2007 annual meeting of CSX shareholders.  (PX 69.)

142.    On April 9, 2007, TCI sought an introduction with Hunter Harrison, the chief executive officer of another Class I railroad, Canadian National, to "see if he would be interested in coming in as CEO of CSX".  (PX 36; PX 75.)

143.    Mr. Behring testified that 3G started to consider taking an activist stance in CSX in the spring of 2007.  (Behring Dep. 115:5-11.) Mr. Behring testified that he asked Mr. Hohn for his advice on activism:  "I recall asking [Hohn] a little bit what his experience being an activist had been around the world.  As you can tell from my testimony, it's the first time we were involved in a proxy fight that I recall anywhere, so I was curious to see what the experience had been to that effect."  (Behring Dep. 161:24-162:9.)

144.    In an April 18, 2007 email exchange between Mr. Amin and Mr. Hohn, Mr. Hohn noted "[t]he management slide in the [Company's first quarter earnings] presentation putting the buybacks over two years was not a good sign" to which Mr. Amin replied "[w]e aren't going to get what we want passively". (PX 83 at TCI10254261.)

145.    On April 24, 2007, TCI wrote a draft of a letter to the Board, in which TCI indicated that its investment in CSX was $3 billion, asked "to engage in a dialogue with the Board immediately on changes to the Board and management", and stated that CSX could "achieve at least 6-7 percent pricing [increases] for at least 5 years", that "management and the Board seem completely unwilling to engage in a discussion with private equity firms", that TCI had "very high conviction that a private equity firm [could] bid $55+ per share for CSX", and that "this business could and should conduct a 20% annual buy-back program until leverage reaches 5x EBITDA". (PX 85 (emphasis in original).)

146.    Mr. Amin gave a presentation at the Bear Stearns Transportation Conference on May 8, 2007, in which he set forth TCI's proposals with respect to the industry and CSX in particular and at which attendance was standing-room-only, with people sitting and standing in the aisles and outside the doorways to the auditorium. In his talk, Mr. Amin proposed that CSX buy back 20 percent of its shares every year and increase prices charged to customers by 7 percent per year. He questioned why CSX considered safety a capital expenditure issue, saying "You don't need cap-ex to put up hand brakes in rail cars." He suggested that the major railroads in the U.S. could be taken private at a significant premium, that TCI had spoken to the private equity firms that would line up to bid on the railroads and that he had a 100-page indicative financing proposal from a bank that could underwrite the LBO debt. (PX 96; Baggs ¶¶ 17-18.)

147.    Mr. Schwartz, Mr. Behring, Mr. Moura and Denise Das of 3G attended Mr. Amin's speech at the May 8, 2007 Bear Stearns conference and Mr. Bahbout of 3G monitored the CSX stock price during the speech. (PX 94; PX 95.)

148.    In the week following Mr. Amin's presentation at the Bear Stearns conference, more than a dozen hedge funds, including TCI and 3G, called and emailed CSX to inquire concerning the results of a non-binding resolution that would allow shareholders to call a special meeting. (Baggs ¶ 19; see also PX 101; PX 207.)

149.    Several times during the first half of 2007, representatives of 3G requested a private meeting with CSX senior management. On June 13, 2007, Mr. Munoz and Mr. Baggs of CSX visited 3G's offices in New York, at 3G's request. They met with Mr. Behring, Mr. Moura and Mr. Schwartz. (Munoz ¶ 25.) During that visit, Mr. Munoz saw laying out in 3G's offices a presentation concerning CSX bearing TCI's logo on the cover. (Munoz ¶ 25.)

149.1    In the HSR letter of June 13 that they sent to CSX, 3G disclosed that it may acquire CSX shares in excess of $597.9 million and cross the 50 percent reporting threshold under HSR. (PX 105.)

149.2   Mr. Behring said that he was instructed by counsel to file. (PX 105; Baggs ¶ 21; Behring Dep. 128:21-25.)

149.2.1   On June 19, 2007, TCI hosted its annual investor conference. In the conference report, TCI indicated that returns at CSX of more than 20% per year were possible if costs were cut, operations improved and the Company engaged in active share repurchases. (PX 107 at 23.)

149.3   Mr. Moura testified that in "2007 and 2006", he attended TCI's Investor Day and met Mr. Hohn and Mr. Sunak. (Moura Dep. 38:25-39:6;132:3-13;140:6-20.) He remembered receiving "[a] presentation at TCI's 2007 Investor Day." (Moura Dep. 48:6-11.)

150.   On June 20, 2007, Mr. Amin and Mr. Sunak met with Mr. Ha, Eduardo Mestre, and Nancy Bryson of Evercore. During that meeting, TCI was adamant about their demands and agitated about the perceived lack of attention TCI was receiving from CSX management. TCI said that it "would like to meet with the Board of CSX to communicate TCI's views on the deficiencies of management and on the desirability of leveraging up the balance sheet"; that "management has done a poor job and the Board should entertain a change in the senior leadership of [CSX]"; that TCI "still own[ed] 4% in physical shares and over 10% in swaps"; that TCI "fully intend[ed] to 'go to war'"; that TCI "would seek to replace the entire Board as a means to change management"; and that TCI "will get support from the shareholders in making the changes at CSX". Evercore reported those statements to CSX. (PX 108; PX 109; Munoz ¶ 29.) On July 11, 2007, Evercore reported to the CSX Board about those recent conversations with TCI. (PX 10 at 7-8; Munoz ¶ 30.)

151.   Also on June 20, 2007, Mr. Behring, Mr. Moura and Mr. Schwartz of 3G met with CSX executives Mr. Ward, Mr. Munoz, Mr. Baggs and Mr. Goldman at CSX's headquarters in Jacksonville. During that meeting, Mr. Behring advocated that CSX pursue more aggressive share buybacks and several times mentioned the issue of leveraging up CSX. (Moura Dep. 173:8-174:4; Baggs ¶ 23.)

151.1   Mr. Ward also "asked [3G] point blank what was [3G's] intention with the HSR [filing]," to which 3G replied "[w]e wanted to keep all of our options open." (Moura Dep. 174:24-175:10.)

152.   On July 17, 2007, Mr. Ha and Mr. Mestre of Evercore had a call with Mr. Hohn. During that conversation, Mr. Ha and Mr. Mestre invited Mr. Hohn to submit his views to the Board in writing. Although he indicated that he would, he never did, issuing instead a public letter on October 16. Mr. Mestre sent emails to Mr. Munoz memorializing the call. (PX 111; PX 112.) In the emails, Mr. Mestre recited the following statements:

152.1   Mr. Hohn said that "TCI would, in due course, attempt to change the entire Board" and that TCI's objective was "to find management that would

be more open to leveraging [CSX] and that would pursue cost improvements more aggressively". (PX 111; Munoz ¶ 31.)

152.2    Mr. Hohn also indicated that "the best way to create long term shareholder value is through a structured share buy back program and that he does not want the [C]ompany sold to [private equity] firms or others." (PX 111.)

152.3    Mr. Hohn also noted the Company's 6,000 employees in Jacksonville and questioned whether the Company could be run with fewer employees. (PX 112.)

153.    On July 23, 2007, Mr. Amin asked Mr. Hatch, a consultant engaged by TCI, to inquire of Al Crown, former chief operating officer of CSX, how many people work at CSX headquarters and what are the management dynamics. (PX 115.)

154.    On July 25, 2007, Mr. Amin had a dinner meeting with Mr. Crown. (PX 115.) On August 13, 2007, Mr. Behring also met with Mr. Crown for dinner. (PX 193 at 3GC00013894.)

155.    On or about July 26, 2007, TCI engaged Schulte Roth & Zabel LLP to work with TCI on its activist agenda for CSX. (PX 114.)

156.    In an agenda for an August 2, 2007,meeting to discuss TCI's looming proxy contest against CSX, one of the "Next Steps" for Schulte Roth was to prepare a Schedule 13D filing and a subcategory of the Schedule 13D "Next Step" was to discuss "TCI 'satellites' and their status re: TCI's holdings." The agenda also included a discussion of a proxy contest for full and partial slates and a bid. (PX 116.)

156.1    At the time, TCI's physical share position in CSX was under 5% of the total outstanding shares. (Subrahmanyam Ex. C.1.)

157.    On August 6 and 7, 2007, D.F. King & Co., Inc. ("D.F. King"), the proxy solicitation firm retained by TCI, provided to TCI memoranda setting forth their analyses of the likely outcomes of a campaign on the part of dissident shareholders to elect representatives to CSX's Board. The analyses contemplated both "control" and "short" slates. D.F. King determined that success was more likely with a "'short slate' of two director-nominees" because of "the unwillingness of shareholders to transfer control in the absence of a premium". D.F. King also noted that ISS, an influential proxy advisory firm, "is reluctant to endorse dissident control slates at companies with arguably successful records of share price 'performance'". (PX 117; PX 118.)

158.    Representatives of TCI and 3G attended the CSX investor and financial analyst conference on September 6, 2007. (PX 122; PX 193 at 3GC00013897.) After the conference, Mr. Schwartz reported on Mr. Hohn's conversation with Mr. Munoz: "Chris pushed Munoz to accelerate the buyback after the [CSX] presentation". (PX 122 at 3GC00006245.)

159.    While at the conference, both Mr. Moura and Mr. Schwartz spoke with Snehal Amin.  (Moura Dep. 179:16-180:2; Schwartz Dep. 168:10-170:7.)

160.    Also on September 6, 2007, after the CSX investor and financial analyst conference, Mr. Hohn approached Mr. Mestre, Mr. Ha and Ms. Bryson of Evercore and Eli Gross of Morgan Stanley, which Evercore memorialized in a memo written for CSX on September 7, 2007.  Mr. Hohn told Evercore and Morgan Stanley that: CSX's "balance sheet [could] be leveraged [up] further"; "[CSX]/industry should take a tougher stance with the government/regulators by threatening to reduce capex if the industry can not earn a reasonable return"; "[CSX] should stop its ad campaign"; the "board is weak" and has "no one with railroad experience/knowledge except management" and "does not challenge management"; "[s]hareholders would support adding 2 or 3 new board members with railroad background to upgrade the current board"; the "[b]uyback should be accelerated"; and that the "entire $3 billion [repurchase] program should be done this year".  Mr. Hohn also said that TCI was "frustrated by the lack of interaction with management" and "their inability to talk directly with the board", and that management and the Board were rejecting the desire of the shareholders regarding shareholder ability to call special meetings.  (PX 124.)

161.    On September 7, 2007, Mr. Amin asked Mr. Hatch to arrange another meeting with Mr. Crown, the former chief operating officer of CSX.  (PX 190.)

162.    Following receipt of D.F. King's advice regarding running a minority slate in early August, TCI discontinued discussions with D.F. King for over a month.  (PX 128).

163.    By September 18, 2007, however, TCI was ready to re-engage in the proxy contest under ISS's minority slate rules.  On that day, Mr. Amin indicated to Ted Dysart of Heidrick & Struggles, a director search firm, that they "will need 1-2 members".  (PX 137 at TCI051274.)

164.    In a September 19-20, 2007,email exchange between Mr. Amin and Peter Harkins of D.F. King, Mr. Amin noted that they "are likely to proceed with a proxy contest".  (PX 128.)

165.    Nevertheless, Mr. Amin continued his attempts to explore ways to win even more control over the Company at the board level.  On October 5, 2007, Mr. Amin asked Mr. Harkins, of D.F. King, the likely ISS reaction to a slate of exactly half of the board and stated that he was "skeptical about what a minority slate can accomplish".  (PX 134.)  In a follow-on email also dated October 5, 2007, Mr. Harkins advised Mr. Amin that they are "unanimous in believing that it would not work.  ISS support for short-slates reflects its belief that minority (not 50/50) representation is good.  ISS would view a 50/50 split (or even a 45/55 split) as not desirable and would either (a) reject your nominees, or (b) endorse only several of your nominees, effectively converting your slate into a "traditional" short-slate for any investors."  Mr. Harkins added, "I can empathize with your concerns regarding the potential effectiveness of a short-slate.  However, from experience, I can tell you that incumbent CEOs/directors actually fear short-slates and the

prospect of losing an election.  In fact, typically, the loss of confidence expressed by shareholders in electing a short-slate dramatically alters long-standing board alliances and creates opportunities for change that would not have occurred had the dissident been defeated in the election."  Mr. Hohn's reaction to Mr. Harkins' advice was that "[ISS] did not support some of the main [TCI] motions in [ABN] but we still got 70% of the vote".  (PX 135.)

166.    On October 6, 2007, Mr. Amin contacted Tim O'Toole for purposes of inviting him to be on their slate of nominees for the CSX board and after meeting Mr. O'Toole, put him in contact with the Schulte Roth firm.  Mr. Amin had met Mr. O'Toole several months earlier through an introduction from Tony Hatch, TCI's consultant.  (PX 138; PX 139.)

167.    On October 8, 2007, Mr. Hohn met with Mr. O'Toole.  (PX 192; <u>see also</u> PX 138.)  On the very same day, Mr. Behring met with Gil Lamphere.  (PX 193 at 3GC00013902.)

168.    On October 11, 2007, Mr. Behring attended the third quarter TCI investor day conference call.  (PX 193 at 3GC00013902.)

169.    On October 12, 2007, Mr. Lamphere met Mr. Behring at 3G's offices.  (PX 194 at LAM0000236.)

170.    On October 16, 2007, TCI sent (and publicized) a letter to CSX's Board.  In that letter, TCI urged the Board to act immediately to:  "[s]eparate the Chairman and CEO roles"; "[r]efresh the Board with new independent directors"; "[a]llow shareholders to call special shareholder meetings"; "[a]lign management compensation with shareholder interests"; "[p]rovide a plan to improve operations"; "[j]ustify the capital spending plan"; and "[p]romote open and constructive relations with labor, shippers and shareholders".  TCI further urged CSX's Board to "[e]ducate policymakers and regulators on the true state of the industry" and to "[f]reeze growth investment until the fate of the re-regulation bill is known".  (PX 140.)

171.    On October 17, 2007, Mr. Behring met with Mr. Amin of TCI.  (PX 193 at 3GC00013903.)

172.    TCI sent another public letter to CSX's Board on October 22, 2007, criticizing the Board for allowing representatives of CSX to describe CSX as a "public service company" in communications to policymakers in Washington, D.C. and also criticizing a statement made by CSX's CEO that no industry, of which he was aware, analyzed returns on investment capital on a replacement cost basis.  (JX 8 at 14; PX 141 at CSX_CORP00007206-07.)

173.    3G and/or Mr. Lamphere prepared an operating plan for CSX titled "Project Improve", the first draft of which is also dated October 22, 2007,and is written on Mr. Lamphere's letterhead.  (PX 142; Lamphere Dep. 49:15-50:22.)  The plan refers to:

173.1   a "credible team, if current senior management is not supportive of overall plan" (PX 142 at 2);

173.2   a "significant reduction in employee base" of "32% of [the] current force" (PX 142 at 4, 7);

173.3   an "[i]nvestor group [that] has substantial rail sector expertise and experience"  (PX 142 at LAM0000004.);

173.4   a "[g]roup [that] has developed a detailed operating plan showing substantial improvement opportunities".  (PX 142 at 2.)  The operating plan was sent to Mr. Amin of TCI by Mr. Schwartz of 3G on December 20, 2007.  (PX 152.)

174.     On December 19, 2007, TCI and 3G filed a Schedule 13D in which they disclosed that they formed a group and intended to conduct a proxy solicitation seeking to elect five nominees to the Board of CSX.  (JX 8.)  TCI and 3G's Schedule 13D stated that TCI and 3G beneficially owned approximately 8.3% of the then-outstanding shares of CSX common stock, and derivative financial instruments known as swaps that reference shares of CSX common stock, as well as credit facility swaps referencing CSX's debt securities.  (JX 8 at 16.)Together, TCI and 3G have equity swaps referencing 12.27% of the outstanding shares of CSX common stock (as of April 21, 2008, the record date for the 2008 CSX annual meeting of shareholders).  (Subrahmanyam Report Exs. C.1, C.2; JX 19 at Annex A; PX 230-PX238.)  The Schedule 13D disclaimed beneficial ownership of the CSX shares referenced in TCI and 3G's swap arrangements.  (JX 8 at 17.)

175.     Also on December 19, 2007, Mr. Hohn called Mr. Ha of Evercore and told Mr. Ha that TCI "is highly confident that TCI/3G will win the proxy fight and is willing to do whatever it takes to win because they have a huge economic incentive to do so" and that he "is miffed that the board is still not willing to meet directly with TCI -- particularly now that they together with 3G own 20% of the company".  Evercore reported those statements to CSX in an email.  (PX 149.)

176.     On January 8, 2008, TCI submitted a Stockholder Notice of Intent to Nominate Persons for Election as Directors to CSX Corporation in which it indicated its intention to nominate Mr. Hohn, Mr. Behring, Mr. Lamphere, Mr. O'Toole, and Mr. Wilson as nominees to serve as directors on the CSX Board.  (Compl. ¶ 95; TCI Ans. ¶ 95; 3G Ans. ¶ 95.)  The supplemental notices incorporated the information in the January 8 notice concerning Defendants' beneficial ownership of CSX stock.

177.     On January 21, 2008 and January 25, 2008, TCI sent two supplemental notices to CSX regarding its intent to present a proposal to amend the bylaws of CSX at the 2008 annual meeting to allow shareholders holding 15% of all the CSX shares outstanding to be able to call a special meeting.  (Compl. ¶ 96; TCI Ans. ¶ 96; 3G Ans. ¶ 96.)

177.1   Article I, Section 11(c)(1) of CSX's Bylaws, which governs the way in which a shareholder may bring a nomination or other business before an annual meeting, provides:

"Only such persons who are nominated in accordance with the procedures set forth in this Section 11 shall be eligible at an annual or special meeting of shareholders of the Corporation to serve as directors and only such business shall be conducted at a meeting of shareholders as shall have been brought before the meeting in accordance with the procedure set forth in this [section]." (JX 30 (CSX Bylaws), at Art. I, § 11(c).)

177.2   Article I, Section 11 of the CSX Bylaws requires advance notice of nominations and shareholder business, and further requires that such notice be timely and set forth certain pertinent information, including: (i) the name and address of any beneficial owner on whose behalf the nomination or proposal is made; (ii) the class and number of shares of capital stock of CSX that are owned beneficially and of record by such shareholder and such beneficial owner; (iii) all information relating to each person whom the shareholder proposes to nominate for election as a director that is required to be disclosed in solicitation of proxies for election of directors in an election contest, or is otherwise required in each case pursuant to the '34 Act; and (iv) any material interest in other proposed business of such shareholder. (JX 30 (CSX Bylaws) at Art. I, §11(a).)

177.3   The TCI special meeting proposal does not include any limitations on the purpose of the meeting, and can be used to elect or remove directors. (JX 19.)

178.   On February 4, 2008, the CSX board of directors amended the Company's bylaws to permit holders of 15% of the outstanding voting stock of the Company to request a special meeting. (JX 30.) This amendment was filed with the SEC on February 4, 2008. (CSX Corp., 8-K (Feb. 4, 2008).)

179.   On February 7, 2008, TCI wrote a public letter to the CSX Board informing the Board that TCI would be proposing a bylaw amendment "that permits one or more shareholders that together hold at least 15% of all the shares of CSX capital stock to request a special shareholder meeting of shareholders to address [any and all] issues - including the election of directors" and would be seeking to repeal "all bylaw amendments enacted since January 1, 2008". (JX 11 Ex. 1.)

180.   On February 14, 2008, responding in a press release to TCI on behalf of the Board with respect to CSX's and TCI's competing views on the bylaw amendments regarding special meetings, Mr. Kelly stated:

"TCI wants the ability to initiate a perpetual 'recall' contest through special meetings as a tool to pressure the Board to

implement TCI's proposals, regardless of their merit.  Taken together with TCI's nomination of candidates to fill five of CSX's twelve Board seats, TCI's criticism of the CSX Bylaw amendments makes it clear that TCI's interest is not in good corporate governance, but in achieving effective control of the company".  (PX 176 at 2.)

181.    In the 3G quarterly report for the fourth quarter of 2007,dated February [2008], 3G indicated that "[t]he formal presentation [Defendants] plan to give to investors will outline…a significant reduction to the share count through accelerated repurchases."  (PX 204 at 40.)

182.    On March 10, 2008, TCI and 3G filed their preliminary proxy statement, and on April 28, 2008, filed their definitive proxy statement on Schedule 14A proposing to elect five directors; to adopt a proposal to amend CSX's Bylaws to permit one or more shareholders holding 15% or more of the outstanding shares of capital stock of CSX having voting power to call a special meeting of the shareholders for any purpose, including to elect and remove directors; and to adopt a resolution to repeal any changes made by CSX's Board to the Bylaws between January 1, 2008, up to and including the date of the 2008 Annual Meeting.  (JX 12; JX 19.)

## C.    TCI Negotiated for "Effective Control" in 2008

183.    After TCI and 3G filed their Schedule 13D on December 19, 2007, CSX's Board asked its Presiding Director, Edward Kelly, III, to try to reach an accommodation with TCI.  (Kelly ¶¶ 21-22.)

184.    Before the outset of negotiations with Mr. Kelly, TCI took the position that "[t]he only alternative to the proxy fight is if they will allow our 5 nominees on and we can mutually agree with them which 5 of their directors to replace".  (PX 155; see also PX 154.)  Mr. Moura of 3G indicated disappointment that Mr. Behring was not invited to participate in the discussions, noting that this is "the first chance to have someone on the board on our side".  (PX 155.)

185.    Following the January 7, 2008, meeting between Mr. Hohn and Mr. Kelly, on January 8, Mr. Hohn proposed various additional candidates for the CSX board of directors, including Ed Harris and Jack McBain, both formerly of Canadian National, and Allen Andreas, former CEO of Archer Daniel Midlands.  (PX 157; PX 158.)

186.    On January 8, 2008, TCI delivered its notice of intent to nominate the five TCI/3G nominees, accompanied by questionnaires and nominee agreements.  (PX 159)  In the notice and questionnaires, TCI and the nominees do not identify the shares referenced in the TCI and 3G swaps as being beneficially owned.  (PX 159 at Annex A.)

187.    On January 9, 2008, Mr. Kelly of CSX spoke with Mr. Hohn, and offered Mr. Hohn three seats on the board:  one for each of Messrs. Hohn, Behring and Lamphere, and rejected Gary Wilson because of union and Washington D.C.-related

issues, as well as Mr. O'Toole.  Mr. Kelly also agreed to a fourth, mutually-agreed upon candidate, Ed Harris.  (PX 161; Kelly ¶ 23.)

188.    In a follow-up January 9, 2008 email exchange, Mr. Hohn warned Mr. Kelly not to pursue a "scorched earth" policy in Washington and lobby for reregulation. (PX 162.)

189.    On or before January 11, 2008, Mr. Hohn proposed John Wilder as an additional nominee to the CSX board.  (PX 163.)

190.    On January 13, 2008, Mr. Kelly spoke again with Mr. Hohn.  On January 14, 2008, Mr. Kelly indicated that the CSX position had not changed regarding accepting the four nominees previously discussed.  (PX 164.)

191.    On January 14, 2008, Mr. Hohn made the following new demands to give his group additional control over the Company.  Mr. Hohn told Mr. Kelly, in an email, that without the following conditions no agreement would be possible:  (i) ability of 10% of shareholders to call a special meeting, which would subject directors to the constant threat of a recall vote, (ii) separation of the chairman and chief executive officer roles, (iii) specific committee representation for the TCI/3G nominees, and (iv) no ability of the board to increase the size of the board without 80% board approval or a shareholder vote. Mr. Hohn also noted that TCI would be proposing a special meeting bylaw for consideration by the CSX shareholders at the annual meeting.  (PX 165.)

191.1    In an email, Mr. Amin noted that it was "unfortunate[ ]" that Mr. Hohn made his proposal in writing.  (PX 275.)

191.2    When asked why he wrote that Mr. Hohn's ultimatum was done "very unfortunately by email", Mr. Amin responded incredibly:  "I believe things like this are better discussed in person so that there is no confusion about what's being requested" and testified that conversation leads to fewer misunderstandings than writings.  (Tr. 207:20-208:15.)

192.    Also on January 14, 2008, Mr. Amin of TCI asked Mr. Hohn of TCI whether CSX had mentioned a standstill agreement and Mr. Hohn said "no".  (PX 164.)

193.    On January 16, 2008, Mr. Kelly sent an email to Mr. Hohn in which he indicated that the CSX position had not changed and that CSX continued to be "very concerned about [the TCI/3G Group's] apparent interest in gaining effective control" over CSX.  (PX 167.)

194.    During the course of the negotiations, Mr. Hohn also said that, if he was able to elect five directors, the future of CSX's Chairman and CEO, Mr. Ward, would be "bleak" and threatened that, if CSX did not agree to his demands, he would run his slate, create a dissident board, and make things unpleasant for Mr. Kelly as presiding director. Mr. Hohn further suggested that his directors would decline to provide written consents to Board actions and otherwise disrupt the operation of the Board.  Mr. Kelly understood

that the implicit premise underlying Mr. Hohn's threats was that his five nominees would vote together as a bloc.  (Kelly ¶ 25.)

195.    On January 17, 2008, Mr. Hohn told Mr. Kelly that TCI would not accept any sort of standstill as part of any agreement.  Mr. Hohn further insisted that he be able to interview each of the current directors.  (PX 169; Kelly ¶¶ 23-24.)

196.    On January 18, 2008, Mr. Kelly terminated discussions in an email noting that the "significant differences between our respective positions, including your indication yesterday that no standstill would ever be acceptable to you" are "impossible to bridge."  (PX 169.)

## V.    THE GROUP'S SWAPS AND ARRANGEMENTS CONFER POWER

197.    Even if TCI and 3G had not used their swaps as part of a plan or scheme to evade the reporting requirements of the securities laws, they are beneficial owners of the shares referenced in their swaps arrangements for additional reasons.

198.    By and through their swap agreements, TCI and 3G have investment power because they can effectively determine the disposition of the CSX shares underlying the swaps.  The counterparties immediately purchased and sold shares of CSX stock in direct one-for-one response to Defendants' swap orders.  (See Section V.A. infra.)

199.    By and through their swap agreements, TCI and 3G have voting power. Their swap agreements allowed TCI and 3G significantly to influence how the shares underlying their swaps were voted.  Defendants took shares out of market and put them into the hands of the counterparties with whom Defendants had significant financial relationships.  The counterparties had an economic incentive to vote the shares in line with Defendants' wishes in order to maintain their lucrative relationships.  In at least one instance, Defendants concentrated shares in the hands of a counterparty (Deutsche Bank) that Defendant knew to be sympathetic to its interests because of that counterparty's own holdings of CSX stock.  (See Section V.B. infra.)

200.    Defendants have offered no credible evidence to dispute Defendants' voting and investment power regarding the shares underlying their swaps.  CSX stock was the only viable hedge against Defendants' swaps and nothing in the swap agreements or the policies of the counterparty banks prevented the counterparties from voting the shares in line with Defendants' goals.  Contrary to Defendants' assertions, swaps are different from futures in important respects.  (See Section V.C. infra.)

201.    Defendants' proffered "expert", Professor Partnoy, is unhelpful to Defendants' case and to the Court.  He is not an expert in economics, let alone swaps, and his proffered testimony is mistaken and misleading.  (See Section V.D. infra.)

### A.    The Group Determines Disposition of the Matched Shares

202.    As a matter of real-world financial economics, the counterparties to TCI's swaps had to hedge their positions with matching physical shares, hold that hedge for the duration of the swap, and upon termination of the swap, dispose of the matching shares. With respect to a large swap position, any other approach would have been extremely risky and irresponsible.  (Subrahmanyam Rebuttal ¶ 5.)

203.    Consistent with what economic theory would predict, TCI's counterparties did in fact hedge their CSX swaps one-for-one with matching physical CSX shares. (Subrahmanyam ¶¶ 114, 115, 125.)  Every time TCI entered into a large swap with one of its counterparties, the counterparty acquired an identical number of CSX shares. (Subrahmanyam Rebuttal ¶ 22; Subrahmanyam Rebuttal Exs. 3.1-3.7, 4.1-4.7.)

204.    Similarly, if and when TCI terminated its swaps, TCI's counterparties sold an identical number of shares.  (Subrahmanyam Rebuttal ¶ 22; Subrahmanyam Rebuttal Exs. 3.1-3.7, 4.1-4.7.)

205.    The following table (Subrahmanyam Rebuttal ¶ 22) illustrates the actual hedging by TCI's counterparties in connection with its CSX swaps:

### TCI Counterparty Swap and Share Transactions
### 10/20/06 – 12/31/07

| | Number of | | Number of | |
| Counterparty | Days on Which Swap Position with TCI Increased | Days with Matching Counterparty Purchase of CSX Shares (Exact Day) | Days on Which Swap Position with TCI Decreased | Days with Matching Counterparty Sale of CSX Shares (Exact Day) |
| --- | --- | --- | --- | --- |
| Citigroup | 13 | 13  (12) [1] | 3 | 3    (3) |
| Credit Suisse | 16 | 15  (15) [2] | 5 | 5    (5) |
| Deutsche Bank | 30 | 30  (30) | 2 | 2    (2) |
| Goldman Sachs | 24 | no data | 10 | 10  (10) |
| Merrill Lynch | 16 | 14  (14) [3] | 9 | 9    (9) [3] |
| Morgan Stanley | 18 | 18  (15) [1] | 6 | 6    (6) |
| UBS | 14 | 14    (9) [4] | 8 | 8    (3) [4] |

Note:

[1]  Matching hedge was established by the end of next business day whenever there was a reported delay in hedging.

[2]  There are no share hedge data for 12/11/07 provided in the Credit Suisse production (CS 000097–1415).

[3]  There are no share hedge data for 12/11/07 provided in the Merrill Lynch production (ML 0000166–333).
      On four days, the share transaction amounts are different from swap transaction amounts by less than 1,000 shares.  Three of these four discrepancies were due to separate transactions, which occurred in addition to the perfectly matching hedge trades on those days.

[4]  Comparisons are based on trade dates for swaps and "dealt dates" for hedges.  In each case when swap trade date is different from hedge "dealt date," "dealt date" is the next calendar day, which is Saturday in some cases, and "dealt time" is shortly after midnight.

206.    All of the counterparties here in fact hedged by acquiring shares and disposing of shares one-for-one in relation to TCI's swap activity.  (Subrahmanyam Rebuttal ¶ 31.)

207.    Citigroup increased its exposure to CSX swaps with TCI on 13 days.  In every instance, Citigroup hedged the increases in exposure one-for-one by purchasing matching numbers of CSX shares.  On 12 of the 13 days, it did so the same day, and in one instance, it did so the next day.  Citigroup decreased its exposure to CSX swaps with TCI on 3 days.  On each of these days, it hedged the decreases in exposure one-for-one by selling matching numbers of CSX shares.  (Subrahmanyam Rebuttal Ex. 4.1.)

208.    Credit Suisse increased its exposure to CSX swaps with TCI on 16 days.  Credit Suisse produced hedging data for 15 of the 16 days (the missing hedging data concerns swap transactions).  In every instance, Credit Suisse hedged the increases in exposure one-for-one by purchasing matching numbers of CSX shares.  Credit Suisse decreased its exposure to CSX swaps with TCI on five days.  On each of these days, it hedged the decreases in exposure one-for-one by selling or transferring to Deutsche Bank matching numbers of CSX shares.  (Subrahmanyam Rebuttal Ex. 4.2.)

209.    Deutsche Bank increased its exposure to CSX swaps with TCI on 30 days. On each of these days, Deutsche Bank hedged the increases in exposure one-for-one by purchasing matching numbers of CSX shares.  Deutsche Bank decreased its exposure to CSX swaps with TCI on two days.  On each of these days, it hedged the decreases in exposure one-for-one by selling matching numbers of CSX shares.  (Subrahmanyam Rebuttal Ex. 4.3.)

210.    Goldman Sachs hedged its exposure to CSX swaps with CSX shares on a quarterly basis in 2006 and 2007.  (Subrahmanyan Ex. I.4.)  Goldman Sachs did not produce daily data sufficient to examine daily activity in this period.  However, Goldman did produce data permitting examination of its decreases in swap exposure.  Goldman Sachs decreased its exposure to CSX swaps with TCI on 10 days.  On each of these days, it hedged the decreases in exposure one-for-one by selling matching numbers of CSX shares.  (Subrahmanyam Rebuttal Ex. 4.4.)

211.    Merrill Lynch increased its exposure to CSX swaps with TCI on 16 days. On 14 of the 16 days, Merrill Lynch hedged the increases in exposure one-for-one by purchasing matching numbers of CSX shares.  On one of the 2 remaining days, December 4, 2006, Merrill Lynch purchased 800 shares in addition to a perfectly matching hedge transaction.  Merrill Lynch did not produce hedging data for the remaining, December 11, 2007, swap transaction with TCI referencing 1,000 CSX shares. Merrill Lynch decreased its exposure to CSX swaps with TCI on nine days.  On each of these days, it hedged the decreases in exposure one-for-one by selling matching numbers of CSX shares.  On one of these nine days, November 12, 2007, Merrill Lynch sold 300 shares in addition to a perfectly matching hedge transaction.  On another of these nine days, November 13, 2007, Merrill Lynch purchased 500 shares in addition to a perfectly matching hedge transaction.  (Subrahmanyam Rebuttal Ex. 4.5.)

212.    Morgan Stanley increased its exposure to CSX swaps with TCI on 18 days.  In every instance, Morgan Stanley hedged the increases in exposure one-for-one by purchasing matching numbers of CSX shares.  On 15 of the 18 days, it did so the same day, and in three instances, it did so by the next trading day.  Morgan Stanley decreased its exposure to CSX swaps with TCI on six days.  On each of these days, it hedged the decreases in exposure one-for-one by selling or transferring to Deutsche Bank matching numbers of CSX shares.  (Subrahmanyam Rebuttal Ex. 4.6.)

213.    UBS increased its exposure to CSX swaps with TCI on 14 days.  In every instance, UBS hedged the increases in exposure one-for-one by purchasing matching numbers of CSX shares.  On nine of the 14 days, it did so the same day and in the remaining instances, the perfect hedge was reported on the following calendar day.  UBS decreased its exposure to CSX swaps with TCI on eight days.  In every instance, UBS hedged the decreases in exposure one-for-one by selling matching numbers of CSX shares.  In three instances, it did so on the same day.  For the remaining five days, the perfect hedge was reported on the following calendar day.  (Subrahmanyam Rebuttal Ex. 4.7.)

214.    Defendants rely on the depositions of Citigroup's Mr. Richard Kennedy and Deutsche Bank's Mr. John Arnone for the proposition that the "TCI counterparties considered the possibility of hedging with instruments other than shares, and at times either used such instruments or did not hedge". (Partnoy Sur Rebuttal ¶ 18.) The depositions of the bankers do not support such a point, and the fact is that the banks hedged the swaps with physical shares.

215.    Messrs. Kennedy and Arnone never state that when the swaps were entered into they considered hedging with anything other than physical shares. The only statements made about hedging with instruments other than shares are speculative and hypothetical. (See Kennedy Dep. 39:7-42:4; Arnone Dep 38:14-39:4.) Neither Mr. Kennedy nor Mr. Arnone offers testimony to specific instruments that were considered to hedge CSX swap transactions. (Kennedy Dep 39:7-42:4; Arnone Dep 38:14-39:4.) At some point after the CSX matching shares were acquired, Citigroup considered alternative hedges, but Mr. Kennedy does not provide details of these considerations and acknowledges that Citigroup always hedged with physical shares. (Kennedy Dep. 41:13-42:4.) Mr. Arnone understood Deutsche Bank to be hedging CSX swaps with the purchase of physical shares of CSX. (Arnone Dep 8:25-9:4.)

216.    Again, Citigroup and Deutsche Bank perfectly hedged the swaps with physical shares. (PX 239; Subrahmanyam Rebuttal Exs. 3.1-4.8.) Even if the counterparties considered alternatives to physical shares, the counterparties only used physical shares as a hedge. (PX 239; Subrahmanyam Rebuttal Exs. 3.1-4.8.) Every time the counterparties entered into a swap with TCI for CSX shares, the counterparties would hedge with the exact same number of physical shares. (PX 239; Subrahmanyam Rebuttal Exs. 3.1-4.8.) Whenever TCI terminated a swap position, the counterparty would sell shares of the same amount immediately. (PX 239; Subrahmanyam Rebuttal Exs. 3.1-4.8.)

217.    Notably, TCI's counterparties engaged in conduct prior to entering into swaps that demonstrated their knowledge that they would be hedging with physical shares. For example, Citigroup limited its swap transactions with TCI by the number of shares it had access to in the market. (See Kennedy Dep 9:3-12.) The Deutsche Bank swap desk had to seek approval prior to entering into swaps once Deutsche Bank had hedged with physical shares in excess of 5% of all CSX stock. (See Arnone Dep. 8:2-9:8.) The counterparties all knew that purchasing physical shares was the only option to hedge the risk derived from the swap agreements.

218.    There is a direct -- indeed, essentially perfect -- correlation between TCI's purchases and sales of large swap positions and purchases and sales by its swap counterparties of matching physical CSX shares. (Subrahmanyam Rebuttal ¶ 3.)

219.    By entering into swap arrangements with the counterparties, TCI effectively caused them simultaneously to purchase the matching shares. TCI counterparties acquired the matching shares as a hedge for their swap positions and would not have acquired such large numbers of CSX shares in the absence of those positions. (Subrahmanyam ¶ 127.)

58

220.    Hence, TCI's and 3G's swap arrangements gave them the ability significantly to influence the disposition of the CSX shares referenced in its swaps.  In fact, TCI and 3G had the ability effectively to determine the timing and size of the acquisition, holding, and disposition of the matching CSX shares by the counterparties.  (Subrahmanyam ¶¶ 126-52; Subrahmanyam Rebuttal ¶ 17.)

221.    TCI knew that the counterparties were hedging with physical shares.  (See Kennedy Dep at 9:3-12.)  Mr. Tim Keogh, an employee at TCI, spoke with Mr. Kennedy about Citigroup's hedging activity, learning from Mr. Kennedy that Citigroup could not acquire enough CSX shares to hedge TCI's desired number of swaps.  (See Kennedy Dep. 8:4-9:12.)  TCI then constructed analysis of potential voting outcomes that reflected their knowledge that the counterparties hedged with physical shares.  (See Tr. 217:6-18.)

222.    Notably, Mr. Amin falsely denied knowing whether TCI's swap counterparties hedged their positions.  (Tr. 202:22-203:1, 204:10-14, 205:24-206:7.)  When confronted with TCI's own documents however, he admitted that TCI understood that its counterparties hedged their positions.  (DX 96; Tr. 217:12-18.)  When asked by counsel for CSX whether he had just "presented to the court an analysis that said 100 percent of the swaps are hedged by physical shares", Mr. Amin had no choice but to answer "Yes."  (DX 96; Tr. 217:12-18.)

## B.    <u>The Group Has the Ability Significantly to Influence Voting</u>

223.    Insofar as TCI had the ability to influence the acquisition and disposition of the matching shares, it had the ability to influence the voting of those shares.  Through its swap arrangements, TCI effectively put the matching shares, and their corresponding voting rights, in the hands of the counterparties, as opposed to the hands of whoever else would have otherwise held the shares.  (Subrahmanyam ¶ 154.)

224.    By effectively determining the vote holder of CSX shares, TCI influenced the voting of those shares.  For this reason alone, TCI had the ability significantly to influence the voting of those shares.  (Subrahmanyam Rebuttal ¶ 39.)

225.    The ability to influence who holds the right to vote is tantamount to the ability to influence how the vote will be cast.  Some types of shareholders are likely to vote one way and others another.  (Subrahmanyam ¶ 155.)

225.1   As indicated in an analysis done by TCI's own proxy solicitor, D.F. King, some institutional investors are known to adhere rigidly to ISS endorsements of short-slates, while others are known to assign significant weight to the voting recommendations of ISS.  (Subrahmanyam ¶ 155; PX 117 at 8; PX 160 at 6-7.)

225.2   A JPMorgan report notes: "CSX's shareholder base is skewed to higher hedge fund ownership and our sense is that there will probably be receptiveness to TCI/ 3G's proposal from this group".  (Subrahmanyam at 62, n.136.)

226.    Putting aside the influence that a hedge fund can have on voting simply by influencing who holds the matching shares, as Professor Subrahmanyam notes, "many a hedge fund has persuaded their CFD counterparty to vote one way or the other, without a problem". (Subrahmanyam ¶ 158.)

227.    Likewise, Alan Miller of Innisfree stated that in his more than 30 years of experience:

227.1    "Even if an arrangement concerning the voting of shares held by the counterparties is not disclosed, . . . the counterparties to swap arrangements frequently vote such shares in the manner specified by the hedge funds." (Miller ¶ 24.)

227.2    "[T]hese counterparties are motivated by a desire to please lucrative hedge fund clients with whom they do business." (Miller ¶ 24.)

228.    Swap agreements generally provide that the bank counterparty has the sole discretion to vote matching shares, which is confirmed by internal guidelines of UBS and a letter from Citigroup counsel produced as part of this litigation. (PX 187.) But that does not mean a bank counterparty is beyond influence. (Subrahmanyam ¶ 160.)

229.    That is especially so where, as in the present instance, the hedge fund has a prime brokerage relationship with the counterparty bank. TCI has prime brokerage relationships with Goldman Sachs, UBS, Morgan Stanley, and Deutsche Bank. (PX 188; Subrahmanyam ¶ 161.)

230.    The existence of a prime brokerage relationship is an important factor in evaluating the reach of TCI's influence. (Subrahmanyam Rebuttal ¶ 43.) Prime brokers provide a range of services to hedge fund clients, including securities lending, financing, cash management, transactions processing and back-office support. Most of the large international banks offer prime brokerage services, which are seen to be an important and growing business for these institutions. (Subrahmanyam ¶ 161; Subrahmanyam Rebuttal ¶ 43.)

231.    Prime brokerage relationships are very lucrative for the major international banks, which often make substantial concessions for their hedge fund customers, particularly when those concessions have little economic or reputational cost to the bank. TCI ranked 41st on the list of top 100 hedge funds out of over 10,000 hedge funds in the world as of December 31, 2006. (Subrahmanyam ¶ 162.) Indeed, in 2007, prime brokers earned over $42.25 million in revenue associated with business with TCI. Thus, TCI was and is likely to be an important customer for its counterparty banks. (Subrahmanyam ¶ 162; Subrahmanyam Rebuttal ¶ 43; see also PX 188.)

232.    Even if there were not a preexisting prime brokerage relationship, the other banks would likely be vying for such a relationship and competing for new business from big clients like TCI. (Subrahmanyam Rebuttal ¶ 43 and n.62.)

233.    TCI's counterparties have no independent economic incentive to vote the matching shares. The counterparties, once perfectly hedged as they were here, are economically neutral to the performance of the company, but still retain the voting rights of the matching shares. This ownership provides an additional basis for the shares to be voted in the interests of an important prime brokerage client. (Subrahmanyam Rebuttal ¶ 44.)

234.    Here again, Mr. Amin misled the Court as to TCI's understanding concerning the voting of shares held by TCI's swap counterparties. He testified that TCI assumed its counterparties would not vote their shares in an election. (Tr. 210:10-11.) When confronted on cross with TCI's own documents however, Mr. Amin admitted that TCI had constructed analyses assuming that its counterparties would vote. (DX 96; Tr. 217:21-23.) When asked whether there were analyses done by TCI for scenarios in which it "assumed [that] there is a vote", Mr. Amin testified that "we did." (Tr. 217:21-23.)

### C.    The Group's Response Is Flawed

235.    In an effort to avoid a finding that they are beneficial owners of the shares referenced in their swaps, TCI and 3G assert a number of arguments against the reality of their influence over those shares.

### 1.    The Swap Contracts Are No Help to the Group

236.    TCI and 3G rely heavily on the terms of their swap agreements, apparently to suggest that the agreements foreclose a finding that TCI and 3G have investment or voting power concerning the CSX shares referenced in their swaps. Neither TCI's nor 3G's swaps agreements foreclose a finding of voting or investment power.

237.    While the agreements do not expressly require the counterparties to hedge with matching shares, they plainly permit hedging. In fact, the agreements contain provisions that, together with the economics of hedging of large positions in CSX swaps, expressly contemplate hedging by the bank counterparty. (Subrahmanyam ¶ 132; PX 231 at TCI0929437; PX 232 at TCI0155833; PX 234 at TCI0156059; PX 235 at TCI0155983; PX 238 at TCI0937720; PX 230 at C 0063; PX 233 at TCI0937661; PX 236 at TCI 937764.)

238.    The swap agreements at issue also give TCI and 3G the right to terminate their swaps earlier than the expiration date, which they may do at their discretion (Subrahmanyam ¶ 134; PX 231 at TCI0929432; PX 232 at TCI0155832; PX 233 at TCI0937661; PX 234 at TCI0156053; PX 235 at TCI0155984; PX 236 at TCI 937762; PX 238 at TCI0937721; PX 230 at C 0063.)

239.    Moreover, while the swap agreements do not require that the counterparties unwind their hedge and dispose of their matching shares, they contain provisions that contemplate just that. (Subrahmanyam ¶ 143; PX 232 at TCI0155832; PX 236 at TCI0937762; PX 238 at TCI0937716.)

## 2.    The Counterparty Policies Are Immaterial

240.    In addition to relying on the terms of their swap contract, TCI and 3G misplace reliance on the policies and/or communications from the counterparties about voting shares held by them to hedge swaps.  Not all of the banks have policies and the ones that do (either written or unwritten) do not prevent the banks from voting in line with TCI and 3G:

> 240.1   Deutsche Bank's general policy is to abstain from voting shares held as hedges against swaps.  However, this policy is unwritten and Deutsche Bank has not determined how it will vote its shares at the upcoming CSX shareholders' meeting.  (Arnone Dep. 22:16-23:13, 23:14-23, 25:22-25, 27:3-7.)

> 240.2   Citigroup's practice is that Citigroup's swap trading desk does not vote the shares it purchases to hedge swap transactions.  Citigroup has said it will not vote its shares in the upcoming CSX shareholders' meeting, but nothing prevents Citigroup from altering its decision.  Citigroup does not have an official policy not to vote shares and would consider voting shares held as a hedge for a swap.  (Kennedy Dep. 19:14-20, 20:20-21:9, 21:18-24, 23:25-24:6, 24:11-15, 35:21-36:8.)

> 240.3   The internal policies of Credit Suisse, Goldman Sachs, and UBS allow them to vote the securities held to hedge against swap transactions. (Partnoy ¶ 49.)

241.    Messrs. Kennedy, Arnone and Busby are incapable of foreclosing the possibility that either Citigroup or Deutsche Bank was being influenced to vote in a certain way.

> 241.1   Mr. Arnone does not know if TCI had conversations with others at Deutsche Bank regarding the voting of CSX shares.  (Arnone Dep 26:7-13.)  Mr. Arnone is not familiar with Austin Friars and does not know how Deutsche Bank's other CSX shares will vote.  (Arnone Dep 17:8-12, 28:17-29:2.)  Mr. Arnone does not even know if there is a contract between Deutsche Bank and TCI concerning the voting of the CSX shares.  (Arnone Dep 48:10-24.)

> 241.2   Mr. Kennedy does not know if anyone at his swap desk had a relationship with TCI.  (Kennedy Dep 17:8-18.)  Mr. Kennedy never even spoke with the Citigroup salesman in England, Mr. Mike Anderson, who was in communication with TCI.  (Kennedy Dep 26:22-23.)  The witness's lack of knowledge, and the actual evidence presented, make it impossible for the Court to be bound by their conclusory and generalized assertions.

## 3.    Swaps Are Different from Futures

242.    Contrary to TCI's suggestion, its swap arrangements are not analogous to cash-settled equity futures.

243.    Single stock futures ("SSFs") and total return equity swaps on single stocks ("TRE swaps") are different contractually.  SSFs are standardized contracts anonymously traded on an exchange.  TRE swaps are privately negotiated bilateral contracts where the parties may deal with each other regularly and have knowledge about the quality of the other's credit and business practices.  (Subrahmanyam ¶ 61; Subrahmanyam Rebuttal Report ¶ 14(a).)

244.    SSFs and TRE swaps on single stocks have different maturities.  SSFs mature generally within one year, while TRE swaps may last ten years or more.  (Compare Ang and Cheng, 2005, "Single Stock Futures: Listing Selection and Trading Volume", Finance Research Letters 2, 30-40 with Ex. 242 at TCI0156333.)

245.    SSFs and TRE swaps present different credit risks to the counterparty.  The exchange guarantees the futures contract, removing most of the risk from the parties.  Parties to a TRE swap are exposed to risks associated with the creditworthiness of the opposing party.  TRE swaps are prices to incorporate this risk.  (Subrahmanyam Rebuttal ¶¶ 11, 14(b).)

246.    The margin requirements for SSFs and TRE swaps differ.  SSFs require both parties to post margin (or collateral) and the margin requirements are re-calculated each day from the market price.  The margin requirements for TRE swaps are negotiated between the counterparties and only one party posts margin.  The margin is computed based on all positions between the parties, rather than for the single contract.  (Subrahmanyam Rebuttal Report ¶ 14(c).)

247.    Different types of traders participate in SSF markets than in the TRE swap markets.  SSFs can be traded by individual investors, while TRE swaps are generally only available to institutional investors or very wealthy individuals.  (Subrahmanyam Rebuttal ¶ 14(e).)

248.    SSFs are not necessarily hedged with physical shares whereas the economics of TRE swaps dictate this approach.  SSF contracts are guaranteed by the exchange, reducing or eliminating the need for hedging.  Counterparties to TRE swaps are not in the business of risking capital on directional stock price movements and have an economic incentive to hedge their exposure to swap positions.  Physical shares are the most likely and best suited hedge.  (Subrahmanyam, ¶¶ 88-89.)  TCI's counterparties did in fact hedge TCI's swaps one-for-one with physical shares.  (Subrahmanyam ¶ 104; Subrahmanyam Rebuttal at Exs. 3.1-4.8; PX 272.)

**D.    Professor Partnoy's Analysis Is Unreliable and Disingenuous**

**1.    Partnoy Is No Expert**

249.    Professor Partnoy is unqualified to opine on the economic issues that are central to this case.  He is a law professor and does not possess the necessary academic credentials or professional experience in this specific field that would ensure his testimony is reliable and of value to the Court.

249.1   Professor Partnoy is not a trained economist and he lacks any graduate, post-graduate, or professional degree in the field.  (Partnoy Rebuttal Ex. A.)

249.2   Professor Partnoy lacks experience in the industry except for 21 months spent in a junior capacity on Wall Street 15 years ago.  He lacks the practical, real world experience in dealing with the economic impact, pressures, and relationship incentives created by derivatives (let alone the total return swaps at issue in this case).  (Partnoy Rebuttal Ex. A.)

250.   Professor Partnoy provides a lengthy list of cases in which he has offered expert testimony.  However, he neglects to identify the subjects on which he opined.  From a review of the cases, it appears that he rarely opined on derivatives and may never have opined on swaps.  (Partnoy Rebuttal Ex. A; CSX's Motion in Limine to Exclude the Expert Reports of Frank Partnoy at 14-15.)

251.   Professor Partnoy's testimony on economic matters has been stricken on at least one prior occasion.  (See S.E.C. v. Todd, No. 03-2230, 2006 WL 5201386, at *4 (S.D. Cal. Oct. 17, 2006) (granting motion to strike Partnoy's testimony).)

252.   Professor Partnoy's publications have been criticized by those with knowledge about the industry.  For example, his book F.I.A.S.C.O.: Blood in the Water on Wall Street received the following commentary from those knowledgeable in the industry (see generally CSX's Motion in Limine to Exclude the Expert Reports of Frank Partnoy at 13-14):

252.1   "After close reading, it's hard to avoid feeling that Partnoy is not being completely honest."  (Leah Nathans Spiro, "Partnoy's Complaint About Morgan Stanley", BUSINESSWEEK (Nov. 3, 1997).)

252.2   "Employing cautiously worded statements, he seems to be stretching his somewhat skimpy experience over too large a set of allegations."  (Id.)

252.3   "[T]he perspective presented in F.I.A.S.C.O. is fundamentally at odds with economic theory."  (Jonathan R. Macey, Wall Street Versus Main Street: How Ignorance, Hyperbole, and Fear Lead to Regulation",  65 U. CHI. L. REV. 1487, 1488 (1998) (reviewing F.I.A.S.C.O.: Blood in the Water on Wall Street by Frank Partnoy).)

252.4   "Clearly, Partnoy's incomplete understanding of how markets work skewed his perception of the environment in which he found himself during his brief stint on Wall Street."  (Id.)

252.5   "Partnoy's highly conjectural descriptions of Morgan Stanley's business stand in sharp contrast to actual industry behavior."  (Id. at 1503.)

64

252.6   "[T]he vast bulk of F.I.A.S.C.O. is misleading or inaccurate . . . . Partnoy displays a calculating lack of understanding of the environment in which he briefly worked."  (Id. at 1510.)

252.7   "[F]or an honest student of derivative markets, the book's sensationalism is only surpassed by its intellectual dishonesty." (Id.)

253.    Professor Partnoy's  opinions are also replete with legal conclusions that are inappropriate subjects for an "expert" on economics.  His reports are nothing more than legal briefs that address the purported extent of TCI's disclosure obligations; set out policy arguments as to why his legal interpretation of TCI's disclosure requirements must be correct; engage in contract interpretation to support his assertions regarding the extent of TCI's legal power; and make conclusive determinations as to what the Court should consider "relevant" or "material".  (CSX's Motion in Limine to Exclude the Expert Reports of Frank Partnoy at 2-11.)

253.1   Moreover, Professor Partnoy applies the wrong legal standard, which makes his reports irrelevant, unhelpful, and therefore inadmissible.

253.2   Professor Partnoy initially recognizes (correctly) that the proper inquiry is whether TCI "directly or indirectly" had the "ability significantly to influence the voting or disposition of the referenced CSX shares".  (Partnoy Rebuttal ¶¶ 5-6 (summarizing Professor Subrahmanyam's report).)  However, in the rest of his report, and in his Sur-Rebuttal Report, he focuses on the much narrower question whether TCI "had the power to direct the disposition of CSX shares referenced in the swap agreements".  (Id. ¶ 14 (emphasis added).)  He addresses whether "TCI 'directed'" its counterparties to "hedge [] swap contracts with shares", and whether "they 'had to'" take such steps "at TCI's direction".  (Id. ¶ 15; see also id. ¶¶ 17, 102, 112-13; Partnoy Sur-Rebuttal ¶¶ 14, 15, 29, 57, 59, 62, 75 n.109.)

253.3   Because his initial premise regarding the legal standard is erroneous, Professor Partnoy spends the bulk of his reports on irrelevant considerations.  His single-minded focus on the "direct" "power to direct" — rather than the "direct[] or indirect[]" "ability significantly to influence" — leads him to place undue weight on the terms of the swap arrangements between TCI and its counterparties.  In fact, he makes those contractual provisions outcome-determinative.  (Partnoy Rebuttal ¶¶ 5-6, 14.)

253.4   He opines that because the relevant contracts technically leave some discretion to the swap counterparties, TCI legally lacks power over any investment or voting decision related to matching shares of CSX.  He asserts that because the swap arrangements do not give TCI total control, identification and disclosure of the matching shares is not required as a matter of law.  (See Partnoy Rebuttal ¶¶ 45-51.)  By applying a too stringent test, Professor Partnoy disregards the practical economic realities addressed by Dr. Subrahmanyam that are relevant to the appropriate legal standard.

## 2.    Partnoy Misrepresents the Data

254.    In an apparent effort to suggest that TCI's and 3G's counterparties do not have to and do not in fact hedge their swap positions, Professor Partnoy identifies 24 instances of alleged mismatches between TCI's swaps and its counterparties' hedging, all of which are illusory.  (Partnoy Sur-Rebuttal ¶ 56, Chart 7A.)

255.    Of the 24 alleged mismatches, 11 are instances where the trade was hedged one-for-one on the next trading day as illustrated below using Professor Partnoy's own chart (boxed and highlighted in grey in chart below; Subrahmanyam Rebuttal ¶ 28.):

255.1   On November 14, 2007, Citigroup hedged its 2,750,000 swap transaction with TCI with 2,688,987 CSX shares resulting in a supposed shortfall of 61,013.  On November 15, 2007,(incorrectly listed as November 14 on Professor Partnoy's chart), Citigroup overhedged a 1,900,000 swap transaction with TCI by 61,013, eliminating the supposed discrepancy.

255.2   On November 14, 2006, UBS purchased 500,000 shares of CSX to hedge perfectly a November 13, 2006, TCI transaction for 500,000 swaps.

255.3   On January 18, 2007, UBS purchased 942,000 shares of CSX stock to hedge perfectly two swap transactions with TCI: a January 17 order for 642,000 and a January 18 order for 300,000.

255.4   On November 14, 2007, UBS sold 1,700,000 shares of CSX stock to hedge perfectly a November 13, 2007, TCI transaction for 1,700,000 swaps.

255.5   On November 15, 2007, UBS sold 2,750,000 shares of CSX stock to hedge perfectly a November 14, 2007, TCI transaction for 2,750,000 swaps.

255.6   On November 16, 2007, UBS sold 1,900,000 shares of CSX stock to hedge perfectly a November 15, 2007, TCI transaction for 1,900,000 swaps.

255.7   On December 11, 2006, Morgan Stanley purchased 100,000 shares of CSX stock to hedge perfectly a December 8, 2007,(the previous trading day), TCI transaction for 100,000 swaps.

255.8   On December 12, 2006, Morgan Stanley purchased 1,315,000 shares of CSX stock to hedge perfectly two swap transactions with TCI:  a December 11 order for 645,000 and a December 12 order for 670,000.

256.    Of the remaining 13 alleged mismatches, 7 are instances where the trade was hedged one-for-one on the same or next trading day, but Professor Partnoy omits the data from his chart (the non-boxed, non-highlighted transactions in the chart below):

256.1   On January 30, 2007, Credit Suisse purchased 850,000 shares of CSX stock to hedge perfectly an 850,000 TCI swap transaction of that same day. (PX 272 at Ex. 4.2.)

256.2   On October 24, 2006, UBS purchased 1,380,000 shares of CSX stock to hedge perfectly an October 23, 2006, TCI transaction for 1,380,000 swaps.  (PX 272 at Ex. 5; Partnoy Rebuttal ¶ 83, Chart 7.)

256.3   On November 15, 2006, UBS purchased 800,000 shares of CSX stock to hedge perfectly a November 14, 2006, TCI transaction for 800,000 swaps.  (Subrahmanyam Rebuttal at Ex. 4.7; PX 249 at UBS517-18.)

256.4   On November 10, 2007, UBS sold 300,000 shares of CSX stock to hedge perfectly a November 9, 2007, TCI transaction for 300,000 swaps. (Subrahmanyam Rebuttal at Ex. 4.7;  PX 249 at UBS517-18.)

256.5   On November 17, 2007, UBS sold 1,382,100 shares of CSX stock to hedge perfectly a November 16, 2007, TCI transaction for 1,382,100 swaps. (Subrahmanyam Rebuttal at Ex. 4.7;  PX 249 at UBS517-18.)

256.6   On December 12, 2007, UBS purchased 1,000 shares of CSX stock to hedge perfectly a December 11, 2007, TCI transaction for 1,000 swaps. (Subrahmanyam Rebuttal at Ex. 4.7.)

256.7   On November 10, 2006, Morgan Stanley purchased 1,850,100 shares of CSX stock to hedge perfectly two swap transactions with TCI: a 1,000,000 order of that day and an 850,100 order of November 9, 2006. (Subrahmanyam Rebuttal at Ex. 4.6; PX 249 at MS–CSX_000153.)

257.    The final six allegedly mismatched transactions are de minimis (boxed with no highlighting in chart below):  1,000 swaps (Credit Suisse, 12/11/07; no data produced); 800 swaps (Merrill Lynch, 12/4/06); 100 swaps (Merrill Lynch, 12/8/06); 300 swaps (Merrill Lynch, 11/12/07); 500 swaps (Merrill Lynch, 11/13/07); 1,000 swaps (Merrill Lynch, 12/11/07; no data produced).

258.    Careful examination of the table set out in Proffesor Partnoy's sur-rebuttal report, which purports to show mismatches between swaps and counterparty hedging with shares, demonstrates that TCI's counterparties did in fact hedge the swaps with physical shares.

## Chart 7A – Mismatches Between Swaps and Counterparty Hedging with Shares

| Counterparty | Date | Swap Trade | Shares Referenced | Share Trade | Shares Purchased | Share Mismatch |
|---|---|---|---|---|---|---|
| Citigroup | 11/14/07 | Long | 2,750,000 | Buy | 2,688,987 | (61,013) |
| Citigroup | 11/14/07 | Long | 1,900,000 | Buy | 1,961,013 | 61,013 |
| Credit Suisse | 1/30/07 | Long | 850,000 | None | 0 | (850,000) |
| Credit Suisse | 12/11/07 | Long | 1,000 | None | 0 | (1,000) |
| UBS | 10/23/06 | Long | 1,380,000 | None | 0 | (1,380,000) |
| UBS | 11/13/06 | Long | 500,000 | None | 0 | (1,380,000) |
| UBS | 11/14/06 | Long | 800,000 | Buy | 500,000 | 1,380,000 |
| UBS | 1/17/07 | Long | 642,000 | None | 0 | (642,000) |
| UBS | 1/18/07 | Long | 300,000 | Buy | 942,000 | 642,000 |
| UBS | 11/9/07 | Short | (300,000) | None | 0 | 300,000 |
| UBS | 11/13/07 | Short | (1,700,000) | None | 0 | 1,700,000 |
| UBS | 11/14/07 | Short | (2,750,000) | Sell | (1,700,000) | 1,050,000 |
| UBS | 11/15/07 | Short | (1,900,000) | Sell | (2,750,000) | (850,000) |
| UBS | 11/16/07 | Short | (1,382,100) | Sell | (1,900,000) | (517,900) |
| UBS | 12/11/07 | Short | 1,000 | None | 0 | (1,000) |
| Morgan Stanley | 11/9/06 | Long | 850,100 | None | 0 | (850,100) |
| Morgan Stanley | 12/8/06 | Long | 100,000 | None | 0 | (100,000) |
| Morgan Stanley | 12/11/06 | Long | 645,000 | Buy | 100,000 | (545,000) |
| Morgan Stanley | 12/12/06 | Long | 670,000 | Buy | 1,315,000 | 645,000 |
| Merrill Lynch | 12/4/06 | Long | 900,000 | Buy | 900,800 | (800) |
| Merrill Lynch | 12/8/06 | Long | 815,700 | Buy | 815,800 | (100) |
| Merrill Lynch | 11/12/07 | Short | (200,000) | Sell | (200,300) | 300 |
| Merrill Lynch | 11/13/07 | Short | (400,000) | Sell | (399,500) | 500 |
| Merrill Lynch | 12/11/07 | Long | 1,000 | None | 0 | (1,000) |

68

259.    Not only does careful review of Professor Partnoy's table show that he is wrong about hedging and thus voting and investment power, but also that his opinions cannot be relied upon.  Reminiscent of Professor Macy's criticism of Professor Partnoy's book, F.I.A.S.C.O., Professor Partnoy's analysis is misguided.  Professor Partnoy deliberately omits from his chart data that disproves his thesis.

## VI.    THE GROUP CONDUCTS A PROXY FIGHT BY HALF-TRUTHS

260.    On December 19, 2007, TCI and 3G publicly but selectively disclosed -- in a Schedule 13D and a Schedule 14A filed with the Securities and Exchange Commission -- a portion of their interest in CSX and some but not all of their plans for the company.  (JX 7; JX 8.)

261.    The Schedule 13D represented that TCI and 3G and several individuals had formed a group as of December 12, 2007, to coordinate their efforts with regard to (i) the purchase and sale of CSX securities, and (ii) the proposal of certain actions and/or transactions to CSX.  (JX 8 at 15.)

262.    The Schedule 14A revealed TCI's and 3G's long held plan to conduct a proxy solicitation seeking to elect nominees to the Board of Directors of CSX at CSX's 2008 Annual Meeting of Shareholders, including Mr. Hohn, Mr. Behring, Mr. Lamphere, Mr. O'Toole, and Mr. Wilson.  (JX 7; JX 19 at 2.)

263.    Both the Schedule 13D and Schedule 14A contain misstatements and omissions relating to (a) TCI's and 3G's beneficial ownership of the shares referenced in the swap arrangement; (b) their plans and proposals relating to CSX; (c) their contracts, arrangements, understandings or relationships; and (d) the formation of their group.  (JX 8; JX 19.)

### A.    The Group Misrepresents Its Beneficial Ownership

264.    In the Schedule 13D, TCI and 3G stated that TCI is the beneficial owner of 17,796,998 shares of CSX common stock, that 3G is the beneficial owner of 17,232,854 shares, and that Defendants' group beneficially owns, in the aggregate, 35,054,952 shares, representing approximately 8.3 percent of CSX's then-outstanding shares of common stock.  (JX 8 at 2-11.)

265.    TCI and 3G also stated in the Schedule 13D that they do not beneficially own any shares of CSX as a result of their economic exposure to CSX shares through swaps.  They further stated that their swaps "do not give [TCI or 3G] direct or indirect voting, investment or dispositive control over any securities of [CSX] and do not require the counterparties thereto to acquire, hold, vote, or dispose of any securities of [CSX]".  (JX 8 at 17.)

266.    In fact, TCI was the beneficial owner of the shares referenced in its swaps, 3G was the beneficial owner of the shares referenced in its swaps and each defendant

beneficially owned all shares of CSX common stock that were beneficially owned by all members of the group by operation of law. (See Sections V.A. and V.B. supra.)

267.    TCI, 3G, and the group beneficially owned the shares referenced in their swaps because, among other things, they had voting and investment power with respect to the shares, used their swap arrangements as part of a plan or scheme to evade the reporting requirements and agreed to act together and with their swap counterparties for purposes of acquiring, holding, voting and/or disposing of CSX shares. (See Sections V.A. and V.B. supra and other Sections generally.)

### B.    The Group Misrepresents Its Plans and Proposals

268.    TCI and 3G stated that they "acquired [their CSX] Shares for investment in the ordinary course of business". (JX 8 at 14.)

269.    In fact, TCI and 3G acquired their stock and swap interests in CSX to change or influence control of CSX.

269.1    They formulated a plan to effect an LBO involving CSX or, failing that, an extraordinary leveraged share repurchase. (PX 20; PX 37 at 2; Baggs ¶¶ 7-9, 11-12, 18; Munoz ¶¶ 12, 18; Ward ¶ 15; Fitzsimmons ¶ 12.) The leveraged share repurchase would have resulted in a downgrade of CSX's debt rating to "junk" status. (PX 264 ¶ 15; PX 80 at CSX_00021830-836.)

269.2    They developed proposals for other major changes in CSX's business and structure, including demands that CSX increase the prices it charges to customers and limit capital expenditures associated with increased capacity. (PX 109; Munoz ¶ 16; Baggs 268 ¶ 18.)

269.3    They attempted to dictate CSX's management of its regulatory affairs. (PX 121; Baggs ¶ 24.)

269.4    They told CSX's advisors that there were "no limits" and that TCI would "go to war" and "seek to replace the entire board". (PX 109; Ward ¶ 19; Munoz ¶ 29; Fitzsimmons ¶ 12.)

269.4.1    In fact, TCI and 3G are currently waging a proxy war to elect five of their nominees to the CSX board. (JX 19 at 2.)

269.4.2    Rather than wait for the annual election, TCI and 3G attempted to force CSX to call a special shareholders' meeting to consider TCI and 3G's nominees. (PX 176; DX 79.)

269.5    They sought to replace the management of CSX. (Tr. 12:9-10, 199:22-25.)

269.6    They developed an operating plan titled "Project Improve", which is the subject of a motion from Defendants to have it designated as "Attorneys'

Eyes Only". The plan calls for a "significant reduction in workforce". (PX 142 at 4.)

270. Defendants failed to disclose their plans and proposals to make major changes in CSX's business and corporate structure. (JX 8; JX 19.)

### C. The Group Misrepresents Its Agreements, Arrangements, and Relationships

271. Defendants stated that they had "no contracts, arrangements, understandings or relationships (legal or otherwise) . . . with respect to any securities" of CSX except as described elsewhere in the Schedule 13D. (JX 8 at 17.)

272. In fact, both TCI and 3G were parties to swap arrangements pursuant to which they had both voting and investment power. (JX 8 at 17.)

273. Neither TCI nor 3G discloses the terms of their equity swap arrangements, including their termination provisions, the original basis price of the referenced shares, the number of CSX shares referenced in each individual swap, as well as the aggregate number of CSX shares referenced in Defendants' overall swap position. (JX 8; JX 19.)

273.1 In fact, TCI attempted further to obfuscate its holdings by keeping token swap positions with six of its eight counterparties in an attempt to hide its plans and influence from the market. (Tr. 204:15-205:1.)

274. Neither TCI nor 3G discloses the source of funds they used to acquire beneficial ownership of the CSX shares underlying the swaps nor did they disclose the transaction history relating to those shares. (PX 8; PX 19.)

275. Nor did 3G disclose the terms of its credit default swap arrangements that they had regarding CSX, which would have informed shareholders that Defendants took a position that effectively was a bet against the company's value as a way to hedge their own position against or to profit from or hedge against any decrease in CSX's credit ratings and/or stock price. (JX 8; JX 19.)

276. None of TCI's or 3G's equity or credit default swap documentation -- the master agreements, including schedules and exhibits, and swap confirmations -- was attached to their Schedule 13D filings. (JX 8.)

277. Neither TCI nor 3G disclosed the particulars of the agreements they had with their nominees for the CSX board. (PX 8; PX 19.)

### D. The Group Misrepresents Its Group Formation/Ownership

278. TCI and 3G represented that they formed a group to coordinate their activities with respect to CSX as of December 12, 2007. (JX 8 at 15.)

279.    The Schedule 13D also states that TCI "expressly disclaims beneficial ownership of the Shares beneficially owned by [3G] and the Additional Nominees" while 3G "expressly disclaims beneficial ownership of the Shares beneficially owned by [TCI] and the Additional Nominees".  (JX 8 at 15.)

280.    In truth, TCI and 3G agreed to act together as a group much earlier than their formal agreement of December 12, 2007, as described in detail above.  By way of example only:

280.1   TCI and 3G had discussion in Feburary 2007, after which 3G bought enormous quantities of CSX shares.  (PFF ¶ 54.)

280.2   On March 29, 2007, TCI and 3G met in 3G's New York offices to discuss "the fundamental case for CSX".  (Amin Dep. 141:17-142:16; Hohn Dep. 111:4-22; see also PX 66.)  In the period from March 29, 2007,to April 17, 2007, 3G increased its holdings in CSX by 11,145,801 shares (for a total of 19,407,894 shares or 4.44% of the then-outstanding shares).  During this period, TCI also began to convert its swaps to physical shares.  (PFF ¶ 78, 80.)

280.3   TCI and 3G exchanged financial models and operations analyses of CSX throughout 2007.  (PFF ¶ 104.)

## VII.    THE REAL "PARADE OF HORRIBLES" CONCERNS DEFENDANTS' CONDUCT

281.    Through Professor Partnoy, TCI  imagines a parade of horribles that would result if hedge funds seeking control of public companies are required to disclose their positions, but they are just that -- imagined.

282.    Professor Partnoy estimates the notional value of the U.S. equity swap market to be one trillion dollars and repeatedly references that figure.  (Partnoy Report ¶¶ 9, 17, 27, 31, 45, 106, 110.)  To arrive at this estimate, Professor Partnoy takes the notional value of the U.S. equity forwards and swaps market as of June 2007 to be $924 billion, attributes 100% of that value to swaps, and applies a 39% annual growth rate. (Partnoy  26-27.)

283.    The $924 billion notional valuation used by Professor Partnoy overestimates the size of the total U.S. equity swap market.  It includes equity index swaps (Bank of International Settlements, November 2007, pp. 4 and 9 available at www.bis.org/publ/rpfxf07t.pdf) and forwards (Subrahmanyam Rebuttal Report, footnote 13, p. 9).

284.    The use of notional value also overstates the size of the market.  A more appropriate measure is the market value, which is $76 billion, not $924 billion. (Subrahmanyam Rebuttal Report, footnote 13, p. 9.)

285.    In any case, the size of the market is not the relevant measure of impact. The relevant inquiries are (1) how often persons acquire 5% of the value of the company

and (2) the harm that would result from allowing those persons to hide positions of that magnitude.

286.    To the first point, there is no evidence in the record that individuals acquiring over 5% interests in companies through the use of swaps is anything but infrequent in a market of only $76 billion.  By way of comparison, 5% of the value of ExxonMobil Corp. alone is $24 billion.  (See wsj.com (giving XOM market value of $479,231.10 million as of 5/26/08).)

287.    To the second point, the real harm would be to allow funds controlling large pools of capital to evade the reporting requirements set forth by the SEC.

287.1   As of the time of this filing, the SEC has not taken a formal position with regard to its requirements as applied to Defendants and those similarly situated.

287.2   CSX, through counsel, submitted materials to the SEC some time ago, but have not yet heard back.  CSX did not ask the SEC to intervene at trial as amicus because of a belief as to SEC policy not to intervene at the trial court level.  (Tr. 70:7-12, 70:20-22.)

287.3   By letter of May 22, 2008, the Court solicited the views of the SEC on two issues:

287.3.1   "Did the defendants have beneficial ownership, within the meaning of Regulation 13D, of the CSX shares held by their cash settled total return equity swap counterparties?"

287.3.2   "What mental state is required to establish the existence of a plan or scheme within the meaning of Rule 13d-3(b)?"

288.    The SEC reporting requirements under 13D are set forth to ensure transparency in the markets.  Defendants conduct has been anything but transparent.  As demonstrated above:

288.1   Defendants have used swaps to hide their ownership of CSX stock.  (Subrahmanyam ¶ 74; JX 8 at 17; Subrahmanyam ¶ 75; Subrahmanyam Exs. D, D.1-D.7.; Subrahmanyam ¶ 76.)

288.2   Defendants have further hid the bulk of their CSX stock holdings in two of the eight counterparties in an attempt further to disguise from the market exactly where Defendants' interests lay.  (Tr. 178:24-179:1, 204:15-205:1.)

288.3   Defendants sought to hide their intentions to take control of CSX, removing management, and seat their own directors on the board.  (Tr. 12:9-10, 199:22-25; PX 109; PX 264 ¶ 19; PX 267 ¶ 29; PX 269 ¶ 12.)

288.4   None of this conduct was disclosed to the market, except to friendly hedge funds such as Atticus, Deccan Value, Seneca, Och-Ziff, Fir Tree, and Lone Pine.  (PFF ¶ 66-73.)

289.    Defendants ignore the harm caused by the opacity of their conduct, particularly given the size of their stake in CSX, and have instead chosen to fight a proxy contest in the courtroom.  Defendants have attacked CSX and its management on grounds that have nothing to do with the ultimate issue of whether Defendants should have disclosed their conduct to the market.  For example, Defendants brought up the use of a CSX-owned hotel by CSX senior management, an inquiry undoubtedly meant for use in Defendants' proxy fight as it had no relevance to either side's suit.

290.    Defendants' failure to report their substantial holdings of stock and their plan to evade the requirements has now forced the Court to intervene in a shareholder voting process.

291.    The horribles that defendants contemplate are illusory, whereas the harms illustrated by CSX -- malfeasance, lack of transparency in the public markets, and manipulation of corporate elections -- are pronounced.

292.    As further discussed below, the most appropriate post hoc remedy that would prevent the Defendants from profiting from their plan of concealment is an injunction preventing Defendants and others who participated in their scheme from voting their shares at the shareholders' meeting.

293.    Defendants' claims of a parade of horribles are particularly misguided in view of the fact that they could have at least disclosed their swaps in a 13D filing at the outset of their buying spree and disclaimed beneficial ownership.  That would not have changed the fact that Defendants were beneficial owners of the shares referenced in their swaps for reasons other than evasion.  But it would have at least protected the unsuspecting public from the effects of Defendants' selective tipping in pursuit of control and influence on CSX.  Had Defendants done so, their, swap counterparties would have been in a position to insist upon an undertaking requiring appropriate disclosures by TCI and 3G.

294.    After repeated questioning by the Court, Mr. Hohn claimed he was not aware that TCI could file a 13-D disclosing an economic position exceeding five percent while disclaiming beneficial ownership on any shares.  (Tr. 187:22-188:15.)  The Court asked Mr. Hohn the following questions, and he gave the following answers.

Q.  Did you at some point learn that it was possible to make a filing under Regulation 13-D with respect to securities as to which you disclaimed beneficial ownership?

A.  We were aware that if you held more than 5 percent of a  company in physical shares, and then I think it was either 5 or 10, then derivative positions where you had economic interests but no voting benefit had to also be disclosed.

Q:  I will ask the reporter to read the question back.  Please listen and answer.

(Question read)

A.  I think we learned early on that you were required to make a finding under 13-D for securities in which you disclaimed beneficial ownership if you had a certain minimum amount of physical shares, and I don't remember whether that was 5 percent or 10 percent. I hope I am answering your question.

Q.  Not quite.  Let's try once more.

(Question read)

Q.  Let me make it more precise.  Under Regulation 13-D even if you owned no physical shares, you could have made a 13-D filing in which you disclosed that you had an economic position exceeding 5 percent and in that filing disclaimed beneficial ownership on any shares, true?

A.  I wasn't aware of that.  (Tr. 187:22-188:15.)

**Proposed Conclusions of Law**

I.    **TCI AND 3G VIOLATED SECTION 13**

    A.    **Proposed Conclusions**

        1.  TCI violated Section 13(d) by failing timely to file a Schedule 13D concerning shares of CSX's common stock referenced in their swap arrangements.  (See PFF ¶¶ 28, 45, 173.)

        a.  TCI entered into and used its swap arrangements as part of a plan or scheme to evade the reporting requirements of Section 13(d), and thus is deemed the beneficial owner of the shares referenced in its swaps.  (See PFF ¶¶  24, 39, 44-45, 259-66.)

        b.  TCI is the beneficial owner of the shares referenced in its swaps because it has or shares voting and investment power with respect to those shares.  (See PFF ¶¶ 196-98, 219, 222-24, 265-66, 271.)

        c.  TCI is the beneficial owner of the shares referenced in its swaps because it has the right to acquire voting and investment power with respect to those shares (within 60 days and beyond) and it entered into and used its swap arrangements with the purpose and effect of changing or influencing control of CSX.  (See PFF ¶¶ 26-27, 30-38.)

        2.  Defendants violated Section 13(d) by failing timely to file a Schedule 13D concerning shares of CSX's common stock beneficially owned by them as a group.  (See PFF ¶¶ 263-66.)

        3.  Defendants violated Section 13(d) by making false and misleading statements in the Schedule 13D filed on December 19, 2007.  (See PFF ¶¶ 260-62.)

        a.  Defendants made material misstatements and omissions regarding their beneficial ownership of CSX shares.  (See PFF ¶¶ 263-66.)

        b.  Defendants made material misstatements and omissions regarding group formation.  (See PFF ¶¶ 52-60, 79, 84-90, 101-05, 109-10, 277-79.)

        c.  Defendants made material misstatements and omissions regarding their arrangements and agreements with others.  (See PFF ¶¶ 61-74, 270-76.)

        d.  Defendants made material misstatements and omissions regarding their plans and proposals concerning CSX.  (See PFF ¶¶ 106-08, 111-137, 267-69.)

    B.    **Discussion**

The Supreme Court has repeatedly noted that the "fundamental purpose" of the '34 Act was to implement a "philosophy of full disclosure".  Basic, Inc. v. Levinson, 485

U.S. 224, 230 (1988) (citations omitted).  In keeping with that purpose, Section 13(d) of the Act "requires any person acquiring beneficial ownership of five percent or more of a corporation's common stock to disclose within ten days of the acquisition certain information to the corporation, the Commission, and the exchanges on which the stock is traded".  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 123 (2d Cir. 2001); see also 15 U.S.C. § 78m(d)(1) (1994).  That information is filed on Schedule 13D.  17 C.F.R. § 240.13d-1(a) (2008).  The purpose of Section 13(d) is to alert the market to large acquisitions that "might represent a potential shift in corporate control".  GAF Corp. v. Milstein, 453 F.2d 709, 717 (2d Cir. 1971).  Schedule 13D disclosures "allow[] investors to be informed of potential changes in corporate control and permit[] the market to value the shares accordingly".  Gen. Aircraft Corp. v. Lampert, 556 F.2d 90, 94 (1st Cir. 1977).

A Schedule 13D filing must be truthful and accurate.  United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991); Dan River, Inc. v. Unitex Ltd., 624 F.2d 1216, 1222 n.5 (4th Cir. 1980).  A materially false or misleading filing will violate Section 13(d), as will the failure to make a timely filing.  See Gen. Aircraft Corp., 556 F.2d at 96; GAF Corp., 453 F.2d at 720-21; SEC v. Gen. Refractories Co., 400 F. Supp. 1248, 1258 (D.D.C. 1975).  In the proxy-solicitation context, the Supreme Court has held that "a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote" and "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).  The courts have since applied this standard to Section 13(d).  Bilzerian, 926 F.2d at 1298; see also Flamm v. Eberstadt, 814 F.2d 1169, 1174 (7th Cir. 1987) ("like every other court of appeals we have taken the definition in TSC as suitable for the term wherever it appears in securities law.").  Defendants have violated Section 13(d) for three independent reasons: (1) TCI failed to disclose the CSX stock it beneficially owned through swaps; (2) Defendants failed to disclose their ownership interests as a group; and (3) the Schedule 13D that Defendants belatedly filed is materially false, misleading and incomplete.[2]

---

[2]  Defendants rely upon an SEC release as support for the proposition that they are not required to disclose swap agreements under Section 13(d).  See Rebuttal Expert Report of Frank Partnoy at 9 n. 20.  As Defendants concede, however, the guidance in that SEC release applies to cash-settled equity futures, not to cash-settled swaps.  As explained by Professor Subrahmanyam, there are important differences between cash-settled equity swaps and futures.  Moreover, the SEC release appears to relate only to Section 13(d)(3)(d) (referring to the right to acquire investment or voting power), whereas Defendants' swap arrangements make them beneficial owners of the shares referenced in their swaps under both Sections 13(d)(3)(a) and (b).

1.     **TCI failed to file Schedule 13D to disclose stock beneficially owned through swaps.**

As of December 6, 2006, TCI had swap agreements with six counterparty banks that together acquired CSX shares referencing 5.2 percent of CSX outstanding common stock.  (PFF ¶ 45.1.)  By March 30, 2007, TCI had swaps referencing more than 14 percent of CSX shares.  (PFF ¶ 45.4.)  TCI claims that it was not required to disclose its swaps in CSX at that time because it was not the beneficial owner of the stock referenced by the swaps.  (PFF ¶¶ 234-47, 264.)  TCI is wrong.

A person is the beneficial owner of a security under Section 13(d) if he: (a) has or shares voting or investment power in the security at issue (17 C.F.R. § 240.13d-3(a)); (b) has the right to acquire beneficial ownership of the security within sixty days or acquired the right to acquire beneficial ownership of the security with the purpose of changing or influencing control of the issuer of the security (17 C.F.R. § 240.13d-3(d)(1)(i)); or (c) uses an agreement or device to prevent an ownership interest from attaching in order to evade Section 13(d)'s reporting requirements (17 C.F.R. § 240.13d-3(b)).

TCI is the beneficial owner of the stock referenced in its swaps under each of these provisions: (a) TCI entered into its swap arrangements as part of a plan or scheme to evade the reporting requirements of Section 13(d); (b) TCI is the beneficial owner of the shares referenced in its swaps because it has or shares voting and investment power with respect to those shares directly, or indirectly, through contracts, arrangements, understandings and otherwise; and (c) TCI is the beneficial owner of the shares referenced in its swaps because it has the right to acquire voting and investment power with respect to those shares (within 60 days and beyond) and it entered into its swap arrangements with the purpose and effect of changing or influencing control of CSX.[3]

---

[3] Defendants suggest their swap activities are immune from disclosure under Section 3A(b) of the Exchange Act, which provides that "[t]he definition of 'security' in Section 3(a)(10) of [the Exchange Act] does not include any security-based swap agreement …" That is false.  The exemption of security-based swap agreements from the definition of "security" under Section 3A of the Exchange Act has no bearing on Defendants' reporting obligations under Section 13(d) of the Exchange Act.  That a certain arrangement or device, such as a security-based swap agreement, does not itself constitute a "security" for purposes of the Exchange Act does not mean that swap arrangements cannot give rise to beneficial ownership (as such term is defined in Rule 13d-3 under the Exchange Act) of an instrument, such as the common stock of CSX, that is a "security" for purposes of the Exchange Act.

(a)    **TCI entered into the swap arrangements to evade the reporting requirements of Secti`on 13(d).**

TCI intentionally used its swap arrangements as a means of hiding its substantial ownership of CSX common stock from CSX shareholders in direct contravention of Section 13(d). Rule 13d-3(b), promulgated under Section 13, provides that, even if a person does not in fact beneficially own a security, beneficial ownership will nevertheless attach if the person "directly or indirectly, create[d] or use[d] a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose or effect of divesting such beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements". 17 C.F.R. § 240.13d-3(b). TCI beneficially owned the stock referenced in the swap arrangements because it used its swap arrangements as part of a plan or scheme to evade Section 13(d)'s reporting requirements.

The determination of whether actions constitute a "plan or scheme to evade" some part of the securities laws turns on the facts and circumstances of each case. See Sorrento, Inc., SEC No-Action Letter, Wash Serv. Bureau File No. 050784005, Fiche No. 768C11 (May 4, 1984) (in response to a no-action letter request regarding Regulation D, the SEC stated, "[w]hether a transaction is part of a plan or scheme to evade the registration provisions will depend on the facts and circumstances of each particular case"). While the phrase "plan or scheme to evade" is used elsewhere in the securities laws, those other applications shed little light on the meaning of the phrase in this case.[4]

Scienter is not an element of a Section 13(d) violation. SEC v. Savoy Indus., 587 F.2d 1149, 1167 (D.C. Cir. 1978); SEC v. Wills, 472 F. Supp 1250, 1268 (D.D.C. 1978) (requiring only negligent failure to comply with disclosure obligations to find liability under Section 13(d)). The language and legislative history of Section 13(d) indicate clearly that it is a reporting, not an antifraud, statute. Id. (citing H.R. Rep. No. 90-1711, at 2819-20 (1968), reprinted in 1968 U.S.C.C.A.N. 2811, 2818). To the extent that Rule

---

[4] For example, the determination of whether there is a "plan or scheme" to evade in certain other securities contexts, such as Regulation S, relates to the availability of certain safe harbor protections from registration for offers and sales of securities outside the United States. Preliminary Note 2 to the Regulation denies this exemption to plans or schemes to evade the registration requirement. 17 C.F.R., ch. II, pt. 230, Reg. S, Refs & Annos, Preliminary Note 2 (1998). Courts have found that the Regulation S safe harbor is not available where transactions are in technical compliance with the law, but are designed to evade registration requirements. See e.g., Geiger v. SEC, 363 F.3d 481, 488 (D.C. Cir. 2004) (finding that the sale of shares was designed to evade the registration requirement since purchaser bought shares at a substantial discount and was anxious to facilitate quick resale so he resorted to fraud); SEC v. Cavanagh, No. 98 Civ. 1818DLC, 2004 WL 1594818, at *24 (S.D.N.Y. July 16, 2004), aff'd 445 F. 3d 105 (2d Cir. 2006) (finding no evidence that purchaser "bought with the intention of holding its shares offshore and for investment purposes").

13d-3(b) has a state of mind requirement, it demands no more than intent to avoid the reporting requirements of Section 13(d).  See Adoption of Beneficial Ownership Disclosure Requirements, Exchange Act Release No. 13291, Example 8, 42 Fed. Reg. 12347 (Feb. 24, 1977) (hypothetical provided by the SEC showing that if any state of mind is required to cause the vesting of beneficial ownership under Rule 13d-3(b), it would be that the person or entity evaded the reporting requirements intentionally).

A person can be deemed by Rule 13d-3(b) to be a beneficial owner even if avoidance of disclosure is not that person's sole motive for entering into an arrangement meant, at least in part, to evade disclosure under Section 13(d).  Defendants have not cited, and we are not aware of, a single case or directive from the SEC suggesting that in order to find a violation of Section 13(d) by operation of Rule 13d-3(b), a person must be solely motivated by a desire to avoid the reporting requirements.  There will almost always be more than a single motive for an arrangement that prevents the vesting of beneficial ownership.  If Rule 13d-3(b) were triggered only where a person's sole motive is evasion, it would be useless as a device to protect against circumvention of the disclosure requirements.  That result would be contrary to the transparency principle of Section 13(d) in cases, like this one, where the evader is seeking influence and control of a public company.

The record demonstrates that TCI used its swap arrangements as part of a plan to avoid the reporting requirements of Section 13(d), as more fully demonstrated above. TCI acquired its interest in CSX as swaps as opposed to physical shares for the purpose of avoiding having to disclose that interest.  Joe O'Flynn, the CFO of TCI Fund, admitted as much at a TCI Fund board of directors meeting, where he said that one of the reasons for using swaps is "the ability to purchase without disclosure to the market or the company".  (PFF ¶ 22.)  TCI emails discuss the need to make certain that counterparties stay below five percent physical share ownership.  (PFF ¶ 24.)  One of the reasons why TCI held less than five percent of physical shares was to avoid disclosure.  (PFF ¶ 21.) Mr. Hohn admits that one of his motivations in avoiding disclosure was to avoid paying a higher price for the shares of CSX.  (PFF ¶ 62.)  Indeed, TCI took a number of steps calculated to conceal its investment from the market.  (PFF ¶ 20-29.)  TCI acquired only approximately 4.5 percent in physical CSX shares to remain safely below the 5 percent reporting requirement.  (See PFF ¶ 28-29.)  TCI only accumulated interests in CSX above the five percent threshold via swap arrangements.  (See PFF ¶ 28-29.)

At the same time, TCI also undertook to conceal the identity and holdings of its swap counterparties so that its interest in CSX would not be revealed by the counterparty banks.  TCI assumed that the counterparties to its swap agreements would hedge their exposure with physical shares, and as a result, TCI was "concerned" that some of the counterparties could cross the five percent threshold, which would trigger a filing requirement for the bank and thereby alert the market to TCI's investment in CSX.  (PFF ¶ 24.)  TCI therefore inquired "on a no names basis" to the counterparties as to each of their respective filing requirements with respect to percentage holdings in CSX outstanding shares.  (PFF ¶ 24.)  TCI planned to and did in fact maintain a diversified CSX swap position among eight counterparties to avoid any one bank crossing the five percent threshold as a result of TCI's swap position.  (PFF ¶¶ 23-24, 30, 39.)  During this

same period, TCI selectively tipped its friends about its position in, and plans for, CSX, so that they could benefit from, among other things, increases in CSX stock price.  (PFF ¶¶ 62-74.)

Even after TCI consolidated its swap position with Deutsche Bank and Citigroup, it maintained <u>de minimis</u> swap positions with six other counterparty banks.  (PFF ¶¶ 30, 99-100.)  TCI admitted that it maintained those swaps in order to conceal the identity of its primary swap counterparties and obscure any link between TCI and a counterparty that could be used to discern TCI's trading activity.  (PFF ¶¶ 99-100.)  In doing so, TCI subverted the transparency provided by Section 13(d) that alerts shareholders to the trading activity of Schedule 13D filers.  Beneficial owners of more than five percent must file an amendment to the Schedule 13D whenever a material change occurs in the facts set forth in a Schedule 13D filing.  15 U.S.C. § 78m(d)(2).

TCI's use of swaps to build a significant position in CSX without having to disclose that position is a "plan or scheme to evade".  It is precisely the type of conduct that Section 13(d) and Rule 13d-3(b) were meant to address.  The purpose of Section 13(d) "is to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control".  <u>GAF Corp.</u>, 453 F.2d at 717.  "In particular, section 13(d) was intended to alert investors to potential changes in corporate control so that they could properly evaluate the company in which they had invested or were investing."  <u>Id.</u> at 720; <u>see also</u> S. REP. NO. 91-1125, at 3 (1970)  The "overall goal" of Section 13(d) is "transparency in the securities markets".  (Trial Tr. 225:10-11.)  Rule 13d-3(b) is directed at attempts -- like TCI's conduct in this case -- to subvert that transparency.[5]

_____

[5] Defendants' violations of the securities laws go beyond Sections 13(d) and 14(a) of the Exchange Act and extend to violations of Section 16(a) of the Exchange Act as well.  Section 16 of the Exchange Act was enacted by Congress to protect the investing public from market abuse by company insiders, including large stockholders (with 10% beneficial ownership of a class of voting securities of a company) who may have the ability to influence or control a company to enable them to acquire material, non-public information.  <u>See</u> e.g., S. REP. NO. 73-1455, at 55 (1934).  Once Defendants became the beneficial owners of more than 10% of the outstanding shares of CSX or a member of a group with more than 10% beneficial ownership, they became obligated to file ownership and transaction reports on Forms 3, 4 and 5 with the SEC relating to their holdings of CSX common stock and derivative securities, including their total return swap arrangements.  <u>See</u> 17 C.F.R. §§ 240.16a-2, .16a-3.  Whether Defendants are subject to any short-swing profit disgorgement liability under Section 16(b) of the Exchange Act is not a question this Court has been asked to decide.  Until Defendants correct their lack of public disclosure with respect to the terms of their numerous total return swap transactions made since Section 16(a) reporting was triggered (many of which appear to fall within six months of each other), neither the Company nor any of its shareholders has sufficient information to determine whether to bring such a claim with respect to these transactions.

**(b)      The swap arrangements give TCI both voting and investment power in CSX's stock.**

TCI beneficially owns the CSX common stock referenced in its swaps because it "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:  (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security."  17 C.F.R. § 240.13d-3(a).

**(i)      Defendants have investment power**

A person has "investment power" over a security where he has the ability significantly to influence the disposition of the security.  <u>SEC v. Drexel Burnham Lambert Inc.</u>, 837 F. Supp. 587, 607 (S.D.N.Y. 1993); <u>see also</u> <u>Calvary Holdings, Inc. v. Chandler</u>, 948 F.2d 59, 63 (1st Cir. 1991).

TCI's swap arrangements gave it investment power over the referenced CSX shares because, among other things:  (a) TCI counterparties holding large CSX swap positions had to, as a practical matter, hedge their exposure to CSX swaps with matching CSX shares (PFF ¶ 201); (b) TCI counterparties hedged CSX swaps with matching shares (PFF ¶ 202); and (c) upon termination of large swap positions, the counterparties had no practical choice but to sell the matching shares, which is what the counterparties did here (PFF ¶ 203).  Defendants feigned uncertainty about the hedging practices of their counterparties but ultimately admitted that the counterparties hedge and that Defendants rely on that assumption.  (PFF ¶ 221)

As a practical matter, no counterparty bank to any large position of swaps in CSX shares (like those involved in this case) would hedge any other way than by purchasing matching physical shares of CSX stock.  (PFF ¶ 201.)  When TCI purchased swaps, its counterparties purchased a nearly identical number of CSX shares.  (PFF ¶ 202.)  When TCI sold or unwound the swaps, its counterparties sold a nearly identical number of CSX shares.  (PFF ¶ 203.)

While Defendants may not have a contractual right to force their counterparties to hedge with physical shares or to unwind their hedged positions, the economic reality is that TCI has the ability effectively to determine not only the disposition of shares by the counterparties, but also the specific quantity and timing of that disposition.  TCI therefore exercises significant influence over the acquisition, holding and disposition of the CSX shares held by the counterparty banks.  (PFF ¶219.)

Putting aside the power associated with the swap arrangements, TCI's and 3G's relationships with the bank counterparties also gives them the ability to influence significantly the disposition of CSX shares.  This is evident, for example, in the changes in the ownership composition of CSX stock discovered by Innisfree in February 2008.  (PFF ¶ 40.)

### (ii)    Defendants Have Voting Power

TCI's swap arrangements also gave TCI voting power over the CSX stock referenced in the swaps. Voting power under Section 13(d) does not require the actual ability to vote the physical stock at issue, but only that a person have the ability significantly to influence the voting of the shares. <u>Wellman v. Dickinson</u>, 682 F.2d 355, 366-67 (2d Cir. 1982). TCI has that power.

When TCI's counterparties acquired CSX shares of common stock as a hedge for the CSX swaps, they, by definition, acquired the actual right to vote the shares, which travels with the physical share itself. (PFF ¶ 222.) Thus, by entering into the swaps TCI had the ability to determine the identity of the vote holder, effectively placing shares and their corresponding voting rights in the hands of the counterparties, as opposed to the hands of whoever else would have otherwise held the shares. This is important as certain types of shareholders vote certain predictable ways in contests for corporate control. (PFF ¶ 224.1.)

TCI also has the ability significantly to influence the voting of the matching shares during the term of a CSX swap based on understandings and relationships with counterparty banks that extend beyond the execution of the swap in question. For example, four of the counterparties here are prime brokers to TCI. (PFF ¶ 228.) In 2007 alone, those banks have enjoyed over $42.25 million in net revenues from business with TCI. (PFF ¶ 230.) Given that lucrative relationship, the counterparty banks have an economic incentive to cooperate with TCI. (PFF ¶ 232.) Indeed, the evidence is that at least Deutsche Bank assisted TCI in executing its plans for CSX. Deutsche Bank's leveraged finance group provided TCI with financial advice concerning CSX throughout March 2007 and did not charge TCI for those services. (PFF ¶ 34.)

TCI exercised this influence by, for example, placing most of its swaps—specifically, swaps referencing more than 28.4 million shares of CSX common stock—with Deutsche Bank because TCI expected that Deutsche Bank would be more likely than other counterparty banks to vote with TCI in a proxy battle. (PFF ¶ 32.) TCI admitted that it believed it could convince Deutsche Bank's proprietary hedge fund subsidiary, Austin Friars, of its case against CSX and thereby influence Deutsche Bank to vote with TCI. (PFF ¶¶ 36-37.)

### (c)    The swap arrangements gave TCI the right to acquire beneficial ownership of CSX's stock.

Even if a person does not have or share voting or investment power under 13d-3(a), it is considered a beneficial owner if the person: (1) "has the right to acquire beneficial ownership of such security . . . within sixty days", 17 C.F.R. § 240.13d-3(d)(1)(i); or (2) acquires a security or right to acquire beneficial ownership of a security "with the purpose or effect of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having such purpose or effect, [who] immediately upon such acquisition shall be deemed to be the beneficial owner of the securities which may be acquired through the exercise or conversion of such security

or power." Id.  TCI beneficially owns the shares referenced by its swaps under both subsections.

By its own admission, TCI has always had the right to acquire beneficial ownership of the CSX stock referenced in its swaps not only within sixty days, but also "at any time".  (PFF ¶ 130.)  From the time that it first approached CSX in late 2006 and early 2007, TCI held itself out to CSX as a major shareholder with significant swap arrangements that it could "convert at any time" to direct ownership stakes.  (PFF ¶ 130.)  TCI reiterated its ability to convert its swaps throughout the spring and summer of 2007, telling CSX that it "would be taking voting positions" and that there would be "no limits" to what TCI would do if CSX did not accede to its demands.  (PFF ¶ 130.)  By April 2007, TCI began to act on its threats, informing CSX's financial advisor Evercore that not only did it have plans to convert its indirect holdings to direct holdings, but also that it was doing so currently.  (PFF ¶ 133.)  Thus, TCI could acquire beneficial ownership of the shares referenced in its swaps not just within sixty days, but also at any time, and in fact did convert the swaps to direct holdings in its efforts to acquire additional direct voting power over CSX.  (PFF ¶ 133.)

Even if TCI could not convert its swap arrangements to direct ownership of CSX's common stock within sixty days, TCI is still the beneficial owner of the stock referenced in the swaps because it could do so beyond 60 days and it entered into the swap arrangements "with the purpose or effect of changing or influencing the control of the issuer [CSX]".  17 C.F.R. § 240.13d-3(d)(1)(i).  As early as December 2006, for example, TCI insisted that CSX pursue a leveraged buyout ("LBO") or, failing that, an extraordinary leveraged share repurchase.  (PFF ¶¶ 115, 268.)  TCI pressed those plans with CSX through the spring and summer of 2007.  (PFF ¶¶ 121-37.)  Indeed, speaking at a Bear Stearns conference in May 2007, Defendant Amin told investors that he had contacted private equity firms to line up bids for an LBO of CSX and that he already had a 100-page indicative financing proposal from a bank that could underwrite the LBO debt.  (PFF ¶ 9.)

Further, Defendants aimed to influence CSX's strategy and urged other major changes in CSX's business and structure, including demands that CSX increase the prices it charges to customers (PFF ¶¶ 144, 145, 268.2), demands to limit capital expenditures associated with increased capacity (PFF ¶¶ 145, 268.2) and attempts to dictate CSX's management of its regulatory affairs (PFF ¶ 268.3).  TCI told CSX representatives that, in addition to other demands, TCI "would seek to replace the entire Board as a means to change management" and that TCI's objective was "to find management that would be more open to leveraging [CSX]".  (PFF ¶ 151.1.)  Indeed, Defendant Christopher Hohn himself stated that the reason why TCI made an HSR filing in March 2007 was to try to influence management in how it runs CSX.  (PFF ¶ 124.)

## 2.    Defendants failed to disclose their ownership interests as a group.

Defendants also failed to file a Schedule 13D within 10 days after they became beneficial owners of more than 5 percent of the outstanding shares of CSX common stock

as a group when the TCI/3G group first exceeded the five percent threshold on April 10, 2007 and entered into arrangements with counterparty banks like Deutsche Bank.

Two or more entities will be considered a "group" under Section 13(d) if they "agree to act together for the purpose of acquiring, holding, voting or disposing of" the equity securities of a corporation. See 17 C.F.R. § 240.13d-5(b)(1) (2000); see also Roth v. Jennings, 489 F.3d 499, 507-08 (2d Cir. 2007); Morales, 249 F.3d at 123-24. The entities need not have combined for all of the purposes of "acquiring," "holding", "voting" or "disposing of" the securities because the list is disjunctive. Roth, 489 F.3d at 508. Instead, the query is whether the entities "combined in furtherance of a common objective with regard to one of those activities". Id. (quotation and citation omitted). The formation of a group "may be formal or informal and may be proved by direct or circumstantial evidence". Morales, 249 F.3d at 124; see also Roth, 489 F.3d at 508. Where, as here, concealment is at issue, "plaintiff's proof necessarily has to be circumstantial". Champion Parts Rebuilders, Inc. v. Cormier Corp., 661 F. Supp. 825, 850 (N.D. Ill. 1987). In short, the issue is whether sufficient evidence supports an inference that such an agreement or understanding exists. Morales, 249 F.3d at 124.

Defendants would have the Court believe that their group appeared suddenly, *deus ex machina*, on December 12, 2007, fully formed with a written agreement between TCI and 3G, a slate of five nominees to the CSX board with written nominee agreements. Section 13D, however, does not require a formal written agreement to form a group, and TCI and 3G in fact formed a group prior to December 12, 2007, as described in detail above.

TCI and 3G's agreement is evidenced by, among other things: (a) the entities' long-standing investment relationship and their frequent communications concerning CSX, including discussions on whether to form a group (PFF ¶ 102);[6] (b) their common plan to restructure CSX through a leveraged buyout or levered share buyback and make other major operational changes (PFF ¶¶ 105); (c) a pattern of parallel purchases of CSX stock over the same, brief time period immediately following their meeting to discuss CSX (PFF ¶¶ 78-80); and (d) parallel activist activities following the run-up in their share purchases, including soliciting the support of other hedge funds with respect to their proposals for CSX, meeting with the same former CSX executive to gather inside information concerning the Company and running a simultaneous search for nominees to put on a slate for election to CSX's board of directors (PFF ¶¶ 106, 153).

---

[6] Mr. Hohn appeared to be of the opinion that TCI could avoid forming a group with 3G merely by saying no to Behring's requests to form a group. (PFF ¶ 109.) Defendants cannot avoid group formation, however, merely by disclaiming that they are a group. Roth, 489 F.3d at 511 (holding that where defendants act together for the purpose of acquiring shares, they form a group under Section 13(d), "regardless of their attempted disclaimers of the legal effect of such joint action").

TCI and 3G have a long-standing investment relationship through 3G's "Synergy" fund, which has invested in TCI since its inception in 2004. (PFF ¶ 15.) TCI and 3G's executives have interacted for years because of that relationship, and 3G is privy to detailed information on TCI's investments—including its investment in CSX—through that relationship. (PFF ¶ 17.) Indeed, both TCI's and 3G's principals testified that they discussed their opinions of CSX's management team and governance throughout 2007 and exchanged financial models and analyses of CSX—models that were strikingly similar in both their criticisms of CSX and their proposed strategic alternatives for the Company. (PFF ¶ 105.)

Throughout the spring and fall of 2007, TCI and 3G engaged in parallel and coordinated activities with respect to CSX. TCI and 3G met concerning CSX at 3G's offices in New York City on March 29, 2007—the same day that TCI met with CSX in New York to discuss TCI's proposals for changes at CSX. (PFF ¶ 78.) Immediately following those meetings, 3G substantially increased its shareholdings in CSX and, within days, TCI began for the first time to convert its swaps into physical shares of CSX common stock. (PFF ¶ 79.) By April 18, 2007, TCI and 3G each owned approximately 4.2 percent of the outstanding shares of CSX common stock—an amount substantially the same as they owned at the time they eventually filed their Schedule 13D in December 2007. (PFF ¶¶ 133, 173.)

Following this stock run up, TCI and 3G's conduct continued in parallel as they moved toward a proxy fight with CSX. Both TCI and 3G sought the support of other hedge funds with respect to their proposals for CSX, both reached out to the same former CSX executive to gather inside information concerning the Company and both began a simultaneous search for nominees to run for election to CSX's board of directors. (PFF ¶¶ 64-74, 152-53, 160, 162, 165.) Despite this, both TCI and 3G make the incredible claim that they did not decide to form a group until December 2007—the eve of the opening of the window under the CSX Bylaws for making shareholder proposals including nominating persons for election as directors at the Annual Meeting. (PFF ¶ 277.)

TCI's and 3G's relationship, interactions and parallel conduct all support an inference that TCI and 3G agreed to acquire CSX stock to further their common plans to implement change at CSX and ultimately to pursue a proxy contest if necessary. See, e.g., Roth, 489 F. 3d at 512 (finding evidence of group formation in parallel means, timing and method of share purchases); Champion, 661 F. Supp at 850 (common plan and goal, parallel share purchases, correlated activities and intercommunications and claims of shareholder support constitute "strong circumstantial evidence demonstrating the existence of an agreement among [Defendants]"). The Court is not required to "play ostrich" in the face of months of parallel plans, communications, investments and activism and assume they are mere coincidence. See Champion, 661 F. Supp. at 850 ("It would require a degree of naïveté unbecoming to this Court to believe that the various activities of Defendants were not the product of an agreement among the group but, rather, were merely coincidences.").

TCI also formed a group with Deutsche Bank's hedge fund arm, Austin Friars, and consequently Deutsche Bank itself. TCI and 3G entered into swap arrangements and began accumulating swap positions with respect to CSX shares with their swap counterparties beginning in late 2006. (PFF ¶ 28.) While TCI and 3G disclaim having any express agreements with their counterparties requiring the counterparties to hedge their position with physical shares, the counterparties had to, as a practical matter, hedge their exposure to CSX swaps with matching CSX shares. (PFF ¶ 201.) The contracts negotiated between TCI and 3G and their counterparties contemplate that the counterparties would hedge, and, combined with the economic incentives of the counterparties, that they would do so by acquiring matching CSX shares upon entering into the swap transaction with TCI and 3G, and TCI assumed they would. (PFF ¶ 205.) So long as the swap position was maintained, the counterparties also had to, as a practical matter, hold their hedge positions. (PFF ¶ 201.) Thus, pursuant to the swap arrangements, TCI and 3G and their respective counterparties acted together for purposes of acquiring, holding, and disposing of CSX shares.

### 3.  Defendants' Schedule 13D is materially false, misleading, and incomplete.

After months of hiding their position, TCI and 3G finally filed the required Schedule 13D on December 19, 2007, literally on the eve of the opening of the window for making shareholder proposals, including nominating persons for election as directors, at CSX's annual meeting. (PFF ¶ 173.) They did so only after concealing their positions and plans for nearly a year, selectively tipping their friends about their positions and plans, and threatening CSX about what would happen if it did not yield to TCI's demands.

The Schedule 13D that Defendants filed is materially false, misleading and incomplete because it: (a) fails to accurately disclose Defendants' beneficial ownership of CSX common stock by falsely disclaiming beneficial ownership of shares associated with total return swaps; (b) misrepresents group formation and group ownership; (c) fails to disclose information concerning contracts, arrangements, understandings or relationships among Defendants and between Defendants and other persons with respect to any securities of CSX; and (d) fails to disclose Defendants' plans or proposals with respect to their interest in CSX.

### (a)  Defendants misrepresented their beneficial ownership.

Section 13(d) requires that a reporting person disclose "the number of shares of [the] security which are beneficially owned". 15 U.S.C. § 78m(d)(1)(D), 17 C.F.R. § 240.13d-101 (Schedule 13D, Item 5). Defendants' Schedule 13D misrepresents their true beneficial ownership of CSX common stock.

In the Schedule 13D, Defendants state that TCI is the beneficial owner of 17,796,998 shares of CSX common stock, that 3G is the beneficial owner of 17,232,854 shares and that Defendants' group beneficially owns, in the aggregate, 35,054,952 shares, representing approximately 8.3 percent of CSX's then-outstanding shares of common

stock.  (PFF ¶ 263.)  Defendants also state in the Schedule 13D that they do not beneficially own any shares of CSX as a result of their economic exposure to CSX shares through swaps.  (PFF ¶ 264.)  Defendants further state that the swaps "do not give [TCI or 3G] direct or indirect voting, investment or dispositive control over any securities of CSX and do not require the counterparties thereto to acquire, hold, vote or dispose of any securities of [CSX]".  (PFF ¶ 264.)  As discussed above, however, TCI did have beneficial ownership of the shares referenced in its swaps and thus its statement to the contrary is materially false and misleading.  17 C.F.R. § 240.13d-101 (Schedule 13D, Item 5).

> **(b)** **Defendants misrepresented group formation and group ownership.**

Defendants also misrepresented the formation of the group and the beneficial ownership of the group members' shares of CSX common stock.  In their Schedule 13D, Defendants state that TCI and 3G formed a group for purposes of coordinating certain of their efforts with regard to their interests in CSX on December 12, 2007.  (PFF ¶ 277.)  In fact, as set out above, TCI and 3G formed a group in the spring of 2007.  (See supra Section I.B.1.(c).2.)

> **(c)** **Defendants failed to disclose arrangements and agreements with members of their group and others.**

Defendants also failed properly to disclose other arrangements, understandings, and relationships with respect to CSX.  17 C.F.R. § 240.13d-101 (Schedule 13D, Item 6).  Defendants state that they have "no contracts, arrangements, understandings or relationships (legal or otherwise) . . . with respect to any securities" of CSX except as described elsewhere in Schedule 13D.  (PFF ¶ 270.)  In fact, Defendants have various undisclosed arrangements, understandings, and relationships with other persons, including each of the counterparties with respect to their interest in CSX.  (PFF ¶ 271.)

Defendants failed to disclose the material terms of the swap arrangements, including their termination provisions, the initial price of the referenced shares, the number of CSX shares referenced in each individual swap as well as the aggregate number of CSX shares referenced in Defendants' overall swap position, and did not file copies of the written agreements governing their swaps as exhibits to the Schedule 13D.  (PFF ¶ 235-38.); 17 C.F.R. § 240.13d-101 (Schedule 13D, Items 6 and 7).  Defendants also failed to disclose the material terms of the credit default swap arrangements that they had regarding CSX, which would have informed shareholders that Defendants took a position that effectively was a bet against the company's value as a way to hedge their own position against or to profit from or hedge against any decrease in CSX's credit ratings and/or stock price.  (PFF ¶ 274.)

        **(d)**      **Defendants failed to disclose plans or proposals as to CSX's business or corporate structure.**

Schedule 13D, Item 4, requires that an individual disclose the "purpose or purposes of the acquisition of securities of the issuer" and "[d]escribe any plans or proposals which the reporting persons may have which relate to or would result in", inter alia:  "(e) [a]ny material change in the present capitalization or dividend policy of the issuer; or (f) [a]ny other material change in the issuer's business or corporate structure . . . ."  17 C.F.R. § 240.13d-101.  A plan does not have to be definite or concrete in order to require disclosure.  Where a plan involves a prospective event, it must be disclosed even though the triggering event may not occur.  See In re Douglas A. Kass, 50 S.E.C. 1110, Release No. 34-31046, 1992 WL 204252, at *6 (S.E.C. Aug. 17, 1992) (citing Otis Elevator Co. v. United Techs. Corp., 405 F. Supp. 960, 970 (S.D.N.Y. 1975)).

Defendants' Schedule 13D is false and misleading because it fails to disclose definite and concrete plans, including in CSX's present capitalization and other major changes to CSX's business and structure.  Defendants state that they originally "acquired [shares of CSX stock] for investment in the ordinary course of business".  (PFF ¶ 267.)  In fact, as described above, Defendants acquired their interests in CSX with the purpose or effect of changing or influencing the control of CSX.  (PFF ¶ 268.)  They formulated a plan to effect an LBO involving CSX or, failing that, an extraordinary leveraged share repurchase.  (PFF ¶ 268.1)  They formulated a plan to change management (PFF ¶ 268.3) and take control of the board (PFF ¶ 268.4).  TCI and 3G also developed proposals for other major changes in CSX's business and structure, including demands that CSX increase the prices it charges to customers (PFF ¶ 268.2), demands to limit capital expenditures associated with increased capacity (PFF ¶ 268.2) and attempts to dictate CSX's management of its regulatory affairs (PFF ¶ 268.3).

                                                \* \* \*

Defendants' misstatements and omissions in their late-filed Schedule 13D are material because a reasonable shareholder would consider the misrepresented or omitted information important, particularly in view of the outstanding proxy fight in connection with CSX's annual meeting of shareholders in June 2008.  Savoy Indus., 587 F.2d at 1166; Southmark Prime Plus, L.P. v. Falzone, 776 F. Supp. 888, 902 (D.Del. 1991).  In particular, the fact that Defendants have been working in concert not for a few months, but for over a year; that they have investment and voting power over more than double the number of shares of common stock they have disclosed; and that they intend to (and have for many months intended to) implement major structural and operational changes at CSX are all facts that a reasonable shareholder would want to know in determining how to vote at the annual meeting.  Indeed, Defendants should be required to correct their misrepresentation if only to put CSX shareholders on notice of their deception, a factor any reasonable shareholder would want to consider in determining whether to vote for Defendants' proposed slate of directors.

## II.    TCI AND 3G VIOLATED SECTION 14

### A.    Proposed Conclusions

4.  Defendants violated Section 14(a) of the '34 Act by making false and misleading statements in their proxy materials.

a.  Defendants failed to disclose the true extent of their beneficial ownership of CSX shares of common stock by falsely disclaiming beneficial ownership of shares associated with total return swaps.

b.  Defendants misrepresented the date that Defendants formed a group and the number of shares of CSX common stock owned by the group.

c.  Defendants failed to disclose information concerning contracts, arrangements, understandings or relationships among Defendants and between Defendants and other persons, such as swap counterparties, with respect to the securities of CSX.

d.  Defendants' proxy statements misrepresented TCI's position with respect to a settlement of the proxy fight.

e.  Defendants set forth a false two-year history of each of their transactions in CSX securities because they did not disclose the history of swap transactions that reference shares of CSX common stock or any information concerning renewals and extensions of the terms thereof or dates on which such swaps were settled.

### B.    Discussion

Section 14(a) makes it unlawful to solicit proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors". 15 U.S.C. § 78n(a). Rule 14a-9, in turn, prohibits proxy solicitation "by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading". 17 C.F.R. § 240.14a-9(a); see also In re Trump Hotels S'holders Derivative Litig., No. 96 Civ 7820 DAB, 2000 WL 1371317, at *12 (S.D.N.Y. Sept. 21, 2000) (quoting GAF Corp. v. Heyman, 724 F.2d 727, 739 (2d Cir. 1983)). The purpose of Section 14(a) is to "promote the 'free exercise of the voting rights of shareholders' by ensuring that proxies would be solicited with 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'" Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 381 (1970) (quoting H.R. Rep. No. 73-1383, at 13 (1934); S. Rep. No. 73-792, at 12 (1934)).

Defendants violated Section 14(a) and Rule 14a-9 by filing false, misleading and incomplete preliminary proxy statements on Schedule 14A on March 10, 2008 and April

15, 2008, and a definitive proxy statement on Schedule 14A filed on April 28, 2008 (collectively, the "Schedule 14A").  Defendants' Schedule 14A is materially false and misleading for several of the same reasons their Schedule 13D is false and misleading, including:  (a) Defendants fail to disclose the true extent of their beneficial ownership of CSX shares of common stock (PFF ¶ 262); (b) Defendants misrepresent the date that Defendants formed a group and the number of shares of CSX common stock owned by the group (PFF ¶ 262); and (c) Defendants fail to disclose information concerning contracts, arrangements, understandings or relationships among Defendants and between Defendants and other persons, such as swap counterparties, with respect to the securities of CSX (PFF ¶ 262).  Those misrepresentations and omissions are materially false and misleading:  (a) Defendants made material misstatements and omissions regarding their beneficial ownership of CSX shares; (b) Defendants made material misstatements and omissions regarding group formation; (c) Defendants made material misstatements and omissions regarding their arrangements and agreements with others; and (d) Defendants made material misstatements and omissions regarding their plans and proposals concerning CSX.  (See supra Section I.B.3.)

Defendants' Schedule 14A is also materially false and misleading for two additional reasons.  First, Defendants' proxy statements misrepresent TCI's position with respect to a settlement of the proxy fight.  Defendants state that "TCI made concessions with the hope of being able to reach an amicable resolution" and that TCI "indicated willingness to sign a one year standstill agreement".  (PFF ¶ 261.)  That is false.  Before the outset of negotiations with Mr. Kelly, TCI took the position that "[t]he only alternative to the proxy fight is if [CSX] will allow our 5 nominees on and we can mutually agree with them which 5 of their directors to replace".  (PFF ¶ 183.)  Indeed, before the issue of a standstill ever came up, on January 17, 2008, Mr. Hohn told Mr. Kelly that TCI would not accept any sort of standstill as part of any agreement. Mr. Hohn only suggested a one-year standstill in a call to CSX's financial advisor after negotiations had terminated.  (PFF ¶ 195.)  Second, Defendants set forth in Schedule 14A the two-year histories of each of their transactions in CSX securities.  Those histories are false because they do not disclose any history of swap transactions that reference shares of CSX common stock or any information concerning renewals and extensions of the terms thereof or dates on which such swaps were settled.  (PFF ¶ 259, 261-62.)

The omissions and misrepresentations in Defendants' Schedule 14A concern information material to investors.  The fact that Defendants have been working in concert not for a few months, but for over a year; that they have investment and voting power over more than double the number of shares of common stock they have disclosed; and that they intend to (and have for many months intended to) implement major structural and operational changes at CSX are all facts that a reasonable shareholder would want to know in determining how to vote at the annual meeting.  There is more than a substantial likelihood that disclosure of that information would be viewed by the reasonable investor as significantly altering the "total mix" of information available with respect to the proposals for which they will cast their proxy.  TSC Indus. v. Northway Inc., 426 U.S. 438, 449 (1976) (holding that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote").

III.    **THE INDIVIDUAL DEFENDANTS VIOLATED SECTION 20 OF THE '34 ACT**

A.    **Proposed Conclusions**

Individual Defendants Hohn and Behring are each jointly and severally liable for the foregoing violations of Sections 13(d) and 14(a) as controlling persons pursuant to Section 20(a) of the '34 Act.

B.    **Discussion**

Section 20(a) provides:

> "Every person who, directly or indirectly, controls any person liable under any provision of [the '34 Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

15 U.S.C. § 78t(a).  "Controlling-person liability is a separate inquiry from that of primary liability and provides an alternative basis of culpability."  In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 77 (2d Cir. 2001) (internal quotation marks omitted).

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's [securities violation]."  ATSI Comm'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007) (citing SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)); Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (same).  Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to prove that he acted in good faith and "that he 'did not directly or indirectly induce the act or acts constituting the violation'".  First Jersey, 101 F.3d at 1473 (quoting 15 U.S.C. § 78t); SEC v. 800America.com, Inc., 02 Civ. 9046 (HB), 2006 WL 3422670, at *6 (S.D.N.Y. Nov. 28, 2006).

First, TCI and 3G committed primary securities violations.  TCI and 3G violated Sections 13(d) and 14(a) of the '34 Act by failing timely to file Schedule 13D and by making false and misleading statements and omissions in their late-filed Schedule 13D and in their Schedule 14A, as discussed above.

Second, Messrs. Hohn and Behring admit that they control, respectively, TCI and 3G. (PFF ¶¶ 10, 12.)  "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"  First Jersey, 101 F.3d at 1472-73 (quoting 17 C.F.R. § 240.12b-2).  Messrs. Hohn and Behring maintained discretionary authority to control or

92

influence the conduct of TCI, 3G and the defendant group and did, in fact, control or influence the conduct of TCI, 3G and the defendant group, including the foregoing violations of Sections 13(d) and 14(a).

Mr. Hohn is Founding and Managing Partner and portfolio manager of TCIF UK, and the sole 100% owner of TCIF Cayman and is a controlling person of TCI.  (PFF ¶ 10.)  These facts alone establish that Mr. Hohn was a controlling person of TCI.  First Jersey, 101 F.3d at 1472-73; Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001); Dietrich v. Bauer, 76 F. Supp. 2d 312, 335 (S.D.N.Y. 1999) ("The position of [defendant] as president . . . is one from which control can be directly inferred without more." (internal citations omitted)).  In addition, along with Mr. Amin, Mr. Hohn signed the SEC filings involved in this case on behalf of TCI and both had the power to direct the contents of those filings.  (PFF ¶ 10.)  See Schnall v. Annuity & Life Re (Holdings), Ltd., No. 3:02 CV 2133 (EBB), 2006 U.S. Dist. Lexis 55493, at *24 (D. Conn. Aug. 10, 2006) (noting that the very fact that a defendant is required to, and does, "sign[] multiple disclosures filed with the SEC that are alleged to have contained actionable misrepresentations" supports a finding of "control" (internal citations omitted)).

Similarly, Mr. Behring is Managing Director of 3G.  (PFF ¶ 12.)  Mr. Behring signed all of the SEC filings on behalf of 3G involved in this case and he had the power to direct the contents of those filings.  (PFF ¶ 12.)  Mr. Behring was a controlling person of 3G.  First Jersey, 101 F.3d at 1472-73; Suez Equity, 250 F.3d at 101; Dietrich, 76 F. Supp. 2d at 335; Schnall, 2006 U.S. Dist. Lexis at *24.

Third, Messrs. Hohn and Behring were culpable participants in TCI's and 3G's primary violations of the securities laws.  They were intimately involved in the transactions underlying the primary security violations.  See In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 414-17 (S.D.N.Y. 2001); First Jersey, 101 F.3d 1472-73.  For example:  (1) Mr. Hohn and Mr. Behring signed the SEC filings at issue on behalf of their respective entities.  (PFF ¶ 10, 12, 173.); (2) Mr. Hohn signed TCI's Hart-Scott-Rodino notice in March 2007 and instructed others that this meant TCI intended to attempt "to try to influence management in how [CSX] is run"  (PFF ¶ 124.); (3) Mr. Hohn was a primary player in making or prompting contacts with CSX on behalf of TCI (PFF ¶ 85, 149), signed letters written to CSX and to the Board (PFF ¶ 169) and authored e-mail communications to CSX (PFF ¶ 184, 188, 190); (4) Mr. Behring signed 3G's Hart-Scott-Rodino notice in June 2007 (PFF ¶ 110) and was the 3G representative who announced to CSX that 3G intended to make that filing (PFF ¶ 148); and (5) it was Mr. Behring's decision that 3G would offer Mr. Behring himself as a Board nominee (PFF ¶ 110).  Defendants admit that Messrs. Hohn and Behring are deemed to "share beneficial ownership of the [CSX] Shares owned by" TCI and 3G, respectively.  (PFF ¶ 10, 12, 265.)

Messrs Hohn and Behring were also the primary players in the agreements and arrangements misrepresented in their Schedule 13D and Schedule 14A filings.  Mr. Hohn negotiated and entered into the swap arrangements referencing CSX's shares to evade Section 13(d)'s reporting requirements and engaged in efforts to conceal those swap

arrangements.  (PFF ¶¶ 10, 20-26.)  Likewise Messrs. Hohn and Behring agreed to coordinate their efforts with respect to CSX, including their efforts to acquire significant numbers of shares of CSX common stock (PFF ¶¶ 110-39), but failed to disclose that agreement in their filings (PFF ¶¶ 263-64).

## IV.   TCI'S AND 3G'S NOTICE OF PROPOSED DIRECTOR NOMINEES AND BYLAW AMENDMENTS FAIL TO COMPLY WITH CSX'S BYLAWS

### A.   Proposed Conclusions

Defendants' notices of intent to nominate persons for election to the CSX board of directors at the 2008 annual meeting of shareholders and to propose amendments of the CSX Amended and Restated Bylaws fail to comply with Article I, Section 11(a)(ii) of CSX's Bylaws.

### B.   Discussion

Section 13.1-624 of the Virginia Stock Corporation Act provides that a corporation's bylaws "may contain any provision for managing the business and regulating the affairs of the corporation that is not inconsistent with law or the articles of incorporation".  Article I, Section 11(c)(1) of CSX's Bylaws governs the way in which a shareholder may bring a nomination or other business before an annual meeting.  That provision provides:

> "Only such persons who are nominated in accordance with the procedures set forth in this Section 11 shall be eligible at an annual or special meeting of shareholders of the Corporation to serve as directors and only such business shall be conducted at a meeting of shareholders as shall have been brought before the meeting in accordance with the procedure set forth in this [section]".  (PFF ¶ 177.)

Article I, Section 11 of the Bylaws also requires advance notice of nominations and shareholder business.  Moreover, the notice must be timely and set forth pertinent information required by Article I, Section 11(a), including:  (i) the name and address of any beneficial owner on whose behalf the nomination or proposal is made; (ii) the class and number of shares of capital stock of CSX that are owned beneficially and of record by such shareholder and such beneficial owner; (iii) all information relating to each person whom the shareholder proposes to nominate for election as a director that is required to be disclosed in solicitations of proxies for election of directors in an election contest, or is otherwise required in each case pursuant to the '34 Act; and (iv) any material interest in other proposed business of such shareholder.  (PFF ¶ 177); see also Openwave Sys. Inc. v. Harbinger Capital Partners Master Fund I, Ltd., 924 A.2d 228, 239 (Del. Ch. 2007) (advance notice bylaws are "commonplace" and "are often construed and frequently upheld as valid").

Defendants' notices of intent to nominate persons for election to the CSX board of directors at the 2008 annual meeting of shareholders and to propose amendments of

the CSX Amended and Restated Bylaws fail to comply with Article I, Section 11(a)(ii) because they do not accurately disclose the number of shares of CSX stock beneficially owned by Defendants.  Defendants' January 8, 2008 Stockholder Notice of Intent to Nominate Persons for Election as Directors to CSX Corporation claims that the TCI/3G group beneficially own 8.3 percent of the outstanding shares of CSX common stock. (PFF ¶ 185.)  On January 21 and January 25, 2008, Defendants sent two supplemental notices to CSX regarding their intent to present a proposal allowing shareholders to call a special meeting.  (PFF ¶ 176.)  Those supplemental notices incorporated the information in the January 8 notice concerning Defendants' beneficial ownership of CSX stock.  (PFF ¶ 176.)  As discussed in detail above, TCI—and therefore the TCI/3G group—had beneficial ownership of the shares referenced in its swaps.  (See supra Section V.)  The notices of intent and disclosures submitted by Defendants therefore violate CSX's Bylaws, and consequently Virginia law, because they fail to report accurately the number of shares of capital stock of CSX that Defendants beneficially owned.  The notices are therefore likewise invalid.

## V.    CSX HAS DEMONSTRATED IRREPARABLE HARM WARRANTING INJUNCTIVE RELIEF

### A.    Proposed Relief

In light of the violations described above, and the irreparable harm that would result absent relief from this Court:

1.  Defendants are declared to have violated Section 13(d) and Section 14(a) of the '34 Act.

2.  Defendants are enjoined from any further violations of the securities laws;

3.  Defendants shall file truthful and accurate Schedule 13D and Schedule 14A disclosures, in compliance with the applicable rules and regulations, forthwith.

4.  Defendants are enjoined from voting any proxies received prior to such time as the Court determines that Defendants have filed accurate and compliant Schedule 13D and Schedule 14A disclosures.

5.  Defendants are enjoined from voting CSX shares owned by them at the 2008 annual meeting of CSX shareholders, as are other members of their group;

6.  Defendants are enjoined from selling their shares of CSX until three days following the 2008 CSX annual meeting; and

7.  The Parties are directed to ask TCI's and 3G's swap counterparties to disclose to the Court on a confidential basis how, if at all, they will vote shares held by them to hedge their CSX swaps with TCI and 3G, and advise the Court as to the banks' position.

B.    **Discussion**

1.    **CSX Shareholders Face Irreparable Harm.**

Defendants sought to secure a controlling position in CSX with a view to launching a proxy contest.  In pursuit of that goal, Defendants accumulated an economic interest in more than 20 percent of CSX stock without alerting the marketplace to its holdings or plans with respect to those holdings.  (See PFF ¶¶ 28, 29, 31.)  Defendants' failure to report their growing accumulations of CSX stock was willful; indeed, a central reason that TCI entered into swaps rather than physical holdings was the ability to retain its anonymity as it built its position.  (PFF ¶¶ 21-25, 39, 44-45).

Defendants violated Section 13(d) by failing to make timely disclosures in a Schedule 13D, and by making false, misleading and incomplete disclosures when they eventually did file.  Defendants likewise violated Section 14(a) by filing false, misleading and incomplete proxy statements.  Defendants violated CSX's Bylaws, and Virginia law, by filing inaccurate notices of intent with respect to CSX's annual shareholder meeting to be held on June 25, 2008.  Defendants have denied CSX shareholders the benefit of the full and accurate information material to their decision in the upcoming proxy contest.  Defendants have unfairly tipped the playing field in their favor, the precise harm the Williams Act was designed to prevent.  Injunctive relief is both warranted and necessary here to restore equilibrium.

In order to obtain injunctive relief for violations of Sections 13(d) and 14(a), plaintiff is required to show that there will be irreparable injury absent the injunction. ICN Pharm., Inc. v. Khan, 2 F.3d 484, 489 (2d Cir. 1993); Kaufman v. Cooper Cos., Inc., 719 F. Supp. 174, 178 (S.D.N.Y. 1989).  There is irreparable injury here.  See Koppel v. 4987 Corp., 167 F.3d 125, 137 (2d Cir. 1999) (stating that the preferred remedy for 14(a) violation is injunctive relief); Kaufman, 719 F. Supp. at 178 (finding that a violation of the proxy rules may cause irreparable harm necessitating injunctive relief).  Indeed, the mere filing of a false and misleading Schedule 13D can give rise to irreparable harm. Gen. Aircraft Corp., 556 F.2d at 96-97; Standard Fin., Inc. v. LaSalle/Kross Partners, L.P., No. 96 C. 8037, 1997 WL 80946, at *6 (N.D. Ill. Feb. 20, 1997) ("The failure to comply with Section 13(d) by filing an inaccurate Schedule 13D has been found to cause irreparable harm to shareholders and the investing public").  The violations here were more than technical violations; Defendants' false and misleading disclosures were willful and designed to achieve effective control of CSX without alerting the market to their growing position.

Defendants acquired beneficial ownership of over 20 percent of the outstanding shares of CSX common stock.[7]  Much of TCI's accumulation was made possible through

_____

[7] A "controlling intent" or "degree of effective control" is apparent when 20 percent of the publicly available shares of a company are owned by an entity or group.  See, e.g., Dan Rive, 624 F.2d at 1225; Chromalloy American Corp. v. Sun Chem. Corp., 611 F.2d 240, 246-47 (8th Cir. 1979) (finding control purpose where purchaser disclosed its plans

swap arrangements, which were designed to provide Defendants with voting and investment power in CSX without disclosing the true extent of their interest to the SEC and other investors.  (PFF ¶ 20-29, 44-45.)  Defendants coordinated their efforts to make major operational and structural changes at CSX without ever disclosing those plans to the SEC or CSX's other investors.  (PFF ¶¶ 40, 46-60, 69-74, 77-84, 87, 89, 104, 106-8, 112-37, 139, 143, 149, 151, 159, 172, 267-69.)

If Defendants are not ordered to file truthful and accurate Schedules 13D and 14A, CSX's shareholders will be irreparably harmed because they will cast their votes based on the false and misleading information disseminated by Defendants to the marketplace.  See, e.g., Kaufman, 719 F. Supp. at 178 (finding that omitting material information from proxy statements can cause irreparable injury to shareholders); MONY Group, Inc. v. Highfields Capital Mgmt., L.P., 368 F.3d 138, 147-48 (2d Cir. 2004) ("It is well-established that a transaction – particularly a change-of-control transaction – that is influenced by noncompliance with the disclosure provisions of the various federal securities laws can constitute irreparable harm") (emphasis omitted); Camelot Indus. Corp. v. Vista Res., 535 F. Supp. 1174, 1184 (S.D.N.Y. 1982) (holding that solicitation of proxies on basis of false and misleading information constitutes irreparable harm).

Moreover, the conduct of the Defendants has already created a fundamental change in the shareholder base.  (PFF ¶ 64-74, 218, 224-26.)  If Defendants are permitted to vote the shares that they unlawfully attained from other shareholders after the date on which they should have filed a Schedule 13D disclosing their positions, the Defendants will benefit from their wrongdoing and the vote of other innocent shareholders will be further diluted.  See Hallwood Realty Partners, L.P. v. Gotham Partners, L.P., 95 F. Supp. 2d 169, 175-76 (S.D.N.Y. 2000) (sustaining allegations that defendant had violated Section 13(d) by falsely stating that it had a beneficial interest in less than 15 percent to avoid triggering poison pill); SEC v. First City Fin. Corp., Ltd., 688 F. Supp. 705, 734 (D.D.C. 1988), aff'd, 890 F.2d 1215, 1228 (D.C. Cir. 1989) (finding that defendant's "surreptitious effort to accumulate a block of shares . . . is the precise type of evil to which Section 13(d) was directed to prevent").

The shareholders' right to corporate democracy through their proxy votes is at the heart of the securities laws.  As the Supreme Court has noted, Congress enacted Section 14(a) in the "belief that '[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.'"  J.I. Case Co. v. Borak, 377 U.S. 426, 431 (1964), quoting H.R.Rep. No. 1383, 73rd Cong., 2d Sess. 13.  The scheme undertaken by TCI and 3G in this case is directly contrary to this bedrock principle of law.

_____

to acquire a 20 percent stake, attempted to gain board representation, and prepared an "acquisition model" based on the company); see also Standard Fin., Inc., 1997 WL 80946, at *4-5 (defendants' intent to gain two seats on the target's board of directors and be active in management gave rise to a "control" intent).

## 2.    Court-Ordered Relief is Required

Federal courts are "empowered to 'grant all necessary remedial relief'" to effectuate the purposes of Sections 13(d) and 14(a) of the Securities Exchange Act. Kaufman, 719 F. Supp. at 178 (quoting Borak, 377 U.S. at 433, 435 (1964)); see also Koppers Co., Inc v. Am. Express Co., 689 F. Supp. 1371, 1382 (W.D. Pa. 1988). At a minimum, courts have routinely required parties to file corrective disclosures when such disclosures are found to be false and misleading, and enjoined wrongdoers from committing further violations. See, e.g., ICN Pharms., 2 F.3d at 489; Krauth v. Exec. Telecard, 890 F. Supp. 269, 292 (S.D.N.Y. 1995); E.ON AG v. Acciona, S.A., 06 Civ. 8720 (DLC), 2007 U.S. Dist. Lexis 7771, at *30 (S.D.N.Y. Jan. 9, 2007) ("These deficiencies provide abundant support for a preliminary injunction against [defendant] prohibiting it from any further violation of Section 13(d) or any other disclosure provision in the securities laws."). Defendants must be required to correct both their 13D and 14A filings.

Here, in view of the egregious nature of the Defendants' conduct, including hiding its position in CSX (PFF ¶ 20-29, 39, 44-45), selectively tipping off certain funds regarding CSX (PFF ¶ 61-73) and causing a fundamental change in the shareholder base (PFF ¶ 218, 224-26), Defendants should be enjoined from voting any proxies that they have received or will receive prior to filing complete and accurate Schedule 13D and Schedule 14A disclosures. See, e.g., Krauth, 890 F. Supp. at 292 (enjoining solicitation of proxies pending corrective disclosures); Kaufman, 719 F. Supp. at 185-86 (voiding all proxies solicited pursuant to false and misleading 13(d) and 14(a) disclosures); Camelot, 535 F. Supp. at 1185 (voiding proxies and ordering resolicitation); see also Morrison Knudsen Corp. v. Heil, 705 F. Supp. 497, 504 (D. Id. 1988) (enjoining shareholder from soliciting proxies until he filed corrective Schedule 13D disclosures); K-N Energy, Inc. v. Gulf Interstate Co., 607 F. Supp. 756, 771 (D. Colo. 1983) (enjoining shareholder from soliciting proxies for 30 days after he filed corrective Schedule 13D disclosures). Voiding proxies and ordering resolicitation is a well-established remedy in this Circuit. See Cent. Foundry Co. v. Gondelman, 166 F. Supp. 429, 446-47 (S.D.N.Y. 1958). As this court noted in Central Foundry, enjoining the voting of illegally solicited consents or proxies is necessary to preserve the rights of the company's shareholders. See id. (rejecting argument that requiring resolicitation was tantamount to disenfranchisement, and noting that "[v]iewing it from the interests of stockholders, the choice is obvious as between failing to exercise the franchise and exercising it influenced by unlawful solicitation."); see also Delcath Sys. v. Ladd, 06 Civ. 6420 (LAP), 2006 U.S. Dist. Lexis 67720, at *16-17 (S.D.N.Y Sept. 20, 2006) ("[i]t is within the equitable power of the Court to void consent solicitations and permit parties to recommence the process"). Indeed, while enjoining Defendants from voting their ill-gotten proxies is insufficient to correct the effects of Defendants' misconduct, it would at least provide aid in restoring fairness to the election process.

While corrective disclosure will have the effect of preventing further harm, the additional relief of ordering resolicitation will serve the aim of restoring the level playing field guaranteed by the Williams Act. See Kaufman, 719 F. Supp. at 185 ("[S]ince it is impossible to assess the effect those premature communications had on its solicitation

effort, permitting the Committee to retain those proxies would also render the contest unfair."). Corrective disclosure is one of the remedies for a violation of Section 13(d), but it is by no means the only available remedy. Indeed, "no court has ever declared disclosure to be the exclusive remedy under the Williams Act". <u>Pac. Realty Trust v. APC Invs., Inc.</u>, 685 F.2d 1083, 1086 (9th Cir. 1982); <u>see also</u> <u>ICN Pharms.</u>, 2 F.3d at 491; <u>Koppers</u>, 689 F. Supp. at 1382 (noting that a court may "require curative disclosure, a permanent injunction in order to punish and deter intentional violations of the securities laws, or a permanent injunction if there are manipulative acts that cannot be cured through disclosure"). Precedent and sound policy considerations dictate that courts can — and should — employ injunctive relief extending beyond corrective disclosure to remedy Section 13(d) violations in certain circumstances.[8]

In <u>ICN Pharmaceuticals, Inc. v. Khan,</u> 2 F.3d 484, 489 (2d Cir. 1993), the defendant had "failed to make material disclosures" in its efforts to oust the company's board of directors, and had neglected to file a Schedule 13D. <u>Id.</u> at 489. Although the Second Circuit reversed the district court's entry of a permanent injunction against the defendant's participation in any takeover of ICN, it emphasized:

> "In this case, however, it is clear that corrective disclosure would not address all the securities law violations that Khan was found to have committed. The district court explicitly concluded, on the basis of factual determinations that are amply supported in the record, that Khan had engaged in illegal inside trading of ICN's common stock. *It would certainly fall within the parameters of traditional injunctive relief to preclude Khan from voting any illegally acquired stock in a contest for control of ICN . . . . In a proper case, divestiture of illegally acquired shares might be directed.*"

<u>Id.</u> at 490-91 (citations omitted) (emphasis added).

The Court of Appeals' decision in <u>Treadway Cos., Inc. v. Care Corp.</u>, 638 F.2d 357 (2d Cir. 1980), also specifically left open the question whether "disenfranchisement

---

[8] <u>See</u> <u>Krauth</u>, 890 F. Supp. at 292; <u>v. First City Fin.</u>, 890 F.2d at 1228 (affirming injunction against further violations of Section 13(d) after considering "whether a defendant's violation was isolated or part of a pattern" and "whether the violation was flagrant and deliberate or merely technical in nature"); <u>Gen. Steel Indus. v. Walco Nat'l Corp.</u>, Exchange Act Release No. 9533, 24 SEC Docket 439, 1981 WL 315222, at *2 (Dec. 21, 1981) ("The Commission expressed the view that equitable remedies in addition to corrective disclosure, such as rescission or divestiture, may be necessary or appropriate to remedy violations of the Williams Act, particularly in cases where the defendant deliberately violated Section 13(d) and the illegal conduct permitted the defendant to obtain a sufficient number of shares to inhibit competing tender offers or merger proposals.").

or divestiture may be appropriate" in certain circumstances, see id. at 380 & n.45, and other courts have established as definitive such an exception to the general rule of corrective disclosure.  See, e.g., Raybestos-Manhattan, Inc. v. Hi-Shear Indus., 503 F. Supp. 1122, 1133 (E.D.N.Y. 1980) ("[d]isenfranchisement or divestiture may be permissible remedies for Section 13(d) violations . . . when the defendant obtains effective control of plaintiff through stock purchases before it comes into compliance with Section 13(d)"); Drobbin v. Nicolent Instrument Corp., 631 F. Supp. 860, 913 n.3 (S.D.N.Y. 1986) (same); Butler Aviation v. Widmark, 335 F. Supp. 146, 155 (E.D.N.Y. 1971) (enjoining shareholder who violated Section 13(d) from voting illegally acquired shares at forthcoming annual meeting, and stating "[i]f Section 13(d) means anything, [a party] should not be permitted to gain advantage from a course of action pursued in clear violation of the law.").[9]

    In addition, the SEC has taken the position that relief beyond corrective disclosure may be both necessary and appropriate to remedy Section 13(d) violations.  In a Litigation Release addressing General Steel Industries, Inc. v. Walco National Corp., No. 81-1410-C, 1981 WL 17552 (E.D. Mo. Nov. 24, 1981), the SEC expressed the view that "equitable remedies in addition to corrective disclosure, such as rescission and divestiture, may be necessary or appropriate to remedy violations of the Williams Act, particularly in cases where the defendant deliberately violated Section 13(d) and the illegal conduct had permitted the defendant to obtain a sufficient number of shares to inhibit competing tender offers or merger proposals."  Gen. Steel Indus., Inc. v. Walco Nat'l Corp., SEC Litigation Release No. 9533, 1981 WL 315222, at *2 (Dec. 21, 1981). Otherwise, "shareholders could be irreparably harmed and the defendant would be permitted to benefit from its wrongful conduct".  Id.

    The SEC reiterated its position as amicus in San Francisco Real Estate Investors v. Real Estate Investment Trust of America, 701 F.2d 1000 (1st Cir. 1983), and set forth a totality of the circumstances test for when injunctive relief should be employed to redress a violation of Section 13(d):

> "[I]n determining whether to order relief beyond corrective disclosure in a particular case, the court should consider all the pertinent circumstances, including whether a substantial number of shares were purchased after the misleading disclosures were made

---

    [9] Courts outside this circuit have also recognized that relief beyond corrective disclosure may be both appropriate and necessary to remedy disclosure violations when the wrongdoer would retain an unfair advantage in a battle for corporate control.  See, e.g., Bath Indus. v. Blot, 427 F.2d  97, 113 (7th Cir. 1970); Gen. Steel, 1981 WL 17552, at *6 ("[W]illful violation of the Williams Act, followed on the heels by its Offer, provides additional basis for the issuance of an injunction."); Gen. Aircraftt, 556 F.2d at 97 (1st Cir. 1977) ("[I]t may be appropriate for the courts to enjoin the voting of shares rapidly acquired just before a contest for control following a Section 13(d) violation") (citing Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 59 n.9 (1975)).

and before corrective disclosure, if any, was made; whether the curative disclosure occurs simultaneously with or shortly before a tender offer; and whether the violation was egregious."

Brief for the SEC as Amicus Curiae at 38, San Francisco Real Estate Investors v. Real Estate Inv. Trust of Am., 701 F.2d 1000 (1st Cir. 1983) (No. 82-1853) ("SFREI Amicus Br."). See San Francisco Real Estate Investors, 701 F.2d at 1009 ("These seem like sensible tests.") (attached hereto as Addendum B); Am. Carriers, Inc. v. Baytree Investors, Inc., 685 F. Supp. 800, 812 (D. Kan. 1988) ("We agree with the First Circuit that this is a sensible test.").

The extension of Section 13(d) relief beyond corrective disclosure in certain instances is supported by sound policy considerations.

"To limit the possible remedies for Williams Act violations . . . to corrective disclosure would distort the essential nature of equity jurisdiction which has been traditionally characterized by 'flexibility rather than rigidity,' would fail to deter violations of the statute, and would fail to afford shareholders adequate protection against harm flowing from the violations."

SFREI Amicus Br. at 33 (internal citations omitted). As the court in Hanna Mining Co. v. Norcen Energy Resources, Ltd., 574 F. Supp. 1172 (N.D. Ohio 1982), recognized:

"[This] result would mean that an acquiring corporation could engage in the most deliberate form of misrepresentation in its statutory filings and when its fraud is discovered merely file corrective amendments and keep the benefits of its wrongful conduct regardless of how that conduct may continue to injure shareholders of the corporation whose stock it has acquired."

Id. at 1203; see also Bath Indus., 427 F.2d at 113 (reasoning that corrective disclosure alone is an insufficient deterrent because it merely enforces the original statutory disclosure obligations and permits the acquiring shareholder to retain the ill-gotten benefits of its conduct). Moreover, such a ceiling on Section 13(d)'s remedies upsets the "well settled" rule "that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use *any available remedy* to make good the wrong done". Borak, 377 U.S. at 433 (emphasis added).

Here, the appropriate remedy for Defendants' violation of Section 13(d) — in addition to an order that Defendants correct the disclosures in their Schedules 13D and 14A and that any proxies received prior to the corrective disclosures be declared void — is an order enjoining Defendants from voting their CSX shares at the CSX annual meeting. Here:

- Defendants adopted a plan and scheme to avoid the reporting requirements of Section 13(d) from as early as the fall of 2006,

which has continued through the trial of this matter.  (PFF ¶¶ 20-26, 39.)

- TCI hid from the public its accumulations of a 10 to 14 percent interest in CSX, while selectively disclosing to potential allies, including 3G, what they were doing.  (PFF ¶¶ 45, 53, 62-68.)

- TCI disclosed its interest to CSX management solely for the purpose of seeking to exercise influence or control over CSX. (PFF ¶¶ 27, 75-77, 111-24, 133-37.)

- TCI and 3G, together, surreptitiously accumulated over a 20 percent interest in CSX, which they disclosed only on December 19, 2007, as they announced their intention to launch a proxy contest for five seats on CSX's Board of Directors.  (PFF ¶¶ 173-75, 181.)

All of the CSX shares now held by the Defendants were illegally acquired from an unsuspecting public after they had embarked on their scheme to evade the reporting requirements of Section 13(d).

Disclosure of the Defendants' bad acts, however, is not enough.  An annual general meeting must be held, and it is of primary importance that innocent shareholders vote at that meeting.  Disclosure of the Defendants' bad acts will help the voting process work as it should.  But that remedy, standing alone, would allow Defendants to enjoy the benefits of their wrongdoing, and would present no deterrent to future violations of Section 13(d) by these Defendants or others.  TCI and 3G, therefore, must be prevented from voting their CSX shares at the annual general meeting.  Further, in case that Defendants lose the proxy contest, they must also be prevented from selling their shares until at least three days after the annual meeting, so that innocent CSX shareholders are not harmed.

In addition, Austin Friars and other CSX investors who were secretly and selectively tipped off by the Defendants about CSX must be prevented from voting their shares at the annual meeting.  Those investors are not currently before the Court, but the parties shall assemble a list of all investors who were tipped off, and the parties shall propose a mechanism for ensuring that their shares are not voted at the annual general meeting.  If any tippee refuses, the parties shall propose to the Court a procedure for bringing that tippee under its jurisdiction.  The parties shall provide Deutsche Bank and Citigroup a copy of this order and request that they submit for my review a statement of their intentions concerning the voting of CSX shares at the annual meeting and, if they decline, propose to the Court a procedure for bringing them under its jurisdiction.

Finally, the parties shall advise the Court of any evidence of conduct that is contrary to the relief ordered by the Court.  Within one week of the annual general meeting, each party shall therefore submit a report as to whether the Court's order has been violated.

## Conclusion

Based upon the foregoing evidence and law, judgment should be entered in favor of CSX on the terms described herein.

Dated: May 27, 2008
       New York, NY

                          Respectfully submitted,

                          **CRAVATH, SWAINE & MOORE LLP,**

                          by _____
                                Rory O. Millson
                                Francis P. Barron
                                David R. Marriott
                                Members of the Firm

                          Attorneys for Plaintiff
                          825 Eighth Avenue
                          New York, NY 10019
                          (212) 474-1000

                                RMillson@cravath.com
                                FBarron@cravath.com
                                DMarriott@cravath.com

DEWEY PEGNO & KRAMARSKY LLP
Keara A. Bergin
220 East 42nd Street
New York, NY 10017
(212) 943-9000
KBergin@dpklaw.com

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
Lance J. Gotko
Paul J. Fishman
1633 Broadway
New York, NY 10019-6708
(212) 833-1100
LGotko@fklaw.com
PFishman@fklaw.com

Attorneys for Plaintiff CSX

Addendum A

## LIST OF ALL KNOWN SWAP AND STOCK TRANSACTIONS (3G)

Source: 

### Initial CDS Transactions

| Effective Date | Maturity Date | Buy/Sell | Notional |
|---|---|---|---|
| 15-Feb-2007 | 20-Mar-2012 | B | 30,000,000 |
|  | 20-Mar-2012 | S | (10,000,000) |
|  | 20-Mar-2012 | S | (20,000,000) |
| 14-Feb-2007 | 20-Mar-2012 | B | 30,000,000 |
| 15-Feb-2007 | 20-Mar-2012 | B | 10,000,000 |
|  | 20-Mar-2012 | S | (10,000,000) |
| 14-Feb-2007 | 20-Mar-2012 | B | 10,000,000 |
|  | 20-Mar-2012 | S | (10,000,000) |

Plaintiff's Exhibit 274

### PURCHASES/ SALES

| Type | Trading Date | Quantity | Avg. Price |
|---|---|---|---|
| Stock | 2/9/07 | 1,700,000 | 36.8700 |
| Stock | 2/12/07 | 2,029,833 | 37.6000 |
| Stock | 2/13/07 | 2,350,000 | 39.1100 |
| Stock | 2/13/07 | 100,000 | 39.3300 |
| Stock | 2/14/07 | 642,800 | 40.2200 |
| Stock | 2/14/07 | 970,900 | 41.4800 |
| Stock | 2/15/07 | 485,860 | 41.2300 |
| Stock | 2/16/07 | 40 | 37.9800 |
| Stock | 2/20/07 | -17,300 | 40.3300 |
| Stock | 2/22/07 | -40 | 41.2600 |

| Type | Trading Date | Quantity | Avg. Price |
|---|---|---|---|
| Stock | 3/29/07 | 600,000 | 39.8100 |
| Stock | 3/29/07 | 114 | 39.9400 |
| Stock | 3/30/07 | 550,000 | 40.3000 |
| Stock | 4/2/07 | 1,528,700 | 38.8500 |
| Stock | 4/2/07 | 1,880,986 | 39.6900 |
| Stock | 4/2/07 | 1,091,879 | 40.2100 |
| Stock | 4/3/07 | 954,822 | 40.2500 |
| Stock | 4/4/07 | 150,550 | 40.9900 |
| Stock | 4/5/07 | 672,000 | 41.1200 |
| Stock | 4/5/07 | 360,000 | 40.9000 |
| Stock | 4/5/07 | 290,000 | 41.0500 |
| Stock | 4/6/07 | 757,100 | 40.1500 |
| Stock | 4/9/07 | 120,000 | 42.0300 |
| Stock | 4/9/07 | 493,000 | 41.9700 |
| Stock | 4/10/07 | 300,000 | 41.9300 |
| Stock | 4/10/07 | 500,000 | 41.8800 |
| Stock | 4/11/07 | 835,000 | 41.7800 |
| Stock | 4/12/07 | 80,950 | 41.8200 |
| Stock | 4/13/07 | 14,200 | 42.0100 |
| Stock | 4/17/07 | 6,500 | 41.8000 |

| Type | Trading Date | Quantity | Avg. Price |
|---|---|---|---|
| Stock | 8/15/07 | 492,809 | 42.1700 |
| Swap | 8/16/07 | 600,000 | 41.2317 |
| Swap | 8/16/07 | 1,100,000 | 41.2517 |
| Stock | 8/24/07 | -165,800 | 43.0700 |
| Stock | 8/24/07 | -47,300 | 43.0700 |
| Stock | 8/27/07 | -520,835 | 43.0700 |
| Stock | 8/27/07 | -148,810 | 43.0700 |
| Stock | 8/28/07 | -82,500 | 41.6800 |
| Stock | 8/28/07 | -1,017,870 | 41.6800 |
| Stock | 8/29/07 | -1,180,809 | 41.2600 |
| Stock | 8/29/07 | -95,741 | 41.2600 |
| Stock | 8/30/07 | -1,163,662 | 40.7300 |
| Stock | 8/30/07 | -94,400 | 40.7300 |
| Stock | 8/30/07 | -21,106 | 40.7300 |
| Stock | 9/11/07 | -795,289 | 38.9900 |
| Stock | 9/11/07 | -140,345 | 38.9900 |
| Stock | 9/12/07 | -110,600 | 38.9900 |
| Stock | 9/12/07 | -626,783 | 38.9900 |
| Stock | 9/13/07 | -1,080,327 | 39.1900 |
| Stock | 9/13/07 | -190,600 | 39.1900 |
| Stock | 9/13/07 | -190,000 | 38.6000 |
| Stock | 9/14/07 | 11,700 | 38.4900 |
| Stock | 9/14/07 | -186,650 | 38.4900 |
| Stock | 9/14/07 | 66,306 | 38.4900 |
| Stock | 9/14/07 | -587,150 | 38.3700 |
| Stock | 9/14/07 | -103,600 | 38.3700 |

---

**2/9/07 – 2/22/07**
Agreement to Form Group


Plaintiff's Exhibit 42

**3/29/07 – 4/17/07**
Group Meeting on 3/29/07

Plaintiff's Exhibit 68

**8/15/07 – 9/14/07**
Group's View on Economy

From: Chris Hohn
To: Snehal Amin
Sent: Wed Sep 12 06:31:18 2007
Subject: Re: rails

I do think there are prices we should reduce csx. I am not a believer that there is no price where we should not sell - a concept which I am still not sure you have bought into.

### EXHIBITS

From: Chris Hohn
Sent: Tue 13/02/2007 11:06
To: Snehal Amin
Subject: Re: Arcelor Brasil MTO - urgent

I will call in a minute to discuss.

Increased activity in cmx cds has caused excitement in the stock. I want to also discuss our friend alex of Brazil.

| Subject: | Alex |
|---|---|
| Location: | 800 3 ave and 50th |
| Start: | Thu 3/29/2007 10:00 AM |
| End: | Thu 3/29/2007 11:00 AM |
| Recurrence: | (none) |

From: Chris Hohn
Sent: 08 September 2007 10:12
To: Patrick Degeorge; Snehal Amin; Rishi Sunak
Subject: Csx


Plaintiff's Exhibit 126

This stock is at best dead money for 2008 if not a lossmaker in the next year.

Long term irr is 15pc.

Our model assumptions in end july were crazy . -2pc volume for 2007 and +1.5pc for 2008.

selling calls is better than straddle if stock is going to be under pressure. On thursday we could have sold 50 strike jun 2009 calls at 4 dollars. Now they are 3. I like that sale at 4 dollars for the stock we will hold.


Plaintiff's Exhibit 126

From: Chris Hohn
To: Snehal Amin; Rishi Sunak
Cc: Patrick Degeorge
Sent: Tue Sep 11 22:05:37 2007
Subject: rails

the US economy is definitely in difficulty.

Having not done proper work on the volume issue in the past I do want to step up our work this time to see if there is another shoe to drop on the volumes as the US economy weakens. What can we do on this ?

# LIST OF ALL KNOWN SWAP AND STOCK TRANSACTIONS (3G)
## (cont'd)

Source: 

**PURCHASES/ SALES**

| Type | Trading Date | Quantity | Avg. Price |
|---|---|---|---|
| Stock | 9/26/07 | 449,122 | 41.4000 |
| Stock | 9/26/07 | 168,200 | 41.3800 |
| Stock | 9/26/07 | 82,400 | 41.4000 |
| Stock | 9/26/07 | 30,800 | 41.3800 |
| Stock | 9/27/07 | 120,000 | 42.2100 |
| Stock | 9/27/07 | 42,000 | 42.3500 |
| Stock | 9/27/07 | 889,300 | 42.2100 |
| Stock | 9/27/07 | 308,000 | 42.3500 |
| Stock | 9/27/07 | 25,700 | 42.3500 |
| Stock | 9/28/07 | 271,200 | 42.8200 |
| Stock | 9/28/07 | 133,000 | 42.9300 |
| Stock | 9/28/07 | 3,156 | 42.8200 |
| Stock | 9/28/07 | 44,844 | 42.8200 |
| Stock | 9/28/07 | 1,512 | 42.9300 |
| Stock | 9/28/07 | 23,488 | 42.9300 |
| Stock | 10/1/07 | 233,200 | 43.2300 |
| Stock | 10/1/07 | 41,000 | 43.2300 |
| Stock | 10/2/07 | 12,500 | 42.9800 |
| Stock | 10/2/07 | 31,900 | 42.9800 |
| Stock | 10/2/07 | 2,200 | 42.9800 |
| Stock | 10/2/07 | 5,600 | 42.9800 |
| Stock | 10/3/07 | 150,000 | 41.9100 |
| Stock | 10/3/07 | 850,000 | 41.9100 |
| Stock | 10/4/07 | 225,900 | 41.9400 |
| Stock | 10/4/07 | 30,461 | 41.9400 |
| Stock | 10/4/07 | 9,539 | 41.9400 |
| Stock | 10/5/07 | 16,500 | 43.3000 |
| Stock | 10/5/07 | 93,500 | 43.3000 |

| Type | Trading Date | Quantity | Avg. Price |
|---|---|---|---|
| Stock | 10/11/07 | 359,000 | 42.0800 |
| Stock | 10/11/07 | 63,200 | 42.0800 |
| Stock | 10/12/07 | 235,500 | 42.5100 |
| Stock | 10/12/07 | 41,600 | 42.5100 |
| Stock | 10/15/07 | 37,700 | 42.5500 |
| Stock | 10/15/07 | 214,000 | 42.5500 |

| Type | Trading Date | Quantity | Avg. Price |
|---|---|---|---|
| Swap | 11/1/07 | 68,000 | 43.5365 |
| Swap | 11/1/07 | 12,000 | 43.5365 |
| Stock | 11/1/07 | 358,100 | 43.8400 |
| Stock | 11/1/07 | 63,200 | 43.8400 |
| Swap | 11/2/07 | 425,000 | 43.2672 |
| Swap | 11/2/07 | 75,000 | 43.2672 |
| Swap | 11/5/07 | 255,000 | 43.7840 |
| Swap | 11/5/07 | 45,000 | 43.7840 |
| Swap | 11/7/07 | 510,000 | 43.9400 |
| Swap | 11/7/07 | 90,000 | 43.9400 |
| Swap | 11/8/07 | 85,000 | 43.9400 |
| Swap | 11/8/07 | 15,000 | 43.9400 |

---

**9/26/07 – 10/5/07**
Group Agreement to Launch Proxy Contest and 9/26 Meeting

**10/11/07 – 10/15/07**
Group's Recruitment of Nominees

**11/1/07 – 11/08/07**
Mr. Lamphere Joins the Group

**EXHIBITS**













Addendum B

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 82-1853

SAN FRANCISCO REAL ESTATE INVESTORS,

Plaintiff-Appellant,

v.

REAL ESTATE INVESTMENT TRUST OF AMERICA,
GEORGE HOWLAND, THOMAS S.K. BUTLER, C. JERRY RAGOSA,
JOHN Q. ADAMS, FRANCIS H. BURR, JOHN H. GARDINER, and
FRANCIS C. WELCH,

Defendants and Counterclaimants-Appellees,

v.

SAN FRANCISCO REAL ESTATE INVESTORS, UNICORP AMERICAN
CORPORATION, UNICORP CANADA CORPORATION and GEORGE S. MANN,

Counterclaim Defendants-Appellants.

On Appeal From the United States District Court
for the District of Massachussetts

BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, AMICUS CURIAE

JACOB H. STILLMAN
Associate General Counsel

DAVID A. SIRIGNANO
Special Counsel

Securities and Exchange Commission
Washington, D.C.  20549

INDEX

|  | Page |
|---|---|
| CITATIONS ...................................................... | ii |
| PRELIMINARY STATEMENT AND INTEREST OF THE SECURITIES AND EXCHANGE COMMISSION .................................... | 1 |
| ARGUMENT........................................................ | 4 |

I.  IMPLIED PRIVATE RIGHTS OF ACTION FOR EQUITABLE RELIEF
    EXIST UNDER SECTIONS 13(d), 14(d) and 14(e) OF THE
    SECURITIES EXCHANGE ACT IN FAVOR OF THE ISSUER CORPORA-
    TION AND A TENDER OFFEROR WHEN, AS HERE, THEY SEEK
    INJUNCTIVE RELIEF TO HALT OR CORRECT ALLEGED VIOLATIONS OF
    THOSE PROVISIONS AND OTHER EQUITABLE RELIEF ...............   4

    A.  The contemporary legal context at the times when
        Congress enacted and later amended the Williams
        Act establishes that it intended to create and
        preserve implied rights of action for equitable
        relief under that Act in favor of issuers and
        tender offerors ....................................  11

        1.  Congress' intent to create private remedies
            under the Williams Act is established by its
            decision in 1968 to model that legislation
            after the proxy provisions under which the
            existence of a private right of action was
            already well established .........................  11

        2.  The congressional intent to preserve private
            remedies under the Williams Act is evidenced
            by Congress' failure to overturn cases recog-
            nizing such private rights of action when it
            amended the statute ..............................  15

    B.  The traditional Cort v. Ash analysis further
        demonstrates the existence of implied rights of
        action for equitable relief under the Williams
        Act ................................................  21

        1.  Implying private rights of action for equit-
            able relief on behalf of issuer corporations
            and tender offerors would benefit shareholders,
            intended beneficiaries of the Williams Act ........  21

i

Page

2.  Congress intended to create private rights
    of action for equitable relief under the
    Williams Act ..................................... 27

3.  Implication of private remedies for equitable
    relief in this case would be consistent with
    the congressional purpose ........................ 29

4.  Actions for equitable relief to remedy viola-
    tions of the Williams Act are not matters
    relegated to the states .......................... 31

II.  A DISTRICT COURT HAS THE AUTHORITY, IN A SUIT ALLEGING
     VIOLATIONS OF THE WILLIAMS ACT, TO ORDER EQUITABLE
     RELIEF IN ADDITION TO CORRECTIVE DISCLOSURE;  THE
     PROPRIETY OF SUCH RELIEF SHOULD BE JUDGED ON AN ABUSE
     OF DISCRETION STANDARD ................................. 32

CONCLUSION ................................................. 39

## TABLE OF CITATIONS

<u>Cases:</u>

Agency Rent-A-Car, Inc. v. Connolly, 686 F.2d 1029
   (1st Cir. 1982) ........................................ 38

American Bakeries Co. v. Pro-Met Trading Co., [1981]
   Fed. Sec. L. Rep. (CCH) ¶97,925 (N.D. Ill. 1981) ............. 7

Applied Digital Data Systems, Inc. v. Milgo Electronic
   Corp., 425 F. Supp. 1145 (S.D.N.Y. 1977) ..................... 8

Armour and Company v. General Host Corp., 296 F. Supp.
   470 (S.D.N.Y. 1969) ........................................ 18

Bath Industries, Inc. v. Blot, 427 F.2d 97 (7th Cir. 1970) ...... 13,18,36,37

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975) ...... 19

Brown v. GSA, 425 U.S. 820 (1976) ............................... 20

Butler Aviation Int'l, Inc. v. Comprehensive Designers, Inc., 425
   F.2d 842 (2d Cir. 1970) .................................... 8,18,37,38

Page

Cases (continued):

Cannon v. University of Chicago, 441 U.S. 677 (1979) ........... 11,12,14,20 passim

Chromalloy American Corp. v. Sun Chemical Corp., 611 F.2d
   240 (8th Cir. 1979) ........................................ 7

Committee for New Management of Butler Aviation v.
   Widmark, 335 F. Supp. 146 (E.D.N.Y. 1971) ................. 35,36,37

Cort v. Ash, 422 U.S. 66 (1975) .............................. 10,11,20,21 passim

Crane Co. v. American Standard, Inc., 603 F.2d 244 (2d Cir.
   1979) ..................................................... 3

Crane Co. v. Anaconda Co., 411 F. Supp. 1208 (S.D.N.Y.
   1975) ..................................................... 8

Crane Company v. Harsco Corp., 511 F. Supp. 294 (D. Del.
   1981) ..................................................... 21,22,23,28 passim

Crane v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir.
   1969); cert. denied, 400 U.S. 822 (1970) .................. 18

Dan River, Inc. v. Unitex Ltd., 624 F.2d 1216 (4th Cir.
   1980), cert. denied, 449 U.S. 1101 (1981) ................. 7

Deckert v. Independence Shares Corp., 311 U.S. 282 (1940) ....... 33

Edgar v. Mite Corp., 102 S. Ct. 2629 (1982) .................... 38

Electronic Specialty Corp. v. International Controls Corp.,
   409 F.2d 937 (2d Cir. 1969) ............................... 8,9,18,23 passim

Fabrikant v. Jacobellis, [1969-70] Fed. Sec. L. Rep. (CCH)
   ¶92,686 (E.D.N.Y. 1970) ................................... 18

Financial General Bankshares v. Lance, [1978] Fed. Sec.
   L. Rep. (CCH) ¶96,403 (D.D.C. 1978) ....................... 35

First Alabama Bancshares, Inc. v. Lowder, [1981] Fed.
   Sec. L. Rep. (CCH) ¶98,015 (N.D. Ala. 1981) ............... 7,8

GAF Corporation v. Milstein, 453 F.2d 707 (2d Cir. 1971),
   cert. denied, 406 U.S. 910 (1972) ......................... 5,7,13,18 passim

Cases (continued):

Gateway Industries, Inc. v. Agency Rent-A-Car, Inc., 492 F. Supp.
    92 (N.D. Ill.), appeal dismissed per stipulation, No. 80-1871
    (7th Cir. 1980) ............................................. 7,20,22,27

General Aircraft Corp. v. Lampert, 556 F.2d 90 (1st Cir.
    1977) ...................................................... 4,7,33,34

General Steel Industries, Inc. v. Walco National Corp.,
    [1981-1982] Fed. Sec. L. Rep. (CCH) ¶98,402 (E.D. Mo. 1981),
    appeal dismissed per stipulation, No. 81-2345 ................. 35

Graphic Sciences, Inc. v. International Mogul Mines
    Limited, 397 F. Supp. 112 (D.D.C. 1974) ...................... 19

Grow Chemical Corporation v. Uran, 316 F. Supp. 891
    (S.D.N.Y. 1970) ............................................. 18

Gulf & Western Industries, v. Great A&P Tea Co., 476
    F.2d 687 (2d Cir. 1973) ..................................... 29

H. K. Porter Co. v. Nicholson File Co., 482 F.2d 421 (1st Cir.
    1973) ...................................................... 8

Hecht Co. v. Bowles, 321 U.S. 321 (1944) ...................... 4,33,38

Humana, Inc. v. American Medicorp, Inc., 445 F. Supp.
    613 (S.D.N.Y. 1977) ......................................... 8,22

Indiana National Bank v. Mobil Oil Corp., 578 F.2d
    180 (7th Cir. 1978) ......................................... 8

J. I. Case Co. v. Borak, 377 U.S. 426 (1964) ................... 12,14,15,18 passim

Jacobs v. Pabst Brewing Co., [Current] Fed. Sec. L. Rep.
    (CCH) ¶98,861 (N.D. Del. 1982) .............................. 7

Kaufman & Broad, Inc. v. Belzberg, 522 F. Supp. 35
    (S.D.N.Y. 1981) ............................................. 7

Kirsch Co. v. Bliss & Laughlin Industries, Inc., 495
    F. Supp. 488 (W.D. Mich. 1980) .............................. 7

Leff v. CIP Corporation, 540 F. Supp. 857 (S.D. Ohio 1982) ...... 7

Leist v. Simplot, 638 F.2d 283 (1980), aff'd sub nom., Merrill
    Lynch, Pierce, Fenner & Smith v. Curran, 102 S. Ct. 1825 (1982).  14,18

iv

Page

Cases (continued):

Life Investors, Inc. v. AGO Holding Co., [1981-82] Fed.
    Sec. L. Rep. (CCH) ¶98,356 (8th Cir. 1981) ................... 33

Ludlow Corp. v. Tyco Laboratories, Inc., [1981-82]
    Fed. Sec. L. Rep. (CCH) ¶98,382 (D. Mass. 1981) .............. 7

Ludlow Corp. v. Tyco Laboratories, Inc., 529 F. Supp. 62
    (D. Mass. 1981) .......................................... 35

Luptak v. Central Cartage Co., [1981] Fed. Sec. L. Rep.
    (CCH) ¶98,034 (E.D. Mich. 1979) .......................... 8

Merrill Lynch, Pierce Fenner & Smith v. Curran, 102 S. Ct.
    1825 (1982) ............................................. 10,11,14,17 passim

Mesa Petroleum Co. v. Aztec Oil & Gas Co., 406 F. Supp.
    910 (N.D. Texas 1976) .................................... 8

Metro-Goldwyn-Mayer, Inc v. Transamerica Corp., 303 F. Supp.
    1354 (S.D.N.Y. 1969) ..................................... 18

Mid-Continent Bancshares, Inc. v. O'Brien, [Current] Fed.
    Sec. L. Rep. (CCH) ¶98,734 (E.D. Mo. 1981) ................ 7,8

Mills v. Electric Auto-Lite Company, 396 U.S. 375 (1970) ........ 19,30,38

Missouri Portland Cement Co. v. H.K. Porter Co., 535
    F.2d 388 (8th Cir. 1976) ................................. 35

Mobil Corp. v. Marathon Oil Co., 669 F.2d 366 (6th Cir.
    1981) .................................................... 8,22,27,30 passim

Pacific Realty Trust v. APC Investments, Inc., 685 F.2d
    1083 (9th Cir. 1982) ..................................... 37

Piper v. Chris-Craft Industries, Inc., 430 U.S. 1 (1977) ........ 4,8,9,15 passim

Porter v. Warner Holding Co., 328 U.S. 395 (1946) .............. 33

Rondeau v. Mosinee Paper Corporation, 422 U.S. 49 (1975) ........ 20,34,36

Rosenbaum v. Klein, [Current] Fed. Sec. L. Rep. (CCH)
    ¶98,879 (E.D. Pa. Sept. 13, 1982) ........................ 7

S-G Securities, Inc. v. The Fuqua Investment Co., 466
    F. Supp. 1114 (D. Mass. 1978) ............................ 35

Page

Cases (continued):

Saunders Leasing System, Inc. v. Societe Holding Gray
    D'Albion, S.A., 507 F. Supp. 627 (N.D. Ala. 1981) ............    7

Scott v. Multi-Amp Corp., 386 F. Supp. 44 (D.N.J. 1974) ........    8

Securities and Exchange Commission v. Manor Nursing
    Centers, Inc., 458 F.2d 1082 (2d Cir. 1972) ..................    33

Securities and Exchange Commission v. Savoy Industries,
    Inc., 587 F.2d 1149 (D.C. Cir. 1978), cert. denied,
    440 U.S. 913 (1979) ..........................................    24

Sisak v. Wings and Wheels Express, Inc., [1970-1971]
    Fed. Sec. L. Rep. (CCH) ¶92,991 (S.D.N.Y. 1970) ..............    18

Sonesta Int'l Hotels Corp. v. Wellington Associates,
    483 F.2d 247 (2d Cir. 1973) ..................................    33

Spencer Companies, Inc. v. Agency Rent-A-Car, Inc., [1981-
    1982] Fed. Sec. L. Rep. (CCH) ¶98,301 (D. Mass. 1981) ........    7,25

Standard Metals Corp. v. Tomlin, 503 F. Supp. 586 (S.D.N.Y.
    1980) ........................................................    7

Sta-Rite Industries, Inc. v. Nortek, Inc., 494 F. Supp.
    358 (E.D. Wisc. 1980) ........................................    7

Susquehanna Corporation v. Pan American Sulphur Company,
    423 F.2d 1075 (5th Cir. 1970) ................................    18,30,31

Texas & Pacific Railway Company v. Rigsby, 241 U.S. 33
    (1916) .......................................................    17

The Hanna Mining Co. v. Norcen Energy Resources Limited, [Current]
    Fed. Sec. L. Rep. (CCH) ¶98,878 (N.D. Ohio 1982), appeal dis-
    missed per stipulation, No. 82-3336 (6th Cir., July 8, 1982) ..    7,35

Touche Ross & Company v. Redington, 442 U.S. 560 (1979) ........    10,26,28

Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S.
    11 (1979) ....................................................    10,26,27,32

Treadway Companies, Inc. v. Care Corp., 638 F.2d 357 (2d
    Cir. 1980) ...................................................    7,35

Page

Cases (continued):

Twin Fair, Inc. v. Reger, 394 F. Supp. 156 (W.D.N.Y. 1975) ......    35

United States v. City of Parma, 661 F.2d 562 (6th Cir.
    1981); cert. denied, 102 S. Ct. 1972 (1982) ..................    33

Universal Container Corp. v. Horwitz, [1977-78] Fed. Sec.
    L. Rep. (CCH) ¶96,161 (S.D.N.Y. 1977) ........................    36

W. A. Krueger Co. v. Kirkpatrick, Pettis, Smith Polian,
    Inc., 466 F. Supp. 800 (D. Neb. 1979) ........................    17

Wachovia Bank and Trust Co. v. National Student
    Marketing Corp., 650 F.2d 342 (D.C. Cir. 1980),
    cert. denied, 452 U.S. 954 (1981) ............................    19

Water & Well Associates, Inc. v. American Consumer
    Industries, Inc. [1973] Fed. Sec. L. Rep. (CCH)
    ¶93,943 (D.N.J. 1973) ........................................    19

Weeks Dredging & Contracting, Inc. v. American Dredging
    Co., 451 F. Supp. 468 (E.D. Pa. 1978) ........................    8,23

Wellman v. Dickinson, 475 F. Supp. 783 (S.D.N.Y. 1979), aff'd,
    682 F.2 355 (2d Cir. 1982) ...................................    8

Whittaker Corp. v. Edgar, 535 F. Supp. 933 (N.D. Ill.
    1982) ........................................................    8

Statutes and Rules:

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.:

    Section 13(d), 15 U.S.C. 78m(d) ...........................    1,2,4,7 passim
    Section 13(d)(1), 15 U.S.C. 78m(d)(1) .....................    5
    Section 14(a), 15 U.S.C. 78n(a) ...........................    12
    Section 14(d), 15 U.S.C. 78n(d) ...........................    1,2,26
    Section 14(d)(1), 15 U.S.C. 78n(d)(1) .....................    6
    Section 14(d)(4), 15 U.S.C. 78n(d)(4) .....................    25
    Section 14(e), 15 U.S.C. 78n(e) ...........................    1,2,6,9, passim
    Section 17(a), 15 U.S.C. 78q(a) ...........................    26
    Section 18, 15 U.S.C. 78r .................................    28
    Section 21, 15 U.S.C. 78u .................................    28
    Section 32, 15 U.S.C. 78ff ................................    28

Page

Statutes and Rules (continued):

Rules Under the Securities Exchange Act:

      Rule 10b-5, 17 CFR 240.10b-5 .............................. 17
      Rule 14d-9(a), 17 CFR 240.14d-9(a) ........................ 25

Investment Advisers Act, 15 U.S.C. 80b-200a, et seq.:

      Section 206, 15 U.S.C. 80b-206 ............................ 26,27

Civil Rights Act of 1964, Title VI:

      42 U.S.C. 2000d .......................................... 12

Commodity Exchange Act:

      7 U.S.C. 1 ............................................... 16

Education Amendments of 1972, Title IX:

      Section 901(a), 20 U.S.C. 1681 ........................... 12

Miscellaneous:

H.R. Rep. No. 1711, 90th Cong. 2d Sess. (1968) ................. 4,5,13,36

H.R. Rep. No. 91-1655, 91st Cong., 2d Sess. (1970) ............. 23

Hearings on H.R. 14475, S. 510 Before the Submittee
   on Commerce and Finance of the House Committee on
   Interstate and Foreign Commerce, 90th Cong., 2d Sess.
   (1968) ........................................................ 15

Hearings on S. 510 before the Subcomm. on Securities of
   the Senate Comm. on Banking and Currency, 90th Cong.,
   1st Sess. (1967) .............................................. 13,15,25

J. Pomeroy, Equity Jurisprudence (5th ed. 1941) ................. 33

Pub. L. No. 91-567, 84 Stat. 1497 (Dec. 22, 1970) .............. 17

S. Rep. No. 550, 90th Cong., 1st Sess. (1967) ................... 13,21,36

Miscellaneous (continued):

113 Cong. Rec. 857 (1967) ........................................    25

113 Cong. Rec. 24665 (1967) ....................................    13,25

116 Cong. Rec. 3024 (1970) .....................................    19

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

No. 82-1853

_____

SAN FRANCISCO REAL ESTATE INVESTORS,

Plaintiff-Appellant,

v.

REAL ESTATE INVESTMENT TRUST OF AMERICA,
GEORGE HOWLAND, THOMAS S.K. BUTLER, C. JERRY RAGOSA,
JOHN Q. ADAMS, FRANCIS H. BURR, JOHN H. GARDINER, and
FRANCIS C. WELCH,

Defendants and Counterclaimants-Appellees,

v.

SAN FRANCISCO REAL ESTATE INVESTORS, UNICORP AMERICAN
CORPORATION, UNICORP CANADA CORPORATION and GEORGE S. MANN,

Counterclaim Defendants-Appellants.

_____

On Appeal From the United States District Court
for the District of Massachussetts

_____

BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, AMICUS CURIAE

_____

PRELIMINARY STATEMENT AND INTEREST OF
THE SECURITIES AND EXCHANGE COMMISSION

The Securities and Exchange Commission, the agency primarily responsible

for administering the Securities Exchange Act of 1934, including the Williams

Act amendments of which Sections 13(d), 14(d) and 14(e) of the Act, 15 U.S.C.

78m(d), 78n(d) and 78n(e), are important parts, submits this brief, amicus

curiae, to express its views on the following legal issues before this Court

concerning the interpretation and enforcement of those statutory provisions:

- 2 -

(1)  Whether private rights of action exist under Sections
     13(d), 14(d), and 14(e) of the Securities Exchange Act
     in favor of the issuer corporation and a tender offeror
     when they seek injunctive relief to halt or correct alleged
     violations of those sections and other equitable relief; and

(2)  Whether a federal district court, in a private action
     under the Williams Act provisions, has authority, under
     appropriate circumstances, to order -- in addition to
     corrective disclosure -- other equitable remedies.

In this action, San Francisco Real Estate Investors ("SFREI") claims
that Real Estate Investment Trust of America ("REITA") violated Section 14(e)
of the Securities Exchange Act by adopting a by-law limiting beneficial
ownership in REITA by any person to 9.8 percent of REITA's outstanding
securities.  REITA has counterclaimed, alleging that SFREI and Unicorp
American Corporation, Unicorp Canada Corporation, and George S. Mann
("counterclaim defendants") violated Sections 13(d), 14(d) and 14(e) of
the Securities Exchange Act in connection with SFREI's purchases of REITA
securities and its tender offer to obtain control of REITA.  On REITA's
motion, the district court entered a preliminary injunction restraining
SFREI's tender offer.

In this appeal by SFREI and the other counterclaim defendants, the
latter appellants argue that REITA lacks standing to sue under Section
13(d).  Because Congress did not provide an express private cause of
action under any of the provisions of the Williams Act, the standing of
both SFREI and REITA to assert their claims turns on whether private rights
of action in their favor may be implied.  The Commission is concerned that

denying issuers and tender offerors standing to obtain an injunction halt-
ing or correcting violations of the Williams Act provisions and to obtain
other equitable relief will severely restrict enforcement of that Act.
Since the Commission does not have the resources to scrutinize every tender
offer or other major acquisition subject to the Williams Act, effective
private enforcement of its provisions is essential to effectuate the statu-
tory purpose. Moreover, private litigants usually have the "greatest motive
and opportunity to seek such relief." Crane Co. v. American Standard, Inc.,
603 F.2d 244, 254 n.23 (2d Cir. 1979). Thus, to deny them standing to seek
injunctive relief to halt or correct violations of the Williams Act and
other equitable relief benefiting shareholders would have the effect of
thwarting the intent of Congress.

Appellants further argue that, as a matter of law, a district court
lacks the power to enjoin a tender offer based upon a finding that the
tender offeror has filed a false Schedule 13D in violation of Section
13(d), where the inaccuracies have been corrected by a subsequent amendment
to the filing. The Commission is concerned that this position as to relief,
if adopted by this Court, would represent an unduly restrictive interpreta-
tion of the Williams Act. Although an interlocutory injunction against
proceeding with a tender offer could in certain situations constitute a
harsh and unwarranted remedy, the Commission believes that under appropriate
circumstances it is among the "variety of tools" available to courts of
equity to remedy violations of the Williams Act (Electronic Specialty Corp.
v. International Controls Corp., 409 F.2d 937, 947 (2d Cir. 1969)), and that
the availability of such relief is consistent with the "historic injunctive

- 4 -

process * * * to mould each decree to the necessities of the particular case" (Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944)).

As amicus curiae, the Commission expresses no view on any factual disputes in this case, or on its ultimate disposition, or on the appropriateness of granting any particular relief.  In addition, the Commission expresses no view on any legal issue involved in this case other than the existence of a private right of action for equitable relief under the Williams Act and the availability of equitable relief beyond corrective disclosure to remedy violations of that Act, issues in which the Commission has had a longstanding interest.

ARGUMENT

I.   IMPLIED PRIVATE RIGHTS OF ACTION FOR EQUITABLE RELIEF EXIST UNDER
     SECTIONS 13(d), 14(d) AND 14(e) OF THE SECURITIES EXCHANGE ACT IN
     FAVOR OF THE ISSUER CORPORATION AND A TENDER OFFEROR WHEN, AS HERE,
     THEY SEEK INJUNCTIVE RELIEF TO HALT OR CORRECT ALLEGED VIOLATIONS
     OF THOSE PROVISIONS AND OTHER EQUITABLE RELIEF.

The Williams Act amendments to the Securities Exchange Act have as a major purpose the protection of shareholders confronted with the possibility of a change in the control of their corporation by giving those shareholders certain protections including disclosure of information concerning persons in a position to effect such change in control.  See Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 22-24 (1977); General Aircraft Corp. v. Lampert, 556 F.2d 90, 94 (1st Cir. 1977); H.R. Rep. No. 1711, 90th Cong. 2d Sess. 3-4 (1968) (hereinafter "H.R. Rep. at —"). In particular, Section 13(d), a key provision of the Williams Act, is designed to require disclosure of information to issuer corporations and their shareholders by "persons who have acquired a substantial interest, or increased their interest in the equity

- 5 -

securities of a company by a substantial amount, within a relatively short period of time." H.R. Rep. at 8. See also GAF Corporation v. Milstein, 453 F.2d 707, 717 (2d Cir. 1971), cert. denied, 406 U.S. 910 (1972). It does so by requiring such persons to send to the issuer and file with the Commission a statement (a Schedule 13D) containing information specified by the Section and required by Commission rules and regulations. 1/ Similarly, Sections 14(d) and 14(e) ensure that shareholders confronted with a tender offer are not required to decide whether to tender their shares on the basis of inadequate or misleading information. Section 14(d) thus requires, among other things, that bidders send to the issuer and its shareholders and file with the Commission a statement describing, among other things, the background and identity of the offeror, the source and amount of funds or other consideration to be used in making the purchases, the extent of the offeror's holdings in the issuer corporation, and the offeror's plans with respect to

---

1/    Section 13(d)(1), 15 U.S.C. 78(d)(1), provides in pertinent part:

>    Any person who, after acquiring directly or indirectly
>    the beneficial ownership of any equity security of a
>    class which is registered pursuant to Section 12 of
>    [the Securities Exchange Act], * * * is directly or
>    indirectly the beneficial owner of more than 5 per
>    centum of such class shall, within ten days after such
>    acquisition, send to the issuer of the security * * *
>    [and] to each exchange where the security is traded,
>    and file with the Commission, a statement containing
>    * * * [information as specified by the Section and
>    required by Commission rules and regulations] as
>    necessary or appropriate in the public interest or
>    for the protection of investors. * * *.

the issuer corporation's business or corporate structure. 2/  And Section

14(e) prohibits deceptive, fraudulent and manipulative practices by all

persons in connection with tender offers. 3/

---

2/    Section 14(d)(1), 15 U.S.C. 78m(d)(1), provides in pertinent part:

> It shall be unlawful for any person, directly or
> indirectly, * * * to make a tender offer for, or a re-
> quest or invitation for tenders of, any class of any
> equity security which is registered pursuant to Section
> 12 of [the Securities Exchange Act], * * * if, after
> consummation thereof, such person would, directly or
> indirectly, be the beneficial owner of more than 5 per
> centum of such class, unless at the time copies of the
> offer or request or invitation are first published or
> sent or given to security holders such person has filed
> with the Commission a statement containing such of the
> information specified in section 13(d) of this title,
> and such additional information as the Commission may
> by rules and regulations prescribe as necessary or
> appropriate in the public interest or for the protec-
> tion of investors.  All requests or invitations for
> tenders or advertisements making a tender offer or
> requesting or inviting tenders of such a security
> shall be filed as a part of such statement and shall
> contain such of the information contained in such
> statement as the Commission may by rules and regula-
> tions prescribe.  * * * Copies of all statements, in
> the form in which such material is furnished to security
> holders and the Commission, shall be sent to the issuer
> not later than the date such material is first published
> or sent or given to any security holders.

3/    Section 14(e), 15 U.S.C. 78n(e), provides in pertinent part:

> It shall be unlawful for any person to make any untrue
> statement of a material fact or omit to state any material
> fact necessary in order to make the statements made, in
> the light of the circumstances under which they are made,
> not misleading, or to engage in any fraudulent, deceptive,
> or manipulative acts or practices, in connection with any
> tender offer or request or invitation for tenders, or any
> solicitation of security holders in opposition to or in
> favor of any such offer, request, or invitation.

- 7 -

While Congress did not provide an express private right of action for violations of Section 13(d), every court of appeals which has considered the question has held that an implied private right of action for equitable relief exists in favor of the issuer under that Section. See Treadway Companise, Inc. v. Care Corp., 638 F.2d 357 (2d Cir. 1980); Dan River, Inc. v. Unitex Limited, 624 F.2d 1216 (4th Cir. 1980), cert. denied, 449 U.S. 1101 (1981); Chromalloy American Corp. v. Sun Chemical Corp., 611 F.2d 240 (8th Cir. 1979); GAF Corp. v. Milstein, supra. 4/

---

4/    The district court opinions, however, lack such unanimity. Compare the following cases upholding an implied private right of action: Jacobs v. Pabst Brewing Co., [Current] Fed. Sec. L. Rep. (CCH) ¶98,861 (D. Del. 1982); The Hanna Mining Co. v. Norcen Resources Limited, [Current] Fed. Sec. L. Rep. (CCH) ¶98,878 (N.D. Ohio 1982), appeal dismissed per stipulation, No. 82-3336 (6th Cir., July 8, 1982); Mid-Continent Bancshares, Inc. v. O'Brien, [Current] Fed. Sec. L. Rep. (CCH) ¶98,734 (E.D. Mo. 1981); Spencer Companies, Inc. v. Agency Rent-A-Car, Inc., [1981-1982] Fed. Sec. L. Rep. (CCH) ¶98,301 (D. Mass. 1981); Ludlow Corp. v. Tyco Laboratories, Inc., [1981-82] Fed. Sec. L. Rep. (CCH) ¶98,382 (D. Mass. 1981); Saunders Leasing System, Inc. v. Societe Holding Grey D'Albion, S.A., 507 F. Supp. 627 (N.D. Ala. 1981); Kaufman & Broad, Inc. v. Belzberg, 522 F. Supp. 35 (S.D.N.Y. 1981); Standard Metals Corp. v. Tomlin, 503 F. Supp. 586 (S.D.N.Y. 1980); Kirsch Co. v. Bliss & Laughlin Industries, Inc., 495 F. Supp. 488 (W.D. Mich. 1980); W.A. Krueger Co. v. Kirkpatrick, Pettis, Smith, Polian, Inc., 466 F. Supp. 800 (D. Neb. 1979); Scott v. Multi-Amp Corp., 386 F. Supp. 44 (D.N.J. 1974); with the following cases holding no private right of action: Rosenbaum v. Klein, [Current] Fed. Sec. L. Rep. ¶98,879 (E.D. Pa. Sept. 13, 1982); Leff v. CIP Corporation, 540 F. Supp. 857 (S.D. Ohio 1982); First Alabama Bancshares, Inc. v. Lowder, [1981] Fed. Sec. L. Rep. (CCH) ¶98,015 (N.D. Ala. 1981); American Bakeries Co. v. Pro-Met Trading Co., [1981] Fed. Sec. L. Rep. (CCH) ¶97,925 (N.D. Ill. 1981); Gateway Industries, Inc. v. Agency Rent-A-Car, Inc.), 492 F. Supp. 92 (N.D. Ill.), appeal dismissed per stipulation, No. 80-1871 (7th Cir. 1980); Sta-Rite Industries, Inc. v. Nortek, Inc., 494 F. Supp. 358 (E.D. Wisc. 1980).

This Court in General Aircraft Corp. v. Lampert, supra, 556 F.2d at 94 n.5, did not question the issuer's standing under Section 13(d), noting that the defendants had not challenged the issuer corporation's standing. But see Dan River, Inc. v. Unitex, Ltd., supra, 624 F.2d at 1223 (construing General Aircraft Corp. as deciding the standing issue).

- 8 -

The courts of appeals have likewise upheld the existence of a private

right of action for equitable relief in favor of issuers and tender offerors

under Sections 14(d) and (e). See Mobil Corporation v. Marathon Oil Company,

669 F.2d 366 (6th Cir. 1981) (bidder has standing under Section 14(e));

Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2d

Cir. 1969) (issuer has standing under Sections 14(d) and 14(e)); Butler Avia-

tion Int'l, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842 (2d Cir.

1970) (issuer has standing under Section 14(e)). 5/

---

5/   See Indiana National Bank v. Mobil Oil Corp., 578 F.2d 180, 183 n.5
     (7th Cir. 1978) (in dictum assuming private right of action limited
     to shareholders under Section 14(e), but permitting issuer to assert
     that cause of action on behalf of shareholders). Accord, Mid-Continent
     Bankshares, Inc. v. O'Brien, supra, [Current] Fed. Sec. L. Rep. (CCH)
     ¶98,734, at 93,706-707.

     See also Whittaker Corp. v. Edgar, 535 F. Supp. 933 (N.D. Ill. 1982)
     (bidder has standing under §14(e)); Wellman v. Dickinson, 475 F. Supp.
     783, 816-817 (S.D.N.Y. 1979), aff'd, 682 F.2d 355 (2d Cir. 1982)
     (issuer has standing under §§14(d) and 14(e)); Weeks Dredging & Con-
     tracting, Inc. v. American Dredging Co., 451 F. Supp. 468 (E.D. Pa.
     1978) (bidder has standing under §14(e)); Humana, Inc. v. American
     Medicorp., Inc., 445 F. Supp. 613 (S.D.N.Y. 1977) (bidder has stand-
     ing under §14(e)); Applied Digital Data Systems, Inc. v. Milgo Elec-
     tronic Corp., 425 F. Supp. 1145 (S.D.N.Y. 1977) (bidder has standing
     under §14(e)); Crane Co. v. Anaconda Co., 411 F. Supp. 1208 (S.D.N.Y.
     1975) (bidder has standing under §14(e)); Mesa Petroleum Co. v. Aztec
     Oil & Gas Co., 406 F. Supp. 910 (N.D. Texas 1976) (bidder has standing
     under §14(e)). Contra First Alabama Bancshares v. Lowder, supra,
     [1981] Fed. Sec. L. Rep. ¶98,015; Luptak v. Central Cartage Co.,
     [1981] Fed. Sec. L. Rep. ¶98,034 (E.D. Mich. 1979) (no private right
     of action under Section 14(d) in favor of tender offeror).

     This Court in H. K. Porter Co. v. Nicholson File Co., 482 F.2d 421
     (1973), held that a private right of action for damages exists in favor
     of a tender offeror under Section 14(e), a result later rejected by
     the Supreme Court in Piper v. Chris Craft Industries, Inc., 430 U.S. 1
     (1977). This Court in H. K. Porter Co. also indicated, in dictum, that
     a private right of action would be implied under Section 14(e) in favor
     of the issuer for injunctive relief and damages. Id. at 424.

In Piper v. Chris-Craft Industries Inc., supra, 430 U.S. 1, the Supreme Court held that a defeated tender offeror does not have standing to sue for damages under Section 14(e). Piper, however, does not control the standing questions at issue here; the Supreme Court emphasized the narrow scope of its holding, stating that the purpose of the Williams Act could "more directly be achieved with other, less drastic means more closely tailored to the precise congressional goal underlying [that statute]." Id. at 40. The Court also quoted with approval Judge Friendly's opinion in Electronic Specialty Co. v. International Controls Corp., supra, 409 F.2d at 947, stating that "in corporate control contests the stage of preliminary injunctive relief, rather than post-contests lawsuits, 'is the time when relief can best be given'" (430 U.S. at 42; see also id. at 40 n.26) and expressly left open the questions of whether the tender offeror could seek injunctive relief under Section 14(e) (id. at 47 n.33) and whether the shareholder-offerees and issuer corporation can sue under that Section (id. at 42 n.28). The majority opinion in Piper further emphasized:

> Our precise holding disposes of many observations made in dissent. Thus, the argument with respect to the 'exclusion' from standing for 'persons most interested in effective enforcement,' post, at 62, is simply unwarranted in light of today's narrow holding.

Id. at 42 n.28.

The appellate decisions upholding private rights of action for equitable relief under the Williams Act in favor of issuers and bidders are fully consistent not only with Piper, but also with the general principles for implying private rights of action enunciated by the Supreme Court. The Supreme Court in Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11,

- 10 -

18 (1979), stated that a plaintiff's right to sue under a federal statute,

if not expressly provided, must be implied from the "language or structure

of the statute, or in the circumstances of its enactment."  To assist the

courts in determining whether such a right should be implied under a federal

statute, the Supreme Court has developed a four-prong test.  In Cort v. Ash,

422 U.S. 66 (1975), the Court articulated the test as follows (id. at 78;

citations omitted; emphasis in original):

> First, is the plaintiff 'one of the class for whose
> especial benefit the statute was enacted' -- that is,
> does the statute create a federal right in favor of
> the plaintiff?  Second, is there any indication of
> legislative intent, explicit or implicit, either to
> create such a remedy or to deny one?  Third, is it
> consistent with the underlying purpose of the legis-
> lative scheme to imply such a remedy for the plain-
> tiff?  And finally, is the cause of action one tradi-
> tionally relegated to state law, in an area basically
> the concern of the States, so that it would be inappro-
> priate to infer a cause of action based solely on
> federal law?

Subsequent to its Cort v. Ash decision, however, the Supreme Court has

emphasized that the ultimate determination of whether a private right of

action exists must turn on the intent of Congress:

> [I]n Cort v. Ash * * * the Court did not decide that
> each of [the] factors is entitled to equal weight.
> The central inquiry remains whether Congress intended
> to create, either expressly or by implication, a pri-
> vate cause of action.

Touche Ross & Company v. Redington, 442 U.S. 560, 575 (1979).  See also

Merrill Lynch, Pierce Fenner & Smith v. Curran, 102 S. Ct. 1825, 1839

(1982).  Since the ultimate question is whether Congress intended that a

a private remedy exist, the Supreme Court has indicated that it is not ne-

cessary to examine each of the factors articulated in Cort v. Ash if con-

gressional intent to grant or deny the private remedy is persuasively evi-
denced by some other means -- e.g., in the present case, by the contemporary
legal context at the time the Williams Act was enacted and later amended.
Curran, 102 S. Ct. at 1844.

     As we show at pages 11-15, infra, congressional intent to create a
private remedy under the Williams Act is established by the legal context
in which the Act was passed in 1968, a time of widespread acceptance of
implied private actions under the federal securities laws, particularly un-
der the proxy provisions after which Congress deliberately modeled the
Williams Act protections. Furthermore, as discussed at pages 16-21, infra,
the fact that Congress, when it subsequently amended the Williams Act, did
not disturb judicial decisions which had recognized a private action under
the Act, demonstrates Congress' intent to preserve the private right of
action. In any event, a complete analysis of the four Cort v. Ash factors
further supports the implication of a private remedy (pages 21-32, infra).

     A.  The Contemporary Legal Context At The Times When Congress Enacted
         And Later Amended the Williams Act Establishes That It Intended
         To Create And Preserve Implied Rights Of Action For Equitable
         Relief Under That Act In Favor of Issuers and Tender Offerors.

         1.  Congress' intent to create private remedies under
             the Williams Act is established by its decision in
             1968 to model that legislation after the proxy pro-
             visions under which the existence of a private right
             of action was already well established.

     "In determining whether a private cause of action is implicit in a
federal statutory scheme when the statute by its terms is silent on that
issue, the initial focus must be on the state of the law at the time the
legislation was enacted." Curran, supra, 102 S. Ct. at 1839. This prin-
ciple was utilized in Cannon v. University of Chicago, 441 U.S. 677 (1979),

where the Supreme Court held that an implied right of action exists under
Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C.
1681, which prohibits discrimination on the basis of sex in education pro-
grams receiving financial support from the federal government.  The Court
in Cannon relied heavily on the fact that Title IX was patterned on Title
VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq., and that at the
time Title IX was enacted in 1972, Title VI already had been construed as
giving rise to an implied private right of action.  The Court reasoned that
because the courts had consistently found implied rights of action under the
civil rights statutes during the years between the enactment of Title VI and
the enactment of Title IX, "Congress was thoroughly familiar with these usual-
ly important precedents * * * and * * * expected its enactment [of Title IX]
to be interpreted in conformity with them." Cannon v. University of Chicago,
supra, 441 U.S. at 698-699.  Indeed, Mr. Justice Rehnquist in his concurring
opinion made the point that during the Sixties and early Seventies, Congress
relied on the federal courts to decide whether a right of action should be
implied under a statute and that "[c]ases such as J.I. Case Co. v. Borak,
[377 U.S. 426 (1964)] and numerous cases from other federal courts, gave
Congress good reason to think that the federal judiciary would undertake this
task." 441 U.S. at 718.

     The evidence that Congress understood in 1968 that private rights of
action would be available under the Williams Act is equally as persuasive
as the evidence present in Cannon.  The sections added to the Securities
Exchange Act by the Williams Act, like Title IX, were patterned after a prior
enactment which had worked successfully, in this case the statute and regula-
tions governing proxy solicitations, chiefly Section 14(a) of the Securities

Exchange Act, 15 U.S.C. 78n(a). See H.R. Rep. at 5-6; S. Rep. No. 550, 90th
Cong., 1st Sess. 2-6 (1967) (hereinafter "S. Rep. at --").

In seeking to remedy the abuses in the area of tender offers and other
major acquisitions, Congress was acutely aware of the obvious parallel be-
tween these devices for seeking control and proxy contests. As explained by
former Commission Chairman Manuel F. Cohen at the Senate hearings,

> [A]cquisitions of blocks of voting securities are
> typically alternatives to proxy solicitations, as
> methods of capturing or preserving control. In
> either case there is involved a form of industrial
> warfare in which the stakes are high, and two or
> more groups are attempting to manipulate the public
> security holder to their own advantage. 6/

Chairman Cohen further explained that the Williams Act would "fill a gap, a
rather large gap in the securities statutes":

> The procedures provided by the bill in the case of
> contested tender offers are analogous to those now
> followed when contending factions solicit proxies
> under the Commission's proxy rules. 7/

And, at the time the bill which with minor amendment later became the Williams
Act was passed by the Senate, its sponsor, Senator Williams, described
the bill as "provid[ing] the same kind of disclosure requirements which now
exist, for example, in contests through proxies for controlling ownership
in a company. * * * [I]t is patterned on the present law and the regula-
tions which govern proxy contests." 113 Cong. Rec. 24665 (1967). See also
GAF Corp. v. Milstein, supra, 453 F.2d at 719; Bath Industries, Inc. v.
Blot, 427 F.2d 97, 110 (7th Cir. 1970).

---

6/   Hearings on S. 510 before the Subcomm. on Securities of the Senate
     Comm. on Banking and Currency, 90th Cong., 1st Sess. 16 (1967)
     (hereinafter "Senate Hearings").

7/   Senate Hearings at 20-21.

The fact that Congress patterned the Williams Act after the proxy provisions is significant because only four years earlier the Supreme Court had decided the landmark case of J.I. Case Co. v. Borak, supra, where the Court held that a shareholder may sue derivatively on behalf of his corporation under Section 14(a) for a violation of the proxy provisions, finding that "[p]rivate enforcement of the proxy rules provides a necessary supplement to Commission action." 377 U.S. at 432. Indeed, as Judge Friendly stated in Leist v. Simplot, 638 F.2d 283, 296 (2d Cir. 1980), aff'd sub nom., Curran, supra, the years prior to the Cort v. Ash decision in 1975 were years of a "widespread, indeed almost general, recognition of implied causes of action" under the Securities Exchange Act. See also Cannon, supra, 441 U.S. at 698-699 (during the period between 1964 and 1972 the Supreme Court had consistently found implied remedies); Leist v. Simplot, supra, 638 F.2d at 297 (implied causes of action were widely recognized under other statutes administered by the Commission).

As the Supreme court has twice recognized, "'[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law.'" Curran, supra, 102 S. Ct. at 1839, quoting Cannon v. University of Chicago, 441 U.S. at 696-697. As was the case in Cannon, it must be concluded that Congress was aware of the fact that these "unusually important precedents" (Cannon, supra, 441 U.S. at 699) under the securities laws had established that private rights of action were an essential part of the enforcement mechanism under Section 14(a) and that Congress likewise intended such actions to be available under the Williams Act. In fact, it is not necessary merely to assume that Congress was aware of the state of the law of implied rights of action under the federal securities laws, since there is

ample legislative history of the Williams Act demonstrating that Congress
was actually informed of the existence of cases upholding such private
rights.  For example, Professor Carlos Israels specifically brought to
Congress' attention the Supreme Court's decision in J.I. Case Co. v. Borak,
supra. 8/  And Chairman Cohen, one of the drafters of the Williams Act,
testified before the House committee considering the bill that litigation
between private parties alleging fraud in takeover bids, one of the subjects
covered by the Williams Act, was a common occurrence, calling it "almost
standard operating procedure." 9/  These circumstances warrant the presump-
tion that Congress intended the Williams Act to be enforced in private actions.

> 2.  The congressional intent to preserve private remedies
>     under the Williams Act is evidenced by Congress' failure
>     to overturn cases recognizing such private rights of
>     action when it amended the statute.

Recently, the Supreme Court expanded upon the rationale utilized in
Cannon and articulated an additional means for determining congressional
intent in situations where Congress revises a statute under which an im-
plied private right of action has already been recognized by the federal
courts.  In Curran, supra, which involved several private actions brought

---

8/   See Senate Hearings at 67.  Although the Supreme Court in Piper
     cautioned against concluding, based on Professor Israels' inter-
     pretation of Borak, that a private right of action exists under
     Section 14(e) on behalf of a tender offeror (430 U.S. at 31),
     this does not detract from the value of Professor Israels' state-
     ment as evidence that Congress was aware that Section 14(a), on
     which the Williams Act was patterned, had been found by the
     Supreme Court in Borak to give rise to a private right of action
     for issuers.

9/   Takeover Bids:  Hearings on H.R. 14475, S. 510 Before the Subcom-
     mittee on Commerce and Finance of the House Committee on Inter-
     state and Foreign Commerce, 90th Cong., 2d Sess. 19 (1968).

under the Commodity Exchange Act, 7 U.S.C. 1 et seq., the Supreme Court

held that an implied private right of action exists under that Act on

behalf of purchasers of commodity futures contracts against commodities

brokers and exchanges.  In reaching this conclusion, the Court stated

that it was not necessary to rely on the four-factor analysis enunciated

in Cort v. Ash, since the intent of Congress to create or deny a private

remedy under a statute can be discerned by focusing on the state of the

law at the time Congress amends a statute or, more accurately, on "Con-

gress' perception" of the law that it is amending (102 S. Ct. at 1839).

The Court explained (id.):

> When Congress enacts new legislation, the question is
> whether Congress intended to create a private remedy as
> a supplement to the express enforcement provisions of
> the statute.

By contrast,

> [w]hen Congress acts in a statutory context in which
> an implied private remedy has already been recognized
> by the courts * * * the inquiry logically is different.
> Congress need not have intended to create a new remedy,
> since one already existed; the question is whether Con-
> gress intended to preserve the preexisting remedy.

Id.

In Curran, the Supreme Court found that when the Commodity Exchange

Act was "comprehensively reexamined and strengthened" in 1974 (id.), the

federal courts had consistently recognized an implied right of action under

that Act comparable to the routine recognition of implied rights of action

under the Securities Exchange Act at that time.  Id. at 1839-1840. 10/  The

---

10/   The Court in Curran stated with respect to the federal securities
      laws (102 S. Ct. at 1846 n.92, quoting from Justime Stevens' dis-

(footnote continued)

Court reasoned that the availability of an implied right of action under
the Commodity Exchange Act was part of the "contemporary legal context" in
which Congress enacted the 1974 amendments to the Act and the fact that
those amendments "left intact the statutory provisions under which the
federal courts had implied a cause of action is itself evidence that Con-
gress affirmatively intended to preserve that remedy."  Id. at 1841 (foot-
note omitted).  Indeed, the Supreme Court cautioned that in making a deter-
mination whether Congress intended to create a private remedy, courts must
be mindful that prior to the 1975 decision in Cort v. Ash, if a federal
statute was enacted to benefit a special class, a remedy was usually recog-
nized by the federal courts for members of that class.  Curran, supra, 102
S. Ct. at 1837, citing Texas & Pacific Railway Company v. Rigsby, 241 U.S.
33 (1916).

    As was the situation under the Commodity Exchange Act in Curran, when
Congress in 1970 amended the Williams Act (Pub. L. No. 91-567, 84 Stat.

---

10/  (Continued)

    senting opinion in Piper v. Chris-Craft Industries, supra, 430 U.S.
    at 55 n.4 (emphasis in original)):

        'The statutes originally enacted in 1933 and 1934 have
        been amended so often with full congressional awareness
        of the judicial interpretation of Rule 10b-5 as im-
        plicitly creating a private remedy that we must now assume
        that Congress intended to create rights for the specific
        beneficiaries of the legislation as well as duties to be
        policed by the SEC. This case [Piper] therefore does not
        present the same kind of issue discussed in Cort v. Ash,
        422 U.S. 66 (1975), namely whether the statute created
        an implied private remedy.  Rather, the question presented
        here is who may invoke that remedy.'

1497 (Dec. 22, 1970)), 11/ federal courts had recognized the existence of a
private right of action in favor of issuers and bidders under that Act.
Susquehanna Corporation v. Pan American Sulphur Company, 423 F.2d 1075
(5th Cir. 1970) (Sections 13(d), 14(d) and 14(e)); Bath Industries, Inc.
v. Blot, supra, 427 F.2d 97 (Section 13(d)); Electronic Specialty Company
v. International Controls Corp., supra (Sections 14(d) and 14(e)); Butler
Aviation Int'l, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842 (2d
Cir. 1970) (Section 14(e)); Crane Co. v. Westinghouse Air Brake Co., 419
F.2d 787 (2d Cir. 1969) (Section 14(e)); Sisak v. Wings and Wheels Express,
Inc., [1970-1971] Fed. Sec. L. Rep. (CCH) ¶92,991 (S.D.N.Y. 1970) (Section
13(d)); Metro-Goldwyn-Mayer, Inc. v. Transamerica Corp., 303 F. Supp. 1354
(S.D.N.Y. 1969) (Sections 14(d) and 14(e)); Armour and Company v. General
Host Corp., 296 F. Supp. 470 (S.D.N.Y. 1969) (Section 14(e)). 12/    See also
Grow Chemical Corporation v. Uran, 316 F. Supp. 891 (S.D.N.Y. 1970);
Fabrikant v. Jacobellis, [1969-70] Fed. Sec. L. Rep. ¶92,686 (E.D.N.Y.
1970) (private right of action on behalf of shareholders). Moreover, less

---

11/  Congress in 1970 amended four of the five sections added to the
     Securities Exchange Act by the Williams Act, including Sections 13(d),
     14(d), and 14(e). These amendments, among other things, lowered the
     percentage of issued and outstanding stock of a corporation necessary
     to trigger the Act's provisions from 10 percent to 5 percent, brought
     the equity securities of insurance companies within the coverage of
     the Act, and added Commission rulemaking authority in Section 14(e).

12/  See also GAF Corporation v. Milstein, supra, 453 F.2d at 714-721,
     where the court held that a private right of action in favor of
     the issuer exists under Section 13(d), stating that "[t]he teach-
     ings of J.I. Case Co. v. Borak * * * are part of the ABC's of
     securities law."  453 F.2d at 719. Although GAF Corporation was
     decided shortly after Congress amended the Williams Act in 1970,
     it is nevertheless indicative of the view of the law at the time
     Congress acted.  See Leist v. Simplot, supra, 638 F.2d at 301.

than a year before Congress amended the Williams Act, the Supreme Court had

decided Mills v. Electric Auto-Lite Company, 396 U.S. 375, 381-383 (1970),

which reaffirmed the Court's holding in J.I. Case Company v. Borak, supra,

that an implied private right of action is available under the proxy provi-

sions of Section 14(a).  The fact that Congress significantly amended the

Williams Act after the federal courts had found an implied right of action

under that Act, without any indication of disapproval of these judicial

decisions, is itself evidence that "Congress affirmatively intended to pre-

serve that remedy."  Curran, supra, 102 S. Ct. at 1841 (footnote omitted). 13/

Congress again amended Section 13(d) in 1977, a time when judicial

recognition of the existence of an implied right of action for equitable

relief in favor of issuers under that Section was even more widespread

than in 1970.  E.g., GAF Corporation v. Milstein, supra, 453 F.2d at 719;

Graphic Sciences, Inc. v. International Mogul Mines Limited, 397 F. Supp.

112 (D.D.C. 1974); Water & Well Associates, Inc. v. American Consumer Indus-

tries, Inc., [1973] Fed. Sec. L. Rep. (CCH) ¶93,943 (D.N.J. 1973).  See

Scott v. Multi-Amp Corporation, 386 F. Supp. 44, 50 (D.N.J. 1974) (implied

---

13/  See also Wachovia Bank and Trust Co. v. National Student Marketing
     Corp., 650 F.2d 342 (D.C. Cir. 1980), cert. denied, 452 U.S. 954
     (1981), where the court stated that "[l]ongstanding judicial appli-
     cation of a court's statutory interpretation, * * * when added to
     the failure of Congress to reject its reasoning, 'argues signifi-
     cantly in favor of [its] acceptance.'"  Id. at 351, quoting Blue
     Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975).

     Not only is there no hint in the legislative history of the 1970
     amendments that Congress was disturbed with the development of the
     Williams Act up to that time, but when Senator Williams introduced
     those amendments he stated that the Williams Act had "worked well"
     and was recognized as "a valuable and important tool in the arsenal
     of investor protection."  116 Cong. Rec. 3024 (1970).

right for equitable relief on behalf of shareholder). 14/  Indeed, the

Supreme Court on the same day in 1975 it decided Cort v. Ash, also delivered

its decision in Rondeau v. Mosinee Paper Corporation, 422 U.S.  49 (1975),

in which the Court dealt with the question of whether an issuer must estab-

lish irreparable harm to obtain injunctive relief under Section 13(d).

Although neither the existence of a private remedy under Section 13(d) nor

the issuer's standing to sue was questioned in Rondeau, the Court stated

that it had "not hesitated to recognize the power of federal courts to

fashion private remedies for securities laws violations when to do so

is consistent with the legislative scheme and necessary for the protec-

tion of investors as a supplement to enforcement by the Securities and

Exchange Commission."  422 U.S. at 62, citing J.I. Case v. Borak, supra.

---

14/  The court in Gateway Industries, Inc. v. Agency Rent-A-Car, supra,
495 F. Supp. at 95, upon which the counterclaim defendants in this
case rely, acknowledged that at the time its opinion was written,
three years after Congress amended Section 13(d), "the decisional
authority unanimously has upheld the existence of a private right
of action for injunctive relief under Section 13(d)" (footnote
omitted).

One of the fundamental errors of the Gateway decision is its view
that recent Supreme Court opinions indicate that the prior cases
upholding private actions were wrongly decided. That approach
ignores the Supreme Court's emphasis on congressional intent and
that "'the relevant inquiry is not whether Congress correctly per-
ceived the then state of the law, but rather what its perception
of the state of the law was.'"  Cannon, supra, 441 U.S. at 711,
quoting Brown v. GSA, 425 U.S. 820, 828 (1976).  See also Curran,
supra, 102 S. Ct. at 1839 n.61.

The fact that some of the decisions "simply assumed" that the pri-
vate remedy was available and did not address the issue scarcely
detracts from the importance of those decisions; exactly to the
contrary, the absence of dispute concerning the issue makes it
"abundantly clear that the private cause of action * * * was part
of the 'contemporary legal context' in which Congress legislated
* * *."  Curran, supra, 102 S. Ct. at 1841.

Thus, if Congress in 1977 had looked to the Supreme Court decisions relevant to the existence of an implied right of action for equitable relief under Section 13(d) or, indeed, under the Williams Act generally, it would have found Rondeau and Borak clearly indicating that such a right was favored by the Supreme Court.

B. The Traditional Cort v. Ash Analysis Further Demonstrates the Existence of Implied Rights of Action for Equitable Relief under the Williams Act.

As we have seen, it is not necessary to utilize the Cort v. Ash analysis since the intent of Congress to create private remedies is readily discerned from the circumstances in which the Williams Act was enacted and subsequently amended. Even if that were not so, however, and the Cort v. Ash analysis were required, application of that analysis would also support implication of private rights of action for equitable relief under the Williams Act.

1. Implying private rights of action for equitable relief on behalf of issuer corporations and tender offerors would benefit shareholders, intended beneficiaries of the Williams Act.

With respect to the first Cort v. Ash factor, it cannot be disputed that shareholders are in the class for whose especial benefit the protections of the Williams Act were enacted. 15/ Even if the other parties to a takeover attempt, the issuer and tender offeror, were not deemed the "especial" beneficiaries of the Act, that would not be fatal to their standing to seek equitable relief to halt or correct violations of that statute, since such relief would benefit shareholders.

_____

15/ Piper v. Chris-Craft Industries, Inc., supra; Crane Company v. Harsco Corp., 511 F. Supp. 294, 300 (D. Del. 1981). See also S. Rep. at 2-3.

- 22 -

In Mobil Corporation v. Marathon Oil Corporation, supra, 669 F.2d at
371, a case in which equitable relief was sought under Section 14(e) by a
tender offeror, the court determined that it could look to the "practical
realities" and "determine that a cause of action is necessary to aid the
shareholders * * *." 16/  It is important in this regard to distinguish
damage actions from actions for equitable relief. Whether the plaintiff
is himself the intended beneficiary of the statute is an essential question
where the plaintiff is seeking damages as compensation for harm suffered by
him. On the other hand, where the plaintiff seeks only equitable relief to
require compliance with the statute, the question logically is whether the
requested relief would benefit the class of persons Congress intended to
protect, even if the plaintiff is not himself within that class. 17/  Con-
sistent with this distinction, the court in Mobil Corporation upheld the
standing of the tender offeror to sue for equitable relief under Section
14(e) since

> [i]ssues such as incomplete disclosure and manipulative
> practices can only be effectively spotted and argued
> by parties with complete knowledge of the target, its
> business, and others in the industry. The tender of-
> feror * * * may often be the only party with enough
> knowledge and awareness to identify nondisclosure or
> manipulative practices in time to obtain a preliminary
> injunction.

---

16/  See also Crane Co. v. Harsco Corp., supra, 511 F. Supp. at 300;
Humana, Inc. v. American Medicorp, Inc., 445 F. Supp. 613, 616
(S.D.N.Y. 1977).

17/  The court in Crane Co. v. Harsco Corp., supra, criticized the
Gateway Industries decision and other cases relied upon by counter-
claim defendants for "ignor[ing] the distinction between injunctive
relief and damages in their analysis." 511 F. Supp. at 301.

699 F.2d at 371.  Accord, Crane Co. v. Harsco Corp., 511 F. Supp. 294, 300
(D. Del. 1981); Weeks Dredging and Contracting, Inc. v. American Dredging
Co., 451 F. Supp. 468, 476 (E.D. Pa. 1978).  In a similar vein, the House
report on the 1970 amendments to the Williams Act states that "management of
a target company should be advised of a tender offer under Section 14(d) for
securities in an amount of over 5 percent of its stock in order to appro-
priately protect the interests of its security holders."  H.R. Rep. No.
91-1655, 91st Cong., 2d Sess. 3 (1970).

The same reasoning also applies in the context of litigation under
Section 13(d); the issuer, because of its significant interest and resources,
may be the only party in a position to uncover and litigate violations of
that statute.  In Electronic Specialty Co. v. International Controls Corp.,
supra, 409 F.2d at 946, the court noted that the "superior resources" of
the issuer corporation can be vital "where remedial action must be speedy
and forceful."  Accord, GAF Corp. v. Milstein, supra, 453 F.2d at 719.  In
fact, the Supreme Court in Piper reiterated its statement first made in
J.I. Case Co. v. Borak, supra, 377 U.S. at 432, that a corporation can
assert remedies on behalf of its shareholders.  430 U.S. at 32 n.21.  Since
violations of the Williams Act, like violations of the proxy provisions at
issue in Borak, can result in damage "'not from the deceit practiced on
[the individual shareholder] alone but rather from the deceit practiced on
the shareholders as a group'" (id.), the issuer can bring suit on behalf of
its shareholders when Section 13(d) is violated.

Moreover, an examination of the language of the various provisions of
the Williams Act and the legislative history demonstrates that Congress

intended to grant the issuer and tender offeror certain rights under that
Act as a means of protecting shareholders.  In Cannon v. University of
Chicago, 441 U.S. 677 (1979), the Supreme Court noted, in this regard, that
whether the "language of the statute" creates a right in favor of a class
of persons including the plaintiff or a duty on the part of the defendant
vis-a-vis such a class "has generally been the most accurate indicator of
the propriety of implication of * * * a cause of action."  441 U.S. 690
n.13. 18/

     Section 13(d)(1) of the Securities Exchange Act provides that any
person who acquires beneficial ownership of more than five percent of a
class of certain equity securities of an issuer must submit a disclosure
statement to the Commission and to the exchange on which the securities
are traded and "send [a copy of the statement and amendments thereto]
to the issuer of the security at its principal executive office, by
registered or certified mail" (emphasis supplied).  Moreover, while Sec-
tion 13(d) does not contain an antifraud provision similar to Section 14(e)
of the Act, the requirement that the purchaser file a truthful statement is
implicit in the provision.  Securities and Exchange Commission v. Savoy
Industries, Inc., 587 F.2d 1149, 1165 (D.C. Cir. 1978), cert. denied, 440
U.S. 913 (1979); GAF Corporation v. Milstein, supra, 453 F.2d at 719-720.

---

18/ See also Cort v. Ash, supra, 422 U.S. at 82 ("[I]n * * * those
     situations in which we have inferred a federal private cause of
     action not expressly provided, there has generally been a clearly
     articulated federal right in the plaintiff * * * or a pervasive
     legislative scheme governing the relationship between the plain-
     tiff class and the defendant class in a particular regard, e.g.,
     J.I. Case Co. v. Borak, supra").

Similarly, Section 14(d)(1) requires the tender offeror to provide the issuer with a statement containing prescribed information. Likewise, Commission Rule 14d-9(a), 17 CFR 240.14d-9(a), promulgated pursuant to Section 14(d)(4) of the Securities Exchange Act, requires any person making a recommendation to shareholders with respect to a tender offer to provide a copy of a disclosure statement to the tender offeror. The truthfulness of these statements is ensured by Sections 14(d) and 14(e).

By requiring that the statements be sent to the issuer and to the tender offeror, the Williams Act grants these parties certain specifically delineated rights — the right to receive the required information and the right to expect that information to be accurate. 19/ As explained by Senator Williams (113 Cong. Rec. 855-856 (1967)), the sponsor of the Williams Act, the disclosure provisions of the Williams Act are

> the only way that corporations, their shareholders
> and others can adequately evaluate a tender offer or
> the possible effect of a change in substantial share-
> holdings. Id. at 855 (emphasis supplied). 20/

Counterclaim-defendants, however, assert with respect to Section 13(d) (Br.38) that implication of a private right of action for equitable would be inconsistent with the Supreme court's decisions in Touche Ross and

---

19/ Sending information to the issuer and the exchanges provides a mechanism by which that data can reach the shareholder-investors. See Spencer Companies v. Agency Rent-A-Car, Inc., [1981-1982] Fed. Sec. L. Rep. (CCH) ¶98,301 at 91,895 (D. Mass. 1981). Armed with accurate information, shareholders can make an informed response to a potential shift in control. Cf. Piper v. Chris-Craft Industries, Inc., supra, 430 U.S. at 35.

20/ See also Senate Hearings at 2, 49; 113 Cong. Rec. 857-858, 24665 (1967) (Remarks of Senator Kuchel).

- 26 -

Company v. Redington, 442 U.S. 560 (1979), and Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11 (1979). In Touche Ross, the Supreme Court held that there was no implied right of action for damages under the broker-dealer reporting provisions of Section 17(a) of the Securities Exchange Act, 15 U.S.C. 78l(a). That statute, however, differs from Section 13(d) (as well as Sections 14(d) and 14(e)) in a critical respect. The Supreme Court in Touche Ross characterized Section 17(a) as not conferring any rights on private parties, resembling

> countless other statutes that simply require certain
> regulated businesses to keep records and file periodic
> reports to enable the relevant governmental authorities
> to perform their regulatory functions. The reports and
> records provide the regulatory authorities with the
> necessary information to oversee compliance with and
> enforce the various statutes and regulations with which
> they are concerned.

Id. at 569. The disclosure requirement of Section 13(d), on the other hand, is intended to do much more than provide assistance to the Commission. The information required by Section 13(d) is intended for the use of the issuer and its shareholders. Since Section 13(d), like the Williams Act generally, denotes a specific class of beneficiaries, it cannot be viewed as merely a record-keeping or filing provision of the type involved in Touche Ross.

Nor does the Supreme Court decision in Transamerica Mortgage Advisors, Inc. v. Lewis, supra, provide any support for rejecting a private right of action for equitable relief under Section 13(d). The Supreme Court there held that an investor did not have a private right of action against an investment adviser for violations of Section 206 of the Investment Advisers Act, 15 U.S.C. 80b-206, which proscribes fraudulent conduct on the part of an investment adviser with respect to its clients, language very similar to

Section 14(e)'s prohibition of fraudulent conduct.  See Mobil Oil Corp. v.
Marathon Oil Co., supra, 669 F.2d at 372-373 n.5.  But the Supreme Court in
Transamerica found that Section 206 satisfies the first prong of the Cort
v. Ash analysis (444 U.S. at 17); the Court rejected the implication of a
private right of action for damages under that Section based upon affirma-
tive evidence of congressional intent to deny any remedy for damages in the
Investment Advisers Act as a whole (id. at 22).  In contrast, as we demon-
strate at pages 27-29 infra, there is no evidence of congressional intent to
deny private rights of action for equitable relief to enforce the disclo-
sure requirements of the Williams Act.

### 2.  Congress intended to create private rights of action for equitable relief under the Williams Act.

With respect to the second Cort v. Ash factor — Congress' intent to
create or deny a private remedy — the Supreme Court in Cannon v. University
of Chicago, supra, held that where, as here, a particular class has been
identified as the especial beneficiaries of the Act, "'it is not necessary
to show an intention to create a private cause of action, although an expli-
cit purpose to deny such cause of action would be controlling.'"  441 U.S.
at 694, quoting Cort v. Ash, supra, 422 U.S. at 82 (emphasis in original).

As we have seen (pages 11-21, supra), there is abundant evidence derived
from the contemporary legal context and the legislative history of the
Williams Act that Congress did in fact intend a private remedy to be avail-
able.  More importantly, there is no indication in the legislative history
or in the structure of the Williams Act that Congress intended to deny such
a remedy.  Contrary to the holding of Gateway Industries, Inc. v. Agency
Rent-A-Car, Inc., 495 F. Supp. 92 (N.D. Ill.), appeal dismissed per stipula-

tion, No. 80-1871 (7th Cir. 1980), relied upon here by counterclaim-defendants (Br. 38), there is no evidence that Congress intended that Section 18 of the Securities Exchange Act, 15 U.S.C. 78r, and the express governmental enforcement remedies included in the Act, 21/ provide the exclusive means for enforcing the provisions of the Williams Act.  Section 18 provides a remedy only for damages — not for equitable relief — and grants standing only to those persons who have purchased or sold securities in reliance upon misstatements in reports filed with the Commission.  Thus, Section 18 has no application to a situation where, as here, the plaintiff is seeking only equitable relief.  See Crane Company v. Harsco Corporation, supra, 511 F. Supp. at 300-301.  Further, Section 18 would provide no remedy to shareholders who determine to retain their shares on the basis of a mis-leading filing — persons whom the Supreme Court has recognized Congress intended to protect when it passed the Williams Act.  Piper v. Chris-Craft Industries, Inc., supra, 430 U.S. at 38-39.  Moreover, Section 18, as well as the express governmental remedies, were enacted by Congress more than 30 years before the enactment of the Williams Act.  It is the intent of Con-gress at the time it enacts or amends a statute which is the touchstone of whether a private right of action will be implied under that statute. Touche Ross & Co. v. Redington, supra, 422 U.S. at 547-575, n.16; Cannon v. University of Chicago, supra, 441 U.S. at 698-699.  The fact that Congress 30 years earlier provided the Commission with an enforcement mechanism, and provided an express private right of action for damages in limited circum-

---

21/  See Sections 21 and 32 of the Securities Exchange Act, 15 U.S.C. 78u and 78ff.

stances, cannot be evidence of any intent on the part of Congress to deny private equitable relief when it later enacted or amended the Williams Act.

### 3. Implication of private remedies for equitable relief in this case would be consistent with the congressional purpose.

In Cannon, the Supreme Court stated that "when a private remedy is necessary or at least helpful to the accomplishment of the statutory purpose, the Court is decidedly receptive to its implication under the statute." 441 U.S. at 703. Allowing the parties to a corporate takeover to obtain equitable relief to enforce the Williams Act will further the congressional purpose of protecting shareholders. The Commission does not have sufficient resources adequately to police all possible violations of the Williams Act or all filings made pursuant to that Act. 22/ This is made evident by the fact that in fiscal year 1982, for example, 1574 Schedule 13D's, 3673 amendments to those reports, as well as 137 Schedule 14D-1's with 366 amendments were filed with the Commission. More importantly, these filings are only a small part of the many thousands of disclosure documents filed with the Commission each year under the various provisions of the federal securities laws. It is entirely unrealistic to assume that the Commission has the resources to investigate every allegation that a report is false or misleading, and to assume that Congress intended to leave corporate issuers, their shareholders and tender offerors without an effective remedy. See Cannon v. University of Chicago, supra, 441 U.S. at 706-707 n.41. Private equitable actions to force compliance with the

---

22/ See GAF Corp. v. Milstein, supra, 453 F.2d at 721; Gulf & Western Industries, Inc. v. Great A&P Tea Co., 476 F.2d 687, 699 (2d Cir. 1973); Crane C v. Harsco Corporation, supra, 511 F. Supp. at 301.

- 30 -

requirements of the Williams Act are thus a "necessary supplement" to Commission actions.  See Mills v. Electric Auto-Lite Co., supra, 396 U.S. at 383; J.I. Case Co. v. Borak, supra, 377 U.S. at 432.  Cf. Cannon v. University of Chicago, supra, 441 U.S. at 706-707.

Moreover, contrary to the contention of counterclaim-defendants (Br. 37), the availability of equitable relief will not provide the issuer with an unwarranted opportunity to defeat tender offers.  Nor will such relief, when properly awarded, tip the balance in favor of one party or the other in a contest for control of the issuer.  Mobil Corp. v. Marathon Oil Co., supra, 669 F.2d at 372.  The Supreme Court itself has suggested that private actions for equitable relief are fully consistent with the congressional goals underlying the Williams Act.  As we have seen, in Piper v. Chris-Craft Industries, Inc., supra, the Supreme Court, in holding that a defeated tender offeror lacks standing under Section 14(e) of the Securities Exchange Act to sue for damages, stated that investor protection can better be served by "less drastic means more closely tailored" to the goals of the Williams Act.  430 U.S. at 40.  Equitable relief meets that criterion.  Indeed, the Court in Piper further stated that "in corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, 'is the time when relief can best be given.'"  430 U.S. at 42, quoting Electronic Speciality Co. v. International Controls Corp., supra 409 F.2d at 947.

Of course, "district judges must be vigilant against resort to the courts on trumped-up or trivial grounds as a means for delaying."  Electronic Speciality Co., supra, 409 F.2d at 947.  See also Susquehanna Corp.

v. Pan American Sulphur Co., supra, 423 F.2d at 1086.  As stated in Elec-
tronic Speciality Co., supra, 409 F.2d at 948:

> Congress intended to assure basic honesty and fair
> dealing, not to impose an unrealistic requirement of
> laboratory conditions that might make the new statute
> a potent tool for incumbent management to protect
> its own interests against the desires and welfare of
> the stockholders.

See also GAF Corp. v. Milstein, supra, 453 F.2d at 719-720.  Abuse of the
statute, however, is not to be avoided by denying standing to the party in
the best position to ensure that Congress' goals are met.  Rather, the
courts must "carefully examine[]" the parties' disclosures to determine
whether they are "basically fair and complete under the circumstances * * *
and comply with the Act and the SEC rules and regulations."  Susquehanna
Corp., supra, 423 F.2d at 1086.

### 4.  Actions for equitable relief to remedy violations of the Williams Act are not matters relegated to the states.

The final factor enunciated in Cort v. Ash for determining whether to
imply a private remedy is whether the action is one traditionally relegated
to state law.  If so, under Cort it would be inappropriate to imply a cause
of action under federal law.  422 U.S. at 78.

In Piper, the court determined that it was appropriate to relegate the
tender offeror to its common law cause of action for "interference with a
prospective commercial advantage," since the defeated tender offeror based
its claim for damages on harm suffered as a result of its loss of "'a fair
opportunity' to compete for control" of the issuer.  430 U.S. at 40-41.
Thus, in Piper the plaintiff sought compensation for harm which the federal
statute was not intended to remedy.  That is not the case here.  It would

- 32 -

be inappropriate to relegate the parties to state court, since the only

interest involved is enforcement of rights granted by a federal statute.

See Transamerica Mortage Advisors, Inc. v. Lewis, 444 U.S. 11, 19 n.8 (1979).

Accordingly, the four-prong Cort v. Ash analysis establishes that Con-

gress intended that there be a private right of action for equitable relief

under the Williams Act.

II. A DISTRICT COURT HAS THE AUTHORITY, IN A SUIT ALLEGING VIOLATIONS
OF THE WILLIAMS ACT, TO ORDER EQUITABLE RELIEF IN ADDITION TO
CORRECTIVE DISCLOSURE; THE PROPRIETY OF SUCH RELIEF SHOULD BE
JUDGED ON AN ABUSE OF DISCRETION STANDARD.

Appellants argue that the remedy ordered by the district court was not

appropriate under the circumstances of this case.  To the extent that appel-

lants argue that in granting the preliminary injunction restraining the

tender offer the court abused its discretion, the Commission expresses no

view as to whether that in fact was the case.  To the extent, however, that

appellants also argue that the remedies available to the district court

were restricted to corrective disclosure as a matter of law, the Commission

disagrees.  There is an important distinction between the propriety of, and

the power to grant, equitable relief; and in this suit based on Williams

Act violations, the district court had broad equitable powers.  Regardless

of whether the relief granted here was appropriate under all the circum-

stances, that equitable remedy was, in the Commission's view, one of the

"variety of tools," in addition to corrective disclosure, which the court

had the power to order.  Electronic Specialty Co. v. International Controls

Corp., supra, 409 F.2d at 947. 23/

Once a court's equity jurisdiction is properly invoked, it may not be
artificially limited. Courts of equity have the power to shape full relief,
taking into account the interests of the parties affected and the goals to
be pursued. See J.I. Case Co. v. Borak, supra, 377 U.S. at 433; Porter v.
Warner Holding Co., 328 U.S. 395, 398 (1946); Deckert v. Independence Shares
Corp., 311 U.S. 282, 288 (1940); United States v. City of Parma, 661 F.2d
562, 576 (6th Cir. 1981); Securities and Exchange Commission v. Manor Nurs-
ing Centers, Inc., 458 F.2d 1082, 1103-1104 (2d Cir. 1972); 1 J. Pomeroy,
Equity Jurisprudence §§114-115, 181, 231, 236(a), 239(a) (5th ed. 1941).

As was the case in Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944), "[w]e
are dealing here with the requirements of equity practice with a background
of several hundred years of history." To limit the possible remedies for
Williams Act violations, in all cases or a predetermined category of cases,
to corrective disclosure would distort the essential nature of equity juris-
diction which has been traditionally characterized by "[f]lexibility rather
than rigidity," would fail to deter violations of the statute, and would
fail to afford shareholders adequate protection against harm flowing from
the violations. Id. Accord, General Aircraft Corp. v. Lampert, 556 F.2d
90, 97 (1st Cir. 1977).

---

23/   The Commission expresses no view on whether corrective disclosure
      has in fact been made in this case. A court's authority to issue
      an injunction pending correction of misleading disclosures is, of
      course, clear. See General Aircraft Co. v. Lampert, supra, 556
      F.2d at 97; Sonesta Int'l Hotels Corp. v. Wellington Associates,
      483 F.2d 247, 250 (2d Cir. 1973); Life Investors, Inc. v. AGO Holding
      Co., [1981-82] Fed. Sec. L. Rep. (CCH) ¶98,356, at 92,197 (8th Cir.
      1981).

In urging that the district court exceeded its equitable jurisdiction, appellants erroneously rely on several judicial decisions. In Rondeau v. Mosinee Paper Company, supra, 422 U.S. 49, the Supreme court held that a showing of irreparable harm is necessary for a private litigant to obtain injunctive relief in a suit under Section 13(d). Contrary to appellants' contention, however, the Court did not hold that relief must be denied merely because the wrongdoer has terminated its violation of the statute. In Rondeau, the purchaser had acquired less than ten percent of the issuer's stock while unaware of the then recent amendment to the statute lowering the triggering level for filing a Schedule 13D from ten to five percent of the outstanding shares.   422 U.S. at 55 & n.4.   This "technical violation" (id. at 56) was quickly remedied upon notice of the section's requirements by filing an accurate Schedule 13D.   Of particular significance, the defendant had not attempted to gain control of the issuer, "either by a cash tender offer or any other device" (id. at 59).

Appellants also rely upon this Court's decision in General Aircraft Corp. v. Lampert, supra, 556 F.2d 90, where this Court affirmed an order of a district court requiring the defendants to correct their Section 13(d) filings, which falsely stated that the purpose of their acquisition of the plaintiff's securities was for investment, but overturned that portion of the district court's order which enjoined the voting of the defendants' shares acquired before the filing of the false Schedule 13D.   This Court pointed out that the defendants' stock "was acquired legally more than a year prior to the filing of the present action," and distinguished cases in which shares were illegally obtained as examples of where there "has

been a clear showing of irreparable injury." 556 F.2d at 97. 24/ Another

factor mentioned by this Court in finding that no irreparable injury had

been demonstrated was the absence of "an imminent contest for control."

Id. Other courts have indicated that a preliminary injunction would be

appropriate where "a take-over attempt 'followed on the heels' of a

belated curative filing." Treadway Companies, Inc. v. Care Corp., 638

F.2d 357, 380 (2d Cir. 1980). See also Financial General Bankshares, Inc.

---

24/  Appellants recognize that some courts have ordered equitable relief
     beyond corrective disclosure — including enjoining a tender offer,
     disenfranchisement, divestiture and rescission — where a significant
     amount of shares were acquired after the filing of a false Schedule
     13D. SFREI Br. 38 n.27; Br. of counterclaim defendants 42-43.  In
     General Steel Industries, Inc. v. Walco National Corp., [1981-1982]
     Fed. Sec. L. Rep. (CCH) ¶98,402 (E.D. Mo. 1981), the court ordered an
     injunction and rescission (followed by divestiture) of the 4.5% of
     the issuer's stock acquired after a false Schedule 13D was filed, but
     not the 29.5% acquired prior to the filing obligation. The General
     Steel opinion was vacated as moot by the Court of Appeals for the
     Eighth Circuit when the parties settled the case after an appeal had
     been taken.  See also The Hanna Mining Co. v. Norcen Energy Resources,
     Inc., supra (preliminary injunction); S-G Securities, Inc. v. The
     Fuqua Investment Co., 466 F. Supp. 1114, 1131 (D. Mass. 1978)
     (rescission); Twin Fair, Inc. v. Reger, 394 F. Supp. 156, 160-161
     (W.D.N.Y. 1975) (preliminary injunction); Committee for New Management
     of Butler Aviation v. Widmark, 335 F. Supp. 146, 155 (E.D.N.Y. 1971)
     (disenfranchisement).

     Compare Missouri Portland Cement Co. v. H.K. Porter Co., 535 F.2d
     388, 399 (8th Cir. 1976), in which disenfranchisement or complete
     divestiture of all shares acquired was denied where, following the
     lawful acquisition of 20.6% of the issuer's stock, the purchaser
     allegedly filed a false Schedule 13D and then purchased an additional
     0.7% of the stock prior to commencing a tender offer.  Accord, Tread-
     way Companies, Inc. v. Care Corp., 638 F.2d 357, 380 n.45 (2d Cir.
     1980); Financial General Bankshares v. Lance, [1978] Fed. Sec. L. Rep.
     (CCH) ¶96,403 (D.D.C. 1978) (where defendant lacked a "degree of
     effective control" rescission and divestiture denied).  See also
     Ludlow Corp. v. Tyco Laboratories, Inc., 529 F. Supp. 62, 66 (D. Mass.
     1981) (preliminary injunction denied where, although substantial
     purchases, no tender offer followed corrective disclosure).

v. Lance, [1978] Fed. Sec. L. Rep. (CCH) ¶96,403 at 93,428 & n.41 (D.D.C. 1978); Universal Container Corp. v. Horwitz, [1977-78] Fed. Sec. L. Rep. (CCH) ¶96,161, at 92,255-56 (S.D.N.Y. 1977). Cf. Rondeau, supra, 422 U.S. at 59-60.

Courts have also considered, in determining whether to grant relief beyond corrective disclosure, whether the violations of Section 13(d) have been deliberate. Absent a remedy beyond ordering corrective disclosure, a person will have little incentive to comply with the statute. On the one hand, the potential benefits to be gained from a violation can be quite substantial, since truthful and prompt disclosure of a potential tender offeror's intention to seek control of the company may require the offeror to pay a higher price for the stock and provide the issuer with valuable time to formulate its responses to the offer. 25/ On the other hand, corrective disclosure is no real deterrent, since it merely requires compliance with the original statutory disclosure obligation and leaves the violator with the profitable fruits of his illegal conduct. See Bath Industries, Inc. v. Blot, supra, 427 F.2d at 113.

---

25/  Thus, the violative conduct would deny shareholders one of the important protections of Section 13(d) because incumbent management would have been deprived of "an opportunity to express and explain its position" with respect to the accumulation of a substantial number of shares by the violator. Rondeau v. Mosinee Paper Corp., supra, 422 U.S. at 58. See Bath Industries, Inc. v. Blot, supra, 427 F.2d at 113 (purpose of Section 13(d) is to give shareholders an opportunity to hear from incumbent management on the merit or lack of merit of bidder's proposals); Committee for New Management of Butler Aviation v. Widmark, supra, 335 F. Supp. at 154. See also S. Rep. at 3; H.R. Rep. at 4.

Courts should not allow a defendant to "escape unscathed from the consequences of inaccurate statements which it could easily have avoided * * *," or, indeed, intentionally caused to be disseminated.  Butler Aviation International v. Comprehensive Designers, Inc., supra, 425 F.2d at 845.  See also Pacific Realty Trust v. APC Investments, Inc., 685 F.2d 1083, 1086 (9th Cir. 1982); Bath Industries, Inc. v. Blot, supra, 427 F.2d at 113; Committee for New Management of Butler Aviation v. Widmark, supra, 335 F. Supp. 146, 155 (E.D.N.Y. 1971).  The Supreme Court in Piper v. Chris-Craft Industries, supra, 430 U.S. at 40 n.26, recognized that deterrence of violations of the Williams Act is a suitable goal, particularly in cases of "flagrant misconduct," and endorsed "injunctive relief at * * * earl[y] stage[s] of the contest" as the "most efficacious form of remedy."

The Second Circuit has described the role of the district judge in ruling upon an application to preliminarily enjoin a tender offer, a stage he characterized as "the time when relief can best be given," as follows:

> If the filings are defective or the tender offer misleading, the court can require correction, along, of course, with an opportunity to withdraw and an injunction against further solicitation until the period for withdrawal has expired.  * * * If the court believes the offeror has improperly depressed the price of the stock before making the offer, it can require rescission and enjoin further solicitation for a period, or allow the offeror the alternative of raising the price for both past and future deposits.  We cite these merely as examples; other techniques will doubtless suggest themselves to resourceful judges.  On the other hand, we do not mean at all that interlocutory relief should be given lightly.  To the contrary, district judges must be vigilant against resort to the courts on trumped-up or trivial grounds as a means for delaying and thereby defeating legitimate tender offers.

Electronic Specialty Co. v. International Controls, supra, 409 F.2d at

947; see Piper v. Chris-Craft Industries, Inc., supra, 430 at 42.

Accordingly, in determining whether to order relief beyond corrective

disclosure in a particular case, the court should consider all the pertin-

ent circumstances, including whether a substantial number of shares were

purchased after the misleading disclosures were made and before corrective

disclosure, if any, was made; whether the curative disclosure occurs simul-

taneously with or shortly before a tender offer; and whether the violation

was egregious.  Since equitable relief can be a harsh remedy precluding the

completion of a tender offer, it is essential that the court take care to

avoid tipping the balance between the issuer and the bidder which the

Williams Act seeks to maintain.  See Edgar v. Mite Corp., 102 S. Ct. 2629,

2836 (1982); Piper v. Chris-Craft Industries, Inc., supra, 430 U.S. at 30.

The court should consider whether a less drastic form of equitable relief

would suffice and should carefully analyze whether granting or denying the

particular relief will be detrimental to shareholders, or will unduly

injure one or the other participant in the takeover contest, to the ultimate

detriment of the shareholders.  See Butler Aviation International, Inc. v.

Comprehensive Designers, Inc., supra, 425 F.2d at 845.  Cf. Agency Rent-

A-Car, Inc. v. Connolly, 686 F.2d 1029, 1033 (1st Cir. 1982) ("injunctive

relief must be tailored to fit the circumstances of the particular case").

As the Supreme court stated in Mills v. Electric Auto-Lite Co., supra, 396

U.S. at 386, arising under the proxy provisions (quoting Hecht Co. v.

Bowles, supra, 321 U.S. at 329-330):

> In selecting a remedy the lower courts should exercise
> 'the sound discretion which guides the determinations
> of courts of equity,' keeping in mind the role of equity
> as the 'instrument for nice adjustment and reconciliation
> between the public interest and private needs * * *.'

- 39 -

## CONCLUSION

The Commission urges that, if this Court reaches the issues addressed in this brief, those questions be resolved in accordance with the positions expressed herein.

Respectfully submitted,


JACOB H. STILLMAN
Associate General Counsel

DAVID A. SIRIGNANO
Special Counsel

Securities and Exchange Commission
Washington, D.C.   20549

December 1982