UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CSX CORPORATION,

                Plaintiff,

                v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS, L.P.,
3G FUND, L.P., CHRISTOPHER HOHN, SNEHAL
AMIN, AND ALEXANDRE BEHRING, A/K/A
ALEXANDRE BEHRING COSTA,

                Defendants.
------------------------------------------------------------
THE CHILDREN'S INVESTMENT MASTER
FUND,

                Counterclaim and Third-
                Party Plaintiff,

                v.

CSX CORPORATION AND MICHAEL J. WARD,

                Counterclaim and Third-
                Party Defendants.
------------------------------------------------------------
3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.

                Counterclaim Plaintiffs,

                v.

CSX CORPORATION AND MICHAEL WARD,

                Counterclaim Defendants.

------------------------------------------------------------x

ECF CASE
08 Civ. 02764 (LAK) (KNF)

**DEFENDANTS' POST-TRIAL REPLY TO THE PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF CSX CORPORATION AND MICHAEL WARD REGARDING COUNTERCLAIMS AND THIRD PARTY CLAIMS**

Although CSX criticizes Defendants for "announc[ing] [their counterclaims] in a press release when filed," CSX fails to note that it also announced the commencement of this lawsuit in a press release -- one that, as discussed below, contained a series of false statements designed to paint Defendants in a negative light and thus influence the proxy contest. It is therefore ironic that CSX charges Defendants with asserting counterclaims for reasons "entirely driven by the proxy contest" when influencing the outcome of the proxy contest is precisely why CSX brought suit, albeit under the pretext of seeking to provide shareholders with full information. In any event, try as CSX might to dismiss Defendants counterclaims as "entirely without merit," CSX cannot explain away the underhanded dealings and false statements that they have liberally employed in their year-long scorched earth effort to keep the incumbent board intact.

Those underhanded dealings and false statements are supported by the ample discovery record in this case. And Defendants' decision to rely on that carefully developed record, rather than cross examine certain CSX witnesses live at trial -- a decision with which CSX for some reason takes issue -- is irrelevant. That Defendants recognized that live cross-examination of their witnesses was unnecessary given the damning admissions they obtained in deposition does nothing to bolster CSX's defense to the Counterclaims.

Accordingly, Defendants respectfully request that this Court grant the declaratory and injunctive relief requested.

**I.    THE CSX PROXY'S DESCRIPTION OF THE 2007-2009 LTIP IS FALSE AND MISLEADING.**

In its proposed findings of fact and conclusions of law, CSX attempts to excuse its failure to provide full disclosure to shareholders by fundamentally mischaracterizing the nature of its LTIP grants. CSX claims that LTIP grants "are not grants of stock" and "are not

like options, where the price on the grant date is determinative of the value of the option." (CSX Proposed Findings of Fact and Conclusions of Law Regarding Counterclaims and Third Party Claims ("CSX CC PFF") ¶¶ 3, 19.) From those erroneous predicates, CSX concludes that "the relationship between the price of CSX stock on the day of the original target grant of performance units and the ultimate payout of CSX stock three years later is attenuated at best" and, accordingly, that CSX need not have disclosed that those LTIP grants were made at a time when the CSX was in possession of material non-public information. (CSX CC PFF ¶ 19.)

CSX's premise, however, ignores both economic reality and CSX's own proxy statement. When the LTIP grants are properly understood, the direct relationship between the price of CSX stock on the day of the original target grant and the ultimate payout of CSX stock becomes clear. That understanding also leads to the conclusion that that the ultimate payout under the LTIP was artificially enhanced by the timing of the release of material non-public information. And yet those facts are wholly absent from CSX's proxy statement.

First, contrary to CSX's claim that LTIP grants are "not grants of stock," the performance units that the Compensation Committee establishes under the LTIP translate, *on a one-to-one basis*, into shares of CSX common stock. (JX 5 at 27.) For example, if Michael Ward earned all of the 92,347 performance units that he was granted when the 2007-2009 LTIP was established, he would be awarded 92,347 shares of CSX common stock. The fact that the number of shares that may eventually be awarded is subject to adjustment -- *i.e.* the shares are not fully vested -- does not change the simple fact that the LTIP performance unit grants are, for all intents and purposes, grants of stock.

Second, the price of CSX stock on the grant date *is* determinative of the value of the LTIP grants and is directly and materially related to the ultimate payout of CSX stock that

LTIP participants receive. As an initial matter, in stark contrast to CSX's assertion, its Proxy Statement calculates the value of the 2007-2009 LTIP using the price of CSX stock on the grant date -- May 1, 2007. The CSX Proxy states that, with respect to the value of the 2007-2009 LTIP, "[s]ince the awards are paid in shares, all values are based on the grant date fair value of shares" -- that is, the average of the high and low price of CSX stock -- "which could potentially be earned." (JX 5 at 34 n.1.)

Perhaps more importantly, however, the price of CSX stock on the date of the grant determines the number of shares that can potentially be earned. That is so because, under the LTIP, the target performance grants that the Compensation Committee approves are dollar values, which are then translated into a number of performance units based on the trading price of CSX stock on the grant date. The lower the trading price of CSX stock on the grant date, the more performance units each participant receives.

To take CSX's own example, Michael Ward was awarded 92,347 performance units, which was based on a $4 million performance grant divided by $43.32, the average of the high and low trading prices on May 1, 2007. If the LTIP grants had been awarded on May 8, 2007, however, Mr. Ward's $4 million performance grant would have to be divided by $46.52, for a total of 85,984 performance units. Mr. Ward received 6,363 -- or 7.4 percent -- more performance units by virtue of the May 1, 2007 grant date. Based on the closing price of CSX stock on May 27, 2008, those additional 6,363 performance units are worth $428,802.57. But Mr. Ward, like every other plan participant, also has the potential to earn up to 240 percent of his performance units. Thus, those 6,363 additional performance units may become as many as 15,271 shares of CSX stock. Again, using the closing price of CSX stock on May 27, 2008, 15,271 shares of CSX stock would be worth $1,029,112.69.

4

As this example makes clear, to characterize the relationship between the price of CSX stock on the day of the original target grant and the ultimate payout of CSX stock as "attenuated," (CSX CC PFF ¶ 19), is disingenuous. And given the importance of this relationship, CSX's failure to disclose even the fact that its May 1, 2007 grants were made while in possession of material non-public information is untenable. For one thing, that information would have allowed a reasonable investor to appreciate fully the chart describing the 2007-2009 LTIP that appears on page 36 of the CSX Proxy. (JX 5 at 36.)

That chart purports to describe the number of shares of stock -- and the value of that stock -- that Mr. Ward and four other CSX officers may earn under the 2007-2009 LTIP. But CSX's representation of the "Grant Date Fair Value of Stock and Option Awards" -- which is the "target" number of shares multiplied by the grant date stock price -- understates the true value of the "target" number of shares. Again, using Mr. Ward as an example, the chart represents that Mr. Ward's 92,347 target shares have a value of $4,000,010. In reality, scarcely a week later, those 92,347 shares were actually worth $4,295,982.44. Moreover, because CSX fails to disclose that it possessed material information that was to be announced one week after the LTIP grant date, CSX shareholders are not given the information necessary to come to their own conclusions about the true value of the 2007-2009 LTIP.

The law requires more transparency than that. In the context of stock options, the SEC requires that companies disclose whether the grant date for stock options is set "in coordination with the release of material non-public information," or whether the company has timed "its release of material non-public information for the purpose of affecting the value of executive compensation." Executive Compensation and Related Person Disclosure, Exchange Act Release Nos. 33-8732A, 34-54302A, 71 Fed. Reg. 53,158, 53,164 (Sept. 8, 2006). As

5

discussed above, the LTIP grants are similar to options in that the price of CSX stock on the grant date is determinative of the value of the LTIP grants and is directly related to the ultimate payout of CSX stock.[1]

Indeed, regardless of the propriety of setting LTIP grants while in possession of material non-public information, a corporation has a duty to disclose that fact. In a recent case from the Delaware Court of Chancery, *In re Tyson Foods, Inc. Consolidated Shareholder Litig.*, the court rejected the notion that because "a preternaturally-attentive shareholder might have focused in upon the grant dates, matched them to Tyson press releases, and inferred from the relationship between them that the directors intended to issue what amounted to in the money options," the corporation was not required to disclose those facts in its proxy statement. No. 1106-CC, 2007 WL 2351071, at *4 (Del. Ch. Aug. 15, 2007).

Equally unavailing is CSX's argument that it need not disclose that the LTIP grants were made while the company was in possession of material non-public information because the LTIP participants' ultimate award is contingent on the corporation's performance, subject to further reduction, or that participants may not receive any award at all. (CSX CC PFF ¶¶ 11-13.) That argument proves too much, as it would permit CSX to omit any discussion at all of the LTIP in its compensation discussion and analysis. But even CSX was unwilling to go that far. When asked whether the contingent nature of the grant of performance units meant that CSX did not have to disclose material information about the LTIP, Ellen Fitzsimmons, CSX's 30(b)(6) designee on matters related to the LTIP, testified that it was "not CSX's position that

---

[1] This similarity to stock options also brings the LTIP grants within the ambit of CSX's insider trading policy. (*See* JX 25 (defining transaction to include "the sale of shares obtained from an exercise of options").)

information [about the LTIP] can be withheld from public filings." (DX 154 (Fitzsimmons Dep. 167:13-168:3).)

Indeed, the ultimate value of stock options also is contingent on a corporation's performance, the vesting schedule, and other factors. Yet the SEC still requires that all material facts, including whether the grant date of the stock options was set in coordination with the release of material non-public information, be disclosed to shareholders.

Lastly, CSX asserts that it was not in possession of material nonpublic information on the LTIP grant date because the Board supposedly did not give final approval to implementing the May 8 Announcements until May 7, 2007. But the absence of a "formal" resolution approving the May 8 Announcements is irrelevant. CSX cannot dispute that management had planned to recommend each of the items disclosed in the May 8 Announcements well before the May 1, 2007 CSX Board meeting. (DX 22 at 8.) And CSX management also knew that the Board was all but certain to approve its recommendations. In fact, Mr. Ward could not recall a single instance in which the Board rejected one of management's recommendation. (DX 154 (Ward Dep. 280:7-11).) So confident was CSX management of board approval of the May 8 Announcements, that David Baggs started preparing for their public release two to three weeks before that date. (DX 154 (Baggs Dep. 164:9-22).) CSX management assumed its recommendations would be approved. (DX 154 (Richardson Dep. 148:6-18).) In those circumstances, as CSX's Compensation Committee Chairman has acknowledged, it would have been inappropriate insider trading for a member of CSX management to trade in CSX stock as of May 1, 2007. (DX 154 (Richardson Dep. 149:12-151:7).)

Accordingly, the Court should conclude that CSX's proxy statement fails to provide full and complete disclosure of all material facts of the 2007-2009 LTIP.

## II. THE CSX PROXY FALSELY DESCRIBES CSX'S DISCRETIONARY GRANT OF 5,000 SHARES OF STOCK TO DIRECTORS.

The CSX Proxy includes just a single sentence about the discretionary stock grant to directors: "On December 15, 2007, each non-employee director also received a grant of 5,000 shares of CSX stock, which had a market value of $217,625 (based on an average of the high and low price per share on the date of grant of $43.525) and was required to be deferred." (JX 5 at 15.) In fact, the discretionary grants were not made on December 15, 2007, but on December 12, 2007. (DX-66 at 8.) The Proxy does not disclose that this grant was made during the CSX "blackout period." (JX 5 at 15.) CSX's only response is to argue that it had been CSX's practice to make such a grant of shares in December. (CSX CC PFF at 28.) But that is no excuse for failing to appropriately disclose all of the material facts related to the grant of stock.

Similarly, CSX asserts, without support, that the grant is not a purchase, sale or other transaction covered by its Insider Trading Policy. (CSX CC PFF at 29). But CSX's Insider Trading Policy prohibits directors from engaging in "transactions" in CSX securities during the blackout period, and defines "transactions" broadly to "include not only open market purchases and sales, including those through a broker, but also the sale of shares obtained from an exercise of options, including in connection with a cashless exercise option" and covers securities within Company employee benefit plans. (JX 25.) Notably, the definition does not limit "transactions" to the examples in the definition, but rather states that covered transactions "include" those examples. *Id.* A Board of Directors who exercises its discretion to award its members company stock engages in a "transaction" within this definition, which specifically contemplates transactions that are not made on the open market or through a broker. This

8

conclusion is further buttressed by the fact that the grants were reported to the SEC on Form 4, (*see*, *e.g.*, sec.gov/Archives/edgar/data/277948/000027794807000106/xslF345X02/edgar.xml), which is the form on which insiders are required to report all *transactions* in the Issuer's securities. 17 C.F.R. § 240.16a-3(g)(1).

Moreover because Directors are covered persons under the policy they have special pre-clearance obligations for *all* transactions, whether within or without the blackout period. (DX 25 at 3.) There is no evidence that these pre-clearance procedures were complied with, which would have required the Directors to receive clearance from the Board's Presiding Director. (*Id.* at 4.) Even then, pre approval would be conditioned on the Directors not actually being aware of any material non-public information (*Id.* at 3.) Of course, during a blackout period, awareness of material non-public information is presumed.

CSX's proxy statement fails to disclose that its directors awarded themselves stock during the blackout period and in violation of CSX's Insider Trading Policy. Accordingly, the Court should conclude that CSX's description of the December 2007 grant of 5,000 shares of CSX stock to directors was materially incomplete.

## III. CSX'S ADDITIONAL FALSE PROXY MATERIALS

In its post-trial submission CSX seeks to justify its willful smear campaign against TCI and 3G as reflecting "accurate" statements of the "honestly held" opinions of CSX management. (CSX CC PFF at 11.) In so doing, CSX simply repeats the offending statements and does nothing to refute the evidence, cited in TCI/3G's Post-Trial Brief, that shows they are neither accurate nor honestly held. CSX's abject failure to address that evidence is yet further proof that those false statements were willful smears made in the service of CSX's larger goal of ensuring that "zero dissidents" are elected to its Board.

A. **The Ward Editorial**

In his March 11, 2008 editorial, Michael Ward, CSX's CEO, broadly and falsely accused TCI of advocating capital expenditure policies for CSX that would jeopardize rail safety. Mr. Ward's motive was obvious: to cast TCI as an irresponsible, "short sighted" investor that poses a danger to the public and shareholders, in the hopes of scaring shareholders into voting for CSX's entrenched slate of directors at the upcoming annual meeting. (*See* PX 184.)

As demonstrated in Defendants' post-trial brief, Mr. Ward's public characterization of TCI's position on capital expenditures and safety is directly contrary to TCI's actual position, and Mr. Ward knew that on March 11 when he published his editorial, as well as when he swore to his witness statement in this litigation. Mr. Ward defends his preposterous distortion by cutely parsing each phrase while ignoring the larger accusation that they comprise. (*See* CSX CC PFF at 11-12.) Thus, CSX cites to evidence that TCI in fact advocated a freeze of capital spending and for the increase in leverage by CSX as supportive of the accuracy and good faith of Mr. Ward's statements. (*Id.*) CSX then argues that Mr. Ward in fact believes the non-controversial point in his editorial that "railroads require constant investment to ensure high levels of safety …." (*Id.*)

But CSX glosses over the fact that the editorial repeatedly juxtaposes those two statements and others like them and thereby implies that TCI is advocating for proposals that will jeopardize safety.[2] In fact, as Mr. Ward knew throughout, TCI never advocated for freezing

---

[2]   For example, Mr. Ward's editorial includes the following statements:

"It would be a real shame <u>if we let the rail system fall prey</u> to the whims of short-sighted investors"

"One hedge fund, for example, actually demanded that CSX freeze investment in its rail system and pile on large amounts of debt on the eve of the recent credit crisis. Keep in mind, the CSX railroad delivers essential

(Continued…)

capital spending or increasing leverage in a manner that would adversely affect railroad safety. Rather, TCI advocated for freezing capital spending only on railroad *expansion* -- not on safety and maintenance of existing assets. (*See* PX 147 at 13 (stating that CSX should "[f]reeze **growth** investment until the fate of the re-regulation bill is known").) And TCI never suggested that its proposal for increasing leverage (a proposal that CSX has ***in fact*** adopted in response to TCI's public statements, (DX 154 (Richardson Dep. 127:6-19))), should come at the expense of spending on maintenance or safety. Indeed, just days prior to Mr. Ward's calumnious editorial was published, Mr. Ward sat next to Mr. Amin of TCI when he testified to Congress that TCI has "never, . . . nor would we ever suggest that railroads cut any spending in maintenance or safety." (DX 82 at 109).

        The Ward editorial is particularly galling because one of TCI's primary criticisms of CSX management has been its unacceptable safety record. Indeed, in its post-trial brief and repeatedly throughout this litigation, CSX quotes Mr. Amin out of context as stating that "you don't need cap-ex to pull up handbrakes" in order to suggest that TCI is indifferent to or cavalier about rail safety. (*See*, *e.g.*, CSX CC PFF at ¶ 88.) In fact, that oft-quoted phrase is part of a larger speech that Mr. Amin gave at the May 8, 2007 Bear Stearns Investor Conference, in which he criticized CSX's safety record and called on management to address the problem. In that speech, Mr. Amin stated:

---

    products to two thirds of the American population . . . . By their very nature, railroads require constant investment to ensure high levels of safety … "

    "A common criticism of corporate managers is that they 'live for the quarter.' But that is precisely what some activist investors are demanding of railroads, regardless of the impact on safety . . . ."

(PX 184.)

> We believe that, relative to potential, these rails are failing, and it's costing all of us.  <u>It's costing labor because the trains aren't as safe as they should be</u>.  It's costing shippers because the trains aren't as reliable as they should be.  It's costing shareholders because the trains aren't as profitable as they should be.
>
> . . . .
>
> Why does CSX say that safety is a cap-ex issue when it has 50% more human caused accidents per mile than Norfolk Southern?  And when 17 of the 20 safety faults that the FRA highlighted were human or management failures.  You don't need cap-ex to pull up hand brakes in rail cars.

(PX 96).  Thus, the record evidence shows that, contrary to his denial, Mr. Ward willfully and cynically mischaracterized TCI's positions on capital spending and leverage as posing a threat to rail safety in order to defend his entrenched position and clubby board at CSX.  Promulgation of such falsity in the context of a proxy solicitation should not be tolerated.

        **B.**       **The March 17 Press Release**

As the evidence cited in TCI and 3G's Post-Trial brief demonstrates, CSX's March 17 Press Release announcing this lawsuit contained a number of knowingly false statements.

First, Defendants demonstrated that CSX's claim that it had undertaken negotiations with TCI "in an effort to find common ground" was false because CSX had in fact adopted a goal of "zero dissidents" and had plotted to kill any deal with TCI regardless of its willingness to acquiesce to CSX's offer of four board seats.  On January 10, 2008 (less than ten days after the parties first began negotiating and a mere two days after Mr. Ward first met with Mr. Hohn), he instructed Mr. Kelly "that we [CSX] needed to let Mr. Hohn know that we were done negotiating."  (DX 154 (Ward Dep. 344:7-14); Trial Tr. at 13:18-20.)  Mr. Ward also told Mr. Kelly that "if Mr. Hohn came back with a yes" to CSX's offer of three board seats "that he, Mr. Kelly, should still try to kill the deal by using the standstill."  (DX 154 (Ward Dep. 349:8-13); Trial Tr. at 16:21-24.)

12

In its proposed findings of fact and conclusions of law, CSX avoids taking this evidence head on and instead argues that Mr. Kelly's statement that he undertook discussions with Mr. Hohn "in an effort to avoid the disruption and expense of a proxy contest" was supported by the record. (CSX CC PFF at 33.) But whatever initially motivated CSX to engage in discussions with Mr. Hohn, the fact remains that those discussions were not undertaken in an effort to find common ground with Defendants. Instead, the fix had been in since CSX created the Project Blue Ridge working group, whose goal was to keep TCI from achieving any board representation. (Trial Tr. at 22:2-23:7; DX 109; DX 307.) Mr. Ward admitted that CSX had intended to "deploy offense and defense with the goal of zero dissidents." (DX 307; Trial Tr. at 22:2-4.) Indeed, when Mr. Hohn indicated to Mr. Kelly that TCI would accept a one-year standstill in exchange for obtaining agreement on a slate of directors, Mr. Kelly simply terminated discussions. (DX 75.)

Second, Defendants demonstrated the falsity of CSX's statement that it had brought this lawsuit "to ensure that all of our shareholders receive complete and accurate information about the group's holdings, agreements, plans and motivation." (DX 86.) The facts show that CSX believed as early as May 22, 2007 that TCI had beneficial ownership of the shares referenced in its swap arrangements and CSX believed as early as December 21, 2007 that TCI and 3G had formed a group earlier than their Schedule 13D reported. (DX 154 (Fitzsimmons Dep. at 93:6-19; 102:11-104:9).)

CSX's feeble attempt to explain that it only came to believe that "TCI's statements disclaiming beneficial ownership of CSX shares hedging the swaps were not true" when it received information from Innisfree regarding the movement of CSX stock, (CSX CC PFF at 33), contradicts the sworn testimony of its 30(b)(6) designee on this issue. Ellen

13

Fitzsimmons testified that as of December 21, 2007 CSX believe that there was a substantial likelihood "that TCI and 3G had understandings and agreements with counterparties that were tantamount to beneficial ownership." (DX 154 (Fitzsimmons 109:3-14).). It also ignores the fact that CSX itself recognized that Innisfree merely speculated that the share movement "suggested the possibility" that swap counterparties were taking steps to be able to vote the shares underlying TCI's swap contracts but "did not reach a conclusion or say that's what happened." (DX 154 (Fitzsimmons Dep. 209:11-19).) Mr. Miller himself admitted that he was "speculating" as to the cause underlying the movement of shares in February 2008. (DX 154 (Miller Dep. 77:10-17).) Moreover, nothing about the movement of shares was at all relevant to CSX's allegations of early group formation, which CSX also believed at least as of December 21, 2007. (DX 154 (Fitzsimmons Dep. 109:15-22).)

CSX's explanations fail to explain why, if CSX was truly interested in ensuring that its shareholders received "complete and accurate information," CSX never approached TCI with its concerns or sought to disclose the information itself to shareholders. Nor do those explanations account for CSX's decision not to bring the lawsuit until after the date for TCI or 3G to correct its disclosures had passed. CSX cannot explain its behavior because the only plausible explanation -- which directly contradicts the statements contained in the March 17 Press Release -- is that CSX brought this lawsuit as part of its "zero dissidents" policy and in the hope of knocking out Defendants' slate of directors.

Third, Defendants have proposed a minority slate of directors (five out of twelve), only one of whom is affiliated with 3G and one of whom is affiliated with TCI. Thus, CSX's unfounded accusation that TCI is seeking "effective control" of CSX, both in a February 14, 2008 letter to Mr. Hohn and in the March 17, 2008 Press Release are materially false and

misleading.  To support its claim, CSX cites to a litany of unrelated and irrelevant evidence, none of which supports the conclusion that TCI and 3G were seeking effective control of CSX.  In essence, CSX simply reads into the evidence whatever it wants to in support of its ultimate contention, without regard to whether that evidence lends any support to its claim.

Among the more egregious examples is CSX's claim that TCI "made a number of proposals and demands to CSX management and its advisors."  (CSX CC PFF ¶¶ 99.)  The idea that a shareholder's submission of business proposals to a company could give rise to an inference that the shareholder was seeking "effective control" of that company is laughable.  Similarly flawed is CSX's argument that Mr. Hohn's negotiating position that Defendants' board candidates be placed on certain committees somehow supports the notion that Defendants were seeking effective control.  (CSX CC PFF ¶ 109.)  To the contrary, that simply indicates an interest on Defendants' part to identify the committees where their nominees -- who collectively have over 50 years of railroad experience -- would be most helpful in increasing the value of CSX.

CSX's willful distortion of Defendants' goals in this proxy contest -- *i.e.* to improve CSX -- and its willingness to graft a nefarious motive onto TCI's every action or statement cannot shield it from liability.  *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093, 111 S.Ct. 2749, 2758 (1991) (statements of belief are "reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading.").  Accordingly, this Court should find that the Ward Editorial and CSX's March 17th Press Release were false and misleading proxy solicitations.

## IV. THE CSX FEBRUARY BYLAW AMENDMENT CONTRAVENES VIRGINIA LAW.

As Defendants' noted in their proposed findings of fact and conclusions of law, Virginia law explicitly grants shareholders the right to "remove one or more directors with or without cause, unless the articles of incorporation provide that directors may be removed only with cause." Va. Code Ann. § 13.1-680(A). This right of removal may be exercised "only at a meeting called for the purpose of removing the director." Va. Code Ann. § 13.1-680(D). It is equally clear that this "meeting" is not the corporation's regularly scheduled annual meeting. See Va. Code Ann. § 13.1-680(E) (noting that the corporation may file an *amended* annual report upon the removal of a director.) The CSX articles of incorporation contain no limit on the circumstances under which directors may be removed. Accordingly, CSX shareholders have the right to remove one or more directors with or without cause.

Since the power to remove directors necessitates the power to call a meeting for that purpose, any limit on the right to call a meeting is also a limit on the right to remove directors. Here, CSX's February Bylaw Amendment has placed an absolute bar on the ability to call "a meeting for the purpose of removing the director" as contemplated by Section 13.1-680(D).

In response, CSX claims that Va. Code. Ann. § 13.1-655, which limits the circumstances in which a "special meeting" may be called, abrogates the rights granted under Section 13.1-680. (CSX CC PFF at 35-36.) In essence, CSX is asking this Court to read Section 13.1-680 out of existence. If Section 13.1-655 does grant CSX the right to eliminate the right of a shareholder to call a meeting for the purpose of removing a director, it also eliminates the right to remove directors granted under Section 13.1-680. The most basic rule of statutory construction does not permit such a result. *See Lillard v. Fairfax County Airport Auth.*, 155

16

S.E.2d 338, 342 (Va. 1967) (statutes should be construed so as to harmonize and force and effect should be given the provisions of each); *Commonwealth v. Jones*, 74 S.E.2d 817, 820 (Va. 1953) ("A statute should be construed so as to give effect to its component parts.").

Fortunately, the two sections can easily be harmonized. Section 13.1-655 refers only to special meetings. But Section 13.1-680(D) does not refer to a "special meeting," even though many other provisions in the Virginia Stock Corporation Act do. See, e.g., Va. Code Ann. §§ 13.1-658, 684, 686 and 728.5. Thus, the structure and language of the Virginia Stock Corporation Act makes clear that Section 13.1-655 does not apply to the meeting referred to in Section 13.1-680(D).

Accordingly, because CSX's February Amendment is inconsistent with Section 13.1-680 of the Virginia Stock Corporation Act, it is void *ab initio*.

## V.    MR. WARD IS LIABLE FOR CSX'S VIOLATIONS OF SECTION 14(a).

Third-Party Defendant Michael Ward is liable under Section 20(a) of the Exchange Act because he directly or indirectly controls CSX and was a culpable participant in each of the primary violations. There is no dispute that Mr. Ward is a controlling person of CSX. (*See* Answer ¶¶ 29, 144.) Moreover, contrary to CSX's claims, the evidence establishes that Mr. Ward was a culpable participant in the violations because he chaired the Board that awarded the LTIP stock grants while in possession of material non-public information, as well as when it awarded discretionary stock grants to directors during a blackout period. (*See* PX 7; PX 8; PX 14, at 8.) Moreover, Mr. Ward authored the March 11, 2008 editorial, and is quoted in the March 17, 2008 press release, in which he made false and misleading statements about TCI. (PX 184; DX 86.) Accordingly, Mr. Ward is a controlling person within the meaning of Section 20(a) of the Exchange Act and is liable for CSX's violations of Section 14(a).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants the declaratory and injunctive relief sought.

May 29, 2008

SCHULTE ROTH & ZABEL LLP

By:  /s/ Howard O. Godnick
    Howard O. Godnick
    Michael E. Swartz
    919 Third Avenue
    New York, New York 10022
    Telephone:    (212) 756-2000
    Facsimile:    (212) 593-5955
    howard.godnick@srz.com
    michael.swartz@srz.com

    Attorneys for Defendants The Children's Investment Fund Management (UK) LLP, The Children's Investment Fund Management (Cayman) Ltd., The Children's Investment Master Fund, Christopher Hohn and Snehal Amin

KIRKLAND & ELLIS LLP

By:  /s/ Peter D. Doyle
    Peter D. Doyle
    Andrew Genser
    Citigroup Center
    153 East 53rd Street
    New York, New York  10022-4611
    Telephone:    (212) 446-4800
    Facsimile:    (212) 446-4900
    pdoyle@kirkland.com
    agenser@kirkland.com

    Attorneys for Defendants 3G Capital Partners Ltd., 3G Capital Partners, L.P., 3G Fund, L.P., and Alexandre Behring