UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

CSX CORPORATION,

                Plaintiff,

                v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS, L.P.,
3G FUND, L.P., CHRISTOPHER HOHN, SNEHAL
AMIN, AND ALEXANDRE BEHRING, A/K/A
ALEXANDRE BEHRING COSTA,

                Defendants.

------------------------------------------------------------:

THE CHILDREN'S INVESTMENT MASTER
FUND,

                Counterclaim and Third-
                Party Plaintiff,

                v.

CSX CORPORATION AND MICHAEL J. WARD,

                Counterclaim and Third-
                Party Defendants.

------------------------------------------------------------

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.

                Counterclaim Plaintiffs,

                v.

CSX CORPORATION AND MICHAEL WARD,

                Counterclaim Defendants.

------------------------------------------------------------x

ECF CASE
08 Civ. 02764 (LAK) (KNF)

**<u>DEFENDANTS' POST-TRIAL REPLY
BRIEF RELATING TO THE CLAIMS
OF CSX CORPORATION</u>**

1

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

**SUMMARY OF ARGUMENT** ................................................................................. 1

**RESPONSE TO PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW** ........................... 8

**I. DEFENDANTS FULLY COMPLIED WITH SECTION 13** ................................................. 8

Plaintiff cobbles together a collection of irrelevant facts and unproven assumptions in an attempt to support its novel proposition that Defendants were the beneficial owners of CSX common stock in an amount equal to the shares referenced in their swap agreements. But nothing Plaintiff says can correct the fundamental flaw in their theory. Beneficial ownership is not a theoretical construct based on economic rationality and expectations. Rather, beneficial ownership is tied to very specific indicia of ownership: voting power and investment power. Although a person may be deemed to be the beneficial owner of securities under circumstances where he has the *right* to acquire those powers, or where he uses certain instruments to prevent the vesting of such power as part of a "plan or scheme to evade" his disclosure obligations, there simply is no basis for imposing a disclosure obligation with respect to securities – as here – as to which Defendants have a purely hypothetical relationship............................................................................................... 8

Thus, as set forth in detail in Defendants' Post-Trial Brief and above, the unrefuted evidence demonstrates that Defendants have absolutely *no* rights with respect to any securities with which their counterparties may choose to hedge their swaps. (Defs. Br. at 14-18, 42-44, 47). Defendants have neither the right to the shares nor to tell the counterparties how to vote them. Defendants have no right to acquire the hedged shares, or to direct their counterparties to dispose of them. They have no control over whether their counterparties hedge with CSX securities or some other instrument, or even whether they hedge at all. All that Defendants have is a contract with their counterparties that entitles them to an economic return that is tied to the value of the referenced CSX stock. Thus, although they have a significant interest in the fortunes of CSX, neither their swap contracts nor any other relationship with the counterparties gives them the right to vote any CSX stock, which is particularly significant given the purpose of the Williams Act "to provide information to the public and the affected issuer about rapid accumulations of its equity securities in the hands of persons who would then have the potential to change or influence control of the issuer." Filing & Disclosure Requirements Relating to Beneficial Ownership, 43 Fed. Reg. 18484, 18484 (Apr. 28, 1978) (citing S. Rep. No. 90-550 (1968); H.R. Rep. 90-1711 (1968)). ........................................ 8

Although Plaintiff discounts the significance of Defendants' swap contracts (Pl. Findings ¶¶ 235-39) and of the counterparties' policies (*id.* at ¶¶ 240-41), even Plaintiff does not suggest that the swap contracts are invalid or unenforceable. Moreover, whereas Defendants presented evidence establishing that Defendants and their swap counterparties had no arrangement, agreement or understanding with

respect to the voting or disposition of any hedge shares (Defs. Br. at 17, 43-44), Plaintiff has presented *no* evidence to show the existence of any such arrangement, agreement or understanding.................................................................................................. 9

Instead of presenting any factual support for the claim that Defendants are the beneficial owners of shares of CSX stock with which their counterparties hedge their swap contracts, Plaintiff relies on its expert's view of how the market works to infer (1) the existence of voting and/or investment power over those shares, (2) a "right" to acquire voting and investment power, and (3) a plan or scheme to evade the reporting obligations. (Pl. Findings at 76.) That view asks this Court to assume, without any evidentiary support (indeed, the evidence proves the contrary), that market participants routinely ignore their contractual obligations, ethical standards, and the federal securities laws. Notwithstanding Plaintiff's theory, there is nothing in the rules that supports a finding that Defendants' swaps conferred beneficial ownership of CSX stock in TCI. ......................................................................................... 9

Rather, as explained in Defendants' Post-Trial Brief, it is generally accepted that "plain vanilla" swap arrangements – such as those at issue here – do not confer beneficial ownership of any hedge securities and, thus, do not trigger reporting requirements under Section 13(d). (Defs. Br. at 36-37.) Although there is no controlling authority that is directly on point, the only analogous SEC guidance is consistent with this viewpoint. In a Q&A issued in 2002, the SEC stated that cash-settlement of a security does not give rise to beneficial ownership of the underlying securities for purposes of Regulation 13D (Rules 13d-1 to 13f-1). (*See id.* at 35-36 (discussing Exchange Act Release No. 46101 (June 21, 2002)).) In addition, the view that equity swaps do not confer beneficial ownership is supported by the fact that Section 16 of the Exchange Act distinguishes between, but requires disclosure of both (A) "equity securities" that are beneficially owned and (B) "security-based swap agreements," demonstrating that if Congress intended to require disclosure of swap agreements under Section 13, it would have done so. (*See* Defs. Br. at 37-38.) Indeed, the amendment of Section 16 to require disclosure of security-based swap agreements was part of the same bill, H.R. 4577, 106th Cong. (2d Sess. 2000), by which the Exchange Act was amended to exclude equity swaps from the definition of equity securities. Nonetheless Congress did not impose a disclosure requirement for swap agreements under Section 13, but instead prohibited the SEC from regulating swap agreements as securities. (*See* Defs. Br. at 35 n.20.) ............................ 10

In contrast to the extant authority that supports Defendants' view of their disclosure obligations and that provided guidance in structuring their transactions, there is *no* authority for Plaintiff's view that Defendants were the beneficial owners of the stock referenced in their swap agreements. Rather than promoting the Williams Act's goal of transparency that Plaintiff trumpets loudly, a holding that cash-settled total return swaps (such as those held by Defendants) confer beneficial ownership of hedged securities would raise a host of problems – which are likely to obfuscate rather than clarify information about the holders of voting securities that have the potential to change or influence control of the issuer. Thus, under Rule 13d-5, if the owner of a swap is considered the beneficial owner of securities with which its counterparty hedges, the owner and its counterparty would be considered a group for the purpose of acquiring, holding, voting or disposing of these securities within

the meaning Rule 13d-5. Accordingly, both the holder of the swap and its counterparty would be required to file a Schedule 13D when their combined "beneficial ownership" of the issuer's equity securities was 5% or more. This would create significant issues that Schedule 13D was not designed to accommodate. (*See* Swartz Decl. Ex. 6 for examples of those issues.)............................ 11

In any event, Plaintiff has presented neither facts or law to support such a finding, but rely almost completely on the views of its expert who has no securities industry expertise regarding rational hedging practices. That is simply not an appropriate for a finding that Defendants were the beneficial owners of CSX stock with which its swap counterparties hedged their swap contracts.............................................................. 12

**A. TCI's Swap Arrangements Do Not Confer Voting or Investment Power.** ................... 12

Unable to produce evidence of any "contract, arrangement, understanding [or] relationship" that gives TCI voting or investment power over any CSX hedge shares that may be held by the swap counterparties, Plaintiff cites *SEC v. Drexel Burnham Lambert Inc*., 837 F. Supp. 587, 607 (S.D.N.Y. 1993) for the proposition that "[a] person has 'investment power' over a security where he has the ability significantly to influence the disposition of the security." (Pl. Findings at 82.) But *Drexel* does not support Plaintiff's novel and expansive theory of investment power. Rather, merely states the unremarkable proposition that a person without legal title to a security can nonetheless be deemed the beneficial owner when he has *actual control* over the person who does hold legal title: ......................................................................... 12

In *Drexel Burnham Lambert*, four conspirators concocted a parking scheme in order to acquire control of a company. "To carry out the plan, it was necessary to enlist others in the conspiracy who would be willing to acquire more than 10% of [the target company's] outstanding voting stock . . . ." 837 F. Supp. at 590. The conspirators enlisted an investor to secretly accumulate stock in the target company on "their behalf. The conspirators promised that investor that "he would not lose any money if he [bought the stock]. [The investor] reasonably understood that he was being sought to do a 'parking' job . . . and that if he took a position in [the target company], he would be 'stopped out', i.e., that he would be 'made whole' if the stock went down before it was delivered to the source for which the parking had occurred." *Id.* at 591. While "parking" the stock for the conspirators, the investor "periodically reported . . . the status of the . . . investment he was making." *Id.* When the value of the stock depreciated significantly, the conspirators "kept assuring him that there was no need to worry and reminded him that he was guaranteed against loss." *Id.* at 592. Next, "[a]rrangements were made . . . for a private placement to finance a takeover of [the stock held in the investor's name] without providing a clue to the parking deal" and the conspirators "set a price which would not be too high in relation to the market price so as to avoid making the transaction seem ridiculous." *Id.* (internal quotation marks omitted). Under this parking arrangement, the court found that the conspirators had beneficial ownership over the shares held in the investor's name. *Id.* at 609.................................................... 13

As the facts of *Drexel Burnham Lambert* demonstrate, the question of whether an arrangement gives a person the "significant ability to affect how . . . investment power will be exercised" turns on whether that person has *actual control* over the person who holds legal title to the security in question – not, as Plaintiff claims, on

iii

whether the "economic reality" is such that an arrangement merely induces one party "as a practical matter" to purchase or dispose of shares while the other party has no power or control over the person holds legal title to those shares. ........................ 14

Plaintiff also cites *Calvary Holdings, Inc. v. Chandler*, 948 F.2d 59, 63 (1st Cir. 1991), to support its novel theory of investment power through the ability to significantly influence share activity.  (Pl. Findings at 82.)  It does not.  *Calvary Holdings* actually supports the prevailing view that Total Return Swaps do not confer beneficial ownership because a swap holder does not have the power to direct its counterparty to purchase, sell or vote the shares referenced in the swap agreement. According to the First Circuit: ........................................................................................... 14

By contrast, in *Wellman v. Dickinson*, 682 F.2d 355, 366 (2d Cir. 1981), also cited by Plaintiff (Pl. Findings at 83), Eberstadt was deemed to be the beneficial owner of a security because he had actual control over the entity that held legal title to that security.  In *Wellman*: ........................................................................................... 15

Here, TCI and 3G have no power to "control" or "direct" the swap counterparty banks to vote, purchase, or dispose of CSX shares they may or may not purchase as a hedge. The undisputed evidence shows that TCI and 3G have no understanding, arrangement or agreement with the counterparties to purchase or dispose of CSX shares on their behalf, and that the counterparties *independently* decide (i) whether to purchase or dispose of shares as a hedge, or whether to even use physical shares, rather than some other financial instrument, to hedge the swap arrangement, *and* (ii) whether and how to vote the shares they hold as a hedge.  (DX 155 (Arnone Dep. 22:16-23:17, 33:5-18, 38:14-39:3, 40:3-9, 43:8-20, 44:7-11, 46:3-19); DX 151 (Kennedy Dep. 19:7-23:24, 35:21-38:2, 39:7-40:21); DX 153 (Busby Dep. 26:10-17).)  Indeed, Plaintiff concedes that Defendants do not "have a contractual right to force their counterparties to hedge with physical shares or to unwind their hedge positions," and instead relies on the "economic reality" that counterparties hedge with physical shares "as a practical matter" to support its claim that Defendants beneficially own those shares.  (Pl. Findings at 82.)  However, this "economic reality" is insufficient to confer beneficial ownership – as a practical, factual or legal matter – because Defendants cannot dictate to their swap counterparties when to purchase, when to dispose, or how to vote the shares they hold as a hedge. ................ 15

Plaintiff's shifting theories as to how Defendants can be deemed beneficial owners of the CSX shares referenced in their swap agreements shows that from the outset, this litigation has been nothing more than a ploy by CSX to gain an advantage in the upcoming proxy contest.  When CSX filed its complaint, it alleged that a mysterious "movement of shares" showed that Defendants had secret agreements with the counterparty banks to vote in their favor.  (PX 264 (Ward ¶ 27); PX 269 (Fitzsimmons ¶¶ 19-21); Trial Tr. (Miller Test. 79:6-22); (*see also* DX 154 (Bryson Dep. 240:9-241:5) (noting that the record date was changed "based on this change in the shareholder base prior to the previous record date in February….").)  After the discovery process exposed the utter falsity of that allegation, Plaintiff now principally relies on its *expert* witness to rebut the deposition testimony of *fact* witnesses from the counterparty banks establishing that TCI does not have investment or voting power over the CSX shares used as hedges to their swap agreements.  (DX 155 (Arnone Dep. 22:16-23:17, 33:5-18, 38:14-39:3, 40:3-9,

43:8-20, 44:7-11, 46:3-19); DX 151 (Kennedy Dep. 19:7-23:24, 35:21-38:2, 39:7-40:21); DX 153 (Busby Dep. 26:10-17).) Putting Professor Subrahmanyam's theoretical generalizations aside, the undisputed evidence shows that – as a *factual* matter – TCI's counterparties do not even have plans to vote any shares held as hedges in the upcoming CSX annual meeting. (DX 151 (Kennedy Dep. 21:14-24); DX 152 (Arnone Dep. 24:10-25:17).) Accordingly, regardless of whether "TCI had the ability to determine the identity of the vote holder," or whether "TCI expected that Deutsche Bank would be more likely than other counterparty banks to vote with TCI in a proxy battle" (Pl. Findings at 83), the undisputed fact that Deutsche Bank or Citigroup will not vote in the proxy contest plainly shows that TCI has no "ability significantly to influence the voting" of any CSX shares held as hedges by the counterparties. Indeed, if Total Return Swaps in fact confer any sort of voting power, it makes little sense for TCI to have ever invested in physical shares. ................. 16

**B. TCI's Swap Arrangements Do Not Give It the Right to Acquire Beneficial Ownership of Any CSX Stock.** ...................................................................... 17

Plaintiff's claim that Defendants' Total Return Swaps confer beneficial ownership pursuant to the first part of Rule 13d-3(d)(1)(i) must fail as a matter of law. The first part of Rule 13d-3(d)(1)(i) provides in relevant part: ................................................ 17

Plaintiff, however, argues that TCI "has always had the right to acquire beneficial ownership of the CSX stock referenced in its swaps not only within sixty days, but also 'at any time.'" (Pl. Findings 84.) Rather than refer to *any* contractual provision contained in TCI's "plain vanilla" Total Return Swap agreements evidencing some "right" to acquire beneficial ownership of the shares referenced in the agreement, or provide *any* legal support for this claim, Plaintiff merely recites purported statements made by TCI representatives that it could "convert" its Total Return Swaps into physical shares. However, the statements made by TCI representatives were expressions that they could terminate their swaps and acquire shares on the open market to maintain the same economic exposure, as they did in April 2007. Those statements obviously did not give rise to legal rights, neither expressed in the swap contracts nor in any other agreements or understandings with the TCI counterparties. Accordingly, Plaintiff has failed to carry its burden of proving that TCI has beneficial ownership of the shares referenced in its swaps pursuant to the first part of Rule 13d-3(d)(1)(i). ................................................ 18

Plaintiff next argues that TCI's Total Return Swaps confer beneficial ownership pursuant to the second part of Rule 13d-3(d)(1)(i) because TCI had proposed that CSX pursue a leveraged buyout ("LBO") and had other suggestions for how CSX's operations could be improved and full value realized. (Pl. Findings at 84.) The second part of Rule 13d-3(d)(1)(i) provides in relevant part: ........................................... 18

As set forth above, a Total Return Swap agreement is *not*: (A) an option, warrant or right; (B) a conversion of a security; or (C) a power to revoke a trust, discretionary account, or similar arrangement, and they do not give the holder the right to acquire beneficial ownership of any security. Accordingly, regardless of whether or not TCI purchased its Total Return Swaps for the purpose of proposing an LBO of CSX or other suggestions, the second part of Rule 13d-3(d)(1)(i) does not apply to TCI's Total Return Swaps. Plaintiff seeks to have the Court simply ignore the provision that a person must acquire a security or power specified in (A), (B) or (C) in order

to be deemed a beneficial owner pursuant to the second part of Rule 13d-3(d)(1)(i). Plaintiff's claim must fail as a matter of law. ................................................................. 19

In sum, TCI cannot be deemed the beneficial owner of the shares referenced in its Total Return Swaps pursuant to Rule 13d-3(d)(1)(i). ................................................................. 19

**C. TCI's Swap Arrangements Are Not A Scheme To Evade The Reporting Requirements of Section 13(d).** ................................................................................... 19

Despite its inability to point to anything out of the ordinary in TCI's swap agreements, Plaintiff argues that those swap arrangements are part of a "plan or scheme to evade the reporting requirements," within the meaning of Rule 13d-3(b) and, accordingly, TCI should be deemed the beneficial owner of the hedged shares. Plaintiff's argument is fundamentally flawed. A scheme to evade disclosure obligations presumes the existence of an obligation to disclose, but here no such obligation exists. ................................................................................................................. 19

As explained above, swap agreements are not securities (indeed, Section 3A of the Exchange Act expressly states that) and the extant authority supports the view that they do not confer beneficial ownership of any referenced securities. Accordingly, as discussed in Defendants' Post-Trial Brief, entering into legitimate swap contracts as a means of building an economic position tied to CSX, without triggering a disclosure obligation, is legitimate. (Defs. Br. at 52-53.) *See* Testimony by Annette Nazareth, Director, Division of Market Regulation, (former SEC Commissioner) July 19, 2000 before Committee on Banking and Financial Services US House of Representatives. (emphasizing that "[nevertheless, the Commission by and large has taken action with respect to swaps only in enforcement cases involving clear instances of fraud.") http://www.sec.gov/news/testimony/ts132000.htm. This is consistent with the presumption that applies with respect to other exemptive provisions that are found in the federal securities laws, and the same standard that is needed to find a "plan or scheme to evade" in those contexts should be required to overcome the presumption that cash-settled equity swaps do not confer beneficial ownership of the hedged securities in the Section 13(d) context. Thus, as in the Regulation S context, structuring a bona fide transaction to take advantage of an exemption from disclosure is completely legitimate and it is only when there is "preconceived artifice" that disclosure of presumptively exempt instruments can be required. *See, e.g., SEC v. Softpoint,* 958 F. Supp. 846, 861 (S.D.N.Y. 1997) (discussed in Defs. Br. at 51.). ....................................................................................... 20

Plaintiff and Defendants both cite the same example which is included in the Exchange Act Release issued on Adoption of Beneficial Ownership Disclosure Requirements, Exchange Act Release No. 13291, 1977 WL 185650, at *14, and is the only SEC guidance as to the meaning of Rule 13d-3(b). Plaintiff maintains, without explanation, that the SEC's hypothetical shows that the state of mind needed to find a plan or scheme to evade under Rule 13d-3(b) is "no more than intent to avoid." (Pl. Findings at 79-80.) In fact, the SEC's example involved a situation akin to a "parking" scheme, where "X" had ten different institutions purchase voting securities of "Z" on his behalf and directed the voting on those securities by providing "A" with a proxy to vote them. (*See* Defs. Br. at 53-54.) Thus, although it does not specifically address an intent requirement, unlike Defendants' swaps, the example involves actual physical shares that were owned by X, and "parked" with

others to avoid disclosure. In fact, as Defendants note in their Post-Trial Brief, these type of parking arrangements are the only situations in which Rule 13d-3(b) has been applied by the courts. (*See* Defs. Br. at 54.) ...................................................... 21

Given the evidence that Defendants use swaps regularly for a variety of reasons, ranging from lower financing costs, administrative convenience and tax benefits (PX 19), it is not surprising that Plaintiff contends that a person can be deemed a beneficial owner even if avoidance of disclosure is not his sole motive for entering into a transaction. (Pl. Findings at 80.) But Plaintiff cites no law in support of that contentions and, indeed, the law that Defendants cite is to the contrary. (*See* Defs. Br. at 51-53.) A legitimate exemption is lost only when the "sole or dominant reason" for the transaction is to violate the law. *See, e.g.*, *Zimmerman v. Chicago Bd. Of Trade*, 360 F.3d 612, 624 (7th Cir. 2004) (discussed in Defs. Br. at 52-53 ). Thus, so long as a legitimate business purpose exists for a transaction, the fact that it is structured to achieve certain regulatory exemptions does not bring it within the scope of a "plan or scheme to evade." (*See* Defs. Br. at 51-53 for discussion of relevant cases drawn from the federal securities law and tax structuring contexts.)......... 21

In fact, the evidence demonstrates that Defendants' primary purpose in entering into swap transactions was *not* the avoidance of disclosure obligations, but rather the financing benefits of swaps. (*See* Defs. Br. at 55 (citing DX 145 (Amin ¶ 7); (DX 144 (Hohn ¶¶ 6, 11)).) Moreover, Defendants acted in a manner that is inconsistent with any "plan or scheme to evade" reporting and thus did not "subvert" the goal of transparency in the securities markets. (Pl. Findings at 81.) Indeed, had TCI's sole or primary purpose in entering into swap transactions was the avoidance of disclosure, it stands to reason that after December 19, 2007, when it filed a Schedule 13D, it would have closed out its swap transactions and purchased physical shares instead, thereby increasing its holdings of CSX, acquiring the ability to vote those shares. The fact that TCI did not do that, even though it anticipated that it would be involved in a highly-contested proxy contest demonstrates that TCI was not driven by nondisclosure either in deciding to purchase swaps or in determining that it had no disclosure obligations. ............................................................. 22

Rather, TCI entered into swaps for a variety of reasons, and believed – based on existing guidance, market practice and advice of counsel – that swaps did not confer beneficial ownership of hedged shares or trigger reporting requirements under Section 13(d). These facts are entirely inconsistent with a plan or scheme to evade disclosure obligations, and none should be found. ............................................................. 23

**D. Defendants' Disclosure As To The Group Formation Is Accurate,    Truthful and Complete** .................................................................... 23

In sum, despite two days of trial testimony, four weeks of deposition testimony, and well over a million pages of documents produced by TCI and 3G during discovery, the record is completely devoid of any evidence that, prior to December 12, 2007, TCI and 3G agreed to act together for the purpose of acquiring, holding, voting, or disposing of equity securities of CSX. Not a single piece of evidence was offered reflecting a common understanding or agreement between TCI and 3G concerning CSX stock, swaps, or a CSX proxy contest. Accordingly, Plaintiff fails to meet its burden of proving that TCI and 3G formed a group prior to December 12, 2007. ........... 29

**E. Defendants' Schedule 13D Is Accurate, Truthful and Complete.** .................................. 30

Defendants timely filed their Schedule 13D on December 19, 2007, after they had formed a group on December 12, 2007. Defendants' Schedule 13D is fully accurate, truthful and complete. ...................................................................... 30

In its Proposed Conclusions of Law, Plaintiff has abandoned its meritless claims that: (i) Defendants did not accurately disclose the source of funds used to purchase their CSX shares; (ii) Defendants failed to file copies of the nominee agreements referenced in their Schedule 13D; and (iii) Defendants failed to disclose the required information regarding the controlling persons of TCI and 3G. Plaintiff has failed to establish any other deficiency in Defendants' Schedule 13D. ............................ 30

Plaintiff's claim that Defendants misrepresented their beneficial ownership in their Schedule 13D must fail. (Pl. Findings at 87-88.) As set forth in Section I.A-C of Defendants' Post-Trial Brief (pp. 33-57), Defendants do not have beneficial ownership of the shares referenced in their Total Return Swaps. ..................................... 30

Plaintiff's claim that Defendants misrepresented their group formation and the ownership interests of the group in their Schedule 13D also must fail. (Pl. Findings at 88.) As set forth in Section I.D of Defendants' Post-Trial Brief, Defendants did not form a group until December 12, 2007. In addition, Defendants truthfully and accurately disclosed the beneficial ownership of the group because, as set forth in Section I.A-C of Defendants' Post-Trial Brief, Defendants do not have beneficial ownership of the shares referenced in their Total Return Swaps. ..................................... 30

Plaintiff incorrectly claims that Defendants' Schedule 13D violated Item 6 of Rule 13d-101 because Defendants did not disclose their Total Return Swaps' "termination provisions, the initial price of the referenced shares, the number of CSX shares referenced in each individual swap as well as the aggregate number of CSX shares referenced in Defendants' overall swap position." (Pl. Findings at 88.) Plaintiff further claims that Defendants "failed to disclose the material terms of the credit default swap arrangements they had regarding CSX." (*Id.*) .............................................. 31

Item 6 requires the filer to "[d]escribe any contracts, arrangements, understandings or relationships (legal or otherwise) among the persons named in Item 2 and between such persons and any person with respect to any securities of the issuer . . . ." 17 C.F.R. § 240.13d-101. ...................................................................................... 31

In their December 19, 2007 Schedule 13D, Defendants truthfully and accurately disclosed all their Total Return Swap counterparties and the fact that TCI's Total Return Swaps "constitute economic exposure to approximately 11% of the Shares" and that 3G's Total Return Swaps "constitute economic exposure to approximately 0.8% of the Shares." (JX 8.) In addition, Defendants truthfully and accurately disclosed that 3G has "credit default swaps that reference debt securities of [CSX]." (*Id.*) Nowhere in Rule 13d-101 does it provide that the filer must disclose the specific contractual provisions that Plaintiff claims should have been disclosed, and Plaintiff has identified no additional legal authority requiring such disclosures. Moreover, such minutiae is not "material." Accordingly, Defendants' failure to disclose such information does not render their Schedule 13D materially incomplete. .................................................................................................. 31

Plaintiff incorrectly claims that Defendants should have filed copies of their Total Return Swap agreements as exhibits in Item 7 of their Schedule 13D. (Pl. Findings at 88.) Item 7 of Rule 13d-101 requires the following to be filed as exhibits: ................ 32

**II. DEFENDANTS COMPLIED WITH THEIR DISCLOSURE REQUIREMENTS UNDER SECTION 14 OF THE EXCHANGE ACT.** ........................................................ 33

**III. THE INDIVIDUAL DEFENDANTS ARE NOT LIABLE UNDER SECTION 20(A) OF THE EXCHANGE ACT.** ................................................................. 36

**IV. DEFENDANTS' NOTICES OF PROPOSED DIRECTOR NOMINEES AND BYLAW AMENDMENTS COMPLY WITH CSX'S BYLAWS.** .......................... 38

**V. THE PLAINTIFF HAS FAILED TO DEMONSTRATE IRREPARABLE HARM AND, ACCORDINGLY, NO INJUNCTION SHOULD ISSUE.** ........................... 40
   A. Plaintiff Has Failed to Identify Any Irreparable Harm. ............................... 41
   B. The Injunctions Sought Are Improper. ................................................... 44

**RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT** .................... 50

**I. THE PARTIES** .................................................................................... 51
   A. CSX ..................................................................................................... 51
   B. TCI ...................................................................................................... 51
   C. Chris Hohn ........................................................................................... 52

**II. TCI ACCUMULATES A SUBSTANTIAL STAKE WITH PROPER DISCLOSURES** ........................................................................................ 55

**III. PLAINTIFF HAS OFFERED NO EVIDENCE TO ESTABLISH THAT TCI CONSOLIDATED ITS TOTAL RETURN SWAPS AT DEUTSCHE BANK AND CITIGROUP TO INFLUENCE AND CONTROL CSX** ..................................... 61

**IV. PLAINTIFF HAS OFFERED NO EVIDENCE TO ESTABLISH AN EXISTENCE                                                              OF A GROUP BEFORE DECEMBER 12, 2007                                               66**
   A. There Is No Evidence That TCI Discussed Its Trading Activities With Anyone Outside of TCI .................................................................................... 66
   B. TCI And 3G Conducted Independent Analyses. ......................................... 80

**V. TCI AND 3G ARE NOT SEEKING CONTROL OF CSX.** .......................... 85
   A. TCI Performed a Rail Industry LBO Analysis to Better Understand Rail Industry Value. ...................................................................................... 85
   B. CSX Management Refuses to Reason with TCI ......................................... 93
   C. TCI Negotiated in Good Faith In An Effort to Reach an Agreement With CSX. ...... 100

**VI. TCI'S TOTAL RETURN SWAPS DO NOT CONFER BENEFICIAL OWNERSHIP** ....................................................................................... 102
   A. TCI and 3G did not Determine the Disposition of Hedged Shares. ............. 102
   B. TCI and 3G Do Not Have the Ability Significantly to Influence. ................ 107
   C. The Swap Contracts Demonstrate that TCI and 3G Do Not Have Voting or Investment Power over the CSX Shares. ................................................ 109
   D. The Treatment of Cash-Settled Security Futures is Instructive. ................ 110

**E. Professor Partnoy is a Qualified Expert.** ........................................................................ 111

**F. Professor Partnoy Accurately Portrays the Hedging Data** ........................................... 115

**G. TCI and 3G Disclosed All of the Information Required Under the Securities
Laws.** ......................................................................................................................................... 116

**H. Defendants Are Not the Beneficial Owners of Any CSX Shares Held by Their
Total Return Equity Swap Counterparties** ........................................................................ 117

I. **Defendants Have Made All Necessary Disclosures Regarding Their Plans and
Proposals** ................................................................................................................................. 118

**J. Defendants Had No Undisclosed Agreements, Arrangements, or Relationships
with Respect to Securities in Their Schedule 13D.** ........................................................ 122

**K. Defendants Did Not Misrepresent Their Group Formation/Ownership.** ................... 125

L. **Ramifications** ......................................................................................................................... 126

# TABLE OF AUTHORITIES

## CASES

*325 Bleecker Inc. v. Local Union No. 747*
  50 F. Supp. 2d 110 (N.D.N.Y 2007) ........................................................................

*ATSI Commc'ns Inc. v. Shaar Funds, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)............................................................................80

*Aaron v. S.E.C.*,
  446 U.S. 680, 100 S. Ct. 1945 (1980) ..................................................................90

*Am. Fed'n of State, County, & Mun. Employees v. Am. Int'l Group, Inc.*,
  462 F.3d 121 (2d Cir. 2006).......................................................................101, 102

*Amoco Production Co. v. Village of Gambell*,
  480 U.S. 531, 107 S. Ct. 1396 (1987) ....................................................................

*Avnet, Inc. v. Scope Industries*,
  499 F. Supp. 1121 (S.D.N.Y. 1980).....................................................................90

*BFP v. Resolution Trust Corp.*,
  511 U.S. 531, 114 S. Ct. 1757 (1994) ...............................................................38, 39

*Bath Indus. v. Blot*,
  427 F.2d 97 (7th Cir. 1970)...............................................................................46

*Bray v. City of New York*,
  346 F. Supp. 2d 480 (S.D.N.Y. 2004) ...................................................................92

*Capital Realty Investors v. Dominium Tax Exempt*,
  944 F. Supp. 250 (S.D.N.Y. 1996)..............................................................8, 85, 87

*Champion Parts Rebuilders, Inc. v. Cormier Corp.*,
  661 F. Supp. 825 (N.D. Ill. 1987) .......................................................................99

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837, 104 S. Ct. 2778 (1984) ...................................................................37

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*,
  480 F.2d 341 (2d Cir. 1973)...............................................................................95

*Chromalloy Am. Corp. v. Sun Chem. Corp.*,
  611 F.2d 240 (8th Cir. 1979)..............................................................................96

*Comm. for New Mgmt. of Butler Aviation v. Widmark*,

335 F. Supp. 146 (E.D.N.Y. 1971) .........................................................................99

*Condec Corp. v. Farley,*
573 F. Supp. 1382 (S.D.N.Y. 1983).................................................................87, 90

*D.L. Cromwell Investments, Inc. v. NASD Regulation, Inc.*,
279 F.3d 155 (2d Cir. 2002)..................................................................................82

*Edelman v. Salomon,*
559 F. Supp. 1178 (D. Del. 1983) .........................................................................92

*Electronic Specialty Co. v. Int'l Controls Corp.*,
409 F.2d 937 (2d Cir. 1969)............................................................................85, 95

*Equal Employment Opportunity Comm'n v. Johnson & Higgins, Inc.*,
91 F.3d 1529 (2d Cir. 1996)................................................................................102

*Fink v. Weill,*
No. 02 Civ. 10250(LTS), 2005 WL 2298224 (S.D.N.Y. Sept. 19, 2005) ............104

*Fla. Commercial Banks v. Culverhouse*,
772 F.2d 1513 (11th Cir. 1985).............................................................................95

*Freedom Calls Found. v. Bukstel*,
No. 05CV5460, 2006 WL 845509 (E.D.N.Y. Mar. 3, 2006)...........................92, 93

*GAF Corp. v. Heyman,*
724 F.2d 727 (2d Cir. 1983)................................................................................124

*GAF Corp. v. Milstein,*
453 F.2d 709 (2d Cir. 1973)....................................................................................1

*Gearhart Indus., Inc. v. Smith Int'l, Inc.*,
741 F.2d 707 (5th Cir. 1984).................................................................................98

*Gen. Aircraft Corp. v. Lampert*,
556 F.2d 90 (1st Cir. 1977).............................................................................84, 98

*Golden v. Zwickler,*
394 U.S. 103 (1969) ..............................................................................................

*Gorman v. Coogan,*
No. 03-173-P-H, 2004 WL 60271 (D. Me. Jan. 13, 2004) ....................................98

*Gottlieb v. Economy Stores,*
102 S.E.2d 345 (Va. 1958)...................................................................................131

*Green v. Goodman-Gable-Gold Co., Inc.*
  268 Va. 102, 597 S.E.2d 77 (2004) ...................................................................................

*Gregory v. Helvering*,
  293 U.S. 465, 55 S. Ct. 266 (1935) ................................................................................52

*Gryl ex rel. Shire Pharms. Group Plc v. Shire Pharms. Group Plc*,
  298 F.3d 136 (2d Cir. 2002) ...........................................................................................37

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
  286 F.3d 613 (2d Cir. 2002) ....................................................................................57, 84

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
  2001 WL 46978 (S.D.N.Y. Jan. 19, 2001) ...................................................................104

*Hanna Mining Co. v. Norcen Energy Res. Ltd.*,
  574 F. Supp. 1172 (N.D. Oh. 1982) ...............................................................................95

*Harrison v. Rubenstein*,
  No. 02 Civ. 9356(DAB), 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007) ...................81

*In re HealthSouth Sec. Litig.*,
  No. CV-03-BE-1500-S (N.D. Ala.) ...........................................................7, 50, 51

*Henrietta D. v. Bloomberg*,
  331 F.3d 261 (2d Cir. 2003) ...........................................................................................82

*Hubco v. Rappaport*,
  628 F. Supp. 345 (D.N.J. 1985) .....................................................................................84

*ICN Pharmaceuticals v. Khan*,
  2 F.3d 484 (2d Cir. 1993) ...........................................................................83, 119, 120

*Int'l Banknote Co. v. Muller*,
  713 F. Supp. 612 (S.D.N.Y. 1989) ............................................................................88, 90

*Int'l Trading Co. v. C. I. R.*,
  484 F.2d 707 (7th Cir. 1973) .........................................................................................52

*Ithaca (Custodians) Ltd. v. Perry Corp.*,
  [2004] NZLR 731, 2003 NZLR LEXIS 76 (Court of Appeals,
  Wellington, Nov. 4, 2003) .................................................................................... *passim*

*K-N Energy, Inc. v. Gulf Interstate Co.*,
  607 F. Supp. 756 (D. Colo. 1983) ...........................................................................57, 100

*Kaufman v. Cooper Companies, Inc.*
    719 F. Supp. 174 (S.D.N.Y.1989)............................................................124

*In re Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...............................................78, 79

*Kidder, Peabody & Co., Inc., v. Maxus Energy Corp.*,
    925 F.2d 556 (2d Cir. 1974)..............................................................

*Kirsch Co. v. Bliss and Laughlin Indus., Inc.*,
    495 F. Supp. 488 (W.D. Mich. 1980)..........................................95, 98, 99

*Knetsch v. United States*,
    364 U.S. 361, 81 S. Ct. 132 (1960) ....................................................52

*Lake Monticello Owners' Ass'n v. Lake*,
    463 S.E.2d 652 (Va. 1995).........................................................130, 131

*Lane Bryant, Inc. v. Hatleigh Corp.*,
    No. 80-Civ. 1617, 1980 WL 1412 (S.D.N.Y. June 9, 1980)..............98, 100

*Estate of Lennon v. Screen Creations, Ltd.*,
    939 F. Supp. 287 (S.D.N.Y. 1996).....................................................103

*Levy v. Southbrook Int'l Inv., Ltd.*,
    No. 99 CIV. 1480 (NRB), 2000 WL 567008 (S.D.N.Y. May 10, 2000), *aff'd*,
    263 F.3d 10, 17-18 (2d Cir. 2001) .............................................6, 46, 47 52

*Liberty Nat'l Ins. Holding Co. v. Charter Co.*,
    734 F.2d 545 (11th Cir. 1984)............................................................96

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*,
    223 F. Supp. 2d 435 (S.D.N.Y. Dec. 10, 2001) ....................................57

*MTD Serv. Corp. v. Weldotron Corp.*,
    No. 93 Civ. 4980 (MP), 1994 WL 455154 (S.D.N.Y. Aug. 19, 1994)....................98

*Maldonado v. Flynn*,
    597 F.2d 789 (2d Cir. 1979)........................................................123, 124

*Malleterier v. Burlington Coat Factory Warehouse Corp.*,
    426 F.3d 532 (2d Cir. 2005)............................................................132

*Markowski v. SEC*,
    34 F.3d 99 (2d Cir. 1994).................................................................56

*Mazurek v. Armstrong*,
  520 U.S. 968, 117 S. Ct. 1865 (1997) ...................................................................82

*Mo. Portland Cement Co. v. H.K. Porter Co., Inc.*,
  535 F.2d 388 (8th Cir. 1976)...............................................................................95

*Morales v. New Valley Corp.*,
  999 F. Supp. 470 (S.D.N.Y. 1998).......................................................................57

*Morales v Quintel, Inc.*,
  249 F.3d 115 (2d Cir. 2001)...........................................................................57, 65

*Neubauer v. Eva-Health USA, Inc.*,
  158 F.R.D. 281 (S.D.N.Y. 1994) .......................................................................127

*New York State Nat. Org. for Women v. Terry*
  886 F.2d 1339 (2d Cir. 1989) ............................................................................

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
  54 F.3d 1424 (9th Cir. 1995).............................................................................128

*Pantry Pride, Inc. v. Rooney*,
  598 F. Supp. 891 (S.D.N.Y. 1984)..........................................................66, 87, 90

*Portsmouth Square, Inc. v. Shareholders Protective Comm.*,
  770 F.2d 866 (9th Cir. 1985)...............................................................................39

*Resnik v. Swartz*,
  303 F.3d 147 (2d Cir. 2002)..............................................................................120

*Reuters Ltd. v. United Press Int'l, Inc.*,
  903 F.2d 904 (2d Cir. 1990)................................................................................94

*Rich v. Maidstone Fin., Inc.*,
  No. 98 Civ. 2569(DAB), 2001 WL 286757 (S.D.N.Y. Mar. 23, 2001) ..................80

*Rondeau v. Mosinee Paper Corp.*,
  422 U.S. 49, 95 S. Ct. 2069 (1975) ......................................................35, 82, 85, 91

*Royal Indus., Inc. v. Monogram Indus., Inc.*,
  No. CV 76-3348-R, 1976 WL 860 (C.D. Cal. Nov. 29, 1976) ................................53

*Sam Wong & Son, Inc. v. N.Y. Mercantile Exch.*,
  735 F.2d 653, 677 (2d Cir. 1984) ..................................................................52, 53

*SEC v. Corporate Relations Group, Inc.*
    No. 6:99CV1222ORL28KRS, 2003 WL 25570113 (M.D. Fla. Mar. 28, 2003)......................51

*S.E.C. v. Culpepper*,
    270 F.2d 241 (2d Cir. 1959)........................................................................................91

*SEC v. Drexel Burnham Lambert Inc.*,
    837 F. Supp. 587 (S.D.N.Y. 1993)..............................................................................54

*S.E.C. v. First City Financial Corp.*,
    890 F. 2d 1215 (D.C. Cir. 1989) .................................................................................94

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)....................................................................................128

*S.E.C. v. Franklin Atlas Corp.*,
    171 F. Supp. 711 (S.D.N.Y. 1959).............................................................................82

*S.E.C. v. Manor Nursing Centers, Inc.*,
    458 F.2d 1082 (2d Cir. 1972).............................................................................91, 94

*SEC v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007).......................................................................53

*SEC v. McNulty*,
    137 F.3d 732 (2d Cir. 1998).......................................................................................37

*SEC v. Softpoint*,
    958 F. Supp. 846 (S.D.N.Y. 1997).............................................................................51

*Schaffer v. CC Investments*,
    115 F. Supp. 2d 440 (S.D.N.Y. 2000)........................................................................58

*Scott County Tobacco Warehouses, Inc. v. Harris*,
    201 S.E.2d 780 (Va. 1974)........................................................................................128

*Seaboard World Airlines, Inc., v. Tiger International, Inc.*,
    600 F.2d 355 (2d Cir. 1979).......................................................................................

*Seinfeld v. Gray*,
    404 F.3d 645 (2d Cir. 2005).....................................................................................120

*Simmons v. Cranston*,
    No. 07 Civ. 3241, 2008 WL 820474 (S.D.N.Y. Jan. 14, 2008)..................................82

*TSC Indus., Inc. v. Northway*,

426 U.S. 438, 96 S. Ct. 2126 (1976) ...................................................................78, 119

*Texas Gulf, Inc. v. Canada Development Corp.*,
366 F. Supp. 374 (S.D. Tex. 1973) .................................................................57

*The Guardian News, Inc. v. Amicone*,
No. 07 Civ. 7078, 2008 WL 594770 (S.D.N.Y. Mar. 3, 2008)..............................82

*Tom Doherty Assoc. Inc. v. Saban Entm't, Inc.*,
60 F.3d 27 (2d Cir. 1995).............................................................................94

*Torchmark Corp. v. Bixby*,
708 F. Supp. 1070 (W.D. Mo. 1988) ..............................................................57

*Trane Co. v. O'Connor Sec.*,
561 F. Supp. 301 (S.D.N.Y. 1983)..................................................................95

*Transcon Lines v. A.G. Becker, Inc.*,
470 F. Supp. 356 (S.D.N.Y. 1979)..............................................................39, 65

*Trayer v. Bristol Parking, Inc.*,
95 S.E.2d 224 (Va. 1956)............................................................................103

*Treadway Cos. v. Care Corp.*,
638 F.2d 357 (2d Cir. 1980)................................................................ passim

*U.S. S.E.C. v. Universal Express, Inc.*,
475 F. Supp. 2d 412 (S.D.N.Y. 2007)..............................................................90

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
985 F.2d 1190 (2d. Cir. 1993).......................................................................78

*Universal Container Corp. v. Horwitz*,
No. 74 Civ. 3865, 1977 WL 1036 (S.D.N.Y. Sept. 6, 1977) ........................57, 67, 87

*Vantico Holdings S.A. v. Apollo Mgmt., LP*,
247 F. Supp. 2d 437 (S.D.N.Y. 2003)..............................................................94

*Vestcom Int'l, Inc. v. Chorpa*,
114 F. Supp. 2d 292 (D.N.J. 2000) .................................................................84

*Virginia Bankshares, Inc. v. Sandberg*,
501 U.S. 1083, 111 S. Ct. 2749 (1991).....................................................119, 125

*Williams v. Southern Bank of Norfolk*,
203 Va. 657, 125 S.E.2d 803 (1962)................................................................

*Wisener v. Air Express Int'l Corp.*,
  583 F.2d 579 (2d Cir. 1978)...........................................................................102

*Zimmerman v. Chicago Bd. of Trade*,
  360 F.3d 612 (7th Cir. 2004)............................................................................52

## STATUTES AND REGULATIONS

15 U.S.C. § 78c-1(a)(2008)..........................................................................2, 36

15 U.S.C. § 78m (d)(1)(2008)...........................................................................35

15 U.S.C. § 78n(a) (2008).............................................................................119

15 U.S.C. § 78p(a)(3) (2008)...........................................................................38

15 U.S.C. § 78t(a) (2008)........................................................................80, 127

17 C.F.R. § 229.402(b) (2008)........................................................................123

17 C.F.R. § 229.402(b)(2)(iv) (2008) .............................................................121

17 C.F.R. § 240.12b-2 (2008) ..........................................................................81

17 C.F.R. § 240.13d-1(h)(i) (2008)...................................................................36

17 C.F.R. § 240.13d-3(a) (2008)...................................................................4, 36

17 C.F.R. § 240.13d-3(b) (2008) ......................................................................50

17 C.F.R. § 240.13d-5(b)(1) (2008)............................................................49, 57

17 C.F.R. § 240.13d-101 (2008) ..............................................73, 75, 76, 77, 80

17 C.F.R. § 240.14a-4(a)(3) (2008) ...............................................................125

17 C.F.R. § 240.14a-9 (2008) ........................................................................125

17 C.F.R. § 240.14a-9(a) (2008) .............................................................78, 119

17 C.F.R. § 240.14a-101 (2008) ......................................................80, 121, 123

17 C.F.R. § 240.16a-1(a) (2008) ......................................................................38

17 C.F.R. § 243.100 (2008) ...........................................................................121

Filing & Disclosure Requirements Relating to Beneficial Ownership,
43 Fed. Reg. 18484 (Apr. 28, 1978)..................................................................35, 83

Va. Code Ann. § 13.1-603 (2008)..............................................................................102

Va. Code Ann. § 13.1-677 (2008)..............................................................................129

Va. Code Ann. § 13.1-680(A) (2008) ........................................................................128

Va. Code Ann. § 13.1-680(D) (2008) ........................................................................129

Va. Code Ann. § 13.1-725 (2008)..............................................................................102

Va. Code Ann. § 13.1-870(A) (2008) ........................................................................130

## SEC RELEASES

Various Proposals Relating to Disclosure of Beneficial Owners and Holders of Record of
Voting Securities,
Exchange Act Release No. 11616, 1975 WL 177966 (Aug. 25, 1975) ....................39

Adoption of Beneficial Ownership Disclosure Requirements,
Exchange Act Release No. 13291, 1977 WL 185650 (Feb. 24, 1977) ....................53

Filing and Disclosure Requirement Relating to Beneficial Ownership
Exchange Act Release No. 15348 (Nov. 12 1978)........................................36, 39, 83

Cross-Board Tender Offers, Business Combinations and Rights Offerings,
Exchange Act Release No. 7611, 1998 WL 792055 (Nov. 13, 1998) ......................51

Cross-Board Tender And Exchange Offers, Business Combinations and Rights
Offerings,
Exchange Act Release No. 7759, 1999 WL 969592 (Oct. 22, 1999) .................51, 52

Selective Disclosure and Insider Trading,
Exchange Act Release Nos. 33-7881, 34-43154, 65 Fed. Reg. 51,716, 51,721
(Aug. 24, 2000) ......................................................................................................121

Commission Guidance on the Application of Certain Provisions of the Securities Act of
1933, the Securities Exchange Act of 1934, and Rules thereunder to Trading in
Security Futures Products,
Exchange Act Release Nos. 33-8107; 34-46101 (June 27, 2002),
*available at* http://www.sec.gov/rules/interp/33-8107.htm...................................2, 37

In re General Elec. Co.,

Exchange Act Release No. 50,426, 2004 WL 2114047 (Sept. 23, 2004) ............................. 122

In re Tyson Foods, Inc., et al.,
Exchange Act Release No. 51,625, 2005 WL 1861834 (Apr. 28, 2005) .............................. 122

Executive Compensation and Related Person Disclosure,
Exchange Act Release Nos. 33-8732A, 34-54302A, 71 Fed. Reg. 53,158, 53,164
(Sept. 8, 2006) ........................................................................................................... 122

## MISCELLANEOUS

146 Cong. Rec. H12442, HH12498 (daily ed. Dec. 15, 2000) ...................................................... 36

146 Cong. Rec. S11855, S11867 (daily ed. Dec. 15, 2000) .................................................. 36, 49

H.R. Rep. 90-1711 (1968)....................................................................................... 35, 83, 85

S. Rep. No. 90-550 (1968) ...................................................................................... 35, 83, 85

Investment in the Rail Industry: Hearing Before the H. Comm. on Transportation and
Infrastructure ,
2008 WL 618062 (Mar. 5, 2008) ...................................................................................... 16

CSX, TCI Dig In,
Traffic World, Jan. 7, 2008 ....................................................................................... 32, 89

Section 13(d) and Disclosure of Corporate Equity Ownership,
119 U. Pa. L. Rev. 853 (1971)......................................................................................... 35

Henry T.C. Hu & Bernard Black, Empty Voting and Hidden (Morphable) Ownership:
Taxonomy, Implications and Reforms,
61 Bus. Law. 1011 (2006) ............................................................................................... 37

Henry T.C. Hu & Bernard Black, The New Vote Buying: Empty Voting and Hidden
(Morphable) Ownership,
79 S. Cal. L. Rev. 811 (2006)......................................................................................... 54

Arnold S. Jacobs, The Williams Act -- Tender Offers and Stock Accumulations,
§ 2.12 (Thompson West 2008) .................................................................................... 37, 38

Michael J. de la Merced, Hedge Funds Propose CSX Directors, Starting Proxy Battle,
New York Times, Dec. 20, 2007...................................................................................... 32, 89

Bhattiprolu Murphy and Desiree Hanford, Hedge Fund Files to Acquire Over
$500M in CSX Stk,

Dow Jones News Service, April 18, 2007...................................................................................88

Travis Reed, *Investors Partner to Nominate Minority Slate to CSX Board*,
Associated Press, Dec. 19, 2007     32, 89

Pursuant to the Court's May 22, 2008 order, Defendants The Children's Investment Fund Management (UK) LLP, The Children's Investment Fund Management (Cayman) Ltd., The Children's Investment Master Fund (collectively, "TCI"), 3G Capital Partners Ltd., 3G Capital Partners, L.P., 3G Fund, L.P. (collectively, "3G"), Christopher Hohn, Snehal Amin, and Alexandre Behring respectfully submit this post-trial reply brief in further support of their defenses to Plaintiff CSX Corporation's ("CSX") claims.

## SUMMARY OF ARGUMENT

Plaintiff's counsel is to be commended for drafting a thriller. In its "movie" version of events, entitled "Proposed Findings of Fact and Conclusions of Law," TCI, a maniacal hedge fund, which donates the vast majority of its profits to a charity for impoverished children, joins with "Alex of Brazil" and "other conspirators" to engage in a "clandestine assault on CSX." (*See* Plaintiff's Proposed Findings of Fact and Conclusions of Law of CSX Corporation Relating to Its Claims ¶¶ 52, 60, 63 (hereinafter "Pl. Findings"[1]).) Throughout the movie, TCI maintains secret after secret about CSX. (*See* Pl. Findings ¶¶ 20, 26, 30, 47, 48, 74.1, 79, 111; Pl. Findings at 1, 6, 14, 102.) The "secrecy of TCI's plan for control" is so powerful that it causes TCI's 30(b)(6) witness to forget details of events that occurred a year and half ago. (*See* Pl. Findings ¶ 48.) But, like Hollywood recreations of real life events, Plaintiff's version of events is a gross distortion of what really happened.

Plaintiff seeks to prove through hint and innuendo what the evidence does not support. Absent from Plaintiff's script are any "dirty" conversations where the conspirators agree to form a group before December 2007, or any "smoking gun" documents evidencing the formation or coordinated acts of the group. The fact that TCI told CSX from the outset what

---

[1]    Citations to Plaintiff's Proposed Findings of Fact are identified by paragraph and citations to Plaintiff's Proposed Findings of Law are identified by page number.

economic interest it held and what its intentions were is conveniently omitted.  The Deutsche

Bank and Citigroup witnesses are given only cameo roles because the powerful truth – that they

had no agreements, or even conversations, with TCI about voting or hedging swaps, does not fit

the story they wish to tell.  (*See* Pl. Findings ¶¶ 42-43, 214-215, 217, 221, 240-241.)  The

"secret" given so much prominence is no more than proprietary trade information that every

hedge fund, investment bank and financial institution keeps confidential every day.  In short, the

rather dull, true story is that Defendants entirely complied with their disclosure obligations under

the U.S. securities laws.

      Also missing from Plaintiff's *dramatis personae* is anyone cast in the role of

"common sense."  Against allegations of the supposed antagonist's "secret" scheme to "sneak"

up on the damsel "CSX" by surreptitiously accumulating a massive interest in CSX, and secretly

scheming to influence management and take control of the company, certain pesky facts would

have no place.  Thus, in the face of the fact that TCI disclosed to CSX (i) the exact amount and

nature of its swap positions and the swap counterparties, as early as 2006, (ii) its disagreements

with CSX's management, (iii) its suggestions for options to create shareholder value at CSX, (iv)

its March 2007 filing of its HSR; and (v) a 14 page letter and 79 page whitepaper, both public,

addressing TCI's "secret plans" the role of common sense would have no place in CSX's tale. To

be sure, who would believe that our sophisticated antagonist would hatch its clandestine plan by

first, and repeatedly, telling poor CSX exactly what it was doing.  Common sense would also ask

the question: if CSX was so concerned about TCI's "secret plans" why did CSX management

and Board repeatedly reject TCI's requests to meet?

      The liability Plaintiff seeks to impose here is similarly bold.  On this record,

which involves standard cash-settled Total Return Swaps, with no evidence of any side

agreement, arrangement or understanding, a determination of Section 13(d) liability based on

TCI's swap ownership would constitute no less than judicial amendment of Section 13(d). This

is evident from the positions taken by Plaintiff. Notwithstanding that Rule 13d-3(a) clearly

defines beneficial ownership as "(1) Voting power which includes the power to vote, or to direct

the voting of, such security; and/or (2) Investment power which includes the power to dispose, or

to direct the disposition of, such security," 17 C.F.R. § 240.13d-3(a), Plaintiff proposes a new

rule for liability whenever a person or entity "has the ability significantly to influence the

disposition of the security" or "significantly to influence the voting of the shares." (Pl. Findings

at 82.) For obvious reasons, Plaintiff seeks to blur what is clear – "significantly to influence" is

not the same thing as controlling. Nor is the "market reality" that a counterparty will often sell

referenced shares upon exit of a swap transaction, the same thing as directing the disposition of a

security.

       Congress and the Securities and Exchange Commission ("SEC") surely are aware

of the unremarkable "market practice" of hedging, and yet did not require that it be disclosed by

the swap buyer. Attaching Section 13(d) liability according to Plaintiff's proffered standard or

its purported proof, while a gift, perhaps, to the plaintiff's bar, would result in securities law

violations in a broad range of circumstances, well beyond the ability of the parties (or the Court)

to predict and well beyond the intentions of the Williams Act. That is why the extension of

Section 13(d) urged by Plaintiff should, respectfully, be left to Congress or the SEC, and the

Court should find what the evidence clearly established in accordance with the well-settled

standard: TCI did not have the power to vote (or to direct the voting) or the power to dispose (or

to direct the disposition) of any shares used by its counterparties to hedge swaps.

Further, despite not being the standard in the law and thus irrelevant to the case, the Plaintiff did not even establish that TCI has "significant influence." (*Id.*) Plaintiff did not prove that any counterparty violated any securities law, or otherwise acted improperly, because they know where their bread is buttered. In the scheme of things, hedge funds, like TCI, are a small percentage of revenues for investment and commercial banks, as compared with the CSX's of the world (indeed, CSX is a fee-paying client of many of the very same investment banks that supposedly were engaged in Defendants' secret and unlawful conspiracy, including Deutsche Bank). Taken to its logical extreme, Plaintiff's theory would result in Deutsche Bank's largest client being the beneficial owner of every share Deutsche Bank owns of any company because Deutsche would do whatever it took to please that client. Of course, that is absurd. But, as surely as that is not the case, TCI was not the beneficial owner of the shares held by its counterparties.

Further, equating TCI's legitimate desire to avail itself of an exemption in the securities laws to avoiding disclosure also would set a dangerous precedent. There is no allegation that the swaps lacked economic substance. There is no allegation of sham transactions. Rather, Plaintiff urges the Court to find liability because "TCI used its swap arrangements as part of a plan to avoid the reporting requirements of Section 13D" and "[o]ne of the reasons why TCI held less than five percent of physical shares was to avoid disclosure." (Pl. Findings at 80.) That is simply not enough:

First, there was no "plan."

Second, there was no effort to "evade." Plaintiff did not disclose its cash-settled swaps based on the advice it received from two law firms that such disclosure was not required.

Third, as Plaintiff itself acknowledges, non-disclosure was only one of TCI's motives.  Avoiding disclosure was not TCI's sole motive.

Fourth, there is no real allegation that avoiding disclosure was even TCI's dominant motive for buying swaps, and any such assertion would not be credible – particularly given (a) the obvious financing benefits provided by swaps, (b) the potential tax benefits (noted specifically in reference to U.S. railroads), and (c) the fact that following public disclosure of TCI's swap position in its December 2007 Schedule 13D filing, TCI did not terminate its swaps and acquire physical shares to vote in the upcoming, hotly-contested proxy contest.  What we are left with, then, is TCI's acknowledged desire not to disclose that which it did not have to disclose.  That is not evasion, and it would constitute a dramatic change in the law for the Court to so find.

Further, plaintiff's papers make clear that no group was formed.  According to plaintiff, anyone with whom TCI spoke confidentiality about CSX was part of a section 13(d) group, regardless of whether they shared a common understanding or had an agreement.  (See Pl. Findings ¶ 66.)  That plainly is not the law, and for good reason.  See Exchange Act Release No. 31,326 (Oct. 16 1992) ("to the degree the current rules inhibit the ability of shareholders not seeking proxy authority to analyze and discuss issues pertaining to the operation of a company and its performance, these rules may in fact run exactly contrary to the best interests of the shareholders.")  And, Plaintiff cherry picks various data points without identifying a single piece of documentary evidence or testimony that establishes that TCI and 3G acted together by agreement before December 12, 2007.  Ignored, for example, is the fact that 3G engaged in heavy buying and selling activity, while TCI essentially remained flat.  Ignored is fact that there

is virtually no correlation between trading activity of TCI and 3G.  Ignored is the fact that there is no commercial logic in forming a group a year before the next annual meeting.

Moreover, an injunction cannot issue here because there was no irreparable harm, particularly in light of the extensive publicity that has accompanied the Schedule 13D filing, the proxy contest and this litigation.  Further, since the date of the announced proxy contest CSX stock has outperformed the market by over 50%.  It is difficult to see what harm, much less irreparable, has been suffered.

Not only should no liability attach, but even should the Court disagree, the appropriate remedy is corrective disclosure.  As described below, the draconian remedies of voiding proxies, enjoining the sale of shares until after the CSX annual general meeting, and share sterilization, would be unprecedented and unwarranted, notwithstanding Plaintiff's misleading reliance on cases from the very different tender offer context.  (Pl. Findings at 100.) Plaintiff's transparent attempt to tip the balance of a proxy contest dispositively in its favor by effectively eliminating the ability for dissident voices to be heard is exactly what Section 13(d) was not intended for.

Finally, plaintiff proposes that the Court enjoin Deutsche Bank, Citigroup and other CSX investors with whom TCI confidentially spoke about its investment in CSX from voting their shares at the annual meeting.  (Pl. Findings at 102.)  Not only would any such order plainly violate due process, but it speaks volumes about plaintiff's motives that it would even make such an astounding proposal.  Like this litigation, this remedy is designed to enhance CSX's ability to prevail in the upcoming proxy contest.  However, as Congress and numerous courts have made clear, the Williams Act was not meant to be abused in this manner.

In the first part, (pp. 8-52) Defendants address Plaintiff's proposed conclusions of law, demonstrating that, based on the controlling law and the evidence adduced at trial, Plaintiff's claims should be denied.  Defendants presented the factual record in their Opening Brief, however, in the second part of this document (pp. 52-135), Defendants address the specific factual assertions made by Plaintiff, demonstrating that they are unsupported by the evidence, contrary to the evidence or, in some instances, wholly fabricated.

We also would highlight that interpreting swap contracts as conferring beneficial ownership, even in the absence of any arrangement or understanding to vote and/or hedge shares referenced in the contract, would have many serious and unexpected consequences. For instances, the implications related to who may be in a Section 13(d) "group" would be complicated, and uncertain.  For example, is TCI a group with Deutsche Bank, as plaintiff asserts?  Is TCI then a group with Austin Friars as well?  What if Austin Friars decides to support CSX in the proxy contest?  Who is in the group now?  Importantly, how does TCI know without asking Austin Friars how it will vote?  Should this have been done in advance of our filing the 13D, and does that amount to a "tip" to Austin Friars as to TCI's strategy?  In addition, is 3G a group with Morgan Stanley even though Morgan Stanley is the advisor to CSX, and explicitly paid to defeat 3G and TCI?  In addition, if the court adopts plaintiff's view of "beneficial ownership" many unsuspecting investors will violate the short-swing profit provisions of Section 16 of the Exchange Act.  Moreover, the FTC, FDIC, and SEC (amongst other agencies) could be inundated with filings by market participants who are uncertain as to who is the beneficial owner of the hundreds of billions of dollars of cash-settled swaps in existence in the United States.

The complexity and severity of the issues, many of which we are not able to foresee, suggests to us that if this matter is in need of change, it should be dealt with through a rule making procedure, with the participation of all affected market participants so that the consequences of the change in law can be properly identified and evaluated.

## RESPONSE TO PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW

### I.     DEFENDANTS FULLY COMPLIED WITH SECTION 13

Plaintiff cobbles together a collection of irrelevant facts and unproven assumptions in an attempt to support its novel proposition that Defendants were the beneficial owners of CSX common stock in an amount equal to the shares referenced in their swap agreements.  But nothing Plaintiff says can correct the fundamental flaw in their theory. Beneficial ownership is not a theoretical construct based on economic rationality and expectations.  Rather, beneficial ownership is tied to very specific indicia of ownership: voting power and investment power.  Although a person may be deemed to be the beneficial owner of securities under circumstances where he has the *right* to acquire those powers, or where he uses certain instruments to prevent the vesting of such power as part of a "plan or scheme to evade" his disclosure obligations, there simply is no basis for imposing a disclosure obligation with respect to securities – as here – as to which Defendants have a purely hypothetical relationship.

Thus, as set forth in detail in Defendants' Post-Trial Brief and above, the unrefuted evidence demonstrates that Defendants have absolutely *no* rights with respect to any securities with which their counterparties may choose to hedge their swaps.  (Defs. Br. at 14-18, 42-44, 47).  Defendants have neither the right to the shares  nor to tell the counterparties how to vote them.  Defendants have no right to acquire the hedged shares, or to direct their counterparties to dispose of them.  They have no control over whether their counterparties hedge with CSX securities or some other instrument, or even whether they hedge at all.  All that

8

Defendants have is a contract with their counterparties that entitles them to an economic return that is tied to the value of the referenced CSX stock.  Thus, although they have a significant interest in the fortunes of CSX, neither their swap contracts nor any other relationship with the counterparties gives them the right to vote any CSX stock, which is particularly significant given the purpose of the Williams Act "to provide information to the public and the affected issuer about rapid accumulations of its equity securities in the hands of persons who would then have the potential to change or influence control of the issuer."  Filing & Disclosure Requirements Relating to Beneficial Ownership, 43 Fed. Reg. 18484, 18484 (Apr. 28, 1978) (citing S. Rep. No. 90-550 (1968); H.R. Rep. 90-1711 (1968)).

Although Plaintiff discounts the significance of Defendants' swap contracts (Pl. Findings ¶¶ 235-39) and of the counterparties' policies (*id.* at ¶¶ 240-41), even Plaintiff does not suggest that the swap contracts are invalid or unenforceable.  Moreover, whereas Defendants presented evidence establishing that Defendants and their swap counterparties had no arrangement, agreement or understanding with respect to the voting or disposition of any hedge shares (Defs. Br. at 17, 43-44), Plaintiff has presented *no* evidence to show the existence of any such arrangement, agreement or understanding.

Instead of presenting any factual support for the claim that Defendants are the beneficial owners of shares of CSX stock with which their counterparties hedge their swap contracts, Plaintiff relies on its expert's view of how the market works to infer (1) the existence of voting and/or investment power over those shares, (2) a "right" to acquire voting and investment power, and (3) a plan or scheme to evade the reporting obligations.  (Pl. Findings at 76.)  That view asks this Court to assume, without any evidentiary support (indeed, the evidence proves the contrary), that market participants routinely ignore their contractual obligations,

9

ethical standards, and the federal securities laws.  Notwithstanding Plaintiff's theory, there is

nothing in the rules that supports a finding that Defendants' swaps conferred beneficial

ownership of CSX stock in TCI.

               Rather, as explained in Defendants' Post-Trial Brief, it is generally accepted that

"plain vanilla" swap arrangements – such as those at issue here – do not confer beneficial

ownership of any hedge securities and, thus, do not trigger reporting requirements under Section

13(d).  (Defs. Br. at 36-37.)  Although there is no controlling authority that is directly on point,[2]

the only analogous SEC guidance is consistent with this viewpoint.  In a Q&A issued in 2002,

the SEC stated that cash-settlement of a security does not give rise to beneficial ownership of the

underlying securities for purposes of Regulation 13D (Rules 13d-1 to 13f-1).  (*See id.* at 35-36

(discussing Exchange Act Release No. 46101 (June 21, 2002)).)[3]  In addition, the view that

equity swaps do not confer beneficial ownership is supported by the fact that Section 16 of the

Exchange Act distinguishes between, but requires disclosure of both (A) "equity securities" that

are beneficially owned and (B) "security-based swap agreements," demonstrating that if

Congress intended to require disclosure of swap agreements under Section 13, it would have

---

[2]      While no US court has addressed the specific issues presented in this case, the New Zealand Court of Appeals has, holding that on similar facts no disclosure obligation was implicated through the use of total return, cash-settled swaps.  *Ithaca (Custodians) Ltd. v. Perry Corp.*, [2004] 1 NZLR 731, 2003 NZLR LEXIS 76 (C.A.) (discussed in Defs. Br. at 3-6).

[3]      Plaintiff discounts the relevance of the SEC guidance -- which relates specifically to "cash-settled security futures" -- by drawing a distinction between futures and swaps.  (Pl. Findings at 78 n.3.)  Although futures and swaps are different financial instruments, the key feature of the example to which the SEC guidance relates is cash-settlement.  *See* Commission Guidance on the Application of Certain Provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and Rules thereunder to the Trading in Security Futures Products, SEC Release No. 33-8107 (June 21, 2002) (Q&A 18; *compare* Q&A 17, regarding a security future that requires physical settlement).  Plaintiff also argues that the SEC guidance only relates to Rule 13d-3(d), which turns on the "right to acquire beneficial ownership," rather than "having" voting power or investment power.  That is because it is self-evident that the holder of a futures contract - or, for that matter, a swap contract - does not "have" voting or disposition power, within the meaning of Rule 13d-3(a), with respect to any underlying (or hedge) securities by virtue of holding the contract.  The relevant question therefore is whether he would be deemed to be the beneficial owner under another part of the Rule, such as 13d-3(d).  Implicit in the SEC's guidance under 13d-3(d) is a strong presumption that the holder of such a contract would not be deemed the beneficial owner of any underlying (or hedge) securities under Rule 13d-3(b) based on the existence of the agreement itself (as Plaintiff argues here).

done so.  (*See* Defs. Br. at 37-38.)  Indeed, the amendment of Section 16 to require disclosure of

security-based swap agreements was part of the same bill, H.R. 4577, 106th Cong. (2d Sess.

2000), by which the Exchange Act was amended to exclude equity swaps from the definition of

equity securities.  Nonetheless Congress did not impose a disclosure requirement for swap

agreements under Section 13, but instead prohibited the SEC from regulating swap agreements

as securities.  (*See* Defs. Br. at 35 n.20.)[4]

In contrast to the extant authority that supports Defendants' view of their

disclosure obligations and that provided guidance in structuring their transactions, there is *no*

authority for Plaintiff's view that Defendants were the beneficial owners of the stock referenced

in their swap agreements.  Rather than promoting the Williams Act's goal of transparency that

Plaintiff trumpets loudly, a holding that cash-settled total return swaps (such as those held by

Defendants) confer beneficial ownership of hedged securities would raise a host of problems –

which are likely to obfuscate rather than clarify information about the holders of voting securities

that have the potential to change or influence control of the issuer.  Thus, under Rule 13d-5, if

the owner of a swap is considered the beneficial owner of securities with which its counterparty

hedges, the owner and its counterparty would be considered a group for the purpose of acquiring,

holding, voting or disposing of these securities within the meaning Rule 13d-5.  Accordingly,

both the holder of the swap and its counterparty would be required to file a Schedule 13D when

their combined "beneficial ownership" of the issuer's equity securities was 5% or more.  This

---

[4]     OCC Interpretive Letter 652, Sept. 13, 1994 (Explaining that "[e]quity derivative swap contracts do not connote ownership of the underlying equity securities" and citing several distinctions between derivative swap contracts and equity securities, including that the parties "not acquire voting or management rights, which generally is associated with equity ownership" and "may not dispose of the securities underlying the equity derivative swap as an actual owner of securities can" and finding that national banks that are prohibited from purchasing and selling certain securities for their own account under Section 16 of the Glass-Steagall Act. 12 U.S.C. §24 (Seventh), are not precluded from entering into equity derivative swap contracts.)

would create significant issues that Schedule 13D was not designed to accommodate.  (*See* Swartz Decl. Ex. 6 for examples of those issues.)

       In any event, Plaintiff has presented neither facts or law to support such a finding, but rely almost completely on the views of its expert who has no securities industry expertise regarding rational hedging practices.  That is simply not an appropriate for a finding that Defendants were the beneficial owners of CSX stock with which its swap counterparties hedged their swap contracts.

### A.    TCI's Swap Arrangements Do Not Confer Voting or Investment Power.

       Unable to produce evidence of any "contract, arrangement, understanding [or] relationship" that gives TCI voting or investment power over any CSX hedge shares that may be held by the swap counterparties, Plaintiff cites *SEC v. Drexel Burnham Lambert Inc*., 837 F. Supp. 587, 607 (S.D.N.Y. 1993) for the proposition that "[a] person has 'investment power' over a security where he has the ability significantly to influence the disposition of the security."  (Pl. Findings at 82.)  But *Drexel* does not support Plaintiff's novel and expansive theory of investment power.  Rather, merely states the unremarkable proposition that a person without legal title to a security can nonetheless be deemed the beneficial owner when he has *actual control* over the person who does hold legal title:

> Deliberate efforts to conceal *legal* ownership do not affect the determination of beneficial ownership.  Indeed, it does not turn on who owns *legal* title to the stock, or who is the registered owner, or in whose name it is held.  Instead, the inquiry "focuses on any relationship that, as a factual matter, confers on a person a significant ability to affect how voting power or investment power will be exercised . . . ."

*Drexel Burnham Lambert*, 837 F. Supp. at 607 (quoting 3 Securities Law Techniques § 70.07[2][c] (A. A. Summers, Jr., ed., 1987)) (emphasis added, emphasis in original omitted).[5]

In *Drexel Burnham Lambert*, four conspirators concocted a parking scheme in order to acquire control of a company. "To carry out the plan, it was necessary to enlist others in the conspiracy who would be willing to acquire more than 10% of [the target company's] outstanding voting stock . . . ." 837 F. Supp. at 590. The conspirators enlisted an investor to secretly accumulate stock in the target company on their behalf. The conspirators promised that investor that "he would not lose any money if he [bought the stock]. [The investor] reasonably understood that he was being sought to do a 'parking' job . . . and that if he took a position in [the target company], he would be 'stopped out', i.e., that he would be 'made whole' if the stock went down before it was delivered to the source for which the parking had occurred." *Id.* at 591. While "parking" the stock for the conspirators, the investor "periodically reported . . . the status of the . . . investment he was making." *Id.* When the value of the stock depreciated significantly, the conspirators "kept assuring him that there was no need to worry and reminded him that he was guaranteed against loss." *Id.* at 592. Next, "[a]rrangements were made . . . for a private placement to finance a takeover of [the stock held in the investor's name] without providing a clue to the parking deal" and the conspirators "set a price which would not be too high in relation to the market price so as to avoid making the transaction seem ridiculous." *Id.* (internal quotation marks omitted). Under this parking arrangement, the court found that the conspirators had beneficial ownership over the shares held in the investor's name. *Id.* at 609.

---

[5]    In its most recent edition, the quoted treatise gives as an example *SEC v. First City Fin. Corp.*, 688 F. Supp. 705, 721 (D.D.C. 1988), wherein the defendant was deemed the beneficial owner of shares because he had an "understanding" with Bear Stearns whereby he had the ability to "'call' up the block of shares deposited in Bear Sterns' proprietary account at any time." By contrast, here, the uncontested evidence shows that neither TCI nor 3G has the ability to "call up" any shares their counterparties hold as a hedge.

As the facts of *Drexel Burnham Lambert* demonstrate, the question of whether an arrangement gives a person the "significant ability to affect how . . . investment power will be exercised" turns on whether that person has *actual control* over the person who holds legal title to the security in question – not, as Plaintiff claims, on whether the "economic reality" is such that an arrangement merely induces one party "as a practical matter" to purchase or dispose of shares while the other party has no power or control over the person holds legal title to those shares.

Plaintiff also cites *Calvary Holdings, Inc. v. Chandler*, 948 F.2d 59, 63 (1st Cir. 1991), to support its novel theory of investment power through the ability to significantly influence share activity. (Pl. Findings at 82.) It does not. *Calvary Holdings* actually supports the prevailing view that Total Return Swaps do not confer beneficial ownership because a swap holder does not have the power to direct its counterparty to purchase, sell or vote the shares referenced in the swap agreement. According to the First Circuit:

> "[F]or purposes of [rule 13d-3], the mere possession of the legal right to vote securities . . . may not be determinative of who is the beneficial owner of such securities inasmuch as another person or persons may have the power whether legal, economic or otherwise to *direct* such voting." Thus, the [SEC] focuses on who can *actually* vote the shares not who is the record owner of the stock . . . . [I]f one person has possession of the legal right to vote while another has the *actual* power to vote, only the individual *able to direct* the voting must file a Schedule 13D.

*Id.* at 63 (quoting Adoption of Beneficial Ownership Disclosure Requirements, Exchange Act Release No. 13291 (Feb. 24, 1977)) (emphasis added, emphasis in original omitted). Moreover, "the courts in defining section 13(d) look to who has the *actual ability* to vote." *Id.* at 64 (emphasis added). The court further noted that the SEC, in No-Action Letters, "consistently exempted entities or individuals that had no *actual* voting power." *Id.* (emphasis added). Based on the foregoing, the *Calvary Holdings* Court found that the defendant could not be deemed the

14

"beneficial owner" of the shares in question because he "[i]n no way could . . . effectuate any

control over" those shares.  *Id.*

By contrast, in *Wellman v. Dickinson*, 682 F.2d 355, 366 (2d Cir. 1981), also cited

by Plaintiff (Pl. Findings at 83), Eberstadt was deemed to be the beneficial owner of a security

because he had actual control over the entity that held legal title to that security.  In *Wellman*:

- "Eberstadt *controlled* the disposition of the Becton shares . . . ."  682 F.2d at 366 (emphasis added).

- "Eberstadt was always in a position to *direct* the disposition of the 443,200 shares of Becton held by the Funds.  *Id.* (emphasis added).

- "[T]he directors of the Funds followed Eberstadt M & D's recommendations as a matter of course."  *Id.*

- "Eberstadt[] *controlled* the sales decisions of the Funds."  *Id.* (emphasis added).

- "[T]he directors routinely followed Eberstadt M & D's recommendation in *directing* the disposition of the Becton stock, which permitted Eberstadt M & D to *control* the shares held by the Funds from the outset."  *Id.* at 366-67 (emphasis added).

Here, TCI and 3G have no power to "control" or "direct" the swap counterparty

banks to vote, purchase, or dispose of CSX shares they may or may not purchase as a hedge.

The undisputed evidence shows that TCI and 3G have no understanding, arrangement or

agreement with the counterparties to purchase or dispose of CSX shares on their behalf, and that

the counterparties *independently* decide (i) whether to purchase or dispose of shares as a hedge,

or whether to even use physical shares, rather than some other financial instrument, to hedge the

swap arrangement, *and* (ii) whether and how to vote the shares they hold as a hedge.  (DX 155

(Arnone Dep. 22:16-23:17, 33:5-18, 38:14-39:3, 40:3-9, 43:8-20, 44:7-11, 46:3-19); DX 151

(Kennedy Dep. 19:7-23:24, 35:21-38:2, 39:7-40:21); DX 153 (Busby Dep. 26:10-17).)  Indeed,

Plaintiff concedes that Defendants do not "have a contractual right to force their counterparties to

hedge with physical shares or to unwind their hedge positions," and instead relies on the "economic reality" that counterparties hedge with physical shares "as a practical matter" to support its claim that Defendants beneficially own those shares. (Pl. Findings at 82.) However, this "economic reality" is insufficient to confer beneficial ownership – as a practical, factual or legal matter – because Defendants cannot dictate to their swap counterparties when to purchase, when to dispose, or how to vote the shares they hold as a hedge.

Plaintiff's shifting theories as to how Defendants can be deemed beneficial owners of the CSX shares referenced in their swap agreements shows that from the outset, this litigation has been nothing more than a ploy by CSX to gain an advantage in the upcoming proxy contest. When CSX filed its complaint, it alleged that a mysterious "movement of shares" showed that Defendants had secret agreements with the counterparty banks to vote in their favor. (PX 264 (Ward ¶ 27); PX 269 (Fitzsimmons ¶¶ 19-21); Trial Tr. (Miller Test. 79:6-22); (*see also* DX 154 (Bryson Dep. 240:9-241:5) (noting that the record date was changed "based on this change in the shareholder base prior to the previous record date in February…").) After the discovery process exposed the utter falsity of that allegation, Plaintiff now principally relies on its *expert* witness to rebut the deposition testimony of *fact* witnesses from the counterparty banks establishing that TCI does not have investment or voting power over the CSX shares used as hedges to their swap agreements. (DX 155 (Arnone Dep. 22:16-23:17, 33:5-18, 38:14-39:3, 40:3-9, 43:8-20, 44:7-11, 46:3-19); DX 151 (Kennedy Dep. 19:7-23:24, 35:21-38:2, 39:7-40:21); DX 153 (Busby Dep. 26:10-17).) Putting Professor Subrahmanyam's theoretical generalizations aside, the undisputed evidence shows that – as a *factual* matter – TCI's counterparties do not even have plans to vote any shares held as hedges in the upcoming CSX annual meeting. (DX

151 (Kennedy Dep. 21:14-24); DX 152 (Arnone Dep. 24:10-25:17).)[6]  Accordingly, regardless of whether "TCI had the ability to determine the identity of the vote holder," or whether "TCI expected that Deutsche Bank would be more likely than other counterparty banks to vote with TCI in a proxy battle" (Pl. Findings at 83), the undisputed fact that Deutsche Bank or Citigroup will not vote in the proxy contest plainly shows that TCI has no "ability significantly to influence the voting" of any CSX shares held as hedges by the counterparties.  Indeed, if Total Return Swaps in fact confer any sort of voting power, it makes little sense for TCI to have ever invested in physical shares.

**B.    TCI's Swap Arrangements Do Not Give It the Right to Acquire Beneficial Ownership of Any CSX Stock.**

Plaintiff's claim that Defendants' Total Return Swaps confer beneficial ownership pursuant to the first part of Rule 13d-3(d)(1)(i) must fail as a matter of law.  The first part of Rule 13d-3(d)(1)(i) provides in relevant part:

> A person shall be deemed to be the beneficial owner of a security . . . , if that person has the *right* to acquire beneficial ownership of such security, as defined in Rule 13d-3(a)(§ 240.13d-3(a)) within sixty days, including but not limited to any *right* to acquire:
>
>> (A) Through the exercise of any option, warrant or right;
>>
>> (B) through the conversion of a security;
>>
>> (C) pursuant to the power to revoke a trust, discretionary account, or similar arrangement; or
>>
>> (D) pursuant to the automatic termination of a trust, discretionary account or similar arrangement . . . .

17 C.F.R. § 240.13d-3(d)(1)(i) (emphasis added).  Total Return Swap agreements merely *reference* shares – they do nothing more than give the holder an *economic exposure* to the shares

---

[6]    As Mr. Amin testified at trial, the fact that the swap counterparties do not vote their hedged shares will have no impact on the board election.  (Trial Tr. (Amin Test. 210:25-211:10 (Board is comprised of "the top 12 vote getters . . . So even if the swaps didn't vote, it does change -- the threshold isn't a 50 percent threshold.")).)

referenced.  They do not, as a matter of law, give the holder the "right" to acquire beneficial ownership of the shares referenced within sixty days or otherwise.  Moreover, a Total Return Swap agreement is *not*: (A) an option, warrant or right; (B) a conversion of a security; (C) a power to revoke a trust, discretionary account, or similar arrangement; *or* (D) an automatic termination of a trust, discretionary account or similar arrangement.  Accordingly, Defendants cannot be deemed the beneficial owner of the shares referenced in their Total Return Swaps pursuant to the first half of Rule 13d-3(d)(1)(i).

Plaintiff, however, argues that TCI "has always had the right to acquire beneficial ownership of the CSX stock referenced in its swaps not only within sixty days, but also 'at any time.'"  (Pl. Findings 84.)  Rather than refer to *any* contractual provision contained in TCI's "plain vanilla" Total Return Swap agreements evidencing some "right" to acquire beneficial ownership of the shares referenced in the agreement, or provide *any* legal support for this claim, Plaintiff merely recites purported statements made by TCI representatives that it could "convert" its Total Return Swaps into physical shares.  However, the statements made by TCI representatives were expressions that they could terminate their swaps and acquire shares on the open market to maintain the same economic exposure, as they did in April 2007.  Those statements obviously did not give rise to legal rights, neither expressed in the swap contracts nor in any other agreements or understandings with the TCI counterparties.  Accordingly, Plaintiff has failed to carry its burden of proving that TCI has beneficial ownership of the shares referenced in its swaps pursuant to the first part of Rule 13d-3(d)(1)(i).[7]

Plaintiff next argues that TCI's Total Return Swaps confer beneficial ownership pursuant to the second part of Rule 13d-3(d)(1)(i) because TCI had proposed that CSX pursue a

---

[7]     The fact that TCI had the financial wherewithal to purchase shares on the open market at any time is of no moment.  One's ability to purchase shares *in the future* does not equate to one's ownership of those shares *in the present* and, thus, has no bearing on whether TCI had voting power over the shares referenced by its swap contracts.

leveraged buyout ("LBO") and had other suggestions for how CSX's operations could be improved and full value realized. (Pl. Findings at 84.) The second part of Rule 13d-3(d)(1)(i) provides in relevant part:

> [A]ny person who acquires a security or power *specified in paragraphs (d)(1)(i)(A), (B) or (C)*, of this section, with the purpose or effect of changing or influencing the control of the issuer . . . immediately upon such acquisition shall be deemed to be the beneficial owner of the securities which may be acquired through the exercise or conversion of such security or power.

17 C.F.R. § 240.13d-3(d)(1)(i) (emphasis added).

As set forth above, a Total Return Swap agreement is *not*: (A) an option, warrant or right; (B) a conversion of a security; or (C) a power to revoke a trust, discretionary account, or similar arrangement, and they do not give the holder the right to acquire beneficial ownership of any security. Accordingly, regardless of whether or not TCI purchased its Total Return Swaps for the purpose of proposing an LBO of CSX or other suggestions, the second part of Rule 13d-3(d)(1)(i) does not apply to TCI's Total Return Swaps. Plaintiff seeks to have the Court simply ignore the provision that a person must acquire a security or power specified in (A), (B) or (C) in order to be deemed a beneficial owner pursuant to the second part of Rule 13d-3(d)(1)(i). Plaintiff's claim must fail as a matter of law.

In sum, TCI cannot be deemed the beneficial owner of the shares referenced in its Total Return Swaps pursuant to Rule 13d-3(d)(1)(i).

### C.    TCI's Swap Arrangements Are Not A Scheme To Evade The Reporting Requirements of Section 13(d).

Despite its inability to point to anything out of the ordinary in TCI's swap agreements, Plaintiff argues that those swap arrangements are part of a "plan or scheme to evade the reporting requirements," within the meaning of Rule 13d-3(b) and, accordingly, TCI should be deemed the beneficial owner of the hedged shares. Plaintiff's argument is fundamentally

flawed.  A scheme to evade disclosure obligations presumes the existence of an obligation to disclose, but here no such obligation exists.

As explained above, swap agreements are not securities (indeed, Section 3A of the Exchange Act expressly states that) and the extant authority supports the view that they do not confer beneficial ownership of any referenced securities.  Accordingly, as discussed in Defendants' Post-Trial Brief, entering into legitimate swap contracts as a means of building an economic position tied to CSX, without triggering a disclosure obligation, is legitimate.  (Defs. Br. at 52-53.)  *See* Testimony by Annette Nazareth, Director, Division of Market Regulation, (former SEC Commissioner) July 19, 2000 before Committee on Banking and Financial Services US House of Representatives.  (emphasizing that "[nevertheless, the Commission by and large has taken action with respect to swaps only in enforcement cases involving clear instances of fraud.")  http://www.sec.gov/news/testimony/ts132000.htm.  This is consistent with the presumption that applies with respect to other exemptive provisions that are found in the federal securities laws, and the same standard that is needed to find a "plan or scheme to evade" in those contexts should be required to overcome the presumption that cash-settled equity swaps do not confer beneficial ownership of the hedged securities in the Section 13(d) context.[8]  Thus, as in the Regulation S context, structuring a bona fide transaction to take advantage of an exemption from disclosure is completely legitimate and it is only when there is "preconceived artifice" that

---

[8]     Plaintiff discounts the relevance of other applications of the phrase "plan or scheme to evade" as used elsewhere in the federal securities laws and, in particular, in the context of Regulation S.  In fact, the situations are analogous and the Regulation S case law, accordingly, is instructive.  Just as Rule 13d-3(b) requires disclosure of certain contracts, etc. that would otherwise fall outside the scope of beneficial ownership when they are part of a plan or scheme to evade the disclosure requirements, Regulation S requires the registration of certain otherwise exempted securities when there is a plan or scheme to evade.  As discussed in greater detail in Defendants' Post-Trial Brief, the case law requires a bad faith state of mind before finding a plan or scheme to evade Regulation S.  (*See* Defs. Br. at 50-52.)  A similar intent requirement should be read into Rule 13d-3(b) regardless of whether scienter is generally an element of Section 13(d).

disclosure of presumptively exempt instruments can be required.  *See, e.g., SEC v. Softpoint*, 958

F. Supp. 846, 861 (S.D.N.Y. 1997) (discussed in Defs. Br. at 51.)[9]

        Plaintiff and Defendants both cite the same example which is included in the

Exchange Act Release issued on Adoption of Beneficial Ownership Disclosure Requirements,

Exchange Act Release No. 13291, 1977 WL 185650, at *14, and is the only SEC guidance as to

the meaning of Rule 13d-3(b).[10]  Plaintiff maintains, without explanation, that the SEC's

hypothetical shows that the state of mind needed to find a plan or scheme to evade under Rule

13d-3(b) is "no more than intent to avoid."  (Pl. Findings at 79-80.)  In fact, the SEC's example

involved a situation akin to a "parking" scheme, where "X" had ten different institutions

purchase voting securities of "Z" on his behalf and directed the voting on those securities by

providing "A" with a proxy to vote them.  (*See* Defs. Br. at 53-54.)  Thus, although it does not

specifically address an intent requirement, unlike Defendants' swaps, the example involves

actual physical shares that were owned by X, and "parked" with others to avoid disclosure.  In

fact, as Defendants note in their Post-Trial Brief, these type of parking arrangements are the only

situations in which Rule 13d-3(b) has been applied by the courts.  (*See* Defs. Br. at 54.)

        Given the evidence that Defendants use swaps regularly for a variety of reasons,

ranging from lower financing costs, administrative convenience and tax benefits (PX 19), it is

not surprising that Plaintiff contends that a person can be deemed a beneficial owner even if

avoidance of disclosure is not his sole motive for entering into a transaction.  (Pl. Findings at 80.)

But Plaintiff cites no law in support of that contentions and, indeed, the law that Defendants cite

---

[9]      Taken to its logical extreme, under Plaintiff's theory, every married couple who chooses to file a joint tax return instead of two individual returns in order to reduce their tax liability is "evading" the tax laws simply because they availed themselves of what the law allows.

[10]     Plaintiff cites to *Sorrento, Inc.*, SEC No-Action Letter, WSB File No. 050784005 (May 4, 1984), for the unexceptional proposition that "[w]hether a transaction is part of a plan or scheme to evade the registration provisions will depend on the facts and circumstances of each particular case."  (Pl. Findings at 79.)  In any event, No-Action Letters are case specific and have no precedential value.

is to the contrary. (*See* Defs. Br. at 51-53.)  A legitimate exemption is lost only when the "sole

or dominant reason" for the transaction is to violate the law.  *See, e.g.*, *Zimmerman v. Chicago*

*Bd. Of Trade*, 360 F.3d 612, 624 (7th Cir. 2004) (discussed in Defs. Br. at 52-53 ).  Thus, so long

as a legitimate business purpose exists for a transaction, the fact that it is structured to achieve

certain regulatory exemptions does not bring it within the scope of a "plan or scheme to evade."

(*See* Defs. Br. at 51-53 for discussion of relevant cases drawn from the federal securities law and

tax structuring contexts.)

　　　　　　In fact, the evidence demonstrates that Defendants' primary purpose in entering

into swap transactions was *not* the avoidance of disclosure obligations, but rather the financing

benefits of swaps.  (*See* Defs. Br. at 55 (citing DX 145 (Amin ¶ 7); (DX 144 (Hohn ¶¶ 6, 11)).)[11]

Moreover, Defendants acted in a manner that is inconsistent with any "plan or scheme to evade"

reporting and thus did not "subvert" the goal of transparency in the securities markets.  (Pl.

Findings at 81.)  Indeed, had TCI's sole or primary purpose in entering into swap transactions

was the avoidance of disclosure, it stands to reason that after December 19, 2007, when it filed a

Schedule 13D, it would have closed out its swap transactions and purchased physical shares

instead, thereby increasing its holdings of CSX, acquiring the ability to vote those shares.[12]  The

fact that TCI did not do that, even though it anticipated that it would be involved in a highly-

---

[11]　　　Indeed, TCI did not keep its interest in CSX secret but rather disclosed to CSX executives that it had swaps referencing CSX shares as early as December 2006, and explained that swaps gave TCI economic exposure to CSX. (DX 145 (Amin ¶ 21); DX 268 (Baggs ¶ 6); Trial Tr. (Baggs Test. 63:8-18).)  On March 2, 2007, TCI notified CSX of its Hart-Scott Rodino filing, which was disclosed by CSX in its first quarter 2007 10Q.  (DX 145 (Amin ¶ 34); DX 8 (notice of HSR filing dated Mar. 2, 2007); DX 114 (disclosing TCI's significant equity and synthetic investment in CSX.).)  In addition, TCI filed a Schedule 13F with the SEC on May 15, 2007, disclosing ownership of 17 million shares of CSX stock, and again on August 14, 2007, November 14, 2007, February 14, 20008 and May 15, 2008.  (Defs. Br. at 21.)

[12]　　　Moreover, the fact that TCI repeatedly disclosed to CSX, the target of its alleged "scheme to evade," and its investment advisors the fact that it had significant economic exposure to CSX in the form of its Total Return Swaps (including telling CSX exactly how much exposure it had, and with which counterparty banks) belies any notion of evasion.

contested proxy contest demonstrates that TCI was not driven by nondisclosure either in deciding to purchase swaps or in determining that it had no disclosure obligations.[13]

Rather, TCI entered into swaps for a variety of reasons, and believed – based on existing guidance, market practice and advice of counsel – that swaps did not confer beneficial ownership of hedged shares or trigger reporting requirements under Section 13(d). These facts are entirely inconsistent with a plan or scheme to evade disclosure obligations, and none should be found.

> **D.    Defendants' Disclosure As To The Group Formation Is Accurate, Truthful and Complete**
>
> 1.    <u>3G and TCI Were Not Part of a Group For the Purposes of Section 13(d) Prior to December 12, 2007</u>

As an initial matter, Plaintiff fails to provide adequate case law in support of its assertion that TCI and 3G formed a group prior to December 12, 2007. Plaintiff cites to cases, pulling from them general legal principles of group formation under Section 13(d), but fails to explore the facts in any of these cases. (Pl. Br. at 85.) Several concepts emerge from the litany of case law that exists on the issue of group formation.

First, the burden of proof to show the existence of a group rests on the plaintiff. *Hallwood Realty Partners,* 286 F.3d 613, 618 (2d Cir. 2002). Second, "[i]t takes more than the arithmetic of adding up shares to determine that a statutory group exists and that a filing must be made . . . ." *Universal Container Corp. v. Horwitz*, No. 74 Civ. 3865, 1977 WL 1036, at *16 (S.D.N.Y. 1977). Third, a "[m]ere relationship, among persons or entities, whether family, personal or business, is insufficient to create the group which is deemed to be a statutory person.

---

[13]    Plaintiff suggests in its post-trial papers, that Defendants also violated Section 16 of the Exchange Act by not filing ownership and transaction reports on Forms 3, 4 and 5. (Pl. Findings at 81 n.5.) But Section 16(a)'s reporting requirements are only triggered when a person becomes the beneficial owner of more than 10% of an issuer's securities. Neither TCI nor 3G have reached that threshold as they are not the beneficial owners of the shares referenced in their swap transactions.

There must be agreement to act in concert." *Id.* Fourth, the agreement to act must be with regard to one or more of "acquiring, holding, voting or disposing" of securities. 17 C.F.R. § 240.13d-5(b)(1). Plaintiff has failed to meet its burden.

Plaintiff strains to infer evidence of an agreement between TCI and 3G based on their business relationship and their periodic CSX-related communications. As previously stated, a mere business relationship among persons or entities is insufficient to create a group" for purposes of Section 13(d). *Universal Container Corp. v. Horwitz*, 1977 WL 1036, at *6; *see also Torchmark Corp. v. Bixby*, 708 F. Supp. 1070, 1083 (W.D. Mo. 1988) (same); *Texas Gulf, Inc. v. Canada Development Corp.*, 366 F. Supp. 374, 403 (S.D. Tex. 1973) (same). Further, "evidence of discussions between defendants" without focusing on "'whether the inference of collusion is really justified in light of all the circumstances'" is insufficient to establish an agreement to act together. *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 618 (2d Cir. 2002) (quoting this Court).

For example, in *Hallwood Realty Partners*, the Second Circuit affirmed Your Honor, ruling that the defendant investment funds were not in a group for the purposes of § 13(d). *Id.* at 618. The plaintiff had "provided evidence of meetings and other communications among the defendants beginning in 1994-1995 and continuing through 2000, as well as evidence that the [company plaintiff] was discussed in these communications." *Id.* at 616. Further, the plaintiff demonstrated that there was a "burst of purchases" by each of the defendants in a particular week. *Id.* Despite the detailed facts set forth by the plaintiff, Your Honor found that this was "a circumstantial case" and that the investment funds had invested in the plaintiff's securities based on their independent due diligence and "a common understanding among knowledgeable investors that [the plaintiff's securities] were undervalued." *Id.* at 616.

24

Here, CSX does no more than provide a checklist of unrelated communications between TCI and 3G and juxtapose them with the fact of trading in an effort to create the impression of coordinated activity.  Mr. Hohn was acquainted with Mr. Behring professionally because 3G is an investment advisor to the Synergy fund, which invests in TCI.  Although TCI and 3G had discussions about the fundamentals of the rail industry in 2007, Mr. Hohn's interactions with Mr. Behring were not fundamentally different from Mr. Hohn's interactions with many other fund managers.  Despite the flow of information among TCI and other funds, the information that TCI shared with 3G was not boundless.  (Def. Br. at 62-63.)  In addition, it is undisputed that 3G had been conducting its own, independent research and analysis of CSX for some time prior to March 29.  (DX 3; DX 4; DX 5; DX 6; DX 7; DX 11.)  Thus, TCI's prior business relationship with 3G and periodic discussions about the rail industry do not provide a basis for finding that TCI and 3G formed a group prior to December 12, 2007.

In addition, Plaintiff falsely accuses TCI and 3G of coordinated activities  with regard to their trading.  In *Hallwood*, the Second Circuit quoted Your Honor:  "[P]rior relationships and trading patterns were relevant to a decision regarding the existence of a § 13(d) group."  *Id*. at 618.  In addition, while trading patterns are relevant to a decision regarding the existence of a Section 13(d) violation, they must be substantiated.  *MEVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*, 260 F. Supp. 2d 616, 632-33 (S.D.N.Y. 2003).

For instance, in *MEVC Draper Fisher Jurvetson Fund I*, the plaintiff alleged that the defendants were a group based on the following evidence:  (1) e-mail communications between the defendants for approximately two years, augmented by one phone call; (2) proxy materials which allegedly indicated that the defendants agreed to vote their stock in unison; and

(3) coordinated trading by the defendants. *Id*. at 632. Despite this evidence, the court held that no group had been formed. *Id*. The court emphasized, however, that the trading coordination between the defendants was "not substantiated by [plaintiff's] supporting chart," of trading activity. *Id*. The court explained that the chart was arbitrarily cropped and that the data relating to the purchase activity between the defendants did not support plaintiff's assertion that the defendants had formed an undisclosed group in violation of § 13(d)(3). *Id*. at 632-33. The court also found that communications between the defendants were "sporadic at best," interrupted by large gaps, and followed by a major public event that affected the issuer's shareholders. *Id*. Further, the court pointed out that the emails between the defendants were general communication about the issuer and that none revealed "any agreement to act together for the purpose of acquiring or voting" the issuer's stock. *Id*. Finally, the court found that the "rhetoric contained within the proxy materials entirely fail[ed] to support an inference that [the defendants] agreed to vote [the issuer's] shares together." *Id*.

Here, the evidence does not support the conclusion that TCI and 3G engaged in coordinated trading activity. In fact, a comparison of 3G's and TCI's trading patterns reveals just the opposite. It is clear that 3G began accumulating a position months after TCI began accumulating its position (in fact, by the time 3G started buying CSX stock TCI had already built 93% of its ultimate position); that 3G's aggregate exposure exhibits "step changes" whereas TCI's does not; and that 3G sold a very significant part of its investment (approximately 38%) during the months of August and September 2007, while TCI sold virtually none of its position (only 3%) over this same period. (PX 206.) They bought on different days, in different months, in entirely different patterns, and the trading patterns show low correlation.

These separate patterns of buying and selling stock and swaps do not illustrate cooperation or agreement between TCI and 3G to act together. If anything, they show the contrary. Based on the above, Plaintiff fails to establish that TCI and 3G agreed "to act together for the purpose of acquiring, holding, voting or disposing of equity securities." 17 C.F.R. § 240.13d-5(b)(1). Moreover, Plaintiff concedes that upon establishing its physical position in CSX stock as of April 2007, TCI's total exposure to CSX – in stock and Total Return Swaps – remained constant. (PX 206.) In fact, it simply cannot be ignored that the physical position that TCI disclosed in its May 2007 13F is exactly the same today as it was on that date. In addition, the Total Return Swap exposure TCI has to CSX is the virtually the same today as it was on December 19, 2007 (the day TCI filed its 13D), and as it was on May 19, 2007. (PX 206.)

Nonetheless, Plaintiff falsely accuses Defendants of being in a group leading up to a proxy contest with CSX. According to Plaintiff, because Defendants both began a nominee search, discussed the fundamentals of the rail industry, and 3G casually mentioned working together with TCI, they must have had an agreement to act as a group prior to December 12, 2007. (Pl. Br. at 86.) Plaintiff is wrong. In *Pantry Pride, Inc. v. Rooney*, 598 F. Supp. 891 (S.D.N.Y. Dec. 5, 1984), the court did not find a group where the defendants were simply discussing the possibility of a proxy contest. *Id*. at 899. The court opined that "§ 13(d) allows individuals broad freedom to discuss the possibilities of future agreements without filing under securities laws." *Id*. at 900.

Here, TCI and 3G are both sizeable investors in CSX and were actively involved in assessing the company's management – the normal activity of a significant investor with fiduciary obligations to its investors. Simply because TCI and 3G both ultimately came to the view that nominating a minority board slate would be in the best interest of CSX and also resolve

27

their individual frustrations with the manner in which they had been treated by CSX especially given their substantial investments in the Company, does not show that they agreed to act together as a group. Toward that end, because TCI had never run a proxy contest before, in August 2007, TCI had a call with D.F. King, one of the nation's leading proxy solicitation firms, and its counsel, Schulte Roth & Zabel, to discuss the process of a possible proxy fight in the event it chose to run a slate. (Trial Tr. (Amin Test. 195:1-7).) Despite Plaintiff's assertion that TCI and 3G had already formed a group by that time, it is undisputed and quite significant that neither 3G nor its counsel participated in that call, the very purpose of which was to discuss running a proxy contest. (Trial Tr. (Amin Test. 213:8-16).) Nor did anyone from TCI ever inform 3G or its advisors that TCI was having the call with D.F. King and Schulte Roth (Trial Tr. (Amin Test. 218:17-20)), and Mr. Behring testified that he knew nothing of this meeting (Trial Tr. (Behring Test. 106:20-107:3)).

Surely, if a group had been formed or even contemplated between TCI and 3G by this point, attendance at 3G at that meeting would have been crucial. There can be no question that, if TCI and 3G had already formed a group as of August 2007, 3G would have been invited to that call. Yet, it was not. This is powerful evidence that the two funds were not part of a group at that time.

Moreover, it is also undisputed that prior to December 2007, TCI issued two public letters to the board. It engaged a search firm to help find potential directors. However, although Plaintiff was able to find evidence of models passing between TCI and 3G, which form the basis of its assertion that there was an "agreement to act," not a single document exists suggesting that 3G was involved in any of these processes. 3G is simply absent from TCI's early public efforts.

28

Finally, Plaintiff improperly suggests that TCI formed a group with Austin Friars and consequently with Deutsche Bank itself. (Pl. Br. at 87.) Plaintiff offers no evidence of (1) conversations involving anything other than ordinary course, fundamental research exchange between investment managers; (2) any link to trading patterns; or (3) any link with respect to voting. Moreover, as the record definitively establishes, Austin Friars and the swaps and securities lending desks of Deutsche Bank have no connections to one another. (DX 152 (Arnone Dep. 17:8-18:8).) When asked about Austin Friars, Mr. Arnone – who runs the North American structured finance desk – responded by saying that he had not heard of Austin Friars. (*Id.*) The internal policies and practices of the counterparties generally dictate that beneficial ownership of the swap shares and voting rights remain with the counterparties themselves. (DX 238.) Moreover, many of the policies dictate that the counterparties will not even vote the shares in a contested situation. Deutsche Bank's letter to Plaintiff's counsel on May 6, 2008 states: "At no time did Deutsche Bank AG have any contract, agreement or understanding with any person with respect to shares of CSX common stock held by Deutsche Bank AG as a hedge to the swap transactions with TCI, including actual or proposed voting of those shares and actual or proposed sale of those shares." (DX 152 (Arnone Dep. 44:20-46:25).) Thus, the record does not support Plaintiff's contention and thereby, should be rejected.

In sum, despite two days of trial testimony, four weeks of deposition testimony, and well over a million pages of documents produced by TCI and 3G during discovery, the record is completely devoid of any evidence that, prior to December 12, 2007, TCI and 3G agreed to act together for the purpose of acquiring, holding, voting, or disposing of equity securities of CSX. Not a single piece of evidence was offered reflecting a common understanding or agreement between TCI and 3G concerning CSX stock, swaps, or a CSX proxy

29

contest.  Accordingly, Plaintiff fails to meet its burden of proving that TCI and 3G formed a group prior to December 12, 2007.

     **E.**    **Defendants' Schedule 13D Is Accurate, Truthful and Complete.**

     Defendants timely filed their Schedule 13D on December 19, 2007, after they had formed a group on December 12, 2007.  Defendants' Schedule 13D is fully accurate, truthful and complete.

     In its Proposed Conclusions of Law, Plaintiff has abandoned its meritless claims that:  (i) Defendants did not accurately disclose the source of funds used to purchase their CSX shares; (ii) Defendants failed to file copies of the nominee agreements referenced in their Schedule 13D; and (iii) Defendants failed to disclose the required information regarding the controlling persons of TCI and 3G.  Plaintiff has failed to establish any other deficiency in Defendants' Schedule 13D.

     1.    <u>Defendants Truthfully and Accurately Disclosed Their Beneficial Ownership of CSX.</u>

     Plaintiff's claim that Defendants misrepresented their beneficial ownership in their Schedule 13D must fail.  (Pl. Findings at 87-88.)  As set forth in Section I.A-C of Defendants' Post-Trial Brief (pp. 33-57), Defendants do not have beneficial ownership of the shares referenced in their Total Return Swaps.

     2.    <u>Defendants Truthfully and Accurately Disclosed the Formation of Their Group and Group Ownership.</u>

     Plaintiff's claim that Defendants misrepresented their group formation and the ownership interests of the group in their Schedule 13D also must fail.  (Pl. Findings at 88.)  As set forth in Section I.D of Defendants' Post-Trial Brief, Defendants did not form a group until December 12, 2007.  In addition, Defendants truthfully and accurately disclosed the beneficial ownership of the group because, as set forth in Section I.A-C of Defendants' Post-Trial Brief,

Defendants do not have beneficial ownership of the shares referenced in their Total Return Swaps.

3.    <u>Defendants Truthfully and Accurately Disclosed Their Total Return Swaps.</u>

Plaintiff incorrectly claims that Defendants' Schedule 13D violated Item 6 of Rule 13d-101 because Defendants did not disclose their Total Return Swaps' "termination provisions, the initial price of the referenced shares, the number of CSX shares referenced in each individual swap as well as the aggregate number of CSX shares referenced in Defendants' overall swap position."  (Pl. Findings at 88.)  Plaintiff further claims that Defendants "failed to disclose the material terms of the credit default swap arrangements they had regarding CSX." (*Id.*)

Item 6 requires the filer to "[d]escribe any contracts, arrangements, understandings or relationships (legal or otherwise) among the persons named in Item 2 and between such persons and any person with respect to any securities of the issuer . . . ."  17 C.F.R. § 240.13d-101.

In their December 19, 2007 Schedule 13D, Defendants truthfully and accurately disclosed all their Total Return Swap counterparties and the fact that TCI's Total Return Swaps "constitute economic exposure to approximately 11% of the Shares" and that 3G's Total Return Swaps "constitute economic exposure to approximately 0.8% of the Shares."  (JX 8.)  In addition, Defendants truthfully and accurately disclosed that 3G has "credit default swaps that reference debt securities of [CSX]."  (*Id.*)  Nowhere in Rule 13d-101 does it provide that the filer must disclose the specific contractual provisions that Plaintiff claims should have been disclosed, and Plaintiff has identified no additional legal authority requiring such disclosures.  Moreover,

such minutiae is not "material."  Accordingly, Defendants' failure to disclose such information

does not render their Schedule 13D materially incomplete.

Plaintiff incorrectly claims that Defendants should have filed copies of their Total

Return Swap agreements as exhibits in Item 7 of their Schedule 13D.  (Pl. Findings at 88.)  Item

7 of Rule 13d-101 requires the following to be filed as exhibits:

> Copies of written agreements relating to the filing of joint
> acquisition statements as required by Rule 13d-1(k) and copies of
> all written agreements, contracts, arrangements, understanding,
> plans or proposals relating to: (1) The borrowing of funds to
> finance the acquisition as disclosed in Item 3; (2) the acquisition of
> issuer control, liquidation, sale of assets, merger, or change in
> business or corporate structure, or any other matter as disclosed in
> Item 4; and (3) the transfer or voting of the securities, finder's fees,
> joint ventures, options, puts, calls, guarantees of loans, guarantees
> against loss or of profit, or the giving or withholding of any proxy
> as disclosed in Item 6.

17 C.F.R. § 240.13d-101.  Defendants' Total Return Swaps are none of these.  Accordingly,

Plaintiff has failed to prove any violation of Item 7 of Rule 13d-101.  In any event, even if

Defendants should have filed its Total Return Swap agreements as exhibits to their Schedule

13D, such a *de minimus* technical violation does not render their Schedule 13D materially false

or misleading because Defendants disclosed their swap position in Item 6 of their Schedule 13D.

4.     Defendants Truthfully and Accurately Disclosed Their Plans and
       Proposals.

Plaintiff claims that Defendants should have disclosed certain plans and proposals

in Item 4 of their Schedule 13D.[14]  The Second Circuit has held that "unless a course of action is

decided upon or intended, it need not be disclosed as a plan or proposal under Item 4."  *Azurite

Corp. Ltd. v. Amster & Co.*, 52 F.3d 15, 18 (2d Cir. 1995).  "Thus, disclosure is required of

definite intentions, and not predictions of future behavior, or of tentative or inchoate plans."

---

[14]     Plaintiff faults Defendants' disclosure regarding the purpose of the acquisition of CSX securities.  As stated
in Defendants' Post-Trial Brief, that disclosure was truthful and accurate.  (*See* Defs. Br. at 74-75.)

*Rosen v. Brookhaven Capital Mgmt. Co.*, 113 F. Supp. 2d 615, 630 (S.D.N.Y. 2000).

Accordingly, only presently-existing plans or proposals need be disclosed under Item 4.

   *First*, in the spring of 2007, TCI had publicly stated it did not favor an LBO transaction at CSX and there is no current or existing "plan or purpose" that requires disclosure. (PX 4 at CSX_00045778.) *Second*, there is no evidence that TCI has any plan or proposal with regard to leveraged share re-purchase. *Third*, TCI does not have plans to replace management. Mr. Amin specifically testified: "There's a difference between trying to evaluate all the options that you have and coming to a decision of what your specific intention was. It was not out specific intention or our intention in general to replace Michael Ward as the CEO." (Trial Tr. (Amin Test. 200:22-201:2).) *Fourth*, Defendants plainly do not plan to take control of the Board because it is running a *minority* slate of *independent* directors, all of whom have pledged to act in the best interests of all stockholders. (*See*, *e.g.*, DX 61; DX 62; DX 64; DX 70.) *Finally*, TCI's suggestions as to how CSX should handle "its regulatory affairs" is not a "plan or proposal," nor would such suggestions constitute a "material change in the issuer's business or corporate structure." In sum, Plaintiff has failed to identify any "plan or proposal" that Defendants should have, but did not, disclose in Item 4 of their Schedule 13D.

## II. DEFENDANTS COMPLIED WITH THEIR DISCLOSURE REQUIREMENTS UNDER SECTION 14 OF THE EXCHANGE ACT.

   Plaintiff claims that TCI and 3G's Schedule 14A filed on March 10, April 15, and April 28, 2008 (collectively, the "Schedule 14A") is materially false and misleading for "several of the same reasons their Schedule 13D is false and misleading." (Pl. Findings at 91.) Plaintiff claims that (i) "Defendants failed to disclose the true extent of their beneficial ownership of CSX shares of common stock"; (ii) "Defendants misrepresent the date that Defendants formed a group and the number of shares of CSX common stock owned by the group . . . and . . . made material

misstatements and omissions regarding group formation."; (iii) "Defendants fail to disclose information concerning contracts, arrangements, understandings or relationships among Defendants and between Defendants and other persons, such as swap counterparties, with respect to the securities of CSX . . . and . . . made material misstatements and omissions regarding their arrangements and agreements with others"; and (iv) "Defendants made material misstatements and omissions regarding their plans and proposals concerning CSX."  (*Id*.)

    As discussed above and in Defendants' opening brief, Defendants' disclosures were not misleading – Defendants did not have beneficial ownership over shares of CSX held by their swap counterparties.  Moreover, in light of information that is publicly available – including TCI's stock holdings, TCI's swap position, TCI and 3G forming a group, CSX's contention with respect to TCI's swap position and an earlier formation of a group, and TCI's plans and proposals concerning CSX – none of the purported disclosures or omission Plaintiff identifies would alter the total mix of information.  *See In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 374 n.6 (E.D.N.Y. 2003) (noting that the total mix of information has greatly expanding with the prevalent use of the internet, widely-available news reports, and publicly available SEC filings).

    Furthermore, Plaintiff alleges that Defendants made materially false and misleading statements in the Schedule 14A with respect to statements made about settlement negotiations.  (Pl. Findings at 91.)  During the settlement negotiations, TCI made a major concession by agreeing to put forth fewer than all of its nominees.  (PX 266 (Kelly ¶ 23).)  To support its allegations that TCI did not make concessions in the settlement discussions and that TCI insisted on putting forth all five of its nominees to the Board, Plaintiff relies on statements that TCI may have made *before* settlement discussions ensued.  According to Plaintiff, "*Before*

*the outset of negotiations with Mr. Kelly*, TCI took the position that '[t]he only alternative to the proxy fight is if [CSX] will allow our 5 nominees on…'" (Pl. Findings at 91(emphasis added).) As indicated in Defendants' post-trial brief, such pre-negotiation discussions have no bearing on the veracity of TCI's statements made *during* negotiations.   (Defs. Br. at 80.) Such discussions merely accentuate the significant compromise that TCI was willing to make to settle the proxy dispute.

   Additionally, TCI conceded to a one-year standstill agreement during negotiations.  (DX 154 (Hohn Dep. 182:9-183:4) ("The first discussion, I said we wouldn't sign one, and then a day or so later, I called him…and said we would accept a one-year standstill but not a multi-year standstill.")  Plaintiff concedes that TCI told its advisors that it would agree to a one-year standstill.  (Pl. Findings at 91.)  In fact, Mr. Ward was so concerned that Mr. Hohn was on the verge of accepting settlement terms, that he advised Mr. Kelly to "kill" the deal by offering a multi-year standstill agreement.  (DX 154 (Ward Dep. 349:8-13); Trial Tr. (Ward Test. 16:11-24) (agreeing that he wrote in his notes that "if Mr. Hohn says yes to those conditions Mr. Kelly should try to kill it on the stand still.").)  Although, at his deposition, when asked whether there was a decision to try to kill the settlement discussions by using a standstill, Mr. Kelly said emphatically, "absolutely not."  (Kelly Dep. 281:19-24.)  What's true is that Mr. Hohn told Mr. Kelly that he would agree to a one-year standstill (DX 144 (Hohn ¶ 47), Mr. Kelly on behalf of CSX unilaterally terminated settlement discussions without explanation (*Id.*; DX 75 (email from Mr. Kelly to Mr. Hohn dated Jan. 18, 2008)), and CSX never responded to Mr. Hohn's attempts to communicate further regarding settlement of the dispute, and instead filed this lawsuit.  (DX 144 (Hohn ¶ 47).)

Finally, Plaintiff claims that the two-year history of their transactions in CSX securities is "false because they do not disclose any history of swap transactions that reference shares of CSX common stock or any information concerning renewals and extensions of the terms thereof or dates on which such swaps were settled." (Pl. Findings at 91.) In fact, Defendants fully disclosed the two-year history associated with their securities transactions as required by Item 5 of the Schedule 14A. 17 C.F.R. § 240.14a-101 Item5.(b)(1)(vi); (JX 19 at 26-29.)

## III.   THE INDIVIDUAL DEFENDANTS ARE NOT LIABLE UNDER SECTION 20(A) OF THE EXCHANGE ACT.

Plaintiff claims that Christopher Hohn and Alexandre Behring are each jointly and severally liable as controlling persons pursuant to Section 20(a) of the Exchange Act ("Section 20(a)").[15]

To begin, Messrs. Hohn and Behring cannot be held individually liable because Plaintiff has failed to carry its burden of proving a primary violation of the securities laws. *ATSI Commc'ns Inc. v. Shaar Funds, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (dismissing Section 20(a) claim because plaintiff failed to allege a primary violation).

Even if Plaintiff has established a primary violation, Messrs. Hohn and Behring are not individually liable because they acted in good faith and did not induce the act or acts constituting the violation. *See* 15 U.S.C. § 78t(a) (no liability where "the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation"). Each of the individual defendants reasonably relied on the advice of counsel that all of the disclosures in their Schedules 13D and 14A were legal, truthful and accurate. (Trial. Tr. (Hohn Test. 187:10-14); DX 146 (Behring ¶¶ 35, 49).) *See Dellastatious v. Williams*, 242 F.3d

---

[15]    Plaintiff has abandoned its Section 20(a) claim against Defendant Snehal Amin. (Pl. Findings at 1 n.1.)

191, 196 (4th Cir. 2001) (holding that individual defendants were not liable under Section 20(a) because they reasonably relied on "an attorney experienced in drafting offering documents"); *cf. SEC v. Enters. Solutions, Inc.*, 142 F. Supp. 2d 561, 576 (S.D.N.Y. 2001) (rejecting Section 20(a) good faith defense because individual defendant "never sought specific advice from counsel with respect to disclosure . . . , nor did he receive specific advice that [the company] was not required to disclose").

        Plaintiff incorrectly claims that Messrs. Hohn and Behring were "culpable participants." (Pl. Findings at 93-94.) Although Messrs. Hohn and Behring signed SEC filings on behalf of TCI and 3G respectively, they reasonably relied on counsel's advice that those filings were truthful, accurate and in full compliance with the law. (Trial. Tr. (Hohn Test. 187:10-14); DX 146 (Behring ¶¶ 35, 39, 49).) The fact that Messrs. Hohn and Behring signed their respective company's HSR filing has no relevance to whether their Schedules 13D and 14A complied with the securities laws. Moreover, contrary to Plaintiff's assertion that Mr. Hohn entered into swap arrangements "to evade Section 13(a)'s reporting requirements and engaged in efforts to conceal those swap arrangements" (Pl. Findings at 93-94), Mr. Hohn did not disclose TCI's swap position because, based on his good faith reliance on the advice of counsel and consistent with prevailing market practice, he reasonably believed that (i) Total Return Swaps do not trigger Section 13(a) filing obligations, and (ii) it was sound business strategy to avoid front running. (Trial. Tr. (Hohn Test. 188:16-189:8.) Finally, the group formation of TCI and 3G does not negate the individual defendants' Section 20(a) good faith defense because, as the evidence establishes, TCI and 3G timely disclosed their group formation in their respective Schedules 13D filed on December 19, 2007. (DX 144 (Hohn ¶¶ 37-41); DX 146 (Behring ¶¶ 46, 49-50).)

Plaintiff's overarching theme – that TCI and 3G were "secretly" accumulating a position for the purpose of seizing control of CSX – collapses under its own weight.  By Plaintiff's own admission, within a few weeks after TCI began investing in Total Return Swaps referencing CSX, Mr. Hohn and other TCI representatives (i) *told* CSX *and* its investment advisors that TCI's investment was in Total Return Swaps; (ii) *told* CSX *and* its investment advisors the size of TCI's position; and (iii) *told* CSX *and* its investment advisors the identity of TCI's counterparties.  (DX 145 (Amin ¶¶ 20-21, 26); PX 268 (Baggs ¶¶ 5-6, 8-9); PX 35.) Moreover, on March 2, 2007, TCI advised CSX *in writing* that it had made an HSR filing in which it disclosed an intention to influence management and, as Plaintiff readily concedes, had spent the prior few months trying to open a dialogue with CSX.  (DX 8; PX 268 (Baggs ¶¶ 2-14); PX 267 (Munoz ¶¶ 2-10); DX 144 (Hohn ¶¶ 15-18); DX 145 (Amin ¶¶ 20-22).)  Similarly, Mr. Behring, acting on behalf of 3G and independently from TCI, informed CSX of 3G's investment on February 27, 2007, and had 3G's broker, Morgan Stanley, send a letter to CSX disclosing the exact size of 3G's investment on May 25, 2007.  (DX 146 (Behring ¶¶ 28, 32); DX 11; DX 30.) Therefore, it cannot be said that TCI and 3G were operating in the cover of night; nor can it be said that Messrs. Hohn and Behring, both advised by counsel about the lack of any disclosure obligations for Total Return Swaps, were acting in bad faith.

In sum, Messrs. Hohn and Behring should not be held individually liable pursuant to Section 20(a).

## IV.    DEFENDANTS' NOTICES OF PROPOSED DIRECTOR NOMINEES AND BYLAW AMENDMENTS COMPLY WITH CSX'S BYLAWS.

Plaintiff claims that Defendants' notices of intent to nominate persons for election to the CSX Board and to propose amendments to CSX's bylaws fail comply with Article I, Section 11(a)(ii) of the bylaws because "they do not accurately disclose the number of shares of

CSX stock beneficially owned by Defendants" only insofar as Defendants "had beneficial ownership of the shares referenced in [their] swaps."  (Pl. Findings at 94-95.)

<u>First</u>, this claim must fail because, as set forth in Defendants' Post-Trial Brief at pages 33 through 78 and 102 through 103, Defendants do not have beneficial ownership over the shares referenced in their swap agreements under federal or Virginia law.

<u>Second</u>, as set forth Defendants' Post-Trial Brief at page 103, assuming the Court deems that Defendants are the beneficial owners of the shares referenced in their Total Return Swaps, this claim should be dismissed because the notices truthfully and accurately reported all of Defendants' physical shares *and* Total Return Swaps.  (*See* DX 72.)  Plaintiff does not contest that Defendants accurately disclosed their swap position in the notices, but rather claim that the notices are void under Plaintiff's novel theory the Total Return Swaps confer beneficial ownership.  Defendants should not be faulted for truthfully and accurately disclosing their Total Return Swaps in a way that comported with the generally accepted understanding that Total Return Swaps do not confer beneficial ownership.

<u>Third</u>, as set forth in Defendants' Post-Trial Brief at pages 103 through 105, Plaintiff is estopped from raising this claim because Plaintiff knowingly failed to provide Defendants with any opportunity to cure this purported deficiency, even though it had given TCI the opportunity to cure its notice in other respects.  (*See* PX 166; DX 74.)  Plaintiff has failed to put forth any evidence to rebut Defendants' contention that Plaintiff knowingly kept silent as to this purported deficiency and is now using it as a pretext to block Defendants' slate of nominees. Indeed, CSX had been fully apprised of the size and nature of TCI's and 3G's Total Return Swap and physical position for well over a year, yet CSX never once informed them of CSX's view that the notices had to disclose Defendants' Total Return Swap position as conferring beneficial

ownership of the CSX shares referenced in order to comply with CSX's bylaws.  Instead of giving Defendants the opportunity to cure this purported deficiency, CSX filed this lawsuit, not for the benefit of its shareholders who have known of Defendants' precise swap position for months, but rather in a transparent attempt to block Defendants' slate of nominees.  Despite the fact that the issue was raised in the Amended Joint Pre-Trial Order at pages 61-62.  Plaintiff's Proposed Conclusions of Law offers no response to Defendants' claim that Plaintiff should be estopped from raising this claim.  Accordingly, Plaintiff should be estopped from claiming that Defendants' notices are void under Virginia law.  *Trayer v. Bristol Parking, Inc.*, 95 S.E.2d 224, 231 (Va. 1956) (setting forth the elements of equitable estoppel).

Fourth, in Plaintiff's Proposed Relief, Plaintiff has abandoned its request for declaratory judgment in connection with its meritless claim that the notices are void under Virginia law.  (*See* Pl. Findings at 95.)  Accordingly, the claim should be dismissed because Plaintiff no longer seeks any remedy in connection with this claim.  *See Factory Assocs. & Exporters, Inc. v. Lehigh Safety Shoe Co. LLC*, No. 05-CV-837, 2007 WL 1834599, at *4 (N.D.N.Y. June 26, 2007) (dismissing causes of action for which plaintiff sought no relief).

For the foregoing reasons, Plaintiff's claim that Defendants' notices of proposed directors and bylaw amendments are invalid should be dismissed.

## V.    THE PLAINTIFF HAS FAILED TO DEMONSTRATE IRREPARABLE HARM AND, ACCORDINGLY, NO INJUNCTION SHOULD ISSUE.

Plaintiff requests a myriad of improper, unprecedented and punitive injunctive relief, principally chosen to influence the proxy contest.    *See Electronic Specialty Co., v. Int'l Controls Corp.*, 409 F.2d 937, 947 (2d Cir. 1969) (Friendly, J.) ("injunctive process not

[designed] to punish").[16]  Under the law, CSX is not entitled to this relief it seeks.  Moreover,

Plaintiff fails to demonstrate that "it will suffer 'real and imminent, not remote, irreparable harm'

in the absence of a remedy."  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 290 (2d Cir. 2003).

Accordingly, no injunctive relief should issue.


### A.    Plaintiff Has Failed to Identify Any Irreparable Harm.

Plaintiff makes no effort to identify the usual source of irreparable harm for

claims of this nature:  a failure to disclose information material to the proxy vote.  *See Treadway

Cos. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir. 1980) (holding that irreparable harm cannot be

established when shareholders receive the information required to be filed).  Plaintiff asserts that

"[i]f Defendants are not ordered to file truthful and accurate Schedules 13D and 14A, CSX's

shareholders will be irreparably harmed because they will cast their votes based on false and

misleading information. . . ."  (Pl. Findings at 97.)  CSX further asserts that "[t]he violations here

were more than technical violations."  *Id.* at 96.  Despite those broad assertions, Plaintiff never

identifies the undisclosed information that needs to be provided to the CSX shareholders.  By

March 2008, over three months before the scheduled shareholder vote, Defendants' entire

economic position in CSX (both it's physical shares as well as its economic exposure via Total

Return Swaps), the existence of the TCI/3G group, and CSX's view that the Defendants'

previous disclosures were inadequate had all been fully disclosed.[17]  (*See* Defs. Br. at 89-90.)

These disclosures prevent a finding of irreparable harm.  *See Int'l Banknote Co. v. Muller*, 713 F.

Supp. 612, 619-22 (S.D.N.Y. 1989) (holding that curative filings regarding the actual date of

---

[16]     Three of Plaintiff's requests have never been made before.  This brief (due less than 48 hours after receipt
of these requests) is Defendants' first and only opportunity to respond to these requests for injunctive relief.

[17]     Even in the discussion of irreparable harm in its post-trial submission, CSX concedes that Defendants'
interest in CSX had been disclosed by December 2007.  (Pl. Findings at 102.)

group formation would not assist shareholders in evaluating the defendants' slate of directors due to "the amended filings, the voluminous discovery, and the ample time for plaintiff to communicate its message to its shareholders.").[18]

   If corrective disclosure are ordered to be made, the Defendants' previously-filed Schedules 13D and 14A will remain unchanged except to reveal the legal determinations of the Court regarding when (not if) the parties entered into a group[19] and the beneficial ownership status of the Defendants' Total Return Swaps. That TCI and 3G are in a group with the purpose of electing certain nominees to the CSX Board has been disclosed; that Defendants have entered into the Total Return Swaps has been disclosed; even CSX's position on these issues has been disclosed. In the light of the previous disclosures, the CSX shareholders have failed to suffer irreparable harm.

   Plaintiff argues that "Defendants have denied CSX shareholders the benefit of the full and accurate information material to their decision in the upcoming proxy contest." (Pl. Findings at 96.) However, none of this has anything to do with the issues being considered by the CSX proxy voters. Shareholders will make their decision about how to vote in the proxy

---

[18] To support the conclusory statement that "CSX's shareholders will be irreparably harmed because they will cast their votes based on false and misleading information . . . ," Plaintiff quotes from *Mony Group, Inc., v. Highfields Capital Mgmt, L.P.*: "It is well-established that a transaction -- particularly a change-of-control transaction -- that is influenced by noncompliance with the disclosure provisions of the various federal securities laws *can* constitute irreparable harm." 368 F.3d 138, 147 (2d Cir. 2004) (emphasis in original). Significantly, however, Plaintiff coyly omits the very next sentence, which addresses the current situation. That sentence reads: "We decline to hold that a transaction influenced by noncompliance with the securities laws *always* results in irreparable harm because there are a number of circumstances that arguably could defeat such a broad rule, including those involving acts of bad faith, securities law infractions on both sides of a transaction, a situation where an injunction would suppress the only voice opposing a transaction, or other circumstances that we need not try to anticipate today." *Id*. (emphasis in original). Here, there is evidence that CSX has been aware of Defendants' economic exposure to CSX stock for over a year but made no effort to disclose that information, that CSX did not notify TCI of their objection to their nominees until after the time had elapsed under the CSX Bylaws for TCI to correct the notice, and that it has already moved the record date once in order to effect the outcome of the proxy contest. (Defs. Br. at 92-94.)

[19] Significantly, Plaintiff cannot point to a single case in which a violation of Schedule 13D due to unreported group formation justified any relief beyond a curative disclosure. Likewise, Plaintiff cannot point to a single case in which illicit group formation, the existence of which is later disclosed, in and of itself justified *any* injunctive relief.

contest based on the strength of the Defendants' nominees and their specific (and fully-disclosed) plans for CSX.

In an effort to identify some manner of irreparable harm, Plaintiff argues that "Defendants sought to secure a controlling position in CSX with a view to launching a proxy contest. In pursuit of this goal, Defendants accumulated an economic interest in more than 20 percent of CSX stock. . . ." (Pl. Findings at 96.) Flatly contradicting this assertion, CSX stated in its Proposed Findings of Fact:

> TCI and 3G purchased their holdings in CSX with *one goal* in mind: to seize control of the Company without paying a premium to bring about an LBO or other liquidity event and to do it by using swaps to keep their plans secret from the public.

(Pl. Findings ¶ 111 (emphasis added).) Moreover, by March 2007, the earliest point at which Plaintiff suggests that Defendants were taking up "a proxy fight" (Pl. Findings ¶¶ 139-40), TCI had substantially completed building its economic position in CSX. (DX 97.) In addition, as has been well-established, the Defendants maintained economic exposure to CSX via swaps for a variety of reasons. (*See* Defs. Br. at 10-11.) There is simply no factual support for the notion that Defendants accumulated and held their swap position in CSX in order to advantage themselves in the proxy contest.

Finally, the manner in which Defendants' hold their exposure to CSX stock (in part through physical shares and in part through swap arrangements) has not advantaged them in the proxy contest or irreparably harmed the CSX shareholders. Plaintiff suggests that Defendants have voting control over 20% of the shares of CSX. This is not supported by the facts. There is no evidence that the Defendants made any effort to recall the shares that had been lent out by their swap counterparties, which would be necessary to vote such shares, or otherwise sought to influence the voting of those shares. (*See* DX 153 (Busby Dep. 24:3-12); Trial Tr.

43

(Miller Test. 84:6-11 (stating that he determined there was no unusual share movement around the current record date).)  The evidence is that any hedges held by the counterparties will not be voted.  Indeed, if Defendants were motivated in the manner in which Plaintiff alleges, they simply would have unwound their swap positions on December 20, 2007, and purchased in the open market the physical equivalent in CSX stock.  That TCI and 3G did not do that is powerful evidence undermining Plaintiff's entire theory of this case.

Having failed to identify any irreparable harm, no injunction should issue.

B.     **The Injunctions Sought Are Improper.**

Even if Plaintiff had identified some sort of irreparable harm, it is not entitled to the draconian injunctive relief it seeks.

1.     Enjoining Defendants from Voting Proxies

Plaintiff asks the Court to enjoin TCI "from voting any proxies that they have received or will receive prior to filing complete and accurate Schedule 13D and Schedule 14A disclosures."  (Pl. Findings at 98.)  Such a remedy only serves to disenfranchise CSX shareholders.  Even if the Court deems it necessary to order corrective disclosures, the shareholders will have those disclosures sufficiently far in advance of the shareholder meeting to revoke proxies previously given to Defendants and vote for CSX management, should any shareholders determine that the corrective disclosures cause them to desire to do so.  A proxy may be revoked by a shareholder at any time before the shareholder meeting by a later-dated proxy card, internet or telephone vote.  (JX 5 (CSX Definitive Proxy at 3).)

Plaintiff sets forth a litany of cases that purport to support the contention that the voiding of proxies is appropriate in this situation.  Several of those cases, however, merely

discuss the possibility of voiding proxies without ever ordering the relief.[20]  In the remainder of

the cases cited by Plaintiff, the court nullified proxies while simultaneously postponing the

shareholders meeting to provide time for the parties to re-solicit the shareholders.[21]  Here, there

is no need for such a delay.  Indeed, Plaintiff never contemplates this Court postponing the

shareholders meeting and Plaintiff's counsel even requested the Court's decision to allow enough

time for the June 25, 2008 meeting to go on as scheduled.  (Trial Tr. at 85:19-85:5.)  If the Court

does not order re-solicitation of the proxies, then any curative disclosure can be made and the

shareholder meeting can occur as scheduled.

            Finally, Plaintiff cites to a SEC litigation release and an SEC *amicus* brief for "the

position that relief beyond corrective disclosure may be both necessary and appropriate to

remedy Section 13(d) violations."  (Pl. Findings at 100.)  However, those SEC statements are

addressed to tender offers.  *See General Steel Indus., Inc. v. Walco Nat'l Corp.*, SEC Litigation

Release No. 9533, 1981 WL 315222, at *2 (Dec. 21, 1981);[22] Brief for the SEC as *Amicus Curie*

in *San Francisco Real Estate Investors v. Real Estate Inv. Trust of Am.*, 701 F.2d 1000 (1st Cir.

1983).  The possibility of a rapidly-accumulated "blocking position" in a tender offer situation,

---

[20]      *See Krauth v. Executive Telecard, Ltd.*, 890 F. Supp. 269 (S.D.N.Y. 1995) (defendants *not* enjoined from voting any proxies already received); *Morrison Knudsen Corp. v. Heil*, 705 F. Supp. 497 (D. Idaho 1988) (defendants *not* enjoined from voting any proxies already received; once curative disclosures filed, solicitations may commence without "cooling-off period"); *K-N Energy, Inc. v. Gulf Interstate Co.*, 607 F. Supp. 756 (D. Colo. 1983) (defendant *not* enjoined from voting proxies already received); *Delcath v. Sys. v. Ladd*, 06 Civ. 6420 (LAP), 2006 U.S. Dist. Lexis 67720, at *16-17 (S.D.N.Y. Sept. 20, 2006) (court permits consent solicitations to become ineffective on their own terms pursuant to Delaware law).

[21]      *See Kaufman v. Cooper Cos.*, 719 F. Supp. 174 (S.D.N.Y. 1989) (court voids all proxies but simultaneously orders a postponement of the shareholder meeting so that shareholders can receive all material information); *Camelot Indus. Corp. v. Vista Res.Inc.*, 535 F. Supp. 1174 (S.D.N.Y. 1982) (court orders a postponement of the annual meeting of about one month so that both sides can cure misleading information and accurate information can be digested by the market); *Cent. Foundry Co. v. Gondelman*, 166 F. Supp. 429 (S.D.N.Y. 1958) (court simultaneously voids all proxies and orders a postponement of the shareholder meeting).

[22]      CSX misleadingly quotes the *General Steel* litigation release as stating that "shareholders could be irreparably harmed."  (Pl. Findings at 100.)  However, that sentence -- when read in full -- states only that irreparable harm occurs if there is no "remedy removing the wrongfully obtained blocking position."  *General Steel Indus., Inc*, 1981 WL 315222, at *2.  There is no allegation that the Defendants have obtained such a position, and, accordingly,  this release is inapplicable to the present dispute.

in which a large position in a company could preclude competing tender offers or merger proposals, presents a wholly different set of implications for shareholders than the nomination of a slate of directors by shareholders with beneficial holdings of less than 9 percent.  Defendants do not contest that district courts have broad equitable powers that can be shaped to fit the particular circumstances.  Further, Defendants do not contest that courts often shape similar remedies for violations of the disclosure regulations in the context of a tender offer and proxy contests.  Nevertheless, the statements by the SEC relied upon by the Plaintiff simply do not apply to the facts of this dispute, where there was no rapid accumulation of shares, no blocking position and no threat that management will be precluded from making its case to shareholders.[23]

2.    Enjoining Defendants from Voting Their Shares

Defendants seek an order enjoining Defendants from voting any CSX shares they own at the 2008 annual meeting of CSX.  (Pl. Findings at 95.)  There is no basis for this relief.

Under different facts, in limited circumstances, court have granted injunctions enjoining the voting of certain shares *acquired after* Section 13(d) or Section 14(a) disclosures were due or misleading disclosures were made.  Plaintiff, however, cites no case granting the relief it now seeks, sterilization of all shares, including those "innocently" acquired, and we are aware of no such case.[24]  There is no basis to enjoin the Defendants from voting shares acquired prior to the time they had any disclosure requirement under Section 13 or Section 14.  The requested injunction is too broad and should not be granted.

---

[23]    Plaintiff cites *Hanna Mining Co. v. Norcen Energy Res. Ltd.*, 574 F. Supp. 1172 (N.D. Oh. 1982).  This case, also, involved a tender offerer who "was in a position to inhibit competing tender offers, merger proposals or any other business combination for" the plaintiff.  *Id.* at 1202.

[24]    In the Joint Pretrial Order, Plaintiff seemed to be aware of this distinction and only requested that the Defendants be enjoined from voting the shares acquired "after the date by which they should have filed a Schedule 13D."  (PTO at 97.)

Even if the Plaintiff limited its request to enjoin the voting of CSX shares acquired after Section 13(a) or Section 14(d) disclosures were required, no injunction is appropriate here.[25]  (*See* Defs. Br. at 98-100.)  An injunction prohibiting a defendant from voting his stock is only warranted in the most extreme situations.  *See Gorman v. Coogan*, No. 03-173-P-H, 2004 WL 60271, at *12-13 (D. Me. Jan. 13, 2004) (noting that sterilization is a "very extraordinary form of relief"); *Lane Bryant, Inc. v. Hatleigh Corp.*, No. 80-Civ. 1617, 1980 WL 1412, at *4 (S.D.N.Y. June 9, 1980) ("Any harm . . . shareholders as a whole could conceivably sustain is outweighed by the certain harm defendants would sustain if they were deprived of their right to participate in the annual meeting, and thereby protect their investment.").[26]  In the limited cases where courts have granted share sterilization, it is only under circumstances where, despite disclosure, shareholders have been irreparably harmed by the faulty Schedule 13D, and, even in such situations, courts are loathe to disenfranchise a shareholder.[27]

As support for sterilization of Defendants' shares, Plaintiff argues that "the CSX shares now held by the Defendants were illegally acquired from an unsuspecting public after they had embarked on their scheme to evade the reporting requirements of Section 13(d)."  (Pl. Findings at 102.)  Plaintiff, however, makes no effort to explain how the shares were illegally

[25]    The court in two of the principal cases upon which Plaintiff relies to show that disenfranchisement is an appropriate remedy, refuse to order such relief.  *See ICN Pharmaceuticals, Inc. v. Khan*, 2 F.3d 484, 490, 492  (2d Cir. 1993); *Treadway Cos., Inc.v. Care Corp.*, 638 F.2d 357 (2d Cir. 1980).

[26]    Indeed, courts routinely deny such requests for relief.  *See MTD Serv. Corp. v. Weldotron Corp.*, No. 93 Civ. 4980 (MP), 1994 WL 455154, at *1 (S.D.N.Y. Aug. 19, 1994) (holding the drastic relief of sterilization to be unwarranted); *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 717 (5th Cir. 1984) (denying share sterilization because there was no risk that other shareholders would be harmed if the shares were voted); *Gen. Aircraft Corp. v. Lampert*, 556 F.2d 90, 97 (1st Cir. 1977) (refusing to grant voting injunction because there was no irreparable harm and therefore "sterilization of appellants' legally acquired shares would be punishment, not deterrence")

[27]    *See Champion Parts Rebuilders, Inc. v. Cormier Corp.*, 661 F. Supp. 825, 847-48 (N.D. Ill. 1987) (injunction granted after finding that controlling shareholder defendants' blocking position in Champion's shares has caused an illiquid market for Champion's shares).  Injuries of this nature have not even been alleged in the current case and further, there are no facts to indicate that a single irreparable adverse effect will result from the purportedly faulty Schedule 13D.

acquired, how the current shareholders of CSX are harmed by this or to provide any legal support for any of these propositions.  "[I]n addressing a request for injunctive relief, as opposed to damages, the focus is on current and future shareholders, and not those who may have sold at an unfairly depressed price. . . . [No] deficiencies that remain are important today."  *E.ON AG v. Acciona, S.A.*, No. 06 Civ. 8720, 2007 WL 316874 at *9-10 (S.D.N.Y. Feb. 5, 2007).

Plaintiff suggests that disenfranchisement is a remedy embraced by the courts.  As explained above and in Defendants' Post-Trial Brief, it is a remedy used only sparingly.  Plaintiff misleadingly employs a quotation from *Raybestos-Manhattan Inc*, 503 F. Supp. 1122, 1133 (E.D.N.Y. 1980):  "Disenfranchisement or divestiture may be permissible remedies for Section 13(d) violations . . . when the defendant obtains effective control of plaintiff through stock purchases before it comes into compliance with Section 13(d)."  However, Plaintiff has conveniently omitted the first five words of that quotation, which makes clear that disenfranchisement is a very limited remedy:  "*The only situation in which* disenfranchisement or divestiture may be permissible remedies for Section 13(d) violations is when the defendant obtains effective control of plaintiff through stock purchases before it comes into compliance with Section 13(d)."  *Id*. (emphasis added).[28]

3.     Enjoining Defendants from Selling Their Shares

_____

[28]     The balance of the cases cited by Plaintiff are equally unhelpful to Plaintiff.  Plaintiff points to a small number of cases where the defendant was a controlling shareholder that acted in bad faith or where the court solely mentions disenfranchisement as a possible (but ultimately rejected) remedy.  *See Drobbin v. Nicolet*, 631 F. Supp. 860, 913 n.3 (S.D.N.Y. 1986) (holding that the question of injunctive relief beyond a curative disclosure was not before the court because Defendants "did not obtain a degree of effective control through their purchases of Braintech stock until after [defendants] had filed his individual Schedule 13D."); *Comm. for New Mgmt. of Butler Aviation v. Widmark*, 335 F. Supp. 146, 149, 155 (E.D.N.Y. 1971) (disenfranchising *controlling* shareholder from voting certain shares); *Bath Indus. v. Blot*, 427 F.2d 97, 113 at n. 8 (7th Cir. 1970) ("Since the preliminary injunction effectively disenfranchises defendants from voting at stockholders' meetings, we have enjoined, on motion of the defendants-appellants, the holding of that meeting until further order of this court."); *General Aircraft*, 556 F.2d at 97 (1st Cir.) ( "[I]t may be appropriate for the courts to enjoin the voting of shares rapidly acquired just before a contest for control following a Section 13(d) violation.").

While CSX seeks an injunction that Defendants not be allowed to vote their shares, they also seek an order enjoining Defendants "from selling their shares of CSX until three days following the 2008 CSX annual meeting." (Pl. Findings at 95.) This relief is wholly unsupported by the law – Plaintiff does not cite even a single case that purports to support this relief. Plaintiff does not even attempt to proffer why this extraordinary remedy would help rectify the complained about behavior.

Moreover, this request represents a 180-degree about-face from the position CSX took in the pretrial order. In the Amended Joint Final Pre-Trial Order, CSX sought an injunction "directing that Defendants sell" shares of CSX and to "terminate all swaps referencing CSX shares" that were acquired or entered into after Defendants "should have filed a Schedule 13D." (PTO at 97.) Such thirteenth-hour changes should not be permitted. The Form of Pretrial Order attached to Your Honor's rules states that the "pleadings are deemed amended to embrace" only the contentions in the pretrial order.

4.    Directing the Counterparties to Disclose How They Intend to Vote Their Shares

Finally, the Plaintiff requests yet another injunction that it has not previously shared with the Defendants or the Court. CSX now asks that the Court direct the parties as follows:

> Austin Friars and other CSX investors who were secretly and selectively tipped off by the Defendants about CSX must be prevented from voting their shares at the annual meeting. Those investors are not currently before the Court, but the parties shall assemble a list of all investors who were tipped off, and the parties shall propose a mechanism for ensuring that their shares are not voted at the annual general meeting. If any tippee refuses, the parties shall propose to the Court a procedure for bringing that tippee under its jurisdiction. The parties shall provide Deutsche Bank and Citigroup a copy of this order and request that they submit for my review a statement of their intentions concerning the voting of CSX shares at the annual meeting and, if they decline,

> propose to the Court a procedure for bringing them under its
> jurisdiction.
>
> Finally, the parties shall advise the Court of any evidence of
> conduct that is contrary to the relief ordered by the Court.  Within
> one week of the annual general meeting, each party shall therefore
> submit a report as to whether the Court's order has been violated.

(Pl. Findings at 102.)  Plaintiff offers no legal support – or even argument – as to why this

extraordinary relief is appropriate.  Among other obvious deficiencies, the scheme is plainly

unconstitutional:  These extraordinary proposals seek to have the parties apply a vague

description of "tippees" to determine the legal rights of entities who are not before the Court for

actions allegedly taken prior to this hearing.  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395

U.S. 100, 110, 89 S. Ct. 1562, 1569 (1969) ("It is elementary that one is not bound by a

judgment in personam resulting from litigation in which he is not designated as a party or to

which he has not been made a party by service of process.")

The sole purpose of this request is to drag perceived allies of Defendants into this

dispute – without the bother of notice or service –  in a hope to effect the proxy contest.  This is

precisely the type of conduct that Courts have made plain that these suits are not to be used for.

*See Condec Corp. v. Farley*, 573 F. Supp. 1382, 1387 (S.D.N.Y. 1983) ("[E]njoining share

purchases, voting, or attempts to exercise, directly or indirectly, any influence upon the

management of [plaintiff corporation] may insulate [plaintiff's] management from challenge for

a year and jeopardize defendants' plans and investments.  Recognizing that delay is often

management's most potent weapon, and that the framers of the Williams Act did not intend to so

arm management, it is our strong belief that returning this struggle from the courtroom to the

marketplace and annual meeting will not irreparably harm the parties or the investing public.")

(internal citations and quotations omitted).

### RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

## I.   THE PARTIES

### A.   <u>CSX</u>

5.      In Paragraph 5 of its findings, CSX describes itself as having had the lowest Surface Transportation operating ratio in a decade.  However, CSX has the worst operational metrics out of all four major North American rail providers.  *See CSX White Paper, available at* http://www.strongercsx.com/whitepaper_051208.pdf at 13, 33 (Swartz Decl. Ex. 1).  CSX is the worst of all railroads in velocity and labor/sales, and second to worst in cost inflation and cost/unit inflation.  (*see id.*)  In fact, CSX is not in the top two in any of the six operational metrics.  (*Id.*)

6.      CSX contends that it moved its annual general meeting ("AGM") "after discovering aberrant share movements."  In truth, CSX commenced this lawsuit to "manipulate the governance and Board election process by delaying the annual meeting."  (JX 13.)  Alan Miller, CSX's witness who testified as to the "aberrant" share movement, admitted that his discovery of alleged share movement was entirely speculative.  (Trial Tr. (Miller Test. 77:11-16).)  Specifically, Mr. Miller admitted that he had no basis for knowing whether shares were moving between institutions because of TCI ordering its counterparties to recall them.  (Trial Tr. (Miller Test. 76:25-77:13).)  CSX filed this suit as a means to boost its chances in an upcoming proxy contest, plain and simple.

### B.   TCI

7.      TCI takes its name from the annual donations it gives to one of the United Kingdom's largest charities.  (DX 144 (Hohn ¶ 4).)  The non-profit, philanthropic organization works to better the lives of impoverished children in developing nations addressing basic needs such as nutrition, education, sanitation and health.  (*Id.*)  Last year alone, TCI donated almost £200m to the foundation.  Alastair McCall, *Sharing Their Good Fortune; Rich List 2008,* Sunday

Times UK, Apr. 27, 2008 (Swartz Decl. Ex. 2).  Mr. Hohn stated in his deposition, that last year TCI gave around $1 billion to the foundation.  (Hohn Dep. 74:5-21).)

8.    Recently, TCI has been involved in high-profile corporate change cases, specifically, contests at Deutsche Borse, ABN Amro, and Mittal Steel.  (DX 144 (Hohn ¶ 25).) In each of these cases, the shareholders profited significantly after TCI became involved.  (*Id.*) In each case TCI advocated shareholder interests over general management incentives.  (*Id.*)

8.1.    In the contest involving Deutsche Börse, after TCI's request that shareholders be permitted to vote on a proposed acquisition of the London Stock Exchange was ignored, TCI successfully fought an entrenched board and subsequently changed management for the benefit of all shareholders.  (DX 144 (Hohn ¶ 25).)  Deutsche Börse has since increased in value almost 400% and TCI continues to be a significant shareholder.  (DX 144 (Hohn ¶ 25).)

8.2.    Over 70% of the shareholders voted in favor of TCI's proposal regarding ABN Amro.  (DX 144 (Hohn ¶ 25)); John D. Bowen, *What Does The Children's Investment Fund Really Want?,* Railway Age, Nov. 1, 2007.  (Swartz Decl. Ex. 3).

8.3.    In the dispute involving Mittal Steel, TCI assisted the minority investors in receiving an 82% premium that the majority shareholders received, fighting its way through the Brazilian regulatory body to do so.  Paul Glader, *Mittal Steel Offers $3.2 Billion for Remainder of Arcelor Brasil,* Wall Street Journal, Oct. 26, 2006.  (Swartz Decl. Ex. 4).

### C.    Chris Hohn

10.1-10.4.    In an attempt to malign Mr. Hohn, Plaintiff alleges that Mr. Hohn was involved in some type of wrong-doing at his former employer, Perry Capital.  The allegations are that Perry Capital used equity swaps in an improper attempt to take over a New Zealand company known as Rubicon.  (Pl. Findings ¶ 10.3.)  Plaintiff boldly claims that Mr. Hohn "incredibly has no direct knowledge of this investment while at Perry."  (Pl. Findings

¶ 10.4.)  First, the New Zealand Court of Appeals found no wrongdoing and that the securities laws of New Zealand did not require the disclosure of swaps.  Plaintiff inappropriately cites to the lower court decision in the Rubicon case, which was subsequently overturned by *Ithaca (Custodians) Ltd. v. Perry Corp.*, [2004] 1 NZLR 731, 2003 NZLR LEXIS 76 (C.A.).  Moreover, as Mr. Hohn testified at trial, he worked out of the European office of Perry Capital; the alleged activity occurred out of the U.S. office, with which he had limited interaction.  (Trial Tr.  (Hohn Test. 186:10-15).)

11 - 19    3G Fund L.P. ("3G Fund") is a Cayman Islands limited partnership.  3G Capital Partners, L.P.  ("3G L.P.") is a Cayman Islands limited partnership and the general partner of 3G Fund.  3G Capital Partners Ltd. ("3G Ltd") is a Cayman Islands company and the general partner of 3G L.P.  (Amd. Joint Pre-Trial Order at ¶ 3 (stipulated facts).)

3G is headquartered on Third Avenue in New York.  (Behring Dep.10:10 - 10:14.)

3G is the investment manager for Synergy, a fund which invests in other funds.  Typically, Synergy is invested in about fifty different hedge funds.  (Behring ¶ 12.)

Synergy has invested in TCI – along with about 50 other hedge funds – since 2004.  TCI sent Mr. Behring quarterly letters discussing TCI's investments, including its investment in the U.S. transportation sector generally, but not CSX in particular.  (Behring Test. 129:5-20; Hohn Test. 159-160).

TCI and 3G do not have  "joint history"; rather, on occasion and as is common in the investment industry, Mr. Hohn and others at TCI spoke with Mr. Behring to gain the benefit of his perspective on investing in Brazil.  (Behring Dep. 149:22-150:18.)

Until it formed a group with TCI on December 12, 2007, 3G had never before conducted an activist campaign, although it always considered activism as an option for all of its significant investments.  (Trial Tr. (Behring Test. 143:25-144:18).)

Mr. Behring has an engineering degree from Brazil and earned an M.B.A. (high distinction) from Harvard Business School. (Behring ¶ 6.)  He moved to New York in 2005 when he joined 3G.  (Behring ¶ 11.)  He worked for 10 years at Latin America's largest private equity firm, and was a partner and member of its investment committee for eight years.  (Behring ¶ 7.)  He served as Chief Executive Officer of America Latina Logistica ("ALL"), Latin America's largest independent railroad and logistics company, and continues to serve on the Management Committee of its Board of Directors (Behring ¶ 8.)  Mr. Behring presided over heavy technology investment, dramatic safety improvements and increase in EBIDTA margins at ALL form 6% to 41%.  (Behring ¶ 9.)  Mr. Behring has extensive hands-on operational experience, including operating many types of locomotives throughout Brazil and Argentina. (Behring ¶ 10.)

Mr. Behring moved to New York in 2005 when he joined 3G.  (Behring ¶ 11.)

3G manages the investments of 3G Fund.  3G Fund makes investments in a variety of opportunities globally, including public equities, derivatives and debt instruments.  3G looks at a wide range of investments, and has particular experience with infrastructure investments.  (Behring ¶¶ 13-14.)

The vast bulk of 3G's investment in CSX is through direct ownership of CSX stock.  A small proportion of 3G's investment is through swaps, which 3G employed for a variety of reasons, including costs and leverage.  (Behring ¶ 54; JX 12, Annex A; DX 128.)

Throughout its investment in CSX, 3G's combined economic exposure through both direct ownership of stock and swap contracts was the equivalent of less than 5% of the total outstanding shares of CSX.  (Behring ¶ 56; JX 12 Annex A; DX 128.)

## II.    TCI ACCUMULATES A SUBSTANTIAL STAKE WITH PROPER DISCLOSURES

20.    Plaintiff accuses TCI of using "complex equity swaps" to secretly invest in CSX beginning in late 2006.

First, TCI's Total Return Swap arrangements were "plain vanilla" equity derivatives standard forms, schedules and confirmations entered into pursuant to ISDA Master Agreement forms.  (Defs. Br. at 42.)  Indeed, Plaintiff's characterization of these "plain vanilla" swap contracts as "complex" and "secret" is baffling as is CSX Chief Financial Officer Oscar Munoz's testimony that at the time he was told that TCI's interest in CSX was in swaps, he "didn't understand . . . how those worked, in essence."  (DX 154 (Munoz Dep. 79:23-80:8).)

Second, from the time TCI began building its position in CSX, TCI made CSX aware of its exposure to CSX through swaps.  (PX 268 (Baggs ¶ 3); PX 267 (Munoz ¶¶ 3-4); Trial Tr. (Munoz Test. 37:1-3).)  On November 14, 2006, Mr. Hohn informed Mr. Munoz that TCI had a $500 million investment with respect to CSX, and shortly thereafter, Mr. Amin explained to Mr. Baggs that TCI had economic exposure to CSX in the form of cash-settled swaps. (DX 145 (Amin ¶ 20-21); PX 268 (Baggs ¶ 5-6); PX 267 (Munoz ¶ 4); Trial Tr. (Baggs Test. 63:8-18); *see also* Defs. Br. 12-13, 20-21.)

Remarkably, not long after learning of TCI's "secret" investment in CSX, the company disclosed to its shareholders in its first quarter 10-Q on April 18, 2007, that TCI held a "significant economic position through common stock ownership and derivative contracts tied to the value of CSX stock."  (Trial Tr. (Munoz Test. 37:4-19, Hohn Test. 164:5-20, Behring Test.

152:3-14); DX 114 (CSX Form 10-Q for the quarter ending Mar. 30, 2007).)   Again, TCI's

"secret" was exposed at the May 8, 2007 Bear Stearns conference when Mr. Amin spoke

publicly about TCI's investment in CSX.  (PX 96 at 10; DX 145 (Amin ¶ 39); DX 144 (Baggs ¶

18); Trial Tr. (Behring Test. 114:4-14; Hohn Test. 169:6-13).)  Moreover, in June 2007, CSX

commissioned its investment advisors, Morgan Stanley and Evercore Partners, to make a

presentation regarding swaps, in an effort to better understand the nature of TCI's interest in

CSX.  (PX 203 (June 2007 Morgan Stanley/Evercore Swaps Presentation).)

   TCI's disclosures regarding its swap positions continued on June 20, 2007, when

TCI met with Evercore.  After the meeting, Evercore relayed to CSX that TCI had told Evercore

that they directly owned 4 percent of CSX's common stock and had additional economic

exposure to the equivalent of over 10 percent of CSX shares outstanding through swaps.  (PX

108.)

   21-22.  Plaintiff's assertion that TCI used swaps to acquire a position in CSX

without disclosing it to anyone other than select friends misstates TCI's intentions with respect to

its CSX swaps.  TCI in fact had numerous business reasons for acquiring a position in CSX

through swaps.

   The minutes of the TCI Board of Directors reflect that TCI uses swaps because

they provide financing benefits, including lower funding costs and lower margin requirements.

(DX 145 (Amin ¶ 7); DX 144 (Hohn ¶ 6); DX 154 (Amin Dep. 38:21-39: 11); DX 154 (Hohn

Dep. 140:6-11); DX 149 (Partnoy ¶ 38); PX 19 (TCI Board Minutes enumerating TCI's reasons

for investing in Total Return Swaps); (PX 106 (reflecting internal TCI discussions about

leverage); PX 148 (same).)  Also, there are significant potential tax benefits to investing through

swaps.  (PX 38 (Jan. 26, 2007 e-mail between CSX and its advisor Morgan Stanley discussing

the tax benefits of using Total Return Swaps); PX 19 (TCI Board minutes enumerating the reasons for investing through swaps).)  As its board minutes reflect, TCI invests through swaps globally and benefits from favorable tax treatment in multiple jurisdictions, including Germany, the United States, and the United Kingdom.  (PX 19 at TCI0011386; *see also* DX 145 (Amin ¶ 7); DX 144 (Hohn ¶ 6); DX 154 (Amin Dep. 38:21-39:11); DX 154 (Hohn Dep. 140:6-11); DX 149 (Partnoy ¶ 38); PX 38 (Jan. 26, 2007 e-mail between CSX and its advisor Morgan Stanley discussing the tax benefits of using Total Return Swaps).)

22.1    TCI has good reason not to want to disclose its investing position. If TCI had disclosed its investment in CSX prior to establishing the position, it would have been subject to front-running by other investors, potentially causing price differentials that would have made it more expensive for TCI to trade.  (Trial Tr. (Hohn Test. 188:21-189:8).)

23.    Plaintiff's description of TCI's use of eight counterparties for its CSX swaps as an attempt to "hide" its CSX positions mischaracterizes TCI's true reasons for doing so. First, CSX conveniently omits reminding the Court that TCI advised CSX of the fact that its swap positions were held through a number of investment bank counterparties.  (DX 154 (Fitzsimmons Dep. 101:22-102:1).)  But, even putting aside the fact that TCI was "hiding" its swap positions in plain sight of CSX (including CSX investment advisor, Morgan Stanley), TCI initially chose to use seven different banks for two reasons:  (i) to diversify the credit risk, and (ii) to prevent front-running.  (DX 145 (Amin ¶ 15).)

24.    Plaintiff's accusation that TCI monitored the physical positions of its counterparties to ensure that TCI's position remained opaque to the market again mischaracterizes TCI's reasons for doing so.  As previously stated, TCI for a time wanted to protect itself and its investors against front-running.  TCI authorized inquiry into the positions of

the counterparties toward the beginning of its investment in CSX.  (PX 22; PX 27; PX 28; PX 30.)  The timing of TCI's authorization demonstrated that it had merely wanted to ensure that the counterparties would not prevent TCI from taking advantage of one of the reasons it had chosen to gain exposure to CSX through swaps.  (DX 145 (Amin ¶ 16).)

24.1-24.3.     With its description of the December 18, 2006 email from Mr. Sunak to Ms. O'Reilly, Plaintiff fails to describe all relevant parts of the document in an attempt to mischaracterize TCI's actions.  In the email, Mr. Sunak authorizes Ms. O'Reilly to contact TCI's counterparties to inquire as to their CSX position due to his concern that the banks would have to file a Schedule 13G if their positions reached five percent.  (PX 22.)  Plaintiff omits the rest of the email in which Mr. Sunak states, "If they don't want to tell us that's fine but you never know."  (PX 22.)  Nothing in the record indicates that TCI actually received this information from the counterparties, which is consistent with the banks' policies regarding disclosure of details regarding hedged shares.

25.     Plaintiff again only considers part of the picture in asserting that TCI's monitoring of the counterparties' actions indicates that TCI's only motivation for using swaps was nondisclosure.  TCI's attempt to reduce the chance that it would be subjected to front-running by attempting to inquire as to its counterparties' positions in no way indicates that TCI's other reasons for using swaps, such as tax benefits and access to better financing, were merely a pretext.  Rather, TCI was taking precautions to ensure that *one* of its reasons for using swaps would not be hindered by the counterparties' acquisition of more than five percent of CSX shares.

Additionally, if nondisclosure had been TCI's primary purpose for entering into swap agreements, it would never have told the purported target of its alleged secret scheme about

58

its swap agreements (it was under no obligation to do so prior to December 19, 2007), and once TCI's positions in CSX were publicly disclosed in December 2007, it would have been logical for TCI, embroiled in a hotly-contested proxy contest, to have unwound its swaps and purchased physical shares – thereby acquiring the ability to vote those shares – at that time.  Instead, TCI retained its position in Total Return Swaps (and continues to retain those swaps) even after its position was disclosed.

26.    Plaintiff's claim that TCI's "secret" accumulation of its CSX position indicates that TCI sought to influence and exert control over CSX is false.

First, Plaintiff's assertion that "[e]very time TCI acquired or disposed of a significant swap position in CSX, TCI's counterparties acquired or disposed of a significant position in physical shares of CSX" is contradicted by the evidence.  It is clear that TCI's counterparties were able to hedge their CSX swaps other than through the purchase of matching shares, and in fact, took advantage of such alternatives.  (Trial Tr. (Amin Test. 206:12-17); DX 149 (Partnoy Rebuttal Report ¶¶ 98-100); DX 150 (Partnoy Sur-Rebuttal Report ¶¶ 56-59); (DX 151 (Kennedy Dep. 39:7-40:21).)

Second, Plaintiff makes the mistaken assumption that by entering into the swap agreements, TCI directed the acquisition and/or disposition of CSX shares, and thereby, could influence or control CSX through its swaps.  Here, Plaintiff deliberately attempts to obfuscate the obvious difference between, the *ability to direct* the counterparties to acquire or dispose of shares taking actions that have the effect of *causing* the counterparties to acquire or dispose of the shares.  (Defs. Br. at 45-46.)  As a result of entering into swap agreements with TCI, the counterparties often purchase shares of CSX because hedging with physical shares often makes economic sense.  (Partnoy Sur-Rebuttal Report ¶ 3.)  That, however, is causation, not the

exercise of any ability on TCI's part to direct the acquisition or disposition of the underlying shares. Causation does not confer the power to influence and control, and therefore, Plaintiff's assertion here is false. Further, this assumes TCI has accurate knowledge of its counterparties hedging, which it does not. Merely assuming what a counterparty may or may not due, even based on market reality, is not enough as market reality does not apply all the time. For example, Pershing Square may have filed for beneficial ownership in Sears Canada, but its counterparty in fact had hedged in a back-to-back swap with another counterparty.

27-27.4.    Plaintiff argues that TCI's purpose in making a large investment in CSX through swaps was to influence and control CSX, noting TCI's suggestion of an LBO of CSX. TCI's exploration of a possible LBO did not indicate TCI was attempting to influence and control CSX. TCI made its investment in CSX because it was attracted to the railroad industry. (DX 145 (Snehal ¶3-5).)

28.    Plaintiff contends that TCI's accumulation of its swap and share positions gave rise to a public disclosure obligation. This assertion is false because at no time before TCI and 3G formed a group was TCI under any obligation to report its interest in CSX. Swaps do not confer beneficial ownership.   This was confirmed in writing by two law firms TCI has retained on the matter. When TCI began accumulating shares of CSX, TCI's interest in CSX did not reach the five percent threshold until formation of the group with 3G, at which time TCI and 3G properly disclosed their beneficial ownership. (JX 8.)

29.    Plaintiff alleges that after March 20, 2007, TCI "converted" some of its swaps to physical shares, but its exposure to CSX remained approximately constant. As explained more fully in Defendants' Post-Trial Brief, TCI did not "convert" any of its swaps to physical shares. (Defs. Br. at 19.) Instead, it is undisputed that TCI purchased shares on the

open market and, in an effort to maintain a roughly consistent economic exposure to CSX, TCI also unwound its swap positions.  (DX 145 (Amin ¶ 37); DX 144 (Hohn ¶ 21); Trial Tr. (Hohn Test. 164:21-23, 165:13-20); DX 154 (Sunak Dep. 39:21-40:5); DX 154 (Amin Dep. 68:22-25, 70:6-8); PX 206 (List of Known Swap and Stock Transactions).)  At *no time* did TCI purchase CSX shares directly from any of its swap counterparties nor did it use any of the same financial institutions to both unwind swaps and purchase stock.  (DX 145 (Amin ¶ 38); PX 206 (List of Known Swap and Stock Transactions); DX 105 (TCI's Terminated Swap Agreements and Physical Share Purchases).)  In fact, TCI purchased every single share of CSX common stock on the open market.  (*Id.*)

## III.    PLAINTIFF HAS OFFERED NO EVIDENCE TO ESTABLISH THAT TCI CONSOLIDATED ITS TOTAL RETURN SWAPS AT DEUTSCHE BANK AND CITIGROUP TO INFLUENCE AND CONTROL CSX

30.-31.        According to Plaintiff, TCI "concentrated" its swaps in two counterparties in order to "secretly influence and control CSX."  (Pl. Findings ¶ 30.)  There is no evidence in the record to support this assertion.  Rather, the evidence indicates that TCI sought to to reduce its credit exposure to investment banks by moving its swaps to counterparties whose credit was backed by Central Banks.  (PX 19 (TCI Board Meeting Minutes dated July 19, 2007); DX 145 (Amin ¶¶ 45-46); DX 144 (Hohn ¶ 30); DX 154 (Amin Dep. 73:16-74:8, Hohn Dep. 152:24-154:3).)  Indeed, TCI moved nearly all its swap positions of its swaps across all investments to commercial banks at or around the same time.  (Trial Tr. (Hohn Test. 183:4-17); *see also* Defs. Br. at 22.)

Plaintiff alleges that by consolidating its Total Return Swaps in Citigroup and Deutsche Bank it somehow took shares out of the "hands of other shareholders."  (Pl. Findings ¶ 31.)  The decision to consolidate its Total Return Swaps in commercial banks did not change TCI's economic exposure to CSX.  (DX 97.)

32.    Plaintiff relies on two paragraphs in Professor Subrahmanyam's rebuttal report ¶¶ 45 and 47 to assert that TCI concentrated its Total Return Swaps in Citigroup and Deutsche Bank in order to influence their vote.  To the contrary, representatives from Citigroup and Deutsche Bank testified that the practice of both banks is not to vote shares that are held as a hedge to a swap position.[29]  (DX 151 (Kennedy Dep. 19:19-20, 20:15:18, 35:21-36:8); DX 152 (Arnone Dep. 23:2-9, 33:5-18); DX 153 (Busby 26:10-17); *see also* DX 149 (Partnoy Report ¶¶ 49-52).)

33.    Plaintiff asserts that once Citigroup and Deutsche Bank were perfectly hedged with respect to the Total Return Swaps referencing CSX shares, there was no economic incentive for them to vote those shares.  (Pl. Findings ¶ 33.)  First, this assertion ignores the fact that because of lending programs, Deutsche Bank and Citigroup may not even have the right to vote the shares because they would not be the record holder.  (DX 151 (Kennedy Dep. 21:18:-22:5); DX 152 (Arnone Dep. 39:23-40:15).)  Second, as described above, Deutsche Bank and Citigroup may not vote the shares as a matter of internal compliance policy.  (DX 151 (Kennedy Dep. 19:19-20, 20:15:18, 35:21-36:8); DX 152 (Arnone Dep. 23:2-9, 33:5-18); DX 153 (Busby 26:10-17).  Finally, the banks may be long shares in another area, such as the proprietary trading desk and the bank may vote in the larger entity's economic interest.

34.    Plaintiff's assertion that TCI was especially likely to have the power to influence the voting of referenced shares because it had a prime brokerage relationship with Deutsche Bank is not supported by the evidence. The actual fees earned by TCI's counterparties do not demonstrate that TCI's swap arrangements with these counterparties differed in any relevant way based on the amount of fees paid.  (DX 149 (Partnoy ¶ 63).)  Nor is there any

---

[29]    Additionally, according to a Citigroup witness, if TCI had asked whether Citigroup would vote matched CSX shares, Citigroup would have instructed them that "we won't vote these even if you call and ask us."  (DX 151 (Kennedy 23:14-5).)

evidence that TCI's swap arrangements with its prime brokers differed from its arrangements with counterparties that were not prime brokers. In addition, each swap counterparty's fees from TCI are no doubt a small percentage of their overall revenues.

If such fees actually gave TCI the power to influence its counterparties, TCI likely would have allocated the bulk of its swaps to the prime broker that received the greatest fees. Yet, by the end of 2007, TCI had just 1,000 shares of swaps outstanding with UBS and Morgan Stanley, the two brokers TCI had paid the highest fees – by far. Plaintiff also does not consider the fact that CSX also paid fees to TCI's counterparties during the relevant times. (DX 149 (Partnoy ¶¶ 63 and 65).) In addition, one of CSX's directors, Edward J. Kelly, III, is the president and CEO of Citi Alternative Investments, a Citigroup entity. ((DX 149 (Partnoy ¶ 63); (Trial Tr. (Kelly Test. 25:21-23).) That factor, too, suggests that TCI has maintained its swaps with Citigroup for the reasons it stated, not because it believed it would be able to influence Citigroup. (Partnoy Rebuttal ¶¶ 62-65.)

35.     There is no evidence in the record that Austin Friars joined with TCI or 3G in any way, let alone that Austin Friars "schemed to influence and control CSX." (Pl. Findings ¶ 35.) The record reflects that TCI "never discussed with Austin Friars how they would vote at the annual shareholders meeting, nor have we ever discussed with Austin Friars, or anyone within Deutsche Bank, whether our cash-settled swaps were hedged with CSX shares and, if so, how they would be voted at the CSX annual stockholders meeting." (DX 145 (Amin ¶ 48).) In fact, Austin Friars was an investor in the rail sector before they ever met TCI. TCI hoped to convince Austin Friars to vote in favor of the TCI/3G slate of nominees, much like CSX hoped to convince shareholders to vote in favor of its slate of nominees.

36.-37.    There is no evidence to indicate that TCI planned to "influence control over Deutsche Bank's voting." (Pl. Findings ¶ 36.) The record reflects that both Mr. Amin and Mr. Hohn hoped that if Austin Friars concluded that voting for the TCI/3G slate was in the economic best interest of Deutsche Bank, and if the swaps desk was inclined to vote its CSX shares held as a hedge, it too would conclude that voting for the TCI/3G slate was in Deutsche Bank's best interests. (Trial Tr. (Hohn Test. 177:20-179:6. 181:8-21); Amin Dep. (105:4-25).)

38.    Plaintiff points to three cases in which they allege that Deutsche Bank "cooperated" with hedge funds to influence or control companies through the use of swaps. (Pl. Findings ¶ 38.) The record in this case is clear, TCI did not have an agreement, arrangement or understanding with Deutsche Bank to influence or control the voting of any CSX shares Deutsche Bank may have held as a hedge. (DX 145 (Amin ¶¶ 8-9); DX 144 (Hohn ¶¶ 12-13); DX 146 (Behring ¶ 59); Trial Tr. (Amin Test. 210:8-11, 219:20); (Hohn Test. 177:5-7, 177:12-14); DX 152 (Arnone Dep. 14:7-11).) Furthermore, Mr. Arnone, head of the swap book at Deutsche Bank testified that it is Deutsche Bank's policy to not vote shares held as a hedge to a swap position. (DX 152 (Arnone Dep. 23:2-9, 33:5-18).)

39.    Contrary to Plaintiff's assertion, when TCI consolidated its swaps holdings at Deutsche Bank and Citigroup in November 2007, TCI maintained swaps on 1,000 shares with six remaining counterparties in an effort to not allow other investors to identify where TCI's Total Return Swaps were held to reduce the risk of other investors front running TCI's trading. (DX 144 (Hohn ¶ 30); Trial Tr. (Amin Test. 204:15-205:12); DX 154 (Amin Dep. 74:9-75:22).) If other investors became aware that TCI maintained most of swap positions at one or two banks, every time such banks traded, investors could presumably identify whether TCI was increasing or decreasing its position, and then try to front-run TCI accordingly. (*Id.*)

40.-43.        Despite what is now uncontradicted fact evidence in the record, CSX continues to put forward a "theory" with respect to the alleged "aberrant" share movement surrounding the original record date.  (Pl. Findings ¶¶ 40-43.)  CSX moved the date based solely on the unfounded suspicion that certain transfers of CSX stock the various counterparty banks prior to the record date occurred because certain shares (and related voting rights) were being recalled so that they could be voted at TCI's direction.  (PX 264 (Ward ¶ 26); PX 269 (Fitzsimmons ¶ 19); PX 270 (Miller ¶ 16).)  However, inconveniently for CSX's theory, there is no evidence that the share movement was caused by a recall in the stock.  (DX 153 (Busby Dep. 24:3-8); DX 149 (Partnoy ¶ 71, 73, 75 (several explanations for the stock movement).)  In fact, according to Mr. Busby, the co-head of the securities lending department at Deutsche Bank, no one at Deutsche Bank requested a recall of the stock.  (DX 153 (Busby Dep. 24:9-12); DX 150 (Partnoy Sur-Rebuttal ¶ 17).)  As Deutsche Bank's counsel confirmed:  (1) Deutsche Bank keeps records of any stock recalled at Deutsche Bank's request, (2) in response to Plaintiff's subpoena, Deutsche Bank reviewed the recall records of the two-week period preceding the February 27, 2008 record date, and (3) found no records of any recall by Deutsche Bank of CSX shares during that period.

41.        Plaintiff quotes extensively from Mr. Miller's witness statement where he indicates that the share movement prior to the original record date was a "significant concern." However, as Miller himself testified, there is no getting around the fact that his conclusions are nothing more than sheer "speculation."  (Trial Tr. (Miller Test. 77:11-16).)

42.1.    Plaintiff mischaracterizes Mr. Busby's testimony with respect to shares being returned to Deutsche Bank in advance of the original record date.  Plaintiff asserts that Deutsche Bank recalled shares in advance of the record date.  Mr. Busby testified that, to the best

of his knowledge, no one at Deutsche Bank requested the return of shares.  (DX 153 (Busby Dep. 24:9-12).)  Mr. Busby was shown DTC records indicating that shares were returned to Deutsche Bank in advance of the record date.  He testified that he only knew some of the codes on the DTC report and could not confirm what had triggered the return of the shares.  (DX 153 (Busby Dep. 40:19-23).)

## IV.    PLAINTIFF HAS OFFERED NO EVIDENCE TO ESTABLISH AN EXISTENCE OF A GROUP BEFORE DECEMBER 12, 2007

### A.    There Is No Evidence That TCI Discussed Its Trading Activities With Anyone Outside of TCI

#### 1.    <u>TCI Disclosed That It Had Swap Positions In CSX.</u>

44.-45.    According to Plaintiff, there was a blanket of "secrecy" surrounding TCI when TCI was accumulating its swap position.  Mr. Hohn and Mr. Amin testified that disclosure of an investment prior to the establishment of an investment position exposes a hedge fund to "front-running."  (DX 145 (Amin ¶¶ 15, 19); Trial Tr. (Hohn Test. 188:16-20)); *see also* Defs. Br. at 11).)  In fact, despite the insinuations of Plaintiff, the fear of being front-run is a significant concern to many successful money managers.

46.    Rishi Sunak graduated from business school not long before performing research on the rail industry at TCI.  (DX 154 (Sunak Dep. 4:2-8).)  When he emailed CSX on October 23, 2006, and stated that TCI had "$100m of stock," he did not understanding the true nature of TCI's investment.  (DX 154 (Sunak Dep. 25:5-19).)  In reality, TCI was accumulating a swap position in CSX.  Mr. Hohn and Mr. Amin communicated this concept to CSX, specifically clarifying that TCI had significant *economic* exposure to the Company.  (Defs. Br. at 14.)  Plaintiff can hardly claim surprise or confusion based on Mr. Sunak's email, given that CSX concedes that TCI informed CSX of the size and nature of its Total Return Swap investment no

later than December 2006, and by January 22, 2007, CSX's investment bank, Morgan Stanley was giving CSX advise regarding TCI's Total Return Swaps.  (PX 38.)

47.  TCI repeatedly requested meetings with CSX senior management, and in particular, CSX's Chairman and CEO Michael Ward and CFO Oscar Munoz.  TCI wanted to explore CSX's strategy and corporate governance.  TCI's requests were consistently ignored or rejected.  (DSX 145 (Amin ¶¶ 17-33).)

48.-50.  Plaintiff alleges that "*through the early part of 2007*" TCI was "*secretly hatching a plan to force an LBO of CSX.*"  (Pl. Findings ¶¶ 47-48.)  Yet, Plaintiff notes that by "late January 2007, TCI had succeeded in arranging a meeting with CSX's financial advisor, Morgan Stanley, to discuss an LBO of CSX."  (Pl. Findings ¶ 50.)[30]  Plaintiff cannot dispute that the "early part of 2007" includes *January* 2007.  During this same period, as noted in Paragraph 47, TCI was attempting to have "meetings with CSX senior management."  (Pl. Findings ¶ 47.)  In fact, TCI did not 'succeed in arranging any meeting.'  Instead CSX directed TCI to speak with Morgan Stanley under the pretense of concerns regarding Regulation FD.  (DX 154 (Baggs Dep. 128:12-129:7).)  TCI did in fact have conversations with CSX lower level employees and CSX advisors regarding its LBO ideas, including preparing and forwarding its model to Evercore at Evercore's request, in April 2007.  By April 2007, and certainly by the summer 2007, TCI had abandoned its idea of an LBO, which was well known to CSX.  (DX 9; DX 10.)

If there was any secret, it was a secret that Plaintiff perpetuated by refusing to meet with TCI despite repeated requests for a meeting.  (*See, e.g.*, PX 268 (Baggs ¶ 2) (numerous phone calls from TCI to CSX during second half of 2006); (Baggs ¶ 4) ("In late October and

---

[30]    Thus, contrary to CSX's allegations of TCI secretly accumulating a significant position in CSX and plotting a scheme to takeover the company, by January 2007, CSX had been specifically advised by TCI of (i) its Total Return Swap positions, (ii) the size of those positions, (iii) the investment banks in which TCI maintained those positions, and (iv) TCI's idea with respect to an LBO.

early November 2006, TCI representatives made several requests for a one-on-one meeting with CSX senior management"); (Baggs ¶ 5) ("November 14, 2006 . . . Mr. Hohn told me that TCI had a $500 million investment in CSX and that he wanted to come down to Jacksonville to visit with CSX management"); (Baggs ¶ 6) ("After the Citigroup Transportation Conference . . . Mr. Amin reiterated TCI's desire to meet with CSX's senior management."); (Baggs ¶ 7) ("On December 6, 2006 . . . After a group meeting, Mr. Amin asked me if TCI could schedule some time to meet privately with CSX's Chairman, President and Chief Executive Officer, Michael Ward, and other members of senior management to discuss TCI's views about a potential leveraged buyout transaction involving CSX."); (Baggs ¶ 8) ("After December 6, 2006, TCI representatives several times asked me to arrange a private meeting with Mr. Ward and Mr. Munoz to discuss TCI's views about a potential LBO involving CSX"); (Baggs ¶ 10) ("TCI was frustrated . . . [and] was waiting to hear confirmation of a private meeting with Mr. Munoz and/or Mr. Ward.").

2.    <u>Repeatedly Waving A Single Email That Has No Bearing On This Case<br>Does Not Establish Plaintiff's Burden To Prove A Group Had Formed.</u>

52.  Because it is the only email that even references 3G among the million pages of documents produced, Plaintiff strains to paint a picture of coordinated activity between TCI and 3G based on a single February 2007 internal email.  (PX 42.)  As stated in Defendants' Post-Trial Brief, when viewed as a whole the email was referring to Mr. Hohn's desire to speak to Mr. Amin about Arcelor Brasil.  (Defs. Br. at 65-66.)

52.1.-52.2.  As part of its due diligence of companies, including CSX, 3G determined the dates to nominate board members at the annual meetings.  (Trial Tr. (Behring Test. 153:3-8).)  This was not unusual for 3G.

53.    Plaintiff takes Mr. Hohn's testimony out of context.  Mr. Hohn specifically testified, "I believe I did not [tell Mr. Behring the size of TCI's investment in CSX]. If you assumed that all of the U.S. transportation was rails and then you made an assumption that the majority of that was CSX, you could interpret a view on what the size was."  (Trial Tr. (Hohn Test. 161:8-12).)  Plaintiff contends that 3G then tried to coordinate its purchases of shares based on Mr. Hohn's January conversation with Mr. Behring about the U.S. rail industry in January. Plaintiff does not provide a single piece of evidence to support its contention.  TCI was months from purchasing its first shares of CSX.  Most significantly, TCI's and 3G's trading patterns do not support Plaintiff's contention.  (DX 145 (Amin ¶ 37); DX 144 (Hohn ¶ 21); Trial Tr. (Hohn Test. 164:21-23); DX 154 (Sunak Dep. 39:21-40:5); PX 206.)[31]

54.-56.  Because of Plaintiff's failure to offer any direct or indirect evidence showing TCI and 3G combined their efforts in furtherance of a commonly-held objective, Plaintiff repeatedly waves the February 2007 email containing the snippet – and Plaintiff's smoking gun – "our friend Alex from Brazil."  (PX 42.)  As previously stated, it is clear that the email – the only email from TCI that even references 3G – when viewed as a whole was referring to Arcelor Brasil, as the subject heading "Arcelor Brasil MTO – urgent," would indicate.  The section that reads, "Increased activity in csx cds has caused excitement in the stock.  I want to also discuss our friend alex of Brazil[,]" does not indicate that the two thoughts are related.  Instead, this section is a laundry list of things that Mr. Hohn wanted to address with Mr. Amin.  (*See* Defs. Br. at 65-67.)

---

[31]    It is clear that 3G began accumulating a position months after TCI began accumulating its position.  By the time 3G started buying CSX stock, TCI had already built 93% of its ultimate position.  3G's aggregate exposure exhibits "step changes," whereas TCI's does not.  3G sold a very significant part of its investments (approximately 38%) during the months of August and September 2007, while TCI sold virtually none of its position (only 3%) over this same period.  (PX 206.)

57.-57.4.  Plaintiff claims that Mr. Behring decided to form a group with respect to 3G's interest in CSX no later than February 9, 2007.  This claim is largely based on a a January 2007 conversation Mr. Behring had with Mr. Hohn about the U.S. rail industry and the "Alex from Brazil" email.  (PX 42.)  Moreover, it is hard to imagine that Mr. Behring would decide to form a group at that time based on one conversation about the U.S. rail industry.  That 3G purchased stocks of CSX shortly thereafter does not evidence that TCI and 3G formed a group.  "A close consulting relationship, even when combined with a possible future acquisition of stock, is insufficient to bring a defendant within the ambit of Rule 13d-3."  *Morales v. New Valley Corp*., 999 F. Supp. 470, 474 (S.D.N.Y. 1998).

In *Pantry Pride, Inc. v. Rooney*, 598 F. Supp. 891 (S.D.N.Y. Dec. 5, 1984), the court did not find a group where defendants were simply discussing the possibility of a proxy contest.  *Id*. at 899.  The court opined that "§ 13(d) allows individuals broad freedom to discuss the possibilities of future agreements without filing under securities laws."  *Id*. at 900.  The court pointed out that defendants had preliminary discussions regarding a proxy contest, but did not control the requisite share of stock until defendants executed their agreement to form a group. *Id*.  "It may be that [the defendant] made up his mind to start a proxy contest in as early as mid-October.  However, [one defendant] could not reach the 13(d) threshold without the other's "stock and acquiescence . . . ."  *Id*. at 900.

Here, there is not even evidence of 3G and TCI discussing a proxy contest in February 2007.  What the evidence does show is that, although Mr. Behring approached Mr. Hohn in the late spring or early summer of 2007 to work together, Mr. Hohn turned him down. (DX-154 (Hohn Dep. 118:18-119:17).)  Plaintiff's inference that a group exists relies on general

conversations between 3G and TCI and does not point to any evidence that demonstrating that a group was formed prior to December 12, 2007.

60.    Plaintiff's chart under paragraph 60 is irrelevant.  Rather than comparing 3G and TCI trading to show coordination, the chart simply aggregates TCI's and 3G's purchases, effectively presuming the legal theory it must prove, namely, that there was an agreement with respect to any or all of "acquisition, holding, or disposition of securities" of CSX.[32]   The table below compares TCI's and 3G's trading activity.

---

[32]    In *Hallwood Realty Partners, L.P. v. Gotham Partners*, L.P., 286 F.3d 613, 618 (2d Cir. 2002, the Second Circuit affirmed Your Honor and noted:  "Judge Kaplan expressly noted that prior relationships and trading patterns were relevant to a decision regarding the existence of a § 13(d)(3) group."  In *MEVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*, 260 F. Supp. 2d 616, 632-33 (S.D.N.Y. 2003), the court ruled that while trading patterns are relevant to a decision regarding the existence of a § 13(d)(3) violation, they must be substantiated.  The court noted that the plaintiff relied on a cropped chart to infer group activity from defendant's trading patterns.  *Id*. at 632.  The court pointed out that the plaintiff's chart 1) cropped out at least eighteen months of one of the defendant's trading activity; and 2) fails to reflect each of the defendant's initial holdings, the volume of the trading as a percentage of the market activity in [issuer's] stock, and any stock sales by the defendants during the relevant period.  *Id*. at 633.  "In fact, the undisputed evidence showed that during April and May 2002 (the period in which the alleged staggering of purchases is most plausible) Karpus acquired a net of only 75 shares, or less than a fiftieth of a percent of its MVC holdings at the time . . . During the entire period in which the coordinated trading is alleged to have occurred, Karpus acquired a net total of 9609 shares, representing a mere 0.06% of MVC's outstanding stock."  *Id*.

       Similarly, as noted above, TCI and 3G were not engaged in coordinated trading activity.  (PX 206.)  For example, 3G sold a very significant part of its investment (approximately 38%) during the months of August and September 2007, while TCI sold virtually none of its position (only 3%) over this same period.  (*Id*.)  They bought on different days, in different months, in entirely different patterns, and the trading patterns show low correlation.  (*Id*.)  CSX does no more than provide a checklist of unrelated communications between TCI and 3G and relies on a chart which goes against its theory that TCI and 3G engaged in coordinated trading activity in violation of § 13(d)(3) group."  *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d. 613, 618 (S.D.N.Y. 2002).



### 3.    Discussions Among Funds Are Common Practice In The Industry.

61.    61.    Information sharing about the fundamentals of an industry is a common industry practice.  (*See* Defs. Br. at 61-62.)  However, TCI does not share information regarding its trading patterns or position size, to prevent other investors from buying shares of a company during the time that TCI is establishing its economic exposure to that company, thereby driving up the price.  (DX 144 (Hohn ¶ 22).)

62.    Plaintiff deceptively mis-quotes Mr. Hohn's testimony – contrary to Plaintiff's assertion, Mr. Hohn never testified that "tipping of hedge funds while TCI was building its book is typical in the hedge fund industry."  (Pl. Findings ¶ 62 (quoting Hohn ¶ 22).)  Rather, Mr. Hohn testified that discussing the "fundamentals" of an industry is typical in the hedge fund industry.  (DX 144 (Hohn ¶ 8).)

63.     As part of TCI's "clandestine assault," Plaintiff now claims that TCI "tipped funds of its interest in CSX." To the extent that Plaintiff is again shifting its theory to argue that TCI engaged in "tipping" under Rule 10b-5, Plaintiff has not properly alleged or has established such a violation. Indeed, TCI's actions do not even fall under the definition of "tipping" as the term is used in connection to Rule 10b-5. So, even if Plaintiff had alleged a 10b-5 claim for tipping, it could not establish such claim, as "tipping" is defined as the "disclos[ure] [of] material inside information in violation of 10b-5," a Rule that was promulgated pursuant to the Securities Exchange Act of 1934. *S.E.C. v. Bausch & Lomb, Inc.*, 420 F. Supp. 1226, 1228 (S.D.N.Y. 1976). In this case, TCI is not an "*insider*," nor is there any allegation in this case (and certainly nothing proven at trial), to suggest that TCI was in "possession of material *inside* information." *S.E.C. v. Texas Gulf Sulphur Co*., 401 F.2d 833, 848 (2d Cir. 1968) (emphasis added); *see also, S.E.C. v. Geon Industries, Inc.*, 531 F.2d 39, 46 (2d Cir. 1975) (examining whether defendant was subject to "tipper liability" based in part on the disclosure of "non-public information"); *S.E.C. v. Musella*, 748 F. Supp. 1028, 1037 (S.D.N.Y. 1989) (describing an "insider" as having a "fiduciary duty or other relationship of trust and confidence to his employer"). Here, TCI had no possession of "material inside information."

65.     As explained in Defendants' Post Trial Brief, TCI would not commit to running a combined slate unless it could find "world class" nominees to run. (Defs. Br. 71-73.) After Gary Wilson faxed his nominee agreement on December 11, 2007, at 5:04 P.M., TCI committed to forming a group with 3G. (DX 64.) There is no evidence to support Plaintiff's skeletal assertion that "once the 15.55% February 15 level for the Group was reached, Mr. Hohn and Mr. Behring looked for more members of the Group, swapping 'inside' information for

support." (Pl. Br. ¶ 65.) It is unclear the type of "inside" information to which Plaintiff is even referring.

66.    Because Plaintiff has failed to offer any evidence establishing an inference of collusion between 3G and TCI, Plaintiff argues for the first time that TCI conspired to expand the "Group" to include "other like-minded members." (Pl. Findings ¶ 66.) Mr. Hohn and Mr. Behring openly stated that they talked to other funds about the fundamentals, a common practice among funds. (DX-144 ¶ 22; DX-145 ¶ 4; Trial Tr. (Behring Test. 176:1-16), (Hohn Test. 130: 14- 131:16).) Despite Plaintiff's listing of emails between TCI and other funds relating to CSX, those do not lead to the conclusion that TCI attempted to recruit other funds in its alleged conspiracy. Plaintiff's contention that other hedge funds, like Austin Friars, "bought CSX shares and in the process joined the TCI/3G Group" contradicts Mr. Amin's testimony that Austin Friars owned CSX shares before TCI spoke to them. (DX 154 (Amin Dep. 80:12-81:2).)[33]

---

[33]    The facts in our case are most analogous to the facts of *MEVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*, 260 F. Supp. 2d 616 (S.D.N.Y. Mar. 6, 2003). In *MEVC*, the plaintiff issuer alleged that defendant investors' "so-called pattern of alternating stock purchases . . . indicates that the companies acted in concert to keep [the plaintiff's] stock price artificially low." *Id*. at 631. In support of its allegation that the defendants constituted a group, the plaintiff pointed to 1) e-mail communications between the defendants from March 2002 to January 2004, augmented by a single phone call in October 2002; 2) proxy materials which allegedly indicated that the defendants agreed to vote their stock in unison; and 3) coordinated trading by the defendants. *Id*. at 632. "The Court [was] not persuaded that Defendants acted as a group." *Id*. Specifically, the Court found communication between the defendants as being "sporadic at best," as they were interrupted by large gaps and were followed by major public events that affected the issuer's shareholders. *Id*. Moreover, the court ruled that the emails between the defendants were general communication about the issuer and none revealed "any agreement to act together for the purpose of acquiring or voting" the issuer's stock. *Id*. The court also noted that the "rhetoric contained within the proxy materials entirely fail[ed] to support an inference that [the defendants] agreed to vote [the issuer's] shares together." *Id*. Finally, the court made it clear that plaintiff's allegation about trading coordination between the defendants was "not substantiated by its supporting chart." *Id*. The Court found the plaintiff's chart demonstrating purchase and sale activity to be arbitrarily cropped and found its data to be inconsistent for showing group activity. *Id*. at 632-33. The court concluded that "it is mindful that Plaintiff need not set forth direct evidence of an agreement between [the defendants] with specified terms. At the same time, Plaintiff must set forth evidence that some agreement exists. Congress did not intend for § 13(d) to serve

> merely as an eleventh-hour bludgeon for management embroiled in proxy contests . . . In this context the Court cannot find that Plaintiff has made a clear or substantial showing of likelihood of success on the merits of its § 13(d) claim."

*Id*. at 633.[33]

Significantly, there was nothing to be gained by forming a group during this period. As Plaintiff has repeatedly asserted during this case, hedge funds tend to be short-term investors, looking to get in and out of a stock in order to make a quick buck. (DX 154 (Hohn Dep. 90:15-22).) With the next annual shareholder meeting over a year away, and without any mechanism for effecting change within CSX through bylaw amendments until that next annual shareholder meeting, it defies commonsense and Plaintiff's theory of the case for hedge funds to have committed themselves to an agreement concerning the buying, selling, voting or holding of shares for that long a period of time. (Trial Tr. (Hohn Test. 181:25-182:17); *see also* DX 144 (Hohn ¶ 31).)

67.-68. Not a single document suggests anything except the ordinary course communications of technical, aka "fundamental" investment information, just like information passed between investment banks, and asset managers daily. To suggest that a bunch of managers with fiduciary responsibilities and investments from major institutions would invest in a stock just to help TCI take it over is preposterous. Moreover, since there is no evidence in the record, except for some scattered emails, it is impossible to determine whether and to what extent these other funds were engaged in the kinds of actions related to securities that are necessary to even begin to analyze under Rule 13d-5. Plaintiff's theories are intended merely to create negative atmospherics.

69.-69.1 The emails outlined by Plaintiff show communication between TCI and other funds in early 2007. (PX 45; PX 46; PX 47; PX 53; PX 54; PX 55; PX 86.) Based on those emails, Plaintiff claims that TCI was apparently tracking the undisclosed shareholdings of other funds for the purposes of creating a voting share scenario chart. (PX 191.) The link between those emails and the chart is tenuous at best. While those emails are from early 2007,

the chart was created in early 2008. (Sunak Dep. 61:15-23.) Further, the chart was created to run a variety of scenarios regarding the possible outcome of a proxy contest. (DX 95; DX 96; Trial Tr. (Amin Test. 209:3-211:1; 217:19-218:2).)[34]

       70.-71. CSX attempts to make all forms of suggestions about TCI and Austin Friars, including the new allegation that Austin Friars is part of TCI's "Group" and had "secret" information about its holdings. (PX 270 (Miller ¶ 8).) Moreover, consistent with Plaintiff's approach to this case, Plaintiff takes two emails during the course of eighteen months and creates an entire theory around the emails, further demonstrating that this is a case of rampant speculation and completely devoid of facts. Taking ordinary course business conversations and spinning them into conspiracy theories would chill all investment.

       74.-74.1 Despite Plaintiff's attempt to suggest every hedge fund invested in CSX did so "as a result of TCI's and 3G's secret discussions," Alan Miller, in his direct testimony stated, "By May 2007, Innisfree's analysis found that total hedge fund ownership had climbed to more than 25% of outstanding shares and that the greatest acceleration appeared to be correlated with TCI's announcement that it would buy more than $200 million in CSX stock." (PX 270 (Miller ¶ 8).) Therefore, Plaintiff's own testimony is that hedge fund ownership increased <u>after</u> public announcement of the TCI HSR. Moreover, it is unclear why anyone would agree to buy, sell, or hold securities in connection with a proxy more than one year a way.

       4.     <u>TCI Files Its HSR In March 2007.</u>

       78.-79. Mr. Hohn met or spoke to 3G almost every month. (Trial Tr. (Hohn Test. 158:12).) It therefore is not unusual that Mr. Behring met with TCI on March 29, 2007, the same month that TCI filed its HSR. As Defendants previously explained, by the meeting date,

---

[34]     Plaintiff never sought to pursue this far-fetched theory through discovery of these alleged co-conspirators. And, of the discovery it did pursue, there is not one scintilla of evidence that supports it.

3G had already owned more than 8 million shares of CSX common stock, and there is simply no evidence that Defendants discussed their respective position sizes in CSX. (Defs. Br. at 66.) In any event, there was no impetus for TCI and 3G to agree in April 2007 for 3G to buy more stock.

81.-83. As shown in Defendants' Post Trial Brief, TCI and 3G had separate patterns of buying and selling stock and swaps. (Defs. Br. at 63-65.) By December 2006, Mr. Hohn decided to make TCI's position in CSX 15-20% of the fund (PX 23), and TCI ultimately ended up with CSX as 21% of its fund. 3G began accumulating a position months after TCI began accumulating its position (in fact by the time 3G started buying CSX stock, TCI had already built 93% of its ultimate position); 3G's aggregate exposure exhibits "step changes" whereas TCI's does not; and 3G sold a very significant part of its investment (approximately 38%) during the months of August and September 2007, while TCI sold virtually none of its position (only 3%) over this same period. (PX 206.) (Trial Tr. (Hohn Test. 158:12).)

84. TCI and 3G did not discuss their trading activities in CSX before mid-November 2007. (Trial Tr. (Hohn Test. 176:14-177:4), (Behring Test. 112:4-113:4, 119:8-25, 120:1-2), (Amin Test. 197:13-14).)

5. <u>TCI's and 3G's Trading Patterns From March Through November Look Nothing Alike</u>.

85.-88. Plaintiff argues that "the TCI/3G Group continued its activist agenda following the April purchasing splurge." Plaintiff stated that both 3G and TCI "considered" selling their shares, and 3G actually did sell shares. That TCI "considered" selling is not significant. The fact that it did not is. By late September, 3G regained confidence in the overall U.S. economic outlook and had adjusted its hedging strategy. (Trial Tr. (Behring Test. 126:3-127:1).) In addition, Warren Buffet announced an HSR filing with respect to Burlington Northern Railroad, which 3G took as a strong vote of confidence in the rail sector. (DX 43.) As a result, beginning on September 26,

2007, 3G began to rebuild its position in CSX after having sold 38% due to concerns about a broad downturn in the U.S. economy.  (Trial Tr. (Behring Test. 107); JX 12, Annex A; DX 43).)  As the table below illustrates, TCI and 3G's trading patterns in March 2007 looked nothing alike. As acknowledged by Plaintiff, TCI's position remained flat during this period.  (Pl. Findings ¶ 88.)



89.    If TCI and 3G had coordinated to buy, there would have been no reason for TCI to allow 3G to sell its shares in August and September 2007.  Even assuming TCI and 3G "coordinated" to sell, selling is not helpful in a proxy contest.  Further, there would be no basis to form a group at this time if 3G is selling its shares.  It would not have helped TCI's stated agenda of approving CSX.  Further, in an attempt to show that TCI and 3G coordinated their activities in search of nominees, Plaintiff's counsel asked Mr. Behring whether on the same day he first met with Gil Lamphere (October 8, 2007), he knew Mr. Hohn also met with Mr.

O'Toole.  The evidence, however, shows that neither TCI nor 3G chose October 8 as their first

meeting date.  Rather, Mr. O'Toole chose October 8 to meet with Mr. Hohn.  (PX 138.)  Notably,

despite the allegation that TCI formed a group as early as February or April for purpose of taking

over the board, the key evidence of TCI's effort to find board members is late September and

early October.  (PX 137.)



6.     To Reduce Counterparty Exposure, TCI Moved a Majority of Its Swap
        Positions to Deutsche Bank and Citigroup.

92.-98.  Plaintiff contends "TCI also coordinated its efforts with Austin Friars

with respect to other companies."  (Pl. Findings ¶ 98.)  Plaintiff cannot address and therefore

ignores some basic facts:  (1)  Deutsche Bank does not vote swaps in the United States (DX 153

(Busby Dep. 26:10-17));  (2) DB clearly states that it did not know it had a proprietary fund

called Austin Friars (DX 153 (Busby Dep. 27:9-11));  (3) Ned Kelly, who is a director and senior

management at Citigroup specifically stated that he believes in the validity of each major investment banks (Trial Tr. (Kelly Test. 28:18-29:8)); (4) there was no testimony to suggest a breach of any information barriers at DB; (5) there were no documents produced because Austin Friars is simply outside the scope of Plaintiff's complaint; (6) the evidence establishes that there were no conversations between Austin Friars and TCI about Deutsche Bank's shares, only about Austin Friar's shares, which are separate and apart from DB (DX 145 (Amin ¶ 48)); (7) there was no evidence of any conversations between Austin Friars and either the securities lending or swaps desks; (8) the shares were never recalled; and (9) TCI moved 90% of its assets globally, which included swaps, to commercial banks.

### B.    TCI And 3G Conducted Independent Analyses.

102.-102.6.  As stated in Defendants' Post Trial Brief, Mr. Hohn and Mr. Behring were acquainted professionally because 3G is an investment advisor to the fund Synergy, which invests in TCI.  (DX 144 (Hohn ¶ 22).)  Not surprisingly then, Mr. Behring attended "TCI [investor] conferences" in connection with Synergy's investment in TCI.  (DX 154 (Behring Dep. 109:3-24); Trial Tr. (Behring Test. 108:25-109:7).)  Additionally, it is neither suspect nor evidence of a conspiracy, as Plaintiff suggests, that as an investor in TCI's Fund, 3G, on behalf of Synergy, received quarterly letters from TCI reporting on the performance of the TCI funds. (DX 154 (Behring Dep. 21:25-22:23).)  In addition to their communication about Synergy's investment in TCI's fund, Mr. Hohn had periodic conversations with Mr. Behring about the railroad sector as part of the investment process.  Drawing from these openly admitted contentions of fact, Plaintiff contends that TCI and 3G were in constant contact coordinating their investment efforts and therefore had formed a group before December, 2007.  But, monthly calls (Trial Tr. (Hohn Test. 158:11-12)), are not evidence of constant contact, especially considering that trading decisions are often made daily.  (PX 206.)  Furthermore, Plaintiff points

to the various meetings between members of TCI and 3G at various transportation investor

conferences.  As investors in the railroad sector, it is not surprising or unusual that both TCI and

3G would be in attendance at the various transportation specific conferences for investors.

Additionally, Plaintiff refers to TCI's and 3G's meeting on March 29, 2007 as more evidence of

coordinated analyses. Yet, by March 29, 2007, the date on which Mr. Amin and Mr. Behring met

while Mr. Amin was already in New York City, TCI had established 99% of its ultimate swap

positions (PX 206), and even with its later acquisition of physical shares of CSX, TCI's

economic exposure to CSX in shares and Total Return Swaps remained constant after that date.

(PX 206.)  If TCI and 3G had purposely coordinated their analyses, there would be no

explanation as to why by the time the two funds met, TCI had already established the majority of

its position, and that position from an exposure perspective has never changed.  (*Id.*)

> 104.    It is undisputed that TCI and 3G discussed the U.S. rail industry, including

CSX, during the course of 2007.  (DX 144 (Hohn ¶ 23).)  The sharing of information about an

industry or a particular company is common in the hedge fund industry.  (Defs. Br. at 61.)  The

exchange of models and operations analysis is included in the gambit of sharing information.

While both TCI and 3G acknowledge sharing information with each other and other funds, the

flow of information among TCI and other funds is not boundless in that the information TCI

shares is general in nature and does not involve TCI's trading patterns or position size.  Although

Plaintiff points out that TCI talked to other funds (plainly legal and not sufficient to form a

group), it fails to show that TCI coordinated activities with those funds.

> 105.    Plaintiff highlights that several analyses and models prepared or

commissioned by 3G and TCI separately, were similar and that therefore is evidence of

coordinated activity.  (PX 73; PX 199.)  A more logical explanation for the similarity is that

public information on CSX is limited, as are the types of equations/formulas one can use to evaluate this information and value of CSX. It is no surprise then that two separate investment analyses of CSX arrive at the same conclusions. Thus, Plaintiff's observation that "[b]oth the 3G March 2007 Investment Discussion report and the TCI-commissioned report from Bain feature similar criticisms of CSX operations" is rather insignificant. (Pl. Findings ¶ 105.4.) The bottom line is, if you start out using the same numbers, such as CSX's past profits, you are going to end up with the same results.

> **1.     TCI and 3G Acted Independently Prior to Forming a Group on December 12, 2007.**

106.     Plaintiff accuses TCI and 3G of coordinated action relating to CSX, as early as August 2, 2007, pointing to a draft Schedule 13D. (PX 116.) However, it is undisputed that neither 3G nor its counsel participated in that call, the very purpose of which was to discuss running a proxy contest. (*See* Defs. Br. at 69.)[35] In addition, 3G approached TCI early in November about whether it was interested in running a proxy contest. At the time that 3G approached TCI, 3G had no knowledge as to whether TCI was looking into potential nominees. In fact, TCI was not even sure whether it would begin a proxy battle. (Defs. Br. at 31.) As such, the parties agreed to defer discussions of the matter. (*Id.*) To further show that TCI and 3G coordinated their activities in search of nominees, Plaintiff draws attention to the fact that Mr. Behring first met with Gil Lamphere on October 8, 2007, the same day Mr. Hohn met with Mr. O'Toole. The evidence, however, shows that neither TCI nor 3G chose October 8 as their first meeting date. Rather, Mr. O'Toole chose October 8 to meet with Mr. Hohn. (PX 138.) That the two meetings occurred on the same day is simply a coincidence.

---

[35]     Additionally, it is undisputed that neither TCI nor 3G had even begun to search for potential board candidates by that point. TCI did not begin its search until it retained a professional search firm at the end of September 2007, and the evidence shows that 3G did not begin its search until October 2007.

107.-108.  Plaintiff singles out the "Project Improve" (PX 142) discussion materials for CSX as further evidence of cooperation and group formation; yet none of the advanced facts support this inference.  For example, in Pl. Findings ¶ 107.1.2, Plaintiff highlights that the materials reference a "group that has developed a detailed operating plan showing substantial improvement opportunities."  Plaintiff then points out that the materials were "sent to Mr. Amin of TCI by Mr. Schwartz of 3G on December 20, 2007."  However, TCI and 3G had already reached a group agreement by December 20, 2007, so the fact that Mr. Schwartz of 3G shared this plan with Mr. Amin of TCI supports that TCI and 3G did not form a group until December 12, 2007.  Notably, the word "group" in the document does not refer to TCI.

109.    TCI was acutely aware of the need to be careful not to form a group, or otherwise give the impression of forming a group because it had been previously investigated for alleged group forming.  (DX-144 ¶¶ 24, 25.)  Mr. Hohn's unequivocal responses to Mr. Behring prior to November 2007 that TCI was not forming a group reflects Mr. Hohn's desire to play by the rules given TCI's public cases of shareholder activism, rather than, as Plaintiff tried to paint, an attempt to cover his tracks.  Indeed, Mr. Hohn testified during his deposition:  I am conscious that a fund – that if we end up in an activist situation, that the very fact that you talk to . . . another fund may be claimed to be evidence that you are a group with them, and that is something . . . I'm aware of that – that thought process amongst people."  (Hohn Dep. 132:25-133:8.)  As Your Honor noted in *Capital Realty Investors v. Dominium Tax Exempt*, a case in which it was found that plaintiff would likely be able to prove violations of Section 14(a): "[T]he objective of courts and of injunctive relief in cases like this [is] not to 'test the ingenuity of sophisticated corporate counsel.'  Nor is it 'to punish.'  Rather, it is to ensure that investors are provided in a timely fashion with the accurate information necessary to the intelligent exercise of

the corporate franchise."  944 F. Supp. 250, 258-59 (S.D.N.Y. 1996).  Mr. Hohn's words were

prophetic, and Your Honor's observation in *Capital Realty* proves the point.  Through the use of

snippets of testimony and very selective and misleading excerpts from only a handful of

documents culled from more than a million pages that were produced, very creative and

sophisticated counsel has attempted to pervert the parties' meaning, intentions and conduct in a

manner designed to upset the "intelligent exercise of the corporate franchise."  Plaintiff's

theories and innuendo, however, don't hold up under the weight of the evidence.

       110.    Plaintiff attacks the credibility of 3G in paragraph 110, by suggesting that

testimony from three different 3G witnesses, (1) Alex Behring, the control person in charge of

3G, (2) Luis Moura who oversees Synergy, the subsidiary of 3G, and (3) Daniel Schwartz, an

analyst at 3G who researches the rail industry, somehow conflict with each other and presumably

destroy credibility.  In fact, it should be unsurprising that Mr. Behring, who had a direct

relationship with Mr. Hohn would not be communicating the details of conversations between

Mr. Hohn to an analyst or someone not deeply connected to the CSX investment thesis.  Despite

hiding behind the cute "take one, take two, take three" headlines, as usual, the facts are

straightforward.  The fact Mr. Moura was relatively uninvolved and Mr. Schwartz was unaware

that Mr. Behring had initiated conversations with Mr. Hohn, and had been rebuffed in his initial

advances is exactly what would be expected given the difference in their positions. All of this

focus on 3G, however, is a sideshow.  In order for a "group" to be formed, an agreement must

exist.  Such agreement requires a meeting of the minds – a meeting that was clearly absent here.

TCI acted alone in its purchasing and scaling up of its position, and did not express any interest

in working with 3G until late in 2007.

## V.    TCI AND 3G ARE NOT SEEKING CONTROL OF CSX.

### A.    TCI Performed a Rail Industry LBO Analysis to Better Understand Rail Industry Value.

1.    <u>TCI Researched a Possible LBO and Decided It Was Not The Best Way To Enhance shareholder Value</u>**.**

111.    CSX begins by making the outrageous claim that TCI and 3G purchased their holdings in CSX with one goal in mind – to seize control of the company without paying a premium by bringing about an LBO or other liquidity event.  (Pl. Findings ¶ 111.)  CSX's claim is patently false, and the evidence proves just that.  To begin, TCI proposed a minority slate of directors, each of whom signed an agreement to vote independently from one another.  (*See* DX 61, 62 64) (stating "there is and can be, no agreement between you and the undersigned that governs the decisions which you will make as a director of CSX".)

TCI performed extensive research on the rail industry and CSX specifically. As part of that due diligence, TCI examined the possibility of a leveraged buyout  (" LBO"). Throughout Plaintiffs Contentions of Fact, Plaintiff falsely mischaracterizes TCI's due diligence and initial research into forming its investment thesis.  While the proposal was initially well received by CSX Management and by its financial advisors, TCI quickly determined that shareholder value would be better maximized by increasing the operational efficiencies at CSX, improving corporate governance, and by increasing the company's financing through share re-purchase programs and re-capitalization.

112.    Starting in October 2006, TCI represented to CSX that it had an economic interest in CSX.  (DX 145 (Amin ¶ 16).)  TCI spoke over the phone with David Baggs and Oscar Munoz on a couple of occasions, but CSX consistently denied TCI any opportunity to meet with Michael Ward or any upper level management face-to-face.

113.    Prior to its investment in CSX, TCI conducted extensive research on all four of the major U.S. railroads.  (*See* PX 80 (CSX Discussion Materials stating "TCI is serious with respect to its investment with CSX, having done much work to evaluate the company over the last 8 months.")  As part of that research, to accurately account for each company's valuation, TCI performed its own leverage buyout analysis.  The results demonstrated that the rail industry as a whole was greatly undervalued.  (PX ¶ 35, 44.)  TCI saw CSX as having 100% upside potential.

114.    In December 2006, as further due diligence into its investment, TCI assessed any potential take out of CSX.  (PX ¶ 31.)  It is part of TCI's investment decision-making process to regularly do LBO analyses of companies that are prospective or existing investments as an evaluation tool to figure out the upside for the company's stock.  (DX 145 (Amin ¶ 24).)

132.    As part of its ongoing diligence and monitoring of its investment in CSX, in early April 2007, 3G explored whether its Credit Default Swap hedges would be affected if CSX were the subject of an LBO transaction.  (PX 68.)  3G's analysis involved speculation on possible types of LBO deals, including consideration of other examples of publicly traded companies that had undergone LBO transactions, demonstrating that 3G had no knowledge of any specific LBO proposal.  (PX 68.)  3G's sensitivity to the possibility of an LBO is unsurprising given Mr. Behring's background in private equity (DX 146 (Behring ¶ 7).)  Indeed, Mr. Ward admitted in his testimony that he himself explored a management led LBO on behalf of CSX in 2007.  (DX 154 (Ward Test. 17-18).)

136.    As part of its ongoing diligence and analysis of its investment, 3G prepared analysis of the impact of a number of possible scenarios on CSX's share price,

including a base case (status quo), a small improvement scenario, and a re-leveraging scenario

that 3G labeled for convenience as an "activist scenario".  These scenarios were illustrative

exercises that contrasted industry consensus assumptions with 3G's proprietary assumptions of

various financial drivers, and how they would impact CSX share price at different hypothetical

conditions.  (DX 154 (Schwartz Dep. 121:6 - 122:25).)  These analyses did not constitute or

reflect "plans" in any way, but rather were part of 3G's ongoing effort to understand the financial

aspects of its investment in CSX.  (DX 154 (Schwartz Dep. 123:3 - 123:13).)

2.     <u>TCI Decided an LBO Was Not the Best Way to Enhance shareholder<br>Value by the Time It Owns stock on April 3, 2007.</u>

116.     In fact, as of December 2006, at the time it crafted its initial LBO analysis,

TCI owned <u>zero</u> shares of CSX common stock.  TCI would have been unable to vote for any

type of LBO at that time.  In fact TCI has never represented that it owned between 10 and 14%

of the outstanding shares of CSX common stock as Plaintiff represents without any factual

evidence to support its proposition.  (*See* Pl. Findings ¶ 116.)

By April 3, 2007, the day that TCI began buying stock, and thus had a means to

vote on any corporate change, Oscar Munoz reported to the Board of Directors that TCI no

longer was interested in pursuing an LBO for CSX.  (*See* PX ¶¶ 4, 74 (TCI also alerted Evercore

to the fact that it was no longer interested in an LBO).)  CSX itself acknowledged that TCI was

no longer proposing an LBO in April 13, 2007, Board of Directors Discussion Materials which

stated that "TCI believes that the share buyback alternative is preferable to an LBO in terms of

long term shareholder value maximization."  (PX 80.)

133-134.     On April 7, 2007, Evercore reported to Mr. Munoz on a call it had

with TCI.  According to Evercore's notes from that meeting, TCI "indicated that they would like

to hold the stock for a long time – they do not believe that sale to a private equity player, for

87

example, will maximize shareholder value given the upside they see in the stock price over the next several years."  (PX 74 at EVR 02554.)

TCI's conclusion that CSX was a solid long term opportunity was further emphasized by Mr. Amin's public speech at the May 8, 2007 Bear Stearns Conference.  In that speech he stated that while "every single major railroad in the U.S. could be LBOed today at a significant premium to today's share price … Personally I would rather make four times my money over five years as I described than to sell to private equity today."  Mr. Amin pointed out that the LBO analysis "highlights that corporate governance in these companies has broken down." (PX 96.)

Specifically, Mr. Amin questioned management's conviction in the business. According to TCI's December 2006 analysis, private equity could accomplish an LBO at $50 or above. (DX 145 (Amin ¶ 23); PX 35.)[36]  However, Michael Ward was selling his stock at $30 a share, greatly undervaluing the company.  (*Id.*)  As Mr. Amin said, "putting $10 billion behind seven-times leverage, as we believe private equity firms would do at CSX is conviction. Selling your personal stock today, while not even being two times levered as Michael Ward has been doing at CSX, is not."  (PX 96.)

3.     TCI at All Times Disclosed its Economic Interest in CSX and Made an Effort to Communicate with CSX.

115.     Throughout the entire period of TCI's investment in CSX, TCI attempted to engage in a dialogue with CSX about the operational opportunities for the company, only one of which was the possibility of an LBO.  (DX 145 (Amin ¶¶ 29-33); DX 144 (Hohn ¶¶ 18-19); PX  268 (Baggs ¶¶ 4,6,7,8, 10);  PX 267 (Munoz ¶¶ 4, 10, 11); PX: 35, 39.)  Yet, CSX was completely unresponsive to TCI's attempted discourse and consistently denied TCI the

---

[36]     Shares were trading at approx $33-$36.

opportunity to meet with upper level management.  (DX 145 (Amin ¶¶ 17-20, 22, 29, 30, 31, 32, 33, 36); DX 144 (Hohn ¶¶ 18-19).)  This was surprising to TCI because David Baggs showed a sincere interest in the prospect of an LBO and requested that TCI continue to refine its views on the LBO and told Mr. Amin that he would figure out how to "deal with Michael [Ward]."  (DX 145 (Amin ¶ 25).)

115-117.     After CSX's further refusal to allow TCI to speak with anyone at CSX about the operational opportunities for the company, Baggs arranged for TCI to communicate with CSX's investment banking advisors, Morgan Stanley.  During that meeting, Mr. Amin set forth TCI's investment thesis for the industry Mr. Amin also disclosed that TCI did not have an ownership interest via stock and that it only had economic exposure through its swap contracts.  (DX 145 (Amin ¶ 26); PX 35 (1/15/07 email from Walsh to Munoz stating he is going to find out "how long the contracts extend for and how the voting rights work" in the swap contracts).)

119.     On February 7, 2007, as part of the type of due diligence that 3G conducts with respect to corporate governance issues for all of its significant investments, 3G reviewed the deadline for shareholder proposals at CSX.  3G conducted the same analysis of all the major U.S. railroads, as reflected in its contemporaneous investment due diligence documentation.  (PX 41; Trial Tr. (Behring Test. 141:17-21; 152:20-153:8); DX 2 at 3GC 00000339; DX 6 at 3GC 00003272).)

125.     All of the evidence in this case demonstrates that TCI did not own a single physical share of CSX common stock until April 3, 2007.  (DX 97, 105.)  On March 2, 2007 TCI filed its HSR, indicating an intention to buy over $500 million in CSX stock.  (DX 8.)  After the thirty day waiting period expired, CSX began to purchase physical shares of CSX stock, and by

May 14, 2007 had accumulated 4.1% of common stock.  TCI closed out of swap contracts at

around the same time in order to maintain its economic exposure to CSX at about the same level.

(DX 145 (Amin ¶ 37); DX 144 (Hohn ¶ 21); Trial Tr. (Hohn Test. 164:21-23, 165:13-20); DX

154 (Amin Dep. 68:22-25, 70:6-8); PX 206 (List of Known Swap and Stock Transactions).)  TCI

has not purchased any additional physical shares and has maintained its economic exposure to

CSX virtually constant since May 2007.[37]  (PX 206.)

       115., 120., 125.      TCI at all times disclosed that it had significant economic

exposure to CSX shares.  (PX 268 (Baggs ¶ 3); PX 267 (Munoz ¶¶ 3-4); Trial Tr. (Munoz Test.

37:1-3).)  It told CSX from the beginning of its investment that its exposure was in cash-settled

total return swaps, which do not have the right to vote.  (DX 145 (Amin ¶ 21).)  In fact, as early

as November 2006, CSX knew that TCI had a $500 million investment in swaps.  (DX 145

(Amin ¶ 20); PX268 (Baggs ¶ 5); PX 267 (Munoz ¶ 4).)  Moreover, as part of its disclosures to

the company, TCI let CSX know that it made its HSR filing in March 2007, to "try to influence

management in how the company is run."  (Pl. Findings. ¶ 125; PX 87.)

      4.      <u>CSX Independently Analyzed LBO, MBO and Other Private
Equity Options.</u>

      Starting in February 2007, CSX analyzed and met about the potential for an LBO.

(PX ¶ 43.)

      CSX continued throughout the spring to investigate whether an LBO was a

possibility for the company.  Even after TCI decided an LBO ws not the best way to enhance

shareholder value, CSX continued to independently asses the upside of entering into a deal.  (PX

6, 79, 80.)

---

[37]      April and May, 2007 were the only two months in which TCI actually bought common stock.

CSX also looked into other potential strategic alternatives for the company, including teaming up with a private equity firm (commonly known as a "white knight" scenario). (Trial Tr. (Ward Test. 17:22-23.)  CSX independently looked into whether a management buyout opportunity ("MBO") was an option for the company.  (Trial Tr. (Ward Test. 17:25-18:16).)  Mr. Ward and Mr. Munoz met with Blackstone, a prominent private equity firm, to discuss different possible buyout possibilities.  Internally, CSX was also entertaining the possibility of getting capital from independent outside sources.  (Trial Tr. (Ward Test.18:6-16.)

127-129.    Subsequently, Deutsche Bank's investment banking division, independently declared that CSX was a "terrific LBO candidate."  (PX 65 at TCI0962472.)  However, despite its endorsement of TCI as a LBO candidate, TCI subsequently dropped any thought of pursuing a LBO.

130.    As with many other funds and as part of the investment process, Mr. Hohn had periodic conversations with Mr. Behring about the railroad sector.  (DX 144 (Hohn ¶ 23).)  Because Mr. Behring serves on a board of a railroad and is an industry expert, Mr. Hohn had discussions with him about the fundamentals of the rail industry during 2007.  (*Id.*)  As part of that discussion 3G gave TCI its analysis of the entire U.S. railroad industry.  The report describes all four of the major railroads and not just CSX. (PX 199.)

123.    Plaintiff cites Subrahmanyam ¶ 167 for the proposition that "[o]n February 27, 2007 Mr. Amin made some remarks on the record date."  (Pl. Findings ¶ 123.)  However, nowhere in that paragraph does Mr. Amin's name appear.  Moreover, nowhere in the record is there any indication that Mr. Amin made any comments with regards to the February 27, 2007 record date, at which time he was not a shareholder.   In other words, Plaintiff is just making up "facts."

5.    TCI Suggested that CSX Increase Its Stock Re-Purchase Program to
maximize Shareholder Value.

122.    By February 24, 2007, management had been completely unreceptive to any of TCI's requests to meet and discuss any of the plans for the company's operations.  Mr. Hohn also correctly noted that CSX could buy back half its shares in the stock market.  But as he stated later in the email "our real goal is to see the company buy back their first 10 pc this year rather than over two years and then do a second ten pc."  (PX 47.)

134.    In paragraph 134, Plaintiff alleges that in a telephone call on April 7, 2007, TCI was converting some of "indirect holdings of CSX to direct holdings."  This is yet another example of TCI voluntarily disclosing to CSX its positions in the company.  TCI had previously informed representatives of CSX that it had economic exposure to between 10 and 14% of CSX's shares.  Because of CSX's continued refusal to meet with TCI, TCI made an HSR filing on March 2, 2007, and after the expiration of the waiting period began to buy physical shares.  In addition to making the HSR filing and alerting the company of the filing as it is required to do, TCI went a step further and disclosed to CSX that it had indeed begun purchasing shares.

TCI also expressed its view to CSX and its advisors that CSX should expand its share re-purchase program.  This idea was eventually implemented by management.  (PX 9.)  In fact, Dr. William Richardson, a Director of CSX, testified that the Board's decision to increase the share repurchase program was at least in part prompted by TCI's suggestion.  (DX 154 (Richardson Dep. 127:6-19).)

137.-138.    Plaintiff's suggestion in Paragraphs 137 and 138 that TCI was acting against the best interest of the company by proposing an LBO is pure hypocrisy.  First, Plaintiffs fail to note that it discussed an MBO, or a going private transaction with private equity

firms.  (Trial Tr. (Ward Test. 17:17-18:16).)  Such transactions are akin to an LBO, except they are management led.  (*Id*.)  Second, Plaintiff's own advisor, Morgan Stanley, believed that there was no reason for the company to maintain an investment grade rating.  (DX 154 (Bryson Dep. 193:24-194:18).)  Finally, Plaintiff knew that TCI had abandoned its idea for an LBO in light of the credit crisis of the summer of 2007.  (DX 154 (Bryson Dep. 48:23-49:25) (indicating that Mr. Hohn was not suggesting that the company "go to the absolute limit" and Mr. Hohn did not want the company "to go private, meaning at that time, they didn't think the LBO was the right answer…").)  According to Ms. Bryson, as of April 2007, TCI was no longer advocating for an LBO.  (DX 154 (Bryson Dep. 50:6-25).)

138.    With respect to Paragraph 138, Plaintiff merely emphasizes the fact that TCI made several unanswered attempts to engage CSX in constructive discussions.  (PX 102.) PX 102 is an email from Mr. Amin to Mr. Baggs dated June 4, 2007.  In this email, Mr. Amin states that it has encountered "difficulty discussing specific proposals with CSX . . . [and] we do not feel that on some very important issues, the management and board have no[t] been willing to engage constructively at all.  (PX 102.)  This has been a recurring theme of TCI's attempts at communicating with CSX management and the Board.

**B.    CSX Management Refuses to Reason with TCI**

140.    Despite TCI's disclosure that it had significant economic exposure to CSX, CSX denied TCI's repeated requests to meet with upper management throughout the fall of 2006 and winter of 2007.  On March 29, 2007, CSX agreed to meet with TCI in New York, following TCI's filing of its HSR submission.  Plaintiff blatantly misquotes TCI's statements made at this meeting.  Plaintiff asserts that, "[w]hen Mr. Munoz asked what would happen if

CSX did not do as TCI wished, Mr. Amin responded that there would be 'no limits' to what TCI would do."[38]  Mr. Amin testified to the facts at his deposition:

> **Q.** Were you ever present when someone from TCI said to a representative of CSX that there were no limits to what TCI would do?
>
> **A.** I don't recall the exact – I don't recall the exact language, but in a meeting with Oscar Munoz we discussed we would look at every possibility or every option that we had.
>
> **Q.** Who is that discussed that?
>
> **A.** I discussed it.
>
> **Q.** Did you say in discussing your options that there were no limits to what it is that TCI would do?
>
> **A.** I don't recall those words, I don't recall saying that.

(DX 154 (Amin Dep. 192:16-25, 193:1-5)**.**)

142.    Throughout the spring TCI continued to research and evaluate its rail investment.  As part of this effort, on April 3, 2007, TCI considered meeting with Hunter Harrison, a person with deep experience in the railroad industry, in case a management shakeup occurred.  (Trial Tr. (Amin Test. 200:5-7, 16-19).)  During trial, Plaintiff portrayed TCI as the villain, looking to remove Mr. Ward as CEO.  Mr. Amin testified:

> There's a difference between trying to evaluate all the options that you have and coming to a decision of what your specific intention was.  It was not our specific intention or our intention in general to replace Michael Ward as the CEO.  What we wanted to do was evaluate the different options that we had to see which route was best for us to take.

(Trial Tr. (Amin Test. 200:22-201:1).)

---

[38]      In any event, if CSX believes that Mr. Amin uttered thse words to it in March 2007, it can hardly cry ignorance of TCI's antagonism towards the company and its management.

143.    Like TCI, 3G was evaluating CSX and the rails, trying to decide how to proceed in the sector.  Mr. Behring testified that 3G had always kept its options open in terms of its investment, but started to really debate taking an activist stance in CSX in the late spring and early summer of 2007, rather than definitively in the spring, as Plaintiff inaccurately cited.  (DX 154 (Behring Dep. 115:5-11).)  Understandably, Mr. Behring sought general information from Mr. Hohn based on Mr. Hohn's past activist investment experience.  (DX 154 (Behring Dep. 162:3-5).)

144.    The email exchange that Plaintiff points to, in which Mr. Hohn and Mr. Amin discuss CSX's first quarter's earning presentation, is only further evidence of the research and analysis TCI continued do with respect to its investment in CSX.  (PX 83.)

146.    On May 8, 2007, Mr. Amin made a big impact on the railroad and transportation community of investors at the Bear Stearns Transportation Conference.  In paragraph 145, Plaintiff grossly mischaracterizes Mr. Amin's statements at the Conference.  Instead of specifically singling out that CSX should buy back 20 percent of its shares, Mr. Amin stated much more generally that "The third facet of our vision is buy-backs."  (PX 96.)  And in fact, Mr. Amin went so far as to say, "And I acknowledge that CSX this morning increased its buy-back program and I think that's a good first step [.]"  (*Id*.)  Plaintiff also distorts Mr. Amin's statement regarding safety and capital expenditures out of context.  What Mr. Amin said was, "Why does CSX say safety is a cap-ex issue when it has 50% more human caused accidents per mile than Norfolk Southern?  And when 17 of the 20 safety faults that the FRA highlighted were human or management failures.  You don't need cap-ex to pull up hand brakes in rail cars."  (*Id*.)  Mr. Amin was underscoring CSX's management failure to properly address safety concerns, by explaining that safety begins with proper management; it is not strictly a monetary issue.  Mr.

Amin also identified the inconsistency that Michael Ward, CSX's CEO, was the highest paid CEO in the industry despite CSX's poor safety record.

147.    As would be expected of investors in the railroad sector, Plaintiff indicates that Mr. Schwartz, Mr. Behring, Mr. Moura and Ms. Das, all of 3G, attended Mr. Amin's speech. Additionally, Mr. Bahbout of 3G monitored the CSX stock while the others were out of the office attending the conference.  This is a completely innocuous fact, as the role of an investment fund is to monitor and track its investments.  It is not surprising that 3G monitored CSX's movement throughout the day during a major transportation conference, given the likelihood that the conference would have some affect on the stock price.  Plaintiff fails to mention that CSX spoke at The Bear Stearn's conference as well, which would also have a direct effect on the stock price.

148.    During his presentation at the Bear Stearns Conference, Mr. Amin "called out" CSX for its mismanagement and lack of concern for its shareholders.  Mr. Amin's list of grievances against CSX management included that "CSX [does not] support allowing shareholders to call  shareholder meetings."  (PX 96.)  Mr. Amin feels strongly that allowing shareholders to call a special meeting to elect or remove directors to the board is one of the most fundamental shareholder rights.  (DX 154 (Amin Dep. 173:12-16).)  Because Mr. Amin delivered his Bear Stearn's speech with real conviction, it is no surprise that, as Plaintiff points out in paragraph 145, that "more than a dozen hedge funds, including TCI and 3G, called and emailed CSX to inquire about the results of a non-binding resolution that would allow shareholders to call a special meeting."  Once again, this is not suspect, or part of an overall conspiracy, but common sense in light of the surrounding circumstances.

149.    While meeting with 3G at 3G's New York offices on June 13, 2007, CSX

claims, Mr. Munoz noticed a CSX-related presentation with a TCI logo on the cover.  No

evidence in the record supports this contention.  Mr. Ward testified at his deposition that he

could not recall the first time he learned of Munoz's purported spotting.  Mr. Ward also testified

that he did not ask 3G, when he subsequently met with them in Jacksonville, if they were

working together with TCI.  (DX 154 (Ward Dep. 135:9).)  In addition, Mr. Baggs testified that

(1) he did not see any papers at 3G's office; (2) Oscar Munoz was with him during their entire

visit; and (3) he did not recall seeing Munoz looking at documents.  (DX 154 (Baggs Dep. 49: 1-

25 - 56: 1-25).)  If their concern was legitimate, it is hard to believe that Mr. Ward or another

member of CSX management would not address it at the earliest opportunity.  Even Munoz

himself, who claims to have seen this elusive TCI presentation, testified that he did not

remember exactly the first time he told anyone else about the discovery, but he believes it was

around the time that CSX learned that TCI and 3G had formed a group.  (DX 154 (Munoz Dep.

271: 1-20).)  It is extremely hard to believe that if Mr. Munoz truly saw the aforementioned

presentation he would not have alerted others to the occurrence sooner.

152.    CSX needs to pick a theory and stick to it.  First CSX contends that TCI

was pushing an LBO on CSX.  Now here, in paragraph 152.2, Plaintiff cites an e-mail between

Evercore and CSX to that contrary.  In the email, Evercore relays to CSX that Mr. Hohn's

perspective on an LBO is as follows:  the "best way to create long term shareholder value is

through a structured share buy back program and that he does not want the [C]ompany sold to

[private equity] firms or others."

154.    TCI met with Al Crown, a former chief operating officer at CSX, on July

25, 2007.  (PX 115.)  This meeting was arranged by Mr. Hatch, a railroad consultant engaged by

TCI.  The following month, on August 13, 2007, Mr. Behring also met with Mr. Crown.  (PX 193.)  Plaintiff leverages this fact to argue that TCI and 3G had already formed a group and planned an activist agenda.  Instead, TCI and 3G were independently working to protect their respective stakeholders' investments in CSX.  Accordingly, it was natural for each fund to seek out and meet the former CSX COO.

156.    On August 2, 2007, TCI met with Schulte Roth & Zabel LLP ("SRZ") regarding the possibility of a CSX proxy context.  TCI prepared a written agenda for the meeting.  In the agenda, TCI states that "CSX has started the campaign," and tasks SRZ with explaining to TCI  "The Proxy Contest, What It Looks Like, How It Operates."  (PX 116.)  As part of this inherently *defensive* agenda, TCI solicited guidance on preparing a Schedule 13D and proxy.  Despite CSX's outrageous insinuation, TCI was not instructing or requesting that SRZ assist it in evading a filing requirement.  TCI simply wanted to understand all of its options, as this was the first time it had ever been in such a situation in the U.S.  (Trial Tr. (Amin Test. 195:1-7), (Hohn Test. 187:3-7).)

158-159.  Both, TCI and 3G, were in attendance at the September 6, 2007 CSX investor and financial analyst conference.  As previously described, this is not an unusual or suspicious occurrence since TCI and 3G had very significant positions in CSX at that time.  (PX 122.)[39]  It also would not have been abnormal for Mr. Moura, Mr. Schwartz, and Mr. Amin to interact at this investor conference, as investors do network with one another at investor conferences.

---

[39]    Undoubtedly, given how CSX has not allowed the facts to get in the way of a good story, if only one of TCI or 3G attended the conference, CSX would have adopted a new theory:  in order to hide the fact they were in a group, TCI attended the conference, and later reported back to 3G.

162.-164.  Mr. Amin first reached out to D.F. King in August to inquire generally about D.F. King's proxy-consulting services.  It was not until mid-September 2007 that TCI indicated it was likely to proceed with a proxy contest.  (PX 128.)  On September 18, 2007, Mr. Amin e-mailed Mr. Dysart of Heidrick & Struggles, an executive search firm, to inform Mr. Dysart that TCI wanted to proceed with a search for board members.  (PX 137.)

170.    After failed attempts to communicate with CSX management, TCI wrote an open letter to the Board.  TCI determined that if the Company failed to respond adequately, it would proceed with the nomination of a slate of Board candidates.  (DX 144 (Hohn ¶¶ 32-33), DX (Amin 145 ¶ 50).)  On October 16, 2007, TCI sent a public letter to the CSX Board (the "October 16 Letter") stating that "[o]ver the past year we have repeatedly, but unsuccessfully, attempted to engage in a constructive dialogue with the Board and top management of CSX on concerns we have about the business."  (DX 47.)

171.    On October 17, 2007, Mr. Behring and Mr. Amin met, but did not discuss the progress of their respective nominee searches.  (Trial Tr. (Behring Test. 139:1-8).)  TCI and 3G were unaware that they were simultaneously attempting to locate potential nominees until November, when the two funds began group discussions.  (Trial Tr. (Behring Test. 136:3-8), (Amin Test. 148:10-15).)

173.    "Project Improve" in no way implicates that there was any group formation prior to December 12, 2007 between TCI and 3G.  This is because the document was shared with TCI on December 20, 2007, after the date TCI and 3G had already announced and declared they were a group.  (PX 152.)  Therefore, the document is not helpful in lending support to Plaintiff's claim that 3G's plans and actions with respect to CSX are based on coordinated

efforts with TCI. In fact, given the date on which it was finally shared with TCI, the document contradicts the theory of CSX entire group claim.

### C. TCI Negotiated in Good Faith In An Effort to Reach an Agreement With CSX.

183-196.     Plaintiff offers the January 2008 negotiations between Mr. Hohn and Mr. Kelly as evidence that TCI purchased its interest in CSX with the goal of seeking effective control of the company. The evidence shows, however, that TCI was "conducting a legitimate process as owners of [CSX] to seek board representation. (PX 162.) Furthermore, TCI engaged in good-faith negotiations with CSX in an effort to effect that representation, while avoiding a proxy fight. (DX 145 (Hohn ¶ 44).) Contrary to Plaintiff's characterization of Mr. Hohn in Paragraphs 189-196 as being difficult to negotiate with, the record and contemporaneous notes taken by Mr. Ward indicate that it was Mr. Ward and CSX who were negotiating in bad faith.

183.     On or around January 8, 2008, Mr. Hohn met with Messrs. Ward and Kelly, to discuss a possible settlement, during which time Mr. Hohn noted that there was no operational plan for CSX and public operational targets were necessary. At that point, Mr. Ward stood up and said, "Do you think we're f*cking idiots?" (DX 144 (Hohn ¶ 44).)

184.     The CSX Board and management know that the TCI Group is only nominating five directors to a twelve-director Board. In addition to the fact that the TCI/3G Group is nominating a minority slate, only one of those nominees is affiliated with TCI and one with 3G. All the nominees are independent of CSX management and have committed in writing to act in the interests of all stockholders. Moreover, neither TCI nor 3G has paid any of the nominees despite the fact that they are permitted to do so. (JX 19 at 6; DX 61; DX 62; DX 64; DX 70.)

185, 189.      During the course of the negotiations, Mr. Hohn repeatedly attempted to propose mutually agreed upon nominees to Mr. Kelly in order to reach an amicable resolution.  (*See, e.g.*, PX 157, PX 158, PX 162, PX 163.)

186.      Because TCI and 3G are not beneficial owners of the shares purchased by the counterparties to their cash-settled Total Return Swaps, it was not necessary for them to identify the swaps as such on the notice and questionnaires.

188.      Plaintiff states that in an email exchange during the negotiations on January 9, 2008, Mr. Hohn warned Mr. Kelly "not to pursue a 'scorched earth' policy in Washington and lobby for reregulation."  This is a blatant misstatement of the facts.  Rather, Mr. Hohn's email expresses the legitimate view that the board had a fiduciary obligation to ensure that management continued to act in the company's best interests, " irrespective of the outcome of this process" and that "actions of a 'scorched earth' defence nature" was inconsistent with that obligation.  Mr. Hohn pointed to "lobby[ing] Washington to threaten re regulation" in the event the board is changed as an example of the type of action management had undertaken in response to TCI/3G's "conduct[ of a] legitimate process as owners of the company to seek board representation."  (PX 162.)  This distinction is key because Plaintiff has in fact executed the "scorched earth" defense by filing the kind of lawsuit that Defendants were concerned about.

195.      During the course of the negotiations, Mr. Kelly and Mr. Hohn continued their discussions by telephone.  During one conversation, Mr. Kelly and Mr. Hohn discussed the issue of a standstill.  After some consideration, Mr. Hohn got back to Mr. Kelly and told him that TCI would accept a one-year standstill in exchange for obtaining agreement on a slate of nominees.  In response, and without proposing an alternative to a one-year standstill, on January 18, 2007, Mr. Kelly terminated discussions.  (DX 75.)  In an effort to continue the dialogue, Mr.

Hohn asked Mr. Kelly to specify what he wanted, but Mr. Kelly refused to elaborate.  (DX 145 (Hohn ¶¶ 46-47.)

191-194, 196.  Despite engaging TCI in negotiations, CSX had, in fact, adopted a goal of "zero dissidents" on its Board.  (Trial Tr. (Ward Test. 20:10-15; 22:2-4).)  Mr. Ward admitted that after only three days of negotiation he instructed Mr. Kelly to tell Mr. Hohn that CSX was done negotiating.  (Trial Tr. (Ward Test. 12:23-25, 13:9-14); DX 154 (Ward Dep. 342:21-343:2, 344:7-25); DX 306 at CSX_00035068.)  Mr. Ward also admitted that he suggested to Mr. Kelly that if TCI and CSX were to come to an agreement on the nominees, Mr. Kelly should try to "kill the deal on standstill."  (Trial Tr. (Ward Test. 13:15-23, 16:21-24); DX 306 at CSX_00035069.)

## VI.    TCI'S TOTAL RETURN SWAPS DO NOT CONFER BENEFICIAL OWNERSHIP

197.-201.    Neither TCI nor 3G beneficially own the shares referenced in their swap agreements.

199.  CSX has offered no credible evidence that 3G has investment or voting power with respect to its swaps referencing CSX stock.  Indeed, CSX's "expert" report expressly limits itself to TCI's swap agreements, and constitutes a tacit admission that CSX does not even have an argument to make on this point.  (Subrahmanyan Report ¶9.)  Indeed, 3G's only swap counterparty is Morgan Stanley – which serves as CSX's strategic advisor in this proxy contest.  That fact demonstrates that (a) 3G had no intent or expectation of being able to influence or direct the voting of any shares that Morgan Stanley may have owned to hedge the swap contracts; and (b) that 3G had no power to do so in any event.

### A.    TCI and 3G did not Determine the Disposition of Hedged Shares.

202.     Plaintiff incorrectly states that that the counterparties "had to hedge their position with matching physical shares."  The fact that the counterparties frequently hedged the Total Return Swaps with matching shares is not disputed.  However, banks may engage in other forms of hedging for Total Return Swaps.  As Professor Partnoy and representatives from certain counterparties described, counterparties may use equity derivatives (Partnoy Sur-Rebuttal ¶ 58; DX 151 (Kennedy Dep. 39:7-40:21)), partial matching (Partnoy Sur-Rebuttal ¶ 58), options (*id.* ¶ 63; DX 151 (Kennedy Dep. 39:7-40:21)), or even shares from other companies (DX 152 (Arnone Dep. 38:14-39:3) to hedge Total Return Swaps.

203-206.     While the evidence demonstrates that the counterparties frequently hedged their positions with matching physical shares, the timing and quantity of the purchases and sales do not always match with the swap transactions.  However, those discrepancies evidence that the counterparties hedged at their own discretion.  (Partnoy Sur-Rebuttal Report at 29.)

207.     On November 13 and 14, 2007, Citigroup did not purchase shares equal to those referenced in TCI's Total Return Swaps entered into on each day.  Instead, Citigroup purchased shares over the course of those two days that added up to an amount equal to the total number of the shares referenced in the Total Return Swaps.  (Partnoy Sur-Rebuttal Report at 29; Subrahmanyam Rebuttal Report, Exhibit 4.1.)  This discretionary act undermines Professor Subrahmanyam's theory, demonstrating that counterparties hedge swaps with shares only when they determined it was in their economic interest to do so.  (Partnoy Sur-Rebuttal ¶ 57.)

208.     Credit Suisse did not hedge the December 11, 2007 Total Return Swap with TCI for 1,000 shares.  (Partnoy Sur-Rebuttal Report at 29; Subrahmanyam Rebuttal Report, Exhibit 4.2, 4.7.)

210.    There is nothing in the record demonstrating that Goldman Sachs hedged with matching shares.

211.    There were a number of discrepancies concerning the Total Return Swaps between TCI and Merrill Lynch.  On December 4, 2006, Merrill Lynch purchased 800 shares more than the shares referenced in the Total Return Swap.  On December 11, 2007, Merrill Lynch purchased no shares to hedge a 1,000 share Total Return Swap.  On November 12, 2007, Merrill Lynch sold 300 more shares than referenced in the terminated Total Return Swap.  On November 13, 2007, Merrill Lynch sold 500 fewer shares than referenced in the terminated Total Return Swap.  Plaintiff attempts to explain this away by stating that it was due to additional transactions along with the "perfectly matching hedge transaction."  In fact, these discretionary acts undermine Professor Subrahmanyam's theory, demonstrating that counterparties hedge swaps with shares only when they determined it was in their economic interest to do so.  (Partnoy Sur-Rebuttal at 29, ¶ 57; Subrahmanyam Rebuttal Report, Exhibit 4.5.)

212.    On November 9, December 8 and 11, 2006, TCI entered into Total Return Swaps with Morgan Stanley, but Morgan Stanley hedged those transactions on the next business day.  Those three transactions constitute over 15% of the transactions between TCI and Morgan Stanley related to Total Return Swaps.  (Partnoy Sur-Rebuttal Report at 29; Subrahmanyam Rebuttal Report, Exhibit 4.6.)

213.    On October 23, November 13 and 14, 2006, January 17, 18, and December 11, 2007, TCI entered into Total Return Swaps with UBS, but UBS did not hedge those transactions until the next day.  On November 9, 13, 14, 15, and 16, 2007 TCI terminated Total Return Swaps with UBS, but UBS did not sell its hedged shares until the next day.  Those 11 transactions constitute over 40% of the transactions between TCI and UBS related to the

104

Total Return Swaps.  (Partnoy Sur-Rebuttal Report at 29; Subrahmanyam Rebuttal Report,

Exhibit 4.7.)

214.    Plaintiff inaccurately describes the testimony from the counterparties.

Representatives from Deutsche Bank and Citigroup made clear that during the course of typical

equity-based swap transactions, they consider the possibility of hedging with instruments other

than shares, and have at times either used such instruments or did not hedge.  (DX 152 (Arnone

Dep. 38:14-39:3); DX 151 (Kennedy Dep. 39:7-40:21).)  Mr. Kennedy, the Citigroup

representative even made clear as it applies to TCI:

> Q:    With respect to the TCI/Citigroup swaps that have been executed, did Citigroup actually consider any of the options other than purchasing physical shares as a hedge to those swaps?
>
> A:    . . . Our hedging activity is both initiated at the time of the transaction, and then there's an ongoing hedging.  So certainly during the life of the transaction Citi considered whether to hedge itself with something other than the shares.

(DX 151 (Kennedy Dep. 41:13-24).)

215.    The fact that the counterparties used physical shares to hedge the Total

Return Swaps does not demonstrate that other options were not considered or possible.  (*See* DX

151 (Kennedy Dep. 41:13-24).)

216-217.    Plaintiff fails to demonstrate that the counterparties knew that the

Total Return Swaps were hedged with physical shares and nothing else.  Plaintiff asserts that

because the swap desk at Deutsche Bank knew that it had to get approval from compliance to

enter into additional trades in CSX as they approached the 5% ownership threshold, the swap

desk must have known that the only way the counterparties hedged was through physical shares.

(DX 152 (Arnone Dep. 7:20-9:8).)  In light of additional testimony describing other forms of

possible hedging (DX 152 (Arnone Dep. 38:14-39:3)), it would be more accurate to say that the swap desk assumed that the swaps may have been hedged in part with physical shares.

218-220.     As Professor Subrahmanyam recognized, the counterparties hedge with shares of CSX because that was the most economically efficient thing to do. (Subrahmanyam Report ¶¶ 87-92.)  However, unilateral action based on economic efficiency is not evidence that TCI had the power to direct that outcome, or that it was the result of an agreement or understanding with TCI to do so.  Beneficial ownership does not turn on whether a person's actions may *cause* the holder of certain equity securities to purchase or dispose of them (even if it is a "market reality"), but rather on whether it has the *power to direct* the purchase or disposition of those shares.  "Causation" and "power to direct" are two different concepts.

221-222.     Plaintiff incorrectly asserts that TCI knew how the counterparties hedged the Total Return Swaps.  Plaintiff asserts that certain voting scenarios created by TCI are evidence of this knowledge.  However, TCI ran a variety of scenarios – some of which assumed none of the counterparties would vote any hedge shares and some which assumed only a portion would vote.  (*See, e.g.*, DX 95; DX 96; Trial Tr. (Amin Test. 209:3-211:1; 217:19-218:2).)  The mere assumption in a scenario that the counterparties may have hedged with shares does not mean that TCI or 3G knew that the Total Return Swaps were hedged in that fashion.  Mr. Amin did not "falsely deny knowing whether TCI's swap counterparties hedged their position."  In fact, the evidence demonstrates that this is not information that the counterparties would disclose to them because according to John Arnone, head of the swap book at Deutsche Bank, "it's none of their business."  (DX 145 (Amin ¶ 8); DX 144 (Hohn ¶ 12); DX 149 (Partnoy ¶¶ 80, 85); Trial Tr. (Amin Test. 202:22-203:1, 206:4-5); (DX 150 (Partnoy Sur-Rebuttal ¶¶ 37, 38, 52); DX 151 (Kennedy Dep. 42:14-19);  DX 154 (Amin Dep. 77:3-19; Hohn Dep. 140:18-141:4, 158:17-

159:23; Sunak Dep. 89:16-23, 91:18-22); DX 152 (Arnone Dep. 14:7-11, 14:17-20, 15:2-8, 37:24-38:13).)

**B.      TCI and 3G Do Not Have the Ability Significantly to Influence.**

223-224.      The evidence does not support a finding that TCI had the ability to influence the voting of the shares purchased by the swap counterparties.

225.      The overwhelming evidence regarding the voting behavior of financial institutions demonstrates that some types of large shareholders (particularly banks) suffer from conflicts of interest that lead them to support management (not hedge funds), even when such support destroys shareholder value.  (Partnoy Rebuttal ¶¶ 52-55; Partnoy Sur-Rebuttal ¶ 49.)

225.1.  The reference to the analysis performed by D.F. King, TCI's proxy solicitation firm, ignores the fact that D.F. King admitted that it could only "guess" as to how shares held by broker/dealers would be voted.  (PX 160.)

226.      The assertion that "many a hedge fund has persuaded their CFD counterparty to vote one way or the other, without a problem" is based on an unsubstantiated statement made by a hedge fund manager in a letter to his investors that does not even refer to equity swap counterparties in the United States during the relevant time period here.  Instead, it refers to the earlier practices of CFD counterparties in the United Kingdom.  Past CFD practice in the United Kingdom is not evidence of more recent equity swap practice in the U.S.  (Partnoy Rebuttal ¶ 57.)

227.      Mr. Miller testified that he was "speculating" as to the cause underlying the movement of shares into Deutsche Bank in February 2008. (Trial Tr. (Miller Test. 77:16).)

228.      The swap agreements generally provide that the bank counterparty has the sole discretion to vote matching shares, and that the counterparties' internal guidelines and letters

confirm that the counterparties have sole discretion with respect to any referenced CSX shares. (Partnoy Rebuttal Report ¶¶ 45-50.)

229-232.    Plaintiff's assertion that TCI was especially likely to have the power to influence the voting of referenced shares because it had prime brokerage relationships with Goldman Sachs, UBS, Morgan Stanley, and Deutsche Bank is not supported by the evidence. The actual fees earned by TCI's counterparties since 2006 do not demonstrate that TCI's swap arrangements with these counterparties differed in any relevant way based on the amount of fees paid. Nor is there any evidence that TCI's swap arrangements with its prime brokers differed from its arrangements with counterparties that were not prime brokers. The amount of fees paid by TCI is not unusual for prime brokerage services provided to hedge funds. In addition, each swap counterparty's fees from TCI are no doubt a small percentage of their overall revenues. Moreover, if such fees actually gave TCI the power to influence its counterparties, TCI likely would have allocated the bulk of its swaps to the prime broker that received the greatest fees. Yet by the end of 2007, TCI had just 1,000 shares of swaps outstanding with UBS and Morgan Stanley, the two brokers to which TCI had paid the highest fees – by far. Plaintiff also does not consider the fact that CSX also paid fees to TCI's counterparties during the relevant times. In addition, one of CSX's directors, Edward J. Kelly, III, is the president and CEO of Citi Alternative Investments, a Citigroup entity. That factor, too, suggests that TCI has maintained its swaps with Citigroup for the reasons it stated, not because it believed it would be able to influence Citigroup. (Partnoy Rebuttal ¶¶ 62-65.) In any case, economic incentive is not an agreement or arrangement that yields voting or dispositive <u>power</u>.

233.    The evidence does not establish that TCI's counterparties even have the right to vote these shares to begin with (because they have been loaned out) or that these shares

will be voted at all (because the counterparties would not vote them as a matter of internal compliance policy).

C.    **The Swap Contracts Demonstrate that TCI and 3G Do Not Have Voting or Investment Power over the CSX Shares.**

235.    TCI and 3G are not beneficial owners of the shares purchased by the counterparties to their cash-settled Total Return Swaps.

236.    TCI's swaps agreements foreclose a finding of voting power.  According to Partnoy's Rebuttal Expert Report "the plain language of these documents – language that is replicated in approximately one trillion dollars worth of equity swap transactions – provided that TCI did not have the power to direct the vote of any CSX shares its swap counterparties held as hedges."  (DX 149 (Partnoy ¶ 45).)

237-238.    CSX is correct in its assertion that the agreements signed between TCI and its counterparties do not expressly require that the counterparties hedge with matching shares.  (Pl. Findings ¶ 237.)  Indeed, both the allocation of hedges and the right to terminate the swap is in the particular counterparty's discretion, and TCI does not have any control over that decision.  (DX 149 (Partnoy ¶ 47); DX 145 (Amin ¶ 8); DX 144 (Hohn ¶ 12); DX 152 (Arnone Dep. 9:5-8); DX 151 (Kennedy Dep. 41:13-42:4); DX 116-134 (TCI Total Return Swap agreements).)  The counterparties may choose to hedge with matching shares, but by no means is that the only option available to them.  (DX 145 (Amin ¶ 9); DX 151 (Kennedy Dep. 42:10-13); DX 149 (Partnoy ¶ 79); DX 95 (voting scenarios); PX 96 (same); PX 38 (Morgan Stanley e-mail explaining benefits of swaps).)

239.    The swap agreements for Deutsche Bank, Morgan Stanley and UBS contain provisions that contemplate that the counterparties unwind their hedge and dispose of their matching stock.  (PX 232 at TCI0155832; PX 236 at TCI0937762; PX 238 at TCI0937716.)

240-241.    Deutsche Bank and Citigroup have made statements that they do not have any agreement concerning the voting of the shares held as a hedge to the Total Return Swaps. Deutsche Bank has stated that its policy is that it will either abstain from voting those shares or it will vote those shares "in line" if abstaining would be considered a vote "for" or "against." Citigroup has stated that as a matter of practice it will generally abstain from voting those shares and, as a matter of policy, it will not accept instructions from any counterparty regarding the voting of such shares. Mr. Kennedy, on behalf of Citigroup, testified that Citigroup will not vote the shares held as a hedge to the Total Return Swaps. Goldman Sachs' policy prohibits any arrangements allowing a synthetically long counterparty from voting. Credit Suisse's policy prohibits voting where there has been a solicitation of swap counterparties regarding their voting preference. UBS's policy prohibits any agreement or understanding, whether written or oral, with the counterparty to vote the shares held as a hedge. (Partnoy Rebuttal Report ¶¶ 49, 50; Arnone Dep. 22:16-23:13, 33:5-18; Kennedy Dep. 21:18-24.)

### D.    The Treatment of Cash-Settled Security Futures is Instructive.

242.-248.    Cash-settled security futures are analogous to equity swaps. Indeed, Professor Subrahmanyam described cash-settled security futures as one of several hedges to an equity swap, because security futures provide an "almost one-to-one, nearly perfect hedge." In any event, the important point is this that both security futures and equity swaps are *cash-settled* derivatives. The other differences between security futures and equity swaps are immaterial compared to the fact that both are derivative contracts that settle in cash, and do not give the holder any right to physical settlement of shares. Although security futures are different in certain technical ways from equity swaps (because they take a different form), from an economic perspective security futures and equity swaps are nearly identical, as Professor

Subrahmanyam has recognized.  (Subrahmanyam Revised Report ¶ 90; Partnoy Sur-Rebuttal ¶ 23-24)

> ### E.     Professor Partnoy is a Qualified Expert.

249-249.2.     Professor Partnoy is eminently qualified to provide expert rebuttal testimony in this matter.  He is a Professor of Law at the University of San Diego School of Law where he is the Chair of the Center on Corporate and Securities Law, and graduate of Yale Law School.  He has taught various courses in the areas of corporate and securities law, finance and derivatives, as well as financial market regulation, and has authored several dozen articles and three books in these areas.  Professor Partnoy has written, taught, and testified about issues related to derivatives, swaps, share lending and hedging, hedge funds, and hedge fund activism.  His scholarly writings include the first academic article to address the challenges derivatives pose to assessing share voting, and the most comprehensive empirical study of hedge fund activism which is to be published in the Journal of Finance, the leading peer-reviewed financial journal.  Professor Partnoy has been previously qualified as an expert.  In addition, he also has given sworn testimony on issues related to securities and derivatives before committees of both the United States Senate and House of Representatives.  (Partnoy Rebuttal Repot ¶ 3)

In any event, there is little if any economic analysis in Professor Subrahmanyam's reports.  Indeed, much of his reports consist of little more than a review of the factual record in this case and publicly available documents related thereto, including lengthy discussions regarding:

- TCI's relationship with CSX (Subrahmanyam Report ¶¶ 38-40),

- TCI and 3G's Schedule 13D filings (*id.* ¶¶ 41-47),

- TCI's purported plans for CSX (*id.* ¶¶ 24, 30),

- The contents of TCI's swap agreements (*id.* ¶¶ 82, 132, 134, 143),

- The deposition testimony of CSX's proxy solicitor (*id.* at 34 n.79, ¶¶ 157, 59, 168),

- Regulatory filings made by TCI's swap counterparties (*id.* ¶¶ 103, 105-13),

- Statements purportedly made by TCI describing its investment in CSX (*id.* ¶¶ 25, 27, 28, 169),

- TCI's dissatisfaction with CSX management (*id.* ¶ 31),

- 3G's relationship with CSX (*id.* ¶¶ 33-37),

- TCI's intention to nominate certain directors (*id.* ¶¶ 48-50),

- TCI's and 3G's proxy statements (*id.* ¶¶ 51-53), and

- How certain parties may vote in a proxy contest (*id.* ¶¶ 155-57).

None of those topics involve any economic analysis by Professor Subrahmanyam. Rather, they essentially attempt to provide a comprehensive summary of plaintiff's case. Although Professor Subrahmanyam's reports do contain a number of charts and graphs related to TCI's swap and equity transactions, there is little if any economic analysis associated with that material. Instead, the charts and graphs simply are a compilation of trading information that Professor Subrahmanyam has assembled, with him occasionally providing aggregate figures regarding such trading. That is basic mathematics.

The one piece of analysis contained in Professor Subrahmanyam reports which requires something more than a basic understanding of addition is his so-called "Value-at Risk" analysis. However, as Professor Partnoy points out (Partnoy Rebuttal Report ¶¶ 95-100) and Professor Subrahmanyam himself acknowledges (Subrahmanyam Rebuttal Report ¶ 35), he calculates the relevant VaR incorrectly. Even when Professor Subrahmanyam attempts to clarify his analysis to address Professor Partnoy's criticism, he manages to directly contradict the

straightforward proscriptions of the leading text in this area that he cites to – a text that its author states "'does not require extensive finance training [and] is accessible to students who have gone through courses that present the principles of investments and corporate finance.'"  (Partnoy Sur-Rebuttal Report ¶ 37, quoting Rene M. Stulz, Risk Management and Derivatives (2003))

250.    Plaintiff's question as to whether Professor Partnoy has ever opined on swaps is utterly disingenuous.  Professor Partnoy has given expert testimony on swaps in two cases in which he was deposed by attorneys from Cravath Swaine & Moore.  *See Daehan Inv. Trust Mgmt. Co., Ltd. v. J.P. Morgan Chase Bank*, No. 02 Civ. 12175 (RCC) (S.D.N.Y.); *Korea Life Ins. Co., Ltd. v. Morgan Guar. Trust Co. of New York*, No. 99 Civ. 12175 (AKH) (S.D.N.Y.); *see also Korea Life Ins. Co., Ltd. v. Morgan Guar. Trust Co. of New York,* 269 F. Supp.2d 624 (S.D.N.Y. 2003); (Partnoy Rebuttal ¶ 3).  Plaintiff is well aware of Professor Partnoy's expertise.

251.    Plaintiff incorrectly asserts that Professor Partnoy's testimony was stricken in *S.E.C. v. Todd*.  The court in that case found that the issues of Professor Partnoy's testimony were not "relevant to the issues of [that] litigation" and made no findings concerning the expertise of Professor Partnoy.  *S.E.C. v. Todd*, No. 03CV2230 (BEN)(WMC), 2006 WL 5201386, at *4 (S.D. Cal. Oct. 17, 2006).

252-252.7.    Plaintiff attempts to demonstrate that Professor Partnoy is not qualified to testify in this action by quoting excerpts from two critical reviews of a book authored by him.  However, bad reviews hardly justify preclusion, and, in any event, plaintiff fails to acknowledge that the book was a finalist for the Financial Times/Booz-Allen Global Business Book Award in 1997.  (Partnoy Rebuttal Report, Ex. A.)

253.    Even a cursory review of Professor Partnoy's reports makes clear that he is not instructing the Court on any legal standard here, but rather, as Professor Partnoy repeatedly states in his reports, he is demonstrating that Professor Subrahmanyam's opinions run counter to market practice regarding equity derivatives and other similar instruments.  (*See* Partnoy Rebuttal Report ¶¶ 9 -13, 15, 21-28, 30-31, 35, 38-39, 41, 45-46, 55, 57, 64, 66-68, 71-72, 77-79, 90, 95, 98, 102, 105-107, 113; Partnoy Sur-Rebuttal Report ¶¶ 15, 21, 23-24, 33, 37, 41, 49-50, 58, 63, 65, 79.)  Market practice is the proper subject of expert testimony, especially in securities cases.

In contrast, Professor Subrahmanyam's reports are nothing more than a transparent attempt by plaintiff to direct the court on how certain of the ultimate legal questions in this case should be resolved.  Professor Subrahmanyam was asked by CSX to determine "whether TCI's swap arrangements give it, directly or indirectly, voting or investment power (the ability to significantly influence the voting or disposition of the referenced CSX shares), and whether, in connection with the swaps, TCI and its counterparties acted together for the purposes of acquiring, holding, voting or disposing of the referenced shares."  (Subrahmanyam Report ¶ 11)  However, each of these questions simply parrots the legal definitions found in Rules 13d-3 and 13d-5.  For instance, Rule 13d-3 defines beneficial ownership as "(1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or (2) Investment power which includes the power to dispose, or to direct the disposition of, such security."  17 C.F.R. § 240.13d-3(a).  Rule 13d-5 provides that "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership . . . ."  17 C.F.R. § 240.13d-5(b)(1).  Although Professor Subrahmanyam claims that he is not offering a legal

opinion (Subrahmanyam Report at ¶ 12), the thrust of his reports is that both prongs of Rule 13d-3(a) are satisfied, and accordingly, TCI should be deemed a beneficial owner of the CSX shares referenced in its swap agreements.  It is precisely that type of expert opinion that is not permitted.

253.1-253.2.   Professor Partnoy's analysis is not flawed.  According to Plaintiff, Professor Partnoy incorrectly focuses on the issue of whether TCI had the "power to direct" the voting or disposition of CSX shares rather than the "ability to significantly influence the voting or disposition" of those shares.  As a result, according to Plaintiff, Professor Partnoy "spends the bulk of his reports on irrelevant considerations" such as whether the swap counterparties "had to" hedge swap contracts with CSX shares.  However, as Professor Subrahmanyam expressly states himself, that is precisely what he is concluding.  Specifically, Professor Subrahmanyam states that " . . . given the economics of the circumstances of these transactions, the counterparties *had to* acquire or dispose of CSX shares based on TCI's purchases and sales of CSX swaps."  (Subrahmanyam Rebuttal Report at 9 n.14 (emphasis added).)

### F.    Professor Partnoy Accurately Portrays the Hedging Data

254.    Plaintiff's assertion that the 24 instances of mismatches between TCI swaps and its counterparties' hedging identified by Professor Partnoy are "illusory" because the swaps were hedged with shares on the next trading day or the share amounts were *de minimis* is incorrect.  Professor Subrahmanyam's explanation of these mismatches undermines his argument that TCI had the power to direct its swap counterparties to buy and sell shares.  He assumes that the next trading date is soon enough, although he does not offer any methodologically sound basis for reaching that conclusion.  Yet the fact that supposedly related share trades do not occur on the same day makes it more tenuous to conclude that the counterparties hedged with swaps the next day at the direction of TCI, or because they "had to" purchase shares.  For example,

evidence that counterparties did not purchase shares on the same day they entered into swaps

with TCI also supports a conclusion that counterparties hedged swaps with shares only when

they determined it was in their economic interest to do so, not because TCI had any power to

direct their share trading.  (Partnoy Sur-Rebuttal ¶ 57.)

### G.    TCI and 3G Disclosed All of the Information Required Under the Securities Laws.

260-262.    Plaintiff accuses Defendants of utilizing a litany of "half-truths" in

connection with its conduct in the proxy contest.  However, its assertions are not supported by

the facts or the evidence.  Indeed, Defendants have complied fully with all disclosure

requirements pursuant to the relevant SEC statutes and rules.  In making its argument, Plaintiff

mischaracterizes Defendants' Schedule 14A, describing TCI's and 3G's announcement regarding

the decision to run a minority slate for the CSX Board of Directors as a "long held plan."  (Pl.

Findings ¶ 262.)  It is clear from the record, however, that the decision for TCI and 3G to form a

group and run a slate occurred shortly before the filing of the Schedule 14A.  (Trial Tr. (Hohn

Test. 176:14-177:4; Trial Tr. (Amin Test. 215:4-12, 216:1-14); Trial Tr. (Behring 136:23-137:1);

DX 64.)  Defendants' Schedule 13D and Schedule 14A are wholly forthcoming and truthful.

263.    The Schedules (a) do not contain misstatements or omissions relating to

TCI's and 3G's beneficial ownership of the shares referenced in the swap agreements; (b)

accurately disclose TCI's and 3G's plans and proposals relating to CSX; (c) do not disclose

contracts, arrangements, understandings or relationships because there were none; and (d)

accurately report the formation of the TCI/3G group on December 12, 2007.  (JX 8, JX 19.)

**H.    Defendants Are Not the Beneficial Owners of Any CSX Shares Held by Their Total Return Equity Swap Counterparties**

264.    Defendants filed a 13D on December 19, 2007 disclosing that their group beneficially owned 8.3 percent of CSX's then-outstanding shares of common stock.  (JX 8 at 2-11.)

265.    Plaintiff incorrectly argues that TCI and 3G were beneficial owners of shares referenced in their swap agreements, and should have disclosed this beneficial ownership in their Schedule 13D.  Rather, it is clear that Defendants did not have beneficial ownership over any shares of CSX held by its counterparties.  To have beneficial ownership of those shares, Defendants would have to hold voting and/or investment power over those shares.  (Defs. Br. at 35.)  Nothing suggests that TCI or 3G had such power.

266.    The evidence shows that TCI holds no right to vote or dispose of the hedged shares, nor has any agreement or arrangement with the banks as to how to vote or dispose of those shares.  (Defs. Br. at 43-44.)  Therefore, TCI and 3G did not beneficially own any shares of CSX common stock that were referenced in their swap agreements.

267.    Defendants are also not beneficial owners of the hedged shares by virtue of having entered into the swap agreements as part of a "plan or scheme to evade" Section 13(d)'s reporting requirements.  (Defs. Br. at 50.)  To have taken part in a "plan or scheme to evade", Defendants would have needed more than a desire to avoid certain legal requirements – they would have needed a bad faith state of mind, which they did not have.  (Defs. Br. at 50-57.)  TCI and 3G merely structured investment contracts to prevent crossing the 5% beneficial ownership threshold, a legitimate and accepted practice in the securities industry, as indicated in part by advice TCI received from counsel.  (Defs. Br. at 52, 56-57.)  Thus, TCI and 3G did not have beneficial ownership of the CSX shares held by the counterparties.

117

I. **Defendants Have Made All Necessary Disclosures Regarding Their Plans and Proposals**

268.     Plaintiff claims that Defendants misrepresented its plans and proposals with regard to CSX in the Schedule 13D when Defendants stated – truthfully – that they "acquired [their CSX] Shares for investment in the ordinary course of business." (JX 8 at 14.)

269.     Plaintiff alleges that Defendants acquired an interest in CSX for the secret purpose of changing or influencing control of CSX. (Pl. Findings ¶ 269.) Plaintiff makes a series of assertions in an effort to show that TCI and 3G acquired their interests in CSX to change or influence control of CSX:

269.1.  Plaintiff points to the fact that TCI discussed a possible leveraged buyout with CSX as an indication that TCI and 3G purchased their stock and swap interests in CSX to change or influence control of CSX. For the reasons described above, and Defs. Br. at 75, those discussions made no such indication.

269.2-3.         Similarly, Plaintiff contends that TCI's suggestions to CSX, regarding certain business and regulatory issues, signaled that TCI purchased its interest in CSX in order to change or influence control are unsupported. Despite Plaintiff's implication otherwise, there is nothing improper about TCI, the owner of approximately 17.9 million shares (or approximately 4.1% of CSX), wishing to engage in dialogue with the CSX Board and top management regarding concerns it had about the business.

269.4.  Plaintiff also points to a June 21, 2007 email from the Evercore Team to Oscar Munoz that describes a meeting between Evercore and TCI to support its argument that TCI wants to change or influence control of CSX. (PX 109.) Plaintiff conveniently highlights only one of the ten summary paragraphs of TCI's statements. In the paragraph immediately before the one Plaintiff chooses to rely on exclusively, Evercore reports

118

TCI's frustration with the Board's refusal to meet with TCI. Plaintiff also ignores the paragraphs in which TCI expresses its suggestions to CSX and reiterates its desire to have an open dialogue with management. (*Id.*).

269.4.1.    Plaintiff cites TCI's and 3G's attempt to effect Board representation at CSX as evidence to support its allegations that TCI wants to change or influence control of CSX. This ignores the fact that TCI and 3G are seeking a minority slate of five, only two of whom are affiliated with the Defendants.

269.4.2.  Plaintiff then relies on its own documents to support the proposition that "[r]ather than wait for the annual election, TCI and 3G attempted to force CSX to call a special shareholders' meeting to consider TCI and 3G's nominees." Pl. Findings ¶ 269.4.2.  In making this argument, Plaintiff uses the fact that TCI criticized CSX's Bylaw amendment, which does not allow shareholders to call special meetings, to draw the baseless conclusion that TCI and 3G "attempted to force CSX to call a special shareholders' meeting" to elect their nominees. Plaintiff incredulously cites two different forms its own Press Release announcing its February 14, 2008 letter to Chris Hohn (PX 176; DX 79) to support its allegation. The letter does not even support Plaintiff's proposition, nor does any other piece of evidence in the record.

269.5.  Plaintiff incorrectly asserts that TCI "sought to replace the management of CSX." (Pl. Findings ¶ 269.5.)  The only evidence that Plaintiff cites to support this merely suggests that Mr. Ward *believes* that TCI intends to remove him, and that Amin approached Hunter Harrison to see if he would possibly, *in the future*, be interested in acting as CEO of CSX. (Trial Tr. (Ward Test. 12:9-12); (Amin Test 199:22-201:5).)  Plaintiff ignores Amin's testimony that, in approaching Mr. Hunter, TCI was merely exploring its options for the

future.  (Trial Tr. (Amin Test 198:14-201:2).)  Clearly, in April 2007, TCI was in no position to

replace Mr. Ward; nor is it in that position today; nor would it be in that position if its entire slate

was elected to CSX's Board of Directors.

          269.6.  Finally, Plaintiff attempts to establish that Defendants' motive in

buying stock and swaps in CSX was to change or influence control through a document titled

"Project Improve."  Plaintiff offers no evidence that TCI and 3G intends, or ever intended to

implement the contents of this document in any way.  Indeed, the evidence is to the contrary.

Luis Moura, a partner at 3G, testified that he had neither seen the document or even heard the

term "Project Improve" (DX 154 (Moura Dep. 98:20-99:11)) and Behring stated during his

examination that he, "never spent a lot of time looking at this particular document", that "[t]he

document was developed by Mr. Lamphere at any given attempt to evaluate whether he saw

opportunity in [CSX] or not."  (Trial Tr. (Behring Test. 149:9-12).)  Behring further stated that

Daniel Swartz at 3G may have assisted Mr. Lamphere "with numbers and number crunching."

(Trial Tr. (Behring Test. 149:12-14).)  Behring also testified that the "Project Improve"

document is not an operating plan.  It is worth noting that Plaintiffs never questioned any TCI

Defendants regarding "Project Improve."

          270.   TCI made all necessary disclosures regarding its plans and proposals.

First, CSX has known since early March 2007, from TCI's Hart-Scott-Rodino filing, that TCI

intended to acquire over $600 million of CSX common stock, and engage in dialogue with

management.  (DX 8; DX 10.)  Moreover, CSX made TCI's HSR filing a matter of public record

in its first quarter 10Q (DX 114.)  Additionally, TCI has made all obligatory disclosures pursuant

to Item 4 of a Schedule 13D, which requires, among other things, disclosure of certain

specifically listed "plans or proposals" which would result in the acquisition of disposition of

additional shares, any change in the board or management, or any material change in the business or corporate structure of the issuer.  17 C.F.R. § 240.13d-101, Item 4.  On Defendants' December 12, 2007 Schedule 13D, TCI fully and accurately disclosed that it had "multiple unsuccessful attempts to engage the management or the Board in a constructive dialogue" regarding CSX's operations and that TCI had suggested to CSX that it should (i) separate the Chairman and CEO roles, (ii) refresh the Board with new independent directors, (iii) allow shareholders to call special shareholder meetings, (iv) align management compensation with shareholder interests, (v) justify the capital spending plan to shareholders, and (vi) provide a plan to improve operations.  (JX 8.)

And, TCI made public disclosures about their investment in CSX.  On May 8, 2007, at a Bear Stearns Conference, Mr. Amin publicly spoke about TCI's investment in CSX, its investment thesis with respect to CSX, and its over $1 billion investment in the U.S. rail industry, the vast majority of which was invested in CSX.  (Defs. Br. at 21-22.)  TCI filed the first of four 13Fs on May 15, 2007, in which it disclosed that it had 17,796,998 shares of CSX stock, and since that time its position in CSX stock has not changed.  (Defs. Br. at 21.)  Thus, no later than May 15, 2007, it was a matter of public record that TCI held almost $18 million shares of CSX common stock, and had a "significant" economic exposure to CSX through derivative instruments.

It is important to note that Defendants have *fully* disclosed their existing plans regarding CSX – TCI and 3G disclosed that they "currently intend to conduct a proxy solicitation seeking to elect [their] Nominees to the Board at [CSX's] 2008 Annual Meeting" and that on December 12, 2007, Defendants "delivered a letter to [CSX] informing [CSX] of their intention

to propose nominees for election to the Board."[40]  Moreover, Defendants disclosed they may

"engage in discussions with management, the Board, other stockholders of [CSX] and other

relevant parties concerning the business, operations, governance, management, strategy and

future plans of [CSX]" and that Defendants "may in the future take such actions with respect to

their investments in [CSX] as they deem appropriate."  (JX 8.)

**J.    Defendants Had No Undisclosed Agreements, Arrangements, or Relationships with Respect to Securities in Their Schedule 13D.**

271–273.        Plaintiff argues that TCI and 3G filed a false and misleading

Schedule 13D on December 19, 2007 by not disclosing details of their swap agreements.  That

allegation is plainly false because in fact, TCI and 3G's 13D disclosed that TCI and 3G had

formed a group with beneficial ownership exceeding 5% and, as part of the filing, disclosed that

TCI had Total Return Swap agreements with eight credit counterparties.  (JX 8 (TCI and 3G

Schedule 13D dated Dec. 19, 2007).)  TCI's Total Return Swaps were accurately described as

giving TCI economic exposure to approximately 11% of the total outstanding shares in CSX, but

without entitling TCI to direct or indirect voting, investment or dispositive control over any CSX

securities.  (*Id*. at 17; DX 144 (Hohn ¶ 42).)

273.1.  TCI maintained swaps on 1,000 shares with six counterparties in

an effort to not allow other investors to identify where TCI's Total Return Swaps were held to

reduce the risk of other investors free riding and front running TCI's trading. (DX 144 (Hohn ¶

30); Trial Tr. (Amin Test. 204:21-23).)[41]

---

[40]       In subsequent Schedules 13D, filed on January 22 and 25, 2008, Defendants updated their intentions regarding running a minority slate of nominees to CSX's Board.  (JX 9; JX 10.)  On March 18, 2008, Defendants updated Item 4 by disclosing CSX's complaint in the instant matter and their intent to defend themselves vigorously. (JX 14.)  On April 7, 2008, Defendants updated Item 4 by disclosing their counterclaims against CSX and third-party claims against Michael Ward.  (JX 16.)

[41]       Mr. Amin testified at trial that it was important that TCI maintained a nominal swap position in the six remaining broker-dealer counterparties to avoid the risk of front-running.  (Trial Tr. (Amin. Test. 204:15-205:12);

274.    Item 3 of Schedule 13D requires disclosure of "the source and the amount of funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is or will be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, trading or voting the *securities*."  17 C.F.R. § 240.13d-101, Item 3 (emphasis added).  Defendants accurately disclosed that they used their general working capital to acquire CSX shares and Plaintiff does not contend otherwise.  (DX 144 (Hohn ¶ 21).)  No evidence to the contrary was offered at trial.  Rather, CSX claims that Defendants did not disclose the "source of funds they used to acquire beneficial ownership of the CSX shares underlying the swaps nor did they disclose the transaction history relating to those shares."  Defendants do not have, nor ever had beneficial ownership over the CSX shares underlying their swap agreements.  Accordingly, Defendants' Item 3 disclosure was complete and accurate.

275.    Disclosure of credit default swap ("CDS") positions is not required by the rules governing Schedule 13D disclosures.[42]  For example, the special instructions for complying with Schedule 13D provide that the primary purpose of the information disclosed is to determine and disclose the holdings of certain beneficial owners of certain equity securities.  17 C.F.R. § 240.13d-101, Special Instructions.  Similarly, Item 6 of Schedule 13D provides an illustrative list of types of arrangements to be disclosed that underscores the primary purpose described in the special instructions.  17 C.F.R. § 240.13d-101, Item 6.  CDS are essentially insurance against an issuer's defaulting on its debt, and fall outside the scope of that stated purpose.  Market

DX 154 (Amin Dep. 74:9-75:22).)  If other investors became aware that TCI maintained most of swap positions at one or two banks, every time such banks traded, investors could presumably identify whether TCI was increasing or decreasing its position, and then try to front-run TCI accordingly.  (*Id.*)

[42]    In the Joint Final Pre-Trial Order submitted by the parties on May 15, 2008, CSX raised for the first time the claim that 3G failed to make adequate disclosures relating to credit default swaps ("CDS") relating to CSX in its Schedule 13D filings.  That contention appears nowhere in CSX's complaint and therefore is an impermissible new claim raised after the close of fact discovery in this matter, that should not be considered by the Court.

practice is to not disclose CDS in Schedule 13D filings.  3G, however, adopted a conservative

approach relative to market practice and in fact disclosed that it has a CDS position that

references CSX.  In Item 6 of its of the December 19, 2007 Schedule 13D, 3G disclosed that:

> In addition, the 3G Reporting Persons currently have contractual
> agreements with Morgan Stanley Capital Services Inc. with regard
> to credit default swaps that reference debt securities of the Issuer.
> The contracts regarding the 3G Total Return Swaps and credit
> default swaps do not give the 3G Reporting Persons direct or
> indirect voting, investment or dispositive control over any
> securities of the Issuer and do not require the  counterparties
> thereto to acquire, hold, vote or dispose of any securities of the
> Issuer.  (JX 8.)

Accordingly, CSX's belated contention relating to CDS, even if it were to be
considered, is entirely without merit.

276.    Contrary to Plaintiff's contention, Item 7 does not require that Defendants

file copies of their equity or credit default swap documentation (such as the master agreements,

including schedules and exhibits, and swap confirmations).  Item 7 requires only that written

agreements pertaining to "the transfer or voting of the securities, finder's fees, joint ventures,

options, puts, calls, guarantees of loans, guarantees against loss or profit, or the giving or

withholding of any proxy disclosed in Item 6" be filed as exhibits to the Schedule 13D.  17

C.F.R. § 240.13d-101, Item 7(3).  Equity or credit default swap documents do not fall into any of

these categories.  These documents do not pertain to the transfer or voting of securities finder's

fees, joint ventures, options, puts, calls, guarantees of loans or the giving or withdrawing of any

proxy.  It is not a guarantee against loss or profit.  They do not guarantee anything to either of the

swap counterparties; rather, one counterparty gains when the stock price rises and the other

counterparty gains when the stock price falls.  Accordingly, Defendants are not legally required

to file their equity or credit default swap documentation as exhibits to their Schedule 13D.

277.    CSX also asserts that Defendants failed to file copies of the nominee agreements referenced in their Schedule 13D.  Item 7(2) of 17 C.F.R. § 240.13d-101 requires "copies of all written agreements, contracts, arrangements, understanding, plans or proposals relating to . . . any other matter as disclosed in Item 4."  Item 4(d) requires "any plans or proposals which the reporting persons may have which relate to or would result in . . . [a]ny change in the present board of directors."  Nominee agreements are entered into with people that may, or may not, ultimately become nominees as part of a proxy contest.  The agreement terminates at the point in time a person succeeds to a board of directors.  Therefore, such agreements do not relate to the Item 4(d) disclosure as contemplated in Item 7.  In any event, even assuming, *arguendo,* that nominee agreements are required to be filed with a Schedule 13D, such a *de minimus* technical violation is not a "material" omission and does not render Defendants' Schedule 13D false or misleading.  Moreover, the substance of the nominee agreements is described in detail in Defendants' Schedule 14A and, therefore, there is sufficient public information for the shareholders to decide how to cast their votes.

### K.    Defendants Did Not Misrepresent Their Group Formation/Ownership.

278.-280.    TCI and 3G reached an agreement to act together with respect to the disposition of CSX securities on December 12, 2007.  (JX 8 (TCI and 3G Schedule 13D dated Dec. 19, 2007); DX 65 (Agreement to form group between TCI and 3G dated Dec. 12, 2007); DX 145 (Amin ¶ 60); Trial Tr. (Hohn 184: 3-4).)  On December 19, 2007, TCI together with 3G filed a Schedule 13D with the SEC that disclosed that TCI and 3G had formed a group with beneficial ownership exceeding 5% and, as part of the filing, disclosed that TCI had total return swap agreements with eight credit counterparties.  (JX 8 (TCI and 3G Schedule 13D dated Dec. 19, 2007).)  TCI's Total Return Swaps were accurately described as giving TCI economic

exposure to approximately 11% of the total outstanding shares in CSX, but without entitling TCI to direct or indirect voting, investment or dispositive control over any CSX securities. (*Id.* at 17; DX 144 (Hohn ¶ 42).) 3G's Total Return Swaps were also accurately described as giving 3G economic exposure to approximately .8% of the total outstanding shares in CSX, but without entitling 3G to direct or indirect voting, investment or dispositive control over any CSX securities. (JX 8.)

Plaintiff insists, despite an overwhelming lack of evidence, that a group was formed "much earlier than their formal agreement of December 12, 2007." This assertion is untrue and lacks support for the reasons set forth above. CSX relies on inferences based on circumstantial evidence to support its assertion that a group was formed prior to December 12, 2007. These assertions include (1) that TCI and 3G had "discussions" in February 2007, after which 3G bought an enormous amount of CSX shares"; (2) that after a TCI and 3G meeting in New York in March, 2007, "3G increased its holdings in CSX" and "TCI also began to convert its swaps to physical shares"; and (3) that TCI and 3G "exchanged financial models and operations analyses of CSX throughout 2007." As discussed above, at best this "evidence" shows that TCI and 3G had a relationship with each other prior to forming a group, and shared information about the rail industry – which Defendants fully admit to – as these practices are common among funds. (DX 144 (Hohn ¶ 23); Trial Tr. (Behring Test. 130:14-131:16).) What is lacking in Plaintiff's case, however, is any concrete evidence that satisfies their burden of showing that TCI and 3G formed a group earlier than December 12, 2007.

### L.    Ramifications

281-284.    "Notional value" is a standard measure in the swaps industry, and is used by market participants, trade organizations, regulators, and experts to refer to the size of swaps. There are no "gross value estimates" available for TCI's equity swaps in this matter.

126

Moreover, Professor Subrahmanyam does not cite any evidence of "gross market value," and he does not to attempt to calculate such a number for any of the swaps. (Partnoy Sur-Rebuttal ¶ 66 n. 97.)

285-286.    There is no evidence in the record indicating the frequency of the use of swaps by investors to acquire exposure to over 5% of an issuer's shares.

287.    Section 13(d), which was enacted as part of the Williams Act, was intended to provide an issuer and investors with information regarding certain acquisitions of the issuer's equity securities for the purpose of acquiring control of the issuer. Courts have rebuffed efforts by management to use Section 13(d) to entrench itself. Existing law and regulations are clear that a person may acquire a large economic interest in an issuer without triggering any disclosure requirements under Section 13(d). It is only after a person acquires five percent or more of an issuer's equity securities that can be voted – and that accordingly can be used to gain control of the issuer – that the disclosure requirements of Section 13(d) apply. Specifically, the SEC defines the type of equity securities that trigger reporting requirements to exclude non-voting securities. In addition to the SEC's exclusion of non-voting securities from reporting requirements, the Exchange Act was amended in 2002 to exclude equity swaps – such as the cash-settled Total Return Swaps that TCI entered into – from the definition of equity securities.

288-290.    TCI's swap investment in CSX has been known to general public since no later than April 2007, when CSX issued its first quarter Form 10Q disclosing not only TCI's Hart-Scott-Rodino filing, but the fact that TCI had a significant investment in derivative securities relating to CSX. (DX 114 (CSX Form 10Q for the quarter ending Mar. 30, 2007).) Then, in May 2007, TCI filed a Form 13F, in which it disclosed that it held over 17 million shares of CSX common stock, a position that has remained virtually unchanged since that filing.

(Godnick Decl. Ex. 17.)  Finally, TCI's and 3G's December 19, 2007 Form 13D (disclosing their physical and swap positions), their supplemental 13D filings disclosing this lawsuit (JX 8 (TCI and 3G Schedule 13D, dated Dec. 19, 2007)), and the intense media attention generated by this case, have certainly assured that the market generally, and CSX shareholders specifically, are fully informed of not only Defendants' respective investments in CSX, but also CSX's contentions that they have beneficial ownership over the shares referenced by the swaps and formed a group earlier than December 12, 2007.  *See, e.g.,* Travis Reed, "Investors Partner to Nominate Minority Slate to CSX Board," Associated Press, December 19, 2007; Michael J. de la Merced, "Hedge Funds Propose CSX Directors, Starting Proxy Battle," New York Times, December 20, 2007; "CSX, TCI Dig In," Traffic World, January 7, 2008.  (*See* Godnick Decl. Exh. 22, 24 and 28)

From at or about the time TCI entered into its first Total Return Swap referencing CSX, TCI made CSX aware that it had significant economic exposure to the Company and the nature of that exposure.  (PX 268 (Baggs ¶ 3); PX 267 (Munoz ¶¶ 3-4); Trial Tr. (Munoz Test. 37:1-3).)  On November 14, 2006, at a Citigroup Transportation Conference in New York City, Mr. Hohn alerted Mr. Munoz to the fact that TCI had a $500 million investment with respect to CSX.  (DX 145 (Amin ¶ 20); PX 268 (Baggs ¶ 5); PX 267 (Munoz ¶ 4).)  Shortly after that meeting, CSX's head of investor relations, David Baggs, questioned Mr. Amin as to the form of TCI's investment in CSX.  (DX 145 (Amin ¶ 21); DX 268 (Baggs ¶ 6); Trial Tr. (Baggs Test. 63:8-18).)  Mr. Amin informed him that the investment was in the form of cash-settled swaps.  (*Id.*)  Mr. Amin explained cash-settled swaps to Mr. Baggs, letting him know that while these derivative instruments gave TCI economic exposure to CSX, they were devoid of all other characteristics that accompany physical ownership, including the right to vote.  (DX 145 (Amin

¶ 21).)  On January 22, 2007, TCI met with CSX's financial advisor, Morgan Stanley.  (DX 145

(Amin ¶ 26); DX 268 (Baggs ¶¶ 8-9); PX 267 (Munoz ¶ 8))  As part of this meeting, TCI advised

Morgan Stanley representatives that its substantial interest with respect to CSX was through

cash-settled total return swaps without voting rights.  (DX 145 (Amin ¶ 26); PX 35 (Jan. 15,

2007 e-mail from Walsh to Munoz stating he is going to find out "how long the contracts extend

for and how the voting rights work" in the swap contracts).)  Furthermore, TCI identified to CSX

at least some of the bank counterparties to its Total Return Swaps.  (DX 154 (Fitzsimmons Dep.

101:22-102:7).)

      291.    A finding that merely entering into a Total Return Swap (without any

agreement, arrangement, or understanding with the counterparty with respect to voting or

disposition of any shares held as hedges by the swap counterparty) creates beneficial ownership

over shares used as a hedge by the counterparty raises a myriad of real issues.  For instance,

because (i) not all swap counterparties hedge with shares of the referenced company, and (ii)

swap agreements generally do not require disclosure of information to the investor about whether

or not the counterparty has hedged or in what manner they are hedging, such a rule would cause

the investor to be required to attribute beneficial ownership of <u>all</u> referenced shares, regardless of

the level of matching of such referenced shares in a hedge by the counterparty.  This may lead to

significant over-reporting in the market in the aggregate of beneficial ownership of shares of an

issuer, including multiple attributions of the same shares to various parties (such as the swap

investor and any party who borrows such shares from the bank to acquire voting rights).  Such

over reporting would damage the transparency of the information provided through 13D

reporting – it would become much more difficult for the issuers and other stockholders to

determine what parties <u>actually</u> had accumulated power with the potential to change or influence control of the issuer.

In addition, it would seem likely that both the counterparty and the client in the Total Return Swap would be forced to consider themselves a "group" pursuant to Rule 13d-5(b) – the logical extension of the rule that automatically attributes to a swap party beneficial ownership because of potential influence over the swap counterparty's voting behavior is that the Total Return Swap contract must be an "agree[ment] to act together for the purpose of . . . voting . . . of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(1). Here, that would mean that since each and every member of a 13(d) group must make a Schedule 13D filing, each and every one of TCI's swap counterparties would have to make such a filing since they would be considered part of a group with TCI. Such a filing would need to disclose, among other things, the identity of the group members, the full amount of the group's ownership, and any plans or proposals regarding the issuer. *See* Schedule 13D. However, the bank counterparties do not necessarily know the requisite information regarding the identities and holdings of TCI's other counterparties in order to comply with these requirements.

In addition, pursuant to Rule 13d-5(b), each group member normally must disclose all of its equity securities holdings in the relevant issuer, not just the amount attributable to reference securities in the swap agreement. Therefore, by extension, any person entering into a swap, regardless of size, would need to monitor the equity holdings of each counterparty, aggregate the entire equity book of each, and when either (1) the counterparties aggregate holdings exceed 5%, all of the investor and the bank counterparties would need to make a Section 13 filing or (2) the investor's swaps with investment banks exceed 5% even though the holdings of each bank are under 5%, notify all parties of the existence of a filing obligation.

Each entity would need to include all of the information required by the Schedule 13D, and each of the swap counterparties along with the investor seeking economic exposure would be required to sign as filers and take liability for the accuracy of the information in such Schedule 13D.  And, because amendments to Schedule 13D trigger upon movements of 1% in the total equity of a public company, the amendment obligations could be continuous.  The administrative burden alone to marshal all the information required by Schedule 13D would be potentially massive.

       293-294.      Mr. Hohn's statement, that he was unaware that there was an option for voluntary filing is an honest response.  Under existing law, practice and interpretation, no obligation exists to make such a filing.  The determination of whether a filing must be made under Section 13 rests exclusively in Rule 13d-1, which states a filing is triggered only upon acquisition of beneficial ownership of equity securities exceeding 5% of an issuer.

## CONCLUSION

      For the foregoing reasons, Defendants respectfully request that all Plaintiff's claims be dismissed in their entirety and judgment be granted for Defendants.

May 29, 2008

SCHULTE ROTH & ZABEL LLP


By:   /s/ Howard O. Godnick
       Howard O. Godnick
       Michael E. Swartz
       919 Third Avenue
       New York, New York 10022
       Telephone:     (212) 756-2000
       Facsimile:     (212) 593-5955
       howard.godnick@srz.com
       michael.swartz@srz.com

       Attorneys for Defendants The Children's Investment Fund Management (UK) LLP, The Children's Investment Fund Management (Cayman) Ltd., The Children's Investment Master Fund, Christopher Hohn and Snehal Amin

KIRKLAND & ELLIS LLP


By:   /s/ Peter D. Doyle
       Peter D. Doyle
       Andrew Genser
       Citigroup Center
       153 East 53rd Street
       New York, New York  10022-4611
       Telephone:     (212) 446-4800
       Facsimile:     (212) 446-4900
       pdoyle@kirkland.com
       agenser@kirkland.com

       Attorneys for Defendants 3G Capital Partners Ltd., 3G Capital Partners, L.P., 3G Fund, L.P., and Alexandre Behring