UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CSX CORPORATION,

                                    Plaintiff,

                v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE BEHRING,
A/K/A ALEXANDRE BEHRING COSTA,

                                    Defendants.

---

THE CHILDREN'S INVESTMENT MASTER
FUND,

                        Counterclaim and Third-
                              Party Plaintiff,

                v.

CSX CORPORATION AND MICHAEL WARD,

                        Counterclaim and Third-
                              Party Defendants.

---

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.,

                        Counterclaim Plaintiffs,

                v.

CSX CORPORATION AND MICHAEL WARD,

                        Counterclaim Defendants.

---

ECF Case

08 Civ. 02764 (LAK) (KNF)

CORRECTED MEMORANDUM
OF CSX CORPORATION AND
MICHAEL WARD
IN RESPONSE TO DEFENDANTS'
POST-TRIAL BRIEF

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................. iii

Citation Conventions ................................................................................................ ix

Preliminary Statement................................................................................................1

I.     DEFENDANTS FORMED AN UNDISCLOSED GROUP TO SEEK
       EFFECTIVE CONTROL.................................................................................5

       A.     TCI Solicits 3G: Will You, Won't You, Will You, Won't You,
              Will You Join the Dance...................................................................6

       B.     Tipping the Other Funds: The Grin Without a Cat .....................................9

       C.     Mr. Hohn's Explanation: When I Use a Word, It Means Just What
              I Choose It To Mean — Neither More Nor Less .....................................10

II.    DEFENDANTS PLANNED AND SCHEMED TO EVADE THE
       REPORTING REQUIREMENTS ..........................................................................13

       A.     Bad Faith as a Sole or Dominant Motive Is Not Required ........................15

       B.     Defendants Acted in Bad Faith ................................................................18

III.   THE GROUP HAD VOTING AND INVESTMENT POWER
       THROUGH ITS SWAP ARRANGEMENTS .......................................................21

       A.     Defendants Misunderstand the Law.........................................................21

       B.     Defendants Ignore the Facts....................................................................26

IV.    DEFENDANTS MADE MISLEADING STATEMENTS ABOUT THEIR
       POSITIONS, RELATIONSHIPS, PLANS, PROPOSALS AND
       AGREEMENTS.................................................................................................32

       A.     Incomplete, False and Misleading Disclosures in Schedule 13D.............33

       B.     Incomplete, False and Misleading Disclosures in Schedule 14A.............40

V.     DEFENDANTS ACTED IN BAD FAITH, SUBJECTING THEM TO
       INDIVIDUAL LIABILITY ...............................................................................43

       A.     Defendants Played Games with the Truth .................................................43

       B.     Mr. Hohn and Mr. Behring Acted in Bad Faith.........................................43

i

**TABLE OF CONTENTS**
**(continued)**

Page

VI.    THE COURT SHOULD GRANT RELIEF TO PROTECT OTHER
       INVESTORS AND TO PREVENT DEFENDANTS FROM ENJOYING
       THE BENEFITS OF THEIR UNLAWFUL SCHEME ......................................46

       A.    Defendants Must File Corrective Disclosure ............................................46

       B.    Defendants Must be Enjoined from Voting their Proxies.........................49

       C.    Defendants Cannot Be Permitted to Profit from Their Bad Faith
             Evasion of the Law ...................................................................................50

       D.    The Court Should Monitor the Counterparties. ........................................53

       E.    Protecting the Investing Public Against Sales by the Group ....................54

Addendum A

# TABLE OF AUTHORITIES

Page(s)

CASES

Aaron v. SEC,
    446 U.S. 680 (1980)............................................................................49

American Federal Group, Ltd. v. Rothenberg,
    136 F.3d 897 (2d Cir. 1998).................................................................44

Basic Inc. v. Levinson,
    485 U.S. 224 (1988)............................................................................17

Bath Indus., Inc v. Blot,
    427 F.2d 97 (7th Cir. 1970) ..........................................................10, 29

Bobsee Corp. v. United States,
    411 F.2d 231 (5th Cir. 1969) ...............................................................17

Capital Realty Investors Tax Exempt Fund Ltd. Partnership v.
    Dominium Tax Exempt Fund LLP,
    944 F. Supp 250 (S.D.N.Y. 1996)..................................................48, 49

Cavalry Holdings, Inc. v. Chandler,
    948 F.2d 59 (1st Cir. 1991)..................................................................25

Cent. Foundry Co. v. Gondelman,
    166 F. Supp. 429 (S.D.N.Y. 1958).......................................................49

Champion Parts Rebuilders, Inc. v. Cormier Corp.,
    661 F. Supp. 825 (N.D. Ill. 1987) ................................................. passim

Comm. for New Mgmt. of Butler Aviation v. Widmark,
    335 F. Supp. 146 (E.D.N.Y. 1971) ................................................50, 51

Doe v. Pfrommer,
    148 F.3d 73 (2d Cir. 1998)..................................................................44

E.ON AG v. Acciona, S.A.
    No. 06-8720 2007 U.S. Dist. LEXIS 7771 (S.D.N.Y. February 5, 2007) ..................47

GAF Corp. v. Milstein,
    453 F.2d 709 (2d Cir. 1973).................................................................1

Gen. Aircraft Corp. v. Lampert,
    556 F.2d 90 (1st Cir. 1977).............................................................51, 52

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Gen. Steel Indus., Inc. v. Walco Nat'l Corp.,
No. 81-1410, 1981 WL 17552 (E.D. Mo. Nov. 24, 1981)..........................................51

Gorman v. Coogan,
No. 03-173, 2004 U.S. Dist. Lexis 301 (D. Me. Jan. 13, 2004) ..........................51, 52

ICN Pharms. Inc. v. Khan,
2 F.3d 484 (2d. Cir. 1993) ...................................................................................50, 51

In re Grand Jury Proceedings,
219 F.3d 175 (2d Cir. 2000).........................................................................................45

In re Kidder Peabody Sec. Litig.,
168 F.R.D. 459 (S.D.N.Y. 1996) .................................................................................46

In re WorldCom, Inc. Sec. Litig.,
No. 02-3288, 2005 WL 638268 (S.D.N.Y. Mar. 21, 2005)..........................................44

International Banknote Co. v. Muller,
713 F. Supp. 612 (S.D.N.Y. 1989)...............................................................................48

Irving Bank Corp. v. The Bank of New York, Inc.,
692 F. Supp 163 (S.D.N.Y. 1988)................................................................................52

Ithaca Ltd. v. Perry Corp., 2003 NZLR LEXIS 76
(Court of Appeals, Wellington, NZ, Nov. 4, 2003) .....................................................25

Lane Bryant, Inc. v. Hatleigh Corp.,
No. 80-1617, 1980 U.S. Dist. Lexis 11833 (S.D.N.Y. June 9, 1980).........................51

Levy v. Southbrook Int'l Invs.,
263 F.3d 10 (2d Cir. 2001)...........................................................................................29

Log on Am., Inc. v. Promethean Asset Mgmt. L.L.C.,
223 F. Supp. 2d 435 (S.D.N.Y. 2001).........................................................................11

Morales v. New Valley Corp.,
999 F. Supp. 470 (S.D.N.Y. 1998)...............................................................................10

Morales v. Quintel Entm't, Inc.,
249 F.3d 115 (2d Cir. 2001)...................................................................................10, 25

# TABLE OF AUTHORITIES
## (continued)

Page(s)

MTC Serv. Corp. v. Weldotron Corp.,
  No. 93-4980, 1994 WL 455154 (S.D.N.Y Aug. 19, 1994)...........................................51

Pantry Pride Inc. v. Rooney,
  598 F. Supp. 891 (S.D.N.Y. 1984).........................................................................13, 47

Roth v. Jennings,
  489 F.3d 499 (2d Cir. 2007)..................................................................................10, 12

Royal Indus., Inc. v. Monogram,
  No. 76-3348, 1976 WL 860 (C.D. Cal. Nov. 29, 1976) ...............................................17

SEC v. Corp. Relations Group, Inc.,
  No. 99-01222, 2003 WL 25570113 (M.D. Fla. Mar. 28, 2003) ............................16, 18

SEC v. Culpepper,
  270 F.2d 241 (2d Cir. 1959).........................................................................................49

SEC v. Drexel Burnham Lambert Inc.,
  837 F. Supp. 587 (S.D.N.Y. 1993)................................................................................26

SEC v. First Jersey Sec., Inc.,
  101 F.3d 1450 (2d Cir. 1996)..................................................................................43, 44

SEC v. Manor Nursing Centers, Inc.,
  458 F.2d 1082 (2d Cir. 1972).......................................................................................49

SEC v. Masri,
  523 F. Supp. 2d 361 (S.D.N.Y. 2001)...........................................................................17

SEC v. Savoy Indus.,
  587 F.2d 1149, 1167 (D.C. Cir. 1978)....................................................................15, 49

SEC v. Softpoint, Inc.,
  958 F. Supp. 846 (S.D.N.Y. 1997)..........................................................................16, 18

SEC v. Wills,
  472 F. Supp 1250 (D.D.C. 1978)..................................................................................49

Sonesta Int'l Hotels Corp. v. Wellington Assoc.,
  483 F.2d 247 (2d Cir. 1973)..........................................................................................52

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Treadway Cos. v. Care Corp.,
    638 F.2d 357 (2d Cir. 1980)....................................................................1, 15, 47, 48, 52

TSC Indus., Inc. v. Northway,
    426 U.S. 438 (1976).................................................................................................41

U.S. SEC v. Universal Express, Inc.,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007)...................................................................49

United States v. Bilzerian,
    926 F.2d 1285 (2d Cir. 1991)...........................................................................45, 46

Universal Container Corp. v. Horowitz,
    No. 74-3865, 1977 WL 1036 (S.D.N.Y. Sept. 6, 1977) ...................................10, 11, 47

Wellman v. Dickinson,
    682 F.2d 355 (2d Cir. 1982).....................................................................................10

Zimmerman v. CBOT,
    360 F.3d 612 (7th Cir. 2004) ....................................................................................17


STATUTES & RULES

17 C.F.R. § 230.144A .........................................................................................16

17 C.F.R. § 240.13d ..................................................................................... passim

17 C.F.R. § 240.13d-1(h)(i) ................................................................................22

17 C.F.R. § 240.13d-2(a) .....................................................................................59

17 C.F.R. § 240.13d-3 .........................................................................................24

17 C.F.R. § 240.13d-3(a) ................................................................21, 22, 23, 29

17 C.F.R. § 240.13d-3(b) ...............................................................14, 15, 16, 29

17 C.F.R. § 240.13d-3(d) ..............................................................................23, 29

17 C.F.R. § 240.13d-4 ..........................................................................................29

17 C.F.R. § 240.13d-5(b)(1) ...............................................................................10

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

17 C.F.R. § 240.13d-101................................................................32, 34, 35, 37

15 U.S.C. § 78c-1(a) ...............................................................................22

15 U.S.C. § 78m(d) ........................................................................... passim

15 U.S.C. § 78n(a) ..................................................................................41

15 U.S.C. § 78n(e) ..................................................................................17

15 U.S.C. § 78p(b) ...................................................................................2

15 U.S.C. § 78t(a).............................................................................43, 44

15 U.S.C. § 78t(c) ..................................................................................44

Fed. R. Civ. P. 8(c) .................................................................................44

Fed. R. Civ. P. 8(c)(1) ..............................................................................44

Fed. R. Civ. P. 26(c)(1)(G) .........................................................................39

**OTHER AUTHORITIES**

Cross Border Tender and Exchange Offers, Business Combinations and Rights,
    Exchange Act Release No. 33-7759, 1999 WL 969592 (November 13, 1998)...........18

Cross-Border Tender Offers, Business Combinations and Rights Offerings,
    Exchange Act Release No. 7611, 1998 WL 792055 (Nov. 13, 1998).........................18

Exchange Act Release No. 13291, § IV, Example 8 (Feb. 24, 1977)...............................16

Exchange Act Release No. 13,787 (July 21, 1977) ............................................36

Exchange Act Release No. 34-22171, Fed. Sec. L. Rep. (CCH) ¶ 83,788
    (June 26, 1985)................................................................................59

Filing and Disclosure Requirement Relating to Beneficial Ownership,
    Exchange Act Release No. 15348 (Nov. 22, 1978) ....................................22

November 28, 2006 SEC Amicus Letter to Judge Karon O. Bowdre in In re
    HealthSouth Sec. Litig., No. 03-1500 (N.D. Ala.).....................................16

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

Interpretive Release Applicable to Insider Reporting and Trading, Exchange Act
Release No. 34-18114, 46 Fed. Reg. 48147-01 (Oct. 1, 1981)....................................25

Sorrento, Inc., SEC No-Action Letter, Wash Serv. Bureau File No. 050784005,
Fiche No. 768C11 (May 4, 1984) ..............................................................................18

Securities Exchange Commission, Manual of Publicly Available Telephone
Interpretations, Section O, Number 14 (available at
http://www.sec.gov/interps/telephone.shtml) (1997)...................................................35

## CITATION CONVENTIONS

"3G": 3G Capital Partners Ltd., 3G Capital Partners, L.P., and 3G Fund L.P.

"3G Ans. ¶ [ ]" or "3G Counterclaims ¶ [ ]": Answer, Affirmative Defenses and Counterclaims of Defendants 3G Capital Partners Ltd., 3G Capital Partners, L.P., 3G Fund, L.P. and Alexandre Behring

"3G Priv. Log nos. [ ]": 3G Revised and Supplemental Privilege Log

"Compl. ¶ [ ]": Complaint

"CSX": Plaintiff-Counterclaim Defendant CSX Corporation

"CSX Proxy": CSX's definitive proxy statement on Schedule 14A filed on April 25, 2008

"CSX Ans. to 3G Counterclaims ¶ [ ]": Answer of Counterclaim-Defendant CSX Corporation and Third Party Defendant Michael Ward to the Counterclaims and Third-Party Claims of Defendants 3G Capital Partners Ltd., 3G Capital Partners, L.P. And 3G Fund L.P.

"CSX Ans. to TCI Counterclaims ¶ [ ]": Answer of Counterclaim-Defendant CSX Corporation and Third Party Defendant Michael Ward to the Counterclaims and Third-Party Claims of The Children's Investment Master Fund

"Defs' Br. at [ ]": Defendants' Post-Trial Brief

"D.F. King Priv. Log nos. [ ]": Privilege Log by D.F. King, Inc.

"PCL Section [ ]": Internal citations to CSX's Proposed Conclusions of Law

"PTO at [ ]": Amended Joint Final Pre-Trial Order

"PTO Stip. ¶ [ ]": Stipulated facts in the Amended Joint Final Pre-Trial Order

"PX [ ] at [ ]" and "JX  [ ] at [ ]": Plaintiff's proposed exhibits and joint proposed exhibits

"PFF ¶ [ ]":  CSX's Proposed Findings of Fact Relating to Its Claims

"PFF CC ¶ [ ]": CSX's Proposed Findings of Fact Concerning Counterclaims and Third-Party Claims

"TCI": The Children's Investment Master Fund

"TCI Ans. ¶ [ ]" or "TCI Counterclaims ¶ [ ]": Answer, Affirmative Defenses of Defendants The Children's Investment Fund Management (UK) LLP, The Children's Investment Fund Management (Cayman) Ltd., The Children's Investment Master Fund, Christopher Hohn, and Snehal Amin and Counterclaims and Third-Party Claims of The Children's Investment Master Fund

"TCI Priv. Log nos. [ ]": TCI Privilege Log for the April 9, 2008 Production

"Trial Tr. [PAGE:LINE NUMBER]": May 21, 2008 and May 22, 2008 Trial Transcript CSX v. TCI et al.

"Virginia Stock Corporations Act": Title 13.1 Chapter 9 of the Virginia Code

"[WITNESS] ¶ [ ]": Direct testimony of witnesses offered in Witness Statements

"[WITNESS] Dep. [PAGE: LINE NUMBER]": Deposition designations

**Preliminary Statement**

The "goal of § 13(d) 'is to alert the marketplace to every large, rapid aggregation or accumulation of securities . . . which might represent a potential shift in corporate control.'" <u>Treadway Cos. v. Care Corp.</u>, 638 F.2d 357, 380 (2d Cir. 1980) (quoting <u>GAF Corp. v. Milstein</u>, 453 F.2d 709, 717 (2d Cir. 1973)).  Defendants concede this.  (Defs' Br. at 1.)

Defendants' aggregation of CSX securities does "represent a potential shift in corporate control" under <u>Treadway</u>.  Defendants concede this.  Although Defendants incorrectly assert that "TCI and 3G satisfied both the letter and the spirit of Section 13(d)" by their filing on December 19, 2007, they explicitly acknowledge that their 8.3% ownership of shares and a 12.3% in economic exposure on swaps is a "potential shift in corporate control".  (Defs' Br. at 1-2.)

The issue under <u>Treadway</u> is thus not the materiality of that economic position, but <u>when</u> Defendants obtained that interest.  In fact, Defendants delayed their disclosure so that they could make a very "large, rapid aggregation . . . of [CSX] securities" without alerting the market, in violation of Section 13(d).  This is described in our Findings of Fact and Conclusions of Law submitted on May 27, which detail at length the record evidence—the exhibits, the deposition testimony and the trial testimony.

Defendants have taken a different approach.  Different from our approach, that is.  Their position has consistently been that they do not want findings tied to the record evidence—instead of pre-trial findings, they insisted on an uncited "short" statement of the case in the Pre-Trial Order; they resisted findings during the trial; and

they decided not to file post-trial findings. In fact, the Defendants' Post-Trial Brief hardly acknowledges the trial at all.

The trial did happen. And it showed that the Defendants conspired to evade the securities laws of the United States, allowing them to achieve a "large, rapid aggregation . . . of [CSX] securities" concededly representing a "potential shift in corporate control", to the detriment of other investors in the marketplace. Since we have already analyzed the <u>entire</u> evidentiary record, we do not add much in the way of findings to respond to Defendants' Brief. Instead, we describe how the actual facts dispose of Defendants' arguments, referring to the established findings.

This case involves Defendants' conspiracy to achieve a "large, rapid aggregation . . . of [CSX] securities", concededly representing a "potential shift in corporate control", to subvert the election of directors at the 2008 CSX Annual Meeting.[1] That illegal conspiracy involved at least the following:

- Defendants hid their "large, rapid aggregation . . . of securities" by forming an undisclosed Group (<u>see</u> Part I, <u>infra</u>);

- Defendants hid their "very large, rapid aggregation . . . of securities" of CSX by swaps to evade their reporting obligations (<u>see</u> Part II, <u>infra</u>);

- Defendants had voting and investment power through their swap arrangements (<u>see</u> Part III, <u>infra</u>);

---

[1] We do not stress the enforcement side of Defendants' misconduct in the conspiracy. Presumably the SEC will look into the evidence presented here. The Court has asked for the SEC's views. Although Defendants' counsel said that they have not heard from the SEC in response to our complaints (Trial Tr. at 70), the SEC knows the truth. Although we doubt that the SEC will simply ignore documented and intentional evasion of disclosure obligations, that is not our focus here. Nor will we get into the liability of the Defendants under Section 16(b).

- Defendants made misleading statements concerning their intentions and plans (see Part IV, infra); and

- Defendants' conduct was in bad faith (see Part V, infra).

Based on these facts, there is liability under Section 13(a), Section 14(a) and Section 20 of the Exchange Act.

The question is largely one of remedy rather than liability. And there are many problems for this Court to remedy. How can the Court remedy: (a) the effects of undisclosed Group activity and the secret accumulation through swaps entered into to evade the reporting requirements; (b) the quid pro quo agreement with other hedge funds, including Austin Friars, a subsidiary of Deutsche Bank, tipped by the Defendants to join the Group; (c) the effects of the agreements with the counterparties, including especially Deutsche Bank, which made the Defendants beneficial owners of those shares; (d) deliberately false statements by the Defendants to the SEC and the marketplace, and the continuation of those false statements in this Court; and (e) the possibility that the Defendants, facing defeat, may sell their shares to the detriment of innocent shareholders?

The Williams Act is not a tool for either side in this proxy fight. Despite Defendants' position, even-handedness is not a free pass for their misconduct. The Court should intervene to remedy false statements when public filings are not accurate or truthful, and so the Court should order corrective disclosures. And obviously no proxies should be voted that have already been received by Defendants prior to that corrective disclosure. Moreover, the Court should enter a declaration and enjoin Defendants from further violations of the securities laws.

3

However, disclosure and prohibition of future misconduct are not enough to remedy the irreparable harm. The relief that we request is entirely appropriate under Section 13(d) and the Court's inherent power and interest in making sure people are nothing but truthful in its Courtroom.

The Court should not permit the Group to vote its shares, obtained in violation of Section 13(d). (See Section VI.) This is especially true for the Defendants. It is also true for the "friends" whom they tipped and who thus became members of the Group. We do not know the identity of everyone falling into this "friend" category. We know Austin Friars. But not everyone. We request that the Court order Defendants to disclose to the Court and CSX immediately all the people that they tipped off about CSX before their interest became public and inform the Court of those entities that they believe are still shareholders. CSX will also look to see what it can find out about the holdings of the entities that Defendants admit they have tipped.

The Court should also address Defendants' efforts to manipulate the counterparties. There are three substantial counterparties—Deutsche Bank, Citigroup and Morgan Stanley. Deutsche Bank and Citigroup both had witnesses who described the activities of the banks at the swap desk level. But Mr. Amin admitted that TCI wished decisions to be made above the swap desk level. For example, TCI hoped that its agreement with Austin Friars would have impact above the swap desk to get the votes of Deutsche Bank. We therefore request that the Court order that the parties request Deutsche Bank, Citigroup and Morgan Stanley to disclose to the Court (but not the parties) how they plan to vote their shares and, following the CSX 2008 annual meeting,

4

how they have voted.  If they decline to do that, we request that the Court hold a hearing at which we could subpoena responsible executives from those entities to testify.

This brings us to the desired annual meeting.  The shareholders should be able to have a referendum, as long as the playing-field is level.  They can then make a choice between the incumbent directors and the Hohn/Behring slate.  Shareholders should be able to vote yes or no on Mr. Hohn and his tactics—the "go to war" and "no limits" bully who, when CSX did not buckle under his threats, filed a false claim of insider trading, announced with a bang in the press but litigated with a whimper in this Court.  For this to happen, equity requires an additional remedy.  Defendants made their investment at a low price because of their conspiracy.  Share prices have risen significantly since then.  If Defendants decide to sell their interest now as a result of this Court's decision or a loss of the election, it would not be equitable to allow them to sell their stake before innocent shareholders have had a chance to sell if they wish.  Therefore, the Court should impose a three business day no-sale period during which the public can sell or trade but the Defendants may not.

### Argument

**I.    DEFENDANTS FORMED AN UNDISCLOSED GROUP TO SEEK EFFECTIVE CONTROL**

Although Defendants' Wonderland has none of the charm of Alice, her trip has features that can characterize their misconduct.  First, TCI and 3G formed a group in February 2007, with 3G gladly accepting TCI's invitation to dance.  (See Part I.A, infra.)  Then, TCI and 3G tipped their "friends", so that they could join the Group, which some did.  The quid pro quo for the tip was support for the Group.  (See Part I.B,

infra.)  Mr. Hohn's rationalization for the Group — there isn't one until I say so — represents a refusal to make sense.  (See Part I.C, infra.)

Defendants formed a group long before December 12, 2007.  As detailed in our May 27 papers: TCI, after building its book, sought allies in its quest for control of CSX (PFF ¶¶ 44-51); TCI immediately found a willing co-conspirator in 3G by February 2007 (PFF ¶¶ 52-60); 3G purchased its shares in furtherance of their common plan (PFF ¶¶ 58-60, 89, 111); and TCI sought allies among its other friends. (PFF ¶¶ 61-74.)

**A.      TCI Solicits 3G: Will You, Won't You, Will You, Won't You, Will You Join the Dance**

Despite the overwhelming evidence, Defendants' story remains the same as it was before the trial: "Defendants did not form a group until December 12, 2007." (Defs' Br. at 57.)  According to Defendants, no coordinated activity ever took place until they formally agreed to be a "group" on that date.  Defendants are wrong.

Defendants argue that "the record is completely devoid" of evidence of Group formation prior to December 12 and that we rely on "inferences based on circumstantial evidence".  (Defs' Br. at 58-59.)  That is completely wrong.

This mass of evidence we provided is "circumstantial", but it is overwhelming.

Defendants do not dispute that we have proven the Group by circumstantial evidence.  Nor could they, because where concealment is an issue, as it is here, "plaintiff's proof necessarily has to be circumstantial".  Champion Parts Rebuilders, Inc. v. Cormier Corp., 661 F. Supp. 825, 850 (N.D. Ill. 1987) (internal citations omitted).

This is especially true where the Defendants were careful not to write things down.[2] And when they did, Mr. Amin said it was unfortunate. Because oral communication is more reliable than written. In reality, writing was "unfortunate" because it limited Defendants' ability to lie. Actually, that's not quite right. Cross examination showed that they did not feel constrained by writing. More accurately, they thought writing unfortunate because it can reveal inconvenient truths.

The "uncontroverted facts" are concerted action. For example, TCI and 3G decided on an "activist" scenario of a proxy fight no later than March 29, 2007. (PFF ¶¶ 75-80.) They co-ordinated their proxy campaign from that day on. Staying away from TCI's August proxy contest meeting and not being identified in nominee searches (Defs' Br. at 69-70) is in fact direct support of their desire to conceal their wrongful conduct. Since TCI and 3G talked frequently during this period and pursued the same course of activism at the same time, this Court should come to the conclusion that the parties communicated about the proxy meeting and nominee search. See Champion, 661 F. Supp. at 850.

Likewise, Defendants' story about 3G's "independent investment" decisions (Defs' Br. at 63) is a fantasy. 3G and TCI co-ordinated every single one of 3G's purchases and sales from February 9, 2007 to the end of 2007. (See PFF ¶¶ 58-60,

---

[2] Defendants were careful to keep things out of writing—likely due to Hohn's oft-expressed fear that their coordinated actions would be perceived as group activity. (See Defs' Br. at 67, 67 n.36 (stating that because of Hohn's "sensitivity" about "the appearance of forming a group", Hohn "was particularly careful when discussing investment information and sharing models" (PFF ¶¶ 191.1-191.2)); see also PX 46, PX 53, PX 54, PX 55 (emails indicating a detailed call would follow a brief email exchange) and PX 86 (email indicating that it would be preferable to send a model to Deccan Value, another hedge fund, via courier rather than via email).)

78-79, 85.)  Indeed, Attachment A to our Findings demonstrates conclusively how 3G co-ordinated with TCI on "all known swaps and transactions" by 3G.  (PX 206.)

Defendants' assertion that 3G's independent "investment decisions [are] based upon its own extraordinarily thorough and extensive research and analysis" (Defs. Br. at 23) is just wrong.  Mr. Hohn tipped Mr. Behring in January 2007 and they co-ordinated 3G's purchases and sales for the rest of the year.  "Friend Alex from Brazil" was the most loyal of the "friends and family" in the Group.  For his loyalty, he got the tip from Mr. Hohn before the others, and so got a better price.[3]  Thus, Mr. Hohn tipped 3G when TCI had "already built 93% of its ultimate position" (Defs' Br. at 64), whereas he waited until after 3G had made its initial wave of purchases resulting from the "friend Alex of Brazil" contact before he tipped the other friends.  (PFF ¶ 64.)

Defendants have no response to the showing that 3G's purchases follow the 3G and TCI agreement of no later than February 9, 2007.  The claim that Mr. Hohn's statement "I want to discuss our friend Alex of Brazil" in his email to Mr. Amin really references Arcelor Brasil, not CSX (Defs' Br. at 65; PX 42), is untrue.  Mr. Hohn's memory of this document—non-existent at his deposition (PFF ¶ 56)—is refuted by the document itself.  (PX 42.)  And Defendants have no response to the other evidence.  Nor could they.  (See PFF Addendum A.)

Defendants admit that there was evidence of "parallel action", "information sharing" and "personal and business relationship[s]" with frequent contacts between TCI and 3G, but argue that this "is not enough" to show group activity prior to

_____

[3] 3G did not even do its own "research and analysis".  3G and TCI pooled their research and shared models, just like good Group members.  (PFF ¶ 104.)

the date of the formal agreement.  (Defs' Br. at 57.)  This is a repetition of Mr. Hohn's

specious argument that there is a Group only when he says there is a Group.  And since

he started every Group meeting with a statement "We are not a Group", he thinks that

there cannot be.  We discuss the Humpty Dumpty argument below.

> ### B.    Tipping the Other Funds: The Grin Without a Cat

Tipping each other about unannounced deals is common practice in the

hedge fund industry.  Defendants concede this.  (Defs' Br. at 61-62.)  TCI followed this

practice when it had largely completed its book.  TCI concedes this.  Indeed, TCI "readily

concedes" it had discussions with other funds.  (Defs' Br. at 62 n.32.)[4]  That "ready

concession" does not detract from the corrupt bargain between Mr. Hohn and his friends.

As put colorfully by European critics, Mr. Hohn and his friends are like "locusts".

And the statements in the Defendants' brief citing Mr. Hohn on his

limitation of information have the same flaw as Mr. Hohn's testimony.  (Defs' Br. at 62-

---

[4] The readiness of its concession may be a result of the cross-examination of
Mr. Hohn on this point.  After he gave his speech that he would never tip anyone
(incuding 3G) on TCI's position because that would disadvantage his investors (Trial Tr.
163:13-16), he was forced to admit that he had tipped other hedge funds, including to tell
them to buy CSX.  (See, e.g., Trial Tr. 173:17-20, 174:23-175:5.)  On those other hedge
funds, Mr. Hohn was careful to make sure that TCI's position was largely filled before he
started recruiting "friends and family" into his conspiracy.  (Trial Tr. 189:24-191:4.)  He
had followed a slightly more generous practice with 3G, which became a significant
Group member, as opposed to some of the other friends, because he viewed them as
small.  (See Trial Tr. 189:3-23.)

As to the suggestion that there was nothing improper in the tipping because TCI did
not have material inside information about CSX (Defs' Br. at 62 n.32), we smile.  That is,
with respect, not the illegality.  The illegality is the offer by Mr. Hohn to his "friends" to
join the Group, and their acceptance.  The "friends" get cheap shares, although not as
cheap as Mr. Hohn's shares, and in exchange these like-minded "friends" support
Mr. Hohn.  No written agreement, it is true.  Mr. Amin would be disappointed if there
was a writing; oral agreements, he says, are more reliable.  Just the grin without the cat.

63.)  Mr. Hohn was lying.  Those few unfortunate e-mails show that he in fact shared information regarding TCI's planned investment in CSX when he considered it in his interest to do so.  (PFF ¶¶ 66-70.)

     C.     **Mr. Hohn's Explanation: When I Use a Word, It Means Just What I Choose It To Mean — Neither More Nor Less**

     Group formation does not depend upon when Mr. Hohn decides a "group" is formed by Mr. Hohn, or on the signature of a group agreement.  A group is formed when the parties agree to act together.  17 C.F.R. § 240.13d-5(b)(1) (2000); see Wellman v. Dickinson, 682 F.2d 355, 363 (2d Cir. 1982) ("The control action of the Group's members need not be expressly memorialized in writing"); Bath Indus., Inc. v. Blot, 427 F.2d 97, 111 (7th Cir. 1970) (date of formation of the group based on circumstantial evidence of an agreement to act in concert for the purpose of acquiring, holding or voting shares of an issuer).  Whether the parties can take present action as a group or whether they have signed a formal document is not determinative; the group formation "may be formal or informal".  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 124 (2d Cir. 2001).  If the parties agree to prepare to act together at some future time—as the evidence clearly shows they did here—then the group is formed at the time of the agreement.  (PFF ¶¶ 52-60.)  Defendants here agreed to act "in concert" (Defs' Br. at 68); the evidence shows that.[5]  See Roth v. Jennings, 489 F.3d 499, 512 (2d Cir. 2007) (finding evidence of group formation in parallel means, timing and method of share purchases).[6]

_____

    [5] Universal Container Corp. v. Horowitz,, No. 74-3865, 1977 WL 1036, at *16 (S.D.N.Y. Sept. 6, 1977).

    [6] Morales v. New Valley Corp., 999 F. Supp. 470 (S.D.N.Y. 1998), is cited by Defendants for the assertion that a consulting arrangement between parties is insufficient to find a group.  (Defs' Br. at 58.)  That is inapposite to this case, since the evidence

10

Defendants respond that some of our evidence is "not enough" to show Group formation, namely that "general allegations of parallel investments" and "mere relationships among persons or entities" are insufficient. (Defs' Br. at 57-58.) We don't really need to argue these. The evidence shows not just "general allegations of parallel investments" but a specific pattern of investment activity that was clearly coordinated and undertaken in concert with one another. (PFF Addendum A; PFF ¶¶ 80-82, 85-91, 102-105.) The evidence shows not just a "mere relationship" but a years-long acquaintance, co-investment, with at-least-monthly contact, that specifically included discussions of CSX and specific, non-public plans and analyses, co-ordination of investment activity by 3G and sharing of nonpublic information about positions in the Company. (See PFF ¶¶ 61-74, 77-84, 102-105.)[7]

Nor do we need to address whether "information sharing alone" establishes a group. (Defs' Br. at 58.) After the Court examines "whether the inference of collusion is really justified in light of all the circumstances" (Defs' Br. at 58), the conclusion is inevitable. It is clear that TCI and 3G's efforts were not limited to "information sharing" and that an inference of collusion is compelled (PFF ¶¶ 52-60). See Champion, 661 F. Supp. at 850 (common plan and goal, parallel share purchases, correlated activities and intercommunications and claims of shareholder support were "strong circumstantial evidence" of an agreement). We note that Mr. Hohn viewed

---

shows there was much more than a consulting arrangement between the parties. (See, e.g., PFF ¶¶ 52-60.)

[7] Therefore, Log on Am., Inc. v. Promethean Asset Mgmt. L.L.C., 223 F. Supp. 2d 435 (S.D.N.Y. 2001), and Universal Container Corp. v. Horwitz, No. 74-3865, 1977 WL 1036 (S.D.N.Y. Sept. 6, 1977), cited by Defendants, are inapposite.

sharing models an advance form of information sharing characteristic of a group. (Trial Tr. 179:11-14.) And he shared freely with his Group members: 3G even before he finished TCI's book, and then with the other "friends" when his book was complete. (PFF ¶¶ 61-71.)

This disposes of Defendants' argument that in November 2007 for the first time Mr. Behring "approached TCI and asked whether it would consider forming a group". (Defs' Br. at 60.) They had formed a Group well before then. But at the risk of making the rubble bounce, we make three more comments.

First, Mr. Behring's testimony is inconsistent with Mr. Hohn's deposition and trial testimony. (Hohn Dep. 116:2-117:23; Trial Tr. 216:20-24.) Mr. Hohn testified that Mr. Behring "informally brought up" forming a group in the spring or summer of 2007 but that "Hohn made clear to Mr. Behring that he had no interest in forming a group" and "wished to avoid the appearance of forming a group". Indeed, it could not be true. Mr. Hohn couldn't have started every Group meeting with the mantra "We're not a Group". In fact, Defendants themselves admit on the very next page that Mr. Hohn testified "that on a couple of occasions during the late spring or early summer of 2007, Mr. Behring asked Mr. Hohn whether TCI would be interested in working with 3G in connection with" CSX. (Defs' Br. at 61.) The truth will set one free, but it is hard to lie consistently.

Second, this argument represents a misunderstanding of when a group is formed. This is Mr. Hohn's Humpty Dumpty point. Defendants could not avoid group formation by merely disclaiming that they were in a group. Roth, 489 F.3d at 511 (where defendants acted together for the purpose of acquiring shares, they formed a group under

12

Section 13(d), "regardless of their attempted disclaimers of the legal effect of such joint action".)[8]  Indeed, starting every meeting with a disclaimer that "We're not a Group" is powerful evidence that they are a Group and seeking to evade that.

Third, Defendants argue there was no reason to form a group before December 12, 2007, because you could "tie your hands" and there was no point to have a Group until the proxy fight could actually start.  (Defs' Br. at 68-69.)  This again indicates Defendants' misunderstanding of when and how a group was formed.  If the parties agreed to prepare to act together at some future time—as the evidence shows they did here—then the group is formed at the time of the agreement.  And they had been working together on a proxy fight since at least March 29.  The evidence clearly shows that Defendants viewed formation of a group, and the resulting requirement to file a Schedule 13D, as a public relations tactic in their effort to acquire effective control of CSX.  They were prepared to file their Schedule 13D only when they had fully assembled their slate of five nominees for the CSX Board of Directors and were ready for a public rollout.

## II.    DEFENDANTS PLANNED AND SCHEMED TO EVADE THE REPORTING REQUIREMENTS

As is described in detail in CSX's proposed findings of fact and conclusions of law, the Group planned and schemed to evade the reporting requirements.

---

[8] Pantry Pride, Inc. v. Rooney, 598 F. Supp. 891, 899-900 (S.D.N.Y. 1984), cited by Defendants for holding that a group had not been formed until a formal agreement was made, is distinguishable from this case.  In Pantry Pride, the formal agreement was preceded by a period of preliminary discussions marked by "lingering indecision and independent goals inconsistent with any agreement"; whereas in this case there is evidence of coordinated effort and actions consistent with an agreement.  Id.

Reporting its positions in, and plans for, CSX would have compromised the Group's quest for control and influence at the Company.  (PFF ¶¶ 20-29, 39.)

Defendants seek to explain away their evasion by representing to the Court that CSX "did not identify Rule 13d-3(b) as a cause of action in its complaint or in the 'Issues to be Tried' in the Joint Pre-Trial Order".  (Defs' Br. at 6.)  That is wrong.  In fact, CSX expressly alleged that Defendants violated Rule 13d-3(b) in the complaint, expressly called it out in response to TCI's contention interrogatories, and specifically referred to it in the Final Pre-Trial Order.[9]  Defendants' effort to avoid responsibility for their illegal conduct on procedural grounds fails as baseless.

Faced with the undisputed fact that Defendants used their swap arrangements to avoid the reporting requirements, Defendants argue that their secret acquisition of a significant stake in CSX, while selectively tipping their friends, does not make them beneficial owners of the CSX shares referenced in their swaps under Rule 13d-3(b) because they did not act in bad faith for the sole or dominant purpose of evading

---

[9] Compl. ¶¶ 58(b), 63 (expressly identifying Rule 13d-3(b)'s attribution of beneficial ownership where a person creates an arrangement with a "plan or scheme to evade the reporting requirements" and specifically alleging that "Defendants beneficially own the shares of CSX referenced in their swaps because they were part of a plan or scheme to evade the reporting requirements of the securities laws"); PTO at 16 (under CSX's contentions:  "even if TCI were not otherwise a beneficial owner of the CSX shares referenced in its swaps, TCI, directly or indirectly, created or used its swap arrangements with the purpose or effect of divesting TCI of beneficial ownership of CSX securities or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements"); Am. Resp. and Obj. of CSX Corp. to TCI's Contention Interrogs. dated May 8, 2008, at 3 ("TCI, directly or indirectly, created or used its swap arrangements with the purpose or effect of divesting TCI of beneficial ownership of CSX securities or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements . . .").

the reporting requirements.  (Defs' Br. at 50-57.)  Defendants are wrong on both the law and the facts.

### A.      <u>Bad Faith as a Sole or Dominant Motive Is Not Required</u>

The goal of Section 13(d) "is to alert the marketplace to every large, rapid aggregation or accumulation of securities. . . which might represent a potential shift in corporate control."  <u>Treadway Cos. v. Care Corp.</u>, 638 F.2d 357, 380 (2d Cir. 1980) (internal citations omitted).  The requirements of Rule 13d-3(b) are satisfied where there is control intent.  The rule says nothing about scienter or bad faith.  Defendants have not cited a single case holding that bad faith is required under Section 13(d) or Rule 13d-3(b).  Nor could they.  The cases have expressly held that scienter is not an element of a Section 13(d) violation.  <u>SEC v. Savoy Indus.</u>, 587 F.2d 1149, 1167 (D.C. Cir. 1978).

Indeed, intent to evade is not relevant to Section 13(d) or the evasion rule.  Evasion is a bright-line test.  The statute addresses concentration and change of control intent.  If there is a change of control intent, then an undisclosed concentration above 5% is an evasion.

Not only is there no requirement that Defendants have a motive to evade, but there is certainly no requirement that evasion must have been their sole, or even dominant, motive.  Here again, the rule does not say, and Defendants have not cited a single case holding, that Rule 13d-3(b) is satisfied only upon a showing that a person's motive was to violate the law.  In fact, the rule applies where an arrangement is used for the purpose <u>or</u> with the effect of evading the reporting requirements.  Purpose is <u>not</u> an essential element of beneficial ownership under Rule 13d-3(b).

For both prongs of their new-found standard, Defendants rely upon an SEC Release from 1977.  The Release provides:

15

"In order to acquire a substantial position in the voting securities of Z Corporation prior to the election of directors which will take place in the near future, X causes ten institutions to each acquire three percent of the outstanding shares of Z Corporation. None of the institutions are aware of the purchases by the other institutions or of X's control objective. As an attempted means of avoiding disclosure of his beneficial ownership of the Z shares until a short time before the election, X, simultaneously with the purchase of the Z shares, gives an irrevocable proxy to A; which proxy will lapse according to its terms…As indicated in Rule 13d-3(b), X is also deemed a beneficial owner of the same Z shares for the period of the proxy as well as thereafter, and therefore must file a Schedule 13D." Exchange Act Release No. 13291, § IV, Example 8 (Feb. 24, 1977).

Rather than support Defendants' position, the SEC's guidance undermines it. In that Release, the SEC says nothing about bad faith or predominance of an evasion motive. Nor can either supposed requirement fairly be inferred from the fact pattern described in the SEC's commentary. The SEC has explicitly stated, however, that in the context of Rule 144A, a determination of the existence of a plan or scheme to evade "*does not turn on the security offeror's motive*". November 28, 2006 SEC Amicus Letter to Judge Karon O. Bowdre in In re HealthSouth Sec. Litig., No. 03-1500 (N.D. Ala.) (available at http://www.sec.gov/litigation/briefs/2006/healthsouthbrief.pdf ) (emphasis added) (The SEC continues: "the safe harbor is unavailable…if an offeror's technical compliance with Rule 144A is an attempt to evade registration . . . .").[10]

Every one of the cases cited by Defendants is inapposite. To support the proposition that bad faith requires proof that an actor's sole or dominant motive is to

---

[10]  Indeed, the two cases cited by Defendants (Defs' Br. at 51) in which a plan or scheme to evade was found to exist do not include any discussion or analysis of alternative or competing motivations.  See SEC v. Softpoint, Inc., 958 F. Supp. 846 (S.D.N.Y. 1997); SEC v. Corp. Relations Group, Inc., No. 99-01222, 2003 WL 25570113 (M.D. Fla. Mar. 28, 2003).  The lack of discussion of alternative motivations is an indication that those motivations are irrelevant.

violate the law, Defendants cite Zimmerman v. CBOT, 360 F.3d 612 (7th Cir. 2004).

(Defs' Br. at 52.)  Zimmerman, however, is an antitrust case rather than a securities case.

360 F.3d at 612.  Defendants also cite SEC v. Masri, 523 F. Supp. 2d 361, 573 (S.D.N.Y.

2001), a market manipulation case, for the proposition that the presence of any legitimate

economic motive for a questioned trade negates a finding of market manipulation.  (Defs'

Br. at 53.)  An evaluation of motives in that context is irrelevant here: market

manipulation must "artificially" affect the price of a security; if the manipulative conduct

was performed for a legitimate economic reason—even if also illegitimate—the stock

price effect would not be artificial.  Masri, 523 F. Supp. 2d at 373.  Finally, Defendants

cite Royal Indus., Inc. v. Monogram, which involves a finding of bad faith under Section

14(e), but does not hold that a finding of sole or dominant intent to violate the law is

required to prove bad faith.  No. 76-3348, 1976 WL 860, at *6 (C.D. Cal. Nov. 29, 1976)

(officers, directors and management of a company violated Section 14(e) by using their

corporate powers to their own advantage and made an acquisition whose "compelling

reason or sole, controlling or primary purpose is to block a tender offer").[11]

Citing two cases, an SEC amicus brief and two SEC Releases regarding

cross-border tender offers, Defendants suggest that their plan and scheme were somehow

exempt from the disclosure requirements and are entitled to a presumption of legitimacy.

---

[11] Defendants go so far as to cite three tax cases.  (Defs' Br. at 52.)  Defendants
contend that a taxpayer motivated by tax avoidance considerations does not violate tax
law so long as a legitimate business purpose is also present.  (Id.)  That is misleading.  If
"a", not even "the", primary purpose of the actor is to avoid taxes, then its conduct is
wrongful regardless of some other innocent business motive.  Bobsee Corp. v. United
States, 411 F.2d 231, 238 (5th Cir. 1969).  The defining principles and purposes of tax
and securities laws are not the same.  Moreover, the purpose of Section 13(d) is to
increase disclosure.  Basic Inc. v. Levinson, 485 U.S. 224, 230 (1988).

(Defs' Br. at 50-52.)  However, the determination of whether a plan to evade exists

depends on the facts of the case.  <u>See</u> Sorrento, Inc., SEC No-Action Letter, Wash Serv.

Bureau File No. 050784005, Fiche No. 768C11 (May 4, 1984).  The authorities cited by

Defendants do nothing more than show certain circumstances where a plan to evade was

found to exist—or not.[12]  None of the authorities cited by defendants states that bad faith

is necessary to finding a plan or scheme to evade.

By the plain language of the rule, CSX need show no more than that

Defendants had a control intent and used their swap arrangements or some other device to

exceed 5% beneficial ownership without disclosure.  Defendants did just that.

### B.    <u>Defendants Acted in Bad Faith</u>

Defendants engaged in a plan and scheme to evade the reporting

requirements of Section 13(d).  CSX's Proposed Findings of Fact and Conclusions of

Law relate in detail how TCI acquired its interest in CSX in swaps instead of physical

shares to avoid reporting requirements (PFF ¶¶ 22, 24); monitored its holdings to ensure

---

[12] <u>SEC v. Corporate Relations Group</u>, No. 99-01222, 2003 WL 25570113, at *16
(M.D. Fla. Mar. 28, 2003) (defendants violated Section 5 of the Securities Act—of which
scienter is not an element—and since defendants structured the transaction to evade
Section 5's reporting requirements, they could not take advantage of the safe harbor
provided by Regulation S); <u>SEC v. Softpoint</u>, 958 F. Supp. 846, 861 (S.D.N.Y. 1997)
(defendants could not take advantage of the Regulation S safe harbor because stock
liquidation plan was meant to evade registration requirements).  Defendants misleadingly
indicate that the SEC Releases they cite also support their bad faith argument.  The
Releases do not.  The Releases state that if a plan is a sham meant to evade, or if the plan
is carried out solely as a pretext to evade, statutory safe harbors are not available.  Cross-
Border Tender Offers, Business Combinations and Rights Offerings, Exchange Act
Release No. 7611, 1998 WL 792055, at *23 (Nov. 13, 1998); Cross Border Tender and
Exchange Offers, Business Combinations and Rights, Exchange Act Release No. 33-
7759, 1999 WL 969592, at *7 (November 13, 1998).  Nothing in the Releases indicates
that those examples are meant to be the only circumstances where a plan or scheme to
evade could be found.

that reporting obligations were not triggered (PFF ¶ 24); took steps calculated to conceal its position from the market, including diversifying its holdings across counterparties to make sure no counterparty was pushed into a filing position (PFF ¶¶ 20-29); and maintained de minimis positions with numerous counterparties to conceal the identity and holdings of its primary counterparties  (PFF ¶¶ 23, 24, 30-39)—all while selectively tipping its friends about its position in, and plans for, CSX (PFF ¶¶ 64-69).

TCI argues that it "did <u>not</u> terminate its swap contracts with its counterparties, as would have been expected had non-disclosure been TCI's primary motive behind the swaps".  (Defs' Br. at 7.)  This, rather than "speak[ing] volumes about TCI's reasons for acquiring and holding swaps" (Defs' Br. at 7), is a total non-sequitur.

TCI likes swaps because they provide a cheap form of financing and there can be tax benefits.  Indeed, TCI's Board Minutes of July 19, 2007, say so.  (PX 19.) And TCI cites these minutes for those precise propositions.  (Defs' Br. at 22.)  However, TCI does not quote what the minutes actually say.  So we will.  In response to a director's question on the reasons for swaps, TCI management describe the reasons:

"[A]ccess to financing/funding, the lack of U.K. stamp tax at 0.5%, <u>disclosure, the ability to purchase without disclosure to the market or to the company</u>".  (PX 19 at TC10011386 (emphasis added).)

Defendants forgot the TCI board's discussion of the "disclosure" benefit of swaps, namely "the ability to purchase without disclosure to the market or the company".  (PX 19 at TC10011386.)

Defendants achieved that goal here, and because they have control intent, their "ability to purchase without disclosure in the market or to the company" was a plan or scheme to evade Section 13(d).

Defendants' continuation of their swaps speaks no volume on this evasion. Defendants have engaged in a rapid aggregation of securities representing a potential change in corporate control in violation of Section 13(d). But scienter is not a required part of the violation, any more than Defendants' reference to "primary motives" is. This is a bright line test. They need to have an intent to control which would otherwise require disclosure of items on Schedule 13D; then they must disclose any economic interest at 5% regardless of their state of mind, their primary/secondary motives or the advice of counsel.

TCI further claims to have received and relied upon unidentified advice of counsel, the implied thrust of which is that TCI's activities were on the up and up. Having asserted privilege as to this advice, and declining to provide documents and other discovery relating to it, TCI is precluded from relying on any advice of counsel in its defense. A party may not use the privilege as a shield (as TCI did in invoking the privilege during discovery) and at the same time use it as a sword (as TCI now does in its post-trial brief).

In any case, we do not believe that Defendants' law firms would have given them the supposed advice in question, if they had had all of the facts, including the fact that Defendants were secretly amassing a huge stake in CSX without disclosing it, while they were at the same time tipping their buddies, seeking influence and control at CSX and influencing the price of CSX stock.

Not to be forgotten is that Defendants failed to provide credible testimony to the Court during the course of the trial. For this reason the Court should—indeed, we submit, must—reject Defendants' testimony as incredible and unreliable. This is further

evidence in support of our evasion argument.  They perpetrated a scheme to evade the reporting requirement to the detriment of CSX and the unsuspecting public, and they should be held accountable for it.

## III.    THE GROUP HAD VOTING AND INVESTMENT POWER THROUGH ITS SWAP ARRANGEMENTS

Even if Defendants had not engaged in a plan and scheme to evade the reporting requirements, they are nevertheless beneficial owners of the CSX shares referenced in their swap arrangements relating to CSX.  None of Defendants' contrary claims bears scrutiny.

### A.    Defendants Misunderstand the Law

The law provides several tests for determining whether a person is a beneficial owner of a security.  Putting aside the test related to evasion (discussed in Section II above), a beneficial owner of a security includes, among others, any person who directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise has voting or investment power over such security.  17 C.F.R. § 240.13d-3(a).  Under the plain language of the Rule, TCI and 3G are beneficial owners of the CSX shares referenced in their swaps for the reasons described in detail in CSX's proposed findings of fact and conclusions of law.  (See PFF ¶¶ 197-259; PCL Section I.B.1.)

Defendants argue that their swap activities were immune from disclosure under this and other provisions of Rule 13(d), relying on "[e]xisting law and regulations", "interpretive guidance from the SEC", "the generally accepted understanding of how cash-settled equity swaps operate", and a few cases.  Defendants contend they were justified in using secret swap arrangements to acquire a significant stake in CSX, while

tipping only their friends, and leaving the unsuspecting public in the dark.  (Defs' Br. at 33-42.)  Defendants are wrong.

First, the argument represents a refusal to make sense.  Section 13(d) expressly covers agreements, etc., that are not securities.  The issue that we are addressing is precisely whether those non-securities confer beneficial ownership.

Thus, it is pointless to look at "existing law and regulations" cited by Defendants, such as 17 C.F.R. § 240.13d-1(h)(i), Filing and Disclosure Requirement Relating to Beneficial Ownership, Exchange Act Release No. 15348 (Nov. 22, 1978), and 15 U.S.C. § 78c-1(a).  Defendants never explain why the exclusion of non-voting securities from the disclosure requirements of Section 13(d), and the amendment of the Exchange Act in 2002 to exclude equity swaps (Defs' Br. at 33-35), have any bearing on the reach of  Section 13(d) in this case.[13]  Rule 13d-3(a) provides that a beneficial owner of a security includes any person who, directly or indirectly, through a non-security, including contract, arrangement, understanding, relationship, or otherwise, has or shares voting and investment power over such security.  Under the plain language of the rule, a swap arrangement may give rise to beneficial ownership of the shares referenced in the swaps if it directly or indirectly confers voting or investment power.  The fact that the swaps are not themselves securities is beside the point.[14]

---

[13] Defendants themselves appear to take the position that if their swaps were physically settled (as opposed to cash settled) then they would be subject to Section 13(d).  (Defs' Br. at 36.)

[14] Defendants also contend that Section 16 of the Exchange Act distinguishes between "equity securities", which confer beneficial ownership, and "security-based equity swap arrangements", which do not confer beneficial ownership and need only be disclosed by a beneficial owner of 10% of the equity security.  (Defs' Br. at 33-38.)  This matters, say Defendants, "because it demonstrates that if Congress intended to require

Second, we very much doubt that the SEC will respond to this Court's questions on evasion and control through swaps with a wave of the hand, saying no problem. Nor do we think that the SEC's interpretative guidance (in Q&A form) from 1992, raised by the Court on the first day of trial, constitutes the SEC's blessing of evasion and control through swaps. As Defendants themselves acknowledge (Defs' Br. at 2), the Q&A does not address swaps; it relates to futures and is thus, at best, relevant by analogy. The analogy ignores the important differences between swaps and futures, differences that bear directly upon the rationale for disclosure under Section 13(d).[15] Moreover, there is no reason to believe that the SEC's Q&A contemplated the situation where, as here, a swap arrangement empowers a person significantly to influence the voting or disposition of the referenced securities. In fact, the Q&A appears, by its terms, to relate to Rule 13d-3(d), which concerns the right to acquire beneficial ownership, not 13d-3(a), which concerns voting and investment power.[16]

---

that swap agreements be disclosed pursuant to Section 13, it would have explicitly done so as it did under Section 16". (Defs' Br. at 37.) The mere fact that the law might differentiate between equity securities and swaps for some disclosure purposes says nothing about whether a swap arrangement triggers a disclosure obligation relevant to the securities referenced by the swap. Again, Rule 13d-3(a) pertains broadly to "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise has or shares" voting or investment power. 17 C.F.R. § 240.13d-3(a).

[15] Swaps are privately negotiated bilateral contracts between knowledgeable parties, have negotiated margins and long maturities, and are used by institutional investors. Futures are standardized contracts, essentially guaranteed by the exchange, and are traded by all investor types. Most importantly, swaps are hedged with physical shares while futures typically are not. (PFF ¶¶ 242-47.)

[16] Defendants claim that the "key factor in the SEC guidance is that the instruments are cash-settled". (Defs' Br. at 36.) While it is true that the Q&A focuses on the cash-

Third, we "readily concede" that some market participants view swaps as a tool through which they can purchase shares with the counterparty with the understanding that the counterparty will vote their way. And we "readily concede" that many of these market participants tip their "friends and family" to join the Group. And we "readily concede" that some "friends and family" join the Group and then lobby the counterparties to vote for the Group. Our "ready concession" will not, we trust, be viewed as an acceptance of the legality of Defendants' schemes. So we view the "market practice" as interpreted by TCI and 3G as a confession of their own misconduct rather than a recommendation of how the law should work on swaps.

But the "market practice" is not worth much. Defendants rely upon a law review article (Defs' Br. at 54), a Q&A from an on-line discussion forum, the chapter of a book on tender offers, and an anonymous letter purportedly found on the FTC's website; these sources do not even support Defendants' point and show nothing more than that some commentators (one of whom is a TCI lawyer) believe that disclosure of cash-settled equity swaps is not normally required. Even if that were true, it has no bearing on this case, which presents anything but a normal situation. TCI and 3G kept the investing public in the dark for over a year as they secretly pursued control of CSX and the removal of CSX's senior management, all the while secretly tipping their friends

---

settled aspect of the futures at issue, there is no reason to believe that all cash settled instruments are immune from disclosure under Section 13(d). That distinction appears nowhere in the language of the rule, which applies broadly to, among other things, "any contract, arrangement, understanding, relationship or otherwise". 17 C.F.R. § 240.13d-3 (emphasis added). A contractual right to physical settlement is merely one way to acquire investment or voting power. To attach primary significance to the right to physical settlement in swap agreements is to ignore the plain language of the rule, which extends even to "indirect" power.

24

about the stock.  The Court has followed the SEC's recommendation that beneficial

ownership is a fact-specific inquiry.  See, e.g., Morales v. Quintel Entm't, Inc., 249 F.3d

115, 124 (2d Cir. 2001).  So there is no need for the articles.

        Fourth, the relevant case law offers no support for Defendants'

interpretation of their disclosure obligations.

        Defendants acknowledge that "no United States Court has considered the

question of whether the holder of a cash-settled swap is the beneficial owner of hedged

shares".  (Defs' Br. at 38-42.)  But they then go on to discuss a case from New Zealand,

Ithaca Ltd. v. Perry Corp., 2003 NZLR LEXIS 76 (Court of Appeals, Wellington, NZ,

Nov. 4, 2003), involving Mr. Hohn's former employer, Perry Capital.  (Defs' Br. at 38-

42.)  We doubt the relevance of this case, from another jurisdiction, other than as

evidence of the milieu in which Mr. Hohn works.

        Notably absent from Defendants 134-page memorandum is any discussion

about the applicable legal standard:  a person is the beneficial owner of a security if that

person has the ability significantly to influence the disposition of that security.[17]

        Beneficial ownership is "interpreted … broadly" and includes the "ability

to control or influence the voting or disposition of the securities".  Interpretive Release

Applicable to Insider Reporting and Trading, Exchange Act Release No. 34-18114, 46

Fed. Reg. 48147-01 (Oct. 1, 1981) (emphasis added); Cavalry Holdings, Inc. v. Chandler,

---

[17] Defendants cite a 1979 case from this Court and two SEC releases for the
proposition that Courts and the SEC have consistently found that an economic interest,
without more, does not confer beneficial ownership.  (Defs' Br. at 38.)  These authorities
are of no help to Defendants because in this case Defendants had more than an economic
interest.  They had the ability significantly to influence the voting and disposition of the
shares referenced in their swaps.

948 F.2d 59, 63 (1st Cir. 1991) (Section 13(d) concentrates on those individuals with the ability to influence voting or disposition of the securities); <u>SEC v. Drexel Burnham Lambert Inc.</u>, 837 F. Supp. 587, 607 (S.D.N.Y. 1993) (beneficial ownership "inquiry focuses on any relationship that, as a factual matter, confers on a person a significant ability to affect how voting power or investment power will be exercised").

**B.    <u>Defendants Ignore the Facts</u>**

The real question in determining whether Defendants beneficially owned the shares referenced by their swaps (evasion aside) is whether they had the ability significantly to influence the disposition of those shares. The indisputable facts demonstrate that they did, as described in detail in CSX's Proposed Findings of Fact and Conclusions of Law. (PCL at 72-84.) Defendants ignore both the appropriate standard and the facts that satisfy it.

There is no principled economic basis for disputing that TCI's swap arrangements gave it the ability effectively to determine the acquisition, holding, and disposition of CSX shares by its swap counterparties and, as a result, the ability significantly to influence the voting of those shares. There is a direct—indeed, essentially perfect—correlation between Defendants' purchases and sales of large swap positions and purchases and sales by their swap counterparties of matching physical CSX shares. (PFF ¶¶ 201-21.) The data amply demonstrate that the one caused the other, and therefore that Defendants and their swap counterparties acted together for purposes of acquiring, holding and disposing of shares. To deny Defendants' influence over the acquisition, holding, voting and disposition of CSX shares by its swap counterparties is to ignore what happened, which is exactly what economics would predict.

26

As a matter of real-world economics, the counterparties to Defendants' swaps had to hedge their positions with matching physical shares, hold that hedge for the duration of the swap, and upon termination of the swap, dispose of the matching shares. With respect to a large swap position, any other approach would have been risky and irresponsible.  It is difficult to imagine circumstances in which Defendants' counterparties would act against their economic self-interest, and indeed, the data demonstrate that they acted here exactly as economic theory would predict.  When Defendants purchased swaps, their counterparties purchased a nearly identical number of CSX shares on the same day (or, in a few instances, on the next business day).  When Defendants sold or unwound swaps, their counterparties sold a nearly identical number of CSX shares on the same day (or, in a few instances, on the next business day).  Thus, by their swap arrangements, Defendants had and exercised significant influence concerning the acquisition, holding and disposition of CSX shares by its swap counterparties.  As a result, Defendants significantly influenced the identity of the vote holder of the matching CSX shares.

Defendants insist that their swap counterparties had discretion on hedging and in theory could have hedged with something other than physical shares of CSX.  The fact of the matter, however, is that pursuant to their swaps with TCI, TCI's counterparties hedged their positions with matching CSX shares.  As summarized in the table below, Deutsche Bank, TCI's largest counterparty, is a perfect example of counterparty hedging. For each swap entered into with TCI, Deutsche Bank acquired the exact number of CSX shares.  In each instance where TCI terminated a certain number of swaps with Deutsche

Bank, Deutsche Bank disposed of the exact same number of shares.  (PFF ¶ 209.)

**Exhibit 3.3**
**Deutsche Bank AG:  Holdings of CSX Swaps with TCI and CSX Share Hedges**
**11/27/06 – 12/5/07**



Thus, TCI's swaps gave TCI significant influence over the acquisition,

holding and disposition of matching CSX shares by the counterparty banks.  Indeed, as an

economic matter, they gave TCI the ability effectively to determine the acquisition,

holding and disposition of CSX shares.

Faced with data that debunk their defense, Defendants resort again to the

claim that a parade of horribles will follow if disclosure is required.  (Defs' Br. at 48-49.)

This time they feature a new float:  that requiring a disclosure in cases like this "may lead

to significant over-reporting in the market" that, they say, "would damage the

transparency of the information provided through 13(D) reporting".  (Defs' Br. at 48.)  In

effect, Defendants raise the specter of "over-transparency".  But there is no reason to

believe that this would create a problem in the market.  In the first instance, disclosures

would still be subject to the 5% beneficial ownership floor and there is no reason to believe that this is anything but infrequent.  Moreover, transparency is the point of the Williams Act.  Those uninterested in the disclosures would ignore them.  There is no reason TCI could not have disclosed its swap arrangements when it began its quest for CSX, except that, if it did, then it could not have selectively tipped its friends at the expense of the unsuspecting public.[18]  More importantly, there will be no confusion from the over-reporting, just as today there is no confusion from reporting by Schedule 13D filers of options or other derivatives instruments.  Schedule 13D filers with swaps will simply report the form of beneficial ownership and the market will in turn expect to see the referenced shares reported by the counterparty in a 13F or Schedule 13D or Schedule 13G filing.

The Court repeatedly asked Mr. Hohn whether TCI could have made a Schedule 13D filing disclaiming beneficial ownership of the shares referenced in the swaps.  Mr. Hohn's eventual response was that he "wasn't aware of that".  (PFF ¶ 294.) In their Brief, Defendants, now aware of the Court's question, choose not to answer it. They say in a footnote:

> "in fact, this in [sic] not how Rule 13d-4 operates. The determination of whether a filing must be made under Section 13 rests exclusively in Rule 13d-1, which states a filing is triggered

---

[18] Defendants cite <u>Bath Industries, Inc. v. Blot</u>, 427 F.2d 97 (7th Cir. 1970), and <u>Levy v. Southbrook Int'l Invs., Ltd.</u>, 263 F.3d 10 (2d Cir. 2001), for the proposition that beneficial ownership attaches only where a person has the "power to direct" the purchase or disposition of shares.  (Defs' Br. at 45-46.)  Neither case is inconsistent with the fact that Defendants here beneficially own the shares referenced in their swaps.  <u>Bath</u> holds merely that voting power bestows beneficial ownership, as stated in Rule 13d-3(a).  427 F.2d at 112.  <u>Levy</u> holds only that a conversion cap can negate the "right to acquire" additional shares under Rule 13d-3(d); it is silent as to Rule 13d-3(a) and (b).  263 F.3d at 15.

only upon acquisition of beneficial ownership of equity securities exceeding 5% of an issuer." (Defs' Br. at 56 n.30.)

That answer is strange. TCI does not have an issue with voluntary filings. In a February 24, 2007 email to Mr. Degorce, copying Messrs. Amin and Sunak, Mr. Hohn contemplates making a voluntary HSR filing: "However, this could partly limit our ability to trade although not if we stay below 5% since swaps would not be filed at this level. In fact we would be filing voluntarily." (PX 47.) Moreover, in a subsequent 2007 email from Mr. Amin, TCI contemplated making an HSR filing while at the same time *selling* its CSX position:

> "if we are going to sell csx, we think it makes sense to make the hsr filing immediately. first we think it's the right thing to do anyway (steps up the heat), and if they make it public (unlikely we think) we will at least be able to sell at a better price. it would be unfortunate to sell down 10% of csx, and then make the filing and watch the stock pop if they made it public." (PX 49.)

So Defendants' footnote response is puzzling insofar as it seems to protest voluntary filings. But the requirement of § 13(d) is not what the Court was addressing. The Court did not ask whether TCI was <u>required</u> to make a filing, only whether TCI could have made a voluntary filing. The answer is yes; there is nothing in the SEC rules that prohibits the making of a voluntary filing. In fact, in other contexts, voluntary filing is even encouraged.[19]

We believe that the Court's approach provides an elegant solution to any disclosure problem regarding swaps that may arise in future cases.

---

[19] In the high yield debt context, for instance, the issuer of the debt securities frequently covenants to file annual and quarterly reports on Forms 10-K and 10-Q even if the issuer is not subject to the Exchange Act reporting regime. Since late 2005, these forms have included a box on the cover page to indicate that a filer is making the filing voluntarily. (<u>See</u>, <u>e.g.</u>, Form 10K.)

We say future cases, because we believe that this case is easily resolved on the evasion and Group proof, and that the relief we have suggested on the counterparties should deal with the effects of Defendants' misconduct without creating the "parade of horribles" that Defendants have tried to conjure up.

We believe that the Court's approach will alleviate even the exaggerated "parade of horribles". The voluntary disclosure by a holder of a 5% economic interest through swaps is entirely consistent with the Williams Act goal that the public be on notice of the large position that the shareholder has in a company. This disclosure could come either on Schedule 13D for a holder with control intent or on Schedule 13G. Following the Court's ruling in this matter, counterparties will seek to protect themselves from unwittingly becoming part of a Section 13(d) Group with their swapholders. They will then request that their swapholders represent that they are not using the swaps as a means to evade the reporting requirements of Section 13(d) and covenant to file voluntarily to disclose the shares referenced in their swaps in the event that their joint stock and derivative (including swap) position causes them to exceed the 5% threshold, on either (i) Schedule 13D if the swapholder has a control intent, or (ii) on Schedule 13G if it does not.

This should both provide clarity of the counterparties and make proof of evasion easier. A refusal by a swapholder to agree to such terms or to comply with such representations and covenants would presumably cause a responsible counterparty to decline the swap. Moreover, a refusal would suggest that the swapholder did intend to use the swaps as a means to evade the reporting requirements. And breach of the

covenant would make it much easier for the next company beset by locusts to prove evasion.

## IV.    DEFENDANTS MADE MISLEADING STATEMENTS ABOUT THEIR POSITIONS, RELATIONSHIPS, PLANS, PROPOSALS AND AGREEMENTS

From at least the spring of 2007, TCI's intent was to change or influence control of CSX, triggering the requirement that it disclose its plans or proposals for changes at CSX pursuant to Schedule 13D, Item 4.  17 C.F.R. § 240.13d-101 (Schedule 13D, Item 4).  At his speech at Bear Stearns on May 8, 2007, Mr. Amin stated with respect to CSX that "[t]hese rails aren't what they used to be and neither are their owners, and nor will be their management teams if they don't adapt and adapt quickly".  (PX 96 at 8.)

Mr. Amin took literally Mr. Hohn's direction "to be open" with CSX about TCI's intentions.  (Hohn ¶ 14.)  Thus:

- On March 29, 2007, the very day that TCI and 3G decided that 3G should buy more shares and TCI would convert some swaps to shares, Mr. Amin told CSX that there would be "no limits" to what TCI would do if CSX did not do as TCI said.

- On June 20, 2007, Mr. Amin told CSX's advisors that "'TCI fully intend[ed] to 'go to war'" and "would seek to replace the entire Board as a means to change management" if CSX did not follow its directions.  (PFF ¶ 149.)

Mr. Hohn was fully aware of these threats—"no limits", "go to war"—because Mr. Amin kept him informed of "important communications" with CSX.  (Hohn ¶ 14.)  Indeed, Mr. Hohn made these same threats:

- On July 17, 2007, Mr. Hohn said that "TCI would, in due course, attempt to change the entire Board" and that TCI's objective was "to find management that that would be more open to leveraging [CSX] and that would pursue cost improvements more

32

aggressively".  (PFF ¶ 151.)  Indeed, Mr. Hohn raised the question of layoffs.  (PFF ¶ 152.3.)

- On December 19, 2007, Mr. Hohn told a CSX advisor that TCI was "willing to do whatever it takes to win because they have a huge economic incentive to do so."  (PFF ¶ 174.)

A.    **Incomplete, False and Misleading Disclosures in Schedule 13D**

The Schedule 13D that Defendants filed is materially false, misleading and incomplete because it:  (a) fails accurately to disclose Defendants' beneficial ownership of CSX common stock by falsely disclaiming beneficial ownership of shares associated with total return swaps; (b) misrepresents group formation and group ownership; (c) fails to disclose information concerning contracts, arrangements, understandings or relationships among Defendants and between Defendants and other persons with respect to any securities of CSX; and (d) fails to disclose Defendants' plans or proposals with respect to their interest in CSX.  (PCL at 87-89.)  Defendants' failure to disclose beneficial ownership of the CSX shares referenced by their swaps and formation of a group with the counterparty banks and with one another is discussed in detail, supra, and will not be repeated here.  Although Defendants belatedly filed a Schedule 13D on December 19, 2007, that disclosure still does not provide complete and accurate information concerning beneficial ownership of CSX shares and Defendants' formation of a group as required by Section 13(d).  (PCL at 87-88.)

With respect to the disclosure of contracts, arrangements, understandings or relationships with respect to CSX securities and Defendants' plans or proposals for CSX, Defendants claim in their Post-Trial Brief that they have complied with all disclosure requirements.  (See Defs' Br. at 73-78.)  Defendants' claim is based on fundamental mischaracterizations of the facts including:  (1) that Defendants' swap

agreements have nothing to do with the acquisition, holding or voting of CSX stock, and (2) that the proposed changes to CSX reflected in documents authored and championed by Defendants—including, among other things, an extraordinary leveraged share repurchase and change of control of both the Board and management—somehow do not constitute material changes to CSX's business or corporate structure. They are wrong.

### 1. Defendants' failure to disclose agreements, relationships, understandings and arrangements relating to CSX securities.

Defendants violated Section 13(d) because they did not disclose their relationships, understandings and arrangements with each of the counterparty banks with respect to the voting and disposition of the CSX shares underlying the swap agreements; the material terms of the swap arrangements and copies of the written swap agreements themselves; and the material terms of 3G's credit default swap arrangements as required by Schedule 13D, Items 6 and 7. 17 C.F.R. § 240.13d-101 (Schedule 13D, Items 6 & 7; see PCL at 88). Defendants in their Post-Trial Brief argue that they were not required to file copies of the swap agreements because Schedule 13D, Item 7 only requires that agreements pertaining to the transfer or voting of CSX securities be filed, and the swap agreements do not pertain to the transfer or voting of CSX securities. (See Defs' Br. at 75-76.) That is wrong. The evidence shows that Defendants entered into swap agreements with the purpose and effect of controlling the disposition and voting of the CSX shares referenced by those swaps. (See PFF ¶¶ 197-234; PCL at 82-84.) The swap agreements must therefore be filed as exhibits to Schedule 13D. 17 C.F.R. § 240.13d-101 (Schedule 13D, Item 7).

Moreover, Defendants were required pursuant to Schedule 13D, Item 6, to describe the material terms of all of their "contracts, arrangements, understandings, or

relationships" that relate to CSX's securities, regardless of whether they concern the voting or transfer of CSX shares. Defendants therefore violated Section 13(d) by failing to disclose, among other things, their relationship with Austin Friars and their understanding that Deutsche Bank and other swap counterparties would vote shares according to TCI's wishes (PFF ¶¶ 32-37, 70-72; PCL at 83, 87), and the material terms of the swap agreements themselves, including termination provisions, initial price, number of CSX shares referenced by each swap and the aggregate number of shares referenced by all of their swap agreements. 17 C.F.R. § 240.13d-101 (Schedule 13D, Item 6); (see also PCL at 88.)

Defendants were also required to disclose 3G's credit default swaps referencing CSX's debt pursuant to Schedule 13D, Item 6. (See PCL at 88.) Defendants claim in their Post-Trial Brief that they were not required to disclose the credit default swaps because they do not concern beneficial ownership of CSX securities and that, even if they did, what Defendants did disclose about the credit default swaps was sufficient.[20] (See Defs' Br. at 77.) They are wrong on both counts. First, the credit default swaps fall under the plain language of Schedule 13D, Item 6, because, as 3G admits, they reference CSX's debt securities. (See JX 8 at 17 (discussing credit default swaps that "reference debt securities of [CSX]"); Securities Exchange Commission, Manual of Publicly Available Telephone Interpretations, Section O, Number 14 (available at http://www.sec.gov/interps/telephone.shtml) (1997) (Item 6 covers disclosures of

---

[20] Defendants also make the unsupported assertion that "[m]arket practice is to not disclose CDS in Schedule 13D filings. (Defs' Br. at 77.) Even if that statement were true, what the market generally does is not determinative of a person's reporting obligations under the law, despite Defendants' apparent belief to the contrary.

agreements relating to debt securities).)  In addition, 3G's credit default swaps are arrangements that 3G entered into to hedge its position in CSX's common stock against a decrease in CSX's credit ratings and/or stock price that would result in a default on CSX's debt.[21]  (See PFF ¶ 275; PCL at 88.)  The credit default swaps therefore specifically relate to 3G's interest in CSX stock because they are a hedge on its interest in the stock.  Second, 3G's disclosure in its Schedule 13D to the effect that it has some unspecified amount of credit default swaps and that the swaps do not convey beneficial ownership of CSX stock is insufficient.  (See JX 8 at 17.)  Item 6 requires disclosure of the material terms of the credit default swaps (see Exchange Act Release No. 13,787 (July 21, 1977)), and 3G does not disclose any terms at all (see JX 8 at 17).  3G's purported "disclosure" of its credit default swaps is therefore deficient on its face.

### 2.    Defendants' failure to disclose plans and proposals to make material changes at CSX.

Defendants also violated Schedule 13(d) by failing to disclose their plans and proposals to make material changes to CSX's business and corporate structure pursuant to Schedule 13D, Item 4.  (See PCL at 89.)  Defendants claim in their Post-Trial Brief that they fully and accurately disclosed their plans for change at CSX and that their plans for, among others things, an LBO and/or an extraordinary releveraging of CSX, were either abandoned or did "not constitute a 'major change in business and structure' which requires disclosure in Item 4."  (Defs' Br. at 75.)  That is wrong.

---

[21] It is notable that 3G's failure to disclose its credit default swaps obscures the fact that 3G was taking a bet that CSX would default on its debt at the same time that it was promoting plans to sell CSX in a leveraged buyout or have CSX undertake an extraordinary releveraging.  (See PFF ¶¶ 54, 105, 132.)

36

As an initial matter, Defendants intent from the outset was to change or influence control of CSX, triggering the requirement that it disclose its plans or proposals for changes at CSX pursuant to Schedule 13D, Item 4.  17 C.F.R. § 240.13d-101 (Schedule 13D, Item 4).  In March 2007 and again in June, TCI told CSX and its advisors that there were "no limits" to what TCI would do with respect to CSX.  (PFF ¶¶ 78, 130, 149.)  At his speech at Bear Stearns on May 8, 2007, Mr. Amin was more specific.  He asked with respect to CSX, "So, what stands between us and realizing this vision for the railroads?  We've come to realize that it's management and boards."  (PX 96 at CSX 00000384.)  By June 2007, TCI threatened to "go to war" and that it would "seek to replace the entire board".  (PFF ¶ 149.)  Mr. Hohn explained that TCI intended to change the board as a means to change CSX's management to a team "more open to leveraging [CSX] and that would pursue cost improvements more aggressively."  (PFF ¶ 151.)

But Defendants did not disclose—and have still not disclosed—their stated plans to change the board and management of CSX and their plans and proposals for other major changes at CSX.  For example, Defendants created and exchanged detailed plans for changes at CSX from as early as March 2007 that included an LBO, an extraordinary leveraged share repurchase,[22] year-over-year price increases of over 7%

---

[22] Defendants also claim in their Post-Trial Brief that the fact that CSX initiated a leveraged share buyback on its own makes their own releveraging proposal immaterial.  (See Defs' Br. at 75.)  The releveraging and share buyback plan championed by TCI to CSX and by 3G in the internal analyses it shared with TCI, however, calls for increased leveraging of $4.5 billion over a single year (see PFF ¶ 105.3 (20% buyback per year); PX 80 at CSX_00021831 (20% buyback equal to approximately $4.5 billion share repurchase)), an amount well in excess of CSX's $3 billion "enhanced" share repurchase program announced on May 8, 2007 (see JX 1).

and limits to capital expenditures despite increased capacity.  (See PFF ¶ 105.)  None of those plans were disclosed in defendants' Schedule 13D.

Defendants also created a plan called "Project Improve"—a plan which they now try to disavow—that calls for major workforce reductions at CSX and references a "detailed operating plan" for CSX, which likewise has not been disclosed. (PFF ¶ 172.)  The genesis of Project Improve and the content of the detailed operating plan referenced therein remain a mystery.  What the evidence shows is that, at the meeting between TCI and CSX on March 29, 2007, Mr. Amin of TCI had an analysis that he at first declined to show the CSX representatives.  He then relented and let them review the summary page of document on condition that it be returned at the end of the meeting. (Fitzsimmons ¶ 13; see PX 4 at 3.)

Project Improve is designated on its cover page as "Draft #1" of a "Confidential Operating Plan," and is dated October 22, 2007.  (PFF ¶ 172.)  The cover page of the document is on the letterhead of Gilbert Lamphere, 3G's nominee for the CSX board.  (PFF ¶ 172.)  But Mr. Lamphere repeatedly stated that Dan Schwartz of 3G prepared it and gave it to him.  (PFF ¶ 108; PX 271 at 14; Lamphere Dep. 49:15-50:22 ("This plan — this piece of paper is [Dan Schwartz's]").)  When Mr. Schwartz was asked whether he or Mr. Lamphere created the Project Improve document, he replied "I don't know who created this document."  (PFF ¶ 108.1; Schwartz Dep. 145:11-12, 145:14-17, 19-20.)  When asked if he ever asked Mr. Lamphere who created the Project Improve document, Mr. Schwartz replied "I don't remember ever asking him who created this." (Schwartz Dep. 147:14-18.)

All of Defendants' witnesses testified that they do not recall Project Improve or the details of the document, or paid no attention to it. (See PFF ¶¶ 108, 108.1-108.6; Trial Tr. 149:7-15; Moura Dep. 98:20-99:4; Schwartz Dep. 147:4-8, 147:10-22.) Yet 3G sent the document to TCI on December 20, 2007, two months after the date on the document and just one day after Defendants filed their Schedule 13D. (PFF ¶ 172.4; see also Schwartz Dep. 154:12-25, 155:2-12.) Moreover, in the litigation, Defendants' counsel insisted that the document be accorded "Attorneys Eyes Only" status under the Protective Order that governs this case. (See Stipulation and Proposed Order Regarding Confidentiality of Trial Exhibits, dated May 20, 2008.) Under Fed. R. Civ. P. 26(c)(1)(G), the Court may enter a protective order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." By designating the document "Attorneys Eyes Only", Defendants' counsel implicitly represent that Project Improve, which defendants are trying hard to disown, constitutes something akin to a trade secret—a concession that they have a secret plan. Setting aside what Defendants' testimony concerning Project Improve says about their credibility, they are not entitled to hide their plans. Project Improve was not disclosed in Defendants' Schedule 13D. Nor was the mysterious "detailed operating plan" referenced therein. Section 13(d) requires that those plans be disclosed.

Finally, it is clear that the plans contained in the documents that defendants have produced—including, for example, an LBO, extraordinary recapitalization and major workforce reduction—represent material changes to CSX's business or corporate structure that must be disclosed pursuant to Schedule 13D, Item 4.

CSX's financial advisors Evercore and Morgan Stanley thoroughly reviewed at least TCI's proposals that CSX undergo an extraordinary recapitalization, effect year-over-year price increase and limit capital expenditures.  (Bryson Dep. 67:15-68:3, 71:5-72:16, 75:3-77:4, 85:21-86:8, 115:17-116:17; <u>see also</u> PX 71; PX 80.)  The advisors found TCI's proposals to be unrealistic, overly aggressive and likely to cause a reduction in CSX's credit rating to junk status.  (<u>See</u> PX 80 at CSX_00021825, 00021831 & 00021836; Bryson Dep. at 76:2-77:4, 115:17-116:17; <u>see also</u> PFF ¶ 268.1.)  The notion that those plans do not constitute material changes to the business or corporate structure of CSX and therefore do not need to be disclosed is simply absurd.

###### B.    <u>Incomplete, False and Misleading Disclosures in Schedule 14A</u>

Defendants Schedule 14A disclosures are materially false and misleading for many of the same reasons that their Schedule 13D disclosures are false and misleading:  (1) Defendants fail to disclose the true extent of their beneficial ownership of CSX shares; (2) Defendants misrepresent the date that Defendants formed a group and the number of shares of CSX stock owned by the group; (3) Defendants fail to disclose information concerning contracts, arrangements, understandings or relationships among Defendants and between Defendants and other persons, such as swap counterparties, with respect to the securities of CSX; and (4) Defendants make material misstatements and omissions regarding their plans and proposals concerning CSX.  (<u>See</u> PCL at 91.)

Defendants in their Post-Trial Brief claim that they do not need to correct their Schedule 14A disclosures to include information about group formation and their swap positions because that information is already publicly available from disclosures made by CSX and TCI in April and May of 2007.  (<u>See</u> Defs' Br. at 20-21, 79-80.)  Defendants even go so far as to argue that they do not need to disclose information

concerning their swap arrangements and early group formation because CSX's

contentions in this lawsuit are sufficient to disclose that information to the public.  (See

Defs' Br. at 79-80.)  Apparently defendants believe that CSX's lawsuit vitiates the need

for them actually to make complete and accurate disclosures pursuant to Section 14(a).

They are wrong.

       The April and May 2007 public "disclosures" that defendants cite are

nothing more than (1) a statement in CSX's April 2007 10-Q that TCI held "a significant

economic position through common stock ownership and derivative contracts tied to the

value of CSX stock"; and (2) defendant Snehal Amin's May 8, 2007 statement at the

Bear Stearns conference that CSX had over $1 billion invested in U.S. rails, the majority

in CSX.  (Defs' Br. at 20-21.)  The argument that those two, vague references to an

unspecified economic exposure to "derivative contracts" can take the place of complete

and accurate disclosure of the actual swap agreements and amounts, Defendants' months-

long concerted actions with respect to CSX and Defendants' plans to effect major

changes at CSX, is meritless.  Complete and accurate disclosure of those facts would

"significantly alter[] the 'total mix' of information made available" to the public from the

limited statements of TCI's unspecified derivative interest in CSX and are therefore

material facts that should have been disclosed.  TSC Indus., Inc. v. Northway, 426 U.S.

438, 449 (1976).

       In addition to failing to disclose information concerning group formation

and Defendants' swap arrangements, Defendants' Schedule 14A is also materially false

and misleading because (1) Defendants' proxy statements make the false and misleading

claim that "TCI made concessions with the hope of being able to reach an amicable

resolution" of the proxy fight and that TCI "indicated willingness to sign a one year standstill agreement"; and (2) the two-year transaction histories that defendants set forth in Schedule 14A do not disclose any history of Defendants' swap transactions. (See PCL at 91.) Defendants in their Post-Trial Brief try to avoid these deficiencies by claiming that Mr. Hohn changed his position with respect to concessions during the negotiations and that he did in fact indicate a willingness to sign a one-year stand-still agreement. (Defs' Br. at 80.) Defendants again take a crabbed interpretation of technical accuracy in order to try to evade disclosure of the substantive truth. It is substantively misleading to characterize Mr. Hohn's movement from insistence on his full slate of five directors to a slate of four, while refusing any other type of concession or standstill, as TCI making concessions in order to reach an amicable solution. As Mr. Kelly testified on direct, Mr. Hohn in fact never actually agreed to CSX's offer of three TCI/3G nominees and a fourth to be mutually agreed and, instead, put on the table a list of unacceptable demands. (Kelly ¶ 23.) Moreover, TCI's own internal email shows that Mr. Hohn engaged in the discussions with a predetermined outcome in mind, telling Mr. Amin that the only point TCI could offer CSX would be for CSX to invite the entire TCI/3G slate on the Board and mutually agree as to who would leave the Board to make room for those five directors. (PFF ¶ 107; PX 154.) Mr. Amin's email to Lamphere, Behring and Schwartz confirmed this strategy as "[t]he only alternative." (PFF ¶ 108; PX 155.)

It is likewise substantively misleading for Defendants to claim that Mr. Hohn's belated statement of some "willingness" to sign a standstill after negotiations had already ended shows that he was negotiating in good faith.

Defendants try to avoid their failure to fully and accurately disclose their swap trading history as required by Item 5 of Schedule 14A by arguing that the swaps did not need to be disclosed because they are not transactions "with respect to CSX securities". (Defs' Br. at 80-81.) Again, Defendants' argument rests on a fundamental mischaracterization of their swap arrangements. Those swap arrangements had the purpose and effect of influencing the disposition and voting of the CSX shares referenced by the swaps. The swap transactions therefore relate to CSX securities and must be disclosed pursuant to Schedule 14A, Item 5. (See PFF ¶¶ 196-233; PCL at 82-84, 91.)

## V. DEFENDANTS ACTED IN BAD FAITH, SUBJECTING THEM TO INDIVIDUAL LIABILITY

### A. Defendants Played Games with the Truth

As described in CSX's Proposed Findings of Fact, Defendants provided false testimony at trial. (See, e.g., ¶¶ 56, 61, 84.) That testimony was a carryover from their conduct at depositions, where Group representatives feigned ignorance. Since Defendants purport in their Post-Trial Brief to have acted in good faith, we attach at Addendum A excerpts from the depositions in which the Defendants feigned ignorance.

### B. Mr. Hohn and Mr. Behring Acted in Bad Faith

A person who controls a person liable for a violation of the securities laws is jointly and severally liable for that violation. See 15 U.S.C. § 78t(a); see also SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). Mr. Hohn and Mr. Behring are individually liable for TCI's and 3G's violations of the securities laws for the reasons set out in Plaintiffs' Proposed Findings of Fact and Conclusions of Law. (See PCL Section III.)

In an effort to escape liability, Mr. Hohn and Mr. Behring contend that they "cannot be held liable as controlling persons because they each acted in good faith". (Defs' Br. at 81.)  According to Defendants, "[e]ach of the individual Defendants reasonably relied on the advice of counsel that all of their disclosures in the Schedules 13D and 14A were legal, truthful and accurate".  (Id.)  Not only is Messrs. Hohn's and Behring's argument incorrect, it effectively establishes their liability.

While good faith is a defense to liability under Section 20(c), it is an affirmative defense.  See, e.g., In re WorldCom, Inc. Sec. Litig., No. 02-3288, 2005 WL 638268, 13 (S.D.N.Y. Mar. 21, 2005) (stating that Section 20(a) "provides for an affirmative defense of good faith and non-inducement") (citing First Jersey Sec., 101 F.3d at 1473).  Affirmative defenses must be pleaded or they are waived.  See Fed. R. Civ. P. 8(c)(1); Am. Fed. Grp., Ltd. v. Rothenberg, 136 F.3d 897, 910 (2d Cir. 1998) (waiver by failure to plead is the general rule under Fed. R. Civ. P. 8(c)); Doe v. Pfrommer, 148 F.3d 73, 80 (2d Cir. 1998) (affirmative defenses "are 'ordinarily' not to be recognized when not in the answer," although "no absolute bar to the consideration of such claims exists") (internal citations omitted).  Neither Mr. Hohn nor Mr. Behring pleaded an affirmative defense of good faith to CSX's claim under Section 20(a).[23] Having failed to plead a defense of good faith, Messrs. Hohn and Behring waived any such defense.

Even if Mr. Hohn and Mr. Behring had not waived a defense of good faith, they failed to establish it.  While Mr. Hohn and Mr. Behring generally assert that

---

[23] By contrast, Mr. Ward specifically pleaded a defense of good faith in response to TCI's and 3G's third-party claims that Mr. Ward violated Section 20(a).  (See CSX Ans. to TCI Counterclaims at ¶ 15; CSX Ans. to 3G Counterclaims at ¶ 11.)

they acted in good faith, these assertions are unsupported by the evidence of record and incredible.  In fact, they lied early and often.  (See, e.g., PFF ¶¶ 109-110.)  Not only did Mr. Hohn and Mr. Behring engage in a plan and scheme to evade the reporting requirements, and form an undisclosed Group while simultaneously and illegally tipping their buddies and seeking influence and control at CSX, but they also lied about it on the stand.

Moreover, even if their misconduct did not sink a waived claim, Mr. Hohn's and Mr. Behring's assertions that they relied on the advice of counsel (Defs' Br. at 81) is flawed.

Defendants' are barred from making such an assertion because they used the privilege as a shield against discovery.  (See, e.g., TCI Priv. Log nos. 402, 425, 466, 482, 530, 723 and 3G Priv. Log nos. 4, 13, 36, 221, 312.)  Defendants withheld from discovery numerous documents on the basis of privilege, thus precluding CSX's inquiry into such a defense.[24]  (Id.)  That is why they did not plead the affirmative defense.  That would have waived the privilege.  So the belated assertion of advice of counsel is prejudicial because we could not force the issue with Defendants.  In any event, the law precludes a person from relying upon the privilege to protect him from individual liability where he declined to produce documents and otherwise allow discovery on the same subject matter.[25]  See United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991)

---

[24] Defendants also instructed their proxy solicitor, D.F. King, to assert the privilege – and thus further obstructed discovery—as to documents that plainly were not privileged in the first place.  (See D.F. King Priv. Log; Harkins Dep. 39:7-40:8, 81:12-19.)

[25] A party must choose between enjoying the protection of the attorney-client privilege and asserting claims or defenses that put the advice of counsel at issue.  See In

("the attorney-client privilege cannot at once be used as a shield and a sword.") (Citations omitted).

## VI.  THE COURT SHOULD GRANT RELIEF TO PROTECT OTHER INVESTORS AND TO PREVENT DEFENDANTS FROM ENJOYING THE BENEFITS OF THEIR UNLAWFUL SCHEME

Defendants' wrongful conduct will cause irreparable injury without intervention by the Court.  We urge the Court to take the following steps to prevent irreparable injury:

### A.  Defendants Must File Corrective Disclosure

The Court should order corrective disclosure, declare the Defendants' conduct unlawful and issue an injunction against further violations of the law by Defendants.

The Defendants do not dispute the availability of corrective disclosure under Section 13(d).  Moreover, the Court should reject Defendants' assertion that "the declarations sought by CSX relate to issues that will never arise again."  (Defs' Br. at 105.)  Indeed, the Court's clear statement that this evasion is unlawful will be a powerful message to end the "locust" scourge.  And we note that the Court can provide guidance to deal with how counterparties can be protected from being immersed in illegal conduct going forward.  Moreover, we believe that TCI, without more than a declaration, will

---

re Grand Jury Proceedings, 219 F.3d 175, 182-183 (2d Cir. 2000) ("a party cannot . . . affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party"); see also Bilzerian, 926 F.2d at 1292 (defendant's invocation of "good-faith" defense to securities fraud based on advice-of-counsel waives attorney-client privilege); In re Kidder Peabody Sec. Litig., 168 F.R.D. 459, 470-72 (S.D.N.Y. 1996) (affirmative use of report to demonstrate "good faith" waives attorney-client privilege as to client statements given to attorney in preparation of report).

continue to violate the securities laws.  This belief is based on a demonstration of their

violations, their lying in Court and the Japanese government's difficulty in getting TCI to

follow its orders.  We therefore urge that the Court enter an injunction against further

violations of the securities laws by Defendants.  <u>E.ON AG v. Acciona, S.A.</u>, No 06-8720

2007 U.S. Dist. LEXIS 7771, *30 (S.D.N.Y. February 5, 2007).

        Defendants rely on a series of cases in an attempt to avoid correcting their

false statements to the market.  The cases cited by Defendants are inapposite.  The

conclusions in each are cabined by findings of mere "technical violations" of the

disclosure rules, or mooted after "all the information was subsequently disclosed to the

public".  (Defs' Br. at 88.)  As Defendants concede, they have not, and do not plan to,

correct the false information they have disseminated to the market as they continue to

solicit proxies.  (<u>Id.</u> at 87 n. 43.)

- In <u>Universal Container Corp. v. Horowitz</u>, No. 74-3865, 1977 WL
  1036, *18-21  (S.D.N.Y. Sept. 6, 1977), unlike here, the change-
  of-control contest had taken place two years prior to the litigation,
  and precluded a finding of irreparable harm.

- In <u>Pantry Pride Inc. v. Rooney</u>, 598 F. Supp. 891, 899-900
  (S.D.N.Y. 1984), the Court found that the information at issue had
  subsequently been disclosed and that, if there had been late
  disclosure, it was late by just two weeks.

- In <u>Treadway Cos., Inc. v. Care Corp.</u>, 638 F.2d 357, 380 (2d Cir.
  1980), the Court found that there was no risk of irreparable injury
  because the information at issue, that defendant intended to seek
  control of plaintiff company, had already been disclosed on
  subsequent filings and "Treadway's shareholders had ample time
  to digest this information" because the shareholders had received
  the information *four months* prior to the proxy contest.[26]

---

[26] Significantly, the Second Circuit not only supported the necessity of full
disclosure, but noted that, in circumstances such as those here, where Defendants have
accumulated a large percentage of shares after filing a false Schedule 13D in anticipation

- In <u>International Banknote Co. v. Muller,</u> 713 F. Supp. 612, 619-20 (S.D.N.Y. 1989), the Court found that the defendants had filed their original Schedule 13D one week late, but that plaintiffs suffered no other prejudice.

- In <u>Capital Realty Investors Tax Exempt Fund Ltd. Partnership v. Dominium Tax Exempt Fund LLP</u>, 944 F. Supp 250, 259 (S.D.N.Y. 1996), the Court found that some information which had not been disclosed in a solicitation letter was disclosed *contemporaneously* by defendants in a press release, demonstrating that the defendant was "not trying to hide the fact", and the Court found that the rest of the information could and would be disclosed shortly.

Defendants' false and misleading statements and omissions were willful, not technical, with real benefits inuring to TCI and 3G. And, Defendants have failed to demonstrate the implied good faith noted by the Court in <u>Capital Realty</u> in finding that the defendant was "not trying to hide the fact and made the information a matter of public knowledge". Indeed, Defendants efforts to convince the Court that corrective disclosure is not necessary is further evidence of their efforts to evade the disclosure requirements.

Defendants contend that the Court should consider scienter as a factor to be taken into account in exercising its equitable discretion in deciding whether or not to grant injunctive relief. (Defs' Br. at 91.) CSX agrees. Defendants clearly acted with bad intentions here. They took steps to conceal their ownership from the market, tipped their friends, developed control plans for CSX, and offered false testimony at trial. Because TCI and 3G acted with scienter, the Court should consider it as an aggravating factor in exercising its equitable discretion and fashioning appropriate injunctive relief. While, as Your Honor noted in <u>Capital Realty Investors</u>, "the objective of Courts and of injunctive

of a contest for control, additional remedies such as "disenfranchisement or divestiture may be appropriate". <u>See</u> <u>Treadway</u>, 638 F.2d at 380 & n.45.

48

relief…is [not] 'to punish'", the Court should look to the likelihood that the conduct will affect the ability of investors to exercise the corporate franchise intelligently, 944 F.Supp. at 259.[27]

### B.    Defendants Must be Enjoined from Voting their Proxies

In view of Defendants' conduct, including hiding its position in CSX (PFF ¶¶ 20-29, 39, 44-45), selectively tipping off certain funds regarding CSX (PFF ¶ 61-73) and causing a fundamental change in the shareholder base (PFF ¶ 218, 224-26), Defendants should be enjoined from voting any proxies that they have received or will receive prior to filing complete and accurate Schedule 13D and Schedule 14A disclosures.  (See PCL at 98-102.)  As this Court noted in Central Foundry, enjoining the voting of illegally solicited consents or proxies is necessary to preserve the rights of the company's shareholders.  Cent. Foundry Co. v. Gondelman, 166 F. Supp. 429, 446-47

---

[27]  Scienter is not a required element of a Section 13(d) violation. SEC v. Savoy Indus., 587 F.2d 1149, 1167 (D.C. Cir. 1978); SEC v. Wills, 472 F. Supp 1250, 1268 (D.D.C. 1978) (requiring only negligent failure to comply with disclosure obligations to find liability under Section 13(d)).  Nevertheless, where proof of scienter is not required to establish a violation of the securities laws, that "is not to say that scienter has no bearing at all on whether a District Court should enjoin a person." Aaron v. SEC, 446 U.S. 680, 701 (1980) (finding that an important factor is the degree of intentional wrongdoing evident in a defendant's past conduct.)  In fact, a District Court may consider scienter or lack of it as one of the aggravating or mitigating factors to be taken into account in exercising its equitable discretion in deciding whether or not to grant injunctive relief.  See U.S. SEC v. Universal Express, Inc., 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007).  In doing so, the Court considers the likelihood that the conduct will be repeated in the future absent an injunction in determining whether to grant an injunction. SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972); SEC v. Culpepper, 270 F.2d 241 (2d Cir. 1959). "[F]raudulent past conduct gives rise to an inference of a reasonable expectation of continued violations."  SEC v. Manor Nursing, 458 F.2d at 1100-1102 (finding that "in view of the 'blatant' nature of the violations found by the District Court to have been committed by [defendants] and in view of their professional occupations which place them in positions where they could misappropriate public investor funds in other offerings, the District Court's decision to enjoin them from further violations was not an unreasonable one.")

(S.D.N.Y. 1958) (rejecting argument that requiring resolicitation was tantamount to disenfranchisement, and noting that "[v]iewing it from the interests of stockholders, the choice is obvious as between failing to exercise the franchise and exercising it influenced by unlawful solicitation."). Defendants offer not a single legal proposition or citation to rebut this claim for relief. (Defs' Br. at 101.)

### C.    Defendants Cannot Be Permitted to Profit from Their Bad Faith Evasion of the Law

With a proxy contest imminent, corrective disclosure here is not enough. (See PCL at 96-97.) If there is to be a fair election, the Court must level the playing field. See ICN Pharms. Inc. v. Khan, 2 F.3d 484, 490 (2d. Cir. 1993). CSX has provided support in its post-trial brief for each of the equitable remedies it seeks. (See PCL at 95-103.) In their post-trial brief, Defendants offer no compelling evidence to rebut CSX's proposed relief. Disclosure of the Defendants' bad acts, however, is not enough. An annual meeting must be held, and it is of primary importance that innocent shareholders vote at that meeting.

### 1.    Defendants Must Be Enjoined From Voting Their Ill-Gotten Shares.

Defendants concede that an injunction against voting shares is an available equitable remedy for violations of the Williams Act. (Defs' Br. at 98, 100.) In fact, Defendants discuss at least two cases in which District Courts ordered an injunction against defendants voting their illegally acquired shares. (Defs' Br. at 100 (citing Champion Parts Rebuilders, Inc. v. Cormier Corp., 661 F. Supp. 825 (N.D. Ill. 1987); Comm. for New Mgmt. of Butler Aviation v. Widmark, 335 F. Supp. 146 (E.D.N.Y. 1971).) Defendants contend, however, that CSX is not "entitled" to an injunction prohibiting TCI and 3G from voting stock accumulated following a violation of Sections

50

13(d) and 14(a), just prior to a proxy contest. (Defs' Br. at 98.) That is wrong. Both of TCI's cases support the proposition that an injunction against voting shares may issue for a violation of Section 13(d) upon a showing of irreparable harm. Here, that harm is plain. (PCL at 96-97.)[28] Indeed, even the cases cited by Defendants that fail to grant such relief acknowledge that, in such circumstances, an injunction against voting wrongly-obtained shares may be appropriate. See, e.g., Gen. Aircraft Corp. v. Lampert, 556 F.2d 90, 97 (1st Cir. 1977) ("[I]t may be appropriate for the Courts to enjoin the voting of shares rapidly acquired just before a contest for control following a Section 13(d) violation"); see also Lane Bryant, Inc. v. Hatleigh Corp., No. 80-1617, 1980 U.S. Dist. Lexis 11833, at *8-9 (S.D.N.Y. June 9, 1980). Defendants simply selected cases where the facts of each made such relief inappropriate. For example,

- In Lane Bryant, the Court merely stated that violations of Section 13(d) "do not necessarily justify" broad injunctive relief. There, the existence of any Section 13(d) violation was not clear, and there was no evidence that "a proxy fight was imminent". Id. at *4, *8.

- In Gorman v. Coogan, No. 03-173, 2004 U.S. Dist. Lexis 301 (D. Me. Jan. 13, 2004), plaintiffs sought permanent injunctive relief declaring an election held *over a year earlier* void. The Court found that, by the time Defendants' had filed a corrective disclosure, "the deed had been done, and the company effectively

---

[28] Defendants argue that this remedy is confined to limited and extreme circumstances where the solvency or existence of the corporation is put at risk. (Defs' Br. at 100.) Neither Champion nor Butler Aviation supports that proposition. Indeed, under Champion, irreparable injury will be found when "a plaintiff cannot wait until the end of trial to get effective relief." Champion, 661 F. Supp. at 849. With a change-of-control contest imminent, CSX shareholders face the type of irreparable injury described in Champion. See ICN Pharms., Inc. v. Khan, 2 F.3d 484, 489 (2d Cir. 1993) (stating that it "would certainly fall within the parameters of traditional injunctive relief to preclude Khan from voting any illegally acquired stock in a contest for control of ICN") (PCL at 99); see also Gen. Steel Indus., Inc. v. Walco Nat'l Corp., No. 81-1410, 1981 WL 17552 (E.D. Mo. Nov. 24, 1981).

taken over by the Coogan interests.  No useful section 13(d) purpose remained to be served."  Id. at *41-42; see also MTC Serv. Corp. v. Weldotron Corp., No. 93-4980, 1994 WL 455154, at *7 (S.D.N.Y Aug. 19, 1994) (finding that defendants had *already* disseminated all material information in the marketplace through both Schedules 13D and 14A, and, as with Gorman, the change of control had already occurred, such that "the situations on the facts and the law have been mooted"). [29]

- In General Aircraft Corp. v. Lampert, 556 F.2d 90 (1st Cir. 1977), the Court held that an injunction against voting shares – while appropriate in some instances – was not called for where defendant acquired his shares more than a year earlier, and no additional shares had been acquired since the filing of the false and misleading Schedule 13D.  Id. at 97.  Moreover, to ensure that defendants would not acquire such shares, the Court of Appeals affirmed the injunction preliminarily enjoining defendant from acquiring further shares of GAC common stock or soliciting proxies or consents until the Schedule 13D was amended.  Id.

In this case, Defendants have wrongfully acquired shares of CSX stock since the time that they should have filed accurate Schedules 13D and 14A.  Just as in General Aircraft, the Court should craft relief that ensures Defendants will not benefit from their wrongful actions in the upcoming proxy contest.  See Id.  ("Flexibility rather than rigidity has distinguished equity practice over the years".)

## 2.    Other Group Members

The friends, even more than the bank counterparties, "know which side of the bread the butter is on."  Thus, Mr. Hohn did not have to ask "Austin Friars to seek to

---

[29] Once a change of control has been accomplished, "it becomes difficult, and sometimes impossible, for Courts to 'unscramble the eggs'."  See Sonesta Int'l Hotels Corp. v. Wellington Assoc., 483 F.2d 247 (2d Cir. 1973); see also Irving Bank Corp. v. The Bank of New York, Inc., 692 F. Supp 163 (S.D.N.Y. 1988).  Injunctive relief is both available and necessary here, prior to the shareholder vote.  See Gorman, 2004 U.S. Dist Lexis at *41-42 (citing Treadway Cos. v. Care Corp., 638 F.2d 357, 380 & n. 45 (2d Cir. 1980) (noting that, in the Second Circuit, relief such as disenfranchisement or divestiture may be appropriate in cases in which a "takeover attempt follows on the heels of a belated curative filing")).

have the Deutsche Bank swap desk" support TCI.  (Defs' Br. at 5.)  The corrupt bargain may have been tacit, but there certainly was a quid pro quo.[30]

We believe that the Court should take steps with respect to them too.

**D.    The Court Should Monitor the Counterparties**

Plaintiff urges the Court to grant further relief in addition to the direction to the parties to ask the swap counterparties to (i) disclose to the Court on a confidential basis how, if at all, they will vote shares held by them to hedge their CSX swaps with Defendants, and (ii) advise the Court as to the banks' position.  Plaintiff seeks an order from the Court directing Defendants' swap counterparties to (i) disclose to the Court (but not the parties) which intermediaries and subintermediaries, including Brown Brothers Harriman, may be holding CSX shares matched to their swaps and whether the counterparties or those intermediaries or subintermediaries have the right to vote those shares, and (ii) disclose to the Court any hedge funds to which they had loans of CSX shares outstanding on the April 21, 2008 record date.

The voting conspiracy contrived by the Group and its swap counterparties may extend beyond the swap counterparties and have reached other yet-unknown members of the Group.  As Mr. Miller testified, there was a "movement of shares out of Deutsche [B]ank on the new record date and into Brown Brothers Harriman".  (Trial Tr. 82:7-10.)

---

[30] Defendants' reference to the lack of communication with the "Deutsche Bank swap desk (on the other side of an internal aformentioned firewall)" (Defs' Br. at 5) is simply misleading.  Mr. Amin conceded that TCI intended for Austin Friars' interaction to come at a level above the desk.  (See Trial Tr. 218:17-219:1.)

This suspicious movement of shares out of Deutsche Bank in connection with the new record date, at a time when Deutsche Bank was aware of CSX's complaint and the trial (Busby Dep. 11:24-12:10), suggests that Deutsche Bank may have moved its matched shares to Brown Brothers Harriman or other intermediaries to hide the shares from scrutiny by the Court and/or to place the shares in the hands of another party, such as Brown Brothers, who has agreed to vote the shares in favor of the Defendants' positions at the Annual Meeting.

### E.    Protecting the Investing Public Against Sales by the Group

CSX believes that there should be a referendum on the conduct of TCI/3G, and that shareholders should be permitted to vote on that referendum without the fear that TCI/3G will be front running again.

### 1.    The referendum

The facts of TCI's/3G's conduct are an appropriate subject for a referendum.

TCI has threatened a swarm of locusts unless CSX agrees to actions that CSX believes to be short sighted.  Even after the LBO idea was rebuffed, Mr. Hohn continued to pursue it as a means to apply additional pressure on the Company.  (See PX 47.)

- On March 29, 2007, Mr. Amin responded that there would be "no limits" to what TCI would do.  (Munoz ¶12; Fitzsimmons ¶12-14.)

- On April 6, 2007, Mr. Hohn demanded that CSX raise prices and conduct a 20% share buyback in the coming year.  TCI also stated that it fully "intend[ed] to make it happen".  Again, TCI "did not specify details of how much of their $2.5 [billion] shareholding was direct and how much in swaps", but indicated that it "plan[ned] to convert [swap] shareholding to direct (and [were] doing so currently)".  (PX 76.)

- On April 18, 2007, Mr. Hohn sent Mr. Amin an email message noting that he is "sure [Mr. Ward] does fear [TCI]."  (PX 83.)

- On June 20, 2007, Mr. Hohn stated that it "still own[ed] 4% in physical shares and over 10% in swaps"; that TCI "fully intend[ed] to 'go to war'"; that TCI "would seek to replace the entire Board as a means to change management"; and that TCI "will get support from the shareholders in making the changes at CSX". (PX 109.)

- On July 15, 2007, Mr. Hohn indicated that "the Board did not have a lot of time" and he reiterated that if necessary, TCI "would, in due course, attempt to change the entire Board" and that TCI's objective was "to find management that would be more open to leveraging [CSX] and that would pursue cost improvements more aggressively". (PX 111.)  Mr. Hohn also noted the 6,000 employees in Jacksonville and questioned whether the company could be run with fewer employees.  (PX 112.)

- On August 23, 2007, Mr. Hohn told CSX to send a letter to the sponsor of the bill, Representative James Oberstar, threatening immediately to freeze capital spending if the bill were allowed to proceed. (See PX 121.)

- On September 6, 2007, Mr. Hohn suggested threatening to reduce capex if the industry can not earn a reasonable return".  He also indicated that he thought the board membership was weak and that he thought shareholders would be receptive to adding two or three new board members with a railroad background.  (PX 124.)

- On September 6, 2007, Mr. Hohn forwarded to Mr. Ha, a UBS report on the rail industry that said that there was "still a lot of fat on this pig" in reference to CSX, noting that he thought it was "obvious to the world that this company should be doing better.  A respected company with great management is not normally referred to as a 'pig'".  (PX 123.)

- On December 19, 2007, Mr. Hohn told Mr. Ha that TCI "is highly confident that TCI/3G will win the proxy fight and is willing to do whatever it takes to win" and that he "is miffed that the board is still not willing to meet directly with TCI—particularly now that they together with 3G own 20% of the company".  (PX 149.)

Moreover, during the course of Mr. Kelly's discussions with Mr. Hohn to

try to negotiate a settlement to avoid a proxy contest, Mr. Hohn said that if he was able to

elect five directors, Mr. Ward's future would be "bleak".  In addition, Mr. Hohn

threatened that, if CSX did not agree to his demands, he would run his slate, create a dissident board, and make things unpleasant for Mr. Kelly as presiding director. He further suggested that his directors would decline to provide written consents to Board actions and otherwise disrupt the operation of the Board. (Kelly ¶ 25.)

Indeed, when CSX would not fold, TCI sued, making false accusations.

Defendants have demonstrated the same cavalier attitude with this lawsuit and with the Court. Not only have Defendants submitted frivolous counterclaims that attempt to bootstrap fiduciary duty claims into claims regarding proxy statement disclosure, but they have also shown a lack of interest with respect to such claims. After besmirching the reputations of Mr. Ward and the Company's very distinguished outside directors, including Mr. Kelly and Mr. Richardson, TCI and 3G declined to ask any relevant questions of CSX's witnesses. In the case of Mr. Richardson and Ms. Fitzsimmons, Defendants did not even bother to cross examine them.

Indeed, as the Court noted, Defendants' counsel seemed determined to use its counterclaims for the purpose of extracting quotations for use in press releases. (Trial Tr. 19:5-12, 27:3-5.)

We believe our shareholders may echo the words of Joseph Welch to Senator Joseph McCarthy, June 9, 1954:

> "Until this moment, Senator, I think I never really gauged your cruelty or your recklessness. Let us not assassinate this land further, Senator. You have done enough. Have you no sense of decency, or, at long last? Have you left no sense of decency?"

Our directors are not "lands", but we believe that our shareholders will say to Mr. Hohn and his friends, "you have done enough".

### 2.    Protection Against Front running

The relief that CSX seeks protects investors against a sudden sell-down of their position as a result of the election; CSX seeks to prevent Defendants from "front-running" the investing public—again.

The Group believes that their "activist" efforts have had a significant role in "puff[ing] up" the Company's stock price and that they "have been a big driver of the csx stock price". (PX 126; PX 44.)  TCI has even contemplated planting false information in the public domain to purposely increase the stock price.  For instance, in a February 25, 2007, email from Mr. Amin to Mr. Hohn, Mr. Amin suggested making an HSR filing even though TCI was contemplating <u>selling</u> its CSX position to (i) increase pressure on CSX and (ii) cause an increase in the stock price:

> "if we are going to sell csx, we think it makes sense to make the hsr filing immediately.  first we think [it's] the right thing to do anyway (steps up the heat), and if they make it public (unlikely we think) we will at least be able to sell at a better price.  it would be unfortunate to sell down 10% of csx, and then make the filing and watch the stock pop if they made it public."  (PX 49.)

The record also shows that Defendants have contemplated reducing — and sometimes have reduced — their interest in CSX.  For example in August and September 2007, 3G sold a net 8,315,171 CSX shares.  (Defs' Br. at 61; PX 206.)  And contrary to Defendants' assertion that "TCI's position remained constant" during that period, TCI too reduced its swap position by 1,971,000 shares in August 2007.  (Defs' Br. at 61; PX 206.)

Moreover, on several occasions, TCI has indicated a desire to sell down its position in CSX.  For example, in February 2007, Mr. Amin "recommend[ed] cutting [TCI's] rail exposure by circa 10% (and doing it with csx, as per below)".  (PX 49.)  Again, in September 2007, when 3G was still selling down its position, Mr. Amin noted

"[i]n hindsight of course I wished we had sold csx at 10 dollars ago" and Mr. Hohn noted that he "think[s] there are prices [TCI] should reduce csx. [He is] not a believer that there is no price where [TCI] should not sell". (PX 126.) In the February 2007 email chain regarding CSX, Mr. Hohn also noted that "[TCI is] not in a private equity world where [it has] permanent capital especially given the size of [its] holding. I would be more open to selling at 50 for sure" and that "[TCI has] to answer to [its] investors each quarter and each year as 3bn comes up for renewal". (PX 44.)

TCI's only deterrent in selling its shares now is the proxy fight and the appearance of how it would look to the voting public.

In March 2008, Mr. Hohn stated that TCI "cannot sell or hedge [the] sector" and that its position in CSX is "not saleable". (PX 181; PX 182.) This is different from TCI's inability to sell during the late summer/early fall of 2007. In that case, CSX's stock price had temporarily fallen below $50 per share and they were unable to sell down their position without suffering negative economic consequences. CSX's current stock price is over $60 per share, which represents a tidy profit for TCI.

The Group may be even more inclined to sell down its position now given the high CSX stock price. The CSX stock price has increased by $31.40 per share from TCI's initial purchase of swaps on October 20, 2006, to May 27, 2007. Not only does TCI state that it has "to answer to [its] investors each quarter and each year as 3bn comes up for renewal" (PX 44), but pressure to sell CSX may be even higher given (i) TCI's recent performance as noted by Mr. Hohn in a March 2008 email in which he states that the "fund is likely to be down 15pc soon" (PX 181) and (ii) TCI's upcoming annual investor day, which last year was held on June 19, 2007 (PX 107). Mr. Hohn noted in

another March 2008 email that "much of [TCI's] book is not saleable" and that TCI "cant keep raising money…[and] will need to take some hard decisions if [it] want[s] to buy [redacted] like forcing out cheap things like [redacted] at bad prices".  (PX 182.)

As a result, the announcement of the outcome of the CSX annual meeting on June 25, 2008, or indeed, the outcome of this trial, may induce the Group to sell their shares and terminate their swap position.  Despite what CSX believes to be the fundamental strength of the Company's stock price, a sudden sell-down of 20% of the Company's stock in a very short period could have a negative impact on its stock price, especially in the short-term.  Indeed, Mr. Hohn made this point clear in a February 18, 2007 email to Mr. Amin:  "don't fool ourselves into thinking if we get out of the stock it will hold".  (PX 44.)

Rule 13d-2(a) requires "prompt[]" disclosure of material changes in a person's Schedule 13D disclosure, including a "disposition of beneficial ownership of securities in an amount equal to one percent or more of the class of securities . . .".  Rule 13d-2(a).  Dispositions of "less than those amounts may be material, depending on the facts and circumstances".  Id.  "Prompt" disclosure is generally considered to be one to two business days.  See, e.g., Exchange Act Release No. 34-22171, Fed. Sec. L. Rep. (CCH) ¶ 83,788 (June 26, 1985) (noting that "[a]lthough the promptness of an amendment to a Schedule 13D must be judged in light of all the facts and circumstances of a particular situation, 'any delay beyond the time the amendment reasonably could have been filed may not be deemed to be [prompt]'", and concluding that it would have been reasonably practicable for the filing person to have filed an amendment on the day

after it had sold 1% of the outstanding shares).  However, even within one business day, the Group may be able to sell down a substantial portion of its holdings.

Thus, as a means to permit those shareholders who are inclined to sell their shares of CSX in advance of the potential massive selldown of shares (over 20% of the outstanding shares) by Group members, it is important that the public has an opportunity to sell its shares first.  In other words, having been "front-run" by the Group for a year, the investing public deserves at least three business days of  "front-running" the Group.

Dated:  June 2, 2008
        New York, NY

Respectfully submitted,

**CRAVATH, SWAINE & MOORE LLP,**

by

/s/ Rory O. Millson
_____

Rory O. Millson
Francis P. Barron
David R. Marriott
Members of the Firm

Attorneys for Plaintiff-Counterclaim
Defendant CSX Corporation and
Third-Party Defendant Michael Ward
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

RMillson@cravath.com
FBarron@cravath.com
DMarriott@cravath.com

DEWEY PEGNO & KRAMARSKY LLP
Keara A. Bergin
220 East 42nd Street
New York, NY 10017
(212) 943-9000
KBergin@dpklaw.com

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
Lance J. Gotko
Paul J. Fishman
1633 Broadway
New York, NY 10019-6708
(212) 833-1100
LGotko@fklaw.com
PFFishman@fklaw.com

*Attorneys for Plaintiff-Counterclaim
Defendant CSX Corporation and Third-Party
Defendant Michael Ward*

61

## ADDENDUM A

Mr. Behring pretended not to remember details of the plan and scheme:

(a)     Mr. Behring was asked for an approximate date that 3G learned that TCI had swap arrangements concerning CSX's shares.  He testified he did not recall.  (Behring Dep. 81:13-21.)  When pressed further, he stated that "using [his] best recollection . . . [which] may not be fully precise," 3G learned of TCI's swap arrangements "probably much later in the year than November", the time 3G entered into its swap transactions referencing CSX stock.  (Behring Dep. 82:2-10.)  That loss of memory was feigned.  Mr. Behring conspired with Mr. Hohn in February 2007.

(b)     Mr. Behring was asked whether 3G and TCI conversed prior to the December 19, 2007 13D filing, regarding the reasons TCI held swaps referencing CSX stock.  Mr. Behring testified that he did not "recall a conversation".  (Behring Dep. 83:15-21.)  That loss of memory was feigned.

(c)     Mr. Behring was asked about what the "Amin" entry in his calendar on September 26, 2007 refers to.  Mr. Behring said that he did not recall.  (Behring Dep. 172:18-173:3.)  Mr. Behring had a meeting that day which led to the rapid purchase of shares by 3G on the following day.

(d)     Mr. Behring was asked whether 3G shared its financial model concerning CSX with anyone outside 3G.  Mr. Behring testified he did not know.  (Behring Dep. 121:8-15; Trial Tr. 131:5-16, 132:17-133:2.)

Similarly, Mr. Hohn feigned ignorance:

(a)     Mr. Hohn was asked whether TCI recommended to 3G that they invest in CSX before it became public knowledge that TCI had invested in CSX.  He testified "I have talked to Alex Behring about our investment in the rail sector during the course of 2007 . . . . which included CSX . . . . I don't remember exactly when I told him that we had a holding in CSX." (Hohn Dep. 111:12-22.)  When asked if it was before TCI's HSR filing, in June 2007, he said "I don't remember."  (Hohn Dep. 111:23-25.)  That testimony was false.  (See PFF ¶¶ 53-54.)

(b)     Mr. Hohn was asked about a February 13, 2007 email from Mr. Hohn to Mr. Amin that refers to CSX and "our friend [A]lex".  (PX 42.)  Mr. Hohn testified "I don't remember this" email.  (Hohn Dep. 109:5-6.)  When asked if "our friend Alex of Brazil" refers to Alex Behring, he said "Could—I assume so.  I don't actually remember."  (Hohn Dep. 109:7-13.)  That loss of memory was false.

(c)     Mr. Hohn was asked what he discussed with Mr. Amin about Alex of
        Brazil.  Mr. Hohn testified "I actually don't remember".  (Hohn Dep.
        109:14-16.)

(d)     Mr. Hohn was asked whether TCI's counterparties hedged any swaps.
        Mr. Hohn testified "Actually, I'm not.  We never — we never ask if
        they've — if they've hedged any swaps."  (Hohn Dep. 140:18-141:4.)
        When asked a second time, he said "Actually, we don't know."  (Hohn
        Dep. 141:5-6.)  That testimony was false.

(e)     Mr. Hohn was asked whether he remembered conversations in which he
        directed that Mr. Amin should make sure that none of the counterparties
        had more than five percent in physical shares.  He testified "I don't
        remember any such discussions."  (Hohn Dep. 141:25-142:6.)  When
        asked if he remembered anyone at TCI expressing such concern, he said
        "[D]on't remember any of these discussions."  (Hohn Dep. 142:7-11.)
        That testimony was false.  (See PFF ¶¶ 23-24.)

(f)     Mr. Hohn was asked whether he remembered that in April 2007 TCI was
        unwinding some of their swaps and buying physical shares.  He testified "I
        don't remember our trading pattern at that point in time."  (Hohn Dep.
        201:3-7.)

(g)     Mr. Hohn was asked which funds TCI contacted prior to mid-May 2007.
        Mr. Hohn testified "I don't remember that.  And as I said, that's — yeah, I
        don't remember that."  (Hohn Dep. 72:6-13.)

(h)     Mr. Hohn was asked whether he said that TCI was willing to "go to war"
        with CSX.  He testified "I don't remember that statement".  (Hohn Dep.
        194:21-195:2.)  When asked a second time, he said "I don't remember if
        that was stated".  (Hohn Dep. 201:11-23.)

(i)     Mr. Hohn was asked whether TCI stated that there would be "no limits" to
        what TCI would do if CSX did not follow orders.  He testified "I don't
        recall that statement".  (Hohn Dep. 174:23-175:8.)  When asked a second
        time, he said "I don't remember that -- it's too long ago for me to
        remember."  (Hohn Dep. 203:18-204:9.)

And Mr. Amin feigned ignorance:

(a)     Mr. Amin was asked about the February 13, 2007 email addressed to Mr.
        Amin from Mr. Hohn that refers to CSX and "our friend Alex of Brazil"
        (PX 42).  Mr. Amin testified "I don't recall the email."  (Amin Dep.
        140:10-12.)  When asked more generally if he recalled a discussion with
        Mr. Hohn in mid-February 2007 regarding Alex Behring, Mr. Amin said
        "[n]one that I recall."  (Amin Dep. 140:7-9.)  When pressed further, he
        said "I don't recall the email . . . I don't know."  (Amin Dep. 141:10-16.)

Mr. Amin was filling more of TCI's coordination of purchases with 3G. (PFF ¶¶ 57-58)

(b)     When Mr. Amin was asked about his discussions with Mr. Behring, Mr. Amin testified "I don't recall anything" except Mr. Behring's "view . . . that all of the U.S. railroads were much less productive than they could be . . . . I don't recall anything further from those . . . meetings prior to . . . the lead up to forming a group." (Amin Dep. 143:9-22.) That testimony was false. See PFF ¶¶ 78-79.

(c)     Mr. Amin was asked why TCI looked at takeover defenses of CSX in December of 2006. Mr. Amin testified "I don't recall specifically." (Amin Dep. 125:23-126:4.) When asked about a specific takeover defense profile, ShockRepellant.Net, and where it came from, he said "I don't remember where it came from." (Amin Dep. 125:12-19.) That testimony was false.

(d)     Mr. Amin was asked about conversations with anyone as to when to unwind the CSX swaps or buy CSX shares. Although he was designated as TCI's Rule 30(b)(6) witness, he testified "I don't remember specific conversations." (Amin Dep. 72:4-8.)

(e)     Mr. Amin was asked why TCI chose to enter swaps with regards to CSX between October 20, 2006 and December 19, 2006, what level TCI was getting to, or what counterparty TCI used. Although he was designated as TCI's Rule 30(b)(6), Mr. Amin testified "Yes, that's right. I don't recall the specific conversations." (Amin Dep. 68:2-15.)

(f)     Mr. Amin was asked whether he recalled any brokers having to file at five percent. Mr. Amin testified "I don't". (Amin Dep. 168:15-17.)

(g)     Mr. Amin was asked about his communications with Austin Friars about CSX. He feigned ignorance:

(i)     Mr. Amin testified "I don't recall when the first conversation was with Austin Friars." (Amin Dep. 87:22-25.) Mr. Amin testified further that he could not recall any specifics of his first meeting with Austin Friars: "I really can't, I don't remember" the physical location of the meeting (Amin Dep. 91:13-23); "I don't" recall the room where I spoke to Austin Friars (Amin Dep. 90:15-17); and "I honestly don't remember the specifics other than just discussing that, you know, railroads seem to be interesting." (Amin Dep. 92:5-10.)

(ii)    Mr. Amin cannot recall any further discussions with Austin Friars, whether he exchanged emails with them or the specifics of their discussion concerning CSX, stating: "I don't know" if we exchanged email with Austin Friars (Amin Dep. 94:14-15); "I

3

don't recall specifically" what we said about CSX (Amin Dep. 97:2-10); and "I don't recall anything specific" from the subsequent discussions with Austin Friars.  (Amin Dep. 101:17-102:2.)

(h)    Mr. Amin was asked what Mr. Hohn said when Mr. Amin informed him that there was a hedge fund within Deutsche Bank that owned CSX shares. Mr. Amin testified "I don't recall."  (Amin Dep. 103:23-104:8.)  When asked if Mr. Hohn agreed with Mr. Amin's view that such information was helpful, he said "I don't recall."  (Amin Dep. 104:9-15.)

(i)    Mr. Amin has asked if he was present when someone from TCI said to CSX that there were "no limits" to what TCI would do.  He testified "I don't recall the exact — I don't recall the exact language".  (Amin Dep. 192:16-22.)  When pressed further, he said "I don't recall those words, I don't recall saying that."  (Amin Dep. 192:23-193:5.)

Mr. Lamphere, who is 3G's nominee for the CSX Board, likewise claimed that he had trouble remembering anything about events that had occurred only months earlier, or anything at all:

(a)    Mr. Lamphere testified "I don't recall exactly" when asked about the timing of the first request "to serve as a director candidate with respect to CSX" and could not recall when he first agreed to serve as nominee even after reviewing his own calendar notations. (Lamphere Dep. 18:20-23, 21:16-18.)

(b)    Mr. Lamphere did not remember what he did to help 3G understand the business of CSX, other than a "hypothetical mathematical analysis of what the expenses were of the railroads that had low operating ratios compared to where CSX was"—an analysis Mr. Lamphere volunteered "didn't constitute a plan because you had to look at the revenue side, and [he wasn't] sure Alex [Behring] even looked at it".  (Lamphere Dep. 16:3-11, 51:24-52:7.)

(c)    Mr. Lamphere identified PX 142 ("Project Improve") as a 3G plan prepared by Mr. Schwartz of 3G.  (Lamphere Dep. 49:15-25, 50:2-6.) Other than that, he feigned about ignorance of this operating plan:

(i)    When asked why it was on his letterhead even though 3G had prepared it, Mr. Lamphere said "I don't know".  (Lamphere Dep. 48:21-50:11.)

(ii)    Mr. Lamphere did not recall when PX 142 was sent to him. (Lamphere Dep. 50:16-25.)  When directed to his own handwriting

on the document indicating 10/22 and 11/5 and asked whether it refreshed his memory, Mr. Lamphere said "[n]o".  (Lamphere Dep. 51:2-7.)

(iii)    When asked about the "group" referred to in the document, Mr. Lamphere answered "It was he [Behring] and his brothers." (Lamphere Dep. 9:23-25.)  Mr. Behring later testified, "I have no siblings."  (Behring Dep. 31:24-25.)

(d)    Mr. Lamphere did not recall when he bought CSX shares, or whether it was before he "agreed to serve as a [director] nominee on the slate". (Lamphere Dep. 52:8-13, 53:15-20.)

(e)    Mr. Lamphere testified that he had "no idea" who Kirkland & Ellis attorney Noah Gellner was, despite being presented with an email that Mr. Lamphere received only a few months ago from Mr. Gellner entitled "3G/Project Chester" and stating "[i]t was a pleasure to meet you today.  I look forward to working with you on this matter."  (Lamphere Dep. 22:15-23:11; PX 145.)  When asked what Project Chester was, Mr. Lamphere testified "Project Chester, I don't know what Project Chester is" and that he never asked anyone what it was.  (Lamphere Dep. 22:17-20; 24:12-16.) He did not recall any meetings with Kirkland & Ellis in their offices. (Lamphere Dep. 23:15-17.)

(f)    Mr. Lamphere testified that he did not know what Project Stevens was and had "never heard of it." (Lamphere Dep. 39:13-15.)  He was not reminded by PX 153, even though his handwriting is "in the top right-hand corner." (Lamphere Dep. 39:16-40:6.)

3G's Moura also had drank from the waters of forgetfulness:

(a)    Mr. Moura feigned total ignorance of 3G's plans:

(i)    When asked about "Project Improve" (PX 142), Mr. Moura said that he had never heard the term before.  (Moura Dep. 99:2-4.)

(ii)    When asked whether 3G ever considered the possibility of reducing employee base at CSX in 2007 or advocating it in Project Improve, Mr. Moura said, "It might have been discussed.  I don't recall."  (Moura Dep. 100:8-21.)

(iii)    When asked if he remembered learning that Mr. Lamphere had prepared analyses relating to CSX or had been asked by anyone at 3G to prepare such analyses, Mr. Moura said he could not recall. (Moura Dep. 104:8-22.)

(b)    When asked whether it was Alex Behring's idea to form a group with TCI, Mr. Moura said he did not know.  When pressed further regarding whether

5

he believed it was Mr. Behring's idea, he said, "I have no beliefs." (Moura Dep. 134:4-14.)

(c)    When asked about the substance of phone calls with Mr. Amin in 2007, Mr. Moura could not recall discussing anything other than "short ideas in the U.S." He purports not to remember whether he and Mr. Amin discussed CSX or railroads. (Moura Dep. 142:5-143:13.)

(d)    When asked whether TCI ever shared any written materials concerning CSX with TCI, Mr. Moura could not recall anything other than an "industry-wide pricing survey". (Moura Dep. 148:17-149:3.)

(e)    When asked about 3G's presentation discussing the railroad industry in the United States, Mr. Moura said that he could not remember with which funds 3G shared the presentation. When asked whether the presentation was ever shared with TCI, Mr. Moura said "I don't — I don't remember. Might have been. I don't remember." (Moura Dep. 150:16-151:7.)

(f)    When asked what he remembered about what was discussed during a meeting with CSX that occurred in 3G's offices, Mr. Moura said "[n]ot much". (Moura Dep. 168:21-169:3.) Mr. Moura remembered that Alex Behring announced that 3G had filed an HSR, but could recall nothing else about what Mr. Behring said. (Moura Dep. 169:21-170:6.)

(g)    When asked about internal 3G discussions regarding the possibility of CSX being bought out, Mr. Moura remembered some discussions taking place, but could not recall who participated. (Moura Dep. 196:24-197:11.)

(h)    When asked whether he had any recollection of hearing about calls between Mr. Hohn and Mr. Behring during the first half of 2007, Mr. Moura said that "[t]hey might have talked. I'm not sure. We talk to hedge funds all the time, so". (Moura Dep. 211:12-20.)

And 3G's Mr. Schwartz was also blissfully forgetful:

(a)    Mr. Schwartz feigned total ignorance of 3G's plans:

    (i)    When asked if he or Mr. Lamphere created the Project Improve document, Mr. Schwartz replied, "I don't know who created the document." (Schwartz Dep. 145:11-12; 145:14-17, 145:19-20.)

    (ii)    When asked if he ever asked Mr. Lamphere who created the Project Improve document, Mr. Schwartz replied, "I don't remember ever asking him who created this." (Schwartz Dep. 147:14-18.)

    (iii)    When asked if he saw any other drafts of the Project Improve document, Mr. Schwartz replied "I may have, yes, I may have. I

don't — I don't remember, though."  (Schwartz Dep. 147:19-22.) After being pointed to the fact that the document says "draft number one" on the front page, Mr. Schwartz added "[s]o I might have seen an earlier version before I updated the numbers, but I don't remember, you know, how many versions or what that looked like."  (Schwartz Dep. 147:23-24; 148:4-7.)

(iv)  Mr. Schwartz cannot recall why he faxed this document (PX 152) to Mr. Amin at TCI, and cannot even remember sending it to him in 2007.  (Schwartz Dep. 155:8-12.)

(b)  When asked if he recalled discussing proxy contests during any of his conversations with Austin Friars, Mr. Schwartz responded "I don't—I don't recall—I don't recall discussing proxy contests with Austin Friars". (Schwartz Dep. 188:4-11.)