UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CSX CORPORATION,

                                                    Plaintiff,

              v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD.,  3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE
BEHRING, A/K/A ALEXANDRE BEHRING
COSTA,

                                                    Defendants.

---

THE CHILDREN'S INVESTMENT MASTER
FUND,

                              Counterclaim and Third-
                                      Party Plaintiff,

              v.

CSX CORPORATION AND MICHAEL WARD,

                              Counterclaim and Third-
                                      Party Defendants.

---

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND L.P.

                              Counterclaim Plaintiffs,

              v.

CSX CORPORATION AND MICHAEL WARD,

                              Counterclaim Defendants.

---

ECF Case

08 Civ. 02764 (LAK) (KNF)


**MOTION FOR LEAVE
TO FILE CSX'S RESPONSE
TO THE LETTER OF
PROF. BERNARD BLACK
SUBMITTED TO THE SEC**

On May 30, 2008, Defendant 3G submitted to the Court a copy of a May 29 letter from Professor Bernard Black to the Securities and Exchange Commission. We seek leave to file CSX's response to that letter, as sent to the SEC.

On May 22, 2008, the Court asked the SEC to provide by June 4 any views it might have on two specific questions and "requested the parties to contact [the SEC] to provide any information [the SEC] may require." Although the Court stated that the parties could submit materials from the trial record to the SEC, we had not anticipated that the parties would provide their SEC submissions to the Court. Defendants' counsel apparently had a different interpretation. Indeed, Professor Black was told by counsel that his opinion would be submitted to the Court. (Black Ltr. at 3, note 8.)

Although Professor Black was evidently retained some time ago, he was not offered as an expert, presumably because his testimony would be legal opinion and would be excluded. (See CSX's Brief and Reply Brief in Support of Its Motion In Limine to Exclude the Expert Reports of Frank Partnoy.) Moreover, viewed properly as a legal brief, Professor Black's letter would not have been permitted as it was not submitted on the schedule set by the Court.

If the Court is inclined to consider Professor Black's letter, we request permission to file CSX's response submitted to the SEC. CSX's response consists of our

letter to the SEC, attached hereto as Exhibit A, and a letter of Professors Grundfest, Hu and Subrahmanyam, attached hereto as Exhibit B.

Dated:  June 2, 2008

Respectfully submitted,

**CRAVATH, SWAINE & MOORE LLP,**

by _[signature]_

Rory O. Milson
Francis P. Barron
David R. Marriot
Members of the Firm

Attorneys for Plaintiff
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

RMilson@cravath.com
FBarron@cravath.com
DMarriott@cravath.com

# CRAVATH, SWAINE & MOORE LLP

ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN E. BEERBOWER
EVAN R. CHESLER
MICHAEL L. SCHLER
RICHARD LEVIN
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON

JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700
———
CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1672

WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE
SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN

DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
TEENA-ANN V. SANKOORIKAL
ANDREW R. THOMPSON
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ERIC L. SCHIELE

SPECIAL COUNSEL
SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III

OF COUNSEL
CHRISTINE BESHAR

June 2, 2008

## CSX Corporation v. The Children's Investment Fund Management (UK) LLP, et al., 08 Civ. 02764 (LAK)(KNF)

Dear Mr. Cartwright:

In connection with the above-referenced matter, we have previously given the Commission our answers to Judge Kaplan's May 22, 2008, questions:

> "1)  Did the defendants have beneficial ownership, within the meaning of Regulation 13D, of the CSX shares held by their cash settled total return equity swap counterparties?"

> "2)  What mental state is required to establish the existence of a plan or scheme within the meaning of Rule 13d-3(b)?"

These answers were specifically tied to the record evidence, which is summarized in our detailed proposed findings of fact and conclusions of law ("PFF"), as we believe that Judge Kaplan contemplated this in his direction to the parties to provide the Commission with materials from the trial to assist the Commission in its answer. Since then, we have received a letter brief by Professor Black, dated May 29, 2008 ("Black Br."), a counsel for Defendants.  (Black Br. at n.3.)

We provide a rebuttal to that brief here.  We have also provided a statement by Professors Joseph A. Grundfest, Henry T. C. Hu, and Marti G. Subrahmanyam addressing the anti-evasion rule in this case.

First, the Black Brief totally misstates the anti-evasion rule.  See Part I, infra.  Prof. Black's legal analysis is confused and wrong.  See Part I.A., infra. Moreover, Prof. Black ignores the facts in this case that show his legal analysis is wrong. See Part I.B., infra.

<u>Second</u>, the Black Brief is wrong because Prof. Black does not give the Commission the facts on CSX's beneficial ownership argument.  <u>See</u> Part II, <u>infra</u>.  Prof. Black assumes away the facts.  Defendants in fact had "arrangement[s], understanding[s or] relationship[s]" relating to the voting of shares by the counterparties.  We discuss these with respect to the counterparties generally and, in particular, with respect to Deutsche Bank.  <u>See</u> Part II.A., <u>infra</u>.  Moreover, Prof. Black ignores Defendants' conceded control intent, their conceded accumulation in secret and evidence of the formation of an undisclosed Section 13(d) "group".  <u>See</u> Part II.B., <u>infra</u>.

<u>Third</u>, the Black Brief is wrong on the law of beneficial ownership.  <u>See</u> Part III, <u>infra</u>.  Prof. Black ignores the economic reality of swaps and comes to the wrong legal conclusion.  <u>See</u> Part III.A., <u>infra</u>.  There are additional problems with Prof. Black's analysis as well.  <u>See</u> Part III.B., <u>infra</u>.

<u>Fourth</u>, the Black Brief misstates the effect of CSX's argument on future cases.  <u>See</u> Part IV, <u>infra</u>.  The proposed relief in this case will cure the problems raised by Defendants.  <u>See</u> Part IV.A., <u>infra</u>.  The implications of the relief in this case for the broader market will be narrow.  <u>See</u> Part IV.B., <u>infra</u>.  And the Court has alluded to an elegant solution for other concerns.  <u>See</u> Part IV.C., <u>infra</u>.

Before launching into the rebuttal, I summarize the facts that Prof. Black ignores:

(a)  Defendants formed an undisclosed Group and lied about it;

(b)  Defendants had agreements, etc. with counterparties and lied about it;

(c)  Defendants concededly had a control intent;

(d)  Defendants concededly accumulated a greater than 5% economic interest in CSX without disclosure (despite their control intent) in order to avoid front-running;

(e)  Defendants concededly used swaps to evade disclosure, but "justify" their evasion by saying it also had financing and tax benefits, <u>i.e.</u>, that evasion becomes better because it is cheaper; and

(f)  Defendants made arrangements with Deutsche Bank on voting and assumed that they had arrangements with the other counterparties too.

## I.    **The Black Brief Totally Misstates the Anti-Evasion Rule.**

Rule 13d-3(b) provides that a person is deemed to beneficially own a security when that person "creates or uses . . . [a] contract, arrangement, or device with the <u>purpose or effect</u> of divesting such person of beneficial ownership of [such] security

or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of Section 13(d) or 13(g)" (emphasis added).

We believe that the answer to the Court's question on intent, if read as intent to evade, is "none" as applied to the "effect" prong of the test. Moreover, we believe that the "purpose" prong is satisfied here because Defendants had such an intent and that the existence of other purposes is irrelevant. In construing "purpose" for the use of swaps as a plan to evade, the existence of other purposes is irrelevant, so Defendants' primary purpose test is irrelevant. The fact that Defendants concededly intended to evade does not become less of an intent to evade because Defendants could evade more cheaply (through financing and tax benefits). A purpose to evade does not go away because there are these factors that make cheating cheaper. We note that this discussion is somewhat academic, as the effect prong does not take into account the purpose of the discounted evasion. The effect prong is just that, an effect. And the effect is conceded.

As Rule 13d-3(b) includes the phrase "purpose or effect" (emphasis added), a person's state of mind is not relevant as long as the effect of such person's actions is to evade the reporting requirements of Section 13(d). The only state of mind required by Rule 13d-3(b) for the purpose prong of the test is that a person have an evasion intent, which Defendants had. We believe that the principal "intent" issue is the intent to change or influence the control of the subject company, as specified in Section 13(d)(5). Defendants have such an intent. And their swap contracts had the effect of evading the Section 13(d) reporting requirements. Christopher Hohn of TCI so testified. (See PFF at ¶ 22.1.)

So the Rule applies, because Defendants' conduct led to the effect of evading the rules. And Defendants conceded an evasion purpose. The fact that there may be reasons for entering into swaps of this type, other than avoiding filing a report on Schedule 13D, does not mean that the purpose prong cannot apply. The only purpose requirement should be that evasion of reporting is one of the purposes. Where a person enters into the swap transaction with a control intent, i.e., where the person, if it filed a truthful Schedule 13D, would be required to disclose a plan or proposal regarding one of the items listed in Item 4 of Schedule 13D, we believe that evasion as the purpose or motive is clear.

A.    Professor Black's Legal Analysis is Confused and Wrong

Professor Black is confused on the anti-evasion rule. (Black Br. at 4-6.) In this, he follows Defendants' Brief before Judge Kaplan. (Defendants' Post-Trial Reply Brief ("Defs' PTRB") at 20.) That is wrong. (PCL at 78, n.3.)

With all due respect, Defendants' position, including when articulated by a law professor, is silly. Defendants' counsel—including the professor—argue that Defendants cannot be liable for evading a rule relating to the beneficial ownership of securities because the instrument that they used to evade that rule is not itself a security. That represents a refusal to make sense. Perhaps I can be forgiven for saying again that this is silly.

Prof. Black argues a circular fallacy that

> "if equity swaps are not 'beneficial ownership' of shares either under the statute (which uses the term 'beneficial ownership' but does not define it) or under the remainder of Rule 13d-3, they are not reportable under § 13(d), and the investor's purpose in acquiring them should be irrelevant. One does not evade a statute by complying with it."

(Black Br. at 5.) This completely disregards Rule 13d-3(b), which expressly provides that "beneficial ownership" under Sections 13(d) and 13(g) of the Exchange Act includes divested or prevented beneficial ownership as part of a plan or scheme to evade the reporting requirements of those sections of the Exchange Act. Under Prof. Black's interpretation, unless a person already had beneficial ownership as defined in Rule 13d-3(a) or Rule 13d-3(d), that person could never have beneficial ownership as a result of the provisions of Rule 13d-3(b). If this were the case, Rule 13d-3(b) would be meaningless given the prior applicability of the other portions of the Rule.

Prof. Black's analogy to Rule 144 and Regulation S under the Securities Act of 1933 is equally unhelpful. (Black Br. at 5.) The anti-evasion provisions of these rules are exemptions from safe harbors and thus are designed to avoid attempted reliance on the safe harbors by literally complying with the specific requirements as a sham. In the case of Rule 13d-3(b), however, the anti-evasion provision is part of the definition and serves to be inclusive rather than exclusive.

Prof. Black also makes the odd assertion that because an equity swap is not the same instrument as a share of voting stock, ownership of an equity swap cannot violate the Exchange Act. (Black Br. at 6.) This flies in the face of the very language of Rule 13d-3(b), which expressly states that beneficial ownership of voting stock can be vested in a person by means of a "contract, arrangement or device with the purpose or effect of…preventing the vesting of such beneficial ownership". Certainly Prof. Black cannot believe that only those "contracts, arrangements and devices" that are recognized as securities under the Exchange Act are covered by Rule 13d-3(b). If that were the case, surely the Commission would have used the word "security" rather than "contract, arrangement or device" in the Rule. Or the Commission would not have bothered with a superfluous anti-evasion rule at all.

B.    Professor Black Ignores the Facts in this Case that Show His Legal Analysis Is Wrong

A determination of whether a person has engaged in a "plan or scheme to evade the reporting requirements of Section 13(d)" of the Exchange Act must be based on the facts and circumstances of the case. Judge Kaplan's questions assume precisely this.

The facts demonstrate that Defendants used swaps with the purpose and effect of divesting themselves of beneficial ownership of the shares of CSX common stock referenced in the swaps as part of a plan or scheme to evade the Section 13(d) reporting requirements. Indeed, Defendants readily admit that they used swaps to avoid

Section 13(d) reporting so that they could hide their rapid investment accumulation and control intent in respect of CSX from the investing public.

Defendants' control intent is precisely why they sought to avoid public disclosure of their position. Every day, Schedule 13Gs are filed by investors with a greater than 5% interest in a company and a pure investment (i.e., non-control) intent, and the market doesn't even blink—the filing of a Schedule 13G does not typically cause a change in a company's stock price because control is not being sought. Defendants' "front-running" argument, their stated reason for non-disclosure, demonstrates that they had a control intent. Control interest accumulations are precisely the kind of activity that the disclosure requirements of the Williams Act were designed to illuminate and that Defendants sought to evade. Defendants even admit this. (Defendants' Post-Trial Brief ("Defs' PTB") at 62, n.32.) "[G]iven TCI's reputation as an activist fund with a proven track record of successful investments another entity will "front-run" or "coattail" TCI's investments." (Id. (internal citations omitted).)

This case is even more troubling than a typical non-disclosure case, as TCI and 3G "tipped" many of their hedge fund "friends" about their interest in CSX after they had largely built up their CSX investment stake, but months before it was revealed to the public. (PFF ¶¶ 61-74; Defs' PTB at 62, n.32.) Thus, not only did Defendants' hide their control intent from the investing public, but they also selectively "tipped" their friends and gave them an unfair advantage over other investors (though the ultimate advantage still lay with Defendants' as the bulk of their transactions were effective before the tipping occurred).

Prof. Black has ignored the facts of this case. Not only is his statement of facts inconsistent with the record evidence summarized in our findings, but it is also inconsistent with Defendants' rebuttal findings to our findings. Missing from Prof. Black's analysis is any discussion of Defendants' concessions in respect of their evasion, their control intent or Defendants' secret accumulation of investment interests and undisclosed Group formation.

Prof. Black should have at least looked at these concessions. When Defendants were finally forced to address the actual record, they made excuses and admissions that would have caused the Professor not to assume away the test. Thus:

- Defendants make a weak defense of their witnesses—whose testimony on cross-examination exploded the "separate acquisition" story that the second sentence of Professor Black's letter simply assumes to be true. Defendants assert that their witnesses were not lying, but only the innocent victims of "vigorous questioning by experienced counsel" who supposedly used the unfair tactic of taking advantage of "the expectable instances of human error, such as forgetfulness or inconsistency." (Defendants' Response to CSX's Proposed Findings of Fact on the Conduct of the Trial at 1-2.) Defendants go on to say that their witnesses' "confusion in answering certain questions was no doubt caused or contributed to by the confusing nature of some of the questions." (Id. at 2.) "Experienced counsel" apparently caused "confusion" through "vigorous questioning" without objection by counsel for

Defendants.  I have a shorter way to describe these witnesses.  They lied.  Early and often.

- Defendants say that the testimony of Snehal Amin of TCI that TCI did not place swaps at Deutsche Bank so that TCI could try to influence the vote is credible because there are "several examples of hedge funds not being able to influence votes."  (Id.)  That non sequitur is not a reason to find Mr. Amin credible—it is a reason to find him not credible.  Mr. Hohn and Mr. Amin admitted that TCI moved swaps to Deutsche Bank to support the voting of the matched shares for TCI.  (Defs' PTRB at 64, ¶¶ 36-37.)

- Defendants concede their goal and secret accumulation of their position in CSX. Citing Mr. Hohn's trial testimony, Defendants assert that

> "TCI has good reason not to want to disclose its investing position.  If TCI disclosed its investment in CSX prior to establishing the position, it would have been subject to front-running by other investors, potentially causing price differentials that would have made it more expensive for TCI to trade."

(Defs' PTRB at 57.)  Defendants go on to say that TCI used eight counterparties "to prevent front-running," and that TCI monitored the physical positions of its counterparties in order "to protect itself and its investors from front-running."  (Id.; see also id. at 64; PFF ¶ 39; Defs' PTRB at 66; PFF ¶¶ 44-45, 122, 272.1.)  TCI used the swaps for the purpose of building a position in CSX while evading the Section 13(d) filing requirement.  The point of the Section 13(d) filing requirement is to enable other shareholders and the public to know about a large accumulation that may signal a change in control—and front-run if they wish to do so.

- Defendants misstate why they have not terminated the swaps to buy the matched shares:

> "if nondisclosure had been TCI's primary purpose for entering into swap agreements, it would never have told the purported target of its alleged secret scheme about the swap agreements (it was under no obligation to do so prior to December 19, 2007), and once TCI's positions in CSX were publicly disclosed in December 2007, it would have been logical for TCI, embroiled in a hotly contested proxy test, to have unwound its swaps and purchased physical shares—thereby acquiring the ability to vote those shares— at that time."

(Defs.' PTRB at 58-59.)  The evidence shows that the reason TCI told CSX management about the swaps ("[We] own 14 percent of your company"), and repeatedly added that they could "convert" their swap position to shares, was to

intimidate management into doing as it was told. (PFF ¶¶ 120, 130.) The reason that TCI has not converted the rest of its swaps to physical shares is that it would be very expensive to do so, and they are confident they will either get the votes of the matched shares or at least prevent them from being voted for the CSX slate. If the shares are not voted at all, that magnifies the voting power of TCI, 3G and all the hedge fund friends that they tipped. From December 31, 2006, to December 19, 2007 (the date on which TCI's and 3G's total interest in CSX, including cash-settled swaps, was made public), there was a fundamental shift in the shareholder base; holdings by hedge funds increased from approximately 11% to 35% and holdings by other institutions decreased from over 60% to approximately 39%. (PFF ¶ 74.1.) If a Schedule 13D had been filed when TCI's interest reached five percent, that movement almost certainly would not have occurred.

- Defendants argue that CSX's assertion that there is no economic incentive for a counterparty to vote the matched shares is wrong because "the banks may be long shares in another area, such as the proprietary trading desk and the bank may vote in the larger entity's economic interest." (Defs' PTRB at 62.) That is precisely the point behind TCI's collusion with Austin Friars and Mr. Amin's hope that "Deutsche Bank in the larger interest of Deutsche Bank is going to say vote the shares on which we have no economic interest, vote them the way Austin Friars wants." (Tr. 218: 21-25; see also PFF ¶¶ 36-37; CSX Corporation's Memorandum in Response to Defendants' Post-Trial Brief ("MR") at 53, n.30.)

- Defendants argue that "if [prime brokerage] fees actually gave TCI the power to influence its counterparties, TCI likely would have allocated the bulk of its swaps to the prime broker that received the greatest fees." (Defs' PTRB at 108.) Another non sequitur. The banks are influenced more by their hope for future prime brokerage fees, even if they have received nothing in the past. Moreover, the bank with the greatest past fees may not be the bank that has a captive hedge fund like Austin Friars.

- Defendants admit that:

> "both Mr. Amin and Mr. Hohn hoped that, if Austin Friars concluded that voting for the TCI/3G slate was in the economic best interest of Deutsche Bank, and if the swaps desk was inclined to vote its CSX shares held as a hedge, it too would conclude that voting for the TCI/3G slate was in Deutsche Bank's best interests."

(Defs' PTRB at 64.) This is inconsistent with Defendants' argument that the Deutsche Bank swap desk had never heard of Austin Friars (Defs' PTRB at 29), and consistent with Mr. Amin's admission on cross-examination that he was hoping that Deutsche Bank would make a decision in its larger self-interest. (Tr. 218:21-25.)

- Defendants admit that there was a return of shares to Deutsche Bank in advance of the original record date of February 27, 2007—which Mr. Miller observed—and only

note that Mr. Busby of Deutsche Bank "could not confirm what had triggered the return of the shares." (Defs' PTRB at 66.)  This demonstrates that the decision to return shares, and presumably to vote shares, is not made at the swap desk level.

- Defendants admit that Mr. Behring approached Mr. Hohn in the late spring or early summer of 2007 to work together, but contend that "Mr. Hohn turned him down." (Defs' PTRB at 70.)  This presumably was an instance of Mr. Hohn chanting what he views as his dispositive mantra, "We are not a group."  (MR at 9.)

- Defendants assert that, when hedge funds speak with each other, they discuss simply the "fundamentals" of the industry.  (See Defs' PTRB at 72, 74.)  That is a lie.  They admit that Mr. Hohn and Mr. Amin knew that Austin Friars owned CSX stock, and contend only that Austin Friars owned the stock before TCI spoke to them.  (Defs' PTRB at 74.)

- Defendants admit that Mr. Behring and Mr. Amin met on October 17, 2007, but insist that they did not discuss the progress of their nominee searches.  (Defs' PTRB at 99; see also PFF ¶ 170.)  This, despite the fact, as defendants admit, that in the late spring or early summer of 2007, "Mr. Behring sought general information from Mr. Hohn based on Mr. Hohn's past activist investment experience."  (Id. at 95; see also PFF ¶ 142.)  The contention and the testimony on which it is based should not be believed.

> 1.    Defendants Concede Evasion, but Claim Additional Benefits of Financing and Taxes

TCI entered into swaps to avoid public disclosure of TCI's interest in CSX because "if TCI had disclosed its investment in CSX prior to establishing the [14%] position, it would have been subject to front-running by other investors, potentially causing price differentials that would have made it more expensive for TCI to trade". (Defs' PTRB at 57.)  Thus, Defendants openly admit that they used the swaps to hide their accumulation from the investing public—exactly the harm to the investing public that the Williams Act was designed to avoid.  Although Defendants claim in their briefs that disclosure evasion was only one of multiple reasons for using swaps (Defs' PTRB at 5, 21-22, 56; Defs' PTB at 7, 10, 55), they ignore the fact that neither the financing nor the tax benefits would be, nor have they been, diminished by public disclosure of Defendants' swap position.[1]

To hide its investment from CSX and the market for as long as possible, TCI split its CSX swap positions among seven, and then in the fall of 2007, eight, counterparties, some of which were TCI prime brokers: Citigroup, Deutsche Bank, Goldman Sachs, Merrill Lynch, UBS, Credit Suisse, JPMorgan and Morgan Stanley. (Defs' PTB at 13; PFF ¶ 23.)  Not only did TCI divide its swaps among eight

---

[1] We note that although Defendants did disclose their swaps when they finally got around to filing a Schedule 13D, their filing tells the public nothing about them other than the percentage economic interest in the Company's stock they represent and the names of the swap counterparties.

counterparties, but it also monitored the physical positions of its counterparties (which acquired matching physical shares to their swap positions) in order to ensure that TCI's position remained opaque to the market.  (PFF ¶ 24.)

Defendants admit that TCI avoided disclosing its investing position to avoid being subject to front-running by other investors, potentially causing price differentials that would have made it more expensive for TCI to trade.  (Defs' PTRB at 57.)

The lengths that TCI and 3G went to in order to avoid public disclosure is telling:

- In a December 18, 2006, email titled "CSX Swap Positions", Rishi Sunak of TCI indicated that TCI is concerned "about [brokers] having to file at 5%".  (PFF ¶ 24.1.)

- In a December 25, 2006, email titled "Re: Friday's CSX Swap Execution", Mr. Hohn wrote to Tim Keough and others at TCI that "we need a view from operations on where we are going to add additional swap positions in this name to . do we  have one since we don't want to push any swap counterparty into a filing position which I am assuming is 5% for a US stock . . . keep going on csx tomorrow but I want to see the plan on swap counterparties."  (Plaintiff's Exhibit ("PX") 27.)

- In a December 27, 2006, email titled "Csx", Mr. Hohn wrote to Mr. Amin and others at TCI, "We seem to have no doubts that we have no disclosure requirements of our swaps so we can keep buying beyond 9.9pc.  Let's keep the position diversified around each counterparty so no one goes above 4pc to start."  (PX 28.)

- In a December 26-27, 2006, email exchange, Robert Ottley of TCI sent Mr. Hohn and other TCI employees information summarizing the "PBs/Brokers" filing requirements and positions in CSX; after receiving this e-mail, Mr. Hohn instructed on December 27, 2006, that "all inquiries should be on a no names basis".  (PFF ¶ 24.3.)

- On April 2, 2007, four days after Mr. Hohn met with Alexandre Behring of 3G at a March 29, 2007, meeting, Mr. Behring sent an email to Daniel Schwartz and others at 3G indicating that it is "very important today to figure out how the 5% rule applies (fully diluted, outstanding, buybacks are treated how?) and create a little daily report of how much we own at the end of each day."  (PX 67.)

- On April 4, 2007, in an email titled "Re: Another csx derailment this morning", Mr. Amin informed Kenny Graham of TCI that they "can buy in physical up to 4.9pc. We should continue to buy physical when in limit or if selling swap".  (PX 70.)

- On April 7, 2007, TCI had a call with Evercore, one of CSX's financial advisors, in which they indicated that they have "plans to convert shareholding to direct (and are doing so currently) and that [CSX] would increasingly see their shareholdings in

regulatory filings… [and that t]hey will likely convert swaps to shares to represent 4.9%-9.9% of total shares outstanding".  (PX 74; see also PX 76.)[2]

- On April 17, 2007, Alexandre Behring of 3G sent an email to Claudio Bahbout of 3G noting that it was "[i]mportant to update tomorrow on the csx control spreadsheet the number of shares outstanding so we know what percentage we own of the company".  (PX 82.)

- TCI did not even want to disclose its holdings to its own investors.  When asked in an April 28, 2007, email from Rahul Moodgal, TCI's head of investor relations, for an update on the TCI portfolio, Mr. Hohn replied "OK but only if they ask".  (PX 87.)  In the TCI June 19, 2007, annual investor conference materials, TCI's holdings in US Railways were aggregated, so that the CSX level could not be determined by TCI's investors.  (PX 107.)  This is consistent with Mr. Hohn's request to Mr. Moodgal to show TCI's U.S. rail position on an aggregated basis for the second quarter letter to investors because Hohn did not "want to show the world our exact csx position".  (PX 110.)

- In a May 9, 2007, Bloomberg article, Snehal Amin falsely stated to a reporter that TCI "isn't trying to stay below [the 5%] threshold for reporting an ownership stake".  (PX 98.)

- Moreover, after TCI's swap position was concentrated at two counterparties, Deutsche Bank and Citigroup, and just before it filed its Schedule 13D on December 19, 2007, TCI re-established 1,000-share swap positions at five of its former counterparties and added an eighth counterparty.  At his deposition, Mr. Amin was asked the following questions and gave the following answers:

"Q. Why did you leave those on [referring to TCI's token swap positions]?

A. We didn't want it easily identifiable to the outside world who our primary swap counterparties were.

Q. And why is that?

A. Because doing so leaves you more susceptible to front running by other hedge funds or other investors.

Q. What do you mean by that?

---

[2]   Defendants (and this is Prof. Black's conclusion, too) argue that "the primary reason for TCI and 3G to hold equity swaps instead of shares cannot have been to avoid disclosure" because they continued to hold the swaps instead of shares after their total economic exposure was publicly disclosed and would have wanted to hold shares in a proxy contest in order to get voting control over those shares.  (Black Br. at n.9; Defs' PTB at 7; Defs' PTRB at 4-5.)  This is circular at best—if a person has beneficial ownership (and thus voting control) of the shares referenced in the swaps as a result of a "contract, arrangement or device", that person has no reason to acquire the shares outright.

A.  If people can easily identify who your primary counterparties are, then it's easier for them potentially to identify whether you are increasing or decreasing your exposure to a specific investment which when you are a fund of our size will leave them to try to front run you, could try to lead them to front run you.

Q.  So knowing how many physical shares your counterparty had and knowing who the counterparty was would make you susceptible to being, to having a front runner?

A.  Knowing who your counterparty is puts us at risk.  In other words, if hypothetically speaking if TCI announced to the world that the only counterparty we would ever use is Goldman Sachs there would be a higher likelihood that every time someone saw Goldman Sachs change its position in the company they would attribute it to TCI.  What we didn't want to do is allow people to establish any sort of link between us and specific counterparty so that they could attribute that counterparty's behavior or trading, whatever it was, back to TCI."

(PFF ¶ 39.1.)  Thus, even after TCI had filed a Schedule 13D, it still fought transparency and hid from the investing public the fact that its swaps were concentrated at only two counterparties:  Deutsche Bank and Citigroup.

### 2.    Defendants Concededly Had a Control Intent

Prof. Black also makes no mention of the fact that TCI and 3G entered into their swap transactions with a clear intent to exercise control over the Company.  As we outline on pages 39-50 of our Proposed Findings of Fact and Conclusions of Law, "TCI and 3G purchased their holdings in CSX with one goal in mind:  to seize control of the Company without paying a premium to bring about an LBO or other liquidity event".  (PFF ¶ 40.)

In addition, in the public arena, TCI represented itself as a shareholder and made demands of the Company characteristic of a shareholder:

- At the November 14, 2006, Citigroup Transportation Conference in New York, Mr. Hohn approached Oscar Munoz and David Baggs of CSX and told Mr. Baggs that TCI had a $500 million investment in CSX.  (Defs' PTB at 12.)  Mr. Hohn did not identify the investment as a swap position.  (Witness Statement of David Baggs ("Baggs") ¶ 5.)  Later, in response to an inquiry from Mr. Baggs, Mr. Amin disclosed that TCI's interest in CSX was in the form of swaps.  (PTB at 12.)  In that conversation, Mr. Amin stated that those swaps could be converted into direct ownership of shares of CSX common stock at any time.  (Baggs ¶ 6.)

- At the February 15, 2007, BB&T Transportation Conference, Mr. Amin approached Mr. Munoz and Mr. Baggs.  Mr. Amin asked how CSX intended to accomplish its recently increased share repurchase program and indicated TCI wanted CSX to do a Dutch auction.  Mr. Baggs told Mr. Amin that CSX could not have a conversation

with a select investor about the specifics of CSX's share repurchase plans because it would run afoul of Regulation FD. Mr. Amin replied by saying, "[We] own 14 percent of your company."  (PFF ¶ 120.)

- On March 29, 2007, Mr. Amin and Arnold Jacobs, outside counsel to TCI, met with Mr. Munoz and Ellen Fitzsimmons of CSX and Alan Stephenson, outside counsel to CSX, at Mr. Jacobs' offices in New York.  Mr. Amin expressed TCI's desire that CSX increase its leverage and repurchase 20 percent of its outstanding common stock during 2007.  Mr. Amin said that he wanted CSX to publicly announce the share repurchase in its first quarter earnings release in April.  When Mr. Munoz asked what would happen if CSX did not do as TCI wished, Mr. Amin responded that there would be "no limits" to what TCI would do.  Again, TCI declined to explain its swap arrangements—and refused to tell CSX the terms of the arrangements or provide copies of the documents governing such arrangements.  Mr. Amin did indicate, however, that the swaps gave TCI the economic equivalent of ownership of 10 to 14 percent of CSX's common stock and that TCI could convert the swaps to shares. (PFF ¶ 130.)

- On April 7, 2007, representatives of Evercore, one of CSX's financial advisors, had a call with Mr. Hohn, Mr. Amin and Mr. Sunak.  On that call, TCI demanded that CSX raise prices and conduct a 20% share buyback in the coming year.  TCI also stated that it fully "intend[ed] to make it happen".  Again TCI "did not specify details of how much of their $2.5 [billion] shareholding was direct and how much in swaps", but indicated that it "plan[ned] to convert [swap] shareholding to direct (and [were] doing so currently)".  (MR at 55.)

- On May 8, 2007, Mr. Amin gave a presentation in which he set forth TCI's proposals with respect to the industry and CSX in particular.  In his talk, Mr. Amin proposed that CSX buy back 20 percent of CSX stock every year and increase prices charged to customers by 7 percent per year.  He suggested that the major railroads in the US could be taken private at a significant premium, that TCI had spoken to private equity firms that would line up to bid on the railroads and that he had a 100-page indicative financing proposal from a bank that could underwrite the LBO debt.  (PFF ¶ 145.)

- On June 20, 2007, representatives of Evercore had a meeting with Mr. Hohn, Mr. Amin and Mr. Sunak.  At that meeting, TCI was adamant about its demands and was agitated about the perceived lack of attention TCI was receiving from CSX management.  TCI stated that it "still own[ed] 4% in physical shares and over 10% in swaps"; that TCI "fully intend[ed] to 'go to war'"; that TCI "would seek to replace the entire Board as a means to change management"; and that TCI "will get support from the shareholders in making the changes at CSX".  (PFF ¶ 149.)

- On July 15, 2007, Mr. Hohn indicated that "the Board did not have a lot of time" and he reiterated that if necessary, TCI "would, in due course, attempt to change the entire Board" and that TCI's objective was "to find management that would be more open to leveraging [CSX] and that would pursue cost improvements more aggressively".

Mr. Hohn also noted the 6,000 employees in Jacksonville and questioned whether CSX could be run with fewer employees.  (MR at 55.)

- On August 23, 2007, Mr. Hohn told CSX to send a letter to the sponsor of the bill, Representative James Oberstar, threatening immediately to freeze capital spending if the bill were allowed to proceed.  (MR at 55.)

- On September 6, 2007, Mr. Hohn suggested "threatening to reduce capex if the industry can not earn a reasonable return". He also indicated that he thought the board membership was weak and that he thought shareholders would be receptive to adding two or three new board members with a railroad background.  (MR at 56.)

- On December 19, 2007, Gil Ha of Evercore, one of CSX's financial advisors, had a call in which Mr. Hohn stated that TCI "is highly confident that TCI/3G will win the proxy fight and is willing to do whatever it takes to win" and that he "is miffed that the board is still not willing to meet directly with TCI --particularly now that they together with 3G own 20% of the company".  (MR at 56.)

- Moreover, during the course of discussions between Edward J. Kelly, III, the presiding director of CSX, and Mr. Hohn in January 2008 to try to negotiate a settlement to avoid a proxy contest, Mr. Hohn said that if he was able to elect five directors, Mr. Ward's future would be "bleak". In addition, Mr. Hohn threatened that, if CSX did not agree to his demands, he would run his slate, create a dissident board, and make things unpleasant for Mr. Kelly as presiding director. He further suggested that his directors would decline to provide written consents to Board actions and otherwise disrupt the operation of the Board.  (MR at 56.)

> 3.  Defendants Also Concealed their Intentions in Respect of Group Formation

Consistent with their attempts to evade the reporting requirements of Section 13(d), Defendants also secretly formed a "group" in February 2007, but did not report their combined holdings on Schedule 13D.  Thus:

- Mr. Hohn of TCI and Mr. Behring of 3G met in January 2007 to discuss TCI's investment in CSX and by February 9, 2007, the date of 3G's first purchase of CSX common stock, TCI and 3G had formed a "group".  (PFF ¶¶ 53, 57.)

- Mr. Hohn and Mr. Behring again discussed CSX on February 13, 2007 and immediately thereafter, 3G's purchases of CSX increased.  (PFF ¶¶ 54, 57-58.)

- Throughout 2007, TCI and 3G met frequently to discuss CSX and shared financial models and analyses.  (PFF ¶¶ 101-05.)

- Throughout the spring of 2007, TCI and 3G engaged in secret discussions with other hedge funds to expand the Group.  (PFF ¶¶ 61-74.)

- Beginning in March 2007, with TCI's filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, the Group took on an activist agenda and coordinated efforts to engage in a proxy contest.  (PFF ¶¶ 138-172.)

II.    **The Black Brief Is Wrong Because Professor Black Does Not Give the Commission the Facts on CSX's Beneficial Ownership Argument**

A.    Prof. Black Assumes Away the Facts

Prof. Black begins his "analysis" of the Court's first question regarding whether Defendants have beneficial ownership over the shares referenced in their swaps generally and assumes away "the specific facts of this case".  (Black Br. at 6.)  As a result, his answer is non-responsive because the Court expressly asked the Commission to offer its opinion with respect to Defendants.  This is necessarily a fact-specific analysis.  Yet, Prof. Black refuses to engage in a fact-specific analysis and provides only his view of the general case—one which we believe is not general at all.  As discussed below under Part III.A., we believe that even assuming away all the facts as he does, Prof. Black still comes to the wrong conclusion in that general case.  To see where Prof. Black falters out of the gate at the Court's actual first question, let us examine Prof. Black's assumptions of the facts:

"TCI has no formal or informal agreement, understanding, arrangement, or relationship with any of the derivatives dealers who acted as counterparties to its equity swaps other than the standard swap documentation"  (Black Br. at 6);

"TCI had no conversations or other communications with any of its dealers about whether or how they would hedge any equity swaps, and if they hedged with CSX shares, whether or how they would vote those shares"  (Black Br. at 6);

"The agreements which do exist between TCI and its dealers, under standard swap documentation, do not imply that TCI and its dealers are acting together for the purpose of acquiring, holding, voting or disposing of CSX shares"  (Black Br. at 7);

"Market practice for U.S. companies, which has developed in part because of the § 13(d) rules, is for the dealer to make its own voting decisions, without consulting its swap counterparties"  (Black Br. at 7);

"Dealers' voting practices with regard to hedged shares vary.  Some dealers have adopted the practice of not voting matched shares in contested situations, or else voting in proportion to what they understand votes by others to be.  Some may adopt other practices, such as following the voting recommendations of Institutional Shareholder Services (ISS), an influential proxy advisory firm"  (Black Br. at 8); and

"[Efforts] to contact a dealer and attempt to persuade it to vote in a particular way…are not the norm for U.S. companies and did not occur in this case".  (Black Br. at 8.)

Prof. Black simply assumes that there is no voting or dispositive power, so it is of no surprise that he comes to the conclusion that swaps do not convey beneficial ownership over their reference shares.  However, his assumptions are inconsistent with the facts of this case.  Therefore, it may be helpful to review the facts regarding the relationships Defendants have with their swap counterparties, especially TCI's relationship with Deutsche Bank, its principal swap counterparty.

1.    Defendants' Agreements, Understandings and Relationships with Counterparties—Generally

Defendants' counterparties have no independent economic incentive to vote the matching shares.  The counterparties, once perfectly hedged as they were here, are economically neutral to the performance of the company, but still retain the voting rights of the matching shares.  This ownership provides an additional basis for the shares to be voted in the interests of an important prime brokerage client.  (PFF ¶ 232.)

Likewise, Mr. Miller testified that in his more than 30 years of experience: "Even if an arrangement concerning the voting of shares held by the counterparties is not disclosed, . . . the counterparties to swap arrangements frequently vote such shares in the manner specified by the hedge funds" and "these counterparties are motivated by a desire to please lucrative hedge fund clients with whom they do business."  (PFF ¶ 226.)

Prime brokerage relationships are very lucrative for the major international banks, which often make substantial concessions for their hedge fund customers, particularly when those concessions have little economic or reputational cost to the bank.  TCI ranked 41st on the list of top 100 hedge funds out of over 10,000 hedge funds in the world as of December 31, 2006.  Indeed, in 2007, prime brokers earned over $42.25 million in revenue associated with business with TCI.  Thus, TCI was and is likely to be an important customer for its counterparty banks.  (PFF ¶ 230.)

2.    Defendants' Agreements, Understandings and Relationships—
      Deutsche Bank

a.    Defendants have agreements and relationships with Austin Friars

To make Defendants' argument, Prof. Black focuses on the lack of a "concrete" agreement.  (Black Br. at 2, n.6.)  Rule 13d-3 was not designed to be limited to "concrete" agreements.  If a written, signed agreement is what is required under Rule 13d-3, then there would be no reason for the "arrangement or understanding" language in the Rule or the anti-evasion provisions of Rule 13d-3(b) at all.  Rule 13d-3 was drafted broadly so that it would encompass the reality of the "market practices" and "winks and nods" that create beneficial ownership in many cases.  Without this broad language, it would be simple for a person to invent a new instrument designed to evade the Rule.

TCI talked to Austin Friars about TCI's accumulation of swaps referencing CSX shares.  (PFF ¶ 70.)

And then it concentrated the swaps in the hands of Austin Friars' parent, Deutsche Bank.  On the eve of its proxy fight with CSX, during the period between October 30, 2007, and November 29, 2007, TCI undertook a systematic transfer of its swaps representing 46.4 million shares of CSX into the hands of only two counterparties: Citigroup and Deutsche Bank.  (PFF ¶ 30.)

At his deposition, Mr. Amin admitted that TCI planned to use its connection to Austin Friars, a hedge fund owned by Deutsche Bank which held approximately one percent of CSX's outstanding shares, as part of a plan to influence control over Deutsche Bank's voting without an explicit agreement:

"Q. And why did you believe it would be helpful [that there was a hedge fund within Deutsche Bank that owned CSX shares]?

A. Because Austin Friars, as far as we can tell, is a hedge fund who we thought we could convince of the value case of what we were trying to accomplish at CSX.  It's better for them as a shareholder to support us than to vote and keep the incumbent board in place.  Hedge funds typically are more receptive to those arguments than non-hedge funds.  And so we thought we would have a good chance at being able to have that discussion and convincing them we were indeed right.

Q. So you thought that given the perspective of a hedge fund that you would be more likely to be able to convince Austin Friars than the regular institutional investor; is that fair?

* * *

A. Yes, I think that's fair.

Q. And you thought that if you convinced Austin Friars of this, it would help Deutsche Bank to go along with Austin Friars' recommendation?

A. We thought it was a helpful fact, yes.

Q. In convincing Deutsche Bank to vote the counterparty shares your way that they were affiliated with this internal hedge fund; correct?

A. It was our view that it would be helpful that Austin Friars had a proprietary position in CSX, and that we thought we had a good chance of convincing Austin Friars to support us. And to the extent that the banks votes in the best interest of the bank and Austin Friars determined that they should support us, we thought that that would be helpful."  (PFF ¶ 36.)

Mr. Hohn also admitted that TCI sought to use Austin Friars to influence the voting of Deutsche Bank shares held as a hedge to its CSX swaps with TCI. Mr. Hohn was asked the following questions and gave the following answers with respect to TCI's decision to concentrate a large CSX swap position with Deutsche Bank:

"Q. I don't want to get into the other situation, but this move to commercial banks has got nothing to do with CSX, right? It's a generalized concern?

A. For this specific, I'd say there -- I'd say the two reasons we concentrated our holdings there, one is the credit counterparty issue, and in the case of Deutsche Bank, we observed that they had a physical holding of a few percent of the company, and we had hypothesized that there may be a chance that if they had hedged it, that they -- and they liked our -- in the event that we did run a slate of directors, that they -- that would -- might be a factor for them to consider voting any underlying shares in which they might have hedged their swap -- their swaps.

Q. So one reason you moved -- you concentrated on Deutsche Bank was that you thought there was a possibility that they would vote the underlying shares for your slate?

A. If they held them, yeah. We didn't know if they held any, but if they did, there was -- that was one of the reasons. The other was counterparty credit risk."  (PFF ¶ 37; see also Tr. 178:18-179:6.)

Austin Friars helped TCI get information from others.  Thus:  in March 2007, Austin Friars set up a call with John Snow, former Secretary of the Treasury and former CEO of CSX, and "invited [TCI] to listen in" on the call, which they did.  Prior to the call, Darren Curtis and Andre Crawford-Brunt of Austin Friars sent both Mr. Amin and Mr. Sunak proposed questions to ask of former Secretary Snow.  (PFF ¶ 71.)  TCI

also coordinated its efforts with Austin Friars with respect to other companies.  (PFF ¶ 71.3.)

3G also had contact with Austin Friars regarding CSX. 3G's Mr. Schwartz spoke with people from Austin Friars.  Mr. Schwartz testified that "[Alexandre Behring of 3G] put them in touch with me and we — and we chatted about CSX."  TCI "might have come up" and proxy contests "could have conceivably come up in conversation" with Austin Friars.  (PFF ¶ 72.)

> b.    <u>Deutsche Bank Has Other Relationships with TCI</u>

Deutsche Bank is a prime broker for TCI—a lucrative relationship that led it to provide free services to TCI.  (PFF ¶ 34.)

Moreover, Deutsche Bank was looking for other business.  In March 2007, TCI sent a model it had prepared with respect to CSX to Deutsche Bank and commissioned a March 21, 2007, presentation from Deutsche Bank regarding an LBO of CSX.  (PFF ¶ 127-28.)

On May 15, 2007, Deutsche Bank sent materials to Snehal Amin of TCI (at Mr. Amin's request) regarding a potential leveraged recapitalization of CSX.  (PFF ¶ 136.)

> c.    <u>Prof. Black Misunderstands the Austin Friars Plan</u>

Prof. Black acknowledges the efforts of TCI to use its relationship with Austin Friars, a hedge fund owned by Deutsche Bank, to influence the voting of the matched shares in its swap arrangements with Deutsche Bank, but he quickly dismisses these efforts because the head of the Deutsche Bank swap desk, John Arnone, testified that he did not know what Austin Friars was.  (Black Br. at 6-7, n.13; <u>see also</u> Mr. Arnone's deposition at 17:7-18:13.)  This is misleading.

First, Mr. Amin conceded that TCI intended for the Austin Friars influence to come at a level above the swap desk.  (MR at 53, n.30.)  So what Prof. Black knows is irrelevant.

Second, the evidence shows that Deutsche Bank does intend to vote the matched shares as TCI wishes.[3]  In the days preceding the original record date of

---

[3] Deutsche Bank is known for cooperating with hedge funds seeking to use swaps to influence and control the companies in which the swaps give the funds exposure.  (PFF ¶ 38.)

In May 2001, Deutsche Bank and another derivatives dealer provided equity swaps to the hedge fund Perry Capital with respect to a 16% undisclosed economic ownership stake in Rubicon Ltd., a New Zealand public company.  When Perry needed the voting rights, it terminated the swaps and bought the shares back from the derivatives dealers.  (PFF ¶ 38.1.)

February 27, 2007, CSX shares in unprecedented numbers flowed into the accounts of Deutsche Bank, then flowed back out immediately following the record date. This indicated to Mr. Miller that Deutsche Bank intended to vote the shares, notwithstanding that it had no economic interest in doing so. (PFF ¶ 43.1.) Defendants concede that there was a return of shares to Deutsche Bank, and only note that Mr. Busby of the Deutsche Bank swap desk "could not confirm what had triggered the return of shares." (Defs' PTRB at 66.)

That is what happens when you call a witness who is not part of the agreement. Someone called the shares back. That the Deutsche Bank swap desk does not know who did so is irrelevant. Someone at Deutsche Bank, above the level of the swap desk, and with knowledge of the record date, ordered the shares called back. This is consistent with Mr. Amin's assumption that Deutsche Bank's vote would be determined at a level that would take into account Deutsche Bank's larger interest, including Austin Friars. (Tr. 218:21-25.) The level of recall for the record date was, in Mr. Miller's experience, unprecedented. (PFF ¶ 41.)

The Defendants fully expected that the matched shares would be voted their way.

A January 2008 presentation analyzing its preliminary vote outlook by D.F. King, Defendants' proxy solicitor, indicates that the swap counterparties will in fact vote their shares in accordance with the wishes of their clients. In the presentation, D.F. King assumed that shares held by broker-dealers and reported on Form 13F are "held in connection with equity swaps with sophisticated, primarily hedge fund investors", that "the TCI/3G platform will appeal…specifically to sophisticated investors, such as hedge funds", that "[i]n light of existing hedge fund ownership of CSX and the known preferences of these investors, to the extent that shares held by broker-dealers are voted, [D.F. King] would guess that such shares will be voted for election of the TCI/3G nominees" and that D.F. King "would expect the broker-dealers to vote". (PX 160.)

When it became clear, through this litigation, that Deutsche Bank had been getting ready to vote the matched shares, Deutsche Bank transferred shares to Brown Brothers Harriman for the re-scheduled record date, presumably to disguise the fact that the shares would be voted. (MR at 54.)

---

In 2007, Sulzer, a Swiss engineering firm, found that two Austrians and a Russian oligarch had secretly acquired a 32% stake, notwithstanding rules requiring disclosure at a 5% ownership threshold. This Austro-Russian group had used cash-settled equity derivatives provided by Deutsche Bank and a Swiss bank. (PFF ¶ 38.2.)

In 2004-2005, Deutsche Bank and BHP Billiton entered into swaps to give BHP Billiton economic exposure to about 4.3% of the voting shares in WMC Ltd. (PFF ¶ 38.3.)

Therefore, as part of the relief requested, CSX has asked the Court to direct the parties to have the counterparties tell the Court (but not the parties) how they intend to vote.  With Brown Brothers Harriman in mind, CSX has also asked the Court to direct that the parties ascertain from the counterparties that they have not assigned or lent the matched shares to some other entity or hedge fund that is part of TCI's "friends and family" circle, and will not vote the shares as TCI wishes.  (MR at 53.)

B.    Without the Missing Facts, Prof. Black's Analysis Is Meaningless

Prof. Black assumes all of the facts away, noting that "[t]he factual record made available to [him] is consistent with the absence of any…agreements".  (Black Br. at 6, n.12.)  However, the facts listed above demonstrate that despite the strict reading of TCI's swap contracts with its counterparties, TCI had "arrangements or understandings" with its counterparties, particularly Deutsche Bank, that gave it investment and voting power over the matched shares under its swap agreements.  This disposes of Prof. Black's statement that "[u]nder current market practices, TCI does *not* have the power to direct how any matched CSX shares are voted, or whether they are voted at all, nor even the practical ability, in a probabilistic sense, to do so".  (Black Br. at 17 (emphasis in the original).)

Given Defendants' admissions regarding their efforts to conceal their investment position and intentions with respect to CSX from the market and their secret Group formation in early 2007, these arrangements gave them power to influence the voting of the matched shares and thus gave them beneficial ownership over such shares.  Moreover, we note that in their briefs Defendants offer no explanation of these arrangements, understandings and relationships other than to issue a flat denial of an agreement with the Deutsche Bank swap desk.  As noted above in Part II.A.2., Defendants meant to use their relationships at a level above the swap desk.

III.    **The Black Brief Is Wrong on the Law of Beneficial Ownership**

A.    The Counterparties Acted Consistently with Economic Theory

Our expert, Prof. Marti Subrahmanyam, the Charles E. Merrill Professor of Finance, Economics and International Business at the Stern School of Business at New York University, has demonstrated that, as a matter of real-world financial economics, the counterparties to TCI's swaps had to hedge their positions with matching physical shares, hold that hedge for the duration of the swap, and upon termination of the swap, dispose of the matching shares.  (PFF ¶ 201.)  Although Prof. Black argues that swaps can be hedged in other manners (e.g., with single stock futures and put and call combinations) (Black Br. at 7-8), he concedes that matching physical shares is the cheapest way for a counterparty to hedge.  (Black Br. at 7-8.)  Indeed, buying and selling matched shares is the only effective way to hedge a swap exposure of this size.  (PFF ¶ 201.)

Consistent with what economic theory would predict, TCI's counterparties did in fact hedge their CSX swaps one-for-one with matching physical CSX shares.

Every time TCI entered into a large swap with one of its counterparties, the counterparty acquired an identical number of CSX shares.  Similarly, if and when TCI terminated its swaps, TCI's counterparties sold an identical number of shares.  (PFF ¶ 202.)

Thus, TCI had the ability to influence the purchases and sales of CSX common stock by its counterparties—and disposition power creates beneficial ownership under Rule 13d-3(a).  Insofar as TCI had the ability to influence the acquisition and disposition of the matching shares, it had the ability to influence the voting of those shares.  Through its swap arrangements, TCI effectively put the matching shares, and their corresponding voting rights, in the hands of the counterparties, as opposed to the hands of whoever else would have otherwise held the shares.  (PFF ¶ 222.)  And by effectively determining the vote holder of CSX shares, TCI influenced the voting of those shares.  For this reason alone, TCI had the ability significantly to influence the voting of those shares.  (PFF ¶ 223.)

But TCI did even more in this case.  It made sure to concentrate its swaps with those counterparties most likely to vote the way TCI wished as it prepared to enter a proxy context with CSX.  (PFF ¶ 30-34.)

Prof. Black refuses to acknowledge this inherent manifestation of beneficial ownership through swaps.  In Prof. Black's world, where counterparties never interact with their customers and have no incentive to listen to their customers' wishes or grant them favors like taking voting instruction from them, he sees beneficial ownership of matched shares through swaps as an impossibility—not because he disagrees with Prof. Subrahmanyam's analysis, but because he believes that it would be difficult to implement because the swap counterparty is free not to hedge or to hedge using something other than shares of common stock.  Here too, Prof. Black misses the point: (i) as Prof. Subrahmanyam demonstrated, swaps in this context are only hedged with shares; it does not make economic sense to do otherwise; and (ii) Rule 13d-3(b) exists to capture attempts at evasion.

B.    Problems with Prof. Black's Analysis

Beyond the flaws with Prof. Black's analysis of the general case for beneficial ownership are a number of other problems.  We outline but a few below:

1.    Professor Black Forgot that Puts and Calls Confer Beneficial Ownership

On pages 14-15 of his Brief, Prof. Black presents a seemingly novel way to evade the reporting requirements of Section 13(d)—the purchase of a call option and the sale of a put.  Prof. Black, who is in the business of teaching the ins-and-outs of the federal securities laws, has forgotten Rule 13d-3(d).  This already confers beneficial ownership on persons having the right to acquire beneficial ownership of a security, including through the exercise of "any option, warrant or right".  Puts and calls are the classic examples of these.  He does not even appear to be relying on the 60-day requirement (which is inapplicable in the case of Defendants in any event as they have a

stated control intent). Prof. Black admits only that this strategy "probably" works. He goes on to say though that if it does not work, "variations on it will". (Black Br. at 12.) Not if someone else remembers the Rule.

2.    <u>Single Stock Futures Are Not the Same as Swaps</u>

Prof. Black's theories also rely heavily on a comparison between swaps and cash-settled single stock futures ("SSFs"), which the SEC has determined may not give rise to beneficial ownership. (Black Br. at 11, 13-14, 16.) He states that "[e]quity swaps and [SSFs] are economically equivalent", so one cannot reconcile a determination that swaps result in beneficial ownership, while SSFs do not. Perhaps it is his lack of expertise in economics and financial matters, but again, Prof. Black seems to be missing a few points:

- SSFs and swaps are different contractually. SSFs are standardized contracts anonymously traded on an exchange. As a result, the holder of an SSF will have no idea who the seller is and has no ability to influence or negotiate with the seller. Swaps, on the other hand, are privately negotiated bilateral contracts where the parties may deal with each other regularly and have knowledge about the quality of the other's credit and business practices. This also permits opportunity for influence. (PFF ¶ 242.)

- SSFs are not necessarily hedged with physical shares, whereas the economics of swaps dictate this approach. SSF contracts are guaranteed by the exchange, reducing or eliminating the need for hedging. Counterparties to swaps are not in the business of risking capital on directional stock price movements and have an economic incentive to hedge their exposure to swap positions. Physical shares are the most likely and best suited hedge in the case of a swap. (PFF ¶ 247.) As noted above, TCI's counterparties did in fact hedge TCI's swaps one-for-one with physical shares. (PFF ¶ 205.)

- SSFs and swaps on single stocks have different maturities. SSFs mature generally within one year, while swaps may last ten years or more. (PFF ¶ 243.)

- SSFs and swaps present different credit risks to the counterparty. The exchange guarantees the futures contract, removing most of the risk from the parties. Parties to a swap are exposed to risks associated with the creditworthiness of the opposing party. Swaps are priced to incorporate this risk. (PFF ¶ 244.)

- The margin requirements for SSFs and swaps differ. SSFs require both parties to post margin (or collateral), and the margin requirements are re-calculated each day from the market price. The margin requirements for swaps are negotiated between the counterparties, and only one party posts margin. The margin is computed based on all positions between the parties, rather than for the single contract. (PFF ¶ 245.)

- Different types of traders participate in SSF markets than in the swap markets. SSFs can be traded by individual investors, while swaps are generally only available to institutional investors or very wealthy individuals. (PFF ¶ 246.)

Indeed, at trial, Defendants conceded that the two instruments were not the same: "[The comparison between SSFs and swaps] is not specifically on point and it's not [TCI's] position that in fact [the Q and A in SEC release 33-8107 concluding that SSFs do not convey beneficial ownership] addresses on all fours a total return cash swap". (Trial Tr. 69:1-22.) Because SSFs are not hedged in the same manner as swaps (so, unlike swaps, there may be no one-for-one hedging with reference shares) and are publicly traded (so, unlike swaps, there is no ability to identify the party on the other side of the trade, to inquire as to that party's hedging practices or to influence the voting of any shares that party may have), it is logical that the Commission would not find beneficial ownership in that case. Where there is (i) a clear economic reality of hedging with matched shares and (ii) the opportunity for multiple arrangements and understandings, as is the case with swaps, the issue of beneficial ownership must come out the opposite way.

### 3.     Prof. Black's Inconsistent Positions

Prof. Black indicates that his Brief may be inconsistent with his prior writings due, in part, to "details about the practices of investors in equity swaps and derivative dealers which were previously not available to" Prof. Black and his co-author, Prof. Henry Hu, but have been learned through this litigation. (Black Br. at 3, n.7.) Our explanation is more negative.

Indeed, Prof. Black proceeds beyond his initial statement that he "believe[s] that large economic-only ownership positions, including those conveyed by equity swaps, should be publicly reported." (Black Br. at 4; see also Black Br. at 10.) His only argument with our position at this early stage of his Brief is that he believes that the current rules do not cover the disclosure of equity swaps and that the SEC should change its rules to do so, rather than "stretch the current 13(d) rules". (Id.)

    (a)    However, Prof. Black takes a different stance further on in the Brief: "More disclosure reduces the return to search [for undervalued companies], and the incentives to engage in shareholder activism. This harms all shareholders, large and small alike." (Black Br. at 18.)

    (b)    Later, he briefly turns back to advocating for disclosure, but becomes distracted with a discussion on Section 16, advocating that the 10% beneficial owner application be waived "for investors for whom there is no other evidence of access to inside information". (Black Br. 19.)[4]

---

[4] In this section, he notes that the specter of Section 16 "impose[s] a substantial hurdle on any outside investor who is considering acquiring more than 10% of a company's shares" and states this as though it were an oversight by the Commission. (Id.) Again, Prof. Black seems unaware of the rationale for using

(c)     Still later, Prof. Black questions the ability of the SEC to act at all and states:  "the explicit limits on the SEC's power to regulate 'security-based swap agreements' (including equity swaps) in the Gramm-Leach-Bliley Act" might be a reason for caution in extending the definition of "beneficial owner" under Section 13(d) further.  (Black Br. at 19.)

These changes of opinion do not have anything to do with what Prof. Black "learned" in the litigation.  Indeed, this letter shows that he learned little about the facts.  This change has to do with a different aspect of his involvement:  paid advocacy.

IV.     **The Black Brief Misstates the Effect of CSX's Proposed Relief on Future Cases**

A.     The Relief in this Case Will Cure Problems in this Case

Although on their face, the two questions on which the Court has asked the Commission to opine seem very different—one relates to Rule 13d-3(a) and the other to Rule 13d-3(b)—they are linked by the facts of this case.  The answers to both questions are specific to the facts and circumstances of Defendants' interests in CSX.  While we have made the case that swaps create beneficial ownership of the referenced shares in this case, the Commission need not consider the general case without the specific facts here.  In the case at hand, the facts demonstrate that (i) TCI had arrangements or understandings with its swap counterparties that gave it the ability to exercise influence over the voting of the reference shares and (ii) TCI and 3G sought to evade the reporting requirements of Section 13(d) in order to hide from the investing public its control intent in respect of the Company.  For this reason, we have laid out detailed relief.

B.     The Problem Here Does Not Apply to Counterparties Generally

Prof. Black raises a strawman, and Defendants have sought amicus briefs of ISDA and SIFMA, suggesting that our claims will result in mass chaos in the derivatives market.  This is simply not true.

As noted above, both questions asked of the Court are fact-specific.  They do not deal with the inherent nature of cash-settled total return swaps, merely those held by Defendants.  Therefore, even if Defendants are found to have beneficial ownership of the matched shares under either Rule 13d-3(a) or Rule 13d-3(b), this will not necessarily result in beneficial ownership for the entire swaps market.

---

the Section 13(d) standard for determining the 10% threshold under Section 16:  the Commission applied this standard because like Section 16, Section 13(d) was designed to apply to persons who, through the accumulation of equity securities, may be in a position to influence or control a company.  See Release No. 34-26333 at § III.A.4. (1988) and Release No. 34-28869 at § I.A.3 (1991).

If there was an effect, this would only have an impact on those swapholders with a combined economic interest of 5% of a subject company.  Again, this narrows the pool of potential filers.

Swapholders with a 5% interest would be free to file on Schedule 13G unless they had a control intent.  This point warrants separate examination under each prong of the beneficial ownership test:

- Under the Rule 13d-3(a) test, a person might have a passive investment intent with respect to a company, but because of the close business ties that person has to its broker dealer, it has power to influence the voting of the reference shares.  Even though it has voting power, it lacks a control intent, so it would be free to file on Schedule 13G.  As a Schedule 13G filer, its filing would not cause a stir in the market, and there would be little risk of front-running.  Of course, if the person had a control intent, it would be required to file on Schedule 13D, which would cause the market to take notice, as it should.  This is the early warning signal the Williams Act intended.

- Under the Rule 13d-3(b) test, if a person is using swaps as part of a plan or scheme to evade reporting, it seems likely that the reason for the plan or scheme is to avoid front-running, which again is only a concern if the person has a control intent, so it is more likely that, under this test, the filer would be using a Schedule 13D.  Note though that, under this test, only those using swaps as part of a plan or scheme to evade would be picked up.  Swapholders without a control intent would be less likely to be seeking to use swaps to evade reporting and thus would be less likely to be picked up under this rule.

Indeed, reporting of derivative instruments on Schedule 13D is already the norm for options, warrants and other derivative products.  The addition of cash-settled swaps should not be any more burdensome.  And, even if it does result in additional filings, that is the goal of the Williams Act—maximum transparency, not, as Prof. Black put it, "optimum" transparency.

C.    The Court's Solution

Prof. Black's concern that beneficial ownership under Section 13(d) could lead to unintended consequences, such as becoming a Section 16 reporting person (here, the universe of impacted persons is even smaller because Section 16 is only triggered at the 10% level)[5] or triggering companies' poison pills and other change of control provisions is nonsense. These provisions are typically triggered upon a determination by a third party, such as an issuer's board of directors, that the beneficial ownership test has been triggered. As a result, and in light of the Court's suggestion, in cases without a control intent, it is unlikely that these would be triggered.

At trial, the Court asked Mr. Hohn whether he had considered simply filing a Schedule 13D before December 19, 2007, with disclosure of TCI's swap position, but disclaiming beneficial ownership of the shares underlying the swaps, just as TCI has done with its current Schedule 13D filing. Mr. Hohn replied that he had not. (PFF ¶ 293.) This idea of the Court's, to encourage voluntary disclosure of swap positions when a person's aggregate (swap and stock) exposure exceeds the 5% level (whether or not the exposure is completely beneficially owned), is an elegant solution.

Such a procedure solves the confusion problem. At the 5% level a person would file, but could disclaim beneficial ownership to the extent such person reasonably believed it did not have beneficial ownership over the reference shares.

Moreover, it provides maximum transparency. The public will be alerted to all material accumulations of interests in a company that can give a person influence over management, including, as we have seen in the facts of this case, swaps.

And this alleviates the concerns of ISDA and SIFMA that swap counterparties may be considered Section 13(d) "group" members with their customers. Except in cases where the swapholder has an arrangement, understanding or relationship with the counterparty that would not allow it to disclaim beneficial ownership, the swapholder would be disclaiming beneficial ownership of the reference shares and so the counterparty would not be implicated in a "group". If the swapholder could not disclaim beneficial ownership, then this is the kind of relationship that should be disclosed to the market and considered under a "group" analysis. Again, we are certain that counterparties will take, and many may already be taking, the necessary precautions to avoid becoming part of an inadvertent group. We assume that ISDA and SIFMA will help in this effort.

---

[5] We note that applying beneficial ownership to cash-settled swaps would actually alleviate Prof. Black's concern over the two beneficial ownership definitions in Section 16. Under this application, cash-settled swaps would be considered for both the 10% test and the pecuniary interest test.

Please do not hesitate to contact me should you wish to obtain copies of the documents cited herein or referenced in such cited documents. Please also let me know if I or any of my colleagues can be of further assistance in this matter.

Sincerely,

Rory O. Millson

Brian G. Cartwright, Esq.
    General Counsel
        United States Securities and Exchange Commission
            100 F Street, NE
                Washington, DC  20549

Andrew N. Vollmer, Esq.
    Deputy General Counsel
        United States Securities and Exchange Commission
            100 F Street, NE
                Washington, DC  20549

Jacob H. Stillman, Esq.
    Solicitor
        United States Securities and Exchange Commission
            100 F Street, NE
                Washington, DC  20549

Christopher Paik, Esq.
    Special Counsel
        United States Securities and Exchange Commission
            100 F Street, NE
                Washington, DC  20549

Nicholas Panos, Esq.
    Senior Special Counsel
        Office of Mergers and Acquisitions
            United States Securities and Exchange Commission
               100 F Street, NE
                  Washington, DC  20549

BY ELECTRONIC MAIL

Professor Joseph A. Grundfest
Stanford Law School
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305

Professor Henry T. C. Hu
The University of Texas School of Law
727 E. Dean Keeton Street
Austin, TX 78705

Professor Marti G. Subrahmanyam
New York University
Kaufman Management Center
44, West Fourth Street # 9-68
New York, NY 10012

June 2, 2008

Brian G. Cartwright, Esq.
General Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20459

<u>CSX v. TCI, et al.</u>

Dear Mr. Cartwright:

At the request of CSX Corporation, we write to address the questions posed to the Commission by The Honorable Lewis Kaplan in the above-titled litigation, and to respond, at least in part, to the related letter submitted to the Commission by Professor Bernard Black dated May 29, 2008. We believe Judge Kaplan's questions raise issues of importance for the markets and urge the Commission to consider our views as it formulates its response to the Court and considers its own actions.

After briefly describing our credentials (<u>see</u> Section I below), we describe the focus of this letter and summarize our view regarding the Commission's potential response to the Court's inquiry (<u>see</u> Section II below). In Section III of this letter, we address the anti-evasion prong of the beneficial ownership test, Rule 13d-3(b), and explain how Defendants' actions in this case clearly violate the Rule's anti-evasion provision. Our analysis, as described in Section III, allows the Commission and Court to distinguish legitimate uses of cash-settled equity swaps from applications that violate the anti-evasion provisions of Rule 13d-3(b). In Section IV, we explain a few of the problems with Professor Black's analysis. Finally, we explain how our approach promotes values consistent with those embodied in Section 13 and in the federal

securities laws more broadly (see Section V below), and set forth our conclusions (see Section VI below).

In sum, we urge that the Commission respond to Judge Kaplan's inquiry with an interpretation of Rule 13(d) that simultaneously respects the language of the Rule as it currently stands yet emphasizes that Defendants, in clear violation of Rule 13d-3(b), engaged in a "scheme to evade the reporting requirements of section 13(d) or (g) of the Act". As explained in detail below, Defendants engaged in six distinct forms of conduct that, taken together, establish a "scheme to evade the reporting requirements" as opposed to a legitimate, good-faith structuring of a transaction that relies on derivative market contracts in order legitimately to avoid Section 13(d) reporting requirements.

More precisely, the six factors present in this case that, taken together, are clearly sufficient to establish evasion are:

1. Defendants acquired a position in the derivative markets that, if held in the form of the registrant's voting equity, would trigger a disclosure requirement. (We emphasize that this factor constitutes a necessary but insufficient condition for a violation of Rule 13d-3(b)'s anti-evasion provision.);

2. Defendants engaged in efforts to influence corporate management in a manner consistent with a course of conduct typical of activist shareholders holding positions in excess of five percent of a registrant's voting equity who are required to file pursuant to Section 13(d);

3. Defendants engaged in efforts with the purpose or effect of influencing the voting position of counterparties who, by virtue of the foreseeable equity hedges held as a result of the equity swap positions at issue, own the registrant's voting shares;

4. Defendants caused a pre-positioning of the registrant's voting shares in a manner that materially facilitates the rapid and low-cost acquisition of a reportable position upon the termination or other unwind of the derivative transactions at issue;

5. Defendants caused the derivative positions at issue to be structured in a manner calculated to prevent counterparties from becoming subject to disclosure obligations under the Federal securities laws; and

6. The information regarding Defendants' activities withheld from the market (e.g., Defendant's equity or derivative positions) is material.

We respectfully submit that these factors demonstrate that Defendants have engaged in a "scheme to evade the reporting requirements of section 13(d) or (g) of the Act", and have violated Rule 13d-3(b). We further suggest that if the foregoing conduct

does not constitute a "scheme to evade the reporting requirements of section 13(d) or (g) of the Act", then Rule 13d-3(b) is rendered a nullity. Indeed, if the conduct present in this case does not constitute a "scheme to evade the reporting requirements of section 13(d) or (g) of the Act", then we would respectfully request that the Commission describe the additional facts and circumstances that would be necessary to establish an evasion.

We believe that the factors on which we rely allow the Commission to address the obvious evasion of Rule 13(d)'s reporting requirements presented on the facts of this case without causing any dislocation of larger, well established market practices in the international markets for derivative securities.[1]  Indeed, Defendants have presented no evidence that the narrow approach we advocate in this letter will have any adverse effect whatsoever on the operation of capital markets, and we believe that no such adverse effect exists.

I.    Our Backgrounds and Credentials

*Professor Joseph A. Grundfest*: Professor Grundfest is a nationally prominent expert on capital markets, corporate governance, and securities litigation. His scholarship has been published in the Harvard, Yale, and Stanford law reviews, and he has been recognized as one of the most influential attorneys in the United States. Professor Grundfest's article, The Limited Future of Unlimited Liability: A Capital Markets Perspective, 102 Yale L. J. 387 (1992), describes in detail the ability to use derivative instruments to synthesize equity positions for a wide range of purposes, and anticipates by more than a decade much of the current controversy regarding the application of derivative market transactions. Professor Grundfest founded the award-winning Stanford Securities Class Action Clearinghouse, which provides detailed, online information about the prosecution, defense, and settlement of federal class action securities fraud litigation. He also launched Stanford Law School's executive education programs, and continues to co-direct Directors' College, the nation's leading venue for the continuing professional education of directors of publicly traded corporations. Professor Grundfest's courses at Stanford cover equity swap market transactions, equity forwards, options, and credit derivative transactions. In addition, he co-directs the Arthur and Toni Rembe Rock Center for Corporate Governance, as well as the Stanford Program in Law, Economics, and Business.

Before joining the Stanford Law School faculty in 1990, Professor Grundfest was a Commissioner of the Securities and Exchange Commission, served on the staff of the President's Council of Economic Advisors as counsel and senior economist for legal and regulatory matters, and was an associate at Wilmer, Cutler & Pickering. Early in his

---

[1] While the factors discussed herein lead us to the firm conclusion that Defendants engaged in a plan or scheme to evade the reporting requirements, it does not necessarily follow that these factors are necessary elements of a violation under Rule 13d-3(b). Their combined presence here merely underscores the point that Defendants' conduct was plainly in the zone of a plan or scheme to evade the reporting requirements.

career, he was a research associate at the Brookings Institution, and an economist and consultant with the RAND Corporation.

*Professor Henry T. C. Hu*:  Professor Hu holds the Allan Shivers Chair in the Law of Banking and Finance at the University of Texas Law School.  He has written on such matters as the corporate objective and fiduciary duty, the "decoupling" of shareholder voting rights from economic ownership, hedge fund and derivatives dealer behavior and regulation, investor illiteracy and mutual fund disclosure, corporate risk management and the hedging question, swaps and other financial innovations, time diversification and asset allocation, and Warren Buffett.  The writings have appeared in law reviews (e.g., Columbia Law Review, University of Pennsylvania Law Review, and Yale Law Journal), specialist journals (e.g., Business Lawyer, Journal of Applied Corporate Finance, and Risk), and newspapers (i.e., Financial Times, Finanz und Wirtschaft, and New York Times).  In 1996, an exchange-traded index derivative with the ticker symbol "HUI" (in recognition of one of his derivatives articles) was introduced.  Today, the HUI is one of the world's two key gold equity indices (according to a Financial Times story).  Four times, an article as to which he was the sole or lead author was selected as one of the "Top 10 Corporate and Securities Articles" of the year in a nation-wide poll of law professors:  1996, 1997, 2000, and 2006.  Professor Hu is the lead author (with Professor Bernard Black as co-author) of writings considered seminal to scholarship on "decoupling," including: (1) The New Vote Buying:  Empty Voting and Hidden (Morphable) Ownership, 79 S. Cal. L. Rev. 811 (2006) ("Hu & Black (2006)"); and (2) Equity and Debt Decoupling and Empty Voting II:  Importance and Extensions, 156 U. Pa. L. Rev. 625 (2008) ("Hu & Black (2008)").

Professor Hu teaches subjects such as corporate law and securities regulation.  He has also taught these subjects at Harvard Law School, where he served as the Bruce W. Nichols Visiting Professor of Law for the 1997-98 academic year.  He was elected to the American Law Institute in 1991, was elected to a year term as the chair of the Association of American Law Schools' Business Associations Section in 1996, and was appointed to the Legal Advisory Board of the National Association of Securities Dealers (now the "Financial Industry Regulatory Authority" or "FINRA") in 2000, the NASD's e-Brokerage Committee in 2001, the NASD's Market Regulation Committee in 2006, and the NASDAQ Market Regulation Committee in 2007.  In May 2007, he was appointed to the Editorial Board of the Capital Markets Law Journal (published by the Oxford University Press).  He has testified before Congress on the collapse of the hedge fund Long Term Capital Management and on the regulatory implications of the New York Stock Exchange going public.  He has also testified before the Securities and Exchange Commission on "equity decoupling" issues (e.g., "empty voting" and "hidden (morphable) ownership").  Professor Hu holds a B.S. (Molecular Biophysics & Biochemistry), M.A. (Economics), and J.D., all from Yale.

*Professor Marti G. Subrahmanyam*:  Professor Subrahmanyam is the Charles E. Merrill Professor of Finance and Economics in the Stern School of Business at New York University.  He holds a degree in Mechanical Engineering from the Indian Institute of Technology, Madras, a post-graduate diploma in Business Administration from the

4

Indian Institute of Management, Ahmedabad, and a doctorate in Finance and Economics from the Massachusetts Institute of Technology. Professor Subrahmanyam has published numerous articles and books in the area of corporate finance, capital markets and international finance. He has been a visiting professor at leading academic institutions in Australia, England, France, Universita Guido Carli LUISS, Rome, Italy, Singapore Management University and Churchill College, Cambridge University. He also sits on the boards of several companies including the ICICI Bank Ltd. (NYSE:IBN), Infosys Technologies Ltd. (NASDAQ:INFY), Metahelix Life Sciences (P) Ltd, Nomura Asset Management Inc., and the board of advisers of Apollo Management L.P. He serves as an advisor to international and government organizations including the Securities and Exchange Board of India.

Professor Subrahmanyam currently serves or has served as an Associate Editor of the European Financial Management, Journal of Banking and Finance, Journal of Business and Accounting, Journal of Finance, Management Science, Journal of Derivatives, Journal of International Finance and Accounting, and Japan and the World Economy. He is the Editor of an academic journal specializing in derivative securities and markets entitled Review of Derivatives Research. His research interests include valuation of corporate securities, options and futures markets, equilibrium models of asset pricing, market microstructure and the term structure of interest rates. He has published several papers in these areas in many of the leading international journals in economics and finance, including Econometrica, The Quarterly Journal of Economics, Journal of Finance, Journal of Financial Economics, and The Review of Financial Studies. His recent books include Recent Advances in Corporate Finance (Irwin, 1985) and Financial Options: From Theory to Practice (Dow Jones-Irwin, 1992). He is currently working on a new book, Interest Rate Derivative Products.

II.    The Issue We Address and Our Conclusion

In a letter to the Commission dated May 23, 2008, Judge Kaplan requested the SEC's views on two issues in the pending litigation between CSX and TCI and 3G.[2] Those questions are: (1) Did Defendants have beneficial ownership, within the meaning of Regulation 13D, of the CSX shares held by their cash settled total return equity swap counterparties; and (2) What mental state is required to establish the existence of a plan or scheme within the meaning of Rule 13d-3(b)?

Apparently at the request of TCI and 3G, Professor Bernard Black of the University of Texas submitted a letter to the SEC on May 29, 2008, offering his opinions

---

[2] "CSX" refers to plaintiff CSX Corporation. "TCI" collectively refers to defendants The Children's Investment Fund Management (UK) LLP, The Children's Investment Fund Management (Cayman) Ltd., and The Childern's Investment Master Fund. "3G" collectively refers to defendants 3G Capital Partners Ltd., 3G Capital Partners, L.P., and 3G Fund L.P. Like Professor Black, we focus on the TCI defendants; references herein generally to "Defendants" refer to them.

with respect to Judge Kaplan's questions.  Professor Black appears to conclude, among other things, that cash-settled equity swaps cannot confer beneficial ownership within the meaning of Rule 13d-3.  Significantly, Professor Black does not take the position that equity swaps can never be used as part of a scheme to evade Section 13(d) in violation of Rule 13d-3(b).  Indeed, to take such a position would be to assume that there is a "safe harbor" under Section 13(d) for the application of equity swaps that does not apply to other capital market instruments -- a position for which there is absolutely no support in the law and that, if adopted, would eviscerate Rule 13d-3(b).

Further, to the extent Professor Black concludes categorically that an arrangement involving cash-settled equity swaps cannot under any circumstances confer beneficial ownership under Rule 13d-3(a), we disagree.  Under Rule 13d-3(a), a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:  (1) Voting power, which includes the power to vote, or to direct the voting of, such security; and/or (2) Investment power, which includes the power to dispose, or to direct the disposition of, such security.  A person is the beneficial owner of a security even if it only indirectly shares the power to direct the voting or disposition of the security.  The rule has been interpreted to confer beneficial ownership upon a person who has the ability significantly to influence the voting or disposition of security.[3]  There is no reason why, in an appropriate case, an arrangement relating to cash-settled equity swaps, or a relationship with a counterparty, could not confer upon a swap holder the ability significantly to influence the voting or disposition of security.

As we believe the Commission is aware, Professor Subrahmanyam has explained that TCI's swap arrangements gave it the ability effectively to determine the acquisition, holding, and disposition of CSX shares by its swap counterparties and, as a result, the ability significantly to influence the voting of those shares.  Professor Subrahmanyam explained that the economics of the swap business dictate that hedge fund managers expect the counterparties to their large equity swaps to hedge their exposure with matching physical shares and that this was in fact what happened with TCI:  "[t]here is a direct -- indeed, essentially perfect -- correlation between TCI's purchases and sales of

---

[3] Beneficial ownership is "interpreted … broadly" and includes the "ability to control or influence the voting or disposition of the securities".  Interpretive Release Applicable to Insider Reporting and Trading, Exchange Act Release No. 34-18114, 46 Fed. Reg. 48147-01 (Oct. 1, 1981) (emphasis added); Cavalry Holdings, Inc. v. Chandler, 948 F.2d 59, 63 (1st Cir. 1991) (Section 13(d) concentrates on those individuals with the ability to influence voting or disposition of the securities); SEC v. Drexel Burnham Lambert Inc., 837 F. Supp. 587, 607 (S.D.N.Y. 1993) (beneficial ownership "inquiry focuses on any relationship that, as a factual matter, confers on a person a significant ability to affect how voting power or investment power will be exercised").

large swap positions and purchases and sales by its swap counterparties of matching physical CSX shares." (Rebuttal Expert Report of Marti G. Subrahmanyam ¶ 3.)[4]

Our disagreement with Professor Black on this point is not, however, the focus of this letter. We focus instead on what we perceive to be the primary concern of Judge Kaplan's letter to the Commission: the evasion prong of the beneficial ownership test, Rule 13d-3(b). Nothing in Professor Black's letter suggests that the evasion prong of the beneficial ownership test cannot be applied to a plan or scheme to evade the reporting requirement using cash-settled equity swaps. Treating cash-settled equity swaps as exempt from Rule 13d-3(b) would run contrary to the goal of the Williams Act (which Rule 13d-3(b) seeks to implement), would eviscerate Rule 13d-3(b), and would render compliance with Section 13(d) essentially voluntary.

III.    <u>Beneficial Ownership by Evasion</u>

Rule 13d-3(b) deems a person to be the beneficial owner of a security if the person uses a contract, arrangement or device of some kind to prevent the vesting of beneficial ownership as part of a plan or scheme to evade the reporting requirements. Specifically, the rule states:

> "Any person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose or effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security."

To be sure, little has been said by the Commission about this prong of Rule 13d-3, which we call the evasion test, and little case law interprets it.[5] Our analysis is thus based primarily upon the plain language of the Rule 13d-3(b) and the overall goal of Section 13(d) of the Exchange Act, which "is to alert the marketplace to every large, rapid aggregation or accumulation of securities. . . which might represent a potential shift in

---

[4] Citations to the expert reports of Marti G. Subrahmanyam or Frank Partnoy are to the full title of the report. Citations to the Proposed Findings of Fact and Conclusions of Law of CSX Corporation Relating to Its Claims are of the form "PFF ¶ _". Citations to the trial transcript are of the form "Trial Tr. PAGE:LINE". Citations to the letter sent by Professor Bernard Black are of the form "Black at __".

[5] Of the few cases that even so much as mention Rule 13d-3(b), <u>Levy ex rel Immunogen, Inc. v. Southbrook Int'l Invs., Ltd.</u>, No. 99-1480, 2000 U.S. Dist. LEXIS 6301 (S.D.N.Y. May 8, 2000), has the most in-depth discussion. It contains a single paragraph on the subject, in which the court denied plaintiff's Rule 13d-3(b) claim for failure to plead and factually support affirmative acts of concealment and lack of disclosure. <u>Id.</u>, at *16.

corporate control".  Treadway Cos. v. Care Corp., 638 F.2d 357, 380 (2d Cir. 1980) (internal citations omitted).  We are mindful of the Commission's guidance that beneficial ownership is "interpreted … broadly" and includes the "ability to control or influence the voting or disposition of the securities".  Interpretive Release Applicable to Insider Reporting and Trading, Exchange Act Release No. 34-18114, 46 Fed. Reg. 48147-01 (Oct. 1, 1981) (emphasis added).

We do not undertake here to identify all of the circumstances under which a person might use cash-settled equity swaps to evade the reporting requirements.  One can imagine any number of plans or schemes to that end.  But, at a minimum, a person engages in a plan or scheme (and should thus be deemed a beneficial owner) when that person has:

1.    Acquired a position in the derivative markets that, if held in the form of the registrant's voting equity, would trigger a disclosure requirement (We emphasize that this factor constitutes a necessary but insufficient condition for a violation of Rule 13d-3(b)'s anti-evasion provision.);

2.    Engaged in efforts to influence corporate management in a manner consistent with a course of conduct typical of activist shareholders having positions in excess of five percent of a registrant's voting equity who are required to file pursuant to Section 13(d);

3.    Engaged in efforts with the purpose or effect of influencing the voting position of counterparties who, by virtue of the foreseeable equity hedges held as a result of the equity swap positions at issue, own the registrant's voting shares;

4.    Caused a pre-positioning of the registrant's voting shares in a manner that materially facilitates the rapid and low-cost acquisition of a reportable position upon the termination or other unwind of the derivative transactions at issue;

5.    Caused the derivative positions at issue to be structured in a manner calculated to prevent counterparties from becoming subject to disclosure obligations under the Federal securities laws; and

6.    Withheld from the market information regarding the person's activities that is material (e.g., the person's equity or derivative positions).

As we understand the facts in the pending litigation, these conditions are satisfied:

1.    By December 6, 2006, TCI accumulated swaps referencing 5.20% of the CSX shares then outstanding, surpassing the 5% reporting threshold (applicable to voting equity) on that date.  Before TCI ever began to convert its swaps into CSX shares, on March 30, 2007, TCI owned

8

swaps referencing 14.07% of the CSX shares then outstanding.  (PFF ¶ 45.);

2.    TCI sought to influence and control CSX by replacing senior management, electing board members sympathetic to TCI, significantly reducing CSX workforce, and engaging in changes to the ownership structure of CSX, such as through a leveraged buy-out.  (PFF ¶ 268.);

3.    Through its swap arrangements, TCI effectively and foreseeably put the matching shares, and their corresponding voting rights, in the hands of the counterparties, as opposed to the hands of whoever else would have otherwise held the shares.  Counterparties have economic incentives to vote shares in favor of TCI as they compete for TCI's business, including the lucrative prime brokerage business.  (Expert Report of Marti G. Subrahmanyam ¶¶ 160-62; Rebuttal Expert Report of Marti G. Subrahmanyam ¶¶ 43-44.)  Moreover, TCI sought to influence at least one of its swap counterparties, Deutsche Bank (which is also a TCI prime broker), to vote in its favor in the proxy fight, based on TCI's connection to a hedge fund owned by Deutsche Bank known as Austin Friars.  Anomalies in the ownership profile of CSX at the time of its initial record date suggest that TCI was successful in its efforts.  (PFF ¶¶ 35-37, 221.);

4.    When TCI unwound its swaps, TCI's counterparties had no practical choice but to unwind their hedges by selling their matching physical shares.  TCI determines when its swaps terminate, knows how many shares are involved, knows when its counterparty would likely sell, and knows how many shares it would likely sell.  Investors with superior knowledge of the order flow in the market compared to other participants realize economic benefits from this information.  Therefore, TCI is in a preferential position vis-à-vis other market participants and can purchase a large block of CSX shares at better prices on the open market than it would have otherwise been able to.  In fact, TCI did purchase large blocks of CSX shares at prices that were very close to the prices obtained by its counterparties on sales of matching shares.  (PFF ¶¶ 201-05; Expert Report of Marti G. Subrahmanyam ¶¶ 145-52; Rebuttal Expert Report of Marti G. Subrahmanyam ¶¶ 52-62.);

5.    TCI (a) divided its swaps among eight counterparties; (b) attempted to monitor their holdings to keep them from acquiring matching physical shares in excess of 5% (which would have required disclosure by the counterparties); and (c) after concentrating its swaps with two counterparties, kept token positions (1,000 swaps each) with the remaining six counterparties so as to hide its positions.  (PFF ¶¶ 23-24, 39.); and

6.      The information TCI withheld from disclosures, <u>e.g.</u>, that it held a significant stake in CSX and was seeking influence and control through swaps was plainly material.  Mr. Hohn and Mr. Amin of TCI testified that TCI attempted to avoid disclosing its ownership and accumulation of CSX shares to other investors in order to prevent the stock price from increasing ahead of further accumulation of CSX shares by TCI.  (Trial Tr. 189:3-189:8, 202:14-203:16, 204:15-205:23.)  TCI's purported expert witness, Professor Frank Partnoy, finds that "[o]verall, returns to shareholders of companies that are targeted by activists have been very positive.  That certainly has been the case for CSX, whose share price rose from $35.99 on October 20, 2006, to $64.03 as May 8, 2008, the date of Professor Subrahmanyam's report.  Overall, CSX shares have increased in value relative to both market-weighted indices and competitor indices.  The raw holding-period returns to an investor who purchased CSX on October 20, 2006, the date of TCI's first equity swap, and held through May 8, 2008, were 77.91%, whereas during the same period the raw returns for a competitor index and the S&P 500 index were 44.48% and 2.12%, respectively."  (Rebuttal Expert Report of Frank Partnoy ¶ 109 (footnote excluded).)

If these are indeed the facts -- and we believe they are -- then we have little difficulty, reaching the conclusion that TCI was the beneficial owner of the shares referenced in its swaps.[6]

Professor Black in his letter states that a violation of 13d-3(b) cannot exist without beneficial ownership "either under the statute … or under the remainder of Rule 13d-3".  Without such a finding, "the investor's purpose for acquiring [the position] should be irrelevant".  (Black at 5.)  This argument misreads the rule.  Rule 13d-3(b) provides an alternative method of finding beneficial ownership to voting or investment power under Rule 13d-3(a).  Requiring Rule 13d-3(a) to be satisfied before Rule 13d-3(b) would render 13d-3(b) superfluous; one would not need to show beneficial ownership twice.  Professor Black's interpretation is also in plain conflict with the language of the rule itself, which expressly provides that it applies when a person does not have beneficial ownership either because of divestiture or because beneficial ownership never vested in the first place.

We understand that TCI and 3G have argued that they have not used their swap arrangements to evade the reporting requirements because, among other things, they did not act in bad faith for the sole or dominant purpose of evading the reporting requirements.  While TCI's and 3G's state of mind is not for us to decide, their argument

_____

[6] We believe that Defendants' activities can be analogized to "stock parking", an alternative method for demonstrating beneficial ownership.  <u>See, e.g.</u>, <u>SEC v. First City Financial Corp., Ltd.</u>, 688 F. Supp. 705 (D.D.C. 1988) (discussing stock parking), aff'd 890 F.2d 1215 (D.C. Cir. 1989).

mischaracterizes Rule 13d-3(b).  The text of the rule says nothing about scienter or bad faith.  The law is, instead, that scienter is not an element of a Section 13(d) violation, <u>see, e.g.</u>, <u>SEC v. Savoy Indus.</u>, 587 F.2d 1149, 1167 (D.C. Cir. 1978), and we are aware of no case requiring a showing of bad faith.  Defendants also cannot cite to any such precedent.

Rule 13d-3(b) also does not require that a person have a motive to evade, much less that evasion be a person's sole, or even dominant, motive.  The text of the rule is clear:  it applies where an arrangement is used for the purpose <u>or</u> with the effect of evading the reporting requirements.  An effect arises independent of any purpose, and "purpose" therefore cannot constitute an essential element of beneficial ownership under Rule 13d-3(b) without rendering the term "effect" a nullity.  Thus, it comes as little surprise that Defendants are unable to cite to any precedent establishing that Rule 13d-3(b) is satisfied only upon a showing that a person's motive was to violate the law.

Professor Black does not address what state of mind is required for a 13(d) violation in his letter.  However, we are aware of the position set forth by TCI and 3G, in their filings before Judge Kaplan, and it appears to be based upon an erroneous reading of an SEC Release from 1977.  The Release provides:

> "In order to acquire a substantial position in the voting securities of Z Corporation prior to the election of directors which will take place in the near future, X causes ten institutions to each acquire three percent of the outstanding shares of Z Corporation.  None of the institutions are aware of the purchases by the other institutions or of X's control objective.  As an attempted means of avoiding disclosure of his beneficial ownership of the Z shares until a short time before the election, X, simultaneously with the purchase of the Z shares, gives an irrevocable proxy to A; which proxy will lapse according to its terms…As indicated in Rule 13d-3(b), X is also deemed a beneficial owner of the same Z shares for the period of the proxy as well as thereafter, and therefore must file a Schedule 13D."  Exchange Act Release No. 13291, § IV, Example 8 (Feb. 24, 1977).

Rather than support TCI's and 3G's position, we believe that the SEC's guidance undermines it.  The Release says nothing about bad faith or predominance of an evasion motive.  Nor can either supposed requirement fairly be inferred from the fact pattern described in the SEC's commentary.  The Commission has explicitly stated, moreover, that in the context of Rule 144A, a determination of the existence of a plan or scheme to evade "*does not turn on the security offeror's motive*".  November 28, 2006 SEC Amicus Letter to Judge Karon O. Bowdre in <u>In re HealthSouth Sec. Litig.</u>, No. 03-1500 (N.D. Ala.) (available at <u>http://www.sec.gov/litigation/briefs/2006/healthsouthbrief.pdf</u> ) (emphasis added) (The SEC continues: "the safe harbor is unavailable . . . if an offeror's technical compliance with Rule 144A is an attempt to evade registration . . . .").

## IV.    <u>Flaws in Professor Black's Analysis</u>

In his letter, Professor Black asserts a variety of positions that are contrary to our understanding of the law, market practice, and the facts developed in the pending

litigation.  An exhaustive list of our disagreements is beyond the scope of this letter, but several points deserve mention:

1.      Professor Black assumes the non-existence of elements that bear upon the determination of beneficial ownership.  For example, he assumes that swaps are "often" hedged with matching shares, but "not always", and does not credit the evidence that on the facts of this case the match is essentially perfect, on a one-for-one basis.  (Black at 7; PFF ¶ 202.)  He also states that he is "not aware of a market practice" regarding swap counterparties contacting dealers to attempt to persuade them to vote in any particular matter.  He goes on to baldly assert that this "did not occur in this case" when there is evidence that TCI did just that with Austin Friars.  (Black at 8; PFF ¶¶ 35-38.)

2.      Professor Black assumes (almost always, if not always, in favor of TCI) facts that are disputed, contrary to the undisputed evidence, or without support.  For example, at the outset, he assumes that TCI had "no formal or informal agreement, understanding, arrangement, or relationship" with its swap counterparties beyond the swap agreements and that it had no communications of any kind regarding how the shares underlying the swaps would be voted, all of which go directly to the ultimate issue of beneficial ownership.  (Black at 6.)  He also ignores evidence that TCI and 3G formed a group before December 12, 2007, and assumes they formed a group no earlier than the date on which they executed a formal group agreement on December 12, 2007.  (Black at 1; PFF ¶¶ 44-110.)  He also states that "since announcing their group formation in December, TCI and 3G have fully disclosed their holdings of both shares and equity swaps", without mention of the evidence offered by CSX to the contrary.  (Black at 5 n.9; PFF ¶¶ 44-110, 263-279.)

3.      Professor Black acknowledges major differences between futures and swaps such as different treatment of dividends, different regulatory structure, different margin requirements, different contracting, and different informational environments.  Professor Black, however, states that "[a] single stock future is basically a publicly traded version of an equity swap."  This statement is incorrect.  (PFF ¶¶ 241-47.)  In addition to the reasons that Professor Black does acknowledge (which alone defeat his conclusion), traders face fundamental differences in counterparty credit risk related to the two types of instruments.  Swaps contracts expose both parties to the risk of the other party's ability to perform under the contract whereas futures have the safety net of the clearing corporation, which provides for a multilateral offset on all future trades.  Additionally, the market for single stock futures is too small or illiquid to allow for hedging swaps approaching 5% of the value of a company the size of CSX.  And Professor Black's other suggested hedging alternatives are too poor a fit or too expensive for the low-margin swap business.  Finally, Professor Black offers no evidence of any situation in which equity swaps positions comparable to those here at issue were hedged through any means that did not involve the acquisition of large numbers of the registrant's shares, and there is no such information of record in these proceedings.  Professor Black's assertions in this regard are thus entirely speculative.

V.     The Benefits of this Approach

Contrary to Professor Black's suggestion, considering TCI's conduct as a plan or scheme to evade the reporting requirements would neither stretch the text of Rule 13d-3(b) nor create dislocations in the marketplace. It would impose little cost and would be of great benefit to shareholders and investors.

Applying Rule 13d-3(b) as we describe would affect relatively few market participants. Disclosure would be required only where a person attains a greater than 5% economic interest for the purpose exerting influence or control of the issuer and simultaneously seeks actually to influence or control the issuer and the voting of physical shares by swap counterparties. In addition, in our analysis, the hedged equity shares would have to be pre-positioned, the swaps would have to be structured in a manner calculated to reduce counterparty disclosure obligations, and the information withheld from the market would have to be material. This is undoubtedly an infrequent occurrence. Moreover, disclosure by a holder of a 5% economic interest through swaps acquired under circumstances consistent with our proposed analysis is entirely in line with the Williams Act's goal that the public be on notice of the large position that the shareholder has in a company with an intent to influence control.

We believe strongly in the case for requiring symmetric disclosure of cash-settled equity swaps positions. Indeed, Professors Hu and Black recently summarized the policy considerations for more disclosure as follows (Hu & Black, 2008, at pages 683-84):

"We discuss the policy factors bearing on the optimal level of shareholder disclosure in [Hu & Black (2006)], and do not repeat that analysis here. These requirements are rooted in the belief that investors, as well as society at large, should know who a company's major shareholders are. Investors should also know whether those shareholders are buying and selling and should have an opportunity to respond. From an economic standpoint, share pricing will be more efficient if investors know what major investors are doing and have advance notice of possible changes of control. The integrity of, and confidence in, the stock market will be enhanced. We also identified reasons more directly related to equity decoupling. Disclosure can provide information on the frequency of empty voting and hidden (morphable) ownership. Disclosure may also deter some new vote buying; not everyone will do in the sunshine what they will do in the dark. Moreover, some empty voting strategies may be less effective if disclosed."

In the context of this case, the integrity of the market for CSX stock was undermined. By disclosing their positions only selectively, TCI and 3G and their hedge fund friends were aware of, and traded on, information not available to the public and not reflected in the share price. The integrity of the stock market was undermined and an uneven playing field was created.

VI.    <u>Conclusion</u>

     We conclude that Defendants, in clear violation of Rule 13d-3(b), engaged in a "scheme to evade the reporting requirements of section 13(d) or (g) of the Act". We urge the Commission to interpret the language of Rule 13(d) in accordance with its terms and to reflect this fact.

Respectfully,

Joseph A. Grundfest

Henry T. C. Hu

Marti G. Subrahmanyam