**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CSX CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    08 Civ. 2764 (LAK) |
| | ) |
| THE CHILDREN'S INVESTMENT FUND | ) |
| MANAGEMENT (UK) LLP, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**BRIEF OF AMICI CURIAE**
**INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC. AND**
**SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION**

Katherine Tew Darras
Rosario Chiarenza
INTERNATIONAL SWAPS AND
DERIVATIVES ASSOCIATION, INC.
360 Madison Avenue, 16th Floor
New York, NY 10017
(212) 901-6000 (Tel)


Ira D. Hammerman
Kevin M. Carroll
SECURITIES INDUSTRY AND
FINANCIAL MARKETS ASSOCIATION
1101 New York Avenue, NW
Washington, DC 20005
(202) 962-7382 (Tel)

David M. Becker
Edward J. Rosen
Michael D. Dayan
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000 (Tel)
(212) 225-3999 (Fax)

2000 Pennsylvania Avenue, NW
Washington DC 20006-1801
(202) 974-1500 (Tel)
(202) 974-1999 (Fax)

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... ii

STATEMENT OF INTEREST........................................................................... 1

PRELIMINARY STATEMENT AND SUMMARY .......................................... 2

ARGUMENT..................................................................................................... 5

I.    Plaintiff Has Misapprehended The Law .................................................. 5

    A.    Absent control, there can be no vicarious beneficial ownership
        by virtue of the actions of another ............................................... 5

    B.    Plaintiff mischaracterizes market behavior................................. 10

    C.    Long swap holders do not acquire "voting power" ..................... 13

II.   Section 3A Of The Exchange Act Forecloses A Finding Of Beneficial
    Ownership Under These Circumstances................................................... 15

III.  Adopting Plaintiff's Position Would Introduce Significant Uncertainties
    Into The Derivative And Potentially Other Markets................................ 17

CONCLUSION................................................................................................. 21

.

# TABLE OF AUTHORITIES

Page(s)

**Rules and Statutes**

12 U.S.C. § 1841(a)(2)(A) .................................................................... 19

15 U.S.C. § 78c-1(b) .......................................................................... 3, 16

15 U.S.C. § 78c-1(b)(1) ........................................................................ 3

15 U.S.C. § 78c-1(b)(3) ........................................................................ 16

15 U.S.C. § 78m(d)(1) .......................................................................... 5

15 U.S.C. § 80a-2 ............................................................................... 19

17 C.F.R. § 240.12b-2(a) ..................................................................... 5, 6

17 C.F.R. § 240.13d-3(a) ..................................................................... 2, 5

**Cases**

Calvary Holdings, Inc. v. Chandler,
948 F.2d 59 (1st Cir. 1991) .................................................................. 8

Ithaca (Custodians) Ltd. v. Perry Corp.,
CA 43/03, 2003 NZLR LEXIS 76 (C.A. Nov. 4, 2003) .................................. 7-8

Jacobs v. Pabst Brewing Co.,
549 F. Supp. 1050 (D. Del. 1982) ........................................................... 8-9

Levner v. Saud,
903 F. Supp. 452 (S.D.N.Y. 1994), aff'd, 61 F.3d 8 (2d Cir. 1995) .................... 6

Levy v. Southbrook Int'l Invs. Ltd.,
263 F.3d 10 (2d Cir. 2001) ................................................................... 6-7

SEC v. Drexel Burnham Lambert, Inc.,
837 F. Supp. 587 (S.D.N.Y. 1993) .......................................................... 8

Todd Shipyards Corp. v. Madison Fund, Inc.,
547 F. Supp. 1383 (S.D.N.Y. 1982) ........................................................ 6

Transcon Lines v. A.G. Becker,
470 F. Supp. 356 (S.D.N.Y. 1979) .......................................................... 6

                                                                                    Page(s)

TSC Indus., Inc. v. Northway, Inc.,
426 U.S. 438, 96 S. Ct. 2126 (1976)....................................................................    5-6

Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger,
423 F.3d 145 (2d Cir. 2005)..............................................................................    6

Wellman v. Dickinson,
682 F.2d 355 (2d Cir. 1982)..............................................................................    8

**Others**

146 Cong. Rec. S11867 (2000) (statement of Senate Banking Committee
Chairman Phil Gramm)......................................................................................    17

2002 ISDA Equity Derivatives Definitions, art. 13, available at
http://www.isda.org/publications/isdaequityderivdefconfir.html .......................    3, 14

The Bond Market Association, Sample "Master Securities Loan Agreement"
(2000), available at
http://www.sifma.net/agrees/master_securities_loan_agreement_2000_version.pdf.........    14

The Commodity Futures Modernization Act of 2000: Joint Hearing the Before
the Comm. on Agric., Nutrition and Forestry, and the Comm. on Banking, Hous.
and Urban Affairs, 106th Cong. 20 (2000), available at
http://bulk.resource.org/gpo.gov/hearings/106s/70514.pdf ................................    16

Financial Services Authority, Disclosure of Contracts for Difference, Consultation
and draft Handbook Text, Annex 4, PWC Survey, available at
http://www.fsa.gov.uk/pubs/cp/cp07_20.pdf..........................................    passim

N.Y. Ins. Law § 1501 .......................................................................................    19

Ownership Reports and Trading By Officers, Directors and Principal Security
Holders, Exchange Act Release Nos. 34-28869, 35-25254, 56 Fed. Reg. 7242
(Feb. 21, 1991), 48 SEC Docket 0236 (Feb. 26, 1991), available at
http://www.sec.gov/rules/final/34-28869.pdf ......................................................    9

SEC Amicus Letter to Judge Bowdre, In re HealthSouth Sec. Litig., No. CV-03-
BE-1500-S (N.D. Ala. Nov. 28, 2006), available at
http://www.sec.gov/litigation/briefs/2006/healthsouthbrief.pdf.........................    16

Bank for International Settlements, Table 19: Amounts Outstanding of over-the-counter
(OTC), available at derivatives, http://www.bis.org/statistics/otcder/dt1920a.pdf ............    18

The International Swaps and Derivatives Association, Inc. ("ISDA") and the Securities Industry and Financial Markets Association ("SIFMA") respectfully submit this brief as *amici curiae*. We file this brief because we believe plaintiff has advanced an erroneous view of the law that, if accepted, would create substantial uncertainties in the securities and derivatives markets and could chill legitimate and desirable commercial activity. Plaintiff's proposed standard for determining when a person is a "beneficial owner" of a security within the meaning of Section 13 of the Securities Exchange Act of 1934 ("Exchange Act") is vague and legally unsupportable. We believe the proposed standard cannot be squared with existing law, rules, judicial precedent, or practice. We are unsure what the standard means, and we are concerned where it would lead.

## STATEMENT OF INTEREST

ISDA, which represents participants in the privately negotiated derivatives industry, is the largest global financial trade association, by number of member firms. ISDA was chartered in 1985 and today has over 825 member institutions from 56 countries on six continents.

Since its inception, ISDA has pioneered efforts to identify and reduce the sources of risk in the derivatives and risk management business. Among its most notable accomplishments are: developing the ISDA Master Agreement; publishing a wide range of related documentation materials and instruments covering a variety of transaction types; producing legal opinions on the enforceability of netting and collateral arrangements (available only to ISDA members); securing recognition of the risk-reducing effects of netting in determining capital requirements; promoting sound risk management practices; and advancing the understanding and treatment of derivatives and risk management from public policy and

regulatory capital perspectives. Today, ISDA Master Agreements serve as the contractual foundation for more than 90% of derivatives transactions globally.

SIFMA brings together the shared interests of more than 650 securities firms, banks, and asset managers. SIFMA's mission is to promote policies and practices that work to expand and perfect markets, foster the development of new products and services and create efficiencies for member firms, while preserving and enhancing the public's trust and confidence in the markets and the industry. SIFMA works to represent its members' interests locally and globally. It has offices in New York, Washington D.C., and London and its associated firm, the Asia Securities Industry and Financial Markets Association, is based in Hong Kong.

## PRELIMINARY STATEMENT AND SUMMARY

Beneficial ownership of securities under Exchange Act Rule 13d-3(a) requires "(1) [v]oting power which includes the power to vote, or to direct the voting of, such security; and/or (2) [i]nvestment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. § 240.13d-3(a). Absent supplemental understandings or arrangements, the 'long' party[1] to a cash-settled equity swap has neither. Such a party does not itself *own* any of the underlying equity securities; equity swaps convey only a synthetic economic interest in the performance of a designated equity security. The standard ISDA Master Agreement and related forms of schedule, definitions, and transaction confirmation that govern the legal rights and obligations of parties to equity swaps do not convey to the long party either title to the underlying shares or any contractual right to acquire or to direct its counterparty's

---

[1]      The 'long' party to a cash-settled equity swap refers to the party that is entitled to receive payments equal in amount to the appreciation of, and dividends payable under, the referenced shares and that is obligated to pay an amount equal to the decline in value of the referenced shares in addition to a periodic floating amount (*i.e.*, a party, such as defendant under the equity swaps at issue, whose economic return profile is analogous to that of the owner of shares). References in this brief to cash-settled equity swaps are not intended to include over-the-counter equity options or similar derivatives whose values do not have a one-to-one economic correspondence to the value of the notional number of referenced shares.

2

acquisition or disposition of shares, or the voting of shares, if any, acquired by the counterparty. The standard ISDA documentation expressly provides that the long party has no interest or expectation with respect to any of the hedge transactions in which the counterparty engages. See 2002 ISDA Equity Derivatives Definitions, art. 13.2 ("2002 ISDA Definitions") available at http://www.isda.org/publications/isdaequityderivdefconfir.html (also relevant portion attached hereto as Appendix A). No legal authority has ever held, or, under these circumstances, could properly hold, that the long party to such contracts – without some other extrinsic understanding or agreement that creates the necessary voting or investment power – is a "beneficial owner" under Rule 13d-3, or part of a group with the swap counterparty under Rule 13d-5.

To the contrary, in the Commodity Futures Modernization Act of 2000 ("CFMA"), Congress considered and expressly rejected the view that a party to an equity swap agreement should, without more, be subject to reporting requirements, such as Section 13(d), under the federal securities laws. Seeking to resolve uncertainties in the regulatory status of certain derivatives under the federal commodities and securities laws, and recognizing the relationship between security-based swaps and the underlying securities markets, Congress amended the Exchange Act to provide that "[t]he definition of 'security' [under the Exchange Act] . . . does not include any security-based swap agreement . . . ." 15 U.S.C. § 78c-1(b). Congress simultaneously amended the Exchange Act to limit the Securities and Exchange Commission's ("SEC") rulemaking authority, denying it any authority to require registration or public filings concerning security-based swap agreements, with a single exception for Exchange Act Section 16. Id.

Plaintiff's proposed test of beneficial ownership – the power "significantly to influence" the disposition or voting of equity securities – is inconsistent with the plain meaning

3

of Section 13(d) and the CFMA. The proposed test to be applied is purportedly based on the

premise that a usual consequence of the long party's entry into a cash-settled equity swap is that

the swap counterparty will purchase the referenced equity securities as a hedge and, upon

termination of the equity swap, will sell the referenced equity securities. Plaintiff further asserts

that the swap counterparty will, when asked, vote its hedging shares in accordance with the long

party's interests rather than its own. We believe that these generalizations about "usual market

practice" are in large measure inaccurate.

   No precedent interpreting beneficial ownership under Section 13(d) has

recognized a "significant influence" standard. To the contrary, the plain language of Section

13(d) and the relevant legal precedents – upon which the market has appropriately relied

(including in its current conventions) – find beneficial ownership only upon a showing of actual

control over voting or disposition of equity securities. Settled understandings of beneficial

ownership have guided for decades the structuring of innumerable transactions. The proposed

"significant influence" standard would change dramatically those and potentially other rules,

including rules under regulatory regimes outside the federal securities laws. Accepting

plaintiff's argument would give rise to significant unintended consequences beyond the market

for equity swaps.[2]

## ARGUMENT

I. Plaintiff Has Misapprehended The Law

   The regulatory scheme at issue is straightforward. Section 13(d) and its

implementing rules require filings when there is "beneficial ownership" of an equity security

required to be registered under the Exchange Act. 15 U.S.C. § 78m(d)(1). SEC rules define

---

[2] We do not address whether there were explicit or tacit arrangements or understandings between defendants
and their swap counterparties as to how the counterparties would dispose of or vote their stock.

4

"beneficial ownership" as the "power" to dispose of or vote, or to "direct" the disposition or vote of the security. 17 C.F.R. § 240.13d-3(a). Clear legal authority precludes a finding of "beneficial ownership" based solely on the existence of a long cash-settled equity swap position.

A.     Absent control, there can be no vicarious beneficial
       ownership by virtue of the actions of another

The linchpin of plaintiff's argument is the assertion that "the applicable legal standard [is that] a person is the beneficial owner of a security if that person has the ability significantly to influence the disposition [or voting] of that security." Plaintiffs' Memorandum in Response to Defendants' Post-Trial Brief ("Pl. Response Mem.") at 25; see also Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pl. Proposed Findings") at 82-83. The law is otherwise. In plain language, Rule 13d-3(a) provides that beneficial ownership arises from the "power . . . to vote . . . and/or . . . dispose" or the "power . . . to direct . . . the voting . . . and/or . . . the disposition of" an equity security. 17 C.F.R. § 240.13d-3(a). There is no claim that defendants themselves disposed of or voted CSX shares; rather, the claim is that they "significantly influenced" voting and disposition by others.

It is hornbook law that the "power to direct" is *control*, not mere influence. See, e.g., 17 C.F.R. § 240.12b-2(a) ("'control' . . . means . . . the power to direct or cause the direction of the management and policies of a person")[3]; TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 451 n.13, 96 S. Ct. 2126, 2134 n.13 (1976) (defining "control" as "the possession, directly or indirectly, of the *power to direct or cause the direction* of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise (citing SEC Rule 12b-2)) (emphasis added); Waldman ex rel. Elliott Waldman Pension

---

[3]     Rules 12b-2 and 13d-3 are to be read *in pari materia*. See Exchange Act Rule 12b-1, 17 C.F.R. § 240.12b-1 (rules "govern all registration statements pursuant to Section 12(b) and 12(g) of the Act and all reports filed pursuant to Sections 13 and 15(d) of the Act").

Trust v. Riedinger, 423 F.3d 145 (2d Cir. 2005) (applying Rule 12b-2 definition of "control," court held that that a co-trustee of a trust did not have voting or investment power over the trusts' shares because another trustee had the final say to the extent there was disagreement); Levy v. Southbrook Int'l Invs. Ltd., 263 F.3d 10, 15-16 (2d Cir. 2001) (referring to Section 13(d) as requiring "disclosure of shareholder *control*") (emphasis added). Rule 13d-3 predicates beneficial ownership on control – arising from any source – but does not authorize a finding of beneficial ownership based on any degree of "power" that falls short of control.

Absent control, it makes no difference if it is foreseeable that one's actions may influence another to buy, sell, or vote an equity security. No court has suggested that it does. Indeed, even where it was likely that a party itself would acquire ownership of an equity security, courts have declined to find beneficial ownership without more. See Transcon Lines v. A.G. Becker, 470 F. Supp. 356, 370 (S.D.N.Y. 1979) (defendant's expectation that due to business dealings and personal relationship he would be acquiring the securities did not give rise to beneficial ownership); see also, e.g., Levner v. Saud, 903 F. Supp. 452, 462 (S.D.N.Y. 1994) (owner of preferred stock, which was not immediately convertible to common stock due to contingencies, was not a "beneficial owner" of the common stock), aff'd, 61 F.3d 8 (2d Cir. 1995); Todd Shipyards Corp. v. Madison Fund, Inc., 547 F. Supp. 1383 (S.D.N.Y. 1982) (brokerage firm with the option to acquire shares from an individual, subject to contingencies, was held not to be the beneficial owner of shares); Levy, 263 F.3d at 15 (defendant's convertible preferred stock, which was convertible upon his divestment of sufficient shares of common stock to reduce holdings below a certain level, did not give rise to the required "right" to acquire, distinguished from an "ability to" acquire, which the court, citing an amicus brief submitted by the SEC, found insufficient to create a beneficial interest) (citing Brief of the Securities and

6

Exchange Commission, Amicus Curiae, in Support of Appellee at 14, Levy, 263 F.3d 10 (00-7630), 2001 WL 34120374).

The only court that has addressed the issue presented here – whether the long party to a cash-settled equity swap should be considered a beneficial owner of the referenced shares for disclosure purposes – held that it is not. It did so even though it was foreseeable under relevant market practices that the swap counterparty would hedge with shares of the referenced security and, even though, in that case, defendant had also actually purchased the referenced securities from its swap counterparty upon termination of the swap. In Ithaca (Custodians) Ltd. v. Perry Corp., CA 43/03, 2003 NZLR LEXIS 76 (C.A. Nov. 4, 2003), the New Zealand Court of Appeals held that the defendant's understanding of the "market reality" that the holder of an equity swap had a reasonable expectation that it would be able to purchase the referenced securities from its counterparty, upon request, at the unwinding of the swap did not create an "arrangement or understanding" sufficient to trigger the disclosure requirements of New Zealand's equivalent to Section 13(d) – Section 5(1)(f) of the Securities Markets Act. Id. at *55.

Under circumstances directly analogous to this case, the court held that even "mutual expectations based on commercial reality," do not give the swap holder the "power" to control the disposition of the referenced security. Id. at **55-56. The court explained that "[t]his conclusion is reinforced by the fact that a relevant interest arises under s[ection] 5(1)(f) when a person has the ability to exercise 'power' in relation to the securities. The term 'power' involves the notion of domination or command. This necessarily implies an ability on the part of the person who allegedly has the power to bring about the effect desired." Id. Absent a showing of actual power to dispose or to direct the disposition of shares, the independent decision by the counterparty to acquire and dispose of the underlying shares based on its own economic self-

7

interest – even if entirely foreseeable as part of accepted commercial practice – was insufficient to establish beneficial ownership.

The cases plaintiff cites are inapposite. <u>SEC v. Drexel Burnham Lambert, Inc.</u>, 837 F. Supp. 587, 607 (S.D.N.Y. 1993), stands only for the proposition that legal ownership is not a *necessary* prerequisite to holding investment power. The conspirator-defendants in <u>Drexel Burnham</u> manufactured a scheme whereby a third party would purchase and "park" securities without economic risk, holding them until the defendants sought to acquire them, which the defendants promised to do in a manner that would make the third-party whole, regardless of any change in the value of the stock. <u>Id.</u> at 590-91. Under the circumstances where both the nominal holder of the securities and the defendants had explicitly agreed to transfer the securities and where the defendants maintained *actual control* over them, the court found that the defendants were beneficial owners.

Plaintiff's reliance on <u>Wellman v. Dickinson</u>, 682 F.2d 355, 366-67 (2d Cir. 1982) is equally misplaced. There, the court found that the investment banker at issue actually controlled the disposition of the shares held in accounts he managed and those held by investment funds he advised. <u>See also</u> Def. Post-Trial Reply Br. at 12-15 (distinguishing cases).[4] The <u>Wellman</u> case stands only for the proposition that someone who is nominally an advisor may, under certain circumstances, exercise actual control. <u>See also</u> <u>Jacobs v. Pabst Brewing Co.</u>, 549 F. Supp. 1050, 1064-66 (D. Del. 1982) (investment advisor deemed the beneficial owner of shares held by its clients and thus required to file under Section 13(d) because of its ability to *direct* their votes in a proxy contest).

---

[4]     Plaintiff also cites to <u>Calvary Holdings, Inc. v. Chandler</u>, 948 F.2d 59 (1st Cir. 1991), a case that is entirely unremarkable, as it stands for the simple proposition that a nominee who by contractual obligation must hold and vote the shares at the specific direction of third parties is not a "beneficial owner" of such shares. <u>Id.</u> at 61-64.

The conclusion that the execution of an equity swap does not give rise to beneficial ownership of the referenced shares is consistent with the regime established by the SEC under Exchange Act Section 16(b). Relying on the same test of beneficial ownership that appears in Rule 13d-3, the SEC has, for more than 15 years, taken the position that cash-settled derivative securities, such as equity swaps, do not convey the ownership that would render the long party an "insider" for Section 16 purposes. See Ownership Reports and Trading By Officers, Directors and Principal Security Holders, Exchange Act Release Nos. 34-28869, 35-25254, 56 Fed. Reg. 7242, at 48 SEC Docket 0236 (Feb. 26, 1991), available at http://www.sec.gov/rules/final/34-28869.pdf ("As proposed, the rules adopted today define ten percent holders under section 16 as persons deemed ten percent holders under section 13(d) of the Exchange Act and the rules thereunder. The section 13(d) analysis, such as the exclusion of nonvoting securities and *counting only those derivative securities exercisable or convertible within 60 days*, are imported into the ten percent holder determination for section 16 purposes.") (emphasis added).

It is not surprising that the "significant influence" test finds no resonance in the law. It is not clear how one could satisfy one's disclosure obligations under such a standard. One would have to know the identity of all beneficial owners of an equity security with whom one has a relationship and then determine if one's influence over them were sufficiently "significant" to warrant a filing. Moreover, "significance," like "materiality" (a level of significance), is a term whose meaning is virtually guaranteed to engender uncertainty and litigation. Like materiality, significance cannot be determined absent a factual context (a "total mix of information") and outside a reference point that answers the question, "significant in whose judgment"? The difficulty would be compounded by the necessity of keeping track of the

9

holdings of disparate parties, as they crossed over and under the five percent (or, in the case of Section 16, ten percent) threshold.

There are many circumstances where one's actions influence another to purchase or sell securities, none of which has ever been thought to make the actor their beneficial owner. The investor who purchases or redeems mutual fund shares foreseeably causes the fund to buy or sell securities, but the investor is not the beneficial owner of those securities. Similarly, a lender who extends unsecured credit to an investor to acquire securities, by withdrawing it, foreseeably causes the disposition of the securities. That foreseeable effect likewise does not make a creditor a beneficial owner.

        B.      Plaintiff mischaracterizes market behavior

Current market practice does not support the claim that cash-settled equity swaps necessarily lead to the swap dealer's acquisition of the referenced shares. Current market practice also does not support any inference that a swap dealer maintains a hedged position in the referenced shares so that they may be available for disposition when and if the dealer's long counterparty terminates an equity swap.

While counterparties generally may hedge equity swaps with referenced shares, it is far from invariably so. See DX 151 (Kennedy Dep. 39:11-21, 22-25) (Head of Citigroup's "Prime Swap" group testifying that a hedge can take many different forms including option combinations, shorts or shares directly, and that there are times when Citigroup chooses not to hedge swap positions entirely, especially in the context of total return swaps); see also Trial Tr. (Amin Test.) 206:12-17; DX 149 (Partnoy ¶¶ 100, 104). In a 2007 PricewaterhouseCoopers LLP survey commissioned by the U.K. Financial Services Authority (in which a number of *amici*'s members and affiliates were surveyed), PwC concluded that "most [market] participants . . . do

10

*not necessarily* hedge their CFD positions by buying the underlying shares" and "found significant differences in practices depending on the size and type of organisation."[5]  Financial Services Authority, Consultation Paper, Disclosure of Contracts for Difference, Annex 4 at 3 ("PwC Survey"), underline available at http://www.fsa.gov.uk/pubs/cp/cp07_20.pdf (emphasis added); underline see also underline id. at 16 (Answer to Q20) (while 85% of the respondents said that "they sometimes hedge with the underlying asset," 46% hedged through "[o]ffsetting positions with derivatives" and 15% "in some other way").

Plaintiff's generalizations about market behavior have additional flaws.  Even when a swap dealer initially hedges with the referenced shares, once the hedge is established, many dealers manage their equity exposures on a portfolio basis, rather than on a transactional basis, because it is economically efficient to do so, combining positions in shares, swaps, futures, options, structured notes and other listed and unlisted derivatives for these purposes. underline See underline generally Robert L. Tortoriello & Paul E. Glotzer, underline Guide to Bank Underwriting, Dealing and underline Brokerage Activities II-139--II-147, II-152--II-155 (2007) (summarizing interpretive letters from Office of the Comptroller of the Currency describing hedging practices that include hedging on a portfolio basis).  Thus, in managing its equity portfolio, a swap dealer may well dispose of referenced shares before the equity swap is terminated, and without the counterparty's knowledge.  For instance:

> ▪ Where a swap dealer has wholly or partially offsetting swaps, it may simply dispose of the two hedges initially established (to the extent they set off), in order to reduce transaction costs.

---

[5]      A CFD, or "Contract for Differences," is "a derivative product that gives the holder an economic exposure, which can be long or short, to the change in price of a specific share over the life of the contract. . . . The contract does not give the holder either ownership of the referenced shares or any ownership rights, such as voting rights. Nor, since the contract is normally cash-settled, does it usually create any right to take delivery of the shares in place of cash settlement." Financial Services Authority, Consultation Paper, Disclosure of Contracts for Difference 11 (2007), underline available at http://www.fsa.gov.uk/pubs/cp/cp07_20.pdf. Thus, equity CFDs are in all material respects equivalent to cash-settled equity swaps for purposes of the issues raised here.

- If traders managing the portfolio decide to take a market 'view' on particular shares, market segments or the market in general, they may do so by reducing or adjusting share holdings that were initially acquired as a hedge to equity swap exposure (or not establish the hedge in the first place).

- Traders may also 'cross-hedge' using one security, or an index of securities, as a surrogate for another, or may hedge positions in multiple different securities with a single listed or unlisted derivative on an index of securities.

- Rather than let them lie idle, swap dealers often lend hedging shares to third parties under arrangements in which the swap dealer does not retain the right to vote the shares. And, as plaintiff itself notes prominently in its complaint, it is the *exception* and not the rule for such shares to be called in by the firm on the occurrence of corporate events. See Pl. Compl. ¶¶ 45-50.

It is instructive, and consistent with common market practice, that defendants' swap counterparties are not alleged either to have sold their shares to any defendant or to any specific person at defendants' direction. Many, if not most, swap dealers, in fact, have policies limiting their traders' ability to do so. See Letter from Prof. Bernard Black to Brian G. Cartwright, CSX Corp. v. The Children's Investment Fund et al., dated May 29, 2008 (submitted to the Court and available at http://ssrn.com/abstract=1138299) ("Prof. Black Ltr."), at 9 ("Dealers' practices with respect to exchange unwinds differ. Some dealers, if they have hedged with matched shares, are willing to sell the shares directly to their investor, if the investor requests this. Other dealers, as a matter of policy, will refuse to sell matched shares directly to the swap counterparty."); cf. PwC Survey at 19 (Answer to Q25) (54% of respondents state they never close out position with physical settlement of underlying stock; 46% stated they do so only 1 to 20% of the time). Additionally, where (as is generally the case) a swap dealer does not sell hedging shares to its swap counterparty, in order to reduce market impact, it is often in the economic self-interest of the swap dealer to dispose of hedging shares in smaller dispersed

12

transactions rather than to a single buyer in a block. This provides little assurance to the long party that the dealer's disposition of such shares will place them in friendly or even neutral hands.

These common market practices by swap dealers, and the commercial incentives that animate these practices, cannot be reconciled with the view that a long party to a cash-settled equity swap can rely on its ability to exert significant influence over its counterparty's disposition of shares, much less that it has any "power" to do so. In the overwhelming number of cases, a variety of potentially fluid incentives (whether economic interest, tax considerations, internal policies or other considerations) motivate swap dealer behavior. Absent some extrinsic understanding, investment funds do not in fact, and would be ill-advised to, enter into equity swaps with an expectation that they will exercise control over the disposition of their counterparties' hedges. Accordingly, even if swap dealers invariably do hedge their swap exposure through the purchase of referenced shares – a categorical assertion that we believe to be unwarranted – that in no way means that the long party to the swap will acquire "the power to dispose, or direct the disposition of, such security" as required under Rule 13d-3(a).

C.    Long swap holders do not acquire "voting power"

There is little evidence that swap counterparties who acquire shares as hedges tend to vote them under the influence of the long parties. See Def. Br. at 15 (citing references to the record). To the contrary, the PwC Survey confirms that most market participants generally do not exercise their voting rights at all for shares purchased as a hedge and that they generally rebuff attempts by others to influence their votes. See PwC Survey at 23 (Answer to Q29) ("Most participants said they normally do not exercise their voting rights under their policies.") & PwC Survey at 25 (Answer to Q30) (listing explanations such as "[c]lients occasionally

13

request us to vote a position but our policy is not to agree to any such requests"). Moreover, *amicus* ISDA's standard documentation for equity swaps is explicit that the long party does not have any interest or expectation in any hedging transactions in which the other party may engage. See 2002 ISDA Definitions, art. 13.

Even if inclined to vote, swap dealers often may be unable to because they have lent hedging shares to third parties under documentation that transfers voting rights to the borrower. See, e.g., Sample "Master Securities Loan Agreement," available at http://www.sifma.net/agrees/master_securities_loan_agreement_2000_version.pdf, art. 7.1, ("Lender hereby waives the right to vote, or to provide any consent or to take any similar action with respect to, the Loaned Securities in the event that the record date or deadline for such vote, consent or other action falls during the term of the Loan."). The respondents to the PwC Survey reported that 24% of the shares acquired as hedges were held in a "stock lending book." PwC Survey at 16 (Answer to Q21). Moreover, rather than vote in line with the swap holder, some dealers vote in proportion to the balance of the balloting or simply follow the recommendations of institutional investor services. See Prof. Black Ltr. at 8.

Swap dealers and their affiliates have a variety of relationships and interests. They have relationships with clients who invest in, issue, buy, sell, lend, or borrow just about every medium of financial exchange and financial instrument that exists. They advise companies, people who want to buy companies, people who want to sell companies, people who want to take control of companies, and people who want to stop other people from accomplishing any of the above. They have banking relationships with issuers and extend credit to issuers. They provide services to issuers. They have duties running to their investors, those whose money they invest, those whom they advise, and those whom they serve. We respectfully

14

submit that a new doctrine of beneficial ownership should not be premised on the reductive notion that a swap dealer's interests usually (much less invariably) lie in taking sides in nasty proxy fights to curry favor with activist hedge fund counterparties.[6]

II.    Section 3A Of The Exchange Act Forecloses A Finding
       Of Beneficial Ownership Under These Circumstances

        Plaintiff's description of the market practice and its rendition of the law would lead to the conclusion that a substantial majority, if not all, cash-settled equity swaps result in the long party becoming the beneficial owner of the referenced securities and thus potentially subject to Section 13(d) reporting requirements.[7]  But if plaintiff is correct that "influence" over the voting and disposition of a swap dealer's hedging shares is the ordinary course incident of an equity swap, without any extrinsic understanding or arrangement, Section 3A of the Exchange Act stands squarely and implacably in the way of any attempt to tie the swaps to a Section 13(d) obligation with respect to the swap.  Section 3A of the Exchange Act flatly forbids the SEC, and, by implication, this Court, from imposing reporting requirements on security-based swap transactions, other than as expressly permitted by Section 16.  See 15 U.S.C. § 78c-1(b).  Section 3A of the Exchange Act prohibits the SEC from promulgating, interpreting, or enforcing rules

---

[6]     Arguments under other provisions of the rules promulgated under Section 13 – namely the "scheme to evade" provisions of Rule 13d-3(b), the "right to acquire" provisions of Rule 13d-3(d) and the "group" provisions of Rule 13d-5 are equally unavailing.  Simply because a party can invest in a way that triggers a Section 13(d) filing, it does not follow that any alternate structure is a scheme to evade the filing requirements.  Such a scheme requires some element of sham.  See SEC Amicus Letter to Judge Bowdre at 7, In re HealthSouth Sec. Litig., No. CV-03-BE-1500-S (N.D. Ala. Nov. 28, 2006), available at http://www.sec.gov/litigation/briefs/2006/healthsouthbrief.pdf.  Similarly, simply because a long swap party can buy shares on the open market (along with everyone else), it does not follow that it has a presently exercisable "right" – a legally enforceable interest – to do so.  Finally, simply because an equity swap holder and a dealer could separately agree to act in concert, it does not follow that an equity swap by itself constitutes an agreement between the long party and the dealer to act together as a group for the purpose of acquiring, holding, voting or disposing of equity securities.

[7]     Not all equity swaps are between banks and hedge funds.  Nonetheless, in part by law and in part for credit reasons, the swap market is an institutional market in which the vast majority of transactions are between swap intermediaries and significant institutional clients, thus presenting the same issues of "influence" raised by plaintiff in the instant case.

that impose reporting or recordkeeping requirements on swap agreements other than as expressly

permitted by Section 16.  15 U.S.C. § 78c-1(b)(3).

The CFMA's legislative history confirms that Congress intended equity swaps to

fall outside the SEC's regulatory purview except for specific exceptions limited to the prevention

of fraud, insider trading, and market manipulation.  At a joint hearing before the Senate

Agriculture and Banking Committees to discuss the proposed CFMA legislation, then-Federal

Reserve Chairman Alan Greenspan testified that Congress' goal should be to "focus on insider

trading, fraud, manipulation, and make sure that any possibility for those practices to take place

is precluded under the regulatory scheme" and disavowed a broader scheme of regulation, stating

that the over-the-counter derivatives market "is best maintained with a minimum of regulation."

S. 2697 - The Commodity Futures Modernization Act of 2000:  Joint Hearing Before the Comm.

on Agric., Nutrition and Forestry, and the Comm. on Banking, Hous. and Urban Affairs, 106th

Cong. 20, 31 (2000), available at http://bulk.resource.org/gpo.gov/hearings/106s/70514.pdf

("Hearing on S. 2697").

Then-Treasury Secretary Lawrence Summers similarly testified that "[a]s a

general matter, we do not believe that swaps should be regulated as securities" and stated that the

purpose of the CFMA was "not so as to extend some net of regulation to OTC derivatives in a

way that they are not now subject to regulation, but only to assure that the basic protections we

provide in our cash markets [against insider trading, fraud and manipulation] do not become

circumvented through this legislation." Id. at 7, 14.  Congress took unusual steps to ensure that

the SEC could not, through interpretation and deference, claim broader authority to regulate

swaps than Congress intended.  It did this by placing the definition of "swap agreement" and

"security-based swap agreement" in a "neutral," non-securities statute to "make[] it clear that the

SEC is not to impose regulations on such instruments as prophylactic measures." See 146 Cong. Rec. S11867 (2000) (statement of Senate Banking Committee Chairman Phil Gramm).

Congress understood perfectly well the existence of interrelationships between security-based swaps and securities and that equity swaps allow parties to accomplish results substantially identical to what can be accomplished through securities trading. See Hearing on S. 2697, at 14 (testimony of Treasury Secretary Lawrence Summers) ("[F]unctionally, through a total return swap, one can do something that is the equivalent of purchasing a share of stock."); id. at 32 (testimony of SEC Chairman Arthur Levitt) ("For example, one could potentially avoid long-established investor and market integrity protections applicable to equity securities by merely documenting an equity transaction as a 'swap.'"). Fully understanding this background, Congress nonetheless erected what it intended as an impenetrable wall to the SEC's exercise of regulatory jurisdiction over trading in security-based swaps, except in the circumstances explicitly delineated in the statute.[8]

III.    Adopting Plaintiff's Position Would Introduce Significant
        Uncertainties Into The Derivative And Potentially Other Markets

The interpretation of Rule13d-3 proposed by plaintiff would create significant uncertainties. The exceptional circumstances giving rise to the "significant influence" the long swap holders are said to have exercised here are far from clear. Such uncertainty over what was understood to be well-settled law would pose particular problems for *amici*'s members, who engage in a vast array and number of equity derivatives and securities transactions on a daily basis, including long and short positions in common stock, options, futures, swaps, mutual funds, indices, baskets, structured notes and other synthetic instruments.

---

[8]    *Amici* do not contend that Section 3A insulates a long party to an equity swap from beneficial ownership status under Section 13(d) in circumstances where actual arrangements or understandings *supplemental to the equity swap itself* create the requisite voting or investment power. See supra note 2.

17

We are especially concerned about plaintiff's assertion (without extended discussion) that defendants formed a "group" for Section 13(d) purposes with each of their counterparties as a result of defendants' "influence." Since members of a group are required to aggregate all holdings of all group members in determining their filing obligations, and since Section 13(d) beneficial ownership is used to determine whether a person is a 10% beneficial owner subject to the short swing profit provisions of Exchange Act Section 16, this assertion would impose unsupportable obligations on swap dealers. While swap dealers and others can determine the number of equity securities they own, they cannot reliably determine the security holdings of their long swap counterparties. We hesitate to overstate the case; however, we are concerned about the market impact of a situation in which firms believe they run a potentially unmitigatable risk of incurring substantial liabilities.[9]

> Among other potential consequences –
>
> - Market participants would face substantial uncertainty as to when their participation in these types of trades would give rise to reporting obligations because they could be said, in retrospect, to have had "significant influence" over someone else who holds equity securities.
>
> - Market participants would have to design and implement highly sophisticated and expensive monitoring systems, if such systems were even possible, to ensure that disclosure obligations were not triggered by securities that they do not own, but over whose owners they may have "significant influence".
>
> - Market participants would face uncertainty as to how a legal standard that depends upon "market practice" would be affected by changes in market practice.
>
> - Market participants would have uncertain obligations in order to avoid liability for "causing" or aiding and abetting counterparty violations of applicable reporting requirements under circumstances in which they

---

[9]    The equity derivatives market is significant in size. The Bank for International Settlements reports that, as of December 2007, the notional amount of equity forwards and swap contracts outstanding in the G-10 countries and Switzerland was $2.2 trillion. See http://www.bis.org/statistics/otcder/dt1920a.pdf.

believe they may be subject to "significant influence" and are on notice
that their counterparties do not intend to make disclosure.

A standard that substitutes influence derived from commercial incentives and

market conventions for "power to control" or "power to vote" also could have consequences

beyond equity swaps and even beyond the reporting requirements of Section 13(d).

Relationships and economic incentives similar to those between hedge funds and swap dealers

exist throughout the markets. As noted above, beneficial ownership under Section 13(d) also

gives rise to potential liability for short swing profits under Section 16. A mistaken judgment

about beneficial ownership as a result of a vague and subjective standard that requires an

evaluation of "influence" could give rise to significant liabilities under Section 16. Numerous

federal and state statutes also regulate or limit beneficial ownership and incorporate concepts of

voting and investment control similar to those under Rule 13d-3.[10] Interpretations of beneficial

ownership under these statutes may well be influenced by the construction of Section 13(d) and

Rule 13d-3. A mistaken judgment about beneficial ownership under these statutes can also result

in substantial legal and financial penalties, and the risk of such a result has significant potential

to chill otherwise legitimate and desirable investment and risk management activity.

Whether or not it is desirable for synthetic economic interests such as cash-settled

equity swaps to be disclosed publicly is a policy judgment and a Congressional prerogative. As

---

[10]     See, e.g., 12 U.S.C. § 1841(a)(2)(A) (Bank Holding Company Act of 1956, which defines control for the
purposes of regulation as "directly or indirectly or acting through one or more other persons own[ing], control[ling],
or ha[ving] power to vote 25 per centum or more of any class of voting securities of the bank or company"); 15
U.S.C. § 80a-2 (Investment Company Act of 1940, which defines affiliate for the purposes of regulation as, *inter
alia*, "any person 5 per centum or more of whose outstanding voting securities are directly or indirectly owned,
controlled, or held with power to vote, by such other person [or] any person directly or indirectly controlling,
controlled by, or under common control with, such other person"); N.Y. Ins. Law § 1501 (New York insurance law,
which defines control for the purposes of regulation as "the possession direct or indirect of the power to direct or
cause the direction of the management and policies of a person, whether through the ownership of voting securities,
by contract or otherwise . . . . Control shall be presumed to exist if any person directly or indirectly owns, controls
or holds with the power to vote ten percent or more of the voting securities of any other person.") (parentheticals
omitted).

19

of today, neither Congress nor the SEC has made a judgment to require such disclosure.  As we note above, *amici* are concerned that plaintiff's proposed standard will give rise to collateral consequences that go far beyond public disclosure of long equity swap positions.  Only Congress is in a position to require such disclosure and, at the same time, avoid adverse unintended consequences.

## CONCLUSION

Adoption of plaintiff's position that a long party to a cash-settled equity swap is a beneficial owner of the securities held by its swap counterparty as a hedge would be counter to the plain meaning of Section 13(d) and its implementing rules, all applicable precedent interpreting beneficial ownership, Congress's clear intent and market participants' long-held understanding and expectations. Such a ruling would give rise to significant unintended and adverse consequences for a broad range of market participants.

Dated: New York, New York
      June 2, 2008

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____
    David M. Becker
    Edward J. Rosen
    Michael D. Dayan

Katherine Tew Darras
Rosario Chiarenza
INTERNATIONAL SWAPS AND
DERIVATIVES ASSOCIATION, INC.
360 Madison Avenue, 16th Floor
New York, NY 10017
(212) 901-6000 (Tel)

One Liberty Plaza
New York, New York 10006
(212) 225-2000 (Tel)
(212) 225-3999 (Fax)

Ira D. Hammerman
Kevin M. Carroll
SECURITIES INDUSTRY AND
FINANCIAL MARKETS ASSOCIATION
1101 New York Avenue, NW
Washington, DC 20005
(202) 962-7382 (Tel)

2000 Pennsylvania Avenue, NW
Washington DC 20006-1801
(202) 974-1500 (Tel)
(202) 974-1999 (Fax)

Attorneys for *Amici Curiae* ISDA and SIFMA

21

# Appendix A

# 2002  ISDA

# Equity  Derivatives

# Definitions



**INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC.**

Copyright © 2002 by
INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC.
360 Madison Avenue
16th Floor
New York, N.Y. 10017

notice of the determination by the Determining Party of such amount (denominated in the currency for settlement of the Transaction as determined by the Determining Party) and the party to pay such amount is effective, which notice shall be provided promptly following such determination.

## ARTICLE 13

### MISCELLANEOUS

**Section 13.1.    Non-Reliance.**  If "Non-Reliance" is specified as applicable in the related Confirmation, then unless agreed to the contrary expressly and in writing in the related Confirmation for a Transaction and notwithstanding any communication that each party (and/or its Affiliates) may have had with the other party, each party to a Transaction represents to the other party that: (a) it is entering into such Transaction as principal (and not as agent or in any other capacity); (b) neither the other party nor any of its Affiliates or agents are acting as a fiduciary for it; (c) it is not relying upon any representations except those expressly set forth herein or in the ISDA Master Agreement (including the related Confirmations between them); (d) it has consulted with its own legal, regulatory, tax, business, investments, financial, and accounting advisors to the extent that it has deemed necessary, and it has made its own investments, hedging, and trading decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the other party or any of its Affiliates or agents; and (e) it is entering into such Transaction with a full understanding of the terms, conditions and risks thereof and it is capable of and willing to assume those risks.

**Section 13.2.    Agreements and Acknowledgments Regarding Hedging Activities.**

(a)        If "Agreements and Acknowledgments Regarding Hedging Activities" is specified as applicable in the related Confirmation, then unless agreed to the contrary expressly and in writing in the related Confirmation for a Transaction and notwithstanding any communication that each party (and/or its Affiliates) may have had with the other party, each party to a Transaction agrees and acknowledges that (i) when entering into, or continuing to maintain, such Transaction, neither party is relying on (A) the manner or method in which the other party or any of its Affiliates may establish, maintain, adjust or unwind its Hedge Positions, (B) any communication, whether written or oral, between the parties or any of their respective Affiliates with respect to any Hedging Activities of the other party or any of its Affiliates, or (C) any representation, warranty or statement being made by such party or any of its Affiliates as to whether, when, how or in what manner or method such party or any of its Affiliates may engage in any Hedging Activities and that (ii) (A) each party and its Affiliates may, but are not obliged to, hedge any Transaction on a dynamic, static or portfolio basis, by holding a corresponding position in the securities or indices referenced by or underlying such Transaction or in any other securities or indices or by entering into any Hedge Position; (B) any Hedge Position established by either party or any of its Affiliates is a proprietary trading position and activity of such party or such Affiliate; (C) each party or such Affiliate is not holding the Hedge Positions or engaging in the Hedging Activities on behalf or for the account of or as agent or fiduciary for the other party, and the other party will not have any direct economic or other interest in, or beneficial ownership of, the Hedge Positions or Hedging Activities; and (D) the decision to engage in Hedging Activities is in the sole discretion of each party, and each party and its Affiliates may commence or, once commenced, suspend or cease the Hedging Activities at any time as it may solely determine.

52

(b)    "Hedge Positions" means any purchase, sale, entry into or maintenance of one or more (i) positions or contracts in securities, options, futures, derivatives or foreign exchange, (ii) stock loan transactions or (iii) other instruments or arrangements (howsoever described) by a party in order to hedge, individually or on a portfolio basis, a Transaction.

(c)    "Hedging Activities" means any activities or transactions undertaken in connection with the establishment, maintenance, adjustment or termination of a Hedge Position.

**Section 13.3.  Index Disclaimer.**  If "Index Disclaimer" is specified as applicable in the related Confirmation, then each party to a Transaction entered into and subject to these Definitions agrees and acknowledges that such Transaction is not sponsored, endorsed, sold, or promoted by the Index or the Index Sponsor and no Index Sponsor makes any representation whatsoever, whether express or implied, either as to the results to be obtained from the use of the Index and/or the levels at which the Index stands at any particular time on any particular date or otherwise.  No Index or Index Sponsor shall be liable (whether in negligence or otherwise) to any person for any error in the Index and the Index Sponsor is under no obligation to advise any person of any error therein.  No Index Sponsor is making any representation whatsoever, whether express or implied, as to the advisability of purchasing or assuming any risk in connection with entering into any Transaction.  Neither party to any Transaction shall have any liability to the other party for any act or failure to act by the Index Sponsor in connection with the calculation, adjustment or maintenance of the Index. Except as disclosed prior to the Trade Date, neither party nor its Affiliates has any affiliation with or control over the Index or Index Sponsor or any control over the computation, composition or dissemination of the Indices.  Although the Calculation Agent will obtain information concerning the Indices from publicly available sources it believes reliable, it will not independently verify this information.  Accordingly, no representation, warranty or undertaking (express or implied) is made and no responsibility is accepted by either party, its Affiliates or the Calculation Agent as to the accuracy, completeness and timeliness of information concerning the Indices.

**Section 13.4.  Additional Acknowledgments.**  If "Additional Acknowledgments" is specified as applicable in the related Confirmation, then unless agreed to the contrary expressly and in writing in the related Confirmation for a Transaction and notwithstanding any communication that each party (and/or its Affiliates) may have had with the other party, each party to a Transaction acknowledges that:

(a)    neither the other party nor its Affiliates provides investment, tax, accounting, legal or other advice in respect of such Transaction;

(b)    it has been given the opportunity to obtain information from the other party concerning the terms and conditions of such Transaction necessary in order for it to evaluate the merits and risks of the Transaction.  Notwithstanding the foregoing, it and its advisors are not relying on any communication (written or oral and including, without limitation, opinions of third party advisors) of the other party or its Affiliates as (i) legal, regulatory, tax, business, investments, financial, accounting or other advice, (ii) a recommendation to enter into such Transaction or (iii) an assurance or guarantee as to the expected results of such Transaction; it being understood that information and explanations related to the terms and conditions of such Transaction are made incidental to the other party's business and shall not be considered (A) legal, regulatory, tax, business, investments, financial, accounting or other advice, (B) a recommendation to enter into such Transaction or (C) an assurance or guarantee as to the expected results of the Transaction. Any such communication should not be the basis on which the recipient has entered into such Transaction, and should be independently confirmed by the recipient and its advisors prior to entering into the Transaction; and

      (c)     the other party and/or its Affiliates may have banking or other commercial relationships with the issuer of the shares underlying such Transaction and may engage in proprietary trading in the Shares or the Index(es) (as applicable) or options, futures, derivatives or other instruments relating to the Shares or the Index(es) (as applicable) (including such trading as such party and/or its Affiliates deem appropriate in their sole discretion to hedge their market risk on such Transaction and other transactions relating to the Shares or the Index(es) (as applicable) between each party and/or its Affiliates and the other party or with third parties), and that such trading may affect the price of the Shares or the Index(es) (as applicable) and consequently the amounts payable or deliverable under such Transaction.  Such trading may be effected at any time, including on or near the Valuation Date(s).