UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CSX CORPORATION,

                Plaintiff,

     v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S,
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN, AND ALEXANDRE BEHRING,
A/K/A ALEXANDRE BEHRING COSTA,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE CHILDREN'S INVESTMENT MASTER
FUND,

                Counterclaim and Third-
                Party Plaintiff,

     v.

CSX CORPORATION AND MICHAEL J. WARD,

                Counterclaim and Third-
                Party Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P., AND 3G FUND, L.P.,

                Counterclaim Plaintiffs,

     v.

CSX CORPORATION AND MICHAEL J. WARD,

                Counterclaim Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ECF CASE
08 Civ. 02764 (LAK) (KNF)

**NOTICE OF MOTION OF
COALITION OF PRIVATE
INVESTMENT COMPANIES
FOR LEAVE TO FILE BRIEF
AS *AMICUS CURIAE***

PLEASE TAKE NOTICE that, upon the annexed Motion of Coalition of Private Investment Companies for Leave to File Brief as *Amicus Curiae*, dated June 2, 2008 ("Motion"), and all prior papers and pleadings herein, *amicus curiae* Coalition of Private Investment Companies ("CPIC") will move this Court, before the Honorable Lewis A. Kaplan, U.S.D.J., United States Courthouse, Room 12D, 500 Pearl Street, New York, New York, at a date and time to be determined by the Court, for an order granting CPIC leave to appear in this action as *amicus curiae*, and to file the Proposed Memorandum of Law of *Amicus Curiae* Coalition of Private Investment Companies annexed as Exhibit A to the Motion and the Declaration of Adam H. Offenhartz annexed as Exhibit B to the Motion.

Dated: New York, New York
        June 2, 2008

GIBSON, DUNN & CRUTCHER LLP

By:    s/ Adam H. Offenhartz
       Adam H. Offenhartz (AO-0952)
       Aric H. Wu (AW-0252)
       J. Ross Wallin (RW-3911)
       LaShann M. DeArcy (LD-6511)

200 Park Avenue
New York, New York 10166-0193
Phone: (212) 351-4000
Fax: (212) 351-4035

*Attorneys for Amicus Curiae*
*Coalition of Private Investment Companies*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CSX CORPORATION,

                 Plaintiff,

      v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S,
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN, AND ALEXANDRE BEHRING,
A/K/A ALEXANDRE BEHRING COSTA,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE CHILDREN'S INVESTMENT MASTER
FUND,

            Counterclaim and Third-
            Party Plaintiff,

      v.

CSX CORPORATION AND MICHAEL J. WARD,

            Counterclaim and Third-
            Party Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P., AND 3G FUND, L.P.,

            Counterclaim Plaintiffs,

      v.

CSX CORPORATION AND MICHAEL J. WARD,

            Counterclaim Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ECF CASE
08 Civ. 02764 (LAK) (KNF)

**MOTION OF COALITION OF
PRIVATE INVESTMENT
COMPANIES FOR LEAVE TO
FILE BRIEF AS *AMICUS
CURIAE***

Pursuant to the Court's Order dated May 29, 2008, the Coalition of Private Investment Companies ("CPIC") respectfully moves for leave to file the Proposed Memorandum of Law of *Amicus Curiae* Coalition of Private Investment Companies, annexed hereto as Exhibit A, and the Declaration of Adam H. Offenhartz, annexed hereto as Exhibit B.  All parties have consented to the filing of an *amicus curiae* brief by CPIC.

CPIC is a coalition of over twenty private investment companies whose members and associates manage or advise an aggregate of over $100 billion in assets.  CPIC was established in 2005 to educate policymakers, the media, and the public about the hedge fund industry and the benefits it provides to capital markets.  CPIC's members are diverse both in size and in the investment strategies they pursue, and include multi-strategy funds that trade a range of financial instruments, long-short equity funds, fundamental short funds, and funds that pursue event-driven strategies.  Since its inception, CPIC has relied on the significant experience of its members to advise Congress, the Securities and Exchange Commission, state governments, and various other policymakers on a wide range of proposed laws, rules, regulations, and policies that would affect its members and capital markets at large.[1]

CPIC respectfully seeks leave to file an *amicus curiae* brief in order to provide perspective from the private investment community on issues raised by this case that relate to the ever-burgeoning derivative markets and that could have unintended consequences on the

---

[1] For example, CPIC's Chairman, James S. Chanos, has testified before both the United States Senate Subcommittee on Securities regarding hedge funds and before the United States House of Representatives Committee on Financial Services regarding hedge funds and systematic risk in the financial markets.  CPIC has also provided comments and suggestions to the SEC on reforms to the accredited investor standards, information collected pursuant to offerings under Regulation D as well as to the State of California on its recently withdrawn proposal regarding regulation of certain types of investment advisors.

financial markets if a court ruling is not limited to the unique facts of the case. CPIC believes that its *amicus curiae* submission provides important perspective that is distinct from that provided in the parties' submissions and will assist the Court.

"There is no governing standard, rule or statute prescribing the procedure for obtaining leave to file an *amicus* brief in the district court." *Onondaga Indian Nation v. New York*, No. 97-CV-445, 1997 WL 369389, at \*2 (N.D.N.Y. June 25, 1997) (internal quotation marks omitted). Rather, the district court has broad discretion to permit the submission of *amicus* briefs in a given case. *See Zell/Merrill Lynch Real Estate Opportunity Partners Ltd. P'ship III v. Rockefeller Ctr. Props., Inc.*, No. 96 CIV. 1445 (JFK), 1996 WL 120672, at \*4 (S.D.N.Y. Mar. 19, 1996). *See also Russell v. Bd. of Plumbing Exam'rs of the County of Westchester*, 74 F. Supp. 2d 349, 351 (S.D.N.Y. 1999) (noting that "[t]he Court has the discretion to determine the extent and manner of the participation of an *amicus*"). Given its broad experience advising policymakers on securities regulations and related issues, CPIC believes that it is well qualified to offer assistance to the Court on the issues raised in its *amicus curiae* brief.

WHEREFORE, CPIC respectfully requests that this Court enter an order in the form annexed hereto as Exhibit C, and grant such other or further relief as the Court deems appropriate.


Dated: New York, New York
       June 2, 2008

                                        GIBSON, DUNN & CRUTCHER LLP

                                        By:  __s/ Adam H. Offenhartz__
                                             Adam H. Offenhartz (AO-0952)
                                             Aric H. Wu (AW-0252)
                                             J. Ross Wallin (RW-3911)
                                             LaShann M. DeArcy (LD-6511)

                                        200 Park Avenue
                                        New York, New York 10166-0193
                                        Phone: (212) 351-4000
                                        Fax: (212) 351-4035

                                        *Attorneys for Amicus Curiae*
                                        *Coalition of Private Investment Companies*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CSX CORPORATION

      Plaintiffs,

      v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT (CAYMAN)
LTD., THE CHILDREN'S INVESTMENT MASTER
FUND, 3G CAPITAL PARTNERS, L.P., 3G FUND, L.P.,
CHRISTOPHER HOHN, SNEHAL AMIN, AND
ALEXANDRE BEHRING, A/K/A ALEXANDRE
BEHRING COSTA,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE CHILDREN'S INVESTMENT MASTER FUND

      Counterclaim and Third-Party Plaintiff,

      v.

CSX CORPORATION AND MICHAEL J. WARD,

      Counterclaim and Third-Party Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P., 3G FUND, L.P.

      Counterclaim Plaintiffs,

      v.

CSX CORPORATION AND MICHAEL J. WARD,

      Counterclaim Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:    08 Civ. 02764 (LAK) (KNF)

**PROPOSED
MEMORANDUM OF LAW
OF *AMICUS CURIAE*
COALITION OF PRIVATE
INVESTMENT COMPANIES**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

INTEREST OF CPIC..........................................................................................4

ARGUMENT .....................................................................................................5

I.    Equity Swaps, Standing Alone, Do Not Convey Beneficial
Ownership .............................................................................................5

    A.    Actual Control Is Required In Order To Trigger The
Disclosure Provisions Of Section 13(d)....................................6

    B.    Other Regulators Have Recognized The Distinction
Between Equity Swaps And Beneficial Ownership.....................7

    C.    A Broad Ruling Equating Equity Swaps with Beneficial
Ownership  Would Have Unintended, and Potentially
Serious, Consequences...........................................................10

    D.    Any Broad Shift in the Definition of Section 13(d)
Beneficial Ownership Should be the Product of SEC
Rulemaking, Not Judicial Revision .........................................13

II.    An Equity Swap Does Not Constitute A *Per Se* "Scheme To
Evade" The Disclosure Requirements Of Section 13(d) .......................14

    A.    A "Scheme To Evade" Requires Both An Underlying
"Beneficial Ownership" Of A Security And A Bad Faith
Intent To Conceal Control Over Such "Beneficial
Ownership" ............................................................................15

    B.    An Equity Swap, In And Of Itself, Has None Of The
Attributes Of A "Scheme To Evade" .......................................16

    C.    The SEC Through Its Notice-And-Comment Rulemaking
Process Is Best Situated To Assess Whether Market
Practices Relating To Equity Swaps Require Any Changes
To Disclosure Rules................................................................17

III.    Any Ruling As To "Group" Activity Should  Be Limited To The
Unique Facts Of This Case ...................................................................19

CONCLUSION..................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

<div align="right"><u>Page(s)</u></div>

### Cases

*Brown Exp., Inc. v. U.S.*,
  607 F.2d 695 (5th Cir. 1979) ................................................................... 13

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994)............................................................................... 21

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
  286 F.3d 613 (2d Cir. 2002) ............................................................ 20, 21

*Lane Bryant, Inc. v. Hatleigh Corp.*,
  No. 80-Civ. 1617, 1980 WL 1412 (S.D.N.Y June 9, 1980) ..................... 20

*Morales v. Quintel Entm't, Inc.*,
  249 F.3d 115 (2d Cir. 2001) ..................................................................... 6

*Moran v. Household Intern., Inc.*,
  490 A.2d 1059 (Del. Ch. 1985) .............................................................. 10

*NLRB v. Wyman-Gordon Co.*,
  394 U.S. 759, 89 S.Ct. 1426 (1969)........................................................ 13

*Pantry Pride, Inc. v. Rooney*,
  598 F. Supp. 891 (S.D.N.Y. 1984) ......................................................... 19

*Russello v. United States*,
  464 U.S. 16 (1983)................................................................................... 7

*Seidman v. Central Bancorp, Inc.*,
  16 Mass. L. Rptr. 383 (Mass. Super. 2003) ............................................ 10

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  128 S. Ct. 761, 772 (2008) ..................................................................... 21

### Statutes

12 U.S.C. § 3201 ......................................................................................... 9

15 U.S.C. § 18(a) ......................................................................................... 8

15 U.S.C. § 78p(a)(3)................................................................................... 7

8 Del. Code Ann. § 203 .............................................................................. 12

Mass. Gen. Laws Ann. ch. 149 § 183 ........................................................ 12

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Regulations**

16 C.F.R. § 801.1(c)(1)........................................................................... 9

17 C.F.R. § 240.13d-3(b)........................................................................ 16

**Other Authorities**

1981 FDIC Interp. Ltr. LEXIS 16 (June 18, 1981)........................................ 9

1982 FDIC Interp. Ltr. LEXIS 22 (Dec. 30, 1982)....................................... 9

ABA Section of Antitrust Law, Premerger Notification Practice Manual 71
    (Neil W. Imus, 3d ed. 2003) ........................................................... 8

Cover Letter to Report of the President's Working Group on Financial Markets,
    Over-the-Counter Derivatives Markets and the Commodity Exchange Act (1999),
    available at http://www.treas.gov/press/releases/reports/otcact.pdf ........... 2

Daniel Caplan, *Equity swaps as an alternative to trading in equities*, Hedgeweek (Oct. 1,
    2005), available at http://www.hedgeweek.com/articles/detail.jsp?content_id=12912 .......... 17

David G. Oedel, *Private Interbank Discipline*, 16 Harv. J.L. & Pub. Pol'y 327 (1993) .............. 16

FTC Informal Staff Opinion (Nov. 14, 2005), available at
    http://www.ftc.gov/bc/hsr/informal/opinions/0511010.htm ......................... 9

Hu & Black, *Equity and Debt Decoupling and Empty Voting II: Importance
    and Extensions*, 156 U. Pa. L. Rev. 625, 726 (2008)................................ 10

Hu and Black, *The New Vote Buying: Empty Voting and Hidden (Morphable)
    Ownership*, 79 S. Cal. L. Rev. 811 (2006)........................................ 7, 18

International Swaps and Derivatives Association, 2003 ISDA Credit Derivatives
    Definitions, available at http://www.isda.org/ ................................... 16

Michael Occhiolini, *Where To Draw The Line: Distinguishing Between
    Restricted and Publicly Registered Securities in an Era of Equity Swaps*,
    1 Stan. J.L. Bus. & Fin. 209 (1995) .............................................. 17

Roberta Karmel, *Regulation By Prosecution: The Securities and Exchange
    Commission vs. Corporate America* 191 (1982) ................................... 19

*Amicus Curiae* Coalition of Private Investment Companies ("CPIC") respectfully submits this memorandum for consideration by the Court. All parties consent to the filing of this *amicus curiae* brief.

## PRELIMINARY STATEMENT

Over the past twenty-five years, swaps and other types of over-the-counter ("OTC") derivatives products, including cash-settled total equity swaps, have become integral and necessary parts of all facets of the global capital markets, increasing the legitimate means by which corporations can manage financial risk, investors can take economic positions and financial risk can be dispersed to a wide variety of market participants able and willing to manage that risk.

Indeed, as stated in a benchmark statement of principles laying out the basis for all subsequent federal regulatory policy on these instruments, the President's Working Group on Financial Markets (consisting at the time of Treasury Secretary Lawrence Summers, Securities and Exchange Commission ("SEC") Chairman Arthur Levitt, Federal Reserve Board of Governors Chairman Alan Greenspan and Commodity Futures Trading Commission Chairman William Rainer),[1] the derivative markets have "transformed" the financial markets. In noting the growth of these markets, the Working Group clearly articulated that one of the major purposes of U.S. regulatory and economic policy is to "promote innovation, competition, efficiency,

---

[1] The President's Working Group on Financial Markets was created by Executive Order 12631, signed by President Ronald Reagan on March 18, 1988. The Working Group currently consists of Treasury Secretary Henry Paulson, Federal Reserve Board of Governors Chairman Benjamin Bernanke, Securities and Exchange Commission Chairman Christopher Cox and Commodity Futures Trading Commission Acting Chairman Walter Lukken. The Office of Comptroller of the Currency, Office of Thrift Supervision, and the Federal Reserve Bank of New York are also participants.

liquidity, and transparency in OTC derivatives markets, by providing legal certainty for OTC

derivatives and removing impediments to innovation." Cover Letter to President's Working

Group on Financial Markets, Over-the-Counter Derivatives Markets and the Commodity

Exchange Act (1999) ("President's Working Group Report on Derivatives Markets"), available at

http://www.treas.gov/press/releases/reports/otcact.pdf. The principles articulated by the

Working Group in 1999 have been reconfirmed on multiple occasions by the Working Group as

a whole and by the individual agencies themselves. *See, e.g.*, Speech by Federal Reserve Board

Chairman Benjamin Bernanke entitled "Regulation and Financial Innovation," from May 15,

2007, available at http://www.federalreserve.gov/newsevents/speech/bernanke20070515a.htm)

(articulating the policies of the Federal Reserve Board with respect to the over-the-counter

derivatives market).

CPIC submits this *amicus curiae* brief to provide perspective from the private investment

community on issues raised by this case relating to the important and ever-burgeoning derivative

markets. CPIC takes no position on the merits of the parties' claims or defenses in this action.

Moreover, CPIC believes that any violation of the securities laws should receive an appropriate

sanction. But the vitality of the financial markets depends on legal certainty, and there are at

least three issues on which a ruling beyond the particular facts of this case could have unintended

and unsettling consequences for the financial markets and the economy as well.

*First*, cash-settled equity swaps, standing alone, have been uniformly understood by

regulators, investors and corporate legal advisors alike not to constitute "beneficial ownership" of

a security. Given the tremendous volume of equity swap transactions and the wide-ranging use

of "beneficial ownership" as a benchmark for corporate and statutory triggers (*e.g.*, shareholders'

rights plans, bank holding company control statutes and regulations, state anti-takeover statutes,

lending and commercial agreements of all types, bond indentures, real estate leases, employee stock option plans and executive compensation plans), a judicial ruling that injects any uncertainty as to the heretofore common and shared understanding of "beneficial ownership" by market participants and regulators would have sweeping consequences far beyond the confines of this case. While there may be in the unique circumstances of a particular case a non-standard equity swap contract which confers "beneficial ownership" on a swap holder, any ruling as to such an atypical swap contract should be limited to the facts of the case. Any decision by this Court to undo the certainty of the lawful use of equity swaps would inject ambiguity and insecurity into a wide range of regulatory, investment, commercial and employment-related legal relationships.

Second, a "scheme to evade" the disclosure requirements of Section 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") necessarily entails in the first instance a reportable, but concealed, "beneficial ownership" of a security. Standard equity swap contracts plainly do not require an underlying "beneficial ownership" position or control by the swap holder over any shares or other hedge held by a dealer. A judicial ruling on the basis of a "scheme to evade" that puts to the side the issue of whether there is any underlying reportable "beneficial ownership" of a security would inappropriately read the definition of "beneficial ownership" out of SEC Rule 13d-3 and put into doubt the heretofore shared decades of understanding of the SEC's disclosure rules by market participants and regulators. While there may be in the unique circumstances of a particular case an equity swap which is a component of a "scheme to evade," any ruling to such effect should be narrowly limited to the facts of that case.

Moreover, changes to the SEC's disclosure rules would greatly benefit from a traditional administrative law process.  The merits of whether such changes should even be considered in the first place has historically fallen within the purview of the SEC and not the courts.  The SEC's notice-and-comment rulemaking process generates full capital market participation, over a period of time where parties can anticipate and price the risk of baseline rule changes into their transactions.  A judicial ruling as a matter of law on the issue of whether equity swaps constitute "beneficial ownership" for Section 13(d) purposes would not benefit from the comparative advantages of an SEC-directed process.

*Third*, the existing jurisprudence as to what constitutes reportable "group" activity under Section 13(d) is well-settled.  Disclosure of an agreement to act in concert for the purpose of acquiring, holding, voting or disposing of securities is required.  However, the law is clear that Section 13(d) otherwise permits investors to freely share information without the burden of disclosure to the broader capital markets.  In this regard, under Section 13(d) an investor that shares his or her expert analysis of otherwise publicly available information of a public company is free to do so as broadly or in as limited a fashion as he or she chooses.  Furthermore, absent a factual finding of an agreement to act in concert for the purpose of acquiring, holding, voting or disposing of securities, Section 13(d) has never been interpreted to deem as part of such an investor's "group" a recipient of such information who then trades based on knowledge of the initial investor's intentions and strategy.

## INTEREST OF CPIC

CPIC is a coalition of over twenty private investment companies whose members and associates manage or advise an aggregate of over $100 billion in assets.  CPIC was established in 2005 to educate policymakers, the media, and the public about the hedge fund industry and the

benefits it provides to capital markets. CPIC's members are diverse both in size and in the investment strategies they pursue, and include multi-strategy funds that trade a range of financial instruments, long-short equity funds, fundamental short funds, and funds that pursue event-driven strategies. Since its inception, CPIC has channeled the significant experience of its members to advise Congress, the SEC, state governments, and various other policymakers on a wide range of proposed laws, rules, regulations, and policies that would affect its members and capital markets at large.[2] CPIC submits this *amicus curiae* brief to provide perspective from the private investment community on issues raised by this case that relate to the ever-burgeoning derivatives markets and that could have unintended and unsettling consequences on the financial markets if a court ruling is not limited to the unique facts of the case.

## ARGUMENT

### I.    Equity Swaps, Standing Alone, Do Not Convey Beneficial Ownership

"The vast majority of [derivative] contracts are settled in cash." President's Working Group Report on Derivatives Markets at 16. Cash-settled equity swaps have been uniformly understood by regulators, investors and corporate legal advisors alike not to constitute "beneficial ownership" of a security for purposes of Section 13(d). And with good reason. The purpose of disclosing significant "beneficial ownership" of a security under Section 13(d) is to provide investors notice of actual or potential changes in control. Cash-settled equity swaps only

---

[2]  For example, CPIC's Chairman, James S. Chanos, has testified before the both the United States Senate Subcommittee on Securities regarding hedge funds and before the United States House of Representatives Committee on Financial Services regarding hedge funds and systematic risk in the financial markets. CPIC has also provided comments and suggestions to the SEC on reforms to the accredited investor standards, information collected pursuant to offerings under Regulation D as well as to the State of California on its recently withdrawn proposal regarding regulation of certain types of investment advisors.

confer economic benefit. They do not confer actual control over a security. Thus, the SEC and numerous other regulators, including the Federal Trade Commission ("FTC"), the Federal Home Loan Bank Board ("FHLBB") and the Federal Deposit Insurance Corporation ("FDIC"), have recognized that equity swaps and other financial instruments do not confer beneficial ownership.

A broad ruling that standard equity swaps, without more, confer "beneficial ownership" on the swap holders would be contrary to the shared understanding of market participants and would have unintended consequences beyond the confines of this case, including the triggering of provisions in shareholders' rights plans, bank holding company control statutes and regulations, state anti-takeover statutes, lending and commercial agreements of all types, bond indentures, real estate leases, employee stock option plans and executive compensation plans.[3] For this reason, CPIC submits that any ruling on this issue should be narrowly tailored to the specific facts of this case. Proposed changes to the definition of "beneficial ownership" should be addressed through SEC notice-and-comment rulemaking, not by an individual court addressing the unique facts of a particular case.

### A.     Actual Control Is Required In Order To Trigger The Disclosure Provisions Of Section 13(d)

The disclosure provisions of Section 13(d) focus on actual control, not economic gain or loss. *See* Defendants' Post-Trial Brief, dated May 27, 2008 (Ds' Br."), at 35-42; Defendants' Post Trial Reply Brief, dated May 29, 2008 ("Ds' Reply Br."), at 8-16; *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115 (2d Cir. 2001) ("§13(d) focuses on control, not on pecuniary benefits."). In this respect, Section 13(d) stands in sharp contrast to Section 16 of the Exchange Act, which

---

[3] This list constitutes only a small fraction of the statutes, contracts and documents that may contain change of control provisions that track, or explicitly reference, Section 13(d)'s definition of beneficial ownership.

requires a beneficial owner of 10% of an equity security to disclose not only "the amount of all equity securities" beneficially owned, *but also* "purchases and sales of the security-based swap agreements." 15 U.S.C. § 78p(a)(3); Hu and Black, *The New Vote Buying: Empty Voting and Hidden (Morphable) Ownership*, 79 S. Cal. L. Rev. 811 (2006) (noting that the disclosure requirements of Section 13(d) focus on voting power, whereas Section 16 focuses on "economic ownership").  The inference is unavoidable – for the purpose of the securities laws, beneficial ownership and economic interest are not synonymous.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").  Moreover, as the language of Section 16 makes clear, when Congress wanted to require disclosure of an economic interest decoupled from voting power – such as the economic interest conveyed by a equity swap – it did so explicitly.  *See* Ds' Br. at 37; Hu and Black, Empty Voting and Hidden (Morphable) Ownership: Taxonomy, Implications and Reforms, 61 Bus. Law 1011, 1041-42 (2006) (noting the view of practitioners that "disclosure of cash-settled equity swaps is normally not required").

For this reason, cash-settled equity swaps, standing alone, which convey only the economic benefits and risks of ownership, have never been understood by practitioners or market participants, or interpreted by the SEC, to constitute "beneficial ownership" for Section 13(d) purposes.  Ds' Br. at 35-37.

**B.    Other Regulators Have Recognized The Distinction Between Equity Swaps And Beneficial Ownership**

The SEC's distinction between equity swaps and beneficial ownership is not unique.  Other federal regulators likewise have respected the distinction between entering into instruments (such as equity swaps) that do not convey voting control, and beneficial ownership.

For example, the Hart-Scott-Rodino Act imposes premerger notification and waiting periods on

persons who "hold" specified amounts of voting securities. *See* 15 U.S.C. § 18(a). The Act

further states that the term "hold" means "beneficial ownership, whether direct, or indirect

through fiduciaries, agents, controlled entities or other means." *See* 16 C.F.R. § 801.1(c)(1). In

interpreting what constitutes "beneficial ownership," the FTC consistently has excluded

instruments that convey solely the economic benefits and risks of ownership. *See* Offenhartz

Decl., Ex. A, ABA Section of Antitrust Law, Premerger Notification Practice Manual 71 (Neil

W. Imus, 3d ed. 2003) (stating that a derivative instrument that allows an individual to recognize

a gain or loss on voting securities held by another person does not confer beneficial ownership

because "the holder of the derivative . . . has only one indicium of beneficial ownership and will

not receive any other indicia of ownership in the voting securities such as the right to vote or

dispose of the acquired securities").

In a more recent informal opinion, the FTC stated that it agreed with the analysis

contained in the following enquiry, which specifically addressed the question at issue here --

namely, whether equity swaps confer "beneficial ownership" for HSR purposes:

> A holds $40 million of C's voting securities. A now enters into a swap contract
> with investment bank B valued at $30 million, pursuant to which A realizes a gain
> or a loss derived from the gain or loss of the underlying voting securities of C. . . .
> If C's stock price rises, A receives cash from B. If C's stock price falls, B receives
> cash from A. In any case, B receives a fee for its services from A. There is no
> obligation for either A or B to purchase any of C's stock as a result of the swap
> agreement, even though B is likely to buy stock in C as a hedge. A has no title to
> or the power to vote or dispose of B's shares in C, and A has no power to instruct
> B to do any of these things.

> In my view, the transaction is not reportable, because A has no beneficial
> ownership of C's voting securities beyond the $40 million that it owns outright.
> The swap agreement does not confer beneficial ownership over those voting
> securities of C that B may hold to A, because A does not have title to, or the
> power to vote or dispose of C's shares. . . .

FTC Informal Staff Opinion (Nov. 14, 2005), available at

http://www.ftc.gov/bc/hsr/informal/opinions/0511010.htm. The same logic applies here.

Something more than economic exposure is, and should be, required to convey beneficial

ownership.

Numerous other regulators have interpreted statutes and rules dealing with beneficial

ownership by reference to Section 13(d), and have similarly concluded that beneficial ownership

does not arise from entering into transactions that do not convey voting control. The FHLBB has

explicitly noted that the term "beneficial ownership" in conversion regulations was intended to

track similar provisions in Section 13(d). *See* Offenhartz Decl., Ex. B, 41 Fed. Reg. 50415

(November 16, 1976) (Federal Home Loan Bank Board) ("The language as to . . . 10 percent

beneficial owner is modeled after language in the Securities Exchange Act (15 U.S.C. 78m) and

is intended to have similar meaning."). In keeping with Section 13(d)'s emphasis on voting

control, the FHLBB has opined that revocable proxies do not confer voting control or beneficial

ownership absent "some agreement or arrangement evidencing a more continuous or less tenuous

control." *Id.*

Similarly, when interpreting the term "beneficial ownership" for the purpose of the

Depository Institution Management Interlocks Act (*see* 12 U.S.C. §§ 3201-08) and related rules,

the FDIC has explicitly relied on Section 13(d)'s definition of "beneficial ownership." *See* 1982

FDIC Interp. Ltr. LEXIS 22 (Dec. 30, 1982); *see also* 1981 FDIC Interp. Ltr. LEXIS 16 (June

18, 1981) (interpreting the term beneficial ownership by reference to the definitions in Section

13(d)). Moreover, in an opinion applying that definition, the FDIC concluded that a directed

proxy did not convey beneficial ownership because the proxy holder had "no choice regarding

the selection and election of directors" and thus did not "control" the voting power of the stock.
*See* 1982 FDIC Inter. Ltr. LEXIS 22 (Dec. 30, 1982).

> **C.    A Broad Ruling Equating Equity Swaps with Beneficial Ownership
> Would Have Unintended, and Potentially Serious, Consequences**

The consistent distinction between beneficial ownership and instruments such as equity

swaps has led to the adoption of various corporate conventions, many of which would be turned

on their heads if equity swaps were equated with beneficial ownership.

For example, the triggers of shareholders' rights plans, or poison pills, frequently are tied

to the concept of Section 13(d) beneficial ownership. *See, e.g. Moran v. Household Intern., Inc.*,

490 A.2d 1059, 1080 (Del. Ch. 1985) (noting that "[t]he group concept and beneficial ownership

[of a right plans] have been admittedly borrowed from comparable provisions in federal

regulations under Sections 13(d) and 14(d) of the Securities Exchange Act of 1934."); *Seidman*

*v. Central Bancorp, Inc.*, 16 Mass. L. Rptr. 383, 2003 WL 21528509, at *3 (Mass. Super., 2003)

(discussing a shareholders' rights agreement which defined "beneficial owner" by reference to

"Section 13(d) of the Exchange Act or Rules 13d-3 and 13d-5 promulgated thereunder");

Offenhartz Decl., Ex. C, Spark Networks, Rights Agreement (Form 8-K), at Ex. 4.1 (July 9,

2007) (defining "Beneficially Own" with reference to Section 13(d)); Offenhartz Decl., Ex. D,

Washington Trust Bancorp Inc., Shareholder Rights Agreement (Form 8-A12B) at Ex. 4.1

(August 17, 2006) (tying "Beneficial Ownership" to Section 13(d) reporting requirements); *see*

*also* Hu & Black, *Equity and Debt Decoupling and Empty Voting II: Importance and*

*Extensions*, 156 U. Pa. L. Rev. 625, 726 (2008) ("[S]tandard poison pills are triggered by owning

more than a specified percentage of the target's shares.  The definition of ownership used in most

pills is borrowed from Exchange Act section 13(d), and does not capture cash-settled

derivatives.").  Judicial revision of what constitutes beneficial ownership for Section 13(d)

purposes – for example, a finding that merely entering into a equity swap conveys beneficial

ownership over any shares or other instruments acquired by the counterparty as a hedge – could

have the unintended consequence of triggering the poison pills of various public companies, with

potentially catastrophic effects.[4]

Similarly, the stock option plans, employment and severance agreements of numerous

public companies contain payout provisions that are triggered by a change in control, usually

defined as the acquisition of a specified percentage of a company's shares.  It is not uncommon

for these provisions to incorporate, either explicitly or implicitly, the concept of Section 13(d)

beneficial ownership.  *See, e.g.,* Offenhartz Decl., Ex. E, IKON Office Solutions Inc., Senior

Executive Employment Agreement (Form S-4), at Ex. 10.28 (Apr. 4, 2008) (defining "Change in

Control" in an employment agreement, in part, with reference to "'beneficial owner' (as defined

in Rule 13d-3 under the Exchange Act")); Offenhartz Decl., Ex. F, Virtual Radiologic Corp.,

Employment Agreement (Form 8-K), at Ex. 10.1 (Apr. 8, 2008) (defining "change in control" in

an employment agreement with reference to the § 13(d) definition of "beneficial owner"); *see*

*also* Offenhartz Decl., Ex. G, Fleischer and Sussman, Takeover Defense (2004), Exhibit 43

Model Definition of Change in Control TKRDF EX 43, EX-467) (incorporating the Rule 13d-3

definition of "Beneficial Ownership" in the "model definition of [a] 'Change in Control'

---

[4]  These effects could include dramatic dilution of certain shareholders in affected companies, litigation resulting from the triggering of pills, and significant waste and distraction for the companies and shareholders involved.

provision).  Here again, a broad finding that equity swaps are the functional equivalent of

holding physical shares could inadvertently trigger these provisions.[5]

In addition to private practitioners and market participants, state legislatures have relied

on Section 13(d) jurisprudence in enacting their own state anti-takeover provisions.  Indeed, the

anti-takeover statute of at least one state, Massachusetts, explicitly references the Section 13(d)

standard of beneficial ownership.  *See* Mass. Gen. Laws Ann. ch. 149 § 183 (stating that a

transfer of control occurs when a person "is or becomes the 'beneficial owner', as defined in

Rule 13d-3 under the [Exchange Act] of 50% or more of a company's outstanding voting

securities.").  The statutes of other states – Delaware, for example – explicitly equate beneficial

ownership with voting control.  *See* 8 Del. Code Ann. § 203 (defining interested shareholder as a

person owning 15% or more of the outstanding voting stock of the corporation).  Market

participants and their legal advisers have operated for many years under the assumption that

equity swaps, absent some control over voting power, did not convey beneficial ownership.

Moreover, given the general understanding of Section 13(d) beneficial ownership, it is likely that

state legislatures did not intend, when they enacted their anti-takeover statutes, for equity swaps

to convey beneficial ownership.  A broad ruling to the contrary thus could have the unintended

consequence of frustrating state legislative intent, as well as triggering state anti-takeover

---

[5]  Judicial revision of what constitutes Section 13(d) beneficial ownership could impact other
corporate documents as well.  For example, many corporations have provisions in their
charters that impose supermajority voting requirements for transactions with an "interested
shareholder" – often defined as a shareholder that beneficially owns 10-20% of the
company's outstanding stock.  Numerous other corporate documents and contracts, such as
lending and commercial agreements of all types, bond indentures, real estate leases and
employee stock option plans, typically contain similar change of control provisions.  The
relevant provisions in these document often explicitly reference the concept of Section 13(d)
beneficial ownership or closely track the language of Section 13(d).

provisions to the detriment of market participants that made every effort *not* to trigger such provisions.

A broad ruling that fails to recognize the integrity of a financial instrument that has the ability to divorce pecuniary interests from voting power could have negative implications for the holders of a broad array of other financial instruments that rely on that characteristic, such as futures and equity shorts.

**D.     Any Broad Shift in the Definition of Section 13(d) Beneficial Ownership Should be the Product of SEC Rulemaking, Not Judicial Revision**

When a question arises as to the prevalence or impact of a particular market practice, it is the SEC, through notice-and-comment rulemaking, which is in the best position to assess that market practice and any necessary regulatory response. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764, 89 S.Ct. 1426, 1429 (1969) (stating that the notice and comment provisions "were designed to assure fairness and mature consideration of rules of general application"); *Brown Exp., Inc. v. U.S.*, 607 F.2d 695, 701 (5th Cir. 1979) ("Congress . . . prescribed these [notice-and-comment rulemaking] procedures to ensure that the broadest base of information would be provided to the agency by those most interested and perhaps best informed on the subject of the rulemaking at hand.").

The concept of Section 13(d) beneficial ownership pervades numerous aspects of corporate governance, contract law and state statutory construction. Thus, any meaningful change in the definition of Section 13(d) beneficial ownership could have great impact on many corporations. Corporations that would be affected by such a sweeping change should be allowed an opportunity to comment. SEC rulemaking provides opportunity for comment in a way that a judicial decision obviously does not. Moreover, the comment period would give corporations an opportunity to adjust their shareholders' rights plans, employment agreements and other affected

- 13 -

documents, if they wanted to do so.  It likewise would give state legislatures an opportunity to

consider the potential impact of a change in definition on their anti-takeover statutes.  Thus, any

paradigm shift in the concept of Section 13(d) beneficial ownership should be the product of

SEC rulemaking, rather than a judicial decision.

For these reasons, CPIC respectfully submits that any ruling in this case on whether

Defendants violated Section 13(d) should be narrowly tailored to the specific facts of this case,

and not based on a sweeping characterization of equity swaps as beneficial ownership interests.

## II.    An Equity Swap Does Not Constitute A *Per Se* "Scheme To Evade" The Disclosure Requirements Of Section 13(d)

CPIC respectfully submits that this Court also should avoid any broad ruling that an

equity swap constitutes a "scheme to evade" the disclosure requirements of Section 13(d).  The

purpose of disclosing significant "beneficial ownership" of a security under Section 13(d) is to

provide investors notice of actual or potential changes in control.  Rule 13d-3(b) "points out that

the rule cannot be circumvented by an arrangement to divest a person of beneficial ownership or

to prevent the vesting of beneficial ownership as part of a plan or scheme to evade the reporting

requirements of Section 13(d)."  Adoption of Beneficial Ownership Disclosure Requirements,

Exchange Act Release No. 13291, 1977 WL 185650, at *5 (Feb. 24, 1977).[6]

---

[6] Rule 13d-3(b) provides in relevant part that "[a]ny person who, directly or indirectly, creates or uses a . . . contract, arrangement, or device with the purpose or effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security."  17 C.F.R. § 240.13d-3(b).

**A.    A "Scheme To Evade" Requires Both An Underlying
"Beneficial Ownership" Of A Security And A Bad Faith
Intent To Conceal Control Over Such "Beneficial Ownership"**

During trial, the Court queried "whether one could put aside entirely" the question of whether there was any underlying beneficial ownership of CSX stock and find a Section 13(d) violation based on a "scheme to evade." *See* Trial Tr. at 221: 25 – 222: 11.  Respectfully, the issue of whether there is any underlying "beneficial ownership" of a security cannot be put to the side.  A "scheme to evade" the disclosure requirements of Section 13(d) necessarily entails in the first instance a reportable, but concealed, "beneficial ownership" of a security.  To put to the side the issue of whether there is any underlying "beneficial ownership" of a security would be to read the definition of "beneficial ownership" out of the SEC rule.  As used in Rule 13d-3(b), a "scheme to evade" requires *both* an underlying "beneficial ownership" of a security and a bad faith intent to conceal control over such "beneficial ownership."  An equity swap, in and of itself, has neither attribute and therefore does not constitute a "scheme to evade."

In its release accompanying the adoption of Section 13(d) and the rules thereunder, the SEC provides as an example of a "scheme to evade" under Rule 13d-3(b) a "parking" scheme in which "X" causes ten different institutions to each purchase three percent of the voting securities of "Z" for him and gives "A" the proxy to vote the securities.  *See* Adoption of Beneficial Ownership Disclosure Requirements, Exchange Act Release No. 13291, 1977 WL 185650, at *14, at Example 8 (Feb. 24, 1977).  The SEC's example thus involves the underlying "beneficial ownership" of securities by third parties (the ten institutions) and "sham" transactions on the part of "X" (division of its 30% stake among the ten institutions and giving of proxy to "A") for the sole or principal purpose of concealing its control over such "beneficial ownership."

**B.    An Equity Swap, In And Of Itself, Has None
Of The Attributes Of A "Scheme To Evade"**

An equity swap does not share the attributes of the "scheme to evade" identified by the

SEC.  It does not require an underlying "beneficial ownership" position.  Equity swap products

are available from many major investment and commercial banks.  *See* President's Working

Group Report on Derivatives Markets at 16 (noting that "most of the dealers in the swaps market

are either affiliated with broker-dealers or FCMs that are regulated by the SEC or the CFTC or

are financial institutions that are subject to supervision by bank regulatory agencies"); *see also*

David G. Oedel, *Private Interbank Discipline*, 16 Harv. J.L. & Pub. Pol'y 327, 409 n.240 (1993)

(noting that there are "more triple-A-rated swap dealers than there are triple-A-rated banks and

securities firms combined").  The terms of the vast majority of equity swaps are based on the

standard language promulgated by the International Swaps and Derivatives Association

("ISDA").  The ISDA swap language does not give the equity swap purchaser any power to

command:  (i) the dealer to hedge; (ii) how the dealer should hedge, with matched shares or

another method; (iii) whether the dealer will hold any shares acquired during a shareholder

meeting, or will lend them to another party; (iv) whether the dealer will vote any shares held

during a shareholder meeting; or (v) how the dealer would vote those shares.  *See* International

Swaps and Derivatives Association, 2003 ISDA Credit Derivatives Definitions, available at

http://www.isda.org/.  A standard equity swap thus has no provision requiring any purchase of

any equity at any time – *i.e.*, no provisions requiring that any party ever adopt a "beneficial

ownership" position.  Nor do equity swaps contain provisions that purport to give the equity

swap holder any control over any shares held by the dealer – the *sine qua non* of any Rule 13d-

3(b) scheme.

Moreover, swap agreements are routinely entered into for legitimate business reasons. For example, as discussed in defendants' briefs, defendants regularly engage in swaps for financing benefits, administrative convenience and tax benefits.  *See* Ds' Br. at 10-11, 55-57; Ds' Reply Br. at 21-23.  *See also* Michael Occhiolini, *Where To Draw The Line: Distinguishing Between Restricted and Publicly Registered Securities in an Era of Equity Swaps*, 1 Stan. J.L. Bus. & Fin. 209, 213 (1995) ("[I]n a number of investment situations, entering into an equity swap contract instead of buying or selling the underlying equity security can simultaneously reduce transaction costs and increase leverage.  The costs associated with settlement, custodial fees, foreign taxes and transfer of funds across national borders can also be avoided by using equity swaps."); Daniel Caplan, *Equity swaps as an alternative to trading in equities*, Hedgeweek (Oct. 1, 2005), available at http://www.hedgeweek.com/articles/detail.jsp?content_id=12912 ("Equity swaps are favoured by counterparties such as hedge funds, as the product enables them to achieve the economic benefits of ownership of shares without the cost and expense of the consequences of ownership, such as high custodian fees in each jurisdiction to hold shares in the relevant clearing system, having to maintain records, monitor corporate actions and undertaking regular reconciliations.").  An equity swap, without more (such as an additional agreement for the dealer to both match shares with the swap position and vote the shares at the direction of the swap holder), thus does not evidence a bad faith intent to conceal control over "beneficial ownership" of a security.

C.    **The SEC Through Its Notice-And-Comment Rulemaking Process Is Best Situated To Assess Whether Market Practices Relating To Equity Swaps Require Any Changes To Disclosure Rules**

Because an equity swap based on the standard ISDA language lacks the essential elements of a "scheme to evade" under Rule 13d-3(b), to broadly hold that equity swaps nonetheless constitute a "scheme to evade" under Rule 13d-3(b) would require an extraordinary

- 17 -

finding – one that the Court need not and indeed should not make – that market customs will *always* supply the elements that are missing from equity swap contracts.[7]

As an empirical and factual matter, such a finding would be dubious at best. *See, e.g.*, President's Working Group Report on Derivatives Markets at 16 ("Most OTC derivatives are not susceptible to manipulation."). As already discussed, there are a number of legitimate business reasons for equity swaps that have nothing to do with corporate control. Furthermore, even where corporate control concerns potentially could be implicated, market practice is not uniform. For example, even where dealers opt to hedge with matched shares, dealers have refused to sell matched shares to swap holders. *See also* Hu & Bernard, *The New Vote Buying: Empty Voting and Hidden (Morphable) Ownership*, 79 S. Cal. L. Rev. 811, 839 (2006) ("Market expectation that a dealer will unwind a swap is not a guarantee."). In fact, in this case, TCI never purchased shares from its dealer, but rather purchased them on the open market. *See* Ds' Br. at 19.

Rule 13d-3(b) was adopted over 30 years ago, prior to the introduction of swaps and other derivative products. *See* Hu & Black, 79 S. Cal. L. Rev. at 870-71 ("The real problem is that the 13D and 13G rules were written in the 1970s, when neither swaps nor any other OTC derivatives existed"). If any updated regulatory response is now required, it should be done through the SEC's notice-and-comment rulemaking process. *See* Offenhartz Decl., Ex. H,

---

[7] While there may be unique circumstances in which an equity swap theoretically could be a component of a "scheme to evade" – for example, a dealer and equity swap holder could enter into a side agreement under which the dealer agrees from the outset to hedge the swap position with matched shares and to vote the shares at the direction of the equity swap holder – those evaluations can and should only be made on a case-by-case basis. Indeed, this Court can and should assess whether there was an underlying "beneficial ownership" position and a bad faith intent to conceal control of a "beneficial ownership" position *in this case*. However, CPIC submits that the Court should refrain from making any generalized ruling as to whether equity swaps as a class constitute a "scheme to evade" under Rule 13d-3(b).

Roberta Karmel, *Regulation By Prosecution: The Securities and Exchange Commission vs. Corporate America* 191 (1982) (noting that it a "wise policy" for the SEC to expand coverage of securities laws through notice-and-comment rulemaking, as opposed to enforcement actions). An individual court is not well-positioned to make findings as to market practices writ large, with only the facts and pleadings of the particular parties before it. *Id.*

<p style="text-align:center">* * *</p>

In sum, a standard equity swap contract does not establish that an equity swap is a "scheme to evade" under Rule 13d-3(b) and there is no reason for this Court to opine on whether prevailing market practices render equity swaps as a class a "scheme to evade" under Rule 13d-3(b). The only issue with respect to Rule 13d-3(b) that the Court need decide is whether in this case there was an underlying "beneficial ownership" position and a bad faith attempt to conceal control of a "beneficial ownership" position through "sham" transactions.

### III.    Any Ruling As To "Group" Activity Should Be Limited To The Unique Facts Of This Case

Finally, any ruling as to "group" activity should be limited to the unique facts of this case. The existing jurisprudence as to what constitutes reportable "group" activity under Section 13(d) is well-settled and not disputed by the parties. *See* Ds' Br. at 57-73; Memorandum of CSX Corporation and Michael Ward in Response to Defendants' Post-Trial Brief at 5-13. Disclosure of an agreement to act in concert for the purpose of acquiring, holding, voting or disposing of securities is required. However, the law is clear that Section 13(d) otherwise permits investors to freely share information without the burden of disclosure. *See Pantry Pride, Inc. v. Rooney*, 598 F. Supp. 891, 900 (S.D.N.Y. 1984) ("Section 13(d) allows individuals broad freedom to discuss the possibilities of future agreements without filing under securities laws."). Indeed,

> Section 13(d) seems carefully drawn to permit parties seeking to acquire large amounts of shares in a public company to obtain information with relative

> freedom, to discuss preliminarily the possibility of entering into agreements and
> to operate with relative freedom until they get to the point where they do in fact
> decide to make arrangements which they must record under the securities laws.
> By requiring the existence of a "group", the law is designed to avoid discouraging
> and making risky that kind of preliminary activity.

*Lane Bryant, Inc. v. Hatleigh Corp.*, No. 80-Civ. 1617, 1980 WL 1412, at *1 (S.D.N.Y June 9,

1980).

As the court in *Lane Bryant* recognized, communication among investors is an essential

component to the robust operation of the capital markets. Any ruling as to "group" activity here

should thus be limited to the unique facts of this case and avoid any broader suggestion that

casual discussions among hedge funds which happen to invest in the same security constitute

"group" activity. A broad ruling would have the unintended consequence of proscribing hedge

fund conduct, which up to this point has been widely accepted among the investor community

and which provides significant benefits for both institutional and non-institutional investors.

The only question presented on the issue of "group" activity is whether "in light of all the

circumstances," an "agreement" exists thereby triggering Section 13(d). Offenhartz Decl., Ex. I,

Brief for Defendants-Appellees Gotham Partners, L.P.; Gotham Partners III, L.P. and Gotham

Holdings II, L.L.C. at 16, *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d

613 (2d Cir. 2002) (No. 01-7246) (citing Kaplan, J. Feb. 23, 2001 oral opinion transcript). As

this Court previously has recognized, this is as fact intensive of an inquiry as a court could ever

be required to make:

> This in the last analysis is as pure a factual judgment call as [a court is] ever asked
> to make in a civil case. Nobody really has any quarrel at all about the law. There
> is no legal issue . . . . The bottom line, the question is: [Is the court] persuaded by
> a preponderance of the evidence that any two or more . . . defendants formed a
> group, group being defined [as] an agreement explicit or implicit to buy, sell or
> hold . . . with respect to the securities of the issuer? . . .

Offenhartz Decl., Ex. J, Brief for Defendants-Appellees Interstate Properties and Steven Roth at

23-24, *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613 (2d Cir. 2002)

(No. 01-7246) (citing Kaplan, J. Feb. 23, 2001 oral opinion transcript).

Proxy rules found in Section 14 of the Exchange Act provide separate bases for

regulation of communication among investors. The strong trend in the SEC's regulation since

the early 1990s has been to facilitate communication among investors. Market participants

recognize that this is an essential component to the robust operation of the capital markets and a

common, every day occurrence. A broad judicial ruling that discussions among independent

hedge funds which invest in the same security constitute "group" activity would dramatically

alter the settled legal landscape and would have the additional negative consequence of

significantly limiting historically acceptable market conduct. Any ruling as to "group" activity

here should be limited to the unique facts of the case and take into account the fact of disclosure

of a "group" well in advance of any contested proxy campaign.

* * *

In sum, the potential "ripple effects" of a ruling that is not narrowly tailored to the

specific facts of this case are significant. As the Supreme Court has noted in different contexts,

certain areas of the securities laws require certainty and predictability in order to ensure the

effective functioning of the country's capital markets. *See Stoneridge Inv. Partners, LLC v.*

*Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 772 (2008) (noting that, if the Court were to interpret

Section 10(b) to extend primary liability to secondary actors who did not make statements to

investors, it would "expose a new class of defendants to [litigation] risks," "rais[e] the costs of

doing business," and "shift securities offerings away from domestic capital markets"); *Central*

*Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) (noting that,

if the Court were to interpret Section 10(b) to encompass aiding and abetting, it would "exact[]

costs that may disserve the goals of fair dealing and efficiency in the securities markets" and

create uncertainty in "an area that demands certainty and predictability.")  So it is with the

disclosure requirements of Section 13(d).  Decisions such as *Stoneridge and Central Bank*

highlight the importance of leaving difficult policy questions concerning the scope of the

securities laws to Congress.

## CONCLUSION

CPIC respectfully requests that this Court rule in accordance with the arguments outlined

above.

Dated:   New York, New York
         June 2, 2008

                                          GIBSON, DUNN & CRUTCHER LLP

                                          By:  *Adam H. Offenhartz*
                                               Adam H. Offenhartz (AO-0952)
                                               Aric H. Wu (AW-0252)
                                               J. Ross Wallin (RW-3911)
                                               LaShann M. DeArcy (LD-6511)

                                          200 Park Avenue
                                          New York, New York 10166-0193
                                          Phone: (212) 351-4000
                                          Fax: (212) 351-4035

                                          *Attorneys for Amicus Curiae*
                                          *Coalition of Private Investment Companies*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :    x

CSX CORPORATION

                           Plaintiffs,

          v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT (CAYMAN)
LTD., THE CHILDREN'S INVESTMENT MASTER
FUND, 3G CAPITAL PARTNERS, L.P., 3G FUND, L.P.,
CHRISTOPHER HOHN, SNEHAL AMIN, AND
ALEXANDRE BEHRING, A/K/A ALEXANDRE
BEHRING COSTA,

                           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

THE CHILDREN'S INVESTMENT MASTER FUND

                     Counterclaim and

Third-Party Plaintiff,

          v.

CSX CORPORATION AND MICHAEL J. WARD,

                     Counterclaim and

Third-Party Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P., 3G FUND, L.P.

                     Counterclaim

Plaintiffs,

          v.

CSX CORPORATION AND MICHAEL J. WARD,

                     Counterclaim

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :    x

08 Civ. 02764 (LAK) (KNF)

**DECLARATION OF ADAM
H. OFFENHARTZ IN
SUPPORT OF PROPOSED
MEMORANDUM OF LAW
OF *AMICUS CURIAE*
COALITION OF PRIVATE
INVESTMENT
COMPANIES**

ADAM H. OFFENHARTZ, pursuant to 28 U.S.C. § 1746, hereby declares:

1.      I am an attorney with the law firm of Gibson, Dunn & Crutcher LLP, with offices located at 200 Park Avenue, New York, New York 10166, counsel to the Coalition of Private Investment Companies, proposed *Amicus Curiae* in the above-captioned matter.  I am a member of the bar of State of New York and of this Court.

2.      Annexed hereto as Exhibit A is a true and correct copy of excerpts from Section 55 of the chapter titled "Interpretations Relating to Part 801," from *ABA Section of Antitrust Law, Premerger Notification Practice Manual* 71 (Neil W. Imus, 3d Ed. 2003).

3.      Annexed hereto as Exhibit B is a true and correct copy of Part 563b— Conversions From Mutual to Stock Form, 41 Fed. Reg. 50414-16 (November 16, 1976).

4.      Annexed hereto as Exhibit C is a true and correct copy of excerpts from the Rights Agreement dated July 9, 2007 by and between Spark Network, Inc. and The Bank of New York as Rights Agent, Exhibit 4.1 to Spark Network Inc.'s Form 8-K filed July 9, 2007.

5.      Annexed hereto as Exhibit D is a true and correct copy of excerpts from Washington Trust Bancorp Inc., and American Stock Transfer & Trust Company as Rights Agent Shareholder Rights Agreement dated as of August 17, 2006, Exhibit 4.1 to Washington Trust Bancorp. Inc.'s Form 8-K filed August 17, 2006.

6.      Annexed hereto as Exhibit E is a true and correct copy of excerpts from Senior Executive Employment Agreement, Exhibit 10.28 to IKON Office Solutions, Inc.'s Form S-4 filed April 4, 2008.

7.      Annexed hereto as Exhibit F is a true and correct copy of excerpts from Employment Agreement, Exhibit 10.1 to Virtual Radiologic Corporation's Form 8-K filed April 8, 2008.

8.    Annexed hereto as Exhibit G is a true and correct copy excerpts from Arthur Fleischer, Jr. & Alexander R. Sussman, *Takeover Defense,* Exhibit 43 "Model Definition of Change in Control" (2004).

9.    Annexed hereto as Exhibit H is a true and correct copy of excerpts from Roberta Karmel, *Regulation By Prosecution: The Securities and Exchange Commission vs. Corporate America* 191 (1982).

10.    Annexed hereto as Exhibit I is a true and correct copy of the Brief for Defendants-Appellees Gotham Partners, L.P.; Gotham Partners III, L.P. and Gotham Holdings II, L.L.C., *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613 (2d Cir. 2002) (No. 01-7246).

11.    Annexed hereto as Exhibit J is a true and correct copy of the Brief for Defendants-Appellees Interstate Properties and Steven Roth, *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613 (2d Cir. 2002) (No. 01-7246).


I declare under penalty of perjury that the foregoing is true and correct.  Executed this 2nd day of June, 2008, at New York, New York.

Adam H. Offenhartz

**EXHIBIT A**

# Premerger Notification Practice Manual

## Third Edition

Neil W. Imus, Editor


Section of Antitrust Law

**ABA**
Defending Liberty
Pursuing Justice

**55**   **Applicable provision.**  801.1(c)(1).

**Issue.**  Has an individual who obtains a one-third share in any gain or loss in voting securities held by another person made a potentially reportable acquisition?

**Analysis.**  Because the individual does not have title to, or the power to vote or dispose of, the acquired securities, the individual has no reporting obligation. The PNO's position is that a derivative agreement like this where an individual realizes a gain or loss derived from the gain or loss of the underlying assets (in this case voting securities) that is held by an unrelated person, standing alone, does not confer beneficial ownership on that individual within the meaning of Section 801.1(c)(1). The holder of the derivative in this case has only one indicium of beneficial ownership and will not receive any other indicia of ownership in the voting securities such as the right to vote or dispose of the acquired securities.

**EXHIBIT B**

50414

**RULES AND REGULATIONS**

or section 408(a) of the Internal Revenue Code of 1954, and withdrawal is made to effect distribution of the funds in the account following the participant's death or disability, or upon attaining not less than 59½ years of age.

6. In § 563.3–2, paragraph (d) (3) is revised to read as follows:

§ 563.3–2 Certificates evidencing other accounts.

*    *    *    *    *

(d) *Provisions relating to early withdrawal.* * *

(3) An insured institution need not penalize a withdrawal of all or any portion of a certificate account prior to completion of its time eligibility period if (i) Such withdrawal is made subsequent to the death of any owner of such account; for purposes hereof an "owner" is an individual who at death had full legal and beneficial title to all or a portion of such account, or beneficial title to all or a portion of such account and full power of disposition and alienation with respect thereto, including but not limited to power of revocation with respect to any trust, regardless of whether such owner was a trustee, of which such account comprises all or part of the trust assets; or (ii) Such account qualifies as a retirement account under section 401(d) or section 408(a) of the Internal Revenue Code of 1954, and withdrawal is made to effect distribution of the funds in the account following the participant's death or disability, or upon attaining not less than 59½ years of age.

(Sec. 4, 80 Stat. 823, 12 U.S.C. 1425b; Sec. 5, 48 Stat. 132, as amended, 12 U.S.C.1464; Secs. 402, 403, 407, 48 Stat. 1256, 1257, 1260, as amended, 12 U.S.C. 1725, 1726, 1730; Reorg. Plan No. 3 of 1947, 12 FR 4981; 3 CFR, 1943–48 Comp., p. 1071, 1947 Supp.)

By the Federal Home Loan Bank Board.

RONALD A. SNIDER,
*Assistant Secretary.*

[FR Doc.76–33813 Filed 11–15–76;8:45 am]

SUBCHAPTER D—RULES AND REGULATIONS FOR INSURANCE OF ACCOUNTS

[No. 76–848]

PART 563b—CONVERSIONS FROM MUTUAL TO STOCK FORM

Offers For and The Sale of Securities of Converting Associations

NOVEMBER 10, 1976.

The following summary of the amendment temporarily adopted by this Resolution is provided for the reader's convenience and is subject to the full explanation in the following preamble and to the specific provisions of the regulation.

I. PRESENT SITUATION

Existing conversion regulations prohibit transfer of the subscription rights of eligible account holders. They also prohibit for a period of three years following the conversion the acquisition of converted insured institutions by companies significantly engaged in unrelated businesses.

II. TEMPORARY REGULATION

A. Prohibits exercise of conversion subscription rights pursuant to an agreement or understanding prior to completion of conversion to transfer such rights or the underlying securities to the account of another.

B. Prohibits any offer or announcement of an offer for a converting institution's conversion securities prior to completion of conversion.

C. Prohibits any offer by any person for a converted institution's securities after completion of conversion if the effect is that such person would be the beneficial owner of more than 10 percent of such class of the converted institution's stock, unless such offer receives prior written approval of the Federal Savings and Loan Insurance Corporation. The prohibition remains in effect for a period of 3 years from the date of completion of the conversion.

D. Defines the term "person" as an individual, a group acting in concert, a corporation, a partnership, an association, a joint stock company, a trust, or any unincorporated association or similar company.

E. Excepts from such prohibition offers directly to the association or an underwriter acting on its behalf.

F. Prescribes civil penalties for any violation of the regulation involving persons connected with the association.

G. Prescribes criteria for denial of the prior written approval required by the regulation.

H. Expires on April 30, 1977, unless extended or made permanent. Since the regulation is temporary, public comment is invited as to whether it should be modified, made permanent, or revoked.

III. REASONS FOR TEMPORARY REGULATION

A. To clarify the meaning of existing Board regulations prohibiting transfer of subscription rights.

B. To protect the integrity of the Board's conversion process and lessen the vulnerability of newly converted institutions to attempts to take unfair advantage of the results of conversion.

The Federal Home Loan Bank Board by Resolution No. 74–144, dated February 28, 1974, (39 FR 9142) adopted what are now its basic existing conversion regulations. Such regulations became effective April 8, 1974. In part, those regulations prohibited acquisitions of newly converted institutions for a three-year period by companies significantly engaged in unrelated business activities, based on the finding that such acquisitions were "inconsistent with economical home financing" as the term is used in section 403(c) of the National Housing Act (12 U.S.C. 1726) and that the conversion process continues for a limited period beyond the sale of stock and issuance of the stock charter.

Further, the Board specifically chose not to adopt that part of the proposal on which such regulations were based (39 FR 9146) which would have permitted

conversions involving holding company acquisitions or mergers. In the preamble to the final regulations it explained that there were serious valuation problems which would have a bearing on the fairness of any conversion involving a merger or acquisition. An example of such valuation problems can be seen in the case of *Jones v. H. F. Ahmanson & Co.,* 460 P 2d 464 (1969). Thereafter, the Board by Resolution No. 75–402, dated May 1, 1975, amended the regulations adopted on February 28, 1974, effective June 9, 1975 (40 FR 1980).

The purpose of the May 1, 1975, amendment was to ensure maximum participation by account holders beyond their pro rata subscription entitlement without encouraging concentrated purchases by a few individuals which would tend to have a destabilizing effect on the conversion process. Accordingly, the current regulations are designed to discourage large block subscriptions by containing (1) Provisions which deter such purchases by the use of reasonable restrictions on the total amount of additional shares that can be purchased by an account holder beyond his pro rata entitlement and (2) In the event of oversubscription, a preference for the account holder in the allocation of subscription rights.

In adopting these revisions the Board recognized the cash rich position of newly converted associations. It further recognized that Congress was concerned that conversions might result in windfall profits for a few individuals and that converted associations might be taken over by large conglomerates or financial holding companies, thereby jeopardizing their independence and local character. S. REP. No. 902, 93rd Cong., 2nd Sess. 23 (1974). The Board was then of the opinion that its amendments of May 1, 1975, together with existing prohibitions against holding company acquisitions, were sufficient to address the problems noted above.

Since June 9, 1975, the Board's staff has analyzed over 67 conversion applications, eighteen of which have been approved and ten of which have been completed.

In two of the 18 approved conversions, the Board has found evidence that a few individuals have engaged in transactions during the conversion process which violated the Board's regulations. In one case, nontransferable subscription rights were actually purchased from eligible account holders, or eligible account holders subscribed for conversion stock with an agreement or understanding that they were acting as nominees or agents for ineligible subscribers. In another case, certain individuals announced a tender offer during the subscription offering, indicating such an increase in subscriptions that the offering was thrown into a massive oversubscription in its early stage. The Board, upon discovery of these abuses, promptly suspended both conversion stock offerings. If they had not been suspended, a substantial percentage of the conversion stock would have been ac-

HeinOnline -- 41 Fed. Reg. 50414 1976

quired by noneligible subscribers. In both of these cases there is evidence that some of the individuals involved were connected with the converting associations. Thus, in both cases, individual account holders who did not otherwise wish to make an investment in the converting association were induced to do so. In one case, the inducement was to the detriment of those account holders who otherwise arrived at their decision to subscribe for their own account. The oversubscription and resulting allocation that would have occurred would have reduced substantially the number of conversion shares available to account holders buying for their own accounts. Also, the key factors bearing upon their original decision to subscribe were changed drastically insofar as the disclosures made concerning management, operations, and condition of the association were affected by an entirely new control group with different or at least unknown objectives.

These particular incidents suggest that the current prohibition against transferability of subscription rights in § 563b.3 (c) requires greater emphasis.

The Board is also concerned about purchases without its knowledge of large blocks of conversion stock subsequent to a conversion. The Board is of the opinion that it has a responsibility, consistent with its Congressional mandate to monitor conversions and ensure their fairness, to ensure that such subsequent purchases will not inure to the detriment of the conversion process.

While purchases of large interests in corporations of any kind are not objectionable per se, in many cases outside the savings and loan industry they have given rise to protracted legal actions, disruption of the target company's operations, a drain on its financial resources, and, in some cases, outright looting of its assets. Several years ago these consequences caused the Congress to enact the Williams Act (15 U.S.C. 78n) governing takeover of companies registered with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934 (15 U.S.C. 78). 

The Board is fully aware that savings and loan associations, because they are depositories of the public's monies, warrant even closer supervision and more stringent safeguards than other companies. Until several years ago, the Board required stock escrow of five years for newly insured institutions.

The experience that it has gained during the course of its conversion study causes the Board to conclude that even greater safeguards respecting takeovers of converting associations than are provided under current regulations are required.

The provisions of the temporary regulation hereby adopted as new § 563b.9 are as follows:

Paragraph (a) defines in paragraphs (a) (1) and (2) the terms "offer" and "person." The definitions apply only to § 563b.9 and are somewhat broader than used elsewhere in Part 563b. The term "offer" is defined to include every offer to buy or acquire, solicitation of an offer to sell, tender offer for, or a request or invitation for tenders of, a security or interest in a security for value. This definition is intended to apply to any sale transaction initiated by the purchaser or proposed purchaser. The term "person" is defined broadly to mean an individual, a group acting in concert, a corporation, a partnership, an association, a joint stock company, a trust, any unincorporated organization, or similar company.

Paragraph (b) applies to transfer of subscription rights or the underlying securities during a conversion and clarifies the prohibition already inherent in § 563b.3 of the existing regulations. It prohibits, prior to completion of a conversion, any agreement or understanding of any kind to transfer the legal or beneficial ownership of conversion securities to the account of another. The prohibition is not intended to prohibit any hypothecation of securities validly purchased.

Paragraph (c) prohibits any offer for a converting or converted association's securities prior to completion of the conversion. It also prohibits an announcement of intent to make such an offer, because such an announcement would create an atmosphere calculated to induce the exercise of subscription rights for the account of the offerors. As with paragraph (b), this prohibition is intended to clarify the existing regulatory provisions (§ 563b.3).

Paragraph (d) is new. It prohibits, without prior written approval of the Federal Savings and Loan Insurance Corporation, any offer or announcement of an offer for any equity security of a converted association if the effect of consummation would be that the offeror would hold more than 10 percent of such class of security. The prohibition is applicable for three years from the date of completion of the conversion. The language as to equity security and 10 percent beneficial owner is modeled after language in the Securities Exchange Act (15 U.S.C. 78n) and is intended to have a similar meaning.

Paragraph (e) sets forth an exception to the prohibitions in paragraphs (c) and (d). The exception is intended to allay any concern that the regulation might work to restrict potential purchasers who may purchase directly from the association, its underwriters, or selling group in a public or private placement of its securities.

Paragraph (f) prescribes criteria for denial of an application submitted pursuant to paragraph (d). It states that the Corporation will not approve any offer which (1) Is manipulative or deceptive; (2) Subverts the fairness of the conversion or is likely to result in injury to the association; (3) Is not consistent with economical home financing; or (4) Is otherwise violative of law or regulation. In applying the first of these criteria the Board will consider whether the measure of disclosure proposed to be made by the offerors is comparable with that made for a company registered under Section 12 of the Securities Exchange Act (15 U.S.C. 78l) or whether the offer is manipulative. As to the second criterion, the Board will consider: (1) The basis upon which the conversion securities will be purchased, including the method of valuation of any cash or exchange offer; (2) The effect of the offer upon the value of any stock not tendered insofar as the liquidity of the trading market may be reduced; (3) The effect of any windfall profits to be derived from the offering; and (4) The potential that such offer will result in expropriation of the proceeds of the conversion.

Factors which the Board will weigh in determining injury to the association are the future financial and managerial prospects of the converted association and of the offeror and whether they would be detrimental to the association. The Board is particularly concerned with the vulnerability of converted associations to unreasonable dividend pressures as a result of debt-financed purchases. Further, the Board wishes to assure itself as to the competency and character of any new management. The last criterion is taken from Section 403(c) of the National Housing Act (12 U.S.C. 1726(c)). The Board already has determined that certain acquisitions are inconsistent with economical home financing and has prohibited in § 563b.3 such acquisitions for a period of three years. However, the purpose and objects of any offeror, even though not expressly prohibited in § 563b.3, if inconsistent with Section 403 (c), may result in denial of the application.

Paragraph (g) provides civil penalties for willful violation of the section by persons connected with the management of the converting or converted association. While the Board has not in the past prescribed any civil penalties for violations of its conversion regulations under the authority conferred on it by Congress under Section 402(j) of the National Housing Act (12 U.S.C. 1724 (j)), its recent experience causes it to conclude that the potential harm to a converting association by a violation of the section is so great that such penalties are both necessary and appropriate.

Paragraph (h) provides for expiration of the temporary regulation on April 30, 1977, unless extended or made permanent.

For the protection of associations now in the process of conversion and their account holders, § 563b.9 is being made effective immediately. However, it is adopted on a temporary basis and interested persons are invited to submit written data, views, and arguments to the Office of the Secretary, Federal Home Loan Bank Board, 320 First Street, N.W., Washington, D.C. 20552, by December 17, 1976, as to whether it should be modified, made permanent, or revoked. Written material submitted will be available for public inspection at the above address.

Accordingly, the Board hereby amends said Part 563b by adding thereto a new § 563b.9 to read as set forth below, effective November 16, 1976.

§ 563b.9   Offers for and sale of securities of converted associations.

(a) *Definitions.* (1) For the purpose of this section, the term "offer" includes every offer to buy or acquire, solicitation of an offer to sell, tender offer for, or request or invitation for tenders of, a security or interest in a security for value.

(2) For the purpose of this section, the term "person" means an individual, a group acting in concert, a corporation, a partnership, an association, a joint stock company, a trust, and any unincorporated organization or similar company.

(3) Without limitation on the generality of its meaning, the term "security" includes nontransferable subscription rights issued pursuant to a plan of conversion.

(b) *Prohibited transfers.* Prior to completion of a conversion, no person shall transfer, or enter into any agreement or understanding to transfer, the legal or beneficial ownership of conversion subscription rights, or the underlying securities, to the account of another.

(c) *Prohibition of offers during conversion.* Prior to completion of a conversion, no person shall make any offer, or announcement of an offer or intent to make an offer, for any security of a converting association issued or to be issued in connection with such conversion.

(d) *Prohibition of offers for three years following conversion.* Without prior written approval of the Corporation, no person shall make for a period of three years following the date of completion of a conversion, directly or indirectly, any offer or announcement thereof for any equity security of a converted association if, after consummation of such offer, such person would be the beneficial owner of more than 10 percent of such class of security.

(e) *Offers to the association not prohibited.* The provisions of paragraphs (c) and (d) of this section shall not apply in respect to any offer made exclusively to the association or underwriters or selling group acting on its behalf.

(f) *Criteria for denial.* The Corporation shall not approve an application involving an offer or announcement thereof for any security of a converted association submitted under paragraph (d) of this section if it finds that such offer is manipulative or deceptive, subverts the fairness of the conversion, is likely to result in injury to the association, is not consistent with economical home financing, or is otherwise violative of law or regulation.

(g) *Penalty for willful violations.* For willful violation or assistance of any such violation of any provision of this section, any person who (1) Has any connection with the management of a converting or converted association, including any director, officer, employee, attorney, or agent, or (2) Controls more than ten percent of the outstanding shares of any class of equity security or voting rights thereto of a converting or converted association, shall be subject to a civil

penalty of not more than $500 (which penalty shall be cumulative to any other remedies) for each day that such violation continues, which penalty the Corporation may recover by suit or otherwise for its own use. The Corporation in its discretion may, at any time before collection of such penalty (whether before or after the bringing of any action or other legal proceedings, the obtaining of any judgment or other recovery, or the issuance or levy of any execution or other legal process thereof), compromise or remit in whole or in part any such penalty.

(h) *Expiration date.* Unless extended or made permanent by the Corporation, the provisions of this section shall expire on April 30, 1977.

(Sec. 105, Pub. L. 93-495, October 28, 1974; Secs 402, 403, 407, 48 Stat. 1256, 1257, 1260, as amended; 12 U.S.C. 1725, 1726, 1730; Sec. 5, 48 Stat. 132, as amended; 12 U.S.C. 1464, Reorg. Plan No. 3 of 1947, 12 FR 4981, 3 CFR, 1943-48 Comp., p. 1071)

By the Federal Home Loan Bank Board.

RONALD A. SNIDER,
*Assistant Secretary.*

[FR Doc.76-33814 Filed 11-15-76;8:45 am]

Title 16—Commercial Practices
CHAPTER I—FEDERAL TRADE COMMISSION

[Docket No. 9030]

PART 13—PROHIBITED TRADE PRACTICES, AND AFFIRMATIVE CORRECTIVE ACTIONS

Kaufman Carpet Co., Inc., et al.

Subpart—Corrective actions and/or requirements: § 13.533 Corrective actions and/or requirements: 13.533-45 Maintain records; 13.533-45(k) Records, in general. Subpart—Furnishing means and instrumentalities of misrepresentation or deception: § 13.1055 Furnishing means and instrumentalities of misrepresentation or deception. Subpart—Misrepresenting oneself and goods—Goods. § 13.1740 Scientific or other relevant facts; § 13.1762 Tests, purported. Subpart—Neglecting, unfairly or deceptively, to make material disclosure: § 13.1895 Scientific or other relevant facts.

(Sec. 6, 38 Stat. 721; 15 U.S.C. 46. Interprets or applies sec. 5, 38 Stat. 719, as amended; 15 U.S.C. 45.)

*In the Matter of Kaufman Carpet Co., Inc., a corporation, Henry Intrator, individually and as an officer of said corporation, Irving L. Merner and Benjamin Wiener, individually and as co-partners trading and doing business as The Durotone Company, and Alvin Myman, individually, and trading and doing business as A & M Carpet Service Co.*

Consent order requiring A & M Carpet Service, Inc., an East Rockaway, N.Y., carpet testing firm, among other things to cease furnishing false or misleading carpet testing results and/or reports; and changing, altering, or excluding pertinent particulars in their test reports.

The order to cease and desist, including further order requiring report of compliance therewith, is as follows: [1]

ORDER

It is ordered, That respondents A & M Carpet Service, Inc., and A & M Carpet Service of Maryland, Ltd., corporations, and Alvin Myman, individually and as an officer of each of said corporations, their successors and assigns, and respondents' officers, agents, representatives and employees directly or through any corporation, subsidiary, division or other device, in connection with the inspection and servicing of carpeting and floor covering, or any other product, in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, do forthwith cease and desist from:

1. Furnishing any reports or test results which purport that any product examined, analyzed or tested has no manufacturing defects, unless such reports clearly and accurately state the test results and unless the tests themselves are so devised and conducted as to constitute a reasonable basis for the stated results or conclusions.

2. Changing, altering or amending, in any manner, the contents of and conclusions contained in any report prepared by respondents as a result of a carpeting inspection or test. However, if a report prepared by respondents is subsequently found to contain errors, respondents may issue a clarifying report where: (1) The original report is specifically identified and referred to; (2) The correction is specifically set forth; and (3) The basis for the correction is fully explained in said corrected report.

3. Failing to include in any report prepared by respondents as a result of a carpeting inspection or test, all defects and conditions found to exist with respect to purchaser complaints which respondents were requested to investigate.

It is further ordered, That respondents distribute a copy of this Order to all operating divisions of said corporation, partnership or other entity, and also distribute a copy of this Order to all personnel, agents or representatives concerned with the promotion, sale and distribution of carpeting and floor covering or with the inspection and servicing of carpeting and floor covering and secure from each such person a signed statement acknowledging receipt of said order

It is further ordered, That respondents notify the Commission at least 30 days prior to any proposed change in the corporate respondents such as dissolution, assignment or sale resulting in the emergence of successor corporations, the creation or dissolution of subsidiaries or any other change in the corporations which may affect compliance obligations arising out of the order.

It is further ordered, That the individual respondent named herein promptly

Copies of the Complaint, Decision and Order filed with the original document.

**EXHIBIT C**

EX-4.1 5 dex41.htm RIGHTS PLAN DATED JULY 9, 2007 BETWEEN SPARK NETWORKS, INC. AND THE BANK OF NY.

EXHIBIT 4.1

RIGHTS AGREEMENT

July 9, 2007

by and between

SPARK NETWORKS, INC.

and

THE BANK OF NEW YORK

as Rights Agent

# RIGHTS AGREEMENT

This Rights Agreement (the "Agreement") is made and entered into as of July 9, 2007 by and between SPARK NETWORKS, INC. , a Delaware corporation (the "Company"), and The Bank of New York, a banking corporation organized under the laws of the State of New York, as rights agent (the "Rights Agent").

WHEREAS, the Board of Directors of the Company has authorized and declared a dividend of one preferred share purchase right (a "Right") for each Common Share (as hereinafter defined) of the Company outstanding on July 9, 2007 (the "Record Date"), each Right representing the right to purchase one one-hundredth of a Preferred Share (as hereinafter defined), upon the terms and subject to the conditions set forth herein, and has further authorized and directed the issuance of one Right with respect to each Common Share that shall become outstanding between the Record Date and the earliest of the Distribution Date, the Redemption Date or the Expiration Date (as such terms are hereinafter defined).

NOW, THEREFORE, in consideration of the premises and the mutual agreements set forth herein, the parties hereto hereby agree as follows:

Section 1. Certain Definitions.

For purposes of this Agreement, the following terms have the meanings indicated:

"Affiliate" and "Associate" shall have the respective meanings ascribed to such terms in Rule 12b-2 promulgated under the Exchange Act, as in effect on the date hereof.

A Person shall be deemed the "Beneficial Owner" of and shall be deemed to "Beneficially Own" any securities:

(i) that such Person or any of such Person's Affiliates or Associates beneficially owns, directly or indirectly, for purposes of Section 13(d) of the Exchange Act and Rule 13d-3 promulgated under the Exchange Act, in each case as in effect on the date hereof;

(ii) that such Person or any of such Person's Affiliates or Associates has the right to acquire (whether such right is exercisable immediately, or only after the passage of time, compliance with regulatory requirements, the fulfillment of a condition or otherwise) pursuant to any agreement, arrangement or understanding, or upon the exercise of conversion rights, exchange rights (other than these Rights), rights, warrants or options, or otherwise, *provided, however,* that a Person shall not be deemed the Beneficial Owner of, or to Beneficially Own, securities tendered pursuant to a tender offer or exchange offer made by or on behalf of such Person or any of such Person's Affiliates or Associates until such tendered securities are accepted for purchase or exchange;

(iii) that such Person or any such Person's Affiliates or Associates has the right to vote, whether alone or in concert with others, pursuant to any agreement, arrangement or understanding, *provided, however,* that a Person shall not be deemed the Beneficial

Owner of, or to Beneficially Own, any security if the agreement, arrangement or understanding to vote such security (A) arises solely from a revocable proxy given to such Person or any of such Person's Affiliates or Associates in response to a public proxy solicitation made pursuant to and in accordance with the applicable rules and regulations promulgated under the Exchange Act, and (B) is not also then reportable on Schedule 13D under the Exchange Act (or any comparable or successor report);

(iv) that are Beneficially Owned, directly or indirectly, by any other Person with which such Person or any of such Person's Affiliates or Associates has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting (other than voting pursuant to a revocable proxy as described in the proviso to clause (iii) of this definition of "Beneficial Owner") or disposing of any securities of the Company; and

(v) that, on any day on or after the Distribution Date, evidence Rights that prior to such date were represented by certificates for Common Shares that such Person Beneficially Owns on such day.

Notwithstanding anything to the contrary in this Section l(b), a Person engaged in business as an underwriter of securities shall not be deemed to be the Beneficial Owner of, or to Beneficially Own, any securities acquired through such Person's participation in good faith in a firm commitment underwriting until the expiration of 40 days after the date of such acquisition.

"Business Day" shall mean any day other than a Saturday, a Sunday or a day on which banking institutions in the State of New York are authorized or obligated by law or executive order to close.

"Certificate of Designations" shall mean the certificate of designations specifying the powers, designations, preferences and rights of the Preferred Shares in accordance with the Delaware General Corporation Law.

"Close of Business" on any given date shall mean 5:00 p.m., New York time, on such date; *provided, however*, that if such date is not a Business Day, it shall mean 5:00 p.m., New York time, on the next succeeding Business Day.

"Closing Price" of a stock or other security on any day shall be the last sale price, regular way, per share of such stock or unit of such other security on such day or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way, in either case as reported in the principal consolidated transaction reporting system with respect to securities listed or admitted to trading on the principal national securities exchange on which such stock or other security is listed or admitted to trading or, if such stock or other security is not listed or admitted to trading on any national securities exchange, the last quoted price or, if not so quoted, the average of the high bid and low asked prices in the over-the-counter market, or, if on any such date such stock or other security is not quoted by any such organization, the average of the closing bid and asked prices as furnished by a professional market maker that makes a market in such stock or other security and that is selected by the Board of Directors of the Company.

<div align="center">2</div>

**EXHIBIT D**

EX-4 2 exhibit4.htm EXHIBIT 4 TO FORM 8-K DATED 8/17/2006
**EXHIBIT 4.1**

**WASHINGTON TRUST BANCORP, INC.**

and

**AMERICAN STOCK TRANSFER & TRUST COMPANY**

as Rights Agent

**SHAREHOLDER RIGHTS AGREEMENT**

Dated as of AUGUST 17, 2006

(b)  "Adjustment Shares" shall have the meaning set forth in Section 11(a)(ii) hereof.

(c)  "Affiliate" and "Associate" shall have the respective meanings ascribed to such terms in Rule 12b-2 of the General Rules and Regulations (the "Rules") under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as in effect on the date of this Agreement; provided, however, that no Person who is a director or officer of the Company shall be deemed an Affiliate or an Associate of any other director or officer of the Company solely as a result of his or her position as director or officer of the Company.

(d)  A Person shall be deemed the "Beneficial Owner" of, and shall be deemed to "Beneficially Own" and have "Beneficial Ownership" of, any securities:

(i)  which such Person or any of such Person's Affiliates or Associates, directly or indirectly, Beneficially Owns (as determined pursuant to Rule 13d-3 of the Rules under the Exchange Act, as in effect on the date of this Agreement);

(ii)  which such Person or any of such Person's Affiliates or Associates, directly or indirectly, has:

(A)  the right to acquire (whether or not such right is exercisable immediately or only after the passage of time or upon the satisfaction of any conditions or both) pursuant to any agreement, arrangement or understanding (whether or not in writing) (other than customary agreements with and between underwriters and selling group members with respect to a bona fide public offering of securities) or upon the exercise of conversion rights, exchange rights, rights (other than the Rights), warrants or options, or otherwise; provided, however, that a Person shall not be deemed the "Beneficial Owner" of, or to "Beneficially Own" or have "Beneficial Ownership" of, (1) securities tendered pursuant to a tender or exchange offer made by or on behalf of such Person or any of such Person's Affiliates or Associates until such tendered securities are accepted for purchase or exchange; (2) securities issuable upon exercise of Rights at any time prior to the occurrence of a Triggering Event; or (3) securities issuable upon exercise of Rights from and after the occurrence of a Triggering Event, which Rights were acquired by such Person or any of such Person's Affiliates or Associates prior to the Distribution Date or pursuant to Sections 3(a), 11(i) or 22 hereof; or

(B)  the right to vote pursuant to any agreement, arrangement or understanding (whether or not in writing); provided, however, that a Person shall not be deemed the "Beneficial Owner" of, or to "Beneficially Own" or have "Beneficial Ownership" of, any security under this clause (B) if the agreement, arrangement or understanding to vote such security (1) arises solely from a revocable proxy or consent given in response to a public proxy or consent solicitation made pursuant to a written proxy or consent solicitation statement filed with the Securities and Exchange Commission in accordance with the Rules of the Exchange Act, and (2) is not also then reportable by such person on

3

Schedule 13D under the Exchange Act (or any comparable or successor report); or

(C)     the right to dispose of pursuant to any agreement, arrangement or understanding (whether or not in writing) (other than customary agreements with and between underwriters and selling group members with respect to a bona fide public offering of securities); or

(iii)     which are Beneficially Owned, directly or indirectly, by any other Person (or any Affiliate or Associate thereof) with which such Person or any of such Person's Affiliates or Associates has any agreement, arrangement or understanding (whether or not in writing) (other than customary agreements with and between underwriters and selling group members with respect to a bona fide public offering of securities) for the purpose of acquiring, holding, voting (except pursuant to a revocable proxy or consent as described in clause (B) of Section 1(d) (ii) hereof) or disposing of any securities of the Company;

provided, however, that (1) no Person engaged in business as an underwriter of securities shall be deemed the Beneficial Owner of any securities acquired through such Person's participation as an underwriter in good faith in a firm commitment underwriting until the expiration of forty (40) days after the date of such acquisition, and (2) no Person who is a director or an officer of the Company shall be deemed, as a result of his or her position as director or officer of the Company, the Beneficial Owner of any securities of the Company that are Beneficially Owned by any other director or officer of the Company.

For all purposes of this Agreement, the phrase "then outstanding," when used with reference to the percentage of the then outstanding securities Beneficially Owned by a Person, shall mean the number of securities then issued and outstanding together with the number of such securities not then actually issued and outstanding which such Person would be deemed to Beneficially Own hereunder.

(e)     "Business Day" shall mean any day other than a Saturday, Sunday, or a day on which banking institutions in the State of Rhode Island and Providence Plantations are authorized or obligated by law or executive order to close.

(f)     "Certificate of Incorporation" when used in reference to the Company shall mean the Restated Articles of Incorporation, as may be amended from time to time, of the Company.

(g)     "Close of Business" on any given date shall mean 5:00 p.m., Providence, Rhode Island time, on such date; provided, however, that if such date is not a Business Day it shall mean 5:00 p.m., Providence, Rhode Island time, on the next succeeding Business Day.

(h)     "Common Stock" when used in reference to the Company shall mean the common stock, par value $.0625 per share, of the Company or any other shares of capital stock of the Company into which such stock shall be reclassified or changed. "Common Stock" when used with reference to any Person other than the Company organized in corporate form shall mean (i) the capital stock or other equity interest of such Person with the greatest voting power,

4

# EXHIBIT E

Exhibit 10.28

## SENIOR EXECUTIVE EMPLOYMENT AGREEMENT
### (FOR LEVEL 1 EXECUTIVES)

AGREEMENT, made and entered into as of the 1st day of February 2008 by and between IKON Office Solutions, Inc., an Ohio corporation with its principal office located at 70 Valley Stream Parkway, Malvern, Pennsylvania 19355 (together with its successors and assigns permitted under this Agreement, the "**Company**") and Jeffrey Hickling, who currently resides at 40 Abbey Rd, Easton, CT 06612-1075 (the "**Executive**");

### W I T N E S S E T H:

WHEREAS, the Company desires to employ the Executive and to enter into an agreement embodying the terms of such employment;

WHEREAS, the Executive desires to accept such employment with the Company, subject to the terms and provisions of this Employment Agreement;

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein and for other good and valuable consideration, the receipt of which is mutually acknowledged, the Company and the Executive (together, the "**Parties**") agree as follows:

1. **Definitions.**

(A) "**Affiliate**" of a Person shall mean a Person who directly or indirectly controls, is controlled by, or is under common control with, the Person specified.

(B) "**Agreement**" shall mean this Employment Agreement, which includes for all purposes its Exhibits hereto.

(C) "**Base Salary**" shall mean the salary provided for in Section 4 or any increased salary granted to the Executive pursuant to Section 4.

(D) "**Board**" shall mean the Board of Directors of the Company.

(E) "**Cause**" shall mean:

(1) Executive fails to comply with any material written Company policy, as the same may from time to time be adopted and/or modified by the Company, including, but not limited to, the Company's Code of Ethics;

(2) Executive breaches his/her material obligations under the terms of this Agreement; or

(3) the Executive has committed an act of dishonesty, moral turpitude or theft against the Company or has breached his/her duties of loyalty to the Company.

1

(F) **"Change in Control"** shall mean the occurrence of any of the following events:

(1) Any "person" (as such term is used in sections 13(d) and 14(d) of the Exchange Act) becomes a "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of IKON representing more than 35% of the voting power of the then outstanding securities of IKON; provided that a Change in Control shall not be deemed to occur as a result of a transaction in which IKON becomes a subsidiary of another corporation and in which the shareholders of IKON, immediately prior to the transaction, will beneficially own, immediately after the transaction, shares entitling such shareholders to more than 65% of all votes to which all shareholders of the parent corporation would be entitled in the election of directors (without consideration of the rights of any class of stock to elect directors by a separate class vote);

(2) The consummation of (A) a merger or consolidation of IKON with another corporation where the shareholders of IKON, immediately prior to the merger or consolidation, will not beneficially own, immediately after the merger or consolidation, shares entitling such shareholders to more than 50% of all votes to which all shareholders of the surviving corporation would be entitled in the election of directors (without consideration of the rights of any class of stock to elect directors by a separate class vote), or (B) a sale or other disposition of all or substantially all of the assets of IKON;

(3) During any twelve month period after the Effective Date, individuals who at the beginning of such period constituted the Board cease for any reason to constitute a majority thereof, unless the election, or the nomination for election by IKON's shareholders, of at least a majority of the directors who were not directors at the beginning of such period, was approved by a vote of at least two-thirds of the directors then in office at the time of such election or nomination who either (i) were directors at the beginning of such period or (ii) whose appointment, election or nomination for election was previously so approved;

(G) **"Claim"** shall mean any claim, demand, request, investigation, dispute, controversy, threat, discovery request, or request for testimony or information.

(H) **"Committee"** shall mean the Human Resources Committee of the Board;

(I) **"Common Stock"** shall mean common stock of the Company.

(J) **"Constructive Termination Without Cause"** shall mean a termination by the Executive of his/her employment hereunder on 30 days' written notice given by him/her to the Company following the occurrence, without his/her prior written consent, of any of the following events, unless the Company shall have fully cured all grounds for such termination within 15 days after the Executive gives notice thereof:

2

**EXHIBIT F**

EX-10.1 2 a08-10346_1ex10d1.htm EX-10.1

**Exhibit 10.1**

<div align="center">

**EMPLOYMENT AGREEMENT**

</div>

EMPLOYMENT AGREEMENT (this "Agreement") dated effective as of April 14, 2008 (the "Effective Date"), between Virtual Radiologic Corporation, a Delaware corporation (the "Company"), and Leonard Purkis ("Executive").

<div align="center">

W I T N E S S E T H

</div>

WHEREAS, the Company desires to employ Executive in the capacities of Chief Financial Officer of the Company;

WHEREAS, the Company and Executive desire to enter into the Agreement as to the terms of his employment by the Company;

NOW THEREFORE, in consideration of the foregoing, of the mutual promises contained herein and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.     Position/Duties.

(a)     During the Employment Term (as defined in Section 2 below), Executive shall serve as the Chief Financial Officer of the Company.  In this capacity Executive shall have such duties, authorities and responsibilities commensurate with the duties, authorities and responsibilities of persons in similar capacities in similarly sized companies and such other duties and responsibilities as the Chief Executive Officer shall designate that are consistent with Executive's position as Chief Financial Officer of the Company.  Executive shall report to the Chief Executive Officer.

(b)     During the Employment Term, Executive shall devote substantially all of his business time (excluding periods of vacation and other approved leaves of absence) to the performance of his duties with the Company; provided the foregoing shall not prevent Executive from (i) participating in charitable, civic, educational, professional, community or industry affairs or, with prior written approval of the Board of Directors of the Company (the 'Board"), serving on the board of directors or advisory boards of other companies; and (ii) managing his and his family's' personal investments so long as such activities do not materially interfere with the performance of his duties hereunder or create a potential business conflict or the appearance thereof.  If at any time service on any board of directors or advisory board would, in the good faith judgment of the Board, conflict with Executive's' fiduciary duty to the Company or create any appearance thereof, Executive shall promptly resign from such other board of directors or advisory board after notice of the conflict is received from the Board.

(c)     Executive further agrees to serve without additional compensation as an officer and director of any of the Company's subsidiaries or affiliates, as the same may exist from time to time, and agrees that any amounts received from any such subsidiary or affiliate may be offset against the amounts due hereunder.  In addition, it is agreed that the Company may assign Executive to one of its subsidiaries or affiliates for payroll purposes providing this does not change the Executive's role as the Chief Financial Officer of the Company.

2.     Employment Term.

Executive's term of employment under this Agreement (such term of employment, as it may be extended or terminated, is herein referred to as the "Employment Term") shall be for a term commencing on the Effective Date and, unless terminated earlier as provided in Section 7 hereof, ending on the third anniversary of the Effective Date (the "Original Employment Term"); provided that the Employment Term shall be automatically extended, subject to earlier termination as provided in Section 7 hereof, for successive additional one (1) year periods (the "Additional Terms"), unless, at least 30 days prior to the end of the Original Employment Term or the then Additional Term, the Company or Executive has notified the other in writing that the Employment Term shall terminate at the end of the then current term.

3.     Base Salary.

The Company agrees to pay Executive a base salary (the "Base Salary") at an annual rate of Three Hundred Thousand Dollars ($300,000), payable in accordance with the regular payroll practices of the Company, but not less frequently than monthly.  Executive's Base Salary shall be fixed for the Original Employment Term, and thereafter in any Additional Term shall be determined by the Board or the Compensation Committee thereof ("Committee") and may be increased, but not decreased, from time to time by the Committee.  The base salary as determined herein from time to time shall constitute "Base Salary" for purposes of this Agreement.

4.     Incentive Bonus.

During the Employment Term, Executive shall be eligible to participate in the Company's bonus and other incentive compensation plans and programs for the Company's senior executives at a level commensurate with his position.  Executive shall have the opportunity to earn an annual target bonus (the "Annual Bonus") to be determined by and measured against objective financial criteria to be determined by the Committee of up to 50% of Base Salary or such greater percentage as may be provided in an annual bonus plan approved by the Committee, upon the Company's

achievement of financial and operating metrics to be annually determined by the Committee, and upon recommendation of the Chief Executive Officer, and prorated for any partial period for which such bonuses are calculated during 2008.   Such annual incentive bonuses are payable to the Executive no later than 60 days following the close of the fiscal year.

     5.    <u>Equity Incentives</u>.

        (a)    <u>Initial Option Award</u>.  The Board or any committee of the Board (the "Committee") appointed to administer the Company's Equity Incentive Plan, as may be amended from time to time (the "Stock Plan") shall award Executive on the Effective Date, options to purchase one hundred sixty thousand (160,000) shares of the Company's common stock, $0.001 par value per share, having an exercise price equal to the fair market value of one share of the Company's common stock as reported by NASDAQ closing quote on the Effective Date, which options shall be subject to certain restrictions (the "Initial Options Award").  The Initial Options

Award shall vest in four (4) equal and successive increments of forty thousand (40,000) shares on the first, second, third and fourth anniversaries of the Effective Date, provided that Executive is employed on each vesting date.  The Initial Options Award shall be granted pursuant to and shall be subject to all of the terms and conditions imposed upon such awards granted under the Stock Plan and shall be evidenced by an Incentive Stock Option Agreement in the form approved by the Board or Committee.

        (b)    <u>Discretionary Grants</u>.  In addition to the Initial Options Award contemplated under this Section 5, at the sole discretion of the Board or the Committee, Executive shall be eligible for grants of stock options and other equity awards of a level commensurate with his position and similar to other Executives of the Company.

        (c)    Notwithstanding any other provision, in the event of a change in control, all equity awards (including, but not limited to, any options or stock grants made subsequent to the date of this Agreement) shall fully vest and be immediately exercisable.   For purposes of this Agreement a change in control shall occur upon (i) any "person" (as such term is used in Sections 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act")) first becoming after the Effective Date (a) a "beneficial owner" (as defined in Rule 13(d) under the Exchange Act), directly or indirectly, of securities of the Corporation representing 50% or more of the combined voting power of the Corporation's then outstanding securities or (b) able to elect a majority of the Company's Board of Directors (excepting in each case a person or group owned by or affiliated with Generation Partners L.P.), or (ii) the sale of all or substantially all of the assets of the Company.

     6.    <u>Employee Benefits</u>.

        (a)    <u>Benefit Plans</u>.  Executive shall be entitled to participate in all employee benefit plans of the Company including, but not limited to, equity, pension, thrift, profit sharing, medical coverage, education, or other retirement or welfare benefits that the Company has adopted or may adopt, maintain or contribute to for the benefit of its senior executives at a level commensurate with his position, subject to satisfying any applicable eligibility requirements.

        (b)    <u>Paid Time Off</u>.  Executive shall be entitled to paid time off in accordance with the Company's policies applicable to its senior executives, but in no event less than twenty days (as prorated for partial years), which paid time off may be taken at such times as Executive elects with due regard to the needs of the Company.

        (c)    <u>Perquisites</u>.  The Company shall provide to Executive all perquisites which other senior executives of the Company are generally entitled to receive.

        (d)    <u>Business and Entertainment Expenses</u>.  Upon presentation of appropriate documentation, Executive shall be reimbursed in accordance with the Company's expense reimbursement policy for all reasonable and necessary business and entertainment expenses incurred in connection with the performance of his duties hereunder.

     7.    <u>Termination</u>.

        Executive's employment and the Employment Term shall terminate on the first of the following to occur:

        (a)    <u>Disability</u>.  Upon written notice by the Company to Executive of termination due to Disability.  For purposes of this Agreement, "Disability" shall be defined as the inability of Executive to have performed his material duties hereunder due to a physical or mental injury, infirmity or incapacity for 180 days (including weekends and holidays) in any 365-day period, with or without reasonable accommodations as defined (and if required) by applicable state and federal disability laws.  The existence or nonexistence of a Disability shall be determined by an independent physician selected by the Company and reasonably acceptable to Executive.

        (b)    <u>Death</u>.  Automatically on the date of death of Executive.

        (c)    <u>Cause</u>.  Immediately upon written notice by the Company to Executive of a termination for Cause.  "Cause" shall mean:

**EXHIBIT G**



<div align="center">

**Aspen Publishers**
**Takeover Defense**
**Arthur Fleischer, Jr. and Alexander R. Sussman**

Copyright © 2004 Aspen Publishers, Inc., a Wolters Kluwer business

Current through 2004
**Exhibits**
</div>

**\*EX-467** EXHIBIT 43 Model Definition of Change in Control

A "Change in Control" shall mean the occurrence during the term of the [Plan/Agreement], of any one of the following events:

(a) An acquisition (other than directly from the Company) of any common stock, par value $ ___ per share, of the Company ("Common Stock") or other voting securities of the Company by any "Person" (as the term person is used for purposes of Section **13(d)** or 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), immediately after which such Person has **"Beneficial Ownership"** (within the meaning of Rule **13d-3** promulgated under the Exchange Act) of [thirty] percent ([30]%) or more of either (i) the then outstanding Common Stock or (ii) the combined voting power of the Company's then outstanding voting securities entitled to vote for the election of directors (the "Voting Securities"); *provided, however,* in determining whether a Change in Control has occurred, Common Stock or Voting Securities which are acquired in a "Non-Control Acquisition" (as hereinafter defined) shall not constitute an acquisition which would cause a Change in Control. A "Non-Control Acquisition" shall mean an acquisition by (i) an employee benefit plan (or a trust forming a part thereof) maintained by (A) the Company or (B) any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned, directly or indirectly, by the Company (for purposes of this definition, a "Related Entity"), (ii) the Company or any Related Entity, or (iii) any Person in connection with a "Non-Control Transaction" (as hereinafter defined);

(b) The individuals who, as of [date of Plan/Agreement] are members of the Board (the "Incumbent Board"), cease for any reason to constitute at least a [two-thirds / a majority] of the members of the Board; *provided, however,* that if the election, or nomination for election by the Company's common stockholders, of any new director was approved by a vote of at least two-thirds of the Incumbent Board, such new director shall, for purposes of this [Plan/Agreement], be considered as a member of the Incumbent Board; *provided, further, however,* that no individual shall be considered a member of the Incumbent Board if such individual initially assumed office as a result of either an actual or threatened "Election Contest" (as described in Rule 14a-11 promulgated under the Exchange Act) or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board (a "Proxy Contest"), including by reason of any agreement intended to avoid or settle any Election Contest or Proxy Contest; or

(c) The consummation of:
(i) A merger, consolidation or reorganization with or into the Company or in which securities of the Company are issued (a "Merger"), unless the Merger is a "Non-Control Transaction." A "Non-Control Transaction" shall mean a Merger if:
(A) [(*Alternative 1*) the stockholders of the Company immediately before such Merger are not required, in accordance with Delaware General Corporate Law or under the rules of the New York Stock Exchange, to vote on the approval of the Merger or the issuance of securities in connection with the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Merger;] **OR**

[(*Alternative 2*) the stockholders of the Company immediately before such Merger own directly or indirectly immediately following the Merger at least [fifty] percent ([50]%) of the outstanding common stock and the combined voting power of the outstanding voting securities of (x) the corporation *EX-468 resulting from such Merger (the "Surviving Corporation"), if fifty percent (50%) or more of the combined voting power of the then outstanding voting securities of the Surviving Corporation is not Beneficially Owned, directly or indirectly by another corporation (a "Parent Corporation"), or (y) the Parent Corporation, if fifty percent (50%) or more of the combined voting power of the Surviving Corporation's then outstanding voting securities is Beneficially Owned, directly or indirectly, by a Parent Corporation;]

(B) the individuals who were members of the Incumbent Board immediately prior to the execution of the agreement providing for the Merger, constitute at least [two-thirds / a majority] of the members of the board of directors of (x) the Surviving Corporation, if fifty percent (50%) or more of the combined voting power of the then outstanding voting securities of the Surviving Corporation is not Beneficially Owned, directly or indirectly by a Parent Corporation, or (y) the Parent Corporation, if fifty percent (50%) or more of the combined voting power of the Surviving Corporation's then outstanding voting securities is Beneficially Owned, directly or indirectly, by a Parent Corporation; and

(C) no Person other than (1) the Company or another corporation that is a party to the agreement of Merger, (2) any Related Entity, or (3) any employee benefit plan (or any trust forming a part thereof) that, immediately prior to the Merger, was maintained by the Company or any Related Entity, or (4) any Person who, immediately prior to the Merger had Beneficial Ownership of [thirty] percent ([30]%) or more of the then outstanding Common Stock or Voting Securities, has Beneficial Ownership, directly or indirectly, of [thirty] percent ([30]%) or more of the combined voting power of the outstanding voting securities or common stock of (x) the Surviving Corporation, if fifty percent (50%) or more of the combined voting power of the then outstanding voting securities of the Surviving Corporation is not Beneficially Owned, directly or indirectly by a Parent Corporation, or (y) the Parent Corporation, if fifty percent (50%) or more of the combined voting power of the Surviving Corporation's then outstanding voting securities is Beneficially Owned, directly or indirectly, by a Parent Corporation; [*provided, however,* that any Person described in clause (4) of this subsection (C) may not, immediately following the Merger, Beneficially Own more than [ ] ([ ]%) of the combined voting power of the outstanding voting securities of the Surviving Corporation or the Parent Corporation, as applicable, for the Merger to constitute a Non-Control Transaction].

(ii) A complete liquidation or dissolution of the Company; or

(iii) The sale or other disposition of all or substantially all of the assets of the Company to any Person (other than a transfer to a Related Entity or under conditions that would constitute a Non-Control Transaction with the disposition of assets being regarded as a Merger for this purpose) or the distribution to the Company's stockholders of the stock of a Related Entity or any other assets).

Notwithstanding the foregoing, a Change in Control shall not be deemed to occur solely because any Person (the "Subject Person") acquired Beneficial Ownership of more than the permitted amount of the then outstanding Common Stock or Voting Securities as a result of the acquisition of Common Stock or Voting Securities by the Company which, by reducing *EX-469 the number of Common Stock or Voting Securities then outstanding, increases the proportional number of shares Beneficially Owned by the Subject Persons, provided that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of Common Stock or Voting Securities by the Company, and after such share acquisition by the Company, the Subject Person becomes the Beneficial Owner of any additional Common Stock or Voting Securities which increases the percentage of the then outstanding Common Stock or Voting Securities Beneficially Owned by the Subject Person, then a Change in Control shall occur.

A2065-E.43A

**\*EX-470EXHIBIT 43A Memorandum: Modifications to Change in Control Definition (September 24, 2001)**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**ARTHUR FLEISCHER, JR., LARAINE ROTHENBERG, PHILIP RICHTER AND LAURICE PEARSON
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON**

   This memorandum summarizes certain possible alternatives to the Fried Frank model Change in Control definition as contained in the Fried Frank form of Omnibus Plan (the "Omnibus Change in Control definition" or "Omnibus definition") (attached as Attachment 1), as well as making certain technical changes. The memorandum also outlines policy related matters that should be considered and discussed with clients when considering the content of a Change in Control provision. The revised model definition (the "Revised Change in Control definition" or "Revised definition") is attached as Attachment 2. A blackline comparing the Omnibus and Revised definitions is attached as Attachment 3.

1. Acquisitions directly from the Company (Omnibus definition clause 1(a); Revised definition clause 1(a)).

   The Omnibus definition excludes from those events triggering a Change in Control an acquisition of stock directly from the Company, even though that acquisition could have the effect of increasing a Person's stock ownership above a permitted threshold. This exclusion is designed to give companies flexibility to issue stock in board approved transactions. However, in current practice in the employee benefits area, the distinction between friendly -- or board approved -- and initially hostile acquisitions has eroded. Generally, boards of directors recognize that "key employees" merit protection in any acquisition context where the target board loses control. In most cases, the existence of a second trigger will ensure that the transaction itself will not trigger the acceleration of benefits, the most common exception being the vesting of equity-based compensation which generally occurs immediately upon a Change in Control. The employee protection issues in the context of an acquisition are also present in the context of stock issuances by the Company. An issuance of stock that results in ownership by a third party above a permitted threshold could place control in the hands of that third party, unless the stock issuance is accompanied by a stand-still precluding the third-party from exercising control. Accordingly, the Company -- and its board -- should determine whether to exclude stock issuances from the definition (and, if so, under what circumstances) or include stock issuances, which provides additional protection for employees at the cost of director flexibility.

   Clause 1(a) of the Revised definition has been drafted to reflect that any event (other than a Non-Control Transaction) that causes a Person's ownership (other than that of the Company, benefit plans, and other related entities) to exceed the permitted percentage threshold will constitute a Change in Control. If the Company wants to exclude stock issuances generally, the Omnibus definition should be utilized.

2. Increases in Ownership Resulting from Repurchases of Stock by the Company (Omnibus definition penultimate paragraph; Revised definition clause 1(a)).

   In the Omnibus definition, an increase in ownership by reason of the repurchase of stock by the Company is excluded from the events triggering a Change in Control. The theories *EX-470.1 behind this exclusion are that the increase in ownership would not be an affirmative act of a third party and that the board of the target would have voluntarily, and knowingly, created the increase. However, stock repurchases essentially present the same issues and considerations as stock issuances -- namely, board flexibility versus employee protection.

   The Revised definition would treat an increase in ownership above the threshold percentage that results from repurchases of stock by the Company as a triggering event. The contrary conclusion would obtain under the Omnibus definition.

3. Change in Control triggered by Change in Board Composition (Omnibus definition clause 1(b); Revised definition clause 1(b)).

   Under the Omnibus definition, a new board member who assumes office as the result of an election contest under Rule 14a-11 or an actual or threatened solicitation of proxies or consent would not be considered a member of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the Incumbent Board. Because Rule 14a-11 is no longer in effect, the specific reference to Rule 14a-11 has been deleted. The general reference to an actual or threatened solicitation of proxies or consents remains and the deletion of the reference to Rule 14a-11 does not change the effect of the provision.

4. Transactions Constituting a "Merger" (Omnibus definition clause 1(c); Revised definition 1(c)).

The Revised definition explicitly covers a merger, etc. with or into a direct or indirect subsidiary of the Company (subject to exceptions embodied in the definition of "Non-Control Transaction" as described below).

5. Definition of Non-Control Transaction (Omnibus definition clause (c)(i)(A)- (C); Revised definition 1(c)(i)(A)&(B)(1)-(3)).

The definition of a Non-Control Transaction has been expanded to address transactions that could be determined as not likely to result in an effective change of control of the Company. For example, the Revised definition clause 1(c)(i)(A) adds a new category of Non-Control Transaction for mergers that do not require a shareholder vote. Typically, these transactions involve the issuance of less than 20% of a Company's stock and thus would probably not affect the actual control of the Company.

The Omnibus definition and the Revised definition of Non-Control Transaction also provide a three-part test to exclude those Mergers, etc. that should not effectively change the control of the Company from the events triggering Change in Control payments. Under the Omnibus definition, the requirements are that:
(i) The Company's stockholders own at least 50% of the surviving entity's or parent corporation's stock;
(ii) At least a majority of the surviving corporation's board (or parent's board, if there is a parent) be members of the Company's Incumbent Board members; and
(iii) The transaction not result in a significant change in voting power in that no unrelated entity (other than a party to the merger) could own more than the threshold percentage of the surviving entity's stock (or the parent, if any).

The first requirement of the three-part test -- that Company stockholders own 50% or more of the surviving entity -- may merit further consideration. The board may wish to have the flexibility to negotiate, without triggering a Change in Control, mergers that meet the conditions (ii) and (iii), even if the Company's stockholders will own less than 50% of the surviving entity. Thus, the Company should consider whether, as a business matter, the **EX-470.2** percentage ownership threshold for Company stockholders should be reduced to, for example, 40% or 30%, or even eliminated entirely if it is determined that the other two requirements are sufficiently protective of employee benefits.

Finally, the Revised definition would alter the effect of the provision in the Omnibus definition of Non-Control Transaction that would permit a Person who immediately prior to the Merger owned more than the threshold percentage of Company stock to own the threshold percentage *or more* of the surviving entity. Permitting a third party to own an increased percentage of the surviving entity could result in a potential Change of Control, regardless of whether that third party was a significant Company stockholder before the Merger. Therefore, the Company should consider whether a transaction which results in the increase of a third party's stock ownership over the threshold percentage should be considered a Non-Control Transaction. A part of this evaluation is whether the board should have the power to exempt a large shareholder of either the company or a merger partner. Again, the power to exempt or grandfather, while granting the board additional flexibility, offers less automatic protection to employees. We have included in bracketed language of the Revised definition a provision that would allow a significant Company stockholder to own a percentage in the Surviving Corporation that does not exceed that stockholder's pre-merger holdings by more than [two] percent.

6. Anticipatory Termination (Omnibus definition final paragraph; Revised definition clause 2.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Employees are protected from terminations in connection with a Change in Control but prior to consummation by a provision deeming those terminations to have occurred after the Change in Control. The Revised definition has deleted, however, the language requiring an executive to "reasonably demonstrate" that his or her termination was in connection with a Change in Control. As a practical matter, the executive will still have to make some showing of a connection; however, without the deleted language, the burden may be less onerous.

**Attachment 1: OMNIBUS CHANGE IN CONTROL DEFINITION AS OF 7/28/01**

2.8 A "Change in Control" shall mean the occurrence of any of the following:

(a) An acquisition (other than directly from the Company) of any voting securities of the Company (the "Voting Securities") by any "Person" (as the term person is used for purposes of Section **13(d)** or 14(d) of the Exchange Act), immediately after which such Person has **"Beneficial Ownership"** (within the meaning of Rule **13d**-3 promulgated under the Exchange Act) of [thirty] percent ([30]%) or more of the then outstanding Shares or the combined voting power of the Company's then outstanding Voting Securities; *provided, however,* in determining whether a Change in Control has occurred pursuant to this Section 2.8(a), Shares or Voting Securities which are acquired in a "Non-Control Acquisition" (as hereinafter defined) shall not constitute an acquisition which would cause a Change in Control. A "Non-Control Acquisition" shall mean an acquisition by (i) an employee benefit plan (or a trust forming a part thereof) maintained by (A) the Company or (B) any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned, directly or indirectly, by the Company (for purposes of **\*EX-470.3** this definition, a "Related Entity"), (ii) the Company or any Related Entity, or (iii) any Person in connection with a "Non-Control Transaction" (as hereinafter defined);

(b) The individuals who, as of [date plan is adopted] are members of the Board (the "Incumbent Board"), cease for any reason to constitute at least [two-thirds/a majority] of the members of the Board or, following a Merger which results in a Parent corporation, the board of directors of the ultimate Parent Corporation (as defined in paragraph (c)(i)(A) below); *provided, however,* that if the election, or nomination for election by the Company's common stockholders, of any new director was approved by a vote of at least two-thirds of the Incumbent Board, such new director shall, for purposes of this Plan, be considered as a member of the Incumbent Board; *provided further, however,* that no individual shall be considered a member of the Incumbent Board if such individual initially assumed office as a result of either an actual or threatened "Election Contest" (as described in Rule 14a-11 promulgated under the Exchange Act) or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board (a "Proxy Contest") including by reason of any agreement intended to avoid or settle any Election Contest or Proxy Contest; or

(c) The consummation of:

(i) A merger, consolidation or reorganization with or into the Company or in which securities of the Company are issued (a "Merger"), unless such Merger is a "Non-Control Transaction." A "Non-Control Transaction" shall mean a Merger where:

(A) the stockholders of the Company, immediately before such Merger own directly or indirectly immediately following such Merger at least [fifty] percent ([50]%) of the combined voting power of the outstanding voting securities of (x) the corporation resulting from such Merger (the "Surviving Corporation") if fifty percent (50%) or more of the combined voting power of the then outstanding voting securities of the Surviving Corporation is not Beneficially Owned, directly or indirectly by another Person (a "Parent Corporation"), or (y) if there are one or more Parent Corporations, the ultimate Parent Corporation; and,

(B) the individuals who were members of the Incumbent Board immediately prior to the execution of the agreement providing for such Merger constitute at least [two-thirds / a majority] of the members of the board of directors of (x) the Surviving Corporation, if there are no Parent Corporation, or (y) if there are one or more Parent Corporations, the ultimate Parent Corporation; and

(C) no Person other than (1) the Company, (2) any Related Entity, (3) any employee benefit plan (or any trust forming a part thereof) that, immediately prior to such Merger was maintained by the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Company or any Related Entity, or (4) any Person who, immediately prior to such Merger had Beneficial Ownership of [thirty] percent ([30]%) or more of the then outstanding Voting Securities or Shares, has Beneficial Ownership of [thirty] percent ([30]%) or more of the combined voting power of the outstanding voting securities or common stock of (x) the Surviving Corporation if there is no Parent Corporation, or (y) if there are one or more Parent Corporations, the ultimate Parent Corporation.

**\*EX-470.4** (ii) A complete liquidation or dissolution of the Company; or

(iii) The sale or other disposition of all or substantially all of the assets of the Company to any Person (other than a transfer to a Related Entity or under conditions that would constitute a Non-Control Transaction with the disposition of assets being regarded as a Merger for this purpose or the distribution to the Company's stockholders of the stock of a Related Entity or any other assets).

Notwithstanding the foregoing, a Change in Control shall not be deemed to occur solely because any Person (the "Subject Person") acquired Beneficial Ownership of more than the permitted amount of the then outstanding Shares or Voting Securities as a result of the acquisition of Shares or Voting Securities by the Company which, by reducing the number of Shares or Voting Securities then outstanding, increases the proportional number of shares Beneficially Owned by the Subject Persons, provided that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of Shares or Voting Securities by the Company, and after such share acquisition by the Company, the Subject Person becomes the Beneficial Owner of any additional Shares or Voting Securities which increases the percentage of the then outstanding Shares or Voting Securities Beneficially Owned by the Subject Person, then a Change in Control shall occur.


If an Eligible Individual's employment is terminated by the Company without Cause prior to the date of a Change in Control but the Eligible Individual reasonably demonstrates that the termination (A) was at the request of a third party who has indicated an intention or taken steps reasonably calculated to effect a change in control or (B) otherwise arose in connection with, or in anticipation of, a Change in Control which has been threatened or proposed, such termination shall be deemed to have occurred after a Change in Control for purposes of this Plan provided a Change in Control shall actually have occurred.

**Attachment 2: Revised Change in Control definition**

1. A "Change in Control" shall mean the occurrence during the term of the [Plan/Agreement], of any one of the following events:

(a) Any event, including acquisitions of securities by the Company, immediately after which any "Person" (as the term person is used for purposes of Section **13(d)** or 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) other than: (i) an employee benefit plan (or a trust forming a part thereof) maintained by (A) the Company or (B) any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned, directly or indirectly, by the Company (for purposes of this definition, a "Related Entity"), (ii) any Related Entity, or (iii) any Person in connection with a "Non-Control Transaction" (as hereinafter defined), immediately after which such Person has **"Beneficial Ownership"** (within the meaning of Rule **13d**-3 promulgated under the Exchange Act) of [thirty] percent ([30]%) or more of either (i) the then outstanding common stock of the Company ("Common Stock") or (ii) the combined voting power of the Company's then outstanding voting securities entitled to vote for the election of directors (the "Voting Securities");

(b) The individuals who, as of [date of Plan/Agreement] are members of the Board (the "Incumbent Board"), cease for any reason to constitute at least [two-**\*EX-470.5** thirds / a majority] of the members of the Board, or following a Merger, the board of directors of the ultimate Parent Corporation (as hereinafter defined); *provided, however*, that if the election, or nomination for election by the Company's common stockholders, of any new director was approved by a vote of at least a [majority] of the Incumbent Board, such new director shall, for purposes of this [Plan/Agreement], be considered as a member of the Incumbent Board; *provided, further, however*, that no individual shall be considered a member of the Incumbent Board if such individual initially assumed office as a result of an actual or threatened solicitation of proxies or consents by or on behalf

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of a Person other than the Board (a "Proxy Contest"), including by reason of any agreement intended to avoid or settle any Proxy Contest; or

 (c) The consummation of:

  (i) A merger, consolidation or reorganization with or into the Company, or a direct or indirect subsidiary of the Company, or any other transaction in which securities of the Company are issued (a "Merger"), unless the Merger is a "Non-Control Transaction." A "Non-Control Transaction" shall mean a Merger if:

   (A) the stockholders of the Company immediately before such Merger are not required, in accordance with [Delaware General Corporate Law] or under the rules of the New York Stock Exchange, to vote on the approval of the Merger or the issuance of securities in connection with the Merger; or

   (B) (1) the stockholders of the Company immediately before such Merger own directly or indirectly immediately following the Merger at least fifty percent (50%) of the outstanding common stock and the combined voting power of the outstanding voting securities of (x) the corporation resulting from such Merger (the "Surviving Corporation"), if fifty percent (50%) or more of the combined voting power of the then outstanding voting securities of the Surviving Corporation is not Beneficially Owned, directly or indirectly by another corporation (a "Parent Corporation"), or (y) if there is one or more Parent Corporations, by the ultimate Parent Corporation;

   (2) the individuals who were members of the Incumbent Board immediately prior to the execution of the agreement providing for the Merger, constitute at least [two-thirds / a majority] of the members of the board of directors of, (x) the Surviving Corporation, if fifty percent (50%) or more of the combined voting power of the then outstanding voting securities of the Surviving Corporation is not Beneficially Owned, directly or indirectly by a Parent Corporation, or (y) if there is one or more Parent Corporations, by the ultimate Parent Corporation; and

   (3) no Person (other than (w) the Company or another corporation that is a party to the agreement of Merger, (x) any Related Entity, [or] (y) any employee benefit plan (or any trust forming a part thereof) that, immediately prior to the Merger, was maintained by the Company or any Related Entity [, or (z) any Person who, immediately prior to such Merger had Beneficial*EX-470.6 Ownership of [thirty] percent ([30]%) or more of the then outstanding Voting Securities or Shares,] has Beneficial Ownership, directly or indirectly, of [thirty] percent ([30]%) or more of the combined voting power of the outstanding voting securities or common stock of (I) the Surviving Corporation, if fifty percent ([50]%) or more of the combined voting power of the then outstanding voting securities of the Surviving Corporation is not Beneficially Owned, directly or indirectly by a Parent Corporation, or (II) if there is one or more Parent Corporations, by the ultimate Parent Corporation; [*provided that* if a Person described in clause (z) of this subsection (3) has Beneficial Ownership immediately after the Merger of a percentage of the combined voting power of the outstanding voting securities or common stock of the Surviving Corporation, Parent Corporation or ultimate Parent Corporation, as applicable, that exceeds the percentage of such Person's Beneficial Ownership of Voting Securities or Shares immediately prior to the Merger by two or more, the Merger shall not be considered a Non-Control Transaction;]

  (ii) A complete liquidation or dissolution of the Company; or

  (iii) The direct or indirect sale or other disposition (including by means of a sale or issuance of securities of one or more subsidiaries of the Company) of all or substantially all of the assets of the Company and its subsidiaries taken as a whole to any Person (other than a transfer to a Related Entity or under conditions that would constitute a Non-Control Transaction with the disposition of assets being regarded as a Merger for this purpose) or the distribution to the Company's stockholders of the stock of a Related Entity or any other assets).

 2. If an Eligible Individual's employment is terminated by the Company or any subsidiary without Cause prior to the date of a Change in Control as provided above, either (i) at the request of a third party who has indicated an intention or taken steps reasonably calculated to effect such a Change in Control, or (ii) otherwise in connection

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

with, or in anticipation of, such a Change in Control which has been threatened or proposed, such termination shall be deemed to have occurred after a Change in Control for purposes of this [Plan/Agreement] provided a Change in Control shall actually occur.

**Attachment 3: Comparison of Omnibus Revised Change in Control Definitions**

1. A "Change in Control" shall mean the occurrence during the term of the [Plan/Agreement], of any one of the following events:

(a) Any event, including acquisitions of securities by the Company, immediately after which any "Person" (as the term person is used for purposes of Section **13(d)** or 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) other than: (i) an employee benefit plan (or a trust forming a part thereof) maintained by (A) the Company or (B) any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned, **\*EX-470.7** directly or indirectly, by the Company (for purposes of this definition, a "Related Entity"), (ii) any Related Entity, or (iii) any Person in connection with a "Non-Control Transaction" (as hereinafter defined), immediately after which such Person has **"Beneficial Ownership"** (within the meaning of Rule **13d**-3 promulgated under the Exchange Act) of [thirty] percent ([30]%) or more of either (i) the then outstanding common stock of the Company ("Common Stock") or (ii) the combined voting power of the Company's then outstanding voting securities entitled to vote for the election of directors (the "Voting Securities");

(b) The individuals who, as of [date of Plan/Agreement] are members of the Board (the "Incumbent Board"), cease for any reason to constitute at least [two-thirds/a majority] of the members of the Board, or following a Merger, the board of directors of the ultimate Parent Corporation (as hereinafter defined); *provided, however,* that if the election, or nomination for election by the Company's common stockholders, of any new director was approved by a vote of at least a [majority] of the Incumbent Board, such new director shall, for purposes of this [Plan/Agreement], be considered as a member of the Incumbent Board; *provided, further, however,* that no individual shall be considered a member of the Incumbent Board if such individual initially assumed office as a result of an actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board (a "Proxy Contest"), including by reason of any agreement intended to avoid or settle any Proxy Contest; or

(c) The consummation of:

(i) A merger, consolidation or reorganization with or into the Company, or a direct or indirect subsidiary of the Company, or any other transaction in which securities of the Company are issued (a "Merger"), unless the Merger is a "Non-Control Transaction." A "Non-Control Transaction" shall mean a Merger if:

(A) the stockholders of the Company immediately before such Merger are not required, in accordance with [Delaware General Corporate Law] or under the rules of the New York Stock Exchange, to vote on the approval of the Merger or the issuance of securities in connection with the Merger; or

(B) (1) the stockholders of the Company immediately before such Merger own directly or indirectly immediately following the Merger at least fifty percent (50%) of the outstanding common stock and the combined voting power of the outstanding voting securities of (x) the corporation resulting from such Merger (the "Surviving Corporation"), if fifty percent (50%) or more of the combined voting power of the then outstanding voting securities of the Surviving Corporation is not Beneficially Owned, directly or indirectly by another corporation (a "Parent Corporation"), or (y) if there is one or more Parent Corporations, by the ultimate Parent Corporation;

(2) the individuals who were members of the Incumbent Board immediately prior to the execution of the agreement providing for the Merger, constitute at least [two-thirds / a majority] of the members of the board of directors of, (x) the Surviving Corporation, if fifty percent (50%) or more of the combined **\*EX-470.8** voting power of the then outstanding voting securities of the Surviving Corporation is not Beneficially Owned, directly or indirectly by a Parent Corporation, or (y) if there is one or more Parent Corporations, by the ultimate Parent Corporation; and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(3) no Person (other than (w) the Company or another corporation that is a party to the agreement of Merger, (x) any Related Entity, [or] (y) any employee benefit plan (or any trust forming a part thereof) that, immediately prior to the Merger, was maintained by the Company or any Related Entity [, or (z) any Person who, immediately prior to such Merger had Beneficial Ownership of [thirty] percent ([30]%) or more of the then outstanding Voting Securities or Shares,] has Beneficial Ownership, directly or indirectly, of [thirty] percent ([30]%) or more of the combined voting power of the outstanding voting securities or common stock of (I) the Surviving Corporation, if fifty percent ([50]%) or more of the combined voting power of the then outstanding voting securities of the Surviving Corporation is not Beneficially Owned, directly or indirectly by a Parent Corporation, or (II) if there is one or more Parent Corporations, by the ultimate Parent Corporation; [*provided that* if a Person described in clause (z) of this subsection (3) has Beneficial Ownership immediately after the Merger of a percentage of the combined voting power of the outstanding voting securities or common stock of the Surviving Corporation, Parent Corporation or ultimate Parent Corporation, as applicable, that exceeds the percentage of such Person's Beneficial Ownership of Voting Securities or Shares immediately prior to the Merger by two or more, the Merger shall not be considered a Non-Control Transaction;]

(ii) A complete liquidation or dissolution of the Company; or

(iii) The direct or indirect sale or other disposition (including by means of a sale or issuance of securities of one or more subsidiaries of the Company) of all or substantially all of the assets of the Company and its subsidiaries taken as a whole to any Person (other than a transfer to a Related Entity or under conditions that would constitute a Non-Control Transaction with the disposition of assets being regarded as a Merger for this purpose) or the distribution to the Company's stockholders of the stock of a Related Entity or any other assets).

2. If an Eligible Individual's employment is terminated by the Company or any subsidiary without Cause prior to the date of a Change in Control as provided above, either (i) at the request of a third party who has indicated an intention or taken steps reasonably calculated to effect such a Change in Control, or (ii) otherwise in connection with, or in anticipation of, such a Change in Control which has been threatened or proposed, such termination shall be deemed to have occurred after a Change in Control for purposes of this [Plan/Agreement] provided a Change in Control shall actually occur.

02/360424

TKRDF EX 43
END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT H**

# REGULATION by PROSECUTION

The Securities and
Exchange Commission
vs.
Corporate America

## by
## Roberta S. Karmel



Simon and Schuster
New York

Paul, Weiss, Rifkind, Wharton & Garrison
345 PARK AVENUE
NEW YORK, NEW YORK 10154

maintain its reputation and credibility in the courts, in the Congress, and among members of the Bar, in order to maintain respect and obedience for the securities laws. Accordingly, I believe it is generally wise policy for the Commission to exercise restraint and decline to expand the coverage of the securities laws through enforcement cases. Although there are times when it is responsible and appropriate for the Commission to institute an enforcement action in order to better delineate the applicability of the securities laws to novel or emerging fact patterns, the Commission should articulate and justify the legal and policy grounds on which an enforcement program or particular case is based.

Unfortunately, the Commission too often has been reluctant to do so on the grounds that such an explanation of its enforcement policies would be a blueprint for fraud. The paralysis that results from such an adversarial attitude interferes with honest and ordinary business practices. For example, the Commission refused to come out with a clear interpretation of the type of employee-benefit plan that would be considered "securities," and how the securities laws applied to different types of plans that were "securities," until after the *Daniel* decision.[3] Billions of dollars of pension-plan interests were affected by this interpretation. It should not have been deferred for the sake of "winning" a single case.

Another type of jurisdictional expansion engaged in by the SEC is procedural. The SEC has been given a varied arsenal of remedies for enforcement of the federal securities laws. The Commission may institute injunctive actions, make criminal references, or initiate administrative proceedings against persons who are accused of having violated the law. The extent of the Commission's authority to imply administrative remedies to sanction securities law violators is controversial. Since I have been one of the participants in this controversy, I feel under some obligation to explain my position. Before I do so, I think it is important to focus upon the context in which this controversy erupted.

Over the past two decades the Commission was given greatly increased regulatory responsibilities. In 1964 and 1975, Congress amended the securities laws and added many new registrants—both public companies and securities industry participants—to the rolls of persons regulated by the SEC. Also during this period the courts generally interpreted the securities laws very broadly, which further expanded the Commission's mandate. The consumer protection movement created a political climate that encouraged and approved of aggressive enforcement of the securities laws. Then, public opinion began to shift in favor of deregulation. The courts began to curtail access to the federal judicial system, and this retrenchment included a narrowing construction of the federal securities laws. In addition, federal judges were more often exercising their equita-

**EXHIBIT I**

# π 01-7246

## United States Court of Appeals

*for the*

## Second Circuit

FILED
UNITED STATES COURT OF APPEALS
JUN 2 5 2001
Roseann B. MacKechnie, CLERK
SECOND CIRCUIT

RECORDS COPY
PLEASE RETURN TO ROOM
1802

---

HALLWOOD REALTY PARTNERS, L.P.,

*Plaintiff-Appellant,*

— against —

GOTHAM PARTNERS, L.P.; GOTHAM PARTNERS III, L.P.;
GOTHAM HOLDINGS II, L.L.C.; PRIVATE MANAGEMENT GROUP, INC.;
INTERSTATE PROPERTIES; STEVEN ROTH; HALLWOOD INVESTORS,
L.P.; LIBERTY REALTY PARTNERS, L.P. and EFO/LIBERTY, INC.,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF FOR DEFENDANTS-APPELLEES
## GOTHAM PARTNERS, L.P.; GOTHAM PARTNERS III, L.P.
## and GOTHAM HOLDINGS II, L.L.C.

---

*Of Counsel:*
  PHILIP H. SCHAEFFER
  KAREN M. ASNER
  K. ALLISON WHITE

WHITE & CASE LLP
*Attorneys for Defendants-Appellees*
  *Gotham Partners, L.P.;*
  *Gotham Partners III, L.P. and*
  *Gotham Holdings II, L.L.C.*
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200

CORPORATE DISCLOSURE STATEMENT

     Pursuant to Fed. R. App. P. 26.1, Defendants-Appellees
Gotham Partners, L.P., Gotham Partners III, L.P. and Gotham
Holdings II, L.L.C. state that they have no parent company or
subsidiaries or affiliates that have issued shares to the public.

<u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

TABLE OF AUTHORITIES ......................................... ii

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ON APPEAL ......... 1

STATEMENT OF THE CASE ......................................... 1

STATEMENT OF FACTS ............................................ 4
    A.  Ownership By Defendants Of Hallwood Units ............ 4
    B.  No Other Defendant Participated In The Delaware
        Action ............................................ 6
    C.  Defendants Have Filed Schedule 13Ds or 13Gs .......... 8
    D.  Communications Among The Defendants ................... 8
    E.  Plaintiff's Private Investigator ..................... 8

SUMMARY OF THE ARGUMENT ...................................... 10

STANDARD OF REVIEW ........................................... 12

ARGUMENT ..................................................... 13

I.  HALLWOOD'S ASSERTION THAT THE DISTRICT COURT APPLIED THE
    WRONG LEGAL STANDARD IS PLAINLY CONTRADICTED BY THE
    RECORD ................................................... 13
    A.  The District Court Applied The Correct Legal
        Standard ......................................... 13
    B.  The District Court Considered All Of Plaintiff's
        Evidence ......................................... 18

II.  THE DECISION TO STRIKE HALLWOOD'S
    DEMAND FOR A JURY TRIAL WAS CORRECT ..................... 22
    A.  A Right To Jury Trial Exists Only
        For Claims That Are Legal In Nature ................ 23
    B.  Damages Are Not Recoverable
        For Violation Of Section 13(d) .................... 26

CONCLUSION ................................................... 33

CERTIFICATE OF COMPLIANCE .................................... 34

<div align="center">(i)</div>

TABLE OF AUTHORITIES

CASES

Anderson v. Bessemer City,
  470 U.S. 564 (1985)................................. 12

Andrew Crispo Gallery, Inc. v.        oner,
  86 F.3d 42 (2d Cir. 1996)....................... 12, 13

Atlantic Mutual Insurance Co. v. Balfour MacLaine
  International Ltd.,
  85 F.3d 68 (2d Cir. 1996)....................... 12, 13

Baltimore & Carolina Line, Inc. v. Redman,
  295 U.S. 654, 55 S. Ct. 890 (1935)................. 24

Bayly Corp. v. Marantette,
  No. 82-1354, 1982 WL 1337 (D.D.C. Oct. 19, 1982)....... 14

Berman v. Metzger,
  No. 80-0394, 1981 WL 1596 (D.D.C. Feb. 9, 1981)........ 31

Corenco Corp. v. Schiavone & Sons, Inc.,
  488 F.2d 207 (2d Cir. 1973).......................... 13

Cort v. Ash,
  422 U.S. 66, 95 S. Ct. 2080 (1975)................... 31

Curtis v. Loether,
  415 U.S. 189, 94 S. Ct. 1005 (1974)................... 24

Fuller v. Gannet Co., Inc.,
  No. 87 Civ. 0668, 1989 WL 146761
  (S.D.N.Y. Nov. 28, 1989)............................. 17

GAF Corp. v. Milstein,
  453 F.2d 709 (2d Cir. 1971)................... 14, 26, 28

Germain v. Connecticut National Bank,
  988 F.2d 1323 (2d Cir. 1993)...................... 23, 24

Global Intellicom, Inc. v. Thomson Kernaghan & Co.,
  No. 99 Civ. 342, 1999 WL 544708 (S.D.N.Y. 1999)........ 26

In Time Products, Ltd. v. Toy Biz, Inc.,
  38 F.3d 660 (2d Cir. 1994)........................... 12

Indiana National Corp. v. Rich,
  712 F.2d 1180 (7th Cir. 1983)........................ 29

Mar Oil, S.A. v. Morrissey,
  982 F.2d 830 (2d Cir. 1993).......................... 12

(ii)

McClellan v. Cablevision of Connecticut, Inc.,
    149 F.3d 161 (2d Cir. 1998)...........................31

Morales v. Quintel Entertainment, Inc.,
    249 F.3d 115 (2d Cir. 2001)...........................14

Panico v. American Export Lines, Inc.,
    213 F. Supp. 116 (S.D.N.Y. 1962).....................17

Pantry Pride, Inc. v. Rooney,
    598 F. Supp. 891 (S.D.N.Y. 1984).....................14

Piper v. Chris-Craft Industrial, Inc.,
    430 U.S. 1, 97 S. Ct. 926 (1977)..................29, 31

Puritan Insurance Co. v. Eagle S.S. Co. S.A.,
    779 F.2d 866 (2d Cir. 1985)...........................12

Rondeau v. Mosinee Paper Corp.,
    422 U.S. 49, 95 S. Ct. 2069 (1975)...................29

Rubin v. Posner,
    701 F. Supp. 1041 (D. Del. 1988).................24, 27

Sanders v. Thrall Car Manufacturing Co.,
    582 F. Supp. 945 (S.D.N.Y. 1983).................27, 32

Schnell v. Schnall, No. 80 Civ 2442, 1981 WL 1618
    (S.D.N.Y. Mar. 30, 1981)..............................27

Seagoing Uniform Corp. v. Texaco, Inc.,
    705 F. Supp. 918 (S.D.N.Y. 1989).....................27

Securities and Exchange Commission v. Singer,
    786 F. Supp. 1158 (S.D.N.Y. 1992)....................17

Standard Metals Corp. v. Tomlin,
    No. 80 Civ. 2983, 1982 WL 1300
    (S.D.N.Y. April 14, 1982)............................25

Stecher-Traung-Schmidt Corp. v. Self,
    529 F.2d 567 (2d Cir. 1976)...........................22

Texasgulf, Inc. v. Canada Development Corp.,
    366 F. Supp. 374 (S.D. Tex. 1973)....................14

Touche Ross & Co. v. Redington,
    442 U.S. 560, 99 S. Ct. 2479 (1979)..............31, 32

Transamerica Mortgage Advisors, Inc. v. Lewis,
    444 U.S. 11, 100 S. Ct. 242 (1979)...................30

United Trans. Union v. Bottalico,
    120 F. Supp. 2d 407 (S.D.N.Y. 2000)..................30

(iii)

<u>Universal Container Corp.</u> v. <u>Horwitz</u>,
    No. 74 Civ. 3865, 1977 WL 1036 (S.D.N.Y. Sept. 6, 1977)
    ..................................................... 14

<u>Wellman</u> v. <u>Dickinson</u>,
    497 F. Supp. 824 (S.D.N.Y. 1980)...................... 27

<u>Wellman</u> v. <u>Dickinson</u>,
    682 F.2d 355 (2d Cir. 1982)................... 13, 14, 16

<u>Wm. Passalacqua Builders, Inc.</u> v. <u>Resnick Developers South, Inc.</u>,
    933 F.2d 131 (2d Cir. 1991)........................... 25

## STATUTES and CONSTITUTIONS

15 U.S.C. § 78m(d) .................................... 24

U.S. Const. amend. VII ................................ 23

## REGULATIONS

17 C.F.R. § 240.13d-5(b)(1) ........................... 13

## LEGISLATIVE HISTORY

H. Rep. 90-1711 (1968).................................31

S. Rep. No. 90-550 (1967).............................31

## TREATISES

8 James Wm. Moore et al., <u>Moore's Federal Practice</u>
§ 38.10[2] (3d Ed. 2000) ....................... 23, 24, 25

Wright & Miller, <u>Federal Practice and Procedure</u>
§ 2302.2 (2d ed. 1995) ................................ 24

Wright & Miller, <u>Federal Practice & Procedure</u>
§ 2302 (2d ed. 1995) .................................. 24

STATEMENT OF THE ISSUES
PRESENTED FOR REVIEW ON APPEAL

1.     Did the District Court erroneously find that Plaintiff
failed to demonstrate the existence of a group as defined in
Section 13(d) of the Exchange Act of 1934 ("Section 13(d)") by a
preponderance of the evidence notwithstanding the District
Court's (a) consideration of all direct and circumstantial
evidence and (b) conclusion this evidence was insufficient to
convince it that Defendants had agreed to act together with
respect to acquiring, voting, holding or disposing of their Units
of ownership in Plaintiff?

2.     Did the District Court erroneously deny a jury trial to
Plaintiff, an issuer, where the District Court held that as an
issuer, Plaintiff was in no more favored position to recover
damages under Section 13(d) than any shareholder or unitholder
and therefore Plaintiff was not entitled to either damages or a
jury trial?

STATEMENT OF THE CASE

Plaintiff Hallwood Realty Partners, L.P. is a limited
partnership that owns commercial real estate ("Plaintiff" or
"Hallwood").  (A1961, A23).  Its units of ownership ("Units") are
publicly traded on the American Stock Exchange.  (Id.).
Hallwood's sole general partner, formerly Hallwood Realty
Corporation and presently Hallwood Realty L.L.C. (the "General
Partner"), is wholly owned by The Hallwood Group Incorporated
("HGI").  (A1129).  HGI, through the General Partner, controls
Hallwood and realizes substantial fee income as a result of its

control position. (A1961-62). The General Partner can be removed only by a vote of holders of two-thirds of outstanding Units. (Id.). A Unit Rights Plan, commonly known as a "poison pill," was created by Hallwood in 1990. (A1962, A117-A194, A47). One of the potential triggering events of the poison pill is formation of a group as defined by Section 13(d). (A1962, A47).

Defendants all own Units or, in the case of defendant Steven Roth, are affiliated with entities that own Units. Defendants Gotham Partners, L.P., Gotham Partners III, L.P., and Gotham Holdings II, L.L.C. (together "Gotham") are affiliated private investment funds. (A1963). Defendant Private Management Group ("PMG") is a California-based money management company. (Id.). Defendant Interstate Properties ("Interstate") is a New Jersey partnership that invests in the stock of public companies with substantial real estate assets. (A1963, A1273). Mr. Roth is a general partner of Interstate Properties. (A1963, A1272). Defendant Liberty Realty Partners, L.P. is an investment entity created to invest in small-capitalization, publicly-traded real estate companies. (A1321). EFO/Liberty, Inc. and Hallwood Investors, L.P. are entities affiliated with Liberty Realty Partners, L.P. (together "EFO"). (A1963, A1324).

Hallwood commenced this action on February 15, 2000, alleging, among other things, that Defendants had organized a "group" as defined by Section 13(d) for the purpose of effecting a takeover of Hallwood, failed to disclose the existence of the group and made false and misleading 13D filings, and that Defendants' actions triggered the poison pill. (A1961, A22-A51).

-2-

An amended complaint asserted the following claims:  (i)
violation of Section 13(d) against Gotham for filing false and
misleading Schedule 13Ds; (ii) violation of Section 13(d) against
PMG for filing a false and misleading Schedule 13G; (iii)
violation of Section 13(d) against Interstate for filing false
and misleading Schedule 13Ds and against Mr. Roth for failure to
file a Schedule 13D; and (iv) violation of Section 13(d) against
all Defendants for their failure to disclose their formation of a
"group;" and (v) seeking a declaratory judgment that the poison
pill was triggered.  (A90-A104).  Hallwood demanded a jury trial
both in its original and amended complaint.  (A102).

On November 22, 2000, Gotham, Interstate and Roth moved to
strike Hallwood's jury demand.  (A108-A109, A197-A198).  The
motions to strike were granted by the District Court in a
Memorandum Opinion dated January 19, 2001.  (A238-A240).

A three-day non-jury trial was held before United States
District Judge Lewis A. Kaplan on February 20-22, 2001.  (A294-
A895).

Following the completion of Hallwood's case, the District
Court granted a motion pursuant to Fed. R. Civ. P. 52(c) that
Hallwood had failed to demonstrate that defendant Roth owned
Units.  (A807-A812).  Judge Kaplan denied the remaining Rule
52(c) motions.  (Id.).  Plaintiff has not appealed the District
Court's dismissal pursuant to Rule 52(c).

On February 23, 2001, Judge Kaplan rendered an oral
decision, whereby he ruled that Hallwood had failed to prove its
case that a group as contemplated by Section 13(d) existed.

-3-

(A1960-A1986).  Judgment of dismissal was entered in favor of
Defendants on March 1, 2001.  (A1987).

STATEMENT OF FACTS[1]

A.    Ownership By Defendants Of Hallwood Units

For several years prior to commencement of this lawsuit,
there was a view among knowledgeable investors, including
Defendants, that the assets of Hallwood were worth substantially
more than its total market capitalization.  (A1964, A1236, A1275-
A1276).  Numerous reasons have been given for this assessment,
including Hallwood's antiquated organizational structure, the
stigma attached to syndicated limited partnerships, the dubious
reputation of Hallwood's General Partner, and a series of
transactions undertaken by Hallwood's General Partner as well as
a pending derivative action brought by Gotham in Delaware
Chancery Court challenging the propriety of those transactions.
(A1964-65).

Although Defendants commonly believed as investors that the
Units were undervalued, each of them independently decided to

---

[1]    In Hallwood's "Statement of Facts," there is little reference,
if any, to the "facts" as determined by the District Court.
Although Hallwood has challenged the ultimate finding of
liability as being based upon an incorrect legal standard,
Hallwood has not challenged a single factual finding as being
clearly erroneous.  As can be observed from Judge Kaplan's
decision (A1960-A1986), Hallwood's version of the facts was
considered and rejected by the District Court.  Gotham will
therefore not burden this Court with a point-by-point
refutation of Hallwood's assertions and simply will refer to
the District Court's decision for the refutation thereof.

purchase Hallwood Units.  PMG began acquiring Units in 1992.
(A1965, A1353, A1082).  Gotham began to purchase Units two years
later in 1994 and acquired all of its Units over the course of a
two-year period, stopping in September 1996 short of the 15%
limit in the poison pill.  (A1965, A1082, A1097).  Mr. William
Ackman, the individual responsible at Gotham for its investment
in the Units, did not communicate with anyone representing any
other Defendant prior to or in connection with Gotham's decision
to acquire Units.  (A1235, A1237).  Interstate began buying Units
in mid-1995 and did not accumulate five percent of the
outstanding Units until approximately two years after Gotham had
completed its purchases.  (A1965, A1082-A1097, A1256-A1260).  EFO
began purchasing Units in late 1998 and purchased most of its
Units in mid-to-late 1999.  (A1965, A1082-1097, A1338).  Two of
the Defendants, Interstate and PMG, also sold Units during time
period in which Plaintiff alleges that a "group" existed.
(A1082-A1097, A1356-A1357, A1297).

Each of the Defendants performed its own due diligence and
made its own investment decision regarding whether to invest in
Hallwood Units.  Prior to buying Units, PMG's employees reviewed
S.E.C. filings, communicated with Plaintiff's property managers
and analyzed Hallwood's cash flows.  (A1353-A1356).  Mr. Ackman
identified Hallwood as a potential investment as a result of his
research into possible investments for Gotham.  (A1235-A1237).
Gotham decided to purchase Units because Mr. Ackman's
contemporaneous analysis of the net asset value of Plaintiff's
properties revealed the price at which those Units were trading

-5-

on the American Stock Exchange to be strikingly low compared to the net asset value of the real properties Plaintiff owned. (Id.). Similarly, Mr. Roth, acting on behalf of Interstate identified Hallwood as a potential investment through the course of his usual research into publicly traded real estate companies. (A1274-A1277). Employees of Interstate conducted extensive due diligence into Plaintiff's assets and operations. (A1277, A1295, A1311-A1314). Mr. Roth ultimately decided to purchase Units for Interstate because he too thought they were trading at a significant discount to their net asset value. (A1275-A1277). By contrast, principals of EFO first identified Plaintiff through efforts by HGI to sell its controlling interest in Plaintiff. (A1324-1326, A1342-A1344). After that transaction collapsed, EFO, convinced that the Units were a good investment, decided to acquire Units on the open market. (A1344, A1326-A1327).

B.    No Other Defendant Participated In The Delaware Action

In 1997, Gotham commenced a derivative action in the Delaware Chancery Court against the General Partner, HGI and directors of the General Partner alleging, inter alia, breach of the governing Partnership Agreement, breach of fiduciary duty, and fraud ("Delaware Action"). (A1965-A1966, A1237-A1245). The gravamen of Gotham's complaint in the Delaware Action is that Gotham believes a series of transactions that the General Partner of Hallwood caused it to undertake with HGI were improper and done to entrench the General Partner and misappropriate the value of Hallwood's assets. (A1965-1966, A1226, A1242). Gotham is seeking, among other relief, the removal of the General Partner.

-6-

(A1966, A1242-A1243).  In denying a motion to dismiss, the
Chancery Court ruled that Gotham had successfully stated both
derivative and individual claims.  (A1243-A1244).  A trial in the
Delaware Action was held in January 2000 before Vice Chancellor
Leo A. Strine and a decision is being awaited.  (A1965, A1245).

Gotham did not consult any other Defendant with regard to
prosecution of the Delaware Action.  (A1245-1246, A1227-A1228).
No other Defendant has funded the Delaware Action, directly or
indirectly, or controlled its prosecution.  (Id.)  Neither Gotham
nor any other Defendants have made any agreements as to what will
happen after the Delaware Action is concluded.  (A1254, A1231).
Regardless of who prevails, resolution of the Delaware Action is
expected by many, including other Defendants, to help precipitate
some event which will have a favorable effect on the value of
their respective Units.  (A1966-1967, A1333, A1336, A1346).
Aside from one other fleeting communication between
representatives of Gotham and PMG well after the Delaware Action
was commenced and during discovery proceedings, any discussions
between Gotham and the other Defendants concerning the Delaware
Action amounted to nothing more than a general discussion of
Gotham's view of the merits or recent developments in the case.
(A1228-A1230, A1247-A1254, A1279-A1282, A1327-A1333, A1360-
A1366).  As to the discussion with PMG, Gotham's in-house lawyer
telephoned PMG's representative in late 1998 or early 1999 to
determine if PMG owned Units as a limited partner or assignee to
determine if PMG's intervention would moot Hallwood's objection

-7-

to Gotham's standing (an objection that was ultimately overruled by the Chancery Court).  (A1228-A1229, A1365).

C.   Defendants Have Filed Schedule 13Ds or 13Gs

All of the Defendants who own more than 5% of the outstanding Units of Plaintiff have filed Schedule 13Ds or Schedule 13Gs, disclosing that ownership and their investment purposes.  (A973-A976, A1256-A1261, A1358).  Gotham filed eleven amendments to its Schedule 13D, thereby disclosing, among other things, the numerous actions it has taken with respect to the filing of the Delaware Action and the relief sought therein. (A977-A1001, A1155-A1218).

D.   Communications Among The Defendants

Over the past eight years, representatives of the other Defendants have occasionally communicated with Gotham.  (A1971). Most of these communications were wholly unrelated to Hallwood or its investors.  What discussions there were about Hallwood involved little more than general observations about Hallwood or matters previously disclosed in Gotham's Section 13(d) filings. (A1228-1230, A1247-A1254, A1279-A1286, A1327-A1338, A1360-A1371).

E.   Plaintiff's Private Investigator

Around May 1999, Hallwood hired a New York private investigator named Juval Aviv to investigate Gotham in connection with the Delaware Action.  (A1142-43).  In September 1999, Mr. Aviv traveled to California to meet with Dennis Reiland, a representative of PMG.  (A1143).  Mr. Aviv admittedly misrepresented his identity, stating that he was a wealthy European investor interested in investment opportunities in U.S.

-8-

real estate, and asked Mr. Reiland questions about Hallwood and
the other Defendants. (A1143-44). At trial, Mr. Aviv testified
that Mr. Reiland had made damaging statements concerning the
existence of a Gotham-led group designed to takeover Plaintiff.
(A1143-45). Surprisingly, Mr. Aviv intentionally destroyed his
allegedly verbatim handwritten notes of that conversation in
which these allegedly damaging statements appeared. (A384-A386).
In addition, on cross-examination it was revealed that the
account Mr. Aviv gave of the Reiland meeting in a written
memorandum to Hallwood's attorneys was strikingly different from
the version Mr. Aviv testified to at trial. (A416, A422-A451).

Mr. Aviv also testified that he met with Christopher
Mahowald, a representative of EFO, a few weeks after his meeting
with Mr. Reiland. (A1145-A1146). Mr. Aviv taped this conversa-
tion, in which he again admittedly lied about his identity and
asked pointed and leading questions about Hallwood and EFO's
communications with other Defendants. (A1145-A1145, A918-A954).
Mr. Aviv expressly queried Mr. Mahowald about what Mr. Aviv
called a "group" of investors in the questions he posed to Mr.
Mahowald. (A921, A1976). A transcript of the tape was admitted
into evidence at trial and was thoroughly considered on direct
and cross-examination as well as by Judge Kaplan. (A918-A954,
A1976-A1981).

Mr. Mahowald also provided Mr. Aviv with a copy of a
document described as EFO's "Investment Recommendation" for Units
in Plaintiff. (A1146). The Investment Recommendation, which had
been confidentially distributed to EFO's clients, set forth EFO's

-9-

analysis of the value of Hallwood Units and its assessment of the
events which might lead to an increase in the value of those
Units. (A896-A917). The Investment Recommendation contained,
among other things, summaries written by Mr. Mahowald of
discussions EFO representatives had had with Gotham regarding the
status of the Delaware Action and Plaintiff. (Id.). Prior to
this action, no one at Gotham was aware of the Investment
Recommendation. (A1253, A1229). The Investment Recommendation
neither states that Defendants had formed a group to takeover
Plaintiff nor that they were acting together in concert in
connection with the Delaware Action or otherwise. (A896-A917,
A1981). Indeed, the Investment Recommendation describes the
adversity and lack of common interest between certain Defendants.
(A1980-A1981, A899).

Shortly after Mr. Aviv met with Mr. Reiland and Mr.
Mahowald, this action was commenced. (A22).

## SUMMARY OF THE ARGUMENT

Hallwood is asking this Court to reverse the District
Court's decision below on the specious theories that (i) the
District Court applied the wrong legal standard to the question
of whether Defendants formed a group for purposes of the
mandatory disclosures required by Section 13(d), and (ii)
Hallwood was entitled to a jury trial on its Section 13(d)
claims.

Hallwood's claim that Judge Kaplan applied the wrong legal
standard to the facts and thereby refused to consider its
circumstantial evidence -- raised for the first time on this

-10-

appeal -- is insulting to Judge Kaplan and to the record before this Court.  Judge Kaplan's decision plainly reveals that he considered all of Hallwood's evidence and that of Defendants -- including circumstantial evidence.[2]  The District Court followed the law of this Circuit and elsewhere and concluded, as the factfinder, that this evidence did not persuade it that Defendants had formed a group within the meaning of Section 13(d).  Absent the use of an erroneous legal standard, which is plainly not the case here, the District Court's findings of fact are not reversible unless clearly erroneous.  Hallwood did not assert and could not prove that these findings are clearly erroneous.

Hallwood's claim of error as to the District Court's denial of a jury trial in this action is equally incorrect.  All relevant authorities state that neither a shareholder nor unitholder is entitled to an award of money damages for violation of Section 13(d) and therefore is without right to trial by jury.  Rather, remedies for Section 13(d) violations are limited to injunctive and declaratory relief.  Hallwood would have this Court be the first to hold that an issuer, who is afforded standing to sue solely to represent the interests of such share-holders or unitholders, should be entitled to a damages remedy

---

[2]  After rendering his decision, Judge Kaplan even asked the parties to tell him whether he had overlooked any relevant facts.  Hallwood's counsel said they had nothing to raise.  (A1985).

notwithstanding that the shareholders or unitholders have no such right to damages.  Such a rule, aside from being contrary to the law, would create the perverse result that issuers are entitled to more favorable remedies than the shareholders or unitholders they purport to represent.

## STANDARD OF REVIEW

Appellate review of findings of fact is governed by Federal Rule of Civil Procedure 52(a), which provides that such findings "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."  Anderson v. Bessemer City, 470 U.S. 564, 573 (1985); see also Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l Ltd., 85 F.3d 68, 78 (2d Cir. 1996); In Time Prods., Ltd. v. Toy Biz, Inc., 38 F.3d 660, 665 (2d Cir. 1994); Mar Oil, S.A. v. Morrissey, 982 F.2d 830, 837-38 (2d Cir. 1993); Puritan Ins. Co. v. Eagle S.S. Co. S.A., 779 F.2d 866, 871 (2d Cir. 1985).  "`[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."  Mar Oil S.A., 982 F.2d at 837 (quoting Anderson, 470 U.S. at 575).

"[F]indings based upon an `improper standard,' `a mistaken impression of the applicable legal principles,' or `a misunderstanding of the governing rule of law' may be corrected as a matter of law."  Andrew Crispo Gallery, Inc. v.

-12-

<u>Commissioner</u>, 86 F.3d 42, 46 (2d Cir. 1996)(internal citations omitted).  In such a case, the Court generally sets forth the proper rule of law and then remands the case for further proceedings consistent with its opinion.  <u>Id.</u>  Conclusions of law are subject to de novo review.  <u>Atlantic Mut. Ins. Co.</u>, 85 F.3d at 78.

<div align="center">ARGUMENT</div>

<div align="center">I.</div>

<div align="center"><u>HALLWOOD'S ASSERTION THAT THE DISTRICT COURT APPLIED THE
WRONG LEGAL STANDARD IS PLAINLY CONTRADICTED BY THE RECORD</u></div>

A.    <u>The District Court Applied The Correct Legal Standard</u>

Section 13(d) "requires a group that has acquired, directly or indirectly, beneficial ownership of more than 5% of a class of a registered equity security, to file a statement with the SEC, disclosing, *inter alia*, the identity of its members and the purpose of its acquisition."  <u>Wellman</u> v. <u>Dickinson</u>, 682 F.2d 355, 362 (2d Cir. 1982) (footnote omitted).

Under the SEC's regulations, a "group" is formed "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities." 17 C.F.R. § 240.13d-5(b)(1); <u>see also</u> <u>Corenco Corp.</u> v. <u>Schiavone</u> <u>& Sons, Inc.</u>, 488 F.2d 207, 217 (2d Cir. 1973) ("[A]bsent an agreement between [defendants] a `group' would not exist."). Although "the concerted action of the group's members need not be expressly memorialized in writing," a plaintiff must prove that "the members combined in furtherance of a common objective." <u>Wellman</u>, 682 F.2d at 363.

<div align="center">-13-</div>

Section 13(d) was not intended to diminish consultation between shareholders. <u>See</u>, <u>e.g.</u>, <u>Pantry Pride, Inc.</u> v. <u>Rooney</u>, 598 F. Supp. 891, 899-900 (S.D.N.Y. 1984). Thus, as noted in the often quoted case of <u>Texasgulf, Inc.</u> v. <u>Canada Dev. Corp.</u>, 366 F. Supp. 374, 403 (S.D. Tex. 1973), "[m]ere relationships among persons or entities, whether family, personal or business, is insufficient to create a group" for purposes of Section 13(d). <u>See</u> <u>Bayly Corp.</u> v. <u>Marantette</u>, No. 82-1354, 1982 WL 1337 *13 (D.D.C. Oct. 19, 1982); <u>Universal Container Corp.</u> v. <u>Horwitz</u>, No. 74 Civ. 3865, 1977 WL 1036 *16 (S.D.N.Y. Sept. 6, 1977).

To succeed, a claimant must prove the existence of an agreement to acquire, hold, vote or dispose of securities by "a fair preponderance of the evidence." <u>GAF Corp.</u> v. <u>Milstein</u>, 453 F.2d 709, 718 (2d Cir. 1971). The existence of a group may be proved by either direct or circumstantial evidence. <u>See</u> <u>Morales</u> v. <u>Quintel Entertainment, Inc.</u>, 249 F.3d 115, 124 (2d Cir. 2001); <u>Wellman</u>, 682 F.2d at 363. Whether the requisite agreement exists is a question of fact. <u>See</u> <u>Morales</u>, 249 F.2d at 124.

The District Court's decision, comprising over twenty-five written transcript pages, contained extensive findings of facts and conclusions of law. (A1960-1986). Early in his decision, Judge Kaplan stated the following as his understanding of the principles of law governing his determination of whether Plaintiff had proven the existence of a group:

> It is pretty much common ground among the parties that a group is formed only when there is an agreement to act for a common purpose of acquiring, holding, voting or disposing of securities of the issuer. It is pretty much common ground that the agreement need not be

-14-

written or for that matter explicit.  It may be
implicit as well.

So the bottom line here is that the search is for an
agreement or an understanding that the defendants would
act together to achieve the common purpose articulated
in the statute.

It is, in my judgment, very important not to
overgeneralize the analysis.  For example, every one of
these defendants had a common purpose.  They have all
acted and they are acting today for the common purpose
of making money on their investments in Hallwood.  That
is quite obviously not enough.  Rather, it is the
plaintiff's burden in this case to show that it is more
likely than not that the defendants acted collusively
rather than independently to achieve that common
objective.

It's also important to bear in mind that, as the
defendants argue, mere relationships among people do
not establish the existence of a group.  On the other
hand, it is equally true that the existence of
relationships among alleged group members most
certainly is relevant to whether they are acting
collusively.

So a lot of the rhetoric in this case on both sides has
not been all that helpful, though I'm not faulting
counsel.  They are just simply repeating what one court
or another has said in one or another case, and that's
their job.

Now the plaintiff lists a long string of factors that
courts have considered in deciding whether to infer the
existence of a group in the cases before them.  They
have looked at things including similar trading of the
securities of the issuer and the existence of a report
or document written by a group member that states the
common objectives of the alleged group.

There is at least one case which regarded as
significant the commencement of a lawsuit by a putative
group member disparaging the issuer.  Other cases have
looked to whether a defendant has solicited others to
join the group.  Communications among members of the
alleged group obviously are relevant, for the reasons
I've stated, and representations by one member of a
group, an alleged group, that he speaks on behalf of a
block of stock, including shares owned by others,
obviously are very important.

Prior conduct that is part of collusive conduct similar
to the conduct at issue in a particular case may be

-15-

suggestive of collusive activity.  The plaintiff ticks
off all of these factors and others and says they are
all present here and that collectively they show that
these defendants formed a group.

I've thought a lot about these factors, and I think it
is important to bear in mind that while they all
identify things which, in a given case, may indeed be
probative of the issue of collusion, they are not a
substitute for a careful analysis of whether the
defendants really are acting collectively rather than
independently.  They all may bear on that issue, but
none of them really is close to dispositive.

The fact that several investors conclude that a stock
is undervalued and buy it, does not necessarily mean
that they formed a group.  Indeed, that's true even if
they all know one another, speak on the phone every
day, and even if one of their number was the guy who
first had the idea that the stock was undervalued and
told everybody else.

So in my judgment, the analysis has to go beyond simply
ticking off factors, each of which, depending on the
circumstances, may well be relevant and may well
suggest an implicit collusion.

What one has to do instead or in addition, rather, is
to draw back or focus on whether the inference of
collusion really is justified in light of all the
circumstances.

(A1968-A1971).

     The District Court, of course, got the standard exactly

right.  There is no formulaic set of factors which, if proven,

demonstrate the existence of a group.  Rather, Judge Kaplan's

comments demonstrate his well-founded understanding that he

needed to look to all the evidence presented to determine if an

agreement had been reached among the defendants.  See Wellman,

682 F.2d at 363 (noting that court "must sift through the record

to determine whether there is sufficient direct or circumstantial

evidence to support the inference of a formal or informal

understanding between [the parties].").  There is nothing in

-16-

Judge Kaplan's statement of the governing legal principles to indicate that he was refusing to consider circumstantial evidence.  To the contrary, the District Court specifically referenced prior relationships and trading patterns as relevant to making a decision, evidence that is, of course, circumstantial in nature.  <u>See</u> <u>Securities and Exchange Comm'n</u> v. <u>Singer</u>, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992) (stating that circumstantial evidence is "`[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but on other facts from which deductions are drawn, showing indirectly the facts sought to be proved.'") (quoting Black's Law Dictionary (6th ed. 1990)); <u>Panico</u> v. <u>American Export Lines, Inc.</u> 213 F. Supp. 116, 118 (S.D.N.Y. 1962) (defining circumstantial evidence as evidence "which to a greater extent than `direct' evidence, relies, in leading the trier of fact from the evidence to the conclusion sought to be proved, upon the process of reasoning known as inference."); <u>Cf.</u> <u>Fuller</u> v. <u>Gannet Co., Inc.</u>, No. 87 Civ. 0668, 1989 WL 146761 *4 (S.D.N.Y. Nov. 28, 1989) ("Direct evidence is defined as `[e]vidence, which if believed, proves existence of fact in issue without inference or presumption.'") (quoting <u>Castle</u> v. <u>Sangamo Weston, Inc.</u>, 837 F.2d 1550, 1558 n.13 (11th Cir. 1988)).

Similarly, at the very beginning of the trial, Judge Kaplan remarked that he was aware of no "smoking gun" and that this was instead a "circumstantial case." (A299).  Hallwood's counsel attempts to turn this remark on its head and use it as an example of the District Court's insistence on a "smoking gun" and its

-17-

reluctance to consider circumstantial proof.  (Pl. Br. at 20-21).
This argument simply defies logic.  If Judge Kaplan thought that
this was a circumstantial case but that circumstantial evidence
was not relevant to his decision, the trial would have been over
before it started.

It is clear that the District Court understood that Hallwood
could try to prove, and was attempting to prove, its case with
both direct and circumstantial evidence.  There also is no doubt
that the District Court fully considered that evidence in
reaching its decision.

B.    The District Court Considered All Of Plaintiff's Evidence

Hallwood does not argue on this appeal that the District
Court refused to accept into evidence any of its circumstantial
proof.[3]  The transcript of the District Court's decision is clear
that it did not refuse to consider the circumstantial evidence
submitted as Hallwood now claims.  Rather, the District Court
considered all the evidence but determined that it was simply
insufficient to persuade the District Court that Defendants had
agreed to act in concert with respect to acquiring, holding,
voting or disposing of their Units.

In its decision, the District Court stated that it believed
that the strongest evidence relied upon by Hallwood was the

---

[3]  Hallwood's counsel acknowledged at the end of Plaintiff's case
that "we've put in a circumstantial case focusing on the
circumstantial factors that cases like Wellman say are
relevant."  (A775).

-18-

testimony of Hallwood's private investigator, Juval Aviv, and that, <u>if accepted fully by the District Court</u>, was "extremely damaging to the defendants." (A1973). Judge Kaplan, however, determined that he had "serious problems with [the testimony of] Mr. Aviv" and explained why he was not able to credit the testimony of Mr. Aviv over that of Mr. Reiland of PMG. (A1973-A1975). Although Judge Kaplan stated that Mr. Aviv's testimony did not rise to the level of perjury, he stated that he was "not prepared to accept without corroboration his account of what Reiland allegedly told him." (A1975). Judge Kaplan concluded by stating that "the uncorroborated pieces of the conversation with Reiland, simply are not persuasive." (<u>Id.</u>).

The District Court next considered the tape of the conversation between Mr. Aviv and Chris Mahowald of EFO. The Court concluded that this conversation was, at best, equivocal on the question of whether Mr. Mahowald's statements on the tape demonstrated that a group existed. (A1976-1979). Judge Kaplan concluded that "while I don't mean to discount entirely the Mahowald tape, I don't find it to be anything approaching the smoking gun that I think plaintiffs would have me regard it as." (A1979).[4]

---

[4]  In Plaintiff's brief, Hallwood's counsel points to such remarks by Judge Kaplan as demonstrating that the District Court required a "smoking gun" before it was prepared in rule in Hallwood's favor. (<u>See</u> Pl. Br. at 20-21). That interpretation of the District Court's remarks is simply ridiculous. Reading the remarks in context reveals that the District Court was merely stating that it did not believe that

(continued...)

Turning to the Investment Recommendation, the District Court likewise concluded that the document was, at best, equivocal: "And when I take that entire statement that I read, in the context of the whole document, I think that the document is at least as consistent with independent action as it is with collusion." (A1980). Judge Kaplan further noted that statements in the document also demonstrated that certain of the Defendants had adverse interests. (A1980-A1981).

Having considered Hallwood's best direct evidence, the District Court then extensively considered the remaining evidence which Hallwood's counsel had characterized as Hallwood's "top ten reasons" why the existence of a group should be found, including: (i) discussions between the Defendants, (ii) the existence of a viable exit strategy for the investment absent an agreement, (iii) discussions between EFO and its potential investors concerning an investment in Hallwood, (iv) whether Gotham had a modus operandi, and (v) discussions between the principals of PMG and PMG's counsel relative to PMG's Schedule 13G. (A1981-A1984).

Much of this evidence was unquestionably "circumstantial" evidence. See supra at 17. Although Judge Kaplan stated that he found some of this evidence "marginally helpful" in proving

---

(...continued)

the evidence had as much force as Hallwood claimed. It was Hallwood who had attempted to portray the tape and the Investment Recommendation as amounting to "smoking guns." (See, e.g., A721).

Hallwood's case, "in some cases, I think it doesn't go anywhere at all." (A1981-A1982).

Finally, the District Court expressly observed that "[t]he fact that I haven't referred to each and every tidbit [of evidence] shouldn't be taken as evidencing a failure to pay attention to it." (A1984). Rather, Judge Kaplan noted that "the law of diminishing returns applies, and I've cut off where I have because of diminishing returns, not anything else." (Id.).

The District Court summed up its assessment of the case as follows:

> The bottom line, the question is: Am I persuaded by a preponderance of the evidence that any two or more of these defendants formed a group, group being defined in the manner I described before . . . with respect to the securities of the issuer? I am not so persuaded.

(A1984). Judge Kaplan further noted that "in the last analysis [this] is as pure a factual judgment call as I have ever been asked to make in a civil case." (A1984-A1985).

Thus, it is clear from the record that far from refusing to consider Hallwood's circumstantial evidence, the District Court thoroughly analyzed and discussed such evidence in its decision. The District Court, as the factfinder, simply did not find the evidence presented persuasive enough to convince it that Defendants had agreed to act together.

At bottom, Hallwood is trying to persuade this Court that despite the fact that Judge Kaplan rejected Hallwood's strongest direct evidence as unpersuasive, he should have accepted its weaker indirect evidence by drawing all possible inferences in its favor. The District Court, as factfinder, was under no

-21-

obligation to do so. <u>See</u> <u>Stecher-Traung-Schmidt Corp.</u> v. <u>Self</u>,
529 F.2d 567, 568 (2d Cir. 1976) (noting that district court is
not required to "draw only those inferences suggested by [a
party].").

Findings of fact, when based upon the proper legal standard,
are subject to a clearly erroneous standard of review. <u>See</u> <u>supra</u>
at 12-13. Hallwood has not even attempted to argue that any
given finding of fact was clearly erroneous. Accordingly, the
District Court's decision to dismiss the case and enter judgment
in favor of Defendants should be affirmed.

II.

THE DECISION TO STRIKE HALLWOOD'S
<u>DEMAND FOR A JURY TRIAL WAS CORRECT</u>

During discovery in this action, Hallwood's lead counsel
flatly stated: "If you know anything about 13D, you will know
that you can't get money damages from 13D." (A114). Apparently
thinking that Hallwood's claims would fare better with a lay jury
than with a sophisticated District Judge with an extensive
background in securities law, Hallwood's counsel reversed course
after discovery was completed and argued that Hallwood, as an
issuer of securities, was entitled to obtain money damages for a
violation of Section 13(d).[5] Realizing that this newly-minted

---

[5] Hallwood's counsel never explained its reversal of position to
the District Court. Their silence continues as they have not
even acknowledged to this Court their prior statement of the
law.

theory was contrary to the law and common sense, the District
Court dispatched this argument, holding that "plaintiff has no
colorable claim for damages under Section 13 of the Exchange Act"
and granted the motion of Defendants to strike the jury demand.
(A240).  That decision should be affirmed.

A.    A Right To Jury Trial Exists Only
      For Claims That Are Legal In Nature

      The Seventh Amendment of the U.S. Constitution provides that
"[i]n suits at common law, where the value in controversy shall
exceed twenty dollars, the right of trial by jury shall be
preserved, and no fact tried by a jury, shall be otherwise
reexamined in any Court of the United States, than according to
the rules of the common law."  U.S. Const. amend. VII.  It is
well-settled that this Amendment provides a right to a jury trial
only when a claim is legal and not equitable.  See Germain v.
Connecticut Nat'l Bank, 988 F.2d 1323, 1328 (2d Cir. 1993)
(citing Parsons v. Bedford, 28 U.S. 433, 446-47 (1830)); 8 James
Wm. Moore et al., Moore's Federal Practice § 38.10[2][a] (3d Ed.
2000).

      Courts examine two factors in determining whether a claim is
legal or equitable.[6]  First, the court asks whether the claim
would have been traditionally brought at common law in

---

[6]  Contrary to the implication taken by Hallwood's counsel (see
Pl. Br. at 39-40), a party is not entitled to damages merely
because it includes a claim for money damages in its prayer of
relief.  It must, of course, demonstrate that it is entitled
to damages for one or more of its claims.

-23-

Eighteenth-Century England.[7]  See Germain, 988 F.2d at 1328;
Moore's, § 38.10[4][a].  Second, the court asks whether the
relief sought is legal or equitable in nature.  See id.  In
making this determination, the relief sought by the litigant is
the more important factor.  See Germain, 988 F.2d at 1328;
Moore's, § 38.10[4][b] ("The [Supreme] Court has repeatedly
stressed that the second factor -- i.e., characterizing the
relief sought -- is the more important factor of the two in its
analysis.").

When Congress enacts a law creating a cause of action that
did not exist at common law, such as Section 13(d), a right to
trial by jury is available only if the action involves rights and
remedies of the sort traditionally enforced in an action at law.[8]
See Curtis v. Loether, 415 U.S. 189, 193, 94 S. Ct. 1005, 1007-8
(1974) (holding the Seventh Amendment is applicable to causes of

---

[7]  Courts look to whether the claim was classified as one at
common law or in equity in England as of 1791, the year the
Seventh Amendment was ratified.  See Baltimore & Carolina
Line, Inc. v. Redman, 295 U.S. 654, 656-67, 55 S. Ct. 890, 891
(1935); Wright & Miller, Federal Practice & Procedure § 2302
(2d ed. 1995).

[8]  Although Congress may expressly grant litigants the right to a
jury trial in the statute in question, see Wright & Miller,
Federal Practice and Procedure § 2302.2 (2d ed. 1995) ("In
addition to common law claims directly governed by the
constitutional jury trial right, when Congress creates a
statutory cause of action it may state explicitly that a jury
trial must be provided, thereby conferring a statutory jury
trial right."), Section 13(d) contains no such provision.  See
15 U.S.C. §78m (West 1997); see also Rubin v. Posner, 701 F.
Supp. 1041 (D. Del. 1988).

actions based on statutes); Wm. Passalacqua Builders, Inc. v.
Resnick Developers South, Inc., 933 F.2d 131, 135 (2d Cir. 1991)
("It is irrelevant whether the action actually existed in England
in 1791 `for [the Seventh] Amendment requires trial by jury in
actions unheard of at common law, provided that the action
involves rights and remedies of the sort traditionally enforced
in an action at law rather than in action in equity or
admiralty.'") (quoting Pernell v. Southall Realty, 416 U.S. 363,
375 (1974)); Moore's, § 38.10[2][d].

Thus, the analysis of whether a statute that did not exist
at common law entitles a litigant to a jury trial is essentially
the same as described above.  That is to say, a court first must
determine if the cause of action created by Congress is analogous
to some common law suit existing as of 1791.  See Passalacqua
Builders, 933 F.2d at 135 ("First, we compare the statutory
action to 18th-century actions brought in the courts of England
prior to the merger of the courts of law and equity.") (internal
quotes omitted).  In addition, a court must examine the
procedural and remedial sections of the statute creating the
right to determine whether the statute provides for legal or
equitable remedies.  See id. ("Second, we examine the remedy
sought and determine whether it is legal or equitable in
nature.") (internal quotes omitted).

There existed, of course, no common law suit analogous to a
Section 13(d) claim in Eighteenth-Century England.  See Standard
Metals Corp. v. Tomlin, No. 80 Civ. 2983, 1982 WL 1300 *3
(S.D.N.Y. April 14, 1982) (holding that "at common law there

existed no right or duty of disclosure that is required by Section 13(d)" and that Section 13(d) is not a claim "that has been traditionally enforced at law.").

B.    Damages Are Not Recoverable
      For Violation Of Section 13(d)

     No court has ever held that a shareholder or unitholder of equity securities - much less an issuer - is entitled to recover damages for violation of the reporting provisions of Section 13(d) of the Exchange Act.  To the contrary, courts have uniformly stated that damages are not available for a Section 13(d) violation.[9]  See e.g., GAF Corp., 453 F.2d at 720 n. 22 ("We should not be wooden or rigid in granting the right to the issuer seeking equitable or prophylactic relief - *not monetary damages* - to take the necessary steps to effectuate the purposes of section 13(d).") (emphasis added); Global Intellicom, Inc. v. Thomson Kernaghan & Co., No. 99 Civ. 342, 1999 WL 544708 *12 (S.D.N.Y. 1999) ("Although rejecting the existence of an implied right of action for damages under Section 13(d), courts in this circuit have recognized the existence of an implied right of

---

[9]   Although Hallwood's counsel contends that it suffered "monetary injury" sufficient to support a damages remedy, that claim is based exclusively on the fact that Gotham has successfully prosecuted a derivative action against its General Partner, the General Partner's directors, and HGI. (Pl. Br. at 41-43).  Hallwood argues that the pendency of this lawsuit has harmed its Unitholders by lowering the Unit price and by making it more difficult for HGI to sell the company. (Id. at 42).  Even if true, the notion that an issuer can seek damages for harm allegedly caused by a meritorious derivative lawsuit *brought on its behalf* is manifestly wrong.

action by an issuer for injunctive relief."); <u>Sanders</u> v. <u>Thrall</u>
<u>Car Manufacturing Co.</u>, 582 F. Supp. 945 (S.D.N.Y. 1983)
("[C]ourts have consistently refused to imply private rights of
action for damages under § 13(d) and similar reporting provisions
in the 1934 Act."), <u>aff'd on opinion below</u>, 730 F.2d 910 (2d Cir.
1984); <u>Schnell</u> v. <u>Schnall</u>, No. 80 Civ. 2442, 1981 WL 1618 *2
(S.D.N.Y. Mar. 30, 1981) (declining to imply a private right of
action for damages under Section 13(d)); <u>Seagoing Uniform Corp.</u>
v. <u>Texaco, Inc.</u>, 705 F. Supp. 918, 927 (S.D.N.Y. 1989) (noting
that plaintiff foreclosed from asserting a private cause of
action for damages under Section 13(d)); <u>Rubin</u> v. <u>Posner</u>, 701 F.
Supp. 1041, 1051 (D. Del. 1988) (concluding that no implied cause
of action for money damages exists under Section 13(d)); <u>Wellman</u>
v. <u>Dickinson</u>, 497 F. Supp. 824, 835 (S.D.N.Y. 1980) ("[T]his
court has consistently held that no implied private cause of
action for damages exists under 13(d)."), <u>aff'd</u>, 682 F.2d 355 (2d
Cir. 1982).

Hallwood's counsel attempts to distinguish these cases on
the grounds that the discussions either were dicta or that in the
cases where the issue was actually decided, the claims were made
by *shareholders or unitholders*. As an *issuer*, Hallwood claims
that this Court should imply that it has a right to damages under

the statute even though its unitholders do not.[10]    (See Pl.

Br. At 44-47).    This claim is meritless.

In GAF Corp. v. Milstein, 453 F.2d 709 (2d Cir. 1971), this

Court held that an issuer of securities had standing to assert a

violation of Section 13(d).    The Court reasoned:

> GAF, as the issuer, unquestionably is in the best
> position to enforce section 13(d).    The statute
> requires a copy of the statement to be sent by
> registered mail to the issuer (this provision alone
> might support the issuer's standing), and the issuer,
> in the course of constantly monitoring transactions in
> its stock, better than anyone else will know when there
> has been a failure to file.    Moreover, the issuer has
> not only the resources, but the self-interest so vital
> to maintaining an injunctive action.    To play upon
> management's self-interest, of course, raises some
> threat to Congress's express desire not to tip the
> scales in favor of incumbent management as against the
> takeover group.    But, this danger can be adequately
> counteracted if the district court carefully
> scrutinizes self-serving management claims allegedly
> made in the self-interest of investor protection.    And,
> as Electronic Specialty, supra at 946, recognized, `in
> cases where management causes the corporation to bring
> a suit motivated by its own interests and contrary to
> the best interests of the true owners, shareholders
> have their usual remedies for waste.'
>
>                    *    *    *
>
> Nor is it realistic to expect shareholders to deter
> persons from filing inaccurate statements by resort to
> the antifraud provisions.    Stockholders are generally
> unaware of the necessary background information to
> judge the truth or falsity of the statements.
> Additionally, since the Act does not require the
> statements to be disseminated to shareholders, they do
> not have the immediate access of the issuer to the
> filings.    Moreover, there may be instances where no
> shareholder has purchased or sold shares `in reliance'

---

[10]  Hallwood has not argued that the cases holding that
      shareholders lacked an implied right to seek damages were
      wrongly decided.

> on the statements.  In that event, even if the
> shareholders had standing, there would be little
> incentive to maintain an action.

Id. at 719-20 (emphasis added) (internal citations omitted).
This Court further noted that "[t]he committee reports make it
clear that the Act was designed for the benefit of investors and
not to tip the balance of regulation either in favor of
management or in favor of the person seeking corporate control."
Id. at 717 n. 16.

The Second Circuit conferred standing on issuers because of
its concern over possible harm to shareholders or unitholders,
not issuers.  See also Piper v. Chris-Craft Indus., Inc., 430
U.S. 1, 35, 97 S. Ct. 926, 946 (1977) ("The legislative history
thus shows that the sole purpose of the Williams Act was the
protection of investors who are confronted with a tender offer");
Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 58, 95 S. Ct. 2069,
2075-76 (1975) ("The purpose of the Williams Act is to insure
that public shareholders who are confronted by a cash tender
offer for their stock will not be required to respond without
adequate information regarding the qualifications and intentions
of the offering party. . . . The Congress expressly disclaimed an
intention to provide a weapon for management . . ."); Indiana
Nat. Corp. v. Rich, 712 F.2d 1180, 1185 (7th Cir. 1983)
(explaining that "the corporation's standing to sue under Section
13(d) is representational.").

Far from there being any policy reasons supporting a right
to money damages for issuers such as Hallwood, the legislative
history of the Williams Act compels the opposite result.  It is

-29-

noteworthy that notwithstanding significant recent reforms to the
federal securities laws, Congress has not intervened to
legislatively overturn the courts' refusal to imply a right to
damages.

Hallwood attempts to distinguish the shareholder cases by
arguing that the holdings are premised on the existence of an
explicit damages remedy for shareholders in Section 18.
Plaintiff's flawed reading of these cases notwithstanding, that
observation supports - not undermines - the conclusion that
issuers like Hallwood should be denied that right absent a right
to damages having been expressly provided by Congress.  See
United Trans. Union v. Bottalico, 120 F. Supp.2d 407, 409
(S.D.N.Y. 2000) ("[I]t appears that the absence of one specific
remedy in a statute, when others are provided, creates a
presumption that Congress did not intend to provide that remedy.
Here, Congress expressly created a right of action for union
members, but did not do so for unions.").

As succinctly stated by the District Court in its Memorandum
Opinion, denial of a right to damages "comports with the purpose
of the statute." (A240).  Section 13 exists "to alert the
securities *marketplace* to every large, rapid aggregation or
accumulation of securities . . . which might represent a
potential shift in corporate control . . ."  Id. (quoting GAF
Corp., 453 F.2d at 717) (emphasis in original).

The Supreme Court has made clear that the implication of
damages as incident to a newly-created cause of action depends on
legislative intent.  See Transamerica Mortgage Advisors, Inc. v.

-30-

Lewis, 444 U.S. 11, 24, 100 S. Ct. 242, 249 (1979); Touche Ross & Co. v. Redington, 442 U.S. 560, 575, 99 S. Ct. 2479, 2488-89 (1979); Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080 (1975); see also McClellan v. Cablevision of Connecticut, Inc., 149 F.3d 161, 164 (2d Cir. 1998). There is nothing in the language of the statute, its legislative history or subsequent cases to support the notion that issuers were the intended beneficiaries of a remedy for damages or that providing a damages remedy would effect the purposes of the statute. See 15 U.S.C. § 78m(d); S. Rep. No. 90-550 (1967); H. Rep. 90-1711 (1968); see also Berman v. Metzger, No. 80-0394, 1981 WL 1596 *2 (D.D.C. Feb. 9, 1981) ("[T]his court concludes that in Section 13(d) Congress expressed no intent to create a private cause of action for damages."). The Supreme Court in Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 39-40, 97 S. Ct. 926, 948 (1977), stated as follows when refusing to imply a private right of action for damages to tender offerors for violation of proxy solicitation provisions of the Williams Act:

> Nor can we agree that an ever-present threat of damages against a successful contestant in a battle for control will provide significant additional protection for shareholders in general. The deterrent value, if any, of such awards can never be ascertained with precision. More likely, however, is the prospect that shareholders may be prejudiced because some tender offers may never be made if there is a possibility of massive damages claims for what courts subsequently hold to be an actionable violation . . .

Plaintiff's tortured reading of Piper notwithstanding (Pl. Br. at 55-59), the Supreme Court's reasoning in Piper applies equally here.

The attempt by Hallwood's counsel to use the lack of an expressed legislative intent *in its favor* is an approach that has

-31-

been squarely rejected by the Supreme Court. (See Pl. Br. at 62 ("There is certainly nothing in the legislative history of §13(d) to suggest that the scope of Congress's intent regarding these implied rights of action by issuers was confined to injunctive claims only and excluded damages claims.")). In Touche Ross & Co. v. Redington, 442 U.S. 560, 571, 99 S. Ct. 2479, 2486 (1979), the Supreme Court stated:

> As the Court of Appeals recognized, the legislative history of the 1934 Act is entirely silent on whether a private right of action for damages should or should not be available under § 17(a) in the circumstances of this case. SIPC and the Trustee nevertheless argue that because Congress did not express an intent to deny a private cause of action under § 17(a), this Court should infer one. But implying a private right of action on the basis of congressional silence is a hazardous enterprise at best. And where, as here, the plain language of the provision weighs against implication of a private remedy, the fact that there is no suggestion whatsoever in the legislative history that § 17(a) may give rise to suits for damages reinforces our decision not to find such a right of action implicit within the section.

(internal citations omitted). For the same reasons, there is no merit to Hallwood's related argument that this Court should imply a right to damages because this Court previously recognized an issuer's right to sue for injunctive relief and there is nothing explicit in the legislative history that relief should be limited to injunctive relief. (See Pl. Br. at 62); see also Sanders v. Thrall Car Mfg. Co., 582 F. Supp. 945, 961 (S.D.N.Y. 1983) (rejecting the notion that a private right for damages is implicit in the recognition of a private right of action for injunctive relief).

There is nothing in the legislative history to support the implication of an issuer's right to seek damages for a violation

-32-

of Section 13(d).  The District Court's decision striking

Hallwood's jury demand therefore should be affirmed.

<u>CONCLUSION</u>

For the foregoing reasons, the judgment of the District

Court and its decision striking Hallwood's demand for a jury

trial should be affirmed in all respects.

Dated:  New York, New York
        June 25, 2001

                                WHITE & CASE LLP

                    By:   *Philip H. Schaeffer*
                          Philip H. Schaeffer (PS 2139)
                          Karen M. Asner (KA 5950)
                          K. Allison White (KW 1544)
                          1155 Avenue of the Americas
                          New York, New York 10036
                          (212) 819-8200

                          Attorneys for Defendants-Appellees
                          Gotham Partners, L.P., Gotham
                          Partners III, L.P., and Gotham
                          Holdings II, L.L.C.

-33-

CERTIFICATE OF COMPLIANCE
PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

I, PHILIP H. SCHAEFFER, of WHITE & CASE LLP, attorneys of record for defendants-appellees Gotham Partners, L.P., Gotham Partners III, L.P. and Gotham Holdings II, L.L.C., hereby certify, pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, that the foregoing brief complies with the type-volume limitation in Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure.  Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, this certification is made in reliance upon the word-count function of the word-processing system used to prepare the brief (Microsoft Word 1995), which returned a word-count for the brief of 8,803, including headings, footnotes and quotations.  This brief was prepared in 12-point Courier font.

Dated:    June 25, 2001

_____
Philip H. Schaeffer

**EXHIBIT J**

# 01-7246

*To be argued by:*
ROBERT J. GIUFFRA, JR.



## United States Court of Appeals

### FOR THE SECOND CIRCUIT

HALLWOOD REALTY PARTNERS, L.P.,

*Plaintiff-Appellant,*

— v. —

GOTHAM PARTNERS, L.P., GOTHAM PARTNERS III, L.P.,
PRIVATE MANAGEMENT GROUP, INC., INTERSTATE PROPERTIES,
STEVEN ROTH, EFO/LIBERTY, INC., GOTHAM HOLDINGS II, L.L.C.,
HALLWOOD INVESTORS, L.P. and LIBERTY REALTY PARTNERS, L.P.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES INTERSTATE PROPERTIES AND STEVEN ROTH

Robert J. Giuffra, Jr.
David M.J. Rein
SULLIVAN & CROMWELL
125 Broad Street
New York, New York  10004
(212) 558-4000

*Attorneys for Defendants-Appellees Interstate Properties and Steven Roth*

June 25, 2001

## CERTIFICATE OF INTERESTED PARTIES

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, defendant-appellee Interstate Properties certifies that it has no parent corporations, and that no publicly-held companies own 10% or more of its partnership units.

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................. iv

PRELIMINARY STATEMENT ............................................. 1

COUNTERSTATEMENT OF ISSUES PRESENTED ...................... 4

COUNTERSTATEMENT OF FACTS ...................................... 4

    1.    `The Parties ......................................................... 5

    2.    Interstate's Investment in Hallwood Units ......................... 7

    3.    Interstate's Schedule 13Ds ......................................... 9

    4.    Hallwood's Complaint ........................................... 10

    5.    Discovery and The Striking of Hallwood's
        Jury Demand ...................................................... 11

    6.    The Absence of Evidence for Hallwood's Claims
        Against the Interstate Appellees ................................. 13

        a.    The Investment Recommendation .......................... 13

                i.    The Hallwood Holdings of the
                      Interstate Appellees ................................. 13

                ii.    The Misdescription of the Relationship
                      Between Gotham's Principals and
                      Mr. Roth ............................................. 15

        b.    The Interstate Appellees' Limited and Unexceptional
             Contacts With Gotham ...................................... 16

*Page*

        i.     Possible Investments ................................. 16

        ii.    The Reebok Gym Encounters ...................... 17

    c.   The Interstate Appellees' Lack of Contact with the Other Alleged Group Members ......................... 18

    d.   The "Serious Problems" Surrounding The Testimony of Hallwood's Private Investigator ............ 19

  7.   Judge Kaplan's Ruling ........................................... 22

SUMMARY OF ARGUMENT ............................................... 24

COUNTERSTATEMENT OF STANDARD OF REVIEW ............... 25

ARGUMENT ................................................................... 26

I.    THE DISTRICT COURT CORRECTLY FOUND NO GROUP UNDER  SECTION 13(D). .................................. 26

    A.   The District Court Correctly Applied this Court's Law Interpreting Section 13(d). ................................... 26

    B.   The District Court Properly Relied on Both Direct And Circumstantial Evidence To Find That a Group Had Not Been Formed. ........................................... 29

    C.   In Any Event, the District Court's Findings Of Fact Were Not Clearly Erroneous. ...................................... 32

II.   HALLWOOD'S CLAIMS WERE PROPERLY TRIED TO THE COURT. ............................................. 35

–ii–

*Page*

A.      There Is No Jury Trial Right for Actions
        Grounded in Equity. ............................................ 35

B.      There is No Jury Trial Right for an Issuer's
        Section 13(d) Claims. ......................................... 40

        i.      Courts Have Uniformly Refused To
                Recognize a Right of Action for Money
                Damages Under Section 13(d). ........................ 40

        ii.     The Court Should Reject Hallwood's Request
                To Rewrite Section 13(d). ........................... 43

CONCLUSION ............................................................. 47

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*In re Air Disaster at Lockerbie,*
  144 F.R.D. 613 (E.D.N.Y. 1992) ........................................ 19-20

*Anderson* v. *City of Bessemer,*
  470 U.S. 564 (1985) ........................................................ 26

*Bayly Corp.* v. *Marantette,*
  No. 82-1354, 1982 WL 1337 (D.D.C. 1982) ................................ 28

*Beacon Theatres, Inc.* v. *Westover,*
  359 U.S. 500 (1959) ........................................................ 37

*Campbell* v. *Metropolitan Property & Casualty Insurance Co.,*
  239 F.3d 179 (2d Cir. 2001) ................................................ 26

*Corenco Corp.* v. *Schiavone & Sons, Inc.,*
  488 F.2d 207 (2d Cir. 1973) ............................................... 34

*Cunningham* v. *Erie Railroad Co.,*
  358 F.2d 640 (2d Cir. 1966) ................................................ 25

*In re Evangelist,*
  760 F.2d 27 (1st Cir. 1985) ................................................. 38

*GAF Corp.* v. *Milstein,*
  453 F.2d 709 (2d Cir. 1971) ................................ 12, 26, 41-42, 45

*Gartenberg* v. *Merrill Lynch Asset Management., Inc.,*
  487 F. Supp. 999 (S.D.N.Y. 1980) .......................................... 38

*Gateway Industries, Inc.* v. *Agency Rent A Car, Inc.,*
  495 F. Supp. 92 (N.D. Ill. 1980) .......................................... 42, 43

*Page(s)*

*Global Intellicom, Inc.* v. *Thomas Kernaghan & Co.,*
  No. 99 Civ. 342 (DLC), 1999 WL 544708
  (S.D.N.Y. July 27, 1999) ....................................................... 42

*Grand Metropolitan PLC* v. *Pillsbury Co.,*
  558 A.2d 1049 (Del. Ch. 1988) ............................................... 39

*Granfinanciera, S.A.* v. *Nordberg,*
  492 U.S. 33 (1989) .......................................................... 36-37

*Hallwood Realty Partners, L.P.* v. *Gotham Partners, L.P.,*
  No. 00 Civ. 1115 (LAK), 2001 WL 46978
  (S.D.N.Y. Jan. 19, 2001) ...................................................... 12

*Indiana National Corp.* v. *Rich,*
  712 F.2d 1180 (7th Cir. 1983) ............................................... 43

*Joseph* v. *New York City Board of Education,*
  171 F.3d 87 (2d Cir. 1999) ..................................................... 2

*K-N Energy, Inc.* v. *Gulf Interstate Co.,*
  607 F. Supp. 756 (D. Colo. 1983) ........................................... 34

*Maldonado* v. *Flynn,*
  477 F. Supp. 1007 (S.D.N.Y. 1979) ........................................ 38

*Mar Oil S.A.* v. *Morrissey,*
  982 F.2d 830 (2d Cir. 1993) ................................................... 25

*Meloff* v. *New York Life Insurance Co.,*
  240 F.3d 138 (2d Cir. 2001) .................................................. 25

*Merex A.G.* v. *Fairchild Weston Systems, Inc.,*
  29 F.3d 821 (2d Cir. 1994) ................................................... 38

*Page(s)*

*Myers* v. *American Leisure Time Enterprises, Inc.*,
402 F. Supp. 213 (S.D.N.Y. 1975), *aff'd*,
538 F.2d 312 (2d Cir. 1976) ................................................... 41

*National Railroad Passenger Corp.* v. *National Association
of Railroad Passengers*, 414 U.S. 453 (1974) .............................. 44

*Northwest Airlines, Inc.* v. *Transport Workers Union of America*,
451 U.S. 77 (1981) ............................................................ 44

*Palazzo* v. *Corio*,
232 F.2d 38 (2d Cir. 2000) .............................................. 25, 26

*Piper* v. *Chris-Craft Industries, Inc.*,
430 U.S. 1 (1977) .......................................................... 45-46

*Prisco* v. *State of New York*,
91 Civ. 3990 (RLC), 1995 WL 693251
(S.D.N.Y. Nov. 22, 1995)...................................................... 39

*Raishevich* v. *Foster*,
247 F.3d 337 (2d Cir. 2001) ................................................. 25

*Repp* v. *Webber*,
132 F.3d 882 (2d Cir. 1997) ................................................. 25

*Rondeau* v. *Mosinee Paper Corp.*,
422 U.S. 49 (1975) ........................................................... 45

*Rosenman & Colin* v. *Richard*,
850 F.2d 57 (2d Cir. 1988) .................................................. 38

*Rubin* v. *Posner*,
701 F. Supp. 1041 (D. Del. 1988) ....................................... 40, 41

–vi–

*Page(s)*

*Sanders* v. *Thrall Car Manufacturing Co.*,
    582 F. Supp. 945 (S.D.N.Y. 1983), *aff'd*,
    730 F.2d 910 (2d Cir. 1984) ........................................ 40-41, 44

*Scala* v. *Moore McCormack Lines, Inc.*,
    985 F.2d 680 (2d Cir. 1993) ................................................ 25

*Seagoing Uniform Corp.* v. *Texaco, Inc.*,
    705 F. Supp. 918 (S.D.N.Y. 1989) ........................................ 41

*SEC* v. *Commonwealth Chemical Securities, Inc.*,
    574 F. 2d 90 (2d Cir. 1978) ............................................... 38

*SEC* v. *The Hallwood Group, Inc. and Anthony J. Gumbiner*,
    CA-3-96-CV-204S-J (N.D. Tex. July 22, 1996) ........................... 6-7

*Shumway* v. *United Parcel Service*,
    118 F.3d 60 (2d Cir. 1997) ............................................... 35

*Standard Metals Corp.* v. *Tomlin*,
    No. 80 Civ. 2983 (CBM), 1982 WL 1300
    (S.D.N.Y. Apr. 14, 1982) ................................................. 42

*Tate & Lyle PLC* v. *Staley Continental, Inc.*,
    Civ. A. No. 9813, 1988 WL 46064
    (Del. Ch. Apr. 28, 1988) ................................................. 39

*Texasgulf, Inc.* v. *Canada Development Corp.*,
    366 F. Supp. 374, (S.D. Tex. 1973) ...................................... 28

*Touche Ross & Co.* v. *Redington*,
    442 U.S. 560 (1979) ................................................. 40, 44

*Tull* v. *United States*,
    481 U.S. 412 (1987) ..................................................... 37

*Page(s)*

*Universal Container Corp.* v. *Horwitz,*
   No. 74 Civ. 3865 (WCC), 1977 WL 1036
   (S.D.N.Y. Sept. 6, 1997) ................................................ 27, 28

*Wellman* v. *Dickinson,*
   682 F.2d 355 (2d Cir. 1982) ............................................. 27, 28

*Wheatley* v. *Ford,*
   679 F.2d 1037 (2d Cir. 1982) ............................................ 2, 25

**Constitutional Provisions, Statutes and Administrative Materials**

U.S. Const. amend. VII ......................................................... 36

15 U.S.C. § 78r(a) (1994) ..................................................... 43

15 U.S.C. § 78m(d) (1994) .................................................. 1, 27

Fed. R. Civ. P. 52(a) .......................................................... 25

17 C.F.R. § 240.13d-1 (2001) ................................................. 27

17 C.F.R. § 240.13d-5 (2001) ................................................. 27

SEC Litig. Release No. 14986, 62 SEC
   Docket 1172 (July 22, 1996) ............................................. 6-7

**Miscellaneous**

10B Charles Alan Wright & Arthur R. Miller, *Federal
Practice and Procedure* § 2769 (3d ed. 1998) ......................... 38-39

Robert Tomsho, *Hallwood Group Settles Allegations of Insider
Trading,* Wall St. J., July 23, 1996, at C23 ............................. 7

## PRELIMINARY STATEMENT

After a three-day bench trial, Judge Lewis Kaplan correctly summed up this case: "This in the last analysis is as pure a factual judgment call as I have ever been asked to make in a civil case. Nobody really has any quarrel about the law. There is no legal issue in this case." (Joint Appendix ("JA") at 1984). Having seen its case dismissed after a full and careful review of the evidence by an experienced district judge, Plaintiff-Appellant Hallwood Realty Partners, L.P. ("Hallwood") now tortures and distorts the trial record in an effort to create "legal issues" for its appeal.

Hallwood's appeal rests principally on the spurious contention that Judge Kaplan did not consider circumstantial evidence in reaching his factual finding that defendants did not form a group under Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d) (1994) (the "Exchange Act"). In support of that assertion, Hallwood cites no evidence — circumstantial or direct — that Judge Kaplan excluded, nor any statement by Judge Kaplan that he would not consider circumstantial evidence. Instead, Hallwood misconstrues Judge Kaplan's statements that certain specific Hallwood evidence was not a "home run" or a "smoking gun," a thought Hallwood claims to mean that he refused to consider circumstantial evidence. In fact, Judge Kaplan expressly recognized that "[i]t's largely a circumstantial case" (JA-299) and relied on both direct ***and***

circumstantial evidence in finding that the defendants did not form a Section 13(d) group.

At the end of its argument, Hallwood reveals its true criticism: that Judge Kaplan "refuse[d] to meaningfully entertain" and "dismissed the relevance" of Hallwood's evidence. (Hallwood Br. at 37, 38). At bottom, then, Hallwood objects to Judge Kaplan's *weighing* of the evidence. Under settled Second Circuit law, this Court must "view the evidence and draw all factual inferences in favor of the appellee," *Wheatley* v. *Ford*, 679 F.2d 1037, 1039 (2d Cir. 1982), and "the weight of the evidence is an argument to be made to the factfinder at trial, not a ground for reversal on appeal." *Joseph* v. *New York City Bd. of Educ.*, 171 F.3d 87, 93 (2d Cir. 1999).

Notwithstanding Hallwood's massive discovery, there was no evidence that Defendants-Appellees Interstate Properties ("Interstate") and Steven Roth (together, the "Interstate Appellees") were part of a "group" led by Defendants-Appellees Gotham Partners, L.P., Gotham Partners III, L.P. and Gotham Holdings II, L.L.C. (collectively, "Gotham"). The Interstate Appellees have never agreed to act in concert — the legal requirement to establish the existence of a group — with Gotham or any of the other appellees in regard to any matter, much less with respect to Hallwood. Given the compelling evidence of independent action by Interstate and Mr. Roth, there is simply no basis for

-2-

upsetting Judge Kaplan's considered factual finding that they were not part of a Gotham-led "group," and Hallwood does not even challenge that finding as clearly erroneous, preferring instead to create a "legal issue" on the basis of its demonstrably false claim that Judge Kaplan did not consider circumstantial evidence.

Mr. Roth is the Chairman and CEO of Vornado Realty Trust ("Vornado"), one of the Nation's ten largest real estate investment trusts ("REITs"). (JA-1272-73). Mr. Roth and his partners at Interstate have a long history of successfully investing in the undervalued securities of public companies with substantial real estate assets. (JA-1273-75, 1293-94). At trial, the evidence demonstrated that Interstate undertook extensive due diligence of Hallwood, and independently invested in Hallwood because Hallwood's Units were trading at a substantial discount to the value of its real estate assets. (JA-1274-77, 1295-97, 1304-06, 1312-14). Interstate's $5.9 million investment in Hallwood (as of January 31, 2001, worth $9.3 million) represented only a small fraction of Interstate's more than $500 million in assets. (JA-1277).

Moreover, this Court should affirm Judge Kaplan's ruling that Hallwood had no right to a jury trial of its claims under Section 13(d). Hallwood cannot cite any case authorizing the jury trial of a claim under Section 13(d). In fact, while attempting to block discovery in this action, Hallwood's counsel, Thomas McCormack, declared: "If you know anything about 13D, you will know

-3-

*you can't get money damages from 13D*." (JA-114) (emphasis added). To evade this settled law, Hallwood now asks this Court to imply a new right of action permitting *issuers* to seek money damages for violations of Section 13(d), even though courts have repeatedly rejected any right of *shareholders* to seek money damages under Section 13(d). *See infra* at II.B. In proposing this new right of action, Hallwood dismisses as "passing *dicta*" and "casual remark[s]" statements of this Court and others rejecting an implied right of action for issuers to seek money damages under Section 13(d). (Hallwood Br. at 49, 50).

## COUNTERSTATEMENT OF ISSUES PRESENTED

1.    Whether, after weighing all of the direct and circumstantial evidence, Judge Kaplan clearly erred in finding that Interstate and Mr. Roth were *not* part of a Section 13(d) group.

2.    Whether Judge Kaplan erred by refusing to fashion a new implied right of action for an issuer to seek money damages under Section 13(d) of the Securities Exchange Act of 1934 — a right not permitted to shareholders and contrary to settled authority — and, therefore, erred in striking Hallwood's jury demand.

## COUNTERSTATEMENT OF FACTS

It is telling that Hallwood's lengthy "Statement of Facts" ignores Judge Kaplan's detailed ruling following a three-day bench trial. Dismissing

Judge Kaplan's central finding that Defendants-Appellees were not a Section 13(d) group (JA-1984-85), Hallwood recites a litany of unfounded and unfound "facts." Not once in its recitation of the supposed "facts" does Hallwood cite to Judge Kaplan's findings of fact. (*See* Hallwood Br. at 7-19). Instead, just as it did before the district court, Hallwood relies on selectivity, distortion and innuendo to conjure up an image far different from the facts found at trial.

### 1.    The Parties

In 1968, Steven Roth founded Interstate with Russell Wight, Jr and another partner. (JA-1272). From 1968 through the early 1980s, Interstate's primary business was developing and operating shopping centers. (JA-1273). In the mid-1970s, Interstate began investing in the securities of public companies with substantial real estate assets. (JA-1273). In the late 1970s, Interstate invested in Vornado, which at that time was a failing retailer with undervalued real estate assets. (JA-1273-74). By the early 1980s, following Interstate's successful investment in Vornado, investing in securities became Interstate's primary business. (JA-1273). The current net value of Interstate's assets is more than $500 million. (JA-1303).

Interstate's largest investment is in Vornado, which now owns more than fifty shopping center properties in seven states, the Merchandise Mart in Chicago, all or portions of twenty-one office building properties in the New York

City area, and a 60% interest in AmeriCold Logistics, LLC, one of the largest cold storage companies in the United States. (JA-1273-74). As of January 31, 2001, Vornado's total market capitalization was approximately $8 billion. (JA-1274).

In making investments, Interstate "seeks to invest in the securities of public companies when the value of the company's real estate assets exceeds its market capitalization." (JA-1275). To search for undervalued companies, Messrs. Roth and Wight spend many hours reviewing SEC filings, trade publications, and the financial press. (JA-1274, 1294). Each year, their staff prepare numerous "write-ups" analyzing the finances and real estate holdings of public companies. (JA-1303-04).

Plaintiff Hallwood, a Delaware limited partnership, "acquires, owns and operates commercial real estate in the United States." (JA-1961). Hallwood Units are traded on the American Stock Exchange. (JA-1961). Hallwood's Chief Executive and "ultimate decision-maker" is Anthony Gumbiner, a resident of Monte Carlo. (JA-822).[1]

---

[1]    On July 22, 1996, the parent of Hallwood's general partner and Mr. Gumbiner settled SEC charges involving insider trading in the stock of ShowBiz Pizza Time, Inc.  *See SEC* v. *The Hallwood Group, Inc. and Anthony J. Gumbiner*, CA-3-96-CV-204S-J (N.D. Tex., July 22, 1996) (Final Judgment and Order); SEC Litig. Release No. 14986, 62 SEC Docket 1172 (July 22, 1996).  Hallwood's general partner agreed to disgorge approximately $953,000 in ill-gotten gains, and Mr. Gumbiner paid a civil
(continued...)

Since the 1980s, Hallwood has "repackaged and promoted the securities of a raft of troubled companies. In lawsuits in state and federal courts, the partners and Hallwood affiliates have been accused of misrepresenting the value of securities and enriching themselves with fees, while other investors suffered big losses. In recent years, Hallwood has settled many of those lawsuits." Robert Tomsho, *Hallwood Group Settles Allegations of Insider Trading*, Wall St. J., July 23, 1996, at C23.

## 2.    Interstate's Investment in Hallwood Units

Sometime in 1994 or early 1995, through its regular review of public companies, Interstate identified Hallwood as a possible investment. (JA-1275, 1295). On the basis of a valuation analysis of Hallwood, dated January 10, 1995, prepared by his staff (JA-1268), Mr. Roth calculated that Hallwood's office space was worth at least $210 million, while its industrial space was worth at least $50 million. (JA-1276). Accordingly, Mr. Roth's "back-of-the-envelope" analysis indicated that the value of Hallwood's real estate, less mortgage debt of $160 million, was roughly $100 million, about five times greater than Hallwood's then-equity market capitalization of $20 million. (JA-1276).

---

[1]/(...continued)
    penalty of approximately $477,000. *See id.*

In May 1995, Messrs. Roth and Wight decided to buy several thousand Hallwood Units. (JA-1276, 1295). There was no evidence at trial that Messrs. Roth or Wight knew that any of the other defendants in this action then owned any Hallwood Units.

In June 1995, *The Wall Street Journal* reported that Hallwood was going to sell Units it purchased from an odd-lot tender to affiliates of its general partner. (JA-1295-96). This unusual transaction, which permitted Hallwood's insiders to increase their ownership of thinly-traded Hallwood Units without paying a "control" premium, confirmed Interstate's view that those Units were grossly undervalued. (JA-1295-96). By the end of June 1995, Interstate increased its position in Hallwood to 11,500 Units. (JA-1296).

In late 1995, Interstate conducted more extensive due diligence of Hallwood's real estate assets. (JA-1296). Mr. Wight and Todd Bassen visited Hallwood's properties in Georgia, Maryland, Michigan, and Washington State. (JA-1296, 1312). Interstate's due diligence file contains substantial information on Hallwood real estate properties, including valuations prepared by Interstate, photographs taken on visits to the properties, and local real estate market data. (*See* JA-1296, 1306, 1312-14).

3.    **Interstate's Schedule 13Ds**

On November 24, 1998, Interstate filed a Schedule 13D disclosing its acquisition of 5.7% of Hallwood's Units. (JA-1256-61). In Item 4 of the Schedule 13D, entitled "Purpose of Transaction," Interstate disclosed that:

> Interstate acquired the Units described in Item 5 for investment purposes.
>
> Interstate will assess its investment in the Company and depending on market conditions and other factors may acquire additional Units dispose of all or any portion of the Units it now owns or may hereafter acquire seek to engage in extraordinary corporate transactions such as a merger or other reorganization involving the Company or a purchase sale or transfer of a material amount of the assets of the Company or any of its subsidiaries (which extraordinary transaction could involve one or more additional parties) engage in discussions with the management and/or other significant unitholders of the Company and take any other action which Interstate may deem to be appropriate in the circumstances.

(JA-1258).

Because Messrs. Roth and Wight believed that the trading price of Hallwood Units did not reflect the value of its real estate assets, Interstate generally continued to purchase Hallwood Units. (JA-1297). On occasion, however, Interstate sold some Hallwood Units to take trading profits. On October 2, 1997, for example, Interstate sold 1,000 Units and, in April 1997, Interstate sold another 5,000 Hallwood Units. (JA-1297).

-9-

With the assistance of Sullivan & Cromwell, Clifford Broser prepared Interstate's Schedule 13Ds. (JA-1297-98, 1307-08). Both Messrs. Roth and Wight reviewed these filings. (JA-1278, 1298). To ensure compliance with Section 13(d), Mr. Broser monitored Smith Barney transaction reports and received a record of each Interstate transaction in Hallwood Units at the time of the transaction. (JA-1307-08, 1317-18).

As required by Section 13(d), Interstate filed amendments to its Schedule 13D on March 25, 1999 (7.0%), August 30, 1999 (8.0%), and July 28, 2000 (9.0%). (JA-955-62,1262-65). Interstate's disclosure with respect to the purpose of its Hallwood investment has remained the same in those filings.

### 4.  Hallwood's Complaint

On February 15, 2000, Hallwood filed this action asserting three causes of action against Interstate and Mr. Roth.

First, the Complaint alleged that the Interstate Appellees "have actually acquired beneficial ownership of approximately 13.5% of the outstanding Hallwood Units." (JA-94). From this speculation, the Complaint alleged that Interstate and Mr. Roth "knowingly" failed to file Schedule 13Ds with the SEC reflecting their "true beneficial ownership in Hallwood." (JA-94-95).

-10-

Second, the Complaint alleged that the Interstate Appellees have "knowingly failed . . . to disclose [their] decision to act as a group with other owners of Hallwood Units." (JA-98).

Third, the Complaint sought a declaratory judgment finding that defendants, including Interstate and Mr. Roth, "acting in concert, have acquired beneficial ownership of 15% or more of the outstanding Hallwood Units" and, thus, "become an 'Acquiring Person' under Hallwood's Unit Purchase Rights Agreement," *i.e.*, "poison pill." (JA-102).

Finally, in its prayer for relief, Hallwood sought an array of equitable remedies, including divestiture, corrective disclosure, and an injunction against the acquisition of further units and instituting a "cooling-off period." At the end, in a boilerplate statement, Hallwood sought "such damages and the costs and disbursements of this action, as are permitted by applicable law." (JA-103).

## 5.    Discovery and the Striking of Hallwood's Jury Demand

Following the denial of defendants' motions to dismiss the Complaint, Hallwood embarked on a massive and costly fishing expedition. Hallwood took 35 depositions around the country, including depositions of the most senior officers of Interstate and Vornado. The Interstate Appellees produced to Hallwood more than 15,000 pages of documents, and Hallwood obtained from

-11-

third-parties years of home and business telephone records for all of the defendants filling approximately thirty boxes.

Although Hallwood had sought a trial by jury, this demand was struck by Judge Kaplan. *Hallwood Realty Partners, L.P.* v. *Gotham Partners, L.P.*, No. 00 Civ. 1115 (LAK), 2001 WL 46978 (S.D.N.Y. Jan. 19, 2001) (JA-238-40). Judge Kaplan declared that "[p]lainly, plaintiff is not entitled to a jury on any of its equitable claims." (JA-239). With regard to Hallwood's purported claim for damages under Section 13(d), Judge Kaplan observed that "[c]ourts repeatedly have held that no such right of recovery may be inferred under Section 13 in favor of shareholders," and that cases addressing the availability of damages to issuers under Section 13 "indicate uniformly that there is no such right to relief." (JA-239-40). Noting that the purpose of Section 13(d) is "to alert the securities *marketplace* to every large, rapid aggregation or accumulation of securities . . . which might represent a shift in corporate control" ((JA-240, quoting *GAF Corp.* v. *Milstein*, 453 F.2d 709, 717 (2d Cir. 1971) (emphasis added)), Judge Kaplan reasoned that this statute "was not intended to protect issuers, much less afford them a vehicle for recovering damages." (JA-240). Accordingly, Judge Kaplan concluded that Hallwood had "no colorable claim for damages under Section 13 of the Exchange Act" and struck Hallwood's jury demand. (JA-240).

-12-

6.    **The Absence of Evidence for Hallwood's Claims Against the Interstate Appellees**

Trial occurred over three days in February 2001. Direct examination was submitted in the form of witness statements, and ten witnesses also testified live before Judge Kaplan, including the principals of all of the accused group members. The Interstate Appellees also submitted the direct testimony of five witnesses by witness statement alone, and Hallwood chose not to cross-examine any of those witnesses. (JA-808, 813, 1287-1319).

a.    **The Investment Recommendation**

i.    **The Hallwood Holdings of the Interstate Appellees**

In Hallwood's view, one of the "most important piece[s] of evidence" was the Liberty/EFO Investment Recommendation (the "Investment Recommendation") (JA-1979), which Liberty/EFO prepared to propose to its clients an investment in Hallwood. (JA-1336).

In one passage, the Investment Recommendation erroneously asserts:

> In this regard, Steve Roth (personally) and Interstate Properties (controlled by Steve Roth) together own approximately 225,000 Hallwood units (13.5% of the outstanding units) which were acquired at prices ranging from $51½ to $58. The principals of Gotham claim to have a long-standing personal relationship with Roth but have purposefully avoided conversations about Hallwood so as not to trigger the poison pill.

(JA-914).

-13-

As of the August 3, 1999, the date of the Investment Recommendation, Interstate owned only 128,400 (less than 8%) of Hallwood Units — not 225,000 (13.5%) of Hallwood's Units, as was erroneously claimed in that document. (JA-1284, 1300, 1310). And, Interstate purchased its Hallwood Units at prices ($10.50 to $65.875) lower and higher than stated in the Investment Recommendation ($51½ to $58). (JA-1284, 1300, 1310).

At trial, EFO's Christopher Mahowald, the author of the Investment Recommendation, testified that after reexamining the public filings on which he had relied, "the number of units, and the purchase price of those units, which I attributed to Interstate Properties and Mr. Roth were in error." (JA-1335). Although Mr. Mahowald had never spoken with anyone at Interstate (JA-1336), he regarded Mr. Roth as having the reputation of "a savvy real estate investor" (JA-1336) and simply used Mr. Roth's name to "add[] credibility" to the investment EFO was proposing to its clients (JA-1336).

At trial, Hallwood's only evidence for its claim that Mr. Roth and/or Interstate owned 13.5% of Hallwood's Units was the erroneous reference to Mr. Roth in the Investment Recommendation. Hallwood's own internal records (kept for tax reporting purposes), Interstate's broker's records, and the testimony of Mr. Roth, his partner, his staff who monitor his investments for tax and securities reporting purposes and his broker all contradicted this claim. (JA-366-67, 1277,

-14-

1288, 1298, 1307, 1317-19).  Given the absence of any supporting evidence,
Judge Kaplan dismissed, at the close of Hallwood's evidence, Hallwood's claim
that Mr. Roth and/or Interstate owned 13.5% of Hallwood Units.  (JA-811-12).
Hallwood has not appealed this ruling.

### ii.    The Misdescription of the Relationship Between Gotham's Principals and Mr. Roth

The evidence also proved that there was no basis for the Investment
Recommendation's assertion that Gotham's principals have a "long-standing
personal relationship" with Mr. Roth.  (JA-914).  Mr. Mahowald based this
statement on his conversation with Gotham's Mr. Ackman in April or May 1999.
(JA-591).  Mr. Mahowald acknowledged that he did not take any notes of the
meeting, and that the Investment Recommendation was prepared "several months
after" the meeting.  (JA-591-92).

The consistent testimony of the other witnesses confirmed that no
such "long-standing personal relationship" ever existed between Messrs. Roth and
Ackman.  Thus, Mr. Ackman testified that he has "never done a business deal
together with Mr. Roth."  (JA-771).  And, Mr. Roth testified:  "I have never
socialized with anyone from Gotham. . . .  Mr. Ackman is not a social
acquaintance, but merely one of the hundreds of people in the investment industry
I know.  I do not have any sort of relationship with anyone else from Gotham."

-15-

(JA-1285). Mr. Wight, Mr. Roth's partner in Interstate, never discussed Gotham with Mr. Roth prior to the start of this action, and he testified that he never spoke with anyone from Gotham. (JA-1298).

### b. The Interstate Appellees' Limited and Unexceptional Contacts With Gotham

As an active real estate investor, Mr. Roth routinely speaks with hundreds of people involved in the business, including investment bankers, brokers, and other investors. (JA-1279). He is frequently asked to participate in various proposed transactions, and he declines to participate in the great majority of those transactions. (JA-1279).

The evidence at trial showed that since the mid-1990s, Mr. Roth and certain of his colleagues at Vornado had a limited number of contacts with Gotham's Mr. Ackman, and that Interstate, Vornado or Mr. Roth have never invested, either directly or indirectly, in any Gotham entity, or engaged with Gotham in any business transaction. (JA-771, 747, 1230, 1246-49, 1279-82, 1289-91, 1298-99).

### i. Possible Investments

In the mid-1990s, at Mr. Ackman's request, Mr. Roth met with Mr. Ackman to discuss a possible investment in Rockefeller Center. (JA-1280). After several follow-up telephone calls, Mr. Roth decided not to invest in

Rockefeller Center. (JA-1280). Hallwood was not discussed during any of these communications. (JA-1280).

Mr. Ackman subsequently called Mr. Roth and Michael Fascitelli, Vornado's President, with proposals for investments in McDonald's, First Union Real Estate Equity and Mortgage Investments ("First Union"), and Best Products. (JA-1280-81, 1289). Vornado rejected each of Mr. Ackman's proposed deals. (JA-1280-81, 1289-90). Mr. Ackman also called Mr. Fascitelli for advice on suitable candidates for the CEO of First Union and to solicit charitable donations. (JA-1290). There was no evidence that Hallwood was ever mentioned in any of these discussions. (*See* JA-1280-81, 1289-90).

### ii.    The Reebok Gym Encounters

Mr. Roth and Mr. Ackman have crossed paths on no more than a handful of occasions at the Reebok gym on Manhattan's Upper West Side. (JA-1281-82). Because Mr. Roth joined the gym only on February 25, 1999, these encounters all occurred after Interstate had already acquired between 5.7% and 7.0% of Hallwood Units. (JA-1256-1265, 1281). In several short conversations, Mr. Ackman and Mr. Roth spoke about Hallwood. (JA-1281-82). Specifically, Mr. Roth asked Mr. Ackman about the Delaware litigation, and Mr. Ackman described the litigation, saying that he expected the case to take a long time and eventually settle. (JA-1281-82). Mr. Roth also may have asked Mr. Ackman what

-17-

he thought Hallwood Units were worth, and Mr. Ackman may have responded with an amount greater than $100. (JA-1282). There was no evidence — none — that Messrs. Roth and Ackman ever discussed any agreement or understanding concerning Hallwood.

### c.    The Interstate Appellees' Lack of Contact with the Other Alleged Group Members

Prior to this action, Messrs. Roth and Wight knew nothing about defendant PMG, and had no recollection of ever speaking to anyone from PMG. (JA-1278, 1299).   Robert Summers, the Chief Financial Officer of PMG who shares portfolio management responsibilities with PMG's President and Chairman Dennis Reiland, testified that he has never communicated with Interstate or Mr. Roth. (JA-820). The only contact between PMG and the Interstate Appellees was a telephone message left by Mr. Reiland for Mr. Roth on December 4, 1998. (JA-954.1, 1283).   Mr. Roth may have forwarded this message to Mr. Wight to handle, but there is no evidence that Mr. Reiland's call was returned by Messrs. Roth or Wight. (JA-954.1 (message slip forwarded to Mr. Wight); JA-1283 (Mr. Roth testifying that Vornado fax header indicates "I may have faxed this message to Mr. Wight to handle); JA-1299 (Mr. Wight testifying that he does not recall returning the call); JA-1366 (Mr. Reiland testifying that call "was never returned," and that he has never spoken with Mr. Roth or anyone from Interstate).

-18-

Messrs. Roth and Wight also testified that they have never spoken with anyone from EFO, including Mr. Mahowald, the author of the Investment Recommendation. (JA-1278, 1299). The EFO defendants, including Mr. Mahowald, similarly testified they have never communicated with the Interstate Appellees. (JA-590, 723, 1336, 1345).

### d. The "Serious Problems" Surrounding The Testimony of Hallwood's Private Investigator

Hallwood devotes much of its recitation of the facts to a discussion of the evidence offered by its private investigator, Juval Aviv, without mentioning Judge Kaplan's conclusion that "I have some serious problems with Mr. Aviv." (Hallwood Br. at 10-14; JA-1973). Mr. Aviv, who purports to be a former member of the Mossad, had previously gained notoriety for developing a theory that "the CIA facilitated the bomb going aboard" Pan Am Flight 103 that exploded over Lockerbie, Scotland. (JA-492, 496). This theory was developed by Mr. Aviv in connection with his retention by Pan Am and its insurers in the civil action brought by the bombing victims' families.[2]

---

[2]    At the outset of the Lockerbie trial, Pan Am and its insurers disclaimed any reliance on Mr. Aviv. As Chief Judge Platt wrote: "defendants did concede at the outset of the trial . . . that they had been unable to discover sufficient corroboration for the Aviv Report . . . defense counsel James M. Shaughnessy should be commended for the concession . . . at the start of the trial and for not attempting to espouse directly or indirectly during the trial (continued...)

At trial, inconsistencies and implausible claims abounded throughout Mr. Aviv's testimony. Mr. Aviv claimed that, posing as a wealthy European investor named Hans von Helbach, he met with Dennis Reiland of PMG in September 1999 and discussed a possible investment in Hallwood. (JA-1143). Mr. Aviv claimed that Mr. Reiland spoke of a "group" of investors using the term "we." (JA-1143-44). Yet, in response to Judge Kaplan's question that "is it really your testimony before you walked in to see Reiland nobody at all had discussed with you that one of the nice things that might come out of these interviews was evidence that Gotham was acting together with someone else," Mr. Aviv, who was paid more than $200,000 for his services by Hallwood, simply responded "I am embarrassed to say as simple as that, yes. . . ." (JA-483, 491-92).

At the commencement of the trial, Judge Kaplan ordered Hallwood to produce a contemporaneous memorandum by Mr. Aviv purporting to describe his meeting with Mr. Reiland. This memorandum, which had been withheld, was inconsistent with Mr. Aviv's direct testimony, which had been submitted by

---

$^{2/}$(...continued)

the uncorroborated versions put forth by [Mr.] Aviv." *In re Air Disaster at Lockerbie*, 144 F.R.D. 613, 617-618 (E.D.N.Y. 1992). Mr. Aviv's testimony at trial starkly contradicted the statement in Chief Judge Platt's published opinion: "Q. Isn't it true that at trial Pan Am and its insurers conceded at the outset of the trial they couldn't corroborate your theory? A: No. . . ." (JA at 494).

witness statement.  Thus, in his memorandum, Mr. Aviv had written that Mr. Reiland has stated that one of the co-conspirators was Mr. Gumbiner's partner in Hallwood, Brian Troup.  (JA-433-34).  This improbable, and presumably significant, "admission" by Mr. Reiland was not included in Mr. Aviv's witness statement. (JA-433-36).  Similarly, in his witness statement, Mr. Aviv wrote that Mr. Reiland had stated that the stock price of Hallwood was going to "triple" once "we" took control.  (JA-439-1144).  Yet, Mr. Aviv's contemporaneous memorandum stated only that Mr. Reiland had stated that the current value of Hallwood was $75 million and would be worth $100 to $110 million with a change in management. (JA-439).  Moreover, in his witness statement, Mr. Aviv testified that Mr. Reiland had told him "we have the votes to win this case," but that presumably important admission did not appear in Mr. Aviv's contemporaneous memorandum.  (JA-441-43, 1144).[3/]

When Mr. Aviv subsequently surreptitiously tape-recorded his meeting with Mr. Mahowald, their conversation contained far fewer "admissions."

---

[3/]    Mr. Aviv's witness statement was prepared without any review by Mr. Aviv of his contemporaneous memorandum describing the Reiland meeting. (JA-415).  Under questioning from Judge Kaplan, Mr. Aviv testified that he had made no changes to the draft of the witness statement provided to him by Chadbourne & Parke.  (JA-443).  In fact, Mr. Aviv testified that, to prepare his witness statement, he reviewed no documents, but merely met once with an associate at Chadbourne & Parke, at which meeting "I got a draft to look at. I read it.  It seemed to be okay, and I signed it."  (JA-447).

In fact, Mr. Roth and Interstate were mentioned only twice — once where Mr. Mahowald stated that Mr. Roth owned Hallwood Units and is a "very smart, savvy investor" (by that time, Interstate's ownership had been publicly disclosed in a Schedule 13(d)) (JA-935), and again when Mr. Mahowald made the obvious supposition that Mr. Roth is "in this to make money sooner rather than later" (JA-949). This was hardly evidence, as Hallwood claims, of the Interstate Appellees' participation in a "Gotham-led group and its plans." (Hallwood Br. at 12).

### 7.    Judge Kaplan's Ruling

After a three-day bench trial, Judge Kaplan dismissed Hallwood's claims in a 27-page ruling from the bench. (JA-1960-86). Judge Kaplan initially noted that while the term "group" is not defined in the securities statutes or regulations, "there isn't really a very serious debate in this case about what it means. The debate is really about whether the evidence shows it exists." (JA-1968). Thus, "the bottom line here is that the search is for an agreement or an understanding that the defendants would act together to achieve the common purpose articulated in the statute," and "it is the plaintiff's burden in this case to show that it is more likely than not that the defendants acted collusively rather than independently to achieve that common objective." (JA-1969). Although Hallwood had proposed a list of "factors" tending to show group activity, Judge Kaplan reasoned that "the analysis has to go beyond simply ticking off facts or

-22-

factors, each of which, depending on the circumstances, may well be relevant and may well suggest collusion. What one has to do instead or in addition, rather, is to draw back or focus on whether the inference of collusion really is justified *in light of all the circumstances*." (JA-1971) (emphasis added).

Turning to the evidence, Judge Kaplan noted that Mr. Aviv's evidence was Hallwood's "strongest evidence," but that "I have some serious problems with Mr. Aviv, " including a "significant discrepancy" between Mr. Aviv's witness statement and his contemporaneous memorandum. (JA-1972, 1973, 1974). Judge Kaplan found the tape of Mr. Mahowald "equivocal" and not "the smoking gun that I think plaintiffs would have me regard it as." (JA-1976, 1979). As to the Investment Recommendation, Judge Kaplan found that "the document is at least as consistent with independent action as it is with collusion" and, thus, "not the home run that I think [Hallwood] would like to believe that it is." (JA-1980, 1981).

After reviewing the evidence, direct and circumstantial, Judge Kaplan concluded (JA-1984-85):

> This in the last analysis is as pure a factual judgment call as I have ever been asked to make in a civil case. Nobody really has any quarrel at all about the law. There is no legal issue in this case. The bottom line, the question is: Am I persuaded by a preponderance of the evidence that any two or more of these defendants formed a group, group being defined in the manner that I described before, an agreement explicit or implicit to buy, sell or hold or whatever, as I

-23-

said earlier, with respect to the securities of the issuer? I am not so persuaded. . . . So I decline to so find, and the case is dismissed.

## SUMMARY OF ARGUMENT

1.      Judge Kaplan applied the correct legal standard in determining that there was no Section 13(d) group. Judge Kaplan's factual finding that Interstate and Mr. Roth were not part of a group with respect to Hallwood Units rested on both direct and circumstantial evidence of their independent conduct. In claiming that Judge Kaplan failed "to meaningfully entertain" Hallwood's purported circumstantial evidence (Hallwood Br. at 37), Hallwood merely disputes Judge Kaplan's weighing of the evidence, an inadequate ground for reversal.

Moreover, although Hallwood does not even challenge Judge Kaplan's factual finding of no group as "clearly erroneous," relying instead on its baseless claim that Judge Kaplan did not consider circumstantial evidence, the trial evidence overwhelmingly supports Judge Kaplan's considered finding below.

2.      Judge Kaplan correctly denied Hallwood's demand for a jury trial. There is no jury trial right for actions grounded in equity. Although contending that it should have been permitted to seek money damages under Section 13(d), Hallwood can cite no case permitting issuers such relief. In fact, this Court and others have declined to recognize a right of action for money damages under Section 13(d), even for shareholders for whose benefit Section 13(d) was enacted. Accordingly, Judge Kaplan properly rejected Hallwood's

-24-

attempt to rewrite Section 13(d) by permitting a right of action to issuers, not available to shareholders.

## COUNTERSTATEMENT OF STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's conclusions of law," *Raishevich* v. *Foster*, 247 F.3d 337, 343 (2d Cir. 2001), and "review[s] a trial court's findings of fact following a bench trial for clear error," *Repp* v. *Webber*, 132 F.3d 882, 891 (2d Cir. 1997). *See also* Fed. R. Civ. P. 52(a). On appeal, this Court must "view the evidence and draw all factual inferences in favor of the appellee." *Scala* v. *Moore McCormack Lines, Inc.*, 985 F.2d 680, 683 (2d Cir. 1993) (quoting *Wheatley* v. *Ford*, 679 F.2d 1037, 1039 (2d Cir. 1982)); *see also Palazzo* v. *Corio*, 232 F.2d 38, 44 (2d Cir. 2000) ("Decisions as to whose testimony to credit and as to which of competing inferences to draw are entirely within the province of the trier of fact."); *Mar Oil S.A.* v. *Morrissey*, 982 F.2d 830, 837 (2d Cir. 1993) (same). Because it is "the primary responsibility of [the District Judge] to draw inferences, as he ha[s] the advantage of seeing the witnesses and observing their demeanor as they testif[y]," *Cunningham* v. *Erie R.R. Co.*, 358 F. 2d 640, 642 (2d Cir. 1966) (Medina, J.), this Court "may not itself weigh the credibility of witnesses or consider the weight of the evidence," *Meloff* v. *N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001).

-25-

Accordingly, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson* v. *City of Bessemer*, 470 U.S. 564, 573-74 (1985); *see also Campbell* v. *Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) ("the weight of the evidence is a matter to be argued to the trier of fact, not a basis for reversal on appeal"); *Palazzo* v. *Corio*, 232 F.3d 38, 44 (2d Cir. 2000) ("The weighing of the evidence is a matter for the trier of fact, not the court of appeals").

## ARGUMENT

### I.

## THE DISTRICT COURT CORRECTLY FOUND NO GROUP UNDER SECTION 13(D).

### A.     The District Court Correctly Applied this Court's Law Interpreting Section 13(d).

Judge Kaplan properly applied Section 13(d), as interpreted by this Court, to the direct and circumstantial evidence introduced at trial. Section 13(d) of the Exchange Act serves "to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control." *GAF Corp.* v. *Milstein*, 453 F.2d 709, 717 (2d Cir. 1971). To that end, Section 13(d), and Rule

-26-

13d-1 promulgated thereunder, require that any "person" who acquires "beneficial ownership" of more than 5% of the securities of a publicly traded company file a Schedule 13D with the SEC (and the issuer and appropriate stock exchange) within ten days of acquiring such securities. 15 U.S.C. § 78m(d)(1); *see* 17 C.F.R. § 240.13d-1. Section 13(d)(3) defines a "person" to include "two or more persons act[ing] as a partnership, limited partnership, syndicate or other group for the purpose of acquiring, holding, or disposing of securities of an issuer." 15 U.S.C. § 78m(d)(3); *see* 17 C.F.R. § 240.13d-5(b)(1).

To constitute a group, parties must agree to "combine[] in furtherance of [a] common objective" with respect to the securities of an issuer. *Wellman* v. *Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982). "It takes more than the arithmetic of adding up shares to determine that a statutory group exists and that a filing must be made. . . . *There must be agreement to act in concert.*" *Universal Container Corp.* v. *Horwitz*, No. 74 Civ. 3865, 1977 WL 1036, at *16 (S.D.N.Y. Sept. 6, 1977) (Conner, J.) (internal citations omitted) (emphasis added); *see Corenco Corp.* v. *Schiavone & Sons, Inc.*, 488 F.2d 207, 212 (2d Cir. 1973) ("[A]bsent an agreement between them a 'group' would not exist.").

In accordance with the standard enunciated in *Wellman* and its progeny, Judge Kaplan's analysis was premised on the principle "that a group is formed only when there is an agreement to act for a common purpose of acquiring,

-27-

holding, voting or disposing of securities of the issuer." (JA-1968). A Section 13(d) group can be based on either "a formal or informal understanding." *Wellman*, 682 F.2d at 363. Judge Kaplan thus recognized in his decision that "the agreement need not be written or for that matter explicit. It may be implicit as well." (JA-1968).

Moreover, under settled law, "[M]ere relationship, among persons or entities, whether family, personal or business, is insufficient to create the group which is deemed to be a statutory person." *Universal Container*, 1977 WL 1036, at *16 (quoting *Texasgulf, Inc.* v. *Canada Dev. Corp.*, 366 F. Supp. 374, 403 (S.D. Tex. 1973)). As a result, Judge Kaplan held that "mere relationships among people do not establish the existence of a group. On the other hand, it is equally true that the existence of relationships among alleged group members most certainly is relevant to whether they are acting collusively." (JA-1969). Thus, consistent with settled interpretation of Section 13(d), Hallwood had the burden of "show[ing] that *each and every one* of the alleged group members *individually* agreed at a specific point in time to act together for a common purpose." *Bayly Corp.* v. *Marantette*, 1982 WL 1337, *2 (D.D.C. 1982) (emphasis added). Hallwood clearly failed to meet that burden regarding Interstate and Mr. Roth.

**B.     The District Court Properly Relied on Both Direct And Circumstantial Evidence To Find That a Group Had Not Been Formed.**

To escape its burden of showing that Judge Kaplan was "clearly erroneous" in his findings of fact, Hallwood distorts the record in claiming that Judge Kaplan "insiste[d] on non-circumstantial proof" of group conduct. (Hallwood Br. at 29).  In fact, Judge Kaplan conducted a careful analysis of both the direct and circumstantial evidence and concluded that Hallwood's evidence failed to persuade him by a preponderance of the evidence that any of the defendants had formed a group.

Although Hallwood claims that Judge Kaplan's use of the term "smoking gun" indicates that he would not take account of circumstantial evidence (Hallwood Br. at 20-21, 25, 33), Judge Kaplan first used that term at the outset of the trial, noting when rejecting Hallwood's proffer of a large number of proposed exhibits:

> I understand where we are.  The Plaintiff's case is that the defendants are acting as a group.  The defendants say, well, we have talked to each other at various times, but we are all independent actors.  There is no smoking gun that I am aware of.  *It's largely a circumstantial case.*  That is it.  If you have something in the documents that shed a lot of light on it obviously I will find out about it.

-29-

(JA-299) (emphasis added). Thus, Judge Kaplan recognized from the start of trial that the evidence would be largely circumstantial and that, despite the mounds of paper submitted by Hallwood, there was no "smoking gun" document.

Judge Kaplan also used the term "smoking gun" once in his decision (JA-1979). However, far from stating that only direct evidence was relevant, Judge Kaplan merely was rejecting *Hallwood's* characterization of Mr. Aviv's tape of Mr. Mahowald as the "smoking gun" that proved the existence of a Section 13(d) group. After describing the tape as "equivocal", and carefully enunciating the different inferences that could be drawn from the recorded statement, Judge Kaplan concluded "while I don't mean to discount entirely the Mahowald tape, I don't find it be anything approaching the smoking gun that I think plaintiffs would have me regard it as." (JA-1976-79).

Hallwood also points to Judge Kaplan's assessment that the Investment Recommendation "certainly is relevant to the plaintiff's case, but once again, it doesn't come close to the home run that I think they would like to believe it is." (Hallwood Br. at 25; JA-1981). Again, this comment was made in the context of *weighing* the evidence ("I think that the document is at least as consistent with independent action as it is with collusion" (JA-1930)) and reflected Judge Kaplan's rejection of *Hallwood's* characterization of the appropriate weight to give that evidence.

-30-

Finally, Hallwood questions Judge Kaplan's decision not to base his decision solely on a check-list of "factors" proposed by Hallwood. (Hallwood Br. at 35-37). As Judge Kaplan explained:

> while they all identify things which, in a given case, may indeed be probative of the issue of collusion, they are not a substitute for a careful analysis of whether the defendants really are acting collectively rather than independently. They all may bear on the issue, but none of them really is close to dispositive.

(JA-1970-71). Again, Judge Kaplan was not rejecting, but assessing, circumstantial evidence, agreeing that "each of [these "factors"], *depending on the circumstances*, may well be relevant . . . ." (JA-1971) (emphasis added).

During trial, Judge Kaplan made further comments indicating that he was considering circumstantial evidence. For example:

> If this investment didn't really make a whole lot of economic sense, unless everybody knew, or most of the people knew that they were all or board for a common objective, that tends to support *an inference of an agreement*.

> If, on the other hand, this is just what you would expect a bunch of well informed, sophisticated investors [to] do, with or without an agreement, *persuasiveness or the case for drawing the inference is a lot weaker if it's got any strength at all*.

(JA-841) (emphasis added).

In his ruling, Judge Kaplan expressly assessed and relied on circumstantial evidence. Thus, Judge Kaplan recognized that "the existence of

-31-

relationships among alleged group members most certainly is relevant to whether they are acting collusively." (JA-1969). Similarly, referring to such circumstantial evidence as alleged similar trading patterns and alleged similar prior conduct, Judge Kaplan explained that "[t]hey all may bear on the issue, but none of them really is close to dispositive." (JA-1971). Thus, Judge Kaplan reasoned, the probativeness of the alleged conduct would "depend[] on the *circumstances*," and the "focus [is] on whether the inference of collusion really is justified *in light of all the circumstances*." (JA-1971).

At bottom, Hallwood's grievance is that Judge Kaplan failed to give what Hallwood deemed the appropriate weight to its circumstantial evidence. Indeed, Hallwood's complaint is that Judge Kaplan failed "to *meaningfully entertain* . . . evidence that as a legal matter was relevant and sufficient to sustain plaintiff's claims." (Hallwood Br. at 37). In light of Judge Kaplan's careful consideration of all the evidence, both direct and circumstantial, Hallwood's attempt to circumvent the clearly erroneous standard by arguing that its evidence was not "meaningfully entertained" should be denied.

## C.    In Any Event, the District Court's Findings Of Fact Were Not Clearly Erroneous.

Although Hallwood does not even challenge Judge Kaplan's finding of no group as "clearly erroneous," ample evidence — both direct and circumstantial — was submitted to Judge Kaplan to support this factual finding

-32-

with regard to the Interstate Appellees, this evidence included, among other things:

- Direct testimony from all of the defendants that they had not entered into any form of agreement with any other defendant with respect to securities in Hallwood. (*See, e.g.*, JA-1279 (Steven Roth); JA-1290 (Michael Fascitelli); JA-1298-99 (Russell Wight, Jr.); JA-1308 (Clifford Broser); JA-1314 (Todd Bassen); JA-1319 (John Mahonchak); JA-1231 (David Klafter); JA-1249 (William Ackman)).

- With the exception of a few comments in passing at the gym between Mr. Roth and Mr. Ackman — all after the time that both Interstate and Gotham had filed Schedule 13(d)s — none of Interstate's few communications with Gotham related to Hallwood. (JA-1279-83, 1246-49).

- Records confirming that Interstate discovered the Hallwood investment through its normal investment review process in 1994 or early 1995 (JA-1268, 1274-76, 1295-96, 1305), and that Interstate conducted extensive due diligence concerning Hallwood. (JA-1276-77, 1295-97, 1304-07, 1312-14).

- All defendants purchased their Hallwood Units over different time periods: Interstate from May 1995 through at least December 2000, Gotham from March 1994 through September 1996, PMG from 1992

-33-

through at least February 1998, and EFO from November 1998 through at least November 1999.  "[P]arallel purchasing, to be persuasive, would have to involve relatively large amounts of stock purchased over a short period of time." *K-N Energy, Inc.* v. *Gulf Interstate Co.*, 607 F. Supp. 756, 766 (D. Colo. 1983).

- In April and October 1997, Interstate *sold* Hallwood Units to take profits, while Gotham was holding its investment, and PMG was acquiring units.  (JA-1089-90, 1297).  *See Corenco Corp.* v. *Schiavone & Sons, Inc.*, 488 F.2d 207, 218 (2d Cir. 1973) (no group when "some Corenco stock was actually sold out of the accounts allegedly controlled by [the defendant] during the period of the alleged conspiracy").

- With respect to the supposed "burst of purchases" (Hallwood Br. at 9) that Interstate and Gotham made in May 1995, the extensive telephone records that were produced revealed no telephone calls between Interstate and Gotham (JA-1098).

- The Interstate Appellees have never engaged in any business transaction with any of the other alleged group members, including Gotham.  (JA-771, 1278, 1285).

-34-

- The testimony of Mr. Aviv, Hallwood's key witness, was expressly found to have "serious problems" by Judge Kaplan. (JA-1973).

In sum, the evidence that the Interstate Appellees were part of a group was so weak, and the evidence of their independent action so compelling, that to find that they were part of a group would have been clear error. As a result, regardless of whether Hallwood was entitled to a jury trial — and it was not, *see* Section III, *infra* — the judgment below should be affirmed on the grounds that there was no evidence upon which a rational fact-finder could find the Interstate Appellees to have participated in a group with respect to Hallwood Units.[4/]

## II.

## HALLWOOD'S CLAIMS WERE PROPERLY TRIED TO THE COURT.

### A.    There Is No Jury Trial Right for Actions Grounded in Equity.

Under settled law, Hallwood's claims against the Interstate Appellees were properly tried to the Court.

In its complaint (JA-102-03), Hallwood sought as relief:

---

[4/]    *See Shumway* v. *United Parcel Serv.*, 118 F.3d 60, (2d Cir. 1997) ("It is beyond cavil that an appellate court may affirm the judgment of the district court on any ground appearing in the record.").

-35-

- A *declaratory judgment* that defendants had "formed a group . . . to change or influence control of Hallwood."

- A *declaratory judgment* that defendants "acting in concert, have acquired beneficial ownership of 15% or more of the outstanding Hallwood Units, and therefore have become an 'Acquiring Person' under Hallwood's ['poison pill']."

- An *injunction* "ordering defendants . . . to divest their Hallwood Units" purchased since forming "the intent to . . . influence the control of Hallwood."

- An *injunction* "ordering defendants . . . to divest their Hallwood Units purchased since any one or more of them decided to act as a group . . . ."

- An *injunction* "enjoining the defendants from acquiring any further Hallwood Units or asserting any rights . . . until such divestitures are completed and corrective disclosures are made."

- An *injunction* "instituting a 'cooling-off' period following any corrective disclosures by the defendants during which defendants would be enjoined from acquiring any further Hallwood Units . . . ."

In boilerplate at the end of its prayer for relief, Hallwood requested judgment "awarding such damages, and the costs and disbursements of this action, as are permitted by applicable law." (JA-103). Notwithstanding the equitable relief it had sought, Hallwood plead that it "demands a trial by jury." (JA-102).

The Seventh Amendment to the United States Constitution preserves the right to a jury trial "[i]n Suits at common law." U.S. Const. amend. VII. The Supreme Court has held that "[t]he Seventh Amendment protects a litigant's right

-36-

to a jury trial only if a cause of action is legal in nature and it involves a matter of 'private right.'" *Granfinanciera, S.A.* v. *Nordberg*, 492 U.S. 33, 42 n.4 (1989).

To determine whether an action based on a federal statute, such as Hallwood's Section 13(d) claim, should be tried to a jury, the Supreme Court has set forth a two-part test. "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Tull* v. *United States*, 481 U.S. 412, 417-18 (1987) (citations omitted). "The second stage of this analysis is more important than the first." *Granfinanciera*, 492 U.S. at 42.

Applying the Supreme Court's two-part test, this Court should affirm Judge Kaplan's striking of Hallwood's demand for a jury on its Section 13(d) claim. Here, Hallwood alleged that it "has no adequate remedy at law" (JA-102) and, thus, expressly requested that the Court grant a multitude of injunctions requiring divestitures by the defendants, enjoining the defendants from acquiring additional Hallwood Units or exercising any rights under those Units, requiring corrective disclosures, and mandating a "cooling-off" period (Compl. at 28-29). *See Beacon Theatres, Inc.* v. *Westover*, 359 U.S. 500, 509 (1959) ("equity has always acted only when legal remedies were inadequate").

-37-

Although Hallwood's prayer for relief also sought "such damages, and the costs and disbursements of this action, as are permitted by applicable law," courts have consistently denied jury trials in securities actions that seek both injunctive relief and restitution.[5/]

Like its Section 13(d) claim, Hallwood's claim for a declaration that the poison pill has been triggered is an equitable claim. No right to a jury trial exists in a declaratory judgment action if, but for the declaratory judgment procedure, the action or its equivalent would have arisen in equity. *See Rosenman & Colin v. Richard*, 850 F.2d 57, 60 (2d Cir. 1988) ("declaratory judgment actions are inherently neither equitable nor legal, and the nature of the underlying dispute determines whether a jury trial is available"); 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2769 (3d ed. 1998) ("There is no

---

[5/]    *See Merex A.G.* v. *Fairchild Weston Sys., Inc.*, 29 F.3d 821, 825 (2d Cir. 1994) ("Restitution damages . . . and money awarded incidental to the grant of equitable relief are not legal in nature"); *In re Evangelist*, 760 F.2d 27 (1st Cir. 1985) (Breyer, J.) (denying jury demand when restitution sought in private action under Section 35(b) of the Investment Company Act); *SEC* v. *Commonwealth Chem. Secs., Inc.*, 574 F.2d 90 (2d Cir. 1978) (Friendly, J.) (denying jury demand when SEC sought disgorgement of profits from improper "all or nothing" offering); *Gartenberg* v. *Merrill Lynch Asset Mgmt., Inc.*, 487 F. Supp. 999 (S.D.N.Y. 1980) (denying jury demand when restitution sought in private action under Section 35(b) of the Investment Company Act); *Maldonado* v. *Flynn*, 477 F. Supp. 1007 (S.D.N.Y. 1979) (denying jury demand when restitution sought in private proxy fraud action under Rule 14a-9 of the Exchange Act).

-38-

right to a jury trial if, absent the declaratory procedure, the issue would have arisen in a proceeding in equity.").

Specifically, Hallwood sought a declaration that "defendants, acting in concert, have acquired beneficial ownership of 15% or more of the outstanding Hallwood Units, and therefore have become an 'Acquiring Person' under Hallwood's Unit Purchase Rights Agreement" *i.e.*, the "poison pill." (JA-102). This claim is simply the "counterpart" of a suit by Hallwood seeking specific enforcement of the purportedly triggered "poison pill,"or of a suit by defendants seeking either to enjoin the exercise of the "poison pill" or for restitutional relief to unwind the effects of improper exercise of the "poison pill." *See Prisco* v. *State of New York*, 91 Civ. 3990 (RLC), 1995 WL 693251, *6 (S.D.N.Y. Nov. 22, 1995) (striking jury demand for declaratory judgment claim when counterpart claims contained "no underlying right to a jury trial").

Courts in Delaware, where Hallwood's limited partnership is organized, routinely rule on disputes over such "poison pills" as a matter of equity. *See, e.g., Grand Metro. PLC* v. *Pillsbury Co.*, 558 A.2d 1049 (Del. Ch. 1988) (applying equitable principles in suit seeking declaratory and injunctive relief regarding "poison pill" of target corporation); *Tate & Lyle PLC* v. *Staley Cont'l, Inc.*, Civ. A. No. 9813, 1988 WL 46064 (Del Ch. Apr. 28, 1988) (granting injunctive relief enjoining exercise of "poison pill").

-39-

**B.    There is No Jury Trial Right for an Issuer's Section 13(d) Claims.**

      **i.    Courts Have Uniformly Refused To Recognize a Right of Action for Money Damages Under Section 13(d).**

As Hallwood acknowledges (*see* Hallwood Br. at 46, 49), Section 13(d) does not expressly create a private right of action for money damages for shareholders *or* issuers.  In seeking to block discovery, Hallwood's counsel, Mr. McCormack, correctly stated at a deposition in this action: "If you know anything about 13D, you will know *you can't get money damages from 13D*."  (JA-114) (emphasis added).  Hallwood has no explanation for its change of position.

As the Supreme Court has recognized, "implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best." *Touche Ross & Co.* v. *Redington*, 442 U.S. 560, 571 (1979).  The legislative history of Section 13(d) does not indicate that Congress intended to authorize a cause of action for damages by shareholders *or* issuers.  *See Rubin* v. *Posner*, 701 F. Supp. 1041, 1050 (D. Del. 1988) ("At best the legislative history is vague and it certainly is not compelling.").

Thus, courts in this Circuit have consistently refused to imply a private right of action for money damages under Section 13(d).  *See, e.g., Sanders* v. *Thrall Car Mfg. Co.*, 582 F. Supp. 945, 960 (S.D.N.Y. 1983) ("courts

-40-

have consistently refused to imply private rights of action for damages under § 13(d)"), *aff'd*, 730 F.2d 910 (2d Cir. 1984); *Seagoing Uniform Corp.* v. *Texaco, Inc.*, 705 F. Supp. 918, 927 (S.D.N.Y. 1989) ("plaintiff is foreclosed from asserting a private cause of action for damages under section 13(d)"); *Rubin* v. *Posner*, 701 F. Supp. at 1051 ("based on the language of § 13(d), . . . the legislative history of § 13(d), which is scant and not compelling on the issue of a private remedy for money damages, and the express private damages remedy available under § 18(a) for a § 13(d) violation, I conclude that no implied cause of action for money damages exists under § 13(d)"); *Myers* v. *American Leisure Time Enters., Inc.*, 402 F. Supp. 213, 214 (S.D.N.Y. 1975) (Weinfeld, J.) ("Insofar as plaintiffs seek damages for the alleged violation of section 13(d), they have not stated a cause of action under the Act because section 18 requires that they be 'Purchasers or sellers'"), *aff'd*, 538 F.2d 312 (2d Cir. 1976).

Moreover, this Court has made clear that *issuers* do not have a right to bring an action for money damages under Section 13(d). Thus, for example, in *GAF Corp.* v. *Milstein*, 453 F.2d 709, 720 n. 22 (2d Cir. 1971), which Hallwood dismisses as "pure *dicta*" (Hallwood Br. at 50), this Court, addressing the remedies available under Section 13(d) declared: "We should not be wooden or rigid in granting the right to the *issuer* seeking equitable or prophylactic relief –

-41-

*not monetary damages* – to take the necessary steps to effectuate the purposes of section 13(d).") (emphasis added).

Other courts have similarly limited the remedies available to issuers under Section 13(d) to equitable relief. *See Global Intellicom, Inc.* v. *Thomas Kernaghan & Co.*, No. 99 Civ. 342 (DLC), 1999 WL 544708, at *12 (S.D.N.Y. July 27, 1999) ("Although rejecting the existence of an implied right of action for damages under Section 13(d), courts in this circuit have recognized the existence of an implied right of action by an issuer for injunctive relief"); *Gateway Indus., Inc.* v. *Agency Rent A Car, Inc.*, 495 F. Supp. 92, 95 n. 7 (N.D. Ill. 1980) ("damage actions for violations of section 13(d) have been limited to suits brought by shareholders pursuant to section 18(a). . . . *Corporations have been denied standing to sue for damages*") (emphasis added).[6/]

---

[6/]    Hallwood is wrong that "there simply is no holding in any case as to the issuer-damages-claim issue presented on this appeal." (Hallwood Br. at 51). In *Standard Metals Corp.* v. *Tomlin*, No. 80 Civ. 2983 (CBM), 1982 WL 1300 (S.D.N.Y. Apr. 14, 1982), where the court struck a Section 13(d) jury demand, the plaintiff — like Hallwood, the *issuer* of the common stock in question — expressly sought money damages in its complaint. Thus, the issuer/plaintiff in *Standard Metals* prayed for a judgment: "Directing defendants jointly and severally to account to Standard for *all damages* suffered by it as a result of their wrongful conduct, including Standard's reasonable attorneys' fees herein." (Reply Mem. of Law in Supp. of Defs. Interstate Properties and Steven Roth's Mot. to Strike Pl. Hallwood Realty Partners, L.P.'s Jury Demand, Ex. A) (emphasis added).

ii.    **The Court Should Reject Hallwood's Request To Rewrite Section 13(d).**

There is no basis for Hallwood's claim that issuers should have greater rights under Section 13(d) than shareholders. *See Indiana Nat'l Corp.* v. *Rich*, 712 F.2d 1180, 1185 (7th Cir. 1983) ("corporation's standing to sue under Section 13(d) is representational"); *Gateway Indus.*, 495 F. Supp. at 101 ("To the extent such corporations have standing under section 13(d), it must be derivative of the shareholders' right of action"). Hallwood, however, makes the tautological argument that because shareholders are protected under the Williams Act, issuers should be able to recover money damages in order to "protect" shareholders. (*See* Hallwood Br. at 54-59).

Contrary to Hallwood's reasoning, there is nothing anomalous about permitting shareholders to recover for losses from Section 13(d) violations under Section 18(a), while denying issuers the right to bring an implied right of action for damages solely under Section 13(d).   In enacting Section 18(a), Congress expressly authorized persons "who, in reliance upon [a statement in an SEC filing], shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance. . . ." 15 U.S.C. § 78r(a) (1994).

-43-

Congress's failure to provide an express private right of action for damages for issuers for violations of Section 13(d) is dispositive here. Thus, in refusing to imply a private right of action for damages against accountants under Section 17(a) of the Exchange Act, the Supreme Court emphasized that "§ 17(a) is flanked by provisions of the 1934 Act that explicitly grant private causes of action," including Section 18(a). *Touche Ross & Co.* v. *Redington*, 442 U.S. 560, 571-72 (1979). As the Court put it: "Obviously, then, when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Id.* at 571, 99 S. Ct. at 2487.[1/] "[G]iven that buyers and sellers of securities injured as a result of their reliance on statements filed pursuant to § 13(d) may seek redress under § 18(a) of the Act, it is doubtful . . . that Congress 'forgot' to provide a remedy for § 13(d)." *Sanders* v. *Thrall Car Mfg. Co.*, 582 F. Supp. 945, 960 (S.D.N.Y. 1983), *aff'd*, 730 F.2d 910 (2d Cir. 1984) ("affirmed on the well reasoned opinion" below).

---

[1/]   *See also Northwest Airlines, Inc.* v. *Transp. Workers Union of Am.*, 451 U.S. 77, 94 (1981) ("unless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist"); *Nat'l R.R. Passenger Corp.* v. *Nat'l Assoc. of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies").

Permitting issuers to bring an action under Section 13(d) for money damages would disrupt the careful "balance" that Congress struck in the Williams Act between the interests of incumbent management and other shareholders. *Rondeau* v. *Mosinee Paper Corp.*, 422 U.S. 49, 58 (1975) ("Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts"). By contending that the implied right of action under Section 13(d) is to redress "violations that have injured the issuer entity" (Hallwood Br. at 52), Hallwood misstates the purpose of Section 13(d). This Court has declared it "clear that the [Williams] Act was designed for the benefit of investors and not to tip the balance of regulation in favor of management or in favor of the person seeking corporate control." *GAF Corp.*, 453 F.2d at 717 n. 16.

Hallwood contends that, under the Williams Act, issuers can adequately "protect and provide redress to shareholders" (Hallwood Br. at 54), because issuers supposedly share "the shareholders' interests" (*id*. at 58) and that "such a remedy is necessary to effectuating the purposes of the Williams Act" (*id*. at 58). Hallwood's argument, however, has been directly rejected by the Supreme Court. In *Piper* v. *Chris-Craft Indus., Inc.*, 430 U.S. 1, 42 (1977), the Court declared that, under the Williams Act, "awarding damages to parties other than the protected class of shareholders has only a remote, if any, bearing upon

-45-

implementing the congressional policy of protecting shareholders who must decide whether to tender or retain their stock."

In this regard, it is telling that the "injury" claimed by Hallwood from the Interstate Appellees' alleged violation of Section 13(d) arises from the derivative ligation that defendant Gotham Partners, L.P. (not the Interstate Appellees) has brought against Hallwood in Delaware Chancery Court seeking the removal of Hallwood's general partner. (*See* Hallwood Br. at 41-43). Permitting an issuer such as Hallwood to seek money damages for a purported injury caused by a third party's filing of such a lawsuit, which survived a motion to dismiss and is now *sub judice* after trial, would tip the balance struck in the Williams Act strongly in favor of incumbent management.

-46-

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

Robert J. Giuffra, Jr.
David M.J. Rein
SULLIVAN & CROMWELL
125 Broad Street
New York, New York  10004
(212) 558-4000
*Attorneys for Defendants-Appellees*
*Interstate Properties and Steven Roth*

June 25, 2001

-47-

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel for Defendants-Appellees Interstate Properties and Steven Roth hereby certifies that this brief complies with the type-volume limitations of Rule 32(a)(7)(B). As measured by the word-processing system used to prepare this brief, there are 10,544 words in this brief.

David M.J. Rein

# CERTIFICATE OF SERVICE

I certify that, on this the 25th day of June, 2001, I caused two true and accurate copies of the foregoing Brief For Defendants-Appellees Interstate Properties and Steven Roth to be served on attorneys for Plaintiff-Appellant and Defendants-Appellees as listed below.

_David M.J. Rein_
David M.J. Rein

Thomas J. McCormack, Esq.
Chadbourne & Parke
30 Rockefeller Plaza
New York, New York 10112

*Attorneys for Plaintiff-Appellant*
*Hallwood Realty Partners, L.P.*
(By Hand)

Albert Shemmy Mishaan, Esq.
Fried, Frank, Harris, Shriver & Jacobson
One New York Plaza
New York, New York 10004

*Attorneys for Defendants-Appellees*
*EFO/Liberty, Inc., Hallwood*
*Investors, L.P. and Liberty Realty*
*Partners, L.P.*
(By Hand)

Philip H. Schaeffer, Esq.
White & Case LLP
1155 Avenue of the Americas
New York, New York 10036

*Attorneys for Defendants-Appellees*
*Gotham Partners, L.P.,*
*Gotham Partners III, L.P., and*
*Gotham Holdings II, L.L.C.*
(By Hand)

Joseph C. Owens, Esq.
Lewis, D'Amato, Brisbois & Bisgaard
221 North Figueroa
Los Angeles, California 90012

*Attorneys for Defendant-Appellee*
*Private Management Group, Inc.*
(By Federal Express)

Ronald H. Alenstein, Esq.
D'Amato & Lynch
70 Pine Street
New York, New York 10270

*Attorneys for Defendant-Appellee*
*Private Management Group, Inc.*
(By Hand)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CSX CORPORATION,

                        Plaintiff,

        v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S,
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN, AND ALEXANDRE BEHRING,
A/K/A ALEXANDRE BEHRING COSTA,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - 

THE CHILDREN'S INVESTMENT MASTER
FUND,

                        Counterclaim and Third-
                        Party Plaintiff,

        v.

CSX CORPORATION AND MICHAEL J. WARD,

                        Counterclaim and Third-
                        Party Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - 

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P., AND 3G FUND, L.P.,

                        Counterclaim Plaintiffs,

        v.

CSX CORPORATION AND MICHAEL J. WARD,

                        Counterclaim Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ECF CASE
08 Civ. 02764 (LAK) (KNF)

**[PROPOSED] ORDER**

The motion of Coalition of Private Investment Companies for leave to appear in this action as *amicus curiae* and to file a brief in this action as *amicus curiae* is HEREBY GRANTED.

SO ORDERED.

Dated: June ___, 2008

_____
Lewis A. Kaplan,
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CSX CORPORATION,

             Plaintiff,

      v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S,
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN, AND ALEXANDRE BEHRING,
A/K/A ALEXANDRE BEHRING COSTA,

             Defendants.

ECF CASE
08 Civ. 02764 (LAK) (KNF)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE CHILDREN'S INVESTMENT MASTER
FUND,

             Counterclaim and Third-
             Party Plaintiff,

      v.

CSX CORPORATION AND MICHAEL J. WARD,

             Counterclaim and Third-
             Party Defendants.

**CERTIFICATE OF SERVICE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P., AND 3G FUND, L.P.,

             Counterclaim Plaintiffs,

      v.

CSX CORPORATION AND MICHAEL J. WARD,

             Counterclaim Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

I, J. Ross Wallin, hereby certify, under penalty of perjury pursuant to 28 U.S.C.

§ 1746, that on this 2nd day of June, 2008, I caused true and correct copies of the

following documents to be served upon counsel of record in this action via the electronic

case filing (ECF) system of the Southern District of New York:

> (1) Notice of Motion of Coalition of Private Investment Companies for Leave to File Brief as *Amicus Curiae*;
>
> (2) Motion of Coalition of Private Investment Companies for Leave to File Brief as *Amicus Curiae* with annexed Proposed Memorandum of Law of *Amicus Curiae* Coalition of Private Investment Companies, annexed Declaration of Adam H. Offenhartz, and annexed Proposed Order;
>
> (3) Corporate Disclosure Statement of Coalition of Private Investment Companies; and
>
> (4) Notice of Appearance.

_____

J. Ross Wallin (RW-3911)