UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CSX CORPORATION,<br><br>                    Plaintiff,<br><br>            v.<br><br>THE CHILDREN'S INVESTMENT FUND MANAGEMENT (UK) LLP, THE CHILDREN'S INVESTMENT FUND MANAGEMENT (CAYMAN) LTD., THE CHILDREN'S INVESTMENT MASTER FUND, 3G CAPITAL PARTNERS LTD.,  3G CAPITAL PARTNERS, L.P., 3G FUND, L.P., CHRISTOPHER HOHN, SNEHAL AMIN AND ALEXANDRE BEHRING, A/K/A ALEXANDRE BEHRING COSTA,<br><br>                    Defendants. | ECF Case<br><br>08 Civ. 02764 (LAK) (KNF)<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S JUNE 2, 2008 SUBMISSION** |
| THE CHILDREN'S INVESTMENT MASTER FUND,<br><br>            Counterclaim and Third-<br>            Party Plaintiff,<br><br>            v.<br><br>CSX CORPORATION AND MICHAEL WARD,<br><br>            Counterclaim and Third-<br>            Party Defendants. | |
| 3G CAPITAL PARTNERS LTD., 3G CAPITAL PARTNERS, L.P. AND 3G FUND, L.P.,<br><br>            Counterclaim Plaintiffs,<br><br>            v.<br><br>CSX CORPORATION AND MICHAEL WARD,<br><br>            Counterclaim Defendants. | |

Pursuant to the Court's June 2, 2008 Order, Defendants submit the following response to Mr. Millson's June 2, 2008 letter (the "Millson Brief") critiquing Professor Bernard Black's submission to the Securities and Exchange Commission (the "SEC"). A copy of Professor Black's letter is attached hereto as Exhibit A..

Plaintiff's submission approaches farce. Unable to deal with the evidence or the case law, Plaintiff engages in improper and offensive *ad hominem* attacks on Defendants, and even Professor Black, who is a colleague of one of Plaintiff's experts.[1] But federal securities law cases are not supposed to be contests in who can write the best fiction or who can most creatively parse statutory language, regardless of the case law and SEC interpretations that have grown around the statute. We trust that the Court will notice the frequently absent citation to the record, to case law or to SEC interpretive support, and carefully compare Plaintiff's assertions to the record. This will do far more in setting the record straight than Defendants could ever hope to accomplish in the ten pages allotted for this response.

As the Court will recall, on May 22, 2008, it referred two specific questions to the SEC. Professor Black's submission to the SEC (the "Black Letter") addresses those points. Mr. Millson's response does not. Instead, he criticizes the Black Letter for failing to focus on the record evidence, which the Court never asked the SEC to do, and, which, in any event, would be an impossible task for the SEC to accomplish under the circumstances. As set forth in great detail in Defendants' post-trial submissions, Plaintiff's analysis of the beneficial ownership rules

---

[1]    Indeed, under CSX's view of the world, every witness who offered sworn testimony in this matter supportive of Defendants' case was a "liar," subjecting himself to the penalties of perjury.

under Section 13(d) is simply wrong in numerous ways which we will not repeat here.[2]  In addition, Plaintiff uses the Millson Brief as yet another occasion to distort the "record evidence" to fit its theories, which are inconsistent with the facts.  Although Defendants already have responded at length to Plaintiff's distortions of the factual record (*see* Defs. Reply Br. at 55-130), we take this opportunity to point to a few of the more egregious examples in the Millson Brief.

<u>Plaintiff's Distortion of the Factual Record</u>

The Millson Brief paints a misleading picture of Defendants' investment as a stealth attack on CSX in which Defendants secretly accumulated a large position in the Company without disclosing their intentions to gain control.  (Millson Brief at 4-5.)  In fact, the evidence conclusively establishes that CSX was hardly caught unaware of Defendants' accumulation of significant economic positions in CSX, but was fully and voluntarily informed by TCI of those positions as well as of Defendants' views on how to increase shareholder value.  Thus, not only did TCI disclose the fact that it was exposed to CSX through swap positions in conversation after conversation with CSX management beginning in November 2006 (*see* Defs. Reply Br. at 55, setting forth record evidence), but on March 2, 2007, TCI informed CSX that it had made a filing under the Hart-Scott-Rodino Act to acquire more than $500 million of CSX stock, which CSX disclosed in its first quarter 2007 10Q (*id.* at 22 n. 11; *see also* Defs. Br. at 18, 20).

---

[2]    *See* Defendants' Post-Trial Brief ("Defs. Br.") at 33-57; Defendants' Corrected Post-Trial Reply Brief Relating to the Claims of CSX Corporation ("Defs. Reply Br.") at 12-23, analyzing case law and other authorities to show, *inter alia*, that cash-settled equity swaps do not confer beneficial ownership of hedge securities; that investment or voting power cannot be conferred based on the theoretical "influence" that Plaintiff's expert imputes to Defendants based on the presumed economic rationality of swap counterparties' hedging behavior; and that the existence of a plan or scheme to evade the disclosure requirements cannot exist where there is no obligation to disclose and Defendants had legitimate reasons for using swap contracts to build an economic position tied to CSX. In contrast to Defendants' analysis of the extant authority to support their positions, Plaintiff simply poses its view of what it thinks the law *should* be without any citation to legal authority (Millson Brief at 20-24) and, as discussed below, sets forth *ad hominem* arguments attacking Defendants for lying without any evidentiary support.

In addition, the investing public has long known of TCI's interest in CSX.  CSX disclosed not only that TCI had made an HSR filing (which, by definition means that TCI's investment in CSX was not passive) and held CSX common stock, but also that it had a significant economic position through "derivative contracts tied to the value of CSX stock." (DX114 at 41.)  Moreover, TCI disclosed its ownership of over 17 million shares of CSX stock on Schedules 13F filed with the SEC on May 15, 2007, and again on August 14, November 14, 2007, February 14, 2008 and May 15, 2008.  (Defs. Br. at 21, 89.)  Most significantly, Defendants' December 19, 2007 Schedules 13D -- filed four months before CSX's originally scheduled Annual Shareholder Meeting and more than six months before the currently scheduled meeting -- disclosed the fact that TCI and 3G had cash-settled equity swaps referencing CSX shares, that gave them economic exposure to 11% and 0.8%, respectively, of CSX common stock.

CSX's disingenuous attempt to portray TCI's acquisition of a position in CSX as a "secret accumulation" is further belied by the numerous TCI statements that CSX itself relies on in its submissions to the Court.  At the same time that CSX seeks to hold TCI responsible for "hiding their rapid accumulation" of an investment in CSX, CSX also criticizes TCI for repeatedly telling CSX that TCI held a significant swap position and representing itself "in the public arena" as a shareholder, citing numerous examples of such public behavior, beginning in November 2006 and continuing beyond the date that Defendants filed their Schedules 13D. (Millson Brief at 11-13.)  Plaintiff cannot have it both ways.  It cannot fault TCI for (i) sharing with CSX's senior management and investment advisors the nature and extent of TCI's swap

positions,[3] and (ii) publicly demanding that CSX acknowledge its interest in the company, yet excoriate its supposed secretive accumulation of an economic interest in CSX as a purported scheme to evade the Section 13(d) disclosure requirements, in an attempt to use that alleged violation as a weapon in this proxy fight.  That is precisely what Congress took care to avoid in enacting the Williams Act.  *See Treadway Cos. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir. 1980) (In enacting Section 13(d), "Congress expressly disclaimed an intention to provide a weapon for management to . . . prevent large accumulations of stock . . . .") (quoting *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S. Ct. 2069, 2076 (1975)).

In the absence of the requisite factual support, Plaintiff repeatedly resorts to name-calling and unsupported factual assertions.  For example, CSX asserts without any factual support that "TCI has not converted . . . its swaps to physical shares [because] it would be very expensive to do so, and they are confident they will either get the votes of the matched shares or at least prevent them from being voted for the CSX slate." (Millson Br. at 7.)  Similarly, Plaintiff asserts that the reason TCI told CSX about its swap position was to "intimidate management into doing as it was told," citing to paragraphs 120 and 130 of its own findings as support.  (Millson Brief at 6-7.)  But nothing in those paragraphs supports Plaintiff's contentions.  Plaintiff further contends that TCI did not unwind its swap positions and purchase physical shares after it filed its Schedule 13D because "they are [sic] confident that they will either get the votes of the matched

---

[3]    Thus, CSX's board and management cannot be heard to complain that they were shocked to wake up one morning to a "new" and significant stockholder on their doorstep, having never had an opportunity to assess the nature or intentions of this surprise visitor.  CSX not only was aware of the full nature and extent of TCI's holdings and concerns with management since no later than December 2006, they were able to mount a counter-offensive over a year ago through congressional lobbying and multiple communications with the SEC during which they laid out CSX's view that the swaps conferred on TCI the beneficial ownership of the referenced shares.  (DX 154 (Fitzsimmons Dep. 93:20-94:14).)  Despite that counterattack, the SEC has never advised TCI that it had an obligation to disclose its swap positions.  (Trial Tr. 69:25-70:12.)

shares or at least prevent them from being voted for the CSX slate," without even attempting to cite any evidence in support of that statement.  (*Id.* at 7.)  Nor is there any evidence cited for Plaintiff's bald assertion that the increase in hedge funds' ownership of CSX stock, and decrease in holdings by other institutions, would not have occurred had TCI filed a Schedule 13D when its purported interest in CSX reached five percent.  (*Id.*)

Perhaps most telling of Plaintiff's desperation to create a record where none exists is its mischaracterization of the testimony regarding the movement of shares around February 27, 2008, the original record date.  That is not entirely surprising since the theory of Plaintiff's case rests heavily on an assumption that Deutsche Bank, TCI's counterparty on just over 60% of its swap contracts at the time (*see* DX 97), recalled shares it held as hedges against those swap contracts so that it could vote them in accordance with TCI's direction.  But the evidence proved otherwise:  Paul Busby, the co-head of the securities lending department at Deutsche Bank testified that no one at Deutsche Bank had requested a recall of CSX stock (Defs. Br. at 32-33; Defs. Reply Br. at 65-66 (citing testimony)); and Deutsche Bank's records confirm that there was no recall (*see* Defs. Br. at 33; Defs. Reply Br. at 65).  In a prime example of *non sequitur*, Plaintiff boldly proclaims that Mr. Busby's statement that he personally could not confirm what had triggered the return of CSX shares to Deutsche Bank (Defs. Reply Br. at 66) "demonstrates that the decision to return shares, and presumably to vote shares, is not made at the swap desk level."  (Millson Brief at 7-8; *see also id.* at 18-20.)  "Demonstrations" require evidence, and CSX has offered none.

The remainder of Plaintiff's attempts to show that TCI had some sort of "control" over Deutsche Bank's voting of its hedge shares is no more successful.  Plaintiff

mischaracterizes Defendants' testimony about Austin Friars as evidence that TCI had "plan[s] to use" a connection to Austin Friars to "influence" Deutsche Bank's voting of any hedge shares it may hold on the record date.  (Millson Br. at 16-18.)  Again, this is false.  Rather, Defendants testified that they *hoped* that they would be able to convince Austin Friars that its slate was beneficial to shareholder value and that Austin Friars' view of what was in Deutsche Bank's economic best interest could, in turn, be relevant to how Deutsche Bank might vote its proprietary shares.  (Defs. Br. at 22.)  Defendants further testified that they had no conversations with Austin Friars concerning voting shares held by Deutsche Bank, and the Deutsche Bank (and Citigroup) witnesses who would have been necessary to vote any shares held as hedges testified that (1) they had no communications with TCI about voting CSX shares held as hedges, and (2) they had no contact with Austin Friars about the CSX shares held as hedges.  (Defs. Br. at 42-44.)  This testimony does not support Plaintiff's assertion that TCI had plans to influence Deutsche Bank's voting of its hedge shares, let alone that it had any control over the voting of such shares.[4]  In fact, it shows the opposite.

Further, Plaintiff's assertion that "the evidence shows that Deutsche Bank does intend to vote the matched shares as TCI wishes" is flatly contradicted by the uncontradicted testimony of the witnesses.  (Millson Brief at 18.)  Plaintiff's citation to its own findings that "Deutsche Bank is known for cooperating with hedge funds" based on examples from other completely unrelated situations is simply inapposite, and is evidence of nothing in this case.  (*Id.*

---

[4]      Nor does Plaintiff's assertion that Deutsche Bank had a prime brokerage relationship with TCI, and was "looking for other business" from it, advance the ball for Plaintiff. (Millson Br. at 18.)  As Defendants explained in their post-trial briefing, the two prime brokers that TCI paid the highest brokerage fees were UBS and Morgan Stanley.  Thus, if TCI were hoping for a *quid pro quo* in terms of voting influence, it would be more likely to allocate the bulk of its swaps to those brokers, rather than to Deutsche Bank or Citigroup.  (Defs. Reply Br. at 63.)

at 18, n.3.)  The fact that Plaintiff would resort to such irrelevant and inadmissible "facts" as evidence of how Deutsche Bank "intends to vote" any hedge shares it may hold should alert the Court to the fundamental weakness of Plaintiff's thesis in this case.

Moreover, Plaintiff repeatedly asserts unsupported conclusions drawn from irrelevant, nonexistent, and often inconsistent facts.  Thus, Plaintiff sets forth a list of bullet points that purportedly illustrate the "lengths" Defendants went to in order to avoid public disclosure of their economic interests in CSX.[5]  (Millson Brief at 9-10.)  In fact, none of the points is in any way remarkable.  Instead, they demonstrate an awareness by Defendants of when their disclosure obligations would be triggered.  Nor is there any truth to Plaintiff's assertion that TCI split its swap positions among numerous counterparties "to hide its investment from CSX and the market as long as possible."  (*Id.* at 9; *see also id.* at 10, 11.)  As explained above, CSX was fully aware of Defendants' economic interests tied to CSX, as well as of its ownership of shares, and TCI was far from a secret investor.  Rather than seeking to hide its position in CSX, TCI split its positions among various counterparties to manage counterparty risk and maintain the confidentiality of its specific trading strategies (Defs. Br. at 22-23) -- which is perfectly legitimate and unrelated to the type of "rapid secret accumulations" that the Williams Act was intended to prevent.  In sum, Plaintiff repeatedly misstates (or makes up) the evidence in an effort to create facts that simply do not exist to prove a theory that it has plucked out of thin air in a desperate, "no dissidents on board," attempt to fend off Defendants' legitimate bid for

---

[5]    Of course, the fact Plaintiff simply refuses to address because it undermines its theory of the case is why TCI would repeatedly disclose to CSX - the purported victim of TCI's secret scheme - the exact nature and extent of its swap position.

representation on the CSX Board.  The Court should not permit this unwarranted use of the

Williams Act as a sword to entrench management rather than a shield to protect investors.

<u>Plaintiff's Mischaracterization of the Black Letter</u>

In addition to mischaracterizing the factual record, CSX's counsel also

extensively mischaracterizes Professor Black's submission to the SEC.  We will not delineate

here the litany of false assertions regarding Professor Black's letter made by Mr. Millson.

Suffice it to say that Professor Black's letter to the SEC says what it says, and not what Mr.

Millson claims it says.

CSX also has submitted to the Court a copy of a letter sent to the SEC by

Professors Joseph Grundfest, Henry Hu (whose designation as a testifying expert for CSX was

previously withdrawn) and Marti Subrahmanyam (who did testify for CSX), purportedly to

address Judge Kaplan's questions and to respond to Professor Black's submission.  Like the

Millson Brief, the letter submitted by Professors Grundfest, Hu and Subrahmanyam repeatedly

mischaracterizes the record.  In addition, it primarily addresses a question that Judge Kaplan did

not ask the SEC, and which Professor Black did not address in his submission – whether

Defendants' use of cash-settled equity swaps violate the anti-evasion provisions of Rule 13d-

3(b).

CSX's experts do not disagree with Professor Black's conclusion that the use of

equity swaps alone can not constitute a plan or scheme to evade the reporting requirements of

Section 13(d).  Rather, they assert that the "[d]efendants engaged in six distinct forms of conduct

that, taken together, establish a 'scheme to evade the reporting requirements' as opposed to a

legitimate, good-faith structuring of a transaction that relies on derivative market contracts in

order legitimately to avoid Section 13(d) reporting requirements." (Grundfest *et al.* Letter at 2.) However, as demonstrated below, the factors relied upon by CSX's experts either are present in every case where there has been an underlying purchase of a 5% economic ownership position by an activist investor, or simply do not constitute any evidence of a plan or scheme to evade one's reporting requirements. In other words, CSX's experts are unable to distinguish Defendants' conduct at issue in this case from those of any other investor who seeks "legitimately to avoid Section 13(d) reporting requirements."

For instance, according to CSX's experts, one of the factors that purportedly establishes evasion is that Defendants acquired a position in equity swaps that if held in the form of voting equity would trigger a Section 13(d) disclosure. (*Id.* at 8.) However, this factor obviously will apply in every case of interest since if there is no 5% economic ownership, then Section 13(d) does not apply, and it makes no difference whatsoever whether an investor holds shares, equity swaps, or any financial instrument (such as debt) that is not equity. The fact that Defendants purportedly engaged in a "course of conduct typical of activist shareholders" likewise has no significance to the determination of whether a scheme to evade exists. (*Id.*) An investor who has engaged in activism also will be present in every case of interest since if the investor is passive, it would file only on Schedule 13G, even if it held more than 5% of the company's shares. Similarly, the fact that information regarding Defendants' "equity or derivative positions" activities may be material, and that Defendants' use of equity swaps "facilitates the rapid and low-cost acquisition of a reportable position" upon the unwind of the swap position does not, even assuming these assertions are true, distinguish Defendants' conduct from any other activist investment who purchases equity swaps. (*Id.*)

The remaining two factors relied upon by CSX's experts simply have no relevance to a determination of whether a plan or scheme to evade one's reporting requirements exists. For instance, nowhere do CSX's experts offer any explanation as to why the purported efforts by Defendants to influence the voting position of certain swap counterparties who held matched shares evidences a scheme to evade.[6] Seeking to influence simply is not evidence of a scheme to evade. Likewise, a desire not to hold more than a 5% economic ownership through equity swaps with any one dealer because of a belief that if the dealer hedged with matched shares, the dealer would have to make a Section 13 filing disclosing its ownership does not support an assertion that one is engaging in a plan to evade one's reporting requirements. Since Defendants' respective positions were not reportable because they did not convey beneficial ownership of any matched shares, then the existence of those positions is the Defendant's private information, and they should be able to legitimately limit leakage of information about those positions.

In short, none of the factors relied upon by CSX's experts, either taken separately or in combination with one another, support the assertion that Defendants engaged in any sort of plan or scheme to evade the reporting obligations of Section 13(d).

---

[6]     CSX's experts' letter to the SEC also misquotes from Interpretive Release on Rules Applicable to Insider Reporting and Trading, Exchange Act Release No. 18,114 (1981), and purports to find in it the SEC's statement that an effort to "influence" voting can be generate a finding of beneficial ownership under Section 13. However, this Interpretive Release is concerned with Section 16, not Section 13. Although the Interpretative Release states that beneficial ownership under Section 16 is interpreted broadly, it does not state that about Section 13. To the contrary, it states that "Rule 13d-3 sets out a very detailed definition of beneficial ownership for purposes of the reporting requirements under Section 13(d) and the Commission's tender offer rules. While the concepts of beneficial ownership under Section 16(a) and under Rule 13d-3 have much in common, the former stresses the economic benefit to be derived from the securities and the latter emphasizes the ability to control or influence the voting or disposition of the securities. As a result, different determinations of beneficial ownership under the section and rule are possible." In other words, Rule 13d-3 is "very detailed" and speaks for itself. The SEC has not said, here or elsewhere, that an attempt to "influence" voting through persuasion, without more, constitutes beneficial ownership under Section 13(d).

Dated:  New York, New York
        June 4, 2008

                              SCHULTE ROTH & ZABEL LLP


                        By: /s/ Howard O. Godnick_____
                              Howard O. Godnick
                              Michael E. Swartz
                              Yocheved Cohen
                              919 Third Avenue
                              New York, New York 10022
                              Telephone:      (212) 756-2000
                              Facsimile:      (212) 593-5955
                              howard.godnick@srz.com
                              michael.swartz@srz.com
                              yocheved.cohen@srz.com

                              *Attorneys for Defendants The Children's
                              Investment Fund Management (UK) LLP,
                              The Children's Investment Fund
                              Management (Cayman) Ltd., The
                              Children's Investment Master Fund,
                              Christopher Hohn and Snehal Amin*

# Exhibit A



*PROF. BERNARD S. BLACK*
*Hayden W. Head Regents Chair for Faculty Excellence and*
*Professor of Law, The University of Texas School of Law*
*Professor of Finance, Red McCombs School of Business*

<u>*bblack@law.utexas.edu*</u>                                          <u>*Tel: 512-471-4632*</u>

29 May 2008

Brian G. Cartwright, Esq.
General Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington DC 20459

### RE: CSX Corp. v. The Children's Investment Fund et al.

Dear Mr. Cartwright:

The SEC has been asked by Judge Lewis Kaplan of the Southern District of New York to address two questions, which have arisen in a lawsuit by CSX against The Children's Investment Fund (TCI), 3G Capital Partners (3G), and other defendants. The defendants separately acquired a combination of CSX shares and long positions in cash-settled equity swaps referencing CSX shares, subsequently formed a 13(d) group and filed a Schedule 13D disclosing their ownership of shares and equity swaps, and launched a proxy fight seeking representation on the CSX board and a change in CSX's bylaws. I will focus here on TCI because, absent evidence that TCI and 3G formed a 13(d) group earlier than they say they did, only TCI's disclosures are at issue.[1]

In a typical cash-settled equity swap, the long holder receives from (pays to) the short holder the full gain (loss) on the referenced shares, relative to an initial price specified in the swap. The initial price is normally the market price of the referenced shares at the inception of the swap. The economic return to the long equity swap holder is identical to the return on the referenced shares. However, the long equity swap holder holds a cash-settled equity derivative, rather than shares, and thus does not hold the voting rights conveyed by ownership of shares. In the terminology which Professor Henry Hu and I have developed to describe this and other similar situations, the long equity swap holder has "economic-only" ownership of the referenced shares but does not have voting ownership.[2]

---

[1] CSX has claimed that TCI and 3G formed a 13(d) group some time before they filed a Schedule 13D, but this is a factual matter for Judge Kaplan to resolve.

[2] See the following articles, all by Henry T.C. Hu and Bernard Black: *Equity, Debt, and Hybrid Decoupling: Governance and Systemic Risk Implications*, 14 **European Financial Management** (forthcoming 2008b), at http://ssrn.com/abstract=1084075; *Equity and Debt Decoupling and Empty Voting II: Importance and Extensions*, 156 **University of Pennsylvania Law Review** 625-739 (2008a), at http://ssrn.com/abstract=1030721; *Hedge Funds, Insiders, and the Decoupling of Economic and Voting Ownership: Empty Voting and Hidden (Morphable) Ownership*, 13 **Journal of Corporate Finance** 343-367 (2007), nearly final version at

TCI, following standard market practice, which in turn relies on legal advice from securities counsel, treated its cash-settled equity swaps as not conveying beneficial ownership in the § 13(d) sense, and therefore not triggering an obligation to file a Schedule 13D.[3]

TCI and 3G formed a 13(d) group and filed a Schedule 13D in December 2007, based on holding together over 5% of the outstanding CSX shares. In the Schedule 13D, they reported their equity swap positions under Schedule 13D, Item 6, because equity swap contracts are "contracts . . . with respect to any securities of the issuer."[4] The Item 6 disclosure accords with market practice. TCI and 3G also reported their equity swap positions in their proxy statement, and the proxy statement disclosure is required by the proxy rules.[5]

CSX claims, in essence, that Item 6 disclosure and proxy statement disclosure is not enough, and that the combination of holding of long equity swap positions, plus the market practices followed by the derivatives dealers who were the counterparties for the equity swaps (all major investment and commercial banks), should be treated as beneficial ownership in the 13(d) sense.[6]

With an expedited trial now complete and CSX's shareholder meeting scheduled for June 25, 1998, Judge Kaplan has asked the SEC to address the following questions:

1) Did [The Children's Investment Fund (TCI)] have beneficial ownership, within the meaning of Regulation 13D, of the CSX shares held by their cash settled total return equity swap counterparties?

2) What mental state is required to establish the existence of a plan or scheme within the meaning of Rule 13b-3(b)?

Prof. Hu and I have written extensively on equity swaps and other ways to decouple economic ownership from voting ownership. CSX cited that work in its own submissions to the SEC, although inaccurately.[7] TCI and 3G Capital Partners have therefore asked me to offer my views

---

http://ssrn.com/abstract=874098; *The New Vote Buying: Empty Voting and Hidden Ownership*, 79 **Southern California Law Review** 811-908 (2006), at http://ssrn.com/abstract=904004.

[3] My reference to legal advice is For examples of the views of securities counsel, see 2 EDWARD F. GREENE ET AL., U.S REGULATION OF THE INTERNATIONAL SECURITIES AND DERIVATIVES MARKETS § 13.02(2) n.25 (7th ed. 2004) ("a long position under an equity swap would generally not be treated as beneficial ownership" under SEC rules) (Cleary Gottlieb); Chin-Chong Liew, *Disclosure Requirements for Purely Cash-settled Derivatives*, H.K. LAW., June 2000, at 59 (Allen & Overy). generic. TCI testified in the CSX trial that they sought legal advice with regard to 13(d) disclosure generally. They were not asked whether they sought advice specifically with regard to their CSX position, but I would be surprised if they did not do so.

[4] The Children's Investment Fund and 3G Capital Partners, Schedule 13D with respect to CSX Corp. (reference date Dec. 7, 2007; filed Dec. 19, 2007).

[5] In my view, proxy statement disclosure is required under Schedule 14A, Item 5, and also under general materiality.

[6] I think it fair to say that CSX was likely hoping to find evidence of a concrete agreement or understanding between the defendants and one or more of their derivatives dealers on voting of CSX shares. As best I understand the facts of the case, no such evidence has been found, so CSX's claim rests on market practices rather than any actual agreement with a particular dealer.

[7] As you are aware, CSX's counsel filed a series of letters with the SEC between May 2007 and February 2008 concerning this matter, raising issues similar to those it later pursued in court. For example, in its initial May 22, 2007 letter to the SEC, CSX cited Hu and Black (2006), supra note 2, 79 So. Cal. L. Rev. at 837-838, for the proposition that "It is common practice for counterparties that write cash-settled call options and hold the shares

on the first of these questions. I will also address a related issue -- the circumstances under which the second question is relevant.[8]

## Qualifications

I am Hayden W. Head Regents Chair for Faculty Excellence and Professor of Law at University of Texas Law School and Professor of Finance, Red McCombs School of Business, University of Texas. As the articles cited in footnote 1 indicate, I have conducted extensive research on equity swaps and other forms in which investors can decouple economic ownership of shares from voting ownership.

The statements below about U.S. market customs are made to my best knowledge, based on this research, conversations in the course of this research with market participants, and the additional knowledge I gained in reviewing the facts of the CSX case. The customs I describe should be understood as only that -- as tendencies, sometimes strong, sometimes less so, that will not apply to every company, every investor, or every derivatives dealer. These customs sometimes differ from customs outside the U.S., in part because investors in U.S. companies and their derivatives dealers must comply with § 13(d) and other SEC rules, and in part due to U.S. tax rules.

To summarize my conclusions:

- Equity swaps alone, without surrounding market customs, are not shares, do not vote, and cannot convey beneficial ownership of shares;

---

underlying such options to take voting instructions with respect to such shares from the optionholders." Leave aside that CSX referred to options rather than equity swaps. We actually wrote: "When the derivatives dealer hedges an equity swap with matched shares, a market practice may well be emerging in which both sides expect that the dealer, if asked, will either unwind the swap and sell the shares to its client . . ., or vote the matched shares as its client wants." We then cited evidence to support this tentative statement involving U.K. companies. We did not say that a practice of taking voting instructions from clients existed for U.S. companies  Such a practice is legal for U.K. companies, but would raise 13(d) issues for U.S. companies. Thus, investors and dealers will behave differently in the two jurisdictions.

In the same letter, CSX also cites Hu and Black (2006), at page 869, for the proposition that "[Hu and Black] analogize [market practices with regard to equity swaps] to "stock parking" in which an investor sells shares to a broker-dealer with the understanding that the investor will later repurchase the shares at the same price plus interest and commission . . . ." We actually wrote (footnotes omitted): "Hidden (morphable) ownership might arguably be analogized to "stock parking" for disclosure purposes. . . . There are material distinctions, however, between the two situations. Parking involves an understanding that the client will buy the stock back at a later date and protect its counterparty against loss. With an equity swap, there is no such understanding and the dealer must protect itself against loss."

I would ask the SEC to rely on the statement of market practices in this letter, to the extent they differ from the statements in my published work with Prof. Hu. The main reasons for differences are: (i) I focus here on U.S. practices, while in our published work we were interested in worldwide practice; (ii) market customs are evolving; and (iii) through this litigation, I have learned some details about the practices of investors in equity swaps and derivatives dealers which were previously not available to us.

[8] I am being compensated for this letter on a flat fee basis. My opinions are entirely my own. I have discussed the substance of this letter with counsel for TCI and 3G, and relied on them to provide factual information, but have written the letter on my own. I understand that counsel will provide a courtesy copy of this letter to Judge Kaplan. I will also post it on the Social Science Research Network at http://ssrn.com/abstract=1138299.

3

- Holding a position in equity swaps alone, without surrounding market customs, cannot be part of a plan or scheme to evade reporting under Exchange Act § 13(d).
- I believe that large economic-only ownership positions, including those conveyed by equity swaps, should be publicly reported. But the way for the SEC to get to that result is to change its rules, not to stretch the current 13(d) rules to reach equity swaps -- an instrument they were never intended to reach, and are reasonably understood by market participants not to reach.
- Any plausible stretch of the current 13(d) rules to include equity swaps will depend on an assumed set of market customs, including the hedging, unwinding, and voting practices of derivatives dealers. However, those practices are evolving and will respond to any expansion in the scope of the rules, likely in ways which undercut their application to economic-only ownership.
- Any plausible stretch of the current 13(d) rules to include equity swaps will be vulnerable to avoidance, by recasting the nature of economic-only ownership. A number of strategies are available, including those discussed below.

## 1. Framing the Question

In my view, the questions posed by Judge Kaplan implicitly rely on additional assumptions about market conditions. I attempt to state those additional assumptions here.

### *Equity swaps alone (without surrounding market customs)*

In my judgment, and I trust in the SEC's as well, it is clear that cash-settled equity swaps (below, simply "equity swaps"), shorn of the market customs followed by investors in swaps and by derivatives dealers, convey only economic ownership and do not convey beneficial ownership of shares (in the § 13(d) sense). To summarize the reasons for this conclusion, equity swaps are not shares. Moreover, they are cash settled. Thus, they do not convey the right to acquire shares. They also carry no voting rights. They are instead, like any derivative, a side bet -- in this case, a side bet on the performance of the company's shares.

From a policy perspective, § 13(d) disclosure of "beneficial ownership" of shares is concerned with providing advance notice to investors and companies of actual and potential changes in control. Equity swaps alone cannot affect control, so there is no reason to think that they should be disclosed.

### *Implications for the relevance of the "plan or scheme" concept.*

The proposition that equity swaps without more do not convey beneficial ownership of shares is also relevant to Judge Kaplan's second question. It does not answer the question, but goes to when the question is relevant.

Putting aside the market practices which surround equity swaps, it must be permissible for an investor to acquire equity swaps, rather than shares, in part -- or indeed entirely -- *because* share

4

ownership is disclosable under § 13(d) while equity swaps are not. [9]  The SEC has never explained what a "plan or scheme to evade the reporting requirements of section 13(d) or (g) of the [Exchange] Act" might be.[10]  But the underlying activity must involve holding a position which is "beneficial ownership" under the *statute* (Exchange Act § 13(d) or (g)), but would otherwise fall outside the *rule* -- outside the SEC's effort to define the concept of beneficial ownership elsewhere in Rule 13d-3.  Put differently, if equity swaps are not "beneficial ownership" of shares *either* under the statute (which uses the term "beneficial owner" but does not define it) *or* under the remainder of Rule 13d-3, they are not reportable under § 13(d), and the investor's purpose for acquiring them should be irrelevant.  One does not evade a statute by complying with it.

Yet an equity swap alone cannot convey beneficial ownership of shares under the statute, for the same reasons it does not convey beneficial ownership of shares under the remainder of Rule 13d-3.

An analogy may be useful.  The SEC has several "safe harbor" rules of the following general form, including Rule 144 and Reg. S:

> If you comply with this rule while issuing or selling securities, you will be deemed not to be engaged in a distribution of securities, and therefore do not need to register the securities under the Securities Act.  However, if you technically comply with the rest of this rule, but engage in a plan or scheme to evade the registration requirements of the Securities Act, this safe harbor is not available.[11]

Suppose that someone distributes a financial instrument which is economically similar to a security, but is not a security under the Securities Act.  This cannot be a violation of the Securities Act.  For example, equity swaps are economically very similar to shares, yet shares are securities while equity swaps are not.  Thus, one cannot violate the Securities Act by distributing unregistered equity swaps.  Instead, one has complied by not issuing "securities."  Equity swaps, meanwhile, are regulated in a different way, by a different agency (the CFTC).

---

[9]  In this case, TCI testified that not being subject to § 13(d) disclosure was one reason for purchasing swaps instead of shares.  At the same time, at least since early 2007, the primary reason for TCI and 3G to hold equity swaps instead of shares cannot have been to avoid disclosure.  TCI and 3G disclosed their equity swap positions to CSX early on.  CSX was at liberty at all times to disclose those holdings, and did so beginning in April 2007.  See, for example, CSX Quarterly Report on Form 10-Q for the First Quarter of 2007 (April 18, 2007).  Moreover, since announcing their group formation in December, TCI and 3G have fully disclosed their holdings of both shares and equity swaps.  Yet they continue to hold together 35 million CSX shares (8.7% of the outstanding shares) plus equity swaps referencing 50 million CSX shares (12.3% of the outstanding CSX shares).  If one is running a proxy fight, it is far better to hold 21% of the votes than to hold 8.7% and (as I discuss below) have no control over whether or how the remaining 12.3% will be voted.  Thus, a reason other than disclosure must be causing them to continue to hold equity swaps.

[10]  Exchange Act Rule 13d-3(b).  The adopting release for the 13(d) rules offers an example of such a plan or scheme.  Exchange Act Release No. 34-13291 (1977), example 8.  This example involves both (i) ownership of shares, and (ii) power to vote those shares at an upcoming meeting.

[11]  See Rule 144, preliminary note 3 ("this rule is not available with respect to any transaction or series of transactions that, although in technical compliance with this section, is part of a plan or scheme to evade the registration provisions of the [Securities] Act; Regulation S, preliminary note 2 (similar); see also Exchange Act Rule 10b-18, preliminary note 1 (safe harbor from the antimanipulation provisions of Exchange Act § 9 and 10(b))..

Similarly, equity swaps (without more) are not shares, so one cannot violate the Exchange Act by owning equity swaps instead of shares, and then not reporting beneficial ownership under 13(d). The Securities Act applies to securities, and not equity swaps. Similarly, Exchange Act § 13(d) applies to voting shares, and not equity swaps.

To offer another analogy, an investment in shares is subject to the margin rules issued by the Federal Reserve Board. An investment in equity swaps is not, and is subject only to the prudential margin requirements which the derivatives dealer imposes on its clients. An investment in single stock futures is subject to prudential margin requirements set by the clearing firm for the futures exchange. These three instruments convey essentially identical financial returns, and the markets for all three of them are linked by a combination of hedging and arbitrage. Yet no one would think that an investor in equity swaps or single stock futures has violated the Federal Reserve's margin rules. Instead, such an investor falls outside those rules. It has complied with the Fed's margin rules, by not borrowing against shares.

### Equity swaps plus market customs

The possibility of a positive answer to Judge Kaplan's first question, and the relevance of his second question, thus depends not on TCI holding equity swaps as such, but on their holding equity swaps supplemented by market customs relating to those swaps. Similarly, his second question as to mental state becomes relevant only if the swap, supplemented by market customs, conveys beneficial ownership under the statute, even though it does not convey beneficial ownership under the rest of Rule 13d-3.

This makes it essential to carefully state the relevant background U.S. market conditions relating to equity swaps. My statement below of those background conditions is consistent with the facts of the CSX case, as best I understand them.

I will assume that the questions which Judge Kaplan posed to the SEC can be answered based on the characteristics of equity swaps plus general market customs, and not on the specific facts of the CSX case. More specifically, I will assume that:

- TCI has no formal or informal agreement, understanding, arrangement, or relationship with any of the derivatives dealers who acted as counterparties to its equity swaps other than the standard swap documentation discussed below.[12]

- TCI had no conversations or other communications with any of its dealers about whether or how they would hedge any equity swaps, and if they hedged with CSX shares, whether or how they would vote those shares.[13]

---

[12] The factual record available to me is consistent with the absence of any such agreements. Their existence is a factual question, which Judge Kaplan can resolve.

[13] The factual record available to me is consistent with the absence of any such efforts. Their existence is again a factual question, which Judge Kaplan can resolve. With one exception, I am not aware of other indirect efforts by TCI to influence how any matched CSX shares held by its swap counterparties were voted. The exception is that TCI choose Deutsche Bank as one of its principal swap counterparties in part because Deutsche Bank owns an internal hedge fund, Austin Friars Capital, which held a proprietary position in CSX. TCI had previously discussed with Austin Friars the merits of investing in CSX. TCI hoped that if Austin Friars supported TCI in the proxy contest, Deutsche Bank might vote any matched CSX shares it held to hedge TCI's swaps to support the Austin

6

- The agreements which do exist between TCI and its dealers, under standard swap documentation, do not imply that TCI and its dealers are acting together for the purpose of acquiring, holding, voting, or disposing of CSX shares. Thus, there is no 13(d) group consisting of TCI and it dealers.[14]

### *Assumptions and background market customs:*

- A hedge fund or another investor acquires a long position in equity swaps which reference the shares of a U.S. public company. As noted above, this long equity swap position conveys economic exposure equivalent to owning the referenced shares, which can be called "economic-only ownership."

- Economic-only ownership can be acquired in other ways, including holding single stock futures or option packages. However, at present, equity swaps are the most common way in which investors acquire large economic-only positions.[15]

- Equity swaps are available on a routine basis from a number of major investment banks and commercial banks, which act as derivative dealers and take the short side of the equity swap.

- Equity swaps are, in theory, privately negotiated contracts. However, the principal terms of the vast majority of equity swaps are based on documentation published by the International Swap Dealers Association (ISDA).[16] Some dealers use supplements to the standard ISDA equity swaps form, but the principal terms of these supplements are standardized and not individually negotiated with each client.

- In most cases, the derivatives dealer will hedge its short equity swap position. When hedging occurs, it often (but now always) involves purchasing "matched shares." For example, a dealer might take the short side of an equity swap referencing 1,000,000 shares of CSX, and at or very close to the same time, purchase 1,000,000 CSX shares in the market. If the dealer is fully hedged and CSX shares then rise (fall), the dealer will lose (gain) on the swap exactly the same amount it gains (loses) on the matched shares.[17]

- Other forms of hedging include acquiring a long position in single stock futures, acquiring a (long call option, short put option) position, and acquiring a long position in another equity swap referencing the same company's shares. The dealer will choose whichever hedging method is most economically attractive. Under current market conditions, for sizeable equity swaps, the cheapest means of hedging is usually to acquire

---

Friars position. As it happens, this hope was unavailing -- the head of the swaps desk at Deutsche Bank didn't know of the existence of Austin Friars, let along any position it might have in CSX.

[14] The factual record available to me is consistent with the absence of any such group. I would also expect that the previous two assumptions would rule out the possible formation of a group.

[15] By "large," I mean large enough as a percentage of the company's outstanding shares to approach the 5% reporting threshold under § 13(d) for a share ownership position.

[16] International Swaps and Derivatives Association (ISDA), 2002 ISDA Equity Derivatives Definitions.

[17] Hedging by the dealer reflects the dealer's preferences, not the investor's. Investors would generally prefer that dealers not hedge, if the dealers were willing, because the hedging transaction is likely to affect market prices.

matched shares. Smaller positions may be hedged in other ways or left unhedged, and hedges of larger positions may be incomplete.

- If the dealer hedges a short equity swap position with matched shares, the dealer will report its ownership to the SEC, in particular on Form 13F.

- The dealer will customarily make the matched shares available for lending in the share loan market.

- The dealer, if it hedges with matched shares and has not lent these shares, will have voting rights over the shares. Market practice for U.S. companies, which has developed in part because of the § 13(d) rules, is for the dealer to make its own voting decisions, without consulting its swap counterparties.

- Dealers' voting practices with regard to hedged shares vary. Some dealers have adopted the practice of not voting matched shares in contested situations, or else voting in proportion to what they understand votes by others to be. Some may adopt other practices, such as following the voting recommendations of Institutional Shareholder Services (ISS), an influential proxy advisory firm.

- I am not aware of a market practice with respect to whether it is appropriate for a swap counterparty to contact a dealer and attempt to persuade it to vote in a particular way. Such efforts may exist, especially for non-U.S. companies, but they are not the norm for U.S. companies and did not occur in this case. If such attempts are made, they may fail because there is no direct contact between the dealer's swaps desk and the persons who make voting decisions, or because the dealer has a policy against responding to such efforts. It is possible that such an effort may backfire by causing the dealer to abstain from voting.[18]

- The ISDA equity swap documentation and any dealer-specific supplements do not give a long equity swap holder any power to direct: (i) whether the derivatives dealer will hedge; (ii) if the dealer hedges, how it does so, with matched shares or in another way; (iii) if the dealer hedges by acquiring matched shares, whether the counterparty will hold those shares on the record date for a shareholder meeting, or will instead lend the shares to others on that date, (iv) if the dealer hedges with matched shares and holds them on a record date, whether the counterparty will vote the shares at the shareholder meeting; or (v) if the counterparty hedges with shares, holds those shares on the record date, and votes the shares, how the counterparty will vote. The dealer-specific addendum will sometimes specifically state that some or all of these matters are in the sole discretion of the dealer.

- Equity swaps have a finite term. Some equity swaps permit early termination of the swap at the request of the investor. Even when the investor does not have the right to terminate early, most dealers are willing, in most circumstances, to accommodate a request for early termination. Some swaps also give the dealer limited rights to terminate early.

---

[18] This practice, or absence thereof, is U.S.-specific. In particular, the U.K. has no rule similar to § 13(d). In the U.K., there is thus no regulatory bar to an asking its dealer to vote matched shares in a particular way, and it is not uncommon for such requests to be made, or for the dealer to do so.

- When a swap expires, or is terminated early, the dealer, assuming it has hedged, will usually seek to unwind the hedge. If the dealer has hedged with matched shares, it will usually sell most or all of the matched shares. However, the dealer could reverse its initial hedge in other ways, including taking the short side of another equity swap or selling a single stock future.

- In some cases, a long equity swap holder will seek to replace that position with full ownership of shares by unwinding the swap and, at the same or nearly the same time, purchasing shares in the market. I will call this an "exchange unwind."[19]

- Dealers' practices with respect to exchange unwinds differ. Some dealers, if they have hedged with matched shares, are willing to sell the shares directly to their investor, if the investor requests this. Other dealers, as a matter of policy, will refuse to sell matched shares directly to the swap counterparty.[20]

- Investor preferences with respect to exchange unwinds also differ. Some investors may ask their dealer whether the dealer holds matched shares and is interested in selling the shares to the investor. Others may prefer not to even make such an inquiry, partly to limit market knowledge of their positions, and partly to avoid any inference that they had a prior agreement with the dealer with respect to a possible unwind.[21]

- Investors usually want to minimize the market impact of acquiring a position, whether in shares or in equity swaps. When an investor acquires a swap position, it will often to do so over a period of time and will spread the position among a number of dealers. Each dealer will normally not know about the investor's transactions with other dealers.[22]

- Many large investors prefer to minimize public disclosure of their trading positions. A principal reason for this preference is to reduce the market impact of their trades. They will disclose their positions when they understand, often on advice of counsel, that this is legally required. However, they will not make disclosures beyond those which they understand to be legally required.

- The standard advice from U.S. securities counsel to hedge funds and other investors is that a position in cash-settled equity swaps does not constitute beneficial ownership under Exchange Act § 13(d), and does not need to be disclosed on Form 13F. In conformity with that advice, investors customarily do not treat a long equity swap position as disclosable on Form 13F, or as creating a disclosure obligation under § 13(d).

- There is no explicit contract, arrangement, or understanding between the investor and the dealer beyond the swap agreement itself and any dealer-specific addendum. The absence of any such contract, arrangement, or understanding arises in part because both sides are

---

[19] The term "matched shares" is a common market term. The term "exchange unwind" is my own term. I am not aware of a standard market term for this practice.

[20] In the CSX case, TCI engaged in a number of exchange unwinds. In each instance, it purchased shares in the market through a broker unrelated to its swap counterparty.

[21] TCI, as a matter of policy, buys shares separately in the market when it engages in exchange unwinds, and did so with regard to CSX.

[22] In the CSX case, for example, TCI acquired a swap position over a period of about five months, through 8 different derivatives dealers.

aware of Exchange Act § 13(d), and try to comply with it. Standard advice from counsel is that any such contract, arrangement, or understanding might trigger reporting requirements under § 13(d), and is therefore to be avoided.

- Investors understand that they are required to disclose their economic-only ownership in at least the following circumstances: (i) in Item 6 of a Schedule 13D filing which is required for other reasons; (ii) in connection with a proxy solicitation; and (iii) in connection with a tender offer. Thus, economic-only ownership will be disclosed prior to any public tender offer or proxy contest.

- Investors who choose to hold equity swaps instead of shares understand what they are gaining, and what they are giving up. They are gaining a lower cost of financing; greater leverage, because equity swaps are not governed by the margin rules which apply to purchases of shares; and possible trading advantages which result from not disclosing their positions. They are giving up the voting rights that come from owning shares.[23]

### A reframed question

Given these background assumptions and market conditions, Judge Kaplan's first question can be rephrased as follows:

> In light of these background market conditions, is it the SEC's view that an investor who acquires a long equity swap position thereby becomes the beneficial owner of the shares referenced in the swap, to the extent that the dealer has hedged with matched shares?

My professional judgment is that the answer should be no.

I believe that large economic-only ownership positions, including those arising from long equity swap positions, should be publicly disclosed. Prof. Hu and I have developed a detailed disclosure proposal in our published articles. We hope that the SEC will adopt our proposal, or one like it. But the appropriate way to provide for disclosure of economic ownership is through rulemaking, not through an effort by the SEC or the courts to make § 13(d) reporting into something it was never intended to be. As former SEC Commissioner Roberta Karmel wrote in her classic book, *Regulation by Prosecution*:

> I believe it is generally wise policy for the Commission to exercise restraint and decline to expand the coverage of the securities laws through enforcement cases. Although there are times when it is responsible and appropriate for the Commission to institute an enforcement action in order to better delineate the applicability of the securities laws to novel or emerging fact patters, the Commission should articulate and justify the legal and policy grounds on which an enforcement program or particular case is based.[24]

Or, as Prof. Hu and I wrote:

---

[23] This is a summary statement of some of the principal advantages and costs of holding equity swaps instead of shares. For a more complete statement of the differences between the two positions, see Hu and Black (2008b), supra note 2.

[24] Roberta Karmel, Regulation By Prosecution: The Securities and Exchange Commission vs. Corporate America 191 (1982).

From a policy perspective, picking at the language of disclosure rules that were not written with [equity swaps] in mind is beside the point. The real problem is that the 13D and 13G rules were written in the 1970s, when neither swaps nor any other OTC derivatives yet existed.[25]

## 2. The Problem of Complexity

One reason to conclude that cash-settled equity swaps, supplemented by market practices, do not create beneficial ownership of the matched shares which dealers may hold is the complexity of the issue. Equity decoupling, in its many forms, is a hard problem. The long list of bullet points I needed to frame the question illustrate its complexity, but in no way do the problem justice. A temporary solution that involves twisting the language of a 30-year-old rule will raise a number of difficult questions, including:

Which of the market practices outlined above is central to the conclusion that economic-only ownership is sufficiently similar to full ownership of shares so that it should be treated as conveying beneficial ownership under § 13(d)?

The market practices discussed above are new and are still evolving. They respond, in part, to market participants' beliefs about what current rules require. If the rules change, market practices will change too, quite possibly in ways which undermine the basis for the conclusion that equity swaps should be treated as providing beneficial ownership under § 13(d). I offer examples of possible changes below.

In its § 16 rules, the SEC has distinguished between beneficial ownership *of shares* (beneficial ownership in the §13(d) sense) and the broader concept of economic ownership (beneficial ownership in the § 16 sense).[26] If economic only ownership of equity swaps counts as beneficial ownership for § 13(d) purposes, what is left of this distinction?

If an investor who holds matched shares is the beneficial owner (in the 13(d) sense) of the matched shares which its dealer holds as a hedge, but the dealer retains the power to hedge in any way it wants, to change the form of its hedge over time, and to potentially not hedge at all, how is the investor to know how many shares it beneficially owns?

Equity swaps and single stock futures are economically equivalent. A single stock future is basically a publicly traded version of an equity swap. There is every reason to think that dealers who take the short side of single-stock futures hedge in the same ways they hedge equity swaps. Yet the SEC has publicly stated its view that a long position in cash settled single stock futures does not create beneficial ownership under § 13(d).[27] How can this position be reconciled with a contrary view for equity swaps?

---

[25] Hu & Black (2006), supra note 2, 79 **So. Cal. .L. Rev.** at 870-71.

[26] It is unfortunate that the SEC has defined the exact same term, "beneficial ownership," in two very different ways, once under § 13 and once under § 16. But two definitions there are, and confusion results.

[27] Commission Guidance on The Application of Certain Provisions of the Securities Act of 1933, The Securities Exchange Act Of 1934, and Rules Thereunder to Trading in Security Futures Products, Exchange Act Release No. 34-46101 (2002), q. 18.

Are derivatives dealers at risk of being considered to be members of a 13(d) group, with accompanying disclosure obligations and litigation risk, based on having entered into equity swaps and hedging with matched shares?

## 3. The Problem of Equivalence

I strongly believe that a piecemeal approach to requiring disclosure of economic-only positions simply *will not work*. The central problem, as Prof. Hu and I discuss in our published work, is that there are multiple ways, which are economically equivalent or nearly so, to achieve the goal of holding economic ownership without voting ownership. If the SEC or the courts decide that holding equity swaps, which are hedged with matched shares, requires disclosure under § 13(d), and some investors prefer not to disclose their positions, then market practices are likely to change to provide for a different form of ownership which does not require this disclosure. I offer here three simple strategies. In my judgment, the first two will clearly work, the third probably does, and if not, variations on it will. Others strategies can be developed.

The existence of multiple roads to the same destination is a central reason why regulation of the disclosure of economic-only ownership needs to focus on economic ownership *as such*, not economic ownership plus market practice A, B, C, or D, or some subset thereof, which make the economic-only ownership look more like beneficial ownership of shares. That will require the SEC to write new ownership disclosure rules.

Prof. Hu and I have proposed that the SEC could, in large measure, extend the approach it now uses under the § 16 rules and the mutual fund rules, which both focus on economic ownership, to disclosure on Schedules 13D, 13G, and Form 13F. But new rules are needed. Twisting the old ones will not work.

### Avoidance strategy 1:  Change the manner in which dealers hedge

Suppose that the SEC or the courts decide that equity swaps, if hedged with matched shares, require disclosure under § 13(d). Many investors will want to find a form of economic-only ownership which retains the other benefits of equity swaps, such as lower margin requirements, in order to capture a larger share of the gains from their private investment in search for good investments. One way to achieve that goal is for the parties to swap contracts to specify that the dealer *cannot* hedge with matched shares. This slightly revised form of an equity swap contract will fall outside the new interpretation of the scope of § 13(d)..

The dealer will still usually want to hedge, but it can hedge in other ways, including acquiring a long position in single stock futures, acquiring a (long call option, short put option) position, and taking a long position in another equity swap referencing the same company's shares. Under current market conditions, a common hedge would likely be an offsetting swap with another dealer ("dealer 2"). Dealer 2 will be free to hedge however it chooses, including with matched shares.

Under this scenario, the other market practices discussed above will continue, much as at present. The investor will still likely have the practical ability to unwind the swap at any time,

and to engage in an exchange unwind by unwinding the swap and buying shares in the market at about the same time.[28]

The chain of hedging could, of course, be extended. Each step in the chain adds a bit to transaction costs, but only a bit. Dealer 1 could hedge with a swap with dealer 2, which could hedge with a swap with dealer 3, which could hedge with a combination of single-stock futures and options obtained from dealer 4, which could hedge with matched shares, and so on.

All one would be able to say with confidence is that if an investor acquires a long equity swap position, the dealers involved in this chain are likely to be mostly or completely hedged, and one of them is likely to hold matched shares. The investor won't know which one. Its direct counterparty may not know which one (or ones) holds matched shares either. It is possible, though unlikely, that no one will hold matched shares. To then say that the investor beneficially owns the shares in the 13(d) sense -- which emphasizes voting rights and the ability to influence control of the underlying company -- would stretch the concept out of all recognizable shape.

### Avoidance strategy 2:  Use single-stock futures

A second avoidance strategy relies on the SEC's stated position that cash-settled single stock futures need not be disclosed under § 13(d). The SEC has written:[29]

> **Q18:** Would the equity securities underlying a security future that requires cash settlement be counted for purposes of determining whether the purchaser of the contract is subject to the Regulation 13D beneficial ownership reporting requirements?

> **A18:** No. A purchaser of a cash-settled security future (i.e., a security future that, by its terms, must be settled by a cash payment) would not count the equity securities underlying the contract for purposes of determining whether he or she is subject to the Regulation 13D reporting requirements, because he or she does not have the right to acquire beneficial ownership of the underlying security.

Dividends aside, equity swaps are economically equivalent to single-stock futures. Let's imagine a hypothetical conversation:

> Investor to dealer:  I want to obtain economic exposure to 1 million CSX shares.

> Dealer:  Sure, no problem, we'll write you an equity swap contract.

> Investor to dealer:  I'd prefer not to disclose my position under the 13(d) rules. Can you make that a single-stock future instead?

> Dealer:  Sure, no problem.

The investor would then take the long side of a single-stock future, and the dealer would take the short side. The other market practices I discussed above, including hedging, unwinding, and the potential for an exchange unwind would remain unchanged. The investor could later reverse its

---

[28]  The initial swap unwind will often lead the initial dealer to seek to unwind its swap with dealer 2, which will often react by unwinding its own hedge. If dealer 2 has hedged with matched shares, it will likely seek to sell those shares. An interested buyer (the investor) and an interested seller (dealer 2) will usually have little trouble finding each other in the market.

[29]  Exchange Act Release No. 34-46101 (2002).

long position (analogous to unwinding the swap) by taking an offsetting short futures position, either with the same dealer or another dealer.[30]

Note too that in evaluating single-stock futures, the SEC was not concerned with how or whether the futures seller would hedge. It surely understood that counterparties often hedge, and that one common way to hedge a short futures position is with matched shares. But it evaluated only the position held by the investor, not the position held by the dealer on the other side, or how the dealer's position might depend on the investor's actions.

### Avoidance strategy 3: Tweak the contractual returns

An equity swap, with returns which exactly mirror those on shares, is only one of an infinite number of contractual options. Others already exist in the market, still others can readily be created. Consider, for example, a "zero-cost collar" -- which combines sale of a call option and purchase of a put option. Company insiders often use zero-cost collars to retain formal ownership of shares for tax and voting purposes, but shed most of their economic risk. The collar holder retains economic risk only for share price changes between the (lower) put option exercise price $P_{put}$ and the (higher) call option exercise price $P_{call}$. For simplicity, I will ignore dividends.

The dealer holds the opposite "short collar" position (long call at $P_{call}$; short put at $P_{put}$). It holds exposure to share price fluctuations for prices below $P_{put}$ and above $P_{call}$. Dealers will customarily hedge most or all of this risk. The hedging strategy is more complicated than for an equity swap, but is entirely feasible.

Suppose now that equity swaps are treated as disclosable for 13(d) purposes. An investor could hold instead a short collar position. The smaller the gap between $P_{put}$ and $P_{call}$, the closer this comes to being economically equivalent to a long equity swap position. The dealer's hedge might involve a combination of shares and options. It might also be a "dynamic hedge," in which the dealer's holdings of shares, options, and other hedging instruments changes as share price changes. Would a short collar position also be considered to be beneficial ownership? If yes, a new set of complexities arises. If not, an avoidance strategy is available. Would the answer depend on the size of the gap between $P_{put}$ and $P_{call}$?

If the investor wanted to close some or all of the gap in economic exposure to the underlying shares between $P_{put}$ and $P_{call}$, it could enter into a long collar position with a second dealer. Or it could use a package of publicly traded options to achieve the same end. Would the two positions then be combined in computing beneficial ownership?

### Other avoidance strategies

---

[30] The principal practical difference between equity swaps and futures is that the open interest in the future would be publicly reported by the futures exchange. If (as would often be the case under current market conditions) the prior open interest was well below 1 million shares, other investors would know that *someone* had acquired economic ownership of 1 million shares, but not whom. Other differences between the swap and the single stock future seem minor, as best I can judge, and on balance may favor use of futures.

I have argued above that a conclusion that equity swap positions should be disclosed under § 13(d) must depend on market practices. One would expect the SEC to tell the world which ones, rather than leave investors and dealers to guess. Whichever practices the SEC focuses on may well turn out to be malleable. Without knowing exactly what the SEC or the courts might conclude, one can only speculate about the responses. But here are some plausible examples:

> If it were important, in order to not have beneficial ownership, for the investor not to have the ability to unwind the swap and obtain matched shares directly from the dealer, rather than indirectly in the market, swap contracts could be written to bar this particular form of unwinding. Some dealers already refuse to sell matched shares directly to their swap counterparty on an unwind. As noted above, in TCI's exchange unwinds, it purchased shares in the market, rather than directly from its swap counterparty.

> If it were important, in order to not have beneficial ownership, that the investor had no ability to unwind the swap prior to termination, swap contracts could be written which could not be unwound. An investor which wanted to reduce its economic exposure to a company would, instead of unwinding a long equity swap, take the short side of a second equity swap, either with the same or a different dealer. Investors could also enter into short-dated swaps, which could be rolled over at expiration, much as short-dated options and futures are now often rolled over.

> If it were important, in order to not have beneficial ownership, that the investor have no way to influence whether or how the dealer votes, the people who make voting decisions for the dealer could be insulated from knowledge of why and for whom the dealer holds matched shares, and charged with making their best voting decision assuming the dealer economically owned the shares. The testimony in the CSX case indicates that some dealers already operate this way.

And so on. The market practices which exist today are simply not a stable basis for a conclusion that a long equity swap position, supplemented by some set of market practices, conveys beneficial ownership.

## 4. The Problem of Consistency Between Rules

The 13(d) rules are focused on control of public companies, and on the power to vote shares. Non-voting shares are expressly outside its scope.[31] Though not in this precise language, the SEC drew in the 13(d) rules, and retains today, a distinction between economic ownership alone (which conveys beneficial ownership in the § 16 sense) and voting ownership (which conveys beneficial ownership in the 13(d) sense).Thus, in the adopting release for the 13(d) rules, the Commission wrote:

> It must be emphasized that the definition of "beneficial owner" and the related rules have been adopted primarily for the purposes of Section 13(d) of the Exchange Act. . . . [T]he new rules are not intended to affect interpretations of the provisions of Section 16 of the Exchange Act, or the rules and regulations thereunder, since the purposes of Section 16 are different from those of Section 13(d). Accordingly, beneficial ownership for the

---

[31] Exchange Act rule 13d-1(i).

15

purposes of Section 16 would continue to be defined and interpreted by the Commission and construed by the federal courts in light of the purposes of that Section.

The derivative revolution has made it clear that the form of an investment is often malleable. The only sensible regulatory response is to focus on substance, not form. It may be that the line between economic-only ownership and voting ownership, written in a simpler day when "shares were shares" and equity derivatives hardly existed, has lost much of its former meaning. I so believe. It may be that the economic-only ownership should be disclosed in much the same manner as voting ownership. I so believe. But one can't get there through tinkering with rules which are premised on a distinction between economic and voting ownership. All one can do is undermine the logical consistency of the existing rules.

If there is no economic difference between an equity swap and a single stock future, one cannot logically say that the former conveys § 13(d) beneficial ownership and the latter does not. If there is no economic difference to an investor between an equity swap hedged by the derivatives dealer with matched shares, and an equity swap hedged in another way, one cannot logically say that the former conveys § 13(d) beneficial ownership and the latter does not. If an investor does not know, often does not care, and in any case does not control how the dealer hedges, one cannot logically impose on the investor an obligation to disclose ownership under § 13(d) if, but only if, the dealer hedges with matched shares.

The current line -- or so investors and dealers believe -- is that economic-only ownership, not accompanied by the power to direct the voting of shares held by someone else, does not convey § 13(d) beneficial ownership. In contrast, voting ownership, including the power to direct the voting of shares held by someone else, does convey § 13(d) ownership. That line is intelligible. Investors know, or think they know, what side they are on. Some arrange their affairs to stay on the nondisclosure side.

I believe that the current line is unsatisfactory, given the ease with which economic-only ownership can be turned into full voting ownership. The result is a form of ownership that Prof. Hu and I call "hidden (morphable) ownership" -- ownership which today is often not disclosed under § 13(d) or other disclosure rules, yet often can be readily morphed into full voting ownership, through an exchange unwind.

But the SEC's response should be to redraw the line, not to wave a magic wand, pretend that § 13(d) "beneficial ownership" is broader than anyone thought it was, and in so doing twist the line out of recognizable shape. Especially when market practices can change to let investors can remain on the nondisclosure side of the new line, wherever it may fall. Still less, in my view, should the SEC twist the line ex post, thus creating a § 13(d) violation where there was, viewed ex ante, only a reasonable belief that one fell on the nondisclosure side of the line.

Experience in other areas teaches that an illogical line is easier to evade than a logical one. In tax law for example, tax differences without economic differences are an open invitation to tax planning, which creates outcomes inconsistent with the legislative goals. So too here.

## 5. Analogy to Nonvoting Shares

Under current market practice, most dealers, most of the time, hedge large equity swap positions with matched shares. Thus, by entering into equity swaps, TCI made it likely, though not certain, that most of its swaps would be matched by CSX shares held by its dealers.

16

TCI will say that this likelihood is not the same as having *power* to *direct* its dealers' acquisition or disposition of shares. CSX will take the opposite view. To answer Judge Kaplan's first question in the affirmative, the SEC will have to conclude that for TCI to act in a way which predictably induces its dealers to buy or sell CSX shares counts as beneficial ownership of the shares.

This, without more, seems inconsistent with the intent of the statute. Recall that nonvoting shares are not covered by 13(d) at all. Under current market practices, TCI does *not* have the power to direct how any matched CSX shares are voted, or whether they are voted at all, nor even the practical ability, in a probabilistic sense, to do so. How and whether the dealers would vote CSX shares was unknown to TCI when it entered into the swaps, and other than partial knowledge obtained through this litigation, would remain unknown to TCI today. Thus, the most TCI could possibly hold is the economic equivalent of nonvoting shares. Yet nonvoting shares are outside § 13(d). One must then ask what policy purpose would be served by stretching the concept of beneficial ownership to capture the equivalent of nonvoting shares, when a direct holding of nonvoting shares would not be disclosable.

### 6. Variation in Dealer Practice

A further problem with treating equity swaps, plus some base set of market practices, as conveying beneficial ownership of dealers' matched shares, is variation between dealers. Some aspects of equity swap practice are consistent across dealers, such as the basic economic terms of the swap and reliance on ISDA documentation. Others are under the investor's control, such as whether, on an exchange unwind, it seeks to buy shares directly from the dealer, or buys them separately in the market. But some terms and market practices vary between dealers. This variation can be embedded in the dealer's supplement to the ISDA documentation, in the dealer's internal compliance guidelines, or even in the organizational structure of a large financial institution.

Some variations, especially those included in internal guidelines, or embedded in organizational structure, may be unknown to investors. Ex ante, if investors and dealers know which market practices trigger 13(d) risk, they can plan around those risks. But lawsuits, such as this one, arise ex post. There is a "gotcha" element in deciding, in an enforcement proceeding, that a particular set of background conditions, some of which were not known to the investor, and others of which were not under its control, imply that the investor has violated a newly expanded concept of beneficial ownership, in the face of what appears, from my reading of the facts taken as a whole, to be reasonable, good faith compliance efforts.

Moreover, it would seem strange to decide *ex post* that equity swaps with dealer 1, which follows one set of practices, count as beneficial ownership of shares; while swaps with dealer 2, which follows a different set of practices, do not. The investor, after all, did not know ex ante which dealers followed which practices, did not know it should care, and may have had no ability to find out.

### 7. Policy Considerations

The ownership disclosure rules in general, and the § 13(d) rules in particular, are sensitive to the costs of disclosure, and to the value to investors of being able to trade and profit on private beliefs, as a way to encourage investment in searching for undervalued companies and then

taking an active role in trying to improve their value. More disclosure reduces the return to search, and the incentives to engage in shareholder activism. This harms all shareholders, large and small alike.

Put differently, TCI and 3G will incur all of the costs of their own activism, including large litigation costs, but will at best realize only a fraction of the gains. Earlier disclosure reduces those gains. Greater uncertainty about what must be disclosed invites litigation, including this lawsuit, and increases the costs of activism.

The goal of disclosure rules is therefore not maximum, but optimum disclosure. Moreover, clarity, and thus reduced litigation risk, is an important aspect of the disclosure rules. What they require should be knowable in advance.

More generally, the goal of the Williams Act, of which § 13(d) was a part, was to provide a set of rules which regulated tender offers and other changes of control, but left a reasonable opportunity for changes of control to occur. This balance is reflected in a number of provisions, including the 20-business-day minimum tender offer period (where bidders would prefer a shorter period and companies a longer one); the requirement to file a Schedule 13D 10 days after crossing 5% beneficial ownership, rather than immediately, thus allowing time for the acquirer to increase its holding prior to public disclosure, potentially to well above 5%, the right of bidders to make offers for less than all shares, and so on.[32]

Sensitivity to the cost of expanded disclosure, to the need for clear rules that limit litigation risk, and to the risk of unintended consequences, all counsel caution here. So too does concern with the disruption which will result from upsetting standard market practices, built around what securities counsel understand § 13(d) to require.

Nor is there, as yet, desperate urgency to do something now about hidden ownership, morphable or otherwise. There is no sense in which TCI and 3G snuck up on CSX, which has known about their economic ownership since early 2007. The CSX investors who must soon vote on the CSX director slate and other proposals have had full details about TCI's and 3G's holdings of both shares and equity swaps since December 2007. The proxy rules required this disclosure, even if TCI and 3G had never crossed the 5% share ownership line, and never filed a Schedule 13D. Investors also had partial knowledge since early 2007, based on CSX's disclosures.[33]

My early academic writing criticizes the SEC for writing broad rules, including the 13(d) rules, which tend to chill shareholder oversight of management, and thus exacerbate the separation of ownership and control of large American firms.[34] The SEC responded to this and other

---

[32] See generally Ronald Gilson & Bernard Black, The Law and Finance of Corporate Acquisitions (2d ed., 1995 and 2006 supplement).

[33] CSX Quarterly Report on Form 10-Q for First Quarter of 2007 (Apr. 18, 2007) (describing TCI's Hart-Scott-Rodino filing, describing it as having a "substantial" economic stake through shares and derivatives); CSX Quarterly Report on Form 10-Q for Second Quarter of 2007 (July 25, 2007) (describing 3G's Hart-Scott-Rodino filing).

[34] See Bernard Black, *Shareholder Passivity Reexamined*, 89 **Michigan Law Review** 520-608 (1990), at http://ssrn.com/abstract=366820, especially pages 542-545. For a argument on the specific need to reform the §13(d) rules, see Bernard Black, *Next Steps in Corporate Governance Reform: 13(d) Rules and Control Person Liability*, in Kenneth Lehn & Robert Kamphuis eds., **Modernizing U.S. Securities Regulation: Economic and Legal Perspectives** 225-238 (1993).

criticisms by revising its proxy rules in 1992. But even after those reforms, it remains the case, as I wrote in 1992, that:

> One can debate how much monitoring [institutional investors] would do under a more facilitating set of legal rules. One can debate how valuable institutional oversight will be. But one cannot seriously dispute the existence of a web of legal rules that obstruct shareholder oversight nor the very limited oversight of American corporate managers by American financial institutions, nor the existence of shortfalls in American corporate performance that institutional oversight *might* help to correct.[35]

The § 13(d) rules are part of that web of shareholder-constraining rules. Large shareholder ownership disclosure rules serve valuable purposes too. But more disclosure is not always better. What is needed is a careful assessment of the costs and benefits of a particular proposal.

A further concern is interaction between the § 13(d) rules and other rules and market practices. In particular, the forfeiture of short-swing trading profits under Exchange Act § 16 applies to directors, officers, and 10% beneficial owners *in the 13(d) sense*. The logic is that 10% shareholders might have access to inside information. But the practical effect is to impose a substantial hurdle on any outside investor which is considering acquiring more than 10% of a company's shares.

Today, investors can own economic stakes above 10% as long as part of the stake is in the form of equity swaps. This, I strongly believe, is a good thing. It allows investors to take larger stakes, and thus reduces the collective action problems which impede shareholder activism. If the SEC revises the ownership disclosure rules, it can -- and I believe it should-- do so without further burdening those investors who want to acquire more than 10% of a company's shares, by limiting the ownership which triggers § 16 to traditional voting ownership, at least for investors for whom there is no other evidence of access to inside information. An expansion of § 13(d) will not permit this sort of adjustment. Thus, that expansion will carry over to § 16. It will also carry over to the thresholds for most company-adopted poison pills, which are typically framed in terms of beneficial ownership in the 13(d) sense. That too would chill shareholder activism.

All of these factors suggest that a rulemaking proceeding is the right way to respond to equity decoupling and hidden economic ownership. I would be the first to say that equity decoupling raises cause for concern, and creates a real need for reform. But rulemaking is the way to go, rather than stretching the existing rules to address the unanticipated implications of equity derivatives.

I might note finally that the term "beneficial owner" must, in the end, be understood to mean what Congress thought it meant in adopting § 13(d), to the extent that Congress's intent can be discerned. The SEC's definition of this term in the 13(d) rules is quite broad already, which might be a further reason for caution in extending it yet further. So too might the explicit limits on the SEC's power to regulate "security-based swap agreements" (including equity swaps) in the Gramm-Leach-Bliley Act.

---

[35] Bernard Black, *Next Steps in Proxy Reform*, 18 **Journal of Corporation Law** 1-55 (1992), at 4.

## 8. Conclusion

SEC commissioners have publicly stated that they are examining the issue of equity decoupling, and how they should respond. Other countries, including Australia, Hong Kong, Switzerland, and the U.K., have changed their rules to require increased disclosure of equity swaps and other economic-only positions, or are considering doing so. I predict that the SEC will have to change its rules as well, in the not too distant future. I believe it should do so. But I do not believe that an effective, reasoned response can emerge from the current language of § 13(d), nor in the urgency of an expedited lawsuit, nor from the limited facts which are available in a single case.

Very truly yours,

Bernard S. Black

Bernard S. Black

20