UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CSX CORPORATION,

                    Plaintiff,

       v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE BEHRING,
A/K/A ALEXANDRE BEHRING COSTA,

                    Defendants.

---

THE CHILDREN'S INVESTMENT MASTER
FUND,

                Counterclaim and Third-
                    Party Plaintiff,

       v.

CSX CORPORATION AND MICHAEL WARD,

                Counterclaim and Third-
                    Party Defendants.

---

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.,

                Counterclaim Plaintiffs,

       v.

CSX CORPORATION AND MICHAEL WARD,

                Counterclaim Defendants.

---

ECF Case

08 Civ. 02764 (LAK) (KNF)

**MEMORANDUM OF CSX IN
RESPONSE TO LETTER TO THE
COURT FROM THE SEC STAFF**

## Preliminary Statement

CSX Corporation respectfully submits this memorandum in response to the letter of Brian V.

Breheny to the Court, dated June 4, 2008 (cited as "Ltr."), expressing the views of the Division of

Corporation Finance (the "Staff") of the Securities and Exchange Commission, as to the questions posed

by the Court to the SEC.  The Staff devotes the better part of its letter to the state-of-mind requirement

under Rule 13d-3(b).  While we disagree with certain aspects of the Staff's letter and while it is not

binding on the Court, the Staff's views support CSX's claim that Defendants engaged in a plan or

scheme to evade the reporting requirements.  The Staff describes a test that is easily satisfied on the

narrow and unique facts of this case.  Moreover, while the Staff states that it disagrees with CSX's

"legal interpretation" of Rule 13d-3(a) as it applies to swaps, there is in fact no conflict between the law

and CSX's theory of the case, which the Staff appears to have misunderstood.

## Response to Views of SEC Staff

### A.      Rule 13d-3(b)

In response to the Court's question concerning the evasion test, the Staff states that "a person

that does nothing more than enter into an equity swap should not be found to have engaged in an

evasion of the reporting requirements" (Ltr. at 4), a proposition with which CSX agrees.  However, the

Staff makes clear that in an appropriate case -- and this is such a case -- a swap arrangement may be

used as part of a plan or scheme to evade the reporting requirements.  (Id. at 3-4.)  In so doing, the Staff

not only confirms that whether a swap arrangement gives rise to beneficial ownership under Rule 13d-

3(b) is a fact-specific inquiry, but also rejects Defendants' contention that an arrangement involving

cash-settled equity swaps cannot under any circumstances confer beneficial ownership under Rule 13d-

3(b) on grounds that swaps are not themselves securities.

The Staff states that a swapholder's "underlying motive for entering into the swap transaction

generally is not a basis for determining whether there is 'a plan or scheme to evade'".  (Id. at 3.)

1

According to the Staff, "the mental state contemplated by the words 'plan or scheme to evade' is generally the intent to enter into an arrangement that creates a false appearance".[1] (Id.) In the Staff's view, "[t]he significant consideration is not the person's motive but rather that the person knew or was reckless in not knowing that the transaction would create a false appearance". (Id.) In addition to stating a general test for intent, the Staff makes clear that, since beneficial ownership is a fact-specific inquiry, Rule 13d-3(b) may be satisfied in the absence of false appearances in other "unusual circumstances". (Id.)

Insofar as we understand the Staff's view -- that the intent to create a false appearance satisfies the state of mind requirement but is not necessarily required so long as there exists other indicia of a plan or scheme -- we agree.[2] The goal of Section 13(d) "is to alert the marketplace to every large, rapid aggregation or accumulation of securities . . . which might represent a potential shift in corporate control". Treadway Cos. v. Care Corp., 638 F.2d 357, 380 (2d Cir. 1980) (internal citations omitted). If the intent to create false appearances by hiding from the investing public a large, rapid aggregation or accumulation of securities, the powers associated with them, and potential shifts in corporate control is insufficient to meet the requirements of Rule 13d-3(b), it is difficult to imagine what would be

---

[1] Here again, the Staff's views support CSX's theory of the case, insofar as they contradict Defendants' contentions about Rule 13d-3(b). Nowhere, for example, does the Staff make mention of a requirement that the swapholder act in bad faith for the sole or dominant purpose of avoiding disclosure. The requirements that Defendants seek to read into the Rule are absent from the Staff's analysis.

[2] In our view, there is no need for special emphasis on the intent to create false appearances, as opposed to the multitude of other ways in which one might perpetrate a plan or scheme to evade the reporting requirements (whether or not there are false appearances). But in this our disagreement with the Staff is merely one of focus and has no bearing on the outcome of this case. The Staff acknowledges, as it must, that Rule 13d-3(b) may be satisfied even in the absence of the intent to create false appearances or engage in a sham transaction. (Ltr. at 3-4.)

sufficient.[3]

The requirements of Rule 13d-3(b) are satisfied here under both the Staff's general intent test and its "unusual circumstances" exception. In fact, they are also satisfied under the more demanding six-part inquiry described by Professors Grundfest, Hu and Subrahmanyam in their letter to the SEC. As is explained in detail in CSX's proposed findings of fact, the evidence adduced at trial demonstrates that TCI:

1.  Acquired a position in the derivative markets that, if held in the form of CSX's voting equity, would trigger a disclosure requirement;

2.  Engaged in efforts to influence corporate management in a manner consistent with a course of conduct typical of activist shareholders having positions in excess of five percent of a registrant's voting equity who are required to file pursuant to Section 13(d);

3.  Engaged in efforts with the purpose or effect of influencing the voting position of counterparties who, by virtue of the foreseeable equity hedges held as a result of the equity swap positions at issue, own CSX's voting shares;

4.  Caused a pre-positioning of the CSX's voting shares in a manner that materially facilitates the rapid and low-cost acquisition of a reportable position upon the termination or other unwinding of the derivative transactions at issue;

5.  Caused the derivative positions at issue to be structured in a manner calculated to prevent counterparties from becoming subject to disclosure obligations under the Federal securities laws; and

---

[3] Our only real concern with the Staff's position regarding Rule 13d-3(b) is its assertion that "a person who entered into a swap would be a beneficial owner under Rule 13d-3(b) if it were determined that the person did so with the intent to create the false appearance of non-ownership of a security". (Ltr. at 3.) We take this statement merely as an example of the kind of intent that would satisfy the evasion test. To the extent the Staff means to say -- and we do not believe that it does -- that a person cannot be a beneficial owner under Rule 13d-3(b), unless the person entered into a swap with the intent to create the false appearances of non-ownership of a security (which the person actually owned), the Staff is wrong, and its view is entitled to no deference. See Gonzales v. Oregon, 546 U.S. 243, 256 (2006) (stating that an interpretation that does not bear the statutory authority of the agency "is 'entitled to respect' only to the extent that it has the 'power to persuade'" (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944))). Construing the Rule in this way would render it a nullity. Rule 13d-3(b) could only be satisfied where Rule 13d-3(a) was also satisfied. That makes no sense, since Rule 13d-3(b) assumes that Rule 13d-3(a) is not satisfied. In any event, as discussed below, Rule 13d-3(a) is satisfied and thus, TCI created a false appearance that it was not.

6.    Withheld from the market information regarding TCI's activities that is material (e.g., CSX's equity or derivative positions).

In so doing, TCI created the false appearance of limited exposure to CSX, when it had economic exposure to approximately 15% of the outstanding shares of CSX; TCI created the false appearance of passive intent, when it sought influence and control of CSX; and TCI created the false appearance of no special access to CSX shares, when it had superior knowledge about the availability of CSX shares and exploited that knowledge to its advantage. Indeed, TCI admits that it used swaps to avoid public disclosure of its large position and the potential "price differentials that would have made it more expensive for TCI to trade."[4] (Defs. Post-Trial Reply Brief at 57.)

This case is especially egregious in that TCI selectively tipped its hedge fund "friends," without the knowledge of CSX and its other shareholders, for the purpose of effecting a material change in CSX's shareholder base. Construing Rule 13d-3(b) and the Staff's letter not to capture TCI's conduct would turn the Staff's letter into a hunting license for activists to use swaps to evade Section 13(d) reporting requirements in contravention of the fundamental purpose of the Williams Act. Unless the clear provisions of Rule 13d-3(b) are applied to the egregious and unusual facts in this case, activists may increasingly use swaps as a device to conceal their beneficial ownership of voting securities to the

---

[4] The Staff states that "when providing guidance on the use of similar 'plan or scheme to evade' language in other [SEC] rules, the [SEC] has stated that a transaction falls within that language if it was a sham, i.e., involved a contract, arrangement or device used to create a false appearance or an illusion that is contrary to the actual situation". (Ltr. at 3.) While we agree that a sham transaction can qualify as a plan or scheme to evade the reporting requirements, there is no basis for limiting Rule 13d-3(b) to sham transactions. Here and generally the Staff's analysis appears largely to be an abstraction from a few cases and commentary. While this approach is understandable (in view of the fact that, as Mr. Cartwright notes, the SEC itself has been unable to consider the issues), the little authority that addresses Rule 13d-3(b) cannot be said to define its reach. To the extent the Staff purports to limit Rule 13d-3(b) to sham transactions -- and we do not believe it does -- the Staff is mistaken, and its view should be afforded no deference. In any case, while TCI's individual swap transactions might not themselves have been shams, TCI's entire course of conduct surely was designed to create a false appearance.

detriment of the investing public.[5]

**B.      Rule 13d-3(a)**

In response to the Court's question about voting and investment power, the Staff expresses

disagreement with what it understands to be CSX's argument. (Ltr. at 1-2.)  That disagreement,

however, is based both on an overly-narrow view of the legal standard and a misunderstanding of

CSX's argument.

Although it quotes from Rule 13d-3(a), the Staff's analysis reads words out of the Rule and

ignores the Staff's own guidance with respect to the Rule.  Contrary to the Staff's suggestion, voting and

investment power are not limited to "the actual authority to vote or dispose or the authority 'to direct'

the voting or disposition". (Ltr. at 2.)  The Rule expressly states that voting and investment power exist

where a person "indirectly", through not only a "contract" but also an "arrangement, understanding,

relationship, or otherwise", "has or shares" the power to vote or direct the disposition of a security.[6]

That is influence.  In fact, the SEC has described Rule 13d-3(a)'s definition of beneficial ownership as a

"broad definition" that is necessary "to obtain disclosure from all those persons who have the ability to

change or influence control."  Filing and Disclosure Requirements Relating to Beneficial Ownership,

SEC Exchange Act Release No. 14692 (Apr. 21, 1978).  Moreover, the Staff has given Interpretive

Guidance, stating that the definition of beneficial ownership under Rule 13d-3(a) emphasizes "the

ability to control or influence the voting or disposition of the securities".  Interpretive Release

Applicable to Insider Reporting and Trading, Exchange Act Release No. 34-18114, at n.17 (Sept. 24,

---

[5] Considering TCI's conduct as a plan or scheme to evade the reporting requirements would neither stretch the text of Rule 13d-3(b) nor create dislocations in the marketplace, as the Court's ruling would turn on, and be limited by, the specific facts of this case.

[6] We note that the Staff also reads words into the Rule by adding the word "restricting" to modify "relationship" (Ltr. at 2), though such a limitation is neither in the Rule nor in the case law interpreting it.  The Staff also excludes the "or otherwise" language of the Rule in its discussion.

1981) (emphasis added).

Contrary to the Staff's suggestion, CSX does not contend that the incentive structure associated with cash-settled equity swaps necessarily makes any and all swapholders the beneficial owners of the shares referenced in their swaps. Rather, we contend that, on the specific facts of this case -- which are described in detail in our proposed findings of fact and which the SEC expressly declined to address -- TCI was and is the beneficial owner of the shares referenced in its swaps because, among other things, it had and exercised significant influence over the CSX shares referenced in its swaps through arrangements, understandings and relationships with its swap counterparties.[7]

Notably, the Staff's views are in important respects supportive of our theory. The Staff acknowledges that "the mere possession of the legal right to vote or dispose of securities may not be determinative of who is a beneficial owner". (Ltr. at 2 n.3.) The Staff impliedly acknowledges that swaps are not per se immune from conveying beneficial ownership under Rule 13d-3(a). The Staff makes clear that, to use the Staff's words, "[a]n analysis of all the relevant facts and circumstances is essential in order to determine whether a person has the requisite voting or investment power". (Id.) It is on the unique facts of this case, not a rule of general application relating only to swaps, that Defendants are the beneficial owners of the CSX shares referenced in their swaps.

### Conclusion

For the foregoing reasons, the Staff's views either support CSX's position or are no impediment to the relief CSX seeks.

---

[7] Some of TCI's counterparties do not merely have a business or economic incentive to vote for TCI in the CSX proxy contest. At least one of them, Deutsche Bank, was actively helping TCI analyze an extraordinary recapitalization of CSX with the expectation of being retained for such a transaction. Moreover, TCI admitted that it has engaged in active discussions with Deutsche Bank's hedge fund arm, Austin Friars -- indeed, the evidence shows, formed a group with it -- in an effort to obtain Deutsche Bank's vote with respect to the referenced shares under its swaps. This is the classic example of an "understanding" or "relationship" that Rule 13d-3(a) is intended to reach.

6

Dated: June 6, 2008
New York, NY

Respectfully submitted,

**CRAVATH, SWAINE & MOORE LLP,**

by

Rory O. Millson
Francis P. Barron
David R. Marriott
Members of the Firm

825 Eighth Avenue
New York, NY 10019
(212) 474-1000

RMillson@cravath.com
FBarron@cravath.com
DMarriott@cravath.com

*Attorneys for CSX Corporation*