UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CSX CORPORATION,<br><br>          Plaintiff,<br><br>  v.<br><br>THE CHILDREN'S INVESTMENT FUND MANAGEMENT (UK) LLP, THE CHILDREN'S INVESTMENT FUND MANAGEMENT (CAYMAN) LTD., THE CHILDREN'S INVESTMENT MASTER FUND, 3G CAPITAL PARTNERS LTD., 3G CAPITAL PARTNERS, L.P., 3G FUND, L.P., CHRISTOPHER HOHN, SNEHAL AMIN AND ALEXANDRE BEHRING, A/K/A ALEXANDRE BEHRING COSTA,<br><br>          Defendants. | ECF Case<br><br>08 Civ. 02764 (LAK) (KNF)<br><br>**DEFENDANTS' RESPONSE TO THE SEC AMICUS LETTER** |
| THE CHILDREN'S INVESTMENT MASTER FUND,<br><br>      Counterclaim and Third-<br>      Party Plaintiff,<br><br>  v.<br><br>CSX CORPORATION AND MICHAEL WARD,<br><br>      Counterclaim and Third-<br>      Party Defendants. | |
| 3G CAPITAL PARTNERS LTD., 3G CAPITAL PARTNERS, L.P. AND 3G FUND, L.P.,<br><br>      Counterclaim Plaintiffs,<br><br>  v.<br><br>CSX CORPORATION AND MICHAEL WARD,<br><br>      Counterclaim Defendants. | |

Defendants submit this response to the *amicus curiae* letter submitted in this action by the Division of Corporate Finance of the Securities and Exchange Commission (the "SEC Amicus Letter").[1] As demonstrated below, the SEC Amicus Letter soundly rejects the legal theory asserted in this matter by plaintiff and the Court should give considerable respect and weight to the views set forth in the SEC Amicus Letter.

The SEC Amicus Letter

The SEC Amicus Letter unequivocally rejects the legal theory put forth by the plaintiff in this action. Specifically, the SEC Amicus Letter expressly recognizes that "a standard cash-settled equity swap agreement, in and of itself, does not confer on a party, here the investment fund, any voting power or investment power over the shares a counterparty purchases to hedge its position." (SEC Amicus Letter at 2.) In addition, it rejects the view put forth by plaintiff and its expert that economic or business incentives can confer "voting power" or "investment power" on a party. (*Id.*) As the SEC Amicus Letter emphasizes, "where [a party] is unconstrained by either legal rights held by the other party or by any understanding, arrangement, or restricting relationship with the other party, it is acting independently and in its own economic interest." (*Id.*)

In addition, the SEC Amicus Letter states that the mental state required to establish the existence of a plan or scheme within the meaning of Rule 13d-3(b) is "generally the intent to enter into an arrangement that creates a false appearance." (*Id.* at 3.) Noting that a party's motive in entering into a swap transaction is generally irrelevant to whether a plan or scheme to evade exists, the SEC Amicus Letter concludes that simply "taking steps with the motive of avoiding reporting and disclosure generally is not a violation of Section 13(d) unless

---

[1] A copy of the SEC Amicus Letter is attached hereto as Exhibit A.

the steps create a false appearance." (*Id*.) It is only the "rare case" involving "egregious" or "unusual" circumstances that "might" qualify as a situation in which a plan or scheme to evade exists without a false appearance of fact. (*Id.* at 3-4.) However, "[n]otwithstanding this reservation, as a general matter, a person that does nothing more than enter into an equity swap should not be found to have engaged in an evasion of the reporting requirements." (*Id.* at 4.)

Applying these standards to the evidence in this case leads to only one conclusion: the total return swaps at issue here did not confer beneficial ownership on the defendants of the shares utilized to hedge those swaps. These swap agreements are standard total return cash-settled equity swaps. There is absolutely no evidence that the swap contracts are somehow "sham transactions." Plaintiff attempts instead to conjure up evidence that can somehow be construed as an extra-contractual arrangement that might give defendants voting or investment power over their swap counterparties' shares. The record evidence irrefutably establishes that there were no conversations, let alone an "arrangement" or "understanding," with Deutsche Bank or Citigroup, the two counterparties with whom TCI has the vast majority of its swap contracts, regarding how – or whether – those counterparties would hedge the swaps, vote any hedge shares, or dispose of any hedge shares. (*See* Defendants' June 4 Response to Plaintiff's June 2, 2008 Submission ("Defs. Response") at 5-7; Defs. Br. at 43-44).

In fact, the only purported "evidence" that plaintiff relies on to show that defendants controlled their counterparties' shares is the movement of CSX shares into Deutsche Bank during the two weeks preceding February 27, 2008, the original record date for the 2008 Annual Shareholder Meeting. But Deutsche Bank records and unrefuted testimony of its employees conclusively establish that it did not recall any of those shares and, indeed, the head of the Deutsche Bank swaps desk, who was responsible for voting any shares held as hedges,

was not even aware that a CSX shareholder meeting was scheduled. (DX 152 (Arnone Dep.) 39:23-40:19, 51:3-54:10, 24:10-25:13).) Nor does plaintiff have any support for its belated theory (*see, e.g.*, Pl. Findings ¶ 70) that Austin Friars, a hedge fund run by Deutsche Bank, was an undisclosed group member. (Defs. Response at 6.) Indeed, plaintiff cannot even link Austin Friars to Deutsche Bank's US swaps desk. (DX 152 (Arnone Dep.) 17:8-18:8).) And the evidence establishes that at no time did TCI or 3G enter into any agreement or understanding with either Deutsche Bank or Austin Friars regarding how they might vote their CSX shares, if at all. (Defs. Br. at 42-44; Defs. Reply Br. at 80, 105-107, 110.)

Further, there is no evidence that defendants violated 13d-3(b). The evidence at trial was that TCI used swaps for a variety of reasons, including among others, finance, tax, administrative and maintenance of its confidential proprietary position. (Defs. Br. at 55; PX 19; DX 145 (Amin ¶ 7); DX 144 (Hohn ¶¶ 6, 11).) Accordingly, this case presents the situation identified in the SEC Amicus Letter in which "a party to a swap has both a motive to avoid reporting and also other motives, such as tax and financial considerations." (SEC Amicus Letter at 3.) As noted, the SEC staff took the position that "[t]he significant consideration is not the person's motive but rather that the person knew or was reckless in not knowing that the transaction would create a false appearance. In this regard, taking steps with the motive of avoiding reporting and disclosure generally is not a violation of Section 13(d) unless the steps create a false appearance." (*Id.*).[2]

---

[2] The SEC's view of this issue is entitled to *Chevron* deference as it is based on a Commission *amicus* brief submitted in *In re HealthSouth Securities Litigation*, No. CV-03-BE-1500-S (N.D. Ala.) (SEC Amicus Letter at 3 n.4). *See Levy v. Southbrook*, 263 F.3d 10, 14 (2d Cir. 2001) (the court is "bound by the SEC's interpretation of its regulations in its amicus briefs, unless they are plainly erroneous or inconsistent with its regulation[s]" (citation omitted).).

No false appearance was created by TCI here.  As noted above, TCI did not have beneficial ownership over any shares held as hedges to the swaps.  Moreover, TCI fully disclosed its swap interest to CSX, and created no false appearance publicly.  None of its disclosures of its swap positions was in anyway inaccurate.  Finally, as noted, there is no evidence of any sham agreements or side deals with any counterparty regarding the shares held as hedges to the swaps.  In short, TCI's swap agreements are not the "egregious situation" or "unusual circumstances" that might qualify as a scheme to evade the reporting requirements of Section 13(d).

The SEC Amicus Letter Should be Given Considerable Respect and Weight

The SEC Amicus Letter should be given considerable respect and weight even though it does not constitute a response from the Commission itself.  The SEC was well informed of the relevant factual and legal issues in this dispute prior to the submission of the SEC Amicus Letter.  Specifically, beginning as far back as May 2007, the SEC's Enforcement Division has been aware of plaintiff's concerns, has received multiple written submissions from plaintiff's counsel regarding the defendants' purported conduct with respect to CSX, and has taken testimony from plaintiff regarding the issues raised in this dispute.  Also, the SEC has recently received a substantial amount of additional factual and legal information regarding this dispute from the parties, as well as certain testifying and consulting experts.  These materials include copies of certain witness statements, the trial transcript, expert reports, post-trial submissions, and submissions from certain experts expressing their views regarding the issues raised by the questions posed to the SEC by the Court.  The SEC also received detailed written submissions by the parties, including a 27-page letter submitted by plaintiff's counsel setting forth plaintiff's view of the "facts" of the case.  In addition, counsel for both parties discussed

certain issues raised by the Court's request directly with high-level members of the staff of the SEC.³

Further, the SEC Amicus Letter is submitted by the Division of Corporation Finance, the division responsible for all Commission rulemaking under Section 13(d). It was signed by Brian V. Breheny, Deputy Director of the Division of Corporation Finance.⁴ There simply is no reason to conclude that an *amicus curiae* from the full Commission would take a position divergent from the SEC Amicus Letter.

Accordingly, although the SEC Amicus Letter may not be binding on the Court, it should be considered highly persuasive. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161, 164 (1944) (weight given to administrative rulings, interpretations and opinions that are not conclusive agency determinations "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."); s*ee also U.S. v. Mead Corp.*, 533 U.S. 218, 234, 121 S. Ct. 2164, 2175 (2001) ("To agree ... that Customs ruling letters do not fall within *Chevron* is not, however, to place them outside the pale of any deference whatever. *Chevron* did nothing to eliminate *Skidmore*'s holding that an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency.") (citation omitted).

In short, the SEC was well informed of the relevant facts and legal issues prior to the submission of the SEC Amicus Letter. Where, as here, the SEC Amicus Letter is consistent

---

³ Participants in these discussion with defendants' counsel included Jacob Stillman, the Commission's solicitor; Randy Quinn, Special Counsel for the Office of Appeals; Chris Paik, Special Counsel, Office of General Counsel; and several Division of Corporation Finance personnel, including Nicholas Panos, Senior Special Counsel, Office of Mergers and Acquisitions and Michelle Anderson, Chief of the Office of Mergers and Acquisition.

⁴ This is likely so because the Director of the Division, John White, is a former partner of Cravath, Swaine & Moore LLP, CSX's counsel, and may have recused himself from participating in this case.

with all prior relevant authority, and is based on a considered and fully informed judgment, the Court should given considerable respect and weight to the SEC Amicus Letter.

Policy Considerations

The Court previously asked about the policy considerations of holding that cash-settled equity swaps confer beneficial ownership. As is evident from the SEC Letter and the briefs of *amici curiae*, the question of whether defendants' equity swaps confer beneficial ownership over their counterparties' CSX shares has implications that go well beyond this case. In its letter, the Division of Corporation Finance indicates that it is considering whether or not to recommend that the Commission propose rules "to address in a more direct way the use of equity swaps," because it is aware of the significant policy issues raised by the use of such swaps. (SEC Amicus Letter at 4.) The Division of Corporation Finance expressed the need for extreme caution in treating swap agreements, like those of the defendants, as conferring beneficial ownership of swap counterparties' shares:

> [I]nterpreting an investor's beneficial ownership under Rule 13d-3 to include a counter-party's hedge, absent unusual circumstances, would be novel and would create significant uncertainties for investors who have used equity swaps in accordance with accepted market practices understood to be based on reasonably well-settled law.

(*Id.*) Defendants' swap arrangements are not the "unusual circumstances" that the SEC implied would justify such a ruling by the Court. Indeed, defendants used equity swaps consistent with accepted market practices and the extant authority. Under, these circumstances, it would be improper to find that defendants violated their Section 13(d) disclosure obligations.

June 6, 2008

           SCHULTE ROTH & ZABEL LLP


           By:  /s/ Howard O. Godnick_____
                Howard O. Godnick
                Michael E. Swartz
                Yocheved Cohen
                919 Third Avenue
                New York, New York 10022
                Telephone:    (212) 756-2000
                Facsimile:     (212) 593-5955
                howard.godnick@srz.com
                michael.swartz@srz.com

                Attorneys for Defendants The Children's
                Investment Fund Management (UK) LLP,
                The Children's Investment Fund
                Management (Cayman) Ltd., The
                Children's Investment Master Fund,
                Christopher Hohn and Snehal Amin

           KIRKLAND & ELLIS LLP


           By:  /s/ Peter D. Doyle_____
                Peter D. Doyle
                Andrew Genser
                Citigroup Center
                153 East 53rd Street
                New York, New York 10022-4611
                Telephone:    (212) 446-4800
                Facsimile:     (212) 446-4900
                pdoyle@kirkland.com
                agenser@kirkland.com

                Attorneys for Defendants 3G Capital
                Partners Ltd., 3G Capital Partners, L.P.,
                3G Fund, L.P., and Alexandre Behring

# EXHIBIT

# A



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

OFFICE OF THE
GENERAL COUNSEL

June 4, 2008

<u>Sent by fax</u>

The Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
United States Courthouse
New York, NY 10007

      Re: CSX Corp. v. The Children's Inv. Fund Mgmt, L.L.P., et al., 08-Civ. 2764

Dear Judge Kaplan:

      I am writing in response to your letter of May 22, 2008, inviting the Securities and Exchange Commission to submit its views as amicus curiae on two questions arising under the beneficial ownership reporting provisions of Section 13(d) of the Securities Exchange Act of 1934 and Rule 13d-3 thereunder. Because the schedule for submitting a response to the Court did not afford enough time for the Commission's staff to present this matter for a vote of the Commission, I have asked the Commission's Division of Corporation Finance to respond to your request. I recognize that these staff views are not accorded the deference that would be accorded the views of the Commission itself, and I regret that time constraints have prevented us from providing the Court with the views of the Commission. The response of the Division is attached.

                                    Respectfully submitted,

                                    Brian G. Cartwright
                                  General Counsel



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

DIVISION OF
CORPORATION FINANCE

June 4, 2008

Sent by fax

The Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
United States Courthouse
New York, New York 10007

      Re: CSX Corp. v. The Children's Inv. Fund Mgmt, L.L.P., et al., 08-Civ. 2764

Dear Judge Kaplan:

      We are writing at the request of Brian G. Cartwright, General Counsel of the Securities and Exchange Commission, in response to your letter of May 22, 2008 to him.

      In responding to the Court, the Division will follow the Commission's practice, as amicus curiae, of addressing legal, and not factual, issues. As we understand this case, the disputed legal issues presented by both of the Court's questions involve the circumstances under which a person is a beneficial owner of stock held by another person. In this case, the defendant, The Children's Investment Fund Management, L.L.P., an investment fund, was the long party in cash-settled total return equity swap transactions with various bank counter-parties.[1] The plaintiff CSX Corporation, the issuer of the stock that was the subject of the equity swaps, is suing the investment fund for allegedly violating Section 13(d), claiming that the fund became the beneficial owner of the shares of the issuer's stock that the banks purchased to hedge their risks with respect to the swaps.

      1.     Your first question asks whether the investment fund had beneficial ownership of the issuer's shares held by the counterparty banks. Rule 13d-3 defines a "beneficial owner" as including a person who, directly or indirectly, has or shares "voting power" or "investment power" through "any contract, arrangement, understanding, relationship or otherwise." "Voting power" includes "the power to vote, or to direct the voting of" a security. "Investment power" includes "the power to dispose, or to direct the disposition of" a security. The issuer in this case argues that, regardless of whether the investment fund had any arrangement, understanding or relationship with any of the counterparty banks concerning voting power or investment power,

---

1) When we refer to swap agreements in this letter, we are referring to total return equity swap agreements that may be settled <u>only</u> in cash.

the investment fund was the beneficial owner of the shares held by the counterparty banks because it had voting power and/or investment power over those shares by virtue of certain economic incentives. The investment fund, in contrast, argues that economic incentives do not constitute a sufficient basis for establishing any such powers.

The Division disagrees with the issuer's legal interpretation. We note at the outset that a distinction should be drawn between the scope of the statute and the scope of the Commission's rule. The Division believes that Rule 13d-3, properly construed, is narrower in coverage than the statute. As a general matter, economic or business incentives, in contrast to some contract, arrangement, understanding, or relationship concerning voting power or investment power between the parties to an equity swap, are not sufficient to create beneficial ownership under Rule 13d-3.[2] We start with the recognition that a standard cash-settled equity swap agreement, in and of itself, does not confer on a party, here the investment fund, any voting power or investment power over the shares a counterparty purchases to hedge its position. In our view, that conclusion is not changed by the presence of economic or business incentives that the counterparty may have to vote the shares as the other party wishes or to dispose of the shares to the other party. While such incentives may exist, when the counterparty chooses to act in these areas in circumstances where it is unconstrained by either legal rights held by the other party or by any understanding, arrangement, or restricting relationship with the other party, it is acting independently and in its own economic interests. The more reasonable interpretation of the terms "voting power" and "investment power" as used in the Rule, which are based on the concept of the actual authority to vote or dispose or the authority "to direct" the voting or disposition, is that they are not satisfied merely by the presence of economic incentives.[3]

2. Your second question is "what mental state is required to establish the existence of a plan or scheme within the meaning of Rule 13d-3(b)." Rule 13d-3(b) provides (emphasis added):

> Any person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement or device with the purpose or effect of divesting such person of beneficial ownership of a security or preventing the

---

2) The staff does not address the factual question of whether the investment fund in this case had some contract, arrangement, understanding or relationship with its counterparties regarding the voting or disposition of the issuer's shares.

3) The Division recognizes that mere possession of the legal right to vote or dispose of securities may not be determinative of who is a beneficial owner of such securities inasmuch as another person may have the power, by various means, to direct the voting or disposition of shares. An analysis of all the relevant facts and circumstances is essential in order to determine whether a person has the requisite voting or investment power. For example, beneficial ownership may be obtained without having legal title to shares through means such as a transfer of voting power from one beneficial owner to another by grant of an irrevocable proxy. See In re Douglas A. Kass, Exchange Act Release No. 31046 (August 17, 1992). By contrast, as the Commission has previously stated, soliciting and receiving "revocable proxy authority (subject to the discretionary limits of Exchange Act Rule 14a-4), without more," will not trigger the beneficial ownership reporting requirements. Exchange Act Release 39538 (January 12, 1998).

2

vesting of such beneficial ownership <u>as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act</u> shall be deemed for purposes of such sections to be the beneficial owner of such security.

It appears from the trial transcript that you are considering a situation where a party to a swap has both a motive to avoid reporting and also other motives, such as tax and financial considerations. See Tr. Transcript pp. 222-23. Your question concerning mental state then is how significant in the swap-party's mind the motive of avoiding reporting must be for Rule 13d-3(b) to apply and the long swap-party to be deemed a beneficial owner of the shares held by the counter-party.

In the Division's view, the long party's underlying motive for entering into the swap transaction generally is not a basis for determining whether there is "a plan or scheme to evade." Rule 13d-3(b) states that a person is a beneficial owner when that person has used "a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement or device" with the purpose or effect of divesting himself of beneficial ownership of a security or preventing the vesting of beneficial ownership of a security "as part of a plan or scheme to evade" reporting requirements. The "plan or scheme to evade" language follows the requirement that a person use an arrangement with the purpose or effect of avoiding beneficial ownership. Thus we do not believe the "purpose of effect" phrase defines the mental state necessary for there to be a "plan or scheme."

We believe that the mental state contemplated by the words "plan or scheme to evade" is generally the intent to enter into an arrangement that creates a false appearance. Thus, a person who entered into a swap would be a beneficial owner under Rule 13d-3(b) if it were determined that the person did so with the intent to create the false appearance of non-ownership of a security. The significant consideration is not the person's motive but rather that the person knew or was reckless in not knowing that the transaction would create a false appearance. In this regard, taking steps with the motive of avoiding reporting and disclosure generally is not a violation of Section 13(d) unless the steps create a false appearance.

It is our understanding that neither the Commission, nor the staff of the Division of Corporation Finance, has previously issued public guidance on the issue of the mental state required for Rule 13d-3(b). However, when providing guidance on the use of similar "plan or scheme to evade" language in other Commission rules,[4] the Commission has stated that a transaction falls within that language if it was a sham, <u>i.e.</u>, involved a contract, arrangement or device used to create a false appearance or an illusion that is contrary to the actual situation.

We cannot rule out the possibility that, in some unusual circumstances, a plan or scheme to evade the beneficial ownership provisions of Rule 13d-3 might exist where the evidence does not indicate a false appearance or sham transaction. No general principle can be designed for all potential future occurrences, and the rare case might present an egregious situation qualifying as

---

4) <u>Amicus curiae</u> letter brief filed in <u>In Re Healthsouth Securities Litig.</u>, No. CV-03-BE-1500-S (N.D. Ala.)

a scheme to evade without also involving the creation of a false appearance of fact. Notwithstanding this reservation, as a general matter, a person that does nothing more than enter into an equity swap should not be found to have engaged in an evasion of the reporting requirements.

* * * *

The Division recognizes the significant policy issues raised by the well-publicized use of equity swaps by investors, particularly in the context of business combinations or other change of control transactions. While the Division is considering whether or not to recommend to the Commission that it propose rules to address in a more direct way the use of equity swaps, it remains mindful that the existing regulatory scheme requires disclosure of such equity swaps. Indeed, to the extent a fund is required to report beneficial ownership on Schedule 13D for shares it has directly acquired or has otherwise been deemed to acquire, the fund must disclose any plans or proposals to acquire additional shares under Item 4 of Schedule 13D.

The Division believes that interpreting an investor's beneficial ownership under Rule 13d-3 to include shares used in a counter-party's hedge, absent unusual circumstances, would be novel and would create significant uncertainties for investors who have used equity swaps in accordance with accepted market practices understood to be based on reasonably well-settled law.

Respectfully submitted,

Brian V. Breheny
Deputy Director
Division of Corporation Finance

cc: Counsel for parties and amici

4