UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

CSX CORPORATION,

                Plaintiff,

                v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS, L.P.,
3G FUND, L.P., CHRISTOPHER HOHN, SNEHAL
AMIN, AND ALEXANDRE BEHRING, A/K/A
ALEXANDRE BEHRING COSTA,

                Defendants.

-------------------------------------------------------------------

THE CHILDREN'S INVESTMENT MASTER
FUND,

                Counterclaim and Third-
                Party Plaintiff,

                v.

CSX CORPORATION AND MICHAEL J. WARD,

                Counterclaim and Third-
                Party Defendants.

-------------------------------------------------------------------

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.

                Counterclaim Plaintiffs,

                v.

CSX CORPORATION AND MICHAEL WARD,

                Counterclaim Defendants.

-------------------------------------------------------------------x

ECF CASE
08 Civ. 02764 (LAK) (KNF)

**AFFIRMATION OF
MICHAEL E. SWARTZ**

**MICHAEL E. SWARTZ,** an attorney duly admitted to practice before this Court, hereby affirms the following to be true:

1. I am a member of the Bar of the State of New York and of Schulte Roth & Zabel LLP, counsel to The Children's Investment Fund Management (UK) LLP, The Children's Investment Fund Management (Cayman) Ltd., The Children's Investment Master Fund, Christopher Hohn, and Snehal Amin. I submit this affirmation in support of Defendant Snehal Amin's motion to correct the Final Judgment and Permanent Injunction of June 11, 2008, pursuant to Rule 60(a) of the Federal Rules of Civil Procedure.

2. Attached hereto as Exhibit 1 is a true and correct copy of the Final Judgment and Permanent Injunction of June 11, 2008.

3. Attached hereto as Exhibit 2 is a true and correct copy of the Second Circuit Remand Order dated July 24, 2008.

4. Attached hereto as Exhibit 3 is a true and correct copy of Plaintiff's Complaint dated March 17, 2008.

5. Attached hereto as Exhibit 4 is a true and correct copy of Plaintiff's Post Trial Brief, dated May 27, 2008.

6. Attached hereto as Exhibit 5 is a true and correct copy of the district court's Opinion of June 11, 2008.

7.     Attached hereto as Exhibit 6 is a true and correct copy of Plaintiff's

Response To The Motion To Correct The Judgment Below, dated July 15, 2008.


/s/  Michael E. Swartz
Michael E. Swartz

Dated:  New York, New York
        July 30, 2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CSX CORPORATION,

              Plaintiff,

     -against-

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, et al.,

              Defendants,

     -against-

MICHAEL J. WARD,

              Additional Counterclaim
              Defendant
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

08 Civ. 2764 (LAK)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/11/2008

## FINAL JUDGMENT AND PERMANENT INJUNCTION

       This Court having duly come on for trial and the Court having rendered its findings

of fact and conclusions of law, it is hereby

       **ORDER, ADJUDGED AND DECREED** as follows:

       1.     Defendants, their officers, agents, servants, employees, attorneys, and all

persons in active concert or participation with any of the foregoing who receive actual notice of this

injunction by personal service or otherwise be and they hereby are enjoined and restrained from

violating Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d), and Regulation

13D thereunder, 17 C.F.R. §§ 240.13d-1 through 13d-102.

2

    2.    Plaintiff shall recover of defendants, jointly and severally, the costs of this action.

    3.    The counterclaims are dismissed with prejudice.

SO ORDERED.

Dated:      June 11, 2008
Issued at:   3:05 pm

_____
Lewis A. Kaplan
United States District Judge

**United States District Court**
**Southern District of New York**
**Office of the Clerk**
**U.S. Courthouse**
**500 Pearl Street, New York, N.Y. 10007-1213**

**Date:**

**In Re:**

-v-

**Case #:**      (     )

Dear Litigant,

Enclosed is a copy of the judgment entered in your case.

Your attention is directed to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, which requires that if you wish to appeal the judgment in your case, you must file a notice of appeal within 30 days of the date of entry of the judgment (60 days if the United States or an officer or agency of the United States is a party).

If you wish to appeal the judgment but for any reason you are unable to file your notice of appeal within the required time, you may make a motion for an extension of time in accordance with the provision of Fed. R. App. P. 4(a)(5). That rule requires you to show "excusable neglect" or "good cause" for your failure to file your notice of appeal within the time allowed. Any such motion must first be served upon the other parties and then filed with the Pro Se Office no later than 60 days from the date of entry of the judgment (90 days if the United States or an officer or agency of the United States is a party).

The enclosed Forms 1, 2 and 3 cover some common situations, and you may choose to use one of them if appropriate to your circumstances.

The Filing fee for a notice of appeal is $5.00 and the appellate docketing fee is $450.00 payable to the "Clerk of the Court, USDC, SDNY" by certified check, money order or cash. **No personal checks are accepted.**

**J. Michael McMahon, Clerk of Court**

by: _____

, Deputy Clerk

**APPEAL FORMS**

Docket Support Unit                         Revised: April 9, 2006

**United States District Court**
**Southern District of New York**
**Office of the Clerk**
**U.S. Courthouse**
**500 Pearl Street, New York, N.Y. 10007-1213**

```
------------------------------------X
                                    |
                                    |        NOTICE OF APPEAL
                                    |
              -V-                   |
                                    |        civ.         (    )
                                    |
------------------------------------X
```

Notice is hereby given that _____
                                                    (party)
hereby appeals to the United States Court of Appeals for the Second Circuit from the Judgment [describe it]




entered in this action on the _____ day of _____ , _____ .
                                     (day)                  (month)            (year)


                                        _____
                                                    (Signature)

                                        _____
                                                     (Address)

                                        _____
                                              (City, State and Zip Code)

Date: _____        (    ) _____-_____
                                              (Telephone Number)


**Note:** You may use this form to take an appeal provided that it is <u>received</u> by the office of the Clerk of the
District Court within 30 days of the date on which the judgment was entered (60 days if the United States
or an officer or agency of the United States is a party).

FORM 1

# United States District Court
## Southern District of New York
### Office of the Clerk
### U.S. Courthouse
### 500 Pearl Street, New York, N.Y. 10007-1213

--------------------------------------------X
                  |
                  |    **MOTION FOR EXTENSION OF TIME**
                  |     **TO FILE A NOTICE OF APPEAL**
       -V-            |
                  |     civ.       (   )
                  |
--------------------------------------------X

Pursuant to Fed. R. App. P. 4(a)(5), _____ respectfully
(party)
requests leave to file the within notice of appeal out of time. _____
(party)
desires to appeal the judgment in this action entered on _____ but failed to file a
(day)
notice of appeal within the required number of days because:

[Explain here the "excusable neglect" or "good cause" which led to your failure to file a notice of appeal within the required number of days.]

 

_____
(Signature)

_____
(Address)

_____
(City, State and Zip Code)

Date: _____     (   ) _____ - _____
(Telephone Number)

**Note:** You may use this form, together with a copy of Form 1, if you are seeking to appeal a judgment and did not file a copy of Form 1 within the required time. If you follow this procedure, these forms must be received in the office of the Clerk of the District Court no later than 60 days of the date which the judgment was entered (90 days if the United States or an officer or agency of the United States is a party).

FORM 2

# United States District Court
## Southern District of New York
### Office of the Clerk
### U.S. Courthouse
### 500 Pearl Street, New York, N.Y. 10007-1213

------------------------------------------------X

                  -v-

------------------------------------------------X

**NOTICE OF APPEAL**
**AND**
**MOTION FOR EXTENSION OF TIME**

civ.       (   )

1.    Notice is hereby given that _____ hereby appeals to

(party)

the United States Court of Appeals for the Second Circuit from the judgment entered on _____.

[Give a description of the judgment]

2.    In the event that this form was not received in the Clerk's office within the required time

_____ respectfully requests the court to grant an extension of time in

(party)

accordance with Fed. R. App. P. 4(a)(5).

    a.    In support of this request, _____ states that

(party)

this Court's judgment was received on _____ and that this form was mailed to the

(date)

court on _____ .

(date)

_____
(Signature)

_____
(Address)

_____
(City, State and Zip Code)

Date: _____

(   ) _____-_____
(Telephone Number)

**Note:** You may use this form if you are mailing your notice of appeal and are not sure the Clerk of the
District Court will <u>receive</u> it within the 30 days of the date on which the judgment was entered (60 days if
the United States or an officer or agency of the United States is a party).

FORM 3

# United States District Court
## Southern District of New York
### Office of the Clerk
### U.S. Courthouse
### 500 Pearl Street, New York, N.Y. 10007-1213

```
------------------------------------------X
                                          |
                                          |        AFFIRMATION OF SERVICE
                                          |
            -V-                           |
                                          |        civ.          (    )
                                          |
------------------------------------------X
```

I, _____, declare under penalty of perjury that I have

served a copy of the attached _____

_____

upon _____

_____

whose address is: _____

_____

Date: _____
      New York, New York

                                    _____
                                        (Signature)

                                      _____
                                        (Address)

                                      _____
                              (City, State and Zip Code)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 24th day of July, two thousand eight.

PRESENT:   HONORABLE JON O. NEWMAN,
           HONORABLE RALPH K. WINTER,
           HONORABLE GUIDO CALABRESI,
                          Circuit Judges.

- - - - - - - - - - - - - - - - - - - - - -

CSX CORPORATION,
     Plaintiff-Appellant-Cross-Appellee,

            v.                        08-2899-cv(L), -3016-cv(XAP)

THE CHILDREN'S INVESTMENT FUND MANAGEMENT
{UK} LLP, ET AL.,
     Defendants-Third-Party-Plaintiffs-
     Counter-Claimants-Appellees-
     Cross-Appellants.

- - - - - - - - - - - - - - - - - - - - - -

<u>ORDER</u>



Defendant-Appellee-Cross Appellant Snehal Amin having moved for leave to file in the District Court a motion to correct the judgment, it is hereby ORDERED that the case is remanded to the District Court for the limited purpose of entertaining and adjudicating a motion to correct the judgment, and upon notice by Amin to the Clerk of this Court that such an adjudication has occurred, the jurisdiction of this Court will be restored.

                         FOR THE COURT,
                         CATHERINE O'HAGAN WOLFE, Clerk

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
#:
FILED: 7/28/08

                  By: _____

                         A TRUE COPY
                  Catherine O'Hagan Wolfe, Clerk

                  by _____
                              DEPUTY CLERK

CERTIFIED:

JUL 2 5 2008

JUDGE KAPLAN

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

# 08 CV 02764

CSX CORPORATION,

         Plaintiff,

    v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE
BEHRING, A/K/A ALEXANDRE BEHRING
COSTA,

         Defendants.



08 Civ. _____

## COMPLAINT

   Plaintiff CSX Corporation ("CSX"), by its undersigned counsel, alleges upon

knowledge as to itself and its own acts and, unless otherwise specifically stated, upon

information and belief as to all other matters, as follows:

### Nature of the Action

   1.   CSX brings this action for injunctive and declaratory relief against

defendants in connection with its annual meeting scheduled for June 25, 2008. Defendants plan

to elect a slate of nominees to CSX's board of directors and amend CSX's Amended and

Restated Bylaws in order to make major changes in CSX's business and corporate structure and

to otherwise change or influence the control of CSX.  In carrying out their plan, defendants have violated Sections 13(d) and 14(a) of the Securities Exchange Act of 1934 and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

      2.    The securities laws require defendants to disclose information that shareholders need to make decisions with respect to their investment.  Section 13(d) requires any person acquiring beneficial ownership of more than 5 percent of a corporation's common stock to disclose, within 10  days of the acquisition, information as to the number of shares beneficially owned, any plans or proposals with respect to the issuer and information as to any contracts, arrangements, understandings or relationships with any person relating to the issuer. To prevent groups of investors from secretly coordinating their efforts, Section 13(d) provides that if two or more shareholders act as a group for the purpose of acquiring, holding or disposing of securities of an issuer, such group shall be deemed a person and be required to make disclosures within 10 days of collectively acquiring more than 5 percent of the issuer's stock. Similarly, Section 14(a) of the '34 Act and Rule 14a-9 prohibit any person from soliciting proxies on the basis of false and misleading information in order to enable shareholders to make an informed choice when voting their proxies.  Schedule 14A is the official form for compliance with Section 14(a), which governs the solicitation of proxies.  Schedule 14A requires anyone who would solicit proxies to disclose, among other things, the number of shares of the issuer which are beneficially owned and information as to any contracts, arrangements, understandings or relationships with any person with respect to that interest.

      3.    Defendants are attempting to change or influence control of CSX. Defendants employed sophisticated derivative transactions with financial counterparties ("swaps" or "swap arrangements") and secretly coordinated efforts with respect to their interests

in CSX among themselves and with others, as part of a plan to change or influence control of CSX by acquiring a large stake in CSX while evading the reporting requirements of the securities laws.

4.    Defendants acquired more than 5 percent of CSX common stock, in excess of the statutory threshold, without making the disclosures required by the securities laws. In February 2007 defendant Snehal Amin told CSX that TCI owned 14 percent of CSX. Defendants repeated this assertion to CSX and to CSX's advisors on several occasions. Yet, defendants did not make any disclosure required by Section 13(d) until they filed their Schedule 13D on December 19, 2007, 10 months after defendant Amin stated that TCI owned 14 percent of CSX.

5.    The December 19, 2007 Schedule 13D is materially false and misleading. Defendants failed to disclose, among other things, the extent of defendants' interest in CSX, the extent of defendants' coordinated efforts and their contracts, arrangements, understandings or relationships relating to shares of CSX, and defendants' plans to change or influence control of CSX.

6.    Defendants have continued to violate the securities laws with a proxy solicitation seeking to elect a slate of nominees to CSX's board of directors at the 2008 annual meeting of CSX shareholders as part of a plan to change or influence control of CSX.

7.    Defendants' preliminary proxy statement on Schedule 14A, filed with the SEC on March 10, 2008, is materially false and misleading. Defendants failed to disclose, among other things, the extent of defendants' interest in CSX and the extent of defendants' coordinated efforts and their contracts, arrangements, understandings or relationships relating to shares of CSX.

8.    The declaratory and injunctive relief sought herein is necessary, among other reasons, to prevent defendants from benefitting from their wrongdoing, and to provide CSX shareholders with all information to which they are entitled and that they need in order to vote at the June 25, 2008 annual meeting. Proper disclosure will allow CSX shareholders to evaluate fairly their investment in CSX and any actions relating to CSX, including the election of directors. Without truthful information about defendants' holdings in CSX securities, defendants' motives for acquiring those securities, defendants' plans for CSX and the extent of their relationships with other parties regarding their interest in CSX, shareholders will be irreparably harmed.

9.    Defendants should be required to divest themselves of all CSX shares that they acquired, and terminate all swaps referencing CSX shares that they entered into, renewed or extended from the time when defendants should have but failed to file a Schedule 13D disclosing their beneficial ownership of more than 5 percent of the outstanding shares of CSX common stock and the other information required to be disclosed under the securities laws. Alternatively, defendants should either be prohibited from voting such shares at the 2008 annual meeting or be required to vote such shares in proportion with the votes of the other CSX shareholders.

### Jurisdiction and Venue

10.    This action arises under Sections 13(d), 14(a) and 20(a) of the '34 Act, 15 U.S.C. §§ 78m(d), 78n(a), 78t(a) and the rules and regulations promulgated thereunder by the SEC.

11.    Jurisdiction over the subject matter of this action is based upon 28 U.S.C. §§ 1331, 1332, 1367 and Section 27 of the '34 Act, 15 U.S.C. § 78aa.

12.    Venue in this district is proper pursuant to Section 27 of the '34 Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(d).

13.    Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201 because an actual controversy exists regarding defendants' compliance with Sections 13(d) and 14(a) of the '34 Act and with CSX's Amended and Restated Bylaws.

### The Parties

14.    Plaintiff CSX is a publicly traded transportation company incorporated under the laws of Virginia and headquartered in Jacksonville, Florida. Through its wholly owned subsidiary, CSX Transportation, Inc., a Class I rail carrier incorporated under the laws of Virginia, it operates one of the largest rail systems in the United States and the largest rail system in the eastern half of the country. Shares of common stock of CSX are traded on the New York Stock Exchange (the "NYSE").

15.    Defendant The Children's Investment Fund Management (UK) LLP ("TCIF UK") is a United Kingdom limited liability partnership.

16.    Defendant The Children's Investment Fund Management (Cayman) Ltd. ("TCIF Cayman") is a Cayman Islands company affiliated with TCIF UK.

17.    Defendant The Children's Investment Master Fund ("TCI Fund") is a Cayman Islands company managed by both TCIF UK and TCIF Cayman.

18.    Defendant Snehal Amin is a citizen of the United States and a founding partner and a controlling person of TCIF UK.

19.    Defendant Christopher Hohn (collectively, with TCIF UK, TCIF Cayman, TCI Fund and Snehal Amin, "TCI") is a citizen of the United Kingdom and managing partner and a controlling person of TCIF UK and sole owner and a controlling person of TCIF Cayman.

20.    Defendant 3G Fund L.P. ("3G Fund") is a Cayman Islands limited partnership.

21.    Defendant 3G Capital Partners L.P. ("3G L.P.") is a Cayman Islands limited partnership and the general partner of 3G Fund.

22.    Defendant 3G Capital Partners Ltd. ("3G Ltd.") is a Cayman Islands company and the general partner of 3G L.P.

23.    Defendant Alexandre Behring (collectively, with 3G Ltd., 3G L.P., and 3G Fund, "3G") is a citizen of Brazil and the managing director and a controlling person of 3G Ltd.

**TCI's Investment in CSX**

24.    In connection with their investment in shares of CSX common stock, TCI formulated a plan to make major changes in CSX's business and corporate structure. To this end, TCI began a series of calls and requests for meetings with CSX management, resulting in a meeting with CSX's financial advisors from Morgan Stanley & Co., in New York in January 2007.

25.    TCI presented various proposals to CSX management and their advisors, including a proposal that CSX management pursue a leveraged buyout ("LBO") transaction and a proposal that CSX pursue an extraordinary recapitalization involving taking on substantially more debt and repurchasing a significant portion of its outstanding shares. The recapitalization would have required CSX to increase its leverage to the point where its credit ratings would fall significantly below investment grade.

26.    TCI represented that it owned a significant stake in CSX, between 10 and 14 percent of CSX, and that a large portion of that interest was held through derivative swap

arrangements. TCI stated that it had all the economic interests of ownership through swaps that it could "convert at any time" to physical ownership of CSX shares.

27.    On February 15, 2007, during a BB&T Capital Markets Transportation Conference, defendant Amin told CSX's Chief Financial Officer that "we own 14 percent of your company".

28.    On March 2, 2007, TCI made a filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR") to cross the $500 million acquisition threshold with respect to shares of CSX common stock. That filing would not have been required if TCI had only a passive investment purpose for acquiring those shares.

29.    On March 29, 2007, during a meeting with CSX in New York, defendant Amin told CSX that TCI's swaps were equivalent to more than 10 percent of CSX's outstanding shares; that "our swaps give us the economic equivalent of ownership"; that TCI could become the direct owner of more than 10 percent of CSX's outstanding shares; and that TCI "would be taking voting positions" with respect to shares of CSX. TCI threatened that if CSX did not immediately announce a 20 percent stock repurchase in its April 2007 earnings release, there would be "no limits" to what TCI would do.

30.    On April 7, 2007, during a call with CSX's outside advisors from Evercore Partners ("Evercore"), defendant Hohn stated that TCI had plans to convert indirect holdings of CSX to direct holdings and were then doing so currently.

31.    On May 8, 2007, during a Bear Stearns conference in New York, defendant Amin made a presentation to investors in which he said that CSX could sell itself in an LBO, indicating that he had contacted private equity firms to line up bids and had, in hand, a 100-page indicative financing proposal from a bank that could underwrite the LBO debt.

-7-

32.     On June 14, 2007, after a presentation given by CSX's Chief Financial Officer at the Merrill Lynch Global Transportation Conference in New York, defendant Amin suggested that if CSX's board of directors was opposed to changes in CSX's capital structure to increase leverage, the board was inhibiting the creation of value.

33.     On June 20, 2007 TCI representatives met with CSX's advisors from Evercore in New York and indicated that TCI directly owned 4 percent of CSX's shares and held over 10 percent in swaps.   At that meeting, TCI told Evercore that they would "go to war" and seek to replace the entire CSX board of directors if CSX management did not yield to TCI's demands.

34.     On July 17, 2007, in a call with CSX's advisors from Evercore, defendant Hohn said that TCI would attempt to change the entire CSX board of directors.

35.     On October 16, 2007, TCI sent a letter to the board of directors of CSX, which it publicized, urging CSX to allow shareholders of 10 percent of CSX's shares to call special meetings for any purpose, including the election of directors.

### TCI's Coordination with 3G and Others

36.     From May 9 through May 15, 2007, defendant Amin sent CSX a series of emails requesting information about the result of a shareholder vote that was announced at the 2007 annual meeting of CSX shareholders. The vote was on a non-binding proposal to give a minority of shareholders the ability to call special meetings.

37.     On May 9, 2007, CSX received a phone call from 3G inquiring about the result of that same shareholder vote.

38.     In the period from May 9 through May 17, 2007, CSX received phone calls from other hedge funds requesting information regarding the result of that shareholder vote.

-8-

39.    On June 13, 2007 CSX met with defendant Behring of 3G at 3G's New York office. At that meeting, 3G told CSX that 3G would be making an HSR filing. CSX executives saw in 3G's offices a copy of presentation materials prepared by TCI about TCI's proposals with respect to CSX.

40.    On June 14, 2007, CSX was formally notified of a 3G HSR filing indicating 3G's intent to acquire shares of CSX common stock in excess of $597.9 million. TCI had made its HSR filing on March 2, 2007. Those filings would not have been required if 3G and TCI had only passive investment purposes for acquiring those shares.

41.    On September 6, 2007, TCI and 3G together attended the CSX Analyst/Investor conference in New York. Afterwards, defendant Hohn along with representatives of 3G approached CSX's Chief Financial Officer. Soon thereafter, defendant Hohn approached CSX's advisors from Evercore and Morgan Stanley & Co. to discuss CSX's board composition, CSX's share repurchase program, and the non-binding special meeting proposal that was approved at the 2007 annual meeting.

42.    One of the defendants' nominees to CSX's board, Gilbert Lamphere, purchased CSX common stock on November 6, 2007 and November 13, 2007. Lamphere purchased those shares in connection with his becoming a nominee to the CSX board, and he entered into a nominee agreement with 3G, obliging 3G to pay the costs of soliciting proxies and to indemnify Lamphere against certain losses.

43.    Another of the defendants' nominees, Timothy O'Toole, purchased shares of CSX common stock on December 6, 2007. O'Toole purchased those shares in connection with becoming a nominee to the CSX board and entered into a nominee agreement with TCI,

obliging TCI to pay the costs of soliciting proxies and to indemnify O'Toole against certain losses.

44.    In anticipation of a May 7, 2008 annual meeting date and a related record date of February 27, 2008, representatives of CSX began notifying brokers and the NYSE of the record and meeting dates beginning on January 30, 2008. That information became generally available to bankers, brokers and other financial institutions.

45.    Financial institutions that hold shares of publicly traded companies for their own account or for the account of their customers frequently lend such shares to traders who engage in short-selling of such shares. Under the terms of the lending arrangements, ownership of the shares is transferred to the short-seller, but the financial institution has the right to require the short-seller to return ownership of the shares to the financial institution at any time.

46.    Where a financial institution holds shares for its own account to hedge its commitments under a swap arrangement, the financial institution has no incentive to require that the short-sellers return shares ahead of a record date for a shareholder meeting unless there is a contractual requirement or some explicit or implicit understanding with the swap holder with respect to the voting of the shares.

47.    Between February 15, 2008 and February 27, 2008, the two-week period prior to original the record date, almost 37 million shares of CSX common stock were transferred to financial institutions that have been identified by defendants as counterparties to their swaps that reference shares of CSX common stock (net of any shares transferred from such institutions), establishing custody of those shares in such institutions as of the record date.

48.     The number of shares involved in those transfers substantially exceeds the number of shares transferred in connection with dividend and voting record dates in 2007, including those dates after which TCI and 3G acquired substantial positions in CSX stock.

49.     After the record date passed, between February 28, 2008 and March 10, 2008, over 20 million shares were transferred from the same financial institutions back to third parties.

50.     The volume of shares moving into the custody of swap counterparties in advance of the original February 27, 2008 record date indicates the existence of agreements or understandings that those counterparties would vote the shares in accordance with the wishes or expectations of TCI and 3G, or alternatively, that the swap counterparties are intending to vote the shares in accordance with the wishes or expectations of TCI and 3G because of their relationships with TCI and 3G.

### Annual Meeting

51.     On March 17, 2008 CSX announced that the 2008 annual shareholder meeting would be held on June 25, 2008 and that the record date for purposes of the meeting would be April 21, 2008.

52.     On March 10, 2008, the defendants filed their preliminary proxy statement on Schedule 14A.

53.     Under Rule 14a-6, defendants may be able to file their definitive proxy statement as early as March 20, 2008.

54.     As soon as defendants file their definitive proxy statement, they may begin to solicit and receive proxies to vote at the annual shareholder meeting on June 25, 2008.

**Defendants' Failure to Comply with the Securities Laws**

55.     Section 13(d) of the '34 Act requires any person acquiring beneficial

ownership of more than 5 percent of a corporation's common stock to disclose within 10 days of

the acquisition certain information to the corporation, the SEC, and the exchanges on which the

stock is traded.

56.     Among the information that must be provided is:

> "(B) the source and amount of the funds or other consideration
> used or to be used in making the purchases, and if any part of the
> purchase price is represented or is to be represented by funds or
> other consideration borrowed or otherwise obtained for the purpose
> of acquiring, holding, or trading such security, a description of the
> transaction and the names of the parties thereto . . . ;
>
> (C) if the purpose of the purchases or prospective purchases is to
> acquire control of the business of the issuer of the securities, any
> plans or proposals which such persons may have to liquidate such
> issuer, to sell its assets to or merge it with any other persons, or to
> make any other major change in its business or corporate structure;
>
> (D) the number of shares of such security which are beneficially
> owned, and the number of shares concerning which there is a right
> to acquire, directly or indirectly, by (i) such person, and (ii) by
> each associate of such person, giving the background, identity,
> residence, and citizenship of each such associate; and
>
> (E) information as to any contracts, arrangements, or
> understandings with any person with respect to any securities of
> the issuer, including but not limited to transfer of any securities,
> joint ventures, loan or option arrangements, puts or calls,
> guaranties of loans, guaranties against loss or guaranties of profits,
> division of losses or profits, or the giving or withholding of
> proxies, naming the persons with who such contracts,
> arrangements, or understandings have been entered into, and
> giving the details thereof."

Copies of certain materials must be appended as exhibits to the disclosure and the SEC has

prescribed Schedule 13D as the official form for compliance with the statute.  17 C.F.R. §§

240.13d-1, 240.13d-101.

57.    Section 14(a) of the '34 Act and the rules promulgated thereunder govern the solicitation of proxies. Rule 14a-9 provides that "[n]o solicitation subject to this regulation shall be made by means of any proxy statement . . . which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. Schedule 14A is the official form for compliance with Section 14(a) and requires anyone who would solicit proxies to disclose, among other things, the number of shares of the issuer which are beneficially owned and information as to any contracts, arrangements, understandings or relationships with any person with respect to that interest.

58.    The Rules promulgated under the '34 Act attribute beneficial ownership to any person who:

(a)    "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:  (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security," 17 C.F.R.  § 240.13d-3(a);

(b)    "directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose or effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements," 17 C.F.R. § 240.13d-3(b);

(c)    acquires an interest in a warrant, option, convertible security or the like "with the purpose or effect of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having such purpose or effect, [who] immediately upon such acquisition shall be deemed to be the beneficial owner of the securities which may be acquired through the exercise or conversion of such security or power," 17 C.F.R. § 240.13d-3(d); or

(d)    has an interest in a security that gives that person "the right to acquire beneficial ownership of such security . . . within sixty days," 17 C.F.R. § 240.13d-3(d).

### Beneficial Ownership of Swap Shares

59.    In their Schedule 13D and preliminary proxy statement on Schedule 14A, defendants state that they are the beneficial owners of 35,054,952 (approximately 8.7 percent) of outstanding ordinary shares of CSX. Defendants disclaim beneficial ownership of the approximately 12.3 percent of CSX's shares referenced in the defendants' swap arrangements. Those statements are false because the securities laws confer beneficial ownership of that 12.3 percent of shares referenced in the swaps on the defendants.

60.    Defendants are now and have been for at least 10 months before they made their December 19, 2007 disclosure, the beneficial owners of the shares referenced in the swaps.

61.    The defendants beneficially own the shares referenced in TCI's swaps because, as TCI's statements confirm, they were acquired or held "with the purpose or effect of changing or influencing the control" of CSX.

    (a)    During calls and meetings, TCI presented various proposals to CSX management and their advisors, including that CSX management pursue an LBO and pursue an extraordinary recapitalization involving taking on substantially more debt and repurchasing a significant portion of its outstanding shares. The recapitalization would have required CSX to increase its leverage to the point where its credit ratings would fall significantly below investment grade.

    (b)    On March 2, 2007, TCI made a filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR") to cross the $500 million acquisition threshold with respect to shares of CSX common stock. That filing would not have been required if TCI had only a passive investment purpose for acquiring those shares.

    (c)    On March 29, 2007, TCI threatened that if CSX did not immediately announce a 20 percent stock repurchase in its April 2007 earnings release, there would be "no limits" to what TCI would do.

    (d)    On May 8, 2007, TCI made a presentation to investors in which it was suggested that CSX could sell itself in an LBO, indicating that TCI had contacted private equity firms to line up bids and had, in hand, a 100-page

-14-

indicative financing proposal from a bank that could underwrite the LBO debt.

(e) On June 20, 2007, TCI told CSX's advisors that they would "go to war" and seek to replace the entire CSX board of directors if CSX management was unresponsive to TCI's demands.

(f) On July 17, 2007, TCI reiterated to CSX's advisors that TCI would attempt to change the entire CSX board of directors.

(g) On October 16, 2007, TCI sent a letter to the board of directors of CSX urging CSX to allow shareholders of 10 percent of CSX's shares to call special meetings for any purpose, including the election of directors.

62. Defendants beneficially own the shares of CSX common stock referenced in TCI's swaps because, as TCI's statements confirm, they could be converted into physical ownership of shares "at any time".

(a) TCI told David Baggs, CSX's Assistant Vice President of Treasury and Investor Relations, that it had all the economic interests of ownership through swaps that it could "convert at any time" to physical ownership of CSX shares.

(b) On March 29, 2007, TCI represented that its swaps were equivalent to 10 percent or more of CSX's outstanding shares, said that "our swaps give us the economic equivalent of ownership", told CSX that TCI could become the direct owner of more than 10 percent of CSX's outstanding shares and told CSX that TCI "would be taking voting positions" with respect to shares of CSX.

(c) On April 7, 2007, TCI told CSX's advisors that TCI had plans to convert indirect holdings to direct holdings and were then doing so currently. TCI indicated that it would convert swaps to direct ownership of between 4.9 and 9.9 percent of outstanding shares of CSX.

63. Defendants beneficially own the shares of CSX referenced in their swaps because they were part of a plan or scheme to evade the reporting requirements of the securities laws. Throughout 2007, TCI and 3G each independently maintained direct ownership of over 4 percent of the outstanding shares of CSX common stock--just below the 5 percent reporting threshold. TCI and 3G did not disclose that they were coordinating their efforts. At all relevant

times, TCI intended to change or influence control of CSX. At all relevant times, TCI could convert the shares referenced in the swaps at any time. TCI and 3G each entered into swap arrangements "with the purpose or effect of divesting [them] of beneficial ownership . . . or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements".

64.    Defendants beneficially own the shares of CSX referenced in their swaps because of the arrangements or understandings they have with swap counterparties, or because of the nature of the relationships between defendants and the counterparties. Based on those understandings or relationships, the counterparties will vote the shares in accordance with defendants' wishes, or they will deliver physical shares of CSX stock to defendants upon settlement of the swaps. Such understandings or relationships give defendants beneficial ownership of the shares by way of indirect voting or investment power.

65.    TCI could convert its swaps into direct ownership of CSX shares "at any time" because of an understanding between TCI and the counterparties to the swaps that they will sell or otherwise deliver the physical the shares of CSX stock referenced in the swaps to TCI upon settlement or because of the relationship between TCI and the counterparties.

### Group Formation

66.    Section 13(d)(3) of the '34 Act states that "when two or more persons act as a . . . group for the purpose of acquiring, holding or disposing of securities of an issuer, such . . . group shall be deemed a 'person' for the purposes of this subsection".

67.    Independent of the shares referenced in defendants' swap arrangements, TCI and 3G formed a group within the meaning of Section 13(d)(3) which beneficially owned more than 5 percent of the outstanding shares of CSX common stock, yet defendants failed to timely make disclosures pursuant to Section 13(d).

68.    Defendants, in their Schedule 13D and preliminary proxy statement on Schedule 14A, misrepresent the facts concerning the formation of the defendants' group. The defendants represent that TCI and 3G agreed to coordinate their efforts with respect to their interests in CSX on December 12, 2007. That representation is false because TCI and 3G formed a group no later than November 6, 2007.

69.    According to Appendix A of the December 19, 2007 Schedule 13D filing, defendants' nominee to CSX's board, Gilbert H. Lamphere, purchased shares of CSX stock on November 6 and November 13, 2007. Item 4 of that same disclosure states that Mr. Lamphere made those purchases "in connection with becoming [a] nominee[] to the board of directors of [CSX]".

70.    Even though a nominee purchased stock as early as November 2007, the defendants failed to disclose themselves as a group whose beneficial ownership exceeded the 5 percent threshold until December 19, 2007.

71.    The formation of the defendants' group occurred even earlier than November 6, 2007. TCI and 3G coordinated their efforts with respect to their interests in CSX:

(a)    Both TCI and 3G made HSR filings to cross the $500 million acquisition threshold with respect to shares of CSX common stock. A shareholder who acquires fewer than ten percent of the outstanding shares of a corporation's securities solely for the purpose of investment need not make such filing. TCI notified CSX of its HSR Filing in March 2007, while 3G notified CSX of its HSR filing in June 2007.

(b)    On May 9, 2007, both TCI and 3G contacted CSX regarding the results of a particular shareholder vote on the rights of minority shareholders to call special meetings of the board.

(c)    On June 13, 2007 CSX managers met 3G at 3G's office. At that meeting, 3G told CSX that 3G would be making its HSR filing. The CSX executives who attended the meeting saw that 3G had a copy of presentation materials prepared by TCI about TCI's proposals with respect to CSX.

-17-

(d)     On September 6, 2007, after a conference presentation by CSX, TCI approached a CSX manager along with representatives from 3G.

72.     Defendants acted as a group for the purpose of acquiring, holding or disposing of securities of CSX such that when they acquired beneficial ownership collectively of more than 5 percent of CSX's common stock, they were required to disclose within 10 days of the acquisition certain information to the corporation, the SEC, and the exchanges on which the stock is traded. By failing to file a Schedule 13D within ten days of forming a group, the defendants were able to secretly accumulate more stock.

### Defendants' Schedule 13D is False and Misleading

73.     The defendants' December 19, 2007 Schedule 13D is materially false and misleading because, among other reasons, it contains several material misstatements and does not adequately disclose information concerning defendants' purpose in acquiring shares of CSX common stock and their plans for CSX, as well as defendants' contracts, arrangements, understandings or relationships relating to shares of CSX common stock.

74.     In the December 19, 2007 Schedule 13D, defendants falsely state that TCI "beneficially owned an aggregate of 17,796,998 Shares, constituting approximately 4.2 % of the Shares outstanding".
(http://www.sec.gov/Archives/edgar/data/277948/000090266407003586/sc13d.txt, Item 5).
Defendants also falsely disclaim "any beneficial ownership" of the approximately 11 percent of CSX shares referenced by TCI's swap arrangements. (*Id.*, Item 6).  Those statements are false because TCI beneficially owned the approximately 11 percent of shares associated with the swaps, giving it beneficial ownership of more than 15 percent of CSX's outstanding shares.

75.     In the December 19, 2007 Schedule 13D, defendants falsely state that 3G "beneficially owned an aggregate of 17,232,854 Shares, constituting approximately 4.1% of the

-18-

Shares outstanding". (*Id.*, Item 5). Defendants also falsely disclaim "any beneficial ownership" of the approximately 0.8 percent of CSX shares referenced in 3G's swap arrangement. (*Id.*, Item 6). Those statements are false because 3G beneficially owned the approximately 0.8 percent of shares associated with the swaps, giving it beneficial ownership of approximately 4.9 percent of CSX's outstanding shares.

76.    In the December 19, 2007 Schedule 13D, defendants falsely state that, as of December 12, 2007, TCI and 3G "entered into an agreement to coordinate certain of their efforts" and that TCI and 3G "may be deemed to have formed a 'group' within the meaning of Section 13(d)(3) [of the '34 Act]". (*Id.*, Item 5). That statement is false because the defendants formed a group prior to December 12, 2007.

77.    In the December 19, 2007 Schedule 13D, defendants falsely state that TCI "expressly disclaims beneficial ownership of the Shares beneficially owned by [3G] and the Additional Nominees" while 3G "expressly disclaims beneficial ownership of the Shares beneficially owned by [TCI] and the Additional Nominees". (*Id.*, Item 5). That statement is false because once the group was formed, each defendant beneficially owned all shares of CSX common stock that were beneficially owned by all members of the group by operation of law. Rule 13d-5(b)(1) states that "when two or more persons agree to act together for the purposes of acquiring, holding, voting, or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of [section 13(d) of the '34 Act], as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons."

78.    In the December 19, 2007 Schedule 13D, defendants falsely state that they "acquired Shares for investment in the ordinary course of business", and failed to disclose that

their purpose in acquiring shares of CSX common stock is to change or influence control of CSX. (*Id.*, Item 4). Defendants have been planning to change or influence control of CSX since no later than June 2007, when TCI told CSX's advisors that TCI would "go to war" and "seek to replace the entire board". Defendants failed to disclose their plans and proposals to make major changes in CSX's business and corporate structure.

79.    In the December 19, 2007 Schedule 13D, defendants falsely state that they have "no contracts, arrangements, understandings or relationships (legal or otherwise) . . . with respect to any securities" of CSX, except as described elsewhere in the Schedule 13D. (*Id.*, Item 6). That statement is false because defendants have acted with respect to CSX securities pursuant to contracts, arrangements, understandings or relationships with other persons that have not been disclosed.

80.    In violation of Item 3 of Schedule 13D, the defendants misrepresented the source of funds used to acquire their interest in CSX as solely the general working capital of TCI and 3G. Defendants falsely state that "the source of funds used to acquire the [TCI or 3G] Shares reported herein was the general working capital of [the TCI Fund or the 3G Fund.]" (*Id.*, Item 3). TCI and 3G have used borrowed funds to acquire their interest in CSX.

81.    In violation of Item 7 of Schedule 13D, defendants have failed to file the written agreements relating to the swap arrangements as exhibits to the Schedule 13D.

82.    In violation of Instruction C to Schedule 13D, the defendants have failed to disclose required information regarding controlling persons of the defendant entities.

83.    In violation of Item 7(2) of Schedule 13D, the defendants have failed to file copies of the nominee agreements referenced in the defendants' December 19, 2007 Schedule 13D.

**Defendants' Preliminary Proxy Statement is False and Misleading**

84.     Rule 14a-9 provides that "No solicitation subject to this regulation shall be made by means of any proxy statement . . . which omits to state any material fact necessary in order to make the statements therein not false or misleading."

85.     On March 10, 2008, defendants filed their preliminary proxy statement on Schedule 14A. That Schedule 14A is materially false and misleading because, among other reasons, it repeats material misstatements contained in the December 19, 2007 Schedule 13D, does not adequately disclose information concerning defendants' plans for CSX and their contracts, arrangements, understandings or relationships with respect to shares of CSX common stock, and it falsely states defendants' purposes in seeking to elect its nominees as directors.

86.     In the March 10, 2008 Schedule 14A, defendants falsely state that TCI beneficially owns only 17,796,998 shares of CSX common stock, or approximately 4.4 percent of the outstanding shares. (http://www.sec.gov/Archives/edgar/data/277948/000104746908002443/a2183197zprec14a.htm, p.4). Defendant TCI also falsely "disclaims any beneficial ownership in securities that may be referenced in [swap arrangements] or that may be held from time to time by any counterparties to the contracts" with regard to the approximately 11.5 percent of CSX shares referenced by TCI's swap arrangements. (*Id.*, p.15). Those statements are false because TCI beneficially owns the approximately 11.5 percent of shares associated with the swaps, giving it beneficial ownership of approximately 15.9 percent of CSX's outstanding shares.

87.     In the March 10, 2008 Schedule 14A, defendants falsely state that 3G beneficially owns only 17,232,854 shares of CSX common stock, or approximately 4.3 percent of the outstanding shares. (*Id.*, p.4). Defendant 3G falsely "disclaims any beneficial ownership in securities that may be referenced in [swap arrangements] or that may be held from time to time

-21-

by any counterparties to the contracts" with regard to the approximately 0.8 percent of CSX shares referenced by 3G's swap arrangement. (*Id.*, p.15). Those statements are false because 3G beneficially owns the approximately 0.8 percent of shares associated with the swaps, giving it beneficial ownership of approximately 5.1 percent of CSX's outstanding shares.

88.    In the March 10, 2008 Schedule 14A, defendants falsely state that the defendant group beneficially owns only 35,054,952 shares of CSX common stock, or approximately 8.7 percent of the outstanding shares. (*Id.*, p.1). That statement is false because the defendant group beneficially owns the approximately 12.3 percent of shares associated with the swaps, giving it beneficial ownership of approximately 21 percent of CSX's outstanding shares.

89.    In the March 10, 2008 Schedule 14A, defendants falsely state that TCI and 3G "entered into an agreement to coordinate efforts with regard to the purchase and sale of Shares and other securities conferring beneficial ownership" as of December 12, 2007 (*Id.*, p.4). That statement is false because defendants formed a group prior to December 12, 2007.

90.    In the March 10, 2008 Schedule 14A, defendants falsely state that, "[o]ther than as disclosed in this proxy statement, there are no arrangements or understandings between either TCI and/or 3G and any Nominee or any other person or persons with respect to the nomination of the Nominees or of the TCI/3G Group's additional proposals". (*Id.*, p.16). That statement is false because defendants have acted with respect to CSX securities pursuant to contracts, arrangements, understandings or relationships with other persons that have not been disclosed.

-22-

91.    Defendants have coordinated their efforts with respect to their interest in CSX and their proxy solicitation pursuant to undisclosed contracts, arrangements, understandings or relationships with other persons.

92.    In the March 10, 2008 Schedule 14A, defendants falsely state that TCI "expressly disclaims beneficial ownership of the Shares beneficially owned by [3G] and the Nominees (as applicable)" while 3G "expressly disclaims beneficial ownership of the Shares beneficially owned by [TCI] and the Nominees (as applicable)". (*Id.*, p.14). That statement is false because once the group was formed, each defendant beneficially owned all shares of CSX common stock that were beneficially owned by all members of the group by operation of law.

93.    In the March 10, 2008 Schedule 14A, defendants falsely state that their nominees, if elected, "will provide a clear perspective of shareholders and railroad operators and will work with the rest of the Board to effect positive change at CSX" and that their nominees, if elected, "intend to work constructively with the remaining Board members to advance the interests of all CSX shareholders". (*Id.*, p.5). Defendants, in fact, intend to gain control of CSX to advance their own undisclosed purposes.

### Defendants' Notices of Intent to Nominate Directors are Noncompliant

94.    Article I, Section 11(a)(ii) of CSX's Amended and Restated Bylaws requires a shareholder to submit a timely and complete notice, including information regarding that shareholders' beneficial ownership of CSX common stock, in order to properly bring a nomination or other business before an annual meeting.

95.    On January 8, 2008 defendants submitted a Stockholder Notice of Intent to Nominate Persons for Election as Directors to CSX Corporation ("January 8 Notice") in which they claimed group beneficial ownership of 8.3% of the outstanding shares of CSX common

-23-

stock. As in their SEC filings, defendants falsely disclaimed beneficial ownership of the shares referenced in swap arrangements.

96.     On January 21, 2008 and January 25, 2008, defendants sent two supplemental notices to CSX (collectively, with January 8 Notice, "Notices") regarding their intent to present a proposal to amend the bylaws of CSX at the 2008 annual meeting to allow shareholders holding 15% of all the shares of outstanding CSX stock to be able to call special a meeting.

97.     In the January 21, 2008 and January 25, 2008 Notices, defendants incorporated the information provided in the January 8 Notice concerning their beneficial ownership.

98.     Defendants' Notices fail to comply with Article I, Section 11(a)(ii) of CSX's Bylaws because, in order for shareholders to nominate persons for election to the CSX board of directors or to propose other business to be considered at an annual meeting of shareholders, they are required to disclose "the number of shares of capital stock of the Corporation that are owned beneficially".

## COUNT I

### (Violations of Section 14(a) of the '34 Act)

99.     CSX repeats the allegations of preceding paragraphs 1-98 as if fully set forth herein.

100.    Defendants violated Section 14(a) and the rules and regulations promulgated thereunder by filing a false and misleading preliminary proxy statement on Schedule 14A.

-24-

101.    Defendants' March 10, 2008 Schedule 14A is incomplete, false and misleading because defendants' swap arrangements confer beneficial ownership of the securities referenced by them upon the defendant group by operation of law.

102.    Defendants' March 10, 2008 Schedule 14A is misleading because it does not sufficiently describe the material terms of defendants' swap arrangements and fails to disclose defendant's swap transactions during the last two years.

103.    Defendants' March 10, 2008 Schedule 14A is misleading because it reports an inaccurate date for the formation of defendants' group as defined by Section 13(d)(3) of the '34 Act, and does not fully and accurately describe the group and the arrangements and understandings among the group members.

104.    Defendants' March 10, 2008 Schedule 14A is misleading because it does not fully disclose information concerning contracts, arrangements, understandings or relationships between defendants and other persons with respect to the shares of CSX common stock.

105.    The omissions and misrepresentations in the defendants' March 10, 2008 Schedule 14A concern information material to CSX shareholders and to the investing public.

106.    CSX's shareholders and the investing public will be irreparably harmed in the absence of the declaratory and equitable relief as prayed for herein.

## COUNT II

### (Violations of Section 13(d) of the '34 Act)

107.    CSX repeats the allegations of preceding paragraphs 1-106 as if fully set forth herein.

108.    TCI beneficially owned more than 5 percent of CSX's outstanding common stock as beneficial ownership is defined under the rules and regulations promulgated

under Section 13(d) of the '34 Act prior to 10 days before its December 19, 2007 filing, and no later than February 25, 2007.

109.    TCI violated Section 13(d) of the '34 Act by failing to file a Schedule 13D within 10 days after it beneficially owned more than 5 percent of the outstanding shares of CSX common stock.

110.    Defendants violated Section 13(d) of the '34 Act by failing to truthfully and accurately disclose their beneficial ownership of CSX common stock in their December 19, 2007 Schedule 13D because defendants' swap arrangements confer beneficial ownership of the securities referenced by them upon the defendant group by operation of law.

111.    Defendants were acting as a group as defined by Section 13(d)(3) of the '34 Act "for the purpose of acquiring, holding, or disposing of securities of an issuer" prior to 10 days before December 19, 2007.

112.    Defendants violated Section 13(d) of the '34 Act by failing to file a Schedule 13D within 10 days after the defendant group collectively accumulated more than 5 percent of CSX's common stock.

113.    Defendants' December 19, 2007 Schedule 13D is misleading because it reports an inaccurate date for the formation of the defendants' group as defined by Section 13(d)(3) of the '34 Act.

114.    Defendants' December 19, 2007 Schedule 13D is misleading because it does not fully disclose required information concerning contracts, arrangements, understandings or relationships between defendants and other persons relating to the shares of CSX common stock.

115.    Defendants' December 19, 2007 Schedule 13D is false because it does not disclose information concerning all contracts, arrangements, understandings or relationships between defendants and other persons relating to the shares of CSX common stock.

116.    Defendants failed to sufficiently describe the material terms of defendants' swap arrangements and failed to disclose required information regarding defendants' controlling persons in the December 19, 2007 Schedule 13D.

117.    Defendants failed to file copies of the agreements governing their swap arrangements and copies of the nominee agreements as exhibits to their December 19, 2007 Schedule 13D as required by law.

118.    Defendants' December 19, 2007 Schedule 13D is misleading because it falsely describes the source of funds used to acquire defendants' interest in CSX.

119.    The failure of the defendants to timely make disclosure and the omissions and misrepresentations in the defendants' December 19, 2007 Schedule 13D concern information material to CSX shareholders and to the investing public.

120.    CSX's shareholders and the investing public will be irreparably harmed in the absence of the declaratory and equitable relief as prayed for herein.

## COUNT III

### (Violations of Section 20(a) of the '34 Act)

121.    CSX repeats the allegations of preceding paragraphs 1-120 as if fully set forth herein.

122.    Defendant Alexandre Behring maintained discretionary authority to control or influence the conduct of 3G and the defendant group and did control or influence the conduct of 3G and the defendant group, including defendants' actions and omissions in violation of Sections 13(d) and 14(a) of the '34 Act complained of herein.

-27-

123.    Defendant Christopher Hohn maintained discretionary authority to control or influence the conduct of TCI and the defendant group and did control or influence the conduct of TCI and the defendant group, including defendants' actions and omissions in violation of Sections 13(d) and 14(a) of the '34 Act complained of herein.

124.    Defendant Snehal Amin maintained discretionary authority to control or influence the conduct of TCI and the defendant group and did control or influence the conduct of TCI and the defendant group, including defendants' actions and omissions in violation of Sections 13(d) and 14(a) of the '34 Act complained of herein.

125.    Defendants Behring, Hohn and Amin are controlling persons of TCI, 3G and the defendant group within the meaning of Section 20(a) of the '34 Act and liable for the violations of Sections 13(d) and 14(a) of the '34 Act as set forth above.

## COUNT IV

**(Failure of Notice of Proposed Director Nominees and Bylaw Amendments to Comply with CSX's Bylaws)**

126.    CSX repeats the allegations of preceding paragraphs 1-125 as if fully set forth herein.

127.    Section 13.1-624 of the Virginia Stock Corporation Act provides that a corporation's bylaws may contain any provision for managing the business and regulating the affairs of the corporation that is not inconsistent with the law or the articles of incorporation.

128.    Defendants are bound by the terms of the Bylaws with respect to the matters contemplated thereby, including Article I, Section 11(a)(ii)'s provisions governing the way in which a shareholder may properly bring a nomination or other business before an annual meeting.

-28-

129.    Article I, Section 11(c)(i) of CSX's Amended and Restated Bylaws provides that "[o]nly such persons who are nominated in accordance with the procedures set forth in this Section 11 shall be eligible at an annual or special meeting of shareholders of the Corporation to serve as directors and only such business shall be conducted at a meeting of shareholders as shall have been brought before the meeting in accordance with the procedure set forth in this Section 11."

130.    On January 8, 21 and 25, 2008, defendants supplied to CSX purported Notices of their intent to nominate five persons for election to the CSX board of directors at the 2008 annual meeting of shareholders and to propose amendments of the CSX Amended and Restated Bylaws, in compliance with Article I, Section 11 of CSX's Amended and Restated Bylaws.

131.    Defendants' Notices fail to comply with Article I, Section 11(a)(ii) of CSX's Bylaws because they failed to accurately report the number of shares of capital stock of CSX that defendants owned beneficially. As in their December 19, 2007 Schedule 13D and March 10, 2008 preliminary proxy statement on Schedule 14A, defendants falsely state their beneficial ownership in the Notices.

132.    By reason of the foregoing, defendants' Notices are invalid as noncompliant with CSX's Bylaws, and CSX is entitled to a declaration to that effect.

## PRAYER FOR RELIEF

WHEREFORE, CSX prays for relief in the form of an Order:

(a)    Declaring that defendants failed to file timely, complete and accurate disclosures in violation of Sections 13(d) and 14(a) of the '34 Act;

(b)    Directing that defendants file truthful and accurate Schedule 13D and Schedule 14A disclosures, in compliance with the applicable rules and regulations, forthwith;

(c)     Enjoining defendants from acquiring additional shares of CSX until accurate and compliant Schedule 13D and Schedule 14A disclosures have been filed;

(d)     Enjoining defendants from acquiring any CSX shares referenced in swap arrangements to which they are party;

(e)     Directing that defendants sell, in an orderly manner pursuant to a plan ordered by the Court, all shares acquired, and terminate all swaps referencing CSX shares that they entered into, renewed or extended, after the date by which they should have filed a Schedule 13D and enjoining defendants from voting such shares at the 2008 annual meeting of CSX shareholders or, alternatively, directing that defendants vote such shares in proportion with the votes of the other CSX shareholders;

(f)     Enjoining defendants from voting any proxies received prior to such time as the Court ascertains that defendants have filed accurate and compliant Schedule 13D and Schedule 14A disclosures;

(g)     Declaring defendants' Notices invalid as noncompliant with CSX's Bylaws;

(h)     Granting leave to CSX to conduct expedited discovery with respect to the claims alleged herein; and

(i)    Granting such other and further relief as the Court may deem just and

proper.

March 17, 2008

CRAVATH, SWAINE & MOORE LLP,

by    *[signature: Francis P. Barron]*

Rory O. Millson
Francis P. Barron
Michael A. Paskin
    Members of the Firm

Attorneys for Plaintiff
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

RMillson@cravath.com
FBarron@cravath.com
MPaskin@cravath.com

-31-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CSX CORPORATION,

                                                Plaintiff,

v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE BEHRING,
A/K/A ALEXANDRE BEHRING COSTA,

                                                Defendants.

---

THE CHILDREN'S INVESTMENT MASTER
FUND,

                        Counterclaim and Third-
                                Party Plaintiff,

                        v.

CSX CORPORATION AND MICHAEL WARD,

                        Counterclaim and Third-
                                Party Defendants.

---

3G CAPITAL PARTNERS LTD., 3G CAPITAL
PARTNERS, L.P. AND 3G FUND, L.P.,

                        Counterclaim Plaintiffs,

                        v.

CSX CORPORATION AND MICHAEL WARD,

                        Counterclaim Defendants.

---

ECF Case

08 Civ. 02764 (LAK) (KNF)

PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW OF
CSX CORPORATION RELATING TO
ITS CLAIMS

**TABLE OF CONTENTS**

Page

**Preliminary Statement**...................................................................................................1

**Proposed Findings of Fact**.............................................................................................3

I.      THE PARTIES.........................................................................................................3

        A.      CSX.............................................................................................................3

        B.      TCI..............................................................................................................4

        C.      3G................................................................................................................5

II.     TCI SECRETLY ACQUIRES A SUBSTANTIAL ECONOMIC INTEREST ......6

        A.      TCI Accumulates a Substantial Stake Without Disclosure.........................6

        B.      The Fix Goes in for Initial Annual Meeting ...............................................8

III.    TCI AND 3G FORM A GROUP IN EARLY 2007 .............................................14

        A.      TCI Seeks an Ally in 3G in its Quest for Control......................................14

        B.      TCI and 3G Coordinated Their Analyses ..................................................33

        C.      TCI and 3G Coordinated their Control Plans ............................................35

IV.     THE GROUP SEEKS CONTROL AND INFLUENCE BY STEALTH..............39

        A.      TCI Tries to Force an LBO and a "Junk Recapitalization" on CSX .........40

        B.      The Group Takes Up "Activism", i.e., a Proxy Fight.................................44

        C.      TCI Negotiated for "Effective Control" in 2008 .......................................52

V.      THE GROUP'S SWAPS AND ARRANGEMENTS CONFER POWER.............55

        A.      The Group Determines Disposition of the Matched Shares ......................55

        B.      The Group Has the Ability Significantly to Influence Voting...................59

        C.      The Group's Response Is Flawed ...............................................................61

        D.      Professor Partnoy's Analysis Is Unreliable and Disingenuous.................63

VI.     THE GROUP CONDUCTS A PROXY FIGHT BY HALF-TRUTHS ............... 69

        A.      The Group Misrepresents Its Beneficial Ownership ................................. 69

        B.      The Group Misrepresents Its Plans and Proposals .................................... 70

        C.      The Group Misrepresents Its Agreements, Arrangements, and
                Relationships .............................................................................................. 71

        D.      The Group Misrepresents Its Group Formation/Ownership ..................... 71

VII.    THE REAL "PARADE OF HORRIBLES" CONCERNS DEFENDANTS'
        CONDUCT .......................................................................................................... 72

Proposed Conclusions of Law ......................................................................................... 76

I.      TCI AND 3G VIOLATED SECTION 13 .......................................................... 76

        A.      Proposed Conclusions ................................................................................ 76

        B.      Discussion .................................................................................................. 76

II.     TCI AND 3G VIOLATED SECTION 14 .......................................................... 90

        A.      Proposed Conclusions ................................................................................ 90

        B.      Discussion .................................................................................................. 90

III.    THE INDIVIDUAL DEFENDANTS VIOLATED SECTION 20 OF THE '34
        ACT .................................................................................................................... 92

        A.      Proposed Conclusions ................................................................................ 92

        B.      Discussion .................................................................................................. 92

IV.     TCI'S AND 3G'S NOTICE OF PROPOSED DIRECTOR NOMINEES AND
        BYLAW AMENDMENTS FAIL TO COMPLY WITH CSX'S BYLAWS ........ 94

        A.      Proposed Conclusions ................................................................................ 94

        B.      Discussion .................................................................................................. 94

V.      CSX HAS DEMONSTRATED IRREPARABLE HARM WARRANTING
        INJUNCTIVE RELIEF ...................................................................................... 95

        A.      Proposed Relief .......................................................................................... 95

        B.      Discussion .................................................................................................. 96

**Conclusion** ....................................................................................................................**103**

Addendum A: List of All Known Swap and Stock Transactions

Addendum B: SEC Amicus Brief in <u>San Francisco Real Estate Investors v. Real Estate Inv. Trust of Am.</u>, 701 F.2d 1000 (1st Cir. 1983)

## CITATION CONVENTIONS

"3G": 3G Capital Partners Ltd., 3G Capital Partners, L.P., and 3G Fund L.P.

"3G Ans. ¶ [ ]" or "3G Counterclaims ¶ [ ]": Answer, Affirmative Defenses and Counterclaims of Defendants 3G Capital Partners Ltd., 3G Capital Partners, L.P., 3G Fund, L.P. and Alexandre Behring

"Compl. ¶ [ ]": Complaint

"CSX": Plaintiff-Counterclaim Defendant CSX Corporation

"CSX Proxy": CSX's definitive proxy statement on Schedule 14A filed on April 25, 2008

"PTO at [ ]": Amended Joint Final Pre-Trial Order

"PTO Stip. ¶ [ ]": Stipulated facts in the Amended Joint Final Pre-Trial Order

"PX [ ] at [ ]" and "JX [ ] at [ ]": Plaintiff's proposed exhibits and joint proposed exhibits

"PFF Section [ ].[ ]": Internal citations to CSX's Proposed Findings of Fact

"TCI": The Children's Investment Master Fund

"TCI Ans. ¶ [ ]" or "TCI Counterclaims ¶ [ ]": Answer, Affirmative Defenses of Defendants The Children's Investment Fund Management (UK) LLP, The Children's Investment Fund Management (Cayman) Ltd., The Children's Investment Master Fund, Christopher Hohn, and Snehal Amin and Counterclaims and Third-Party Claims of The Children's Investment Master Fund

"Virginia Stock Corporations Act": Title 13.1 Chapter 9 of the Virginia Code

"[WITNESS] ¶ [ ]": Proposed direct testimony of witnesses

"[WITNESS] Dep. [PAGE: LINE NUMBER]": Deposition designations

Plaintiff CSX Corporation ("CSX" or the "Company") respectfully submits the following Proposed Findings of Fact and Conclusions of Law in support of its request for judgment in its favor on all claims asserted by it against The Children's Investment Fund Management (UK) LLP, The Children's Investment Fund Management (Cayman) Ltd., The Children's Investment Master Fund (together "TCI"), 3G Capital Partners Ltd., 3G Capital Partners, L.P., 3G Fund, L.P. (together "3G"), Christopher Hohn, Snehal Amin, and Alexandre Behring, A/K/A Alexandre Behring Costa (together "Individual Defendants") (collectively "Defendants").

## Preliminary Statement

This case concerns a plan and scheme by TCI and 3G to evade the reporting requirements of the securities laws in an attempt to gain control of and exert influence over CSX. Defendants plan to elect a slate of nominees to CSX's board of directors and amend CSX's Amended and Restated Bylaws in order to make major changes in CSX's business and corporate structure and to otherwise change or influence the control of CSX. In carrying out their plan and scheme, Defendants have violated Sections 13(d) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulations of the Securities and Exchange Commission promulgated thereunder, as well as Article I, Section 11(a)(ii) of CSX's Bylaws. In addition, individual Defendants Hohn and Behring violated Section 20(a) of the Exchange Act and are thus personally liable as they are controlling persons of TCI, 3G and the Defendant group.[1]

The securities laws require Defendants to disclose information that shareholders need to make decisions with respect to their investment. Section 13(d) requires any person acquiring beneficial ownership of more than five percent of a class of an issuer's voting equity securities to disclose, within 10 days of the acquisition, information as to the number of shares beneficially owned, any plans or proposals with respect to the issuer and information as to any contracts, arrangements, understandings or relationships with any person relating to the issuer. To prevent groups of investors from secretly coordinating their efforts, Section 13(d) provides that if two or more shareholders act as a group for the purpose of acquiring, holding or disposing of securities of an issuer, such group shall be deemed a person and be required to make disclosures within 10 days of collectively acquiring more than five percent of such class of the issuer's voting equity.

Defendants secretly acquired a large stake in CSX while evading the reporting requirements of Section 13(d). They evaded the reporting requirements by using sophisticated swap arrangements with financial counterparties and coordinating efforts with respect to their interests in CSX among themselves and with others. Defendants also had, but failed to disclose, beneficial ownership of the CSX shares referenced in their swaps because they had voting and investment power with respect to those shares, had the right to acquire such power and acted with the purpose and effect of changing or influencing control of CSX. Defendants also concealed their plans for the future of CSX,

---

[1]    CSX no longer contends that Mr. Amin is a control person of TCI.

its management, and its board, and the details of the morass of contracts that enabled it to control secretly an enormous stake in the Company. When Defendants belatedly filed a Schedule 13D on December 19, 2007 -- more than a year after they had acquired beneficial ownership of more than five percent of the outstanding shares of CSX common stock, it was materially false and misleading. (See Proposed Conclusions of Law Section I.)

Defendants also violated Section 14(a) of the Exchange Act and Rule 14a-9, which prohibit any person from soliciting proxies on the basis of false and misleading information (in order to enable shareholders to make an informed choice when voting their proxies). This they did by failing to disclose, among other things, the extent of Defendants' interest in CSX and the extent of Defendants' coordinated efforts and their contracts, arrangements, understandings, or relationships relating to shares of CSX. (See Proposed Conclusions of Law Section II.) Defendants' violations of Sections 13(d) and 14(a) create individual liability for Messrs. Hohn and Behring (see Proposed Conclusions of Law Section III) and run afoul of Article I, Section II(a)(ii) of CSX's Bylaws (see Proposed Conclusions of Law Section IV).

Based on these violations, Defendants should be required to file truthful and accurate Schedule 13D and Schedule 14A disclosures. Amended disclosures are essential to carry out the undisputed purposes of the Williams Act, as well as the proxy rules.

On the facts of this case, however, corrective disclosure is not enough. Not only did Defendants fail to disclose the scope of their beneficially owned shares of CSX, and not only did Defendants perpetrate a plan and scheme to evade the reporting requirements of the securities laws, but they also concealed their significant stake in CSX and their plans to make significant changes to the Company while selectively tipping their friends. This was done as Defendants and the other members of their Group sought to and achieved dramatic change in the shareholder composition of CSX. If Defendants had disclosed their positions and plans for CSX, other shareholders likely would have held their shares (rather than selling them in recent months), making it more difficult for TCI and 3G to succeed in their quest for influence and control at CSX.

Under the circumstances, the Court should: (1) declare that Defendants have violated Section 13(d) and Section 14(a) of the Exchange Act and enjoin further violations; (2) order Defendants to file truthful, accurate, and complete disclosures, and enjoin them from voting any proxies until they have done so; (3) enjoin Defendants, as well as other members of their group, from voting CSX shares owned by them at the 2008 annual meeting of CSX shareholders; (4) enjoin Defendants from selling their shares of CSX stock until three days following the 2008 CSX annual meeting; and (5) direct the parties to request TCI's and 3G's counterparties disclose to the Court (on a confidential basis) how, if at all, they will vote shares held by them to hedge their CSX swaps with TCI and 3G, and advise the Court as to the banks' position. Any lesser remedy will fail to restore the balance upset by Defendants' scheme, which, unless stopped by this Court, will further compromise the integrity of the election at CSX's upcoming annual meeting.

## Proposed Findings of Fact

### I.    THE PARTIES

#### A.    CSX

1.    CSX is a publicly traded transportation company incorporated under the laws of Virginia and headquartered in Jacksonville, Florida.  Shares of common stock of CSX are traded on the New York Stock Exchange (the "NYSE").  (CSX Complaint ¶ 14, TCI Ans. ¶ 14, 3G Ans. ¶ 14.)

2.    Through its wholly owned subsidiary, CSX Transportation, Inc. ("CSXT"), a Class I rail carrier incorporated under the laws of Virginia, CSX operates one of the largest rail systems in the United States and the largest rail system in the eastern half of the country.  (CSX Complaint ¶ 14, TCI Ans. ¶ 14, 3G Ans. ¶ 14.)

3.    CSX's roots date back to the early 19th century when the Baltimore & Ohio Railroad ("B&O"), the nation's first common carrier, was chartered in 1827. Numerous railroads have combined with the former B&O through mergers and consolidations to create CSX.  Most recently, CSXT acquired key assets of Conrail, Inc., which allow CSX to link New England and New York with Chicago, the Midwest, and growing markets in the Southeast.  (JX 4 at 5.)

4.    CSX provides a crucial link to the transportation supply chain through its approximately 21,000 route mile rail network, which serves every major population center in 23 states east of the Mississippi River, the District of Columbia, and the Canadian provinces of Ontario and Quebec.  (JX 4 at 3.)  CSX serves 70 ocean, river, and lake ports along the Atlantic and Gulf Coasts, the Mississippi River, the Great Lakes, and the St. Lawrence Seaway.  CSX also serves thousands of production and distribution facilities through track connections to more than 230 short-line and regional railroads. (JX 4 at 3.)

5.    In 2007, CSX had its lowest Surface Transportation operating ratio in a decade.  Revenue and revenue per unit increased 5% and 8%, respectively, from 2006 to 2007, reflecting the improving value CSX provides its customers through better service.  (JX 4 at 27.)  The Company was able to achieve substantial pricing gains predominantly due to CSXT service improvements and the overall cost advantages that the Company's rail-based solutions provide to customers versus other modes of transportation.  (JX 4 at 27.)

6.    In March 2008, after discovering aberrant share movements suggesting that TCI and 3G were exercising influence over the voting of the shares of CSX common stock referenced in the cash-settled swaps held by TCI and 3G, CSX commenced this lawsuit.  (See Ward ¶¶ 26-29.)

**B.    TCI**

7.    The Children's Investment Fund Management (UK) LLP ("TCIF UK") is a United Kingdom limited liability partnership. The Children's Investment Fund Management (Cayman) Ltd. ("TCIF Cayman") is a Cayman Islands company affiliated with TCIF UK. The Children's Investment Master Fund ("TCI Fund") is a Cayman Islands company managed by both TCIF UK and TCIF Cayman.

8.    TCI is a hedge fund well known for shareholder activism. (Compl. 15-17; TCI Ans. 15-17; Hohn Dep. 94:7-16, 94:17-20; Hohn 25; Tr. 180:9-11.)

   8.1    After TCI's requests to allow shareholders to vote on a proposed acquisition, TCI forced board and management change of Deutsche Börse. (Hohn ¶ 25.)

   8.2    TCI called for the break-up, merger, or sale of ABN Amro, which subsequently was broken apart and sold to a consortium of buyers. (Hohn ¶ 25.)

   8.3    TCI supported Mittal Steel's hostile takeover bid for Arcelor, then obstructed Mittal's subsequent acquisition of an Arcelor subsidiary until Mittal raised its offer price. (Hohn ¶ 25.)

9.    Like other activist hedge funds, TCI uses derivative financial instruments known as swaps in pursuit of its investment strategy. (Subrahmanyam ¶¶ 70-71, Exs. C.1 and C.2.)

10.    Christopher Hohn is a citizen of the United Kingdom and managing partner and a controlling person of TCIF UK and sole owner and a controlling person of TCIF Cayman. (Compl. ¶ 19; TCI Ans. ¶ 19.)

   10.1    Before founding TCI, Mr. Hohn was employed as a portfolio manager at Perry Capital, a well known activist hedge fund. (Hohn ¶ 1; Tr. 185:15-21.)

   10.2    Mr. Hohn worked at Perry Capital from January 1, 1996, through the spring of 2003. (Hohn ¶ 1; Tr. 185:15-21.)

   10.3    While Mr. Hohn was employed at Perry, Perry used equity swaps held by Deutsche Bank in an attempt to take over a New Zealand company known as Rubicon. (Ithaca (Custodians) Ltd. v. Perry Corp., [2003] 2. N.Z.L.R. 216 (High Court – Auckland), [2003] 1 N.Z.L.R. 731 (Court of Appeal – Wellington) (appeal allowed; orders by High Court set aside), [2004] 2 N.Z.L.R. 182 (Court of Appeal – Wellington) (conditional leave to appeal refused).)

   10.4    Mr. Hohn incredibly claims to have no direct knowledge of this investment while at Perry. (Tr. 186:16-187:2.)

C.    **3G**

11.    3G Fund L.P. ("3G Fund") is a Cayman Islands limited partnership. 3G Capital Partners, L.P. ("3G L.P.") is a Cayman Islands limited partnership and the general partner of 3G Fund. 3G Capital Partners Ltd. ("3G Ltd.") is a Cayman Islands company and the general partner of 3G L.P. (Compl. ¶¶ 20-22; 3G Ans. ¶¶ 20-22.)

12.    Alexandre Behring is a citizen of Brazil and the managing director of 3G Ltd. and has discretionary authority to control or influence the conduct of 3G. (Compl. ¶¶ 23, 122; 3G Ans. ¶¶ 23, 122; Behring Dep. 4:3-10, 5:25-6:3, 9:12-23; Schwartz Dep. 24:2-4, 24:6-25, 25:3-9, 25:16-26:18.)

13.    3G "has several funds", including 3G Fund onshore, 3G Fund offshore, and Synergy Fund. (Behring Dep. 15:14-16:4, 48:4-8.) Like TCI, 3G is a hedge fund that uses swaps to pursue its investment strategy. (Behring ¶ 54; DX 128.)

14.    Synergy is a "fund of funds" whose "main objective is to invest in hedge funds". (Moura Dep. 25:8-12; see also Behring Dep. 16:5-8; Hohn Dep. 107:10-20.)

15.    Through "Synergy", 3G has been an investor in TCI since TCI's inception in 2004. (Hohn Dep. 107:10-108:23; Behring Dep. 15:14-20; 18:15-23; see also Behring Dep. 19:12-19; Moura Dep. 36:19-37:14.) When asked to identify the funds in which Synergy invests, Mr. Behring initially omitted TCI from his list, admitting 3G was an investor in TCI only when specifically asked. (Behring Dep. 18:15-23; 19:4-19.)

16.    Luis Moura of 3G is Synergy's portfolio manager. (Moura Dep. 31:8-32:10.) But Mr. Behring manages 3G, and 3G is, in turn, Synergy's ultimate manager and investment advisor. (Behring Dep. 15:14-20.) Synergy generally discusses the strategy of a fund in which it invests with the fund manager prior to actually investing. (Moura Dep. 27:10-15.)

17.    Because Synergy is an investor in TCI, 3G executives regularly meet with TCI, receive regular updates on TCI's investments, and attend TCI's investor conferences. (See Moura Dep. 34:21-35:16; see also Moura Dep. 37:19-38:10, 38:25-39:6, 122:20-123:21, 125:3-18.) For example, Mr. Behring attended TCI's investor conferences in connection with Synergy's investment in TCI. (Behring Dep. 109:3-9, 109:18-24.) Similarly, TCI sent Mr. Behring quarterly letters discussing TCI's investments, including its investment in CSX. (Behring Dep. 21:25-22:8, 23:18-24:2, 24:12-17.)

18.    TCI's and 3G's joint history predates their interest in CSX. For example, 3G also advised TCI on TCI's Brazilian holdings. Mr. Hohn and others at TCI contacted Mr. Behring for information and advice concerning TCI's "investments in Brazil". (Behring Dep. 108:2-11, 149:22-150:18.)

19.    Until it formed a group with TCI to influence and control CSX, 3G had never before been an activist hedge fund. (Tr. 122:16-20.)

## II.    TCI SECRETLY ACQUIRES A SUBSTANTIAL ECONOMIC INTEREST

### A.    TCI Accumulates a Substantial Stake Without Disclosure

20.    In late 2006, TCI became interested in investing in U.S. rails and in CSX in particular and undertook secretly to do so using a series of complex equity swap arrangements. (Subrahmanyam ¶ 75; DX 144 ¶¶ 8-9.)

21.    Like Perry Capital and other hedge funds before it, TCI used swaps to acquire a position in CSX without disclosing it to the market or anyone other than selected friends. (Subrahmanyam ¶ 72; PX 19 at TCI0011386.)

22.    Minutes from a meeting of the Board of Directors of The Children's Investment Master Fund reflect that TCI recognized the avoidance of public disclosure as an important reason for using swap arrangements to acquire an interest in a public company. The TCI minutes state that the reasons for use of swaps include "the ability to purchase without disclosure to the market or the company". (Subrahmanyam ¶ 72; PX 19 at TCI0011386.)

22.1    In his deposition, Mr. Hohn admitted that one of the reasons it did not buy physical shares over the five percent level was to avoid making a filing: "[W]e did not want to buy in physical, amongst other reasons, more than five percent because if we exited at that point, we would be concerned about people front running us and shorting stock against us." (Hohn Dep. 137:8-18.)

23.    To hide its investment from CSX and the market for as long as possible, TCI split its CSX swap positions among eight counterparties, some of which were TCI prime brokers:  Citigroup Global Markets Limited ("Citigroup"), Deutsche Bank AG ("Deutsche Bank"), Goldman Sachs International ("Goldman"), Merrill Lynch International ("Merrill Lynch"), UBS AG ("UBS"), Credit Suisse Securities (Europe) Limited ("Credit Suisse"), JPMorgan Chase Bank ("JPMorgan"), and Morgan Stanley & Co. International plc ("Morgan Stanley") (collectively, the "TCI counterparties"). (Subrahmanyam ¶ 74; JX 8 at 17; Subrahmanyam ¶ 75; Subrahmanyam Exs. D, D.1-D.7.; Subrahmanyam ¶ 76.)

24.    Not only did TCI divide its swaps among eight counterparties, but it also monitored the physical positions of its counterparties (which acquired matching physical shares to their swap positions) in order to ensure that TCI's position remained opaque to the market. (Tr. 202:12-18, 203:2-6; PX 22; PX 27; PX 28; PX 30.)

24.1    With the consent of Mr. Amin, Rishi Sunak, a partner at TCI, sent an email to Cathy O'Reilly, another CSX employee, on December 18, 2006 authorizing her to contact TCI's counterparty banks for the express purpose of "ask[ing] the brokers about their total CSX exposure" because TCI was "concerned about [the banks] having to file [13D disclosures] at 5%". (PX 22.)

24.2    Mr. Sunak provided Ms. O'Reilly with a list of TCI's counterparty banks and the amounts of TCI's exposure to CSX and expressly asked her to "let

me know what the responses [to TCI's inquiries] are when we get them". (PX 22.)

    24.3    Robert Ottley of TCI then sent Mr. Hohn and other TCI employees information summarizing the "PBs/Brokers" filing requirements and positions in CSX; after receiving this e-mail, Mr. Hohn instructed on December 27, 2006 that "all inquiries should be on a no names basis". (PX 30)

25.    While swaps can be used for purposes other than avoiding the reporting requirements of Section 13(d), such as avoiding stamp taxes, that is not why TCI used them to acquire a stake in CSX. If TCI had been motivated by reasons other than non-disclosure, it would have no reason to monitor the actions of its counterparties, for whom there is no evidence that stamp tax is a concern. (Tr. 202:12-18, 203:2-6; PX 22; PX 27; PX 28; PX 30.)

26.    In secretly accumulating a position of this size, TCI sought not only to invest in TCI, but also to influence and exert control over the Company. Every time TCI acquired or disposed of a significant swap position in CSX, TCI's counterparties acquired or disposed of a significant position in physical shares of CSX. Thus, TCI's swap arrangement directly affected the ownership profile of CSX. (Subrahmanyam ¶¶ 87-125.)

27.    The purpose of TCI's making an investment of this size was to acquire a stake sufficient to permit it to influence and control CSX.

    27.1    In December 2006, TCI contacted Goldman Sachs to explore a possible leveraged buy-out ("LBO") of CSX. (PX 20.)

    27.2    On December 7, 2006, Mr. Sunak met with Adrian Jones, a partner at Goldman Sachs' principal investment area, to discuss the possibility of an LBO concerning CSX. (PX 20; Sunak Dep. at 72:6-12, 72:25-73:10.) The idea was met by Goldman Sachs with "obvious excitement". (PX 20.)

    27.3    Following the meeting, Mr. Sunak sent an email to Mr. Jones and Philip Grovit, a business unit manager at the principal investment area group at Goldman Sachs, in which Mr. Sunak reiterated TCI's interest in pursuing an LBO with Goldman Sachs for CSX and offering to "spend some time . . . to walk through the business/industry in some detail". (PX 20; Sunak Dep. at 72:13-16.)

    27.4    Mr. Sunak also attached a detailed LBO model for CSX, and "changed the premium [to be charged to Goldman Sachs] to reflect a more reasonable take out!" (PX 20.)

28.    By late 2006/early 2007, TCI had, without any public disclosure, accumulated CSX swap positions resulting in economic exposure to well over 5% of the outstanding shares of CSX. By March 30, 2007, before TCI began to convert some of its swaps into CSX shares, TCI owned swaps referencing 61,627,400 shares, or 14.07% of the CSX shares then outstanding. (Subrahmanyam ¶ 85.)

29.    After March 30, 2007, TCI converted some of its swaps to physical shares, but its exposure to CSX remained approximately constant. (Amin ¶ 37; Tr. 195:17-19; PX 206.)

29.1    Mr. Amin testified that "in the beginning of April 2007, TCI began unwinding swap positions and at the same time accumulating physical shares of CSX in the open market. TCI wanted its exposure in CSX to remain roughly constant." (Amin ¶ 37.)

29.2    As illustrated in Exhibit E to the expert report of Professor Subrahmanyam, TCI's exposure to CSX reached its pinnacle on April 18, 2007, and has remained constant.

**Exhibit E**
**CSX Share and Swap Ownership by TCI**
**10/20/06 – 2/6/08**



**B.    The Fix Goes in for Initial Annual Meeting**

30.    In late 2007, to implement its plan to secretly influence and control CSX, TCI concentrated its swaps (giving TCI exposure to 46.4 million CSX shares) in the hands of two counterparty banks, Deutsche Bank and Citigroup, to maximize its influence on the shares held by its counterparties as a hedge. (Subrahmanyam ¶¶ 78-79, 164.)

31.    In so doing, TCI effectively put matching CSX shares in the hands of Citigroup and Deutsche Bank, as opposed to the hands of other shareholders, and thus influenced the voting or non-voting of these shares. (Subrahmanyam ¶ 154.)

32.    In addition to that influence, TCI concentrated its swaps with Deutsche Bank and Citigroup in order to influence them to vote the CSX shares held by them in favor of TCI and 3G. (Subrahmanyam Rebuttal ¶¶ 45, 47.)

33.    Neither Deutsche Bank nor Citigroup had any independent economic incentive to vote the CSX shares held by them to hedge their CSX swaps with TCI. Once perfectly hedged, as they were here, Deutsche Bank and Citigroup were economically neutral to the performance of CSX, but still retained the voting rights of its matching shares. (Subrahmanyam Rebuttal ¶ 44.)

34.    Deutsche Bank is a prime broker for TCI -- a lucrative relationship that led it to provide free services to TCI. (Subrahmanyam ¶¶ 161-65.) While Citigroup is not a prime broker for TCI, it was likely vying for such a relationship and competing for new business. (Subrahmanyam Rebuttal ¶ 43.)

35.    Moreover, Deutsche Bank owns Austin Friars, a hedge fund that joined TCI's and 3G's scheme to influence and control CSX. (Amin Dep. 105:11-16; Tr. 132:5-7.)

36.    Mr. Amin admitted that TCI planned to use its connection to Austin Friars, which held approximately one percent of CSX's outstanding shares, as part of a plan to influence control over Deutsche Bank's voting without an explicit agreement:

> Q. And why did you believe it would be helpful [that there was a hedge fund within Deutsche Bank that owned CSX shares]?
>
> A. Because Austin Friars, as far as we can tell, is a hedge fund who we thought we could convince of the value case of what we were trying to accomplish at CSX. It's better for them as a shareholder to support us than to vote and keep the incumbent board in place. Hedge funds typically are more receptive to those arguments than non-hedge funds. And so we thought we would have a good chance at being able to have that discussion and convincing them we were indeed right.
>
> Q. So you thought that given the perspective of a hedge fund that you would be more likely to be able to convince Austin Friars than the regular institutional investor; is that fair?
>
> * * *
>
> A. Yes, I think that's fair.
>
> Q. And you thought that if you convinced Austin Friars of this, it would help Deutsche Bank to go along with Austin Friars' recommendation?
>
> A. We thought it was a helpful fact, yes.

9

> Q. In convincing Deutsche Bank to vote the counterparty shares
> your way that they were affiliated with this internal hedge fund;
> correct?
>
> A. It was our view that it would be helpful that Austin Friars had a
> proprietary position in CSX, and that we thought we had a good
> chance of convincing Austin Friars to support us. And to the
> extent that the banks votes in the best interest of the bank and
> Austin Friars determined that they should support us, we thought
> that that would be helpful.  (Amin Dep. 104:16-106:17.)

37.     Mr. Hohn admitted that TCI sought to use Austin Friars to influence the
voting of Deutsche Bank shares held as a hedge to its CSX swaps with TCI.  Mr. Hohn
was asked the following questions and gave the following answers with respect to TCI's
decision to concentrate a large CSX swap position with Deutsche Bank:

> Q. I don't want to get into the other situation, but this move to
> commercial banks has got nothing to do with CSX, right?  It's a
> generalized concern?
>
> A. For this specific, I'd say there -- I'd say the two reasons we
> concentrated our holdings there, one is the credit counterparty
> issue, and in the case of Deutsche Bank, we observed that they had
> a physical holding of a few percent of the company, and we had
> hypothesized that there may be a chance that if they had hedged it,
> that they -- and they liked our -- in the event that we did run a slate
> of directors, that they -- that would -- might be a factor for them to
> consider voting any underlying shares in which they might have
> hedged their swap -- their swaps.
>
> Q. So one reason you moved -- you concentrated on Deutsche
> Bank was that you thought there was a possibility that they would
> vote the underlying shares for your slate?
>
> A. If they held them, yeah. We didn't know if they held any, but if
> they did, there was -- that was one of the reasons. The other was
> counterparty credit risk.  (Hohn Dep. 154:4-155:4.)

38.     Deutsche Bank is known for cooperating with hedge funds seeking to use
swaps to influence and control the companies in which the swaps give the funds
exposure.

38.1    In May 2001, Deutsche Bank and another derivatives dealer
provided equity swaps to the hedge fund Perry Capital with respect to a 16%
undisclosed economic ownership stake in Rubicon Ltd., a New Zealand public
company.  When Perry needed the voting rights, it terminated the swaps and
bought the shares back from the derivatives dealers.  (Ithaca (Custodians) Ltd. v.

Perry Corp. [2003] 2 N.Z.L.R. 216 (H.C.) rev'd, [2004] 1 N.Z.L.R. 731 (C.A.); [2004] 2 N.Z.L.R. 182 (C.A. (refusing conditional leave to appeal).)

      38.2    In 2007, Sulzer, a Swiss engineering firm, found that two Austrians and a Russian oligarch had secretly acquired a 32% stake, notwithstanding rules requiring disclosure at a 5% ownership threshold. This Austro-Russian group had used cash-settled equity derivatives provided by Deutsche Bank and a Swiss bank. (See Henry T. C. Hu & Bernard Black, Equity and Debt Decoupling and Empty Voting II:  Importance and Extensions, 156 U. Pa. L. Rev. 625, 655-56 (2008).)

      38.3    In 2004-2005, Deutsche Bank and BHP Billiton entered into swaps to give BHP Billiton economic exposure to about 4.3% of the voting shares in WMC Ltd.  (Australian Takeovers Panel, Discussion Paper – Equity Derivatives (Sept. 10, 2007), available at http://www.takeovers.gov.au/display.asp?ContentID=1268 .)

    39.    Consistent with their plan to keep the market in the dark, TCI kept token positions at six other of its swap counterparties to obfuscate its position, plans and influence relating to CSX from CSX and from the market.  (Tr. 178:24-179:1, 204:15-205:1.)

      39.1    Mr. Amin was asked the following questions and gave the following answers:

    Q.  Why did you leave those on [referring to TCI's token swap positions]?

    A.  We didn't want it easily identifiable to the outside world who our primary swap counterparties were.

    Q.  And why is that?

    A.  Because doing so leaves you more susceptible to front running by other hedge funds or other investors.

    Q.  What do you mean by that?

    A.  If people can easily identify who your primary counterparties are, then it's easier for them potentially to identify whether you are increasing or decreasing your exposure to a specific investment which when you are a fund of our size will leave them to try to front run you, could try to lead them to front run you.

    Q.  So knowing how many physical shares your counterparty had and knowing who the counterparty was would make you susceptible to being, to having a front runner?

A. Knowing who your counterparty is puts us at risk. In other words, if hypothetically speaking if TCI announced to the world that the only counterparty we would ever use is Goldman Sachs there would be a higher likelihood that every time someone saw Goldman Sachs change its position in the company they would attribute it to TCI. What we didn't want to do is allow people to establish any sort of link between us and specific counterparty so that they could attribute that counterparty's behavior or trading, whatever it was, back to TCI. (Amin Dep. 74:14-75:22.)

40.    With its positions and plans hidden from the market, TCI and 3G and others in the Group manipulated the ownership of CSX shares around the initial record date after the CSX 2008 annual meeting. CSX's proxy solicitor, Innisfree M&A Incorporated, found ownership changes in CSX's ownership patterns suggesting the exercise of influence over the voting of physical shares held by its CSX swap counterparties, particularly Deutsche Bank.

40.1    Between February 12 and February 27, 2008, the original record date, Deutsche Bank increased its holdings of CSX shares by 23 million, resulting in total holdings of 27 million shares. (Subrahmanyam ¶ 167; PX 189 at CSX_00016000, CSX_00016006.)

40.2    For comparison, TCI held economic exposure to 28 million CSX shares through CSX swaps with Deutsche Bank as of February 8, the last day of available data on swap positions and transactions in Deutsche Bank's document production. (Subrahmanyam ¶ 167; PX 196.)

40.3    The change in Deutsche Bank's holdings represented roughly two-thirds of the net change in holdings of the top hedge fund custodians of CSX shares. (Subrahmanyam ¶ 167.)

40.4    In the eight business days following the record date, Deutsche Bank decreased its holdings by over 24 million shares, an amount similar to the net change that occurred at the same time in the holdings of the top hedge fund custodians of CSX shares. (Subrahmanyam ¶ 167; PX 189 at CSX_00016006.)

40.5    This pattern is consistent with Deutsche Bank's lending out CSX matching shares to traders who engage in short-selling of such shares, as is common practice, but recalling those shares in time for the record date (and lending them back again after the record date passed). (Subrahmanyam ¶ 167; PX 189 at CSX_00016000, CSX_00016006.)

41.    With respect to these share movements, Mr. Miller of Innisfree testified:

41.1    The "unprecedented movement and concentration of shares in the hands of swap counterparties to hedge funds likely rendered a fair proxy contest impossible". (Miller ¶ 22.)

      41.2    Mr. Miller "had a significant concern that, based on [his] experience, the counterparties to the swap arrangements with the hedge funds were likely to vote the shares they held as directed by the hedge funds, as is frequently the case." (Miller ¶ 22.)

      41.3    "The dramatic movement of shares into the hands of the TCI counterparties before the February 27, 2008 record date suggested to me that those shares were being put into place for the record date with the understanding that they would be voted at the annual meeting in accordance with the wishes of TCI." (Miller ¶ 24.)

      41.4    "In my experience, the movement of shares to brokers aligned with hedge fund interests was unprecedented in both magnitude and concentration and could not be explained by normal share movements." (Miller ¶ 23.)

      41.5    "Even if an arrangement concerning the voting of shares held by counterparties is not disclosed, my 30 years of experience in the industry indicate that, to the extent they can, the counterparties to swap arrangements frequently vote such shares in the manner specific by the hedge funds. It is my belief that these counterparties are motivated by a desire to please lucrative hedge fund clients with whom they do business." (Miller ¶ 24.)

42.    Defendants rely upon the testimony of Professor Partnoy and a representative of Deutsche Bank, Mr. Arnone, to explain the recall of CSX's stock by Deutsche Bank around the record date. (Partnoy Rebuttal ¶ 71-75; Partnoy Sure-Rebuttal ¶ 17.) However, Professor Partnoy's opinion is unfounded speculation (Subrahmanyam Rebuttal ¶¶ 48-49) and none of the witnesses from Deutsche Bank provided an explanation for why the CSX shares were recalled twelve days before the record date.

      42.1    In fact, the witnesses provided no information explaining the recall. Mr. Arnone said he did not know that the shares were lent out, much less recalled. (Arnone Dep. 52:22-53:11.) The swap desk would not have been responsible for the recalling of CSX shares, that is the responsibility of the securities lending department. (Arnone Dep. 51:3-20.) Mr. Paul Busby, co-head of Deutsche Bank's securities lending department, was not aware that the CSX shares were recalled twelve days before the record date. (Busby Dep. 21:17-21.) Mr. Busby did not know the reason why the CSX shares were recalled. (Busby Dep. 21:17-21, 24:3-8.) Mr. Busby was shown the records of the recall, but was unable to tell who recalled the shares. (Busby Dep 40:19-23.)

43.    Although CSX reset the record date and rescheduled the date of the Annual Meeting, TCI and 3G have continued to exercise influence over the upcoming vote.

      43.1    Alan Miller of Innisfree provided unrebutted trial testimony as to his concern that Deutsche Bank was recalling shares to vote them on behalf of TCI. (Tr. 79:23-80:1.)

43.2    Citigroup has stated that it does not intend to vote its shares, thus depriving CSX of those votes. (Kennedy Dep. 21:18-24.) Deutsche Bank by contrast claims not to have made a decision about voting its shares, which remain susceptible to influence by TCI, 3G, and Austin Friars. (Arnone Dep. 25:14-17, 26:14-27:2.)

## III.    TCI AND 3G FORM A GROUP IN EARLY 2007

### A.    TCI Seeks an Ally in 3G in its Quest for Control

#### 1.    TCI builds up a secret 13% position in CSX using swaps

44.    In late 2006, TCI began accumulating its position in CSX using swaps. (PX 206.)

45.    By late 2006/early 2007, TCI had, without any public disclosure, accumulated CSX swap positions resulting in economic exposure to well over 5% of the outstanding shares of CSX.

45.1    By December 6, 2006, TCI owned swaps referencing 22,643,200 shares, or 5.20% of the CSX shares then outstanding, . (Subrahmanyam ¶ 85(a).)

45.2    By December 31, 2006, TCI owned swaps referencing 38,135,700 shares, or 8.76% of the CSX shares then outstanding. (Subrahmanyam ¶ 85(b).)

45.3    By January 16, 2007, TCI owned swaps referencing 43,972,200 shares, or 10.10% of the CSX shares then outstanding. (Subrahmanyam ¶ 85(c).)

45.4    By March 30, 2007, before TCI began to convert some of its swaps into CSX shares, TCI owned swaps referencing 61,627,400 shares, or 14.07% of the CSX shares then outstanding. (Subrahmanyam ¶ 85(d).)

45.5    The secrecy of TCI's position perhaps influenced Mr. Amin, TCI's Rule 30(b)(6) witness, at his deposition. When asked how many swap transactions TCI had entered into with respect to CSX, he testified "I don't know". (Amin Dep. 41:10-20.)

46.    At the same time, TCI began contacting the Company regarding its business, and on October 23, 3006, just three days after its initial purchase of CSX swaps, TCI began demanding a meeting with senior management, representing that TCI had approximately "$100m of stock". (PX 133.)

47.    This pattern of secret accumulation and demands for meetings with CSX senior management continued through the early part of 2007. (PX 206; PX 136; PX 33; PX 34.)

48.    During this period, TCI was secretly hatching a plan to force an LBO of CSX, even sending an LBO model to an investment bank and requesting a profile of

CSX's takeover defenses from Proskauer Rose LLP, its outside counsel. (PX 20; PX 21; PX 24; PX 31.) Again, the secrecy of TCI's plan for control perhaps influenced Mr. Amin, TCI's Rule 30(b)(6) witness. When asked why TCI looked at takeover defenses of CSX in December of 2006, he testified "I don't recall specifically". (Amin Dep. 125:20-126:4.) And when asked about a specific takeover defense profile, SharkRepellant.Net, and where it came from, he again testified "I don't remember where it came from." (Amin Dep. 125:12-19; PX 31.)

49.    TCI was promoting an LBO of CSX in order to make a quick profit on its investment that would provide a liquidity event. Indeed, on December 21, 2006, Patrick Degorce of TCI told Mr. Hohn: "I am getting very stressed by the fund leverage if you want to buy more rails we have to sell something and put every other buying on hold." (PX 23.)

50.    By late January 2007, TCI had succeeded in arranging a meeting with CSX's financial advisor, Morgan Stanley, to discuss an LBO of CSX. (PX 37; DX 145 ¶ 26.))

51.    By February 8, 2007, TCI's position in swaps represented 57,259,200 shares or over 13% of the outstanding CSX shares. (PX 206; Subrahmanyam Ex. C.1.)



Combined TCI/3G Interest in CSX (Shares and Swaps)
10/20/2006-2/8/2007

## 2.    TCI Solicits 3G to Form a Group.

52.    By early February 2007, TCI was frustrated with CSX and found a willing co-conspirator in its activism in the form of 3G and Mr. Hohn's "friend Alex of Brazil". (PX 42.)

52.1    3G's intentions were activist from the beginning, because Mr. Hohn had involved Mr. Behring in the conspiracy. On February 7, 2007, two days before 3G made its initial purchase of CSX shares, Mr. Schwartz noted to Mr. Behring and Mr. Moura in an email titled "CSX Board election" that "it looks like we're past the deadline for shareholder proposals from the 2007 agm". (PX 41.)

52.2    Mr. Behring sought to explain away the investigation of the "dates to nominate board members, and other things [as] part of the normal due diligence for CSX," just as they "were also part of the due diligence for the other[] [Class I rails]". (Tr. 153:3-8.) That testimony, far from confirming the false impression that Mr. Behring tried to leave the court, confirms that Mr. Behring had joined the conspiracy with Mr. Hohn. Mr. Behring conceded that 3G had no experience in "activism" and looked to Mr. Hohn, a world-class "activist" for advice. At trial, Mr. Behring noted that he asked Mr. Hohn "about his experience being an activist shareholder around the world, what are the pros and the cons, and things like that". (Tr. 121:1-6.) TCI had been considering the other Class I rails, including Norfolk Southern, Burlington Northern and Union Pacific, as well as Canadian National. (PX 21.) Indeed, Mr. Hohn testified that he told Mr. Behring about TCI's position in other rails, including Norfolk Southern and Union Pacific. (Tr. 160:22-161:2.)

53.    Mr. Hohn told Mr. Behring of TCI's investment in CSX in January 2007. (Tr. 161:3-161:6.) Even Mr. Hohn conceded that Mr. Behring "could interpret a view on what the size [of TCI's interest in CSX and other rails] was". (Tr. 161:7-161:13.) TCI and 3G agreed to co-ordinate their purchases no later than February 9, 2007. (DX 206.) As a result, 3G bought shares of CSX on February 9 and February 12, 2007. (DX 206.) 3G's purchases on those two days totaled 3,729,833 shares or 24.03% of the total market volume for CSX shares on those two days. (Tr. 159:4-159:24, 160:22-161:6; wsj.com.) As described below, 3G also bought over 4.5 million shares over the next few days.

54.    The documentary evidence shows that Mr. Hohn had a specific conversation about 3G's purchases on February 13, 2007. Thus:

54.1    On February 13, 2007, Mr. Hohn sent Mr. Amin an e-mail in response to a question that Mr. Amin had sent about an investment in Arcelor Brasil. (PX 42.) Mr. Hohn responded by BlackBerry that he would call Mr. Amin "in a minute" to discuss the Arcelor issue. (PX 42.) Mr. Hohn went on to say in a separate paragraph:

54.2    "Increased activity in csx cds has caused excitement in the stock. I want to also discuss our friend Alex of Brazil." (PX 42.)

54.3    "[F]riend Alex of Brazil" is Mr. Behring. (Tr. 155:17-155:24)

54.4    On that very day, February 13, 2007, 3G purchased credit default swaps or CDS relating to CSX. (PX 274.)

16

55.    At his deposition, Mr. Hohn claimed not to remember sending the "friend Alex of Brazil" e-mail. (Hohn Dep. 109:5-13.) Indeed, Mr. Hohn testified at his deposition that he only "assume[d]" that "friend Alex of Brazil" was Mr. Behring; he "didn't" actually remember". (Hohn Dep. 109:12-13.) Likewise Mr. Amin claimed not to have any memory of conversations about "friend Alex of Brazil." (Amin Dep. 140:2-22.) Indeed Mr. Amin testified that he did not "think Alex refers to Alex Behring" (Amin Dep. 140:16-18) and claimed not to know whether there was a relationship between the CSX credit default swaps or CDS and "friend Alex of Brazil". (Amin Dep. 141:10-25.) Similarly, Mr. Behring at his deposition and at trial pleaded ignorance about any conversation with Mr. Hohn about CSX in early 2007. (Behring Dep. 149:22-150:18; Tr. 98:5-98:10.)

56.    At trial, Mr. Hohn, although he did not remember anything about PX 42 at his deposition (Hohn Dep. 109:2-6.), tried to explain it away. He indicated that he wanted to speak with Mr. Behring about Arcelor Brasil, not CSX. (Tr. 156:9-156:19.) That testimony is false. The reference to "Alex of Brazil" comes <u>after</u> the discussion on Arcelor Brasil. More importantly, it is in the same paragraph and follows immediately after the statement regarding increased activity in CSX CDS. (Tr. 157:6-157:18.)

57.    Mr. Hohn and Mr. Behring decided to form a group with respect to purchases of interests in CSX no later than February 9, 2007. This finding is based on the following:

57.1    The January 2007 conversation between Mr. Hohn and Mr. Behring regarding TCI's investment in CSX (Tr. 161:7-13;

57.2    Mr. Hohn's and Mr. Amin's concession that TCI "selectively" tipped certain hedge funds in respect of TCI's investment strategies (Tr. 189:3-20);

57.3    The "friend Alex of Brazil" e-mail, the purported total lack of memory displayed by Mr. Hohn, Mr. Behring and Mr. Amin on the issue, the simultaneous purchase by 3G of CSX CDS on the very day of the e-mail (PX 42; PX 274); and

57.4    The extraordinary level of purchases by 3G around that time (PX 206).

58.    In the three days from February 13-15, 2007, 3G purchased 4,549,560 shares of CSX (PX 206):

| Transaction Date | Number of Shares |
| --- | --- |
| 2/13/2007 | 2,450,000 |
| 2/14/2007 | 1,613,700 |
| 2/15/2007 | 485,860 |

17

59.     These purchases were very unusual for 3G.  Indeed, on March 14, 2007, 3G received an inquiry from UBS regarding the trading by 3G in CSX shares in recent weeks, which "was a very sizeable position and not something that fits into [3G's] regular trading patterns."  (PX 63.)

60.     3G's purchases in the period from February 9, 2007, to February 15, 2007, totaled 8,279,393 shares.  The Group's ownership position was at that time 67,653,693 shares of CSX or 15.69% of the then-outstanding shares.  (PX 206.)  The Group decided that this was an appropriate level and began to solicit other conspirators to join the Group.  (PX 47.)



### 3.     TCI Solicits Others for the Group

61.     At the trial, Mr. Hohn testified that TCI is "very careful not to ever tip another investor as to whether [TCI is] going to increase [its] stake in a company or not, because that would disadvantage [its] investors."  (Tr. 163:13-16; see also Hohn ¶ 22.) He tried to lead the Court to believe that this was evidence of why he did not tip 3G. That testimony is false.

62.     Mr. Hohn's testified that the tipping of hedge funds while TCI was building its book "is typical in the hedge fund industry".  (Hohn ¶ 22.)  Mr. Hohn conceded, in response to the Court's questioning, that such tipping was inconsistent with TCI's economic interest to avoid frontrunning:

18

"Q.  And you viewed front running, generally speaking, as against the interests of TCI, is that true?

A.  Yes.

Q.  And the reason for that was what?

A.  Because you would be forced to pay a higher price for the shares or accept a lower price when selling.

Q.  But in one way or another you made known to selective investors, one of them if memory serves me being [Deccan], that you were building a position and suggested or implied to them that they might do the same, true?

A.  I don't know if we told them we were building.  We certainly told them we had a position, and [Deccan] is a very small fund also that has been very highly value added to us.  So I don't think it's true that we told them we were buying securities.

Q.  You told them to buy in exactly those words, 'buy CSX,' true?

A.  Yes, that is true." (Tr. 189:3-20.)

62.1    Mr. Hohn admitted that one of his motivations in avoiding disclosure was to avoid paying a higher price for his shares.  (Trial Tr. 188:16-189:8.)

63.    Mr. Hohn testified that this detriment was outweighed by an informational benefit:

"The benefit of sharing our ideas with other ideas with other investors is that they in turn share their ideas with us." (DX 144 ¶ 22.)

Mr. Hohn's testimony is incredible.  In fact, TCI tipped funds of its interest in CSX so that these funds could be part of its group in its clandestine assault on CSX.  In the case of the tip to 3G, this strategy paid off by the formation of a full-fledged group.

64.    Indeed, after forming the Group with 3G and securing a joint 15.55% stake in CSX, TCI made disclosures "selectively" to other hedge funds about TCI's "thesis" for CSX.  (Amin Dep. 136:24-137:3.)  Specifically, TCI had been recommending CSX to hedge funds as a "good fundamental investment" and urging other hedge funds to "buy CSX".  (Hohn Dep. 85:6-22; PX 53.)

65.    Mr. Hohn testified that he is "particularly sensitive to the issue of groups and knowledgeable about when a group is formed and when it is not formed".  (Tr. 180:5-18).  He also claims that until a group agreement is signed, there is no group

formation. (Tr. 183:25-184:4.) Mr. Hohn's legalistic approach is illegal. Mr. Hohn
ignores the obvious quid pro quo co-ordination. Mr. Hohn tipped other hedge funds so
that they could buy the shares cheaply and vote in TCI's favor. (PX 45; PX 46; PX 53;
PX 54.) Mr. Hohn did protect his investors against front-running by not tipping most of
the other funds until TCI had established its position (and that of its co-conspirator). (Tr.
189:9-191:5.) So once the 15.55% February 15 level for the Group was reached, Mr.
Hohn and Mr. Behring looked for more members of the Group, swapping "inside"
information for support. (PX 47; PX 48; PX 58.)

66.    In approaching these other hedge funds, TCI sought to expand the Group
with other like-minded members. In some cases these other hedge funds, including
Deutsche Bank's Austin Friars, bought CSX shares and in the process joined the TCI/3G
Group. For example, during this period, TCI urged Deccan Value to "buy" CSX:

66.1    Mr. Hohn testified that he discussed TCI's investment with Deccan
Value: "Deccan Value was one, so I knew that . . . they knew Warren Buffett
and Buffett's investment in the sector, and so I knew that they had been studying
it because of that, and so I asked them their thoughts on it. That was one, but
there was, you know, other funds." (Hohn Dep. 32:12-18.)

66.2    On February 20, 2007, Mr. Hohn informed Mr. Vinit Bodas of Deccan
Value that we think "CSX is the best" railroad investment. (Hohn Dep. 80:6-24;
see also PX 46.) Mr. Hohn asked Mr. Bodas to "keep this confidential" and
indicated that "we cannot be in a group so we are careful on sending models", but
referred Mr. Bodas to Mr. Amin for any questions he might have. (PX 46.)

66.3    Mr. Hohn urged Deccan to buy CSX stock. (Hohn Dep. 80:6-24,
83:25-84:9.)

66.4    In an email exchange on February 23, 2007, Mr. Hohn and
Mr. Bodas discussed becoming "sister" organizations where each would
"bec[o]me the preferred party for sharing ideas once the other was executed or
even while researching with the agreement not to act until a position was
reached". (PX 47.)

66.5    By February 24, 2007, Mr. Amin had spoken at length with
Mr. Bodas about TCI's "hypothesis about CSX". (Hohn Dep. 83:25-84:9; PX
48.) Again, the secrecy of the effort seems to have affected Mr. Amin's memory
at his deposition. When asked whether he recalled having a number of
communications with Deccan Value before the May 8, 2007,announcement, he
testified "I don't." (Amin Dep. 137:22-138:2.) When asked a second time, he
said "I don't. It is not to say it didn't happen, but I don't recall." (Amin Dep.
138:2-4.)

66.6    On March 2, 2007, the day on which TCI notified CSX of its HSR
filing, Mr. Hohn recommended that Mr. Bodas "[b]uy csx" and indicated that he
would try to speak to Mr. Bodas about it. (PX 53; PX 55.)

66.7    On April 24, 2007, Mr. Hohn directed Mr. Sunak to send TCI's CSX financial model to Mr. Bodas. Mr. Sunak concluded that sending the model by courier rather than email would be preferable. (Hohn Dep. 77:20-78:13; PX 84 and 86.) Mr. Hohn had previously told Deccan Value that trading models could lead to an inference of being a Group. (PX 46.) Mr. Hohn said at trial that his statement was honest. (Tr. 174:20-22.) Mr. Hohn, of course, had no qualms about sharing models with 3G on this ground (which TCI did) because he knew that TCI and 3G had formed a Group. He and Mr. Behring had done so by February 9, 2007, even if he now denies it. (Tr. 179:11-180:2.)

67.    Similarly, during this same period after the Group had reached its desired level of ownership, TCI urged Lone Pine to buy CSX stock:

67.1    On February 19, 2007, Mr. Hohn urged Mala Gaonkar of Lone Pine Capital, a hedge fund in which Synergy is invested (Moura Dep. 50:5-7), to "[t]ake a look at this [CSX] stock". (PX 45; see also Hohn Dep. 76:21-77:11.)

67.2    On March 2, 2007, the day on which TCI notified CSX of its HSR filing, Eashwar Krishnan of Lone Pine Capital wrote to Mr. Hohn, indicating that "I think this CSX could be a very good stock indeed", after which Mr. Hohn requested Mr. Krishnan's mobile telephone number. (PX 54; PX 55.)

67.3    Mr. Krishnan also contacted Mr. Amin to discuss CSX and "compare models" and to request a copy of the Bain report. (PX 58; PX 60.)

68.    Mr. Hohn concedes that "[t]hroughout 2007, I spoke with my colleagues at other funds, such as Deccan Value Advisors, Seneca, [redacted], 3G Capital Partners, Lone Pine, TCW and Atticus". (Hohn ¶ 22.) Indeed:

68.1    TCI "recommend[ed]" to Atticus that it have investments in CSX. (Hohn Dep. 86:22-25.) Mr. Hohn recognized that "if [Atticus] were a shareholder and we ever became activists, it would be helpful" in connection with TCI's "optionality". (Hohn Dep. 88:7-89:3.) Here, Mr. Hohn conceded the quid pro quo agreement -- a tip in exchange for support.

68.2    TCI discussed CSX with multiple other hedge funds during the second half of 2007. (See Hohn Dep. 32:7-18.) TCI had communications with Seneca, another hedge fund, regarding TCI's investment in CSX. (Hohn Dep. 68:11-25.) Mr. Amin in particular had meetings with five to ten other funds concerning TCI's "view of the fundamental case" for CSX. (Hohn Dep. 88:20-89:8.) Those funds included York Capital, Glenview and Atticus. (Hohn Dep. 89:18-20.) Mr. Hohn joined Mr. Amin for some of those meetings. (Hohn Dep. 88:20-89:8.)

69.    TCI needed these discussions to track the undisclosed shareholdings of other funds. In early 2008, Mr. Sunak created a spreadsheet described as "Share Scenarios". (PX 191; Sunak Dep. 61:15-23.) This exhibit calculates the "total physical shares" held by TCI and 3G, as well as the number of shares held in derivative "swap"

21

transactions by TCI (11%) and 3G (1%). (PX 191.) In addition, in this analysis, Mr. Sunak broke down the number of shares held by various investors – both those formally "disclosed" in securities filings, and "probable" total holdings, whether disclosed or not. (PX 191; Sunak Dep. 63:2-64:17.) TCI got the information from its fellow undisclosed Group members, including Austin Friars Capital, the proprietary hedge fund arm of Deutsche Bank.

69.1    Mr. Sunak testified that the holdings of Austin Friars, estimated at over 9.2 million shares, had not shown up in a public filing "because it is amalgamated under the Deutsche Bank filing." (PX 191; Sunak Dep. 61:24-62:13.) Mr. Sunak updated "column E" on the spreadsheet - representing "shares that [TCI] understood those investment firms to actually own" (versus what had been disclosed) – through conversations with those entities. (Sunak Dep. 63:2-7.)

70.    One of the Group's most significant undisclosed additions was Austin Friars, the proprietary hedge fund arm of Deutsche Bank, one of TCI's principal swap counterparties. Thus:

70.1    TCI had Austin Friars actively working on its behalf in March 2007. (PX 25; PX 57; Sunak Dep. at 57:18-58:9, 59:17-21, 129:2-14, 130:2-9.)

70.2    In exchange for the tip from TCI, Austin Friars had joined the Group by buying shares and was working for the support of the Group.

70.3    As discussed later, TCI concentrated its swaps at Deutsche Bank because it is the parent of Austin Friars, one of the undisclosed Group members.

70.4    Mr. Hohn testified that he knew that Austin Friars had a lot of CSX shares and that he had picked Deutsche Bank as TCI's main swap counterparty because Austin Friars is owned by Deutsche Bank (Tr. 178:18-179:6.)

70.5    However, Mr. Amin, when asked to confirm that he did not remember why TCI chose to enter into swaps referencing CSX shares between October 20, 2006 and December 29, 2006, what percentage of the outstanding CSX shares such swaps represented, or what counterparty TCI used, said, "Yes, that's right. I don't recall." (Amin Dep. 68:2-15.) When asked what Mr. Hohn said when Mr. Amin informed him that there was a hedge fund within Deutsche Bank that owned CSX shares, Mr. Amin said "I don't recall." (Amin Dep. 104:6-8.) When asked if Mr. Hohn agreed with Mr. Amin's view that such information was helpful, he said "I don't recall". (Amin Dep. 104:9-15.)

71.    Austin Friars helped TCI in getting information from others. Thus:

71.1    In March 2007, Austin Friars set up a call with John Snow, former Secretary of the Treasury and former CEO of CSX and "invited [TCI] to listen in" on the call, which they did. (PX 57; Sunak Dep. 57:18-58:9, 59:17-21, 129:2-14, 130:2-9.)

71.2    Prior to the call, Darren Curtis and Andre Crawford-Brunt of Austin Friars sent both Mr. Amin and Mr. Sunak proposed questions to ask of Former Secretary Snow. (PX 57.) One question of interest to both TCI and Austin Friars was whether companies in the railroad industry could "lend themselves to being run by private equity". (PX 57.) Other proposed questions included "[W]hy spend money on expansionary capex unless there is fair return on this spend?"; "Do the rating agencies really matter?"; "Are there non core real estate assets that could be sold?"; and what was Former Secretary Snow's view on CSX's being "criticized for having underspent on capex during the 90s (under his regime)"? (PX 57.)

71.3    TCI also coordinated its efforts with Austin Friars with respect to other companies. (PX 25.)

72.    3G also had contact with Austin Friars regarding CSX. 3G's Mr. Schwartz spoke with people from Austin Friars. Mr. Schwartz testified that "Alex put them in touch with me and we — and we chatted about CSX." (Schwartz Dep. 183:16-23; 184:8-17; 185:6-13; 185:20-186:14.) TCI "might have come up" and proxy contests "could have conceivably come up in conversation" with Austin Friars. (Schwartz Dep. 187:8-16; 188:4-15.) Mr. Behring's contrary testimony at trial (Tr. 131:17-133:2) is incredible.

73.    3G also discussed CSX with "multiple funds" or "tens" of funds during the course of 2007. (Moura Dep. 187:9-21.) Thus:

73.1    3G spoke with Deccan Value. (Behring Dep. 97:7-98:15.) Mr. Behring testified that during those conversations, "it probably would have been natural to talk about CSX". (Behring Dep. 98:8-15.)

73.2    Mr. Schwartz spoke to Atticus and other hedge funds about 3G's ideas concerning CSX pricing. (Schwartz Dep. 109:14-110:5, 111:8-19, 111:23-112:10; see also PX 202.) Mr. Behring also spoke with Atticus about "ideas" and that it is "possible" that he discussed CSX with Atticus. (Behring Dep. 101:3-13.)

73.3    Mr. Moura recalled speaking to Fir Tree, Och-Ziff, Edgerton, and Tiger Global concerning CSX. (Moura Dep. 188:4-189:2.)

73.4    3G also shared its "Investment Discussion" analysis on U.S. Railroads with different funds. (Moura Dep. 150:18-24; see also PX 199.) The 3G "Investment Discussion" focuses on the case for hedge fund investment in CSX. (PX 199 at 36-62.)

74.    The purpose of soliciting these funds was to find support for the proxy fight TCI is currently running. In fact, the principal goal has been to get their support on what Mr. Hohn calls TCI's "optionality for activism". (Hohn Dep. 86:4-20.) TCI's tippings of these hedge funds were solicitations for its contemplated proxy fight. This "optionality for activism" is merely a complicated and deliberately unclear description of

23

a proxy fight. Indeed, Mr. Hohn testified that "a proxy fight…is really the only tangible form of activism permissible in [CSX]". (Tr. 182:6-17.)

74.1    As a result of TCI's and 3G's secret discussions with other hedge funds, there was a fundamental shift in the shareholder base. From December 31, 2006 to December 19, 2007,(the date on which TCI's and 3G's total interest in CSX, including cash-settled swaps, was made public), holdings by hedge funds increased from approximately 11% to 35% and holdings by other institutions decreased from over 60% to approximately 39%. (PX 189 at CSX_00001588, CSX_00016085.)

## 4.    The Group Becomes "Activist" in March 2007

75.    On March 2, 2007, TCI made a filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR") and notified the Company that TCI planned to cross the $500 million acquisition threshold with respect to CSX shares. CSX disclosed that notice to the public on April 18, 2007. (Compl. ¶ 28; TCI Ans. ¶ 28; PX 55.) Under HSR, a filing is not required for purchases of physical securities representing no more than 10% of a company's voting securities if the purchases are made "solely for the purpose of investment". (15 U.S.C. § 18(c)(9) (2006).)

76.    Mr. Hohn testified that an HSR filing gave TCI the "optionality of potential activism in the future". (Hohn Dep. 35:5-20.)

77.    Mr. Behring spoke to TCI sometime in "the sequence of" TCI's HSR filing in March 2007. (Behring Dep. 205:14-206:6.) This occurred no later than the March 29, 2007, meetings between Mr. Behring and TCI; thus, before public knowledge, which came on April 17, 2007. (DX 114 at 39.) 3G knew that TCI would begin purchasing CSX shares at the end of the HSR 30-day waiting period in April.

78.    On March 29, 2007, Mr. Hohn and Mr. Amin met with Mr. Behring at 3G's offices in New York to discuss "the fundamental case for CSX". (Amin Dep. 141:17-142:16; Hohn Dep. 114:6-8; PX 66.) This meeting was on the same day that TCI met with CSX at the office of TCI's counsel, Proskauer Rose LLP, when Mr. Amin threatened that there would be "no limits" to what TCI would do. (See Munoz ¶ 12; PX 61; PX 62.) But, no one can remember what happened. Mr. Hohn testified, "I remember one meeting at [Behring's 3G] office where we met to go talk about the fundamental case for CSX and, in fact, also the industry." (Hohn Dep. 113:24-114:3.) Mr. Amin, who attended both the meeting at Proskauer's New York offices and 3G's New York offices on March 29, 2007, claimed not to recall what was discussed at the March 29, 2007,meeting at 3G. (Amin Dep. 141:17-142:16.) Again, he gave the meeting of "fundamentals" -- he testified that "the spring or summer of '07 is when we talked to [3G] about, again, the fundamentals of the railroads. And we would have discussed each one specifically and our views on each one of the major four, including CSX." (Amin Dep. 139:14-20, 143:9-22.) Indeed, at his deposition, Mr. Amin was shown a calendar entry for March 29, for "Alex" at "800 Third Avenue" and he professed ignorance again. (Amin Dep. 141:17-142:16.) Mr. Behring confirmed that "800 Third Avenue" is the

24

address of 3G's New York offices.  (Behring Dep. 10:10-14.)  At trial, Mr. Amin finally
conceded that he met with Mr. Behring at 3G's New York offices on March 29.  (Tr.
196:5-11.)

79.    In truth, TCI and 3G agreed at that meeting that 3G would purchase
additional physical shares of CSX common stock – something it had not done for over
one month.  (PX 206.)  The Group was secretly expanding its secret position.  The Group
also decided that it would begin switching some swaps to shares following termination of
the HSR 30-day waiting period in April.  (PX 206; Subrahmanyam Ex. E.)

80.    In the period from March 29, 2007, to April 17, 2007, 3G increased its
holdings in CSX by 11,145,801 shares (for a total of 19,407,894 shares or 4.44% of the
then-outstanding shares).  3G's purchases during this period were as follows
(Subrahmanyam Ex. C.2; wsj.com stock quotes):

| Transaction Date | 3G Share Purchases | Daily Volume | % of Total Daily Volume |
|---|---|---|---|
| 3/29/2007 | 600,114 | 9,985,500 | 6.08 |
| 3/30/2007 | 550,000 | 9,775,500 | 5.63 |
| 4/2/2007 | 5,456,387 | 6,087,300 | 89.64 |
| 4/4/2007 | 822,550 | 6,922,000 | 11.88 |
| 4/5/2007 | 610,000 | 11,345,700 | 5.38 |
| 4/6/2007 | 757,100 | N/A | N/A |
| 4/9/2007 | 613,000 | 12,433,900 | 4.93 |
| 4/10/2007 | 800,000 | 7,870,700 | 10.16 |
| 4/11/2007 | 835,000 | 9,079,900 | 9.20 |
| 4/12/2007 | 80,950 | 11,937,400 | 0.68 |
| 4/13/2007 | 14,200 | 10,980,100 | 0.13 |
| 4/17/2007 | 6,500 | 5,971,600 | 0.11 |

81.    Following the expiration of the 30-day HSR waiting period, TCI began to
convert a portion of its swaps into physical shares, while remaining at approximately the
same exposure level.  (PX 206.)



82.    At the end of this April 2007,buying spree, the TCI/3G Group held a total interest in the Company representing 85,567,792 shares or 19.57% of the outstanding shares of CSX. But TCI individually remained below the five percent threshold in physical shares, 3G remained below the five percent threshold in physical shares and kept quiet about this.



83.    Just as was the case with the initial 3G purchases, Mr. Hohn's coordination with Mr. Behring was against TCI's other investors' best interests, as it allowed 3G to "frontrun" TCI. (PFF ¶ 39.)

84.    Mr. Behring testified that 3G "learned of TCI's activities regarding CSX through publicly available materials". (DX 146 ¶ 48.) That testimony is false.

84.1    Mr. Hohn testified that he had spoken with Mr. Behring regarding CSX in January. (Tr. 161:3-161:13.)

84.2    TCI and 3G conspired together to form a group before February 9, 2007.

84.3    They conferred again on March 29, 2007. (Amin Dep. 141:17-142:16; Hohn Dep. 111:4-22; see also PX 66.)

84.4    Indeed, at the trial, Mr. Hohn conceded that he discussed TCI's interests in U.S. rails, and CSX and Union Pacific in particular, with Mr. Behring as early as January 2007. (Tr. 160:16-161:6.)

84.5    Mr. Behring knew about TCI's HSR filing before it was made public and had spoken to TCI sometime "in the sequence of" TCI's HSR filing in March 2007. (Behring Dep. 205:14-206:6.; see Addendum A.)

### 5.    The Group Takes a Co-ordinated Time-out in Late Summer/Early Fall 2007

85.    As discussed below, the TCI/3G Group continued with its activist agenda following the April purchasing surge. (PFF ¶ 146-57.) However, in the late summer/early fall of 2007, the TCI/3G Group ran into two problems, which affected their covert, co-ordinated effort to take control of CSX: (i) the downturn in the U.S. economy and (ii) the threat of re-regulation.

85.1    First, the U.S. economy became the subject of concern to both 3G (DX 146 at 22) and TCI. (DX 146 at 22; DX 145, ¶ 43.)

85.2    On August 17, 2007, Mr. Hohn called Mr. Ha of Evercore to tell CSX that it should accelerate its share buyback program to take advantage of the recent stock price decline. (PX 120.) The declining stock price continued to be a concern of Hohn's into September. (PX 121; PX 123; PX 125; PX 126.)

85.3    Both 3G and TCI considered selling their CSX shares, and 3G actually did sell shares. "In August and early September [3G] sold a large portion of [its] position in CSX." (Behring ¶ 22.) In fact, as illustrated below, 3G sold a net 8,315,171 shares of CSX common stock during the period from August 24 through September 14, 2007. (PX 121; PX 123; PX 125; PX 126.)



85.4    TCI also engaged in an internal discussion of selling:

85.4.1    On September 8, 2007, in an email titled "Csx", Mr. Hohn examined with his colleagues Mr. Degorce, Mr. Amin and Mr. Sunak "exiting [at the] end [of] 2008" and noted that he saw "no upside on a trading basis". He added that "[t]his stock is at best dead money for 2008 if not a lossmaker in the next year" and that he would be amenable to selling calls at $4 with a $50 strike price in January 2009. (PX 125.)

85.4.2    On September 11, 2007, Mr. Hohn told Mr. Amin:

85.4.3    "Having not done proper work on the volume in the past I do want to step up our work this time to see if there is another shoe to drop on the volumes as the U.S. economy weakens." (PX 126.)

85.4.4    That same day, Mr. Amin responded:

85.4.5    "Let's seriously discuss tomorrow. We are working on volumes but we are not going to be able to accurately forecast volumes. I think we need to sit down and seriously discuss whether we are comfortable holding something which we have high conviction in long-term but isn't forecastable short-term. If not we should exit the rails." (PX 126.)

On September 12, 2007, Mr. Hohn responded:

"I do think there are prices we should reduce csx. I am not a believer that there is no price where we should not sell."

"It is also not all or nothing we can have different position sizes at different prices."

"It is not just an issue of forecastability but quality of work we have been doing." (PX 126.)

That same day Mr. Amin responded:

"Chris I was pushing to [sell] [redacted]...and have also sold mittal, arcelor Brasil, and [redacted] and [redacted] all despite having fundamental upside. We also agreed on [redacted] being a trading sell. In hindsight of course I wished we had sold csx at 10 dollars ago, but I keep telling you that the value of our activism (at the time) made it unobvious for me." (PX 126.)

85.4.6    And Mr. Hohn's response:

85.4.7    "My point was only in reference to CSX. We are not understanding properly the stock movement … My point is every position you manage should have a sale price or a price we have less." (PX 126.)

85.5    Between August 23, 2007,and August 31, 2007, TCI reduced its swap (and total) position in CSX by 1,971,000 shares. (PX 206.)

85.6    TCI's ultimate inability to sell down its position further during this period is explained by its more recent market woes. For example:

85.6.1    On March 1, 2008, Mr. Hohn noted to his colleague Mr. Degorce that "[o]ur fund is likely to be down 15pc soon and we have no money to buy [redacted] since all sales will become distressed prices." In the same email chain on March 2, 2008, Mr. Hohn contemplated raising more capital but worried that it "may damage [TCI's] long term franchise." (PX 181.)

85.6.2    In a March 8, 2008 email exchange between Mr. Hohn and Mr. Degorce of TCI, Mr. Hohn noted "selling discipline has been poor not average. One area I did help on was reducing banks although we went and bought [redacted]. we have not appreciated the banking crisis meant banks were just bad to invest in because we kept too much exposure. losses on [redacted] this year are huge. I am annoyed at this because it was clear how risky banks were." (PX 182.)

85.6.3    Mr. Degorce also reminded Mr. Hohn of Hohn's own risky behavior: "The main issue for me remain that we do not have to be always fully invested . . . I do no[t] see how we can improve in mkt portfolio given your inability to hold short or protection when mkt goes up. You have to make up your mind either we have some protection and we always have it (even in good times) or we do not." (PX 182.)

85.7    In contrast, 3G appears to have significantly hedged its CSX position and could thus afford to sell down its position.  For example:

85.7.1    In its quarterly report dated May 2007, 3G noted that its exposure to CSX was significantly hedged with a net exposure to CSX of $255 million on $723 million worth of shares.  (PX 200 at 40.)  Subsequent quarters show similar hedging of exposure to CSX.  In 3G's July 2007 report for the first half of 2007, 3G indicates that the co-investment portion of its investment is CSX (16.7 million shares out of 19.4 million shares) had a net exposure of $225 million, while the shares were worth $755 million and its short position was $528 million.  (PX 202 at 46.)  In 3G's October 2007 report for the third quarter, 3G indicates that its net exposure to CSX is $144 million, while its shares are worth $573 million and its short position is $424 million.  (PX 132 at 35.)  In 3G's 2007 fourth quarter report, 3G indicates that its net exposure was $168 million, and it held 4.9% of the outstanding shares of CSX and its short position was $679 million.  (PX 204 at 38.)

85.7.2    3G has hedges not only directly against CSX, but also against customers of CSX, including home builders and suppliers and paper/forest products companies.  In an October 23-24 email exchange, Daniel Schwartz and Luis Moura of 3G discussed 3G's "custom" hedges against CSX, which include short positions on companies in the home builder/supplies/mortgages, paper/forest products, trucker, airline and other industrial sectors.  They contemplated taking profits in the home/mortgage sector.  (PX 143.)

85.7.3    3G also has hedges against the other U.S. Class I rails.  As of March 31, 2008, 3G had puts over 2,000,000 shares of Burlington Northern, 2,200,000 shares of Norfolk Southern and 1,440,000 shares of Union Pacific.  (3G Capital Partners Ltd., Quarterly Report (Form 13-F) (May 15, 2008).)

86.    Second, there was growing concern regarding the possibility of re-regulation of the rail industry:

86.1    On August 23, 2007, Mr. Hohn spoke with Mr. Goldman and Mr. Baggs of CSX.  On that call, Mr. Hohn expressed his concern about the regulatory environment and the threat that he perceived of re-regulation associated with a bill that was being considered by a Congressional committee.  Mr. Hohn told CSX to send a letter to the sponsor of the bill, Representative James Oberstar, threatening immediately to freeze capital spending if the bill were allowed to proceed.  Mr. Hohn also emailed CSX to express TCI's concern about the regulatory environment and, in one of those emails, Mr. Hohn urged CSX to respond to the bill "with a public specific threat to cut all growth capex".  (PX 121; Munoz ¶ 32; Baggs ¶ 24; Hohn ¶ 28.)

30

86.2     Because of the perceived threat of re-regulation, which could potentially impact the economics of an investment in CSX, Hohn indicated that "any possible debate on activism was premature and would have to wait until TCI could study and better understand the regulatory risk". (Hohn ¶ 28.)

87.     In September 2007, the Group decided to purchase more shares. (Tr. 126:3-11.) They agreed to purchase more shares.

87.1     In a September 20, 2007, email exchange between Snehal Amin of TCI and Peter Harkins of D.F. King, Mr. Amin noted that they "are likely to proceed with a proxy contest". (PX 128.)

87.2     In late September, the Group decides to go forward with the proxy fight and to increase their shares. (See PX 128; PX 134; PX 135; Tr. at 194:14-20; PX 206.)

87.3     Although 3G had been engaged in a massive sell down of its CSX position, on September 26, 3G began to repurchase shares of CSX and steadily continued building this position. (PX 206.)



88.     Moreover, as they started finding members for their slate, 3G bought more shares and increased its position to just under 5% of the outstanding shares. TCI's position remained flat during this period. (PX 206; Tr. at 108:13-19.)

89.     On October 8, 2007, TCI and 3G held coordinated meetings with two of their slate's nominees: Mr. Lamphere and Mr. O'Toole. (PX 192; PX 193.) These meetings triggered another series of purchases by 3G. From October 11, 2007 through October 15, 2007, 3G purchased an additional 951,000 shares of CSX. (PX 206.)

90.     3G then bought more shares as Mr. Lamphere joined the Group.  3G resumed building its position in CSX during the period from November 1, 2007 through November 8, 2007, this time with a series of swaps purchases representing a total of 1,580,000 shares and purchases of 421,300 physical shares.  (PX 206.)

90.1    On November 1, 2007, Mr. Lamphere met with Mr. Behring. (PX 194.)

90.2    On November 2, 2007, Mr. Lamphere met with Kirkland & Ellis LLP, 3G's attorneys.  (PX 145.)

90.3    On November 6, 2007, Mr. Lamphere made his first purchase of CSX common stock, which was "in connection with becoming a nominee".  (JX 12 at 24.)

90.4    On November 8, 2007, Mr. Lamphere again met with Mr. Behring. (PX 193.)

91.     These early November meetings and the purchase by Mr. Lamphere coincide with the last period of purchases by 3G.  This is illustrated in Addendum A hereto, which lists all of the known CSX stock and swap transactions by 3G from PX 206, with annotations regarding key events.  (See Addendum A.; PX 206.)

### 6.    In connection with the proxy fight, TCI moved its swaps to Deutsche Bank, the parent of Group member Austin Friars

92.     In preparation for its proxy fight with CSX, during the period between October 30, 2007 and November 29, 2007, TCI undertook a systematic transfer of its swaps representing 46.4 million shares of CSX into the hands of only two counterparties: Citigroup and Deutsche Bank.  (PX 206; Subrahmanyam ¶ 79.)

93.     TCI concentrated its swaps with Deutsche Bank and Citigroup in order to influence them to vote the CSX shares held by them in favor of TCI.  (Subrahmanyam Rebuttal ¶¶ 45, 47.)

94.     Deutsche Bank is a prime broker for TCI -- a lucrative relationship that led it to provide free services to TCI.  (Subrahmanyam ¶¶ 161-65; Amin Dep 61:22-25, 101:7-16; PX 65; PX 100.)  While Citigroup is not a prime broker for TCI, it was likely vying for such a relationship and competing for new business.  (Subrahmanyam Rebuttal ¶¶ 43.)

95.     Moreover, Deutsche Bank owns Austin Friars, the hedge fund that is part of the TCI/3G Group.  (See Amin Dep. 104:2-25; 11-20.)

96.     Mr. Amin admitted that TCI planned to use its connection to Austin Friars, which held approximately 1 percent of CSX's outstanding shares, as part of a plan to influence control over Deutsche Bank's voting without an explicit agreement.  (Amin Dep. 104:16-106:5-17.)

32

97.     Mr. Hohn also admitted that TCI sought to use Austin Friars to influence the voting of Deutsche Bank shares held as a hedge to its CSX swaps with TCI.  (Hohn Dep. 154:4-155:4.)

98.     Deutsche Bank is known for cooperating with hedge funds seeking to use swaps to influence and control the companies in which the swaps give the funds exposure.  (PFF ¶ 10.)

###     7.     TCI Concentrated Its Swap Positions at Two Counterparties while Keeping Nominal Positions at Six Others to Mislead the Investing Public

99.     Although TCI's swap position was concentrated at only two swap counterparties, Deutsche Bank and Citigroup, TCI kept swaps referencing 1,000 shares at each of the remaining five counterparties and added a sixth, for a total of eight.  (PX 206; JX 19 at 18.)

100.     By reporting only an aggregate total swap position across its eight counterparties, TCI made it impossible for the investing public to know where its swaps and the shares of CSX common stock referenced therein were held.  When questioned about keeping the six nominal counterparties, Mr. Amin testified that "we didn't want people to be able to identify who our large counterparties were" because if they were identified, that would make TCI more susceptible to front-running by other hedge funds or other investors.  (Tr. 204:21-206:5.)

### B.     TCI and 3G Coordinated Their Analyses

101.     Contrary to the assertions in TCI's and 3G's definitive additional proxy solicitation materials that TCI has spent "years, literally," studying CSX and the industry (JX 20 at 15), both TCI and 3G began analyzing investments in the U.S. railroad industry in late 2006 and early 2007.  (Amin Dep. 3:9-4:2; Schwartz Dep. 35:16-19.)

102.     TCI and 3G were in constant contact as they coordinated their investment efforts with respect to CSX:  TCI and 3G communicated and exchanged opinions and analyses concerning CSX throughout 2007.  For example:

102.1    TCI's and 3G's principals, Mr. Hohn and Mr. Behring, met and spoke multiple times throughout 2007 "about different things regarding the investment environment, regarding the rail industry, certainly about -- certainly regarding CSX later on in the year".  (Hohn Dep. 111:12-25, 112:2-6; Behring Dep. 110:17-111:4,161:15-23.)

102.2    Mr. Behring spoke to Mr. Hohn "on and off in the course of '07".  (Behring Dep. 110:17-111:4.)  Behring testified that "over time, [he had] spoken to the people at TCI, including Chris [Hohn] and Snehal [Amin], about different things, including things other than CSX".  (Behring Dep. 150:2-5.)  Mr. Behring attended "TCI's [investor] conferences" in connection with Synergy's investment in TCI.  (Behring Dep. 109:3-24; Tr. 108:25-109:7.)  Synergy (and thus 3G) also

"receives quarterly letters" from TCI discussing "the performance of the [TCI] Funds", and TCI's investments. (Behring Dep. 21:25-22:23.) Mr. Behring "remember[s] references to CSX being made in the last letter" from TCI. (Behring Dep. 23:18-24:2, 24:12-17.)

102.3    Other executives at TCI and 3G also met and corresponded throughout 2007. (See, e.g., Moura Dep. 117:19-118:16, 122:17-123:18, 124:5-10, 141:14-143:8; see also Schwartz Dep. 162:19-163:11.) Mr. Moura met Snehal Amin "[i]n person" at either a TCI "Investor Day or in . . . [a] meeting[]" 3G had at TCI's offices "[p]robably [in the] first half" of 2007. He also saw Amin at several sell-side conferences. (Moura Dep. 117:19-118:16, 122:17-123:21, 124:5-10.)

102.4    At the "end of the first quarter" of 2007, Mr. Moura attended a meeting with TCI at TCI's offices. (Moura Dep. 125:3-13.) Mr. Moura met Mr. Hohn once in 2006, at the 2007 TCI Investor Day, and again in late 2007. (Moura Dep. 138:2-12.) Mr. Hohn "came to [3G's] offices" in New York, possibly in the first half of 2007. (Moura Dep. 209:1-210:2.) Mr. Moura met Rishi Sunak ("Mr. Sunak"), a TCI partner, in the first half of 2007 at one of the "sell-side conferences", and saw him again at the TCI Investor Day and other sell-side conferences. (Moura Dep. 139:12-23, 140:6-20.)

102.5    Mr. Schwartz testified that he first met Mr. Amin in approximately March or April 2007 on "a trip that [he] took to Washington, D.C. with an analyst from JP Morgan and several other — and several other investors to learn more about the rail regulatory environment." (Schwartz Dep. 162:19-163:11.)

102.6    As mentioned above, there was a meeting on March 29, 2007 between TCI and 3G's offices to "discuss the fundamental case for CSX". (Amin Dep. 139:11-20, 141:17-142:16, 143:9-22; Hohn Dep. 111:4-22, 113:20-114:3; Tr. 196:5-11; PX 66.)

103.    These discussions included their opinions of the management team and governance of CSX. (Behring Dep. 161:15-23.)

104.    TCI and 3G exchanged financial models and operations analyses of CSX. (Behring Dep. 156:4-158:2.) Thus:

104.1    3G provided its models of CSX to TCI and requested TCI's input on those models. (Behring Dep. 141:2-13, 142:6-11; 147:13-16, PX 199.)

104.2    TCI provided its models and analyses of CSX to 3G. (Behring Dep. 143:21-144:9-11, 156:4-158:2; Moura Dep. 147:8-148:3.)

104.3    TCI shared a CSX pricing survey, prepared by advisors Bain Capital, with 3G. (Moura Dep. 147:15-19.)

105.    During the spring of 2007, TCI was actively discussing pricing, capex and relevering changes with CSX management and had prepared a model and commissioned a report from Bain completed in March 2007 reflecting the same. (PX 52; PX 59.) Thus:

105.1    3G's report to the 3G Board of Directors on CSX for the same time period also focused on pricing power, capex and relevering. (See PX 200 at 3GC00014093-94; see also Schwartz Dep. 100:9-11, 100:16-19, 123:3-13; Moura Dep. 74:4-22.)

105.2    Both TCI and 3G created parallel models with activist scenarios for CSX. (See PX 73; PX 199.)

105.3    Both models featured two primary strategic alternatives for CSX: (1) a leveraged buyout of the company at a 7x multiple; and (2) leveraging the company via share buybacks of approximately 20 percent. (PX 199 at 46, 50; PX 71.)

105.4    Both the 3G March 2007 Investment Discussion report and the TCI-commissioned report from Bain feature similar criticisms of CSX operations. (PX 199; PX 71.)

105.5    Both reports are premised on the notion that CSX is undervalued because certain operational modifications and increased pricing are easily achievable goals. (PX 199; PX 71.)

## C.    **TCI and 3G Coordinated their Control Plans**

### 1.    **TCI and 3G Coordinated their Actions**

106.    3G's plans and actions in respect of CSX complemented TCI's during the same time periods, showing that these plans and actions were co-developed and efforts were co-ordinated. Thus:

106.1    As early as August 2, 2007, TCI's attorneys were in the process of preparing a draft Schedule 13D in connection with the proxy contest even though at all times TCI claimed to have beneficial ownership of fewer than 5% of CSX's outstanding shares of common stock. (PX 116.)

106.2    3G had decided to "attempt . . . to get elected to the [CSX] board" in approximately the fall of 2007. (Behring Dep. 128:2-25.)

106.3    Mr. Behring testified that by at least "October 5th, 3G was . . . exploring potential people that would make sense in that process" of altering the board composition. (Behring Dep. 178:2-23.)

106.4    "[A]round the same time," 3G approached "at least one, if not two" additional potential director nominees. (Behring Dep. 218:3-16.)

106.5   Mr. Behring asked Mr. Schwartz to "help him look for potential candidates."   Yet Mr. Schwartz did not engage any consultants.  Mr. Lamphere was the first one he found based just on reviewing annual reports.  Mr. Schwartz also did not look for any other candidates.  (Schwartz Dep. 134:8-136:12, 137:19-20, 137:25-138:2.)

106.6   TCI had been contemplating a control slate, yet only asked its director search firm to find one candidate.  (PX 137 at TCI0512739.)

106.7   TCI and 3G both met with their first identified nominees on the same day:

106.7.1     Mr. Amin of TCI met with Mr. O'Toole, who ultimately became a nominee on TCI's slate, on October 8, 2007.  (Amin Dep. 154:22-155:2; see also PX 192.)

106.7.2     Mr. Behring and Mr. Schwartz of 3G met Mr. Lamphere, who ultimately became a nominee on 3G's slate, also on October 8, 2007.  (PX 193; see also Schwartz Dep. 135:20-136:12.)

106.8   Mr. Lamphere, a 3G nominee, and Mr. O'Toole, a TCI nominee, each purchased shares of CSX common stock "in connection with becoming a nominee".  (JX 15 at 8.)

106.9   The nomination agreements entered into between Mr. Lamphere and 3G, on the one hand, and Mr. O'Toole and TCI, on the other, are largely identical and use the same template.  In addition, each of the agreements was signed on December 10, two days in advance of the execution of the agreement that TCI and 3G claims made them a "group".  (JX 19; PX 168.)

107.   The "Project Improve" operating plan for CSX, which everyone is claiming not to remember, shows further evidence of co-operation and group formation.  (PX 142.)

107.1   The plan includes references to:

107.1.1     an "investor group [that] has substantial rail sector expertise and experience"  (PX 142 at LAM0000004.); and

107.1.2     a "[g]roup [that] has developed a detailed operating plan showing substantial improvement opportunities".  The operating plan was sent to Mr. Amin of TCI by Mr. Schwartz of 3G on December 20, 2007.  (PX 152.)

107.2   Mr. Behring claimed not to know what the "credible team" was that that had been assembled by "the group", as described in the document.  (Behring Dep. 184:23-186:24.)

36

107.3  Mr. Lamphere testified that he talked with Mr. Behring about a "group", which included Mr. Behring and "his brothers". (Lamphere Dep. 9:14-25.) Mr. Behring does not have any siblings. (Behring Dep. 31:22-25.)

108.  Despite the multiple copies of the plan produced in discovery (PX 142; PX 152), no one recalls the genesis of the document.

108.1  Despite the fact that the document is written on Mr. Lamphere's letterhead, Mr. Lamphere said Mr. Schwartz created it (Lamphere Dep. 49:15-50:22), and Mr. Schwartz says he does not know who created it, but that Mr. Lamphere sent it to him. (Schwartz Dep. 145:7-147:18.)

108.2  Mr. Schwartz testified that he "may have" seen drafts of the template document, but that he does not recognize the name "Project Improve". (Schwartz Dep. 146:24-147:6, 147:19-22.) He did not "recall" seeing any version prior to November 5, 2007. (Schwartz Dep. 148:4-11.)

108.3  Mr. Schwartz testified that in "October or November 2007," Mr. Lamphere sent him a mathematical analysis of CSX, which Mr. Schwartz described as "a template of steps that would be — illustrative template of various steps and analyses." (Schwartz Dep. 143:14-144:9.) Mr. Schwartz identified PX 142 as this mathematical "template". (Schwartz Dep. 144:19-145:23, 146:4-24.)

108.4  Mr. Schwartz further stated that Mr. Lamphere "asked me to fill in some of the numbers on this template that he had", but that Schwartz only "filled in some numbers, not all numbers". (Schwartz Dep. 144:10-18, 146:14-22.)

108.5  Mr. Schwartz did not recall sending this document to TCI, even though there is a document indicating he "faxed this to Mr. Amin at TCI" on December 20, 2007. (PX 152; Schwartz Dep. 154:12-14, 155:8-12.)

108.6  Mr. Behring has also disavowed the document, noting that he thinks it was developed by Mr. Lamphere and that Mr. Schwartz may have helped him with the numbers, but that he "never spent [any] time with the document [himself]". (Tr, 149:7-15.)

## 2.    Defendants' Assertions Regarding Group Formation are Incredible

109.  Mr. Hohn testified that until he signed the group agreement with 3G on December 12, 2007, TCI and 3G were "never in a group". (Tr. 183:25-184:4.) He also testified that he started every Group meeting before December with a statement that there was no group:

109.1  Mr. Hohn testified that Mr. Behring asked him multiple times in 2007 whether he wanted to form a group to coordinate activities or engage in a proxy fight against CSX, but that he told Mr. Behring "no". (Hohn Dep. 116:5-117:23, 118:18-119:9.)

109.2  As Mr. Hohn remembers events, 3G "had asked me at points during the year whether I wanted to be involved with them in a group, and I consistently said, no, I'm not interested in forming any group. So from—I only decided I was interesting in forming—exploring forming a group in a serious manner in late November 2007." (Hohn Dep. 116:5-15.)

109.3  The purpose of the group that Mr. Behring proposed was to be activists and run for the board of CSX: "A.  He asked me do I want to have a group to be an activist on the company, and my answer has always been no. . . . Q.  And to be an activist to achieve what goal?  A.  Well, the only real substance of an activist would be to run for a board because there's no—nothing else is really relevant." (Hohn Dep. 118:18-119:9; Tr. 182:6-17.)

109.4  Mr. Hohn appears to believe that telling Behring he did not want to form a group would prevent group formation: "The concept was, 'Do you want to be a group,' and my response is, was 'Definitively no, I don't want to have any agreement and no understanding'. . . Because I was very aware of the group laws that say no agreements, no understandings, no—no whatsoever." (Hohn Dep. 117:16-118:3; Tr. 183:25-184:4.)

110.    3G has three different versions of the "group" discussions.

*Take One—no "formal" group:*

110.1  Mr. Behring admitted that 3G began debating whether to form a group with TCI in the summer of 2007: "internally, we debated it some in the summer, some in the fall.  I don't think we ever started a formal conversation with TCI until—until November, or so, but that's my recollection". (Behring Dep. 114:9-17.)

110.2  Mr. Behring admitted that 3G "may have asked [TCI] more than once" about forming a group, but did not think 3G "started exploring it seriously with any amount of focus or anything before November." (Behring Dep. 132:8-133:4.)  At trial, Mr. Behring denied having any group discussions, including discussions to form a group to run a proxy contest, prior to November.  (Tr. 134:22-139:8.)

110.3  Mr. Behring later distinguished between "formally" inviting TCI to form a group and just "ventilat[ing] potential courses of action" that TCI and 3G might take with respect to CSX: "I don't remember asking Chris during the year several times about that.  I may have ventilated potential courses of action that we could take or not or expressed doubts that we had, but I don't remember asking or inviting him to form—formally in the sense that Peter [Behring's counsel at the deposition] alluded to—a group with us in the course of the year.  (Behring Dep. 133:5-18.)

110.4  3G and TCI had "several" conversations throughout 2007, including a November 2007 discussion regarding "the details of [the] potential

38

group ... could [they] form a group and how and when and so on." (Behring Dep. 160:14-25.) At trial, Mr. Behring testified that the group discussions started in November 2007. (Tr. 118:9-11.)

110.5   However, Mr. Behring recalled "asking [Hohn] a little bit what his experience being an activist had been around the world" prior to the November group discussion. (Behring Dep. 161:24-162:16.) At trial, Mr. Behring testified that in these discussions, Mr. Hohn indicated that he did not want to form a group. (Tr. 120:22-121:6.)

*Take Two—TCI and 3G activities just a coincidence:*

110.6   When asked "[w]ho communicated the idea of forming a group with TCI", Mr. Moura replied that it was "Alex Behring." (Moura Dep. 133:24-134:3.)

110.7   One of the things that led to 3G's decision to form a group with TCI was the opportunity for "increasing the economic interest in the company" and thus "[t]rying to elect board members." (Moura Dep. 131:18-132:15.)

110.8   Mr. Moura testified that 3G began to discuss offering Mr. Behring as a nominee to the CSX board in "[l]ate 2007". (Moura Dep. 135:21-24.) Mr. Behring decided that 3G would nominate Mr. Behring as a director. (Schwartz Dep. 132:4-133:11.)

110.9   Mr. Moura stated that 3G "discussed" internally ways to help CSX improve operations before filing under HSR. (Moura Dep. 135:14-17.)

110.10 Mr. Moura stated that he learned that TCI had selected potential CSX board nominees "[r]ight when we formed the group," which he identified was "[a]round Thanksgiving" of 2007. (Moura Dep. 137:11-20.)

110.11 When asked if he heard that Mr. Hohn rejected Mr. Behring's requests to form a group before the group was formed, Mr. Moura testified that he "ha[d] not heard that." (Moura Dep. 134:15-19.)

110.12 Mr. Moura also testified that he "ha[d] not heard" that Mr. Hohn rejected Mr. Behring's suggestion that TCI and 3G coordinate their efforts regarding CSX. (Moura Dep. 134:20-24.)

*Take Three—"I don't remember":*

110.13 When asked if he had heard that Mr. Hohn had refused any request by Mr. Behring to form a group in 2007, Schwartz responded, "I - I don't recall hearing that, no." (Schwartz Dep. 165:18-166:3, 166:19-167:7.)

## IV.   THE GROUP SEEKS CONTROL AND INFLUENCE BY STEALTH

111.    TCI and 3G purchased their holdings in CSX with one goal in mind: to seize control of the Company without paying a premium to bring about an LBO or other liquidity event and to do it by using swaps to keep their plans secret from the public.

## A.    TCI Tries to Force an LBO and a "Junk Recapitalization" on CSX

112.    Starting in October 2006, TCI expressed its interest in investing in CSX and had numerous calls and other communications, including in-person meetings, with CSX and its advisors about investing in the Company. (TCI Ans. ¶ 24; Baggs ¶¶ 2-5, 7-8, 14; Munoz ¶¶ 2-7, 9-12; PX 133; PX 136.)

113.    In December 2006, TCI determined that "[t]he rails are takeout candidates", saw "100 pc upside in [CSX]" (PX 24; PX 26) and believed that "CSX has a high probability of being a home run." (PX 23.) TCI viewed CN as the most likely LBO candidate, "followed by the two east coast rails. [W]e strongly prefer [CSX], followed by [NSC] and then BN." (PX 21.) TCI even developed a financial model for an LBO of CSX with a leverage multiple of 6.0x EBITDA with a "premium to reflect a . . . reasonable take out!" (PX 20.)

114.    In December 2006, TCI instructed lawyers from Proskauer Rose LLP to report to TCI on CSX's takeover defenses. (PX 31.) TCI sought the report on CSX's takeover defenses "to assess . . . whether it could be subject to a hostile takeover". (Amin Dep. 125:23-126:4.)

115.    In December 2006, January 2007, and Feburary 2007, TCI representatives several times requested to meet privately with CSX's Chairman and CEO and other members of CSX's senior management team to discuss TCI's views about a potential LBO involving CSX with the current management team in place. (Compl. ¶ 25; TCI Ans. ¶ 25; Hohn ¶¶ 15, 18; Amin ¶¶ 23, 29; Baggs ¶¶ 8, 10; Munoz ¶¶ 6, 9, 11, 18.) CSX management suggested that TCI instead contact CSX's advisors at Morgan Stanley to present their views. TCI contacted Morgan Stanley and told Morgan Stanley that they believed they were "onto something very compelling, and that engaging on it early is in the best interests of all parties involved," that there was a big LBO opportunity with respect to CSX, and that they "could see a transaction for CSX above $50 / share based upon their numbers and [Mr. Amin's] personal background in private equity". (PX 33; PX 34; Baggs ¶¶ 8-9.)

116.    At the time that TCI made this proposal to CSX, it represented that it owned between 10 and 14% of the outstanding shares of CSX common stock. (Fitzsimmons ¶ 14; see also Baggs ¶ 12.)

117.    On January 22, 2007, TCI met with Morgan Stanley to pitch the LBO of CSX with the current management team in place at a 6.0x debt to EBITDA ratio. At that meeting, TCI submitted to Morgan Stanley a presentation in which TCI recommended that CSX be taken private. In the presentation, TCI wrote that "[i]t is not clear that public markets will ever re-rate rails", that it believed that "a major rail will get a private equity bid"; that "CSX is at the top of people's lists"; that "[i]t is important to seize this

40

opportunity, act now and be the first"; that the "'perfect storm' of conditions makes a private equity bid nearly inevitable"; that "CSX is logically the prime candidate"; and that CSX could be taken private for $50 per share. (PX 37; Munoz ¶ 8.) At that time, TCI liked CSX management just fine: in the presentation TCI indicated that an LBO would be an "[o]pportunity for top management to become more significant owners of the business"; that "[a]cting early will allow management to choose who it is accountable to"; that the reality of the perceived risk that "[m]anagement teams [are] often fired" is that it "[v]ery rarely happens, especially in [an] operations intensive company"; and that management compensation would typically include an "[o]ptions package with target value of $300m-$400m at exit for a deal of this size". (PX 37 at 3-7.) TCI also requested a "meeting with the CEO & CFO to hear their view on this matter" and stated that "[g]iven our experience and contacts in private equity, we believe we can genuinely add value here. We aim to be constructive". (PX 37 at 8 (emphasis in the original).)

118.    Morgan Stanley had follow up discussions with TCI, and TCI indicated that it was a "bit frustrated" with CSX's response and that it had had discussions in respect of CSX with various LBO firms. (PX 39; PX 43 at 12-13.)

119.    On February 7, 2007, months before 3G ever met with CSX management and even before 3G bought any shares of CSX, 3G reviewed the deadline for shareholder proposals at the CSX 2007 annual meeting of shareholders, noting that "we're past the deadline". 3G also noted that the whole board is up for re-election each year and examined the election process for directors. (PX 41.)

120.    On February 15, 2007, at the BB&T Transportation Conference, Mr. Amin asked Mr. Baggs and Mr. Munoz of CSX how CSX intended to accomplish CSX's increased share repurchase program that had been recently announced. TCI urged CSX to do a Dutch auction. After Mr. Baggs told TCI that CSX could not have a conversation with a select investor about the specifics of CSX's share repurchase plans because it would run afoul of the SEC's Regulation FD, the TCI representative, attempting to influence CSX's conduct of the share repurchase, replied by saying "[We] own 14 percent of your company." (Munoz ¶ 10; Baggs ¶ 12.) At that conference, TCI representatives spoke to other investors or potential investors about a potential LBO of CSX. (PX 44 at TCI002438.)

121.    By February 19, 2007, Mr. Hohn noted that "[i]t will not be easy to put one of [the rail companies] in play. Feasible but not simple." (PX 44 at TCI0024377.)

122.    On February 24, 2007, as part of TCI's plan to influence CSX to buy "back tons of stock", Mr. Hohn contemplated putting in "a bid on [CSX] at 45" and had contacted a "manager that might be interested in an [LBO] of one of the rails or being chairman to increase leverage". TCI considered making a "proposal for him to become a chairman of [CSX] with a mandate to increase leverage, cut costs, [and] sell non core assets". TCI thought that CSX "would likely reject [the proposal] but [would] know that by the next [annual meeting] they had better have bought back tons of stock or the hammer will be on them". Mr. Hohn noted that he thought CSX "could buy back half of its shares in the stock market" and debated taking an activist stance then to "lead an

41

aggressive campaign for [CSX] to step up releveraging, sell real estate, cut costs more aggressively." Mr. Hohn also indicated that he was "pretty sure that [they] should file hart scott next week to give [TCI] options." (PX 47 at TCI0350650.)

123.    On February 27, 2007, Mr. Amin made some remarks on the record date. (Subrahmanyam ¶ 167.)

124.    "just talking about [CSX's] announced buyback [program with the Company's CFO] doesn't get us anywhere near what we want". (PX 50.)

125.    On March 2, 2007, TCI made a filing under HSR to cross the $500 million acquisition threshold with respect to shares of CSX common stock and informed CSX of the filing. (PX 55.) Mr. Hohn later explained the reason that TCI made the HSR filing in an email. He wrote: "We have filed Hart Scott Rodino in CSX meaning that we intend to try to influence management in how the company is run." (PX 87.)

126.    In a March 4-5, 2007 email exchange, Mr. Amin recommended that TCI try to hire the law firm Skadden Arps if they "decide to bid" for CSX, "depending on how [TCI's] mtg with [Deutsche Bank] goes". (PX 56.)

127.    In March 2007, Austin Friars -- a Deutsche Bank proprietary fund -- set up a call with former Secretary of the Treasury and former CSX Chairman and CEO, John Snow, and invited TCI to listen in on the call, which they did. Prior to the call, Mr. Curtis and Mr. Crawford-Brunt of Austin Friars sent TCI proposed questions to ask of former Secretary Snow. One question of interest to both TCI and Austin Friars was whether companies in the railroad industry could "lend themselves to being ru[n] by private equity". (PX 57; Sunak Dep. 57:18-58:5.)

128.    In March 2007, TCI sent a model it had prepared in respect of CSX to Deutsche Bank. (PX 64.) TCI also sent its CSX model to CSX's financial advisors, Evercore Partners ("Evercore"), in April 2007. (PX 71.) The model includes an LBO analysis at a debt to EBITDA ratio of 7.0x and a leverage recapitalization model with share repurchases at a debt to EBITDA ratio of 5.0x.

129.    TCI commissioned a March 21, 2007 presentation from Deutsche Bank regarding an LBO of CSX at a debt to EBITDA ratio of 7.0x. (PX 65 at 1-2.) In the presentation, Deutsche Bank stated that they "believe that there are several significant factors which make CSX a terrific LBO candidate". (PX 65 at 2.) The presentation also discussed real estate financing.

130.    3G gave TCI a 92-page report entitled, "US Railroads Investment Discussion", dated March 2007, which presents a detailed study of CSX financials and operations. (Behring Dep. 146:14-147:16; PX 199.) In that report, 3G analyzed a possible LBO of CSX at a debt to EBITDA ratio of 7.0x and increased leveraging of CSX's balance sheet through share buybacks at a debt to EBITDA ratio of 3.0x, as well as a standalone analysis of CSX's real estate assets. (Behring Dep. 146:14-147:2, 189:2-23; PX 199 at 46, 48, 50.)

131. On March 29, 2007, Mr. Munoz and Ellen Fitzsimmons of CSX and Alan Stephenson of Cravath, Swaine & Moore LLP, outside counsel to CSX, met with Mr. Amin and Mr. Sunak of TCI and Arnold Jacobs of Proskauer Rose LLP, outside counsel to TCI. At that meeting, Mr. Amin told CSX that TCI no longer thought that pursuing an LBO was the best course for CSX, but that CSX should increase its leverage and repurchase 20 percent of its stock during 2007. Mr. Amin said that he wanted CSX to publicly announce the share repurchase in its first quarter earnings release on April 18. He also said that TCI had the economic equivalent of ownership of between 10 and 14% of CSX's shares outstanding, that TCI could convert the swaps to shares, and that TCI would be taking voting positions with respect to CSX shares. (Fitzsimmons ¶¶ 11-14.) When Mr. Munoz asked what would happen if CSX did not do as TCI wished, Mr. Amin responded that there would be "no limits" to what TCI would do. (Munoz ¶ 12; Fitzsimmons ¶ 12; Amin Dep. 192:16-24.) Mr. Munoz reported TCI's statements at a meeting of the Board on April 3, 2007 and the Board discussed the likely nature of TCI's interest, given the absence of Williams Act filings. (PX 4; Munoz ¶¶ 13-14.)

132. On April 3, 2007, at the same time it was doubling its shareholdings, 3G began to investigate the consequences of CSX being taken private or recapitalized. In an e-mail on that date, Mr. Behring told Mr. Schwartz, "[please] make sure cds [credit default swaps] on csx we have applies to a situation where the company is taken private or recapped by means of issuing new more expensive debt to retire existing one." (PX 68.)

133. On April 5, 2007, Mr. Amin sent Gil Ha of Evercore TCI's model for CSX. (PFF ¶ 128.) In the cover email, Mr. Amin noted that the LBO could be done at a 7x debt to EBITDA ratio at a $55 per share price and had conviction that in a competitive process the range could be between $55-60 per share. (PX 71.)

134. On April 7, 2007, on a telephone call with CSX's financial advisor, Evercore, which Evercore reported to CSX management and later, to the CSX Board, TCI reiterated that it wanted "a 20% share buyback in the coming year (5% per quarter or 10% in next 6 months followed by another 10% in following 6 months)" with a reassessment thereafter. TCI also indicated that it had plans to convert indirect holdings of CSX to direct holdings and that it was doing so presently. (PX 74 at EVR02555; PX 6 at CSX_00045785; Munoz ¶ 16.) Indeed, in early April 2007, TCI began terminating some of its swaps and purchasing physical CSX shares. By April 18, 2007, TCI directly owned 17,554,198 shares or approximately 4.02% of CSX's shares outstanding. (Subrahmanyam ¶ 29; PX 196; PX 197; JX 19 at 26.)

135. On April 12, 2007, TCI sent to Evercore TCI's analysis advocating that CSX repurchase 20% of its shares in each of 2007 and 2008, and another 10% in each of 2009 and 2010. (PX 77.)

136. In its quarterly board presentation dated May 2007, 3G indicated that CSX "can be relevered to at least 3x Net Debt/Ebitda", referring to this scenario as the "Activist Case". (PX 200 at 42-43.) Similar statements regarding leverage are included in the reports for subsequent quarters. (PX 204; PX 132; PX 202; Tr. 146:21-147:1.)

137.    On May 15, 2007, Deutsche Bank sent materials to Mr. Amin (at Mr. Amin's request) regarding a potential leveraged recapitalization of CSX at a 5.0x debt to EBITDA level bringing CSX's credit rating to BB-, i.e., junk status. (PX 100 at TCI0437446.)

138.    On June 4, 2007, TCI's Mr. Amin again urged CSX to increase its indebtedness level to 5.0x EBITDA and asked for CSX's rationale for maintaining its investment grade credit ratings. (PX 102; PX 103; Baggs ¶ 20.)

### B.    The Group Takes Up "Activism", i.e., a Proxy Fight

139.    TCI filed under HSR on March 2, 2007 for "optionality" on activism. (Hohn Dep 35:5-20; PX 55.) This meant that TCI was free to buy shares on April 2, 2007, following the expiration of the 30-day waiting period.

140.    On March 29, 2007, Mr. Munoz and Ellen Fitzsimmons of CSX and Alan Stephenson of Cravath, Swaine & Moore LLP, outside counsel to CSX, met with Mr. Amin and Mr. Sunak of TCI and Arnold Jacobs of Proskauer Rose LLP, outside counsel to TCI. At that meeting, Mr. Amin told CSX that TCI no longer thought that pursuing an LBO was the best course for CSX, but that CSX should increase its leverage and repurchase 20 percent of its stock during 2007. Mr. Amin said that he wanted CSX to publicly announce the share repurchase in its first quarter earnings release on April 18. He also said that TCI had the economic equivalent of ownership of between 10 and 14% of CSX's shares outstanding, that TCI could convert the swaps to shares, and that TCI would be taking voting positions with respect to CSX shares. (Fitzsimmons ¶ 14.) When Mr. Munoz asked what would happen if CSX did not do as TCI wished, Mr. Amin responded that there would be "no limits" to what TCI would do. (Munoz ¶ 12; Fitzsimmons ¶ 12; Amin Dep. 192:16-24.) Mr. Munoz reported TCI's statements at a meeting of the Board on April 3, 2007 and the Board discussed the likely nature of TCI's interest, given the absence of Williams Act filings. (PX 4; Munoz ¶¶ 13-14.)

141.    On April 3, 2007, 3G examined excerpts from CSX's 2007 proxy statement regarding the record date and the number of shares outstanding as of the record date for the 2007 annual meeting of CSX shareholders. (PX 69.)

142.    On April 9, 2007, TCI sought an introduction with Hunter Harrison, the chief executive officer of another Class I railroad, Canadian National, to "see if he would be interested in coming in as CEO of CSX". (PX 36; PX 75.)

143.    Mr. Behring testified that 3G started to consider taking an activist stance in CSX in the spring of 2007. (Behring Dep. 115:5-11.) Mr. Behring testified that he asked Mr. Hohn for his advice on activism: "I recall asking [Hohn] a little bit what his experience being an activist had been around the world. As you can tell from my testimony, it's the first time we were involved in a proxy fight that I recall anywhere, so I was curious to see what the experience had been to that effect." (Behring Dep. 161:24-162:9.)

44

144.    In an April 18, 2007 email exchange between Mr. Amin and Mr. Hohn, Mr. Hohn noted "[t]he management slide in the [Company's first quarter earnings] presentation putting the buybacks over two years was not a good sign" to which Mr. Amin replied "[w]e aren't going to get what we want passively". (PX 83 at TCI10254261.)

145.    On April 24, 2007, TCI wrote a draft of a letter to the Board, in which TCI indicated that its investment in CSX was $3 billion, asked "to engage in a dialogue with the Board immediately on changes to the Board and management", and stated that CSX could "achieve at least 6-7 percent pricing [increases] for at least 5 years", that "management and the Board seem completely unwilling to engage in a discussion with private equity firms", that TCI had "very high conviction that a private equity firm [could] bid $55+ per share for CSX", and that "this business could and should conduct a 20% annual buy-back program until leverage reaches 5x EBITDA". (PX 85 (emphasis in original).)

146.    Mr. Amin gave a presentation at the Bear Stearns Transportation Conference on May 8, 2007, in which he set forth TCI's proposals with respect to the industry and CSX in particular and at which attendance was standing-room-only, with people sitting and standing in the aisles and outside the doorways to the auditorium. In his talk, Mr. Amin proposed that CSX buy back 20 percent of its shares every year and increase prices charged to customers by 7 percent per year. He questioned why CSX considered safety a capital expenditure issue, saying "You don't need cap-ex to put up hand brakes in rail cars." He suggested that the major railroads in the U.S. could be taken private at a significant premium, that TCI had spoken to the private equity firms that would line up to bid on the railroads and that he had a 100-page indicative financing proposal from a bank that could underwrite the LBO debt. (PX 96; Baggs ¶¶ 17-18.)

147.    Mr. Schwartz, Mr. Behring, Mr. Moura and Denise Das of 3G attended Mr. Amin's speech at the May 8, 2007 Bear Stearns conference and Mr. Bahbout of 3G monitored the CSX stock price during the speech. (PX 94; PX 95.)

148.    In the week following Mr. Amin's presentation at the Bear Stearns conference, more than a dozen hedge funds, including TCI and 3G, called and emailed CSX to inquire concerning the results of a non-binding resolution that would allow shareholders to call a special meeting. (Baggs ¶ 19; see also PX 101; PX 207.)

149.    Several times during the first half of 2007, representatives of 3G requested a private meeting with CSX senior management. On June 13, 2007, Mr. Munoz and Mr. Baggs of CSX visited 3G's offices in New York, at 3G's request. They met with Mr. Behring, Mr. Moura and Mr. Schwartz. (Munoz ¶ 25.) During that visit, Mr. Munoz saw laying out in 3G's offices a presentation concerning CSX bearing TCI's logo on the cover. (Munoz ¶ 25.)

149.1    In the HSR letter of June 13 that they sent to CSX, 3G disclosed that it may acquire CSX shares in excess of $597.9 million and cross the 50 percent reporting threshold under HSR. (PX 105.)

149.2  Mr. Behring said that he was instructed by counsel to file. (PX 105; Baggs ¶ 21; Behring Dep. 128:21-25.)

149.2.1  On June 19, 2007, TCI hosted its annual investor conference. In the conference report, TCI indicated that returns at CSX of more than 20% per year were possible if costs were cut, operations improved and the Company engaged in active share repurchases. (PX 107 at 23.)

149.3  Mr. Moura testified that in "2007 and 2006", he attended TCI's Investor Day and met Mr. Hohn and Mr. Sunak. (Moura Dep. 38:25-39:6;132:3-13;140:6-20.) He remembered receiving "[a] presentation at TCI's 2007 Investor Day." (Moura Dep. 48:6-11.)

150.  On June 20, 2007, Mr. Amin and Mr. Sunak met with Mr. Ha, Eduardo Mestre, and Nancy Bryson of Evercore. During that meeting, TCI was adamant about their demands and agitated about the perceived lack of attention TCI was receiving from CSX management. TCI said that it "would like to meet with the Board of CSX to communicate TCI's views on the deficiencies of management and on the desirability of leveraging up the balance sheet"; that "management has done a poor job and the Board should entertain a change in the senior leadership of [CSX]"; that TCI "still own[ed] 4% in physical shares and over 10% in swaps"; that TCI "fully intend[ed] to 'go to war'"; that TCI "would seek to replace the entire Board as a means to change management"; and that TCI "will get support from the shareholders in making the changes at CSX". Evercore reported those statements to CSX. (PX 108; PX 109; Munoz ¶ 29.) On July 11, 2007, Evercore reported to the CSX Board about those recent conversations with TCI. (PX 10 at 7-8; Munoz ¶ 30.)

151.  Also on June 20, 2007, Mr. Behring, Mr. Moura and Mr. Schwartz of 3G met with CSX executives Mr. Ward, Mr. Munoz, Mr. Baggs and Mr. Goldman at CSX's headquarters in Jacksonville. During that meeting, Mr. Behring advocated that CSX pursue more aggressive share buybacks and several times mentioned the issue of leveraging up CSX. (Moura Dep. 173:8-174:4; Baggs ¶ 23.)

151.1  Mr. Ward also "asked [3G] point blank what was [3G's] intention with the HSR [filing]," to which 3G replied "[w]e wanted to keep all of our options open." (Moura Dep. 174:24-175:10.)

152.  On July 17, 2007, Mr. Ha and Mr. Mestre of Evercore had a call with Mr. Hohn. During that conversation, Mr. Ha and Mr. Mestre invited Mr. Hohn to submit his views to the Board in writing. Although he indicated that he would, he never did, issuing instead a public letter on October 16. Mr. Mestre sent emails to Mr. Munoz memorializing the call. (PX 111; PX 112.) In the emails, Mr. Mestre recited the following statements:

152.1  Mr. Hohn said that "TCI would, in due course, attempt to change the entire Board" and that TCI's objective was "to find management that would

46

be more open to leveraging [CSX] and that would pursue cost improvements more aggressively". (PX 111; Munoz ¶ 31.)

     152.2  Mr. Hohn also indicated that "the best way to create long term shareholder value is through a structured share buy back program and that he does not want the [C]ompany sold to [private equity] firms or others." (PX 111.)

     152.3  Mr. Hohn also noted the Company's 6,000 employees in Jacksonville and questioned whether the Company could be run with fewer employees. (PX 112.)

153.    On July 23, 2007, Mr. Amin asked Mr. Hatch, a consultant engaged by TCI, to inquire of Al Crown, former chief operating officer of CSX, how many people work at CSX headquarters and what are the management dynamics. (PX 115.)

154.    On July 25, 2007, Mr. Amin had a dinner meeting with Mr. Crown. (PX 115.) On August 13, 2007, Mr. Behring also met with Mr. Crown for dinner. (PX 193 at 3GC00013894.)

155.    On or about July 26, 2007, TCI engaged Schulte Roth & Zabel LLP to work with TCI on its activist agenda for CSX. (PX 114.)

156.    In an agenda for an August 2, 2007,meeting to discuss TCI's looming proxy contest against CSX, one of the "Next Steps" for Schulte Roth was to prepare a Schedule 13D filing and a subcategory of the Schedule 13D "Next Step" was to discuss "TCI 'satellites' and their status re: TCI's holdings." The agenda also included a discussion of a proxy contest for full and partial slates and a bid. (PX 116.)

     156.1  At the time, TCI's physical share position in CSX was under 5% of the total outstanding shares. (Subrahmanyam Ex. C.1.)

157.    On August 6 and 7, 2007, D.F. King & Co., Inc. ("D.F. King"), the proxy solicitation firm retained by TCI, provided to TCI memoranda setting forth their analyses of the likely outcomes of a campaign on the part of dissident shareholders to elect representatives to CSX's Board. The analyses contemplated both "control" and "short" slates. D.F. King determined that success was more likely with a "'short slate' of two director-nominees" because of "the unwillingness of shareholders to transfer control in the absence of a premium". D.F. King also noted that ISS, an influential proxy advisory firm, "is reluctant to endorse dissident control slates at companies with arguably successful records of share price 'performance'". (PX 117; PX 118.)

158.    Representatives of TCI and 3G attended the CSX investor and financial analyst conference on September 6, 2007. (PX 122; PX 193 at 3GC00013897.) After the conference, Mr. Schwartz reported on Mr. Hohn's conversation with Mr. Munoz: "Chris pushed Munoz to accelerate the buyback after the [CSX] presentation". (PX 122 at 3GC00006245.)

159.    While at the conference, both Mr. Moura and Mr. Schwartz spoke with Snehal Amin. (Moura Dep. 179:16-180:2; Schwartz Dep. 168:10-170:7.)

160.    Also on September 6, 2007, after the CSX investor and financial analyst conference, Mr. Hohn approached Mr. Mestre, Mr. Ha and Ms. Bryson of Evercore and Eli Gross of Morgan Stanley, which Evercore memorialized in a memo written for CSX on September 7, 2007. Mr. Hohn told Evercore and Morgan Stanley that: CSX's "balance sheet [could] be leveraged [up] further"; "[CSX]/industry should take a tougher stance with the government/regulators by threatening to reduce capex if the industry can not earn a reasonable return"; "[CSX] should stop its ad campaign"; the "board is weak" and has "no one with railroad experience/knowledge except management" and "does not challenge management"; "[s]hareholders would support adding 2 or 3 new board members with railroad background to upgrade the current board"; the "[b]uyback should be accelerated"; and that the "entire $3 billion [repurchase] program should be done this year". Mr. Hohn also said that TCI was "frustrated by the lack of interaction with management" and "their inability to talk directly with the board", and that management and the Board were rejecting the desire of the shareholders regarding shareholder ability to call special meetings. (PX 124.)

161.    On September 7, 2007, Mr. Amin asked Mr. Hatch to arrange another meeting with Mr. Crown, the former chief operating officer of CSX. (PX 190.)

162.    Following receipt of D.F. King's advice regarding running a minority slate in early August, TCI discontinued discussions with D.F. King for over a month. (PX 128).

163.    By September 18, 2007, however, TCI was ready to re-engage in the proxy contest under ISS's minority slate rules. On that day, Mr. Amin indicated to Ted Dysart of Heidrick & Struggles, a director search firm, that they "will need 1-2 members". (PX 137 at TCI051274.)

164.    In a September 19-20, 2007,email exchange between Mr. Amin and Peter Harkins of D.F. King, Mr. Amin noted that they "are likely to proceed with a proxy contest". (PX 128.)

165.    Nevertheless, Mr. Amin continued his attempts to explore ways to win even more control over the Company at the board level. On October 5, 2007, Mr. Amin asked Mr. Harkins, of D.F. King, the likely ISS reaction to a slate of exactly half of the board and stated that he was "skeptical about what a minority slate can accomplish". (PX 134.) In a follow-on email also dated October 5, 2007, Mr. Harkins advised Mr. Amin that they are "unanimous in believing that it would not work. ISS support for short-slates reflects its belief that minority (not 50/50) representation is good. ISS would view a 50/50 split (or even a 45/55 split) as not desirable and would either (a) reject your nominees, or (b) endorse only several of your nominees, effectively converting your slate into a "traditional" short-slate for any investors." Mr. Harkins added, "I can empathize with your concerns regarding the potential effectiveness of a short-slate. However, from experience, I can tell you that incumbent CEOs/directors actually fear short-slates and the

prospect of losing an election.  In fact, typically, the loss of confidence expressed by
shareholders in electing a short-slate dramatically alters long-standing board alliances and
creates opportunities for change that would not have occurred had the dissident been
defeated in the election."  Mr. Hohn's reaction to Mr. Harkins' advice was that "[ISS] did
not support some of the main [TCI] motions in [ABN] but we still got 70% of the vote".
(PX 135.)

166.    On October 6, 2007, Mr. Amin contacted Tim O'Toole for purposes of
inviting him to be on their slate of nominees for the CSX board and after meeting Mr.
O'Toole, put him in contact with the Schulte Roth firm.  Mr. Amin had met Mr. O'Toole
several months earlier through an introduction from Tony Hatch, TCI's consultant.
(PX 138; PX 139.)

167.    On October 8, 2007, Mr. Hohn met with Mr. O'Toole.  (PX 192; see also
PX 138.)  On the very same day, Mr. Behring met with Gil Lamphere.  (PX 193 at
3GC00013902.)

168.    On October 11, 2007, Mr. Behring attended the third quarter TCI investor
day conference call.  (PX 193 at 3GC00013902.)

169.    On October 12, 2007, Mr. Lamphere met Mr. Behring at 3G's offices.
(PX 194 at LAM0000236.)

170.    On October 16, 2007, TCI sent (and publicized) a letter to CSX's Board.
In that letter, TCI urged the Board to act immediately to:  "[s]eparate the Chairman and
CEO roles"; "[r]efresh the Board with new independent directors"; "[a]llow shareholders
to call special shareholder meetings"; "[a]lign management compensation with
shareholder interests"; "[p]rovide a plan to improve operations"; "[j]ustify the capital
spending plan"; and "[p]romote open and constructive relations with labor, shippers and
shareholders".  TCI further urged CSX's Board to "[e]ducate policymakers and regulators
on the true state of the industry" and to "[f]reeze growth investment until the fate of the
re-regulation bill is known".  (PX 140.)

171.    On October 17, 2007, Mr. Behring met with Mr. Amin of TCI.  (PX 193 at
3GC00013903.)

172.    TCI sent another public letter to CSX's Board on October 22, 2007,
criticizing the Board for allowing representatives of CSX to describe CSX as a "public
service company" in communications to policymakers in Washington, D.C. and also
criticizing a statement made by CSX's CEO that no industry, of which he was aware,
analyzed returns on investment capital on a replacement cost basis.  (JX 8 at 14; PX 141
at CSX_CORP00007206-07.)

173.    3G and/or Mr. Lamphere prepared an operating plan for CSX titled
"Project Improve", the first draft of which is also dated October 22, 2007, and is written
on Mr. Lamphere's letterhead.  (PX 142; Lamphere Dep. 49:15-50:22.)  The plan refers
to:

173.1   a "credible team, if current senior management is not supportive of overall plan" (PX 142 at 2);

173.2   a "significant reduction in employee base" of "32% of [the] current force" (PX 142 at 4, 7);

173.3   an "[i]nvestor group [that] has substantial rail sector expertise and experience" (PX 142 at LAM0000004.);

173.4   a "[g]roup [that] has developed a detailed operating plan showing substantial improvement opportunities". (PX 142 at 2.) The operating plan was sent to Mr. Amin of TCI by Mr. Schwartz of 3G on December 20, 2007. (PX 152.)

174.    On December 19, 2007, TCI and 3G filed a Schedule 13D in which they disclosed that they formed a group and intended to conduct a proxy solicitation seeking to elect five nominees to the Board of CSX. (JX 8.) TCI and 3G's Schedule 13D stated that TCI and 3G beneficially owned approximately 8.3% of the then-outstanding shares of CSX common stock, and derivative financial instruments known as swaps that reference shares of CSX common stock, as well as credit facility swaps referencing CSX's debt securities. (JX 8 at 16.)Together, TCI and 3G have equity swaps referencing 12.27% of the outstanding shares of CSX common stock (as of April 21, 2008, the record date for the 2008 CSX annual meeting of shareholders). (Subrahmanyam Report Exs. C.1, C.2; JX 19 at Annex A; PX 230-PX238.) The Schedule 13D disclaimed beneficial ownership of the CSX shares referenced in TCI and 3G's swap arrangements. (JX 8 at 17.)

175.    Also on December 19, 2007, Mr. Hohn called Mr. Ha of Evercore and told Mr. Ha that TCI "is highly confident that TCI/3G will win the proxy fight and is willing to do whatever it takes to win because they have a huge economic incentive to do so" and that he "is miffed that the board is still not willing to meet directly with TCI -- particularly now that they together with 3G own 20% of the company". Evercore reported those statements to CSX in an email. (PX 149.)

176.    On January 8, 2008, TCI submitted a Stockholder Notice of Intent to Nominate Persons for Election as Directors to CSX Corporation in which it indicated its intention to nominate Mr. Hohn, Mr. Behring, Mr. Lamphere, Mr. O'Toole, and Mr. Wilson as nominees to serve as directors on the CSX Board. (Compl. ¶ 95; TCI Ans. ¶ 95; 3G Ans. ¶ 95.) The supplemental notices incorporated the information in the January 8 notice concerning Defendants' beneficial ownership of CSX stock.

177.    On January 21, 2008 and January 25, 2008, TCI sent two supplemental notices to CSX regarding its intent to present a proposal to amend the bylaws of CSX at the 2008 annual meeting to allow shareholders holding 15% of all the CSX shares outstanding to be able to call a special meeting. (Compl. ¶ 96; TCI Ans. ¶ 96; 3G Ans. ¶ 96.)

177.1    Article I, Section 11(c)(1) of CSX's Bylaws, which governs the way in which a shareholder may bring a nomination or other business before an annual meeting, provides:

"Only such persons who are nominated in accordance with the procedures set forth in this Section 11 shall be eligible at an annual or special meeting of shareholders of the Corporation to serve as directors and only such business shall be conducted at a meeting of shareholders as shall have been brought before the meeting in accordance with the procedure set forth in this [section]."  (JX 30 (CSX Bylaws), at Art. I, § 11(c).)

177.2    Article I, Section 11 of the CSX Bylaws requires advance notice of nominations and shareholder business, and further requires that such notice be timely and set forth certain pertinent information, including: (i) the name and address of any beneficial owner on whose behalf the nomination or proposal is made; (ii) the class and number of shares of capital stock of CSX that are owned beneficially and of record by such shareholder and such beneficial owner; (iii) all information relating to each person whom the shareholder proposes to nominate for election as a director that is required to be disclosed in solicitation of proxies for election of directors in an election contest, or is otherwise required in each case pursuant to the '34 Act; and (iv) any material interest in other proposed business of such shareholder.  (JX 30 (CSX Bylaws) at Art. I, §11(a).)

177.3    The TCI special meeting proposal does not include any limitations on the purpose of the meeting, and can be used to elect or remove directors.  (JX 19.)

178.    On February 4, 2008, the CSX board of directors amended the Company's bylaws to permit holders of 15% of the outstanding voting stock of the Company to request a special meeting. (JX 30.)  This amendment was filed with the SEC on February 4, 2008.  (CSX Corp., 8-K (Feb. 4, 2008).)

179.    On February 7, 2008, TCI wrote a public letter to the CSX Board informing the Board that TCI would be proposing a bylaw amendment "that permits one or more shareholders that together hold at least 15% of all the shares of CSX capital stock to request a special shareholder meeting of shareholders to address [any and all] issues - including the election of directors" and would be seeking to repeal "all bylaw amendments enacted since January 1, 2008".  (JX 11 Ex. 1.)

180.    On February 14, 2008, responding in a press release to TCI on behalf of the Board with respect to CSX's and TCI's competing views on the bylaw amendments regarding special meetings, Mr. Kelly stated:

"TCI wants the ability to initiate a perpetual 'recall' contest through special meetings as a tool to pressure the Board to

51

implement TCI's proposals, regardless of their merit. Taken together with TCI's nomination of candidates to fill five of CSX's twelve Board seats, TCI's criticism of the CSX Bylaw amendments makes it clear that TCI's interest is not in good corporate governance, but in achieving effective control of the company". (PX 176 at 2.)

181.    In the 3G quarterly report for the fourth quarter of 2007, dated February [2008], 3G indicated that "[t]he formal presentation [Defendants] plan to give to investors will outline…a significant reduction to the share count through accelerated repurchases." (PX 204 at 40.)

182.    On March 10, 2008, TCI and 3G filed their preliminary proxy statement, and on April 28, 2008, filed their definitive proxy statement on Schedule 14A proposing to elect five directors; to adopt a proposal to amend CSX's Bylaws to permit one or more shareholders holding 15% or more of the outstanding shares of capital stock of CSX having voting power to call a special meeting of the shareholders for any purpose, including to elect and remove directors; and to adopt a resolution to repeal any changes made by CSX's Board to the Bylaws between January 1, 2008, up to and including the date of the 2008 Annual Meeting. (JX 12; JX 19.)

## C.    TCI Negotiated for "Effective Control" in 2008

183.    After TCI and 3G filed their Schedule 13D on December 19, 2007, CSX's Board asked its Presiding Director, Edward Kelly, III, to try to reach an accommodation with TCI. (Kelly ¶¶ 21-22.)

184.    Before the outset of negotiations with Mr. Kelly, TCI took the position that "[t]he only alternative to the proxy fight is if they will allow our 5 nominees on and we can mutually agree with them which 5 of their directors to replace". (PX 155; see also PX 154.) Mr. Moura of 3G indicated disappointment that Mr. Behring was not invited to participate in the discussions, noting that this is "the first chance to have someone on the board on our side". (PX 155.)

185.    Following the January 7, 2008, meeting between Mr. Hohn and Mr. Kelly, on January 8, Mr. Hohn proposed various additional candidates for the CSX board of directors, including Ed Harris and Jack McBain, both formerly of Canadian National, and Allen Andreas, former CEO of Archer Daniel Midlands. (PX 157; PX 158.)

186.    On January 8, 2008, TCI delivered its notice of intent to nominate the five TCI/3G nominees, accompanied by questionnaires and nominee agreements. (PX 159) In the notice and questionnaires, TCI and the nominees do not identify the shares referenced in the TCI and 3G swaps as being beneficially owned. (PX 159 at Annex A.)

187.    On January 9, 2008, Mr. Kelly of CSX spoke with Mr. Hohn, and offered Mr. Hohn three seats on the board: one for each of Messrs. Hohn, Behring and Lamphere, and rejected Gary Wilson because of union and Washington D.C.-related

issues, as well as Mr. O'Toole. Mr. Kelly also agreed to a fourth, mutually-agreed upon candidate, Ed Harris. (PX 161; Kelly ¶ 23.)

188.    In a follow-up January 9, 2008 email exchange, Mr. Hohn warned Mr. Kelly not to pursue a "scorched earth" policy in Washington and lobby for reregulation. (PX 162.)

189.    On or before January 11, 2008, Mr. Hohn proposed John Wilder as an additional nominee to the CSX board. (PX 163.)

190.    On January 13, 2008, Mr. Kelly spoke again with Mr. Hohn. On January 14, 2008, Mr. Kelly indicated that the CSX position had not changed regarding accepting the four nominees previously discussed. (PX 164.)

191.    On January 14, 2008, Mr. Hohn made the following new demands to give his group additional control over the Company. Mr. Hohn told Mr. Kelly, in an email, that without the following conditions no agreement would be possible: (i) ability of 10% of shareholders to call a special meeting, which would subject directors to the constant threat of a recall vote, (ii) separation of the chairman and chief executive officer roles, (iii) specific committee representation for the TCI/3G nominees, and (iv) no ability of the board to increase the size of the board without 80% board approval or a shareholder vote. Mr. Hohn also noted that TCI would be proposing a special meeting bylaw for consideration by the CSX shareholders at the annual meeting. (PX 165.)

191.1    In an email, Mr. Amin noted that it was "unfortunate[ ]" that Mr. Hohn made his proposal in writing. (PX 275.)

191.2    When asked why he wrote that Mr. Hohn's ultimatum was done "very unfortunately by email", Mr. Amin responded incredibly: "I believe things like this are better discussed in person so that there is no confusion about what's being requested" and testified that conversation leads to fewer misunderstandings than writings. (Tr. 207:20-208:15.)

192.    Also on January 14, 2008, Mr. Amin of TCI asked Mr. Hohn of TCI whether CSX had mentioned a standstill agreement and Mr. Hohn said "no". (PX 164.)

193.    On January 16, 2008, Mr. Kelly sent an email to Mr. Hohn in which he indicated that the CSX position had not changed and that CSX continued to be "very concerned about [the TCI/3G Group's] apparent interest in gaining effective control" over CSX. (PX 167.)

194.    During the course of the negotiations, Mr. Hohn also said that, if he was able to elect five directors, the future of CSX's Chairman and CEO, Mr. Ward, would be "bleak" and threatened that, if CSX did not agree to his demands, he would run his slate, create a dissident board, and make things unpleasant for Mr. Kelly as presiding director. Mr. Hohn further suggested that his directors would decline to provide written consents to Board actions and otherwise disrupt the operation of the Board. Mr. Kelly understood

that the implicit premise underlying Mr. Hohn's threats was that his five nominees would vote together as a bloc.  (Kelly ¶ 25.)

195.    On January 17, 2008, Mr. Hohn told Mr. Kelly that TCI would not accept any sort of standstill as part of any agreement.  Mr. Hohn further insisted that he be able to interview each of the current directors.  (PX 169; Kelly ¶¶ 23-24.)

196.    On January 18, 2008, Mr. Kelly terminated discussions in an email noting that the "significant differences between our respective positions, including your indication yesterday that no standstill would ever be acceptable to you" are "impossible to bridge."  (PX 169.)

## V.    THE GROUP'S SWAPS AND ARRANGEMENTS CONFER POWER

197.    Even if TCI and 3G had not used their swaps as part of a plan or scheme to evade the reporting requirements of the securities laws, they are beneficial owners of the shares referenced in their swaps arrangements for additional reasons.

198.    By and through their swap agreements, TCI and 3G have investment power because they can effectively determine the disposition of the CSX shares underlying the swaps. The counterparties immediately purchased and sold shares of CSX stock in direct one-for-one response to Defendants' swap orders. (See Section V.A. infra.)

199.    By and through their swap agreements, TCI and 3G have voting power. Their swap agreements allowed TCI and 3G significantly to influence how the shares underlying their swaps were voted. Defendants took shares out of market and put them into the hands of the counterparties with whom Defendants had significant financial relationships. The counterparties had an economic incentive to vote the shares in line with Defendants' wishes in order to maintain their lucrative relationships. In at least one instance, Defendants concentrated shares in the hands of a counterparty (Deutsche Bank) that Defendant knew to be sympathetic to its interests because of that counterparty's own holdings of CSX stock. (See Section V.B. infra.)

200.    Defendants have offered no credible evidence to dispute Defendants' voting and investment power regarding the shares underlying their swaps. CSX stock was the only viable hedge against Defendants' swaps and nothing in the swap agreements or the policies of the counterparty banks prevented the counterparties from voting the shares in line with Defendants' goals. Contrary to Defendants' assertions, swaps are different from futures in important respects. (See Section V.C. infra.)

201.    Defendants' proffered "expert", Professor Partnoy, is unhelpful to Defendants' case and to the Court. He is not an expert in economics, let alone swaps, and his proffered testimony is mistaken and misleading. (See Section V.D. infra.)

### A.    The Group Determines Disposition of the Matched Shares

202.    As a matter of real-world financial economics, the counterparties to TCI's swaps had to hedge their positions with matching physical shares, hold that hedge for the duration of the swap, and upon termination of the swap, dispose of the matching shares. With respect to a large swap position, any other approach would have been extremely risky and irresponsible. (Subrahmanyam Rebuttal ¶ 5.)

203.    Consistent with what economic theory would predict, TCI's counterparties did in fact hedge their CSX swaps one-for-one with matching physical CSX shares. (Subrahmanyam ¶¶ 114, 115, 125.) Every time TCI entered into a large swap with one of its counterparties, the counterparty acquired an identical number of CSX shares. (Subrahmanyam Rebuttal ¶ 22; Subrahmanyam Rebuttal Exs. 3.1-3.7, 4.1-4.7.)

204.    Similarly, if and when TCI terminated its swaps, TCI's counterparties sold an identical number of shares.  (Subrahmanyam Rebuttal ¶ 22; Subrahmanyam Rebuttal Exs. 3.1-3.7, 4.1-4.7.)

205.    The following table (Subrahmanyam Rebuttal ¶ 22) illustrates the actual hedging by TCI's counterparties in connection with its CSX swaps:

### TCI Counterparty Swap and Share Transactions
### 10/20/06 – 12/31/07

| | Number of | | Number of | |
| Counterparty | Days on Which Swap Position with TCI Increased | Days with Matching Counterparty Purchase of CSX Shares (Exact Day) | Days on Which Swap Position with TCI Decreased | Days with Matching Counterparty Sale of CSX Shares (Exact Day) |
| --- | --- | --- | --- | --- |
| Citigroup | 13 | 13  (12) [1] | 3 | 3   (3) |
| Credit Suisse | 16 | 15  (15) [2] | 5 | 5   (5) |
| Deutsche Bank | 30 | 30  (30) | 2 | 2   (2) |
| Goldman Sachs | 24 | no data | 10 | 10  (10) |
| Merrill Lynch | 16 | 14  (14) [3] | 9 | 9   (9) [3] |
| Morgan Stanley | 18 | 18  (15) [1] | 6 | 6   (6) |
| UBS | 14 | 14   (9) [4] | 8 | 8   (3) [4] |

Note:
[1]  Matching hedge was established by the end of next business day whenever there was a reported delay in hedging.
[2]  There are no share hedge data for 12/11/07 provided in the Credit Suisse production (CS 000097–1415).
[3]  There are no share hedge data for 12/11/07 provided in the Merrill Lynch production (ML 0000166–333).
      On four days, the share transaction amounts are different from swap transaction amounts by less than 1,000 shares.  Three of these four
      discrepancies were due to separate transactions, which occurred in addition to the perfectly matching hedge trades on these dates.
[4]  Comparisons are based on trade dates for swaps and "dealt dates" for hedges.  In each case when swap trade date is different from hedge
      "dealt date," "dealt date" is the next calendar day, which is Saturday in some cases, and "dealt time" is shortly after midnight.

206.    All of the counterparties here in fact hedged by acquiring shares and disposing of shares one-for-one in relation to TCI's swap activity.  (Subrahmanyam Rebuttal ¶ 31.)

207.    Citigroup increased its exposure to CSX swaps with TCI on 13 days.  In every instance, Citigroup hedged the increases in exposure one-for-one by purchasing matching numbers of CSX shares.  On 12 of the 13 days, it did so the same day, and in one instance, it did so the next day.  Citigroup decreased its exposure to CSX swaps with TCI on 3 days.  On each of these days, it hedged the decreases in exposure one-for-one by selling matching numbers of CSX shares.  (Subrahmanyam Rebuttal Ex. 4.1.)

208.    Credit Suisse increased its exposure to CSX swaps with TCI on 16 days.  Credit Suisse produced hedging data for 15 of the 16 days (the missing hedging data concerns swap transactions).  In every instance, Credit Suisse hedged the increases in exposure one-for-one by purchasing matching numbers of CSX shares.  Credit Suisse decreased its exposure to CSX swaps with TCI on five days.  On each of these days, it hedged the decreases in exposure one-for-one by selling or transferring to Deutsche Bank matching numbers of CSX shares.  (Subrahmanyam Rebuttal Ex. 4.2.)

209.    Deutsche Bank increased its exposure to CSX swaps with TCI on 30 days. On each of these days, Deutsche Bank hedged the increases in exposure one-for-one by purchasing matching numbers of CSX shares. Deutsche Bank decreased its exposure to CSX swaps with TCI on two days. On each of these days, it hedged the decreases in exposure one-for-one by selling matching numbers of CSX shares. (Subrahmanyam Rebuttal Ex. 4.3.)

210.    Goldman Sachs hedged its exposure to CSX swaps with CSX shares on a quarterly basis in 2006 and 2007. (Subrahmanyan Ex. I.4.) Goldman Sachs did not produce daily data sufficient to examine daily activity in this period. However, Goldman did produce data permitting examination of its decreases in swap exposure. Goldman Sachs decreased its exposure to CSX swaps with TCI on 10 days. On each of these days, it hedged the decreases in exposure one-for-one by selling matching numbers of CSX shares. (Subrahmanyam Rebuttal Ex. 4.4.)

211.    Merrill Lynch increased its exposure to CSX swaps with TCI on 16 days. On 14 of the 16 days, Merrill Lynch hedged the increases in exposure one-for-one by purchasing matching numbers of CSX shares. On one of the 2 remaining days, December 4, 2006, Merrill Lynch purchased 800 shares in addition to a perfectly matching hedge transaction. Merrill Lynch did not produce hedging data for the remaining, December 11, 2007, swap transaction with TCI referencing 1,000 CSX shares. Merrill Lynch decreased its exposure to CSX swaps with TCI on nine days. On each of these days, it hedged the decreases in exposure one-for-one by selling matching numbers of CSX shares. On one of these nine days, November 12, 2007, Merrill Lynch sold 300 shares in addition to a perfectly matching hedge transaction. On another of these nine days, November 13, 2007, Merrill Lynch purchased 500 shares in addition to a perfectly matching hedge transaction. (Subrahmanyam Rebuttal Ex. 4.5.)

212.    Morgan Stanley increased its exposure to CSX swaps with TCI on 18 days. In every instance, Morgan Stanley hedged the increases in exposure one-for-one by purchasing matching numbers of CSX shares. On 15 of the 18 days, it did so the same day, and in three instances, it did so by the next trading day. Morgan Stanley decreased its exposure to CSX swaps with TCI on six days. On each of these days, it hedged the decreases in exposure one-for-one by selling or transferring to Deutsche Bank matching numbers of CSX shares. (Subrahmanyam Rebuttal Ex. 4.6.)

213.    UBS increased its exposure to CSX swaps with TCI on 14 days. In every instance, UBS hedged the increases in exposure one-for-one by purchasing matching numbers of CSX shares. On nine of the 14 days, it did so the same day and in the remaining instances, the perfect hedge was reported on the following calendar day. UBS decreased its exposure to CSX swaps with TCI on eight days. In every instance, UBS hedged the decreases in exposure one-for-one by selling matching numbers of CSX shares. In three instances, it did so on the same day. For the remaining five days, the perfect hedge was reported on the following calendar day. (Subrahmanyam Rebuttal Ex. 4.7.)

214.    Defendants rely on the depositions of Citigroup's Mr. Richard Kennedy and Deutsche Bank's Mr. John Arnone for the proposition that the "TCI counterparties considered the possibility of hedging with instruments other than shares, and at times either used such instruments or did not hedge". (Partnoy Sur Rebuttal ¶ 18.) The depositions of the bankers do not support such a point, and the fact is that the banks hedged the swaps with physical shares.

215.    Messrs. Kennedy and Arnone never state that when the swaps were entered into they considered hedging with anything other than physical shares. The only statements made about hedging with instruments other than shares are speculative and hypothetical. (See Kennedy Dep. 39:7-42:4; Arnone Dep 38:14-39:4.) Neither Mr. Kennedy nor Mr. Arnone offers testimony to specific instruments that were considered to hedge CSX swap transactions. (Kennedy Dep 39:7-42:4; Arnone Dep 38:14-39:4.) At some point after the CSX matching shares were acquired, Citigroup considered alternative hedges, but Mr. Kennedy does not provide details of these considerations and acknowledges that Citigroup always hedged with physical shares. (Kennedy Dep. 41:13-42:4.) Mr. Arnone understood Deutsche Bank to be hedging CSX swaps with the purchase of physical shares of CSX. (Arnone Dep 8:25-9:4.)

216.    Again, Citigroup and Deutsche Bank perfectly hedged the swaps with physical shares. (PX 239; Subrahmanyam Rebuttal Exs. 3.1-4.8.) Even if the counterparties considered alternatives to physical shares, the counterparties only used physical shares as a hedge. (PX 239; Subrahmanyam Rebuttal Exs. 3.1-4.8.) Every time the counterparties entered into a swap with TCI for CSX shares, the counterparties would hedge with the exact same number of physical shares. (PX 239; Subrahmanyam Rebuttal Exs. 3.1-4.8.) Whenever TCI terminated a swap position, the counterparty would sell shares of the same amount immediately. (PX 239; Subrahmanyam Rebuttal Exs. 3.1-4.8.)

217.    Notably, TCI's counterparties engaged in conduct prior to entering into swaps that demonstrated their knowledge that they would be hedging with physical shares. For example, Citigroup limited its swap transactions with TCI by the number of shares it had access to in the market. (See Kennedy Dep 9:3-12.) The Deutsche Bank swap desk had to seek approval prior to entering into swaps once Deutsche Bank had hedged with physical shares in excess of 5% of all CSX stock. (See Arnone Dep. 8:2-9:8.) The counterparties all knew that purchasing physical shares was the only option to hedge the risk derived from the swap agreements.

218.    There is a direct -- indeed, essentially perfect -- correlation between TCI's purchases and sales of large swap positions and purchases and sales by its swap counterparties of matching physical CSX shares. (Subrahmanyam Rebuttal ¶ 3.)

219.    By entering into swap arrangements with the counterparties, TCI effectively caused them simultaneously to purchase the matching shares. TCI counterparties acquired the matching shares as a hedge for their swap positions and would not have acquired such large numbers of CSX shares in the absence of those positions. (Subrahmanyam ¶ 127.)

220.    Hence, TCI's and 3G's swap arrangements gave them the ability significantly to influence the disposition of the CSX shares referenced in its swaps. In fact, TCI and 3G had the ability effectively to determine the timing and size of the acquisition, holding, and disposition of the matching CSX shares by the counterparties. (Subrahmanyam ¶¶ 126-52; Subrahmanyam Rebuttal ¶ 17.)

221.    TCI knew that the counterparties were hedging with physical shares. (See Kennedy Dep at 9:3-12.) Mr. Tim Keogh, an employee at TCI, spoke with Mr. Kennedy about Citigroup's hedging activity, learning from Mr. Kennedy that Citigroup could not acquire enough CSX shares to hedge TCI's desired number of swaps. (See Kennedy Dep. 8:4-9:12.) TCI then constructed analysis of potential voting outcomes that reflected their knowledge that the counterparties hedged with physical shares. (See Tr. 217:6-18.)

222.    Notably, Mr. Amin falsely denied knowing whether TCI's swap counterparties hedged their positions. (Tr. 202:22-203:1, 204:10-14, 205:24-206:7.) When confronted with TCI's own documents however, he admitted that TCI understood that its counterparties hedged their positions. (DX 96; Tr. 217:12-18.) When asked by counsel for CSX whether he had just "presented to the court an analysis that said 100 percent of the swaps are hedged by physical shares", Mr. Amin had no choice but to answer "Yes." (DX 96; Tr. 217:12-18.)

### B.    The Group Has the Ability Significantly to Influence Voting

223.    Insofar as TCI had the ability to influence the acquisition and disposition of the matching shares, it had the ability to influence the voting of those shares. Through its swap arrangements, TCI effectively put the matching shares, and their corresponding voting rights, in the hands of the counterparties, as opposed to the hands of whoever else would have otherwise held the shares. (Subrahmanyam ¶ 154.)

224.    By effectively determining the vote holder of CSX shares, TCI influenced the voting of those shares. For this reason alone, TCI had the ability significantly to influence the voting of those shares. (Subrahmanyam Rebuttal ¶ 39.)

225.    The ability to influence who holds the right to vote is tantamount to the ability to influence how the vote will be cast. Some types of shareholders are likely to vote one way and others another. (Subrahmanyam ¶ 155.)

225.1    As indicated in an analysis done by TCI's own proxy solicitor, D.F. King, some institutional investors are known to adhere rigidly to ISS endorsements of short-slates, while others are known to assign significant weight to the voting recommendations of ISS. (Subrahmanyam ¶ 155; PX 117 at 8; PX 160 at 6-7.)

225.2    A JPMorgan report notes: "CSX's shareholder base is skewed to higher hedge fund ownership and our sense is that there will probably be receptiveness to TCI/ 3G's proposal from this group". (Subrahmanyam at 62, n.136.)

226.    Putting aside the influence that a hedge fund can have on voting simply by influencing who holds the matching shares, as Professor Subrahmanyam notes, "many a hedge fund has persuaded their CFD counterparty to vote one way or the other, without a problem". (Subrahmanyam ¶ 158.)

227.    Likewise, Alan Miller of Innisfree stated that in his more than 30 years of experience:

227.1    "Even if an arrangement concerning the voting of shares held by the counterparties is not disclosed, . . . the counterparties to swap arrangements frequently vote such shares in the manner specified by the hedge funds." (Miller ¶ 24.)

227.2    "[T]hese counterparties are motivated by a desire to please lucrative hedge fund clients with whom they do business." (Miller ¶ 24.)

228.    Swap agreements generally provide that the bank counterparty has the sole discretion to vote matching shares, which is confirmed by internal guidelines of UBS and a letter from Citigroup counsel produced as part of this litigation. (PX 187.) But that does not mean a bank counterparty is beyond influence. (Subrahmanyam ¶ 160.)

229.    That is especially so where, as in the present instance, the hedge fund has a prime brokerage relationship with the counterparty bank. TCI has prime brokerage relationships with Goldman Sachs, UBS, Morgan Stanley, and Deutsche Bank. (PX 188; Subrahmanyam ¶ 161.)

230.    The existence of a prime brokerage relationship is an important factor in evaluating the reach of TCI's influence. (Subrahmanyam Rebuttal ¶ 43.) Prime brokers provide a range of services to hedge fund clients, including securities lending, financing, cash management, transactions processing and back-office support. Most of the large international banks offer prime brokerage services, which are seen to be an important and growing business for these institutions. (Subrahmanyam ¶ 161; Subrahmanyam Rebuttal ¶ 43.)

231.    Prime brokerage relationships are very lucrative for the major international banks, which often make substantial concessions for their hedge fund customers, particularly when those concessions have little economic or reputational cost to the bank. TCI ranked 41st on the list of top 100 hedge funds out of over 10,000 hedge funds in the world as of December 31, 2006. (Subrahmanyam ¶ 162.) Indeed, in 2007, prime brokers earned over $42.25 million in revenue associated with business with TCI. Thus, TCI was and is likely to be an important customer for its counterparty banks. (Subrahmanyam ¶ 162; Subrahmanyam Rebuttal ¶ 43; see also PX 188.)

232.    Even if there were not a preexisting prime brokerage relationship, the other banks would likely be vying for such a relationship and competing for new business from big clients like TCI. (Subrahmanyam Rebuttal ¶ 43 and n.62.)

233.    TCI's counterparties have no independent economic incentive to vote the matching shares. The counterparties, once perfectly hedged as they were here, are economically neutral to the performance of the company, but still retain the voting rights of the matching shares. This ownership provides an additional basis for the shares to be voted in the interests of an important prime brokerage client. (Subrahmanyam Rebuttal ¶ 44.)

234.    Here again, Mr. Amin misled the Court as to TCI's understanding concerning the voting of shares held by TCI's swap counterparties. He testified that TCI assumed its counterparties would not vote their shares in an election. (Tr. 210:10-11.) When confronted on cross with TCI's own documents however, Mr. Amin admitted that TCI had constructed analyses assuming that its counterparties would vote. (DX 96; Tr. 217:21-23.) When asked whether there were analyses done by TCI for scenarios in which it "assumed [that] there is a vote", Mr. Amin testified that "we did." (Tr. 217:21-23.)

## C.    The Group's Response Is Flawed

235.    In an effort to avoid a finding that they are beneficial owners of the shares referenced in their swaps, TCI and 3G assert a number of arguments against the reality of their influence over those shares.

### 1.    The Swap Contracts Are No Help to the Group

236.    TCI and 3G rely heavily on the terms of their swap agreements, apparently to suggest that the agreements foreclose a finding that TCI and 3G have investment or voting power concerning the CSX shares referenced in their swaps. Neither TCI's nor 3G's swaps agreements foreclose a finding of voting or investment power.

237.    While the agreements do not expressly require the counterparties to hedge with matching shares, they plainly permit hedging. In fact, the agreements contain provisions that, together with the economics of hedging of large positions in CSX swaps, expressly contemplate hedging by the bank counterparty. (Subrahmanyam ¶ 132; PX 231 at TCI0929437; PX 232 at TCI0155833; PX 234 at TCI0156059; PX 235 at TCI0155983; PX 238 at TCI0937720; PX 230 at C 0063; PX 233 at TCI0937661; PX 236 at TCI 937764.)

238.    The swap agreements at issue also give TCI and 3G the right to terminate their swaps earlier than the expiration date, which they may do at their discretion (Subrahmanyam ¶ 134; PX 231 at TCI0929432; PX 232 at TCI0155832; PX 233 at TCI0937661; PX 234 at TCI0156053; PX 235 at TCI0155984; PX 236 at TCI 937762; PX 238 at TCI0937721; PX 230 at C 0063.)

239.    Moreover, while the swap agreements do not require that the counterparties unwind their hedge and dispose of their matching shares, they contain provisions that contemplate just that. (Subrahmanyam ¶ 143; PX 232 at TCI0155832; PX 236 at TCI0937762; PX 238 at TCI0937716.)

## 2.    The Counterparty Policies Are Immaterial

240.    In addition to relying on the terms of their swap contract, TCI and 3G misplace reliance on the policies and/or communications from the counterparties about voting shares held by them to hedge swaps. Not all of the banks have policies and the ones that do (either written or unwritten) do not prevent the banks from voting in line with TCI and 3G:

240.1    Deutsche Bank's general policy is to abstain from voting shares held as hedges against swaps. However, this policy is unwritten and Deutsche Bank has not determined how it will vote its shares at the upcoming CSX shareholders' meeting. (Arnone Dep. 22:16-23:13, 23:14-23, 25:22-25, 27:3-7.)

240.2    Citigroup's practice is that Citigroup's swap trading desk does not vote the shares it purchases to hedge swap transactions. Citigroup has said it will not vote its shares in the upcoming CSX shareholders' meeting, but nothing prevents Citigroup from altering its decision. Citigroup does not have an official policy not to vote shares and would consider voting shares held as a hedge for a swap. (Kennedy Dep. 19:14-20, 20:20-21:9, 21:18-24, 23:25-24:6, 24:11-15, 35:21-36:8.)

240.3    The internal policies of Credit Suisse, Goldman Sachs, and UBS allow them to vote the securities held to hedge against swap transactions. (Partnoy ¶ 49.)

241.    Messrs. Kennedy, Arnone and Busby are incapable of foreclosing the possibility that either Citigroup or Deutsche Bank was being influenced to vote in a certain way.

241.1    Mr. Arnone does not know if TCI had conversations with others at Deutsche Bank regarding the voting of CSX shares. (Arnone Dep 26:7-13.) Mr. Arnone is not familiar with Austin Friars and does not know how Deutsche Bank's other CSX shares will vote. (Arnone Dep 17:8-12, 28:17-29:2.) Mr. Arnone does not even know if there is a contract between Deutsche Bank and TCI concerning the voting of the CSX shares. (Arnone Dep 48:10-24.)

241.2    Mr. Kennedy does not know if anyone at his swap desk had a relationship with TCI. (Kennedy Dep 17:8-18.) Mr. Kennedy never even spoke with the Citigroup salesman in England, Mr. Mike Anderson, who was in communication with TCI. (Kennedy Dep 26:22-23.) The witness's lack of knowledge, and the actual evidence presented, make it impossible for the Court to be bound by their conclusory and generalized assertions.

## 3.    Swaps Are Different from Futures

242.    Contrary to TCI's suggestion, its swap arrangements are not analogous to cash-settled equity futures.

243.    Single stock futures ("SSFs") and total return equity swaps on single stocks ("TRE swaps") are different contractually.  SSFs are standardized contracts anonymously traded on an exchange.  TRE swaps are privately negotiated bilateral contracts where the parties may deal with each other regularly and have knowledge about the quality of the other's credit and business practices.  (Subrahmanyam ¶ 61; Subrahmanyam Rebuttal Report ¶ 14(a).)

244.    SSFs and TRE swaps on single stocks have different maturities.  SSFs mature generally within one year, while TRE swaps may last ten years or more. (Compare Ang and Cheng, 2005, "Single Stock Futures: Listing Selection and Trading Volume", Finance Research Letters 2, 30-40 with Ex. 242 at TCI0156333.)

245.    SSFs and TRE swaps present different credit risks to the counterparty. The exchange guarantees the futures contract, removing most of the risk from the parties. Parties to a TRE swap are exposed to risks associated with the creditworthiness of the opposing party.  TRE swaps are prices to incorporate this risk.  (Subrahmanyam Rebuttal ¶¶ 11, 14(b).)

246.    The margin requirements for SSFs and TRE swaps differ.  SSFs require both parties to post margin (or collateral) and the margin requirements are re-calculated each day from the market price.  The margin requirements for TRE swaps are negotiated between the counterparties and only one party posts margin.  The margin is computed based on all positions between the parties, rather than for the single contract. (Subrahmanyam Rebuttal Report ¶ 14(c).)

247.    Different types of traders participate in SSF markets than in the TRE swap markets.  SSFs can be traded by individual investors, while TRE swaps are generally only available to institutional investors or very wealthy individuals.  (Subrahmanyam Rebuttal ¶ 14(e).)

248.    SSFs are not necessarily hedged with physical shares whereas the economics of TRE swaps dictate this approach.  SSF contracts are guaranteed by the exchange, reducing or eliminating the need for hedging.  Counterparties to TRE swaps are not in the business of risking capital on directional stock price movements and have an economic incentive to hedge their exposure to swap positions.  Physical shares are the most likely and best suited hedge.  (Subrahmanyam, ¶¶ 88-89.)  TCI's counterparties did in fact hedge TCI's swaps one-for-one with physical shares.  (Subrahmanyam ¶ 104; Subrahmanyam Rebuttal at Exs. 3.1-4.8; PX 272.)

### D.    Professor Partnoy's Analysis Is Unreliable and Disingenuous

#### 1.    Partnoy Is No Expert

249.    Professor Partnoy is unqualified to opine on the economic issues that are central to this case.  He is a law professor and does not possess the necessary academic credentials or professional experience in this specific field that would ensure his testimony is reliable and of value to the Court.

249.1   Professor Partnoy is not a trained economist and he lacks any graduate, post-graduate, or professional degree in the field.  (Partnoy Rebuttal Ex. A.)

249.2   Professor Partnoy lacks experience in the industry except for 21 months spent in a junior capacity on Wall Street 15 years ago.  He lacks the practical, real world experience in dealing with the economic impact, pressures, and relationship incentives created by derivatives (let alone the total return swaps at issue in this case).  (Partnoy Rebuttal Ex. A.)

250.   Professor Partnoy provides a lengthy list of cases in which he has offered expert testimony.  However, he neglects to identify the subjects on which he opined. From a review of the cases, it appears that he rarely opined on derivatives and may never have opined on swaps.  (Partnoy Rebuttal Ex. A; CSX's Motion in Limine to Exclude the Expert Reports of Frank Partnoy at 14-15.)

251.   Professor Partnoy's testimony on economic matters has been stricken on at least one prior occasion.  (See S.E.C. v. Todd, No. 03-2230, 2006 WL 5201386, at *4 (S.D. Cal. Oct. 17, 2006) (granting motion to strike Partnoy's testimony).)

252.   Professor Partnoy's publications have been criticized by those with knowledge about the industry.  For example, his book F.I.A.S.C.O.: Blood in the Water on Wall Street received the following commentary from those knowledgeable in the industry (see generally CSX's Motion in Limine to Exclude the Expert Reports of Frank Partnoy at 13-14):

252.1   "After close reading, it's hard to avoid feeling that Partnoy is not being completely honest."  (Leah Nathans Spiro, "Partnoy's Complaint About Morgan Stanley", BUSINESSWEEK (Nov. 3, 1997).)

252.2   "Employing cautiously worded statements, he seems to be stretching his somewhat skimpy experience over too large a set of allegations." (Id.)

252.3   "[T]he perspective presented in F.I.A.S.C.O. is fundamentally at odds with economic theory."  (Jonathan R. Macey, Wall Street Versus Main Street: How Ignorance, Hyperbole, and Fear Lead to Regulation", 65 U. CHI. L. REV. 1487, 1488 (1998) (reviewing F.I.A.S.C.O.: Blood in the Water on Wall Street by Frank Partnoy).)

252.4   "Clearly, Partnoy's incomplete understanding of how markets work skewed his perception of the environment in which he found himself during his brief stint on Wall Street."  (Id.)

252.5   "Partnoy's highly conjectural descriptions of Morgan Stanley's business stand in sharp contrast to actual industry behavior."  (Id. at 1503.)

252.6    "[T]he vast bulk of F.I.A.S.C.O. is misleading or inaccurate . . . . Partnoy displays a calculating lack of understanding of the environment in which he briefly worked." (Id. at 1510.)

252.7    "[F]or an honest student of derivative markets, the book's sensationalism is only surpassed by its intellectual dishonesty." (Id.)

253.    Professor Partnoy's opinions are also replete with legal conclusions that are inappropriate subjects for an "expert" on economics. His reports are nothing more than legal briefs that address the purported extent of TCI's disclosure obligations; set out policy arguments as to why his legal interpretation of TCI's disclosure requirements must be correct; engage in contract interpretation to support his assertions regarding the extent of TCI's legal power; and make conclusive determinations as to what the Court should consider "relevant" or "material". (CSX's Motion in Limine to Exclude the Expert Reports of Frank Partnoy at 2-11.)

253.1    Moreover, Professor Partnoy applies the wrong legal standard, which makes his reports irrelevant, unhelpful, and therefore inadmissible.

253.2    Professor Partnoy initially recognizes (correctly) that the proper inquiry is whether TCI "directly or indirectly" had the "ability significantly to influence the voting or disposition of the referenced CSX shares". (Partnoy Rebuttal ¶¶ 5-6 (summarizing Professor Subrahmanyam's report).) However, in the rest of his report, and in his Sur-Rebuttal Report, he focuses on the much narrower question whether TCI "had the power to direct the disposition of CSX shares referenced in the swap agreements". (Id. ¶ 14 (emphasis added).) He addresses whether "TCI 'directed'" its counterparties to "hedge [] swap contracts with shares", and whether "they 'had to'" take such steps "at TCI's direction". (Id. ¶ 15; see also id. ¶¶ 17, 102, 112-113; Partnoy Sur-Rebuttal ¶¶ 14, 15, 29, 57, 59, 62, 75 n.109.)

253.3    Because his initial premise regarding the legal standard is erroneous, Professor Partnoy spends the bulk of his reports on irrelevant considerations. His single-minded focus on the "direct" "power to direct" — rather than the "direct[] or indirect[]" "ability significantly to influence" — leads him to place undue weight on the terms of the swap arrangements between TCI and its counterparties. In fact, he makes those contractual provisions outcome-determinative. (Partnoy Rebuttal ¶¶ 5-6, 14.)

253.4    He opines that because the relevant contracts technically leave some discretion to the swap counterparties, TCI legally lacks power over any investment or voting decision related to matching shares of CSX. He asserts that because the swap arrangements do not give TCI total control, identification and disclosure of the matching shares is not required as a matter of law. (See Partnoy Rebuttal ¶¶ 45-51.) By applying a too stringent test, Professor Partnoy disregards the practical economic realities addressed by Dr. Subrahmanyam that are relevant to the appropriate legal standard.

65

### 2.    Partnoy Misrepresents the Data

254.    In an apparent effort to suggest that TCI's and 3G's counterparties do not have to and do not in fact hedge their swap positions, Professor Partnoy identifies 24 instances of alleged mismatches between TCI's swaps and its counterparties' hedging, all of which are illusory.  (Partnoy Sur-Rebuttal ¶ 56, Chart 7A.)

255.    Of the 24 alleged mismatches, 11 are instances where the trade was hedged one-for-one on the next trading day as illustrated below using Professor Partnoy's own chart (boxed and highlighted in grey in chart below; Subrahmanyam Rebuttal ¶ 28.):

255.1   On November 14, 2007, Citigroup hedged its 2,750,000 swap transaction with TCI with 2,688,987 CSX shares resulting in a supposed shortfall of 61,013.  On November 15, 2007,(incorrectly listed as November 14 on Professor Partnoy's chart), Citigroup overhedged a 1,900,000 swap transaction with TCI by 61,013, eliminating the supposed discrepancy.

255.2   On November 14, 2006, UBS purchased 500,000 shares of CSX to hedge perfectly a November 13, 2006, TCI transaction for 500,000 swaps.

255.3   On January 18, 2007, UBS purchased 942,000 shares of CSX stock to hedge perfectly two swap transactions with TCI: a January 17 order for 642,000 and a January 18 order for 300,000.

255.4   On November 14, 2007, UBS sold 1,700,000 shares of CSX stock to hedge perfectly a November 13, 2007, TCI transaction for 1,700,000 swaps.

255.5   On November 15, 2007, UBS sold 2,750,000 shares of CSX stock to hedge perfectly a November 14, 2007, TCI transaction for 2,750,000 swaps.

255.6   On November 16, 2007, UBS sold 1,900,000 shares of CSX stock to hedge perfectly a November 15, 2007, TCI transaction for 1,900,000 swaps.

255.7   On December 11, 2006, Morgan Stanley purchased 100,000 shares of CSX stock to hedge perfectly a December 8, 2007,(the previous trading day), TCI transaction for 100,000 swaps.

255.8   On December 12, 2006, Morgan Stanley purchased 1,315,000 shares of CSX stock to hedge perfectly two swap transactions with TCI:  a December 11 order for 645,000 and a December 12 order for 670,000.

256.    Of the remaining 13 alleged mismatches, 7 are instances where the trade was hedged one-for-one on the same or next trading day, but Professor Partnoy omits the data from his chart (the non-boxed, non-highlighted transactions in the chart below):

256.1   On January 30, 2007, Credit Suisse purchased 850,000 shares of CSX stock to hedge perfectly an 850,000 TCI swap transaction of that same day. (PX 272 at Ex. 4.2.)

66

256.2   On October 24, 2006, UBS purchased 1,380,000 shares of CSX stock to hedge perfectly an October 23, 2006, TCI transaction for 1,380,000 swaps.  (PX 272 at Ex. 5; Partnoy Rebuttal ¶ 83, Chart 7.)

256.3   On November 15, 2006, UBS purchased 800,000 shares of CSX stock to hedge perfectly a November 14, 2006, TCI transaction for 800,000 swaps.  (Subrahmanyam Rebuttal at Ex. 4.7; PX 249 at UBS517-18.)

256.4   On November 10, 2007, UBS sold 300,000 shares of CSX stock to hedge perfectly a November 9, 2007, TCI transaction for 300,000 swaps.  (Subrahmanyam Rebuttal at Ex. 4.7;  PX 249 at UBS517-18.)

256.5   On November 17, 2007, UBS sold 1,382,100 shares of CSX stock to hedge perfectly a November 16, 2007, TCI transaction for 1,382,100 swaps.  (Subrahmanyam Rebuttal at Ex. 4.7;  PX 249 at UBS517-18.)

256.6   On December 12, 2007, UBS purchased 1,000 shares of CSX stock to hedge perfectly a December 11, 2007, TCI transaction for 1,000 swaps.  (Subrahmanyam Rebuttal at Ex. 4.7.)

256.7   On November 10, 2006, Morgan Stanley purchased 1,850,100 shares of CSX stock to hedge perfectly two swap transactions with TCI: a 1,000,000 order of that day and an 850,100 order of November 9, 2006.  (Subrahmanyam Rebuttal at Ex. 4.6; PX 249 at MS–CSX_000153.)

257.    The final six allegedly mismatched transactions are de minimis (boxed with no highlighting in chart below):  1,000 swaps (Credit Suisse, 12/11/07; no data produced); 800 swaps (Merrill Lynch, 12/4/06); 100 swaps (Merrill Lynch, 12/8/06); 300 swaps (Merrill Lynch, 11/12/07); 500 swaps (Merrill Lynch, 11/13/07); 1,000 swaps (Merrill Lynch, 12/11/07; no data produced).

258.    Careful examination of the table set out in Proffesor Partnoy's sur-rebuttal report, which purports to show mismatches between swaps and counterparty hedging with shares, demonstrates that TCI's counterparties did in fact hedge the swaps with physical shares.

## Chart 7A – Mismatches Between Swaps and Counterparty Hedging with Shares

| Counterparty | Date | Swap Trade | Shares Referenced | Share Trade | Shares Purchased | Share Mismatch |
|---|---|---|---|---|---|---|
| Citigroup | 11/14/07 | Long | 2,750,000 | Buy | 2,688,987 | (61,013) |
| Citigroup | 11/14/07 | Long | 1,900,000 | Buy | 1,961,013 | 61,013 |
| Credit Suisse | 1/30/07 | Long | 850,000 | None | 0 | (850,000) |
| Credit Suisse | 12/11/07 | Long | 1,000 | None | 0 | (1,000) |
| UBS | 10/23/06 | Long | 1,380,000 | None | 0 | (1,380,000) |
| UBS | 11/13/06 | Long | 500,000 | None | 0 | (1,380,000) |
| UBS | 11/14/06 | Long | 800,000 | Buy | 500,000 | 1,380,000 |
| UBS | 1/17/07 | Long | 642,000 | None | 0 | (642,000) |
| UBS | 1/18/07 | Long | 300,000 | Buy | 942,000 | 642,000 |
| UBS | 11/9/07 | Short | (300,000) | None | 0 | 300,000 |
| UBS | 11/13/07 | Short | (1,700,000) | None | 0 | 1,700,000 |
| UBS | 11/14/07 | Short | (2,750,000) | Sell | (1,700,000) | 1,050,000 |
| UBS | 11/15/07 | Short | (1,900,000) | Sell | (2,750,000) | (850,000) |
| UBS | 11/16/07 | Short | (1,382,100) | Sell | (1,900,000) | (517,900) |
| UBS | 12/11/07 | Short | 1,000 | None | 0 | (1,000) |
| Morgan Stanley | 11/9/06 | Long | 850,100 | None | 0 | (850,100) |
| Morgan Stanley | 12/8/06 | Long | 100,000 | None | 0 | (100,000) |
| Morgan Stanley | 12/11/06 | Long | 645,000 | Buy | 100,000 | (545,000) |
| Morgan Stanley | 12/12/06 | Long | 670,000 | Buy | 1,315,000 | 645,000 |
| Merrill Lynch | 12/4/06 | Long | 900,000 | Buy | 900,800 | (800) |
| Merrill Lynch | 12/8/06 | Long | 815,700 | Buy | 815,800 | (100) |
| Merrill Lynch | 11/12/07 | Short | (200,000) | Sell | (200,300) | 300 |
| Merrill Lynch | 11/13/07 | Short | (400,000) | Sell | (399,500) | 500 |
| Merrill Lynch | 12/11/07 | Long | 1,000 | None | 0 | (1,000) |

259.    Not only does careful review of Professor Partnoy's table show that he is wrong about hedging and thus voting and investment power, but also that his opinions cannot be relied upon. Reminiscent of Professor Macy's criticism of Professor Partnoy's book, F.I.A.S.C.O., Professor Partnoy's analysis is misguided. Professor Partnoy deliberately omits from his chart data that disproves his thesis.

## VI.    THE GROUP CONDUCTS A PROXY FIGHT BY HALF-TRUTHS

260.    On December 19, 2007, TCI and 3G publicly but selectively disclosed -- in a Schedule 13D and a Schedule 14A filed with the Securities and Exchange Commission -- a portion of their interest in CSX and some but not all of their plans for the company. (JX 7; JX 8.)

261.    The Schedule 13D represented that TCI and 3G and several individuals had formed a group as of December 12, 2007, to coordinate their efforts with regard to (i) the purchase and sale of CSX securities, and (ii) the proposal of certain actions and/or transactions to CSX. (JX 8 at 15.)

262.    The Schedule 14A revealed TCI's and 3G's long held plan to conduct a proxy solicitation seeking to elect nominees to the Board of Directors of CSX at CSX's 2008 Annual Meeting of Shareholders, including Mr. Hohn, Mr. Behring, Mr. Lamphere, Mr. O'Toole, and Mr. Wilson. (JX 7; JX 19 at 2.)

263.    Both the Schedule 13D and Schedule 14A contain misstatements and omissions relating to (a) TCI's and 3G's beneficial ownership of the shares referenced in the swap arrangement; (b) their plans and proposals relating to CSX; (c) their contracts, arrangements, understandings or relationships; and (d) the formation of their group. (JX 8; JX 19.)

### A.    The Group Misrepresents Its Beneficial Ownership

264.    In the Schedule 13D, TCI and 3G stated that TCI is the beneficial owner of 17,796,998 shares of CSX common stock, that 3G is the beneficial owner of 17,232,854 shares, and that Defendants' group beneficially owns, in the aggregate, 35,054,952 shares, representing approximately 8.3 percent of CSX's then-outstanding shares of common stock. (JX 8 at 2-11.)

265.    TCI and 3G also stated in the Schedule 13D that they do not beneficially own any shares of CSX as a result of their economic exposure to CSX shares through swaps. They further stated that their swaps "do not give [TCI or 3G] direct or indirect voting, investment or dispositive control over any securities of [CSX] and do not require the counterparties thereto to acquire, hold, vote, or dispose of any securities of [CSX]". (JX 8 at 17.)

266.    In fact, TCI was the beneficial owner of the shares referenced in its swaps, 3G was the beneficial owner of the shares referenced in its swaps and each defendant

69

beneficially owned all shares of CSX common stock that were beneficially owned by all members of the group by operation of law.  (See Sections V.A. and V.B. supra.)

267.    TCI, 3G, and the group beneficially owned the shares referenced in their swaps because, among other things, they had voting and investment power with respect to the shares, used their swap arrangements as part of a plan or scheme to evade the reporting requirements and agreed to act together and with their swap counterparties for purposes of acquiring, holding, voting and/or disposing of CSX shares.  (See Sections V.A. and V.B. supra and other Sections generally.)

## B.    The Group Misrepresents Its Plans and Proposals

268.    TCI and 3G stated that they "acquired [their CSX] Shares for investment in the ordinary course of business".  (JX 8 at 14.)

269.    In fact, TCI and 3G acquired their stock and swap interests in CSX to change or influence control of CSX.

269.1    They formulated a plan to effect an LBO involving CSX or, failing that, an extraordinary leveraged share repurchase.  (PX 20; PX 37 at 2; Baggs ¶¶ 7-9, 11-12, 18; Munoz ¶¶ 12, 18; Ward ¶ 15; Fitzsimmons ¶ 12.)  The leveraged share repurchase would have resulted in a downgrade of CSX's debt rating to "junk" status.  (PX 264 ¶ 15; PX 80 at CSX_00021830-836.)

269.2    They developed proposals for other major changes in CSX's business and structure, including demands that CSX increase the prices it charges to customers and limit capital expenditures associated with increased capacity.  (PX 109; Munoz ¶ 16; Baggs 268 ¶ 18.)

269.3    They attempted to dictate CSX's management of its regulatory affairs.  (PX 121; Baggs ¶ 24.)

269.4    They told CSX's advisors that there were "no limits" and that TCI would "go to war" and "seek to replace the entire board".  (PX 109; Ward ¶ 19; Munoz ¶ 29; Fitzsimmons ¶ 12.)

269.4.1    In fact, TCI and 3G are currently waging a proxy war to elect five of their nominees to the CSX board.  (JX 19 at 2.)

269.4.2    Rather than wait for the annual election, TCI and 3G attempted to force CSX to call a special shareholders' meeting to consider TCI and 3G's nominees.  (PX 176; DX 79.)

269.5    They sought to replace the management of CSX.  (Tr. 12:9-10, 199:22-25.)

269.6    They developed an operating plan titled "Project Improve", which is the subject of a motion from Defendants to have it designated as "Attorneys'

Eyes Only". The plan calls for a "significant reduction in workforce". (PX 142 at 4.)

270.    Defendants failed to disclose their plans and proposals to make major changes in CSX's business and corporate structure. (JX 8; JX 19.)

### C.   The Group Misrepresents Its Agreements, Arrangements, and Relationships

271.    Defendants stated that they had "no contracts, arrangements, understandings or relationships (legal or otherwise) . . . with respect to any securities" of CSX except as described elsewhere in the Schedule 13D. (JX 8 at 17.)

272.    In fact, both TCI and 3G were parties to swap arrangements pursuant to which they had both voting and investment power. (JX 8 at 17.)

273.    Neither TCI nor 3G discloses the terms of their equity swap arrangements, including their termination provisions, the original basis price of the referenced shares, the number of CSX shares referenced in each individual swap, as well as the aggregate number of CSX shares referenced in Defendants' overall swap position. (JX 8; JX 19.)

273.1   In fact, TCI attempted further to obfuscate its holdings by keeping token swap positions with six of its eight counterparties in an attempt to hide its plans and influence from the market. (Tr. 204:15-205:1.)

274.    Neither TCI nor 3G discloses the source of funds they used to acquire beneficial ownership of the CSX shares underlying the swaps nor did they disclose the transaction history relating to those shares. (PX 8; PX 19.)

275.    Nor did 3G disclose the terms of its credit default swap arrangements that they had regarding CSX, which would have informed shareholders that Defendants took a position that effectively was a bet against the company's value as a way to hedge their own position against or to profit from or hedge against any decrease in CSX's credit ratings and/or stock price. (JX 8; JX 19.)

276.    None of TCI's or 3G's equity or credit default swap documentation -- the master agreements, including schedules and exhibits, and swap confirmations -- was attached to their Schedule 13D filings. (JX 8.)

277.    Neither TCI nor 3G disclosed the particulars of the agreements they had with their nominees for the CSX board. (PX 8; PX 19.)

### D.   The Group Misrepresents Its Group Formation/Ownership

278.    TCI and 3G represented that they formed a group to coordinate their activities with respect to CSX as of December 12, 2007. (JX 8 at 15.)

71

279.    The Schedule 13D also states that TCI "expressly disclaims beneficial ownership of the Shares beneficially owned by [3G] and the Additional Nominees" while 3G "expressly disclaims beneficial ownership of the Shares beneficially owned by [TCI] and the Additional Nominees".  (JX 8 at 15.)

280.    In truth, TCI and 3G agreed to act together as a group much earlier than their formal agreement of December 12, 2007, as described in detail above.  By way of example only:

> 280.1   TCI and 3G had discussion in Feburary 2007, after which 3G bought enormous quantities of CSX shares.  (PFF ¶ 54.)

> 280.2   On March 29, 2007, TCI and 3G met in 3G's New York offices to discuss "the fundamental case for CSX".  (Amin Dep. 141:17-142:16; Hohn Dep. 111:4-22; see also PX 66.)  In the period from March 29, 2007,to April 17, 2007, 3G increased its holdings in CSX by 11,145,801 shares (for a total of 19,407,894 shares or 4.44% of the then-outstanding shares).  During this period, TCI also began to convert its swaps to physical shares.  (PFF ¶ 78, 80.)

> 280.3   TCI and 3G exchanged financial models and operations analyses of CSX throughout 2007.  (PFF ¶ 104.)

## VII.    THE REAL "PARADE OF HORRIBLES" CONCERNS DEFENDANTS' CONDUCT

281.    Through Professor Partnoy, TCI  imagines a parade of horribles that would result if hedge funds seeking control of public companies are required to disclose their positions, but they are just that -- imagined.

282.    Professor Partnoy estimates the notional value of the U.S. equity swap market to be one trillion dollars and repeatedly references that figure.  (Partnoy Report ¶¶ 9, 17, 27, 31, 45, 106, 110.)  To arrive at this estimate, Professor Partnoy takes the notional value of the U.S. equity forwards and swaps market as of June 2007 to be $924 billion, attributes 100% of that value to swaps, and applies a 39% annual growth rate.  (Partnoy  26-27.)

283.    The $924 billion notional valuation used by Professor Partnoy overestimates the size of the total U.S. equity swap market.  It includes equity index swaps (Bank of International Settlements, November 2007, pp. 4 and 9 available at www.bis.org/publ/rpfxf07t.pdf) and forwards (Subrahmanyam Rebuttal Report, footnote 13, p. 9).

284.    The use of notional value also overstates the size of the market.  A more appropriate measure is the market value, which is $76 billion, not $924 billion.  (Subrahmanyam Rebuttal Report, footnote 13, p. 9.)

285.    In any case, the size of the market is not the relevant measure of impact.  The relevant inquiries are (1) how often persons acquire 5% of the value of the company

and (2) the harm that would result from allowing those persons to hide positions of that magnitude.

286.    To the first point, there is no evidence in the record that individuals acquiring over 5% interests in companies through the use of swaps is anything but infrequent in a market of only $76 billion.  By way of comparison, 5% of the value of ExxonMobil Corp. alone is $24 billion.  (See wsj.com (giving XOM market value of $479,231.10 million as of 5/26/08).)

287.    To the second point, the real harm would be to allow funds controlling large pools of capital to evade the reporting requirements set forth by the SEC.

287.1  As of the time of this filing, the SEC has not taken a formal position with regard to its requirements as applied to Defendants and those similarly situated.

287.2  CSX, through counsel, submitted materials to the SEC some time ago, but have not yet heard back.  CSX did not ask the SEC to intervene at trial as amicus because of a belief as to SEC policy not to intervene at the trial court level.  (Tr. 70:7-12, 70:20-22.)

287.3  By letter of May 22, 2008, the Court solicited the views of the SEC on two issues:

287.3.1    "Did the defendants have beneficial ownership, within the meaning of Regulation 13D, of the CSX shares held by their cash settled total return equity swap counterparties?"

287.3.2    "What mental state is required to establish the existence of a plan or scheme within the meaning of Rule 13d-3(b)?"

288.    The SEC reporting requirements under 13D are set forth to ensure transparency in the markets.  Defendants conduct has been anything but transparent.  As demonstrated above:

288.1  Defendants have used swaps to hide their ownership of CSX stock. (Subrahmanyam ¶ 74; JX 8 at 17; Subrahmanyam ¶ 75; Subrahmanyam Exs. D, D.1-D.7.; Subrahmanyam ¶ 76.)

288.2  Defendants have further hid the bulk of their CSX stock holdings in two of the eight counterparties in an attempt further to disguise from the market exactly where Defendants' interests lay.  (Tr. 178:24-179:1, 204:15-205:1.)

288.3  Defendants sought to hide their intentions to take control of CSX, removing management, and seat their own directors on the board.  (Tr. 12:9-10, 199:22-25; PX 109; PX 264 ¶ 19; PX 267 ¶ 29; PX 269 ¶ 12.)

288.4   None of this conduct was disclosed to the market, except to friendly hedge funds such as Atticus, Deccan Value, Seneca, Och-Ziff, Fir Tree, and Lone Pine. (PFF ¶ 66-73.)

289.    Defendants ignore the harm caused by the opacity of their conduct, particularly given the size of their stake in CSX, and have instead chosen to fight a proxy contest in the courtroom. Defendants have attacked CSX and its management on grounds that have nothing to do with the ultimate issue of whether Defendants should have disclosed their conduct to the market. For example, Defendants brought up the use of a CSX-owned hotel by CSX senior management, an inquiry undoubtedly meant for use in Defendants' proxy fight as it had no relevance to either side's suit.

290.    Defendants' failure to report their substantial holdings of stock and their plan to evade the requirements has now forced the Court to intervene in a shareholder voting process.

291.    The horribles that defendants contemplate are illusory, whereas the harms illustrated by CSX -- malfeasance, lack of transparency in the public markets, and manipulation of corporate elections -- are pronounced.

292.    As further discussed below, the most appropriate post hoc remedy that would prevent the Defendants from profiting from their plan of concealment is an injunction preventing Defendants and others who participated in their scheme from voting their shares at the shareholders' meeting.

293.    Defendants' claims of a parade of horribles are particularly misguided in view of the fact that they could have at least disclosed their swaps in a 13D filing at the outset of their buying spree and disclaimed beneficial ownership. That would not have changed the fact that Defendants were beneficial owners of the shares referenced in their swaps for reasons other than evasion. But it would have at least protected the unsuspecting public from the effects of Defendants' selective tipping in pursuit of control and influence on CSX. Had Defendants done so, their swap counterparties would have been in a position to insist upon an undertaking requiring appropriate disclosures by TCI and 3G.

294.    After repeated questioning by the Court, Mr. Hohn claimed he was not aware that TCI could file a 13-D disclosing an economic position exceeding five percent while disclaiming beneficial ownership on any shares. (Tr. 187:22-188:15.) The Court asked Mr. Hohn the following questions, and he gave the following answers.

Q. Did you at some point learn that it was possible to make a filing under Regulation 13-D with respect to securities as to which you disclaimed beneficial ownership?

A. We were aware that if you held more than 5 percent of a company in physical shares, and then I think it was either 5 or 10, then derivative positions where you had economic interests but no voting benefit had to also be disclosed.

Q:  I will ask the reporter to read the question back.  Please listen and answer.

(Question read)

A.  I think we learned early on that you were required to make a finding under 13-D for securities in which you disclaimed beneficial ownership if you had a certain minimum amount of physical shares, and I don't remember whether that was 5 percent or 10 percent. I hope I am answering your question.

Q.  Not quite.  Let's try once more.

(Question read)

Q.  Let me make it more precise.  Under Regulation 13-D even if you owned no physical shares, you could have made a 13-D filing in which you disclosed that you had an economic position exceeding 5 percent and in that filing disclaimed beneficial ownership on any shares, true?

A.  I wasn't aware of that.  (Tr. 187:22-188:15.)

**Proposed Conclusions of Law**

**I.    TCI AND 3G VIOLATED SECTION 13**

    **A.    Proposed Conclusions**

        1.  TCI violated Section 13(d) by failing timely to file a Schedule 13D concerning shares of CSX's common stock referenced in their swap arrangements.  (See PFF ¶¶ 28, 45, 173.)

        a.  TCI entered into and used its swap arrangements as part of a plan or scheme to evade the reporting requirements of Section 13(d), and thus is deemed the beneficial owner of the shares referenced in its swaps.  (See PFF ¶¶  24, 39, 44-45, 259-66.)

        b.  TCI is the beneficial owner of the shares referenced in its swaps because it has or shares voting and investment power with respect to those shares. (See PFF ¶¶ 196-98, 219, 222-24, 265-66, 271.)

        c.  TCI is the beneficial owner of the shares referenced in its swaps because it has the right to acquire voting and investment power with respect to those shares (within 60 days and beyond) and it entered into and used its swap arrangements with the purpose and effect of changing or influencing control of CSX.  (See PFF ¶¶ 26-27, 30-38.)

        2.  Defendants violated Section 13(d) by failing timely to file a Schedule 13D concerning shares of CSX's common stock beneficially owned by them as a group. (See PFF ¶¶ 263-66.)

        3.  Defendants violated Section 13(d) by making false and misleading statements in the Schedule 13D filed on December 19, 2007.  (See PFF ¶¶ 260-62.)

        a.  Defendants made material misstatements and omissions regarding their beneficial ownership of CSX shares.  (See PFF ¶¶ 263-66.)

        b.  Defendants made material misstatements and omissions regarding group formation.  (See PFF ¶¶ 52-60, 79, 84-90, 101-05, 109-10, 277-79.)

        c.  Defendants made material misstatements and omissions regarding their arrangements and agreements with others.  (See PFF ¶¶ 61-74, 270-76.)

        d.  Defendants made material misstatements and omissions regarding their plans and proposals concerning CSX.  (See PFF ¶¶ 106-08, 111-137, 267-69.)

    **B.    Discussion**

    The Supreme Court has repeatedly noted that the "fundamental purpose" of the '34 Act was to implement a "philosophy of full disclosure".  Basic, Inc. v. Levinson, 485

U.S. 224, 230 (1988) (citations omitted).  In keeping with that purpose, Section 13(d) of the Act "requires any person acquiring beneficial ownership of five percent or more of a corporation's common stock to disclose within ten days of the acquisition certain information to the corporation, the Commission, and the exchanges on which the stock is traded".  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 123 (2d Cir. 2001); see also 15 U.S.C. § 78m(d)(1) (1994).  That information is filed on Schedule 13D.  17 C.F.R. § 240.13d-1(a) (2008).  The purpose of Section 13(d) is to alert the market to large acquisitions that "might represent a potential shift in corporate control".  GAF Corp. v. Milstein, 453 F.2d 709, 717 (2d Cir. 1971).  Schedule 13D disclosures "allow[] investors to be informed of potential changes in corporate control and permit[] the market to value the shares accordingly".  Gen. Aircraft Corp. v. Lampert, 556 F.2d 90, 94 (1st Cir. 1977).

A Schedule 13D filing must be truthful and accurate.  United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991); Dan River, Inc. v. Unitex Ltd., 624 F.2d 1216, 1222 n.5 (4th Cir. 1980).  A materially false or misleading filing will violate Section 13(d), as will the failure to make a timely filing.  See Gen. Aircraft Corp., 556 F.2d at 96; GAF Corp., 453 F.2d at 720-21; SEC v. Gen. Refractories Co., 400 F. Supp. 1248, 1258 (D.D.C. 1975).  In the proxy-solicitation context, the Supreme Court has held that "a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote" and "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).  The courts have since applied this standard to Section 13(d).  Bilzerian, 926 F.2d at 1298; see also Flamm v. Eberstadt, 814 F.2d 1169, 1174 (7th Cir. 1987) ("like every other court of appeals we have taken the definition in TSC as suitable for the term wherever it appears in securities law.").  Defendants have violated Section 13(d) for three independent reasons: (1) TCI failed to disclose the CSX stock it beneficially owned through swaps; (2) Defendants failed to disclose their ownership interests as a group; and (3) the Schedule 13D that Defendants belatedly filed is materially false, misleading and incomplete.[2]

---

[2] Defendants rely upon an SEC release as support for the proposition that they are not required to disclose swap agreements under Section 13(d).  See Rebuttal Expert Report of Frank Partnoy at 9 n. 20.  As Defendants concede, however, the guidance in that SEC release applies to cash-settled equity futures, not to cash-settled swaps.  As explained by Professor Subrahmanyam, there are important differences between cash-settled equity swaps and futures.  Moreover, the SEC release appears to relate only to Section 13(d)(3)(d) (referring to the right to acquire investment or voting power), whereas Defendants' swap arrangements make them beneficial owners of the shares referenced in their swaps under both Sections 13(d)(3)(a) and (b).

1.    **TCI failed to file Schedule 13D to disclose stock beneficially owned through swaps.**

As of December 6, 2006, TCI had swap agreements with six counterparty banks that together acquired CSX shares referencing 5.2 percent of CSX outstanding common stock. (PFF ¶ 45.1.)  By March 30, 2007, TCI had swaps referencing more than 14 percent of CSX shares. (PFF ¶ 45.4.)  TCI claims that it was not required to disclose its swaps in CSX at that time because it was not the beneficial owner of the stock referenced by the swaps. (PFF ¶¶ 234-47, 264.)  TCI is wrong.

A person is the beneficial owner of a security under Section 13(d) if he: (a) has or shares voting or investment power in the security at issue (17 C.F.R. § 240.13d-3(a)); (b) has the right to acquire beneficial ownership of the security within sixty days or acquired the right to acquire beneficial ownership of the security with the purpose of changing or influencing control of the issuer of the security (17 C.F.R. § 240.13d-3(d)(1)(i)); or (c) uses an agreement or device to prevent an ownership interest from attaching in order to evade Section 13(d)'s reporting requirements (17 C.F.R. § 240.13d-3(b)).

TCI is the beneficial owner of the stock referenced in its swaps under each of these provisions: (a) TCI entered into its swap arrangements as part of a plan or scheme to evade the reporting requirements of Section 13(d); (b) TCI is the beneficial owner of the shares referenced in its swaps because it has or shares voting and investment power with respect to those shares directly, or indirectly, through contracts, arrangements, understandings and otherwise; and (c) TCI is the beneficial owner of the shares referenced in its swaps because it has the right to acquire voting and investment power with respect to those shares (within 60 days and beyond) and it entered into its swap arrangements with the purpose and effect of changing or influencing control of CSX.[3]

---

[3] Defendants suggest their swap activities are immune from disclosure under Section 3A(b) of the Exchange Act, which provides that "[t]he definition of 'security' in Section 3(a)(10) of [the Exchange Act] does not include any security-based swap agreement ..." That is false.  The exemption of security-based swap agreements from the definition of "security" under Section 3A of the Exchange Act has no bearing on Defendants' reporting obligations under Section 13(d) of the Exchange Act.  That a certain arrangement or device, such as a security-based swap agreement, does not itself constitute a "security" for purposes of the Exchange Act does not mean that swap arrangements cannot give rise to beneficial ownership (as such term is defined in Rule 13d-3 under the Exchange Act) of an instrument, such as the common stock of CSX, that is a "security" for purposes of the Exchange Act.

(a)     **TCI entered into the swap arrangements to evade the
reporting requirements of Secti`on 13(d).**

TCI intentionally used its swap arrangements as a means of hiding its substantial
ownership of CSX common stock from CSX shareholders in direct contravention of
Section 13(d). Rule 13d-3(b), promulgated under Section 13, provides that, even if a
person does not in fact beneficially own a security, beneficial ownership will nevertheless
attach if the person "directly or indirectly, create[d] or use[d] a trust, proxy, power of
attorney, pooling arrangement or any other contract, arrangement, or device with the
purpose or effect of divesting such person of beneficial ownership of a security or
preventing the vesting of such beneficial ownership as part of a plan or scheme to evade
the reporting requirements". 17 C.F.R. § 240.13d-3(b). TCI beneficially owned the
stock referenced in the swap arrangements because it used its swap arrangements as part
of a plan or scheme to evade Section 13(d)'s reporting requirements.

The determination of whether actions constitute a "plan or scheme to evade" some
part of the securities laws turns on the facts and circumstances of each case. See
Sorrento, Inc., SEC No-Action Letter, Wash Serv. Bureau File No. 050784005, Fiche No.
768C11 (May 4, 1984) (in response to a no-action letter request regarding Regulation D,
the SEC stated, "[w]hether a transaction is part of a plan or scheme to evade the
registration provisions will depend on the facts and circumstances of each particular
case"). While the phrase "plan or scheme to evade" is used elsewhere in the securities
laws, those other applications shed little light on the meaning of the phrase in this case.[4]

Scienter is not an element of a Section 13(d) violation. SEC v. Savoy Indus., 587
F.2d 1149, 1167 (D.C. Cir. 1978); SEC v. Wills, 472 F. Supp 1250, 1268 (D.D.C. 1978)
(requiring only negligent failure to comply with disclosure obligations to find liability
under Section 13(d)). The language and legislative history of Section 13(d) indicate
clearly that it is a reporting, not an antifraud, statute. Id. (citing H.R. Rep. No. 90-1711,
at 2819-20 (1968), reprinted in 1968 U.S.C.C.A.N. 2811, 2818). To the extent that Rule

---

[4] For example, the determination of whether there is a "plan or scheme" to evade in
certain other securities contexts, such as Regulation S, relates to the availability of certain
safe harbor protections from registration for offers and sales of securities outside the
United States. Preliminary Note 2 to the Regulation denies this exemption to plans or
schemes to evade the registration requirement. 17 C.F.R., ch. II, pt. 230, Reg. S, Refs &
Annos, Preliminary Note 2 (1998). Courts have found that the Regulation S safe harbor
is not available where transactions are in technical compliance with the law, but are
designed to evade registration requirements. See e.g., Geiger v. SEC, 363 F.3d 481, 488
(D.C. Cir. 2004) (finding that the sale of shares was designed to evade the registration
requirement since purchaser bought shares at a substantial discount and was anxious to
facilitate quick resale so he resorted to fraud); SEC v. Cavanagh, No. 98 Civ. 1818DLC,
2004 WL 1594818, at *24 (S.D.N.Y. July 16. 2004), aff'd 445 F. 3d 105 (2d Cir. 2006)
(finding no evidence that purchaser "bought with the intention of holding its shares
offshore and for investment purposes").

13d-3(b) has a state of mind requirement, it demands no more than intent to avoid the reporting requirements of Section 13(d).  See Adoption of Beneficial Ownership Disclosure Requirements, Exchange Act Release No. 13291, Example 8, 42 Fed. Reg. 12347 (Feb. 24, 1977) (hypothetical provided by the SEC showing that if any state of mind is required to cause the vesting of beneficial ownership under Rule 13d-3(b), it would be that the person or entity evaded the reporting requirements intentionally).

A person can be deemed by Rule 13d-3(b) to be a beneficial owner even if avoidance of disclosure is not that person's sole motive for entering into an arrangement meant, at least in part, to evade disclosure under Section 13(d).  Defendants have not cited, and we are not aware of, a single case or directive from the SEC suggesting that in order to find a violation of Section 13(d) by operation of Rule 13d-3(b), a person must be solely motivated by a desire to avoid the reporting requirements.  There will almost always be more than a single motive for an arrangement that prevents the vesting of beneficial ownership.  If Rule 13d-3(b) were triggered only where a person's sole motive is evasion, it would be useless as a device to protect against circumvention of the disclosure requirements.  That result would be contrary to the transparency principle of Section 13(d) in cases, like this one, where the evader is seeking influence and control of a public company.

The record demonstrates that TCI used its swap arrangements as part of a plan to avoid the reporting requirements of Section 13(d), as more fully demonstrated above.  TCI acquired its interest in CSX as swaps as opposed to physical shares for the purpose of avoiding having to disclose that interest.  Joe O'Flynn, the CFO of TCI Fund, admitted as much at a TCI Fund board of directors meeting, where he said that one of the reasons for using swaps is "the ability to purchase without disclosure to the market or the company".  (PFF ¶ 22.)  TCI emails discuss the need to make certain that counterparties stay below five percent physical share ownership.  (PFF ¶ 24.)  One of the reasons why TCI held less than five percent of physical shares was to avoid disclosure.  (PFF ¶ 21.)  Mr. Hohn admits that one of his motivations in avoiding disclosure was to avoid paying a higher price for the shares of CSX.  (PFF ¶ 62.)  Indeed, TCI took a number of steps calculated to conceal its investment from the market.  (PFF ¶ 20-29.)  TCI acquired only approximately 4.5 percent in physical CSX shares to remain safely below the 5 percent reporting requirement.  (See PFF ¶ 28-29.)  TCI only accumulated interests in CSX above the five percent threshold via swap arrangements.  (See PFF ¶ 28-29.)

At the same time, TCI also undertook to conceal the identity and holdings of its swap counterparties so that its interest in CSX would not be revealed by the counterparty banks.  TCI assumed that the counterparties to its swap agreements would hedge their exposure with physical shares, and as a result, TCI was "concerned" that some of the counterparties could cross the five percent threshold, which would trigger a filing requirement for the bank and thereby alert the market to TCI's investment in CSX.  (PFF ¶ 24.)  TCI therefore inquired "on a no names basis" to the counterparties as to each of their respective filing requirements with respect to percentage holdings in CSX outstanding shares.  (PFF ¶ 24.)  TCI planned to and did in fact maintain a diversified CSX swap position among eight counterparties to avoid any one bank crossing the five percent threshold as a result of TCI's swap position.  (PFF ¶¶ 23-24, 30, 39.)  During this

same period, TCI selectively tipped its friends about its position in, and plans for, CSX, so that they could benefit from, among other things, increases in CSX stock price. (PFF ¶¶ 62-74.)

Even after TCI consolidated its swap position with Deutsche Bank and Citigroup, it maintained <u>de minimis</u> swap positions with six other counterparty banks. (PFF ¶¶ 30, 99-100.) TCI admitted that it maintained those swaps in order to conceal the identity of its primary swap counterparties and obscure any link between TCI and a counterparty that could be used to discern TCI's trading activity. (PFF ¶¶ 99-100.) In doing so, TCI subverted the transparency provided by Section 13(d) that alerts shareholders to the trading activity of Schedule 13D filers. Beneficial owners of more than five percent must file an amendment to the Schedule 13D whenever a material change occurs in the facts set forth in a Schedule 13D filing. 15 U.S.C. § 78m(d)(2).

TCI's use of swaps to build a significant position in CSX without having to disclose that position is a "plan or scheme to evade". It is precisely the type of conduct that Section 13(d) and Rule 13d-3(b) were meant to address. The purpose of Section 13(d) "is to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control". <u>GAF Corp.</u>, 453 F.2d at 717. "In particular, section 13(d) was intended to alert investors to potential changes in corporate control so that they could properly evaluate the company in which they had invested or were investing." <u>Id.</u> at 720; <u>see also</u> S. REP. NO. 91-1125, at 3 (1970) The "overall goal" of Section 13(d) is "transparency in the securities markets". (Trial Tr. 225:10-11). Rule 13d-3(b) is directed at attempts -- like TCI's conduct in this case -- to subvert that transparency.[5]

---

[5] Defendants' violations of the securities laws go beyond Sections 13(d) and 14(a) of the Exchange Act and extend to violations of Section 16(a) of the Exchange Act as well. Section 16 of the Exchange Act was enacted by Congress to protect the investing public from market abuse by company insiders, including large stockholders (with 10% beneficial ownership of a class of voting securities of a company) who may have the ability to influence or control a company to enable them to acquire material, non-public information. <u>See e.g.</u>, S. REP. NO. 73-1455, at 55 (1934). Once Defendants became the beneficial owners of more than 10% of the outstanding shares of CSX or a member of a group with more than 10% beneficial ownership, they became obligated to file ownership and transaction reports on Forms 3, 4 and 5 with the SEC relating to their holdings of CSX common stock and derivative securities, including their total return swap arrangements. <u>See</u> 17 C.F.R. §§ 240.16a-2, .16a-3. Whether Defendants are subject to any short-swing profit disgorgement liability under Section 16(b) of the Exchange Act is not a question this Court has been asked to decide. Until Defendants correct their lack of public disclosure with respect to the terms of their numerous total return swap transactions made since Section 16(a) reporting was triggered (many of which appear to fall within six months of each other), neither the Company nor any of its shareholders has sufficient information to determine whether to bring such a claim with respect to these transactions.

### (b)    The swap arrangements give TCI both voting and investment power in CSX's stock.

TCI beneficially owns the CSX common stock referenced in its swaps because it "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. § 240.13d-3(a).

### (i)    Defendants have investment power

A person has "investment power" over a security where he has the ability significantly to influence the disposition of the security. SEC v. Drexel Burnham Lambert Inc., 837 F. Supp. 587, 607 (S.D.N.Y. 1993); see also Calvary Holdings, Inc. v. Chandler, 948 F.2d 59, 63 (1st Cir. 1991).

TCI's swap arrangements gave it investment power over the referenced CSX shares because, among other things: (a) TCI counterparties holding large CSX swap positions had to, as a practical matter, hedge their exposure to CSX swaps with matching CSX shares (PFF ¶ 201); (b) TCI counterparties hedged CSX swaps with matching shares (PFF ¶ 202); and (c) upon termination of large swap positions, the counterparties had no practical choice but to sell the matching shares, which is what the counterparties did here (PFF ¶ 203). Defendants feigned uncertainty about the hedging practices of their counterparties but ultimately admitted that the counterparties hedge and that Defendants rely on that assumption. (PFF ¶ 221)

As a practical matter, no counterparty bank to any large position of swaps in CSX shares (like those involved in this case) would hedge any other way than by purchasing matching physical shares of CSX stock. (PFF ¶ 201.) When TCI purchased swaps, its counterparties purchased a nearly identical number of CSX shares. (PFF ¶ 202.) When TCI sold or unwound the swaps, its counterparties sold a nearly identical number of CSX shares. (PFF ¶ 203.)

While Defendants may not have a contractual right to force their counterparties to hedge with physical shares or to unwind their hedged positions, the economic reality is that TCI has the ability effectively to determine not only the disposition of shares by the counterparties, but also the specific quantity and timing of that disposition. TCI therefore exercises significant influence over the acquisition, holding and disposition of the CSX shares held by the counterparty banks. (PFF ¶219.)

Putting aside the power associated with the swap arrangements, TCI's and 3G's relationships with the bank counterparties also gives them the ability to influence significantly the disposition of CSX shares. This is evident, for example, in the changes in the ownership composition of CSX stock discovered by Innisfree in February 2008. (PFF ¶ 40.)

### (ii)    Defendants Have Voting Power

TCI's swap arrangements also gave TCI voting power over the CSX stock referenced in the swaps. Voting power under Section 13(d) does not require the actual ability to vote the physical stock at issue, but only that a person have the ability significantly to influence the voting of the shares. Wellman v. Dickinson, 682 F.2d 355, 366-67 (2d Cir. 1982). TCI has that power.

When TCI's counterparties acquired CSX shares of common stock as a hedge for the CSX swaps, they, by definition, acquired the actual right to vote the shares, which travels with the physical share itself. (PFF ¶ 222.) Thus, by entering into the swaps TCI had the ability to determine the identity of the vote holder, effectively placing shares and their corresponding voting rights in the hands of the counterparties, as opposed to the hands of whoever else would have otherwise held the shares. This is important as certain types of shareholders vote certain predictable ways in contests for corporate control. (PFF ¶ 224.1.)

TCI also has the ability significantly to influence the voting of the matching shares during the term of a CSX swap based on understandings and relationships with counterparty banks that extend beyond the execution of the swap in question. For example, four of the counterparties here are prime brokers to TCI. (PFF ¶ 228.) In 2007 alone, those banks have enjoyed over $42.25 million in net revenues from business with TCI. (PFF ¶ 230.) Given that lucrative relationship, the counterparty banks have an economic incentive to cooperate with TCI. (PFF ¶ 232.) Indeed, the evidence is that at least Deutsche Bank assisted TCI in executing its plans for CSX. Deutsche Bank's leveraged finance group provided TCI with financial advice concerning CSX throughout March 2007 and did not charge TCI for those services. (PFF ¶ 34.)

TCI exercised this influence by, for example, placing most of its swaps—specifically, swaps referencing more than 28.4 million shares of CSX common stock—with Deutsche Bank because TCI expected that Deutsche Bank would be more likely than other counterparty banks to vote with TCI in a proxy battle. (PFF ¶ 32.) TCI admitted that it believed it could convince Deutsche Bank's proprietary hedge fund subsidiary, Austin Friars, of its case against CSX and thereby influence Deutsche Bank to vote with TCI. (PFF ¶¶ 36-37.)

### (c)    The swap arrangements gave TCI the right to acquire beneficial ownership of CSX's stock.

Even if a person does not have or share voting or investment power under 13d-3(a), it is considered a beneficial owner if the person: (1) "has the right to acquire beneficial ownership of such security . . . within sixty days", 17 C.F.R. § 240.13d-3(d)(1)(i); or (2) acquires a security or right to acquire beneficial ownership of a security "with the purpose or effect of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having such purpose or effect, [who] immediately upon such acquisition shall be deemed to be the beneficial owner of the securities which may be acquired through the exercise or conversion of such security

83

or power." Id. TCI beneficially owns the shares referenced by its swaps under both subsections.

By its own admission, TCI has always had the right to acquire beneficial ownership of the CSX stock referenced in its swaps not only within sixty days, but also "at any time". (PFF ¶ 130.) From the time that it first approached CSX in late 2006 and early 2007, TCI held itself out to CSX as a major shareholder with significant swap arrangements that it could "convert at any time" to direct ownership stakes. (PFF ¶ 130.) TCI reiterated its ability to convert its swaps throughout the spring and summer of 2007, telling CSX that it "would be taking voting positions" and that there would be "no limits" to what TCI would do if CSX did not accede to its demands. (PFF ¶ 130.) By April 2007, TCI began to act on its threats, informing CSX's financial advisor Evercore that not only did it have plans to convert its indirect holdings to direct holdings, but also that it was doing so currently. (PFF ¶ 133.) Thus, TCI could acquire beneficial ownership of the shares referenced in its swaps not just within sixty days, but also at any time, and in fact did convert the swaps to direct holdings in its efforts to acquire additional direct voting power over CSX. (PFF ¶ 133.)

Even if TCI could not convert its swap arrangements to direct ownership of CSX's common stock within sixty days, TCI is still the beneficial owner of the stock referenced in the swaps because it could do so beyond 60 days and it entered into the swap arrangements "with the purpose or effect of changing or influencing the control of the issuer [CSX]". 17 C.F.R. § 240.13d-3(d)(1)(i). As early as December 2006, for example, TCI insisted that CSX pursue a leveraged buyout ("LBO") or, failing that, an extraordinary leveraged share repurchase. (PFF ¶¶ 115, 268.) TCI pressed those plans with CSX through the spring and summer of 2007. (PFF ¶¶ 121-37.) Indeed, speaking at a Bear Stearns conference in May 2007, Defendant Amin told investors that he had contacted private equity firms to line up bids for an LBO of CSX and that he already had a 100-page indicative financing proposal from a bank that could underwrite the LBO debt. (PFF ¶ 9.)

Further, Defendants aimed to influence CSX's strategy and urged other major changes in CSX's business and structure, including demands that CSX increase the prices it charges to customers (PFF ¶¶ 144, 145, 268.2), demands to limit capital expenditures associated with increased capacity (PFF ¶¶ 145, 268.2) and attempts to dictate CSX's management of its regulatory affairs (PFF ¶ 268.3). TCI told CSX representatives that, in addition to other demands, TCI "would seek to replace the entire Board as a means to change management" and that TCI's objective was "to find management that would be more open to leveraging [CSX]". (PFF ¶ 151.1.) Indeed, Defendant Christopher Hohn himself stated that the reason why TCI made an HSR filing in March 2007 was to try to influence management in how it runs CSX. (PFF ¶ 124.)

## 2. Defendants failed to disclose their ownership interests as a group.

Defendants also failed to file a Schedule 13D within 10 days after they became beneficial owners of more than 5 percent of the outstanding shares of CSX common stock

as a group when the TCI/3G group first exceeded the five percent threshold on April 10, 2007 and entered into arrangements with counterparty banks like Deutsche Bank.

Two or more entities will be considered a "group" under Section 13(d) if they "agree to act together for the purpose of acquiring, holding, voting or disposing of" the equity securities of a corporation. See 17 C.F.R. § 240.13d-5(b)(1) (2000); see also Roth v. Jennings, 489 F.3d 499, 507-08 (2d Cir. 2007); Morales, 249 F.3d at 123-24. The entities need not have combined for all of the purposes of "acquiring," "holding", "voting" or "disposing of" the securities because the list is disjunctive. Roth, 489 F.3d at 508. Instead, the query is whether the entities "combined in furtherance of a common objective with regard to one of those activities". Id. (quotation and citation omitted). The formation of a group "may be formal or informal and may be proved by direct or circumstantial evidence". Morales, 249 F.3d at 124; see also Roth, 489 F.3d at 508. Where, as here, concealment is at issue, "plaintiff's proof necessarily has to be circumstantial". Champion Parts Rebuilders, Inc. v. Cormier Corp., 661 F. Supp. 825, 850 (N.D. Ill. 1987). In short, the issue is whether sufficient evidence supports an inference that such an agreement or understanding exists. Morales, 249 F.3d at 124.

Defendants would have the Court believe that their group appeared suddenly, *deus ex machina*, on December 12, 2007, fully formed with a written agreement between TCI and 3G, a slate of five nominees to the CSX board with written nominee agreements. Section 13D, however, does not require a formal written agreement to form a group, and TCI and 3G in fact formed a group prior to December 12, 2007, as described in detail above.

TCI and 3G's agreement is evidenced by, among other things: (a) the entities' long-standing investment relationship and their frequent communications concerning CSX, including discussions on whether to form a group (PFF ¶ 102);[6] (b) their common plan to restructure CSX through a leveraged buyout or levered share buyback and make other major operational changes (PFF ¶¶ 105); (c) a pattern of parallel purchases of CSX stock over the same, brief time period immediately following their meeting to discuss CSX (PFF ¶¶ 78-80); and (d) parallel activist activities following the run-up in their share purchases, including soliciting the support of other hedge funds with respect to their proposals for CSX, meeting with the same former CSX executive to gather inside information concerning the Company and running a simultaneous search for nominees to put on a slate for election to CSX's board of directors (PFF ¶¶ 106, 153).

---

[6] Mr. Hohn appeared to be of the opinion that TCI could avoid forming a group with 3G merely by saying no to Behring's requests to form a group. (PFF ¶ 109.) Defendants cannot avoid group formation, however, merely by disclaiming that they are a group. Roth, 489 F.3d at 511 (holding that where defendants act together for the purpose of acquiring shares, they form a group under Section 13(d), "regardless of their attempted disclaimers of the legal effect of such joint action").

TCI and 3G have a long-standing investment relationship through 3G's "Synergy" fund, which has invested in TCI since its inception in 2004. (PFF ¶ 15.) TCI and 3G's executives have interacted for years because of that relationship, and 3G is privy to detailed information on TCI's investments—including its investment in CSX—through that relationship. (PFF ¶ 17.) Indeed, both TCI's and 3G's principals testified that they discussed their opinions of CSX's management team and governance throughout 2007 and exchanged financial models and analyses of CSX—models that were strikingly similar in both their criticisms of CSX and their proposed strategic alternatives for the Company. (PFF ¶ 105.)

Throughout the spring and fall of 2007, TCI and 3G engaged in parallel and coordinated activities with respect to CSX. TCI and 3G met concerning CSX at 3G's offices in New York City on March 29, 2007—the same day that TCI met with CSX in New York to discuss TCI's proposals for changes at CSX. (PFF ¶ 78.) Immediately following those meetings, 3G substantially increased its shareholdings in CSX and, within days, TCI began for the first time to convert its swaps into physical shares of CSX common stock. (PFF ¶ 79.) By April 18, 2007, TCI and 3G each owned approximately 4.2 percent of the outstanding shares of CSX common stock—an amount substantially the same as they owned at the time they eventually filed their Schedule 13D in December 2007. (PFF ¶¶ 133, 173.)

Following this stock run up, TCI and 3G's conduct continued in parallel as they moved toward a proxy fight with CSX. Both TCI and 3G sought the support of other hedge funds with respect to their proposals for CSX, both reached out to the same former CSX executive to gather inside information concerning the Company and both began a simultaneous search for nominees to run for election to CSX's board of directors. (PFF ¶¶ 64-74, 152-53, 160, 162, 165.) Despite this, both TCI and 3G make the incredible claim that they did not decide to form a group until December 2007—the eve of the opening of the window under the CSX Bylaws for making shareholder proposals including nominating persons for election as directors at the Annual Meeting. (PFF ¶ 277.)

TCI's and 3G's relationship, interactions and parallel conduct all support an inference that TCI and 3G agreed to acquire CSX stock to further their common plans to implement change at CSX and ultimately to pursue a proxy contest if necessary. See, e.g., Roth, 489 F. 3d at 512 (finding evidence of group formation in parallel means, timing and method of share purchases); Champion, 661 F. Supp at 850 (common plan and goal, parallel share purchases, correlated activities and intercommunications and claims of shareholder support constitute "strong circumstantial evidence demonstrating the existence of an agreement among [Defendants]"). The Court is not required to "play ostrich" in the face of months of parallel plans, communications, investments and activism and assume they are mere coincidence. See Champion, 661 F. Supp. at 850 ("It would require a degree of naïveté unbecoming to this Court to believe that the various activities of Defendants were not the product of an agreement among the group but, rather, were merely coincidences.").

TCI also formed a group with Deutsche Bank's hedge fund arm, Austin Friars, and consequently Deutsche Bank itself. TCI and 3G entered into swap arrangements and began accumulating swap positions with respect to CSX shares with their swap counterparties beginning in late 2006. (PFF ¶ 28.) While TCI and 3G disclaim having any express agreements with their counterparties requiring the counterparties to hedge their position with physical shares, the counterparties had to, as a practical matter, hedge their exposure to CSX swaps with matching CSX shares. (PFF ¶ 201.) The contracts negotiated between TCI and 3G and their counterparties contemplate that the counterparties would hedge, and, combined with the economic incentives of the counterparties, that they would do so by acquiring matching CSX shares upon entering into the swap transaction with TCI and 3G, and TCI assumed they would. (PFF ¶ 205.) So long as the swap position was maintained, the counterparties also had to, as a practical matter, hold their hedge positions. (PFF ¶ 201.) Thus, pursuant to the swap arrangements, TCI and 3G and their respective counterparties acted together for purposes of acquiring, holding, and disposing of CSX shares.

### 3.    Defendants' Schedule 13D is materially false, misleading, and incomplete.

After months of hiding their position, TCI and 3G finally filed the required Schedule 13D on December 19, 2007, literally on the eve of the opening of the window for making shareholder proposals, including nominating persons for election as directors, at CSX's annual meeting. (PFF ¶ 173.) They did so only after concealing their positions and plans for nearly a year, selectively tipping their friends about their positions and plans, and threatening CSX about what would happen if it did not yield to TCI's demands.

The Schedule 13D that Defendants filed is materially false, misleading and incomplete because it:  (a) fails to accurately disclose Defendants' beneficial ownership of CSX common stock by falsely disclaiming beneficial ownership of shares associated with total return swaps; (b) misrepresents group formation and group ownership; (c) fails to disclose information concerning contracts, arrangements, understandings or relationships among Defendants and between Defendants and other persons with respect to any securities of CSX; and (d) fails to disclose Defendants' plans or proposals with respect to their interest in CSX.

### (a)    Defendants misrepresented their beneficial ownership.

Section 13(d) requires that a reporting person disclose "the number of shares of [the] security which are beneficially owned". 15 U.S.C. § 78m(d)(1)(D), 17 C.F.R. § 240.13d-101 (Schedule 13D, Item 5). Defendants' Schedule 13D misrepresents their true beneficial ownership of CSX common stock.

In the Schedule 13D, Defendants state that TCI is the beneficial owner of 17,796,998 shares of CSX common stock, that 3G is the beneficial owner of 17,232,854 shares and that Defendants' group beneficially owns, in the aggregate, 35,054,952 shares, representing approximately 8.3 percent of CSX's then-outstanding shares of common

87

stock. (PFF ¶ 263.) Defendants also state in the Schedule 13D that they do not beneficially own any shares of CSX as a result of their economic exposure to CSX shares through swaps. (PFF ¶ 264.) Defendants further state that the swaps "do not give [TCI or 3G] direct or indirect voting, investment or dispositive control over any securities of CSX and do not require the counterparties thereto to acquire, hold, vote or dispose of any securities of [CSX]". (PFF ¶ 264.) As discussed above, however, TCI did have beneficial ownership of the shares referenced in its swaps and thus its statement to the contrary is materially false and misleading. 17 C.F.R. § 240.13d-101 (Schedule 13D, Item 5).

**(b)    Defendants misrepresented group formation and group ownership.**

Defendants also misrepresented the formation of the group and the beneficial ownership of the group members' shares of CSX common stock. In their Schedule 13D, Defendants state that TCI and 3G formed a group for purposes of coordinating certain of their efforts with regard to their interests in CSX on December 12, 2007. (PFF ¶ 277.) In fact, as set out above, TCI and 3G formed a group in the spring of 2007. (See supra Section I.B.1.(c).2.)

**(c)    Defendants failed to disclose arrangements and agreements with members of their group and others.**

Defendants also failed properly to disclose other arrangements, understandings, and relationships with respect to CSX. 17 C.F.R. § 240.13d-101 (Schedule 13D, Item 6). Defendants state that they have "no contracts, arrangements, understandings or relationships (legal or otherwise) . . . with respect to any securities" of CSX except as described elsewhere in Schedule 13D. (PFF ¶ 270.) In fact, Defendants have various undisclosed arrangements, understandings, and relationships with other persons, including each of the counterparties with respect to their interest in CSX. (PFF ¶ 271.)

Defendants failed to disclose the material terms of the swap arrangements, including their termination provisions, the initial price of the referenced shares, the number of CSX shares referenced in each individual swap as well as the aggregate number of CSX shares referenced in Defendants' overall swap position, and did not file copies of the written agreements governing their swaps as exhibits to the Schedule 13D. (PFF ¶ 235-38.); 17 C.F.R. § 240.13d-101 (Schedule 13D, Items 6 and 7). Defendants also failed to disclose the material terms of the credit default swap arrangements that they had regarding CSX, which would have informed shareholders that Defendants took a position that effectively was a bet against the company's value as a way to hedge their own position against or to profit from or hedge against any decrease in CSX's credit ratings and/or stock price. (PFF ¶ 274.)

88

        **(d)**      **Defendants failed to disclose plans or proposals as to CSX's business or corporate structure.**

Schedule 13D, Item 4, requires that an individual disclose the "purpose or purposes of the acquisition of securities of the issuer" and "[d]escribe any plans or proposals which the reporting persons may have which relate to or would result in", <u>inter alia</u>: "(e) [a]ny material change in the present capitalization or dividend policy of the issuer; or (f) [a]ny other material change in the issuer's business or corporate structure . . . ." 17 C.F.R. § 240.13d-101. A plan does not have to be definite or concrete in order to require disclosure. Where a plan involves a prospective event, it must be disclosed even though the triggering event may not occur. <u>See In re Douglas A. Kass</u>, 50 S.E.C. 1110, Release No. 34-31046, 1992 WL 204252, at *6 (S.E.C. Aug. 17, 1992) (citing <u>Otis Elevator Co. v. United Techs. Corp.</u>, 405 F. Supp. 960, 970 (S.D.N.Y. 1975)).

Defendants' Schedule 13D is false and misleading because it fails to disclose definite and concrete plans, including in CSX's present capitalization and other major changes to CSX's business and structure. Defendants state that they originally "acquired [shares of CSX stock] for investment in the present ordinary course of business". (PFF ¶ 267.) In fact, as described above, Defendants acquired their interests in CSX with the purpose or effect of changing or influencing the control of CSX. (PFF ¶ 268.) They formulated a plan to effect an LBO involving CSX or, failing that, an extraordinary leveraged share repurchase. (PFF ¶ 268.1) They formulated a plan to change management (PFF ¶ 268.3) and take control of the board (PFF ¶ 268.4). TCI and 3G also developed proposals for other major changes in CSX's business and structure, including demands that CSX increase the prices it charges to customers (PFF ¶ 268.2), demands to limit capital expenditures associated with increased capacity (PFF ¶ 268.2) and attempts to dictate CSX's management of its regulatory affairs (PFF ¶ 268.3).

* * *

Defendants' misstatements and omissions in their late-filed Schedule 13D are material because a reasonable shareholder would consider the misrepresented or omitted information important, particularly in view of the outstanding proxy fight in connection with CSX's annual meeting of shareholders in June 2008. <u>Savoy Indus.</u>, 587 F.2d at 1166; <u>Southmark Prime Plus, L.P. v. Falzone</u>, 776 F. Supp. 888, 902 (D.Del. 1991). In particular, the fact that Defendants have been working in concert not for a few months, but for over a year; that they have investment and voting power over more than double the number of shares of common stock they have disclosed; and that they intend to (and have for many months intended to) implement major structural and operational changes at CSX are all facts that a reasonable shareholder would want to know in determining how to vote at the annual meeting. Indeed, Defendants should be required to correct their misrepresentation if only to put CSX shareholders on notice of their deception, a factor any reasonable shareholder would want to consider in determining whether to vote for Defendants' proposed slate of directors.

## II.    TCI AND 3G VIOLATED SECTION 14

### A.    Proposed Conclusions

4.  Defendants violated Section 14(a) of the '34 Act by making false and misleading statements in their proxy materials.

a.  Defendants failed to disclose the true extent of their beneficial ownership of CSX shares of common stock by falsely disclaiming beneficial ownership of shares associated with total return swaps.

b.  Defendants misrepresented the date that Defendants formed a group and the number of shares of CSX common stock owned by the group.

c.  Defendants failed to disclose information concerning contracts, arrangements, understandings or relationships among Defendants and between Defendants and other persons, such as swap counterparties, with respect to the securities of CSX.

d.  Defendants' proxy statements misrepresented TCI's position with respect to a settlement of the proxy fight.

e.  Defendants set forth a false two-year history of each of their transactions in CSX securities because they did not disclose the history of swap transactions that reference shares of CSX common stock or any information concerning renewals and extensions of the terms thereof or dates on which such swaps were settled.

### B.    Discussion

Section 14(a) makes it unlawful to solicit proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors". 15 U.S.C. § 78n(a). Rule 14a-9, in turn, prohibits proxy solicitation "by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading". 17 C.F.R. § 240.14a-9(a); see also In re Trump Hotels S'holders Derivative Litig., No. 96 Civ 7820 DAB, 2000 WL 1371317, at *12 (S.D.N.Y. Sept. 21, 2000) (quoting GAF Corp. v. Heyman, 724 F.2d 727, 739 (2d Cir. 1983)). The purpose of Section 14(a) is to "promote the 'free exercise of the voting rights of shareholders' by ensuring that proxies would be solicited with 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'" Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 381 (1970) (quoting H.R. Rep. No. 73-1383, at 13 (1934); S. Rep. No. 73-792, at 12 (1934)).

Defendants violated Section 14(a) and Rule 14a-9 by filing false, misleading and incomplete preliminary proxy statements on Schedule 14A on March 10, 2008 and April

15, 2008, and a definitive proxy statement on Schedule 14A filed on April 28, 2008 (collectively, the "Schedule 14A"). Defendants' Schedule 14A is materially false and misleading for several of the same reasons their Schedule 13D is false and misleading, including: (a) Defendants fail to disclose the true extent of their beneficial ownership of CSX shares of common stock (PFF ¶ 262); (b) Defendants misrepresent the date that Defendants formed a group and the number of shares of CSX common stock owned by the group (PFF ¶ 262); and (c) Defendants fail to disclose information concerning contracts, arrangements, understandings or relationships among Defendants and between Defendants and other persons, such as swap counterparties, with respect to the securities of CSX (PFF ¶ 262). Those misrepresentations and omissions are materially false and misleading: (a) Defendants made material misstatements and omissions regarding their beneficial ownership of CSX shares; (b) Defendants made material misstatements and omissions regarding group formation; (c) Defendants made material misstatements and omissions regarding their arrangements and agreements with others; and (d) Defendants made material misstatements and omissions regarding their plans and proposals concerning CSX. (See supra Section I.B.3.)

Defendants' Schedule 14A is also materially false and misleading for two additional reasons. First, Defendants' proxy statements misrepresent TCI's position with respect to a settlement of the proxy fight. Defendants state that "TCI made concessions with the hope of being able to reach an amicable resolution" and that TCI "indicated willingness to sign a one year standstill agreement". (PFF ¶ 261.) That is false. Before the outset of negotiations with Mr. Kelly, TCI took the position that "[t]he only alternative to the proxy fight is if [CSX] will allow our 5 nominees on and we can mutually agree with them which 5 of their directors to replace". (PFF ¶ 183.) Indeed, before the issue of a standstill ever came up, on January 17, 2008, Mr. Hohn told Mr. Kelly that TCI would not accept any sort of standstill as part of any agreement. Mr. Hohn only suggested a one-year standstill in a call to CSX's financial advisor after negotiations had terminated. (PFF ¶ 195.) Second, Defendants set forth in Schedule 14A the two-year histories of each of their transactions in CSX securities. Those histories are false because they do not disclose any history of swap transactions that reference shares of CSX common stock or any information concerning renewals and extensions of the terms thereof or dates on which such swaps were settled. (PFF ¶¶ 259, 261-62.)

The omissions and misrepresentations in Defendants' Schedule 14A concern information material to investors. The fact that Defendants have been working in concert not for a few months, but for over a year; that they have investment and voting power over more than double the number of shares of common stock they have disclosed; and that they intend to (and have for many months intended to) implement major structural and operational changes at CSX are all facts that a reasonable shareholder would want to know in determining how to vote at the annual meeting. There is more than a substantial likelihood that disclosure of that information would be viewed by the reasonable investor as significantly altering the "total mix" of information available with respect to the proposals for which they will cast their proxy. TSC Indus. v. Northway Inc., 426 U.S. 438, 449 (1976) (holding that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote").

## III.    THE INDIVIDUAL DEFENDANTS VIOLATED SECTION 20 OF THE '34 ACT

### A.    Proposed Conclusions

Individual Defendants Hohn and Behring are each jointly and severally liable for the foregoing violations of Sections 13(d) and 14(a) as controlling persons pursuant to Section 20(a) of the '34 Act.

### B.    Discussion

Section 20(a) provides:

> "Every person who, directly or indirectly, controls any person liable under any provision of [the '34 Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

15 U.S.C. § 78t(a). "Controlling-person liability is a separate inquiry from that of primary liability and provides an alternative basis of culpability." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 77 (2d Cir. 2001) (internal quotation marks omitted).

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's [securities violation]." ATSI Comm'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007) (citing SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)); Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (same). Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to prove that he acted in good faith and "that he 'did not directly or indirectly induce the act or acts constituting the violation'". First Jersey, 101 F.3d at 1473 (quoting 15 U.S.C. § 78t); SEC v. 800America.com, Inc., 02 Civ. 9046 (HB), 2006 WL 3422670, at *6 (S.D.N.Y. Nov. 28, 2006).

First, TCI and 3G committed primary securities violations. TCI and 3G violated Sections 13(d) and 14(a) of the '34 Act by failing timely to file Schedule 13D and by making false and misleading statements and omissions in their late-filed Schedule 13D and in their Schedule 14A, as discussed above.

Second, Messrs. Hohn and Behring admit that they control, respectively, TCI and 3G. (PFF ¶¶ 10, 12.) "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" First Jersey, 101 F.3d at 1472-73 (quoting 17 C.F.R. § 240.12b-2). Messrs. Hohn and Behring maintained discretionary authority to control or

92

influence the conduct of TCI, 3G and the defendant group and did, in fact, control or
influence the conduct of TCI, 3G and the defendant group, including the foregoing
violations of Sections 13(d) and 14(a).

Mr. Hohn is Founding and Managing Partner and portfolio manager of TCIF UK,
and the sole 100% owner of TCIF Cayman and is a controlling person of TCI. (PFF
¶ 10.) These facts alone establish that Mr. Hohn was a controlling person of TCI. First
Jersey, 101 F.3d at 1472-73; Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250
F.3d 87, 101 (2d Cir. 2001); Dietrich v. Bauer, 76 F. Supp. 2d 312, 335 (S.D.N.Y. 1999)
("The position of [defendant] as president . . . is one from which control can be directly
inferred without more." (internal citations omitted)). In addition, along with Mr. Amin,
Mr. Hohn signed the SEC filings involved in this case on behalf of TCI and both had the
power to direct the contents of those filings. (PFF ¶ 10.) See Schnall v. Annuity & Life
Re (Holdings), Ltd., No. 3:02 CV 2133 (EBB), 2006 U.S. Dist. Lexis 55493, at *24 (D.
Conn. Aug. 10, 2006) (noting that the very fact that a defendant is required to, and does,
"sign[] multiple disclosures filed with the SEC that are alleged to have contained
actionable misrepresentations" supports a finding of "control" (internal citations
omitted)).

Similarly, Mr. Behring is Managing Director of 3G. (PFF ¶ 12.) Mr. Behring
signed all of the SEC filings on behalf of 3G involved in this case and he had the power
to direct the contents of those filings. (PFF ¶ 12.) Mr. Behring was a controlling person
of 3G. First Jersey, 101 F.3d at 1472-73; Suez Equity, 250 F.3d at 101; Dietrich, 76
F. Supp. 2d at 335; Schnall, 2006 U.S. Dist. Lexis at *24.

Third, Messrs. Hohn and Behring were culpable participants in TCI's and 3G's
primary violations of the securities laws. They were intimately involved in the
transactions underlying the primary security violations. See In re Livent, Inc.
Noteholders Sec. Litig., 151 F. Supp. 2d 371, 414-17 (S.D.N.Y. 2001); First Jersey, 101
F.3d 1472-73. For example: (1) Mr. Hohn and Mr. Behring signed the SEC filings at
issue on behalf of their respective entities. (PFF ¶ 10, 12, 173.); (2) Mr. Hohn signed
TCI's Hart-Scott-Rodino notice in March 2007 and instructed others that this meant TCI
intended to attempt "to try to influence management in how [CSX] is run" (PFF ¶ 124.);
(3) Mr. Hohn was a primary player in making or prompting contacts with CSX on behalf
of TCI (PFF ¶ 85, 149), signed letters written to CSX and to the Board (PFF ¶ 169) and
authored e-mail communications to CSX (PFF ¶ 184, 188, 190); (4) Mr. Behring signed
3G's Hart-Scott-Rodino notice in June 2007 (PFF ¶ 110) and was the 3G representative
who announced to CSX that 3G intended to make that filing (PFF ¶ 148); and (5) it was
Mr. Behring's decision that 3G would offer Mr. Behring himself as a Board nominee
(PFF ¶ 110). Defendants admit that Messrs. Hohn and Behring are deemed to "share
beneficial ownership of the [CSX] Shares owned by" TCI and 3G, respectively. (PFF
¶ 10, 12, 265.)

Messrs Hohn and Behring were also the primary players in the agreements and
arrangements misrepresented in their Schedule 13D and Schedule 14A filings. Mr. Hohn
negotiated and entered into the swap arrangements referencing CSX's shares to evade
Section 13(d)'s reporting requirements and engaged in efforts to conceal those swap

arrangements.  (PFF ¶¶ 10, 20-26.)  Likewise Messrs. Hohn and Behring agreed to coordinate their efforts with respect to CSX, including their efforts to acquire significant numbers of shares of CSX common stock (PFF ¶¶ 110-39), but failed to disclose that agreement in their filings (PFF ¶¶ 263-64).

## IV.    TCI'S AND 3G'S NOTICE OF PROPOSED DIRECTOR NOMINEES AND BYLAW AMENDMENTS FAIL TO COMPLY WITH CSX'S BYLAWS

### A.    Proposed Conclusions

Defendants' notices of intent to nominate persons for election to the CSX board of directors at the 2008 annual meeting of shareholders and to propose amendments of the CSX Amended and Restated Bylaws fail to comply with Article I, Section 11(a)(ii) of CSX's Bylaws.

### B.    Discussion

Section 13.1-624 of the Virginia Stock Corporation Act provides that a corporation's bylaws "may contain any provision for managing the business and regulating the affairs of the corporation that is not inconsistent with law or the articles of incorporation".  Article I, Section 11(c)(1) of CSX's Bylaws governs the way in which a shareholder may bring a nomination or other business before an annual meeting.  That provision provides:

> "Only such persons who are nominated in accordance with the procedures set forth in this Section 11 shall be eligible at an annual or special meeting of shareholders of the Corporation to serve as directors and only such business shall be conducted at a meeting of shareholders as shall have been brought before the meeting in accordance with the procedure set forth in this [section]".  (PFF ¶ 177.)

Article I, Section 11 of the Bylaws also requires advance notice of nominations and shareholder business.  Moreover, the notice must be timely and set forth pertinent information required by Article I, Section 11(a), including:  (i) the name and address of any beneficial owner on whose behalf the nomination or proposal is made; (ii) the class and number of shares of capital stock of CSX that are owned beneficially and of record by such shareholder and such beneficial owner; (iii) all information relating to each person whom the shareholder proposes to nominate for election as a director that is required to be disclosed in solicitations of proxies for election of directors in an election contest, or is otherwise required in each case pursuant to the '34 Act; and (iv) any material interest in other proposed business of such shareholder.  (PFF ¶ 177); see also Openwave Sys. Inc. v. Harbinger Capital Partners Master Fund I, Ltd., 924 A.2d 228, 239 (Del. Ch. 2007) (advance notice bylaws are "commonplace" and "are often construed and frequently upheld as valid").

Defendants' notices of intent to nominate persons for election to the CSX board of directors at the 2008 annual meeting of shareholders and to propose amendments of

94

the CSX Amended and Restated Bylaws fail to comply with Article I, Section 11(a)(ii) because they do not accurately disclose the number of shares of CSX stock beneficially owned by Defendants. Defendants' January 8, 2008 Stockholder Notice of Intent to Nominate Persons for Election as Directors to CSX Corporation claims that the TCI/3G group beneficially own 8.3 percent of the outstanding shares of CSX common stock. (PFF ¶ 185.) On January 21 and January 25, 2008, Defendants sent two supplemental notices to CSX regarding their intent to present a proposal allowing shareholders to call a special meeting. (PFF ¶ 176.) Those supplemental notices incorporated the information in the January 8 notice concerning Defendants' beneficial ownership of CSX stock. (PFF ¶ 176.) As discussed in detail above, TCI—and therefore the TCI/3G group—had beneficial ownership of the shares referenced in its swaps. (See supra Section V.) The notices of intent and disclosures submitted by Defendants therefore violate CSX's Bylaws, and consequently Virginia law, because they fail to report accurately the number of shares of capital stock of CSX that Defendants beneficially owned. The notices are therefore likewise invalid.

## V.  CSX HAS DEMONSTRATED IRREPARABLE HARM WARRANTING INJUNCTIVE RELIEF

### A.  Proposed Relief

In light of the violations described above, and the irreparable harm that would result absent relief from this Court:

1. Defendants are declared to have violated Section 13(d) and Section 14(a) of the '34 Act.

2. Defendants are enjoined from any further violations of the securities laws;

3. Defendants shall file truthful and accurate Schedule 13D and Schedule 14A disclosures, in compliance with the applicable rules and regulations, forthwith.

4. Defendants are enjoined from voting any proxies received prior to such time as the Court determines that Defendants have filed accurate and compliant Schedule 13D and Schedule 14A disclosures.

5. Defendants are enjoined from voting CSX shares owned by them at the 2008 annual meeting of CSX shareholders, as are other members of their group;

6. Defendants are enjoined from selling their shares of CSX until three days following the 2008 CSX annual meeting; and

7. The Parties are directed to ask TCI's and 3G's swap counterparties to disclose to the Court on a confidential basis how, if at all, they will vote shares held by them to hedge their CSX swaps with TCI and 3G, and advise the Court as to the banks' position.

**B.**     **Discussion**

1.     **CSX Shareholders Face Irreparable Harm.**

Defendants sought to secure a controlling position in CSX with a view to launching a proxy contest. In pursuit of that goal, Defendants accumulated an economic interest in more than 20 percent of CSX stock without alerting the marketplace to its holdings or plans with respect to those holdings. (See PFF ¶¶ 28, 29, 31.) Defendants' failure to report their growing accumulations of CSX stock was willful; indeed, a central reason that TCI entered into swaps rather than physical holdings was the ability to retain its anonymity as it built its position. (PFF ¶¶ 21-25, 39, 44-45).

Defendants violated Section 13(d) by failing to make timely disclosures in a Schedule 13D, and by making false, misleading and incomplete disclosures when they eventually did file. Defendants likewise violated Section 14(a) by filing false, misleading and incomplete proxy statements. Defendants violated CSX's Bylaws, and Virginia law, by filing inaccurate notices of intent with respect to CSX's annual shareholder meeting to be held on June 25, 2008. Defendants have denied CSX shareholders the benefit of the full and accurate information material to their decision in the upcoming proxy contest. Defendants have unfairly tipped the playing field in their favor, the precise harm the Williams Act was designed to prevent. Injunctive relief is both warranted and necessary here to restore equilibrium.

In order to obtain injunctive relief for violations of Sections 13(d) and 14(a), plaintiff is required to show that there will be irreparable injury absent the injunction. ICN Pharm., Inc. v. Khan, 2 F.3d 484, 489 (2d Cir. 1993); Kaufman v. Cooper Cos., Inc., 719 F. Supp. 174, 178 (S.D.N.Y. 1989). There is irreparable injury here. See Koppel v. 4987 Corp., 167 F.3d 125, 137 (2d Cir. 1999) (stating that the preferred remedy for 14(a) violation is injunctive relief); Kaufman, 719 F. Supp. at 178 (finding that a violation of the proxy rules may cause irreparable harm necessitating injunctive relief). Indeed, the mere filing of a false and misleading Schedule 13D can give rise to irreparable harm. Gen. Aircraft Corp., 556 F.2d at 96-97; Standard Fin., Inc. v. LaSalle/Kross Partners, L.P., No. 96 C. 8037, 1997 WL 80946, at *6 (N.D. Ill. Feb. 20, 1997) ("The failure to comply with Section 13(d) by filing an inaccurate Schedule 13D has been found to cause irreparable harm to shareholders and the investing public"). The violations here were more than technical violations; Defendants' false and misleading disclosures were willful and designed to achieve effective control of CSX without alerting the market to their growing position.

Defendants acquired beneficial ownership of over 20 percent of the outstanding shares of CSX common stock.[7] Much of TCI's accumulation was made possible through

---

[7] A "controlling intent" or "degree of effective control" is apparent when 20 percent of the publicly available shares of a company are owned by an entity or group. See, e.g., Dan Rive, 624 F.2d at 1225; Chromalloy American Corp. v. Sun Chem. Corp., 611 F.2d 240, 246-47 (8th Cir. 1979) (finding control purpose where purchaser disclosed its plans

swap arrangements, which were designed to provide Defendants with voting and investment power in CSX without disclosing the true extent of their interest to the SEC and other investors. (PFF ¶ 20-29, 44-45.) Defendants coordinated their efforts to make major operational and structural changes at CSX without ever disclosing those plans to the SEC or CSX's other investors. (PFF ¶¶ 40, 46-60, 69-74, 77-84, 87, 89, 104, 106-8, 112-37, 139, 143, 149, 151, 159, 172, 267-69.)

If Defendants are not ordered to file truthful and accurate Schedules 13D and 14A, CSX's shareholders will be irreparably harmed because they will cast their votes based on the false and misleading information disseminated by Defendants to the marketplace. See, e.g., Kaufman, 719 F. Supp. at 178 (finding that omitting material information from proxy statements can cause irreparable injury to shareholders); MONY Group, Inc. v. Highfields Capital Mgmt., L.P., 368 F.3d 138, 147-48 (2d Cir. 2004) ("It is well-established that a transaction – particularly a change-of-control transaction – that is influenced by noncompliance with the disclosure provisions of the various federal securities laws can constitute irreparable harm") (emphasis omitted); Camelot Indus. Corp. v. Vista Res., 535 F. Supp. 1174, 1184 (S.D.N.Y. 1982) (holding that solicitation of proxies on basis of false and misleading information constitutes irreparable harm).

Moreover, the conduct of the Defendants has already created a fundamental change in the shareholder base. (PFF ¶ 64-74, 218, 224-26.) If Defendants are permitted to vote the shares that they unlawfully attained from other shareholders after the date on which they should have filed a Schedule 13D disclosing their positions, the Defendants will benefit from their wrongdoing and the vote of other innocent shareholders will be further diluted. See Hallwood Realty Partners, L.P. v. Gotham Partners, L.P., 95 F. Supp. 2d 169, 175-76 (S.D.N.Y. 2000) (sustaining allegations that defendant had violated Section 13(d) by falsely stating that it had a beneficial interest in less than 15 percent to avoid triggering poison pill); SEC v. First City Fin. Corp., Ltd., 688 F. Supp. 705, 734 (D.D.C. 1988), aff'd, 890 F.2d 1215, 1228 (D.C. Cir. 1989) (finding that defendant's "surreptitious effort to accumulate a block of shares . . . is the precise type of evil to which Section 13(d) was directed to prevent").

The shareholders' right to corporate democracy through their proxy votes is at the heart of the securities laws. As the Supreme Court has noted, Congress enacted Section 14(a) in the "belief that '[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.'" J.I. Case Co. v. Borak, 377 U.S. 426, 431 (1964), quoting H.R.Rep. No. 1383, 73rd Cong., 2d Sess. 13. The scheme undertaken by TCI and 3G in this case is directly contrary to this bedrock principle of law.

---

to acquire a 20 percent stake, attempted to gain board representation, and prepared an "acquisition model" based on the company); see also Standard Fin., Inc., 1997 WL 80946, at *4-5 (defendants' intent to gain two seats on the target's board of directors and be active in management gave rise to a "control" intent).

## 2.    Court-Ordered Relief is Required

Federal courts are "empowered to 'grant all necessary remedial relief'" to effectuate the purposes of Sections 13(d) and 14(a) of the Securities Exchange Act. Kaufman, 719 F. Supp. at 178 (quoting Borak, 377 U.S. at 433, 435 (1964)); see also Koppers Co., Inc v. Am. Express Co., 689 F. Supp. 1371, 1382 (W.D. Pa. 1988). At a minimum, courts have routinely required parties to file corrective disclosures when such disclosures are found to be false and misleading, and enjoined wrongdoers from committing further violations. See, e.g., ICN Pharms., 2 F.3d at 489; Krauth v. Exec. Telecard, 890 F. Supp. 269, 292 (S.D.N.Y. 1995); E.ON AG v. Acciona, S.A., 06 Civ. 8720 (DLC), 2007 U.S. Dist. Lexis 7771, at *30 (S.D.N.Y. Jan. 9, 2007) ("These deficiencies provide abundant support for a preliminary injunction against [defendant] prohibiting it from any further violation of Section 13(d) or any other disclosure provision in the securities laws."). Defendants must be required to correct both their 13D and 14A filings.

Here, in view of the egregious nature of the Defendants' conduct, including hiding its position in CSX (PFF ¶ 20-29, 39, 44-45), selectively tipping off certain funds regarding CSX (PFF ¶ 61-73) and causing a fundamental change in the shareholder base (PFF ¶ 218, 224-26), Defendants should be enjoined from voting any proxies that they have received or will receive prior to filing complete and accurate Schedule 13D and Schedule 14A disclosures. See, e.g., Krauth, 890 F. Supp. at 292 (enjoining solicitation of proxies pending corrective disclosures); Kaufman, 719 F. Supp. at 185-86 (voiding all proxies solicited pursuant to false and misleading 13(d) and 14(a) disclosures); Camelot, 535 F. Supp. at 1185 (voiding proxies and ordering resolicitation); see also Morrison Knudsen Corp. v. Heil, 705 F. Supp. 497, 504 (D. Id. 1988) (enjoining shareholder from soliciting proxies until he filed corrective Schedule 13D disclosures); K-N Energy, Inc. v. Gulf Interstate Co., 607 F. Supp. 756, 771 (D. Colo. 1983) (enjoining shareholder from soliciting proxies for 30 days after he filed corrective Schedule 13D disclosures). Voiding proxies and ordering resolicitation is a well-established remedy in this Circuit. See Cent. Foundry Co. v. Gondelman, 166 F. Supp. 429, 446-47 (S.D.N.Y. 1958). As this court noted in Central Foundry, enjoining the voting of illegally solicited consents or proxies is necessary to preserve the rights of the company's shareholders. See id. (rejecting argument that requiring resolicitation was tantamount to disenfranchisement, and noting that "[v]iewing it from the interests of stockholders, the choice is obvious as between failing to exercise the franchise and exercising it influenced by unlawful solicitation."); see also Delcath Sys. v. Ladd, 06 Civ. 6420 (LAP), 2006 U.S. Dist. Lexis 67720, at *16-17 (S.D.N.Y Sept. 20, 2006) ("[i]t is within the equitable power of the Court to void consent solicitations and permit parties to recommence the process"). Indeed, while enjoining Defendants from voting their ill-gotten proxies is insufficient to correct the effects of Defendants' misconduct, it would at least provide aid in restoring fairness to the election process.

While corrective disclosure will have the effect of preventing further harm, the additional relief of ordering resolicitation will serve the aim of restoring the level playing field guaranteed by the Williams Act. See Kaufman, 719 F. Supp. at 185 ("[S]ince it is impossible to assess the effect those premature communications had on its solicitation

98

effort, permitting the Committee to retain those proxies would also render the contest unfair."). Corrective disclosure is one of the remedies for a violation of Section 13(d), but it is by no means the only available remedy. Indeed, "no court has ever declared disclosure to be the exclusive remedy under the Williams Act". Pac. Realty Trust v. APC Invs., Inc., 685 F.2d 1083, 1086 (9th Cir. 1982); see also ICN Pharms., 2 F.3d at 491; Koppers, 689 F. Supp. at 1382 (noting that a court may "require curative disclosure, a permanent injunction in order to punish and deter intentional violations of the securities laws, or a permanent injunction if there are manipulative acts that cannot be cured through disclosure"). Precedent and sound policy considerations dictate that courts can — and should — employ injunctive relief extending beyond corrective disclosure to remedy Section 13(d) violations in certain circumstances.[8]

In ICN Pharmaceuticals, Inc. v. Khan, 2 F.3d 484, 489 (2d Cir. 1993), the defendant had "failed to make material disclosures" in its efforts to oust the company's board of directors, and had neglected to file a Schedule 13D. Id. at 489. Although the Second Circuit reversed the district court's entry of a permanent injunction against the defendant's participation in any takeover of ICN, it emphasized:

> "In this case, however, it is clear that corrective disclosure would not address all the securities law violations that Khan was found to have committed. The district court explicitly concluded, on the basis of factual determinations that are amply supported in the record, that Khan had engaged in illegal inside trading of ICN's common stock. *It would certainly fall within the parameters of traditional injunctive relief to preclude Khan from voting any illegally acquired stock in a contest for control of ICN . . . . In a proper case, divestiture of illegally acquired shares might be directed.*"

Id. at 490-91 (citations omitted) (emphasis added).

The Court of Appeals' decision in Treadway Cos., Inc. v. Care Corp., 638 F.2d 357 (2d Cir. 1980), also specifically left open the question whether "disenfranchisement

---

[8] See Krauth, 890 F. Supp. at 292; v. First City Fin., 890 F.2d at 1228 (affirming injunction against further violations of Section 13(d) after considering "whether a defendant's violation was isolated or part of a pattern" and "whether the violation was flagrant and deliberate or merely technical in nature"); Gen. Steel Indus. v. Walco Nat'l Corp., Exchange Act Release No. 9533, 24 SEC Docket 439, 1981 WL 315222, at *2 (Dec. 21, 1981) ("The Commission expressed the view that equitable remedies in addition to corrective disclosure, such as rescission or divestiture, may be necessary or appropriate to remedy violations of the Williams Act, particularly in cases where the defendant deliberately violated Section 13(d) and the illegal conduct permitted the defendant to obtain a sufficient number of shares to inhibit competing tender offers or merger proposals.").

or divestiture may be appropriate" in certain circumstances, see id. at 380 & n.45, and
other courts have established as definitive such an exception to the general rule of
corrective disclosure. See, e.g., Raybestos-Manhattan, Inc. v. Hi-Shear Indus., 503
F. Supp. 1122, 1133 (E.D.N.Y. 1980) ("[d]isenfranchisement or divestiture may be
permissible remedies for Section 13(d) violations . . . when the defendant obtains
effective control of plaintiff through stock purchases before it comes into compliance
with Section 13(d)"); Drobbin v. Nicolent Instrument Corp., 631 F. Supp. 860, 913 n.3
(S.D.N.Y. 1986) (same); Butler Aviation v. Widmark, 335 F. Supp. 146, 155 (E.D.N.Y.
1971) (enjoining shareholder who violated Section 13(d) from voting illegally acquired
shares at forthcoming annual meeting, and stating "[i]f Section 13(d) means anything, [a
party] should not be permitted to gain advantage from a course of action pursued in clear
violation of the law.").[9]

In addition, the SEC has taken the position that relief beyond corrective disclosure
may be both necessary and appropriate to remedy Section 13(d) violations. In a
Litigation Release addressing General Steel Industries, Inc. v. Walco National Corp.,
No. 81-1410-C, 1981 WL 17552 (E.D. Mo. Nov. 24, 1981), the SEC expressed the view
that "equitable remedies in addition to corrective disclosure, such as rescission and
divestiture, may be necessary or appropriate to remedy violations of the Williams Act,
particularly in cases where the defendant deliberately violated Section 13(d) and the
illegal conduct had permitted the defendant to obtain a sufficient number of shares to
inhibit competing tender offers or merger proposals." Gen. Steel Indus., Inc. v. Walco
Nat'l Corp., SEC Litigation Release No. 9533, 1981 WL 315222, at *2 (Dec. 21, 1981).
Otherwise, "shareholders could be irreparably harmed and the defendant would be
permitted to benefit from its wrongful conduct". Id.

The SEC reiterated its position as amicus in San Francisco Real Estate
Investors v. Real Estate Investment Trust of America, 701 F.2d 1000 (1st Cir. 1983), and
set forth a totality of the circumstances test for when injunctive relief should be employed
to redress a violation of Section 13(d):

> "[I]n determining whether to order relief beyond corrective
> disclosure in a particular case, the court should consider all the
> pertinent circumstances, including whether a substantial number of
> shares were purchased after the misleading disclosures were made

---

[9] Courts outside this circuit have also recognized that relief beyond corrective
disclosure may be both appropriate and necessary to remedy disclosure violations when
the wrongdoer would retain an unfair advantage in a battle for corporate control. See,
e.g., Bath Indus. v. Blot, 427 F.2d 97, 113 (7th Cir. 1970); Gen. Steel, 1981 WL 17552,
at *6 ("[W]illful violation of the Williams Act, followed on the heels by its Offer,
provides additional basis for the issuance of an injunction."); Gen. Aircraftt, 556 F.2d at
97 (1st Cir. 1977) ("[I]t may be appropriate for the courts to enjoin the voting of shares
rapidly acquired just before a contest for control following a Section 13(d) violation")
(citing Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 59 n.9 (1975)).

> and before corrective disclosure, if any, was made; whether the
> curative disclosure occurs simultaneously with or shortly before a
> tender offer; and whether the violation was egregious."

Brief for the SEC as Amicus Curiae at 38, <u>San Francisco Real Estate Investors v. Real
Estate Inv. Trust of Am.</u>, 701 F.2d 1000 (1st Cir. 1983) (No. 82-1853) ("SFREI Amicus
Br."). <u>See San Francisco Real Estate Investors</u>, 701 F.2d at 1009 ("These seem like
sensible tests.") (attached hereto as Addendum B); <u>Am. Carriers, Inc. v. Baytree
Investors, Inc.</u>, 685 F. Supp. 800, 812 (D. Kan. 1988) ("We agree with the First Circuit
that this is a sensible test.").

> The extension of Section 13(d) relief beyond corrective disclosure in certain
instances is supported by sound policy considerations.

>> "To limit the possible remedies for Williams Act violations . . . to
>> corrective disclosure would distort the essential nature of equity
>> jurisdiction which has been traditionally characterized by
>> 'flexibility rather than rigidity,' would fail to deter violations of the
>> statute, and would fail to afford shareholders adequate protection
>> against harm flowing from the violations."

SFREI Amicus Br. at 33 (internal citations omitted). As the court in <u>Hanna Mining
Co. v. Norcen Energy Resources, Ltd.</u>, 574 F. Supp. 1172 (N.D. Ohio 1982), recognized:

>> "[This] result would mean that an acquiring corporation could
>> engage in the most deliberate form of misrepresentation in its
>> statutory filings and when its fraud is discovered merely file
>> corrective amendments and keep the benefits of its wrongful
>> conduct regardless of how that conduct may continue to injure
>> shareholders of the corporation whose stock it has acquired."

<u>Id.</u> at 1203; <u>see also Bath Indus.</u>, 427 F.2d at 113 (reasoning that corrective disclosure
alone is an insufficient deterrent because it merely enforces the original statutory
disclosure obligations and permits the acquiring shareholder to retain the ill-gotten
benefits of its conduct). Moreover, such a ceiling on Section 13(d)'s remedies upsets the
"well settled" rule "that where legal rights have been invaded, and a federal statute
provides for a general right to sue for such invasion, federal courts may use *any available
remedy* to make good the wrong done". <u>Borak</u>, 377 U.S. at 433 (emphasis added).

> Here, the appropriate remedy for Defendants' violation of Section 13(d) — in
addition to an order that Defendants correct the disclosures in their Schedules 13D and
14A and that any proxies received prior to the corrective disclosures be declared void —
is an order enjoining Defendants from voting their CSX shares at the CSX annual
meeting. Here:

> • Defendants adopted a plan and scheme to avoid the reporting
>   requirements of Section 13(d) from as early as the fall of 2006,

which has continued through the trial of this matter. (PFF ¶¶ 20-26, 39.)

- TCI hid from the public its accumulations of a 10 to 14 percent interest in CSX, while selectively disclosing to potential allies, including 3G, what they were doing. (PFF ¶¶ 45, 53, 62-68.)

- TCI disclosed its interest to CSX management solely for the purpose of seeking to exercise influence or control over CSX. (PFF ¶¶ 27, 75-77, 111-24, 133-37.)

- TCI and 3G, together, surreptitiously accumulated over a 20 percent interest in CSX, which they disclosed only on December 19, 2007, as they announced their intention to launch a proxy contest for five seats on CSX's Board of Directors. (PFF ¶¶ 173-75, 181.)

All of the CSX shares now held by the Defendants were illegally acquired from an unsuspecting public after they had embarked on their scheme to evade the reporting requirements of Section 13(d).

Disclosure of the Defendants' bad acts, however, is not enough. An annual general meeting must be held, and it is of primary importance that innocent shareholders vote at that meeting. Disclosure of the Defendants' bad acts will help the voting process work as it should. But that remedy, standing alone, would allow Defendants to enjoy the benefits of their wrongdoing, and would present no deterrent to future violations of Section 13(d) by these Defendants or others. TCI and 3G, therefore, must be prevented from voting their CSX shares at the annual general meeting. Further, in case that Defendants lose the proxy contest, they must also be prevented from selling their shares until at least three days after the annual meeting, so that innocent CSX shareholders are not harmed.

In addition, Austin Friars and other CSX investors who were secretly and selectively tipped off by the Defendants about CSX must be prevented from voting their shares at the annual meeting. Those investors are not currently before the Court, but the parties shall assemble a list of all investors who were tipped off, and the parties shall propose a mechanism for ensuring that their shares are not voted at the annual general meeting. If any tippee refuses, the parties shall propose to the Court a procedure for bringing that tippee under its jurisdiction. The parties shall provide Deutsche Bank and Citigroup a copy of this order and request that they submit for my review a statement of their intentions concerning the voting of CSX shares at the annual meeting and, if they decline, propose to the Court a procedure for bringing them under its jurisdiction.

Finally, the parties shall advise the Court of any evidence of conduct that is contrary to the relief ordered by the Court. Within one week of the annual general meeting, each party shall therefore submit a report as to whether the Court's order has been violated.

102

## Conclusion

Based upon the foregoing evidence and law, judgment should be entered in favor of CSX on the terms described herein.

Dated: May 27, 2008
New York, NY

Respectfully submitted,

**CRAVATH, SWAINE & MOORE LLP,**

by

Rory O. Millson
Francis P. Barron
David R. Marriott
Members of the Firm

Attorneys for Plaintiff
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

RMillson@cravath.com
FBarron@cravath.com
DMarriott@cravath.com

DEWEY PEGNO & KRAMARSKY LLP
Keara A. Bergin
220 East 42nd Street
New York, NY 10017
(212) 943-9000
KBergin@dpklaw.com

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
Lance J. Gotko
Paul J. Fishman
1633 Broadway
New York, NY 10019-6708
(212) 833-1100
LGotko@fklaw.com
PFishman@fklaw.com

Attorneys for Plaintiff CSX

Addendum A





## LIST OF ALL KNOWN SWAP AND STOCK TRANSACTIONS (3G)
### (cont'd)

Source:

Addendum B

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 82-1853

SAN FRANCISCO REAL ESTATE INVESTORS,

Plaintiff-Appellant,

v.

REAL ESTATE INVESTMENT TRUST OF AMERICA,
GEORGE HOWLAND, THOMAS S.K. BUTLER, C. JERRY RAGOSA,
JOHN Q. ADAMS, FRANCIS H. BURR, JOHN H. GARDINER, and
FRANCIS C. WELCH,

Defendants and Counterclaimants-Appellees,

v.

SAN FRANCISCO REAL ESTATE INVESTORS, UNICORP AMERICAN
CORPORATION, UNICORP CANADA CORPORATION and GEORGE S. MANN,

Counterclaim Defendants-Appellants.

On Appeal From the United States District Court
for the District of Massachussetts

BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, AMICUS CURIAE

JACOB H. STILLMAN
Associate General Counsel

DAVID A. SIRIGNANO
Special Counsel

Securities and Exchange Commission
Washington, D.C.  20549

INDEX

Page

CITATIONS ................................................... ii

PRELIMINARY STATEMENT AND INTEREST OF THE SECURITIES
    AND EXCHANGE COMMISSION ................................. 1

ARGUMENT..................................................... 4

I.    IMPLIED PRIVATE RIGHTS OF ACTION FOR EQUITABLE RELIEF
      EXIST UNDER SECTIONS 13(d), 14(d) and 14(e) OF THE
      SECURITIES EXCHANGE ACT IN FAVOR OF THE ISSUER CORPORA-
      TION AND A TENDER OFFEROR WHEN, AS HERE, THEY SEEK
      INJUNCTIVE RELIEF TO HALT OR CORRECT ALLEGED VIOLATIONS OF
      THOSE PROVISIONS AND OTHER EQUITABLE RELIEF ............... 4

      A.   The contemporary legal context at the times when
           Congress enacted and later amended the Williams
           Act establishes that it intended to create and
           preserve implied rights of action for equitable
           relief under that Act in favor of issuers and
           tender offerors .................................... 11

           1.   Congress' intent to create private remedies
                under the Williams Act is established by its
                decision in 1968 to model that legislation
                after the proxy provisions under which the
                existence of a private right of action was
                already well established ........................ 11

           2.   The congressional intent to preserve private
                remedies under the Williams Act is evidenced
                by Congress' failure to overturn cases recog-
                nizing such private rights of action when it
                amended the statute ............................. 15

      B.   The traditional Cort v. Ash analysis further
           demonstrates the existence of implied rights of
           action for equitable relief under the Williams
           Act ............................................... 21

           1.   Implying private rights of action for equit-
                able relief on behalf of issuer corporations
                and tender offerors would benefit shareholders,
                intended beneficiaries of the Williams Act ........ 21

i

Page

2.  Congress intended to create private rights
    of action for equitable relief under the
    Williams Act ................................    27

3.  Implication of private remedies for equitable
    relief in this case would be consistent with
    the congressional purpose ........................    29

4.  Actions for equitable relief to remedy viola-
    tions of the Williams Act are not matters
    relegated to the states .........................    31

II.  A DISTRICT COURT HAS THE AUTHORITY, IN A SUIT ALLEGING
     VIOLATIONS OF THE WILLIAMS ACT, TO ORDER EQUITABLE
     RELIEF IN ADDITION TO CORRECTIVE DISCLOSURE;  THE
     PROPRIETY OF SUCH RELIEF SHOULD BE JUDGED ON AN ABUSE
     OF DISCRETION STANDARD ....................................    32

CONCLUSION ................................................    39

## TABLE OF CITATIONS

Cases:

Agency Rent-A-Car, Inc. v. Connolly, 686 F.2d 1029
    (1st Cir. 1982) ..............................................    38

American Bakeries Co. v. Pro-Met Trading Co., [1981]
    Fed. Sec. L. Rep. (CCH) ¶97,925 (N.D. Ill. 1981) .............    7

Applied Digital Data Systems, Inc. v. Milgo Electronic
    Corp., 425 F. Supp. 1145 (S.D.N.Y. 1977) .....................    8

Armour and Company v. General Host Corp., 296 F. Supp.
    470 (S.D.N.Y. 1969) ..........................................    18

Bath Industries, Inc. v. Blot, 427 F.2d 97 (7th Cir. 1970) ......    13,18,36,37

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975) ......    19

Brown v. GSA, 425 U.S. 820 (1976) ...............................    20

Butler Aviation Int'l, Inc. v. Comprehensive Designers, Inc., 425
    F.2d 842 (2d Cir. 1970) ......................................    8,18,37,38

ii

Page

Cases (continued):

Cannon v. University of Chicago, 441 U.S. 677 (1979) ...........    11,12,14,20 passim

Chromalloy American Corp. v. Sun Chemical Corp., 611 F.2d
   240 (8th Cir. 1979) .........................................    7

Committee for New Management of Butler Aviation v.
   Widmark, 335 F. Supp. 146 (E.D.N.Y. 1971) ..................    35,36,37

Cort v. Ash, 422 U.S. 66 (1975) ...............................    10,11,20,21 passim

Crane Co. v. American Standard, Inc., 603 F.2d 244 (2d Cir.
   1979) ......................................................    3

Crane Co. v. Anaconda Co., 411 F. Supp. 1208 (S.D.N.Y.
   1975) ......................................................    8

Crane Company v. Harsco Corp., 511 F. Supp. 294 (D. Del.
   1981) ......................................................    21,22,23,28 passim

Crane v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir.
   1969); cert. denied, 400 U.S. 822 (1970) ...................    18

Dan River, Inc. v. Unitex Ltd., 624 F.2d 1216 (4th Cir.
   1980), cert. denied, 449 U.S. 1101 (1981) ..................    7

Deckert v. Independence Shares Corp., 311 U.S. 282 (1940) .......    33

Edgar v. Mite Corp., 102 S. Ct. 2629 (1982) ..................    38

Electronic Specialty Corp. v. International Controls Corp.,
   409 F.2d 937 (2d Cir. 1969) ................................    8,9,18,23 passim

Fabrikant v. Jacobellis, [1969-70] Fed. Sec. L. Rep. (CCH)
   ¶92,686 (E.D.N.Y. 1970) ....................................    18

Financial General Bankshares v. Lance, [1978] Fed. Sec.
   L. Rep. (CCH) ¶96,403 (D.D.C. 1978) ........................    35

First Alabama Bancshares, Inc. v. Lowder, [1981] Fed.
   Sec. L. Rep. (CCH) ¶98,015 (N.D. Ala. 1981) ................    7,8

GAF Corporation v. Milstein, 453 F.2d 707 (2d Cir. 1971),
   cert. denied, 406 U.S. 910 (1972) ..........................    5,7,13,18 passim

iii

Page

Cases (continued):

Gateway Industries, Inc. v. Agency Rent-A-Car, Inc., 492 F. Supp. 92 (N.D. Ill.), appeal dismissed per stipulation, No. 80-1871 (7th Cir. 1980) .................................................. 7,20,22,27

General Aircraft Corp. v. Lampert, 556 F.2d 90 (1st Cir. 1977) ........................................................ 4,7,33,34

General Steel Industries, Inc. v. Walco National Corp., [1981-1982] Fed. Sec. L. Rep. (CCH) ¶98,402 (E.D. Mo. 1981), appeal dismissed per stipulation, No. 81-2345 ................. 35

Graphic Sciences, Inc. v. International Mogul Mines Limited, 397 F. Supp. 112 (D.D.C. 1974) ...................... 19

Grow Chemical Corporation v. Uran, 316 F. Supp. 891 (S.D.N.Y. 1970) .................................................. 18

Gulf & Western Industries, v. Great A&P Tea Co., 476 F.2d 687 (2d Cir. 1973) ...................................... 29

H. K. Porter Co. v. Nicholson File Co., 482 F.2d 421 (1st Cir. 1973) ........................................................ 8

Hecht Co. v. Bowles, 321 U.S. 321 (1944) ...................... 4,33,38

Humana, Inc. v. American Medicorp, Inc., 445 F. Supp. 613 (S.D.N.Y. 1977) ................................................ 8,22

Indiana National Bank v. Mobil Oil Corp., 578 F.2d 180 (7th Cir. 1978) ................................................ 8

J. I. Case Co. v. Borak, 377 U.S. 426 (1964) ................... 12,14,15,18 passim

Jacobs v. Pabst Brewing Co., [Current] Fed. Sec. L. Rep. (CCH) ¶98,861 (N.D. Del. 1982) ............................... 7

Kaufman & Broad, Inc. v. Belzberg, 522 F. Supp. 35 (S.D.N.Y. 1981) .................................................. 7

Kirsch Co. v. Bliss & Laughlin Industries, Inc., 495 F. Supp. 488 (W.D. Mich. 1980) ................................ 7

Leff v. CIP Corporation, 540 F. Supp. 857 (S.D. Ohio 1982) ...... 7

Leist v. Simplot, 638 F.2d 283 (1980), aff'd sub nom., Merrill Lynch, Pierce, Fenner & Smith v. Curran, 102 S. Ct. 1825 (1982). 14,18

iv

Case 1:08-cv-02764-LAK    Document 106-6    Filed 07/30/2008    Page 37 of 81
Case 1:08-cv-02764-LAK    Document 61-3    Filed 05/27/2008    Page 7 of 51
Page

Cases (continued):

Life Investors, Inc. v. AGO Holding Co., [1981–82] Fed.
    Sec. L. Rep. (CCH) ¶98,356 (8th Cir. 1981) ...................    33

Ludlow Corp. v. Tyco Laboratories, Inc., [1981–82]
    Fed. Sec. L. Rep. (CCH) ¶98,382 (D. Mass. 1981) ..............    7

Ludlow Corp. v. Tyco Laboratories, Inc., 529 F. Supp. 62
    (D. Mass.  1981) ...........................................    35

Luptak v. Central Cartage Co., [1981] Fed. Sec. L. Rep.
    (CCH) ¶98,034 (E.D. Mich. 1979) ............................    8

Merrill Lynch, Pierce Fenner & Smith v. Curran, 102 S. Ct.
    1825 (1982) ................................................    10,11,14,17 passim

Mesa Petroleum Co. v. Aztec Oil & Gas Co., 406 F. Supp.
    910 (N.D. Texas 1976) ......................................    8

Metro–Goldwyn–Mayer, Inc v. Transamerica Corp., 303 F. Supp.
    1354 (S.D.N.Y. 1969) .......................................    18

Mid–Continent Bancshares, Inc. v. O'Brien, [Current] Fed.
    Sec. L. Rep. (CCH) ¶98,734 (E.D. Mo. 1981) .................    7,8

Mills v. Electric Auto–Lite Company, 396 U.S. 375 (1970) ........    19,30,38

Missouri Portland Cement Co. v. H.K. Porter Co., 535
    F.2d 388 (8th Cir. 1976) ...................................    35

Mobil Corp. v. Marathon Oil Co., 669 F.2d 366 (6th Cir.
    1981) ......................................................    8,22,27,30 passim

Pacific Realty Trust v. APC Investments, Inc., 685 F.2d
    1083 (9th Cir. 1982) .......................................    37

Piper v. Chris–Craft Industries, Inc., 430 U.S. 1 (1977) ........    4,8,9,15 passim

Porter v. Warner Holding Co., 328 U.S. 395 (1946) ..............    33

Rondeau v. Mosinee Paper Corporation, 422 U.S. 49 (1975) ........    20,34,36

Rosenbaum v. Klein, [Current] Fed. Sec. L. Rep. (CCH)
    ¶98,879 (E.D. Pa. Sept. 13, 1982) .........................    7

S–G Securities, Inc. v. The Fuqua Investment Co., 466
    F. Supp. 1114 (D. Mass. 1978) ..............................    35

Page

Cases (continued):

Saunders Leasing System, Inc. v. Societe Holding Gray
  D'Albion, S.A., 507 F. Supp. 627 (N.D. Ala. 1981) ............    7

Scott v. Multi-Amp Corp., 386 F. Supp. 44 (D.N.J. 1974) ........    8

Securities and Exchange Commission v. Manor Nursing
  Centers, Inc., 458 F.2d 1082 (2d Cir. 1972) ..................    33

Securities and Exchange Commission v. Savoy Industries,
  Inc., 587 F.2d 1149 (D.C. Cir. 1978), cert. denied,
  440 U.S. 913 (1979) .........................................    24

Sisak v. Wings and Wheels Express, Inc., [1970-1971]
  Fed. Sec. L. Rep. (CCH) ¶92,991 (S.D.N.Y. 1970) ..............    18

Sonesta Int'l Hotels Corp. v. Wellington Associates,
  483 F.2d 247 (2d Cir. 1973) .................................    33

Spencer Companies, Inc. v. Agency Rent-A-Car, Inc., [1981-
  1982] Fed. Sec. L. Rep. (CCH) ¶98,301 (D. Mass. 1981) ........    7,25

Standard Metals Corp. v. Tomlin, 503 F. Supp. 586 (S.D.N.Y.
  1980) .......................................................    7

Sta-Rite Industries, Inc. v. Nortek, Inc., 494 F. Supp.
  358 (E.D. Wisc. 1980) .......................................    7

Susquehanna Corporation v. Pan American Sulphur Company,
  423 F.2d 1075 (5th Cir. 1970) ...............................    18,30,31

Texas & Pacific Railway Company v. Rigsby, 241 U.S. 33
  (1916) ......................................................    17

The Hanna Mining Co. v. Norcen Energy Resources Limited, [Current]
  Fed. Sec. L. Rep. (CCH) ¶98,878 (N.D. Ohio 1982), appeal dis-
  missed per stipulation, No. 82-3336 (6th Cir., July 8, 1982) ..    7,35

Touche Ross & Company v. Redington, 442 U.S. 560 (1979) ........    10,26,28

Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S.
  11 (1979) ...................................................    10,26,27,32

Treadway Companies, Inc. v. Care Corp., 638 F.2d 357 (2d
  Cir. 1980) ..................................................    7,35

Page

Cases (continued):

Twin Fair, Inc. v. Reger, 394 F. Supp. 156 (W.D.N.Y. 1975) ......    35

United States v. City of Parma, 661 F.2d 562 (6th Cir.
   1981); cert. denied, 102 S. Ct. 1972 (1982) ...................    33

Universal Container Corp. v. Horwitz, [1977-78] Fed. Sec.
   L. Rep. (CCH) ¶96,161 (S.D.N.Y. 1977) .......................    36

W. A. Krueger Co. v. Kirkpatrick, Pettis, Smith Polian,
   Inc., 466 F. Supp. 800 (D. Neb. 1979) .......................    17

Wachovia Bank and Trust Co. v. National Student
   Marketing Corp., 650 F.2d 342 (D.C. Cir. 1980),
   cert. denied, 452 U.S. 954 (1981) ...........................    19

Water & Well Associates, Inc. v. American Consumer
   Industries, Inc. [1973] Fed. Sec. L. Rep. (CCH)
   ¶93,943 (D.N.J. 1973) .......................................    19

Weeks Dredging & Contracting, Inc. v. American Dredging
   Co., 451 F. Supp. 468 (E.D. Pa. 1978) .......................    8,23

Wellman v. Dickinson, 475 F. Supp. 783 (S.D.N.Y. 1979), aff'd,
   682 F.2 355 (2d Cir. 1982) ..................................    8

Whittaker Corp. v. Edgar, 535 F. Supp. 933 (N.D. Ill.
   1982) .......................................................    8

Statutes and Rules:

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.:

       Section 13(d), 15 U.S.C. 78m(d) ............................    1,2,4,7 passim
       Section 13(d)(1), 15 U.S.C. 78m(d)(1) .....................    5
       Section 14(a), 15 U.S.C. 78n(a) ............................    12
       Section 14(d), 15 U.S.C. 78n(d) ............................    1,2,26
       Section 14(d)(1), 15 U.S.C. 78n(d)(1) .....................    6
       Section 14(d)(4), 15 U.S.C. 78n(d)(4) .....................    25
       Section 14(e), 15 U.S.C. 78n(e) ...........................    1,2,6,9, passim
       Section 17(a), 15 U.S.C. 78q(a) ...........................    26
       Section 18, 15 U.S.C. 78r ................................    28
       Section 21, 15 U.S.C. 78u ................................    28
       Section 32, 15 U.S.C. 78ff ...............................    28

Page

Statutes and Rules (continued):

Rules Under the Securities Exchange Act:

     Rule 10b-5, 17 CFR 240.10b-5 ............................... 17
     Rule 14d-9(a), 17 CFR 240.14d-9(a) ........................ 25

Investment Advisers Act, 15 U.S.C. 80b-200a, et seq.:

     Section 206, 15 U.S.C. 80b-206 ........................... 26,27

Civil Rights Act of 1964, Title VI:

     42 U.S.C. 2000d ......................................... 12

Commodity Exchange Act:

     7 U.S.C. 1 .............................................. 16

Education Amendments of 1972, Title IX:

     Section 901(a), 20 U.S.C. 1681 ........................... 12


Miscellaneous:

H.R. Rep. No. 1711, 90th Cong. 2d Sess. (1968) ................. 4,5,13,36

H.R. Rep. No. 91-1655, 91st Cong., 2d Sess. (1970) ............. 23

Hearings on H.R. 14475, S. 510 Before the Submittee
  on Commerce and Finance of the House Committee on
  Interstate and Foreign Commerce, 90th Cong., 2d Sess.
  (1968) ....................................................... 15

Hearings on S. 510 before the Subcomm. on Securities of
  the Senate Comm. on Banking and Currency, 90th Cong.,
  1st Sess. (1967) ............................................. 13,15,25

J. Pomeroy, Equity Jurisprudence (5th ed. 1941) ............... 33

Pub. L. No. 91-567, 84 Stat. 1497 (Dec. 22, 1970) ............. 17

S. Rep. No. 550, 90th Cong., 1st Sess. (1967) ................. 13,21,36

Page

Miscellaneous (continued):

113 Cong. Rec. 857 (1967) ........................................    25

113 Cong. Rec. 24665 (1967) ....................................    13,25

116 Cong. Rec. 3024 (1970) .....................................    19

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

---

No. 82-1853

---

SAN FRANCISCO REAL ESTATE INVESTORS,

Plaintiff-Appellant,

v.

REAL ESTATE INVESTMENT TRUST OF AMERICA,
GEORGE HOWLAND, THOMAS S.K. BUTLER, C. JERRY RAGOSA,
JOHN Q. ADAMS, FRANCIS H. BURR, JOHN H. GARDINER, and
FRANCIS C. WELCH,

Defendants and Counterclaimants-Appellees,

v.

SAN FRANCISCO REAL ESTATE INVESTORS, UNICORP AMERICAN
CORPORATION, UNICORP CANADA CORPORATION and GEORGE S. MANN,

Counterclaim Defendants-Appellants.

---

On Appeal From the United States District Court
for the District of Massachussetts

---

BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, AMICUS CURIAE

---

PRELIMINARY STATEMENT AND INTEREST OF
THE SECURITIES AND EXCHANGE COMMISSION

The Securities and Exchange Commission, the agency primarily responsible
for administering the Securities Exchange Act of 1934, including the Williams
Act amendments of which Sections 13(d), 14(d) and 14(e) of the Act, 15 U.S.C.
78m(d), 78n(d) and 78n(e), are important parts, submits this brief, amicus
curiae, to express its views on the following legal issues before this Court
concerning the interpretation and enforcement of those statutory provisions:

Case 1:08-cv-02764-LAK    Document 106-6    Filed 07/30/2008    Page 44 of 81
Case 1:08-cv-02764-LAK    Document 61-3    Filed 05/27/2008    Page 14 of 51

- 2 -

(1)  Whether private rights of action exist under Sections

13(d), 14(d), and 14(e) of the Securities Exchange Act

in favor of the issuer corporation and a tender offeror

when they seek injunctive relief to halt or correct alleged

violations of those sections and other equitable relief; and

(2)  Whether a federal district court, in a private action

under the Williams Act provisions, has authority, under

appropriate circumstances, to order -- in addition to

corrective disclosure -- other equitable remedies.

In this action, San Francisco Real Estate Investors ("SFREI") claims

that Real Estate Investment Trust of America ("REITA") violated Section 14(e)

of the Securities Exchange Act by adopting a by-law limiting beneficial

ownership in REITA by any person to 9.8 percent of REITA's outstanding

securities.  REITA has counterclaimed, alleging that SFREI and Unicorp

American Corporation, Unicorp Canada Corporation, and George S. Mann

("counterclaim defendants") violated Sections 13(d), 14(d) and 14(e) of

the Securities Exchange Act in connection with SFREI's purchases of REITA

securities and its tender offer to obtain control of REITA.  On REITA's

motion, the district court entered a preliminary injunction restraining

SFREI's tender offer.

In this appeal by SFREI and the other counterclaim defendants, the

latter appellants argue that REITA lacks standing to sue under Section

13(d).  Because Congress did not provide an express private cause of

action under any of the provisions of the Williams Act, the standing of

both SFREI and REITA to assert their claims turns on whether private rights

of action in their favor may be implied.  The Commission is concerned that

- 3 -

denying issuers and tender offerors standing to obtain an injunction halt-
ing or correcting violations of the Williams Act provisions and to obtain
other equitable relief will severely restrict enforcement of that Act.
Since the Commission does not have the resources to scrutinize every tender
offer or other major acquisition subject to the Williams Act, effective
private enforcement of its provisions is essential to effectuate the statu-
tory purpose.  Moreover, private litigants usually have the "greatest motive
and opportunity to seek such relief." Crane Co. v. American Standard, Inc.,
603 F.2d 244, 254 n.23 (2d Cir. 1979).  Thus, to deny them standing to seek
injunctive relief to halt or correct violations of the Williams Act and
other equitable relief benefiting shareholders would have the effect of
thwarting the intent of Congress.

Appellants further argue that, as a matter of law, a district court
lacks the power to enjoin a tender offer based upon a finding that the
tender offeror has filed a false Schedule 13D in violation of Section
13(d), where the inaccuracies have been corrected by a subsequent amendment
to the filing.  The Commission is concerned that this position as to relief,
if adopted by this Court, would represent an unduly restrictive interpreta-
tion of the Williams Act.  Although an interlocutory injunction against
proceeding with a tender offer could in certain situations constitute a
harsh and unwarranted remedy, the Commission believes that under appropriate
circumstances it is among the "variety of tools" available to courts of
equity to remedy violations of the Williams Act (Electronic Specialty Corp.
v. International Controls Corp., 409 F.2d 937, 947 (2d Cir. 1969)), and that
the availability of such relief is consistent with the "historic injunctive

Case 1:08-cv-02764-LAK    Document 106-6    Filed 07/30/2008    Page 46 of 81
Case 1:08-cv-02764-LAK    Document 61-3    Filed 05/27/2008    Page 16 of 51

- 4 -

process * * * to mould each decree to the necessities of the particular case"
(Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944)).

As amicus curiae, the Commission expresses no view on any factual dis-
putes in this case, or on its ultimate disposition, or on the appropriateness
of granting any particular relief. In addition, the Commission expresses
no view on any legal issue involved in this case other than the existence
of a private right of action for equitable relief under the Williams Act
and the availability of equitable relief beyond corrective disclosure to
remedy violations of that Act, issues in which the Commission has had a
longstanding interest.

### ARGUMENT

I.  IMPLIED PRIVATE RIGHTS OF ACTION FOR EQUITABLE RELIEF EXIST UNDER
    SECTIONS 13(d), 14(d) and 14(e) OF THE SECURITIES EXCHANGE ACT IN
    FAVOR OF THE ISSUER CORPORATION AND A TENDER OFFEROR WHEN, AS HERE,
    THEY SEEK INJUNCTIVE RELIEF TO HALT OR CORRECT ALLEGED VIOLATIONS
    OF THOSE PROVISIONS AND OTHER EQUITABLE RELIEF.

The Williams Act amendments to the Securities Exchange Act have as a
major purpose the protection of shareholders confronted with the possibility
of a change in the control of their corporation by giving those shareholders
certain protections including disclosure of information concerning persons in
a position to effect such change in control. See Piper v. Chris-Craft Indus-
tries, Inc., 430 U.S. 1, 22-24 (1977); General Aircraft Corp. v. Lampert, 556
F.2d 90, 94 (1st Cir. 1977); H.R. Rep. No. 1711, 90th Cong. 2d Sess. 3-4
(1968) (hereinafter "H.R. Rep. at --"). In particular, Section 13(d), a key
provision of the Williams Act, is designed to require disclosure of informa-
tion to issuer corporations and their shareholders by "persons who have ac-
quired a substantial interest, or increased their interest in the equity

securities of a company by a substantial amount, within a relatively short period of time." H.R. Rep. at 8.  See also GAF Corporation v. Milstein, 453 F.2d 707, 717 (2d Cir. 1971), cert. denied, 406 U.S. 910 (1972).  It does so by requiring such persons to send to the issuer and file with the Commission a statement (a Schedule 13D) containing information specified by the Section and required by Commission rules and regulations. 1/  Similarly, Sections 14(d) and 14(e) ensure that shareholders confronted with a tender offer are not required to decide whether to tender their shares on the basis of inadequate or misleading information.  Section 14(d) thus requires, among other things, that bidders send to the issuer and its shareholders and file with the Commission a statement describing, among other things, the background and identity of the offeror, the source and amount of funds or other consideration to be used in making the purchases, the extent of the offeror's holdings in the issuer corporation, and the offeror's plans with respect to

---

1/    Section 13(d)(1), 15 U.S.C. 78(d)(1), provides in pertinent part:

> Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to Section 12 of [the Securities Exchange Act], * * * is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security * * * [and] to each exchange where the security is traded, and file with the Commission, a statement containing * * * [information as specified by the Section and required by Commission rules and regulations] as necessary or appropriate in the public interest or for the protection of investors. * * *.

- 6 -

the issuer corporation's business or corporate structure. 2/  And Section

14(e) prohibits deceptive, fraudulent and manipulative practices by all

persons in connection with tender offers. 3/

---

2/    Section 14(d)(1), 15 U.S.C. 78m(d)(1), provides in pertinent part:

> It shall be unlawful for any person, directly or
> indirectly, * * * to make a tender offer for, or a re-
> quest or invitation for tenders of, any class of any
> equity security which is registered pursuant to Section
> 12 of [the Securities Exchange Act], * * * if, after
> consummation thereof, such person would, directly or
> indirectly, be the beneficial owner of more than 5 per
> centum of such class, unless at the time copies of the
> offer or request or invitation are first published or
> sent or given to security holders such person has filed
> with the Commission a statement containing such of the
> information specified in section 13(d) of this title,
> and such additional information as the Commission may
> by rules and regulations prescribe as necessary or
> appropriate in the public interest or for the protec-
> tion of investors.  All requests or invitations for
> tenders or advertisements making a tender offer or
> requesting or inviting tenders of such a security
> shall be filed as a part of such statement and shall
> contain such of the information contained in such
> statement as the Commission may by rules and regula-
> tions prescribe.  * * * Copies of all statements, in
> the form in which such material is furnished to security
> holders and the Commission, shall be sent to the issuer
> not later than the date such material is first published
> or sent or given to any security holders.

3/    Section 14(e), 15 U.S.C. 78n(e), provides in pertinent part:

> It shall be unlawful for any person to make any untrue
> statement of a material fact or omit to state any material
> fact necessary in order to make the statements made, in
> the light of the circumstances under which they are made,
> not misleading, or to engage in any fraudulent, deceptive,
> or manipulative acts or practices, in connection with any
> tender offer or request or invitation for tenders, or any
> solicitation of security holders in opposition to or in
> favor of any such offer, request, or invitation.

- 7 -

While Congress did not provide an express private right of action for violations of Section 13(d), every court of appeals which has considered the question has held that an implied private right of action for equitable relief exists in favor of the issuer under that Section.  See Treadway Companise, Inc. v. Care Corp., 638 F.2d 357 (2d Cir. 1980); Dan River, Inc.  v. Unitex Limited, 624 F.2d 1216 (4th Cir. 1980), cert. denied, 449 U.S. 1101 (1981); Chromalloy American Corp. v. Sun Chemical Corp., 611 F.2d 240 (8th Cir. 1979); GAF Corp. v. Milstein, supra. 4/

---

4/    The district court opinions, however, lack such unanimity.  Compare the following cases upholding an implied private right of action: Jacobs v. Pabst Brewing Co., [Current] Fed. Sec. L. Rep. (CCH) ¶98,861 (D. Del. 1982); The Hanna Mining Co. v. Norcen Resources Limited, [Current] Fed. Sec. L. Rep. (CCH) ¶98,878 (N.D. Ohio 1982), appeal dismissed per stipulation, No. 82-3336 (6th Cir. July 8, 1982); Mid-Continent Bancshares, Inc. v. O'Brien, [Current] Fed. Sec. L. Rep. (CCH) ¶98,734 (E.D. Mo. 1981); Spencer Companies, Inc. v. Agency Rent-A-Car, Inc., [1981-1982] Fed. Sec. L. Rep. (CCH) ¶98,301 (D. Mass. 1981); Ludlow Corp. v. Tyco Laboratories, Inc., [1981-82] Fed. Sec. L. Rep. (CCH) ¶98,382 (D. Mass. 1981); Saunders Leasing System, Inc. v. Societe Holding Grey D'Albion, S.A., 507 F. Supp. 627 (N.D. Ala. 1981); Kaufman & Broad, Inc. v. Belzberg, 522 F. Supp. 35 (S.D.N.Y. 1981); Standard Metals Corp. v. Tomlin, 503 F. Supp. 586 (S.D.N.Y. 1980); Kirsch Co. v. Bliss & Laughlin Industries, Inc., 495 F. Supp. 488 (W.D. Mich. 1980); W.A. Krueger Co. v. Kirkpatrick, Pettis, Smith, Polian, Inc., 466 F. Supp. 800 (D. Neb. 1979); Scott v. Multi-Amp Corp., 386 F. Supp. 44 (D.N.J. 1974); with the following cases holding no private right of action: Rosenbaum v. Klein, [Current] Fed. Sec. L. Rep. ¶98,879 (E.D. Pa. Sept. 13, 1982); Leff v. CIP Corporation, 540 F. Supp. 857 (S.D. Ohio 1982); First Alabama Bancshares, Inc. v. Lowder, [1981] Fed. Sec. L. Rep. (CCH) ¶98,015 (N.D. Ala. 1981); American Bakeries Co. v. Pro-Met Trading Co., [1981] Fed. Sec. L. Rep. (CCH) ¶97,925 (N.D. Ill. 1981); Gateway Industries, Inc. v. Agency Rent-A-Car, Inc., 492 F. Supp. 92 (N.D. Ill.), appeal dismissed per stipulation, No. 80-1871 (7th Cir. 1980); Sta-Rite Industries, Inc. v. Nortek, Inc., 494 F. Supp. 358 (E.D. Wisc. 1980).

This Court in General Aircraft Corp. v. Lampert, supra, 556 F.2d at 94 n.5, did not question the issuer's standing under Section 13(d), noting that the defendants had not challenged the issuer corporation's standing. But see Dan River, Inc. v. Unitex, Ltd., supra, 624 F.2d at 1223 (construing General Aircraft Corp. as deciding the standing issue).

- 8 -

The courts of appeals have likewise upheld the existence of a private

right of action for equitable relief in favor of issuers and tender offerors

under Sections 14(d) and (e).  See Mobil Corporation v. Marathon Oil Company,

669 F.2d 366 (6th Cir. 1981) (bidder has standing under Section 14(e));

Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2d

Cir. 1969) (issuer has standing under Sections 14(d) and 14(e)); Butler Avia-

tion Int'l, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842 (2d Cir.

1970) (issuer has standing under Section 14(e)). 5/

---

5/    See Indiana National Bank v. Mobil Oil Corp., 578 F.2d 180, 183 n.5
      (7th Cir. 1978) (in dictum assuming private right of action limited
      to shareholders under Section 14(e), but permitting issuer to assert
      that cause of action on behalf of shareholders).  Accord, Mid-Continent
      Bankshares, Inc. v. O'Brien, supra, [Current] Fed. Sec. L. Rep. (CCH)
      ¶98,734, at 93,706-707.

      See also Whittaker Corp. v. Edgar, 535 F. Supp. 933 (N.D. Ill. 1982)
      (bidder has standing under §14(e)); Wellman v. Dickinson, 475 F. Supp.
      783, 816-817 (S.D.N.Y. 1979), aff'd, 682 F.2d 355 (2d Cir. 1982)
      (issuer has standing under §§14(d) and 14(e)); Weeks Dredging & Con-
      tracting, Inc. v. American Dredging Co., 451 F. Supp. 468 (E.D. Pa.
      1978) (bidder has standing under §14(e)); Humana, Inc. v. American
      Medicorp., Inc., 445 F. Supp. 613 (S.D.N.Y. 1977) (bidder has stand-
      ing under §14(e)); Applied Digital Data Systems, Inc. v. Milgo Elec-
      tronic Corp., 425 F. Supp. 1145 (S.D.N.Y. 1977) (bidder has standing
      under §14(e)); Crane Co. v. Anaconda Co., 411 F. Supp. 1208 (S.D.N.Y.
      1975) (bidder has standing under §14(e)); Mesa Petroleum Co. v. Aztec
      Oil & Gas Co., 406 F. Supp. 910 (N.D. Texas 1976) (bidder has standing
      under §14(e)).  Contra First Alabama Bancshares v. Lowder, supra,
      [1981] Fed. Sec. L. Rep. ¶98,015; Luptak v. Central Cartage Co.,
      [1981] Fed. Sec. L. Rep. ¶98,034 (E.D. Mich. 1979) (no private right
      of action under Section 14(d) in favor of tender offeror).

      This Court in H. K. Porter Co. v. Nicholson File Co., 482 F.2d 421
      (1973), held that a private right of action for damages exists in favor
      of a tender offeror under Section 14(e), a result later rejected by
      the Supreme Court in Piper v. Chris Craft Industries, Inc., 430 U.S. 1
      (1977).  This Court in H. K. Porter Co. also indicated, in dictum, that
      a private right of action would be implied under Section 14(e) in favor
      of the issuer for injunctive relief and damages.  Id. at 424.

- 9 -

In _Piper_ v. _Chris-Craft Industries Inc._, supra, 430 U.S. 1, the Supreme
Court held that a defeated tender offeror does not have standing to sue for
damages under Section 14(e). _Piper_, however, does not control the standing
questions at issue here; the Supreme Court emphasized the narrow scope of
its holding, stating that the purpose of the Williams Act could "more di-
rectly be achieved with other, less drastic means more closely tailored to
the precise congressional goal underlying [that statute]." _Id_. at 40.
The Court also quoted with approval Judge Friendly's opinion in _Electronic_
_Specialty Co._ v. _International Controls Corp._, supra, 409 F.2d at 947,
stating that "in corporate control contests the stage of preliminary injunc-
tive relief, rather than post-contests lawsuits, 'is the time when relief
can best be given'" (430 U.S. at 42; _see also id_. at 40 n.26) and expressly
left open the questions of whether the tender offeror could seek injunctive
relief under Section 14(e) (_id_. at 47 n.33) and whether the shareholder-
offerees and issuer corporation can sue under that Section (_id_. at 42 n.28).
The majority opinion in _Piper_ further emphasized:

> Our precise holding disposes of many observations
> made in dissent. Thus, the argument with respect
> to the 'exclusion' from standing for 'persons most
> interested in effective enforcement,' _post_, at 62,
> is simply unwarranted in light of today's narrow
> holding.

_Id_. at 42 n.28.

The appellate decisions upholding private rights of action for equit-
able relief under the Williams Act in favor of issuers and bidders are fully
consistent not only with _Piper_, but also with the general principles for
implying private rights of action enunciated by the Supreme Court. The
Supreme Court in _Transamerica Mortgage Advisors, Inc._ v. _Lewis_, 444 U.S. 11,

- 10 -

18 (1979), stated that a plaintiff's right to sue under a federal statute,
if not expressly provided, must be implied from the "language or structure
of the statute, or in the circumstances of its enactment." To assist the
courts in determining whether such a right should be implied under a federal
statute, the Supreme Court has developed a four-prong test. In Cort v. Ash,
422 U.S. 66 (1975), the Court articulated the test as follows (id. at 78;
citations omitted; emphasis in original):

> First, is the plaintiff 'one of the class for whose
> especial benefit the statute was enacted' -- that is,
> does the statute create a federal right in favor of
> the plaintiff? Second, is there any indication of
> legislative intent, explicit or implicit, either to
> create such a remedy or to deny one? Third, is it
> consistent with the underlying purpose of the legis-
> lative scheme to imply such a remedy for the plain-
> tiff? And finally, is the cause of action one tradi-
> tionally relegated to state law, in an area basically
> the concern of the States, so that it would be inappro-
> priate to infer a cause of action based solely on
> federal law?

Subsequent to its Cort v. Ash decision, however, the Supreme Court has
emphasized that the ultimate determination of whether a private right of
action exists must turn on the intent of Congress:

> [I]n Cort v. Ash * * * the Court did not decide that
> each of [the] factors is entitled to equal weight.
> The central inquiry remains whether Congress intended
> to create, either expressly or by implication, a pri-
> vate cause of action.

Touche Ross & Company v. Redington, 442 U.S. 560, 575 (1979). See also
Merrill Lynch, Pierce Fenner & Smith v. Curran, 102 S. Ct. 1825, 1839
(1982). Since the ultimate question is whether Congress intended that a
a private remedy exist, the Supreme Court has indicated that it is not ne-
cessary to examine each of the factors articulated in Cort v. Ash if con-

- 11 -

gressional intent to grant or deny the private remedy is persuasively evi-
denced by some other means -- e.g., in the present case, by the contemporary
legal context at the time the Williams Act was enacted and later amended.
Curran, 102 S. Ct. at 1844.

As we show at pages 11-15, infra, congressional intent to create a
private remedy under the Williams Act is established by the legal context
in which the Act was passed in 1968, a time of widespread acceptance of
implied private actions under the federal securities laws, particularly un-
der the proxy provisions after which Congress deliberately modeled the
Williams Act protections. Furthermore, as discussed at pages 16-21, infra,
the fact that Congress, when it subsequently amended the Williams Act, did
not disturb judicial decisions which had recognized a private action under
the Act, demonstrates Congress' intent to preserve the private right of
action. In any event, a complete analysis of the four Cort v. Ash factors
further supports the implication of a private remedy (pages 21-32, infra).

    A.   The Contemporary Legal Context At The Times When Congress Enacted
        And Later Amended the Williams Act Establishes That It Intended
        To Create And Preserve Implied Rights Of Action For Equitable
        Relief Under That Act In Favor of Issuers and Tender Offerors.

        1.   Congress' intent to create private remedies under
            the Williams Act is established by its decision in
            1968 to model that legislation after the proxy pro-
            visions under which the existence of a private right
            of action was already well established.

"In determining whether a private cause of action is implicit in a
federal statutory scheme when the statute by its terms is silent on that
issue, the initial focus must be on the state of the law at the time the
legislation was enacted." Curran, supra, 102 S. Ct. at 1839. This prin-
ciple was utilized in Cannon v. University of Chicago, 441 U.S. 677 (1979),

- 12 -

where the Supreme Court held that an implied right of action exists under

Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C.

1681, which prohibits discrimination on the basis of sex in education pro-

grams receiving financial support from the federal government.  The Court

in Cannon relied heavily on the fact that Title IX was patterned on Title

VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq., and that at the

time Title IX was enacted in 1972, Title VI already had been construed as

giving rise to an implied private right of action.  The Court reasoned that

because the courts had consistently found implied rights of action under the

civil rights statutes during the years between the enactment of Title VI and

the enactment of Title IX, "Congress was thoroughly familiar with these usual-

ly important precedents * * * and * * * expected its enactment [of Title IX]

to be interpreted in conformity with them." Cannon v. University of Chicago,

supra, 441 U.S. at 698-699.  Indeed, Mr. Justice Rehnquist in his concurring

opinion made the point that during the Sixties and early Seventies, Congress

relied on the federal courts to decide whether a right of action should be

implied under a statute and that "[c]ases such as J.I. Case Co. v. Borak,

[377 U.S. 426 (1964)] and numerous cases from other federal courts, gave

Congress good reason to think that the federal judiciary would undertake this

task."  441 U.S. at 718.

The evidence that Congress understood in 1968 that private rights of

action would be available under the Williams Act is equally as persuasive

as the evidence present in Cannon.  The sections added to the Securities

Exchange Act by the Williams Act, like Title IX, were patterned after a prior

enactment which had worked successfully, in this case the statute and regula-

tions governing proxy solicitations, chiefly Section 14(a) of the Securities

Exchange Act, 15 U.S.C. 78n(a).  See H.R. Rep. at 5-6; S. Rep. No. 550, 90th
Cong., 1st Sess. 2-6 (1967) (hereinafter "S. Rep. at --").

In seeking to remedy the abuses in the area of tender offers and other
major acquisitions, Congress was acutely aware of the obvious parallel be-
tween these devices for seeking control and proxy contests.  As explained by
former Commission Chairman Manuel F. Cohen at the Senate hearings,

> [A]cquisitions of blocks of voting securities are
> typically alternatives to proxy solicitations, as
> methods of capturing or preserving control.  In
> either case there is involved a form of industrial
> warfare in which the stakes are high, and two or
> more groups are attempting to manipulate the public
> security holder to their own advantage. 6/

Chairman Cohen further explained that the Williams Act would "fill a gap, a
rather large gap in the securities statutes":

> The procedures provided by the bill in the case of
> contested tender offers are analogous to those now
> followed when contending factions solicit proxies
> under the Commission's proxy rules. 7/

And, at the time the bill which with minor amendment later became the Williams
Act was passed by the Senate, its sponsor, Senator Williams, described
the bill as "provid[ing] the same kind of disclosure requirements which now
exist, for example, in contests through proxies for controlling ownership
in a company.  * * * [I]t is patterned on the present law and the regula-
tions which govern proxy contests."  113 Cong. Rec. 24665 (1967).  See also
GAF Corp. v. Milstein, supra, 453 F.2d at 719; Bath Industries, Inc. v.
Blot, 427 F.2d 97, 110 (7th Cir. 1970).

---

6/   Hearings on S. 510 before the Subcomm. on Securities of the Senate
     Comm. on Banking and Currency, 90th Cong., 1st Sess. 16 (1967)
     (hereinafter "Senate Hearings").

7/   Senate Hearings at 20-21.

- 14 -

The fact that Congress patterned the Williams Act after the proxy pro-
visions is significant because only four years earlier the Supreme Court
had decided the landmark case of J.I. Case Co. v. Borak, supra, where the
Court held that a shareholder may sue derivatively on behalf of his cor-
poration under Section 14(a) for a violation of the proxy provisions, find-
ing that "[p]rivate enforcement of the proxy rules provides a necessary
supplement to Commission action." 377 U.S. at 432.  Indeed, as Judge Friendly
stated in Leist v. Simplot, 638 F.2d 283, 296 (2d Cir. 1980), aff'd sub nom.,
Curran, supra, the years prior to the Cort v. Ash decision in 1975 were
years of a "widespread, indeed almost general, recognition of implied causes
of action" under the Securities Exchange Act.  See also Cannon, supra, 441
U.S. at 698-699 (during the period between 1964 and 1972 the Supreme Court
had consistently found implied remedies); Leist v. Simplot, supra, 638 F.2d
at 297 (implied causes of action were widely recognized under other statutes
administered by the Commission).

As the Supreme court has twice recognized, "'[i]t is always appropri-
ate to assume that our elected representatives, like other citizens, know
the law.'"  Curran, supra, 102 S. Ct. at 1839, quoting Cannon v. University
of Chicago, 441 U.S. at 696-697.  As was the case in Cannon, it must be
concluded that Congress was aware of the fact that these "unusually impor-
tant precedents" (Cannon, supra, 441 U.S. at 699) under the securities laws
had established that private rights of action were an essential part of the
enforcement mechanism under Section 14(a) and that Congress likewise intended
such actions to be available under the Williams Act.  In fact, it is not
necessary merely to assume that Congress was aware of the state of the law of
implied rights of action under the federal securities laws, since there is

- 15 -

ample legislative history of the Williams Act demonstrating that Congress

was actually informed of the existence of cases upholding such private

rights.  For example, Professor Carlos Israels specifically brought to

Congress' attention the Supreme Court's decision in J.I. Case Co. v. Borak,

supra. 8/  And Chairman Cohen, one of the drafters of the Williams Act,

testified before the House committee considering the bill that litigation

between private parties alleging fraud in takeover bids, one of the subjects

covered by the Williams Act, was a common occurrence, calling it "almost

standard operating procedure." 9/  These circumstances warrant the presump-

tion that Congress intended the Williams Act to be enforced in private actions.

   2.  The congressional intent to preserve private remedies
       under the Williams Act is evidenced by Congress' failure
       to overturn cases recognizing such private rights of
       action when it amended the statute.

Recently, the Supreme Court expanded upon the rationale utilized in

Cannon and articulated an additional means for determining congressional

intent in situations where Congress revises a statute under which an im-

plied private right of action has already been recognized by the federal

courts.  In Curran, supra, which involved several private actions brought

---

8/  See Senate Hearings at 67.  Although the Supreme Court in Piper
    cautioned against concluding, based on Professor Israels' inter-
    pretation of Borak, that a private right of action exists under
    Section 14(e) on behalf of a tender offeror (430 U.S. at 31),
    this does not detract from the value of Professor Israels' state-
    ment as evidence that Congress was aware that Section 14(a), on
    which the Williams Act was patterned, had been found by the
    Supreme Court in Borak to give rise to a private right of action
    for issuers.

9/  Takeover Bids:  Hearings on H.R. 14475, S. 510 Before the Subcom-
    mittee on Commerce and Finance of the House Committee on Inter-
    state and Foreign Commerce, 90th Cong., 2d Sess. 19 (1968).

under the Commodity Exchange Act, 7 U.S.C. 1 et seq., the Supreme Court
held that an implied private right of action exists under that Act on
behalf of purchasers of commodity futures contracts against commodities
brokers and exchanges.  In reaching this conclusion, the Court stated
that it was not necessary to rely on the four-factor analysis enunciated
in Cort v. Ash, since the intent of Congress to create or deny a private
remedy under a statute can be discerned by focusing on the state of the
law at the time Congress amends a statute or, more accurately, on "Con-
gress' perception" of the law that it is amending (102 S. Ct. at 1839).
The Court explained (id.):

> When Congress enacts new legislation, the question is
> whether Congress intended to create a private remedy as
> a supplement to the express enforcement provisions of
> the statute.

By contrast,

> [w]hen Congress acts in a statutory context in which
> an implied private remedy has already been recognized
> by the courts * * * the inquiry logically is different.
> Congress need not have intended to create a new remedy,
> since one already existed; the question is whether Con-
> gress intended to preserve the preexisting remedy.

Id.

In Curran, the Supreme Court found that when the Commodity Exchange
Act was "comprehensively reexamined and strengthened" in 1974 (id.), the
federal courts had consistently recognized an implied right of action under
that Act comparable to the routine recognition of implied rights of action
under the Securities Exchange Act at that time.  Id. at 1839-1840. 10/  The

---

10/  The Court in Curran stated with respect to the federal securities
laws (102 S. Ct. at 1846 n.92, quoting from Justime Stevens' dis-

(footnote continued)

- 17 -

Court reasoned that the availability of an implied right of action under

the Commodity Exchange Act was part of the "contemporary legal context" in

which Congress enacted the 1974 amendments to the Act and the fact that

those amendments "left intact the statutory provisions under which the

federal courts had implied a cause of action is itself evidence that Con-

gress affirmatively intended to preserve that remedy." Id. at 1841 (foot-

note omitted). Indeed, the Supreme Court cautioned that in making a deter-

mination whether Congress intended to create a private remedy, courts must

be mindful that prior to the 1975 decision in Cort v. Ash, if a federal

statute was enacted to benefit a special class, a remedy was usually recog-

nized by the federal courts for members of that class. Curran, supra, 102

S. Ct. at 1837, citing Texas & Pacific Railway Company v. Rigsby, 241 U.S.

33 (1916).

As was the situation under the Commodity Exchange Act in Curran, when

Congress in 1970 amended the Williams Act (Pub. L. No. 91-567, 84 Stat.

---

10/   (Continued)

senting opinion in Piper v. Chris-Craft Industries, supra, 430 U.S.
at 55 n.4 (emphasis in original)):

'The statutes originally enacted in 1933 and 1934 have
been amended so often with full congressional awareness
of the judicial interpretation of Rule 10b-5 as im-
plicitly creating a private remedy that we must now assume
that Congress intended to create rights for the specific
beneficiaries of the legislation as well as duties to be
policed by the SEC. This case [Piper] therefore does not
present the same kind of issue discussed in Cort v. Ash,
422 U.S. 66 (1975), namely whether the statute created
an implied private remedy. Rather, the question presented
here is who may invoke that remedy.'

- 18 -

1497 (Dec. 22, 1970)), 11/ federal courts had recognized the existence of a

private right of action in favor of issuers and bidders under that Act.

Susquehanna Corporation v. Pan American Sulphur Company, 423 F.2d 1075

(5th Cir. 1970) (Sections 13(d), 14(d) and 14(e)); Bath Industries, Inc.

v. Blot, supra, 427 F.2d 97 (Section 13(d)); Electronic Specialty Company

v. International Controls Corp., supra (Sections 14(d) and 14(e)); Butler

Aviation Int'l, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842 (2d

Cir. 1970) (Section 14(e)); Crane Co. v. Westinghouse Air Brake Co., 419

F.2d 787 (2d Cir. 1969) (Section 14(e)); Sisak v. Wings and Wheels Express,

Inc., [1970-1971] Fed. Sec. L. Rep. (CCH) ¶92,991 (S.D.N.Y. 1970) (Section

13(d)); Metro-Goldwyn-Mayer, Inc. v. Transamerica Corp., 303 F. Supp. 1354

(S.D.N.Y. 1969) (Sections 14(d) and 14(e)); Armour and Company v. General

Host Corp., 296 F. Supp. 470 (S.D.N.Y. 1969) (Section 14(e)). 12/   See also

Grow Chemical Corporation v. Uran, 316 F. Supp. 891 (S.D.N.Y. 1970);

Fabrikant v. Jacobellis, [1969-70] Fed. Sec. L. Rep. ¶92,686 (E.D.N.Y.

1970) (private right of action on behalf of shareholders).  Moreover, less

---

11/   Congress in 1970 amended four of the five sections added to the
      Securities Exchange Act by the Williams Act, including Sections 13(d),
      14(d), and 14(e).  These amendments, among other things, lowered the
      percentage of issued and outstanding stock of a corporation necessary
      to trigger the Act's provisions from 10 percent to 5 percent, brought
      the equity securities of insurance companies within the coverage of
      the Act, and added Commission rulemaking authority in Section 14(e).

12/   See also GAF Corporation v. Milstein, supra, 453 F.2d at 714-721,
      where the court held that a private right of action in favor of
      the issuer exists under Section 13(d), stating that "[t]he teach-
      ings of J.I. Case Co. v. Borak * * * are part of the ABC's of
      securities law."  453 F.2d at 719.  Although GAF Corporation was
      decided shortly after Congress amended the Williams Act in 1970,
      it is nevertheless indicative of the view of the law at the time
      Congress acted.  See Leist v. Simplot, supra, 638 F.2d at 301.

than a year before Congress amended the Williams Act, the Supreme Court had

decided Mills v. Electric Auto-Lite Company, 396 U.S. 375, 381-383 (1970),

which reaffirmed the Court's holding in J.I. Case Company v. Borak, supra,

that an implied private right of action is available under the proxy provi-

sions of Section 14(a).  The fact that Congress significantly amended the

Williams Act after the federal courts had found an implied right of action

under that Act, without any indication of disapproval of these judicial

decisions, is itself evidence that "Congress affirmatively intended to pre-

serve that remedy."  Curran, supra, 102 S. Ct. at 1841 (footnote omitted). 13/

Congress again amended Section 13(d) in 1977, a time when judicial

recognition of the existence of an implied right of action for equitable

relief in favor of issuers under that Section was even more widespread

than in 1970.  E.g., GAF Corporation v. Milstein, supra, 453 F.2d at 719;

Graphic Sciences, Inc. v. International Mogul Mines Limited, 397 F. Supp.

112 (D.D.C. 1974); Water & Well Associates, Inc. v. American Consumer Indus-

tries, Inc., [1973] Fed. Sec. L. Rep. (CCH) ¶93,943 (D.N.J. 1973).  See

Scott v. Multi-Amp Corporation, 386 F. Supp. 44, 50 (D.N.J. 1974) (implied

---

13/  See also Wachovia Bank and Trust Co. v. National Student Marketing
     Corp., 650 F.2d 342 (D.C. Cir. 1980), cert. denied, 452 U.S. 954
     (1981), where the court stated that "[l]ongstanding judicial appli-
     cation of a court's statutory interpretation, * * * when added to
     the failure of Congress to reject its reasoning, 'argues signifi-
     cantly in favor of [its] acceptance.'"  Id. at 351, quoting Blue
     Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975).

     Not only is there no hint in the legislative history of the 1970
     amendments that Congress was disturbed with the development of the
     Williams Act up to that time, but when Senator Williams introduced
     those amendments he stated that the Williams Act had "worked well"
     and was recognized as "a valuable and important tool in the arsenal
     of investor protection."  116 Cong. Rec. 3024 (1970).

right for equitable relief on behalf of shareholder). 14/   Indeed, the

Supreme Court on the same day in 1975 it decided Cort v. Ash, also delivered

its decision in Rondeau v. Mosinee Paper Corporation, 422 U.S.  49 (1975),

in which the Court dealt with the question of whether an issuer must estab-

lish irreparable harm to obtain injunctive relief under Section 13(d).

Although neither the existence of a private remedy under Section 13(d) nor

the issuer's standing to sue was questioned in Rondeau, the Court stated

that it had "not hesitated to recognize the power of federal courts to

fashion private remedies for securities laws violations when to do so

is consistent with the legislative scheme and necessary for the protec-

tion of investors as a supplement to enforcement by the Securities and

Exchange Commission."  422 U.S. at 62, citing J.I. Case v. Borak, supra.

---

14/   The court in Gateway Industries, Inc. v. Agency Rent-A-Car, supra,
495 F. Supp. at 59, upon which the counterclaim defendants in this
case rely, acknowledged that at the time its opinion was written,
three years after Congress amended Section 13(d), "the decisional
authority unanimously has upheld the existence of a private right
of action for injunctive relief under Section 13(d)" (footnote
omitted).

One of the fundamental errors of the Gateway decision is its view
that recent Supreme Court opinions indicate that the prior cases
upholding private actions were wrongly decided.  That approach
ignores the Supreme Court's emphasis on congressional intent and
that "'the relevant inquiry is not whether Congress correctly per-
ceived the then state of the law, but rather what its perception
of the state of the law was.'"  Cannon, supra, 441 U.S. at 711,
quoting Brown v. GSA, 425 U.S. 820, 828 (1976).  See also Curran,
supra, 102 S. Ct. at 1839 n.61.

The fact that some of the decisions "simply assumed" that the pri-
vate remedy was available and did not address the issue scarcely
detracts from the importance of those decisions; exactly to the
contrary, the absence of dispute concerning the issue makes it
"abundantly clear that the private cause of action * * * was part
of the 'contemporary legal context' in which Congress legislated
* * *."   Curran, supra, 102 S. Ct. at 1841.

Thus, if Congress in 1977 had looked to the Supreme Court decisions rele-

vant to the existence of an implied right of action for equitable relief

under Section 13(d) or, indeed, under the Williams Act generally, it would

have found Rondeau and Borak clearly indicating that such a right was

favored by the Supreme Court.

    B.  The Traditional Cort v. Ash Analysis Further Demonstrates
        the Existence of Implied Rights of Action for Equitable
        Relief under the Williams Act.

As we have seen, it is not necessary to utilize the Cort v. Ash analy-

sis since the intent of Congress to create private remedies is readily dis-

cerned from the circumstances in which the Williams Act was enacted and

subsequently amended. Even if that were not so, however, and the Cort v.

Ash analysis were required, application of that analysis would also support

implication of private rights of action for equitable relief under the

Williams Act.

        1.  Implying private rights of action for equitable re-
           lief on behalf of issuer corporations and tender
           offerors would benefit shareholders, intended bene-
           ficiaries of the Williams Act.

With respect to the first Cort v. Ash factor, it cannot be disputed

that shareholders are in the class for whose especial benefit the protec-

tions of the Williams Act were enacted. 15/ Even if the other parties to

a takeover attempt, the issuer and tender offeror, were not deemed the

"especial" beneficiaries of the Act, that would not be fatal to their

standing to seek equitable relief to halt or correct violations of that

statute, since such relief would benefit shareholders.

---

15/  Piper v. Chris-Craft Industries, Inc., supra; Crane Company v.
    Harsco Corp., 511 F. Supp. 294, 300 (D. Del. 1981). See also S.
    Rep. at 2-3.

In Mobil Corporation v. Marathon Oil Corporation, supra, 669 F.2d at

371, a case in which equitable relief was sought under Section 14(e) by a

tender offeror, the court determined that it could look to the "practical

realities" and "determine that a cause of action is necessary to aid the

shareholders * * *." 16/ It is important in this regard to distinguish

damage actions from actions for equitable relief. Whether the plaintiff

is himself the intended beneficiary of the statute is an essential question

where the plaintiff is seeking damages as compensation for harm suffered by

him. On the other hand, where the plaintiff seeks only equitable relief to

require compliance with the statute, the question logically is whether the

requested relief would benefit the class of persons Congress intended to

protect, even if the plaintiff is not himself within that class. 17/ Con-

sistent with this distinction, the court in Mobil Corporation upheld the

standing of the tender offeror to sue for equitable relief under Section

14(e) since

> [i]ssues such as incomplete disclosure and manipulative
> practices can only be effectively spotted and argued
> by parties with complete knowledge of the target, its
> business, and others in the industry. The tender of-
> feror * * * may often be the only party with enough
> knowledge and awareness to identify nondisclosure or
> manipulative practices in time to obtain a preliminary
> injunction.

---

16/  See also Crane Co. v. Harsco Corp., supra, 511 F. Supp. at 300;
Humana, Inc. v. American Medicorp, Inc., 445 F. Supp. 613, 616
(S.D.N.Y. 1977).

17/  The court in Crane Co. v. Harsco Corp., supra, criticized the
Gateway Industries decision and other cases relied upon by counter-
claim defendants for "ignor[ing] the distinction between injunctive
relief and damages in their analysis." 511 F. Supp. at 301.

- 23 -

699 F.2d at 371.  Accord, Crane Co. v. Harsco Corp., 511 F. Supp. 294, 300

(D. Del. 1981); Weeks Dredging and Contracting, Inc. v. American Dredging

Co., 451 F. Supp. 468, 476 (E.D. Pa. 1978).  In a similar vein, the House

report on the 1970 amendments to the Williams Act states that "management of

a target company should be advised of a tender offer under Section 14(d) for

securities in an amount of over 5 percent of its stock in order to appro-

priately protect the interests of its security holders."  H.R. Rep. No.

91-1655, 91st Cong., 2d Sess. 3 (1970).

The same reasoning also applies in the context of litigation under

Section 13(d); the issuer, because of its significant interest and resources,

may be the only party in a position to uncover and litigate violations of

that statute.  In Electronic Specialty Co. v. International Controls Corp.,

supra, 409 F.2d at 946, the court noted that the "superior resources" of

the issuer corporation can be vital "where remedial action must be speedy

and forceful."  Accord, GAF Corp. v. Milstein, supra, 453 F.2d at 719.  In

fact, the Supreme Court in Piper reiterated its statement first made in

J.I. Case Co. v. Borak, supra, 377 U.S. at 432, that a corporation can

assert remedies on behalf of its shareholders.  430 U.S. at 32 n.21.  Since

violations of the Williams Act, like violations of the proxy provisions at

issue in Borak, can result in damage "'not from the deceit practiced on

[the individual shareholder] alone but rather from the deceit practiced on

the shareholders as a group'" (id.), the issuer can bring suit on behalf of

its shareholders when Section 13(d) is violated.

Moreover, an examination of the language of the various provisions of

the Williams Act and the legislative history demonstrates that Congress

- 24 -

intended to grant the issuer and tender offeror certain rights under that
Act as a means of protecting shareholders.  In Cannon v. University of
Chicago, 441 U.S. 677 (1979), the Supreme Court noted, in this regard, that
whether the "language of the statute" creates a right in favor of a class
of persons including the plaintiff or a duty on the part of the defendant
vis-a-vis such a class "has generally been the most accurate indicator of
the propriety of implication of * * * a cause of action."  441 U.S. 690
n.13. 18/

Section 13(d)(1) of the Securities Exchange Act provides that any
person who acquires beneficial ownership of more than five percent of a
class of certain equity securities of an issuer must submit a disclosure
statement to the Commission and to the exchange on which the securities
are traded and "send [a copy of the statement and amendments thereto]
to the issuer of the security at its principal executive office, by
registered or certified mail" (emphasis supplied).  Moreover, while Sec-
tion 13(d) does not contain an antifraud provision similar to Section 14(e)
of the Act, the requirement that the purchaser file a truthful statement is
implicit in the provision.  Securities and Exchange Commission v. Savoy
Industries, Inc., 587 F.2d 1149, 1165 (D.C. Cir. 1978), cert. denied, 440
U.S. 913 (1979); GAF Corporation v. Milstein, supra, 453 F.2d at 719-720.

---

18/  See also Cort v. Ash, supra, 422 U.S. at 82 ("[I]n * * * those
situations in which we have inferred a federal private cause of
action not expressly provided, there has generally been a clearly
articulated federal right in the plaintiff * * * or a pervasive
legislative scheme governing the relationship between the plain-
tiff class and the defendant class in a particular regard, e.g.,
J.I. Case Co. v. Borak, supra").

- 25 -

Similarly, Section 14(d)(1) requires the tender offeror to provide the issuer with a statement containing prescribed information. Likewise, Commission Rule 14d-9(a), 17 CFR 240.14d-9(a), promulgated pursuant to Section 14(d)(4) of the Securities Exchange Act, requires any person making a recommendation to shareholders with respect to a tender offer to provide a copy of a disclosure statement to the tender offeror. The truthfulness of these statements is ensured by Sections 14(d) and 14(e).

By requiring that the statements be sent to the issuer and to the tender offeror, the Williams Act grants these parties certain specifically delineated rights — the right to receive the required information and the right to expect that information to be accurate. 19/ As explained by Senator Williams (113 Cong. Rec. 855-856 (1967)), the sponsor of the Williams Act, the disclosure provisions of the Williams Act are

> the only way that corporations, their shareholders and others can adequately evaluate a tender offer or the possible effect of a change in substantial share-holdings. Id. at 855 (emphasis supplied). 20/

Counterclaim-defendants, however, assert with respect to Section 13(d) (Br.38) that implication of a private right of action for equitable would be inconsistent with the Supreme Court's decisions in Touche Ross and

---

19/    Sending information to the issuer and the exchanges provides a mechanism by which that data can reach the shareholder-investors. See Spencer Companies v. Agency Rent-A-Car, Inc., [1981-1982] Fed. Sec. L. Rep. (CCH) ¶98,301 at 91,895 (D. Mass. 1981). Armed with accurate information, shareholders can make an informed response to a potential shift in control. Cf. Piper v. Chris-Craft Industries, Inc., supra, 430 U.S. at 35.

20/    See also Senate Hearings at 2, 49; 113 Cong. Rec. 857-858, 24665 (1967) (Remarks of Senator Kuchel).

- 26 -

Company v. Redington, 442 U.S. 560 (1979), and Transamerica Mortgage Advi-

sors, Inc. v. Lewis, 444 U.S. 11 (1979).  In Touche Ross, the Supreme

Court held that there was no implied right of action for damages under the

broker-dealer reporting provisions of Section 17(a) of the Securities

Exchange Act, 15 U.S.C. 78l(a).  That statute, however, differs from Section

13(d) (as well as Sections 14(d) and 14(e)) in a critical respect.  The

Supreme Court in Touche Ross characterized Section 17(a) as not conferring

any rights on private parties, resembling

> countless other statutes that simply require certain
> regulated businesses to keep records and file periodic
> reports to enable the relevant governmental authorities
> to perform their regulatory functions.  The reports and
> records provide the regulatory authorities with the
> necessary information to oversee compliance with and
> enforce the various statutes and regulations with which
> they are concerned.

Id. at 569.  The disclosure requirement of Section 13(d), on the other hand,

is intended to do much more than provide assistance to the Commission.  The

information required by Section 13(d) is intended for the use of the issuer

and its shareholders.  Since Section 13(d), like the Williams Act generally,

denotes a specific class of beneficiaries, it cannot be viewed as merely a

record-keeping or filing provision of the type involved in Touche Ross.

Nor does the Supreme Court decision in Transamerica Mortgage Advisors,

Inc. v. Lewis, supra, provide any support for rejecting a private right of

action for equitable relief under Section 13(d).  The Supreme Court there

held that an investor did not have a private right of action against an

investment adviser for violations of Section 206 of the Investment Advisers

Act, 15 U.S.C. 80b-206, which proscribes fraudulent conduct on the part of

an investment adviser with respect to its clients, language very similar to

Section 14(e)'s prohibition of fraudulent conduct.  See Mobil Oil Corp. v.
Marathon Oil Co., supra, 669 F.2d at 372-373 n.5.  But the Supreme Court in
Transamerica found that Section 206 satisfies the first prong of the Cort
v. Ash analysis (444 U.S. at 17); the Court rejected the implication of a
private right of action for damages under that Section based upon affirma-
tive evidence of congressional intent to deny any remedy for damages in the
Investment Advisers Act as a whole (id. at 22).  In contrast, as we demon-
strate at pages 27-29 infra, there is no evidence of congressional intent to
deny private rights of action for equitable relief to enforce the disclo-
sure requirements of the Williams Act.

> ### 2.  Congress intended to create private rights of action for equitable relief under the Williams Act.

With respect to the second Cort v. Ash factor — Congress' intent to
create or deny a private remedy — the Supreme Court in Cannon v. University
of Chicago, supra, held that where, as here, a particular class has been
identified as the especial beneficiaries of the Act, "'it is not necessary
to show an intention to create a private cause of action, although an expli-
cit purpose to deny such cause of action would be controlling.'"  441 U.S.
at 694, quoting Cort v. Ash, supra, 422 U.S. at 82 (emphasis in original).

As we have seen (pages 11-21, supra), there is abundant evidence derived
from the contemporary legal context and the legislative history of the
Williams Act that Congress did in fact intend a private remedy to be avail-
able.  More importantly, there is no indication in the legislative history
or in the structure of the Williams Act that Congress intended to deny such
a remedy.  Contrary to the holding of Gateway Industries, Inc. v. Agency
Rent-A-Car, Inc., 495 F. Supp. 92 (N.D. Ill.), appeal dismissed per stipula-

- 28 -

tion, No. 80-1871 (7th Cir. 1980), relied upon here by counterclaim-defendants (Br. 38), there is no evidence that Congress intended that Section 18 of the Securities Exchange Act, 15 U.S.C. 78r, and the express governmental enforcement remedies included in the Act, 21/ provide the exclusive means for enforcing the provisions of the Williams Act.  Section 18 provides a remedy only for damages — not for equitable relief — and grants standing only to those persons who have purchased or sold securities in reliance upon misstatements in reports filed with the Commission.  Thus, Section 18 has no application to a situation where, as here, the plaintiff is seeking only equitable relief.  See Crane Company v. Harsco Corporation, supra, 511 F. Supp. at 300-301.  Further, Section 18 would provide no remedy to shareholders who determine to retain their shares on the basis of a mis-leading filing — persons whom the Supreme Court has recognized Congress intended to protect when it passed the Williams Act.  Piper v. Chris-Craft Industries, Inc., supra, 430 U.S. at 38-39.  Moreover, Section 18, as well as the express governmental remedies, were enacted by Congress more than 30 years before the enactment of the Williams Act.  It is the intent of Con-gress at the time it enacts or amends a statute which is the touchstone of whether a private right of action will be implied under that statute. Touche Ross & Co. v. Redington, supra, 422 U.S. at 547-575, n.16; Cannon v. University of Chicago, supra, 441 U.S. at 698-699.  The fact that Congress 30 years earlier provided the Commission with an enforcement mechanism, and provided an express private right of action for damages in limited circum-

---

21/  See Sections 21 and 32 of the Securities Exchange Act, 15 U.S.C. 78u and 78ff.

- 29 -

stances, cannot be evidence of any intent on the part of Congress to deny private equitable relief when it later enacted or amended the Williams Act.

3.    Implication of private remedies for equitable relief in this case would be consistent with the congressional purpose.

In Cannon, the Supreme Court stated that "when a private remedy is necessary or at least helpful to the accomplishment of the statutory purpose, the Court is decidedly receptive to its implication under the statute." 441 U.S. at 703. Allowing the parties to a corporate takeover to obtain equitable relief to enforce the Williams Act will further the congressional purpose of protecting shareholders. The Commission does not have sufficient resources adequately to police all possible violations of the Williams Act or all filings made pursuant to that Act. 22/ This is made evident by the fact that in fiscal year 1982, for example, 1574 Schedule 13D's, 3673 amendments to those reports, as well as 137 Schedule 14D-1's with 366 amendments were filed with the Commission. More importantly, these filings are only a small part of the many thousands of disclosure documents filed with the Commission each year under the various provisions of the federal securities laws. It is entirely unrealistic to assume that the Commission has the resources to investigate every allegation that a report is false or misleading, and to assume that Congress intended to leave corporate issuers, their shareholders and tender offerors without an effective remedy. See Cannon v. University of Chicago, supra, 441 U.S. at 706-707 n.41. Private equitable actions to force compliance with the

---

22/  See GAF Corp. v. Milstein, supra, 453 F.2d at 721; Gulf & Western Industries, Inc. v. Great A&P Tea Co., 476 F.2d 687, 699 (2d Cir. 1973); Crane Co. v. Harsco Corporation, supra, 511 F. Supp. at 301.

- 30 -

requirements of the Williams Act are thus a "necessary supplement" to Com-

mission actions.  See Mills v. Electric Auto-Lite Co., supra, 396 U.S. at

383; J.I. Case Co. v. Borak, supra, 377 U.S. at 432.  Cf. Cannon v. Uni-

versity of Chicago, supra, 441 U.S. at 706-707.

Moreover, contrary to the contention of counterclaim-defendants

(Br. 37), the availability of equitable relief will not provide the issuer

with an unwarranted opportunity to defeat tender offers.  Nor will such re-

lief, when properly awarded, tip the balance in favor of one party or the

other in a contest for control of the issuer.  Mobil Corp. v. Marathon Oil

Co., supra, 669 F.2d at 372.  The Supreme Court itself has suggested that

private actions for equitable relief are fully consistent with the congres-

sional goals underlying the Williams Act.  As we have seen, in Piper v.

Chris-Craft Industries, Inc., supra, the Supreme Court, in holding that a

defeated tender offeror lacks standing under Section 14(e) of the Securities

Exchange Act to sue for damages, stated that investor protection can better

be served by "less drastic means more closely tailored" to the goals of the

Williams Act.  430 U.S. at 40.  Equitable relief meets that criterion.

Indeed, the Court in Piper further stated that "in corporate control contests

the stage of preliminary injunctive relief, rather than post-contest lawsuits,

'is the time when relief can best be given.'"  430 U.S. at 42, quoting

Electronic Speciality Co. v. International Controls Corp., supra 409 F.2d

at 947.

Of course, "district judges must be vigilant against resort to the

courts on trumped-up or trivial grounds as a means for delaying."  Elec-

tronic Speciality Co., supra, 409 F.2d at 947.  See also Susquehanna Corp.

v. Pan American Sulphur Co., supra, 423 F.2d at 1086.  As stated in Electronic Speciality Co., supra, 409 F.2d at 948:

> Congress intended to assure basic honesty and fair
> dealing, not to impose an unrealistic requirement of
> laboratory conditions that might make the new statute
> a potent tool for incumbent management to protect
> its own interests against the desires and welfare of
> the stockholders.

See also GAF Corp. v. Milstein, supra, 453 F.2d at 719-720.  Abuse of the statute, however, is not to be avoided by denying standing to the party in the best position to ensure that Congress' goals are met.  Rather, the courts must "carefully examine[]" the parties' disclosures to determine whether they are "basically fair and complete under the circumstances * * * and comply with the Act and the SEC rules and regulations."  Susquehanna Corp., supra, 423 F.2d at 1086.

### 4.  Actions for equitable relief to remedy violations of the Williams Act are not matters relegated to the states.

The final factor enunciated in Cort v. Ash for determining whether to imply a private remedy is whether the action is one traditionally relegated to state law.  If so, under Cort it would be inappropriate to imply a cause of action under federal law.  422 U.S. at 78.

In Piper, the court determined that it was appropriate to relegate the tender offeror to its common law cause of action for "interference with a prospective commercial advantage," since the defeated tender offeror based its claim for damages on harm suffered as a result of its loss of "'a fair opportunity' to compete for control" of the issuer.  430 U.S. at 40-41.  Thus, in Piper the plaintiff sought compensation for harm which the federal statute was not intended to remedy.  That is not the case here.  It would

- 32 -

be inappropriate to relegate the parties to state court, since the only

interest involved is enforcement of rights granted by a federal statute.

See Transamerica Mortage Advisors, Inc. v. Lewis, 444 U.S. 11, 19 n.8 (1979).

Accordingly, the four-prong Cort v. Ash analysis establishes that Con-

gress intended that there be a private right of action for equitable relief

under the Williams Act.

II.   A DISTRICT COURT HAS THE AUTHORITY, IN A SUIT ALLEGING VIOLATIONS
      OF THE WILLIAMS ACT, TO ORDER EQUITABLE RELIEF IN ADDITION TO
      CORRECTIVE DISCLOSURE; THE PROPRIETY OF SUCH RELIEF SHOULD BE
      JUDGED ON AN ABUSE OF DISCRETION STANDARD.

Appellants argue that the remedy ordered by the district court was not

appropriate under the circumstances of this case.  To the extent that appel-

lants argue that in granting the preliminary injunction restraining the

tender offer the court abused its discretion, the Commission expresses no

view as to whether that in fact was the case.  To the extent, however, that

appellants also argue that the remedies available to the district court

were restricted to corrective disclosure as a matter of law, the Commission

disagrees.  There is an important distinction between the propriety of, and

the power to grant, equitable relief; and in this suit based on Williams

Act violations, the district court had broad equitable powers.  Regardless

of whether the relief granted here was appropriate under all the circum-

stances, that equitable remedy was, in the Commission's view, one of the

"variety of tools," in addition to corrective disclosure, which the court

had the power to order.  Electronic Specialty Co. v. International Controls

Case 1:08-cv-02764-LAK    Document 106-6    Filed 07/30/2008    Page 75 of 81
Case 1:08-cv-02764-LAK    Document 61-3    Filed 05/27/2008    Page 45 of 51

- 33 -

Corp., supra, 409 F.2d at 947. 23/

Once a court's equity jurisdiction is properly invoked, it may not be artificially limited. Courts of equity have the power to shape full relief, taking into account the interests of the parties affected and the goals to be pursued. See J.I. Case Co. v. Borak, supra, 377 U.S. at 433; Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946); Deckert v. Independence Shares Corp., 311 U.S. 282, 288 (1940); United States v. City of Parma, 661 F.2d 562, 576 (6th Cir. 1981); Securities and Exchange Commission v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103-1104 (2d Cir. 1972); 1 J. Pomeroy, Equity Jurisprudence §§114-115, 181, 231, 236(a), 239(a) (5th ed. 1941).

As was the case in Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944), "[w]e are dealing here with the requirements of equity practice with a background of several hundred years of history." To limit the possible remedies for Williams Act violations, in all cases or a predetermined category of cases, to corrective disclosure would distort the essential nature of equity jurisdiction which has been traditionally characterized by "[f]lexibility rather than rigidity," would fail to deter violations of the statute, and would fail to afford shareholders adequate protection against harm flowing from the violations. Id. Accord, General Aircraft Corp. v. Lampert, 556 F.2d 90, 97 (1st Cir. 1977).

---

23/ The Commission expresses no view on whether corrective disclosure has in fact been made in this case. A court's authority to issue an injunction pending correction of misleading disclosures is, of course, clear. See General Aircraft Co. v. Lampert, supra, 556 F.2d at 97; Sonesta Int'l Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2d Cir. 1973); Life Investors, Inc. v. AGO Holding Co., [1981-82] Fed. Sec. L. Rep. (CCH) ¶98,356, at 92,197 (8th Cir. 1981).

- 34 -

In urging that the district court exceeded its equitable jurisdiction, appellants erroneously rely on several judicial decisions. In Rondeau v. Mosinee Paper Company, supra, 422 U.S. 49, the Supreme court held that a showing of irreparable harm is necessary for a private litigant to obtain injunctive relief in a suit under Section 13(d). Contrary to appellants' contention, however, the Court did not hold that relief must be denied merely because the wrongdoer has terminated its violation of the statute. In Rondeau, the purchaser had acquired less than ten percent of the issuer's stock while unaware of the then recent amendment to the statute lowering the triggering level for filing a Schedule 13D from ten to five percent of the outstanding shares. 422 U.S. at 55 & n.4. This "technical violation" (id. at 56) was quickly remedied upon notice of the section's requirements by filing an accurate Schedule 13D. Of particular significance, the defendant had not attempted to gain control of the issuer, "either by a cash tender offer or any other device" (id. at 59).

Appellants also rely upon this Court's decision in General Aircraft Corp. v. Lampert, supra, 556 F.2d 90, where this Court affirmed an order of a district court requiring the defendants to correct their Section 13(d) filings, which falsely stated that the purpose of their acquisition of the plaintiff's securities was for investment, but overturned that portion of the district court's order which enjoined the voting of the defendants' shares acquired before the filing of the false Schedule 13D. This Court pointed out that the defendants' stock "was acquired legally more than a year prior to the filing of the present action," and distinguished cases in which shares were illegally obtained as examples of where there "has

- 35 -

been a clear showing of irreparable injury." 556 F.2d at 97. 24/ Another

factor mentioned by this Court in finding that no irreparable injury had

been demonstrated was the absence of "an imminent contest for control."

Id. Other courts have indicated that a preliminary injunction would be

appropriate where "a take-over attempt 'followed on the heels' of a

belated curative filing." Treadway Companies, Inc. v. Care Corp., 638

F.2d 357, 380 (2d Cir. 1980). See also Financial General Bankshares, Inc.

---

24/  Appellants recognize that some courts have ordered equitable relief
     beyond corrective disclosure — including enjoining a tender offer,
     disenfranchisement, divestiture and rescission — where a significant
     amount of shares were acquired after the filing of a false Schedule
     13D.  SFREI Br. 38 n.27; Br. of counterclaim defendants 42-43.  In
     General Steel Industries, Inc. v. Walco National Corp., [1981-1982]
     Fed. Sec. L. Rep. (CCH) ¶98,402 (E.D. Mo. 1981), the court ordered an
     injunction and rescission (followed by divestiture) of the 4.5% of
     the issuer's stock acquired after a false Schedule 13D was filed, but
     not the 29.5% acquired prior to the filing obligation.  The General
     Steel opinion was vacated as moot by the Court of Appeals for the
     Eighth Circuit when the parties settled the case after an appeal had
     been taken.  See also The Hanna Mining Co. v. Norcen Energy Resources,
     Inc., supra (preliminary injunction); S-G Securities, Inc. v. The
     Fuqua Investment Co., 466 F. Supp. 1114, 1131 (D. Mass. 1978)
     (rescission); Twin Fair, Inc. v. Reger, 394 F. Supp. 156, 160-161
     (W.D.N.Y. 1975) (preliminary injunction); Committee for New Management
     of Butler Aviation v. Widmark, 335 F. Supp. 146, 155 (E.D.N.Y. 1971)
     (disenfranchisement).

     Compare Missouri Portland Cement Co. v. H.K. Porter Co., 535 F.2d
     388, 399 (8th Cir. 1976), in which disenfranchisement or complete
     divestiture of all shares acquired was denied where, following the
     lawful acquisition of 20.6% of the issuer's stock, the purchaser
     allegedly filed a false Schedule 13D and then purchased an additional
     0.7% of the stock prior to commencing a tender offer.  Accord, Tread-
     way Companies, Inc. v. Care Corp., 638 F.2d 357, 380 n.45 (2d Cir.
     1980); Financial General Bankshares v. Lance, [1978] Fed. Sec. L. Rep.
     (CCH) ¶96,403 (D.D.C. 1978) (where defendant lacked a "degree of
     effective control" rescission and divestiture denied).  See also
     Ludlow Corp. v. Tyco Laboratories, Inc., 529 F. Supp. 62, 66 (D. Mass.
     1981) (preliminary injunction denied where, although substantial
     purchases, no tender offer followed corrective disclosure).

Case 1:08-cv-02764-LAK   Document 106-6   Filed 07/30/2008   Page 78 of 81
Case 1:08-cv-02764-LAK   Document 61-3   Filed 05/27/2008   Page 48 of 51

- 36 -

v. Lance, [1978] Fed. Sec. L. Rep. (CCH) ¶96,403 at 93,428 & n.41 (D.D.C.

1978); Universal Container Corp. v. Horwitz, [1977-78] Fed. Sec. L. Rep.

(CCH) ¶96,161, at 92,255-56 (S.D.N.Y. 1977).  Cf. Rondeau, supra, 422 U.S.

at 59-60.

Courts have also considered, in determining whether to grant relief

beyond corrective disclosure, whether the violations of Section 13(d) have

been deliberate.  Absent a remedy beyond ordering corrective disclosure, a

person will have little incentive to comply with the statute.  On the one

hand, the potential benefits to be gained from a violation can be quite

substantial, since truthful and prompt disclosure of a potential tender

offeror's intention to seek control of the company may require the offeror

to pay a higher price for the stock and provide the issuer with valuable

time to formulate its responses to the offer. 25/  On the other hand,

corrective disclosure is no real deterrent, since it merely requires com-

pliance with the original statutory disclosure obligation and leaves the

violator with the profitable fruits of his illegal conduct.  See Bath

Industries, Inc. v. Blot, supra, 427 F.2d at 113.

---

25/ Thus, the violative conduct would deny shareholders one of the import-
ant protections of Section 13(d) because incumbent management would
have been deprived of "an opportunity to express and explain its
position" with respect to the accumulation of a substantial number
of shares by the violator.  Rondeau v. Mosinee Paper Corp., supra,
422 U.S. at 58.  See Bath Industries, Inc. v. Blot, supra, 427 F.2d
at 113 (purpose of Section 13(d) is to give shareholders an oppor-
tunity to hear from incumbent management on the merit or lack of
merit of bidder's proposals); Committee for New Management of Butler
Aviation v. Widmark, supra, 335 F. Supp. at 154.  See also S. Rep.
at 3; H.R. Rep. at 4.

Courts should not allow a defendant to "escape unscathed from the consequences of inaccurate statements which it could easily have avoided * * *," or, indeed, intentionally caused to be disseminated. Butler Aviation International v. Comprehensive Designers, Inc., supra, 425 F.2d at 845. See also Pacific Realty Trust v. APC Investments, Inc., 685 F.2d 1083, 1086 (9th Cir. 1982); Bath Industries, Inc. v. Blot, supra, 427 F.2d at 113; Committee for New Management of Butler Aviation v. Widmark, supra, 335 F. Supp. 146, 155 (E.D.N.Y. 1971). The Supreme Court in Piper v. Chris-Craft Industries, supra, 430 U.S. at 40 n.26, recognized that deterrence of violations of the Williams Act is a suitable goal, particularly in cases of "flagrant misconduct," and endorsed "injunctive relief at * * * earl[y] stage[s] of the contest" as the "most efficacious form of remedy."

The Second Circuit has described the role of the district judge in ruling upon an application to preliminarily enjoin a tender offer, a stage he characterized as "the time when relief can best be given," as follows:

> If the filings are defective or the tender offer misleading, the court can require correction, along, of course, with an opportunity to withdraw and an injunction against further solicitation until the period for withdrawal has expired. * * * If the court believes the offeror has improperly depressed the price of the stock before making the offer, it can require rescission and enjoin further solicitation for a period, or allow the offeror the alternative of raising the price for both past and future deposits. We cite these merely as examples; other techniques will doubtless suggest themselves to resourceful judges. On the other hand, we do not mean at all that interlocutory relief should be given lightly. To the contrary, district judges must be vigilant against resort to the courts on trumped-up or trivial grounds as a means for delaying and thereby defeating legitimate tender offers.

- 38 -

Electronic Specialty Co. v. International Controls, supra, 409 F.2d at

947; see Piper v. Chris-Craft Industries, Inc., supra, 430 at 42.

Accordingly, in determining whether to order relief beyond corrective

disclosure in a particular case, the court should consider all the pertin-

ent circumstances, including whether a substantial number of shares were

purchased after the misleading disclosures were made and before corrective

disclosure, if any, was made; whether the curative disclosure occurs simul-

taneously with or shortly before a tender offer; and whether the violation

was egregious.  Since equitable relief can be a harsh remedy precluding the

completion of a tender offer, it is essential that the court take care to

avoid tipping the balance between the issuer and the bidder which the

Williams Act seeks to maintain.  See Edgar v. Mite Corp., 102 S. Ct. 2629,

2836 (1982); Piper v. Chris-Craft Industries, Inc., supra, 430 U.S. at 30.

The court should consider whether a less drastic form of equitable relief

would suffice and should carefully analyze whether granting or denying the

particular relief will be detrimental to shareholders, or will unduly

injure one or the other participant in the takeover contest, to the ultimate

detriment of the shareholders.  See Butler Aviation International, Inc. v.

Comprehensive Designers, Inc., supra, 425 F.2d at 845.  Cf.  Agency Rent-

A-Car, Inc. v. Connolly, 686 F.2d 1029, 1033 (1st Cir. 1982) ("injunctive

relief must be tailored to fit the circumstances of the particular case").

As the Supreme court stated in Mills v. Electric Auto-Lite Co., supra, 396

U.S. at 386, arising under the proxy provisions (quoting Hecht Co. v.

Bowles, supra, 321 U.S. at 329-330):

> In selecting a remedy the lower courts should exercise
> 'the sound discretion which guides the determinations
> of courts of equity,' keeping in mind the role of equity
> as the 'instrument for nice adjustment and reconciliation
> between the public interest and private needs * * *.'

- 39 -

## CONCLUSION

    The Commission urges that, if this Court reaches the issues addressed in this brief, those questions be resolved in accordance with the positions expressed herein.

                          Respectfully submitted,

                          JACOB H. STILLMAN
                          Associate General Counsel

                          DAVID A. SIRIGNANO
                          Special Counsel

                          Securities and Exchange Commission
                          Washington, D.C.  20549

December 1982

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CSX CORPORATION,

                              Plaintiff,

              -against-                                          08 Civ. 2764 (LAK)

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, et al.,

                              Defendants,

              -against-

MICHAEL J. WARD,

                              Additional Counterclaim
                              Defendant
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                              **OPINION**

              Appearances:

                              Rory O. Millson
                              Francis P. Barron
                              David R. Marriott
                              CRAVATH, SWAINE & MOORE LLP
                              *Attorneys for Plaintiff and Additional Counterclaim*
                              *Defendant*

                              Howard O. Godnick
                              Michael E. Swartz
                              Yocheved Cohen
                              SCHULTE ROTH & ZABEL LLP
                              *Attorneys for Defendants The Children's Investment Fund*
                              *Management (UK) LLP, The Children's Investment Fund*
                              *Management (Cayman) LTD, The Children's Investment*
                              *Manager Fund, Christopher Hohn, and Snehal Amin*

Peter Duffy Doyle
Andrew M. Genser
KIRKLAND & ELLIS LLP
*Attorneys for Defendants 3G Capital Partners Ltd., 3G Capital Partners, L.P., 3G Fund, LP and Alexandre Behring (a/k/a Alexandre Behring Costa)*

David M. Becker
Edward J. Rosen
Michael D. Dayan
CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Attorneys for* Amici Curiae *International Swaps and Derivatives Associations, Inc. and Securities Industry and Financial Markets Association*

Adam H. Offenhartz
Aric H. Wu
J. Ross Wallin
LaShann M. DeArcey
GIBSON DUNN & CRUTCHER LLP
*Attorneys for* Amicus Curiae *Coalition of Private Investment Companies*

Brian Breheny
Division of Corporation Finance
*Attorney for* Amicus Curiae *Division of Corporation Finance, Securities and Exchange Commission*

# Table of Contents

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   I.     Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   II.    Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   III.   Total Return Swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
       A.    The Basics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
       B.    The Purposes of  TRSs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
           1.     Short Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
           2.     Long Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   IV.   The Events of Mid-2006 Until Late 2007 . . . . . . . . . . . . . . . . . . . . . . . 13
       A.    TCI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
           1.     TCI Develops a Position in CSX . . . . . . . . . . . . . . . . . . . 14
           2.     TCI's Leveraged Buyout Proposal . . . . . . . . . . . . . . . . . . 15
           3.     January through March 2007 . . . . . . . . . . . . . . . . . . . . . . 17
           4.     TCI Begins Preparing for a Proxy Fight . . . . . . . . . . . . . . . 21
           5.     CSX Files Its 10-Q and Discloses that TCI Has an Economic Position
                 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
           6.     Proxy Fight Preparations Continue . . . . . . . . . . . . . . . . . . 23
           7.     TCI Concentrates its Swaps in Deutsche Bank and Citigroup . . . 26
           8.     TCI Enters into Agreements with Two Director-Nominees . . . . 27
       B.    3G . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
           1.     3G Develops a Position in CSX . . . . . . . . . . . . . . . . . . . . 28
           2.     3G Resumes Buying CSX Shares . . . . . . . . . . . . . . . . . . . 30
           3.     3G's Hart-Scott-Rodino Filing . . . . . . . . . . . . . . . . . . . . 31
           4.     3G Sells Some Shares . . . . . . . . . . . . . . . . . . . . . . . . . 31
           5.     3G Rebuilds its Investment in CSX . . . . . . . . . . . . . . . . . . 32
           6.     3G Prepares for a Proxy Fight . . . . . . . . . . . . . . . . . . . . . 32
       C.    The Relationship Between TCI and 3G . . . . . . . . . . . . . . . . . . . . 34
           1.     3G Learns of TCI's Interest in CSX . . . . . . . . . . . . . . . . . . 34
           2.     3G and TCI Discuss Activity in CSX . . . . . . . . . . . . . . . . . 35
           3.     3G and TCI Meet on March 29 . . . . . . . . . . . . . . . . . . . 36
           4.     TCI and 3G Inquire of CSX Regarding a Shareholder Vote . . . . 37
           5.     The August-September Pause . . . . . . . . . . . . . . . . . . . . . . 38
           6.     TCI and 3G Ramp Up Again . . . . . . . . . . . . . . . . . . . . . . 38
           7.     TCI and 3G Search for Director Nominees . . . . . . . . . . . . . . 39
   V.    The Proxy Contest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
       A.    TCI and 3G Disclose the Formation of a Formal Group . . . . . . . . . . . 40
       B.    The Group Files Its Notice of Intent to Nominate Directors . . . . . . . . . 41
       C.    CSX and TCI Attempt to Negotiate a Resolution . . . . . . . . . . . . . . . 42
       D.    CSX and The Group File Proxy Materials . . . . . . . . . . . . . . . . . . . . 44
           1.     CSX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
           2.     The Group's Proxy Statement . . . . . . . . . . . . . . . . . . . . . 44
   VI.   The Positions of the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    I.      Section 13(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
            A.      Beneficial Ownership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
                    1.      Rule 13d-3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
                            a.      Investment Power . . . . . . . . . . . . . . . . . . . . . . . . . 51
                            b.      Voting Power . . . . . . . . . . . . . . . . . . . . . . . 55
                            c.      Synthesis . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
                    2.      Rule 13d-3(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
            B.      Group Formation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
            C.      Alleged Schedule 13D Deficiencies . . . . . . . . . . . . . . . . . . 77
                    1.      Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . 78
                    2.      Beneficial Ownership . . . . . . . . . . . . . . . . . . . . . . 78
            3.      Group Formation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
            4.      Contracts, Arrangements, Understandings, or Relationships . . . . . . . . 80
            5.      Plans or Proposals . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
    II.     Section 14(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
    III.    Section 20(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
    IV.     Notice of Proposed Director Nominee and Bylaw Amendment . . . . . . . . . . . . 87
    V.      Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
            A.      Section 14(a) Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
                    1.      Target Awards Under the Long Term Incentive Plan . . . . . . . . . 91
                    2.      The CSX Board's Compliance With CSX Insider Trading Policy
                            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
                    3.      CSX's Belief that TCI Seeks Effective Control . . . . . . . . . . . . 96
                    4.      TCI's Proposal Regarding Capital Expenditures . . . . . . . . . . . . 97
                    5.      The CSX-TCI Negotiations . . . . . . . . . . . . . . . . . . . . . . . 99
                    6.      CSX's Purposes in Bringing this Lawsuit . . . . . . . . . . . . . . . 101
            B.      Declaratory Relief Regarding By-Laws Amendment . . . . . . . . . . . . 101
    VI.     Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
            A.      Success on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . 104
            B.      Share Sterilization . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
                    1.      Irreparable Harm . . . . . . . . . . . . . . . . . . . . . . . . . . 105
                    2.      Deterrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
            C.      Enjoining Further Disclosure Violations . . . . . . . . . . . . . . . . 111
                    1.      Probability of Future Violations . . . . . . . . . . . . . . . . . . 113
                    2.      Irreparable Injury . . . . . . . . . . . . . . . . . . . . . . . . . 114

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

Appendix 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

Appendix 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

LEWIS A. KAPLAN, *District Judge.*

Some people deliberately go close to the line dividing legal from illegal if they see a sufficient opportunity for profit in doing so. A few cross that line and, if caught, seek to justify their actions on the basis of formalistic arguments even when it is apparent that they have defeated the purpose of the law.

This is such a case. The defendants – two hedge funds that seek extraordinary gain, sometimes through "shareholder activism" – amassed a large economic position in CSX Corporation ("CSX"), one of the nation's largest railroads. They did so for the purpose of causing CSX to behave in a manner that they hoped would lead to a rise in the value of their holdings. And there is nothing wrong with that. But they did so in close coordination with each other and without making the public disclosure required of 5 percent shareholders and groups by the Williams Act, a statute that was enacted to ensure that other shareholders are informed of such accumulations and arrangements. They now have launched a proxy fight that, if successful, would result in their having substantial influence and perhaps practical working control of CSX.

Defendants seek to defend their secret accumulation of interests in CSX by invoking what they assert is the letter of the law. Much of their position in CSX was in the form of total return equity swaps ("TRSs"), a type of derivative that gave defendants substantially all of the indicia of stock ownership save the formal legal right to vote the shares. In consequence, they argue, they did not beneficially own the shares referenced by the swaps and thus were not obliged to disclose sooner or more fully than they did. In a like vein, they contend that they did not reach a formal agreement to act together, and therefore did not become a "group" required to disclose its collaborative activities, until December 2007 despite the fact that they began acting in concert with respect to CSX far earlier. But these contentions are not sufficient to justify defendants' actions.

2

The question whether the holder of a cash-settled equity TRS beneficially owns the referenced stock held by the short counterparty appears to be one of first impression. There are persuasive arguments for concluding, on the facts of this case, that the answer is "yes" – that defendants beneficially owned at least some and quite possibly all of the referenced CSX shares held by their counterparties. But it ultimately is unnecessary to reach such a conclusion to decide this case.

Rule 13d-3(b) under the Exchange Act[1] provides in substance that one who creates an arrangement that prevents the vesting of beneficial ownership as part of a plan or scheme to avoid the disclosure that would have been required if the actor bought the stock outright is deemed to be a beneficial owner of those shares. That is exactly what the defendants did here in amassing their swap positions. In consequence, defendants are deemed to be the beneficial owners of the referenced shares.

As for the question whether defendants made prompt disclosure after they formed a "group" within the meaning of Section 13(d) of the Exchange Act, the evidence, as in virtually all such cases, is circumstantial. But it quite persuasively demonstrates that they formed a group many months before they filed the necessary disclosure statement. Their protestations to the contrary rest in no small measure on the premise that they avoided forming a group by starting conversations by stating that they were not forming a group and by avoiding entry into a written agreement. But the Exchange Act is concerned with substance, not incantations and formalities.

---

[1]

17 C.F.R. § 240.13d-3(b).

3

This is not to say that CSX is entitled to all of the relief that it seeks. The Williams Act was intended not only to prevent secret accumulation and undisclosed group activities with respect to the stock of public companies, but to do so without "tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid."[2]  It must be applied, especially in private litigation, with due regard for the principle that the purpose of private equitable relief is "to deter, not to punish."[3]  Moreover, the Court's ability to formulate a remedy is sharply constrained by precedent. Accordingly, while the Court will enjoin defendants from further Section 13(d) violations, it may not preclude defendants from voting their CSX shares and declines to grant any of the other drastic relief that CSX seeks. Any penalties for defendants' violations must come by way of appropriate action by the Securities and Exchange Commission ("SEC") or the Department of Justice.

## Background

### I.    Parties

Plaintiff CSX Corporation ("CSX") is incorporated in Virginia and headquartered in Jacksonville, Florida. Its shares are traded on the New York Stock Exchange, and it operates one of the nation's largest rail systems through its wholly owned subsidiary, CSX Transportation, Inc. Its chairman, president, and chief executive officer is Michael J. Ward, who is named here as an additional defendant on the counterclaims.

---

[2]

    *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58-59 (1975) (quoting S. REP. No. 550, 90th Cong., 1st Sess., 3 (1967)).

[3]

    *Id.* at 61 (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

4

Defendants The Children's Investment Fund Management (UK) LLP ("TCIF UK")

and The Children's Investment Fund Management (Cayman) LTD. ("TCIF Cayman") are,

respectively, an English limited liability partnership and a Cayman Islands company. Defendant The

Children's Investment Master Fund ("TCI Fund") also is a company organized under the laws of the

Cayman Islands and is managed by both TCIF UK and TCIF Cayman.  These entities are run by

defendant Christopher Hohn, who is managing partner and a controlling person of TCIF UK and the

sole owner and a controlling person of TCIF Cayman.  Defendant Snehal Amin is a partner of TCIF

UK.  These five defendants are referred to collectively as TCI.

Defendants 3G Fund L.P. ("3G Fund") and 3G Capital Partners L.P. ("3G LP") are

Cayman Islands limited partnerships.  Defendant 3G Capital Partners Ltd. ("3G Ltd.") is a Cayman

Islands company and the general partner of 3G LP, which in turn is the general partner of 3G Fund.

They are run by defendant Alexandre Behring, also known as Alexandre Behring Costa, who is the

managing partner of 3G Ltd.  These four defendants are referred to collectively as 3G.

*II.    Proceedings*

TCI and 3G currently are engaged in a proxy fight in which they seek, *inter alia,* to

elect their nominees to five of the twelve seats on the CSX board of directors and to amend its by-

laws to permit holders of 15 percent of CSX shares to call a special meeting of shareholders at any

time for any purpose permissible under Virginia law.  The CSX annual meeting of shareholders,

which is the object of the proxy fight, is scheduled to take place on June 25, 2008.

CSX brought this action against TCI and 3G on March 17, 2008.  The complaint

alleges, among other things, that defendants failed timely to file a Schedule 13D after forming a

5

group to act with reference to the shares of CSX and that both the Schedule 13D and the proxy statement they eventually filed were false and misleading.[4]  It seeks, among other things, an order requiring corrective disclosure, voiding proxies defendants have obtained, and precluding defendants from voting their CSX shares. TCI Master Fund, 3G Fund, 3G LP, and 3G Ltd. filed counterclaims against CSX and Ward asserting various claims under the federal securities laws.[5]

With the consent of the parties, the Court consolidated the preliminary injunction hearing with the trial on the merits.[6]  Following the conduct of a great deal of expedited discovery, the case was tried on May 21 to 22, 2008.  The Court subsequently has had the benefit of more than 500 pages of post-trial submissions by the parties, two *amicus* briefs, an *amicus* letter on behalf of the Division of Corporation Finance of the SEC, and two lengthy letters by professors, one of whom is a former commissioner of the SEC.

The parties have urged the Court to render a decision by this week in order to permit an expedited appeal prior to the meeting.  This opinion contains the Court's findings of fact and conclusions of law.[7]

---

[4]

Docket item 1.

[5]

Docket items 26-27.

[6]

Docket item 9.

[7]

In addition to the findings set forth in this opinion, the Court adopts proposed findings 11.3 - 11.5, 11.17, 11.19-11.22, 12.2, 12.4-12.9, 13.2-13.5, and 13.7-13.10 set forth in docket item 62.

6

III.    *Total Return Swaps*

    A.    *The Basics*

        The term "derivative," as the term is used in today's financial world, refers to a financial instrument that derives its value from the price of an underlying instrument or index. Among the different types of derivatives are swaps, instruments whereby two counterparties agree to "exchange cash flows on two financial instruments over a specific period of time."[8] These are (1) a "reference obligation" or "underlying asset" such as a security, a bank loan, or an index, and (2) a benchmark loan, generally with an interest rate set relative to a commonly used reference rate (the "reference rate") such as the London Inter-Bank Offered Rate ("LIBOR").[9]   A TRS is a particular form of swap.[10]

        The typical – or "plain vanilla" – TRS[11] is represented by Figure 1.[12]

---

[8]
    Expert Report of Marti G. Subrahmanyam ("Subrahmanyam Report") ¶ 62.

[9]
    *Id.*

[10]
    *Id.*

[11]
    The terms of a plain vanilla TRS frequently follow a framework established by the International Swaps and Derivatives Association, Inc. ("ISDA").  The ISDA master agreement is "a standard form that . . . includes basic representations and covenants," DX 149 (Partnoy Report) ¶ 46, that parties supplement with modifications to account for their specific interests. Subrahmanyam Report ¶ 68; DX 150 (Partnoy Surrebuttal) ¶ 20 n.26.  For example, counterparties may negotiate such terms as the reference obligation that underlies the agreement or the rights of each party to terminate the swap.  It is these contract-specific terms "that determine the value of the transaction." Subrahmanyam Report ¶ 68.

[12]
    Subrahmanyam Report, at 19.

7

## Figure 1



Counterparty A – the "short" party – agrees to pay Counterparty B – the "long" party – cash flows

based on the performance of a defined underlying asset in exchange for payments by the long party

based on the interest that accrues at a negotiated rate on an agreed principal amount (the "notional

amount"). More specifically, Counterparty B, which may be referred to as the "total return receiver"

or "guarantor," is entitled to receive from Counterparty A the sum of (1) any cash distributions, such

as interest or dividends, that it would have received had it held the referenced asset, and (2) either

(i) an amount equal to the market appreciation in the value of the referenced asset over the term of

the swap (if the TRS is cash-settled) or, what is economically the same thing, (ii) the referenced asset

in exchange for its value on the last refixing date prior to the winding up of the transaction (if the

8

TRS is settled in kind).  Counterparty A, referred to as the "total return payer" or "beneficiary," is

entitled to receive from Counterparty B (1) an amount equal to the interest at the negotiated rate that

would have been payable had it actually loaned Counterparty A the notional amount,[13] and (2) any

decrease in the market value of the referenced asset.[14]

        For example, in a cash-settled TRS with reference to 100,000 shares of the stock of

General Motors, the short party agrees to pay to the long party an amount equal to the sum of (1) any

dividends and cash flow, and (2) any increase in the market value that the long party would have

realized had it owned 100,000 shares of General Motors.  The long party in turn agrees to pay to the

short party the sum of (1) the amount equal to interest that would have been payable had it borrowed

the notional amount from the short party, and (2) any depreciation in the market value that it would

have suffered had it owned 100,000 shares of General Motors.

        In practical economic terms, a TRS referenced to stock places the long party in

substantially the same economic position that it would occupy if it owned the referenced stock or

security.   There are two notable exceptions.   First, since it does not have record ownership of the

referenced shares, it does not have the right to vote them.   Second, the long party looks to the short

---

[13]

       The notional amount typically is the value of the referenced asset at the time the transaction is agreed and may be recalculated periodically.  Subrahmanyam Report ¶ 63.  The difference between the reference rate and the negotiated interest rate of the swap depends on (1) the creditworthiness of the two parties, (2) characteristics of the underlying asset, (3) the total return payer's cost of financing, risk, and desired profit, and (4) market competition.  *Id.* ¶ 64.

[14]

       *Id.* ¶ 63; DX 149 (Partnoy Report) ¶ 25.

       The payments occur on "refixing dates" that recur throughout the duration of the TRS as specified by the contract.

9

party, rather than to the issuer of the referenced security for distributions and the marketplace for any appreciation in value.

The short party of course is in a different situation. It is entitled to have the long party place it in the same economic position it would have occupied had it advanced the long party an amount equal to the market value of the referenced security. But there are at least two salient distinctions, from the short party's perspective, between a TRS and a loan. First, the short party does not actually advance the notional amount to the long party. Second, it is subject to the risk that the referenced asset will appreciate during the term of the TRS. As will appear, the institutions that make a business of serving as short parties in TRSs deal with this exposure by hedging, a fact pivotal to one of CSX's claims here.

The swap agreements at issue in this case are cash-settled TRSs entered into by TCI with each of eight counterparties, most significantly Deutsche Bank AG ("Deutsche Bank") and Citigroup Global Markets Limited ("Citigroup"), and by 3G with Morgan Stanley.[15]

B.    *The Purposes of TRSs*

The goals of those who enter into TRSs vary.

---

[15]

TCI's other counterparties are Credit Suisse Securities (Europe) Limited ("Credit Suisse"), Goldman Sachs International ("Goldman"), J.P. Morgan Chase Bank ("J.P. Morgan"), Merrill Lynch International ("Merrill Lynch"), Morgan Stanley & Co. International plc ("Morgan Stanley") and UBS AG ("UBS"). TCI's swap agreements can be found at PX 230 (TCI and Citigroup), PX 231 (TCI and Credit Suisse), PX 232 (TCI and Deutsche Bank), PX 233 (TCI and Goldman), PX 234 (TCI and J.P. Morgan), PX 235 (TCI and Merrill Lynch), PX 236 (TCI and Morgan Stanley), and PX 238 (TCI and UBS). 3G's swap agreement with Morgan Stanley can be found at PX 237.

10

*1.    Short Parties*

As a generic matter, a short party may be motivated to enter into a TRS simply to obtain the cash flow generated by the long party's payment of the negotiated rate on the notional amount over the term of the swap. But the *quid pro quo* for that cash flow is the exposure to the risk of market appreciation in the referenced security.

As a matter of theory and on occasion in practice, a short party may accept that exposure either because it thinks the risk of appreciation is small – in other words, it is making its own investment decision with respect to the referenced security – or because it has a more or less offsetting long exposure that it wishes to hedge. But that is not what we are dealing with in this case.

The defendants' counterparties in this case are major financial service institutions that are in the business, among others, of offering TRSs as a product or service and seeking an economic return via the pseudo-interest, if it may be so called, that they receive on the notional amount and from other incidental revenue sources. They are not, in this aspect of their endeavors, in the business of speculating on the market fluctuation of the shares referenced by the TRSs into which they enter as short parties. Accordingly, they typically hedge their short exposures by purchasing the referenced securities in amounts identical to those referenced in their swap agreements.[16]

---

[16]    An incidental consequence of their doing so is to enable them to generate additional revenue by lending the shares, for a fee, to short sellers. Subrahmanyam Report ¶¶ 65-66.

11

Institutions that hedge short TRS exposure by purchasing the referenced shares typically have no economic interest in the securities.[17] They are, however, beneficial owners and thus have the right to vote the referenced shares.[18]

Institutional voting practices appear to vary. As noted below, some take the position that they will not vote shares held to hedge TRS risk. Some may be influenced, at least in some cases, to vote as a counterparty desires. Some say they vote as they determine in their sole discretion. Of course, one may suppose that banks seeking to attract swap business well understand that activist investors will consider them to be more attractive counterparties if they vote in favor of the positions their clients advocate. In any case, however, the accumulation of substantial hedge positions significantly alters the corporate electorate. It does so by (1) eliminating the shares constituting the hedge positions from the universe of available votes, (2) subjecting the voting of the shares to the control or influence of a long party that does not own the shares, or (3) leaving the vote to be determined by an institution that has no economic interest in the fortunes of the issuer, holds nothing more than a formal interest, but is aware that future swap business from a particular client may depend upon voting in the "right" way.

---

[17]    A notable exception would occur if the long party to the TRS became insolvent and thus unable to perform its obligation to hold the short party harmless against any decline in the value of the referenced security.

[18]    This decoupling of the economic and voting interests is discussed, among other places, in Henry Hu & Bernard Black, *The New Vote Buying: Empty Voting and Hidden (Morphable) Ownership*, 79 S. CAL. L. REV. 811 (2006).

12

2.    *Long Parties*

A long party to a TRS referencing equity in a public company gains economic exposure to the equity. In other words, it is exposed to essentially the same potential benefits and detriments as would be the case if it held the referenced security, and it gains that exposure without the need for the capital to fund or maintain such a purchase directly. This may permit such investors to operate with greater leverage or a lower cost than might be the case if they bought the security directly.[19] But those are by no means the only reasons motivating long parties to engage in TRSs. There can be tax advantages. Most importantly for purposes of this case, if the long party to a cash-settled TRS is not the beneficial owner of the referenced shares – a question hotly contested here – one interested in amassing a large economic exposure to the equity of a registered company may do so without making the public disclosure that is required when a person or group acquires 5 percent or more of the outstanding shares.

The avoidance of public disclosure can confer significant advantages on the long party. By concealing its activities, it may avoid other investors bidding up the referenced stock in anticipation of a tender offer or other corporate control contest and thus maximize the long party's profit potential. Second, it permits a long party who is interested in persuading an issuer to alter its policies, but desirous of avoiding an all-out battle for control, to select the time of its emergence to the issuer as a powerful player to a moment of its choosing, which may be when its exposure is substantially greater than 5 percent. In other words, it permits a long party to ambush an issuer with a holding far greater than 5 percent.

---

[19]

Subrahmanyam Report ¶ 70.

13

One other point bears mention here. TRSs, like all or most derivatives, are privately negotiated contracts traded over the counter. Their terms may be varied during their lives as long as the counterparties agree. In consequence, a TRS that in its inception contemplates cash settlement may be settled in kind – i.e., by delivery of the referenced shares to the long party – as long as the parties consent.

This confers another potential advantage on a long party that contemplates a tender offer, proxy fight, or other corporate control contest. By entering into cash-settled TRSs, such an investor may concentrate large quantities of an issuer's stock in the hands of its short counterparties and, when it judges the time to be right, unwind those swaps by acquiring the referenced shares from those counterparties in swiftly consummated private transactions. Moreover, even if such TRSs were settled in cash, the disposition by the short counterparties of the referenced shares held to hedge their swap exposures would afford a ready supply of shares to the market at times and in circumstances effectively chosen and known principally by the long party. The long party therefore likely would have a real advantage in converting its exposure from swaps to physical shares even if it does not unwind the swaps in kind.

IV.     *The Events of Mid-2006 Until Late 2007*

The events preceding this lawsuit are best understood by first considering the conduct of TCI and 3G separately. The Court then will analyze the relationship between TCI and 3G and their conduct in order to determine whether they in fact acted independently.

14

A.    TCI

1.    *TCI Develops a Position in CSX*

TCI began to research the United States railroad industry in the second half of 2006

and rapidly focused on Norfolk Southern and CSX, the two largest railroads in the eastern portion

of the country.  It decided to concentrate on CSX because it "had more legacy contracts that were

below market value prices" and, in TCI's view, "ran less efficiently" than did Norfolk.[20]  In short,

it felt that changes in policy and, if need be, management could bring better performance and thus

a higher stock price.  That insight, if insight it was, however, would be worthless or, at any rate, less

valuable if CSX did not act as TCI thought appropriate.  So TCI embarked on a course designed from

the outset to bring about changes at CSX.

TCI made its initial investment in CSX on October 20, 2006, by entering into TRSs

referencing 1.4 million shares of CSX stock.[21]  By the end of that month, it was party to TRSs

referencing 1.7 percent of CSX shares.[22]

TCI almost immediately contacted CSX and informed it that TCI had accumulated

approximately $100 million of CSX stock.  Two weeks later, it advised CSX that it had $300 million

invested in CSX, "with the potential to scale that further," and sought a meeting with senior

---

[20]

DX 145 (Amin) ¶¶ 3-5, 10-11; DX 144 (Hohn) ¶¶ 8-9.  Legacy contracts are "long-term contracts that have not been repriced to current market prices." DX 145 (Amin) ¶ 10.

[21]

PX 206.

[22]

Subrahmanyam Report Ex. C.1.

15

management at the Citigroup Transportation Conference,[23] which was scheduled to take place on November 14, 2006.

In the meantime, TCI continued accumulating TRSs referencing CSX throughout November, engaging in seventeen swap transactions with various financial institution counterparties. By the middle of the month, it had increased its exposure to approximately 2.7 percent.[24]

On November 14, 2006, TCI's Hohn and Amin attended the Citigroup conference. During the course of the day, they approached CSX representatives, including David Baggs, the assistant vice president of treasury and investor relations. Amin later told Baggs that TCI's swaps, the only type of investment exposure TCI then had in CSX, could be converted into direct ownership at any time.[25]

Following the conference, TCI continued to build its position through additional swaps throughout December, reaching 8.8 percent by the end of 2006.

2.      TCI's Leveraged Buyout Proposal

TCI's belief that it could profit substantially if it could alter CSX's policies or, if need be, management manifested itself when, during December 2006, it began to investigate the possibility of a leveraged buyout ("LBO"). It explored this possibility with Goldman Sachs, sending

---

[23]

PX 267 (Munoz) ¶¶ 3-4; PX 133; PX 136.

[24]

Subrahmanyam Report Ex C.1.

[25]

PX 268 (Baggs) ¶¶ 5-6. The Court does not credit Amin's denial of any such statement. *See* DX 145 (Amin) ¶¶ 20-21.

16

its LBO model.[26] Its email "re-iterate[d]" the need to keep the communication highly confidential, as TCI "ha[d] not taken the idea to anyone else, nor [was its] holding publicly disclosed so any leakage of our conversations with you would be damaging for our relations with the company."[27]

On January 22, 2007, by which date TCI had amassed TRSs referencing 10.5 percent of CSX,[28] TCI met with one of CSX's financial advisors, Morgan Stanley, to discuss the LBO proposal.[29] It noted during its presentation that a "'perfect storm' of conditions makes a private equity bid [for a major U.S. railroad] nearly inevitable" and that "CSX [was] logically the prime candidate" because of its "valuation, size, [and] quality of franchise." TCI urged Morgan Stanley to back the plan and suggested that CSX "formally hire an investment bank to proceed urgently."[30]

Morgan Stanley relayed the substance of its conversation to CSX.[31] TCI then approached CSX directly about the issue on February 8 at an investor conference organized by J.P. Morgan.[32] Amin asked Baggs for CSX's views on the LBO proposal. Baggs confirmed that Morgan Stanley had relayed the proposal but said that CSX was not in a position to respond.

---

[26]

PX 20, at TCI0159800-02.

[27]

*Id.* at TCI0159799.

[28]

Subrahmanyam Report Ex. C.1.

[29]

PX 37; PX 267 (Munoz) ¶ 8. Hohn indicates that he requested that Deutsche Bank analyze the LBO possibility as well. He places this request in early 2007. DX 144 (Hohn) ¶ 17.

[30]

PX 37, at TCI0153575.

[31]

PX 267 (Munoz) ¶¶ 8-9.

[32]

PX 268 (Baggs) ¶ 11; DX 145 (Amin) ¶ 30.

17

3.    *January through March 2007*

TCI continued to build its TRS position in CSX. In the meantime, CSX was not idle. On February 14, 2007, it filed a Report of Form 8-K in which it announced a plan to buy back $2 billion worth of its common stock.[33]

By February 15, 2007, the date of the BB&T Transportation Conference, which was attended by CSX, TCI, and others, TCI had increased its position, still entirely via TRSs, to 13.6 percent.[34] At the conference, Amin approached Baggs and Oscar Munoz, CSX's chief financial officer, to inquire as to how CSX intended to conduct its share repurchase program. Baggs and Munoz declined to discuss the specifics in light of Regulation FD under the securities laws.[35] During the course of the brief conversation, however, Amin stated that TCI "owned" 14 percent of CSX.[36]

Following the BB&T Transportation Conference, TCI began to contact other hedge funds about CSX. Hohn told Mala Gaonkar, a partner of Lone Pine Capital, to "[t]ake a look" at

---

[33]

JX 6. Share repurchases often are made by companies facing control contests.

[34]

Subrahmanyam Report Ex. C.1.

[35]

17 C.F.R. § 243.100 *et seq.* "In general terms, Regulation FD prohibits a company and its senior officials from privately disclosing any material nonpublic information regarding the company or its securities to certain persons such as analysts or institutional investors." *SEC v. Siebel Sys., Inc.*, 384 F. Supp. 2d 694, 696 (S.D.N.Y. 2005). If the company makes selective disclosure of material nonpublic information, it must disclose the same information publicly.

[36]

PX 268 (Baggs) ¶ 12; PX 267 (Munoz) ¶ 10. The Court does not credit Amin's testimony that he did not speak to Baggs or Munoz at the conference.

18

CSX[37] and Vinit Bodas, managing director of Deccan Value Advisors, that "csx is the best to us. keep this confidential [sic]."[38] On March 2, 2007, Hohn told Bodas to "[b]uy csx [sic]."[39]

These contacts, the Court finds, were intended to promote the acquisition of CSX shares by hedge funds that TCI regarded as favorably disposed to TCI and its approach to CSX in an effort to build support for whatever course of action it ultimately might choose with respect to the company. Moreover, the evidence convinces the Court that it is likely that TCI made similar approaches to other such funds. Hohn contended in his witness statement that he had conversations with hedge funds such as Deccan Value Advisors, Lone Pine Capital, 3G, Seneca, Icahn, TWC, and Atticus, but only concerning the railroad industry generally, not CSX in particular.[40] Given the evidence to the contrary regarding Hohn's discussions with Deccan Value and Lone Pine, the Court's assessment of Hohn's credibility, and TCI's clear interest in doing so, the Court finds that Hohn did not limit his conversations with other hedge funds to industry-level topics. He suggested, in one way or another, that they buy CSX shares and alerted them to the fact that CSX had become a TCI target.

Up to this point, TCI had not acquired directly even a single share of CSX stock. But it decided to begin such acquisitions to place more pressure on the company and to lay the groundwork for a proxy fight.

---

[37]

PX 45; Tr. (Hohn) at 172-73.

[38]

PX 46.

[39]

PX 53; Tr. at 174-75, 189.

[40]

DX 144 (Hohn) ¶ 22.

19

On March 2, 2007, TCI filed a premerger notification report under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act")[41] in which it stated that it intended to acquire an undetermined number of CSX common shares in an amount that would meet or exceed $500 million.[42] A few days later, Amin advised CSX of the filing by letter.[43]

TCI, in the meantime, had not abandoned the idea of taking CSX private in an LBO. Moreover, the circumstances suggest, and the Court finds, that it continued to discuss its interest in CSX and this and other possibilities for altering CSX's practices in a manner that TCI believed would cause its stock to rise,[44] at least at some level of specificity, with other like-minded hedge funds.

The record demonstrates that TCI in March was invited by Austin Friars, a Deutsche Bank proprietary hedge fund, to listen in on a phone call that Austin Friars had arranged with John Snow, a former CSX chief executive officer, to review a list of questions that Austin Friars had compiled for him, and to submit questions of their own. This of course suggests, and the Court finds, that TCI had made Austin Friars aware of its investment in and interest in provoking basic change at CSX, else Austin Friars would have been unlikely to extend this invitation.

Among the questions proposed by Austin Friars for Mr. Snow was whether railroad

---

[41]

See 15 U.S.C. § 18a.

[42]

PX 55; DX 145 (Amin) ¶ 34; DX 144 (Hohn) ¶ 21.

[43]

DX 10; DX 145 (Amin) ¶ 35. CSX asserts that it received such notice on March 15. See Tr. (Hohn) at 166.

[44]

An LBO of course would have afforded a different route to the big profit that TCI sought.

20

companies could "lend themselves to being ru[n] by private equity."[45]  TCI responded that this, among other questions, was "great," thus making clear to Austin Friars, even if it had not specifically done so earlier, that TCI was looking at the possibility of trying to take CSX private.  And this was not its only interaction with Deutsche Bank on the subject.  It subsequently enlisted Deutsche Bank to analyze its LBO proposal, and Deutsche Bank concluded that CSX was a "terrific LBO candidate."[46]

TCI continued to exert pressure on CSX management through the end of March. They met in New York on March 29, at which time Amin criticized management for failing to take certain actions and pressed it to implement TCI's proposals.  He indicated that TCI held up to 14 percent of CSX's stock, the bulk of it in swaps that could be converted to physical shares, and that there were "no limits" to what TCI would do absent CSX's acquiescence in its demands.[47]  The day after the meeting, March 30, TCI entered into additional swaps that brought its economic exposure to approximately 14.1 percent.

---

[45]

PX 57.

[46]

PX 65, at TCI0962472; PX 64.  Hohn contends that Deutsche Bank approached TCI to market its various banking services and performed the LBO analysis for no compensation. DX 144 (Hohn) ¶ 17.

[47]

PX 269 (Fitzsimmons) ¶¶ 11-14; PX 267 (Munoz) ¶ 12.

21

### 4.    TCI Begins Preparing for a Proxy Fight

In early April, TCI sent its LBO model to Evercore, another CSX advisor,[48] and reached out to Hunter Harrison, the chief executive officer of Canadian National, a Class I railroad like CSX, to inquire whether "he would be interested in coming in as CEO of CSX."[49]  By the middle of the month, Amin wrote that TCI was not "going to get what we want passively."[50]  At more or less the same time, TCI began to unwind some of its swaps and to purchase CSX stock with a goal of keeping its exposure to CSX "roughly constant."[51]  It is relevant to consider why TCI decided to shift some of its position into shares.

Certainly there is no persuasive evidence that any economic factor that led TCI to choose swaps in the first place had changed.  In other words, if financing considerations made swaps more attractive at the outset, that advantage persisted.  So the explanation lies elsewhere.  And it is, in the circumstances, obvious.  TCI saw the payoff on its CSX investment, if there was to be one, resulting from a change in CSX policies and, if need be, management.  But CSX had rebuffed all of

---

[48]
        PX 71.

[49]
        PX 36; PX 75.  Amin explained at trial that TCI sought only to determine whether Harrison was interested, but that it was not TCI's intention "to necessarily have him as CEO of CSX." Tr. (Amin) at 200.  Assuming (but not finding) that to be so, the incident nevertheless would confirm the Court's view that TCI was determined to force changes in CSX's policies and, if need be, to bring about a change in control.

[50]
        PX 83, at TCI0254261.

[51]
        DX 145 (Amin) ¶ 37.

        By April 18, its combined economic exposure to CSX common, including both its directly owned shares and its swap position, reached 15.1 percent.  Subrahmanyam Report Ex. C.1.

22

TCI's overtures for substantive high level meetings and shown little interest in an LBO. So TCI by this time understood that a proxy fight likely would be required to gain control of or substantial influence over CSX. Holding shares that it could vote directly had an advantage over swaps because the votes of shares held by swap counterparties were less certain. They depended upon TCI's ability to influence those counterparties to vote the shares as TCI wished. This advantage, however, was not enough to cause TCI to dump a large part of its TRS position.

> 5.    *CSX Files Its 10-Q and Discloses that TCI Has an Economic Position*

On April 18, 2007, CSX filed its Form 10-Q for the period ending March 30, 2007, in which it disclosed that it had

> "received notice from The Children's Investment Fund Management (U.K.) LLP that it had made a filing under the Hart-Scott-Rodino Antitrust Improvements Act to acquire more than $500 million of CSX stock. That firm has also advised CSX that it currently holds a significant economic position through common stock ownership and derivative contracts tied to the value of CSX stock."[52]

Following this disclosure, TCI essentially paused its trading activities. But it continued and, perhaps, stepped up its efforts to lay the groundwork for a proxy contest and to induce like-minded investors to buy CSX shares. On May 8, Amin attended the Bear Stearns Transportation Conference where he gave a heavily attended speech. He set forth TCI's (1) interest in CSX, (2)

---

[52]    There is some disparity as to when the Form 10-Q actually became publicly available. The document is dated April 17, 2007, but the SEC notes that it was filed on April 18. *See* http://www.sec.gov/Archives/edgar/data/277948/000119312507083489/d10q.htm.    The difference matters only insofar as it affects the analysis of TCI's April 18 swap and stock purchase activity. Notwithstanding this disparity, it is clear that TCI made no additional stock purchases after April 18, and engaged in only one swap unwind between April 19 and August 23.

23

proposals to improve CSX, and (3) view that management was unresponsive to those proposals.[53] The next day, TCI, among others, emailed CSX to ascertain the outcome of the shareholder vote, taken at the annual meeting on May 2, on a non-binding resolution concerning shareholders' ability to call special meetings.[54]

CSX subsequently had little contact with TCI between the Bear Stearns Conference and August. TCI, however, met again with Evercore to express frustration that neither CSX management nor its board had been willing to meet to discuss TCI's proposals to improve operations and governance at the company. TCI informed Evercore that it directly owned 4 percent of CSX shares and had entered into swaps referencing over 10 percent of the company's shares.[55]

### 6.     *Proxy Fight Preparations Continue*

TCI claims to have begun reconsidering its position in CSX as it entered August 2007 because (1) it was reevaluating its entire portfolio in light of turmoil in the credit and equity markets and (2) it perceived a heightened risk of re-regulation of the railroad industry.[56] As we shall see, it in fact reduced its exposure by nearly 2 million shares. Nevertheless, on August 2, TCI met with D.F.

---

[53]

DX 145 (Amin) ¶ 39; PX 268 (Baggs) ¶ 18; *see* PX 96.

[54]

PX 207; PX 268 (Baggs) ¶ 19 (noting that this "was the first instance in my experience of having investors calling about the outcome of a particular shareholder proposal.").

[55]

PTO ¶ 13; DX 145 (Amin) ¶ 42; DX 144 (Hohn) ¶ 27.

[56]

DX 145 (Amin) ¶ 43.

24

King, its proxy solicitation firm, to discuss the mechanics of a proxy contest.[57] D.F. King advised that

success in a proxy contest was more likely if TCI proposed a "short slate" of two director-nominees,

rather than a control slate, because Institutional Shareholder Services ("ISS")[58] would be more

willing to endorse that approach than to endorse a control slate at a company with a record of success

vis-à-vis share price performance.[59]

Hohn expressed his professed concern over re-regulation to CSX on August 23, stating

that the proposed legislation was "a death threat to returns in the industry." He recommended that

the railroad industry threaten to "cut all growth capex [i.e., capital expenditure]" because it would be

"impossible to justify growth capex if this bill is passed."[60]

CSX held an analyst/investor conference in New York on September 6. TCI attended.

Following the conference, Hohn met with CSX advisors Evercore and Morgan Stanley and again

expressed disappointment with and criticism of CSX.[61] TCI then contacted Heidrick & Struggles, an

executive search firm, and asked it to locate one or two potential nominees to the board.[62]

---

[57]
PX 116.

[58]
ISS is an organization that, among other things, advised institutional investors with respect to voting in proxy fights. *See* http://www.issproxy.com/serve/index.html.

[59]
PX 117; PX 118.

[60]
PX 121, at CSX CORP 00007174.

[61]
PTO ¶ 15.

[62]
PX 137, at TCI0512741-42.

25

On September 20, TCI informed D.F. King that it was "likely to proceed in a proxy contest,"[63] although Amin expressed skepticism that a minority slate of directors could accomplish what TCI wished to achieve. He therefore inquired as to the feasibility of running a slate of nominees for half the board, an idea that D.F. King thought would be unsuccessful because it would not command support by ISS.[64] TCI continued other preparations as well. It identified Tim O'Toole as a potential director nominee at the end of September, and Amin contacted him on October 6 to arrange a meeting between him and Hohn.[65] After the meeting, Amin put O'Toole in touch with an attorney at Schulte Roth, TCI's counsel, "to discuss what a process may look like."[66]

TCI continued to press CSX. It sent an open letter to the board on October 16 in which it stated that it owned 4.1 percent of CSX's shares as a "long-term investor." Hohn and Amin reiterated demands that the board (1) "[s]eparate the [c]hairman and CEO roles," (2) "[r]efresh the [b]oard with new independent directors," (3) "[a]llow shareholders to call special shareholder meetings," (4) "[a]lign management compensation with shareholder interests," (5) "[p]rovide a plan to improve operations," (6) "[j]ustify the capital spending plan," and (7) "[p]romote open and constructive relations with labor, shippers and shareholders."[67] They requested also that the board

---

[63]

PX 128; Tr. (Behring) at 107.

[64]

PX 135, at TCI0955614.

[65]

PX 192; Tr. (Behring) at 136.

[66]

PX 139.

[67]

PX 140, at CSX CORP 00007180-81.

26

freeze growth investment until the fate of any regulatory legislation becomes more apparent.[68]  Hohn

and Amin concluded that they "sincerely hope[d that CSX would] act now – and act voluntarily – to

address the serious issues facing CSX."[69]  TCI followed with a second open letter on October 22 in

which it criticized CSX's response to its first letter as "pandering to Washington" and its

management's statements to lawmakers as "reckless and "irresponsible.""[70]


7.    *TCI Concentrates its Swaps in Deutsche Bank and Citigroup*

As the likelihood of a proxy fight increased, TCI began to address the matter of its

voting power.

From the inception of its TRS acquisitions in October 2006 until the end of October

2007, TCI carefully distributed its swaps among eight counterparties so as to prevent any one of them

from acquiring greater than 5 percent of CSX's shares and thus having to disclose its swap

agreements with TCI.  On October 30, 2007, however, TCI began unwinding its TRSs with Credit

Suisse, Goldman Sachs, J.P. Morgan, Merrill Lynch, Morgan Stanley, and UBS and replacing them

with TRSs with Deutsche Bank and Citigroup.  Ultimately, it shifted exposure equal to approximately

9 percent of CSX from other counterparties into Deutsche Bank and Citigroup.

TCI contends that it did this for two reasons.  It claims first that it was motivated by

the credit market crisis, believing that Deutsche Bank and Citigroup, as commercial banks backed by

---

[68]     *Id.* at CSX CORP 00007192.

[69]     *Id.* at CSX CORP 00007193.

[70]     DX 52, at CSX_00001013-14.

27

governmental central banks, would reduce TCI's exposure to counterparty credit risk. Perhaps so. But there was another and, from TCI's point of view, far more important reason for this move. The likelihood of its counterparties voting the hedge shares with TCI was very much on its mind. Indeed, Hohn stated that he and Amin

> "discussed whether picking Deutsche Bank and Citigroup would be beneficial in terms of a potential vote of any hedge shares in a potential proxy fight. With respect to Deutsche Bank, we speculated that it might be helpful that a hedge fund within Deutsche Bank, Austin Friars Capital, also had a proprietary position in CSX."[71]

But Hohn was modest. As the record demonstrates, TCI and Austin Friars had been working together, at least to some degree, on the CSX project for some time. TCI had consulted Deutsche Bank about its LBO proposal. And, as we shall see, there is additional reason to believe that Deutsche Bank was exceptionally receptive, to say the least, to TCI's goals and methods.

### 8.    TCI Enters into Agreements with Two Director-Nominees

TCI had met with Tim O'Toole in October to gauge his interest in being nominated for the CSX board. On December 6, 2007, O'Toole purchased 2,500 shares of CSX stock, which qualified him for election, and on December 10 entered into a formal agreement to be a nominee for the board.[72] The next day, and after a two week negotiation, Gary Wilson also agreed to be a nominee for TCI's slate of directors.[73]

---

[71]      DX 144 (Hohn) ¶ 30; DX 145 (Amin) ¶¶ 46-47.

[72]      PTO ¶ 31; DX 61.

[73]      DX 64.

28

B.    3G

1.    *3G Develops a Position in CSX*

3G began to analyze the investment potential of the North American railroad industry

during 2005 and 2006 but began to focus on CSX only toward the end of 2006 and beginning of

2007.[74] It claims that it perceived CSX to be 3G's best investment opportunity because it thought that

(1) the share price of CSX was "less likely to decrease and more likely to appreciate over time as

compared with other railroads," (2) "CSX had a large proportion of legacy contracts at below-market

prices that would expire and could then be re-priced over time" to increase revenues, and (3) "CSX

had substantial upside potential from improving operational efficiency."[75]

During the first week of February, Daniel Schwartz of 3G contacted CSX's investor

relations department to inquire about the company.[76]  He then emailed Behring on February 7 to

indicate that the deadline had passed for CSX shareholders to submit proposals to be included in the

company's proxy materials, including board nominations, for that year's annual general meeting.  As

3G was not then a shareholder of CSX – indeed, it had no investments in or exposure to it of any kind

– this demonstrates its interest in a proxy fight right from the outset.[77]

---

[74]

DX 146 (Behring) ¶¶ 16-19.

[75]

*Id.* ¶ 21.

[76]

PTO ¶ 17.

[77]

Its denial of this at trial was not credible.

29

3G made its first investment in CSX on February 9, purchasing 1.7 million shares of common stock.[78]  In the week ended February 16, it amassed 8.3 million shares, or 1.9 percent of shares outstanding.[79]  3G then sold 17,340 shares and temporarily stopped trading.[80]

Behring wrote to CSX's Ward on February 27 to request a meeting.  He explained that his interest stemmed from his ownership of approximately 2 percent of CSX shares.[81]  Baggs responded on Ward's behalf, stating that he was available to discuss the railroad industry and CSX, but indicating that the J.P. Morgan investor/analyst conference, scheduled in the middle of March, might be a convenient time for Behring to meet with Ward.[82]  Behring attended the conference and introduced himself to Ward, who agreed to arrange a meeting with 3G representatives.[83]

---

[78]     PX 206; Subrahmanyam Report Ex. C.2.  Behring asserted in his witness statement that this purchase was made on February 8, *see* DX 146 (Behring) ¶ 22, but agreed at trial that it actually occurred on February 9.  Tr. (Behring) at 97, 140.

[79]     PX 206; Subrahmanyam Report Ex. C.2.

3G's sudden and high volume trading in CSX shares raised interest at UBS, one of 3G's prime brokers.  A UBS representative asked 3G why it had focused on CSX, and observed that its CSX holdings represented "a very sizeable position and not something that fit[] into [its] regular trading patterns."  PX 63.

[80]     PX 206; Subrahmanyam Report Ex. C.2.

[81]     DX 11, at CSX_00007286-87.

[82]     *Id.* at CSX_00007285-86.

[83]     DX 146 (Behring) ¶ 30.  This meeting never occurred.

30

## 2. *3G Resumes Buying CSX Shares*

On March 29, 2007, 3G began to purchase shares of CSX stock at a rapid rate. Between that date and April 17, it acquired 11.1 million shares, bringing its holdings to 4.4 percent of the company's outstanding stock.[84] Its April 2 purchases alone represented 89.6 percent of the total daily volume of trading in CSX stock.[85] But it stopped buying as abruptly as it began and made no further investments in CSX between April 17 and August 15.[86]

3G nevertheless remained very much interested in CSX. It attended the Bear Stearns Conference on May 8 and heard Amin's speech, which Schwartz characterized as "an amazing speech, ripping into csx mgmt!!!! [*sic*]."[87] It monitored the price of CSX stock during the speech and noted that it rose to $46.50, up 1.3 percent.[88] On May 9, 2007, Schwartz telephoned CSX to find out the results of votes conducted at the May 2 annual general meeting on various shareholder proposals.[89] He called again on May 17 to seek a meeting between 3G and CSX, a meeting that CSX

---

[84]

      PX 206; Subrahmanyam Report Ex. C.2.

[85]

      Docket item 61 ¶ 80.

[86]

      PX 206.

[87]

      PX 94.

[88]

      *Id.*

[89]

      PX 268 (Baggs) ¶ 19.

31

refused to have.  The two parties ultimately[90] agreed to arrange a June visit to CSX's Jacksonville

headquarters.[91]

### 3.  3G's Hart-Scott-Rodino Filing

Baggs and Munoz met with 3G at its New York offices on June 11.  Behring told CSX

that 3G would be making a Hart-Scott-Rodino premerger notification filing, which it subsequently

did on June 13.[92]  In a subsequent letter to CSX confirming the filing, 3G indicated that it intended

to acquire shares of CSX common stock in excess of $500 million and that it might acquire more than

50 percent.[93]

### 4.  3G Sells Some Shares

Notwithstanding its Hart-Scott-Rodino filing, 3G did not change its investment

position in CSX for nearly four months after its purchase on April 17.  Starting in the middle of

August, however, it began once again to increase its holdings, purchasing about 493,000 shares on

August 15 and then entering into its first TRSs, which referenced 1.7 million CSX shares, on August

---

[90]

CSX initially declined to meet without documentation of 3G's holdings.  *See* Tr. (Baggs) at 52.  3G then had Morgan Stanley write to CSX and state that 3G held 19,407,894 shares of CSX common stock in an account there.  DX 30.

[91]

DX 146 (Behring) ¶¶ 34, 41.

[92]

PTO ¶¶ 20-21.

[93]

PX 105.

32

16.[94] Between August 24 and September 14, however, it sold 8.3 million CSX shares, over 40 percent of its position.[95]  The Court deals with those sales below.

### 5.    3G Rebuilds its Investment in CSX

By September 15, 3G held 11.6 million shares and swaps referencing 1.7 million shares, giving it economic exposure to just over 3 percent of the shares outstanding, and had stopped reducing its exposure.  On September 26, 3G reversed course again and began increasing its direct position.  By October 15, it had purchased 5.2 million shares and held 3.8 percent of the shares outstanding.  Together with its swaps, it had economic exposure to 4.2 percent of the shares outstanding.

### 6.    3G Prepares for a Proxy Fight

During this period, 3G also began to pursue possible nominees for the CSX board. It identified Behring as one potential candidate and focused on Gil Lamphere, a former director of Canadian National Railway, as another.[96]  Following an October 12 meeting, Lamphere put together

---

[94]

The counterparty for these swaps was Morgan Stanley.  PX 206; Subrahmanyam Report Ex. C.2.

[95]

PX 206; Subrahmanyam Report Ex. C.2.

[96]

DX 146 (Behring) ¶¶ 44-45.  Schwartz contends that Behring identified Lamphere by reviewing annual reports.  *See* Docket item 61 ¶ 106.5.

33

an operating plan for CSX entitled "Project Improve."[97]  On November 2, Lamphere met with 3G's

lawyers at Kirkland & Ellis.[98]  He then purchased 22,600 shares of CSX stock, thus qualifying for

election to the board, and, on December 10, 2007,  entered into a formal agreement to be a board

nominee.[99]

3G simultaneously acquired more shares and entered into more swaps.  On November

1, it increased its physical holdings in CSX by 421,300 shares.[100]  Between November 1 and 8, it

entered into TRSs referencing an additional 1.58 million CSX shares.[101]  On November 8, the final

day on which 3G's CSX position changed, it held 4.1 percent of the shares outstanding and had swaps

referencing 0.8 percent of shares outstanding, for an aggregate economic exposure of 4.9 percent of

the company.[102]

---

[97]

PX 142.  The Court does not credit Lamphere's deposition testimony that Schwartz created the document.

[98]

PX 194, at LAM 0000237; PX 145.

[99]

PTO ¶ 30.

[100]

PX 206; Subrahmanyam Report Ex. C.2.

[101]

*Id.*

[102]

*Id.*

34

C.    *The Relationship Between TCI and 3G*

TCI and 3G have had a long-standing relationship. Synergy, a fund under the 3G umbrella, has been an investor in TCI since its beginning.[103] TCI and 3G thus are well known to and communicate regularly with each other. Moreover, TCI is widely regarded as an "activist" hedge fund. This was of considerable interest to 3G, which regarded itself as inexperienced in playing such a role. Behring therefore sought out Hohn for the purpose of educating himself in this area.[104]

1.    *3G Learns of TCI's Interest in CSX*

In the early part of 2007, Synergy received a letter from TCI disclosing the industries in which TCI was invested. The report showed a very large holding in "U.S. transportation."[105]

Behring contacted TCI to inquire as to what this meant, He was particularly interested in TCI's holdings in the railroad industry.[106] Hohn told him that TCI had "an interest in CSX," the size of which could be deduced from TCI's overall position in the railroad industry. While Hohn professes not to recall having told Behring of TCI's exact holdings in the company,[107] it would have been entirely natural for him to have disclosed at least the approximate size of TCI's holding. The Court finds that he did so.

---

[103]

Docket item 61 ¶ 15.

[104]

Tr. (Behring) at 122-23.

[105]

Tr. (Hohn) at 159.

[106]

*Id.* at 160.

[107]

*Id.* at 160-61.

35

### 2.    3G and TCI Discuss Activity in CSX

As discussed above, 3G purchased its first shares of CSX on February 9 and made additional purchases on February 12. These were no piddling acquisitions. Its purchases over these two days constituted approximately 24 percent of the total market volume for CSX shares.[108] Moreover, its purchasing continued through February 16, by which time 3G had accumulated 8.3 million shares of CSX. In addition, 3G entered into some CSX credit default swaps ("CDS") on February 13 and 14.[109]

These events coincided with an email that Hohn sent to Amin on February 13 with the subject line "Re: Arcelor Brasil MTO - urgent." The first paragraph stated that Hohn wanted to discuss communications that Amin had had with a third party regarding Arcelor Brasil. In the next paragraph, however, Hohn raised a new subject. He wrote that "[i]ncreased activity in csx cds [sic] has caused excitement in the stock. I want to also discuss our friend alex [sic] of Brazil."[110]

Hohn admitted that he spoke with Behring in relation to this email and that the conversation occurred at about the time the email was sent. At trial, however, he denied that his interest in discussing his "friend Alex" with Amin, or his conversation with Behring that occurred at this time, related to CDS activity in CSX.[111]

---

[108]

Docket item 61 ¶ 53.

[109]

PX 274.

[110]

PX 42.

[111]

Tr. (Hohn) at 156 ("If you read the email, again, you see the title is Arcelor Brasil. It does not say that I wanted to speak to him about CDS swaps. In fact, I wanted to speak to him about Arcelor Brasil, which was a $500 million position for us where we were engaged in

36

This testimony is not credible except perhaps in an extremely literal sense.  3G was interested in CSX no later than January 2007 and Hohn knew it.  3G purchased a very large volume of CSX shares in the open market immediately before the email.  Its CDS transactions, on the other hand, were a handful of private contracts that were characterized by defense counsel as "a tiny minuscule hedge," costing only $10,000 a year, "of what became an over billion dollar equity position."[112]  The likelihood therefore is that Hohn's email "misspoke" in referring to 3G's *CDS* transactions, the intention being to refer to its *stock* purchases.  But whether the reference was intended to be to CDSs or shares, the real "excitement" concerned the volume of trading in CSX shares, not a few private CDS transactions.  The Court infers that Hohn wanted to discuss his "friend Alex" with Amin because he was concerned that 3G was acting in a manner that risked having the marketplace become aware of the accumulation of a position that might presage a control battle.

### 3.    3G and TCI Meet on March 29

This conclusion dovetails with the fact that 3G made no investments in CSX from February 22 until March 29.  On the latter date, Behring met with Amin in New York.[113]  Each

---

an issue with the Brazilian SEC ruling on a minority buyout.  I wanted to get Alex's views on whether the Brazilian SEC, how they would deal with the situation.").  His reasoning, however, is not credible, as a discussion with Behring arose only after Hohn focused on CSX.  Moreover, Hohn's current explanation is undermined by his deposition testimony, in which he claimed that he did not know that "friend Alex of Brazil" referred to Alex Behring.  *See* Docket item 61 ¶ 55.

[112]

Tr., June 9, 2008, at 53.

[113]

PX 66.

37

claimed not to recall attending that meeting,[114] but both testified, unpersuasively, that they did not

discuss their respective holdings in CSX.[115] On that very day, however, 3G resumed purchasing CSX

stock, buying 11.1 million more shares by April 18. In addition, during this period, the waiting period

resulting from TCI's HSR Act filing expired, and TCI also began purchasing CSX common stock,

accumulating 17.6 million shares by April 18.


                4.        *TCI and 3G Inquire of CSX Regarding a Shareholder Vote*

        TCI and 3G, along with many other investors and CSX, attended the Bear Stearns

Transportation Conference on May 8, 2007, at which Amin made his speech about TCI's position and

interest in CSX.

        The next day, TCI contacted CSX to inquire about the results of shareholder voting

at the CSX annual general meeting held one week earlier.[116] 3G made the same inquiry, as did several

other investors.[117] According to Baggs, who had been the vice president of investor relations for over

---

[114]

    Tr. (Behring) at 99; *id.* (Amin) at 196. Behring, however, admitted that he met with Amin
    from time to time and that he could have met with him around March 29, *see id.* (Behring)
    at 102, and Amin testified that he had no reason to believe that the meeting did not occur.
    *Id.* (Amin) at 196.

[115]

    *Id.* (Behring) at 102; (Amin) at 197.

[116]

    PX 207.

[117]

    *See* PX 268 (Baggs) ¶ 19; PX 101.

38

three years and with the company for over twenty, this "was the first instance in [his] experience of

having investors calling about the outcome of a particular shareholder proposal."[118]

### 5.    The August-September Pause

We have seen already that TCI began professing concern about the risk of reregulation

of railroads in August 2007. And for a period of about two weeks, TCI and 3G evidenced that

concern. Both reduced their positions. Between August 23 and August 31, TCI reduced its exposure

to CSX by nearly 2 million shares.[119] Indeed, Amin told Hohn on September 12, 2007 that he wished

that TCI had sold CSX "10 dollars ago."[120] And over almost the same period – August 24 to

September 14 – 3G sold 8.3 million CSX shares, over 40 percent of its position.[121] But this change

of heart was temporary.

### 6.    TCI and 3G Ramp Up Again

On September 20, just six days after 3G completed the sales referred to above, TCI

informed D.F. King that it likely would go ahead with a proxy contest and began looking for suitable

---

[118]

PX 268 (Baggs) ¶ 19.

[119]

Subrahmanyam Report Ex. C.1.

[120]

PX 126, at TCI0017049

[121]

PX 206; Subrahmanyam Report Ex. C.2.

39

director-nominees. During that same time period, 3G contemplated proposing Behring as a director-nominee.[122]

Amin and Behring met again on September 26. Although both parties deny that they discussed anything related to the purchase of CSX common stock, they both admitted that the topic of CSX likely arose and that each knew that the other had an investment position in the company.[123] And just as occurred on March 29, the date of an earlier Amin-Behring meeting, 3G again began buying CSX holdings on the day of this September 26 meeting.[124] By October 15, it had purchased over 5 million shares, bringing its physical holdings to 16.8 million shares.

### 7.    TCI and 3G Search for Director Nominees

TCI and 3G both began searching for director-nominees during the same time period. TCI identified Tim O'Toole as a potential candidate and contacted him on October 6 to arrange a meeting. Hohn and O'Toole met in London on October 8.

By October 5, Behring, he says, was reviewing annual reports to identify suitable director candidates. He identified Lamphere around that time and met with him in New York on October 8.

---

[122]      DX 146 (Behring) ¶ 44.

[123]      Tr. (Behring) at 124-27; *id.* (Amin) 197. The Court does not credit Amin's testimony that they never discussed buying or selling CSX stock.

[124]      PX 206; Subrahmanyam Report Ex. C.2.

40

Behring met with Lamphere again on October 12 and then met with Amin on October

17.  He denied having told Amin during that meeting that 3G was searching for nominees and that

it had met twice with a potential candidate.


V.      *The Proxy Contest*

    A.      *TCI and 3G Disclose the Formation of a Formal Group*

On December 10, 2007, Lamphere[125] and O'Toole[126] entered into nominee agreements

with 3G and TCI, respectively, and on December 11, Gary Wilson agreed with TCI to be a

nominee.[127]

On December 19, 2007, TCI, 3G, Lamphere, O'Toole, and Wilson (the "Group") filed

a Schedule 13D with the SEC.  The filing disclosed that they had "entered into an agreement to

coordinate certain of their efforts with regard [*sic*] (i) the purchase and sale of [various shares and

instruments] and (ii) the proposal of certain actions and/or transactions to [CSX]."[128]  It stated that

the Group disclosed that it collectively owned 8.3 percent of CSX shares outstanding, all of which

were said to have been "originally acquired . . . for investment in the ordinary course of business"

save for the 25,100 purchased by Lamphere and O'Toole in connection with becoming director

---

[125]

    DX 70.

[126]

    DX 61.

[127]

    DX 145 (Amin) ¶ 60.

[128]

    JX 8 (Item 5).

41

nominees.[129]  The Group disclosed that it "intend[ed] to conduct a proxy solicitation" but "ha[d] no

present plan or proposal that would relate to or result in any of the matters set forth in subparagraphs

(a) - (j) of Item 4."[130]  The Group reserved the right to take future action that it deemed appropriate.

The 13D disclosed also that TCI had cash-settled equity swap arrangements with eight

counterparties that gave it economic exposure to approximately 11 percent of CSX's shares

outstanding.  3G similarly disclosed its swap economic exposure to 0.8 percent, all of which was held

with Morgan Stanley.  Both disclaimed beneficial ownership of the underlying shares referenced by

their TRSs.[131]


B.    *The Group Files Its Notice of Intent to Nominate Directors*

Pursuant to CSX's amended and restated bylaws, the Group filed a "Stockholder

Notice of Intent to Nominate Persons for Election as Directors of CSX Corporation" ("Notice") on

January 8, 2008.[132]

---

[129]
  *Id.* (Item 4).  TCI had paid $762,251,613, including commissions, to acquire the 17,796,998
shares that it held and 3G had paid $707,588,338, including commissions, for its 17,232,854
shares.  *Id.* (Item 3).

[130]
  *Id.* (Item 4).

[131]
  *Id.* (Item 6).

[132]
  DX 72.

42

C.      *CSX and TCI Attempt to Negotiate a Resolution*

Edward Kelly, the presiding director of the CSX board, met with Hohn in January to see whether a proxy contest could be avoided.  CSX expressed a willingness to nominate three of the Group's director nominees, including Hohn and Behring, and a fourth mutually acceptable candidate.[133]  But Kelly and Hohn were unable to agree on a fourth candidate.[134]

Hohn's efforts in the negotiations were not limited to seating directors on the board. On January 14, he demanded that (1) he be able to interview the current directors, dictate which directors the Group's three nominees would replace, and determine which committees they would be seated on, (2) the roles of CEO and chairman be split, (3) the board's size not be increased without approval of the shareholders or 80 percent of the board, and (4) shareholders controlling 10 or 15 percent of the outstanding shares of voting stock be permitted to call a special meeting at any time and for any legally permissible purpose.[135]  Hohn told Kelly that he would create a dissident board and make things unpleasant for Kelly.  Moreover, he told Kelly that if TCI were successful in electing

---

[133]

PX 266 (Kelly) ¶ 23; DX 144 (Hohn) ¶ 45; PX 161, at TCI0874906.

[134]

*See* PX 157, 158, 161, 163.

[135]

PX 266 (Kelly) ¶ 23; PX 165.  Amin noted that it was "very unfortunate[]" that Hohn articulated his demands in an email. *See* PX 275, at TCI0959364; Tr. (Amin) at 208.  He claims to have said that because he thought such matters were "better discussed in person so that there is no confusion about what's being requested."  Tr. (Amin) at 208.  This testimony, which borders on the absurd, is patently incredible.

43

its five directors, Ward's future would be "bleak."[136]  Kelly responded on January 16 that he was

"concerned about [Hohn's] apparent interest in gaining effective control."[137]

The two sides met the next day, and Kelly inquired as to whether Hohn would be

interested in a standstill agreement.[138]  Hohn was not receptive to the idea so, on January 18, Kelly

informed Hohn that the differences between CSX and TCI would be "impossible to bridge,"

particularly because of Hohn's position that a standstill agreement, no matter its contents, would not

be acceptable.[139]

Three days later, the Group supplemented its Notice to include its intent to present a

proposal that would amend the CSX bylaws to allow shareholders holding at least 15 percent of all

shares outstanding the ability to call a special meeting.[140]

---

[136]

PX 266 (Kelly) ¶ 25.

[137]

PX 167.

[138]

DX 306, at CSX_00035073.

[139]

PX 169.

[140]

PTO ¶ 33; JX 9.  The Group filed an additional supplemental notice on January 25 proposing to repeal any bylaws passed by the board from January 1, 2008, onward. JX 10. The effect of this proposal would be to repeal the board's February 4, 2008, amendment to the bylaws that permitted shareholders of fifteen percent or more of a class of stock to call a special meeting.

44

D.    *CSX and The Group File Proxy Materials*

1.    *CSX*

CSX filed a preliminary proxy statement on February 21 and a revised version on February 22, 2008. It urged shareholders to vote for the board's proposed directors and not to vote for any nominees offered by the Group.[141] It stated also that the shareholders would be presented with three proposals concerning their ability to call a special meeting: one supported by CSX, one by TCI, and a third.

CSX proposed amending the bylaws to permit holders of 15 percent of the company's outstanding shares to require the board to call a special meeting unless the proposed topic of the meeting had been voted on within the previous year or would be voted on at the annual meeting within the next ninety days.[142] It urged that its proposal provided safeguards against the use of such meetings as a mechanism for disruption or delay that were lacking in the other proposals.[143]

2.    *The Group's Proxy Statement*

The Group filed its preliminary proxy statement on March 10, 2008. It proposed Hohn, Behring, Lamphere, O'Toole, and Wilson for election to the board and advocated its proposal to permit investors holding at least 15 percent of CSX stock to call a special meeting for any purpose permissible under Virginia law. The materials noted that the Group collectively held 35.1 million

---

[141]

JX 3, at third page.

[142]

*Id.* at page 57.

[143]

*Id.* The third proposal ultimately was withdrawn.

45

shares, representing approximately 8.7 percent of those outstanding, and that the value of its investment in CSX exceeded $1.65 billion.[144]  It disclosed its members' swap arrangements and the aggregate percentage of CSX shares to which they provided economic exposure.[145]  It disclosed also that Deutsche Bank beneficially owned 36.7 million shares of CSX, or 9.1 percent of the common stock.[146]

## VI.    The Positions of the Parties

CSX contends that (1) TCI violated Section 13(d) of the Exchange Act by failing to disclose its beneficial ownership of shares of CSX common stock referenced in their TRSs and (2) TCI and 3G violated Section 13(d) by failing timely to disclose the formation of a group.  It argues further that TCI and 3G violated Section 14(a) of the Exchange Act because their proxy statements were materially false and misleading.  Its state law claim contends that defendants' notice of intent to nominate directors failed to comply with CSX's bylaws in violation of Section 13.1-624 of the Virginia Stock Corporation Act.[147]

Defendants contend first that CSX and Ward violated Section 14(a) of the Exchange Act because the CSX proxy statement is materially false and misleading concerning (1) executive compensation and director stock awards, and (2) the defendants and their intentions.  They allege also

---

[144]
    JX 12, at fourth page.

[145]
    *Id.* at page 15.

[146]
    *Id.* at page 17.  This fact was disclosed in CSX's proxy materials as well.

[147]
    PTO, at 92-93.

46

that a bylaw amendment passed by CSX on February 4 concerning shareholder special meetings

violates Section 13.1-680 of the Virginia Stock Corporation Act.[148]


### Discussion

I.       Section 13(d)

The Williams Act, which enacted what now is Section 13(d) of the Exchange Act, was

passed to address the increasing frequency with which hostile takeovers were being used to effect

changes in corporate control.[149]  Section 13(d) in particular was adopted "to alert the marketplace to

every large, rapid aggregation or accumulation of securities, regardless of technique employed, which

might represent a potential shift in corporate control."[150]

---

[148]

   *Id.* at 93-94.

[149]

   *See* Act of July 29, 1968, Pub. L. No. 90-439, § 2, 82 Stat. 454 (1968).  Senator Williams
   opened the hearings on the legislation by stating that filling the large gap in the disclosure
   requirements of the securities laws, a step already taken at that point by several other
   countries, would ensure that

      "[a]ll will be able to deal in the securities markets knowing that all of the pertinent
      facts are available.  This is the premise under which our securities markets are
      supposed to work.  Following this premise they have thrived and prospered over the
      years.  Now is the time to eliminate the last remaining areas where full disclosure
      is necessary but not yet available."

   *Full Disclosure of Corporate Equity Ownership and in Corporate Takeover Bids: Hearing
   Before the Subcomm. on Securities of the S. Comm. On Banking and Currency*, 90th Cong.,
   1st Sess. 2-3 (1967) (statement of Sen. Williams, Chairman, Senate Subcomm. on
   Securities).

[150]

   *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971), *cert. denied*, 406 U.S. 910 (1972).

47

The core of the statute for present purposes is Section 13(d)(1), which provides in

relevant part that

> "Any person who, after acquiring directly or indirectly the beneficial
> ownership of any equity security of a class which is registered pursuant to section 78*l*
> of this title, . . . is directly or indirectly the beneficial owner of more than 5 per centum
> of such class shall, within ten days after such acquisition, send to the issuer of the
> security at its principal executive office, by registered or certified mail, send to each
> exchange where the security is traded, and file[] with the Commission, a statement
> containing such of the following information, and such additional information, as the
> Commission may by rules and regulations, prescribe as necessary or appropriate in the
> public interest or for the protection of investors–
>
>> "(A) the background, and identity, . . . and the nature of such beneficial
>> ownership by, such person and all other persons by whom or on whose behalf
>> the purchases have been or are to be effected;
>>
>>                    *   *   *
>>
>> "(C) if the purpose of the purchases or prospective purchases is to acquire
>> control of the business of the issuer of the securities, any plans or proposals
>> which such persons may have to liquidate such issuer, to sell its assets to or
>> merge it with any other persons, or to make any other major change in its
>> business or corporate structure;
>>
>> "(D) the number of shares of such security which are beneficially owned, and
>> the number of shares concerning which there is a right to acquire, directly or
>> indirectly, by (i) such person, and (ii) by each associate of such person, giving
>> the background, identity, residence, and citizenship of each such associate . .
>> . ."[151]

In order to prevent circumvention of Section 13(d)(1), Section 13(d)(3) further provides that "[w]hen

two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose

---

[151]      15 U.S.C. § 78m(d)(1).

48

of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."[152]

The heart of the dispute presently before the Court concerns whether (1) TCI's investments in cash-settled TRSs referencing CSX shares conferred beneficial ownership of those shares upon TCI, and (2) TCI and 3G formed a group prior to December 12, 2007.

### A.    Beneficial Ownership

The concept of "beneficial ownership" is the foundation of the Williams Act and thus critical to the achievement of its goal of providing transparency to the marketplace.[153]    Although Congress did not define the term, its intention manifestly was that the phrase be construed broadly.[154]. The SEC did so in Rule 13d-3, which provides in relevant part:

"(a)    For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

"(1)    Voting power which includes the power to vote, or to direct the voting of, such security; and/or,

"(2)    Investment power which includes the power to dispose, or to direct the disposition of, such security.

---

[152]

*Id.* § 78m(d)(3).

[153]

*See Takeover Bids: Hearing Before the Subcomm. on Commerce and Finance of the H. Comm. on Interstate and Foreign Commerce*, 90th Cong., 2d Sess. 40-41 (1968) (statement of Manuel F. Cohen, Chairman, Securities and Exchange Commission) ("[B]eneficial ownership is the test. [The acquiring entity] might try to get around it, and that would be a violation of law, but the legal requirement is beneficial ownership.").

[154]

*See, e.g., Wellman v. Dickinson,* 682 F.2d 355, 365-66 (2d Cir. 1982) (rejecting narrow construction of § 13(d)(3) in light of legislative history), *cert. denied* 460 U.S. 1069 (1983).

49

"(b)     Any person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose of [*sic*] effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security."[155]

The SEC intended Rule 13d-3(a) to provide a "broad definition" of beneficial ownership so as to ensure disclosure "from all those persons who have the ability to change or influence control."[156] This indeed is apparent from the very words of the Rule. By stating that a beneficial owner "includes" rather than "means" any person who comes within the criteria that follow, it made plain that the language that follows does not exhaust the circumstances in which one might come within the term.[157] The phrases "directly or indirectly" and "any contract, arrangement, understanding, relationship, or otherwise" reinforce that point and demonstrate the focus on substance rather than on form or on the legally enforceable rights of the putative beneficial owner. It therefore is not surprising that the SEC, at the very adoption of Rule 13d-3, stated that the determination of beneficial ownership under Rule 13d-3(a) requires

---

[155]

*See* 17 C.F.R. § 240.13d-3.

[156]

Filing and Disclosure Requirements Relating to Beneficial Ownership, Exchange Act Release Nos. 33-5925, 34-14692, 43 Fed. Reg. 18,484, 18,489 (Apr. 28, 1978); Interpretive Release on Rules Applicable to Insider Reporting and Trading, Exchange Act Release No. 34-18114, 46 Fed. Reg. 48,147 (Oct. 1, 1981) (indicating that the concept of beneficial ownership under Section 13(d) "emphasizes the ability to control or influence the voting or disposition of the securities.").

[157]

*See, e.g., Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 99-100 (1941); *United States v. Huber*, 603 F.2d 387, 394 (2d Cir. 1979), *cert. denied* 445 U.S. 927 (1980); *W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*, No. 03 Civ. 8606 (RWS), 2004 WL 2187069, at *5 (S.D.N.Y. Sept. 29, 2004).

50

"[a]n analysis of all relevant facts and circumstances in a particular situation . . . in order to identify each person possessing the requisite voting power or investment power. For example, for purposes of the rule, the mere possession of the legal right to vote securities under applicable state or other law . . . may not be determinative of who is a beneficial owner of such securities inasmuch as another person or persons may have the power whether legal, economic, or otherwise, to direct such voting."[158]

Nor does Rule 13d-3(a) exhaust the Commission's efforts to cast a very broad net to capture all situations in which the marketplace should be alerted to circumstances that might result in a change in corporate control. Rule 13d-3(b) was adopted so that Rule 13d-3(a) "cannot be circumvented by an arrangement to divest a person of beneficial ownership or to prevent the vesting of beneficial ownership as part of a plan or scheme to evade the reporting requirements of [S]ection 13(d)."[159]

With these considerations in mind, the Court turns to CSX's contentions. It first considers whether TCI had beneficial ownership, within the meaning of Rule 13d-3(a), of the shares of CSX stock referenced by its swap agreements and held by its counterparties by considering the facts and circumstances surrounding those contracts. It then turns to the question of whether TCI, assuming it were not a beneficial owner of the hedge shares under Rule 13d-3(a), nevertheless would be deemed a beneficial owner under Rule 13d-3(b) because it used the TRSs as part of a plan or scheme to evade the disclosure requirements of Section 13(d) by avoiding the vesting of beneficial ownership in TCI.

---

[158]

Adoption of Beneficial Ownership Disclosure Requirements, Exchange Act Release Nos. 33-5808, 34-13291, 42 Fed. Reg. 12,342, 12,344 (Mar. 3, 1977)(emphasis added).

[159]

*Id.*

51

*1.      Rule 13d-3(a)*

The contracts embodying TCI's swaps did not give TCI any legal rights with respect to the voting or disposition of the CSX shares referenced therein. Nor did they require that its short counterparties acquire CSX shares to hedge their positions. But the beneficial ownership

> "inquiry focuses on any relationship that, as a factual matter, confers on a person a *significant ability to affect* how voting power or investment power will be exercised, because it is primarily designed to ensure timely disclosure of market-sensitive data about changes in the identity of those who are able, as a practicable matter, to influence the use of that power."[160]

It therefore is important to consider whether TCI's TRSs contemplated that its counterparties would hedge their positions with CSX shares and, if so, whether TCI had "a significant ability to affect how voting power or investment power will be exercised."

*a.      Investment Power*

TCI acknowledges, as it must, that its swaps contemplated the possibility that the counterparties might – indeed would – hedge by acquiring physical shares. It emphasizes, however, that they were under no contractual obligation to do so and, indeed, had other means of hedging their short positions. Moreover, TCI asserts that it had no influence over how its counterparties disposed

---

160

SEC v. Drexel Burnham Lambert Inc., 837 F. Supp. 587, 607 (S.D.N.Y. 1993) (internal quotation marks and emphasis omitted), *aff'd sub nom. SEC v. Posner*, 16 F.3d 520 (2d Cir. 1994), *cert. denied,* 513 U.S. 1077 (1995) (emphasis added). *Accord* Filing and Disclosure Requirements Relating to Beneficial Ownership, Exchange Act Release Nos. 33-5925, 34-14692, 43 Fed. Reg. 18,484, 18,489 (Apr. 28, 1978) (Rule 13d-3(a) requires disclosure "from all those persons who have the ability to change *or influence* control") (emphasis added); Interpretive Release on Rules Applicable to Insider Reporting and Trading, Exchange Act Release No. 34-18114, 46 Fed. Reg. 48,147 (Oct. 1, 1981) (indicating that the concept of beneficial ownership under Section 13(d) "emphasizes the ability to control or *influence* the voting or disposition of the securities.") (emphasis added).

52

of physical shares used to hedge a swap, if any, at the time of termination.  TCI therefore maintains

that it had no investment power over any shares used to hedge its swaps.

TCI correctly describes the legal instruments constituting the swaps.  They do not

require the counterparties to hedge their positions by purchasing CSX stock and do not in terms

address the question of how the counterparties will dispose of their hedges at the conclusion of the

swaps. But the evidence is overwhelming that these counterparties in fact hedged the short positions

created by the TRSs with TCI by purchasing shares of CSX common stock.  As the charts set forth

in Appendix 1 show, they did so on virtually a share-for-share basis and in each case on the day or

the day following the commencement of each swap.[161]

This is precisely what TCI contemplated and, indeed, intended.  None of these

counterparties is in the business, so far as running its swap desk is concerned, of taking on the

stupendous risks entailed in holding unhedged short (or long) positions in significant percentages of

the shares of listed companies.  As a practical matter, the Court finds that their positions could not

be hedged through the use of other derivatives.[162]  Thus, it was inevitable that they would hedge the

TCI swaps by purchasing CSX shares.

---

[161]

Four of the counterparties – Citigroup, Deutsche Bank, Morgan Stanley, and UBS –
purchased shares to hedge its corresponding swap short position every time they and TCI
entered into a TRS.  *See* Subrahmanyam Rebuttal Report, at 12.  Deutsche Bank in each
case did so on the same day on which the TRS was transacted.  *See id.* at 12.  Merrill Lynch
hedged fifteen of its sixteen swaps by purchasing an equivalent number of matching shares,
all on the same day as the swap transaction, and Credit Suisse hedged fourteen of its sixteen
swaps in the same manner, all on the same day as the swaps.  *Id.*  (No data were provided
for Goldman or J.P. Morgan.)

[162]

*See* Subrahmanyam Report ¶¶ 87-102 (explaining why alternative instruments used to hedge
risk were not economically practical for the bank counterparties).

53

TCI knew that the banks would behave in this manner and therefore sought at the outset to spread its TRS agreements across a number of counterparties so as to avoid pushing any counterparty, individually, across the 5 percent threshold that would have triggered an obligation on the counterparty's part to disclose its position under Regulation 13D.[163] This would have been a cause for concern only if TCI understood that its counterparties, although not legally obligated to do so, in fact would hedge by purchasing CSX shares equal or substantially equal to the shares referenced by the TCI swaps.[164]

Moreover, TCI understood that there were advantages to TCI of its short counterparties hedging with physical shares. The fact that these are nominally cash-settled TRSs does not necessarily mean that they all will be settled for cash. TCI and its counterparties have the ability to agree to unwind the swaps in kind, i.e., by delivery of the shares to TCI at the conclusion of each transaction, as indeed commonly occurs.[165] That simple fact means that the hedge positions of the counterparties hang like the sword of Damocles over the neck of CSX. Once the Hart-Scott-Rodino waiting period expired, nothing more was required to move the legal ownership of the hedge shares from the banks to TCI than the stroke of a pen or the transmission of an email. This greatly enhances TCI's leverage over CSX, even if it never settles any of the TRSs for cash, as indeed has been the case to date. And TCI so views the realities as evidenced by Amin's statement to CSX that TCI's swap

---

[163]

See PX 30, at TCI0929168; PX 22; PX 27.

[164]

Mr. Amin's testimony that TCI could not and did not assume that each counterparty would hedge the swaps by purchasing a corresponding number of physical shares, *see* Tr. (Amin) at 202-03, 205-06, simply is not credible.

[165]

Henry Hu & Bernard Black, 79 S. Cal. L. Rev. at 868.

54

position could be converted to shares at any time as well as his assertion on February 15, 2007, that TCI "owned" a quantity of shares that clearly included the shares held by its counterparties.

The corollary to the bank's behavior at the front end of these transactions, viz. purchasing physical shares to hedge risk, is that the banks would sell those shares at the conclusion of the swaps (assuming cash settlement) so as to avoid the risk that holding the physical shares would entail once the downside protection of the swap was removed. And that is exactly what happened here. With very minor exceptions, whenever TCI terminated a swap, the counterparty sold the same number of physical shares that were referenced in the unwound swap and it did so on the same day that the swap was terminated.[166] Citigroup, Credit Suisse, Deutsche Bank, Goldman, and Morgan Stanley did precisely this, as did Merrill Lynch and UBS save that (1) Merrill Lynch's sales on a few occasions involved slightly different numbers of shares, and (2) UBS on five occasions sold on the day following the termination of a swap.[167]

To be sure, there is no evidence that TCI explicitly directed the banks to purchase the hedge shares upon entering into the swaps or to sell them upon termination. Nor did it direct the banks to dispose of their hedge shares by any particular means. But that arguably is not dispositive.

On this record, it is quite clear that TCI significantly influenced the banks to purchase the CSX shares that constituted their hedges because the banks, as a practical matter and as TCI both knew and desired, were compelled to do so. It significantly influenced the banks to sell the hedge shares when the swaps were unwound for the same reasons.

---

[166]

*See* Subrahmanyam Rebuttal Report Exs. 4.1 to 4.7.

[167]

*Id.*

55

   b.    *Voting Power*

There is no evidence that TCI and any of its counterparties had explicit agreements

that the banks would vote their hedge shares in a certain way.[168] Moreover, the policies and practices

of the counterparties with respect to voting hedge shares vary.[169] But these are not the only pertinent

considerations.

   (1)    *Deutsche Bank*

Between October and November 2007, TCI moved swaps referencing 28.4 million and

18.0 million shares into Deutsche Bank and Citigroup, respectively, while leaving swaps referencing

1,000 shares with each of its remaining six counterparties.[170] Hohn offered two reasons for doing so.

First, he said that he felt that commercial banks, which are backed by governmental

institutions, entailed less credit risk than investment banks.  Second, he conceded that he picked

---

[168]

   *See, e.g.*, DX 149 (Partnoy Report) ¶ 50.

[169]

   Some appear to have policies that preclude its swap counterparties from influencing any votes on proprietary shares purchased to hedge swaps. Others, notably Deutsche Bank, do not prohibit swap counterparties such as TCI from influencing the manner in which it votes hedge shares.  Still others appear to lack any uniform policies. Citigroup views the shares it purchases to hedge swaps as exclusively under its control and as "a matter of practice" does not vote those shares, but admitted that it "might vote" them. Kennedy Dep. at 19, 24. UBS refers "[a]ny request by a swap counterparty relating to voting of a [UBS proprietary share]" to its legal department.  DX 149 (Partnoy Report) ¶¶ 49(c).

[170]

   TCI left swaps in each of its six other counterparties to obscure the identities of its principal counterparties.  Tr. (Amin) at 204-06; Docket item 70, at 64-65 ¶ 39.

56

Deutsche Bank and Citigroup – as opposed to other commercial banks – because he thought that "would be beneficial in terms of a potential vote of any hedge shares in a potential proxy fight."[171]

Hohn's credit risk argument is not entirely persuasive. Assuming *arguendo* that the commercial banks in general were safer than investment banks, it was by no means clear in November 2007 that Citigroup was not a credit risk, notwithstanding its backing by the Federal Reserve.[172]  But it is unnecessary to pause on that point, as it is entirely clear that the move into at least Deutsche Bank was made substantially out of Hohn's belief that he could influence the voting of the shares it held to hedge TCI's swaps.  As an initial matter, Hohn was well aware that Austin Friars, a hedge fund within Deutsche Bank, held a proprietary position in CSX common stock.  From at least March 2007, when Austin Friars invited TCI to submit questions for and listen in on the John Snow call, the two funds shared a common interest in taking a railroad private.  Nor was this the first time that they had shared detailed information about positions or plans.  Hohn believed that TCI could exploit this relationship to influence how Austin Friars, and in turn how Deutsche Bank, voted its CSX shares.[173]  But there is considerably more to the Deutsche Bank situation than Austin Friars.

CSX initially set the record date for voting at its annual meeting as February 27, 2008.[174]  Immediately before that record date, Deutsche Bank owned 28.4 million shares to hedge its

---

171

     DX 144 (Hohn) ¶ 30.

172

     *See, e.g.*, Carrick Mollenkamp, *HSBC, the Subprime Seer: Sanguine View Isn't Likely*, WALL ST. J., Nov. 12, 2007, at C1 (noting that Citigroup was expected to announce potential write-downs of nearly $11 billion in the fourth quarter of 2007).

173

     Amin's testimony to the contrary, *see* Tr. (Amin) at 218, is not credible.

174

     PX 264 (Ward) ¶ 25.

57

short position created by its TCI TRSs.[175] Immediately preceding and following the record date, there

were large and aberrant movements of CSX shares into and out of Deutsche Bank's hands.[176] CSX

argues that these movements show that Deutsche Bank (1) had sought to boost revenues by loaning

the shares in its hedge positions, presumably to short sellers, (2) recalled the loans so that it would

own the shares on the record date and thus be entitled to vote them, (3) wished to vote those shares

pursuant to an arrangement with TCI, and (4) then reloaned the shares immediately after the record

date.

TCI would have the Court reject this scenario as speculative. It argues that the record

date for voting coincided closely[177] with the record date determining the right to receive dividends and

that it would have been quite natural for Deutsche Bank to have acted to ensure its receipt of those

funds. Moreover, it argues that Deutsche Bank witnesses denied that any recall occurred.[178]

TCI's argument falls considerably short. For one thing, CSX adjourned its annual

meeting and changed the record date after the record date for payment of a dividend had passed.[179]

There is no evidence that the record date for the dividend was changed. Nevertheless, a similar influx

---

[175]

Subrahmanyam Rebuttal Report Ex. 4.3.

[176]

PX 270 (Miller) ¶¶ 16-19, 26, 28, 34; Tr. (Miller) at 76-77.

[177]

The coincidence was not exact. There was a two day difference. PX 16, at CSX CORP
00008177-78; PX 17, at CSX CORP 00008181.

[178]

Tr., June 9, 2008, at 28:18-29:5.

[179]

The record date for payment of dividends was February 29. The new record date for the
adjourned shareholders meeting was set on March 14. PX 17, at CSX CORP 00008181; PX
18, at CSX CORP 00008206.

58

and outflow of shares took place around the adjourned record date.[180]  In consequence, the desire to

receive the dividend is not a likely explanation for what transpired.  Moreover, the bank witnesses

upon whom TCI relies in fact lacked any personal knowledge of the material facts.[181]

   In the last analysis, the question whether there was an agreement – explicit or implicit

– between Deutsche Bank and TCI with respect to the voting of the shares is a close one.  In view of

the grounds on which the Court ultimately disposes of this case, however, it is unnecessary to make

a finding on the point.


     (2)  *All of the Counterparties*

   The Court is not persuaded that there was any agreement or understanding between

TCI and any of the other banks with respect to the voting of their hedge shares.  But the SEC has

made plain that a party has voting power over a share under Rule 13d-3(a)(1) if that party has the

"ability to control *or influence* the voting . . . of the securities."[182]  So the question of influence must

be considered with respect to all of the banks.

   As an initial matter, TCI, which knew that the banks would hedge the swaps by

purchasing physical shares, could and at least to some extent did select counterparties by taking their

---

180

  Tr. (Miller) at 84.

181

  *See* Arnone Dep. at 39-40, 51-54; Busby Dep. at 24, 28-30, 34.  In fact, TCI cites to the
deposition of Arnone, *see* docket item 59, at 33, without disclosing that the pages referenced
record not testimony, but a statement by counsel.  *See* Arnone Dep. at 54-48.

182

  Interpretive Release on Rules Applicable to Insider Reporting and Trading, Exchange Act
Release No. 34-18114, 46 Fed. Reg. 48,147 (Oct. 1, 1981) (emphasis added).  *See also*
*Wellman,* 682 F.2d at 365 n.12 (beneficial ownership not defined by Rule 13d-3 "solely as
present voting power").

59

business to institutions it thought would be most likely to vote with TCI in a proxy contest. D.F.

King's "Preliminary Vote Outlook" presentation concerning the proxy contest indicates that certain

types of investors adhere to particular voting patterns in contested elections and are influenced by the

recommendations made by institutional proxy advisory firms such as RiskMetrics (formerly ISS).[183]

Although D.F. King was clear that it could not guarantee the manner in which a particular investor

would vote, patterns of behavior made it possible for TCI to predict the likelihood of that vote and

place its swap transactions accordingly.

Further, some of the banks' policies gave TCI the power to prevent a share from being

voted. Credit Suisse, for example, appears to follow a policy of not voting its hedge shares if it is

solicited by its counterparty in a contested situation.[184] In such instances, then, TCI could ensure that

that bank's hedge shares would not be voted against it by the simple expedient of soliciting its

counterparty. Thus, by entering into a TRS with Credit Suisse, TCI was in a position to ensure that

Credit Suisse would purchase shares that otherwise might have been voted against TCI in a proxy

fight and then to ensure that those shares would not be so voted. While this would not be as favorable

a result as dictating a vote in its favor, it would be better than leaving the votes of those shares to

chance.

Finally, the fact that TCI thought it could influence Citigroup at least suggests that its

relationship with Citigroup permitted it to do so. Nevertheless, the proof on this point is not sufficient

to find that TCI in fact had that ability.

---

[183]

       *See* PX 160, at TCI0891561-62.

[184]

       DX 149 (Partnoy Report) ¶ 49(a).

60

*c.*     *Synthesis*

In the last analysis, there are substantial reasons for concluding that TCI is the beneficial owner of the CSX shares held as hedges by its short counterparties. The definition of "beneficial ownership" in Rule 13d-3(a) is very broad, as is appropriate to its object of ensuring disclosure "from all . . . persons who have the ability [even] to . . . influence control."[185] It does not confine itself to "the mere possession of the legal right to vote [or direct the acquisition or disposition of] securities,"[186] but looks instead to all of the facts and circumstances to identify situations in which one has even the ability to influence voting, purchase, or sale decisions of its counterparties by "legal, economic, or other[]" means.[187]

On this record, TCI manifestly had the economic ability to cause its short counterparties to buy and sell the CSX shares. The very nature of the TRS transactions, as a practical matter, required the counterparties to hedge their short exposures. And while there theoretically are means of hedging that do not require the purchase of physical shares, in the situation before the Court it is perfectly clear that the purchase of physical shares was the only practical alternative. Indeed, TCI effectively has admitted as much. It did so by spreading its swap transactions among eight counterparties to avoid any one hitting the 5 percent disclosure threshold and thus triggering its own reporting obligation – a concern that was relevant only because TCI knew that the counterparties were hedging by buying shares. And it did so in closing argument, where its counsel said that the banks'

---

185

    Note 156, *supra.*

186

    Note 158, *supra.*

187

    *Id.*

61

purchases of CSX shares were "the natural consequence" of the swap transactions.[188]  Thus, TCI

patently had the power to cause the counterparties to buy CSX.  At the very least, it had the power

to influence them to do so.  And once the counterparties bought the shares, TCI had the practical

ability to cause them to sell simply by unwinding the swap transactions.  Certainly the banks had no

intention of allowing their swap desks to hold the unhedged long positions that would have resulted

from the unwinding of the swaps.

     The voting situation is a bit murkier, but there nevertheless is reason to believe that

TCI was in a position to influence the counterparties, especially Deutsche Bank, with respect to the

exercise of their voting rights.

     TCI nevertheless argues strenuously against a finding that it has beneficial ownership

of the shares, focusing heavily on the fact that it had no legal right to direct its short counterparties

to buy or sell shares or to vote them in any particular way, indeed at all.[189]  Some *amici,* more

---

[188]

    Tr., June 9, 2008, at 27:33.

[189]

    Defendants rely on an SEC interpretive release in which the Commission took the position
that "[a] purchaser of a cash-settled security future (*i.e.,* a security future that, by its terms,
must be settled by a cash payment) would not count the equity securities underlying the
contract for purposes of determining whether he or she is subject to the Regulation 13D
reporting requirements, because he or she does not have the right to acquire beneficial
ownership of the underlying security." Commission Guidance on the Application of Certain
Provisions to Trading in Security Futures Products, 67 Fed. Reg. 43,234, 43,240 (June 27,
2002) (listed as an interpretive release at 17 C.F.R. pts. 231 and 241).

    As an initial matter, no one suggests that this interpretation resolves the question before this
Court. The interpretive release involved only cash-settled securities futures, which are
impersonal exchange traded transactions, and at least to that extent, unlike cash-settled
equity swaps. Moreover, there is no evidence that the Commission intended this guidance
to apply outside the context of cash-settled securities futures. In any case, in view of the
fact that the matter is being decided on other grounds, this interpretation need not be
addressed at greater length.

62

cautiously, urge that any finding of beneficial ownership be rooted in unique facts of this case to avoid

upsetting what they say is the settled expectation of the marketplace that equity swaps, *in and of*

*themselves,* do not confer beneficial ownership of the referenced shares. They contend that a broader

ruling could have extensive implications and that the subject therefore is dealt with more

appropriately by administrative agency rule making than case-by-case adjudication. And the SEC

Division of Corporation Finance argues – perhaps inconsistently with some of the Commission's past

statements about the breadth of the definition of beneficial ownership[190] – that there is no beneficial

ownership where the short counterparties buy, sell, or vote their hedge shares as a result of their own

economic incentives and not pursuant to legal obligations owed to their long counterparties, although

it does not comment on the facts of this case. The Division, moreover, suggests that a contrary ruling

would be novel and upset settled expectations of the market.

      The focus on TCI's legal rights under its swap contracts, while those rights certainly

are relevant, exalts form over substance. The securities markets operate in the real world, not in a law

school contracts classroom. Any determination of beneficial ownership that failed to take account

of the practical realities of that world would be open to the gravest abuse. Indeed, this Court is not

alone in recognizing that abuses would be facilitated by a regime that did not require disclosure of

the sort that would be required if "beneficial ownership" were construed as advocated by CSX.[191]

---

[190]

      The statements referred to, *e.g.,* note 156, *supra,* were not made in the specific context of
swaps or other derivatives.

[191]

      *See, e.g.,* Henry Hu & Bernard Black, *Equity and Debt Decoupling and Empty Voting II:
Importance and Extensions,* 156 U. PENN. L. REV. 625, 735-37 (2008) (assuming that equity
swaps do not give the long party beneficial ownership, they can be used to secure effective
control without disclosure otherwise required by § 13(d)).

63

Moreover, the Court is inclined to the view that the Cassandra-like predictions of dire consequences of holding that TCI has beneficial ownership under Rule 13d-3(a) have been exaggerated.[192]   For one thing, there is no reason to believe that there are many situations in which the 5 percent reporting threshold under Section 13(d) would be triggered by such a ruling.  The overwhelming majority of swap transactions would proceed as before without any additional Regulation 13D or G reporting requirements.  The issue here, moreover, is novel and hardly settled. And markets can well adapt regardless of how it ultimately is resolved.  Indeed, the United Kingdom reportedly now requires disclosure of economic stakes greater than 1 percent in companies involved in takeovers and is considering requiring disclosure at the 3 percent level in other companies, levels lower than would be required to trigger Section 13(d), assuming that the TRSs here fall within Rule 13d-3(a).[193]  Yet there is no reason to believe that the sky has fallen, or is likely to fall, in London.

Nor do potentially broad implications or any supposed advantage of administrative rule making over adjudication permit a court to decline to decide an issue that must be decided in order

---

[192]

Similarly, professor and former SEC commissioner Joseph Grundfest and other academics have written that "[i]n the context of this case, the . . . integrity of the stock market was undermined and an uneven playing field was created." *See* Letter from Joseph Grundfest, Henry Hu, and Marti Subrahmanyam to Brian Cartwright, General Counsel of the SEC (June 2, 2008), at 13.

[193]

A major proponent of the hypothesis that dire consequences will ensue from a determination of beneficial ownership in this case is defendants' expert Frank Partnoy.  Having considered Partnoy's positions and Marti Subrahmanyam's responses, the Court believes Partnoy's views are exaggerated and declines to accept them.  In addition, Partnoy's views in this respect are unpersuasive because his failure to engage with the specific circumstances of this case renders his generalizations suspect.

Robert Cyran, *Policing Equity Derivatives,* WALL ST. J., June 7, 2008, at B14.

64

to resolve a case before it. But it is equally true that courts should decide no more than is essential to resolve their cases.

In this case, it is not essential to decide the beneficial ownership question under Rule 13d-3(a). As is discussed immediately below, TCI used the TRSs with the purpose and effect of preventing the vesting of beneficial ownership of the referenced shares in TCI as part of a plan or scheme to evade the reporting requirements of Section 13(d). Under Rule 13d-3(b), TCI, if it is not a beneficial owner under rule 13d-3(a), therefore is deemed – on the facts of this case – to beneficially own those shares. The Court therefore does not rule on the legal question whether TCI is a beneficial owner under Section 13d-3(a).

### 2.    Rule 13d-3(b)

In construing any statute or rule, the Court is governed by well-established principles. It first must examine "the language of the provision at issue,"[194] which governs "'unless that meaning would lead to absurd results.'"[195] In addition, the provision "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error."[196]

We begin with the language. Rule 13d-3(b) provides:

---

[194]

*Resnik v. Swartz*, 303 F.3d 147, 151-52 (2d Cir. 2002).

[195]

*Forest Watch v. United States Forest Serv.*, 410 F.3d, 115, 117 (2d Cir. 2005) (quoting *Reno v. Nat'l Transp. Safety Bd.*, 45 F.3d 1375, 1379 (9th Cir. 1995)).

[196]

*APWU v. Potter*, 343 F.3d 619, 626 (2d Cir. 2003) (internal citation omitted).

65

"Any person who, directly or indirectly, [1] creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device [2] with the purpose of [*sic*] effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership [3] as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security."[197]

Thus, the Rule by its plain terms is triggered when three elements are satisfied:

- the use of a contract, arrangement, or device

- with the purpose or effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership

- as part of a plan or scheme to evade the reporting requirements of Section 13(d) or (g).

It is undisputed that TCI's cash-settled TRSs are contracts. The first element therefore concededly is satisfied.

The evidence that TCI created and used the TRSs, at least in major part, for the purpose of preventing the vesting of beneficial ownership of CSX shares in TCI and as part of a plan or scheme to evade the reporting requirements of Section 13(d) is overwhelming. Joe O'Flynn, the chief financial officer of TCI Fund told its board, albeit not in the specific context of CSX, that one of the reasons for using swaps is "the ability to purchase without disclosure to the market or the company."[198]  TCI emails discussed the need to make certain that its counterparties stayed below 5

---

[197]

    *See* 17 C.F.R. § 240.13d-3(b).

[198]

    PX 19, at TCI0011386; *see also* Subrahmanyam Report ¶ 72.

66

percent physical share ownership,[199] this in order to avoiding triggering a disclosure obligation on the

part of a counterparty. TCI admitted that one of its motivations in avoiding disclosure was to avoid

paying a higher price for the shares of CSX, which would have been the product of front-running that

it expected would occur if its interest in CSX were disclosed to the market generally.[200] Indeed, TCI

acquired only approximately 4.5 percent in physical CSX shares to remain safely below the 5 percent

reporting requirement until it was ready to disclose its position.

To be sure, there is evidence that TCI argues points in the opposite direction. It did

disclose to CSX the fact that it had exposure to its stock well before it made a Schedule 13D filing.

But that does not carry the day. Telling an issuer that an investor has exposure to its stock is quite

a different matter than timely disclosing to the marketplace generally the details of the investor's

position, its plans and intentions, its contracts and arrangements with respect to the issuer's securities,

and its financing and then keeping that information up to date as Regulation 13D requires. For one

thing, the market in general does not necessarily know even what the issuer knows. And the issuer

is left to guess as to many of the important matters that compliance with Regulation 13D requires.

Here, TCI's limited disclosure to CSX and its concealment of broader, more timely, and more

accurate information from the marketplace served its objectives. It exerted pressure on CSX, a

pressure that was enhanced by the lack of complete information. And it kept the marketplace entirely

and, after CSX filed its Form 10-Q, largely in the dark, thus serving TCI's interest in permitting it to

---

[199]

PX 22, 27-30; *see also* Subrahmanyam Report Exs. D, D.1-D.7.

[200]

DX 144 (Hohn) ¶ 22; Tr. (Hohn) at 188-90.

build its position without running up the price of the stock. In all the circumstances, the Court finds

that each of the elements of Rule 13d-3(b) is satisfied here.

This outcome is supported by the views of the SEC's Division of Corporation Finance

as the Court understands them. While the Division did not comment upon or attempt to analyze the

facts of this case in light of governing legal standards, its *amicus* letter appears to take two positions.

First, it states the view that "the long party's underlying motive for entering into the swap transaction

generally is not a basis for determining whether there is 'a plan or scheme to evade.'"[201] It goes on

to say that it believes "that the mental state contemplated by the words 'plan or scheme to evade' is

generally the intent to enter into an arrangement that creates a false appearance." It states that "a

person who entered into a swap would be a beneficial owner under Rule 13d-3(b) if it were

determined that the person did so with the intent to create the false appearance of non-ownership of

a security." But it adds that it "cannot rule out the possibility that, in some unusual circumstances,

a plan or scheme to evade the beneficial ownership provisions of Rule 13d-3 might exist where the

evidence does not indicate a false appearance or sham transaction."[202] Having said that, however, the

letter concludes that "as a general matter, a person that does nothing more than enter into an equity

swap should not be found to have engaged in an evasion of the reporting requirements."[203]

As an initial matter, no one suggests that TCI did "nothing more than enter into an

equity swap." At a minimum, it entered into the TRSs rather than buying stock for the purpose,

---

[201]

Letter from Brian Breheny, Deputy Director of the Division of Corporation Finance, to Judge Kaplan (June 4, 2008), at 3.

[202]

*Id.*

[203]

*Id.* at 4.

68

perhaps among others, of avoiding the disclosure requirements of Section 13(d) by preventing the vesting of beneficial ownership in TCI.

Passing on to its other point, the Division's assertion that "a person who entered into a swap would be a beneficial owner under Rule 13d-3(b) if it were determined that the person did so with the intent to create the false appearance of non-ownership of a security" suffers from some degree of ambiguity. On the one hand, the statement may be intended merely to illustrate a specific intent that would satisfy the test, without intending to exhaust the possibilities. On the other, it may intend to convey the thought that an intent to create a false appearance of non-ownership is indispensable to a Rule 13d-3(b) finding. Two considerations persuade the Court that the former is the case.

First, the Division declined to "rule out the possibility that . . . a plan or scheme to evade . . . might exist [without] a false appearance or sham transaction." It follows that it cannot be saying that, in its view, a false appearance of non-ownership is a necessary condition for application of Rule 13d-3(b).

Second, reading Rule 13d-3(b) as requiring an intent to create a false appearance of non-ownership would violate a fundamental principle of statutory construction. An appearance of non-ownership cannot be false unless one in fact is at least a beneficial owner. That beneficial ownership would satisfy Rule 13d-3(a), thus making Rule 13d-3(b) superfluous. In consequence, Rule 13d-3 as a whole is inconsistent with any view that a false appearance of non-ownership is a prerequisite to application of Rule 13d-3(b).

This leaves us with the Division's more likely position, viz. that Rule 13d-3(b) is satisfied only where the actor intends to create some false appearance, albeit not necessarily a false appearance of non-ownership. But false appearance of what?

The goal of Section 13(d) "is to alert the marketplace to every large, rapid aggregation or accumulation of securities . . . which might represent a potential shift in corporate control."[204] In consequence, the natural reading is that the Division refers to a false appearance that no such accumulation is taking place. Put another way, Rule 13d-3(b) applies where one enters into a transaction with the intent to create the false appearance that there is no large accumulation of securities that might have a potential for shifting corporate control by evading the disclosure requirements of Section 13(d) or (g) through preventing the vesting of beneficial ownership in the actor.

If that is what the Division means, then its proposed standard is more than satisfied in this case. TCI intentionally entered into the TRSs, with the purpose and intent of preventing the vesting of beneficial ownership in TCI, as part of a plan or scheme to evade the reporting requirements of Section 13(d) and thus concealed precisely what Section 13(d) was intended to force into the open. And if this is not what the Division means, the Division's argument would be unpersuasive.[205] After all, there is not one word in Section 13(d) or in Rule 13d-3 that supports a

---

[204]

  *Treadway Cos., Inc. v. Care Corp.,* 638 F.2d 357, 380 (2d Cir.1980) (internal citation omitted).

[205]

  As a staff interpretation, the Division's views are entitled to no greater weight than flows from their persuasive qualities. *See United States v. Mead Corp.,* 533 U.S. 218, 234-35 (2001); *Skidmore v. Swift & Co.,* 323 U.S. 134, 139-40 (1944); *see also Gryl ex rel. Shire Pharms. Group PLC v. Shire Pharms. Group PLC,* 298 F.3d 136, 145 (2d Cir. 2002), *cert. denied* 537 U.S. 1191 (2003).

70

requirement of an intent to create a false appearance of non-ownership if that term requires anything
more than concealment of the sort of secret market accumulations that went on here.

Undaunted, TCI argues that it did not trigger Rule 13d-3(b). It relies in part on a letter
from Professor Bernard Black to the SEC in which the professor argued that "it must be permissible
for an investor to acquire equity swaps, rather than shares, in part – or indeed entirely – *because* share
ownership is disclosable under § 13(d) while equity swaps are not."[206] He bases this argument on the
premise that "the underlying [i.e., evasive] activity must involve holding a position which is
'beneficial ownership' under the *statute* (Exchange Act § 13(d) or (g)), but would otherwise fall
outside the *rule* – outside the SEC's effort to define the concept of beneficial ownership elsewhere
in Rule 13d-3."[207] With respect, the Court finds the argument unpersuasive.

As an initial matter, the SEC, in the Court's view, has the power to treat as beneficial
ownership a situation that would not fall within the statutory meaning of that term. Section 23(a) of
the Exchange Act[208] grants the Commission the "power to make such rules and regulations as may
be necessary or appropriate to implement the provisions of this chapter for which [it is] responsible

---

[206]      Letter from Bernard Black to Brian G. Cartwright, General Counsel of the SEC (May 29, 2008), at 4-5 (emphasis in original).

[207]      *Id.* at 5 (emphasis in original).

[208]      15 U.S.C. § 78w(a).

71

. . . ."[209]  The validity of a rule or regulation promulgated under such a grant of authority will be

sustained so long as it is "reasonably related to the purposes of the enabling legislation."[210]

The purpose of Section 13(d) is to alert shareholders of "every large, rapid aggregation

or accumulation of securities, regardless of technique employed, which might represent a potential

shift in corporate control."[211]  Rule 13d-3(b) was promulgated to further this purpose by preventing

circumvention of Rule 13d-3 with arrangements designed to avoid disclosure obligations by

preventing the vesting of beneficial ownership as defined elsewhere[212] – in other words, where there

is accumulation of securities by any means with a potential shift of corporate control, but no

beneficial ownership.  As Rule 13d-3(b) therefore is reasonably related to the purpose of the statute,

it is a perfectly appropriate exercise of the Commission's authority even where it reaches

arrangements that otherwise would not amount to beneficial ownership.

---

[209]

*Id.* § 78w(a)(1).

[210]

*See* Amendments to Tender Offer Rules; All-Holders and Best-Price, Exchange Act Release Nos. 33-6653, 34-23421, 51 Fed. Reg. 25,873-01, 25,875 (July 11, 1986); *see also Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973) (quoting *Thorpe v. Housing Auth. of City of Durham*, 393 U.S. 268, 280-81 (1969)); *Polaroid Corp. v. Disney*, 862 F.2d 987, 994-95 (3d Cir. 1988) (sustaining All Holders Rule as within the SEC's rulemaking authority).

[211]

*GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971), *cert. denied* 406 U.S. 910 (1972).

[212]

Adoption of Beneficial Ownership Disclosure Requirements, Exchange Act Release No. 33-5808, No. 34-13291, 42 Fed. Reg. 12,342, 12,344 (Mar. 3, 1977).

72

Second, while it may be debated whether the term "beneficial ownership" as used in the Williams Act is broader than or coextensive with the same language as used in Rule 13d-3(a),[213] one thing is quite clear. If Rule 13d-3(b) reaches only situations that involve beneficial ownership, then it reaches only situations that are reached by Rule 13d-3(a). Professor Black's view thus would render Rule 13d-3(b) superfluous.

\* \* \*

In sum, the Court finds that TCI created and used the TRSs with the purpose and effect of preventing the vesting of beneficial ownership in TCI as part of a plan or scheme to evade the reporting requirements of Section 13(d). Under the plain language of Rule 13d-3(b), it thus is deemed to be a beneficial owner of the shares held by its counterparties to hedge their short exposures created by the TRSs.

B.    *Group Formation*

CSX contends that TCI and 3G violated Section 13(d) because they failed timely to disclose that they had formed a group. TCI and 3G contend that they did not form a group until

---

[213]   The language of the Rule defines the term "[f]or the purposes of sections 13(d) and 13(g) of the Act." 17 C.F.R. § 240.13d-3(a). While the use in the Rule of the term "includes," *inter alia,* makes clear that Rule 13d-3(a)(1) and (2) are not the only criteria that define "beneficial ownership," Rule 13d-3(a) as a whole appears quite plainly to reflect the Commission's intent to define the term exhaustively for purposes of the statute. Curiously, however, the Division's *amicus* letter, without citation of authority, states that the Division "believes that Rule 13d-3, properly construed, is narrower in coverage than the statute."

73

December 12, 2007, and therefore satisfied their disclosure obligations when they filed a Schedule

13D on December 19, 2007.[214]

Section 13(d)(3) provides that "[w]hen two or more persons act as a partnership,

limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of

securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this

subsection."[215] The existence of a group turns on "whether there is sufficient direct or circumstantial

evidence to support the inference of a formal or informal understanding between [members] for the

purpose of acquiring, holding, or disposing of securities."[216] Group members need not "be committed

to acquisition, holding, or disposition on any specific set of terms. Instead, the touchstone of a group

within the meaning of Section 13(d) is that the members combined in furtherance of a common

objective."[217] In this respect, an allegation that persons have formed a group "is analogous to a charge

of conspiracy" in that "both assert that two or more persons reached an understanding, explicit or

tacit, to act in concert to achieve a common goal."[218] The requisite agreement "may be formal or

---

[214]

JX 8.

[215]

15 U.S.C. § 78m(d)(3).

[216]

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,* 286 F.3d 613, 617 (2d Cir. 2002) (internal quotation marks omitted).

[217]

*Wellman,* 682 F.2d at 363; *see Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 124.

[218]

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,* 95 F. Supp. 2d 169, 176 (S.D.N.Y 2000), *aff'd,* 286 F.3d 613.

74

informal, and need not be expressed in writing."[219]  The likelihood that any agreement in this case

would be proved, if at all, only circumstantially is perhaps greater than usual because the parties went

to considerable lengths to cover their tracks.[220]

> The Court already has made detailed findings concerning the defendants' activities and
>
> motives throughout the relevant period.  The most salient points are summarized and, to a large
>
> extent, conveniently depicted on the timeline included in Appendix 2:[221]

- • TCI and 3G have had a close relationship for years, in part because 3G's Synergy Fund is an investor in TCI.

- • January 2007 - Hohn and Behring discuss TCI's investment in CSX, including its approximate size.

- • February 2007 – 3G begins buying CSX shortly after Behring's January conversation with Hohn.

---

[219]

*Hallwood Realty Partners*, 286 F.3d at 617; *see Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994) ("[C]onspiracies are by their very nature secretive operations that can hardly ever be proven by direct evidence.").

[220]

Hohn testified that he was "particularly sensitive to the issue of groups and knowledgeable about when a group is formed and when it is not formed," Tr. (Hohn) at 180, and claims often to have begun conversations with other hedge funds, including 3G, by saying that the two parties were not a group. *Id.* (Behring) at 120.  Furthermore, when TCI approached the line between non-group and group behavior as it viewed it, it sought to limit any paper trail. *See, e.g.*, PX 84; *see also* PX 46, at TCI0345190 ("we cannot be in a group so we are careful on sending models").

[221]

The timeline in the original and official copy of this opinion is in color and larger than the standard 8.5 x 11 inch page.  A reduced, black and white copy is included in the electronically filed version.

Case 1:08-cv-02764-LAK    Document 106-7    Filed 07/30/2008    Page 79 of 130
Case 1:08-cv-02764-LAK    Document 96    Filed 06/11/2008    Page 79 of 130

75

- On or about February 13, 2007 – Hohn speaks to his "friend Alex" Behring about CSX as a result of market excitement regarding CSX attributable in whole or part to 3G's heavy buying.

- At about the same time, Hohn begins tipping other funds to CSX, which continues for some time. This is an effort to steer CSX shares into the hands of like-minded associates.

- March 29, 2007 – Amin and Behring meet.

- March 29, 2007 – 3G resumes CSX purchases after hiatus.

- March 29, 2007 through April 18, 2007 – TCI increases its overall (shares plus swaps) position by 5.5 million shares, or 1.2 percent of CSX. 3G increases its position by 11.1 million shares, or 2.5 percent of CSX.

- August to September 2007 – Hohn becomes concerned about possible reregulation. Both 3G and TCI reduce their CSX exposures, although 3G to a proportionately greater extent than TCI.

- Late September - October 2007 – TCI tells D.F. King it probably will mount proxy contest. Hohn and Behring meet on September 26, 2007. Both TCI and 3G resume increasing their positions in the wake of the meeting. Both begin looking for director nominees.

These circumstances – including the existing relationship, the admitted exchanges of views and information regarding CSX, 3G's striking patterns of share purchases immediately following meetings with Hohn and Amin, and the parallel proxy fight preparations – all suggest that the parties' activities from at least as early as February 13, 2007, were products of concerted action

76

notwithstanding the defendants' denials. Defendants nevertheless argue strenuously that they did not

form a group until December 2007.

Perhaps their most significant point is the assertion that 3G's sale of 40 percent of its

holdings in August to September 2007 is inconsistent with concerted action because TCI did not act

accordingly. But the argument ultimately is unpersuasive for at least two reasons.

First, while it is true that TCI did not reduce its exposure by a like proportion (40

percent), TCI and 3G in that period shared misgivings about being as heavily exposed to CSX as they

then were. TCI also reduced its exposure, albeit by a smaller percentage. The difference may be

characterized as static. Moreover, what is most striking about this period is not that the two entities

reduced their exposure asymmetrically. It is that 3G began increasing its exposure again less than a

week after TCI decided to launch a proxy fight and on precisely the same day that Amin and Behring

met – September 26, 2007. In other words, the parties shared misgivings in August-September when

they were reducing their positions, but they got back on the track, so to speak, that they had been on

previously by late September.

Second, even assuming, for the sake of argument, that 3G's August-September sales

were, in whole or in part, not within the mutual contemplation of the defendants, that would not

necessarily foreclose a finding that they acted as a group. Co-conspirators and members of cartels

act on their own from time to time. While this is a fact entitled to be considered in determining

whether an agreement existed and, if so, its terms and duration, the weight to be given to it depends

upon the circumstances.[222]

---

[222]

See, e.g., United States v. Beaver, 515 F.3d 730, 739 (7th Cir. 2008) ("It is not uncommon
for members of a price-fixing conspiracy to cheat on one another occasionally, and evidence

77

Defendants rely heavily also on the Court's bench opinion in *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*[223] and, in particular, on its observations that relationships and communications among people and parallel investments in the same company, even where coupled with a motive to avoid discovery, do not *necessarily* require the conclusion that the actors formed a group. That of course is true. Equally true, however, is that these and other factors all are relevant to the question.[224] Each case presents the issue whether the trier of fact is persuaded by a preponderance of the evidence that the defendants before it formed a group. Each turns on its own facts. So *Hallwood Realty* does not decide this case, although it certainly is pertinent.

In the last analysis, the question comes down to whether this trier of fact, having considered all of the circumstantial evidence – including the frequent lack of credibility of Hohn, Amin, and Behring and the inferences to be drawn therefrom – is persuaded that TCI and 3G formed a group with respect to CSX securities earlier than they claim. It finds that they did so no later than February 13, 2007.

### C.    Alleged Schedule 13D Deficiencies

CSX contends that the TCI-3G Schedule 13D was materially false and misleading because it (1) failed accurately to disclose their beneficial ownership of CSX common stock by falsely

---

of cheating certainly does not, by itself, prevent the government from proving a conspiracy.").

[223]

No. 00 Civ. 1115 (LAK) (S.D.N.Y. dated Feb. 23, 2001), *aff'd, Hallwood Realty Partners, L.P.,* 286 F.3d 613.

[224]

*Id.; see Wellman,* 682 F.2d at 363-65 (relying, *inter alia,* upon communications and common objectives among putative members to sustain "group"finding).

78

disclaiming beneficial ownership of the shares referenced in the swaps, (2) misrepresented the date

of group formation and the beneficial ownership of the group's holdings, (3) failed to disclose

information concerning contracts, arrangements, understandings, or relationships among group

members and others, and (4) failed to disclose plans or proposals as to CSX's business or corporate

structure.

### 1.    *Legal Standard*

A beneficial owner of greater than 5 percent of a class of any equity security is required

to disclose, within ten days of acquiring that position, the information contained in Section

13(d)(1)(A) - (E) on a Schedule 13D.[225]  "A duty to file under [Section] 13(d) creates the duty to file

truthfully and completely."[226]  Section 13(d) is violated only to the extent that any misstatement or

omission is material, viz. "there is a substantial likelihood that a reasonable shareholder would

consider it important in making an investment decision."[227]

### 2.    *Beneficial Ownership*

CSX contends that defendants' Schedule 13D is materially misleading because it (1)

fails to include the shares referenced in the TRSs in the aggregate of shares beneficially owned and

---

[225]

15 U.S.C. § 78m(d)(1).

[226]

*United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir.), *cert. denied*, 502 U.S. 813 (1991).

[227]

*Id.* (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (noting that to satisfy the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

79

(2) disclaims beneficial ownership over those shares. Whether because TCI and 3G beneficially own those shares under Rule 13d-3(a), which the Court does not decide, or because they are deemed to beneficially own them under Rule 13d-3(b), as the Court has held, the 13D in fact was misleading. Nevertheless, the 13D disclosed the entirety of defendants' position in CSX and the manner in which it was held. It therefore was not materially so. In any case, the facts now are widely disseminated.

### 3.    Group Formation

CSX asserts that the Schedule 13D is materially misleading because defendants fail to disclose (1) the correct date on which the group was formed, and (2) an accurate number of shares beneficially owned by the group.

The latter contention fails for the reason discussed above. And although the failure to file a Schedule 13D disclosing the existence of a group within ten days of its formation violated Section 13(d), the information that was material when the Schedule 13D belatedly was filed was the existence of the group, not the date of its formation. No reasonable investor, aware of the existence of a group, would find the date on which the group was formed to be important in making an investment decision.[228]

---

[228]

See Standard Metals Corp. v. Tomlin, 503 F. Supp. 586, 603-04 (S.D.N.Y. 1980) (disclosure of the existence of a group renders the date of formation "relatively immaterial").

80

### 4.    *Contracts, Arrangements, Understandings, or Relationships*

Item 6 of Schedule 13D mandated disclosure of any contracts, arrangements, understandings, or relationships with respect to any CSX securities. CSX contends that defendants failed to disclose material terms of their swap agreements, the number of shares referenced in each, and the aggregate number of shares referenced in all of their swaps, and failed to file the swap agreements under Item 7. Moreover, CSX asserts that 3G failed to disclose the material terms of its credit default swaps.

Defendants disclosed that (1) they had swaps and the counterparties to those swaps, (2) the aggregate percentage of shares that were referenced in those swaps, and (3) 3G had credit default swaps. Moreover, they disclosed in Item 5 that they had calculated the percentages of their holdings based on the assumption that CSX had 420,425,477 shares outstanding.[229] While defendants might have disclosed more, what they omitted was not material. Further, assuming *arguendo* that defendants should have included the actual swap agreements in Item 7, their failure to do so was *de minimis*.[230]

### 5.    *Plans or Proposals*

The statement in the 13D that defendants "originally acquired Shares for investment in the ordinary course of business because they believed that the Shares, when purchased, were

---

[229]

JX 8 (Items 5 and 6).

[230]

The Court doubts whether any reasonable investor would have found those agreements, some of which exceeded 100 pages, important in making an investment decision.

81

undervalued and represented an attractive investment opportunity"[231] was accurate in a limited sense

but was false and misleading because it misrepresented the fact that TCI intended from the outset to

bring about changes in the policies and, if need be, management of CSX. Nevertheless, defendants'

present plans and intentions are plain from the additional paragraphs in Item 4 and the letters attached

as Exhibits 2 and 3 and incorporated by reference into Item 4. In light of these disclosures, the false

statement concerning defendants' reasons for originally acquiring shares therefore would be unlikely

to have any significant impact on shareholders.[232] The misstatement therefore is not material.


II.     Section 14(a)

CSX contends that defendants made materially false and misleading statements in their

preliminary and definitive proxy statements filed on March 10, April 15, and April 28, 2008,[233]

(collectively the "Proxy Filings") in violation of Section 14(a) of the Exchange Act[234] and Rule 14a-9

thereunder.[235] Specifically, it asserts that defendants (1) failed to disclose the true extent of their

beneficial ownership of CSX shares of common stock by falsely disclaiming beneficial ownership

of shares associated with TRSs, (2) misrepresented the date upon which the TCI-3G group was

formed and the number of shares it beneficially owned, (3) failed adequately to disclose the contracts

---

[231]

JX 8 (Item 4).

[232]

See Int'l Banknote Co., Inc. v. Muller, 713 F. Supp. 612, 621 (S.D.N.Y. 1989).

[233]

JX 12, JX 17, JX 19.

[234]

15 U.S.C. § 78n(a).

[235]

17 C.F.R. § 240.14a-9.

82

with swap counterparties, (4) misrepresented TCI's position with respect to a settlement of the proxy

fight, and (5) set forth a false two-year history of the insurgents' respective transactions in CSX

securities because they failed properly to disclose the swap transactions.

Section 14(a) makes it unlawful to solicit proxies "in contravention of such rules and

regulations as the Commission may prescribe as necessary or appropriate in the public interest or for

the protection of investors."[236]  Rule 14a-9 prohibits the solicitation of proxies "containing any

statement which, at the time and in the light of the circumstances under which it is made, is false or

misleading with respect to any material fact, or which omits to state any material fact necessary in

order to make the statements therein not false or misleading."[237]  A fact is material in a proxy

solicitation "if there is a substantial likelihood that a reasonable shareholder would consider it

important in deciding how to vote."[238]

As an initial matter, CSX's first three bases for contending that the Proxy Filings are

materially false and misleading mirror the challenges it levied against defendants' Schedule 13D

filing.  They fail for the same reason.

CSX next asserts that TCI's statements that it "made many concessions with the hope

of being able to reach an amicable resolution with CSX that would avoid a proxy contest" and,

during the January 2008 negotiations, "indicated willingness to sign a one year stand-still

---

[236]

15 U.S.C. § 78n(a).

[237]

17 C.F.R. § 240.14a-9(a).

[238]

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991); *Resnik v. Swartz*, 303
F.3d 147, 151 (2d Cir. 2002).

83

agreement"[239] were materially false and misleading.  It contends that TCI (1) mischaracterizes Mr. Hohn's approach to the negotiations and (2) fails to mention that Mr. Hohn expressed willingness to enter into a standstill agreement only after negotiations were terminated.

None of these statements is materially false or misleading.  TCI did make concessions during negotiations, a fact demonstrated by Mr. Ward's notes,[240] notwithstanding Mr. Hohn's original position that he wanted all five of his candidates seated on the board.  Moreover, although it is true that Hohn expressed willingness to agree to a standstill only after negotiations had terminated, it is not clear that he knew they had been terminated or that they could not have been resuscitated by such a concession.

Finally, CSX contends that TCI failed to disclose its history of swap transactions over the preceding two years.  Item 5(b)(1)(vi) of Schedule 14A requires that the filing party "[s]tate with respect to all securities of the registrant purchased or sold within the past two years, the dates on which they were purchased or sold and the amount purchased or sold on each such date."[241]  This does not require disclosure of swap transactions.  Notwithstanding that fact, both 3G and TCI disclosed the swap agreements in which they were counterparties.[242]

Accordingly, defendants made no materially misleading statements or omissions in its Proxy Filings and therefore are not in violation of Section 14(a) or Rule 14a-9.

---

[239]
    JX 19, at page 5.

[240]
    *See* DX 306.

[241]
    17 C.F.R. § 240.14a-101.

[242]
    JX 19, at 18.

84

III.    *Section 20(a)*

Section 20(a) of the Exchange Act provides:

"Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."[243]

CSX claims that Messrs. Hohn and Behring are jointly and severally liable for the violation of Sections 13(d). It is undisputed that Messrs. Hohn and Behring, respectively, controlled these entities. The only possible remaining question as to their personal liability relates to their individual culpability.

There is a lively debate in this Circuit as to whether culpable participation is an element of a plaintiff's *prima facie* case under Section 20(a) or, instead, whether lack of culpability is an affirmative defense that must be pleaded and proved by a controlling person in order to escape liability for violations by a controlled person. This Court holds the latter view,[244] which in this case is fatal to the individual defendants because they have neither pleaded nor proved the affirmative defense. In this case, however, the controversy is beside the point. CSX would prevail on this point even if it bore the burden of proving culpable participation.

---

[243]

15 U.S.C. § 78t(a).

[244]

*E.g., In re BISYS Sec. Litig.,* 397 F. Supp. 2d 430, 450-52 (S.D.N.Y. 2005); *In re Parmalat Sec. Litig.,* 375 F. Supp. 2d 278, 307-10 (S.D.N.Y. 2005); *In re NTL, Inc. Sec. Litig.,* 347 F. Supp. 2d 15, 37 n.127 (S.D.N.Y. 2004)

85

Hohn was involved in the day-to-day oversight of the swap agreements from the beginning of TCI's investment in CSX. His focus included ensuring that TCI did not push any counterparty across the five percent reporting threshold. He engaged in discussions with Behring regarding TCI's investments and precipitated the conversation on or about February 13 by which – and probably during which – TCI and 3G formed a group regarding CSX. He was responsible for making a filing under the HSR Act in which TCI said that TCI "intend[ed] to try to influence management in how the company is run,"[245] and he signed the October 16 letter to the CSX board.[246] Hohn signed also the Schedule 13D filed on December 19, 2007.[247]

Behring similarly controlled the day-to-day investment activities of 3G. He spoke with TCI frequently and formed a group with Hohn. He attempted at various times to meet with CSX management and signed a letter to them indicating that 3G had made a Hart-Scott-Rodino filing.[248] He met with Amin on several occasions, during which time the two spoke about their respective investment plans for their TCI holdings and then directed purchases or sales to be made thereafter. Behring also signed the Schedule 13D.

In all the circumstances, Hohn and Behring quite plainly induced the Section 13(d) violations. Hohn nevertheless argues that he relied upon the advice of counsel and therefore acted

---

[245]

PX 87A, at TCI0418758.

[246]

PX 140.

[247]

JX 8.

[248]

PX 105.

in good faith.[249]  The argument relies exclusively on his trial testimony that TCI retained counsel

before it made investments, followed their advice as to what was permissible, and was "aware that

if you held more than 5 percent of a company in physical shares, . . . then derivative positions where

you had economic interests but no voting benefit had to also be disclosed."[250]  The implication is that

he was advised that TCI was not obliged to disclose its derivative position before becoming the

beneficial owner of more than 5 percent of the physical shares.  The argument, however, is not

appropriately considered and in any case unpersuasive.

 During pretrial discovery, CSX sought disclosure, including production of documents,

concerning the legal advice that TCI  had obtained.  TCI and Hohn responded by asserting the

attorney-client privilege to block disclosure.[251]  CSX objects to their now relying on the belatedly and

incompletely disclosed advice of counsel.

 The Court agrees with CSX.  Having blocked discovery of the existence and nature

of any legal advice it sought, Hohn will not now be heard to assert that his actions were consistent

with the advice of counsel and therefore in good faith.[252]  In any case, Hohn's attempt to rely on the

---

[249]

  *See* Docket item 59, at 56-57.

[250]

  Tr. (Hohn) at 187-88.

  The fact that the testimony that TCI relies upon came in response to a question by the Court
is beside the point.  It would be fundamentally unfair for TCI now to assert that it relied
upon the advice of counsel after having prevented CSX from inquiring into what advice was
sought and on what factual predicate, and what advice in fact was given.

[251]

  *See, e.g.,* Docket item 89, at 3-7.

[252]

  *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.,* 90 F. Supp. 2d 277, 296 n.133 (S.D.N.Y.
2000), *aff'd,* 4 Fed. Appx. 81 (2d Cir. 2001) (affirming judgment and finding of bad faith);
*Trouble v. Wet-Seal, Inc.,* 179 F. Supp. 2d 291, 304 (S.D.N.Y. 2001) (party waives advice

87

advice of counsel is not convincing given that he has failed to offer evidence sufficient to permit the

Court to find that TCI fully disclosed all material facts to counsel, that any failure to do so did not

make Hohn's reliance unreasonable, and that Hohn and TCI conformed their actions in all respects

to the advice they received. In fact, Hohn testified at his deposition that TCI did not even ask counsel

whether it needed to disclose its swaps because it thought it already knew the answer.[253]

Accordingly, the Court finds that Hohn and Behring are jointly and severally liable for

the violations of Section 13(d).

IV.    *Notice of Proposed Director Nominee and Bylaw Amendment*

As noted, TCI on January 8, 2008, submitted to CSX a Stockholder Notice of Intent

to Nominate Persons for Election as Directors in which it proposed its slate of candidates for the

board.   Later in January, it sent two supplemental notices regarding its intent to propose an

amendment of the bylaws to allow holders of 15 percent or more of all outstanding CSX shares to call

a special meeting for any purpose permissible under Virginia law.  The January 8 notice,[254] which in

---

of counsel defense by failing to disclose intention to assert that defense during discovery);
*In re Buspirone Antitrust Litig.,* 208 F.R.D. 516, 521-24 (S.D.N.Y. 2002) (similar);  *In re
Worldcom, Inc. Sec. Litig.,* No. 02 Civ. 3288 (DLC), 2005 WL 600019 (S.D.N.Y. Mar. 15,
2005) (denying leave to amend to assert advice of counsel defense given lack of notice
during discovery); *In re Worldcom, Inc. Sec. Litig.,* No. 02 Civ. 3288 (DLC), 2005 WL
627721 (S.D.N.Y. Mar. 16, 2005) (same); *see Bilzerian,* 926 F.2d at 1292.

[253]

Docket item 90, Ex. 15, at 139:19-140:5.

[254]

PX 159.

88

this respect was incorporated into the supplemental notices,[255] avowed that TCI beneficially owned

8.3 percent of CSX's shares, a figure that did not include the shares referenced under its TRSs.

Article I, Section 11(a)(i), of CSX's bylaws provides in substance that any shareholder

of record as of the appropriate date may nominate persons for election and propose business to be

considered by the shareholders provided, in relevant part, that the shareholder "complies with the

notice procedures set forth in . . . Section 11."[256]  Section 11(c)(i) makes clear that "[o]nly such

persons who are nominated in accordance with the procedures set forth in . . . Section 11 shall be

eligible . . . to serve as directors and only such business shall be conducted at a meeting of

shareholders as shall have been brought before the meeting in accordance with the procedures set

forth in . . . Section 11."[257]  Section 11(a)(ii) states in pertinent part that a shareholder's notice:

> "shall set forth . . . (C) as to the shareholder giving the notice and the beneficial
> owner, if any, on whose behalf the nomination or proposal is made . . . (2) the class
> and number of shares of capital stock of the Corporation that are owned beneficially
> and of record by such shareholder and such beneficial owner."[258]

CSX's position is simplicity itself.  Defendants, it argues, beneficially owned the

shares referenced by their TRSs.  Accordingly, it argues, defendants' statement in the notice that they

beneficially owned 8.3 percent of CSX's shares did not accurately disclose their beneficial ownership

---

[255]
    JX 9, 10.

[256]
    JX 30, at 4.

[257]
    *Id.* at 7.

[258]
    *Id.* at 5.

89

in compliance with the bylaws in consequence of which the notice was deficient. The response to this argument is equally simple.

Assuming for purposes of discussion that the defendants were beneficial owners of the shares referenced by their TRSs within the meaning of Rule 13d-3, and assuming further that the definition of the term "beneficial owner" in the bylaws is coextensive with that in the Rule, the fact remains that the defendants' swap positions were disclosed in Annex E to the notice. Under Virginia law, corporate bylaws are construed in accordance with principles used in construing statutes, contracts, and other written instruments.[259] The essential purpose of the notice provision having been satisfied by the defendants' disclosure of their interest, they have complied with its requirements in substance if not in all trivial particulars.[260] That is all that was required. Moreover, it ill behooves CSX, which asks the Court to focus on substance rather than form in determining whether defendants' swaps gave them beneficial ownership of the referenced shares held by their counterparties, to exalt form over substance in construing defendants' notice by disregarding the fact that defendants disclosed the swap positions, albeit without characterizing those positions as giving them beneficial ownership. This is especially so because CSX drafted its own bylaw and thus could have defined beneficial ownership in a manner that would have required the precise disclosure that it here contends was required.

---

[259]

*Virginia High Sch. League, Inc. v. J.J. Kelly High Sch.*, 254 Va. 528, 531 (1997).

[260]

*See, e.g., Akers v. James T. Barnes of Washington, D.C.*, 227 Va. 367, 370-71 (1984) ("Substantial compliance with reference to contracts, means that although the conditions of the contract have been deviated from in trifling particulars not materially detracting from the benefit the other party would derive from a literal performance, he has received substantially the benefit he expected, and is, therefore, bound to pay.") (emphasis removed).

90

Accordingly, CSX's attack on defendants' notice is without merit.


## V.    Counterclaims

Defendants have asserted counterclaims against CSX and Ward. They allege that CSX's proxy solicitations are materially false and misleading in violation of Section 14(a) and that Ward is liable for this violation under Section 20(a). They claim also that a by-law amendment adopted by the CSX board on February 4, 2008 (the "Amendment") violates Virginia law. They seek declaratory and injunctive relief.


### A.    Section 14(a) Claim

Section 14(a) of the Exchange Act prohibits the solicitation of proxy materials in contravention of rules and regulations prescribed by the SEC.[261]   Rule 14a-9 prohibits proxy solicitation:

> "by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."[262]

Thus, an "omission of information from a proxy statement will violate [Section 14(a)] if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or

---

[261]    15 U.S.C. § 78n(a).

[262]    17 C.F.R. § 240.14a-9(a).

91

the omission makes other statements in the proxy statement materially false or misleading."[263] "In the context of a proxy solicitation, a statement is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'"[264]

### 1.    Target Awards Under the Long Term Incentive Plan

Defendants argue that the CSX proxy statement is incomplete and misleading in its disclosure of the long term incentive compensation awarded to executives and employees.

On May 1, 2007, CSX's compensation committee submitted and the board adopted the CSX 2007-2009 Long Term Incentive Plan ("LTIP"), which set target awards for covered executives and employees. The target awards are measured in CSX shares. They are not grants of shares, but establish the possibility of future compensation. Actual awards may be adjusted depending, *inter alia*, on performance. The target award, measured in CSX shares, however, serves as the benchmark for any adjustments. The value of CSX shares on the date of the target awards therefore affects the range of potential actual awards.

---

[263]     *See Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002).

[264]     *Resnik*, 303 F.3d at 151 (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991)).

92

The CSX compensation committee and the board possessed material non-public information at the time it set the target awards.[265]  However, the board did not coordinate setting the target awards with the disclosure of material non-public information.[266]

The CSX proxy describes the timing of the performance grants as follows:

"Beginning with the 2006-2007 and 2006-2008 [LTIP], the [Compensation] Committee adopted the practice of granting target awards at the May meeting of the Committee, which is the first regular meeting following receipt in April by the Committee and the Board of the Company's business plan for the upcoming three-year period . . . ."[267]

Defendants argue that this is inadequate because it does not disclose that the company set the performance grants while in possession of material non-public information.

SEC rules require that a proxy statement "explain all material elements of the registrant's compensation of the named executive officers," including the information specified in Item 402 of Regulation S-K.[268]  Regulation S-K explains that "[h]ow the determination is made as to when [compensation] awards are granted, including awards of equity-based compensation," may be a material element of compensation.[269]  An SEC release further explains that under these regulations, a company should disclose if it had or intends to have "a program, plan or practice to select option grant dates . . . in coordination with the release of material non-public information. . .

---

[265]

  *See, e.g.,* PX 4 at 5; PX 267 (Munoz) ¶ 21; PX 265 (Richardson) ¶ 13.

[266]

  PX 265 (Richardson) ¶¶ 12, 14.

[267]

  JX 5, at 27.

[268]

  17 C.F.R. § 240.14a-101 (Item 8).

[269]

  17 C.F.R. § 229.402(b)(2)(iv).

93

."[270]  Thus, if CSX had a program, plan or practice to coordinate the timing of the grants with the

release of material non-public information, that practice should have been disclosed in the proxy

materials.  But there is no convincing evidence that CSX had such a practice.  Furthermore, disclosure

of the fact that the compensation committee possessed material non-public information at the time

they set the target awards is not necessary to make other statements not false or misleading.


2.    *The CSX Board's Compliance With CSX Insider Trading Policy*

Defendants argue that the CSX proxy statement is materially misleading because it

fails to disclose that the board violated the company's insider trading policy.

CSX's policy provides that "[n]o CSX officer, employee or director . . . may purchase,

sell or otherwise conduct transactions in any CSX security while he or she is aware of material

nonpublic information about CSX."[271]  It further prohibits any officer, employee, or director from

---

[270]

Executive Compensation and Related Person Disclosure, Exchange Act Release Nos.
33-8732A, 34-54302A, 71 Fed. Reg. 53,158, 53,163-64 (Sept. 8, 2006).  CSX argues that
the performance grants are not options and thus fall outside of this regulation.  But the SEC
release makes clear that this disclosure should be made with regard to "the award of stock
options and other equity-based instruments."  *Id.* at 53,165.  The SEC's Division of
Corporation Finance confirms this.  SEC, Item 402 of Regulation S-K - Executive
Compensation, Questions & Answers of General Applicability, Question 3.01,
http://www.sec.gov/divisions/corpfin/guidance/execcomp402interp.htm.    That the
performance grants are subject to later adjustment is immaterial because the trading price
on the date of the grant determines the number of shares that can be earned.  If the grants
were made just prior to the release of material non-public information that increased the
trading price, then the monetary value of the grants would appear artificially small.  It is this
type of timing, if done as part of a program, plan, or practice, that should be disclosed under
the regulation and guidance.

[271]

JX 27, at 1.

94

engaging in transactions in CSX securities during certain "blackout periods."[272]  The policy defines

"CSX security" broadly to include "any derivative instrument (including, but not limited to contracts,

swap agreements, warrants and rights), the value of or return on which is based on or linked to the

value of or return on any CSX security."[273]

As described above, on May 1, 2007, the compensation committee and the board set

the target awards for the 2007-2009 LTIP while in possession of material non-public information.

In addition, on December 12, 2007, the board granted 5,000 shares of common stock to each non-

employee director,[274] pursuant to the CSX Stock Plan for Directors, which  allows directors to grant

themselves shares on a discretionary basis at any time and upon such terms as the board deems fit.[275]

The size and timing of this grant was consistent with discretionary grants made in prior years, and did

not depend on the market value of the shares on the day of the grant.[276]  The board's December 12,

2007, grants were made during a blackout period as defined by the insider trading policy.

Defendants argue that the board violated CSX's insider trading policy by (1) setting

the 2007-2009 LTIP target awards while in possession of material non-public information, and (2)

making discretionary share grants to directors during a blackout period.  Defendants argue that the

proxy statement is materially misleading because it does not disclose these violations.

---

[272]

  *Id.* at 3.

[273]

  *Id.* at 1.

[274]

  PX 14, at 8.

[275]

  JX 5, at 15.

[276]

  PX 269 (Fitzsimmons) ¶ 10.

95

The Court is not persuaded that the insider trading policy, which by its terms applies to transactions of an officer, employee or director, applies also to transactions of the board when it acts as a board. Furthermore, assuming *arguendo* that these transactions violated the insider trading policy, the defendants do not articulate how the omission of this fact renders any statement in the proxy statement materially false or misleading. It is not sufficient that defendants characterize a violation of the insider trading policy as a breach of the board's fiduciary duty. "[N]o general cause of action lies under § 14(a) to remedy a simple breach of fiduciary duty."[277]

In any case, the proxy statement discloses the facts and circumstances of these transactions. Defendant's complaint is merely that CSX should have described the transactions as violations of its insider trading policy. But the disclosure rules do not oblige CSX to describe these transactions in pejorative terms.[278]

The Court is not persuaded that the transactions by the board violated CSX's insider trading policy. But assuming, *arguendo*, that these transactions constitute breaches of the board's fiduciary duties, the Court concludes that the CSX proxy statement is not materially false or misleading by its failure to disclose those breaches.

---

[277]

*Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999); *see Va. Bankshares*, 501 U.S. at 1098 n.7 ("Subjection to liability for misleading others does not raise a duty of self-accusation; [rather] it enforces a duty to refrain from misleading.")

[278]

*In re: PHLCORP Sec. Tender Offer Litig.*, 700 F. Supp. 1265, 1269 (S.D.N.Y.1988) (stating, in a § 14(e) case, that as long as the relevant underlying facts are disclosed, the securities laws do not require insiders to characterize conflict of interest transactions with pejorative nouns or adjectives); *see GAF Corp. v. Heyman*, 724 F.2d 727, 740 (2d Cir. 1983).

96

### 3.   CSX's Belief that TCI Seeks Effective Control

Defendants argue that CSX's statements that it believed that TCI was seeking "effective control" of the board[279] are materially false and misleading.

TCI has nominated only five candidates for election to a twelve-member board.[280] Although this would not be a majority, TCI told CSX that it would use this position to influence the work of the board.[281]  Based on this and other experiences with TCI,[282] CSX honestly believed that TCI was seeking effective control.[283]

Statements of opinion may be materially false and misleading if the opinion is both objectively and subjectively false.[284]  The defendants argue that CSX could not have believed that TCI was seeking effective control of the board because TCI has nominated only a minority slate of directors.  Thus, the defendants seek to define effective control as being nothing less than a majority of the board.   This is not the natural implication of the phrase as used by CSX in these

---

[279]

Such statements were made in the Board's February 14, 2008, letter to Hohn (DX 79) and in CSX's March 17, 2008, press release (DX 86).  CSX has filed both of these documents as additional solicitation material pursuant to Rule 14a-12.

[280]

JX 17, at 1.

[281]

PX 266 (Kelly) ¶ 25 (Kelly understood Hohn to have threatened to create a dissident board that could disrupt the operation of the board).

[282]

*See, e.g.*, PX 108 (indicating that TCI might attempt to replace the entire board); PX 111 (same).

[283]

PX 266 (Kelly) ¶ 27.

[284]

*Virginia Bankshares*, 501 U.S. at 1095-96; *Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074 (JSM), 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003); *In re: McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1260, 1265 (N.D.Cal. 2000).

97

circumstances.[285]  Indeed, the February 14, 2008, letter acknowledges specifically that TCI had

nominated only a minority slate before concluding that TCI sought effective control.  Because

effective control often is understood to mean something considerably less than a majority position,

there is no conflict between CSX's knowledge that TCI has nominated a minority slate and its opinion

that TCI hopes to use that position to exert effective control.  Accordingly, the Court concludes that

these statements are not materially false or misleading.

### 4.    TCI's Proposal Regarding Capital Expenditures

Defendants argue that Michael Ward's statement[286] that "one hedge fund . . . actually

demanded that CSX freeze investment in its rail system" is materially false and misleading.  It has

suggested, it says, only that CSX freeze all *growth* investment pending congressional action on a re-

regulation bill.[287]

CSX argues that Ward's statement is true because Ward believed and continues to

believe that it is true.  But Ward's belief is not relevant – this statement is one of fact, not opinion.

Ward's statement inaccurately represents that TCI suggested that CSX freeze all as opposed to a

particular type of investment.  But this does not get defendants where they want to go.

---

285

> For example, TCI's proxy solicitor, D.F. King, expressed the opinion that "the loss of
> confidence expressed by shareholders in electing a short-slate dramatically alters long-
> standing board alliances and creates opportunities for change."  PX 135.

286

> This statement was made in a March 11, 2008, opinion article by Michael Ward published
> in the *Washington Times*.  DX 184.  CSX filed the article as additional soliciting material.

287

> *See, e.g.*, DX 47, 83, 82 at 99, 152-54; PX 96, 121.

98

In order to violate Rule 14a-9, a misleading statement must be made with respect to a material fact. The relevant question therefore is whether there is "a substantial likelihood that a reasonable investor would consider [TCI's position on non-growth investment] important in deciding how to vote."[288]

Whether this is a material fact in the context of this proxy fight is a close question. One of the matters that shareholders will be asked to decide is whether to vote for the minority slate nominated by TCI. The directors' recommendation about how to vote is likely to be material to such a decision, and the directors' reasons for a recommendation also may be material.[289] When the Supreme Court evaluated the materiality of false statements in *Virginia Bankshares*, it observed that "[n]aturally . . . the shareowner faced with a proxy request will think it important to known the directors' belief about the course they are recommending and their specific reasons for urging the stockholders to embrace it."[290]

An argument for finding materiality in this case is that Ward, by describing TCI's proposal inaccurately, was able to make the board's recommendation to vote against the TCI slate more persuasive. Faced with a somewhat similar circumstance, the D.C. Circuit concluded that it

---

[288]

*Resnik*, 303 F.3d at 151 (quoting *Virginia Bankshares*, 501 U.S. at 1090).

[289]

*See Virginia Bankshares*, 501 U.S. at 1090-91 ("We think there is no room to deny that a statement of belief by corporate directors about a recommended course of action, or an explanation of their reasons for recommending it, can [be material].")

[290]

*Id.* at 1091.

would be intolerable to allow someone to claim that a fact is immaterial after relying on that fact to make a decision appear well informed.[291]

While such an outcome might be troubling, it does little to explain whether a fact is material. A trivial fact does not become material merely because it is related to a material fact. For example, if a false reason is given for a decision but the false reason is trivial, then it is unlikely that it did much to make the decision appear well reasoned and it remains a trivial fact.

In the circumstances of this case, the Court is not persuaded that there is a substantial likelihood that a reasonable investor would consider this important in deciding how to vote. Accordingly, Ward's statement did not violate the law.

5.      *The CSX-TCI Negotiations*

In a March 17, 2008, CSX press release, CSX's lead director, Mr. Kelly is quoted as saying: "In an effort to avoid the disruption and expense of a proxy contest [CSX has] spoken with TCI on a number of occasions in an attempt to find common ground."[292] Defendants claim this statement is materially false and misleading.

The CSX board asked Kelly, as presiding director of the CSX board, to meet with Hohn to assess whether a proxy contest could be avoided.[293] Early in the negotiations, Ward

---

[291]

   *Berg v. First Am. Bankshares, Inc.*, 796 F.2d 489, 496 (D.C. Cir. 1986).

[292]

   DX 86.

[293]

   PX 266 (Kelly) ¶ 21.

100

encouraged Kelly to end the negotiations and kill any agreement.[294]  But the CSX board asked Kelly

to continue negotiations with Hohn, which he did.[295]  As the negotiations proceeded, both sides

discussed possible concessions.[296]  Ultimately, the negotiations ended without an agreement.[297]

Defendants claim that CSX had no intention of finding common ground with TCI, and

that its statement to the contrary therefore is materially false and misleading.  TCI provides no

evidence to support this claim.  Defendants focus on Ward's intention to end the negotiations and

CSX's post-negotiation strategy to win the proxy contest,[298] but neither of these facts suggest that

CSX approached the negotiations in January with no intent to find common ground.

There is no evidence that CSX had no intention of finding common ground with TCI.

Defendants, therefore, cannot establish that Kelly's statement is materially false or misleading.

---

[294]

Tr. (Ward), at 13:9-14; 13:21-23; 16:21-24.

[295]

PX 15, at 2-3; PX 266 (Kelly) ¶¶ 21-22.

[296]

*See, e.g.*, PX 266 (Kelly) ¶ 23; DX 144 (Hohn) ¶¶ 45-47.

[297]

*See* PX 169.

[298]

Although Ward admits that CSX's current plan is to "deploy offense and defense with the goal of zero dissidents," there is no evidence that CSX adopted this plan while the negotiations with TCI were ongoing.  *See* Tr. (Ward) at 22:2-23:7; DX 307 (notes from meeting that occurred after end of negotiations).

101

6.    *CSX's Purposes in Bringing this Lawsuit*

CSX's March 17, 2008, press release quotes Mr. Ward as saying that "[CSX] filed this suit . . . to ensure that all of our shareholders receive complete and accurate information."[299] Defendants argue that this statement is materially false and misleading.

Speaking bluntly, this contention does not warrant a serious response. If the American people do not know that not every protestation of high motive, made in a contested election, can be taken literally, there is not much hope for any of us.

B.    *Declaratory Relief Regarding By-Laws Amendment*

On February 4, 2008, the CSX board adopted an amendment to the CSX bylaws under which shareholders of record representing at least fifteen percent of the outstanding shares of CSX's stock may call a special meeting for certain limited purposes.[300] The Amendment does not allow special meetings to be called to elect or remove directors.[301] CSX management is seeking shareholder ratification of the Amendment at the upcoming shareholder meeting.[302]

---

[299]

DX 86.

[300]

JX 5, at 54; JX 30, at Art. I, § 2(b) (the amendment).

[301]

Although the Amendment does not preclude specifically the use of special meetings for the election or removal of directors, its terms achieve that effect. *See* DX 266 (Kelly ¶ 7).

[302]

JX 5, at 54.

102

CSX's Articles of Incorporation do not limit the circumstances in which directors may be removed.[303]  Its shareholders thus have the power to remove directors with or without cause,[304] although "[a] director may be removed . . . only at a meeting called for the purpose of removing the director."[305]

Defendants argue that the Amendment is void because it prevents shareholders from calling a special meeting to remove a director without cause and therefore prevents the shareholders from exercising their right to remove directors without cause.  This argument is flawed.  First, Virginia law does not guarantee shareholders the right to call special meetings.[306]  Second, the Amendment does not change shareholders' ability to call special meetings to remove directors – they were not able to call a special meeting to remove directors before its adoption.  Finally, although the Amendment does not allow shareholders to call a special meeting for the purpose of removing a director, others are authorized to do so.[307]

---

[303]

*See* DX 98.

[304]

VA. CODE § 13.1-680.

[305]

*Id.*

[306]

Rather, shareholders are only able to call a special meeting if the articles or bylaws of the corporation authorize it. VA. CODE § 13.1-655.

[307]

VA CODE § 13.1-655 provides that "[a] corporation shall hold a special meeting of shareholders . . . [o]n call of the chairman of the board of directors, the president, the board of directors . . . ."

103

VI.    *Relief*

CSX seeks several forms of injunctive relief, some of it far reaching.

In considering its request, it is well to bear in mind that courts in this circuit have found an implied private right of action for issuers – such as plaintiff – to bring claims for injunctive relief for violations of Sections 13(d) and 14(a)[308] on the premise that the "congressional purpose was furthered by providing issuers with the right to sue 'to enforce [the] duties created by [the] statute.'"[309] Allowing an issuer to seek injunctive relief "furthers the object of § 13(d) by increasing honest disclosure for the benefit of investors without placing incumbent management in a stronger position than aspiring control groups."[310]  This principle informs the scope of relief available to an issuer-plaintiff like CSX.

In private actions under the securities laws, relief is "determined according to traditional principles. Thus, [CSX] must succeed on the merits and 'show the absence of an adequate remedy at law and irreparable harm if the relief is not granted.'"[311]  Further, to obtain an injunction

---

[308]

> *See, e.g., GAF Corp. v. Milstein,* 453 F.2d 709, 720 (2d Cir. 1971) (§13(d)), *cert. denied,* 406 U.S. 910 (1972); *Capital Real Estate Investors Tax Exempt Fund Ltd. P'ship v. Schwartzberg,* 929 F.Supp. 105, 108-09 (S.D.N.Y. 1996) (§ 14(a)). *See also Rondeau,* 422 U.S. at 62-63 (securities laws generally); *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366, 371 (6th Cir.1981) (§ 14(a)), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982).

[309]

> *Hallwood Realty Partners, L.P.,* 286 F.3d at 620.

[310]

> *Id.* at 620-21.

[311]

> *Roach v. Morse,* 440 F.3d 53, 56 (2d Cir. 2006) (quoting *N.Y. State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989) (citing *Rondeau,* 422 U.S. at 57)). The Court applies the standard for a permanent injunction because this case was tried on the merits, pursuant to FED. R. CIV. P. 65(a)(2).

based on a violation of Section 13(d), the irreparable harm must be to those interests which that section seeks to protect.[312]

## A.     Success on the Merits

The Court has found that the defendants violated Section 13(d) in that (1) TCI did not file the required disclosure within 10 days of acquiring beneficial ownership in 5 percent of CSX shares, and (2) TCI and 3G failed to file the required disclosure within 10 days of forming a group.[313] But the Court has not found that the defendants' Schedule 13D disclosure is false, misleading, or otherwise inadequate as to a material fact.

Nor has the Court found that the defendants violated Section 14(a) or Rule 14d-9. Accordingly, injunctive relief is evaluated in light of the two 13D violations.

The fact that the Court has found no proxy rule violation or material misstatement or omission in the Schedule 13D that belatedly was filed disposes of several of CSX's prayers for relief. There is no basis for ordering corrective disclosure or for voiding proxies that defendants have obtained.  Thus, the only remedies within the range of reasonable consideration are sterilization of

---

[312]

> *ICN Pharm., Inc. v. Khan,* 2 F.3d 484, 489 (2d Cir. 1993) ("[A]n injunction will issue for a violation of § 13(d) only on a showing of irreparable harm to the interests which that section seeks to protect" (quoting *Treadway Cos.,* 638 F.2d at 380); *Capital Realty Investors Tax Exempt Fund Ltd. P'ship v. Dominium Tax Exempt Fund L.L.P.,* 944 F. Supp. 250, 258-599 (S.D.N.Y. 1996) (§ 14); *ONBANCorp, Inc. v. Holtzman,* 956 F. Supp. 250, 256 (N.D.N.Y. 1997) (§ 14); *E. H. I. of Fla., Inc. v. Ins. Co. of N. Am.,* 499 F.Supp. 1053, 1066 (D.C.Pa. 1980) (§ 14). Moreover, when assessing irreparable harm for 13(d) claims, the court is not concerned with the shareholder who already has sold shares at a depressed price. *E.ON AG v. Acciona, S.A.*, 468 F.Supp.2d 537, 557 (S.D.N.Y. 2006) (citing *Rondeau,* 422 U.S. at 59).

[313]

> The Court has found also that Hohn and Behring are personally liable for the violations of TCI and 3G respectively.

105

the shares that defendants acquired during the period when they were out of compliance with Section 13(d), which amounts to about 6.4 percent of CSX's outstanding shares,[314] and an injunction against future disclosure violations.

### B.    Share Sterilization

Plaintiff seeks an injunction prohibiting the voting of any CSX shares owned by the defendants or members of their group at the 2008 annual meeting. It contends that this relief is warranted for two reasons. CSX's shareholders, they maintain, would be harmed irreparably in its absence. In any case, they argue, sterilization of this stock is required to avoid permitted defendants to retain the fruits of their violations and to deter future violations.

### 1.    Irreparable Harm

CSX's irreparable injury argument sweeps too broadly. It offers no persuasive reason to prevent defendants from voting shares that they acquired before they breached any disclosure obligation, so the only proper focus is on the 6.4 percent of CSX shares that they purchased during the period in which they had not satisfied their disclosure obligations. Moreover, any present shareholders who have purchased for the first time after defendants filed their 13D knew what they were getting into and could not be injured in any cognizable way by allowing defendants to vote all their shares. Those current shareholders who have held shares throughout the period, however, may be in a different position. Defendants' actions may have contributed to creating a corporate electorate

---

[314]

Defendants most recently held 8.3 percent of CSX's shares. Of that total, 1.9 percent were acquired by 3G before its disclosure obligation arose upon the expiration of 10 days following the formation of a group with TCI no later than February 13, 2007.

that is materially different today than it was before defendants made those purchases. Those who are content with present management and unconvinced by defendants' blandishments may be in a weaker position than they might have occupied had defendants made full and timely disclosure.[315] That all of the facts now have been disclosed does not alter this prospect. So the question is whether foreclosing defendants from voting the shares they acquired during their violations would avert irreparable injury that otherwise would occur.

In *Rondeau v. Mosinee Paper Corp.*,[316] the Supreme Court addressed the irreparable harm that a private plaintiff must show in order to obtain injunctive relief for a Section 13(d) violation. Rondeau did not file a Schedule 13D until three months after he had acquired more than 5 percent of the issuer's outstanding stock. He acquired an additional 2.5 percent of the outstanding stock before disclosing his position. Although Rondeau admitted violating Section 13(d), the district court found no irreparable harm and denied injunctive relief.[317]

The Court of Appeals reversed. It found irreparable harm because Mosinee Paper "'was delayed in its efforts to make any necessary response to' [Rondeau's] potential to take control." In any case, it concluded, Mosinee "'need not show irreparable harm as a prerequisite to obtaining permanent injunctive relief . . . .'" It remanded with instructions to enjoin Rondeau from voting the shares acquired while in violation of Section 13(d). "It considered 'such an injunctive decree

---

[315]

Had defendants made full and timely disclosure, it is likely that the price of CSX shares would have risen on the prospect of a battle for control.

[316]

422 U.S. 49.

[317]

*Id.* at 51-54.

107

appropriate to neutralize [Rondeau's] violation of the Act and to deny him the benefit of his wrongdoing."[318]

The Supreme Court reversed.  In evaluating the claimed harm, it focused on whether "the evils to which the Williams Act was directed ha[d] occured . . . ."  It concluded that "[o]n this record there is no likelihood that [Mosinee's] shareholders will be disadvantaged should petitioner make a tender offer, or that [Mosinee] will be unable to adequately place its case before them should a contest for control develop."[319]

*Rondeau* does not foreclose the possibility relief such as sterilization for Section 13(d) violations, but it does make clear that a prerequisite to such relief is a showing of irreparable harm. Moreover, the determinative question is whether, absent an injunction, there would be irreparable harm to the interests which Section 13(d) seeks to protect – viz. "alert[ing] investors to potential changes in corporate control."[320]  In consequence, private plaintiffs usually are unable to establish an irreparable harm once the relevant information has been made available to the public.  Second Circuit cases go so far as to suggest, in *dicta*, that irreparable harm can not be established once corrective disclosure is made.[321]

---

[318]
  *Id.* at 56-57.

[319]
  *Id.* at 59.

[320]
  *Kamerman v. Steinberg*, 891 F.2d 424, 430 (2d Cir. 1989) (quoting *GAF Corp.*, 453 F.2d at 720).

[321]
  *ICN Pharm.*, 2 F.3d at 489 ("'[A]n injunction will issue for a violation of § 13(d) only on a showing of irreparable harm to the interests which that section seeks to protect.  Those interests are fully satisfied when the shareholders receive the information required to be filed.'" (citations omitted) (quoting *Treadway Cos.*, 638 F.2d at 380)); *Treadway Cos.*, 638 F.2d at 380 ("Since the informative purpose of § 13(d) had thereby been fulfilled, there was

108

Nonetheless, the Second Circuit in *Treadway* left open the possibility of finding irreparable harm despite corrective disclosure, observing that it would not rule out the possibility that "'disenfranchisement or divestiture may be appropriate'" where a defendant has obtained "'a degree of effective control' as a result of purchases made before it has complied with § 13(d) . . . ."[322] It did not resolve the issue, however, because it regarded the defendants' 31 percent holding of the outstanding shares as insufficient to confer "a degree of effective control."[323] *Treadway* thus stands for the proposition that acquisition of a 31 percent block, partially during a period of noncompliance with Section 13(d) is insufficient to threaten irreparable injury on the remaining shareholders because control has not passed at that level.

It is questionable whether a bright line rule that appears to foreclose the existence of "a degree of effective control" in the absence of a stock holding larger than 31 percent is consistent with commercial realities. One need look no farther than Hohn's threat to Kelly that election of his slate of a minority of directors would permit him to render Ward's future "bleak" and be disruptive in the CSX boardroom[324] to see why that is so. Moreover, courts have recognized that minority

---

no risk of irreparable injury . . . .").

[322]

*Treadway Cos.*, 638 F.2d at 380 n.45 (quoting *Fin. Gen'l Bankshares, Inc. v. Lance,* No. 78-0276, 1978 WL 1082, at *13 (D.D.C., Apr. 27, 1978)).

[323]

This conclusion is consistent with the district court case to which the Circuit cited. In *Financial General Bankshares Inc.*, the Court observed that enjoining any future stock acquisition "might be appropriate if defendants had obtained effective control . . . as a result of purchases made while not complying with section 13(d)." The Court concluded that the defendants had not obtained effective control despite acquiring approximately an additional 15 percent of the outstanding shares. *Fin. Gen'l Bankshares, Inc.,* No. 78-0276, 1978 WL 1082, at *13 (D.D.C. Apr. 27, 1978).

[324]

PX 266 (Kelly) ¶ 25.

109

shareholdings or board representation may confer a degree of control, at least in some

circumstances.[325] But *Treadway* is the law of our Circuit, and this Court is obliged to follow it.

Indeed, plaintiffs have cited no case, in or out of our Circuit, in which irreparable harm was found

because a defendant had obtained a degree of effective control.[326] It necessarily follows that the

alteration of the corporate electorate arguably effected by defendants' actions, which did no more than

increase its likelihood of prevailing in the current contest, cannot be regarded as irreparable injury that

properly may be remedied by preventing the voting of the stock acquired while defendants were in

violation of Section 13(d).[327]

---

[325]

*See, e.g., Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1225 (4th Cir. 1980) (20 percent "frequently is regarded as control of a corporation"); *Standard Fin., Inc. v. LaSalle/Kross Partners, L.P.*, No. 96 C 8037, 1997 WL 80946, at *4-*5 (N.D. Ill. Feb. 20, 1997) (intention to obtain two board seats and to influence company evidenced purpose to exercise control); *Saunders Leasing Sys., Inc. v. Societe Holding Gray D'Albion, S.A.*, 507 F. Supp 627, 633-34 (N.D. Ala. 1981) (intention to acquire 25 percent of issuer "controlling").

[326]

*E.g., Raybestos-Manhattan, Inc. v. Hi-Shear Indus.*, 503 F.Supp. 1122, 1133 (E.D.N.Y. 1980) (quoting *Treadway*, but not finding degree of effective control); *Drobbin v. Nicolet Instrument Corp.*, 631 F.Supp. 860, 913 n.3 (S.D.N.Y. 1986) (same).

[327]

Other courts have observed that the disadvantage to management or to a tender offeror that may result from a shift in the corporate electorate does not an irreparable harm. *See, e.g., Gearhart Indus., Inc. v. Smith Intern., Inc.*, 741 F.2d 707, 715 (5th Cir. 1984) ("Insofar . . . as the injunction is made to rest on disadvantage created to . . . management's resistance to the takeover, the Williams Act does not support it."); *E.ON AG v. Acciona, S.A.*, No. 06 Civ. 8720 (DLC), 2007 WL 316874, at *9 (S.D.N.Y. Feb. 5, 2007) (fact that defendant's substantial stock holdings may make tender offer more difficult does not constitute irreparable harm); *Fin. Gen'l Bankshares, Inc.*, No. 78-0276, 1978 WL 1082, at *12 (no irreparable injury based "unlawful headstart [tender offerors] have obtained in their surreptitious efforts to seize control. . . .").

2.      *Deterrence*

Other courts have suggested that relief beyond corrective disclosure is appropriate, at least in some circumstances, in order to deter violations.[328]  In the main, they have done so in reliance on arguments made by the SEC in an *amicus curiae* brief to the First Circuit where the Commission suggested that, "in determining whether more than corrective disclosure is called for, [a court] should . . . consider (1) whether a substantial number of shares were purchased after the misleading disclosures and before corrective disclosure, (2) whether the curative disclosure occurred simultaneously with or on the eve of a tender offer, and (3) whether the violation was egregious"[329] and argued that "[a]bsent a remedy beyond ordering corrective disclosure, a person will have little incentive to comply with the statute."[330]

The difficulty with this argument is that it is foreclosed by *Rondeau*, where the Supreme Court rejected the contention that the relief ordered in that case was justified, notwithstanding the lack of threatened irreparable injury, by the "public interest" in enforcing the disclosure requirements.[331]  "[T]he fact that [a plaintiff] is pursuing a cause of action which has been generally recognized to serve the public interest," it said, "provides no basis for concluding that it is

---

328

 *See, e.g., San Francisco Real Estate Investors v. Real Estate Inv. Trust of Am.*, 701 F.2d 1000, 1009 (1st Cir. 1983); *Am. Carriers, Inc. v. Baytree Investors, Inc.*, 685 F.Supp. 800, 812-13 (D. Kan. 1988); *Hanna Mining Co. v. Norcen Energy Resources Ltd.*, 574 F.Supp. 1172, 1202-03 (N.D.Ohio 1982).

329

 *San Francisco Real Estate Investors*, 701 F.2d at 1009.

330

 Brief for the SEC as *Amicus Curiae, San Francisco Real Estate Investors v. Real Estate Inv. Trust of Am.*, 701 F.2d 1000 (1st Cir. 1983) [DI 61, Add. B]; *see also Gen. Steel Indus., Inc. v. Walco Nat'l Corp.*, SEC Litig. Release No. 9533, 1981 WL 315222 (Dec. 21, 1981).

331

 *Rondeau,* 422 U.S. at 62, 65.

111

relieved of showing irreparable harm and other usual prerequisites for injunctive relief."[332]  While a

footnote in *Piper v. Chris-Craft Industries, Inc.,*[333] decided two years after *Rondeau,* suggests that

deterrence "possibly" is an appropriate consideration in formulating relief "with respect to the most

flagrant sort of [securities law] violations which no reasonable person could consider lawful,"[334] this

*dictum* is insufficient to overcome *Rondeau's* square holding that threatened irreparable injury is a

*sine qua non* of the sort of relief that CSX seeks here.[335]

Accordingly, this Court holds that a threat of irreparable injury is essential to obtain

an injunction sterilizing any of defendants' voting rights and that plaintiff has failed to establish such

a threat.  Were the Court free as a matter of law, however, to grant such an injunction, whether on the

basis that such relief is warranted to afford deterrence or on another basis, it would do so.


C.       *Enjoining Further Disclosure Violations*

CSX seeks an injunction against further violations of the securities laws.

---

[332]

*Id.* at 64-65.

[333]

430 U.S. 1 (1977).

[334]

*Id.* at 40 n.26.

[335]

Plaintiff cites two post-*Rondeau* cases in which shares were sterilized despite corrective disclosure.  *Champion Parts Rebuilders, Inc. v. Cormier Corp.,* 661 F.Supp. 825 (N.D.Ill. 1987);*General Steel Indus., Inc. v. Walco Nat. Corp.,* No. 81-1410-C, 1981 WL 17552, at *3 (E.D.Mo. Nov. 24, 1981). Both, however, relied on considerations that are inappropriate in light of *Rondeau.*

112

The SEC is authorized by statute to seek such an injunction.[336]  But it "must

demonstrate that there is a substantial likelihood of future [securities] violations . . . ."[337]  In

evaluating whether there is a substantial likelihood of future violations, a court considers

> "the fact that the defendant has been found liable for illegal conduct; the degree of
> scienter involved; whether the infraction is an 'isolated occurrence;' whether
> defendant continues to maintain that his past conduct was blameless; and whether,
> because of his professional occupation, the defendant might be in a position where
> future violations could be anticipated."[338]

Of course, when the SEC appears before the Court seeking an injunction against

further violations, it "appears . . . not as an ordinary litigant, but as a statutory guardian charged with

safeguarding the public interest in enforcing the securities laws."[339]  The SEC therefore is "relieved

. . . of the obligation, imposed on private litigants, to show risk of irreparable injury or the

unavailability of remedies at law."[340]  CSX, a private litigant, however, must demonstrate a threat of

irreparable injury to the interests which Section 13(d) seeks to protect.[341]

---

[336]

15 U.S.C. § 78u(d).

[337]

*SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998) (citing *SEC v. Unifund SAL*, 910 F.2d
1028, 1040 (2d Cir.1990)).

[338]

*Cavanagh*, 155 F.3d at 135 (quoting *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90,
100 (2d Cir.1978)).

[339]

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 809 (2d Cir. 1975).

[340]

*Unifund SAL*, 910 F.2d at 1036 (citations omitted); *also Mgmt. Dynamics, Inc.*, 515 F.2d at
808-09.

[341]

*Rondeau*, 422 U.S. at 57 (addressing, *inter alia,* injunction against future violations);
*Wininger v. SI Mgmt. L.P.*, 33 F. Supp. 2d 838, 847 (N.D.Cal. 1998) (concluding that
plaintiff's request for a permanent injunction was not futile because the Court could issue
a permanent injunction on a showing of irreparable harm).

113

*1.    Probability of Future Violations*

In this case, defendants have committed two violations of Section 13(d) of the Exchange Act.  Both failed to make a timely filing after forming a group.  TCI failed to file within 10 days after being becoming, or being deemed to have become a beneficial owner of more than 5 percent of CSX's shares.

These violations were not products of ignorance.  There is evidence that the use of derivatives such as those at issue here is "a standard technique [in the hedge fund industry] to avoid disclosure of these big stakes."[342]  In any case, TCI deliberately evaded disclosure obligations.  Both defendants were more than cognizant of the obligation to file promptly upon forming a group and, in this Court's view, knew full well, or recklessly disregarded the substantial likelihood, that they had formed a group, this notwithstanding Hohn's incantations and the lack of a formal written agreement.

Both continue to maintain that their actions were blameless and, indeed, testified falsely in a number of respects, notably including incredible claims of failed recollection, to avoid responsibility for their actions.  Both, moreover, are engaged in lines of endeavor in which future violations are far more than a speculative possibility.

In all the circumstances, the Court finds a substantial likelihood of future violations. Defendants have sought to control CSX for over a year.  As obstacles to control surfaced, they adapted their strategy for achieving control, making disclosures only when convenient to their strategy. Defendants' latest strategy for control will be tested at the annual shareholder meeting. And

---

[342]

U.S. Securities and Exchange Commission, *Unofficial Transcript of the Roundtable Discussion on Proxy Mechanics* May 24, 2007 (remarks of Prof. Henry Hu). (Unfortunately, the document is not paginated.)

114

if this strategy is not successful, the Court perceives a substantial likelihood that the defendants would

craft a new strategy for control without regard to their disclosure obligations.

### 2.    Irreparable Injury

The fact that future violations are probable absent an injunction is highly pertinent to

the irreparable injury question.    Defendants' past violations have advanced significantly the

achievement of their objectives.    They likely were able to acquire a larger position in CSX for a price

lower than would have been required had all of the facts been disclosed as and when required.    The

motive for building on that position through concealment remains.    The battle for CSX may not end

with the June 25 annual meeting.    Further Section 13(d) violations could allow defendants to increase

their position to a point of working control.    Remaining shareholders in that event would find

themselves with shares in a corporation with a controlling shareholder and thus deprived of the

opportunity to gain a control premium for their shares.    Corrective disclosure could not remedy that

harm because it would come too late.    In any case, the legal remedy, if any, manifestly would be

inadequate because it would be impossible to determine with any accuracy the price that the

remaining shareholders could have realized if that fact that defendants were in the process of

obtaining working control.    A permanent injunction against future Section 13(d) injunctions therefore

is appropriate.[343]

---

[343]

See, e.g., E.On AG v. Acciona, S.A., No. 06 Civ. 8720 (DLC), 2007 WL 316874, at *10 (S.D.N.Y. Feb. 5, 2007).

115

*Conclusion*

For the foregoing reasons, plaintiff is entitled to a permanent injunction restraining future violations of Section 13(d) of the Exchange Act and the rules thereunder. The counterclaims are dismissed. The Court has concluded that it is foreclosed as a matter of law from enjoining defendants from voting the 6.4 percent of CSX's shares that they acquired between the expiration of to10 days following the formation of the group no later than February 13, 2008 and the date of the trial. If, however, it were free to grant such relief, it would exercise its discretion to do so.

Counsel shall notify the Court no later than 11 a.m. on June 12, 2008 whether an application will be made to this Court for relief pending appeal. In the event that they wish to do so, any application will be heard orally that day in Courtroom 12D at 2:15 p.m.

SO ORDERED.

Dated:        June 11, 2008
Issued at:    3:05 p.m.

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

**Appendix 1**

Case 1:08-cv-02764-LAK    Document 106-7    Filed 07/30/2008    Page 121 of 130
Case 1:08-cv-02764-LAK    Document 96    Filed 06/11/2008    Page 121 of 130

117



## Citigroup Inc.: Holdings of CSX Swaps with TCI and CSX Share Hedges
## 12/12/06 – 1/23/08

No. of Shares (millions)

Legend:
- Citigroup CSX Swap Holdings with TCI
- Citigroup CSX Share Hedges

Note: There was one short swap transaction and one long swap transaction on 1/23/08. Each was for 10,000 shares.

Case 1:08-cv-02764-LAK    Document 106-7    Filed 07/30/2008    Page 122 of 130
Case 1:08-cv-02764-LAK    Document 96    Filed 06/11/2008    Page 122 of 130

118



Credit Suisse: Holdings of CSX Swaps with TCI and CSX Share Hedges
12/5/06 – 12/11/07

No. of Shares
(in millions)

Credit Suisse CSX Swap Holdings with TCI
Credit Suisse CSX Share Hedges

Note:
[1] There is no share hedge data for 12/11/07 provided in either the 5/15/08 and 5/20/08 Credit Suisse productions (CS 000097–1415).

Case 1:08-cv-02764-LAK    Document 106-7    Filed 07/30/2008    Page 123 of 130
Case 1:08-cv-02764-LAK    Document 96    Filed 06/11/2008    Page 123 of 130

119



Deutsche Bank AG: Holdings of CSX Swaps with TCI and CSX Share Hedges
11/27/06 – 12/5/07

Case 1:08-cv-02764-LAK    Document 106-7    Filed 07/30/2008    Page 124 of 130
Case 1:08-cv-02764-LAK    Document 96    Filed 06/11/2008    Page 124 of 130

120



**Goldman Sachs Group, Inc.: Terminations of CSX Swaps with TCI and Sales of CSX Shares**
**4/13/07 – 11/29/07**

No. of Shares (millions)

Note:
[1] Goldman Sachs Group, Inc. only provided data for hedging transactions corresponding to CSX swap terminations with TCI.

Legend:
- Goldman Terminations of CSX Swaps with TCI
- Goldman Sales of CSX Shares

Dates: 4/13/07, 4/18/07, 5/14/07, 11/20/07, 11/21/07, 11/23/07, 11/26/07, 11/27/07, 11/28/07, 11/29/07

Case 1:08-cv-02764-LAK    Document 106-7    Filed 07/30/2008    Page 125 of 130
Case 1:08-cv-02764-LAK    Document 96    Filed 06/11/2008    Page 125 of 130

121



Merrill Lynch & Co. Inc.:  Holdings of CSX Swaps with TCI and CSX Share Hedges
11/13/06 – 2/6/08

No. of Shares
(millions)

■ Merrill Lynch CSX Swap Holdings with TCI
□ Merrill Lynch CSX Share Hedges

Note:
[1] There was a long swap transaction for 1,000 shares on 12/11/07.  There was one short swap transaction and one long swap transaction on 2/6/08.
Each was for 1,000 shares.

Case 1:08-cv-02764-LAK    Document 106-7    Filed 07/30/2008    Page 126 of 130
Case 1:08-cv-02764-LAK    Document 96    Filed 06/11/2008    Page 126 of 130

122



Morgan Stanley:  Holdings of CSX Swaps with TCI and CSX Share Hedges
11/9/06 – 1/24/08

No. of Shares (millions)

■ Morgan Stanley CSX Swap Holdings with TCI
□ Morgan Stanley CSX Share Hedges

Case 1:08-cv-02764-LAK    Document 106-7    Filed 07/30/2008    Page 127 of 130
Case 1:08-cv-02764-LAK    Document 96    Filed 06/11/2008    Page 127 of 130

123



Case 1:08-cv-02764-LAK    Document 106-7    Filed 07/30/2008    Page 128 of 130
Case 1:08-cv-02764-LAK    Document 96    Filed 06/11/2008    Page 128 of 130

124



Morgan Stanley:  Holdings in CSX Swaps with 3G and CSX Share Hedges
8/16/07 – 11/8/07

**Appendix 2**

Case 1:08-cv-02764-LAK    Document 106-7    Filed 07/30/2008    Page 130 of 130
Case 1:08-cv-02764-LAK    Document 96    Filed 06/11/2008    Page 130 of 130

126

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

CSX CORPORATION,
　　　　　　　　Plaintiff-Appellant-Cross-Appellee,

MICHAEL WARD,
　　　　　　　　　　Third-Party-Defendant,

　– against–

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN, and ALEXANDRE BEHRING,
also known as ALEXANDRE BEHRING COSTA,

　　　　Defendants-Third-Party-Plaintiffs-Counter-
　　　　Claimants-Appellees-Cross-Appellants

---

Nos. 08-2899-cv(L),
08-3016-cv(XAP)

On Appeal from the United
States District Court for the
Southern District of New York
No. 08-cv-2764 (Kaplan, J.)

---

## RESPONSE TO THE MOTION OF SNEHAL AMIN TO CORRECT THE JUDGMENT BELOW

Rory O. Millson
Francis P. Barron
David R. Marriott
CRAVATH, SWAINE & MOORE LLP
　825 Eighth Avenue
　　New York, NY 10019
　　　(212) 474-1000

*Attorneys for Plaintiff-Appellant-Cross-
Appellee CSX Corporation*

July 15, 2008

Snehal Amin's motion to seek leave to move the district court to correct its Final Judgment and Permanent Injunction of June 12, 2008 ("Judgment"), is unnecessary and should be denied as a waste of judicial resources. The district court's opinion quite clearly excludes Mr. Amin from personal liability under § 20(a) for the securities violations shown below. Indeed, Mr. Amin's own brief ("Br.") gives the reasons why his motion should not be granted.

*First*, the premise of the motion is wrong. The district court did not find Mr. Amin liable and it did not personally bind him by the injunction. Mr. Amin concedes this. He recognizes with respect to liability that "CSX dropped its Section 20(a) claim against Mr. Amin" and "consistent with that concession . . . Judge Kaplan . . . found only Mr. [Christopher] Hohn and Mr. [Alexandre] Behring liable". (Br. at 3.) Thus, Mr. Amin is clearly not liable. There is therefore little risk that CSX would argue that Mr. Amin was personally enjoined based on a non-existent finding of a prior violation. Not surprisingly, CSX so advised Mr. Amin's counsel. However, Mr. Amin's counsel rejected CSX's offer to stipulate that Mr. Amin is not personally bound by the injunction. Despite this rejection, there is no chance that the district court would ever hold Mr. Amin in contempt, even if CSX were to make such an unfounded application.

*Second*, the relief sought does not make any difference here. Mr. Amin concedes that he is already subject to an injunction against him as an employee, officer, and/or person in active concert with The Children's Investment Fund Management (UK) LLP.

1

(Br. at 4.)  The Judgment enjoins him from violations of the securities laws even absent

personal liability under § 20(a).  Nothing in Mr. Amin's proposed "Corrected Final

Judgment and Permanent Injunction" would release him from the injunction now in force

directing him not to violate the securities laws.

For the foregoing reasons, Mr. Amin's motion for leave to re-open the Judgment

below should be denied.

July 15, 2008

Respectfully submitted,

**CRAVATH, SWAINE & MOORE LLP,**

by
/s/ Rory O. Millson
Rory O. Millson
Francis P. Barron
David R. Marriott
Members of the Firm

Attorneys for Plaintiff
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

2

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

---

CSX CORPORATION,

                              Plaintiff-Appellant,

            v.

THE CHILDREN'S INVESTMENT FUND
MANAGEMENT (UK) LLP, THE CHILDREN'S
INVESTMENT FUND MANAGEMENT
(CAYMAN) LTD., THE CHILDREN'S
INVESTMENT MASTER FUND, 3G CAPITAL
PARTNERS LTD., 3G CAPITAL PARTNERS,
L.P., 3G FUND, L.P., CHRISTOPHER HOHN,
SNEHAL AMIN AND ALEXANDRE
BEHRING, A/K/A ALEXANDRE BEHRING
COSTA,

                              Defendants-Appellees.

Nos. 08-2899 cv (L); 08-3016 cv (XAP)

**CERTIFICATE OF SERVICE**

Robert B. Zwillich hereby certifies the following under the penalty of perjury:

I am over the age of 18 years, not a party to this action and reside at 255 Killarney Drive, Berkeley Heights, New Jersey 07922.

On the 15th day of July, 2008, I served the annexed

**RESPONSE TO THE MOTION OF SNEHAL AMIN
TO CORRECT THE JUDGMENT BELOW**

upon

Howard O. Godnick, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Peter D. Doyle, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022

by having true copies of the aforementioned document personally delivered to each of the above-listed law firms.

Dated: July 15, 2008
       New York, NY


_____
                                    Robert B. Zwillich

.

## ANTI-VIRUS CERTIFICATION FORM

*See* Second Circuit Interim Local Rule 25(a)6.

CASE NAME: CSX Corp. v. The Children's Investment Fund Mgmt. (UK) LLP

DOCKET NUMBER: 08-2899, 08-3016

I, (please print your name) Jefferson E. Bell                                   , certify   that

I have scanned  for viruses  the  PDF version of the attached document that was submitted in this case as

an email attachment to [   ]      <agencycases@ca2.uscourts.gov>.

[   ]      <criminalcases@ca2.uscourts.gov>.

[✓]      <civilcases@ca2.uscourts.gov>.

[   ]      <newcases@ca2.uscourts.gov>.

[   ]      <prosecases@ca2.uscourts.gov>.

and that no viruses were detected.

Please print the **name** and the **version** of the anti-virus detector that you used Symantec/Norton
Anti-Virus Version 10.1.5

If you know, please print the version of revision and/or the anti-virus signature files _____

(Your Signature) _____

Date: 07/15/2008